IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § <br> § <br> v. § <br> § <br> ROBERT ALLEN STANFORD, § <br> LAURA PENDERGEST-HOLT, § <br> GILBERTO LOPEZ, § <br> MARK KUHRT, and § <br> LEROY KING § | CR. NO. H-09-342 <br> Hon. David Hittner <br> Magistrate Frances Stacy |

**DEFENDANT R. ALLEN STANFORD'S EXPEDITED MOTION
FOR AN ORDER DIRECTING THE UNITED STATES TO TAKE ALL
NECESSARY STEPS TO RELEASE FUNDS TO PAY FOR MR.
STANFORD'S DEFENSE, OR, IN THE ALTERNATIVE,
<u>TO DISMISS THE INDICTMENT</u>**

Defendant R. Allen Stanford hereby moves this Honorable Court for an order directing the United States to take all necessary steps to release funds to pay for Mr. Stanford's defense in this criminal matter. In the alternative, Mr. Stanford moves to dismiss the Indictment. In support, Mr. Stanford states the following:

<u>INTRODUCTION</u>

Since the inception of these proceedings and the proceedings in the S.E.C. civil enforcement action in the Northern District of Texas, the United States government and parties acting under its authority have coordinated an attack on Mr. Stanford's constitutional rights. The government has repeatedly sought to deprive Mr. Stanford of his ability to obtain funds to defend himself in both actions

1

in violation of his Sixth Amendment rights. In addition, the government has infringed upon Mr. Stanford's Fifth Amendment privilege against self-incrimination by attempting to coerce him into producing an accounting of assets (even though the government had seized all of Stanford's records, both business and personal, thus making it impossible to comply) in order to obtain funds to pay for his defense. Ultimately, the government has presented Mr. Stanford with a Hobson's choice: waive his Fifth Amendment privilege against self-incrimination or waive his Sixth Amendment right to counsel. These sorts of procedural games, with dire constitutional consequences, should not be allowed by this Court.

## BACKGROUND

The agencies of the United States government involved in the civil and criminal actions against Mr. Stanford (primarily the S.E.C. and the Department of Justice), as well as the Receiver appointed at the government's behest and operating under the government's control (collectively, the "Government"), have acted in concert with one another in the investigation and prosecution of these two cases. *See* Receiver's Report (Civ. Dkt. No. 336) (attached hereto as Ex. A, pp.25-26) ("The principal such activities have been coordination with the SEC, the FBI and the Department of Justice in *identifying and gathering large amounts of documents and information* relevant to their ongoing investigations and *responding to numerous and extensive requests* from the SEC, the FBI and the Department of

Justice to analyze and provide information and documents." (emphasis added)); Fox Business, "DOJ Halted SEC's Investigation Into Stanford Financial," June 5, 2009 (attached hereto as Ex. B) ("The Securities and Exchange Commission [SEC] was told to stand down in its investigation of billionaire financier Robert Allen Stanford's global banking empire by the Department of Justice, according to the chairman of the Domestic Policy Subcommittee of the Oversight and Government Reform Committee."). Over the past several months, these coordinated efforts led to the following events:

- On February 17, 2009, the Court in the civil case entered an *ex parte* temporary restraining order drafted by the Government (Civ. Dkt. No. 8) (attached hereto as Ex. C). The Government's order included a far-reaching and all-encompassing asset freeze that instantly rendered Mr. Stanford unable to pay his defense costs.

- Mr. Stanford was briefly able to obtain counsel, Charles Meadows, of Meadows, Collier, Reed, Cousins, & Blau LLP, in Dallas, who made a "limited appearance" for the purpose of filing an extension for the preliminary injunction hearing. Motion for Leave to Enter Limited Appearance and to Continue Hearing on Motion for Preliminary Injunction (Civ. Dkt. No. 76) (attached hereto as Ex. D.). On the morning of the actual hearing, Mr. Meadows withdrew his limited

