IN THE HIGH COURT OF JUSTICE                    Case No. 13959 of 2009
CHANCERY DIVISION
COMPANIES COURT

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD, STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

RALPH STEVEN JANVEY

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD, STANFORD GROUP
COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                                   Applicant

---

SECOND AFFIDAVIT OF
KARYL VAN TASSEL

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

A    Introduction

1.  I am the same Karyl Van Tassel who swore an affidavit herein on 8 May 2009

    A.  in support of the application by the US Receiver under the Cross-Border Insolvency
        Regulations 2006, alternatively under English common law for recognition of his status
        as a foreign representative in relation to all the Stanford Entities, for recognition of the
        US proceedings as foreign main proceedings, and for relief to be granted to the US
        Receiver in relation to the assets of the Stanford Entities located in England and Wales;

    B.  in opposition to the application of the Antiguan Liquidators dated 22 April 2009 under
        the Cross-Border Insolvency Regulations 2006 for recognition as a foreign
        representative in relation to SIB.

2.  In particular I make this affidavit in reply to the second affidavit of Mr Hamilton-Smith,
    sworn on 15 May 2009 ("Hamilton-Smith 2"). In this affidavit, I do not answer every point
    made by Mr Hamilton-Smith where to do so would simply be to repeat my previous

evidence. Where I do not deal with a point raised by Mr Hamilton-Smith, however, I do not mean to accept that his evidence is accurate.

3. Save where otherwise appears, the facts and matters which I state in this affidavit are from my own personal knowledge and they are true. Where I rely on information from others it is true to the best of my knowledge and belief and it is from the source stated.

4. There are now produced and shown to me marked as follows true copies of the following documents:

"KVT9"      Transcript of a video of Stanford addressing Stanford financial advisers (i.e. brokers) in Miami in October 2008

"KVT9A"     Video of Stanford addressing Stanford financial advisers (i.e. brokers) in Miami in October 2008

"KVT10"     Email string dated 11 November 2008 between a financial adviser and Laura Pendergest Holt

"KVT11"     12 February 2009 letter from Allen Stanford to SIB CD investors

"KVT12"     Schedule of SIB loans with customer identification information redacted.

"KVT13"     Antiguan entity analysis

"KVT14"     Stanford Corporate Data Book data sheets for The Pavilion-Antigua and The Sticky Wicket Limited

"KVT15"     SIB 2008 draft budget

"KVT16"     Bank of Houston statement showing 2008 average daily balance

"KVT17"     Schedule showing SIB average daily balance from January through October 2008

"KVT18"     Trustmark National Bank on-line printout evidencing 13 November 2008 wire transfer of $6 million to SIB's Bank of Antigua account

"KVT19"     Record of 2 December 2008 wire-transfer of $3 million from Toronto Dominion Bank to SIB's Bank of Antigua account

"KVT20"     12 November 2008 email from Jim Davis to Patricia Maldonado instructing her to wire transfer $6 million to SIB's Bank of Antigua

| "KVT21" | Transcript of a 2006 marketing video entitled "SFG Corporate Video" |
| "KVT21A" | 2006 marketing video entitled "SFG Corporate Video" |
| "KVT22" | 31 March 2004 press release regarding "Stanford Financial Group's CEO R. Allen Stanford['s]" donation of $100,000 to a Dallas, Texas charity |
| "KVT23" | SIB compliance procedures and policies |
| "KVT24" | 6 February 2009 email to Allen Stanford from Frans Vingherhoedt |
| "KVT25" | Listing of Tier 2 investments |
| "KVT26" | SIB 4th Quarter 2006 Internal Audit Report |
| "KVT27" | SIB 1st Quarter 2006 Internal Audit Report |
| "KVT28" | SIB 3rd Quarter 2004 Internal Audit Report |
| "KVT29" | 2007 internal SIB audit report |
| "KVT30" | 11 November 2008 email chain between Patricia Maldonado, "Treasury Manager -- Stanford Financial Group" and one of her assistants |

5. In order to make this affidavit easier to follow, I deal with each of Mr Hamilton-Smith points on a paragraph by paragraph basis. Inevitably this means that there will be some internal duplication, for which I apologise.

**B    General points**

6. Before I turn to my paragraph by paragraph reply to Hamilton-Smith 2, I have some general points that arise from that affidavit.

7. Mr Hamilton-Smith agrees in paragraph 11(a) that "SIB and other Stanford group companies were involved in a massive 'Ponzi' scheme," yet he spends the balance of his affidavit essentially contending that SIB observed corporate formalities. This ignores the fact that SIB (like STC, SGC (the Stanford US broker-dealer entity), and many -- probably most -- other Stanford entities) was used as an instrument for the execution of an apparent massive fraud on the Stanford investors. The apparent fraud was directed from the United States and occurred, for the vast majority of investors, not in Antigua, but where the individual investors met with their financial advisers (not SIB-employees) and received verbal and written misrepresentations concerning SIB's financial strength and legitimacy.

8. Financial advisers persuaded their clients to purchase Stanford CDs using misinformation given to the financial advisers in training materials, training sessions and corporate "pep

talks." The misinformation came from Stanford, Davis and Holt, directly or through persons acting on their behalf, principally in the United States. It included misrepresentations regarding the value of SIB's investments, SIB's investment allocation, SIB's investment strategy, the persons who managed SIB's investments, SIB's history of consistently high earnings, Stanford's purported capital infusion into SIB to strengthen it, the security of customer's deposits with SIB, etc.

9.  Attached as **KVT9** is a transcript of a video of Stanford addressing Stanford financial advisers (i.e. brokers) in Miami in October 2008. I believe that it is reasonable to assume that much of the message was likely repeated to investors. Stanford's comments in that video should be read in the context of the following facts:

   A.  His comments regarding investment performance relate to SIB's investments. This is so because the principal business of the Stanford companies was selling SIB certificates of deposit and investing the sales proceeds. There were few other funds, if any, to invest.

   B.  At the time of this address, barely four months before the U.S. Court placed SIB and the other companies owned by Stanford in receivership, SIB was already insolvent by several billion dollars. Cash was being consumed and Tier 2 investments were being liquidated to meet a rising demand for redemptions.

   C.  Schemes for "capital infusions" using inflated real estate had been devised and were already being implemented to meet an equity number which had been targeted earlier in the year.

   D.  The true state of SIB's financial affairs was a closely guarded secret, known only to Stanford, Davis and a few others.

10. Interspersed between Stanford's remarks on the state of the global and U.S. economy, how politicians are ruining "the country" (meaning the U.S., not Antigua), how he views himself as a "middle [class], common-sense-thinking American [and] [h]opefully, that's where my values will always be", he makes the following statements about the Stanford companies' financial performance:

   - "This is not going to be an easy period for any of us, but we're going to do very well."

   - "But this world is going to change, ladies and gentlemen, and we're going to be a leader in all areas of it."

   - "I'll say it again: We have no securitized debt, we don't depend on the credit markets as a company, and our use of leverage has been minimal."

   - "We have always had to put the client first, because we were always fighting that uphill battle to get that client, and we're not going to change. That's the number one priority in this company and always will be, to take care of the client."

- "Right now it's the worst we've done in a long time. We're about, as of early October, down about four percent, I guess. We've had a lot of hot spots within. I saw one return up 16% here today. Different things that are, in spite of the confusion, are actually benefiting. But overall we're down about four percent. I'm not happy with that; in this market I guess it's astounding."

- "We've got a lot of cash, we're positioning to grow our business, and nothing's really changed in our companies."

- "Our investment model works, it's a long-term play, and it's proven itself in this day, in this market to be the toughest I've ever seen to work better than ever."

11. It was widely-known to the community of investors that SIB's affairs were conducted from the United States, principally by Stanford, Davis and Holt. By way of example only:

A. **KVT10** is an email string, dated 11 November 2008, between a financial adviser and Laura Pendergest Holt. It begins with the financial adviser asking for information regarding SIB's financial strength and investment portfolio performance. Holt responds that "there has not been a loss on the portfolio," a "$235 million capital infusion was just made," and "liquidity stands at $1.5 billion." None of these three statements, made from the United States, was correct. Nonetheless, this illustrates where a financial adviser went - not to Antigua, but to Memphis, Tennessee or Tupelo, Mississippi - to obtain information with which to reassure his clients regarding the safety of their SIB investments.

B. **KVT11** is a 12 February 2009 letter from Allen Stanford, on stationery headed merely "Stanford" and bearing the Stanford Eagle logo, to SIB CD investors, along with an email transmitting it to financial advisers for their use in forwarding to investors. Here are excerpts:

- "Yesterday, there was a business magazine article about the Stanford Companies. In light of these recent press reports, I believe it is important for you to hear directly from me.

As you know, the Stanford Companies were built on the values set by my grandfather 77 years ago. We have weathered the ups and downs of the markets and we have used the most challenging economic periods to spot opportunities and grow our company in a steady and consistent manner. ..."

- "As far as Stanford International Bank is concerned, I want to be very clear, the bank remains a strong institution. ... [W]e have already taken a number of decisive steps to preserve our core capital and to reinforce our financial strength and investment base. ... [W]e have already added two capital infusions into the bank and are considering additional actions. ... You have placed your confidence in the Stanford Companies, and we know you are counting on us more than ever in these uncertain times."

12. Mr Hamilton-Smith asserts on a number of occasions in his second affidavit (see, for example, paragraph 19) that the US Receiver's case is not put on the basis of commingling

of funds, but rather upon the fact that SIB was used as a creature of fraud. In fact the case is based upon both bases.

A.  Although SIB was part of the fraud, it is also the case that the flow of funds between and among the companies was such that their assets and liabilities will be exceedingly difficult, expensive, and time consuming to unscramble. Indeed, in relation to a substantial portion of funds it may be impossible to do so. SIB was the mouth of the Ponzi scheme. SGC, the other Stanford broker-dealer entities and STC, the trust company, all helped feed the scheme. Thereafter, the funds were shunted around the Stanford Financial Group body, many times among multiple entities. The whole thing was one organism.

B.  The effort to trace and de-tangle is made more difficult by the confusing state of the Stanford records. I know from my work in connection with the Receivership that critical information about Stanford's operations has been difficult to locate and some that has been located is incomplete or inaccurate. Based on the information to which we have had access, it appears that the Stanford companies had approximately 200 different accounting, finance and operating systems, most of which did not centrally report. I believe the use of a myriad of different independent systems may have been deliberate, so that only a very few people -- all in the United States or the Unites States Virgin Islands -- had a complete picture of the Stanford companies' overall financial position.

C.  Mr Hamilton-Smith has done no analysis of the other Stanford entities themselves. I do not believe he can do so because in fact most of the substantive, detailed information for those other entities (as with SIB) is in the United States.

D.  With more than $7 billion in claims, CD holders will be by far the largest class of claimants by dollar amount, dwarfing all other claims against SIB and the other Stanford entities. This is consistent with SIB's role as the mouth of the Ponzi scheme.

13. Mr Hamilton-Smith contends in paragraph 72 that "SIB operated in its own right and is a legal entity distinct from the other Stanford entities. I have not seen any evidence to suggest that its assets are so commingled with the assets of any other Stanford entity or entities that they cannot be identified, gathered in and distributed among SIB's creditors." I take issue with both statements.

A.  First, as set out above, SIB was not a legitimate enterprise in its own right. It was an instrument of the fraud. It existed for the purpose of issuing sham CDs (meaning CDs backed by insufficient investments) that were sold by other Stanford entities using misrepresentations regarding SIB's financial strength and legitimacy. The funds that came in from these sales were then widely dispersed throughout the Stanford body of companies and beyond, with substantial amounts drawn off to fund Allen Stanford's lavish lifestyle and large salaries plus bonuses for his confidants. The SIB employees in Antigua were specifically not allowed access to much information, and certainly were not given much say on the bank's most important matters, such as the investments.

B.  There is at present more than a $6 billion shortfall between SIB CD proceeds and the known assets of all Stanford entities combined. I know from those transactions that my

team has been able to trace that funds left SIB's accounts and were widely dispersed to many other Stanford entities and from those entities yet farther. Based upon our analysis to date, roughly $1 billion simply cannot be accounted for. The financial records for these entities are confusing, incomplete and do not begin to tell the story of what happened to all of the proceeds. While some additional assets may be traced and separated, that will likely not be feasible as to all.

**C**        **Paragraph by paragraph response to Hamilton-Smith 2**

14. I set out below my detailed response to Hamilton-Smith 2. I have attempted to avoid repeating evidence I have previously given, and to restrict myself to the new points in that evidence.

**(1)        SIB was just one part of a large fraudulent empire**

15. Mr Hamilton-Smith contends in paragraph 11(b) that Mr Stanford and his confidants did not control and direct the operations of SIB from the United States. This is not correct:-

A.    SIB's principal business activities were selling CDs and "investing" the proceeds of sale. Both activities were controlled from the United States, with no meaningful management input from Antigua. Based on directions from the United States, SIB's investment portfolio was represented to potential CD purchasers as wisely invested and more than adequate security for SIB's CD obligations.

B.    The CDs were sold through non-SIB brokers, mostly with Stanford-owned broker dealer entities located in the United States and elsewhere. The misinformation regarding investment strategy, investment earnings, investment safety, and other such matters that brokers used to sell the CDs came from the United States.

C.    All investment decisions were made from the United States by Stanford, Davis, Holt or those acting at their direction. Investment records were kept in the United States. As to the great bulk of investments -- Tier 3 -- SIB management in Antigua received only periodic summaries from Jim Davis' office in the United States, but nothing detailed and certainly no backup documents. Internal auditors were not permitted to see the backup documents supporting the investment summaries provided by Davis's office.

D.    The making of loans was a very small part of SIB's business. Loans were restricted to advancements against a depositor's CD that was not yet due. The most a depositor could receive on a loan was 80% of his CD balance. At SIB's closing, such loans consisted of only approximately $97 million, with approximately $23 million of that amount owed by depositors from the U.S. (see **KVT12**).

E.    The figures in SIB's financial statements for investments and investment income came from Jim Davis or persons working under him in the United States or U.S.V.I..

16. Mr Hamilton-Smith notes in paragraph 11(b) that among the many Stanford entities, 38 were

chartered in Antigua. As indicated in the schedule attached as **KVT13**:

A. 13 were holding companies for other entities.

B. 5 were headquartered (had their "principal operating office" somewhere other than Antigua (according to the "Stanford Financial Group of Companies Corporate Data Book").

