UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | CR. NO.4:09-342-01 |
| | § | |
| | § | |
| ROBERT ALLEN STANFORD | § | |

## DEFENDANT ROBERT ALLEN STANFORD'S MOTION TO DISMISS AND/OR SUPPRESS BASED ON VIOLATIONS OF THE FOURTH AND FIFTH AMENDMENT

TO THE HONORABLE DAVID HITTNER, UNITED STATES DISTRICT JUDGE FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION:

COMES NOW Robert Allen Stanford ("Mr. Stanford," herein), by and through his attorneys of record, and respectfully moves, pursuant to the Due Process, Double Jeopardy and Takings Clauses of the Fifth Amendment to the United States Constitution, and the Fourth Amendment to the United States Constitution, that this Honorable Court (1) dismiss the indictment, (2) suppress all evidence provided to the government by the Receiver and/or his agents, and all evidence derived directly or indirectly therefrom, and/or (3) order discovery and an evidentiary hearing to determine, *inter alia*, (a) the extent to which the government has controlled, supervised, coordinated with

and/or instructed the Receiver and its agents (including the law firm Baker Botts and FTI Forensics and Litigation Consulting, Inc.) regarding tasks to be performed to further the government's investigation and prosecution of Mr. Stanford, and (b) the extent to which the government acted in concert with the Securities and Exchange Commission ("SEC," herein), in submitting the application for receivership in the parallel SEC proceeding in the United States District Court for the Northern District of Texas (Lindsay, J.), and whether material facts were omitted from the application, such as the government's intent to utilize the Receiver and SEC to further its investigation and prosecution.

*This motion addresses an extraordinary, if not unprecedented, example of a citizen's constitutional rights being profoundly violated by the government through its utilization of a civil process that at its essence constituted punishment without a trial, all in violation of the most fundamental of liberties conferred by the Fourth and Fifth Amendments.* As detailed in Section I of this memorandum, there has been an extraordinary exploitation of the receivership imposed in the parallel SEC litigation, whereby the government has utilized the Receiver's expansive access to personal and corporate records, as well as an army of private lawyers, forensic accountants and other consultants to further its investigation and

prepare its prosecution of Mr. Stanford, all of which has been funded by the global seizure and liquidation of Mr. Stanford's personal and corporate assets. In a system of justice that strives to achieve a balance of power between the government and those citizens accused of federal offenses, *see Wardius v. Oregon*, 412 U.S. 470, 474 (1973) ("Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, it does speak to the balance of forces between the accused and his accuser."), that balance has been unconstitutionally and irremediably thrust in favor of the government through its use of the receivership. The criminal justice system has a constitutional obligation to provide a defendant a fundamentally fair trial. *See Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"). That fairness evaporates, however, when the government is permitted, through a Receiver who is subject to an Order requiring him to facilitate other investigations, to seize, liquidate, and utilize the personal and corporate assets of the accused, here Mr. Stanford, to fund and further its investigation and prosecution, yet concomitantly denies Mr. Stanford the ability to use one penny of those very same assets to fund his defense. As detailed in Part 1 of this memorandum, the deep interdependence of the

prosecution and the receivership imposed in the parallel SEC litigation violates Mr. Stanford's Fifth Amendment guarantee of due process, substantively to the extent the government has been permitted to freely use Mr. Stanford's personal and corporate assets to further its investigation and prosecution, *through the extraordinary if not unprecedented* use of the Receiver, and procedurally to the extent the government (through the Receiver) has been permitted to take all of Mr. Stanford's property without affording him any meaningful opportunity to contest that permanent deprivation of property.[1]   Indeed, the process provided to Mr. Stanford to contest the Receiver's worldwide seizure of all his property and worldly possessions, and subsequent substantial liquidation, fell short of even the civil and criminal forfeiture provisions ordinarily relied upon to freeze, seize and forfeit (after judgment) property derived from criminal conduct.[2]

---

[1] It should be noted that as a result of the SEC takeover of Mr. Stanford's U.S. domiciled businesses on February 17, 2009, a substantial portion of Mr. Stanford's personal and/or corporate assets located in Latin America and Europe were seized by Antiguan authorities or taken over by foreign governments where those businesses or assets were domiciled, rather than the U.S. Receiver.  Hence, where the instant pleading refers to the seizure of "all" assets, it refers to assets seized other than those seized by the Antiguan authorities or other foreign governments.  In any event, as noted herein, the Receiver has seized billions of dollars of Mr. Stanford's worldwide assets.

[2] In a recently filed interim status report that illustrates *in part* the extraordinary liquidation of assets, the Receiver observed that its activities "will include continuing liquidation of the coins and bullion inventory, liquidation of 29 real estate holdings, finalizing pending sales of 12 private

Second, as set forth in Part 2 of this memorandum, the punishment imposed upon Mr. Stanford in connection with the ancillary civil suit filed by the SEC has been "so punitive" in both "purpose and effect" as to render this instant prosecution forbidden by the Double Jeopardy Clause of the Fifth Amendment. *See, e.g., United States v. Ursery*, 518 U.S. 267, 289 n.3 (1996) ("Nevertheless, where the 'clearest proof' indicates that an *in rem* civil forfeiture is 'so punitive either in purpose or effect' as to be equivalent to a criminal proceeding, that forfeiture may be subject to the Double Jeopardy Clause"). Through the construct of the Receiver imposed in the parallel SEC litigation, Mr. Stanford has been stripped of all of his possessions and assets, personal and corporate worldwide, which were valued in the *billions* of dollars. Not only has the Receiver taken possession of Mr. Stanford's assets worldwide, but he immediately began an *extraordinary if not unprecedented* liquidation of these assets, before any final adjudication (civil or criminal), forever depriving him the opportunity to vindicate his rightful ownership of those personal and corporate assets. Mr. Stanford was literally left with only the suit he was wearing at the time

---

equity investments, sale of 18 additional private equity investments, liquidation of assets and entities in Latin America . . . and liquidation of other miscellaneous assets, including boats, office furniture, other personality, etc." *See* Receiver's Interim Report Regarding Status of Receivership, Asset Collection and Ongoing Activities, Case No. 09-cv-00298-N, Dkt. Entry 1117, at 13.

of the SEC take-over on February 17, 2009; the government even seized his underwear.  Through the punitive actions of the SEC and the Receiver's worldwide seizure and subsequent liquidation and disposal of his personal and corporate assets, Mr. Stanford has suffered punishment in the constitutional sense, and the instant prosecution is thus barred by the Double Jeopardy Clause.

Finally, the government has used the receivership to unconstitutionally seize and search a vast universe of personal and corporate documents, including laptops, computer hard drives, flash drives and emails, without regard for the Fourth Amendment's probable cause and particularity requirements.  As set forth in Part 3 of this memorandum, the government cannot ignore the probable cause and particularity requirements of the Fourth Amendment, and circumvent centuries of law in the process, by seizing the defendant's possessions through the construct of a Receiver—an agent of the prosecution—rather than directly from Mr. Stanford.  The Fourth Amendment was clearly violated as shown by the demonstrable proof that the Receiver acted as an arm and agent of the prosecution in the Receiver's repeated practice of searching, seizing, and then providing to the government the fruits of such searches and seizures, and its further practice of liquidating the seized Stanford property and using the fruits to fund

experts, attorneys, and investigators thereafter providing the government with the work product of their forensic and investigatory work.

## REQUEST FOR HEARING

Mr. Stanford hereby requests an evidentiary hearing in this matter, which is necessary and appropriate to resolve the issues raised herein.

## PART 1: VIOLATIONS OF DUE PROCESS AND TAKINGS CLAUSES

I.      *Introduction*

The Supreme Court has held:

> the Due Process Clause protects individuals against two types of government action. So-called "substantive due process" prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). This requirement has traditionally been referred to as "procedural" due process.

*United States v. Salerno*, 481 U.S. 739 (1987).

Here, as demonstrated in detail *infra*, the government has violated Mr. Stanford's substantive and procedural due process rights by utilizing the

7

Receiver, and the extraordinary powers and access bestowed upon the Receiver, to further its investigation and prosecution of Mr. Stanford. Mr. Stanford was not present nor represented by counsel during the hearing at which the Receiver was appointed, the court ordered no compensation to Mr. Stanford for the seizure or liquidation of his global assets (further compromising Mr. Stanford's ability to defend himself), and, incredibly, the liquidated assets have been utilized to fund the SEC's and government's investigation of Mr. Stanford and the preparation of the government's case against him. The Receiver – which are typically appointed with limited enumerated powers geared towards locating and preserving assets – has, along with the SEC, taken such a dominant role in the preparation of the criminal case (including using the defendant's own liquidated funds for the purpose of bolstering the prosecution of the defendant) that there has been an improper privatizing of the prosecution and exploitation of the parallel civil proceeding (with its separate and more encompassing discovery and compulsion processes than is lawful or available, post-indictment, in the government's criminal investigation and prosecution of a citizen). Mr. Stanford's procedural and substantive due process rights have been violated in myriad ways.

First, the government has utilized the Receiver to conduct a post-indictment investigation of Mr. Stanford (*i.e*., when the grand jury and its concomitant compulsory process and investigative powers remain unavailable to the government) and to collect and analyze the vast reservoir of documents that would otherwise remain unavailable to the government. This has undoubtedly and unconstitutionally greatly assisted the prosecutor in preparing for the criminal trial. Second, exacerbating the prejudice and grossly unfair composition of these events is that every minute of time spent by the Receiver (and the army of lawyers, forensic accountants, and consultants at his disposal) to assist the government in its investigation and prosecution of Mr. Stanford is, incredibly, being funded by Mr. Stanford himself, through the Receiver's dissipation of his personal assets and global business empire.[3]  As of September 2010, the Receiver and his agents have been either paid or approved to be paid more than $45 million dollars for their work—with every penny of this money coming from Mr. Stanford's personal or corporate assets.  Third, through its exploitation of the Receiver's work, the government is utilizing the very same assets to prepare

---

[3] For example, in a responsive pleading defending his first interim request for fees, the Receiver asserted that 101 Baker Botts attorneys, 108 FTI professionals, and 70 Ernst and Young professionals rendered services to the Receiver in the first 8 weeks after his appointment.  Receiver's Reply to Objections to First Request for Interim Fees, Case No. 09-cv-00298-N, Dkt. Entry 494, at 17.

itself for trial that remain unavailable to Mr. Stanford to fund his defense. Fourth, by converting the Receiver into its own privately funded army, the government has caused the Receiver to vastly exceed the powers ordinarily bestowed upon Receivers by courts in parallel civil proceedings.

This government conduct, detailed *infra*, clearly violates the due process clause, as it (1) constitutes an "arbitrary taking" of Mr. Stanford's property without any adequate hearing, (2) constitutes an intolerable abuse of a parallel civil proceeding, (3) constitutes a taking without any compensation, (4) strips from this prosecution any sense of fundamental fairness or justice, and (5) irreversibly and unconstitutionally unhinges the balance of power by permitting the government to abrogate to itself Mr. Stanford's private funds to support the government's investigation and prosecution, when those very same resources remain unavailable to Mr. Stanford to fund his own defense.  In total, the factual circumstances limned herein violate principles implicit in the concept of ordered liberty, they transgress established principles of private right and distributive justice, and they ultimately shock the universal sense of fairness and justice.

As such, for the reasons articulated herein, Mr. Stanford requests the following remedies:

1. The indictment should be dismissed as the government's conversion of the Receiver into a prosecutorial arm, at the expense of and funded

by the liquidation of Mr. Stanford's personal and corporate assets, violates Due Process.

2. Any and all evidence obtained from the Receiver and/or the SEC, directly or indirectly, and any or all information derived directly or indirectly from that evidence, must be suppressed, including but not limited to any and all information derived directly or indirectly from the work of Baker Botts, FTI Forensics and Litigation Consulting, Inc., or any other agent working on behalf of the Receiver.

3. Order discovery and an evidentiary hearing to determine, *inter alia*, (a) the extent to which the government has controlled, supervised, coordinated with or instructed the Receiver and its agents regarding tasks to be performed to further the government's investigation and prosecution of Mr. Stanford, (b) the extent to which the government has utilized the Receiver (or other receivers), FTI (or other similar agents), and Baker Botts (or other law firms) in similar fashion in other prosecutions, and (c) the extent to which the government acted in concert with the SEC in submitting the application for receivership and whether material facts were omitted from the application, such as the government's intent to utilize the Receiver and the SEC to further its investigation and prosecution of Mr. Stanford.

II.   *Relevant facts*.

Mr. Stanford was indicted on June 18, 2009, at which time he surrendered to authorities in Fredericksburg, Virginia. Four months prior to his indictment, on February 17, 2009, in the Northern District of Texas, the SEC filed a civil complaint, as well as a motion for temporary restraining order and other emergency relief. In that ancillary civil proceeding, titled *Securities and Exchange Commission v. Stanford International Bank, LTD., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt* (Case Number 09-cv-00298-N) ("*SEC v. SIB, LTD et al.*, *Northern District of Texas*," herein), the

11

SEC moved for an order appointing a Receiver, "with the power to marshal, conserve and, where necessary, operate the assets."  *SEC v. SIB, LTD, et al., Northern District of Texas*, Case No. 09-cv-00298-N, Dkt. Entry 9.

