# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CR. NO. 4:09-342-01** |
| **v.** | § | |
| | § | |
| **ROBERT ALLEN STANFORD** | § | |

## RESPONSE OF THE UNITED STATES TO
## STANFORD'S MOTION TO DISMISS AND/OR SUPPRESS
## <u>BASED ON FOURTH AND FIFTH AMENDMENT VIOLATIONS</u>

If degree of heated rhetoric were the standard by which courts decided motions, then Stanford's  98-page Motion To Dismiss And/Or Suppress (Docket No. 316) might have a chance.  Unfortunately for him, courts decide motions based on facts and law.  Because Stanford's Motion is sorely lacking in both areas, it should be denied.

Once one gets past the hyperbolic language and baseless conspiracy-mongering, it is apparent that Stanford's Motion relies on nothing more than the following fact:  pursuant to a federal court order, the United States requested documents from the court-appointed Receiver who controls the Stanford entities and the Receiver produced those documents.  That benign practice–following a court-mandated proceed for obtaining documents relevant to the criminal investigation–results in none of the constitutional violations Stanford conjures.  His amorphous due process challenge is an improper attempt to attack in this forum the

orders of the Northern District of Texas court presiding over the SEC civil action. Moreover, an erroneous and offensive premise underlying the due process and takings arguments–that the assets the Receiver is charged with liquidating and distributing belong to Stanford rather than the CD investors who are still out billions of dollars–reflects the mind set of a person who showed no compunction in stealing investors' money to fund his lavish lifestyle.

Case law overwhelmingly rejects the other claims Stanford raises. The SEC civil suit, which has been stayed and not resulted in any fine, and the Receivership have not resulted in criminal punishment that bars this prosecution. Stanford's Fourth Amendment argument fails for the elementary reason that Stanford has no standing to challenge the production of documents which were lawfully in the possession of the Receiver.

I.   THE ACTIONS OF THE COURT OVERSEEING THE SEC CIVIL CASE CANNOT BE CHALLENGED IN THIS COURT AND DO NOT VIOLATE DUE PROCESS

The Motion's italicized reference to due process as a "fluid concept not subject to rigid application" (Motion 32) is a recognition that Stanford's due process claim lacks any discernible legal authority. The everything-but-the-kitchen-sink approach of his due process argument makes it difficult to even submit an organized response. In an attempt to provide some clarity to these issues, this response will first show that Stanford's claim rest on two faulty premises: 1) that the Receiver is a government

actor, and 2) that the funds the Receiver is using belong to Stanford.  Once these factual pillars of Stanford's due process and takings claims are removed, the legal arguments fail.

A.    *The Receiver Is Not A Governmental Actor*

Because all of the constitutional claims Stanford raises only apply to state action, the following explanation of why the Receiver is not a governmental actor dooms his entire motion.

1.    <u>The Receiver's Authority</u>

 In appointing a Receiver for the Stanford entities, Judge Godbey invoked "a well-established equity remedy available to the SEC in its civil enforcement proceedings."  *SEC v. First Financial Group of Texas*, 645 F.2d 429, 438-39 (5th Cir. 1981).  An equity receiver is "appointed by the court to take control, custody or management of property that is involved or is likely to become involved in litigation for the purpose of preserving the property, receiving rents, issues or profits . . .."  12 Charles Alan Wright, et al., FED. PRAC. & PROC. § 2981, at 8-9 (2d ed. 1997).  Federal law vests a receiver "with complete jurisdiction and control of all such [received] property with the right to take possession thereof."  28 U.S.C. § 754; *see also* 28 U.S.C. § 959; FED. R. CIV. P. 66 (both discussing the law applicable to receivers).

## 2.   The Receiver Is Not A State Actor

As the United States has repeatedly explained in responding to other Stanford motions which allege that the prosecution team is responsible for acts of the Receiver (see Docket Nos. 83, 288), a "receiver is considered to be an officer of the court, and therefore not an agent of the parties." 12 Wright, et al, § 2981; *see also United States v. Beszborn*, 21 F.3d 62, 68 (5th Cir. 1994) ("In its capacity as receiver, the RTC stands as a private, non-governmental entity."); *United States v. Ely*, 142 F.3d 1113, 1121 (9th Cir. 1997) (explaining that the FDIC, when serving as a receiver, was not acting in a governmental capacity).

