**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
**FILED**

MAY 0 4 2011

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ROBERT ALLEN STANFORD** | § | **Cr. No. H-09-342-01-S** |
| **a/k/a Sir Allen Stanford,** | § | |
| **a/k/a Allen Stanford,** | § | |
| | § | |
| **Defendant.** | § | |

## SUPERSEDING INDICTMENT

The Grand Jury charges that at all times relevant to this Superseding Indictment, unless otherwise specified:

## INTRODUCTION

### Relevant Entities and Individuals

1.      Stanford Financial Group ("Stanford Financial") was a corporation that provided its affiliated companies in the financial services industry with professional support services, including accounting and investment research.  Stanford Financial was incorporated in both Florida and Antigua (a Caribbean island nation), and it maintained offices in, among other locations, Houston, Texas and Memphis, Tennessee.  Stanford Financial had several affiliated companies. Two of Stanford Financial's subsidiary companies were Stanford International Bank, Ltd. ("SIB") and Stanford Group Company ("SGC").

2.      SIB was an Antiguan banking corporation which maintained offices in various countries.  SIB was originally organized in or about 1985 on Montserrat, a Caribbean island and independent nation, under the name Guardian International Bank ("Guardian Bank").  In or about 1990, following notification that Montserrat intended to revoke its banking license, Guardian Bank relocated to Antigua and subsequently changed its name to SIB.  SIB was a private, offshore bank that sold various financial products.  SIB's primary product was a Certificate of Deposit ("CD") which the bank marketed to investors by promising substantially higher rates of return than were generally offered at banks in the United States.

3.      SGC was a Texas corporation organized in or about 1995 and headquartered in Houston, Texas, which maintained offices in 25 locations throughout the United States.  SGC was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer of securities and investment advisor.

4.      SGC employed numerous financial advisors who, among other things, marketed and sold SIB CDs to investors.  As an incentive to sell the CDs, the commissions that SGC's financial advisors earned from sales of the CDs were substantially higher than those earned from the sale of other financial products.

5.      Although SIB marketed and sold its CDs within the United States, SIB, as an Antiguan-based bank, was not regulated by any United States banking authority.  Instead, SIB was regulated by an agency of the Antiguan government known as the Financial Services Regulatory Commission (the "Antiguan Regulatory

Commission"), which claimed to conduct inspections to determine the solvency of banks, to review the quality of banks' investments, and to confirm the accuracy of banks' reported returns.

6.      ROBERT ALLEN STANFORD, the defendant, founded and was the sole shareholder of Stanford Financial and its affiliated companies, including SGC and SIB.  In addition to being the sole owner of SIB, STANFORD also served as chairman of the SIB Board of Directors.

7.      James M. Davis, a co-conspirator not named as a defendant herein, was the Chief Financial Officer ("CFO") of Stanford Financial.

8.      Laura Holt, a co-conspirator not named as a defendant herein, was the Chief Investment Officer ("CIO") of Stanford Financial.

9.      Gilberto Lopez, a co-conspirator not named as a defendant herein, was the Chief Accounting Officer of Stanford Financial.

10.      Mark Kuhrt, a co-conspirator not named as a defendant herein, was the Global Controller of Stanford Financial Group Global Management, an affiliate of Stanford Financial and SIB.

11.      Leroy King, a co-conspirator not named as a defendant herein, was the Administrator and Chief Executive Officer for the Antiguan Regulatory Commission.  Among other things, King was responsible for Antigua's regulatory oversight of SIB's investment portfolio, which involved reviewing SIB financial reports

3

for the Antiguan Government and responding to requests by foreign regulators, including

the SEC, for information and documents about SIB's operations.

      12.    In addition to oversight by the Antiguan Regulatory Commission,

SIB also publicized that it had retained an independent accounting firm based in Antigua

(the "Outside Auditor") which supposedly performed audits that verified the accuracy of

SIB's financial statements, which were in turn disseminated to investors in SIB CDs.

### Overview of the Fraudulent Scheme

      13.    From in or about 1990 through in or about February 2010,

STANFORD, together with others, perpetrated a scheme to defraud investors who

purchased SIB CDs of billions of dollars by soliciting funds under false pretenses, failing

to invest those funds as promised, misappropriating funds for personal use, creating and

disseminating false and fraudulent documents to investors falsely showing how their

funds had been invested, and funneling bribes to Antiguan regulators and the Outside

Auditor to conceal the scheme.