3

appearance because he was not assured of payment, causing Mr. Stanford to default on the Government's motion. Notice of Withdrawal of Special Appearance (Civ. Dkt. No. 155) (attached hereto as Ex. E.); *see also* March 12, 2009 Preliminary Injunction and Other Equitable Relief As To R. Allen Stanford (Civ. Dkt. No. 159) (attached hereto as Ex. F, ¶25). The Government and the Court knew that Mr. Stanford's counsel had precipitously withdrawn the morning of the preliminary injunction hearing, but made no effort to determine whether Mr. Stanford was aware of the withdrawal. Instead, the hearing proceeded despite the fact that no lawyer appeared for Mr. Stanford and Mr. Stanford had no idea that he was unrepresented.[1]

---

[1] The court began the March 12, 2009 hearing with the following interchange:

```
3    THE COURT: Be seated. Good morning.
4    MR. REECE: Good morning.
5    MR. SADLER: Good morning.
6    MR. TILLOTSON: Good morning.
7    THE COURT: I am advised that we do not anticipate
8    that Mr. Meadows will appear on behalf of Mr. Stanford or
9    anyone else.
10   Does anybody know anything different than that?
11   MR. REECE: No, Your Honor.
12   THE COURT: Okay. I'm happy to wait for a while
13   if we think someone will make another last-second entry.
14   But, in seriousness, I take it nobody anticipates that.
15   MR. TILLOTSON: We do not, Your Honor.
16   THE COURT: Okay. All right. Let's see. ...
```

*See* Tr. of March 12, 2009 hearing, attached hereto as Exhibit G, p.3.

- The Government moved for the appointment of a Receiver who, without a single proven allegation, took possession of and then systematically disrupted, dismantled, or sold all of the Stanford entities and assets that he could locate.

- Months after the Underwriters of Stanford's Directors & Officers Policies stated their consent to pay Mr. Stanford's defense costs, and on the eve of payment for those costs, the Government asserted a "right" to those funds and threatened the Underwriters with contempt proceedings to prevent their payment of Mr. Stanford's defense costs. *See* Ltr. from Underwriters' Counsel to Mr. Stanford's Counsel (attached hereto as Ex. H).

- The Government filed a vigorous opposition to Mr. Stanford's Motion to Amend the Preliminary Injunction Order to free assets for the payment of reasonable attorneys' fees. *See* Plaintiff's Opposition to R. Allen Stanford's Motion to Modify Preliminary Injunction Order (Civ. Dkt. No. 356) (attached hereto as Ex. I).

- While Mr. Stanford lacks the resources to mount any sort of defense, the Government has, through May 15, 2009, appropriated almost $20 million of Mr. Stanford's assets in legal, consulting, and expert fees and costs in his prosecution. Motion for Approval of Interim Fee Application and

Procedures for Future Compensation of Fees and Expenses (Civ. Dkt. No. 384) (attached hereto as Ex. J, p.5 of Dkt. Entry; p.1 of Motion). The sum total of these actions, taken in the appropriate context, demonstrates a concerted effort on behalf of the Government to subvert the fundamental principles of fairness underlying Mr. Stanford's constitutional rights.

## DISCUSSION

The Government's unfettered, and thus far successful, attempts to prevent Mr. Stanford from being able to mount a defense in his criminal proceedings amount to a deprivation of both his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The Supreme Court has held that a part of that constitutional guarantee is the right of the accused to "a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *Newton v. Dretke*, 371 F.3d 250, 255 (5th Cir. 2004) (quoting *United States v. Hughey*, 147 F.3d 423, 429 (5th Cir. 1998)) ("A defendant has a right under the Sixth Amendment 'to retain counsel of the defendant's own choosing.'"). As Justice Scalia explained in *Gonzalez-Lopez*, the "root meaning" of this constitutional right is that when the

6

government has deprived a criminal defendant of this "particular guarantee of fairness," the trial is irreparably flawed. 548 U.S. 140, 146-48 (2006); *see also Dretke*, 371 F.3d at 255 (citing *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir.1992)) (finding that the Sixth Amendment requires "that the defendant be given a fair or reasonable opportunity to obtain particular counsel"); *see also United States v. Stein*, 541 F.3d 130, 154 (2d Cir. 2008) ("The government must honor a defendant's Sixth Amendment right to counsel . . . [which means that] 'at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.'") (quoting *Maine v. Moulton*, 474 U.S. 159, 170-71 (1985)).