C. 7 were non-revenue-generating.

D. Of the non-revenue generating entities, 4 held single assets.

E. At least 2 were inactive before the receivership went into effect.

F. At least 2 are parent and subsidiary. The Pavilion-Antigua appears to be a subsidiary of The Sticky Wicket Limited (see **KVT14**, two data sheets from the Corporate Data Book kept by the Stanford legal department).

G. Two of the listed entities are foreign offices of other entities on the list -- i.e., Bank of Antigua Ltd Mexico and Stanford Trust Company Limited Representative Office in Columbia.

H. Mr. Hamilton-Smith's affidavit indicates that a number had no employees.

17. Mr Hamilton-Smith sets out in paragraph 11(b)(ii) purported percentages of total worldwide CD sales attributable to the United States, Venezuela, and other countries. These percentages apparently are based on country notations contained within one of the Stanford financial systems. In my view a more accurate indication of the number of U.S. residents who purchased SIB CDs and the amount of U.S. funds that went into SIB CDs can be obtained by reference to customer statement addresses. It is unlikely that a customer who was really from, say, Mexico would choose to have his or her monthly statement delivered to an address in the United States. While there may have been the occasional investor who followed such a practice, it is difficult to conceive that the practice would have been wide-spread. By contrast, if a person wanted to establish an out-of-country address for receiving his or her business mail, he or she likely would have chosen Antigua for a mail drop, since "hold-mail" services are readily available in Antigua, a known offshore banking haven.

18. We have sorted the SIB CD portfolio by statement addresses and ending balances on the last statements that were sent. The results indicate that persons in the United States accounted for 37% of total CDs by dollar amount and 25% of all CD holders. The schedule that follows summarizes our analysis.

| Country | Based on Most Recent Statement Information (Address & Ending Balance) | |
| --- | --- | --- |
| | Number of Clients | Amount US$ |
| United States of America | 7,072 | $ 2,660,676,142 |
| Venezuela | 2,686 | 402,020,342 |
| Antigua and Barbuda | 10,926 | 2,470,203,308 |
| Mexico | 2,801 | 605,649,240 |
| Canada | 215 | 43,511,546 |
| Haiti | 18 | 1,667,010 |
| Peru | 444 | 72,412,827 |
| Colombia | 769 | 126,368,594 |
| Panama | 152 | 38,913,111 |
| British Virgin Islands | 3 | 588,335 |
| | 25,086 | $ 6,422,010,455 |
| Other | 2,915 | 769,001,388 |
| Total | 28,001 | $ 7,191,011,843 |

19. The 34% by dollar amount and 39% by number of investors attributed to Antigua in this schedule do not indicate the actual amount of funds or number of investors attributable to Antiguans.

   A. First, as Mr Hamilton-Smith accepts at paragraph 11(c) of his affidavit, SIB was prohibited by Antiguan law from serving Antiguans. Therefore, no matter what manner you choose to indicate the country for a CD holder, Mr Hamilton Smith and I both agree that there should be no Antiguans.

B. Second, an analysis of the Antiguan statement addresses indicates that for almost all, these were merely addresses of convenience for persons who reside outside of Antigua. As indicated by the schedule below based on number of clients, fully 86% of the Antiguan addresses were "hold mail," which most likely indicates that the recipients live elsewhere but for some reason wish to conceal their addresses. Another 12% have SIB or STC addresses, again indicating that these investors likely live elsewhere.

| Category | Based on Most Recent Statement Information (Address & Ending Balance) | |
|---|---|---|
| | Number of Clients | Amount US$ |
| Hold Mail | 9,413 | $ 1,787,139,940 |
| STCL | 1,342 | 625,716,774 |
| SIBL | 16 | 7,742,306 |
| No Address Information (Just Account Number) | 127 | 46,583,031 |
| Other | 28 | 3,021,256 |
| Total | 10,926 | $ 2,470,203,308 |

*Notes*
The "Category" was determined using a prioritization, therefore "Hold Mail" was identified first, then "STCL", then "SIBL", etc. Thus, some clients and respective ending balances would apply to more than one category.

20. Therefore, the actual number of Antiguan investors and the amount of Antiguan funds invested, if any (bearing in mind that under Antiguan law, there should have been none), were minimal. By contrast, whichever figures are used -- those set forth above or those set forth in Mr Hamilton-Smith's paragraph 11(b)(ii), the result is the same:  U.S. investors contributed more CD dollars than investors from any other country and Antiguans contributed few, if any.

21. Mr Hamilton-Smith identifies the financial advisers working for Stanford around the world, selling the SIB CDs. As to this, I note that Stanford financial advisers working in the United States accounted for by far the largest percentage of sales of any sales group. Commissions paid to U.S. financial advisers as a percentage of total commissions paid worldwide approximate 48% for 2008 and 44% for 2007. These percentages, in my opinion, closely approximate the percentages of sales dollars attributable to U.S. financial advisers in these years. The reasonableness of the commission-comparison approach as a way to estimate sales made from the U.S. is confirmed by 2007 actual data reflected in the Stanford 2008 budget. According to the December 31, 2007 actual figures contained on the 2008 budget spreadsheet (**KVT15**), CDs sold by SGC (the U.S. broker-dealer entity) accounted for 42% of total CDs sold in 2007, which closely matches the 44% figure calculated using the commission-comparison approach. Although not all sales by U.S. financial advisers were to U.S. citizens, the fact that between 42% and 48%, by dollar amount, of SIB's CD sales were made from the United States is significant in determining SIB's center of main interests.

Certainly no other country approached the United States as a generator of CD sales.

22. Although none of the financial advisers entered into the CD contracts on behalf of SIB, they were the persons whose misrepresentations as to the Stanford empire's profitability and combined investment power induced investors to purchase SIB CDs. They were the people who marketed those investments. The object of that marketing exercise, whether or not the individual financial adviser knew it, was to bring in more money in order to keep the Ponzi scheme functioning. The fact that a minority of the selling brokers did not work for a Stanford entity is irrelevant. Their sales efforts were still directed, ultimately, from the United States. SIB had no sales personnel of its own.

23. Mr Hamilton-Smith states at paragraph 11(b)(iv) that "CDs were sold to investors by SIB directly from its headquarters in Antigua". While this may be true it could only be for a small fraction of SIB's total CD sales. Our review of commission records reveals that the vast majority of CDs were sold by financial advisers outside of Antigua. The vast majority were the result of sales by financial advisors employed by Stanford broker-dealer entities in other countries. As discussed above, U.S. brokers alone accounted for between 42% and 48% of all SIB CD sales in 2007 and 2008.

24. Mr Hamilton-Smith deals at paragraph 11(d) with those investors who paid money by check to SIB. That was not, however, how SIB received most of its funds. A Stanford accounting system indicates that for the years 2003 through 2009, 73% of sales proceeds received by SIB were by wire transfer and only 27% were by check. Of those paid by check, we do not know how many were handed to financial advisers outside of Antigua as opposed to being sent directly by the investor to Antigua. However, we do know from examining bank account activity that the checks sent to Antigua were not deposited or negotiated in Antigua, but instead were bundled and sent to Trustmark Bank in Houston for deposit.

25. Mr Hamilton-Smith deals at paragraph 11(e) with the accounts held by SIB. As to this paragraph:

A. Mr Hamilton-Smith states that the Bank of Houston account "was the account to which funds were sent for the purpose of investing monies deposited with SIB. The monies moved out of this account were therefore paid into portfolios to be managed by international banking institutions or to other group companies for onward investment in equities, debt or other investments." First, I assume that Mr Hamilton-Smith is referring to the 8706 account at Bank of Houston. If so, he is correct that some of the funds that flowed through the Bank of Houston account were diverted to "Tier 2" and "Tier 3" investments, which were managed from the U.S. However, this account was also used for a variety of other services, including payments to other Stanford entities, such as Stanford Financial Group Global Management (SFGGM), supposedly for various support services and capital contributions or loans to other Stanford entities made "on behalf of shareholder".

B. My firm's continued examination has revealed that, in addition to SIB's Bank of Houston accounts, its six (and possibly more) accounts at Trustmark Bank (located in Houston, Texas) also played a significant role in SIB's business.

    i)   SIBL Sweep Account – 300-310-1707

- This account sent $295 million to SIB's account at Toronto Dominion in 2008.
- It appears to have been a primary source of funding for other SIB accounts at Trustmark. In 2008 approximately $66 million was sent to the SIB Client account, $32 million to SIBL Vendor Account and $2 million to the SIB Payroll account.

    ii)   SIBL Vendor Account – 300-310-1541

- There were approximately $34 million in disbursements made from this account in 2008.

    iii) SIBL Client Account – 300-310-1558

- There were approximately $71.6 million in disbursements from this account in 2008.
- This account was used for interest payments to CD holders and at least some CD redemptions .
- There were also checks written to the Bank of Antigua, most of which were deposited into Bank of Antigua's account at Bank of America.

    iv) SIBL – Payroll Account – 300-310-1608

- Based upon discussions with Tiffany Petty, a payroll supervisor at Stanford's Houston headquarters, most of SIB's payroll was paid out of this account. Checks were issued to the majority of the employees; very few had direct deposit. Payroll processing occurred in Houston.

C.    An examination of the activity in SIB's Bank of Houston and Trustmark accounts reveals that these two United States based financial institutions played a significant role in SIB's day-to-day operations. These accounts appear to have been used to make a wide variety of payments including, but not limited to, vendor payments, payments to employees, and payments to SIB clients. There were especially large transfers from Trustmark account 300-310-1541, SIB's "Vendor Account," to a variety of other Stanford entities.

26. Mr Hamilton-Smith states at paragraph 11(e) that SIB's Bank of Antigua account "held $10 million, or 22% of Tier 1 assets." As to this,

    i)   Tier 1, which consisted only of cash and cash equivalents, was a small part of SIB's overall assets. Therefore, SIB's Bank of Antigua account was an even smaller portion of SIB's overall reported assets, approximately 0.1%, and, therefore, no significant indicator of where SIB's center of main interests resides.

    ii)  Further, the date the receivership went into effect is not a proper measurement date because this was a low-point for SIB's US bank accounts and an extreme high-point for SIB's Bank of Antigua account. Therefore, it was not reflective of SIB's typical

fund flow.

iii) By far the most activity with cash and cash equivalents occurred outside of Antigua. As detailed in my previous affidavit, hundreds of millions of dollars (in fact billions over a period of time) of CD sales proceeds were deposited in accounts in the U.S., Canada, and the UK and were dispersed from there.

iv) When SIB and the other Stanford entities were "operating," the Bank of Houston accounts and other accounts had much higher average daily balances. For example, during 2008, the average daily balance for the Bank of Houston money market account (the Bank of Houston account where funds were kept until needed in the Bank of Houston operating account) was approximately $42 million. (See **KVT16**)

v) As indicated by the schedule attached as **KVT17**, the average month-end balance of SIB's account at the Bank of Antigua through October 2008 was only $615,503.44. The approximately $10 million that was in the account at the time the U.S. Receiver was appointed was deposited there from the United States as the Stanford empire was crumbling.

vi) Most of the $10 million in SIB's Bank of Antigua account at the institution of the receivership consisted of funds received in two wire transfers. One transfer was for $6 million from Trustmark Bank in Houston on 13 November 2008 (see **KVT18**) and another for $3 million from Toronto Dominion on 1 December 2008 (see **KVT19**). The $6 million transfer was authorized by Jim Davis and executed by Patricia Maldonado's Treasury group (see **KVT20**).

vii) SIB and the other Stanford entities experienced extreme cash flow problems during the three months immediately preceding the receivership. Tier 2 investments were being liquidated to raise cash. Yet it appears that the $10 million in the Bank of Antigua account was not used to any appreciable extent prior to the Receivership.

**(2) The entire operation was a single economic unit and SIB relied heavily on the work of the other US local entities and employees of the Stanford enterprise**

27. With respect to paragraph 18 of Hamilton-Smith 2, while there was a legal entity named "Stanford Financial Group *Company*" that operated in the United States (and performed services for SIB), Mr Hamilton-Smith is correct that "Stanford Financial Group was not a legal entity but a concept." Stanford Financial Group was the "brand name" used in marketing literature to lend credibility to SIB by portraying it as part of a larger global group of companies headquartered in the U.S..

A. To quote the page that Mr Hamilton Smith attached to his affidavit, "Stanford Financial Group is a privately held, wholly owned global group of independent financial services companies founded in 1932 by Lodis B. Stanford, grandfather to the current sole shareholder Sir Allen Stanford. ... Stanford International Bank is a member of Stanford Financial Group".

B. **KVT21** is the transcript of a 2006 marketing video entitled "SFG Corporate Video" in which Allen Stanford explains Stanford Financial Group as follows:

- "Stanford Financial Group is a family of financial services companies with global reach. We serve over 40,000 clients who reside in 79 countries on six continents. Our world headquarters are located in Houston, Texas, and we have a continual growing number of offices around the world to serve our clients. …

- Although independent, all of our affiliate companies work together to form a powerful cohesive network. Together they represent over 20 billion dollars in assets under management or advisement. We pride ourselves on the extraordinary level of personal service we offer, and we take the time necessary to truly understand your individual financial needs, developing a relationship based on trust and integrity. …

- This commitment to outstanding personal service is deeply rooted in our past. In 1932 my grandfather, Lotus (sic) Stanford, founded Stanford Insurance Company in my hometown of Mexia, Texas. The Great Depression had its grip on America, and most businesses were sacrificing quality and services to survive. But my grandfather refused to lower his standards. Instead, he made service his top priority. …

- The values that built our company to what it is today are the same values that will carry us into the future. Over the past seven decades we've mastered new skills, embraced new technologies, and expanded our opportunities to new markets. Here are some of the products and services that make us unique in the marketplace.

- We offer innovative international private and institutional banking services. Stanford International Bank, domiciled in Antigua, was founded for the specific purpose of private-client wealth management. …

- Using our unbiased wealth-management approach we tailor a financial plan to your specific requirements, and then we put that plan into action through the Stanford worldwide network of affiliates. In this way we help you weather the market cycles and, most importantly, we help you reach your financial goals. …

- We offer investment banking, merchant banking, institutional equity sales and trading, and the services of our multi-billion-dollar Stanford fixed-income desk from our offices in Houston, Dallas, Miami, San Diego, and New York.

- And because information is as important as capital in a global economy, our Memphis office provides cutting-edge research on the latest trends affecting business and finance in the United States and around the world. …

- We provide critical financial support for artistic and community programs worldwide, and I am proud to say that we have been a major financial supporter for the restoration of the Leland Stanford mansion in Sacramento, helping preserve an important piece of California and Stanford family history."