On or about February 17, 2009, after a hearing in which Mr. Stanford was not represented by counsel, the court issued an order appointing the requested Receiver, noting it was "both necessary and appropriate in order to prevent waste and dissipation of the assets of Defendants to the detriment of the investors."[4]  *SEC v. SIB, LTD, et al., Northern District of Texas*, Case No. 09-cv-00298-N, Dkt. Entry 10, at 1.  As such, the court assumed exclusive jurisdiction and took possession of (1) the assets, monies, securities, properties, and legally recognized privileges (with regard to the entities) ("Receivership Assets"), and (2) the books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers, telephones, personal digital devices and other informational resources of or in possession of defendants, or issued by defendants and in possession of any agent or employee of defendants ("Receivership Records"), and therein appointed the Receiver for the Receivership Assets and Receivership

---

[4] The appointment of the Receiver during a hearing at which Mr. Stanford had no legal representation denied Mr. Stanford the opportunity to meaningfully object to the appointment, and the process of the appointment violated Mr. Stanford's right to due process of law.

Records (collectively, "Receivership Estate"), with "the full power of an equity receiver under common law as well as such powers" as were enumerated in the Order.  *SEC v. SIB, LTD, et al., Northern District of Texas*, Case No. 09-cv-00298-N, Dkt. Entry 10 (Order attached hereto as Exhibit 1).  The Order proceeded to enumerate the powers of the Receiver, which were largely geared towards collecting, marshalling and taking custody, control and possession of receivership assets and records.  *SEC v. SIB, LTD, et al., Northern District of Texas*, Case No. 09-cv-00298-N, Dkt. Entry 10, at Par. 5(a)-(m).  Additionally, the court also empowered the Receiver to "[p]romptly provide the United States Securities and Exchange Commission and *other governmental agencies* with all information and documentation they may seek in connection with its regulatory or investigatory activities."  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 10, at Par. 5(k) (emphasis added).[5]

---

[5] On March 12, 2009, an order amending the receivership order was granted. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 157. Once again, Mr. Stanford was not represented by counsel at this hearing.  *See* Transcript, March 12, 2009, attached hereto as Exhibit 2, at 3 (Court: "I am advised that we do not anticipate that Mr. Meadows will appear on behalf of Mr. Stanford or anyone else. Does anybody know anything different than that?; "No, Your Honor"; Court: "Okay. I'm happy to wait for a while if we think someone will make another last-second entry. But, in seriousness, I take it nobody anticipates that."; "We do not, Your Honor"). On information and belief, there was laughter by the parties present

As set forth in detail below, from this platform, the government derived a mandate to employ the Receiver and its agents, including the law firm Baker Botts and FTI Forensics and Litigation Consulting, Inc., among others, as if they were another investigatory agency within the Department of Justice. The extent to which the government has tasked the Receiver and the other professional firms hired by the Receiver can be gleaned from a review of pleadings filed in the ancillary civil matter (including the Receiver's requests for payment of fees on an interim basis), as well as discovery indices provided to the defense by the government in this case. An analysis of these materials illuminates the extent to which the government has tasked the Receiver to further its investigation and prosecution of Mr. Stanford, and how the government has leveraged the appointment of the Receiver to unconstitutionally and unlawfully further its investigation and prosecution of Mr. Stanford.

      a.    *Receiver's Request for Interim Fees and Supporting Billing Records*.

On May 15, 2009, the Receiver filed its first request for approval of interim fees. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 384. It has since filed seven additional requests for

---

after the Court made its comment regarding "another last-second entry," which prompted the "But, in seriousness" comment.

payments of interim fees (thus totaling eight (8) requests), the last being filed on September 14, 2010 for the time period of May 1, 2010 to June 30, 2010. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entries 384-385 (First, May 15, 2009), 669, 671, 754-55 (Second, August 4, 2009), 820-21, 874 (Third, October 2, 2009), 914-915, 973-74 (Fourth, December 11, 2009), 1033-34, 1056 (Fifth, March 11, 2010), 1084-85, 1092 (Sixth, May 14, 2010), 1132-33 (Seventh, July 20, 2010), and 1163-64 (Eighth, September 14, 2010).

The Receiver has hired many additional professional firms ostensibly to assist the Receiver in fulfilling its court ordered mandate, each of which have sought and received astronomical fees for their services.[6] As of August 11, 2010, when the court granted the Receiver's seventh request for interim fees, more than $43 million dollars has been paid from Mr. Stanford's personal and corporate liquidated assets for the work performed by the Receiver and its army of attorneys, forensic accountants, and other consultants. *The pace of spending is truly astounding*—in its most recent request for interim fees, the Receiver billed $2,360,559.39 in fees and

---

[6] For example, for services rendered through April 12, 2009 (for less than two months work), FTI Forensics and Litigation Consulting, Inc., billed $6,102,396.40 (and $562,869.25 in expenses), Ernst & Young billed $3,751,885 and Thompson & Knight billed $1,842,031.60 (and $69,533.39 in expenses). *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 385, at Exhibits D, E and F.

expenses for the two months of May and June 2010, and sought immediate payment of $1,888,447.53 (the reduction reflecting the court's order that 20% of fees and expenses be held back, subject to the Receiver later seeking that compensation). *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 1163, at 3. In its seventh request for interim fees, the Receiver billed $4,010,533.60 for the two months of March and April 2010 and sought a "reduced" payment of $3,208,426.87, which was granted by the Court with a notation that the Receiver could later apply for the remaining amounts. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 1151.[7] Obviously, the Receiver and its agents have performed work unrelated to assisting the government in its investigation and prosecution of Mr. Stanford, but there is undeniable proof that the Receiver and its agents have expended an extraordinary amount of time performing work on behalf of the identified government agencies. For example, in its most recent request for interim fees (its eighth request), the Receiver asserted that in May and June 2010 alone, "Baker Botts assisted the Receiver in responding to over 30 requests for production from various federal and state authorities and *producing over 13,100 pages of documents and over 47 gigabytes of electronic data from over 30 custodians*," and that

---

[7] The Receiver has discounted approximately $6 million and is permitted to seek reimbursement at a later date.

in "responding to these various requests, Baker Botts participated in numerous telephone conferences with governmental and regulatory agency representatives; coordinated with FTI and other members of the Receiver's team to identify the records requested; identified and gathered relevant documentation and information; and prepared documents for production." *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 1163, at 13 (emphasis added).  Likewise, in a recent filing in the ancillary SEC litigation, the Receiver noted that there were $185,000 in fees incurred in April 2010 in connection with its efforts to respond to inquiries from the SEC, DOJ, IRS and state agencies.  *See* Receiver's Interim Report Regarding Status of Receivership, Asset Collection and Ongoing Activities, Case No. 09-cv-00298-N, Dkt. Entry 1117, at 13.  The Receiver further noted that the April 2010 fees were more than double the fees incurred for such activities in January 2010, that similar fees for May 2010 were substantially reduced from April 2010, but that the Receiver expected that "substantial work will be devoted to these efforts for the foreseeable future as government action against the financial advisors proceeds and the criminal case nears trial."  *Id*.

There is difficulty quantifying the precise amount of time spent by the Receiver furthering the government's investigation and prosecution from the

publicly available billing records alone, in part because in some places the billing records apparently account for time spent exclusively assisting the government and in other places the records aggregate time attributed for various tasks (including time spent assisting the government).  According to an analysis by Mr. Stanford's civil counsel, The Brewer Law Group, of those publicly available billing records, the following hours have been expended (in whole or part) by the Receiver and its army of agents assisting the government's investigation and prosecution of Mr. Stanford:

| **AGENCY** | **HOURS** |
| --- | --- |
| FBI | 1198.2 |
| DOJ | 1031.1 |
| SEC | 2666.17 |
| IRS | 264.2 |
| USPS | 63.2 |
| CONFERRING WITH VENDOR FTI REGARDING PROVIDING THEIR WORK PRODUCT TO GOVERNMENT | 880.46 |
| OTHER CONTRACTORS REGARDING PROVIDING THEIR WORK PRODUCT TO GOVERNMENT | 103.3 |

*See* Affidavit of Christopher Griffin, attached hereto as Exhibit 5.

A separate problem in calculating a precise amount of time or money spent by the Receiver to further the government's investigation and prosecution from the publicly filed documents alone is that *they do not account for the likely thousands of hours spent by the Receiver and its agents compiling reports summarizing their work, which were then made available to the government and their various agencies.* Therefore, the hours and fees strictly allocated to responding to inquiries by the DOJ, the FBI, and other governmental agencies (in the Receiver's recent status report and the publicly filed billing records) likely represents *only a fraction* of actual time used by the Receiver to ultimately assist the government in its investigation and prosecution of Mr. Stanford.

A review of the billing records generated by the Receiver further illustrates the scope of tasks that have been performed by the Receiver and its agents for the benefit of the government's criminal investigation and prosecution.   By means of illustration only (and not meant to be an exhaustive list of tasks performed by the Receiver and its agents for the government), the bills submitted to support the requests for interim fees demonstrate that the following tasks have been performed for the government:

| DATE | TASKS BILLED FOR | HOURS |
|------|------------------|-------|

| | | |
|---|---|---|
| April 14, 2009 | "Reviewed and revised production letters to FBI and SEC, coordinated preparation of documents flagged by postal inspectors for FBI for production, coordinated preparation of financial documents for FBI request" | 5.20 hours (total time, which included other tasks) |
| April 15, 2009 | "prepared documents requested by the US Postal Inspection Service for production to the FBI" | 5.70 hours (total time, which included other tasks) |
| April 15, 2009 | "quality checked documents for production per M. Hurd; prepared documents for production to Federal Bureau of Investigation per M. Hurd; prepared FedEx per M. Hurd; provided J. Scarazzo and M. Hurd with requested tracking information; emailed M. Hurd requested documents; updated topics list; emailed M. Hurd bates range and document information regarding Department of Labor production | 9.10 hours |

b.   _Fruits of the Receiver's labors: materials provided to government by Receiver and agents_.

In its applications for interim fees, in addition to detailing its own work and time, the Receiver details all of the work performed by the professional firms it has hired.  One such entity is the law firm Baker Botts. According to the Receiver, the "SEC, not the Receiver, first contacted Baker Botts about representing the Receiver."  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 494 (Receiver's Consolidated Reply to Objection To Motion For Approval of Interim Fee Application and Procedures for Future Compensation").

For just the period February 17, 2009 to April 12, 2009, according to the Receiver's first request for interim fees, Baker Botts had over 100 lawyers working for the Receiver, who each billed a total of approximately 147 hours in those 54 days, at hourly rates as much as $555/hour.  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 384 and 385 (Exhibit C).  In their initial submission for legal fees, wherein Baker Botts specifically avers that it *"[c]oordinated with the SEC, DOJ, FBI, USPI, DOL and DEA in identifying and gathering relevant documents and information,"* the firm sought payment of $5,703,111.50 and an additional $180,605.27 in expenses.  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 385 (Exhibit C) (emphasis added).  In a second interim application for fees and expenses, seeking payment for

services provided for the seven week period of April 13, 2009 through May 31, 2009, the Receiver sought approval to pay Baker Botts an additional $2,573,784.47. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 721 (Response in Opposition to Receiver's Motion for Approval of Second Interim Fee Application"). As such, as of June 2009, a period of only four months, Baker Botts had already billed a staggering $7,128,889.38 in fees and $180,605.27 in expenses, with every penny of this paid for by Mr. Stanford. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entries 384, 669. Importantly, this was the period that the grand jury investigation was on-going, as Mr. Stanford was indicted on June 18, 2009. In total, as of July 20, 2010, Baker Botts has billed $7,309,494.65.