Two high-profile disputes between the SEC and Receiver Janvey demonstrate the independence of the Receiver from the government in Stanford's case.  The SEC has opposed a number of the Receiver's fee requests as excessive.  *See, e.g.*, SEC's Response to Receiver's Second Fee Application (Docket No. 738) (Aug. 27, 2009); SEC's Response to Receiver's Third Fee Application (Docket No. 853) (Oct. 26, 2009), both in *SEC v. Stanford Int'l Bank Ltd.*, *et al*, No. 3:09-CV-298 (N.D. Tex.). In addition, the SEC opposed the Receiver's attempt to claw back both interest and principal from certain CD investors, a dispute that had to be resolved by the Fifth Circuit.  *See Janvey v. Adams*, 588 F.3d 831, 833-34 (5th Cir. 2009) (chronicling the dispute between Janvey and the SEC).

3.    The Receiver, Like Any Private Entity, Is Allowed To Comply With Document Requests From Third Parties, Including Law Enforcement

Judge Godbey's Receivership Order states that the Receiver should "promptly provide the [SEC] and other governmental agencies with all information and documentation they may seek in connection with regulatory or investigative functions." Order Appointing Receiver ¶ 5(k). Pursuant to that provision, federal law enforcement (as well as state regulators and a variety of other parties) has sent letter requests to the Receiver seeking specific documents relevant to the criminal investigation.[1] The Receiver's compliance with such requests pursuant to the court order is the primary fact the Receiver relies on to claim that the Receiver is acting as an agent of the prosecution.

Although Stanford's Motion echoes his numerous motions for release from custody in viewing his situation as somehow unique and unprecedented in terms of the Receiver complying with document requests, just last year the Fifth Circuit reaffirmed the traditional role of receivers in SEC cases and the lawfulness of receivers providing documents to law enforcement. *See United States v. Setser*, 568 F.3d 482, 486-493 (2009) (rejecting in a $173 million dollar Ponzi scheme case many

---

[1] The Receiver attempted to set up a conference call with counsel for Stanford and the other defendants to discuss the procedure for those defendants obtaining copies of records from the Receiver. The United States does not know if that call ever took place or the outcome, but certainly the defendants can seek documents from the Receiver as they would from any other entity.

of the same challenges Stanford raises such as improper collusion and Fourth Amendment violations); *see also United States v. Gray*, 751 F.2d 733, 737 (5th Cir. 1985) (rejecting argument that Receiver's production of documents to government raised constitutional problem).

While the Motion's estimate of how much time and money the Receiver has spent responding to document requests from federal agencies is grossly exaggerated,[2] the premise that there is something unusual about a corporation spending significant amounts of money to comply with requests from regulators and law enforcement is simply bizarre.   The government has multiple means at its disposal to request documents from entities when wrongdoing is suspected.   Absent the appointment of the Receiver, the Stanford entities would have been legally obligated to turn over the same documents the Receiver produced in response to grand jury subpoenas and other law enforcement tools.   Stanford's premise that the incriminating documents the

---

[2]   The Motion does not cite or attach any of the actual billing records of the receiver. The only evidentiary support for the Motion's estimate of the cost of the Receiver's compliance with document requests is a two-page declaration from a law student who apparently has some unmentioned expertise in analyzing law firm billing records. *See* Motion, Ex. 5.  What is puzzling is that the law student's declaration states that he is working as a law clerk for Mr. Bennett, Stanford's counsel in his criminal case.  But the Motion itself states that the analysis of the billing records was performed by "Stanford's civil counsel, The Brewer Law Group."  This disconnect casts doubt on the credibility of this analysis, especially given the notable absence of the underlying records.