      14.    To execute their scheme, STANFORD and his co-conspirators

disseminated and caused others to disseminate various representations falsely describing

SIB CDs to potential and existing investors.  According to those representations, which

STANFORD reviewed and approved, SIB invested the proceeds from the sales of its CDs

in a portfolio consisting of various assets, and the performance of that investment

portfolio generated returns that SIB then paid to the purchasers of the CDs.  Therefore,

the return earned by investors who purchased the CDs depended on SIB's strategy in

4

investing proceeds from the sale of the CDs, as returns on the CDs were contingent on SIB's investment portfolio.

15.     STANFORD and his co-conspirators disseminated documents to current SIB CD investors as well as to prospective investors that falsely described the make-up and performance of SIB's investment portfolio, including SIB's financial statements and other periodic reports. STANFORD and his co-conspirators also made presentations regarding the financial condition of SIB and its investment portfolio directly to: (a) prospective and existing investors; and (b) financial advisors employed by SGC, who functioned as a sales force for SIB CDs because they marketed the CDs to their customers.

16.     The representations that STANFORD and his co-conspirators made regarding the operation and nature of SIB CDs, as well as the roles played by the Outside Auditor and Antiguan regulators to protect investors, were false. Specifically, STANFORD and his co-conspirators executed their scheme by making and causing others to make to investors the following misrepresentations, among others:

       a.    All of the proceeds from the sales of the CDs would be invested with professional money managers in conservative, highly liquid assets, such as stocks, bonds, and foreign currencies, when, in truth and in fact, as STANFORD and his co-conspirators well knew, billions of dollars were funneled to STANFORD in the form of undisclosed personal "loans";

       b.    SIB was earning substantial rates of return on its investment portfolio, when, in truth and in fact, as STANFORD and his co-conspirators well knew, SIB was steadily losing money because its investment portfolio was not invested in

profitable assets as represented, and because STANFORD did not repay the loans he had made to himself from SIB;

c.    STANFORD had personally invested hundreds of millions of dollars of cash into SIB to provide capital, when, in truth and in fact, as STANFORD and his co-conspirators well knew, no such investment ever took place and in fact STANFORD had borrowed approximately $2 billion from SIB; and

d.    The Antiguan Regulatory Commission regulated SIB, and the Outside Auditor verified the accuracy of the disclosures in SIB's financial statements, when, in truth and in fact, as STANFORD and his co-conspirators well knew, STANFORD bribed both King and the Outside Auditor to conceal his fraudulent scheme from investors and the SEC.

17.    Contrary to their representations to investors, STANFORD and his co-conspirators misappropriated a significant percentage of the proceeds from the CD sales to finance STANFORD's personal business ventures and lavish lifestyle.  By in or about December 2008, SIB represented to investors that it had approximately $8.5 billion in assets when in fact approximately $2 billion of that total consisted of undisclosed personal "loans" to STANFORD, who had misappropriated those funds to finance his personal, failing business ventures and for his own use and enjoyment, including personal living expenses, several yachts and private jet airplanes, and numerous residences around the world.

## Misrepresentations Regarding Investment Strategy

18.    STANFORD and his co-conspirators reviewed and caused the issuance of SIB's periodic annual, quarterly and monthly financial reports, which were provided to investors and used by SGC's financial advisors in marketing SIB CDs,

together with various other SIB documents and brochures that claimed to describe SIB's investment portfolio. The periodic reports and other documents falsely represented that the CDs were safe and secure investments. For example, the SIB December 2008 Monthly Report emphasized that SIB was "strong, safe and fiscally sound" and that its investment strategy for the CDs consisted of a "conservative approach" that was "long term, hands on and globally diversified with strong liquidity and minimal leverage."

19.    Specifically, STANFORD and his co-conspirators made false and misleading misrepresentations regarding the management of SIB's investment portfolio. According to those false statements, SIB's entire investment portfolio was closely managed by a global network of independent money managers who worked outside the bank. In truth and in fact, as STANFORD and his co-conspirators well knew, only a fraction of SIB's reported investment portfolio was invested as SIB represented.