The Fifth Amendment privilege against self-incrimination is an equally essential and important right. *See United States v. Verdugo-Urquindez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants."). The Fifth Amendment protects an individual from being compelled to provide testimony that may be incriminating, and can be asserted "in any proceeding, civil or criminal, . . . in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding." *United States v. Balsys*, 524 U.S. 666, 672 (1998) (citations and quotations omitted).

## I. The Government Is Depriving Mr. Stanford of His Sixth Amendment Right to Secure Counsel

Throughout the duration of this case, the Government has repeatedly sought to deprive Mr. Stanford of his ability to obtain any funds to defend himself. The Government's actions, taken together, amount to a violation of Mr. Stanford's Sixth Amendment rights and evidence a total disdain for the notions of fairness that underpin the criminal justice system. To wit:

- The Government coordinated the seizure of Mr. Stanford's assets without any showing that all of the assets frozen were procured by fraud.[2] *See* Order Appointing Receiver (Civ. Dkt. 10) (attached hereto as Ex. K).

- The Government drafted a preliminary injunction order of incredible sweep, demanding that Mr. Stanford provide an accounting of the company's assets, while knowing full well that it had seized and was in possession of the only records with which Mr. Stanford might

---

[2] It is the Government's burden to show that the assets it intends to freeze are related to the alleged crime. *See United States v. Brown*, 988 F.2d 658, 664 (6th Cir. 1993) (holding that "[t]he court may freeze only those assets related to the alleged fraud," and remanding so that "the district court [could] reevaluate the nature of the assets that it froze"); *United States v. Quadro Corp.*, 916 F. Supp. 613, 619 (E.D. Tex. 1996) (stating that "[f]reezing assets which the government did not show by preponderance of the evidence to be proceeds from a fraudulent scheme would exceed the scope of the injunction," and refusing to freeze any assets because the government had not carried its burden); *see also United States v. Fang*, 937 F. Supp. 1186, 1194 (D. Md. 1996) ("Most courts assign to the Government the burden of persuasion with regard to establishing which funds in possession of a defendant are tainted by the fraud."). Here, the Government made no effort to parse through Mr. Stanford's assets, instead simply seizing and freezing every one of his assets, including his apartment in Houston, his vehicles, his family photographs, and his clothing.

provide such an accounting. It exercised its enormous power despite the fact that Mr. Stanford was not present when the order was entered and was not represented by counsel, facts known by the Government. (Ex. F).

- The Government has opposed every attempt Mr. Stanford has made for the release of reasonable attorney's fees from his estate, while simultaneously using $20 million of the Receivership's assets to procure evidence against him. *See* Plaintiff SEC's Opposition to R. Allen Stanford's Motion to Modify Preliminary Injunction Order (Ex. I).

- Then, after depriving Mr. Stanford of the entirety of his personal possessions, the Government went after the one means that he had left available to pay for his criminal defense: the proceeds of the insurance policies designed to pay attorneys' fees and litigation expenses. As detailed above, well after Mr. Stanford had obtained a guarantee from a third party – the insurance carrier – to pay for his criminal defense fees, the Government suddenly took the position that the Receiver was entitled to the insurance proceeds and threatened the insurance carrier with a contempt proceeding. Tellingly, the Government took this position just days after Mr. Stanford's indictment, even though the

>Government had known for months that Mr. Stanford had obtained a guarantee. *See* Ltr. from Underwriters' Counsel to Mr. Stanford's Counsel (Ex. H).

This latest and most egregious attempt by the Government to deprive Mr. Stanford of his ability to secure counsel for his criminal defense is strikingly analogous to the situation considered by the Second Circuit in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ("*Stein* II"). In *Stein*, defendants, employees of an accounting firm, were indicted for accounting fraud. *Id.* at 134 n.4. Like Mr. Stanford, the *Stein* defendants arranged for a third-party guarantor – their employer – to provide for their legal fees. *Id.* at 137. As in this case, the Government in *Stein* sought to deprive the defendants of their Sixth Amendment right to counsel by pressuring the third party not to pay. Here, the Government threatened contempt proceedings if the insurance carrier were to release funds for Mr. Stanford's defense, while in *Stein*, the Government pressured the defendants' employer to back out of the fee arrangement by threatening future prosecutions. *Id.* at 137-39.