C. **KVT22** is a 31 March 2004 press release regarding "Stanford Financial Group's CEO R. Allen Stanford['s]" donation of $100,000 to a Dallas, Texas charity. It states this about Stanford Financial Group:

> "Stanford Financial Group is an international network of affiliated companies that together provide a wide range of coordinated financial services to more than 40,000 clients in 79 countries. ... Headquartered in Houston, Texas, Stanford Financial Group has some 2,000 employees in the United States and worldwide."

28. As to paragraph 20:

A. As I set out above, the fraud of which the operation of SIB was one part depended upon the sale of the CDs. These were marketed by financial advisers (principally from the US) and not from Antigua. In fact, whether the financial adviser resided in the US or not, their directions and messages all came from the US. It is therefore artificial to separate out the "referral agreement" process from the actual sale to investors. The relevant fact is that the financial advisers were used to convey misinformation to potential investors to induce them to part with their funds. The fraud was committed where the misrepresentations were conveyed. It was set in motion from the United States. Whether or not the Stanford financial advisers had the legal authority to bind SIB is beside the point (and I express no conclusion of law on that issue).

B. I agree that documentation was sent to SIB for "acceptance." However, as I set out in my previous affidavit, this so-called "approval" was a pure documenting exercise. I have reviewed SIB's Client Policy and Procedures and note that the requirements are primarily administrative in nature (see **KVT23**). Further, it does not appear that SIB's client acceptance procedures in Antigua wholly succeeded in keeping out depositors with a propensity to lawlessness. **KVT24** is a 6 February 2009 email to Allen Stanford from Frans Vingherhoedt. Vingherhoedt states that "things are starting the [sic] unravel quickly on our side in the Caribbean and Latin America." He goes on to say that if there is a run on SIB, "[w]e all know what that means. There are real bullets with my name on [them], David's (Nanes) name and many others and they are very real." In other words, Stanford's people feared for their personal safety. Ordinary investors, even if angry, do not resort to violence.

C. SIB did not merely delegate "significant" investment decision-making to the United States, but total investment decision-making.

i) Previously attached as exhibit KVT5 is a summary of Tier 3 "assets" as of shortly before the institution of the receivership. These investments were made solely at the discretion of Stanford and Davis, with no input from SIB management in Antigua.

(1) As can be seen from that exhibit, the Tier 3 investments included $1.7 billion in "loans to shareholder" -- i.e., loans to Allen Stanford. Typically, for a bank to loan money to one of its directors, the loan application must be referred to a separate "independent" committee to assure that the decision to make the loan is

not influenced by conflict of interest. I have seen no evidence that such a procedure was followed here. Indeed, I have seen no evidence that anyone in Antigua was consulted regarding the loans to Stanford.

ii) Attached as KVT25 is a listing of all Tier 2 investments as of approximately the date of the institution of the US Receivership. These investments were chosen by Laura Pendergest Holt or persons working under her direction in the United States.

D. As to the fees paid by SIB to various Stanford entities, while it may be true that these fees were in excess of market value for the services performed as yet another way to pull money out of SIB (and I have not analyzed the fair market value for the services), there is no question but that real and substantial services were provided by these companies to SIB. My team and I have interviewed numerous U.S. employees who have described the functions they served for SIB. We have also analyzed the results of those efforts such as financial statements and investment analyses, and have documented through email the flow of information, most of which excluded anyone from Antigua entirely. Further, it is clear that SIB's Antiguan staff of 88 was much too small for the operation of a bank with 28,000 clients and $7.2 billion in deposits.

E. As I set out in my previous affidavit, employees located in Antigua performed some administrative, bookkeeping and operational functions for SIB, but certainly not most and, in my opinion, none of the most significant and vital functions. Services provided by SFGGML and other Stanford entities outside of Antigua included, but were not limited to:

i) Legal Services provided by Mauricio Alvarado and others within the legal department in the United States.

ii) Jim Davis and Laura Pendergest Holt provided investment services from the United States.

iii) Accounting services were provided from the United States and the U.S.V.I. by a group led by Mark Kurht and/or Gil Lopez from Houston and St. Croix.

iv) Human resources services by Joan Stack and Nancy Rummel from St. Croix.

v) Information technology services (including IT procurement) provided by John Varkey's group in Houston. (Mr Varkey indicated in his interview that Juan Rodriguez-Tolentino would call him from Antigua, requesting assistance.)

vi) Lina Stinson, Director of Compliance, and her group provided compliance services from the United States.

vii) Lula Rodriguez, Global Director of Corporate Communications and Public relations, provided extensive public relations support from the United States.

viii) Jason Green, President of SGC's private client group based in the United States, in addition to leading a group of Financial Advisors, also trained Financial Advisors

on how to sell the CDs.

F.  Based on my interview of employees, including John Varkey, the SIB records that exist in Antigua relate principally to customer identities and account balances. The same information either existed in duplicate or was accessible here in the United States.

G.  Most of the detailed records relating to SIB's investments (and all relating to Tier 3 investments) and records relating to investment income reside in the United States, and not in Antigua, where they would be available for review by internal and external auditors. These records were kept principally in Memphis and Houston, and not in Antigua. Mr Hamilton-Smith indicates in paragraph 34 that statements for investments were received in Antigua. These were only for investments in the Tier 2 portfolio, which like the other two investment Tiers, was managed from the United States. Based upon interviews with Ms Pendergest Holt and others who worked under her direction, there was no business reason for these statements to be sent to Antigua, as the investments were managed in the US, where weekly statements were received. The persons interviewed have also stated that SIB's Antiguan employees did not access the Tier 2 statements sent there and no one in Antigua was charged with reconciling the statements against internal records. Investment personnel who traveled to Antigua have informed me that Antiguans disclaimed knowledge of any of the investment details.

H.  Internal audit reports of SIB make it clear that investments, which comprised more than 90% of SIB's assets, were not being audited. They were merely compared against summaries provided by Davis. Here is a sampling of statements:

i)  "On this occasion, we did not review supporting documentation for the investments and investment income accounts." (see **KVT 26**).

ii)  "The audit process for the investment portfolio solely consisted of tracing the account balances from the trial balance to the account balances as presented on the balance sheet as of March 31, 2006." (see **KVT27**).

iii)  "Investment Portfolio ... Account in good order. Investment account was expressed and recorded as per summary analysis reported by CFO office." (see **KVT28**).

iv)  Recipients of the audit reports included Allen Stanford, Jim Davis, Juan Rodriguez-Tolentino, and C.A.S. Hewlett, the purported external auditor. Thus, Mr Rodriguez-Tolentino knew from the internal audit reports that SIB's investments, more than 90% of its assets, were not being audited, yet did not remedy that situation. It would be odd if someone truly functioning as a bank president would both cede control over bank investments and excuse audits for the investments.

**(3) Virtually all decisions concerning SIB were made in the US or otherwise outside Antigua and Barbuda**

29. Mr Hamilton-Smith accepts in paragraph 24 that "many" decisions at a strategic level were taken by Mr Stanford and Mr Davis. In fact all of them were. Mr Hamilton-Smith asserts that the implementation of those strategic decisions was undertaken to a large extent within

Antigua. He gives no examples of any such "implementation". In fact it appears there was no or minimal implementation in Antigua. SIB, SGC and other Stanford companies were instruments of a massive Ponzi scheme. The principal strategy was to keep the sales of CDs up so that the scheme would not collapse. That strategy was directed by Stanford, Davis, Holt and their close confidants from the United States.

**(4) Most sales activity occurred outside Antigua**

30. In paragraph 27, Mr Hamilton-Smith refers to "30 calls a day" received by SIB in Antigua. He attempts to justify this as a sum which is "not insignificant". In fact, it is insignificant in view of the approximately 28,000 investors. In addition, as Mr Hamilton-Smith frankly admits, the reason why investors did not contact SIB in Antigua was because their connection to SIB was through their financial adviser. I also note that in paragraph 28, Mr Hamilton-Smith states that SIB refused to deal with clients by telephone. Therefore, it seems these 30 calls could not have been about substantive issues, but rather likely were about issues such as a change of address or addition of a new telephone number.

31. As to the "private banking" services which Mr Hamilton-Smith addresses in paragraph 27 , I note that SIB's private banking clients were at most only several hundred, which is insignificant when compared with total depositors of approximately 28,000. In paragraph 28, Mr Hamilton-Smith relies upon the existence of the "client services" department. However, as they did not take instructions verbally from clients and few clients visited SIB in Antigua, that was plainly not a "department" that dealt with any substantive issues.

32. As to the marketing position, with which Mr Hamilton-Smith deals in paragraph 29, I note that the quotations from marketing videos and a press release set forth in paragraph 27 above, clearly establish that SIB was marketed as part of the Stanford Financial Group, headquartered in Houston, Texas. Moreover, the face of all Stanford entities, SIB included, was Allen Stanford. Listening to Stanford in either of the two videos leaves one in no doubt that Stanford is an American, whose business roots in Texas (purportedly) go back seven decades.

33. It is correct, as Mr Hamilton-Smith asserts in paragraph 30, that financial advisers could not open accounts or accept deposits themselves. However, this appears principally to have been the documenting of a deal already done from the investor's perspective and a paper exercise.

**(5) SIB held itself out to creditors, borrowers and other obliges, as having its location in the United States**

34. It is true, as set out in paragraph 33, that the CDs said SIB was located in Antigua and that the CDs were executed in Antigua. However, they were not sold in Antigua. As stated previously, the sales process that employed misinformation was perpetrated elsewhere, mostly from the US.

35. As to the bank statements, to which Mr Hamilton-Smith refers in paragraph 34, I repeat my previous evidence that copies were also sent to the US, or that they only include month-end

statements sent there only in furtherance of the fraud and of no use to the employees in Antigua due to the fact that they were not involved in the bank's investments

### (6) The assets of SIB are located principally in jurisdictions other than Antigua and Barbuda

36. As to the figures provided in paragraphs 36-38, they do not differ significantly from the amounts we have located. However, the listing is incomplete, omitting several investments, including CMSU (managed by Ms Pendergest-Holt's husband), Axia, Medieval, and Casa de Valores. I do agree with Mr Hamilton Smith that none are in Antigua. As set out above, these figures do appear to be approximately correct, but as of the date of the inception of the US Receivership the US accounts were inordinately low. For example the Bank of Houston balance averaged $42 million during 2008. I agree with Mr Hamilton-Smith that none of the Tier 2 accounts were in Antigua.

37. I have already dealt with the properties to which Mr Hamilton-Smith refers in paragraph 38(iii) that were owned by other Stanford companies in Antigua (and not by SIB).

38. As to the further "investments" by Stanford in other Stanford companies in Antigua, to which Mr Hamilton-Smith refers in paragraph 39, this was simply re-circulating monies.

39. Mr Hamilton-Smith asserts in paragraph 40 that SIB was the only sole source of income in the Stanford group, other than management fees. This is not correct. Other Stanford entities did produce income that was unrelated to the SIB CD sales. Income generating companies included the Stanford broker-dealer groups (Stanford Group Company in the U.S.), the Bank of Antigua, and Stanford Bank-Panama. SIB CD proceeds were, however, far and away the greatest source of cash inflows from external sources into the Stanford group of companies. This was consistent with its role as the mouth of the Ponzi scheme.

### (7) Investments resulted from sales outside Antigua (principally in the US)

40. Mr Hamilton-Smith contends in paragraph 42 that the investors were not primarily located in the United States. As I have already explained in paragraph 17, the figures he provides are based on country codes contained in a Stanford accounting system whereas in my view the more reliable indicator of the amount of funds contributed by residents of the US are statement addresses. When the CD accounts are analyzed based on statement mailing address, the result is that persons in the U.S. account for 37% of total CDs by dollar amount and 25% of all CD holders, significantly more than persons from any other country. Again, as mentioned above, Mr Hamilton Smith and I agree that Antiguans were not permitted to hold CD's in SIBL.

### (8) Stanford marketing emphasized the entire global Stanford family of companies

41. Paragraph 48 asserts that financial advisers took customers through the terms and conditions before completing the account opening forms, making it clear that SIB was an Antiguan bank. Even if true, this means little given that the terms and conditions being explained related to a transaction induced with misinformation. The investor was led to believe that he or she was purchasing a CD from a legitimate bank with a healthy financial condition, when

in fact it was a Ponzi scheme. Emphasis was also given to SIB's inclusion in the greater Stanford empire, to provide additional legitimacy.

### (9) SIB incorporated in Antigua

42. As to the lease payment for the Antiguan "headquarters" of SIB with which Mr Hamilton-Smith deals at paragraph 49, SIB was not the owner of the property, whether legally or in equity, except in the sense that all of the Stanford entities operated as one unit.

### (10)    Operational decisions not made in Antigua

43. As to the assertions made in paragraph 51 in relation to the alleged roles of Mr Rodriguez-Tolentino and other employees:-

A. Mr Hamilton-Smith states that Mr Rodriguez-Tolentino hosted "the investment committee" in Antigua annually. Based on the facts my team has learned, I believe "hosted" meant simply that he provided the meeting place. Rodriguez-Tolentino had no role in investment management or strategy. All investment activities were handled from the US, and the vast majority of investments -- Tier 3 -- were kept so secret that the office of the CFO, Jim Davis, provided SIB with only high-level summaries and pie-charts of investment allocation by broad categories. The internal audits that Rodriguez-Tolentino received made clear that the auditors did not audit the investments other than to tie-back totals on SIB's financial statements to the summaries provided by Davis. In other words, more than 90% of SIB's assets went unaudited by internal auditors.

B. From the evidence my team has compiled so far, I suspect the same is true with respect to the external auditor, Mr C.A.S. Hewlett. I have found no record of Mr Hewlett or anyone working for him traveling to the United States to audit the detailed records for SIB's investments. That state of affairs -- having investments completely controlled by the CFO in the United States, with no audits of those investments -- was apparently acceptable to Mr Rodriguez-Tolentino. I have seen no evidence of any complaint by him. This is not conduct to be expected of someone truly performing the functions of a bank president.

C. I note that Mr Hamilton-Smith identifies Omari Osbourne in paragraph 5 as "Finance Manager" and in paragraph 51 as "the Internal Auditor." The information gathered by my team is that Mr Osbourne succeeded Bhanoo Persaud as Finance Manager. If he is also SIB's Internal Auditor, then that responsibility appears to have been added very recently, based on the internal audits we have discovered. Further, if true, Mr Osbourne's dual role is just further evidence of the inadequacy of SIB's internal audits. Under no recognized auditing or accounting standards can someone audit records that he or she is personally responsible for maintaining.