While, like the Receiver, Baker Botts has performed work unrelated to the government's investigation and prosecution of Mr. Stanford, an index prepared by the U.S. Postal Inspection Service, dated June 21, 2010, indicates that the government has received a staggering amount of materials from Baker Botts. To wit, in the U.S. Postal Inspection Service index, attached hereto as Exhibit 3, wherein the government detailed the source of evidence provided to the defense, the following materials were attributed to Baker Botts:

| Evid. No./Bates Prefix | Source | Production Date | Description of evidence |
|---|---|---|---|
| A01394645 | Baker Botts | 12/10/09 | Affidavits |
| A01432055 | Baker Botts | 2/16/10 | SIBL financial statements |
| A01432056 | Baker Botts | 2/17/10 | RAS Bank of Antigua accounts, Legacy accounting info, P/E valuations |
| A01432057 | Baker Botts | 2/26/10 | Swiss Bank records; Roca revenue calculations, P/E investments, Redbooks, Oracle financials |
| B009 | Stanford via Baker Botts | 4/1/2009 | Robert Allen Stanford E-Mails (Bates Prefix "AStanford") |
| B010 | Stanford via Baker Botts | 4/1/2009 | Contents of hard drive Lopez and Alvarado laptops; Holt and Roca flash drives (search by Custodian) |
| B011 | Stanford via Baker Botts | 4/1/2009 | Alvarado, Blair, Kurht and Roca hard drives (search by Custodian) |
| B012 | Stanford via Baker Botts | 4/1/2009 | PST files for Stanford, Davis, Weeden, Stinson, Amato, Holt, Groesbeck, |

| | | | Alvarado, Blair, Casey, Amadio, Kuhrt, Roca, Bogar, Lopez (included in bates prefix "AStanford") |
|---|---|---|---|
| B013 | Stanford via Baker Botts | 4/1/2009 | Hard drives containing Holt, Lopez, and Amadio hard drive images (search by Custodian) |
| B015 | Stanford via Baker Botts | 4/1/2009 | Documents relating to shredding; insurance documents |
| B016 | Stanford via Baker Botts | 3/24/2009 | Ft. Lauderdale employees' emails (1/1/2009 to current) |
| B017 | Stanford via Baker Botts | 3/24/200 | Email to Stanford employees |
| B018 | Stanford via Baker Botts | 3/24/2009 | Personnel files for Laura Pendergest-Holt and James M. Davis |
| B019 | Stanford via Baker Botts | 3/24/2009 | Personnel file for Bruce Perraud |
| B020 | Stanford via Baker Botts | 3/24/2009 | Various documents including digital pictures from Ft. Lauderdale office |
| B021 | Stanford via Baker Botts | 3/24/2009 | Suarez emails (1/1/2007 – |

| | | | |
|---|---|---|---|
| | | | current), Amadio and Holt laptop, Roca flash drive |
| B022 | Stanford via Baker Botts | 3/24/2009 | Personnel files for Gilbert Lopez, Henry P. Amadio, Thomas W. Raffanello, and Mark Kuhrt |
| B023 | Stanford via Baker Botts | 3/24/2009 | Robert Allen Stanford travel records |
| B024 | Stanford via Baker Botts | 3/24/2009 | Overflight exemptions for Stanford related companies and aircraft |
| B026 | Stanford via Baker Botts | 3/24/2009 | List of all computers, flash drives, hard drives |
| B027 | Stanford via Baker Botts | 3/24/2009 | Stanford aviation passenger usage/flight activity report, maintenance records |
| B028 | Stanford via Baker Botts | 3/31/2009 | Flight activity reports |
| B029 | Stanford via Baker Botts | 3/31/2009 | Expense reports for Lena Stinson, Mauricio Alvarado, James Davis, and Laura Pendergest Holt |
| B035 | Stanford via Baker Botts | 4/10/2009 | Documents related to Memphis office |

| B038 | Stanford via Baker Botts | 4/22/2009 | Hard drive belonging to Henry Amadio AKA "the football" |
| B039 | Stanford via Baker Botts | 4/22/2009 | Leroy King folder/docs |
| B040 | Stanford via Baker Botts | 4/22/2009 | Stanford records related to Huntington condo |
| B041 | Stanford via Baker Botts | 4/17/2009 | Various Stanford business records including: financial statements, audit reports, merchant asset docs |
| B042 | Stanford via Baker Botts | 4/17/2009 | Stanford international bank annual reports |
| B043 | Stanford via Baker Botts | 4/27/2009 | Credit card statements |
| B044 | Stanford via Baker Botts | 4/27/2009 | SIBL pouch logs |
| B045 | Stanford via Baker Botts | 4/27/2009 | Stanford corporate video |
| B046 | Stanford via Baker Botts | 4/27/2009 | Business documents re: capital contributions |
| B047 | Stanford via Baker Botts | 4/27/2009 | SIB CD program marketing material |
| B048 | Stanford via Baker Botts | 4/27/2009 | List of all bank accounts |
| B066 | Stanford via Baker Botts | 5/22/2009 | Documents related to pelican |

| | | | |
|---|---|---|---|
| | | | island property and asset exchange |
| B067 | Stanford via Baker Botts | 5/22/2009 | Various business documents |
| B069 | Stanford via Baker Botts | 5/22/2009 | Stanford marketing materials; expense records |
| B091 | Stanford via Baker Botts | 6/26/2009 | Jason Green's calendar |
| B094 | Stanford via Baker Botts | 6/26/2009 | Stanford Financial Group financial statements, global cash reports; corporate agreements of SIB |
| B099 | Baker Botts | 7/24/2009 | "red book" related to Stanford entities |
| B100 | Baker Botts | 7/24/2009 | An inventory list of all digital data copied by the receiver |
| B101 | Baker Botts | 7/24/2009 | 1 hard drive containing digital data related to the Ft. Lauderdale employees (search bates prefix "A01394637") |
| B102 | Baker Botts | 7/24/2009 | Pelican Island closing docs Wire transfers related to Stanford entities |

| B104 | Baker Botts | 7/27/2009 | Emails related to C.A.S. Hewlett |
|------|-------------|-----------|-----------------------------------|
| B105 | Baker Botts | 7/27/2009 | Wire transfer log; copy of Robert Stanford's Antigua Passport; correspondence |
| 1A076 | Baker Botts | [no date provided] | Handwritten notes |
| 1A080 | Baker Botts | [no date provided] | Memorandum |
| 1A081 | Baker Botts | [no date provided] | Org charts |
| 1A082 | Baker Botts | [no date provided] | Emails |
| 1A083 | Baker Botts | [no date provided] | FSRC docs |
| 1A089 | Baker Botts | [no date provided] | Barbara Fortin emails |
| 1A091 | Baker Botts | 6/3/2010 | PST files for Julie Hodge |

The foregoing represents only those materials provided by Baker Botts. In total, the amount of materials provided to the government by the

Receiver and all of its agents is far more expansive, as reflected in the 21 page log attached hereto as Exhibit 3, which ostensibly represents all of the materials provided to the government by the Receiver or an agent thereof as of August 6, 2010.

     c.     <u>*The role of FTI Forensics and Litigation Consulting, Inc.*</u>

Karyl Van Tassel, a certified public accountant and senior managing director of FTI Forensics and Litigation Consulting Inc., has filed several affidavits that demonstrate, unequivocally, the central role the Receiver and its agent (FTI) have played in the government's investigation and prosecution of Mr. Stanford.  FTI was hired by the Receiver on the same date the Receiver was appointed by the Northern District (February 16, 2009).  *See* Declaration of Karyl Van Tassel, *SEC v. SIB*, Case No. 09-cv-0298, dated July 27, 2009, attached hereto as Exhibit 4 ("Van Tassel July 27, 2009 Declaration," herein).  According to Ms. Van Tassel, one purpose of her and FTI's work included *"determin[ing] the roles that the various Stanford entities played in the fraud alleged by the SEC* and specifically in the sale and redemption of SIB certificates of deposit . . .." Van Tassel July 27, 2009 Declaration at ¶4 (emphasis added).   In fulfilling this responsibility, the scope and depth of the work performed by Ms. Van Tassel's team mirrors those functions expected of the FBI or some other law

enforcement agency.  To wit, Ms. Van Tassel avers that she performed the following tasks:

- Interviewed numerous present and former Stanford Entity employees. (Van Tassel July 27, 2009 Declaration at ¶5).

- Examined all available accounting and other records relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, Unites States Virgin Islands; Antigua and Barbuda, and other locations within and outside the United States. (Van Tassel July 27, 2009 Declaration at ¶5).

- Obtained and analyzed paper and electronic files from third-party financial institutions where various Stanford Entities' bank accounts are located. (Van Tassel Declaration at ¶6).

Her conclusions likewise reflect a governmental investigatory mindset, rather than simply attempting to locate and preserve assets.  *See, e.g.*, Van Tassel July 27, 2009 Declaration at ¶10 ("Most, and perhaps all, of the Stanford Entities were part of the scheme alleged by the SEC or derived benefit from it").  In short, the functions and tasks performed by Ms. Van Tassel are not wholly endemic to those ordinarily performed by a Receiver—*i.e.*, they are not only oriented towards identifying and preserving assets, but instead are focused on forensically investigating as a government agent the operations of Mr. Stanford and his companies, with the corollary

effect of substantially bolstering the government's investigation and subsequent prosecution of Mr. Stanford. In its most recent request for interim fees, the Receiver estimates that FTI spent 14% of its time during that discrete billing period responding to government requests for document production. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 1163, at 23-24.

      d.    *Denial of funds for Mr. Stanford*.

While the government, through the work of the Receiver, Baker Botts, FTI and the other professional firms, has unlimited access to Mr. Stanford's liquidated personal and corporate assets to fund its investigation and prosecution, Mr. Stanford has been denied any access to these liquidated assets for the purpose of defending the charges levied by the government in this case. To wit, on April 19, 2009, Mr. Stanford moved in the ancillary civil proceeding for a modification of the preliminary injunction entered in that matter, to permit payment of $10,000,000.00 for legal fees, *see SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 318 and 319, a seemingly reasonable sum considering the SEC expended $20,000,000.00 of the Receivership Estate assets *in just eight weeks following the Receiver's appointment*, *see SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 439. The Receiver

opposed the requested modification.  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 358.  On July 1, 2009, the court denied Mr. Stanford's request for legal fees, though the court noted it would entertain a modest request for fees so counsel could assist Mr. Stanford in demonstrating the existence of personal assets unrelated to and untainted by the alleged fraud.  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 544.

III.   *The Due Process Clause: a fluid concept not subject to rigid application designed to ensure fundamental fairness, to preserve rights implicit in the concept of ordered liberty, and to prevent arbitrary takings by the government.*

One overarching purpose of the Due Process Clause is, unquestionably, to provide a fundamentally fair process for a citizen charged with Federal criminal offenses.  *See, e.g., Rivera v. Illinois*, 129 S.Ct. 1446 (2009) ("The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'") (*quoting Spencer v. Texas,* 385 U.S. 554, 563-564 (1967); *Gideon v. Wainwright*, 372 U.S. 335 (1963) ("From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law"; reversing *Betts* and declaring that

"[i]n returning to these old precedents, sounder we believe than the new, we but restore constitutional principles established to achieve a fair system of justice"); *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"); *Georgia v. McCollum*, 505 U.S. 42, 57 (1992) ("As a preliminary matter, it is important to recall that peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial."). Likewise, the Due Process Clause seeks to strike the proper balance of power between the government and citizen. *See Wardius v. Oregon* (1973)("Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, it does speak to the balance of forces between the accused and his accuser") (*citing In re Winship*, 397 U.S. 358, 361-364 (1970).[8]

---

[8] The fairness guaranteed by the Due Process Clause extends to the entire criminal prosecution, not merely the conduct of the trial itself. *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); *Giglio v. United States*, 405 U.S. 150 (1972) (non-disclosure of promise or reward violated due process).

Importantly, the phrase "due process of law" represents a "fluid" concept, and whether the government has violated the dictates of due process must be judged in the context of the "totality of facts" of the case at hand.  This fluid concept of the Due Process Clause was captured by the Supreme Court in *Betts v. Brady*, 316 U.S. 455 (1942):

> The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial. In the application of such a concept there is always the danger of falling into the habit of formulating the guarantee into a set of hard and fast rules the application of which in a given case may be to ignore the qualifying factors therein disclosed.

*Betts v. Brady*, 316 U.S. 455 (1942).  While the Court ultimately reversed the holding of *Betts* in *Gideon*, this fluid concept of the Due Process Clause survives, as the Court recently reiterated in *County of Sacramento v. Lewis*, 523 U.S. 833, 850-51 (1998):

> Rules of due process are **not**, however, **subject to mechanical application in unfamiliar territory**. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due

process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. What we have said of due process in the procedural sense is just as true here:

"The phrase [due process of law] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Betts v. Brady*, 316 U.S. 455, 462 (1942).

*Sacramento v. Lewis,* 523 U.S. at 850-51 (emphasis added); *see also Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) *quoting Morrisey v. Brewer*, 408 U.S. 471, 481 (1972) ("Due process is flexible and calls for such procedural protections as the particular situation demands."); *see Crowe v. Smith*, 151 F.3d 217, 230-31 (5th Cir.1998) (noting that "'[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation," that "due process," "'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances,'" and that in "each individual case, identification of the specific dictates of due process is 'guided by a *Mathews v. Eldridge* balancing which requires the weighing of the private interests

affected by the official action, the risk of erroneous deprivation through the existing procedure, and the government's interest in minimizing its administrative and financial burdens'"). In *County of Sacramento v. Lewis*, the Court also made the following observations regarding the concept of Due Process:

> Since the time of our early explanations of due process, we have understood the core of the concept to be protecting against arbitrary action:
>
> "The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in *Bank of Columbia v. Okely*, 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 559 (1819): 'As to the words from Magna Charta (sic), incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.'" *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. at 117 (1884).
>
> We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), whether the fault lies in a denial of fundamental procedural fairness, *see, e.g., Fuentes v. Shevin*, 407 U.S. 67, 82 (1974) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, *see, e.g., Daniels v.*

> *Williams*, 474 U.S. at 331 (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised). While due process protection in the substantive sense limits what the government may do in both its legislative, *see, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965), and its executive capacities, *see, e.g., Rochin v. California*, 342 U.S. 165 (1952), criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.

*County of Sacramento v. Lewis*, 523 U.S. at 845-46.

## IV.  *A confluence of "special circumstances" presents the Court with "unfamiliar territory" warranting remedial relief*.

Against the backdrop of these fundamental concepts of due process, there do exist some consistent principles that courts have applied in resolving due process violations, though the facts of this case truly do constitute the "unfamiliar territory" cited by the Supreme Court in *County of Sacramento v. Lewis*.  First, the government certainly cannot conclusively and finally take private property for public use—as it has done here— without first affording the owner of that property a constitutionally sufficient hearing (which has not been provided here).  Second, government conduct in pursuing parallel proceedings can be so improper and abusive as to violate the Due Process Clause.  Third, the government cannot take private property for public use without adequate compensation.  Fourth, government conduct

can be so offensive that it shocks the universal sense of justice, as it does here, resulting in a denial of fundamental fairness and hence violation of the Due Process Clause.