To cite just one of the Motion's outrageous exaggerations, it states that the receiver has charged 880.46 hours for "conferring with vendor FTI regarding providing their work product to government."  Motion 18.  This makes no sense and, not surprisingly, the Motion does not cite the underlying records that would support such a farcical allegation.

United States obtained were somehow immune from production absent Judge Godbey's court order is simply wrong.

Indeed, corporations have entire compliance units which deal with such requests and routinely spend hundreds of thousands if not millions of dollars in related legal fees. Financial institutions in particular are subject to various inspections and document requests from the SEC, FINRA, FDIC, OCC, as well as other federal agencies and state regulators. Costly corporate compliance with requests from the government does not turn those corporations into a governmental actor. Nor did the Receiver become a governmental actor by virtue of its compliance with Judge Godbey's order that it comply with law enforcement requests for documents.

Because the Receiver's production of documents was done in compliance with a federal court order, and there is nothing generally untoward about a company complying with requests from law enforcement, the major premise of Stanford's Motion falls away.

4.   There Is No Support For Stanford's Other Allegations Of Concerted Action Between the Receiver and DOJ

Other than the Receiver's compliance with law enforcement requests for documents, the only other conduct Stanford cites to show that the Receiver is acting as a governmental agent is the work of the Receiver's forensic accountants and the

decision of Judge Godbey to deny Stanford's request to use $10 million of investor funds for his criminal defense. _Stanford's Motion contends that the Receiver's forensic consultant, FTI Consulting, demonstrated a "governmental investigatory mindset." Stanford does not cite any evidence that the United States hired FTI or directed its forensic analysis. It was perfectly logical for the receiver to hire forensic accountants to trace investor funds.

Stanford's conspiracy theories are so far-reaching that he even argues that a federal district judge is serving as a mere puppet of the DOJ. He cites Judge Godbey's denial of Stanford's motion seeking $10 million of investor funds for Stanford's defense costs as another action that should be attributed to the government. In any event, Stanford ended up receiving that amount of funding through the Lloyd's of London Directors and Officers Policy which paid approximately $9.8 million for Stanford's defense costs in both the SEC and criminal cases.

B.   *The Investors' Money Does Not Belong To Stanford*

Another erroneous premise underlying Stanford's arguments is that the Receiver is using "Stanford's personal assets" in assisting the prosecution. Indeed, it is startling how many times the Motion classifies as "Stanford's money" the relatively small amount of investor funds Stanford had not yet squandered and that remained when the Receiver took over. *See, e.g.*, Motion at 4 ("The Receiver has seized billions of dollars of Mr. Stanford's worldwide assets."); *id.* at 8 (referring to

the "defendant's own liquidated funds"); *id.* at 9 (the "Receiver's dissipation of [Stanford's] personal assets"); *id.* at 38 (referring to "Mr. Stanford's personal and corporate assets"); *id.* at 41 (referring to Mr. Stanford's "private property").

Judge Godbey issued a permanent injunction freezing Stanford's assets, finding that they were proceeds of fraud. Indeed, more than eighteen months after the Receiver took over, it has still located less than $1 billion in assets even though investors were owed $7 billion. *See* Receiver's Interim Report, July 1, 2010 (chronicling the value of liquidated assets which is far less than $1 billion). Even with the investors out billions of dollars, Stanford insists on claiming the remaining investor money as his own.

While Stanford obviously does not like the result of the injunction, he cannot challenge it in this court and makes no showing that the assets of Stanford International Bank Ltd. exceed the amounts owed to CD investors. Moreover, the Motion's claim that Stanford did not have representation in the SEC case is false. Indeed, the public record in the insurance coverage case reveals that Lloyd's of London has paid millions to attorneys, including the international law firm Patton Boggs, representing Stanford in the SEC case. On March 2, 2009, Stanford's lawyer convinced Judge Godbey to continue the permanent injunction hearing so that Stanford's counsel could be prepared to mount a defense. Stanford may now regret the strategic decisions he made to not testify or present evidence at the injunction

hearing, but that second-guessing does not create a due process violation.  Judge Godbey provided Stanford with procedural due process and any claims Stanford has to the contrary should be presented to that court.