20.    STANFORD and his co-conspirators made similarly false and misleading representations concerning SIB's investment strategy. For example, SIB's CD Disclosure Statement described SIB's investment strategy as seeking to "minimize risk and achieve liquidity" through asset diversification in "readily marketable" securities. In various periodic reports issued by SIB, STANFORD and his co-conspirators falsely represented the different types of asset classes into which investor proceeds had purportedly been invested, specifically misidentifying the percentages held in stocks, bonds, foreign currencies, and other financial assets.

## Falsified Financial Statements

21.    To induce investors to purchase the CDs and to conceal their fraud, STANFORD and his co-conspirators falsified the financial statements for SIB that were disseminated to potential and existing CD investors, misrepresenting, among other material facts, the value and performance of SIB's investment portfolio.

22.    Beginning at least as early as in or about 1990, when SIB was still known as Guardian Bank, the value and performance of the bank's assets were less than it reported to CD investors. Over time, that gap steadily grew. To conceal this discrepancy, STANFORD and his co-conspirators misrepresented the nature and value of the assets in SIB's investment portfolio. For example, in or about June 2008, STANFORD and his co-conspirators caused SIB to report that SIB's investment portfolio contained approximately $8 billion in assets consisting of stocks, bonds, foreign currencies, and other financial assets. In fact, SIB had only invested a fraction of this amount in such assets, and the balance of the portfolio had been misappropriated by STANFORD in the form of undisclosed personal loans to finance his various personal business ventures.

23.    STANFORD and his co-conspirators also made and caused to be made false and misleading representations concerning SIB's financial condition by touting year-by-year percentage and dollar amount increases in the supposed value of its earnings, revenue, and assets. According to SIB's fabricated financial disclosures, the purported value of SIB's assets rose from approximately $1.2 billion in 2001 to

8

approximately $8.5 billion in December 2008. In truth and in fact, as STANFORD and his co-conspirators well knew, those values were entirely fictional and designed to deceive investors into believing that SIB's investment portfolio was performing as represented.

## Misrepresentations Regarding STANFORD's Personal Investment

24.     STANFORD also misrepresented to investors the size of his own investment in SIB. As the financial crisis grew in 2008, investors began to redeem their CDs. Between in or about May 2008 and in or about December 2008, STANFORD directed SGC's financial advisors to inform their clients that STANFORD had increased SIB's capital to approximately $1 billion by investing an additional approximately $740 million that year into the bank's capital. In truth and in fact, as STANFORD and his co-conspirators well knew, STANFORD never made any such investments in SIB.

25.     STANFORD and his co-conspirators repeatedly represented to investors that he had invested approximately $740 million in SIB, and they caused the internal records of SIB to be falsified to reflect the non-existent investments. For example, STANFORD caused to be sent to investors SIB's monthly report for December 2008, which falsely represented that SIB had received a "contribution" of approximately $541 million from STANFORD. Similarly, on or about February 12, 2009, STANFORD sent an email to SGC's financial advisors in which STANFORD made representations that SIB "remains a strong institution" and that he had recently made "two capital infusions" into SIB, which the financial advisors then relayed to investors.

9

26.     In late 2008 and early 2009, STANFORD and his co-conspirators began formulating a plan to engage in a fraudulent revaluation of real estate in an attempt to generate artificial bookkeeping entries to support Stanford's supposed 2008 capital infusions and to offset the more than $2 billion in loans Stanford owed SIB by this time. The plan contemplated using a series of related-party transactions between Stanford, SIB and other Stanford-entities that would result in ascribing a value of $3.2 billion to real estate SIB had purchased only a few months earlier for $67.5 million.

## Misrepresentations Regarding
## Regulatory Oversight and the Outside Auditor

27.     STANFORD and his co-conspirators made false and misleading representations regarding the nature and extent of regulatory oversight of SIB, including that SIB's operations and financial condition were being closely overseen by the Antiguan Regulatory Commission and that SIB's financial statements were subject to annual audits and regulatory inspections by Antiguan regulators.  Similarly, STANFORD and his co-conspirators falsely represented that the Outside Auditor periodically reviewed and approved of the accuracy of SIB's financial statements.  In truth and in fact, as STANFORD and his co-conspirators well knew, they bribed King and the Outside Auditor to ensure that they did not accurately audit SIB's financial statements by verifying the existence or value of SIB's purported assets.