In dismissing the indictment because of the government's actions, the district court in *Stein* did not mince words in expressing its disdain for the Government's tactics, calling the Government's actions "outrageous" and "shocking in the constitutional sense." *United States v. Stein*, 495 F. Supp. 2d 390,

414 (S.D.N.Y. 2007) ("*Stein* I"). The Second Circuit affirmed the district court's ruling that the Government's deliberate interference impermissibly infringed upon the defendants' constitutional rights by jeopardizing "defendants' relationship with counsel and their ability to mount a defense, in violation of the Sixth Amendment." *Stein* II, 541 F.3d at 136. According to the Second Circuit, "The Sixth Amendment protects an individual's right to choose the lawyer or lawyers he or she desires . . . [and] protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Id.* at 151, 156 (internal citations and quotations omitted). The Government's attempts to infringe upon Mr. Stanford's Sixth Amendment rights are no less egregious and no less outrageous in this case. Mr. Stanford has been the victim of a sustained and coordinated effort on the part of the Government to deprive him of his constitutional rights.

It is important to bear in mind that Mr. Stanford is presumed innocent and has not been convicted of any crime. As one district court observed in a similar context:

> [The defendant] has pleaded not guilty, and has the benefit of the presumption of innocence. He faces potential penalties that are effectively life imprisonment if convicted. He is entitled to quality legal representation as he challenges the Government's case against him. The allegations of massive fraud necessitate large scale document review, and the complexity of the case will require extensive time and expertise by defense counsel.

*United States v. Petters*, Civil No. 08-5348, 2009 WL 803482, at *3 (D. Minn. March 25, 2009).

Moreover, the assets subject to the asset freeze still belong to Mr. Stanford. The Order Appointing the Receiver states that the Receiver "is authorized to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." (Ex. K, ¶ 4). The Order does not give title of the assets to the Receiver. The freeze acts only as an equitable and temporary restraint upon his property. This is not a case of forfeiture, where the title of the seized property is transferred to the government.[3] Rather, the asset freeze here is akin to an asset freeze pursuant to 18 U.S.C. § 1345, which also contains no title reversion. *See United States v. Payment Processing Ctr.*, LLC, 439 F. Supp. 2d 435, 441 (E.D. Pa. 2006) (noting that unlike statutes providing for forfeiture, "Section 1345 features no such title reversion and instead focuses on preventing further injury to victims until a criminal investigation is completed"). In addition, a chief concern for the Court in ordering the asset freeze was that Mr. Stanford's assets were "in

---

[3] See *United States v. Monsanto*, 491 U.S. 600, 613-14 (1989) (holding that Comprehensive Forfeiture Act, 21 U.S.C. 853, which vested "[a]ll right, title, and interest" in the property in the United States on commission of the underlying offense, did not grant the court discretion to exempt funds subject to forfeiture from pre-trial restraining order, even if for purpose of paying legal fees); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) (holding that restraining order against use of funds subject to forfeiture pursuant to 21 U.S.C. 853 for legal fees did not violate Sixth Amendment because there is no constitutional right to use funds belonging to another [i.e., the United States] to pay for an attorney).

12

imminent jeopardy of dissipation or loss." March 12, 2009 Preliminary Injunction and Other Equitable Relief As To R. Allen Stanford (Ex. F, ¶ 12). The purpose of the freeze was to halt dissipation, not to prevent their use to mount a defense to the very allegations on which the freeze is predicated in the first place. One cannot say that Mr. Stanford's desire to defend himself from the prospect of 375 years in prison is an attempt to "dissipate" funds. As noted by the Fifth Circuit:

> [T]he government errs when it contends that exempting from restraint sufficient assets to pay reasonable attorneys fees and necessary living expenses allows the defendant to benefit economically from criminal proceeds. . . . Expenditures the defendant must make to keep himself and his dependants alive and to secure competent counsel to prove his innocence or protect his procedural rights should not be considered incentives to crime. *The notion that a defendant would commit criminal acts to accumulate monies or property* in order to pay for necessary food, clothing and shelter while he is being tried or *in order to pay a reasonable fee to the attorney he chooses to assist in his defense is sophistry.*

*United States v. Thier*, 801 F.2d 1463, 1474-75 (5th Cir. 1986) (emphasis added), *mod. on den. of reh'g* 809 F.2d 249 (1987), *overruled on other grounds by United States v. Holy Land Foundation for Relief and Development*, 493 F.3d 469 (5th Cir. 2007).