D. As for the other SIB managers mentioned by Mr Hamilton-Smith, I again point out that SIB was a fraudulent enterprise and its activities were in furtherance of the fraud. It had no significant separate business function that was not in support of the Ponzi scheme. Many, indeed most, of its employees may have been unaware of this. They may have performed their duties with the utmost good faith and diligence, but that does not change

the fact that they did not manage or direct the fraud. Persons within the U.S. (Stanford, Davis, Holt and others) did that.

44. I note that Mr Hamilton-Smith reports in paragraph 52 that he has been informed by Mr Rodriguez-Tolentino that "he had been trying to change his pay structure for some time but it had not been processed". I note that Mr Hamilton-Smith does not exhibit any evidence in support of Mr Rodriguez-Tolentino's claim, and I have neither seen nor heard any such evidence in my review of emails and interview of Stanford employees.

A. Moreover, employment and payment records indicate that, in addition to Rodriguez-Tolentino, two other high-ranking Antiguan managers Bhanoo Persaud and Pedro Rodriguez were paid by Stanford entities located in the U.S. Virgin Islands, and not by SIB.

B. Additionally, as noted in paragraph 45 above, SIB's payroll for its non-management employees was paid from an account located at Trustmark Bank in Houston. Further, the payroll itself was processed by employees in Houston. My team has confirmed that this is the case by reviewing images of cancelled payroll checks and also by interviewing Tiffany Petty, a Houston Payroll Supervisor employed by Stanford Financial Group Company who was directly involved in processing SIB's monthly payroll (along with a third-party U.S. payroll services vendor, ADP).

**(12)    Payments of interest and capital redemptions made from accounts outside Antigua; Copies of client files were maintained in the originating branch offices of the Stanford entities**

45. As to paragraphs 54 and 55, I do not propose to repeat previous evidence. The position remains that local Antiguan actions were minimal and administrative in nature. Whether or not client data should have been made available outside Antigua, it was in fact available outside of Antigua. If Mr Hamilton-Smith is correct regarding Antiguan law, then this simply means that SIB and/or Stanford Group ignored the law.

**(13) Accounting functions of SIB were a branch and function of the accounting and auditing functions of the Stanford group**

46. As to the allegations made in paragraph 57 in relation to the "auditing" of SIB, there were in fact no real audits of SIB.

A. It is no doubt in the interests of the "Finance Manager" of SIB to claim that SIB was properly audited. However, the information which I have so far received, together with such documentary evidence as I have seen to date, indicates that this is far from the truth. I note that Mr Hamilton-Smith does not exhibit any of the alleged internal auditing papers, and I do not know whether he has seen any of them. However, no external auditor could perform an independent audit as mandated by international accounting standards without independently verifying more than 90% of the assets. Whatever Mr Hewlett or his employees were purportedly reviewing at SIB over the course of several weeks, one thing is for sure -- they were not reviewing investment records. There were no legitimate records for them to review apart from the Tier 2 account

statements, which were not the most significant part of SIB's investment portfolio. In addition, as Mr Hamilton-Smith notes in paragraph 56, "Mr Davis ... provided the figures for the tier 2 and tier 3 investments." Those investments comprised the investment funds that supposedly backed the CDs that were being sold all around the world (except to Antiguans).

B. Bearing in mind the fact that even the Stanford internal auditors were not provided with information to review the investments, it does not seem likely that the external auditors had any more information. I note from news reports that the audit firm C.S.A. Hewlett was a very small firm with a small office in Antigua and a small office in London. Mr Hewlett, a native of Antigua, was SIB's only auditor, having begun auditing the bank at its formation. According to news reports, he died in January 2009, the month before the U.S. receivership was instituted.

### (14) Loans made by SIB were minimal

47. As to the figures on SIB loans with which Mr Hamilton-Smith deals in paragraphs 58 to 59, as I discussed on para. 15 above, loans made up a very small portion of SIB's business. However approximately 25% of the outstanding loan balance consisted of loans to U.S. customers based on their statement address.

### (15) Private banking

48. As to the "private banking" services which Mr Hamilton-Smith addresses in paragraph 61, as I set out above, I note that SIB's private banking clients were at most only several hundred, which is insignificant when compared with total depositors of approximately 28,000.

### (16) Comments on my first affidavit

49. Mr Hamilton-Smith states in paragraph 66 that SIB employees managed the monies being paid into the accounts under tier 1 and would have a continued involvement in the management of those accounts until those monies were transferred for the purposes of onward investment in tier 2 or 3. As to this:

A. Exhibit **KVT29**, a 2007 internal SIB audit report, refutes Mr Hamilton-Smith's contention. It states: "[T]he Houston Treasury Department (Treasury) manages SIBL cash flow according to corporate guidelines and places short term deposits with other banking institutions as deemed appropriate. However, the SIBL accountant is not informed of the terms of the investments (such as maturity date, interest rate, etc.), so that he can record the interest receivable, according." Thus, not only does this document demonstrate that the Houston Treasury Department managed SIB's cash flow, but also that SIB's Antiguan accountants did not know how funds were invested or what interest they earned.

B. **KVT30** is a November 10-11, 2008 email chain between Patricia Maldonado, "Treasury Manager -- Stanford Financial Group," and one of her assistants, a "Senior Treasury Analyst," that illustrates Maldonado's hands-on management of SIB cash. Her assistant

is recommending, and Maldonado is approving, various transfers among SIB accounts at Toronto Dominion (Toronto), Bank of Houston (Houston), Trustmark Bank (Houston) and Comerica (Houston).

50. Mr Hamilton-Smith claims in paragraph 67 that most of the sales force for SIB was not in the US. As to this, I refer to paragraph 21 above, in which I explain that U.S. financial advisers accounted for 42% to 48% of SIB's CD sales, by dollar amount, for the years 2007 and 2008. This is far more than the sales generated by any other country, including Antigua.

51. Mr Hamilton-Smith claims in paragraph 67 that STC did not accept customers who were citizens of the US. There is no way to tell what this means. He says that beneficiaries could be US citizens. See Hamilton-Smith paragraph 23.

52. Mr Hamilton-Smith claims in paragraph 68 that Antiguan SIB employees would provide daily details of account movements to other group companies. He refers to daily cash reports -- daily listings of balances in different accounts. Many of the various Stanford entities reported to the Houston Treasury department in this manner. However, the flow of funds -- the transfer of funds from account to account -- was managed from the United States, and not from Antigua. This function was accomplished principally by the Stanford Treasury Department in Houston, as established by the evidence set out in paragraph 50 above and in my previous affidavit.

53. Mr Hamilton-Smith claims in paragraph 69 that there were some Antiguan CD investors. As to this I note that Mr Hamilton-Smith confirms that SIB was prohibited by Antiguan law from serving Antiguans.

**(18) Offshore banking**

54. Mr Hamilton-Smith relies in paragraph 70 upon the statement that SIB was "domiciled in a low tax jurisdiction". However, this statement should be read in the context of other statements in the marketing materials that gave the clear impression that SIB was a U.S. managed company. After reviewing the strategy and marketing materials, the primary attraction of SIB CDs was not that Antigua was a low tax jurisdiction but that the CDs paid an above-market interest rate. If a customer were looking for a low-tax jurisdiction, there are a number of others much more established than Antigua as financial centers from which to choose. The combination of unusually high interest rates and a low tax jurisdiction was unique to SIB.

AUS01:552158.7     23

(21)     **Inaccuracy of Stanford financials**

55. Finally, as to paragraph 85, I note Mr Hamilton-Smith's explanation of his statements to the Antiguan Courts. Nevertheless the point remains that the numbers provided by SIB (just as with the other Stanford entities) are unreliable and were in many respects fictitious. For example, assets and revenue balances were based upon fictitious figures provided by Jim Davis's office. (The Antiguan bank employees may not have known the figures were false.) Also, as discussed above, it appears that the financial statements were never properly audited.

|  |  |  |
|---|---|---|
| SWORN at | ) | |
| | ) | |
| This ___/___ day of June, 2009 | ) | *Karyl Van Tassel* |
| In the presence of | ) | **Karyl Van Tassel** |
| | ) | |

*Debra Williford*

Notary Public
My Commission Expires: 6/1/11



Debra Williford
My Commission Expires
06/01/2011

**IN THE HIGH COURT OF JUSTICE**          **Case No. [ ] of 2009**
**CHANCERY DIVISION**
**COMPANIES COURT**

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

**RALPH STEVEN JANVEY**

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                  **Applicant**

---

**Exhibit KVT9**

This is the exhibit "KVT9" signed and sworn to before me, the undersigned notary public in and for the State of Texas, on the _1_ day of June, 2009.

Notary Public
My Commission Expires _6/1/11_

Debra Williford
My Commission Expires
06/01/2011

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 1

1    Stanford Disk 1: "Keeping the Entrepreneurial Spirit Alive"

2    Tape began mid-sentence:

3

4    ALLEN STANFORD:

5    ...that your success in business as a leader depends totally

6    on two things:  Your achievements and your relationships.

7    You have all achieved something very special today, a

8    milestone in your life.  [Interruption in recording]

9

10   ...2005, and I just want to be sure that what I'm saying

11   today has believability, validity to those who just joined

12   this firm and hear what I'm saying, not just today, but I've

13   already said it prior.  I've got many more examples, but I

14   don't want to be here all day.  Let's go into what I said

15   before the NASDAQ at the International Advisors Meeting we

16   had in New York last month.  Play that clip.

17

18   I want to welcome you on the eve of Stanford Financial

19   Group's International...  [Interruption in recording.]

20

21   Well, repetition is what people remember.  They don't

22   remember anything if you tell them one time.  So that

23   story's now been told four times today.  But it can't be

24   told too much in this, in this climate we're in.  Now, I

25   started off doom-and-gloom speeches you've heard from me and

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 2

1    [indiscernible] speeches in 2001 speech, not necessarily

2    inspiring.  Turn on the news, read the newspaper, your

3    Blackberry, walk through the airplanes, none of it's good.

4

5    You know, and reporters, let's say what they like to do:

6    They like to sell negativity.  The world is so small and

7    reporters are all over the world, reporters all over the

8    world are reporting negativity, and they're just -- it's the

9    same:  IBM is up and we may have reached the bottom; IBM is

10   at an all-time low and stocks are at an all-time low and

11   there's no hope.  You know, there's half full and half

12   empty.  I'm half full, but I'm real in terms of how I view

13   things.

14

15   This is not going to be an easy period for any of us, but

16   we're going to do very well.  But I'm very concerned about

17   the world, I'm concerned about the United States becoming a

18   second-rate economy, as I hope and think all of you are.

19   I'm not somewhere in Never Never Land on my boat floating

20   around scuba diving or fishing trying to forget all of this

21   and saying, Well, what the hell.  I'm very concerned about

22   our future.  I've got six children.  I'm concerned about

23   their future.

24

25   We're going to be a leader in all areas:  In our business,

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 3

```
 1    in how business of the world should be conducted, and how
 2    politics should be played out anew, not old school -- and
 3    I'm afraid we're going to have some old school stuff still
 4    to deal with in the couple of years forward.  But we're
 5    going to shake all this stuff out.  Out of all negative
 6    comes positive.  This shakeout was long overdue.  Business
 7    as usual is not business going forward, and that's got to
 8    change.  Politicians are politicians.  Most of them don't
 9    get it.  They don't understand it.  And that's frightening,
10    but that's the truth.
11
12    But this world is going to change, ladies and gentlemen, and
13    we're going to be a leader in all areas of it, and we're
14    going to have a say and a voice all over the globe in how
15    things should be done differently.  Just our success alone
16    will get us in the door of people listening to us that, hey,
17    just because somebody was the biggest player in the world
18    certainly back then, everybody thought they should be the
19    ones you listened to.  Today they don't look that good.
20
21    Now, I have an answer to how to solve all this, by the way,
22    if I was President.  You give me one term, we wouldn't be in
23    this mess.  We'd be back on the road to prosperity.  But I'm
24    not, and I wouldn't want to be, but somebody has got to step
25    up somewhere and take a leadership role.  So we're going to
```

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 4

1   have to push things forward ourself.  That's a whole 'nother

2   topic, a whole 'nother thing off of what we're talking about

3   today.  We're going to have a meeting just on that.  Now, I

4   want all of you to become active in shaping our own future

5   and taking care of our children's future.  I'm not concerned

6   about the world.

7

8   Now, I'm going to go just kind of hit some things here.  All

9   of you, I hope, were given the book "Plan B.30."  Is that

10  right, Lula?  Okay.  Lester Brown is a friend of mine who

11  gave a talk to our advisors last month in New York.  He's

12  right on spot.  The environment, in spite of what's going on

13  right now in the economic crisis, is more of a looming

14  crisis than what we're going through now.  I'm not some

15  environmental nut, and I'm not some global-warming kook.

16  All scientists now agree that global warming is here and

17  it's real.  Read that book.  Nothing more I'm going to say

18  about that.  Read that book.  It gives you answers, good

19  common sense that'll work; plus it'll take this country

20  energy independent in a matter of years.  We should have

21  jumped on that bandwagon back in '73, '4, and '5.

22

23  We're going to stay to the 15-minute rule.  The 15-minute

24  rule is this:  We're having deals pitched at us like I've

25  never seen.  People need money, they need help.  They're

Stanford: Keeping the Entrepreneurial Spirit Alive

1   lined up at the door.  But we're not going to get greedy.

2   We're not going to do things stupid.  The 15-minute rule is

3   this:  When somebody comes in to one of our Stanford offices

4   on the merchant banking, investment, any other deal or

5   whatever it may be, one of Laura's teams or whoever's teams,

6   if we don't understand it in 15 minutes, we're not getting

7   involved in it.

8

9   If something is so complicated or so difficult that somebody

10  can't sit down and explain it totally, clearly, and in 15

11  minutes you've got it and you make a decision that that's

12  something you want to pursue to another level, it will never

13  work, from our perspective.  We stuck with that over the

14  years.  Now, I've seen some deals that some of you got,

15  maybe not some of you here, but some others have pitched to

16  us in Stanford that are about a 30-minute deal in length.