As the Supreme Court instructed in *County of Sacramento v. Lewis* and other cases, assessing claims of due process violations "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking," and an "[a]sserted denial is to be tested by an appraisal of the totality of facts in a given case." *County of Sacramento v. Lewis*, 523 U.S. at 850-51. As detailed below, the totality of facts and circumstances, as it relates to Mr. Stanford, clearly does constitute a violation of the Due Process Clause and requires dismissal or, at minimum, demands an evidentiary hearing so a complete factual record can be established against which the Court can measure the due process claims.

A.    *The government's conversion of Mr. Stanford's personal and corporate assets constitutes an "arbitrary taking" in violation of the Due Process Clause*.

The government's utilization of the Receiver to seize and convert Mr. Stanford's personal and corporate assets for its own public use (*i.e*., to further its investigation and prosecution of Mr. Stanford), without affording Mr. Stanford a meaningful opportunity to contest that permanent deprivation of property, violates the procedural due process guarantees of the Fifth

Amendment. *See Sacramento v. Lewis*, 523 U.S. at 845-46 (noting that the "touchstone of due process is protection of the individual against arbitrary action of government," including the "denial of fundamental procedural fairness") (internal citations omitted); *Fuentes*, 407 U.S. at 82 (the procedural due process guarantee protects against "arbitrary takings"). At bare minimum, due process demands "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). *See Crowe v. Smith*, 151 F.3d 217, 230-31 (5th Cir.1998) (noting court could "rely on the well established propositions that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'") (*quoting Mathews*, 424 U.S. at 333).

Here, the government, through its agency relationship with the Receiver and the army of professionals working for the Receiver, has taken and permanently deprived Mr. Stanford of all his worldly assets, without any meaningful opportunity to contest the conversion of these assets. *See Federal Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir.1991) ("The Supreme Court 'consistently has held that some form of hearing is required before an individual is finally deprived of a property

interest.'") (*quoting Matthews v. Eldridge*, 424 U.S. at 333). As the Supreme

Court observed in *Fuentes*:

> If the right to notice and a hearing is to serve its
> full purpose, then, it is clear that it must be granted
> at a time when the deprivation can still be
> prevented. . . . [N]o later hearing and no damage
> award can undo the fact that the arbitrary taking
> that was subject to the right of procedural due
> process has already occurred.

*Fuentes*, 407 U.S. at 82, 90.

Here, according to an analysis conducted by Mr. Stanford's attorneys

and staff, *see* Affidavit of Christopher Griffin, attached hereto as Exhibit 5,

the Receiver and the professionals it has hired have spent an astounding

amount of time facilitating and furthering the government's investigation

and prosecution of Mr. Stanford. The analysis reveals that the Receiver has

expended some portion of 1198 hours performing tasks for the FBI, 1031

hours performing tasks for the Department of Justice, 2666 hours on behalf

of the SEC, and countless hours on behalf of various other governmental

agencies. *See* Part 1 Section II(a) *infra* (chart). In total, as of August 11,

2010 (*i.e.*, not accounting for the Receiver's eighth request for interim fees)

the Receiver and its agents had been paid more than $40 million dollars in

professional fees and expenses, and at least an additional $46.6 million

dollars had been spent by the Receiver by that date for expenses other than

professional fees, including Stanford personnel, insurance, taxes, security, and other matters. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 1117, at 10. The government's abrogation and use of Mr. Stanford's private property for public use  constitutes a flagrant violation of the Due Process Clause. *See Delahoussaye v. Seale*, 788 F.2d 1091, 1094 (5th Cir.1986) ("we note that the Due Process Clause of the Fourteenth Amendment requires 'some form of hearing' before an individual is finally deprived of a protected property or liberty interest.") (*quoting Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982). Indeed, when the insurance company Lloyds of London sought to depose Ms. Van Tassel in a civil suit (wherein Lloyds is attempting to terminate insurance coverage for legal defense fees in this case), the SEC objected and the court would only grant leave to do so if the insurance company agreed to pay half of the fees and expenses the Receiver incurred in obtaining her opinions or if it limited its examination to simply authenticating her declarations. *See Stanford et al. v. Certain Underwriters at Lloyd's of London et al.*, Case No. 09-cv-03712, Document No. 199.

In *Federal Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir.1991), in confronting a bank's claim that the procedures implemented for the FDIC's issuance of a capital directive violated due

process, the Fifth Circuit reiterated that *Mathews* articulated the controlling

test:

> "[C]onsideration of what procedures due process may require under
> any given set of circumstances must begin with a determination of the
> precise nature of the government function involved as well as of the
> private interest that has been affected by governmental action."
> *Cafeteria v. Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895
> (1961). Likewise, what due process may require "in dealing with one
> set of interests . . . may not be required in dealing with another set of
> interests." *Arnett v. Kennedy*, 416 U.S. 134, 155 (1974). Accordingly,
> *Mathews* adopted a three factor test:
>
> > First, the private interest that will be affected by the official
> > action; second, the risk of an erroneous deprivation of such
> > interest through the procedures used, and the probable value, if
> > any, of additional or substitute procedural safeguards; and
> > finally, the Government's interest, including the function
> > involved and the fiscal and administrative burdens that the
> > additional or substitute procedural requirement would entail.

*Federal Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d at 1130.  In *Bank

of Coushatta*, the court called the private interest affected "obviously

substantial" given that the capital directive required a capital infusion of

$725,000.  *Bank of Coushatta*, 930 F.2d at 1131.  Here, the Receiver to date

has taken over $86,000,000, far in excess of $725,000, from Mr. Stanford's

personal and corporate assets, some significant part of which has gone

towards assisting the government in its investigation and prosecution of Mr.

Stanford and hence the privacy interest is greater than those "obviously

substantial" interests identified in *Bank of Coushatta*.

The risk of an erroneous deprivation is tremendous, particularly given the SEC's own argument that the standards for the issuance of the emergency relief it requested in the SEC action (including Receivership) are less than those required of private litigants, and it advocated standards of proof less than even a preponderance of the evidence. *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 6 at 18 ("Because the Commission is 'not an ordinary litigant, but a statutory guardian charged with safeguarding the public interest in enforcing securities laws,' its burden to secure temporary or preliminary relief is less than that of a private party") (citation omitted); ("Moreover, the ancillary remedy of a freeze order requires a lesser showing than that needed to obtain injunctive relief").  Moreover, Mr. Stanford was not afforded any hearing to contest the government's *use* of his personal and corporate assets to fund its criminal investigation and prosecution.  *Cf. Bank of Coushatta*, 930 F.2d at 1130 (noting that Bank "had an opportunity to respond to the notice of intent, including to the examination report," that the "need for additional procedural safeguards is speculative" given the Bank did not show that evidence it could present at a hearing could not have been presented in response to the notice, and the decision to issue the capital directive "comes only after several deliberative steps and thorough documentation, including

a bank examination, presentation of the examination report to a bank and consideration of any written response" from the Bank).  Even our expansive forfeiture statutes do not allow the government to first liquidate a citizen's property and then provide a hearing to contest the seizure and liquidation— in America, a citizen must be afforded a meaningful opportunity to contest such a deprivation of property at a meaningful time.

Third, the government has zero legitimate interest in using Mr. Stanford's personal and corporate assets to further its investigation or prosecution.  While the government might have a legitimate interest in pursuing an investigation and/or prosecution, it has no lawful or recognized right to dissipate the assets of the defendant to fund that investigation or prosecution.  Indeed, as argued below (*see* Section "B"), far from serving a legitimate interest, the government's use of Mr. Stanford's personal and corporate funds to further its investigation and prosecution violates the Due Process Clause of the Fifth Amendment.

> B.   *Abuse of parallel proceedings*.

This case presents the "special circumstances" referenced by the Supreme Court in *United States v. Kordel*, 397 U.S. 1 (1970), when discussing whether the government's conduct in the context of parallel proceedings violates the Due Process Clause.  In *Kordel*, the Supreme Court

held that the government did not violate the due process rights of corporate executives when it used evidence it obtained from an FDA civil investigation to convict them of criminal misbranding. *Kordel*, 397 U.S. at 11.[9] The court did not categorically reject application of the Due Process Clause to invalidate improper use of parallel proceedings, but instead declined to do so on the facts presented in that case:

> **On the record before us**, we cannot agree that the respondents have made out either a violation of due process or a departure from proper standards in the administration of justice requiring the exercise of our supervisory power . . . We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution, or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; **nor with a case where the defendant is without counsel** or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; **nor with any other special circumstances** that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

*Kordel*, 397 U.S. at 11-12 (emphasis added).[10] *See also United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993) ("It is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit. . . . Significantly different rights, responsibilities, and expectations apply to civil

---

[9] The Court explained that the FDA did not act in bad faith when it made a request for information, which ultimately was used in the criminal investigation, for the agency made similar requests as a matter of course in 75% of its civil investigations. *Kordel*, 397 U.S. at 6.

[10] The Supreme Court has not addressed these issues since *Kordel*. *See United States v. Stringer*, 535 F.3d 929, 937 (9th Cir.2008).

audits and criminal tax investigations.").  Evidence acquired in a civil action should not be permitted in a parallel criminal matter if its "use would violate [Mr. Stanford's] constitutional rights or depart from the proper administration of criminal justice."  *United States v. Teyibo*, 877 F. Supp. 846, 855 (S.D.N.Y. 1995), aff d, 101 F.3d 681 (2d Cir.1996).

1.    *Abuse of the Receivership.*

By converting the Receiver and its agents into a privately-funded arm of the prosecutor's office, the government has caused the Receiver to vastly exceed the powers bestowed upon it by the court in the parallel civil proceeding, and, more generally, bestowed on Receivers, ordinarily, by courts in parallel civil proceedings and in doing so has violated Mr. Stanford's due process rights.[11]  While acknowledging "the well-settled rule that the government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise departing from proper standards in administering justice," the Fifth Circuit, in *United States v. Posada Carilles*, 541 F.3d 344 (5th Cir.2008), and earlier cases, has made clear that "the government's ability to do so is not wholly unrestrained," noting that the *Kordel* Court "was careful to note what type of case was before it and, in so doing, make it clear that under some

---

[11] As argued *infra*, *see* Part II, this conduct also constitutes punishment and the Double Jeopardy Clause thus precludes the instant prosecution.

circumstances the government's use of parallel civil and criminal proceedings may be improper." *Posada Carilles*, 541 F.3d at 354. In *Posada Carilles*, the Fifth Circuit explicitly recognized the authority of lower courts to suppress evidence where the government has improperly exploited parallel proceedings, at the very least where the government makes "material misrepresentations" about the nature of the investigation or inquiry, though the burden to show such misrepresentations remains on the subject of the investigation. *Posada Carilles*, 541 F.3d at 355.[12]

---

[12] In *Posada Carilles*, the court noted that it has "continued to rely upon the principles discussed in [*United States v.*] *Tweel* [550 F.2d 297 (5th Cir.1977)], in resolving challenges to the propriety of dual investigations by civil and criminal branches of a government agency (or dual investigations by separate agencies)," *citing United States v. Blocker*, 104 F.3d 720, 729-30 (5th Cir.1997) (affirming the denial of a motion to suppress where a state insurance examiner conducting an audit pursuant to a state administrative scheme had secretly agreed in advance to furnish any evidence of criminal activity to the FBI because the examiner did not exceed the scope of his authority under state law and there was no deception or misrepresentation about the scope or purpose of the audit); *United States v. Powell,* 835 F.2d 1095, 1099 (5th Cir.1988) (same in a tax case where the civil audit was not initiated with criminal overtones but instead "grew" into a criminal investigation); *United States v. Caldwell*, 820 F.2d 1395, 1400 (5th Cir.1987) (same in a tax case where evidence indicated that the civil audit was not requested as part of a clandestine criminal investigation); *SEC v. SEM Gov't Sec., Inc.,* 645 F.2d 310, 311-12, 317 (5th Cir.Unit B 1981) (holding that government deception is grounds for denying an administrative subpoena where an SEC investigator failed to disclose the existence of an investigation and instead obtained access to the company's records under the guise of obtaining "education" for himself).