The Motion's refrain that the receiver is using "Stanford's money" is thus at odds with the findings of a federal court that the money is proceeds of fraud.  It is well-established that a criminal defendant is not entitled to use criminal proceeds to fund his defense.  The Supreme Court has illustrated this point using the example of a bank robber who "has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended . . . The Government does not violate the Sixth Amendment if it seized the robbery proceeds and refuses to permit the defendant to use them to pay for his defense."[3]  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989).

D.     *There Is No Due Process Violation*

In its strained attempt to find some legal basis for its complaints about Stanford's situation, the Motion cites practically every line of cases in which the words "due process" appear.  None of the legal claims Stanford throws against the wall comes close to sticking.  As discussed above, they fail in the first instance because the Receiver is not a governmental actor and the funds Judge Godbey froze

---

[3] Judge Godbey's finding that these funds do not belong to Stanford's  defeats the Takings Clause claim.  And again, Stanford's contention that Judge Godbey's ruling somehow amounted to a judicial taking should be raised in the SEC case.

do not belong to Stanford.  In additional to these factual deficiencies, Stanford's due process claims lack legal support.  The United States addresses below a few of the arguments to which Stanford devotes the most attention.[4]

1.    Complying With A Federal Court Order On Document Production Does Not "Shock the Conscience"

Stanford's first relies on the "shock the conscience" standard that applies to substantive due process challenges.   But these cases apply to "arbitrary *executive* action." *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (italics added) (explaining that substantive due process applies to arbitrary and egregious "legislation" or a "specific act of a governmental officer").  By its very nature, action of government employees cannot be arbitrary and egregious when it complies with the orders of an independent federal judge.  It is thus ridiculous to argue that following court-mandated procedures for obtaining documents from the receiver "shocks the conscience."

2.    There Was No Abuse Of Parallel Proceedings

It is a "well-settled rule that the government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise

---

[4]  Stanford also claims that the Receiver's production of Stanford's email may have resulted in the turning over of privileged communications between Stanford and any personal counsel he had (as opposed to counsel representing the Stanford entities as the Receiver has waived privileged for those communications).  *See* Motion 56-58.  But despite the defense's access to the same emails the United States has and the fact that Stanford would know about any such personal counsel he had retained, the Motion does not identify any privileged communications.

departing from proper standards in administering justice." *United States v. Posada-Carriles*, 541 F3d 344, 353 (5th Cir. 2008).   None of the issues with parallel proceedings that may give rise to due process concerns are present here.  First, the civil action was not brought "solely to obtain evidence for [the] criminal prosecution." *Setser*, 568 F.3d at 492.  The SEC acted on its own.  The appointment of the Receiver and asset freeze about which Stanford complains demonstrate the significant objectives the SEC achieved in filing the civil action.

This is certainly not a case in which the government "deceived the defendant into believing there was no criminal investigation." *Id.*   The existence of a criminal investigation was widely reported  at the time the SEC filed its case in February 2009.  Indeed, the first arrest (of codefendant Holt) occurred within days of the filing of the SEC case.  Stanford's assertion of his privilege against self-incrimination in the civil case demonstrates his knowledge of the ongoing criminal investigation.  This case obviously does not present the situation in which the government filed a pretextual civil case in order to trick the defendant into giving a confession that could later be used in a criminal prosecution.  Thus, the parallel proceedings do not raise a due process issue.

II.     STANFORD'S DOUBLE JEOPARDY CLAIM FAILS

     A.     *Only In The Rarest Instances Will A Civil Penalty Constitute Criminal Punishment*

The Double Jeopardy Clause of the Fifth Amendment protects "only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 488, 493 (1997) (italics in original) (holding that Office of the Comptroller of the Currency's civil fines and disbarment penalties did not bar subsequent criminal prosecution). In *United States v. Halper*, 490 U.S. 435, 440 (1989), *overruled by Hudson*, the Supreme Court expanded the scope of the Double Jeopardy Clause in holding that civil sanctions that were "overwhelmingly disproportionate to the damages [a defendant] has caused" could constitute criminal punishment for Double Jeopardy purposes. *Halper*, 490 U.S. at 448–49. In the years following *Halper*, it was common for defendants facing parallel civil and criminal proceedings to raise Double Jeopardy claims. But the *Halper* experiment lasted less than a decade because in 1997 the Supreme Court overruled that broad interpretation of the Double Jeopardy Clause. *See Hudson*, 522 U.S. at 95–96 ("We hold that the Double Jeopardy Clause of the Fifth Amendment is not a bar to the later criminal prosecution because the administrative proceedings were civil, not criminal.").