28.     In addition to ensuring that Antiguan regulators whom he supervised did not effectively scrutinize SIB, King also assisted STANFORD in obstructing an

10

investigation by the SEC.  In or about 2005, the SEC initiated an investigation of

Stanford Financial and began making official inquiries with the Antiguan Regulatory

Commission headed by King regarding the value and content of SIB's purported

investments.  As part of that investigation, the SEC confidentially requested the

assistance of King in determining whether SIB and Stanford Financial had perpetrated a

fraud upon investors.

29.    In or about September 2006, the SEC submitted a letter to the

Antiguan Regulatory Commission confidentially requesting, among other things, copies

of the Antiguan Regulatory Commission's exam reports regarding SIB.  King provided

the SEC's confidential requests for information to STANFORD and his co-conspirators.

King then made false representations in response to official inquiries from the SEC and

allowed employees of Stanford Financial to assist in preparing the Antiguan Regulatory

Commission's response to the SEC's confidential inquiry.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud and Mail Fraud)

### THE CONSPIRACY

30.    From in or about 1990 through on or about March 3, 2009, in the

Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN

STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly combine,

conspire, confederate and agree with Holt, Lopez, Kuhrt, King, Davis, and with others,

11

known and unknown to the Grand Jury, to commit certain offenses against the United

States, that is:

      a.      to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341;

      b.      to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343; and

### PURPOSE OF THE CONSPIRACY

    31.    It was a purpose of the conspiracy that the defendant and his co-

conspirators would solicit and obtain billions of dollars of investors' funds through false

pretenses, representations and promises, all in order to obtain substantial economic

benefits for themselves and others through the payment of fees, wages, bonuses, and

other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

32.     It was a part of the conspiracy that the defendant and his co-conspirators would make and cause to be made false and misleading representations in various documents regarding, among other things, the investment strategy, management, and composition of SIB's investment portfolio.

33.     It was further a part of the conspiracy that the defendant and his co-conspirators would create and cause to be created false and misleading accounting and other records concerning the value and performance of SIB's investment portfolio.

34.     It was further a part of the conspiracy that the defendant and his co-conspirators would divert hundreds of millions of dollars from SIB's accounts into a numbered Swiss bank account held by Stanford Financial (the "Swiss Bank Account"), from which STANFORD and Davis would then transfer funds to finance STANFORD's various personal ventures and lifestyle.

35.     It was further a part of the conspiracy that the defendant and his co-conspirators would make and cause to be made false and misleading representations to investors regarding, among other things, personal investments by STANFORD in SIB.

36.     It was further a part of the conspiracy that STANFORD would make regular secret corrupt payments of thousands of dollars in cash and other items of value, including Super Bowl tickets, to King, the Administrator and CEO of the Antiguan Regulatory Commission.

37.     It was further a part of the conspiracy that STANFORD and Davis would regularly use the Swiss Bank Account to make secret corrupt payments of thousands of dollars to SIB's Outside Auditor.

## OVERT ACTS

38.     In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

> a.   At various times between in or about December 1987 and in or about October 2008, STANFORD approved for dissemination to existing and potential CD investors annual reports and quarterly updates issued by SIB that supposedly contained accurate disclosures regarding the management, composition, and performance of SIB's investment portfolio.
>
> b.   Between on or about October 1, 2003 and on or about October 8, 2003, STANFORD and Davis wire transferred approximately $22 million from the Swiss Bank Account into one of STANFORD's personal bank accounts located in Houston, Texas.
>
> c.   On or about April 24, 2006, STANFORD and Davis caused two wire transfers from the Swiss Bank Account, consisting of one for approximately $2.9 million and another for $3.5 million, into two of STANFORD's personal bank accounts located in Houston, Texas, and Miami, Florida, respectively.