## II. The Government Is Depriving Mr. Stanford of his Fifth Amendment Privilege Against Self-Incrimination By Coercing Him Into Producing An Accounting of Assets In Order To Obtain Attorneys' Fees

The Government has aggressively argued that Mr. Stanford should be denied access to any funds for use in mounting his criminal defense if he does not submit

an accounting of his current assets in the civil case pending against him. In doing so, the Government is essentially coercing Mr. Stanford into waiving his Fifth Amendment privilege against self-incrimination by threatening deprivation of his Sixth Amendment right to counsel.

Undoubtedly aware that any incriminating statements made by Mr. Stanford in the civil case would be enormously helpful in the Government's criminal prosecution, in the very first days of this case the Government sought and obtained entry of an order that would require Mr. Stanford to produce a sworn statement detailing each of his assets and accounting for "all monies and other benefits which [he] received, directly or indirectly" from the activities alleged in the Complaint (even though the Government seized and withheld from Mr. Stanford the very records necessary to make the accounting, thus effectively making compliance impossible). *See* Feb. 17, 2009 Temporary Restraining Order ("TRO") (Ex. C, p.6). Without a doubt, the broad request was an attempt to compel Mr. Stanford to disclose information that may be used against him in a criminal proceeding.

As was his right to do, Mr. Stanford invoked his Fifth Amendment privilege against self-incrimination shortly after the TRO was issued, making it clear that he would not provide an accounting or any documents relating to his personal assets. *See* Declaration of Robert Allen Stanford Asserting Fifth Amendment Right Against Self-Incrimination, March 2, 2009 (Civ. Dkt. 142-2) (attached hereto as

Ex. L, ¶2). Because Mr. Stanford was well aware that a criminal proceeding would be forthcoming, his decision not to provide an accounting of assets was completely justified under the Fifth Amendment, as the privilege against self-incrimination can be asserted "in any proceeding, civil or criminal, . . . in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding." *United States v. Balsys*, 524 U.S. 666, 672 (1998) (citations and quotations omitted).

Any subsequent efforts to coerce the production of an accounting of Mr. Stanford's assets after he had already asserted his Fifth Amendment privilege against self-incrimination were clearly violations of his constitutional rights. *See, e.g., S.E.C. v. College Bound, Inc.*, 849 F. Supp. 65, 67-68 (D.D.C. 1994) (order compelling civil defendants to create a sworn accounting of all assets would require defendants to "create evidence in violation of their asserted right against self-incrimination."); *S.E.C. v. Rehtorik*, 755 F. Supp. 1018, 1019 (S.D. Fla. 1990) ("To compel him to 'speak' in this civil proceeding by ordering an accounting of alleged illicit funds would directly impinge [defendant's] right against self-incrimination."); *Allstate Insurance Co. v. Davidson Medical Group*, No. Civ. A. 01-5938, 2004 WL 2357797, at *4 (E.D. Pa. Oct. 18, 2004) (defendant could not "be compelled to create an equitable accounting, as the process of making and

producing an accounting would be testimonial and potentially self-incriminating"). Nevertheless, the Government was undeterred by Mr. Stanford's assertion of his Fifth Amendment rights and continued to advocate for the entry of a Preliminary Injunction that included the exact same requirement of accounting of assets that was included in the TRO. *See* March 12, 2009 Preliminary Injunction and Other Equitable Relief As To R. Allen Stanford (Ex. F, pp.9-10).