17  No 30-minute deals.  15 minutes.

18

19  Put up that Pendulum on Capitalism slide.  I drew this

20  myself last -- late yesterday afternoon.  We did this

21  internally.  It's, you know, it's something out of junior

22  high school, I guess, but it's the real thing.  The Pendulum

23  of Capitalism will right itself.  It'll stay back in the

24  middle, but invariably the Pendulum of Capitalism goes this

25  way and it goes this way.  And when it goes to the right or

5

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 6

1   this way to the left, things happen in a negative way.  When
2   the economy overheats, you have a tremendous bull market,
3   greed, common sense, malfeasance, all of those things take
4   place and you have a correction.  When it goes the other way
5   to correct, where we are now, people are scared.  They lose
6   confidence, fear sets in.
7
8   We are going to stay in the green zone, and we've stayed in
9   the green zone through all these years.  That's what all of
10  you need to remember.  That's a very simplistic thing, but I
11  believe in simplicity.  I don't like complex stuff.  It
12  usually doesn't work.  That's why I never would have
13  invented the atom bomb, I guess.
14
15  We don't need in this country or the world any more
16  financial engineering.  What we need is financial common
17  sense, the 15-minute rule.  I'll say it again:  We have no
18  securitized debt, we don't depend on the credit markets as a
19  company, and our use of leverage has been minimal.  We're
20  also a private company.  We're looking at the sole
21  shareholder.  All of you are part of this organization.  The
22  part of this program today is going to be unveiled today to
23  give you essentially phantom stock, but make you part of the
24  success as we go forward.
25

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 7

1    But our real shareholders, you know who they are?  They're

2    our clients.  Take this as one example.  When Citibank or

3    any other big, publicly held company -- and I'm not beating

4    up on Citibank, because they don't need to be beat up on

5    anymore.  But when you take Citibank, what is their number

6    one priority?  It's top management and shareholders.

7    Where's the client?  They're so damn big they don't care,

8    really, unless you've got a hundred million dollars with

9    them.

10

11   We have always had to put the client first, because we were

12   always fighting that uphill battle to get that client, and

13   we're not going to change.  That's the number one priority

14   in this company and always will be, to take care of the

15   client.  And as a privately held company we now have huge

16   advantages.  I was tempted quite often to go, especially

17   during some of the run-ups, to go public, quite frankly, and

18   cash out.  I knew the company would change, I knew the core

19   values would go out the window, and I knew things that I

20   wouldn't want to be a part of anymore.  What else was I

21   going to do?  So I didn't take the company public or any one

22   of our companies public.

23

24   And thank God.  Today we have a huge advantage being

25   private.  As I've said before, we're not, never will be, a

7

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 8

1   Wall Street firm.  Out of chaos and confusion, out of

2   despair and negativity comes opportunity.  As a privately

3   held company we can't go to the government.  I wouldn't go

4   to the government.  You are the government.  How stupid is

5   that?  No wonder people have lost confidence.  Politicians

6   think all of us -- and I put myself in the same boat,

7   regardless of how much wealth I've accumulated, as a middle,

8   common-sense-thinking American.  Hopefully, that's where my

9   values will always be.

10

11  When you make these enormous amounts of money and you sit

12  afar in Washington and Wall Street and you think the rest of

13  the world are a bunch of dumb-asses -- farmers, secretaries,

14  schoolteachers, policemen, regular people who are far

15  smarter and are the backbone, produce 75 percent of the GDP

16  of this country and are more important than a Citi, than an

17  Exxon or any of the big industries that we have in this

18  country, they are the backbone.  That's what made this

19  country.

20

21  All of this political rhetoric trying to get back in bed

22  with middle America is just saddening my heart.  So I don't

23  believe any of it, McCain or Obama.  That's my personal

24  belief.  It's all politicians doing this to get elected.

25  We're going to change that.  For this country to have a

8

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 9

1    future, for this country to be a real, wonderful place again

2    to live and to grow up with your family, we've got to make

3    changes quickly.  The old way of business is not going to

4    work anymore.  Politicians that are in positions of power

5    now, I'm convinced most of them don't get it.  They're not

6    in touch with the backbone of this country.

7

8    But the backbone of this country is getting ready to rebel,

9    because they've already shown that they have no confidence

10   in the way things have been going on lately.  It has nothing

11   to do now other than confidence, period, the end.  And I get

12   angry, as you can tell, when I start thinking about the

13   abuse.

14

15   Now, going back to some positive things out of this chaos,

16   we're going to set up a five-billion-dollar global vulture

17   fund, a global vulture fund, five billion in cash, new

18   money.  We're going to go out and buy into companies.  We

19   may even invest in new companies, buy real estate -- hell,

20   there's tons of it here in Miami.  You can go downtown on

21   Brickle and you can see 10,000 condo units coming on stream

22   in the next few months on top of an over-flooded market.

23   I've seen it, I've been there, I've done it.

24

25   It'll take 10 years for all this to work out.  10 years.

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 10

1   This is going to be a long-term play.  We're going to make a
2   huge amount of money off this.  It'll be for an investor
3   that wants to come in, we'll have minimum amounts of a
4   million dollars per investor, maybe ten million in some
5   cases.  But we're going to do it on a global level, and
6   we're going to raise five billion dollars, and we're going
7   to go worldwide through our offices and make acquisitions
8   and do investments probably early in the first quarter of
9   next year.  I want to see what happens in this new
10  administration, separate from everything we're doing today.
11
12  You all know the valuations of companies are at levels none
13  of us have ever seen before, and there's a lot of deals out
14  there that make a lot of sense.  We want to be very careful,
15  15-minute rule.  We want to do these things right, bring in
16  wealthy people and some -- we've got some sovereign funds
17  that want to participate with us.  You know, we could
18  probably do -- populate the whole thing with two sovereign
19  funds participating, but I don't want to do that only.  I
20  want to bring in a lot of people with us that believe in us
21  and we believe in them and do a 10-year plan.  We're going
22  to make a lot of money.  Same thing that happened in
23  Houston, just on a bigger scale.
24
25  We have had to run a tighter ship because we're privately

10

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 11

1    held.  We didn't have shareholders to go to to raise capital

2    in the markets.  We didn't have the government to go do this

3    to.  This isn't the first time this has happened.  Remember

4    Lee Iacocca in Chrysler a few years ago had to get the

5    government to bail them out.  There have been other

6    bailouts, just not on this scale.  We'd have never had that

7    option.  And thank God we haven't, because we've had to run

8    a tighter ship.

9

10   I'm talking to you stream of consciousness now, what's in

11   here and what's in here.  The more things change, the more

12   they stay the same.  I'm not fan of the IMF, I'm not a fan

13   of President Clinton.  But if you want to learn how to solve

14   this problem as a political leader, you can look back

15   historically at what other governments have gotten themself

16   into.

17

18   All you gotta do is go back to 1994 in Mexico.  We have an

19   office in Mexico.  We were there in 1994.  The wave of bank

20   failures in Mexico December 1994 followed a rapid growth in

21   liberalization and expansion of credit.  When the poor

22   quality of the Mexican bank loan portfolios became evident,

23   the peso tanked, real estates tanked, banks failed.  The

24   whole country went to hell in a handbag.  Clinton, who I'm

25   not a fan of, and the IMF came with a rescue package, as we

11

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 12

```
 1    all know, 38 billion dollars.  In today's dollars it would
 2    be a lot more, and in today's proportion to the 700 billion
 3    dollars as a percentage of GDP is roughly the same.
 4
 5    What Mexico went through then, what we're going through now,
 6    it's the same thing.  They had loose-lending underwriting
 7    standards, got a lot of greedy people in the thing, and
 8    Mexico went crazy and they grew and everything was going
 9    to go on forever, and it blew up.  Same thing's going on
10    today and even though Mexico's rescue was tainted with
11    corruption -- a lot of people took some of this money, put
12    it in their pocket -- in 1997, two years ahead of the plan,
13    actually, ahead of time, they paid everything back; plus the
14    Treasury and the IMF made a little profit off of this.
15
16    The main lesson here is that this country has got to put an
17    austerity program in place like we've never seen before.
18    We've just got to quit spending money.  We can't raise taxes
19    either.  We can't go out and take what steam we have left in
20    what energy or other companies we have out there and kill
21    them, our financial services.  The democrats, I'm afraid,
22    are going to be totally in power, and they have a history of
23    taxing the hell out of everybody.  But I hope they're smart
24    enough this time to understand we're going to lobby like
25    heck for this, that you're going to have to cut out
```

12

Page 13

1    spending, all these entitlements, these farm subsidies,

2    these, these things that don't make any sense.  They've all

3    got to go away.

4

5    We've got to get out of Iraq and Afghanistan.  We've got to

6    cut that billion-dollar-a-day bleed.  All of these things

7    that just make common sense have got to stop.  And we can't

8    raise taxes, even though we need the money; and even though

9    now they've put a trillion-plus on our backs, we can't raise

10   taxes.  You've got to encourage business to invest, you've

11   got to send the right message, and that will get us out of

12   this mess.

13

14   If they do anything other than that, we'll have another

15   meeting like this and we'll talk about Plan D; not B, C, but

16   D.  But Mexico did it.  A second-world developing-still

17   nation did it.  U.S. has been good at telling other people,

18   like the IMF, This is what you should do.  Let's learn what

19   they did.  Let's go ask Mexico how they got out of their

20   mess.  And there's other examples, Chile and other places;

21   but places we're familiar with, we know.  And it'll work.

22   It's just common sense, and it's operating everything as a

23   business.  Not living in La-La-Land in Washington and

24   getting your check regardless.

25

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 14

1    Juan, bring me that -- never mind.  I brought it up here.

2    If any of you want to read this, again, I'm not a fan of the

3    IMF, but it's called "Stabilization and Reform in Latin

4    America."  It's a, it's occasional paper number 238.  It's a

5    good read, but it will tell you -- here is a blueprint,

6    ladies and gentlemen.  I told you coming on how we're going

7    to get out of this mess.  Read this.  I've read the whole

8    thing, and it will tell you how to get us out of this mess.

9    We don't have to reinvent the wheel.  I've said before,

10   things that happen today have happened prior.  This big mess

11   we're in today has already happened before, it's just on a

12   bigger scale.

13

14   We can get out of this mess.  It's going to take leadership,

15   real leadership, leadership that people have confidence in,

16   and that's where you're going to have to have a voice and

17   multiply your voice with other people.  Don't be shy, don't

18   be timid.  Don't take this crap anymore.  We don't need a

19   leader like our president now who brings great confidence to

20   us.  You've gotta laugh.  You can't go to a funeral all day

21   today.  You've gotta laugh.

22

23   But seriously, we need leaders who inspire confidence that

24   you believe in and have an answer.  And we all know the

25   15-minute rule.  Somebody's got to get up and tell us in 15

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

14

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 15

1  minutes how we're getting out of this mess, because it can

2  be done.  It can be done.  You've got to, you've got to get

3  that out and multiply that.

4

5  Now I'm getting ready to get off.  I'm going to shift gears.

6  In 1997 we started this program called MFP, Mutual Fund

7  Partners.  It later became SAS.  It is part of SGC.  They're

8  running today, I think, about three billion dollars, modest

9  amount of money, and they've had some success, some not so

10  good success, in this market.  And it was a

11  relative-to-market, not an absolute return like SIM.

12

13  In January of this year I agreed that now is the time for us

14  to globally do in all, especially since I regionalized the

15  companies -- I regionalized all of our companies to North

16  America, Latin America, Caribbean, and Europe, four regions

17  now with their own regional leaders, and they're going to

18  speak here in a minute -- that the SIMs strategy needed to

19  be unitized, uniform throughout all four regions under our

20  CIO, Laura, with each region's SIO; because we have been

21  running somewhat of hybrid models, staying more or less in

22  the SIMs strategy, but sometimes getting off the SIMs

23  strategy.

24

25  We now are in the process of fully implementing the SIMs

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 16

1    strategy on a global level.  Through Stanford Global

2    Advisory we are going to, with Laura running that

3    program -- and the SIOs will not report to her, but they

4    will work with her very closely, and she's going to oversee

5    that program.  But they will work with her, and they will

6    not veer from -- I want to be very, very clear on this.

7    None of the regions, and I've met with the four regional

8    leaders yesterday, are not going to veer from this program.

9    We are going to be unitized -- that's the word that I keep

10   hearing from Jim and Laura and others -- and together in the

11   SIMs strategy globally, internally the way we've been

12   managing money.

13

14   Right now it's the worst we've done in a long time.  We're

15   about, as of early October, down about four percent, I

16   guess.  We've had a lot of hot spots within.  I saw one

17   return up 16 percent here today.  Different things that are,

18   in spite of this confusion, are actually benefitting.  But

19   overall we're down about four percent.  I'm not happy with

20   that; in this market I guess it's astounding.

21

22   As I said last month, and I'll say again today, we're not

23   going to make any money this year, first time in a long time

24   flat.  We've got a lot of cash, we're positioning to grow

25   our business, and nothing's really changed in our companies.

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 17

1  Our investment model works, it's a long-term play, and it's
2  proven itself in this day, in this market to be the toughest
3  I've ever seen to work better than ever.
4
5  But we can't have hybrids out there that that -- well, one
6  of the SAS units I was looking at is up four and a half
7  percent here today.  It's lost -- well, not here today.
8  It's lost in March, actually.  Jason D'Amato is going to
9  have a little tape that we're going to play in a minute.
10  But we're going to see this program unveiled now in a very
11  rapid way through Laura and Stanford Global Advisory and
12  through the regional SIOs working with her, bringing deals
13  to her, her looking at them, her team, back and forth.
14  There's nothing like firsthand knowledge.
15
16  Example being Columbia.  Huge opportunities in Columbia for
17  investment banking, merchant banking.  Who better to ask
18  than our people on the ground in our Columbian operation?
19  Naturally we're going to work together there, but work
20  together better than ever.  The four regions were broken
21  apart so that there will be people overseeing those regions
22  in North America, Latin America, Caribbean, and Europe that
23  were in those regions.  The leader is in that region.
24  They're close to the pulse.  They understand the cultural
25  nuances, they understand the language.  They understand all

17

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 18

1   the things that makes that region unique.

2

3   And we aren't building an ivory tower, i.e. Citibank, i.e.

4   Merrill Lynch, i.e. UBS, in running the world from one

5   place. We're running our regions from where we do business.

6   Autonomy, accountability, communication, and teamwork.

7   Those are the mandates I gave the four leaders.

8

9   We have all entrepreneurs in this company. Every one of you

10  out here is an entrepreneur. You're Type A, which means

11  you're going to get pissed off at somebody else in this room

12  in some point in time during your tenure at Stanford,

13  because they're Type A. You're going to do this, and I want

14  you to do that. If any of you disagree, you're doing it,

15  hopefully, for the right reason because you have a better

16  way to do it different, better for the client and for the

17  company. Ultimately benefits yourself. If all of you agree

18  on everything, and even what I'm saying up here, you're not

19  thinking.