That the government has converted the Receiver and its agents into a privately funded arm of the prosecutor's office cannot be reasonably denied by the government.  In addition to the enormous number of hours expended by the Receiver and its agents to assist and further the government's investigation and prosecution of Mr. Stanford (as detailed *supra*), the breadth and nature of the materials provided to the government by the Receiver, Baker Botts, FTI, and others reveals the critical role the Receiver and its agents have played in assisting the government in its investigation and prosecution of Mr. Stanford.  Baker Botts alone has provided the government with vast quantities of electronic evidence, including but not limited to .PST files (emails) and hard drives of computers belonging to critical witnesses, targets and defendants.  To wit, as detailed in the Chart at Part I, Section II(b), *supra*, the Receiver and Baker Botts have provided the government with (a) records from foreign jurisdictions that would have been impossible or otherwise extremely difficult to obtain, such as Bank of Antigua account records (A01432056) and Swiss bank records (A01432057), (b) personal emails of Mr. Stanford (B009), (c) contents of hard drives from laptops of key individuals, such as Lopez and Alvarado (B010), Blair, Kurht and Roca (B011), Holt, Lopez, and Amadio (B013), (d) email files of key individuals such as Davis, Weeden, Stinson, Amato, Holt,

Groesbeck, Alvarado, Blair, Casey, Amadio, Kuhrt, Roca, Bogar, Lopez (B012), (e) computer flash drives of Holt and Roca (B010), and (f) emails to and from employees (B016 and B017). The Receiver views its role as assisting the government's prosecution.  *See, e.g.*, Receiver's Reply to Objections to First Request for Interim Fees, Case No. 09-cv-00298-N, Dkt. Entry 494, at 13-14 (arguing complexity of its task, asserting that no party has asserted the task was quick or easy "to assert control over the Estate, collect and preserve the integrity of the evidence that will be used in both the civil and possible criminal trials.").[13]

By employing the Receiver, Baker Botts, FTI, and the other professionals hired by the Receiver as an arm of the prosecution, and tasking these private persons and entities to expend thousands of hours and enormous amounts of money performing tasks to further the government's investigation and prosecution, the government has undoubtedly caused the Receiver to greatly exceed the powers initially bestowed upon it.   The Receiver was not appointed by the Court with the powers to conduct investigations on behalf of the government, or to analyze materials to further

---

[13] Given that the Receiver, as demonstrated herein, has become an arm of the prosecution, the government must provide to Mr. Stanford any and all *Brady* material within the Receiver's possession, custody or control.  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419 (1996); *Strickler v. Green*, 527 U.S. 263, 280-81 (1999).

the government's prosecution of Mr. Stanford, or to fund an investigation and prosecution with the liquidation of Mr. Stanford's personal and corporate assets. The court empowered the Receiver, at most, to "[p]romptly provide the United States Securities and Exchange Commission and other governmental agencies with all information and documentation they may seek in connection with its regulatory or investigatory activities." *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 10, at p.5, Par. 5(k).[14]

To the extent that the Northern District understood or intended that the Receiver would become an arm of the prosecution, and that Mr. Stanford's personal and corporate assets would be liquidated to fund the government's investigation and prosecution, such an order, again, is repugnant to the Due Process Clause.   Appointing a receiver is an extraordinary remedy.  *See, e.g., Strickland v. Peters*, 120 F.2d 53 (5th Cir.1941) ("The appointment of a receiver is an extraordinary remedy, not to be resorted to without necessity"); *Rosen v. Siegel*, 106 F.3d 28, 33-34 (2d Cir.1997) ("A district court may appoint a receiver to manage a defendant's assets during litigation.  The appointment of a receiver is considered to be an

---

[14] As addressed in Part III, this order, which provided the government with unfettered access to every document ever created by Mr. Stanford and all of his corporate entities, without satisfying either the probable cause or particularity requirements of the Fourth Amendment, was unlawful.

extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property"); *Aviation Supply Corp. v. R.S.B.I. Aerospace , Inc*., 999 F.2d 314, 316-17 (8th Cir.1993) ("A receiver is an extraordinary equitable remedy that is only justified in extreme situations").  While the Fifth Circuit has sanctioned the district court's appointment of a receiver ancillary to an SEC complaint, it has suggested the propriety of doing so only where necessary to conserve resources, *not liquidate them*, observing that "in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought."  *S.E.C. v. First Financial Group of Texas, et al*., 645 F.2d 429, 438 (5th Cir.1981); *see also S.E.C. v. American Bd. Of Trade, Inc*., 830 F.2d 431 (2d Cir.1987) (noting that district courts are vested with the power to appoint receivers despite the absence of any express provision within the Securities Act of 1933 or the Securities Exchange Act of 1934, but observing that a Receiver should be appointed "where necessary to prevent the dissipation of a defendant's assets pending further action by the court" and that "[a] primary purpose of appointing a receiver is to conserve the existing estate") (*quoting Esbitt v. Dutch-*

*American Mercantile Corp*., 335 F.2d 141, 143 (2d Cir.1964)); *S.E.C. v. TLS Invs. And Trade Co.,* 147 F. Supp. 2d. 1031, 1036 (C.D. Ca. 2001) ("[i]t is only in rare cases that it is appropriate for a receiver, rather than a bankruptcy court and particularly before judgment has been entered, *to liquidate*, rather than manage, the assets of a receivership." (emphasis added); *S.E.C. Comm'n v. Current Fin. Services*, 783 F.Supp. 1441, 1445-46 (D.D.C.1992) (appointing receiver but refusing to grant right to liquidate; "[s]uch drastic measures are [not] appropriate prior to the entry of final judgment. The SEC may renew its motion to encompass such relief if necessary in the future").

At least one circuit—the Second—has been "disturbed by the subsequent use of the receivership to effect the liquidation of" entities, and has "in the past criticized the use of receivers to effect the liquidation of a defendant firm in litigation under the Securities Act or the Securities Exchange Act," even in the absence of the *extraordinarily unique* backdrop of this case.   *S.E.C. v. American Bd. Of Trade, Inc*., 830 F.2d 431 (2d Cir.1987).   In *Esbitt v. Dutch-American Mercantile Corp.,* 335 F.2d 141, 143 (2d Cir.1964), the Second Circuit expressed misgivings about the particular use to which the receiver had been put:

> This is not to say that we approve the use of an
> equity receivership to perform the functions of the

> bankruptcy court. The record plainly indicates that the First Discount Corporation is hopelessly insolvent and is in the process (almost completed) of liquidation. We see no reason why violation of the Securities Act should result in the liquidation of an insolvent corporation via an equity receivership instead of the normal bankruptcy procedures, which are much better designed to protect the rights of interested parties.

*S.E.C. v. American Bd. Of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir.1987) (quoting *Esbitt*, 335 F.3d at 143).  "On several other occasions we repeated our view that equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws." *S.E.C. v. American Bd. Of Trade, Inc.*, 830 F.2d 431 (2d Cir.1987).  As the Receiver itself told the court in a motion to amend the order appointing the Receiver, "Receivers 'safeguard the disputed assets, administer the property as suitable, and . . . assist the district court in achieving a final, equitable distribution of the assets if necessary."  *SEC v. SIB, Ltd. et al.*, Case No. 09-cv-00298-N, Dkt. Entry 146 at 4.  Here, these purposes have <u>not</u> been served, as *the Receiver and its army of agents have dissipated an incredible amount of money to assist the prosecution and to compensate themselves for the thousands of hours spent assisting the prosecution, rather than pursuing some equitable distribution of assets.*  Axiomatically, to the extent that the Receiver is spending funds on aiding the criminal prosecution, these are not

only funds that have been taken from Mr. Stanford in violation of his constitutional rights, but also funds that are no longer available to be distributed to investors.

Here, the Court is not simply presented with the liquidation of a company's assets in the context of a receivership, and a Receiver assisting the district court in achieving a final, equitable distributions of assets if necessary, but instead the dissipation of personal and corporate assets so the Receiver and its agents can perform tasks geared towards facilitating the government's investigation and prosecution of the very person who owns the assets and corporations at issue.  Rather than merely limiting its function to those purposes enumerated in the SEC's papers seeking the appointment of the Receiver, and those powers traditionally associated with the common law equitable powers of a receiver, *see Boothe v. Clarke*, 58 U.S. 322, 331 (1854) ("A receiver is an indifferent person . . . he is appointed on behalf of all parties"); *Sterling v. Stewart*, 158 F.3d 1999 (11th Cir.1998), *quoting* 12 Charles Wright & Arthur Miller, Federal Practice and Procedure §2981, at 5 (1973) (A receiver is a neutral court officer appointed by the court, usually to "take control, custody, or management of property that is involved in or is likely to become involved in litigation for the purpose of . . . undertaking any appropriate action."), the government has instead converted the Receiver

54

and its agents into an arm of the prosecution, literally and figuratively at Mr. Stanford's expense. The astonishing usurpation of power and dissipation of assets in this matter, in direct contravention of the traditional purpose of a receivership (*i.e.*, maintaining the status quo and conserving assets) violates any concept of fundamental fairness and due process.

　　　　2.　　*Violation of Separation of Powers Doctrine*.

In addition to the foregoing, given that the Receiver is considered, at least in theory, to be a neutral officer appointed by the court, the conduct outlined herein violates the separation of powers doctrine. The executive branch prosecutes. U.S. Const., Art. II; *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). The judicial branch decides cases and controversies. U.S. Const., Art. III, Sec. 1. Permitting the Receiver and its army of agents to freely provide the government whatever information it seeks from the endless reservoir of materials collected by the Receiver—in fact, ordering the Receiver to provide these materials—violates the separation of powers doctrine. This paradigm affects the framework within which the trial proceeds, rather than simply an error in the trial process itself, and requires dismissal. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

3.     *Absence of counsel.*

The Kordel Court noted that it was not presented with "a case where the defendant is without counsel . . .."  *Kordel*, 397 U.S. at 11-12.  By contrast, as previously discussed, Mr. Stanford was not represented by counsel on February 17, 2009, when the court issued its original order appointing the Receiver**.**  Likewise, on March 12, 2009, when the order appointing the Receiver was amended, once again Mr. Stanford was not represented by counsel.[15]  *See* Exhibit 2 (Transcript, March 12, 2009) (Court: "I am advised that we do not anticipate that Mr. Meadows will appear on behalf of Mr. Stanford or anyone else.").  Moreover, Mr. Stanford was not present at either hearing.  Incredibly, then, the process in this case— the imposition of the Receiver—was set in motion at hearings during which neither Mr. Stanford nor his legal counsel were present.

4.     *Invasion of attorney-client and work product privileged materials.*

Pursuant to the Receivership Order, the Receiver assumed control of the entities' "legally recognized privileges," but he did not assume control of

---

[15]  Recognizing that the SEC court filings effectively precluded Mr. Stanford from gaining access to the funds necessary to provide for legal representation, these dynamics can scarcely be viewed in a surprising light; they were readily predictable. One wonders is this is what the government had planned.

Mr. Stanford's personal privileges.  *SEC v. SIB, LTD, et al., Northern District of Texas*, Case No. 09-cv-00298-N, Dkt. Entry 10.  The Receiver's massive seizure of electronic materials necessarily included the seizure of materials protected by Mr. Stanford's personal attorney-client privilege, as well as the work product privilege.  For example, computers seized from legal offices in both Houston and St. Croix and Mr. Stanford's personal automobile in Miami, which were held by Mr. Stanford in his personal capacity, contained materials protected by the attorney-client and work product privileges.  Mr. Stanford knows of no measures taken to segregate and protect those legally privileged materials.  To the extent the government has reviewed and not protected these legally protected materials, and has disregarded the fact that the Order specifically excepted his personal privileges, it would constitute yet additional violations of Mr. Stanford's due process rights.

Even if the invasion of Mr. Stanford's privileges does not alone warrant dismissal of the indictment pursuant to the Due Process Clause, Mr. Stanford, at minimum, is entitled to suppression of all evidence obtained directly or indirectly by the government, and both its evidentiary and non-evidentiary fruits.  *See, e.g., In Re Grand Jury Subpoenas*, 454 F.3d 511, 517 (6th Cir.2006) ("leak[age] of privileged materials to investigators would raise

the specter of *Kastigar*-like evidentiary hearings"); *United States v. Terzado-Madruga*, 897 F.2d 1099, 1111 (11th Cir.1990) (holding that proper remedy for Sixth Amendment violation caused by interference with defense counsel's relationship with his client was "the exclusion of the evidence at the trial").  At such a hearing, the defendant does not bear the burden of proving the government made direct or indirect use of the underlying privileged documents—or information derived directly or indirectly from those materials.  *Rather, the government must show non-use*, *see generally Kastigar v. United States*, 406 U.S. 441 (1972)  The requisite showing "is not limited to negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460.  *See also United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) (observing that once information is absorbed by the human brain, common sense counsels the conclusion that such information will necessarily be taken into account).

5.     _An evidentiary hearing should be convened to determine the extent to which the government acted in concert with the SEC in seeking the receivership and/or whether material facts were omitted from the application, including the extent to which the government anticipated utilizing the Receiver and SEC to further its investigation and prosecution_.

An evidentiary hearing should be convened to determine whether the government acted in concert with the SEC in seeking the appointment of the Receiver and whether the government intentionally failed to inform the Northern District that it intended to utilize the Receiver and SEC to further its investigation and prosecution. In its one-page motion for order appointing receiver, the SEC simply requested the appointment of a Receiver "with the power to marshal, conserve and, where necessary, operate the assets." *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 9. Likewise, in its memorandum of law in support of its motion for emergency and other relief, the SEC noted that the defendants "have made every effort to deny access to the records and data necessary to enforce the federal security laws" and "many of the funds appear to be easily transferable outside the United States," and then represented that a "receiver is necessary here to marshal, liquidate and distribute assets to the victims of the defendants' scheme and especially warranted in light of the Defendants' efforts to shield relevant financial data and other key documents from

independent review, the recent effort to remove operations from the United States, and recent large liquidations and lying to investors seeking to redeem their CD's."  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 6, at 34.   Clearly, there was no mention in either pleading that the Receiver would serve as an uninhibited super conduit to the government of all information ever produced or preserved by the defendants, or that the government would use (or needed) the Receiver to assist and further its criminal investigation.   As noted earlier, the Receiver has represented to the Northern District that the "SEC, not the Receiver, first contacted Baker Botts about representing the Receiver" in connection with the ancillary proceeding.  *See SEC v. SIB et al, Northern District of Texas*, No. 09-cv-00298-N, Dkt. Entry 494 (Receiver's Consolidated Reply to Objection To Motion For Approval of Interim Fee Application and Procedures for Future Compensation").