In rejecting *Halper*, the Supreme Court reinstated the two-part statutory construction test it explained in *United States v. Ward*, 448 U.S. 242, 248–49 (1980).

*See Hudson*, 522 U.S. at 96. Under this test, a court first determines whether the legislature, in establishing the penalty, intended it to be considered civil or criminal. *Id*. at 493. For cases in which the legislature intended to establish a civil penalty, the penalty may nonetheless be considered criminal only when the "statutory scheme was 'so punitive either in purpose or effect' as to 'transform what was clearly intended as a civil remedy into a criminal penalty.'"[5] *Id*. (citing *Ward*, 448 U.S. at 248-49 and *Rex Trailer Co. v. United States*, 350 U.S. 148, 154 (1956)). In that second inquiry, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id*. (citing *Ward*, 448 U.S. at 249).

That "clearest proof" certainly does not exist in this case to transform the SEC action and resulting Receivership into criminal punishment. The SEC case and the Receivership are undoubtedly civil in nature. As discussed below, courts have repeatedly rejected defendants' claims that sanctions resulting from SEC civil enforcement actions or the consequences of a Receivership are criminal punishment. Indeed, courts did so even when the pro-defendant *Halper* decision was governing

---

[5] In this inquiry, the Supreme Court considers the following nonexhaustive factors: 1) whether the sanction involves an affirmative disability or restraint; 2) whether it has historically been regarded as punishment; 3) whether it comes into play only upon a finding of *scienter*; 4) whether its operations will promote the traditional aims of punishment-retribution and deterrence; 5) whether the behavior to which it applies is already a crime; 6) whether an alternative purpose is assignable to it; and 7) whether it appears excessive in relation to the alternative purpose assigned. *See Hudson*, 522 U.S. at 493 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

law because these civil attempts to recover investor money do not result in punitive sanctions.

**B.**   *The SEC Civil Action And Receivership Did Not Impose Criminal Punishment*

1.   Courts of Appeals Have Uniformly Held That SEC Penalties Are Not Criminal Punishment.

Stanford's claim that the SEC action imposed criminal punishment makes no sense because the SEC action, in which discovery is stayed pending resolution of the criminal case, has not resulted in a judgement or fine of any kind. In any event, even when an SEC case has concluded and a fine has been imposed, courts have uniformly rejected claims that civil penalties such as fines and disgorgement orders constitute criminal punishment. *See, e .g.*, *United States v. Van Waeyenberghe*, 481 F.3d 951, 569-59 (7th Cir. 2007) ("[Defendant] offers little to no analysis under *Hudson* as to why the injunction, disgorgement and restitution required of him are anything other than equitable remedies that present no bar to subsequent criminal prosecution."); *United States v. Perry*, 152 F.3d 900, 904 (8th Cir. 1998) ("We join [the Second Circuit] and the several other circuits that have held that the SEC disgorgement remedies are not criminal punishments."); *SEC v. Palmisano*, 135 F.3d 860, 865-66 (2d Cir. 1998) ("Congress's intent clearly favors classifying disgorgement and the fines at issue here as civil.");*United States v. Gartner*, 93 F.3d 633, 635 (9th Cir. 1996) (holding that SEC disgorgement penalty and asset freeze did