14

d.  On or about September 25, 2006, King delivered official and confidential correspondence to STANFORD and Davis that the Antiguan Regulatory Commission had received from the SEC.

e.  On or about May 18, 2008, STANFORD and Davis increased the monthly wire transfers from the Swiss Bank Account to the Outside Auditor, which were in addition to on-the-books payments that Stanford Financial made to the Outside Auditor, from approximately 15,000 sterling pounds per month to approximately 20,000 sterling pounds per month.

f.  In or about December 2008, STANFORD, Holt, Davis and others caused to be sent to investors in Houston, Texas, and elsewhere SIB's Monthly Report for December 2008, which falsely represented that SIB had received a "capital infusion" of $541 million from STANFORD.

g.  On or about February 11, 2009, STANFORD caused a letter to be sent to investors, in which STANFORD made representations that the pending regulatory investigations were "routine examinations," that SIB "remains a strong institution" and that he had "already added two capital infusions into the bank."

h.  On or about February 12, 2009, STANFORD sent an email to Stanford Financial's global employees, including financial advisors employed by SGC in Houston, Texas, in which STANFORD repeated the false representations that he made in the February 11, 2009 letter to investors.

i.  The acts alleged in Count Two through Count 18 of the Indictment are re-alleged and incorporated herein as additional overt acts in furtherance of the conspiracy and to achieve the objects and purpose thereof.

All in violation of Title 18, United States Code, Section 1349.

15

## COUNTS TWO THROUGH SIX
### (Wire Fraud)

37.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

38.     From in or about at least 1990 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant,  ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt, Lopez, Kuhrt, King, Davis, and others, known and unknown to the Grand Jury, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

### PURPOSE OF THE SCHEME AND ARTIFICE

39.     It was a purpose of the scheme and artifice that the defendant and his co-conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

### SCHEME AND ARTIFICE

40.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

16

## USE OF THE WIRES

41.      On or about the dates specified as to each Count below, the

defendant, for the purpose of executing the scheme and artifice to defraud described

above, and attempting to do so, did knowingly transmit and cause to be transmitted, by

means of wire communications in interstate and foreign commerce, certain writings,

signs, signals, pictures and sounds, as more particularly described below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|--------------|-----------------------------------|
| Two | February 2, 2006 | $9,000 purchase of Super Bowl tickets by STANFORD for King from an entity located in California using a credit card account located in Houston, Texas |
| Three | April 24, 2006 | Wire transfer of approximately $2.9 million from Stanford Financial account #8731 located in Switzerland to STANFORD's personal checking account #2134 located in Houston, Texas |
| Four | December 24, 2008 | Wire transmission of approximately $700,000 from SGC account #4183 located in Houston, Texas, to an SIB account located in Houston, Texas, regarding Investor WJ's purchase of SIB CDs |
| Five | January 5, 2009 | Email from Kuhrt in St. Croix, U.S. Virgin Islands, to Lopez in Houston, Texas, attaching spreadsheet concerning artificial "roundtrip" real estate transaction to transfer interests in island properties back to SIB |
| Six | February 12, 2009 | Email from STANFORD to Stanford Financial Employees transmitted to employees in Houston, Texas, Memphis, Tennessee, and elsewhere representing that SIB "remains a strong institution" and that he had recently made "two capital infusions" into the bank |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SEVEN THROUGH ELEVEN
### (Mail Fraud)

42.      Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

43.      From in or about at least 1990 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt, Lopez, Kuhrt, King, Davis, and others known and unknown to the Grand Jury, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

### PURPOSE OF THE SCHEME AND ARTIFICE

44.      It was a purpose of the scheme and artifice that the defendant and his co-conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

### SCHEME AND ARTIFICE

45.      Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

18

## USE OF THE MAILS

46.     On or about the dates specified as to each count below, the

defendant, for the purpose of executing the scheme and artifice to defraud described

above, and attempting to do so,  knowingly deposited and caused to be deposited the

matters and things listed below to be sent and delivered, and caused the matters and

things to be sent and delivered, by private and commercial interstate carrier and by the

United States Postal Service:

| COUNT | APPROX. DATE | DESCRIPTION OF MAIL MATTER |
|-------|-------------|----------------------------|
| Seven | February 22, 2008 | Package of documents, including investor subscription information, sent and delivered  via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Eight | August 13, 2008 | Package of documents, including investor subscription information, sent and delivered  via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Nine | September 18, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Ten | October 16, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Eleven | December 16, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TWELVE
### (Conspiracy to Obstruct SEC Investigation)

47.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

48.     From in or about June 2005 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant,  ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly combine, conspire, confederate and agree with Holt, King, Davis, and others, known and unknown to the Grand Jury, to commit a certain offense against the United States, that is: to corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the United States Securities and Exchange Commission, in violation of 18 U.S.C. § 1505.