When the entry of the Preliminary Injunction did not persuade Mr. Stanford to give up his Fifth Amendment privilege against self-incrimination and create an accounting of his assets, the Government upped the ante. As a means of coercion, the Government began to threaten the deprivation of Mr. Stanford's Sixth Amendment right to counsel if he did not waive his Fifth Amendment rights and produce the accounting of assets. In addition to the last-minute effort to assert claims over insurance proceeds that were to be paid to Mr. Stanford's counsel in his criminal case, the Government argued to the Court that the Preliminary Injunction should not be modified to permit payment of legal fees, in part because "Stanford . . . has not produced an accounting of assets . . . ." *See* Plaintiff SEC's Opposition to R. Allen Stanford's Motion to Modify Preliminary Injunction Order (Ex. I, p.2). The Court was seemingly convinced by the Government's argument, as it entered an Order on July 1, 2009 declining to modify the Preliminary Injunction to permit payment of attorneys' fees because "Stanford has not yet

provided an accounting of personal assets as required in the Court's Temporary Restraining Order of February 17, 2009." *See* July 1, 2009 Order (Civ. Dkt. No. 544) (attached hereto as Ex. M, p.1). In effect, Mr. Stanford cannot obtain counsel of his choice unless he produces information to the same Government that is attempting to imprison him for hundreds of years.

Mr. Stanford must now choose between two evils: waiver of his Fifth Amendment privilege against self-incrimination or waiver of his Sixth Amendment right to counsel. This untenable choice cannot be forced upon him. The law is clear the Government cannot penalize assertion of the constitutional privilege against self-incrimination by threatening to deprive the Defendant of rights, freedoms, or economic interests. *See S.E.C. v. Grossman*, 121 F.R.D. 207, 210 (S.D.N.Y. 1987) (finding that it is "unconstitutionally coercive to condition the exercise of the Fifth Amendment privilege against self-incrimination on the loss of substantial economic interests"); *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) ("[T]he touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids."). Similarly, the Government should be precluded from forcing Mr. Stanford to forego his Fifth Amendment right because he wishes to assert his Sixth Amendment right to counsel. Mr. Stanford's Sixth Amendment right is of the greatest value and

import, and the Government should not be permitted to use it as a bargaining chip to extort potentially incriminating documents for use in their criminal case.

## CONCLUSION

The Government's efforts to prevent Mr. Stanford from being able to mount a defense in his criminal proceedings amounts to a deprivation of both his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination.

WHEREFORE Defendant R. Allen Stanford respectfully requests that the Court enter an Order:

(1) Directing the United States to take all necessary steps to release funds to pay for Mr. Stanford's defense in the criminal matter; and

(2) In the alternative, Mr. Stanford moves to dismiss the Indictment.

DATED: July 6, 2009         Respectfully submitted,

By: /S/ _____
Dick DeGuerin
DEGUERIN & DICKSON
The Republic Building
1018 Preston Avenue
Seventh Floor
Houston, TX 77002
Tel: (713) 223-5959
Fax (713) 223-9231

*Attorneys for Defendant,*
*ROBERT ALLEN STANFORD*

## CERTIFICATE OF CONFERENCE

I have attempted to confer with Gregg Costa, attorney for the Government, concerning the filing of this motion and as of the time of filing I have not been able to reach Mr. Costa.

/S/
_____
Dick DeGuerin

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Defendant R. Allen Stanford's Expedited Motion For an Order Directing the United States to Take All Necessary Steps to Release Funds to Pay for Mr. Stanford's Defense, or, In the Alternative, to Dismiss the Indictment** has been filed via the ECF System on July 6, 2009.

/S/
_____
Dick DeGuerin

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | CR. NO. H-09-342 |
| | § | (Hon. David Hittner) |
| ROBERT ALLEN STANFORD, | § | (Magistrate Frances Stacy) |
| LAURA PENDERGEST-HOLT, | § | |
| GILBERTO LOPEZ, | § | |
| MARK KUHRT, and | § | |
| LEROY KING | § | |

## PROPOSED ORDER

Upon consideration of Defendant R. Allen Stanford's Expedited Motion For An Order Directing The United States To Take All Necessary Steps To Release Funds To Pay For Mr. Stanford's Defense, Or, In The Alternative, To Dismiss The Indictment, the Court is of the opinion that the Motion be and is hereby GRANTED.

It is therefore ORDERED that:

(1) The United States must take all necessary steps to release funds sufficient to fund Mr. Stanford's defense in the criminal matter;

(2) In the alternative, the Indictment is dismissed.

Signed this _____ day of _____, 2009.

_____
Hon. David Hittner