20

21  Now, we can't have mavericks, lone wolfs going out there

22  doing their own thing. You've got to be part of the team,

23  but you've got to think, you've got to bring something to

24  the table, you've got to be committed, you've got to be

25  loyal, but you've got to bring everything you've got every

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 19

1  day to this job.  And we've got to get what you have, what's

2  up here and what's in here.

3

4  The most important thing that I can leave you with today is

5  to tell you this:  I am committed to each one of you, I am

6  committed certainly to all of our clients, I'm committed to

7  seeing that the decisions that are implemented by our

8  regional leaders are the decisions that I agree with so when

9  they are implementing these things I agree with those

10  decisions.  And I'm committed to stay as close in contact

11  and communicate as close as I can to you in the months

12  ahead.  Should things get worse, should things change in the

13  political scene, or should things stay the same, I'm going

14  to commit myself now to stay as close as I can.  Not

15  somewhat in the 41,000-foot level, but down on the ground,

16  in some cases maybe from the 5- or 10,000-foot level.  I'm

17  going to be looking at every single deal that we have coming

18  our way carefully myself.  It'll be brought to me.  I'll be

19  part of the review process.

20

21  In the past I've let others make those decisions and as I

22  signed on, because they're coming fast and furious.  So I'm

23  not remotely asleep at the switch, I'm not remotely out of

24  touch, I'm not remotely unaware of all your concerns.  As

25  you may think I'm in a different plateau and I live over

19

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 20

 1   here and I'm immune from all this, I'm very much concerned.

 2   Not about Stanford, not about your future; I'm concerned

 3   about the country's future and the world and my children.

 4   That's what I'm really concerned about.  And we're going to

 5   be a catalyst for good and for change and for positive

 6   things.

 7

 8   Okay.  Let's take a short break, and then Laura's going to

 9   come up and go through some things for us.  Thank you very

10   much.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Stanford: Keeping the Entrepreneurial Spirit Alive

Page 21

1            REPORTER'S CERTIFICATION
2        OF THE STANFORD AUDIO RECORDING
     KEEPING THE ENTREPRENEURIAL SPIRIT ALIVE
3
4        I, Sandra S. Givens, Certified Shorthand
5   Reporter in and for the State of Texas, hereby
6   certify to the following:
7        That this transcript of the aforementioned
8   Stanford audio recording disk is a true record of
9   the recording as taken down by me;
10       That the transcript was submitted on May 27,
11   2009, via electronic mail, to Baker Botts, LLP;
12       I further certify that I am neither counsel
13   for, related to, nor employed by any of the parties
14   or attorneys in any action to which this recording
15   may relate, and further, that I am not financially
16   or otherwise interested in the outcome of any such
17   action.
18       Certified to by me this 27th day of May, 2009.
19
             GIVENS COURT REPORTING
20           9532 Morgan Creek Drive
             Austin, Texas 78717
21           (512) 301-7088
22
23           _____

             SANDRA S. GIVENS, CSR
24           Certification No. 5000
             Certificate Expires 12/31/09
25
     sg-#999

**IN THE HIGH COURT OF JUSTICE**                    Case No. [ ] of 2009
**CHANCERY DIVISION**
**COMPANIES COURT**

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

RALPH STEVEN JANVEY

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                        **Applicant**

_____

**Exhibit KVT10**

_____

This is the exhibit "KVT10" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the ⎯ day of June, 2009.

Notary Public
My Commission Expires ___6/1/11___

Debra Williford
My Commission Expires
06/01/2011

From: Tonarelli, Oreste
Sent: Tuesday, November 11, 2008 8:17 PM
To: Pendergest, Laura
Subject: FW: HELP

*Laura:*
*Taking advantage of your offer I am contacting you again for help.*
*FAs and clients are all asking many questions. Some of them are:*

*1) Current and anticipated profitability of SIB:*
*2) Return of Equity, Fixed Income, Alternative*
*3) Appreciation (or Depreciation) of the value of the portfolio.*
*4) Explanation of the $ 71MM accumulated loss at Sep. 30*
*5) Impact of recent high volatility in the investment portfolio (Positive? Negative?).*
*6) Need of a new capital infusion*
*7) Need of reducing interest rates*

*Laura I sincerely think that we should have a sort of communiqué or guidelines to be able to reply clients' questions, being clear and consistent in our responses.*
*This is to avoid that FAs speculate, guess and invent their responses to clients. Should we have had some clear, true indication upon the inception of this financial crisis, we are sure that SIB wouldn't have experienced so many withdrawals.*
*A client told me that he left SIB because he had heard a FA mentioning that he was estimating that SIB Portfolio may have lost 15% ($ 1,200MM) of its December 2007 value!*
*Please help!*
*Oreste*

From: Pendergest, Laura
Sent: Tuesday, October 28, 2008 12:49 PM
To: Tonarelli, Oreste
Subject: FW: HELP
Importance: High

Hi Oreste,

As promised, below are the answers to your questions.  I hope this helps; please do not hesitate to contact us if you need further information.

1.    There has not been a loss on the portfolio.  If you would refer to the SIBQ Report and allocation, you will notice the private equity is 23% of the portfolio and reflected as part of the 55% equity holdings.  As you are aware, private equity has been a strong performer thus far this year.  While equities have lost, elsewhere the portfolio is holding up well and has positive positioning.
2.    A $235million capital infusion was just made and further deposits will be added as

mhtml:https://rtlegal.ftitools.com/rtl2005/showImage.asp?page_id=660319&main_id=660896&rivPageNu... 5/5/2009

*1*

necessary as has been the mandate of the Board of Directors as has been demonstrated by the 25 year history of Stanford International Bank, Ltd.

    3.    Year to date, there has been net 0.

    4.    The liquidity stands at $1.5billion.

Laura

---

    From: Tonarelli, Oreste
Sent: Sunday, October 26, 2008 8:14 AM
To: Pendergest, Laura
Subject: RE: HELP

Thank you Laura.

I cetainly look forward to your response before talking with the client.

What he expect from me a "cristal clear" sincere response.

Regards

Oreste

---

    From: Pendergest, Laura
Sent: Sun 10/26/2008 6:49 AM
To: Tonarelli, Oreste
Subject: Re: HELP

Hi Oreste,


    I will need to get with Mr. Davis on some of these questions, but I know the information will be readily available.  Worst case scenario, I should be able to get back to you with all of the answers by tomorrow morning.


    Best regards,

    Laura


    On Oct 25, 2008, at 11:14 AM, "Tonarelli, Oreste" < <mailto:OTonarelli@StanfordEagle.com> OTonarelli@StanfordEagle.com> wrote:

        Laura:

        I badly need your help.

2

My US$ 20MM at SIB client (Miyasato) is getting every day more concerned.

I have been able to keep him calm up today. He now telling me that is planning to withdraw his money unless I have convencing arguments that his money is safe at SIB.

(His basic questions - among others - for which I do not have an answer are:

1. How much has been the loss of value of our entire portfolio at the date.

2. How much more contributions to capital is planning Mr. Stanford to offset losses.

3. How much has been as of today the total withdrawals from deposits.

4. How much is the remaining liquidity to honor withdrawals)

Your valuable assistance will be greatly appreciated.

Regards.

Oreste.

3

IN THE HIGH COURT OF JUSTICE                        Case No. [ ] of 2009
CHANCERY DIVISION
COMPANIES COURT

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

RALPH STEVEN JANVEY

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                              Applicant

---

Exhibit KVT11

This is the exhibit "KVT11" signed and sworn to before me, the undersigned notary public in

and for the State of Texas, on the 1 day of June, 2009.

Notary Public
My Commission Expires 6/1/11

Debra Williford
My Commission Expires
06/01/2011



12 February, 2009

Dear Client:

Today *The New York Times* published an article that details how more than 100 regulators descended on the offices of major banking institutions such as Citigroup. Bank of America, JPMorgan Chase and other big banks across the nation. Yesterday, there was a business magazine article about the Stanford Companies. In light of these recent press reports, I believe it is important for you to hear directly from me.

As you know, the Stanford Companies were built on the values set by my grandfather 77 years ago. We have weathered the ups and downs of the markets and we have used the most challenging economic periods to spot opportunities and grow our company in a steady and consistent manner. Our goals have always been simple – to provide hard work, clear vision and value for you, our client. That's not just a catchy motto, it is our guiding principle. By keeping our focus on you, we have developed relationships that have endured generations.

This global economic crisis, the unparalleled turbulence within the financial industry and the recently highly publicized scandals has investors rightly concerned. It is expected that, during these times of heightened market anxiety, the press would focus on covering what could be a potential scandal. I can assure you that we are working diligently to answer all press inquiries and getting our message out there so you can be correctly informed. Please do not get discouraged by what you read in the press, we are hard at work in delivering on our commitment to you.

Regulatory agencies are increasing their oversight of all financial institutions and are responding appropriately after the deficiencies of the last decade. Regulatory officers have visited our offices and have stated that these are routine examinations. I want to assure you that if they find any areas in which we need to improve or modify our operations, we will take immediate action to correct them. You and your confidence in us deserve no less. We have been fully cooperative with the regulators and focused on upholding industry guidelines and standards.

As far as Stanford International Bank is concerned I want to be very clear, the bank remains a strong institution. Without the benefit of billions of taxpayers' money, we have already taken a number of decisive steps to preserve our core capital and to reinforce our financial strength and investment base. We will continue to take whatever steps necessary to protect all the bank's depositors. To illustrate the support we have given the SIB clients over the past few months, we have already added two capital infusions into the bank and are considering additional actions. We have never taken such strong actions before, but the current global economic situation, and in particular the challenges facing our industry, demand bold and significant measures.



You have placed your confidence in the Stanford Companies, and we know you are counting on us more than ever in these uncertain times. I can assure you this company is well-positioned, with the right products to be successful even in this environment. You have always demanded uniqueness and good value from us, and we are dedicated to delivering on that. Our pledge remains clear, to provide hard work, clear vision and value for you, our clients. Thank you for the loyalty and trust you have placed with us, we will continue to work hard on your behalf.

Yours truly,

R. Allen Stanford

R. Allen Stanford

2

**IN THE HIGH COURT OF JUSTICE**                    <u>Case No. [ ] of 2009</u>
**CHANCERY DIVISION**
**COMPANIES COURT**

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

**RALPH STEVEN JANVEY**

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
<u>Applicant</u>

---

**Exhibit KVT12**

This is the exhibit "KVT12" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the ⎩ day of June, 2009.

Notary Public
My Commission Expires ___6/1/11___

Debra Williford
My Commission Expires
06/01/2011

Stanford Group Company

*SIBL Originated Loans - United States - Most Recent Mailing Address*
Available SIBL Data (2008 - February 2009)

| Client Number | Legal Name | Most Recent Ending Balance | Cumulative Most Recent Ending Balance | Cumulative Percent |
|---|---|---|---|---|
| | | ($2,596,938.13) | ($2,596,938.13) | 11% |
| | | ($2,442,838.52) | ($5,039,776.65) | 21% |
| | | ($1,718,712.10) | ($6,758,488.75) | 29% |
| | | ($1,006,703.57) | ($7,765,192.32) | 33% |
| | | ($1,001,263.88) | ($8,766,456.20) | 37% |
| | | ($972,843.55) | ($9,739,299.75) | 41% |
| | | ($896,012.94) | ($10,635,312.69) | 45% |
| | | ($872,682.42) | ($11,507,995.11) | 49% |
| | | ($791,847.34) | ($12,299,842.45) | 52% |
| | | ($752,322.70) | ($13,052,165.15) | 56% |
| | | ($591,958.76) | ($13,644,123.91) | 58% |
| | | ($556,485.01) | ($14,200,608.92) | 60% |
| | | ($516,990.46) | ($14,717,599.38) | 63% |
| | | ($483,540.56) | ($15,201,139.94) | 65% |
| | | ($473,030.09) | ($15,674,170.03) | 67% |
| | | ($406,205.22) | ($16,080,375.25) | 68% |
| | | ($403,794.05) | ($16,484,169.30) | 70% |
| | | ($400,592.83) | ($16,884,762.13) | 72% |
| | | ($388,781.47) | ($17,273,543.60) | 74% |
| | | ($370,939.38) | ($17,644,482.98) | 75% |
| | | ($369,821.52) | ($18,014,304.50) | 77% |
| | | ($305,645.75) | ($18,319,950.25) | 78% |
| | | ($269,936.99) | ($18,589,887.24) | 79% |
| | | ($266,220.99) | ($18,856,108.23) | 80% |
| | | ($264,553.99) | ($19,120,662.22) | 81% |
| | | ($253,152.29) | ($19,373,814.51) | 82% |
| | | ($229,597.29) | ($19,603,411.80) | 83% |
| | | ($225,343.22) | ($19,828,755.02) | 84% |
| | | ($191,218.76) | ($20,019,973.78) | 85% |
| | | ($181,644.98) | ($20,201,618.76) | 86% |
| | | ($167,949.37) | ($20,369,568.13) | 87% |
| | | ($163,555.97) | ($20,533,124.10) | 87% |
| | | ($162,677.71) | ($20,695,801.81) | 88% |
| | | ($145,245.92) | ($20,841,047.73) | 89% |
| | | ($141,915.78) | ($20,982,963.51) | 89% |
| | | ($137,332.21) | ($21,120,295.72) | 90% |
| | | ($128,559.90) | ($21,248,855.62) | 90% |
| | | ($126,269.05) | ($21,375,124.67) | 91% |
| | | ($118,204.63) | ($21,493,329.30) | 92% |
| | | ($110,377.02) | ($21,603,706.32) | 92% |
| | | ($100,490.41) | ($21,704,196.73) | 92% |
| | | ($100,244.13) | ($21,804,440.86) | 93% |
| | | ($91,319.17) | ($21,895,760.03) | 93% |
| | | ($90,072.38) | ($21,985,832.41) | 94% |
| | | ($84,348.96) | ($22,070,181.37) | 94% |
| | | ($80,528.61) | ($22,150,709.98) | 94% |
| | | ($80,198.99) | ($22,230,908.97) | 95% |
| | | ($75,619.06) | ($22,306,528.03) | 95% |
| | | ($75,353.87) | ($22,381,881.90) | 95% |
| | | ($74,868.45) | ($22,456,750.35) | 96% |
| | | ($74,536.59) | ($22,531,286.94) | 96% |
| | | ($73,787.69) | ($22,605,074.63) | 96% |
| | | ($73,415.63) | ($22,678,490.26) | 97% |
| | | ($55,263.22) | ($22,733,753.48) | 97% |
| | | ($54,238.55) | ($22,787,992.03) | 97% |
| | | ($51,742.22) | ($22,839,734.25) | 97% |
| | | ($51,515.02) | ($22,891,249.27) | 97% |
| | | ($51,180.38) | ($22,942,429.65) | 98% |
| | | ($47,832.60) | ($22,990,262.25) | 98% |
| | | ($46,460.73) | ($23,036,722.98) | 98% |
| | | ($43,340.35) | ($23,080,063.33) | 98% |
| | | ($42,434.99) | ($23,122,498.32) | 98% |
| | | ($40,937.14) | ($23,163,435.46) | 99% |
| | | ($31,660.11) | ($23,195,095.57) | 99% |
| | | ($31,301.43) | ($23,226,397.00) | 99% |
| | | ($30,805.72) | ($23,257,202.72) | 99% |
| | | ($30,270.60) | ($23,287,473.32) | 99% |