The Fifth Circuit, in judging claims of outrageous government misconduct, has repeatedly focused on the presence *vel non* of government trickery, deceit and misrepresentations.  For example, in *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977), the IRS initiated a tax audit at the request of the Organized Crime and Racketeering Section of the Department of Justice as part of a criminal investigation that ultimately led to the

taxpayer's conviction on various tax fraud charges.  *Tweel*, 550 F.2d at 298-99.  When approached by the IRS revenue agent, the taxpayer's accountant asked whether a "special agent," traditionally associated with a criminal investigation was involved, and the revenue agent's negative response led the accountant to believe that the audit was merely a civil one, and the taxpayer thereafter produced records for inspection.  *Id.*  On appeal, the Fifth Circuit ordered that the records supplied for inspection should be suppressed based on the government's deception.  The court observed that the "mere failure . . . to warn the taxpayer that the investigation may result in criminal charges" did not "constitute fraud, deceit and trickery," but the court found that the agent's response "though technically true, had been intentionally misleading" and the agent's "failure to apprise the [taxpayer] of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent . . . and a flagrant disregard for [the taxpayer's] rights."  *Tweel*, 550 F.2d at 299.

Here, the government has undoubtedly utilized the receivership to further its investigation and prosecution, and the Receiver and its agents have, according to the exhibits referred to, *supra*, performed an extraordinary amount of work and expended an extraordinary amount of time and Mr. Stanford's money facilitating the government's prosecution of

him.  In the application for receivership, there was no mention—directly or implicitly—that the Receiver would assist and further the government's investigation and prosecution of Mr. Stanford, at Mr. Stanford's expense, by performing extraordinary groundwork for the government.  Importantly, the SEC did not warn Mr. Stanford or disclose to the Court that the government would utilize the Receiver to further the criminal investigation and prosecution of Mr. Stanford, or that it would dissipate Mr. Stanford's global personal and corporate assets to fund that investigation and prosecution.  If the government was actively involved in the decision to seek the receivership, with the intent to utilize the Receiver and its army of private attorneys and professionals to gain unfettered access to the defendant's personal and corporate materials (such as computers, hard drives and emails), thereby circumventing the probable cause and particularity requirements of the Fourth Amendment, these would constitute yet additional facts supporting dismissal of the indictment for improper exploitation of a parallel civil proceeding.  Similarly, if the government and the SEC secretly worked in tandem with one another for the purpose of furthering the government's investigation and prosecution, dismissal of the indictment would likewise be warranted.

In *Franks v. Delaware*, 438 U.S. 154 (1978), in the context of the Fourth Amendment, the Supreme Court held that remedial relief is appropriate when law enforcement officers make material misrepresentations (affirmative or via omission of material facts) in affidavits in support of applications for search warrants.  It did so "[b]ecause it is the magistrate who must determine independently whether there is probable cause, [and] it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165.  *Franks* also applies to omissions, *see, e.g., United States v. Tomblin,* 46 F.3d 1369, 1377 (5th Cir.1995); *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006), and has been applied to "technically accurate statements that have been rendered misleading by material omissions." *United States v. Grant*, 218 F.3d 72, 77 (1st Cir. 2000).

Here, by contrast, there is serious reason to believe that the Northern District would have significantly curtailed the Receiver's authority if it was the government's intent all along to utilize the receivership and/or the SEC to further its criminal investigation and prosecution, and that intent was disclosed to the court.  As such, for all of the foregoing reasons, an

evidentiary hearing should be convened to determine whether outright material omissions, half-truths, or other statements running afoul of the Franks v Delaware test were made to the Northern District.

C.     *Taking without any compensation*.

The government's actions described *supra* constitute an arbitrary taking of personal property for public use without compensation. "The Takings Clause of the Fifth Amendment . . . provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 536 (2005). *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897) (due process prohibits States from taking of private property for public use without just compensation). Here, the government has undoubtedly taken private property belonging to Mr. Stanford and his corporate entities (all of which are wholly owned by Mr. Stanford) for public use, without any compensation, further compromising Mr. Stanford's ability to defend himself.  It is a patent violation of the Takings Clause.

From a constitutional perspective, it matters not that the government has taken the property through the construct of a court appointed receiver.

The critical point, which is not subject to reasonable debate, is that the government is funding a very significant portion of its investigation and preparing its case for trial with funds taken from Mr. Stanford's personal and corporate assets, rather than exclusively by funds congressionally allocated to the Department of Justice or U.S. Attorney's Office. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"). In essence, the government has utilized the work of several private law firms, including but not limited to the Receiver's law firm, Baker Botts, the forensic accounting firm FTI, and other professional firms, to assist with its investigation and preparation for trial, with all payments to these firms for their assistance to the government being paid for by Mr. Stanford. The government simply cannot take a citizen's property, without any compensation, and doing so here constitutes a violation of the Takings Clause and has further compromised Mr. Stanford's ability to defend himself.

> D.      *The Receivership Order violates the Due Process Clause given it compelled the Receiver to provide law enforcement officials with any and all requested documents.*

As noted, the Receivership Order compelled the Receiver to provide any and all documents requested by investigating agencies, without any limitations. Such an order itself violates the due process rights of Mr. Stanford. There is no lawful justification for a court, presiding over a civil proceeding, to compel a receiver, ostensibly appointed to preserve and marshal assets, to provide private and personally owned documents to the government agencies conducting a criminal investigation. A review of public records indicates it was not part of the receivership order imposed in *United States v. Setser*, 568 F.3d 482, 488 (5th Cir.2009), a recent decision involving a Fourth Amendment challenge to a receiver's transfer of records to law enforcement officials. *See* Part III *infra* (addressing and distinguishing *Setser* in context of Fourth Amendment). Nevertheless, whether unique or not, such a directive violates the fundamental elements of fairness guaranteed by the Due Process Clause. *See Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

V.      *These extraordinary, "special circumstances," warrant dismissal of the indictment, or, at the very least, suppression of all evidence derived directly or indirectly from the Receiver*.

This case clearly presents "unfamiliar territory" and, ultimately, "special circumstances" that render further prosecution repugnant to due process of law. The government has unlawfully utilized the Receiver to

conduct a post-indictment investigation of Mr. Stanford, to collect and analyze documents that would otherwise remain unavailable to the government, and to use this information to prepare itself for trial in the criminal matter.  A review of the Receiver's requests for interim fees and the discovery provided to date unequivocally demonstrates that the government's investigation and prosecution of Mr. Stanford is being funded by Mr. Stanford himself, through the Receiver's seizure and liquidation of his personal and corporate assets—the very same assets that the civil and criminal process has rendered unavailable to Mr. Stanford to fund his own defense.

This conduct is anathema to the principles and rights implicit in the concept of ordered liberty and fundamental fairness. *See Salerno*, 481 U.S. at 746 ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty'") (internal citations omitted).  As the Supreme Court has observed, there is no "yardstick" to determine what conduct is "arbitrary" or "shocks the conscience" in the constitutional sense. *See Sacramento v. Lewis*, 523 U.S. at 847 ("Most recently, . . . we said again that the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or

conscience shocking, in a constitutional sense.' While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, "poin[t] the way").   However, where the government seizes every last penny of a citizen's personal and corporate assets, in effect rendering him indigent[16], unable to finance his defense to an incredibly complex criminal prosecution, while simultaneously using those very assets to finance its own investigation and prosecution (through the construct of a Receiver appointed in a parallel proceeding at the request of an agency working in tandem with the prosecution), all sense of fundamental fairness has been compromised, and the balance of power has been unconstitutionally tilted.   Likewise, a system that permits the government to freely use assets to fund its investigation and prosecution, without any concomitant burden to demonstrate the assets are untainted by alleged criminal conduct, yet simultaneously denies the defendant access to those very same assets unless and until he can demonstrate the assets are untainted by the alleged criminal conduct, represents an unconstitutional shifting of the balance of power, and ultimately constitutes a violation of the defendant's constitutional right to due process of law.   In summation, the confluence of actions present here are

---

[16] The district court has previously found Mr. Stanford to be conditionally eligible for court appointed counsel based on his financial status (in the event that insurance indemnification terminates).

indeed shocking to any universal sense of justice and fairness, and require remedial action.

*VI.*   **_Remedies_**

1. The indictment should be dismissed as the government's conversion of the Receiver into a prosecutorial arm, at the expense of and funded by Mr. Stanford's personal and corporate assets, violates Due Process.

2. Any and all evidence obtained from the Receiver and/or the SEC, directly or indirectly, and any or all information derived directly or indirectly from that evidence, must be suppressed, including but not limited to any and all information derived directly or indirectly from the work of Baker Botts, FTI Forensics and Litigation Consulting, Inc., or any other agent working on behalf of the Receiver.

3. Order discovery and an evidentiary hearing to determine, *inter alia*, (a) the extent to which the government has controlled, supervised, coordinated with or instructed the Receiver and its agents regarding tasks to be performed to further the government's investigation and prosecution of Mr. Stanford, (b) the extent to which the government has utilized the Receiver (or other receivers), FTI (or other similar agents), and Baker Botts (or other law firms) in similar fashion in other prosecutions, and (c) the extent to which the government acted in concert with the SEC in submitting the application for receivership and whether material facts were omitted from the application, such as the government's intent to utilize the Receiver and the SEC to further its investigation and prosecution of Mr. Stanford.

**PART 2:**    **The instant prosecution is barred by the double jeopardy clause because the government's permanent liquidation and dissipation of Mr. Stanford's worldwide assets constitutes punishment.**

Here, where the government has exacted punishment through a civil proceeding, prior to any adjudication of guilt, through the worldwide seizure and liquidation of personal and corporate assets owned by Mr. Stanford, valued in the *billions* of dollars, the Double Jeopardy Clause precludes further punishment.  The case law reflects no comparable precedent of a civil process that has resulted in the citizen's own funds being used in massive amounts to resource a criminal investigation and prosecution of him.  Simply put, there is absolutely nothing more the Court could have done to punish Mr. Stanford, one of the world's wealthiest men, by effectively turning him into an indigent on February 17, 2009.[17]  Given these facts, as well as the government's utilization of the appointment of the Receiver to unconstitutionally acquire massive amounts of discovery to further its investigation and prosecution, the Double Jeopardy Clause compels dismissal of the instant prosecution.  *See, e.g., United States v. Ursery*, 518 U.S. 267, 289 n.3 (1996) ("Nevertheless, where the 'clearest proof' indicates that an *in rem* civil forfeiture is 'so punitive either in

---

[17] Exacerbating the punishment, Mr. Stanford has now suffered pretrial imprisonment in maximum security prisons for over one year and 3 months with the expectation that, absent intervention by the Supreme Court, he will be further incarcerated for over 4 additional months before the start of trial and thereafter for many more months during the pendency of the trial.  In all Mr. Stanford could well spend over two years incarcerated before any determination of guilt or innocence is made.

purpose or effect' as to be equivalent to a criminal proceeding, that forfeiture may be subject to the Double Jeopardy Clause").

The Fifth Amendment provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb," and it protects against multiple punishments for the same offense. *See, e.g.*, *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 769, n.1 (1994). *Congress* may impose both a criminal and a civil sanction for the same act without violating the double jeopardy clause. *See Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). Here, the Court does not confront government action in a civil case pursuant to authority granted by Congress via a statutory scheme. There is no statutory scheme that authorizes the government to use a Receiver appointed in a SEC action to further a parallel criminal investigation and prosecution, all at the expense of the defendant in the parallel criminal proceeding, *Yet, that is precisely what has occurred here, resulting in the permanent and irreversible liquidation and dissipation of Mr. Stanford's personal and corporate assets. Not only has there not been any civil or criminal adjudication, Mr. Stanford has yet to even go to trial.* The monetary penalty imposed on Mr. Stanford by the government's utilization of the Receiver represents criminal punishment imposed on Mr. Stanford, thus rendering the instant prosecution barred by the Double

Jeopardy Clause.   *Cf. Sasak v. Copeland*, 46 Fed.Appx. 429, 430 (9th Cir.2002) (rejecting argument that criminal prosecution barred by double jeopardy clause, holding that "there was insufficient finality to the civil forfeiture proceedings at the time that Sasak was convicted and sentenced in the criminal action," noting that it was "true that some of Sasak's assets, including his home, were seized and liquidated prior to his conviction," but "*none of the funds obtained from the liquidations were distributed*" and that "[u]p to the time of his conviction, it was possible that through the presentation of a successful defense, Sasak could recover the value of his property") (emphasis added).   Here, unlike *Sasak*, there has been a total worldwide seizure of a global business empire valued in the *billions* of dollars and the Receiver and its agents have been allowed to liquidate these personal and corporate assets for a mere fraction of their value and have been paid huge multi-million dollar fees from the seized assets, thus forever preventing Mr. Stanford from exonerating himself and recovering his businesses and money, even if he prevails in both the criminal and civil cases.