not constitute criminal punishment because civil securities laws "primarily seek to protect investors and to remedy the unjust enrichment"); *S.E.C. v. Bilzerian,* 29 F.3d 689, 696 (D.C. Cir. 1994) ("Because the disgorgement order did not ask Bilzerian excess of the amount of his illicit gains, Bilzerian does not present the rare case contemplated by the Court in *Halper*."); *SEC v. Credit Bancorp, Ltd.*, 2010 WL 358906 (S.D.N.Y. Sept. 13, 2010) ("A line of cases have applied [*Hudson*] and found that disgorgement, Commission penalties, and injunctions are civil penalties, and thus do not violate the Double Jeopardy Clause.").  In reviewing a defendant's claim in a Ponzi scheme case  that a prior SEC fine and disgorgement order barred the criminal prosecution, the Second Circuit characterized the claim as "plainly meritless in light of *Hudson*."   *Palmisano*, 135 F.3d at 864.   The *Palmisano* Court noted that congressional intent  was clear in classifying penalties available in SEC actions as civil, that the penalties available in civil securities fraud cases have not historically been viewed as punishment, and that the sanctions have clear nonpunitive purposes such as compensating victims, preventing the wrongdoer from profiting from his conduct, and deterring others from engaging in securities fraud.  *See id*. at 864-866. Given that the SEC action has not resulted in any fines against Stanford, it certainly does not bar this criminal prosecution.

2.   <u>The Receiver's Actions Are Not Criminal Punishment Because He Is Not The Government And Is Only Seeking To Return Funds To Investors</u>

If the argument that fines and disgorgement orders resulting from SEC enforcement actions constitute criminal punishment is "plainly meritless" under *Hudson*, then Stanford's additional claim that the actions of the Receivership create a Double Jeopardy bar is frivolous.  First, the Receiver is not the government, and only government conduct implicates the Double Jeopardy Clause.  *See United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir. 1994) ("In order for the Double Jeopardy Clause to have any application, there must be actions by a sovereign . . . [It] does not apply to actions involving private individuals.").  The Fifth Circuit held that when the Resolution Trust Corporation was acting as the receiver of a savings and loan institution it was "not the Government for purpose[s] of the Double Jeopardy Clause." *Id*. at 68; *see also United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997) (rejecting Double Jeopardy claim based on prior actions of FDIC because the FDIC "did not sue the defendants as the United States" but was "acting only as the receiver of a failed institution").  If dual-capacity federal agencies such as the RTC and FDIC are not considered governmental actors for Double Jeopardy purposes when serving as receivers, then certainly the private attorney appointed as the Receiver in Stanford's civil case is not a governmental actor.  The Double Jeopardy challenge to the Receiver's actions thus fails because the Receiver is not a governmental actor.

In any event, even aside from the lack of state action, the actions of the Receiver do not constitute criminal punishment because they are plainly civil in nature. *See Ely*, 142 F.3d at 1122 (noting the fact that the FDIC's conduct as receiver did not result in punishment as a second reason for rejecting Double Jeopardy claim). Judge Godbey appointed the Receiver in a civil case pursuant to the court's equitable authority. The statutes that govern receiverships (*see* p. 3 *supra*) and Federal Rule of Civil Procedure 66 demonstrate Congress's intent that receivers act in a civil capacity. Receiverships have a strong historical lineage as creations of a civil courts' equitable powers. *See* 12 Charles Alan Wright, et al., FED. PRAC. & PROC. § 2981, at 8-9 (2d ed. 1997) ) (tracing the use of receivers back to Elizabethan England).

While SEC fines and disgorgement orders can impose sanctions beyond the amount investors lost, the Receiver's  function in the Stanford case is the purely remedial one of restoring funds to investors who have lost billions of dollars. The Receiver has no power to impose fines or other penalties on Stanford. Despite Stanford's numerous statements that the money is "his," billions of dollars are still owed to CD investors. *See supra* pp. 8-10. Until all $7 billion owed to investors is recovered, Stanford has no basis for arguing that the Receiver's actions are punitive rather than remedial. *Cf. United States v. Tilley*, 18 F.3d 295, 300 (5th Cir. 1994) ("[I]nstead of punishing the forfeiting party, the forfeiture of illegal proceeds, much like the confiscation of stolen money from a bank robber, merely places that party in

the lawfully protected financial status quo that he enjoyed prior to launching his illegal scheme.  That is not punishment 'within the plain meaning of the word.'" ((quoting *Halper*, 490 U.S. at 449)).