### PURPOSE OF THE CONSPIRACY

49.     It was a purpose of the conspiracy that the defendant and his co-conspirators would corruptly influence, obstruct and impede the SEC's investigation of Stanford Financial, including the SEC's efforts to ascertain SIB's true financial condition and the content and value of SIB's investment portfolio, all in an effort to, among other things, perpetuate and prevent detection of an ongoing fraud and continue receiving economic benefits from the fraud.

### MANNER AND MEANS OF THE CONSPIRACY

50.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy.

### OVERT ACTS

51.     In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

a.      Paragraphs 1 through 29 and 30 through 38 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein as overt acts.

b.      At various times in or about 2005 and in or about 2006, King shared with STANFORD and his co-conspirators confidential requests from the SEC to the Antiguan Regulatory Commission for information relating to SIB.

c.      From in or about January 2003 through in or about February 2009, King deposited more than approximately $300,000 in cash in various accounts that he held in the United States.

d.      On or about June 21, 2005, King falsely represented in a letter to the SEC that if STANFORD were running a Ponzi scheme then the Antiguan Regulatory Commission's examination of SIB would have detected it.

e.      On or about February 2, 2006, STANFORD purchased Super Bowl tickets for $9000 for King.

f.      On or about February 23, 2009, King caused approximately $150,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

g.      On or about February 26, 2009, an attorney at the SEC sent a letter to King seeking assistance of the Antiguan Regulatory Commission ("SEC Request for Assistance Letter") to determine, among other things, the amount of investor funds which were in SIB accounts and to identify persons who had been involved in the fraudulent scheme or had been victims of the scheme.

h.      On or about March 2, 2009, King caused approximately $410,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

i.      On or about March 3, 2009, in response to the SEC Request for Assistance Letter, King sent a letter to the SEC denying the request and stating that the Antiguan Regulatory Commission had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to your request."

All in violation of Title 18, United States Code, Section 371.

## COUNT THIRTEEN
### (Obstruction of SEC Investigation)

52.      Paragraphs 1 through 29, 31 through 38, and 51 of this Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

53.      From in or around June 2005, through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt,

22

King, Davis, and others, known and unknown to the Grand Jury, did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the Securities and Exchange Commission.

In violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT FOURTEEN
### (Conspiracy to Commit Money Laundering)

54.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### THE CONSPIRACY

55.     Beginning in or around 1990 through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly and intentionally conspire, combine, confederate, and agree with Holt, Kuhrt, Lopez, King, Davis, and others, known and unknown to the Grand Jury, to commit the following offenses:

      a.     to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud and mail fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

      b.     to knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000 that was

derived from specified unlawful activity, that is wire fraud and mail fraud, in violation of Title 18, United States Code, Section 1957.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

56.     It was a part of the conspiracy that STANFORD, Holt, Kuhrt, Lopez, King, Davis and others would cause the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts located in the Southern District of Texas and elsewhere in the United States to various bank accounts located outside of the United States as follows:

a.     STANFORD, Holt, Kuhrt, Lopez, Davis and others would cause investors in SIB CDs to transfer the investors' funds into bank accounts located in the Southern District of Texas which were maintained by STANFORD;

b.     STANFORD, Holt, Kuhrt, Lopez, Davis and others would subsequently cause the transfer of the investors' funds in amounts exceeding $10,000 from bank accounts located in the Southern District of Texas into intermediary bank accounts located outside of the United States; and

c.     STANFORD, Holt, Kuhrt, Lopez, Davis and others, would cause the transfer of investors' funds from intermediary bank accounts into other bank accounts located outside of the United States in order for STANFORD, Holt and Davis to exercise exclusive control over the investors' funds.

24

57.     It was further a part of the conspiracy that STANFORD would make corrupt payments in excess of $10,000 to King who would then cause the deposit of those funds into financial institutions located throughout the United States.

All in violation of Title 18, United States Code, Section 1956(h).

## NOTICE OF FORFEITURE
### 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1)

### NOTICE AS TO COUNTS ONE THROUGH ELEVEN AND FOURTEEN

58.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that in the event of his conviction of any of the offenses charged in Counts One through Eleven of this Superseding Indictment, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(l)(C), the United States intends to forfeit the following property:

> All property, real or personal, which constitutes or is derived from proceeds traceable to each such offense, including the conspiracy to commit such offenses.