**Stanford Group Company**

*SIBL Originated Loans - United States - Most Recent Mailing Address*
Available SIBL Data (2008 - February 2009)

| Client Number | Legal Name | Most Recent Ending Balance | Cumulative Most Recent Ending Balance | Cumulative Percent |
|---|---|---|---|---|
| | | ($29,156.41) | ($23,316,629.73) | 99% |
| | | ($28,837.01) | ($23,345,466.74) | 99% |
| | | ($25,076.68) | ($23,370,543.42) | 100% |
| | | ($24,220.69) | ($23,394,764.11) | 100% |
| | | ($20,641.26) | ($23,415,405.37) | 100% |
| | | ($19,984.01) | ($23,435,389.38) | 100% |
| | | ($17,808.03) | ($23,453,197.41) | 100% |
| | | ($12,680.07) | ($23,465,877.48) | 100% |
| | | ($10,157.60) | ($23,476,035.08) | 100% |
| | | ($5,982.19) | ($23,482,017.27) | 100% |
| | | ($1,438.53) | ($23,483,453.80) | 100% |
| | | ($466.68) | ($23,483,920.48) | 100% |
| | | ($35.56) | ($23,483,956.04) | 100% |
| | | ($27.30) | ($23,483,983.34) | 100% |
| | | ($9.35) | ($23,483,992.69) | 100% |
| | | ($23,483,992.69) | | |

2

**IN THE HIGH COURT OF JUSTICE**                                    Case No. [ ] of 2009
**CHANCERY DIVISION**
**COMPANIES COURT**

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

RALPH STEVEN JANVEY

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                                    **Applicant**

---

**Exhibit KVT13**

---

This is the exhibit "KVT13" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the ⌊ day of June, 2009.

Notary Public
My Commission Expires _6/1/11_

Debra Williford
My Commission Expires
06/01/2011

Stanford Financial Group Receivership

Per NHS 2, pages 1 & 3

| Name | Office in Antigua | Employees in Antigua | Function | Headquarters | Company Type | Per TTA Activity VE 2008 Revenue USD | VE 2008 Total Assets USD | Number of Employees 2008 | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Antigua Athletic Club Limited | Yes | Yes | Athletic Club | Antigua | Fitness Club | | | | |
| Bank of Antigua Limited | Yes | Yes | Bank | Antigua | Commercial Bank | $ 854,774.68 | $ 619,322.88 | 44 | |
| Bank of Antigua Ltd Mexico Representative Office | No | No | Representing Bank of Antigua Mexico | Antigua | Rep Office of BoA in Mexico - not a separate entity | 13,441,423.42 | 220,930,474.66 | 107 | |
| Buckingham Investments A/V | UNKNOWN | UNKNOWN | UNKNOWN | Antigua | Holding Company | 33.19 | 2,002.60 | | |
| Caribbean Airlines Services Limited | UNKNOWN | UNKNOWN | UNKNOWN | Antes | Airline Support Services | | 100,460.78 | | Financial Information Not Available |
| Caribbean Star Airlines Holdings Limited | No | No | Holding Co for Caribbean Star Airline | Antigua | Holding Company | | | | As of 3/31/2008 - further financials not available |
| Caribbean Star Airlines Limited | Yes | Yes | Airline | Antigua | Airline | | | | Financial Information Not Available |
| dBra The Pavilion Antigua | Yes | Yes | Restaurant | Antigua | Airline Transport | | | | Financial Information Not Available after 6/31/2007 |
| Devlcious Limited | No | No | House & Land at Jumby Bay (House may have now been developed) | Antigua | Subsidiary of The Stick Wicket Ltd | | | 19 | Subsidiary of The Stick Wicket Ltd |
| Foreign Corporate Holdings Limited (Antigua) | No | No | Holding Company | Antigua | Real Estate (House has been developed) | | | | Financial Information Not Available |
| Gilana Island Holdings Ltd. | No | No | Holding company for Gilana Island property | Antigua | Holding Company | | | | Financial Information Not Available |
| Maiden Island Holdings Ltd. (Antigua) | No | No | Holding company for Maiden Island property | Antigua | Holding Company - Construction and Development | | | | Financial Information Not Available |
| Pelican Island Properties Limited | No | No | Property development - Pelican Island | Antigua | Holding Company - Construction and Development | | 27,347,667.09 | | |
| Polygon Construction A/V (Aruba) | UNKNOWN | UNKNOWN | UNKNOWN | Aruba | Owns Pelican Island Property | | | | Financial Information Not Available |
| Propelis Industries Limited | UNKNOWN | UNKNOWN | UNKNOWN | Antigua | Holding Company | | | | Financial Information Not Available |
| Robust Eagle Limited | No | If you include crew (might not be Antiguan) | Boat and Crew | Antigua | Marine Services | | | | Financial Information Not Available |
| Sea Eagle Limited | No | If you include crew (might not be Antiguan) | Boat and Crew | Antigua | Marine Services | | | | Financial Information Not Available |
| Stanford 20/20 Inc | Yes | Yes | Organizing 20/20 cricket tournament | Antigua | Holding Company for individual "Pro" teams | | | | Financial Information Not Available |
| Stanford Aerospace Limited | | | | UNKNOWN | Aviation Repair Station 145 | | | | Financial Information Not Available |
| Stanford Aviation Limited (Antigua) | Yes | Yes | Handled Private & Corporate Jets visiting SIB | Antigua | Handled Private & Corporate Jets visiting SIB | 81.00 | 152,665.00 | 8 | |
| Stanford Bank Holdings Limited (Antigua) | No | No | Holding Company for Bank of Antigua Limited | Antigua | Holding Company | 4,200,878.15 | 33,728,588.44 | | Revenue is the holding company's portion of BoA revenue. Assets represent an investment in BoA. |
| Stanford Caribbean LLC | Yes | Yes | Regional Management for Antigua | USVI | Owned by R Allen Stanford LLC | | | | Financial Information Not Available |
| Stanford Caribbean Regional Management Holdings, LLC | Yes | No | Holding Company for Stanford Caribbean LLC | USVI | Holding Company | | | | Financial Information Not Available |
| Stanford Development Company (Antigua) | Yes | Yes | Property Development - Gilana Island and Maiden Island property | Antigua | Construction Development | | 300,333,099.26 | 407 | |
| Stanford Financial Group Limited (Antigua) | Yes | Yes | Mgmt Services | Antigua | Administrative Functions | 1,758,650.00 | 32,410,504.00 | 1 | |
| Stanford Group (Antigua) Limited (SGC) | Office space at SIB | Yes | Private Wealth Management Services | Antigua | Investor Advisory Services | 50,097,624.00 | 34,256,489.00 | 43 | |
| Stanford Group Aruba N.V. (Aruba) | No | No | Private Wealth Management Services | Aruba | Investor Advisory Services | 2,041,624.94 | 346,187.04 | 6 | |
| Stanford International Bank Holdings Limited (Antigua) | No | No | Holding Company for SIB | Antigua | Holding Company | | | | Financial Information Not Available |
| Stanford International Bank Limited (Antigua) | Yes | Yes | Bank | Antigua | International Bank | 66,211,372.00 | 8,434,793,838.89 | 66 | |
| Stanford Pro Team Antigua | Yes | Yes | 20/20 cricket | Antigua | Antigua Stanford Cricket Team | | | | Financial Information Not Available |

Stanford Financial Group Receivership

Per NUMB 3, pages 2 & 3

| Name | Office in Antigua | Employees in Antigua | Function | Headquarters | Company Type | Per FTI Analysis | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | YE 2008 Revenue USD | YE 2008 Total Assets USD | Number of Employees 2008 | |
| Stanford Trust Company Limited (Antigua) | Yes | Yes | Trust Company | Antigua | International Trust Business | 18,474,134.34 | 27,462,018.68 | 18 | |
| Stanford Trust Company Limited Representative Office in Colombia | No | No | STC representative office in Colombia | Antigua | Reg Office of STC located in Colombia - not a separate entity | | | 7 | Financial Information Not Available |
| Stanford Trust Holdings Limited (Antigua) | No | No | Holding company for STC | Antigua | Holding Company | | | | Financial Information Not Available |
| Sun Printing and Publishing Limited (formerly True Journalism Limited) (Antigua) | Yes | Yes | Printing Services | Antigua | Holding Company | 2,602,000.00 | 6,357,806.00 | 73 | |
| Sun Printing Limited (Antigua) | UNKNOWN | UNKNOWN | UNKNOWN | Antigua | Printing Business - inactive | | | | Financial Information Not Available |
| The Antigua Sun Limited (Antigua) | Yes | Yes | Newspaper | Antigua | Newspaper | | | | Financial Information Not Available |
| The Islands Club Ltd | Yes | Yes | Guiana Island Project | UNKNOWN | | | 10,120,664.35 | | |
| The Sticky Wicket Limited (Antigua) | Yes | Yes | Restaurant | Antigua | Restaurant | 474,747.42 | 1,927,762.03 | 76 | |

Notes: Amounts originally presented in Eastern Caribbean Dollars were converted to United States Dollars at an exchange rate of ECD 0.3617 per USD.

Sources:
Headquarters Information - Stanford Financial Group of Companies Corporate Data Book, which contains corporate data sheets for the Stanford entities. The country of the "Principle Operating Office" was used to identify the headquarter country.
Revenue and Total Asset Information - IFTG income statement and balance sheets for the above entities, which were prepared by various Stanford employees, and distributed to members of management.
Number of Employees - Stanford Employee phone listing as of February 18, 2009

2

Stanford Financial Group Receivership

### Holding Companies

Buckingham Investments AVV
Caribbean Star Airlines Holdings Limited
Foreign Corporate Holdings Limited (Antigua)
Polygon Commodities AVV (Aruba)
Porpoise Industries Limited (Antigua)
Stanford Bank Holdings Limited (Antigua)
Stanford Caribbean Regional Management Holdings, LLC
Stanford International Bank Holdings Limited (Antigua)
Stanford Trust Holdings Limited (Antigua)
Sun Printing and Publishing Limited (formerly True Journalism Limited) (Antigua)
Guiana Island Holdings Ltd.
Maiden Island Holdings Ltd. (Antigua)
Stanford 20/20 Inc

|  Sub-Total | 13 |

### Entities Headquartered Other than Antigua

Buckingham Investments AVV
Polygon Commodities AVV (Aruba)
Stanford Caribbean LLC
Stanford Caribbean Regional Management Holdings, LLC
Stanford Group Aruba N.V. (Aruba)

|  Sub-Total | 5 |

### Known Non Revenue Generating Entities

Caribbean Airlines Services Limited
Robust Eagle Limited
Sea Eagle Limited
Pelican Island Properties Limited
Devinhouse Limited
Stanford Development Company Limited (Antigua)
The Islands Club Ltd

|  Sub-Total | 7 |

### Property or Single Asset Ownership Entities (non revenue generating)

Robust Eagle Limited
Sea Eagle Limited
Pelican Island Properties Limited
Devinhouse Limited

|  Sub-Total | 4 |

### Inactive Entities

Stanford Aerospace Limited (Antigua)
Sun Printing Limited (Antigua)

|  Sub-Total | 2 |

### Parent-Subsidiary Entities

d/b/a The Pavilion Antigua
The Sticky Wicket Limited (Antigua)

|  Sub-Total | 2 |

### Representative Offices Counted as Separate Entities

Bank of Antigua Ltd Mexico Representative Ofc
Stanford Trust Company Limited Representative Office in Colombia

|  Sub-Total | 2 |

### Remaining Entities

Stanford Financial Group Limited (IBC)
Caribbean Star Airlines Limited
Stanford Pro Team Antigua
Bank of Antigua Limited (Antigua)
Antigua Athletic Club Limited
Stanford Aviation Limited (Antigua)
Stanford International Bank Limited (Antigua)
Stanford Trust Company Limited (Antigua)
Stanford Group (Antigua) Limited
The Antigua Sun Limited (Antigua)

|  Sub-Total | 10 |

3

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**Case No. [ ] of 2009**

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC. (IN RECEIVERSHIP)**
**AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS 2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**

**Applicant**

---

**Exhibit KVT14**

This is the exhibit "KVT14" signed and sworn to before me, the undersigned notary public in and for the State of Texas, on the $\underline{1}$ day of June, 2009.

Notary Public
My Commission Expires $\underline{6/1/11}$

NOTARY PUBLIC
STATE OF TEXAS
Debra Williford
My Commission Expires
06/01/2011

# THE STICKY WICKET LIMITED

**PRINCIPAL OPERATING OFFICE:**
New Address: No. 20 Pavilion Drive
St. John's Antigua W.I.

Old Address: 7000 Airport Blvd.
St. John's, Antigua, W.I.

**INCORPORATION:**

COMPANY NO.: 4192
TAX ID NO.:

Date:        1/12/01
Country:     Antigua and Barbuda
(note: Incorporated under The Companies Act of Antigua & Barbuda
1995; No. 18 of 1995)

**ANNUAL STOCKHOLDERS' MEETING:**
Date:        Annually, at such time agreed to by the Board of Directors
Location:    At any place agreed to by the Board of Directors.