In *Hudson v. United States*, 522 U.S. 93 (1997), the Court determined whether a prosecution of former bank officials was barred pursuant to the Double Jeopardy Clause because the defendants were previously fined and

occupationally debarred by the Office of the Comptroller of the Currency. In addressing the Double Jeopardy issue, and refining the analysis to be applied in cases of that nature, the Court observed that "[w]hether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction," a court "must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other,'" and "[e]ven in those cases where the legislature 'has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect' as to 'transform what was clearly intended as a civil remedy into a criminal penalty.'" *Hudson*, 522 U.S. at 99 (internal citations omitted).  In making the latter determination, the Court reaffirmed that the factors listed in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) "provide useful guideposts, including: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; (7)

whether it appears excessive in relation to the alternative purpose assigned." *Hudson*, 522 U.S. at 99-100.   In *Hudson*, the Court reiterated that the threshold consideration is whether the punishment at issue is "criminal in nature," and specified that "no one factor should be considered controlling as they "may often point in differing directions." *Hudson*, 522 U.S. at 100-101 (criticizing *Halper* decision for applying double jeopardy clause to a sanction "without first determining that it was criminal in nature").

Here, again, there is no congressional statutory scheme at issue, and the *Hudson* framework is therefore not a perfect fit.   The SEC requested a receivership pursuant to the court's traditional equitable authority, and the government converted the Receivership Order into a vehicle to seize and liquidate Mr. Stanford's personal and corporate worldwide assets to finance the government's investigation and prosecution of Mr. Stanford.[18]   In so doing, though, the government has permanently deprived Mr. Stanford of his personal and corporate assets.   *Cf. Gumbs v. Kelly*, 2000 WL 1172350, *15 (S.D.N.Y.2000) (holding that "Gumbs' prosecution following the issuance of the order of attachment did not constitute a second punishment for the same crime because the order of attachment was not punitive in nature," that

---

[18] Hence, where there does exist a statute that authorizes receivership in certain circumstances, *see* 28 U.S.C. §959(b), it does not authorize or obligate the trustee to assist law enforcement agencies in their investigation and prosecution of a defendant in a parallel criminal proceeding.

"[n]o court, state or federal, has addressed the double jeopardy implications of the order of attachment authorized under CPLR §1317 [a state forfeiture provision]," but "*it is clear that the purpose of the attachment was not to punish Gumbs but to protect the assets pending the outcome of the forfeiture action*") (emphasis added).  To the extent the *Hudson* factors are relevant, this punishment "involves an affirmative disability [and] restraint," the liquidation of Mr. Stanford's worldwide assets to finance the government's investigation and prosecution smacks of retribution, there is no alternative purpose to which it may rationally be connected, and it is certainly *beyond excessive* given the absence of any lawful authority to support the action.

In *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767 (1994), the Supreme Court held that the Double Jeopardy Clause precluded the imposition of a tax on the possession of illegal drugs after the state had already punished the defendant via a criminal prosecution.  The Court noted that "[c]riminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior," and that "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment."  *Kurth Ranch*, 511 U.S. at 778.  Here, the

extraordinarily severe penalty imposed upon Mr. Stanford via the global seizure of all his personal and corporate assets and their substantial subsequent liquidation prior to any conviction or final determination of wrongdoing to further the government's investigation has advanced the government's fiscal initiatives, via preservation of government resources, notwithstanding the extent to which that course of action has inflicted *horrendous punishment* upon Mr. Stanford.

The property taken from Mr. Stanford to finance the government's investigation and prosecution was not done within the context of an "*in rem*" forfeiture proceeding, thus it cannot be justified through the legal fiction of an action against the property. *Cf. Various Items of Personal Property v. United States*, 282 U.S. 577 (1931) (holding that forfeiture of property "is no part of the punishment for the criminal case" because it is an "*in rem*" proceeding, which constitutes an action against the property, not the person); *United States v. Ursery*, 518 U.S. 267, 279 (1996) ("Though the two-part analytical construct employed in [*United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984)] was more refined, perhaps, than that we had used over 50 years earlier in *Various Items*, the conclusion was the same in each case: *In rem* civil forfeiture is a remedial civil sanction, distinct from potentially punitive *in personam* civil penalties such as fines, and does not

constitute a punishment under the Double Jeopardy Clause."). Instead, it has been done within the context of an ancillary civil action that names Mr. Stanford as a defendant. Moreover, given that a purpose of the dissipation of all his assets was to further the government's investigation and prosecution, and given the *extraordinarily severe punitive nature of the penalty imposed* on Mr. Stanford, the remedy of dismissal is clearly warranted.[19]

**PART 3:     The Government's Wholesale Seizure of Every Piece of Digital and Hard Copy Record, Pursuant to the Receivership Order Directing The Receiver to Produce Any Records Requested by Investigative Agencies, Violated the Fourth Amendment.**

Through the Receiver and the Receivership Order, but without a warrant founded upon probable cause and containing limitations of

---

[19] Even so, in *Ursery*, the Court noted it was not holding that *in rem* civil forfeiture actions were *per se* exempt from the scope of the Double Jeopardy Clause. *See Ursery*, 518 U.S. at 289, n.3 (asserting that "Justice Stevens mischaracterized" the majority's holding, declaring that "[w]e do not hold that *in rem* civil forfeiture is *per se* exempt from the scope of the Double Jeopardy Clause."). The Court likewise declared that it did "not rest [its] conclusion in these cases upon the long-recognized fiction that a forfeiture *in rem* punishes only malfeasant property rather than a particular person." *Id.* Instead, the Court held that where "a forfeiture is designated as civil by Congress and proceeds *in rem*" a presumption is established that it is not subject to double jeopardy," but "where the 'clearest proof' indicates that an *in rem* civil forfeiture is 'so punitive either in purpose or effect' as to be equivalent to a criminal proceeding, that forfeiture may be subject to the Double Jeopardy Clause." *Id.*

particularization, the government has taken possession, *i.e.* seized, and searched whatever computer, hard drive, flash drive, PDA, or other digital repository owned or possessed personally by Mr. Stanford or by his corporate entities on February 17, 2009 (the date the Northern District Court issued the Receivership Order).  It goes without saying, therefore, that the government has seized a universe of materials that defies adequate description because of the sheer magnitude (estimated to currently be in excess of 20 million pages of emails and other documentary evidence) that touch upon diverse subject matters both related and wholly unrelated to the allegations lodged in this case, including but obviously not limited to private and intimate communications between relatives, as well as privileged communications with attorneys.  In a pleading in the related SEC action, the Receiver asserted that "the Estate holds over 500 electronic devices (personal computers, network drives, USB storage devices, etc.) that have been imaged, and the professionals have processed over 2.5 million documents with many millions remaining untouched."  *See, e.g.*, Receiver's Reply to Objections to First Request for Interim Fees, Case No. 09-cv-00298-N, Dkt. Entry 494, at 15.

As detailed below in Section A, the government cannot search and seize a citizen's private materials, without a warrant founded upon probable

cause that particularly describes the items to be searched or seized, and the fact that the government did so here ostensibly through the construct of a Receiver and concomitant Receivership Order does not immunize such conduct from the bedrock Fourth Amendment principles that formed our Nation's struggle for independence, particularly because the Receivership Order *ordered* the Receiver to provide law enforcement agencies with any and every document they requested.  Second, as detailed in Section B *infra*, the good faith exception to the exclusionary rule does not remedy the government's unconstitutional searches and seizures of Mr. Stanford's private materials.   As such, any and all evidence derived directly or indirectly from these unconstitutional searches and seizures must be suppressed—an issue that can only be resolved through an evidentiary hearing, as even witness testimony should be suppressed if derived from unconstitutional searches and seizures.  *See, e.g., Ward v. Dretke*, 420 F.3d 479, 488-89 (5th Cir.2005) ("The test for determining whether evidence is inadmissible as fruit of the poisonous tree is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"); *United States v. Ceccolini*, 435 U.S. 268, 276-77 (1978) (holding

that even testimonial evidence is subject to suppression if it represents the unattenuated fruit of an illegal search and seizure).

A.   The Receivership Order represents nothing more than a general warrant or writ of assistance.

As noted in the Due Process factual introduction, *see* Part I *supra*, the Receiver, by its appointment, took possession of every document—hard copy and digital—possessed by Mr. Stanford personally and his corporate entities that existed on or about February 17, 2009.  *See* Receivership Order (Court assuming possession of, *inter alia*, "the books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers, telephones, personal digital devices and other informational resources of or in possession of defendants, or issued by defendants and in possession of any agent or employee of defendants).  The Northern District Court then *ordered* the Receiver to promptly provide the SEC *and any other investigative agency* whatever materials were requested by those agencies, without imposing any limitations or restrictions on the nature or quantity of materials within that directive.

These combined directives are constitutionally (and historically) indistinguishable from the general warrants and writs of assistance that lie at the heart of the invasions of private liberty and property that animated the

Founding Fathers in their enactment of the Fourth Amendment.  *See Virginia v. Moore*, 553 U.S. 164, 168-69 (2008) ("The immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that English judges had employed against the colonists"); *see also Virginia School District 47J v. Acton*, 515 U.S. 646, 669 (1995) (O'Connor, J., dissenting) ("As recently confirmed in one of the most exhaustive analyses of the original meaning of the Fourth Amendment ever undertaken, *see* W. Cuddihy, The Fourth  Amendment Origins and Original Meaning (1990) (Ph.D. Dissertation at Claremont Graduate School) (hereinafter Cuddihy), what the Framers of the Fourth Amendment most strongly opposed, with limited exceptions wholly inapplicable here, were general searches-that is, searches by general warrant, by writ of assistance, by broad statute, or by any other similar authority").

Here, the provision at issue within the Receivership Order, which was leveraged by the government to seize every piece of digital and hardcopy evidence possessed by Mr. Stanford, undoubtedly represents a modern day general warrant and writ of assistance.  For example, it has permitted the government to seize and read, *inter alia*, every email ever written by Mr. Stanford to the extent they were stored and thus remained in existence on the date of the Receivership Order.  There were no limits to the government's

search of Mr. Stanford's computers—no limitation as to subject matter (thus permitting the government to review the most private of emails, entirely unrelated to any alleged criminal conduct) or time period (thus permitting the government to review materials that predate any alleged criminal conduct).  Nor was there any protection for legally privileged materials.

The Fourth Amendment, by its literal language, "provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965).  As the Supreme Court observed in *Stanford v. State of Texas*, 379 U.S. 476, 481-82 (1965):

> These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the

> liberty of every man in the hands of every petty
> officer.' The historic occasion of that denunciation,
> in 1761 at Boston, has been characterized as
> 'perhaps the most prominent event which
> inaugurated the resistance of the colonies to the
> oppressions of the mother country. 'Then and
> there,' said John Adams, 'then and there was the
> first scene of the first act of opposition to the
> arbitrary claims of Great Britain. Then and there
> the child Independence was born.

Here, the breadth of the government's seizure of private materials, and the

immediacy with which the government capitalized on the Receivership

Order, is staggering, as the Stanford Receivership Production Log, attached

hereto as Exhibit 3, clearly demonstrates.  For example, on March 16, 2009,

less than one month after the Receivership Order was issued, the Receiver

provided the government with "Laura Pendergest Holt's emails (June 1,

2008-present), images of Pendergest Holt's flash drive and floppy disk of

James Davis, Henry Amadio laptop and external hard drive images, Rolando

Roca workstation and external hard drive images."  On March 24, 2009, the

government received "[h]ard drive image for Laura Pendergest Holt laptop,

Yolanda Suarez emails, Henry Amadio hard drives, and Rolando Roca flash

drive."  The Stanford Receivership Production Log details, at minimum, the

universe of materials provided to the government.  It includes the following

private Stanford materials:

| ITEMS | DATE PRODUCED | GOVT AGENCY |
|---|---|---|
| Exchange email PST files for R. Allen Stanford | April 1, 2009 | FBI |
| Exchange email files for Robert Allen Stanford (1/1/07-present) | April 1, 2009 | FBI |
| Robert Allen Stanford's Personal Address Book | March 16, 2009 | FBI |
| Robert Allen Stanford's travel from Jan. 1, 2007 to present | March 14, 2009 | FBI |
| R. Allen Stanford's Insurance File | March 30, 2009 | FBI |
| List of Stanford Swiss Bank Accounts | April 30, 2009 | DOJ |
| RAS Credit Card Statements | April 27, 2009; April 30, 2009 | DOJ |
| Back-up support for Stanford Swiss Bank Accounts | April 30, 2009 | DOJ |
| RAS Online Banking Statements for Bank of St. Croix | May 6, 2009 | FBI |

Thus, before the return of a Grand Jury indictment, the Receiver, acting as a *de facto* Grand Jury, was the primary source of a vast array of evidentiary materials.

In *United States v. Gray*, 751 F.2d 733 (5th Cir.1985), the Fifth Circuit held that a receiver, who has properly come into possession of property, may turn the property over to law enforcement officials without a warrant. In *Gray*, however, the document at issue—a brochure containing false

statements—was discovered independently by a receiver, who was later visited by an FBI agent who informed the receiver that the defendant was under investigation; in response, the receiver apparently voluntarily provided the FBI agent with the brochure at issue.  *Gray*, 751 F.2d at 735.  In rejecting the defendant's assertion that the FBI agent should have obtained a warrant before seizing the brochure, the court held (1) the defendant no longer had a reasonable expectation of privacy because custody and control of the materials had passed to the receiver and (2) the government had the consent of the lawful custodian—the receiver—and therefore did not need a warrant. *Gray*, 751 F.2d at 737.