III.  STANFORD'S FOURTH AMENDMENT CHALLENGE FAILS

To ensure that his Motion does not omit any constitutional provision that applies to criminal procedure, Stanford's final argument is that the Receiver's providing of documents to the United States violates the Fourth Amendment.  Fifth Circuit law rejects Stanford's claim.

The procedure by which the United States and others have obtained documents from the Receiver was discussed above.  *See supra* pp. 4-6.  The Receiver's compliance with letters requesting specific documents in his possession is no different than the routine practice of corporations complying with requests and subpoenas from regulators and law enforcement agencies .  Neither individuals nor corporations have a Fourth Amendment right to resist requests for records made pursuant to lawful authority.  There is no "search" or unlawful "seizure" when the FBI serves a grand jury subpoena on a business; likewise, there was no "search" or unlawful "seizure" when the FBI complied with a court order and obtained documents by sending letters with specific requests to the Receiver.  Such requests did not involve agents rummaging around a home or business to look for incriminating

evidence and thus implicate none of the privacy concerns animating the concerns about general warrants that Stanford invokes.

Another framework showing the futility of Stanford's claim is the Fourth Amendment doctrine of standing.  To raise a Fourth Amendment claim, a defendant must show that he had a reasonable expectation of privacy in the area search or the item seized.  *See Rakas v. Illinois*, 439 U.S. 128 (1978); *Katz v. United States*, 389 U.S. 347 (1967).  The Fifth Circuit has rejected two Fourth Amendment challenges to a Receiver's production of records to law enforcement on the obvious rationale that the "property owner 'no longer had a reasonable expectation that those records would remain private' once a court has appointed a receiver, and the receiver has taken custody of records under the authority given him."  *Setser*, 568 F.3d at 490 (quoting *United States v. Gray*, 751 F.2d 733, 737 (5th Cir. 1985)).

*Setser*, decided last year, was a $173 million Ponzi scheme case in which a receiver was appointed by the judge presiding over the SEC case.  When Sester challenged the receiver's production of documents to law enforcement, the Fifth Circuit explained that there is "no violation of the Fourth Amendment for a receiver who is the 'lawful custodian' of the records to turn them over to law enforcement agents, at their request."  *Setser*, 568 F.3d at 490.  The Fifth Circuit cited the statutory and equitable authority of receivers to control the property in their possession which meant that once "the receiver took possession of the property, Setser's possessory

rights were lost." *Id*. at 491. *Setser*'s rule that "after a receiver validly takes possession of records and other property, becoming their 'lawful custodian,' the original owner has lost any 'reasonable expectation that those records would remain private" (*id.*) applies equally in Stanford's case.[6]  The Fourth Amendment claim thus fails.

---

[6] Stanford's attempts to distinguish his case from *Setser* are unavailing as none of the distinctions he identifies are relevant to the issue of whether he maintained a reasonable expectation of privacy in the company's documents after the Receiver was appointed.

## <u>CONCLUSION</u>

Stanford's decision to raise so many claims appears to be an attempt to obscure the fact that not one of them has any legitimacy.  The practices of the Receivership that Stanford complains about are common and well-grounded in the law.  This Court should deny Stanford's Motion to Dismiss And/Or Suppress because the prosecution of Stanford complies with Due Process, Double Jeopardy and the Fourth Amendment. Because the factual and legal basis for rejecting these claims is clear from the parties' filings, a hearing is not necessary.

Respectfully submitted,

JOSE ANGEL MORENO
United States Attorney

\s\ Gregg Costa
GREGG COSTA
Assistant United States Attorney

PAUL E. PELLETIER
Principal Deputy Chief
Fraud Section, Criminal Division
WILLIAM STELLMACH
Assistant Chief
ANDREW H. WARREN
Trial Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify this response was served to counsel for defendant Stanford via ECF on October 25, 2010.

\s\ Gregg Costa
Gregg Costa
Assistant United States Attorney