59.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that in the event of his conviction of the offense charged in Count Fourteen, pursuant to Title 18, United States Code, Section 982(a)(1), the United States intends to forfeit the following property:

> All property, real or personal, involved in a money laundering conspiracy as charged in Count Fourteen, and any property, real or personal, traceable to such property.

25

## MONEY JUDGMENT

60.    The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that upon his conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

## PROPERTY SUBJECT TO FORFEITURE

61.    The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that the property subject to forfeiture includes, but is not limited to, the following property:

        a.    at least $7 billion in United States dollars;

        b.    all funds on deposit in the following accounts:

### Union Bancaire Privee UBP, Geneva

| Account Holder | Account Number |
| --- | --- |
| Bank of Antigua Ltd. | XXXX203 |

### HSBC Bank, PLC, London, United Kingdom

| Account Holder | Account Number |
| --- | --- |
| Stanford International Bank Ltd. | XXXX0160 |
| | XXXX3136 |
| | XXXX8105 |
| | XXXX0538 |

26

## Credit Suisse, United Kingdom

| Account Holder | Account Number |
|---|---|
| Stanford International Bank, Ltd. | LDXXX051 |
| | LDXXX465 |
| | LDXXX830 |
| | 2LFXXX651 |
| | LDXXX909 |

## SG Private Banking, Geneva, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 800 |
| Stanford International Bank (Antigua) | XXX 801 |
| Stanford Financial Group LTD, Lausanne | XXX 731 |
| Robert Allen Stanford | X XXX 600 |
| Bank of Antigua Ltd. | XXX732 |

## Banque Franck, Galland, Geneva, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 058 |

## Julius Baer, Zurich, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX.XXX.6744 |

### RBS Coutts, Zurich, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX XXX 375 |
| | XX XXX560 |
| | XX XXX565 |

### Toronto Dominion Bank, Canada

| Account Holder | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXXX-XXX1573 |
| | XXXXXX-XXX1670 |
| | XXXXXX-XXX4235 |
| | XXXXXX-XXX0513 |
| | XXXXXX-XXX0380 |
| | XXXXXX-XXX5558 |
| | XXXXXX-XXX5569 |
| | XXXXXX-XXX5624 |

### Friends Provident International Limited

| Account Holder | Account Number |
|---|---|
| The Prophecy Trust | XX8097 |

### Coutts Bank Ltd.

| Account Holder | Account Number |
|---|---|
| Southpac Life Insurance Limited | XXXX7443.1000 |

### Credit Suisse, Zurich

| Account Holder | Account Number |
| --- | --- |
| Stanford Group (Suisse) SA | XXXX-XXX X50-4 |

### First Bank Virgin Islands

| Account Holder | Account Number |
| --- | --- |
| C.A.S. Hewlett | XXXXXXX131 |

### First Citizens Bank dba Sun American Bank, Boca Raton, Florida

| Account Holder | Account Number |
| --- | --- |
| Rebecca Reeves-Stanford | XXXXXX306 |

### Marex Financial Limited

| Account Holder | Account Number |
| --- | --- |
| Bank of Antigua | XX885 |
| Stanford International Bank, Limited | XX886 |
| Stanford Financial Group, Limited | XX889 |

### SUBSTITUTE ASSETS

In the event that property subject to forfeiture, as a result of any act or omission of the defendant, ROBERT ALLEN STANFORD,

(A)     cannot be located upon the exercise of due diligence;

(B)     has been transferred or sold to, or deposited with, a third party;

29

(C)     has been placed upon the jurisdiction of the court;

(D)     has been substantially diminished in value; or

(E)     has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the

defendant up to the total value of the property subject to forfeiture, pursuant to Title 21,

United States Code, Section 853(p), incorporated by reference in Title 28, United States

Code, Section 2461(c), and Title 18, United States Code, Section 982(b)(1).


A TRUE BILL

ORIGINAL SIGNATURE ON FILE
FOREPERSON


JOSE ANGEL MORENO
UNITED STATES ATTORNEY

GREGG COSTA
ASSISTANT UNITED STATES ATTORNEY


GREG ANDRES
Deputy Assistant Attorney General
Criminal Division
U.S. Department of Justice

WILLIAM STELLMACH
Deputy Chief
ANDREW H. WARREN
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

30