**RESIDENT AGENT IN COUNTRY OF INCORPORATION:**
Cort & Associates
44 Church Street
St. John's, Antigua

**BUSINESS:**
Restaurant

**QUALIFIED TO DO BUSINESS IN: ANTIGUA AND BARBUDA**

**CAPITAL STOCK:**
Authorized:  10,000 @ EC $1.00 par
Total:       10,000
Issued: .    1,000
Ownership:   100% Stanford Development Company Limited

**OFFICERS: (As of 02/12/04)**
President:              Linda Wingfield
Chairman of the Board: R. Allen Stanford
Secretary:             Yolanda M. Suarez

**DIRECTORS: (As of 06/27/03)**
R. Allen Stanford
Yolanda M. Suarez

**BY LAWS / ARTICLES OF INCORPORATION / MINUTE BOOK / CORPORATE SEAL KEPT AT:**
5050 Westheimer, Houston, TX 77056

**RESPONSIBLE:**     Legal Department in Houston     Phone: 713 964-5244

Revised: 05/25/06

Data Sheet The Sticky Wicket Limited

*l*

## THE PAVILION-ANTIGUA (dba under The Sticky Wicket Limited)

**PRINCIPAL OPERATING OFFICE:**
New Address:  No. 7 Pavilion Drive
St. John's Antigua, W.I.

**INCORPORATION:**                              COMPANY NO.: 4478
Date:  09/26/2002                        TAX ID NO.:
State:  Antigua & Barbuda
(note: Business Name under the Business Name Registration Act, 1989)

**ANNUAL STOCKHOLDERS MEETING:**
Date:            Annually
Location:      Per stated notice of meeting

**RESIDENT AGENT IN STATE OF INCORPORATION:**
Cort & Associates
44 Church Street, P.O. Box 2010
St. John's, Antigua

**BUSINESS:**     Hospitality

**QUALIFIED TO DO BUSINESS IN:** Antigua & Barbuda

**CAPITAL STOCK:**
Ownership:     The Sticky Wicket Limited

**OFFICERS:**
Chairman of the Board   R. Allen Stanford
President:              Linda Wingfield
Secretary:             Yolanda M. Suarez

**DIRECTORS:** (Same as the Sticky Wicket Limited)

**BY LAWS / ARTICLES OF INCORPORATION / MINUTE BOOK KEPT AT:**
Same as The Sticky Wicket Limited

**RESPONSIBLE:**     Legal Department in Houston   PHONE: 713 964-5244

Revised: 05/25/06

Data Sheet The Pavilion-Antigua

2

**IN THE HIGH COURT OF JUSTICE**                    **Case No. [ ] of 2009**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**
                                                                    **Applicant**

---

**Exhibit KVT15**

This is the exhibit "KVT15" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the ⊥ day of June, 2009.

Notary Public
My Commission Expires _6/1/11_

Debra Williford
My Commission Expires
06/01/2011

STANFORD INTERNATIONAL BANK LIMITED
2006 Operating Plan - Projection

**Parameters**
New Money
Fixed Assets Growth
Advances to Customers and Other Accounts
Other Assets

Spread

**Plan 2006**
Noninterest Income % of Portfolio
Interest Income % of Portfolio
Management Fee % of Client Deposits

**ASSETS**
Cash and Deposits with Other Banks
Investments at Fair Value
Advances to Customers and Other Accounts
Fixed Assets - growth of 1%/yr
Other Assets
TOTAL ASSETS

**LIABILITIES AND SHAREHOLDERS EQUITY**
Client Deposits
Accounts Payable and Accruals
TOTAL LIABILITIES
SHAREHOLDERS EQUITY
Share Capital Authorized
Share Premium Account - Initial fund
Retained Earnings - Prior Year
Current Year Results
TOTAL SHAREHOLDERS EQUITY
TOTAL LIABILITIES AND EQUITY

**Income Statement Calculations**
Investment Income
Noninterest Interest Income
Interest Income Other
Other Income

Interest Expense
Express Accounts
Performance Accounts
FixedCD
FloatCD
ILCD

Management Fee calculation
Referral Fee calculation

Gross Revenue

| | Dec-06 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



2

**IN THE HIGH COURT OF JUSTICE**                    <u>Case No. [ ] of 2009</u>
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**
                                                                 **Applicant**

---

**Exhibit KVT16**

---

This is the exhibit "KVT16" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the _1_ day of June, 2009.

Notary Public
My Commission Expires _6/1/11_

Debra Willford
My Commission Expires
06/01/2011

BANK OF HOUSTON, HOUSTON, TX



Sign Out                    Options
Summary  |  Accounts  |  Funds Management  |  Administration  |  Review  |  Print                    Help
Balances  |  Transactions  |  Stop Payments

8284 SIBL MMKT          8284: Account Information as of 05/26/2009 4:01 PM CDT

| Account Information | |
| --- | --- |
| Average Ledger Balance Current Month: | .00 |
| Average Ledger Balance 2009: | 178,428.78 |
| Average Ledger Balance 2008: | 42,467,981.86 |
| Last Deposit:         12/19/2008 | 4,065,047.20 |
| Last Check:          03/02/2009 | 1,402.27 |

| Account Activity | |
| --- | --- |
| Current Balance: | .00 |
| Presentments: | .00+ |
| Anticipated Balance: | .00 |

| Available Funds | |
| --- | --- |
| Current Balance: | .00 |
| Holds: | .00 - |
| Available Balance: | .00 |
| Presentments: | .00+ |
| Anticipated Available Balance: | .00 |
| Total Funds Available: | .00 |

| Interest Information | |
| --- | --- |
| Current Accrued Interest: | .00 |
| Last Interest:         04/30/2009 | .00 |
| Interest Paid 2009: | 1,401.27 |
| Interest Paid 2008: | 963,675.26 |

| Interest Rate | |
| --- | --- |
| Current Interest Rate: | .0000% |

MEMBER FDIC     EQUAL HOUSING     BUSINESS BILL PAY     POSITIVE     TRUSECURE     VERISIGN
                LENDER                                  PAY
Copyright Information Technology, Inc. 2001 - 2009

https://www.fiservsa1.com/ebc_ebc1961/EBC1961.ASP?WCI=Process&STU=34CF30C8...    5/26/2009

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**                                      <u>Case No. [ ] of 2009</u>

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC. (IN RECEIVERSHIP)**
**AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS 2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**
**Applicant**

---

**Exhibit KVT17**

This is the exhibit "KVT17" signed and sworn to before me, the undersigned notary public in and for the State of Texas, on the _1_ day of June, 2009.

Notary Public
My Commission Expires _6/1/11_

Debra Williford
My Commission Expires
08/01/2011

Stanford Financial Group Receivership
Month End 2008 Balance of SIBL's Bank of Antigua Accounts

| | 1/30/2008 | 2/28/2008 | 3/31/2008 | 4/29/2008 | 5/30/2008 | 7/1/2008 | 7/30/2008 | 8/27/2008 | 9/30/2008 | 10/31/2008 | 11/30/2008 | 12/30/2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bank of Antigua | $ 93,714.36 | $(112,723.49) | $127,554.39 | $200,164.61 | $38,629.04 | $(14,339.00) | $27,841.00 | $43,275.00 | $51,503.00 | $128,716.00 | $240,461.00 | $ 197,025.00 |
| Bank of Antigua | 557,603.90 | 375,718.99 | 408,639.63 | 469,934.44 | 508,560.48 | 545,544.00 | 624,179.00 | 653,927.00 | 689,751.00 | 745,841.00 | 6,745,641.00 | 9,771,936.00 |
| **Total** | **651,318.26** | **262,995.50** | **536,194.02** | **669,099.05** | **547,189.52** | **531,205.00** | **652,020.00** | **697,202.00** | **741,254.00** | **872,557.00** | **6,986,302.00** | **9,968,961.00** |

Note: The dates presented are the dates closest to the month end date for which a Daily Cash Report was found. 7/1/2008 was used for June as the lastest date found for June was 6/19/2008.

Average balance for January 2008 through October 2008        $ 615,503.44

Source: Daily Global Cash Report of the Stanford entities, for the dates listed.
Prepared for and sent to Stanford Financial Group management.

**IN THE HIGH COURT OF JUSTICE**            **Case No. [ ] of 2009**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC. (IN RECEIVERSHIP)**
**AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS 2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**
**Applicant**

---

**Exhibit KVT18**

This is the exhibit "KVT18" signed and sworn to before me, the undersigned notary public in and for the State of Texas, on the ___ day of June, 2009.

Notary Public
My Commission Expires _____

Debra Williford
My Commission Expires
06/01/2011

Preview Payment - Trustmark National Bank Online                                   Page 1 of 2

 **Trustmark**
Banking and Financial Solutions

◯ Messages  ◯ Admin  ◯ Help
                              ◯ Exit
ACCOUNTS      PAYMENTS      TRANSFERS      SERVICES

◇                    ◇                    ◇
  Payments            Templates            Recipients

# Preview Payment
Use this screen to preview wire payment information.

**Payment Information**

       Payment Description: SIB SIB-Bank of Antigua-USD
       Payment Type: Wire

[ View Audit History ▷ ]

       Destination Currency: US Dollar
       Pay From: 01-01707 SIBL Sweep -- 3003101707

       Total Maximum Payment Amount:
       Amount: $6,000,000.00
       Memo Line 1:

       Memo Line 2:

       Memo Line 3:

       Memo Line 4:

       Sender's Reference: R30-154001

       Authorization Memo:
       Effective Date: 11/13/2008
       Frequency One Time Only

**Recipient Information**

       Recipient Name: Stanford International Bank Limited

       Recipient ID: SIBLUSDClientAcctBankOFAntigua

       Street Address: No 11 Pavilion Drive
       City: St. John's, Antigua, West Indies
       Country: Antigua and Barbuda
       State/Region:
       Postal Code:

       Phone Number: 268.480.3773
       Email Address:

**Primary Account Information**

       Account Number: 60734
       Account Currency: US Dollar
       Account Name: Stanford International Bank Ltd
       Account Type: Checking

       Bank Identifier: ANTIAGAG
       Bank ID Type: SWIFT
       Bank Name: Bank of Antigua Limited
       Address: 1000 Airport Boulevard
       Bank of America Acct No. 6550852033
       City: St. Georges
       State/Region:

https://trustmark.openbank.com/fi3036/bb/protected/bbdisb/wireModify                    11/13/2008

*1*

Preview Payment - Trustmark National Bank Online

Page 2 of 2

|  | Country: | ANTIGUA AND BARBUDA |
|---|---|---|
|  | Postal Code: | ANTIGUA |

**Intermediary Bank Information**

Bank Identifier: 026009593
Bank ID Type: ABA
Bank Name: Bank of America International
Street Address: 100 West 33rd Street

City: New York
State/Region: NEW YORK
Country: UNITED STATES
Postal Code: 10001

**Password Required**

You are required to enter your password to complete this instruction.
Please enter your password to continue.

Enter Password:                    *

                     

ACCOUNTS | PAYMENTS | TRANSFERS | SERVICES
Copyright Information

                     

https://trustmark.openbank.com/fi3036/bb/protected/bbdisb/wireModify

11/13/2008

2

**IN THE HIGH COURT OF JUSTICE**                    Case No. [ ] of 2009
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006**

**RALPH STEVEN JANVEY**

**(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)**
                                                          **Applicant**

---

**Exhibit KVT19**

This is the exhibit "KVT19" signed and sworn to before me, the undersigned notary public in
and for the State of Texas, on the ⎿ day of June, 2009.

Notary Public
My Commission Expires ___6/1/11___

Debra Williford
My Commission Expires
06/01/2011

| SvcnCo TRN (TID) RID | O_ValDt (TSAV) O_BkDt | O_Amt | O_Ccy | O_Frt | O_Rcl | O_Url | O_Ctr | O_Spec/Proc | O_Open/Instr (TESAV) | O_Opt/Cust Id (O/BSD) | O_Opt/Inst Id (TESAV) | O_Bec Bk/Id (TESAV) | O_Bant/Acct Id (TRN (RNG)) | O_Bant/Id (TESAV) | Account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 395 08120025607280 | 02-Dec-08 USD | 3,000,000.00 | 16189 | 09122028A 06120228A 16189 16189 | 292 | 8 | | BOFAUS3NBEH ANITIAGAOXXX | | JO89001216529 | BOFAUUS3NXXX | ANITIAGAOXXX /ESAV | N550852033 | Debit | 36001216529 |

IN THE HIGH COURT OF JUSTICE                          Case No. [ ] of 2009
CHANCERY DIVISION
COMPANIES COURT

IN THE MATTER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.
(IN RECEIVERSHIP)
AND IN THE MATTER OF THE CROSS BORDER INSOLVENCY REGULATIONS
2006

RALPH STEVEN JANVEY

(AS RECEIVER OF STANFORD INTERNATIONAL BANK, LTD., STANFORD
GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, ROBERT ALLEN
STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, STANFORD
FINANCIAL GROUP, AND THE STANFORD FINANCIAL GROUP BUILDING INC.)
                                                              **Applicant**

_____

Exhibit KVT20

_____

This is the exhibit "KVT20" signed and sworn to before me, the undersigned notary public in

and for the State of Texas, on the __ day of June, 2009.

_____

Notary Public
My Commission Expires __6/1/11__

Rcvd 11/12/08 Logged 11/13 🖉 Funded? Yes/No/Today/TM8

Value date 11/13/08 Initiated by: JM Approved by 🖉 Email Conf# Yes/No

**Patlan, Tarrie**

| | |
|---|---|
| **From:** | Davis, James |
| **Sent:** | Wednesday, November 12, 2008 12:31 PM |
| **To:** | Maldonado, Patricia |
| **Cc:** | Patlan, Tarrie; Lopez, Gil |
| **Subject:** | RE: SIBL Cash Balances (TXT Format) |
| | |
| **Categories:** | SIBL, Wire |

D. Cort
D. williams
J. Davis
G. Lopez
O. Osbourne

Xfer, val tomorrow, Nov 13th, 6mm USD from an account below to the SIB USD a/c at BofAnu.

JMD

-----Original Message-----
From: Maldonado, Patricia
Sent: Tuesday, November 11, 2008 4:09 PM
To: Davis, James
Cc: Patlan, Tarrie
Subject: FW: SIBL Cash Balances (TXT Format)

Please see positions today. Tarrie will update me on client outgoings for tomorrow. We are moving funds from Comerica 10MM tomorrow and will most likely drawn down on CAN and GBP positions next. When can we get some relief from second tier?

Regards,
Patricia C. Maldonado
Treasury Manager
Stanford Financial Group

-----Original Message-----
From: Patlan, Tarrie
Sent: Tuesday, November 11, 2008 12:05 PM Central Standard Time
To: Maldonado, Patricia
Subject: SIBL Cash Balances (TXT Format)


CASH REPORT

Monday, November 10, 2008


BANK BAL

BOA - XCD     65,818


1