The facts here significantly distinguish this case from *Gray*.  Here, the government has undoubtedly acted in concert with the Receiver, starting before, at, and no later than immediately following the appointment of the Receiver and subsequent seizure of a vast universe of materials.  Unlike *Gray*, where the FBI agent visited the receiver as part of an independent investigation, there is no apparent independence between the Receiver and the government in this case.  Indeed, just weeks after the receiver's appointment, the flow of materials from the Receiver to the government began pursuant to an Order that fully anticipated this interdependent and

ongoing relationship between the Receiver and the DOJ, USAO, FBI, IRS, and Postal Service.

In *United States v. Setser*, 568 F.3d 482, 488 (5th Cir.2009), the Fifth Circuit recently rejected a challenge to a receiver's transfer of records to law enforcement officials, holding that the receiver lawfully took possession of the records pursuant to a court order, and further particularity within the receivership order was not necessary. *Setser*, 568 F.3d at 488 ("One reason that particularity is not translatable to the receiver context is that once appointed, the receiver often takes possession of all property of the distressed or distrusted entity. That seizure of all assets on behalf of the court is a central purpose for the appointment of a receiver.").

Several critical facts distinguish this case from *Setser*. First, here, unlike *Setser* (and *Gray*), the receivership order actually *ordered* the receiver to provide the government with documents. In *Setser*, the government relied heavily upon the so-called voluntary consent of the Receiver in providing the government access to books and records seized pursuant to the receivership. *See SEC v. IPIC International, Inc. et al,* Case No. 03-cv-02781, Dkt. Entry 273 (Government Response to Motion to Suppress) at 7 (distinguishing prior case law, arguing Receiver "had sole legal possession of the premises and business when he gave his consent for the IPIC books

and records in his possession to be reviewed by criminal authorities"). Whatever the applicability of the Fourth Amendment where a receiver voluntarily and independently provides documents to law enforcement officials, the protections of the Fourth Amendment must apply where the court *orders* the receiver to furnish the government with any records requested by law enforcement agents, which is tantamount to a search and seizure order.

Second, the facts presented here demonstrate that the Receiver and its agents (such as FTI) are not independent actors, as argued by the government in *Setser*, but instead truly represent an arm of the government. In *Setser*, on the date of the defendants' arrests, federal agents went with a receiver and FTI Consulting to conduct searches of the defendants' offices (the receiver having been appointed in a previously filed parallel SEC action). *See SEC v. IPIC International, Inc. et al*, Case No. 03-cv-02781, Dkt. Entry 269 (defendants' reply to government response to motion to suppress) at 2. In their pleadings, the defendants argued that the federal agents were working in concert with a receiver and FTI consulting, including the submission of memoranda prepared in advance of the execution of the searches setting forth the protocol to be utilized during the searches. *Id*. at 3. In response to the defendants' motion, the government

represented to the court that the defendants' assertion that the receiver was acting at the behest of the DOJ or SEC was "patently false," asserting that the receiver was legally an officer of the court, not an agent of the government. *SEC v. IPIC International, Inc. et al*, Case No. 03-cv-02781, Dkt. Entry 273 at 6. Where, here, the government has once again employed FTI Consulting and a receiver as its agent and vehicle to seize and search mountains of materials, the government's argument in *Setser*—that the receiver is independent and an agent of the Court—*rings hollow*. While, under the law, a receiver is intended to be an officer of the court and not an agent of either party, the government's conduct in *Setser* and again here strongly indicates that the government has designed and implemented a policy and strategy to employ receivers and their consultants, and particularly FTI Consulting, as agents of the Department of Justice, in direct contravention of the protections of the Fourth Amendment. A review of the pleadings in *Setser* indicates that the government has construed *Gray* as a vehicle to systemically circumvent the protections guaranteed by the Fourth Amendment. At minimum, *an evidentiary hearing is warranted to determine the particulars of the government's relationship to FTI*

Consulting[20], the Receiver, Baker Botts, and the other attorneys and firms working for and with the Receiver.

Third, there are material differences between the Receivership Order issued here and that issued in *Setser* (in addition to the fact that the Order in this case compels the Receiver to provide documents to investigating agencies).   Here, unlike *Setser*, the Receivership Order expressly assumes attorney-client and work product privileges to the Court and thus the Receiver.   Such a directive is utterly beyond the objective of preventing waste and dissipation, or marshalling assets to protect investors and other creditors, and instead is more akin to a wholesale, warrantless and unparticularized seizure and subsequent liquidation of personal and corporate possessions.   *See* Order at Paragraph 1.   Second, the Order here compels the attendance of any person or entity for examination, and provides that the production of records can be compelled in the United States and foreign countries.   See Order at Paragraph 12(c).   Third, here, unlike *Setser*, in addition to ordering the Receiver to promptly provide governmental agencies with any requested documents, the Order specifically provides that nothing therein "shall prohibit any federal or state law enforcement . . . authority from commencing or prosecuting an action

---

[20] It should be noted that FTI's Form 10-K trumpets its close relationship to the government.

against the Defendants," see Order at Paragraph 15, and it thus clearly contemplates that documents will be utilized to establish or further a criminal investigation and prosecution.

Finally, numerous courts, including the Fifth Circuit, have found that an ostensibly private party can become "an agent or instrument of the government" such that its searches and seizures become subject to Fourth Amendment scrutiny. *See United States v. Jenkins*, 46 F.3d 447, 459-60 (5th Cir.1995) ("Courts have found, however, that a private citizen, acting as 'an agent or instrument of the government,' violates the Fourth Amendment by engaging in an unlawful search") (*quoting United States v. Pierce*, 893 F.2d 669, 673 (5th Cir.1990). In *United States v. Jenkins*, the court "assumed the adequacy of" the formulation of the Ninth Circuit in *United States v. Miller*, 688 F.2d 652, 657 (9th Cir.1982), wherein "the court held that 'two critical factors in the 'instrument or agent' analysis are: (1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.'" *Jenkins*, 46 F.3d at 460. Here, there is no doubt that the Receiver (and those it employed) were instruments and agents for the government, as the government knew of and acquiesced to (if not controlled) the conduct, and the Receiver and those acting on its behalf fully intended to

assist law enforcement efforts from the very beginning of the Receivership Order.

The government's acquisition of private computers, hard drives, emails, PDA's, letters, memoranda, and the like, without the consent of the owner, without a showing of probable cause, without a warrant, and without limits on the scope of the invasion of privacy authorized is one of grave importance in an age where computers have become virtually endless repositories of the most private details of one's life. The government should not be permitted to circumvent the Fourth Amendment and centuries of legal precedent by using a receiver to seize and search the private materials of an individual, without any limitations, and without establishing probable cause for doing so. The fruits of the wholesale unconstitutional searches and seizures conducted in this case are *truly astounding if not unprecedented*. The Receiver assumed control over every piece of information ever generated and preserved by Mr. Stanford personally and numerous corporate entities he owns. The court's order compelled the Receiver to provide to law enforcement any materials as directed, and the government fully capitalized on this structure to seize every piece of private material preserved by Mr. Stanford that it desired to obtain from the Receiver, regardless of their relevance to the instant case. There is no material distinction between this

structure and the general warrants and writs of assistance that served as the catalyst for the enactment of the Fourth Amendment.  Wherefore, any and all evidence derived directly or indirectly from these searches and seizures must be suppressed.

B.    The Good Faith exception does not remedy the government's unconstitutional conduct.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court found that the use of a "neutral magistrate" to assess the government's conduct adequately addressed the concerns of the Fourth Amendment and, therefore, the exclusionary rule did not apply when law enforcement officers acted in a good faith reliance on a magistrate's determination of probable cause. *Leon*, 468 U.S. at 914-15.  Here, of course, there was no warrant application submitted to any neutral or detached magistrate.  Moreover, given that the "good faith" exception does not apply where an agent "could not have harbored an objectively reasonable belief" in the validity of the warrant, *Leon*, 468 U.S. at 926, the government could not have held an "objectively reasonable belief" in the validity of a Receivership Order that facially compelled production to the government of every document ever generated by Mr. Stanford in existence up until the time of the Receivership Order.

In *Illinois v. Krull*, 480 U.S. 340, 343, 346, 353, 356-57 (1987), the Supreme Court extended the good-faith exception to situations where the agents conducting a search relied in good faith, not on a warrant, but on a statute's regulatory scheme that permitted warrantless administrative searches, when that statutory regulatory scheme was later declared unconstitutional.   Here, of course, the precise verbiage reflected in the Receivership Order was not imposed pursuant to some regulatory scheme, but instead with "the full power of an equity receiver under common law as well as such powers" as were enumerated in the Order.   *See* Exhibit 1.   It seems incomprehensible that the provision at issue here—which obligated the Receiver to produce to unnamed investigatory agencies any document they requested—is an ordinary provision within receivership orders generally issued pursuant to our courts' general equitable powers.   As noted, it was not part of the receivership order imposed in the *Setser* case.   As with *Leon*, the *Krull* "good faith" exception does not apply where it was objectively unreasonable for government personnel to have believed that the authorizing provision was constitutional.   As such, whether or not it is a traditional provision routinely included within receivership orders, such a provision so profoundly violates the Fourth Amendment that no agent could

have reasonably relied upon the pertinent segment of the Order believing it to be constitutional.

Likewise, the "good faith" exception articulated in *Krull* does not apply *where the agents fail to comply with the statute upon which their "good faith" claim is based*.  At the end of its opinion in *Krull*, the Supreme Court specifically noted that in extending the good faith exception to reliance on a statute later declared unconstitutional, it did ***not*** mean to endorse extending the exception further to protect police conduct that, in fact, was "outside" the statute in question:

> Respondents also argue that Detective McNally acted outside the scope of the statute, and that such action constitutes an alternative ground for suppressing the evidence even if we recognize, as we now do, a good-faith exception when officers reasonably rely on statutes and act within the scope of those statutes.... At this juncture, ***we decline the State's invitation to recognize an exception for an officer who erroneously, but in good faith, believes he is acting within the scope of a statute.*** Not only would such a ruling be premature, but ***it does not follow inexorably from today's decision***. As our opinion makes clear, the question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence. ***The answer to this question might well be different when police officers act outside the scope of a statute, albeit in good faith. In that context, the relevant actors are not legislators or magistrates, but police officers*** who concededly are "engaged in the often competitive

94

> enterprise of ferreting out crime." *Johnson* v.
> *United States*, 333 U.S. 10, 14 (1948).

*Krull*, 480 U.S. at 360 n. 17 (emphasis added).  *The true purpose of a receivership is to preserve and marshal assets for the benefit and protection of the creditors, not to furnish the government with evidence to support its investigation or prosecution.  There is no lawful reason to include within a receivership order a directive for the receiver to provide any law enforcement agency with any documents they demand access to, nor is such a directive authorized by any statute known to the defense.*

Finally, in *Groh v. Ramirez*, 540 U.S. 551, 561, 563-64 (2004), the Supreme Court refused to apply the good-faith exception, and refused to conclude that the officer was entitled to qualified immunity in a civil action for damages, where the officer "himself prepared the invalid warrant" and so "he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid."  Here, if the government itself drafted the receivership order, or at minimum the provision in question here (that required the receiver to provide law enforcement agencies with the documents), that is yet another compelling reason why the "good faith" exception would not apply here.

## CONCLUSION

Defendant Robert Allen Stanford respectfully moves, pursuant to the Due Process, Double Jeopardy and Takings Clauses of the Fifth Amendment to the United States Constitution, and the Fourth Amendment to the United States Constitution, that this Honorable Court grant this Motion and (1) dismiss the indictment, (2) suppress all evidence provided to the government by the Receiver and/or his agents, and all evidence derived directly or indirectly therefrom, and/or (3) order discovery and an evidentiary hearing to determine, *inter alia*, (a) the extent to which the government has controlled, supervised, coordinated with and/or instructed the Receiver and its agents (including the law firm Baker Botts and FTI Forensics and Litigation Consulting, Inc.) regarding tasks to be performed to further the government's investigation and prosecution of Mr. Stanford, and (b) the extent to which the government acted in concert with the Securities and Exchange Commission in submitting the application for receivership in the parallel SEC proceeding in the United States District Court for the Northern District of Texas (Lindsay, J.), and whether material facts were omitted from the application, such as the government's intent to utilize the Receiver and SEC to further its investigation and prosecution.

Respectfully submitted,

/s/ ROBERT S. BENNETT
Robert S. Bennett

Texas Bar No. 02150500
Fed. Bar No. 465
515 Louisiana St., Suite 200
Houston, TX 77002
(TEL) 713-225-6000
(FAX) 713-225-6001

ATTORNEY FOR R. ALLEN STANFORD

## CERTIFICATE OF CONFERENCE

I HEREBY CERTIFY that I have complied or attempted to comply

with the meet and confer requirement of the rules of this Honorable Court

and the local rules of the Southern District of Texas. Further, Counsel has

conferred with U.S. Attorney Gregg Costa via email on September 30, 2010

and he is opposed to this motion.

/s/ ROBERT S. BENNETT
Robert S. Bennett

## CERTIFICATE OF SERVICE

I certify compliance with the Court's Procedures. On October 4, 2010,

I electronically filed the foregoing with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to all registered

parties.

/s/ ROBERT S. BENNETT
Robert S. Bennett