1
2
3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

4  UNITED STATES OF AMERICA        *     09-CR-342
                                  *     Houston, Texas
5  VS.                            *
                                  *     January 27, 2012
6  ROBERT ALLEN STANFORD          *     10:06 a.m.

7

8                          **JURY TRIAL**

9                          **VOLUME 5**

10                 **BEFORE THE HONORABLE DAVID HITTNER**
                   **UNITED STATES DISTRICT JUDGE**
11

12 **APPEARANCES: APPEARANCES:**

13 **FOR THE GOVERNMENT:**
   Gregg J. Costa
14 Assistant US Attorney
   PO Box 61129
15 Houston, Texas 77208-1129

16 William Stellmach
   Andrew Howard Warren
17 U.S. Department of Justice
   1400 New York Avenue NW
18 Washington, DC 20005

19

20 **FOR THE DEFENDANT:**
   Ali R. Fazel
21 Robert Scardino
   Scardino & Fazel
22 1004 Congress Street
   3rd Floor
23 Houston, Texas 77002

24

25

1 A P P E A R A N C E S: (Continued)

2 FOR THE DEFENDANT: (Continued)
  John M. Parras
3 Attorney at Law
  1018 Preston
4 Floor 2
  Houston, Texas 77002

5


6 Kenneth W. McGuire
  McGuire Law Firm
7 PO Box 79535
  Houston, Texas 77279

8


9


10 Court Reporter:
   Johnny C. Sanchez, RPR, RMR, CRR
11 515 Rusk, #8016
   Houston, Texas 77002
12 713.250.5581

13 Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-assisted transcription.
14

15

16

17

18

19

20

21

22

23

24

25

1

# I N D E X

2 **WITNESS**                                                        **PAGE**

3

**JASON GREEN**

4

CROSS-EXAMINATION BY MR. FAZEL................. 1262

5

REDIRECT EXAMINATION MR. STELLMACH............. 1410

6

RECROSS EXAMINATION BY MR. FAZEL............... 1430

7

REDIRECT EXAMINATION MR. STELLMACH............. 1436

8

9 **JOSEPH FLYNN**

10       DIRECT EXAMINATION BY MR. WARREN............... 1446

11       CROSS EXAMINATION BY MR. MCGUIRE............... 1478

12       REDIRECT EXAMINATION BY MR. WARREN............ 1509

13       RECROSS EXAMINATION BY MR. MCGUIRE............. 1515

14

**MARK PAUL COLLINSWORTH**

15

16       DIRECT EXAMINATION BY MR. WARREN............... 1519

VOIR DIRE EXAMINATION BY MR. FAZEL............. 1547

17

18

19

20

21

22

23

24

25

1       THE COURT:  Hang on one second.  We have one
2   juror inquiry.  So just stand at ease, please, or sit at
3   ease.

4       Let me see the attorneys up here.

10:08:21   5       Everybody have a seat for a moment.

6       **(The following was held at the bench)**

7       THE COURT:  Okay.  Two of the jurors have
8   mentioned that a lady in the back was sleeping.  Okay.  Two
9   of the jurors have mentioned that.

10:08:57   10       MR. FAZEL:  One of the jurors was sleeping?

11       THE COURT:  Oh, yes.

12       What number is that, Ellen?

13       CASE MANAGER:  Juror Number 11.

14       THE COURT:  11.  The older woman in the back.
10:09:10   15   I've noticed it.  I mean, I've been -- you know, while you
16   are in the pit, I always watch the jurors.  And she is
17   sleeping.  And we just asked -- and two of the jurors
18   mentioned it to Ellen, because they, you know, are working.

19       And we just mentioned it to the lady and
10:09:29   20   said I could put her like we did with Mr. James, years ago
21   in the bribery trial, we put him on the end, that he could
22   get up -- he had back problems -- and he could walk around
23   a little bit and sit down.  But she just said she doesn't
24   think that would help.  She's always had problems with it.
10:09:47   25   Thanks a lot for not telling us.

1              So if you want to do anything, fine; if

2  you don't, I'll leave her on there and have that in state

3  court.  Do you want to talk about it?

4              MR. COSTA:  We would like to talk about it.

10:09:57  5              THE COURT:  Okay.

6              MR. FAZEL:  Maybe after lunch.

7              THE COURT:  You want to go for the morning and

8  come back to this thing?

9              MR. COSTA:  Yes.

10:10:05  10              MR. FAZEL:  Judge, there's one other thing, if

11  the Court is done.

12              THE COURT:  Go on.

13              MR. FAZEL:  There's one other thing.  There's

14  three exhibits that I tendered to the government today.

10:10:12  15  Originally we had no exhibits for Green.  And we went back

16  and forth.  I sent an e-mail to Mr. Costa.  And then I

17  said, "Well, wait a minute.  There might be one."  And then

18  I said, "No, there isn't one."

19              After the direct examination, there was

10:10:21  20  some mention about insurance, and so that prompted us to

21  find some documents that we think are relevant and would

22  like to cross-examine Mr. Green with.

23              And I will be very frank with you, given

24  the circumstances, Your Honor, we haven't turned those over

10:10:35  25  yet.  These are things that they produced to us.  It's not

1  stuff that we came up on our own, but these are things that

2  we did not say --

3            MR. STELLMACH:  Well, I don't see a Bates

4  number on here indicating they produced them.

10:10:46  5            THE COURT:  When is he -- do you have some more

6  time on it?

7            MR. FAZEL:  I'm on it.

8            MR. STELLMACH:  He's on cross.

9            THE COURT:  Oh, he's on cross.  Okay.  That's

10:10:52  10  right.

11            MR. STELLMACH:  So, Your Honor, we would object

12  to these documents coming in.  We're getting them literally

13  in the middle of the cross-examination.  This is typical of

14  the problem we've had with documents.

10:11:00  15            THE COURT:  Let's see what you've got.

16            MR. STELLMACH:  They purport to be documents

17  from insurance brokers stating that they located insurance

18  for Stanford International Bank.

19            THE COURT:  Does he know about this?

10:11:09  20            MR. FAZEL:  That's why I was going to ask him

21  about it.

22            The other issue is just like anything else

23  in trial, Your Honor, there's always -- they sent us

24  exhibits yesterday saying this is going to be an amended

10:11:17  25  exhibit or something.  I understand --

1    MR. STELLMACH:  Two weeks from now.

2    MR. FAZEL:  No, I understand that.  I

3 appreciate that.  I'm not saying we're perfect.

4    THE COURT:  One ruling at a time.  See if he

10:11:26   5 recognizes it or tell the government it's the last time

6 we'll put up with it, okay?  This is Friday.  They have the

7 whole weekend.  Monday is a whole new ball game, okay?  But

8 let's be flexible today.  I understand your position.

9    MR. STELLMACH:  As long as we're on the same

10:11:41  10 page, that's the exception we're going to make.

11    THE COURT:  Well, unless it's something that's

12 purely rebuttal, it came out of left field.  This could

13 have been anticipated.  We understand that.  But they have

14 this problem, and now they know what sequence it is.

10:11:57  15 Monday will be a different ball game.

16    MR. STELLMACH:  Thank you, Your Honor.

17    THE COURT:  All right.  Please call the jury

18 in, please.

19    THE COURT:  Ellen, is everything on here?  All

10:12:15  20 the camera?

21    **(The following was held before the jury)**

22    THE COURT:  Thank you.  Be seated.

23    Good morning.  We're ready to proceed.  I

24 think Mr. Fazel is up.

10:13:44  25    Go right ahead.

*Cross-Green-By Mr. Fazel*

1          MR. FAZEL:  Thank you, Your Honor.

2                **JASON GREEN**

3             **CROSS-EXAMINATION**

4  BY MR. FAZEL:

10:13:46  5  **Q.**   Good morning, Mr. Green.

6  **A.**   Good morning.

7  **Q.**   I just wanted to kind of summarize what we discussed

8  yesterday.  Since we left off at a particular place

9  yesterday, I want for a kind of bring you up to where we

10:13:59  10  are and then we can go from there; okay?

11  **A.**   Okay.

12  **Q.**   And just like I discussed with you yesterday, if I go

13  too fast, if you don't understand a question, let me know

14  and I'll repeat myself.

10:14:08  15  **A.**   Yes, sir.

16  **Q.**   And if you don't know the answer to a question, just

17  say, I don't know.

18  **A.**   Okay.

19  **Q.**   Fair enough?

10:14:12  20  **A.**   Fair enough.

21  **Q.**   Okay.  Great.  Mr. Green, we talked about you joining

22  the had Stanford companies, and we talked about your

23  salary being $70,000 and a bonus of $10,000.

24          Do you remember that discussion?

10:14:23  25  **A.**   That was my initially bonus, yes.

*Cross-Green-By Mr. Fazel*

1  **Q.**   And you found that to be perfectly normal within

2  industry norms; correct?

3  **A.**   Yes.

4  **Q.**   Okay.  And then we talked about what you did

10:14:31  5  originally for the company, that you developed a type of

6  investment model.

7             Do you remember that testimony?

8  **A.**   Financial plans.

9  **Q.**   I'm sorry.  Financial planning.

10:14:39  10  **A.**   Yes.

11  **Q.**   And basically, you -- perhaps yourself or you and

12  other people put together a criteria for financial

13  advisors to speak to their clients about, about what would

14  about a good opportunity for them to invest in and what

10:14:55  15  they needed, and then make those investments as necessary?

16  **A.**   That -- that wasn't my role per se.

17  **Q.**   Okay.

18  **A.**   Mine was -- there were other people perhaps that did

19  that, but my role was to do financial plans, which was, if

10:15:07  20  someone wanted to plan for retirement, education funding,

21  estate planning, I would do analysis and then deliver that

22  to the advisors.

23  **Q.**   I see.

24  **A.**   So I wasn't getting involved per se in the investment

10:15:19  25  piece of it at that stage of the game.

*Cross-Green-By Mr. Fazel*

1    Q.    But you made recommendations as to what they should

2    invest in?

3    A.    I don't recall my plans being as detailed as that.

4    It may have been more general asset allocation.  Because

10:15:34    5    one of the things is we wanted to leave that to the

6    brokers as opposed to, you know, me as one financial

7    planner trying to dictate to every broker how they should

8    invest their client funds.

9    Q.    I understand.  And -- well, the point of the matter

10:15:49    10    is that your -- what you were doing is trying to determine

11    what individuals needed and then apply whatever they

12    needed to come up with a plan for them individually.

13                    Would that be fair?

14    A.    Yes, that would.

10:16:01    15    Q.    You and your group; correct?

16    A.    Right, yeah.

17    Q.    And then you remember we talked about what's behind

18    you, which was the way -- let me pull that out of the way.

19                    And I want to go through this quickly

10:16:19    20    because we talked about this yesterday.

21    A.    Sure.

22    Q.    But we talked about the fact that SIBL was the bank;

23    correct?

24    A.    Correct.

10:16:25    25    Q.    And Stanford International Bank, Limited --

1  **A.**  Right.

2  **Q.**  -- had an agreement with SGC?

3  **A.**  Yes.

4  **Q.**  And you came on board to SGC at its inception, when

10:16:33  5  it was born; correct?

6  **A.**  Right.

7  **Q.**  Right about that time?

8  **A.**  Yes, yeah.

9  **Q.**  And we talked about how this was set up so that SIBL

10:16:40  10  and SGC had some kind of a contractual agreement; correct?

11  **A.**  Yes.

12  **Q.**  And that's disclosed in the disclosure statement.

13       Do you remember that?

14  **A.**  Yes.

10:16:47  15  **Q.**  Okay.  And we'll talk about that a little bit later.

16  **A.**  Okay.

17  **Q.**  And that SGC would sell CDs for SIBL.

18       Do you remember that discussion?

19  **A.**  Yes.

10:16:57  20  **Q.**  Okay.  And then we talked about the fact that even

21  though that contractual agreement was in effect that was

22  just a portion of the business for SGC.

23       Do you remember that?

24  **A.**  Yes.

10:17:07  25  **Q.**  As a matter of fact, we talked about how SGC had

*Cross-Green-By Mr. Fazel*

1   under management over maybe 10 billion, but maybe more

2   than $10 billion worth of assets; correct?

3   **A.**   Correct.

4   **Q.**   And only small portion of that -- and we said about

10:17:23   5   30 percent, and this is not exact science -- but

6   approximately 30 percent, maybe more, maybe less?

7   **A.**   Yeah.  I've been thinking --

8             THE COURT:  Hold it.  One at a time, please.

9             THE WITNESS:  Okay.  I'm sorry.

10:17:27   10   BY MR. FAZEL:

11   **Q.**   Maybe more, maybe less were CDs.

12             Do you remember that discussion?

13   **A.**   Yes, I do.

14   **Q.**   Okay.  All right.  Let's move on.

10:17:43   15             THE WITNESS:  Your Honor, may I add a point

16   about that?

17             THE COURT:  Yes.  Go on.

18             THE WITNESS:  There were international advisors

19   that weren't under my group, and I think they also did CDs

10:17:53   20   through the broker dealer.  So I've been thinking I -- that

21   number may have been as high as $5 billion through the

22   broker dealer.  I'm not sure.

23   BY MR. FAZEL:

24   **Q.**   You mean that --

10:18:01   25   **A.**   The 30 percent down here, could have been as much as

 1  50 percent perhaps.

 2  **Q.**   Okay.  But you just don't know?

 3  **A.**   I wouldn't know.

 4  **Q.**   Okay.

10:18:08   5  **A.**   The group I was responsible for, my guess, best

 6  guess, was it was about $3 billion or 30 percent.

 7  **Q.**   And I guess the point is, we don't know -- we don't

 8  have any information -- or you don't have any information

 9  how much CDs were sold in the other banks or what their

10:18:25  10  production rates were or anything like that?

11  **A.**   Well, they had groups that would have gone through my

12  company, Stanford Group Company --

13  **Q.**   Right.

14  **A.**   -- but some of the international advisors, that

10:18:36  15  business may have run through Stanford Group Company, and

16  I'm fairly certain it was for some period of time, but I'm

17  not privy to all those numbers.  So I can't speak for the

18  whole broker dealer is my point.

19  **Q.**   Okay.  And I completely understand that.

10:18:47  20  **A.**   Okay.

21  **Q.**   And what we're asking is what you know personally.

22  **A.**   I know.  I'm just trying to be as accurate as I can.

23  **Q.**   And please be that way.

24  **A.**   Yes.

10:18:55  25  **Q.**   And there's nothing wrong with that.

*Cross-Green-By Mr. Fazel*

1    **A.**   Right.

2    **Q.**   But you personally speaking, let's focus in on the

3    U.S.

4    **A.**   Okay.

10:19:00    5    **Q.**   And if you need to clarify, then, just do like you

6    did.

7    **A.**   Right.

8    **Q.**   Fair enough?

9    **A.**   Okay.  Sure.

10:19:04    10   **Q.**   But to your knowledge, as far as you know, that

11   30 percent was about right as far as your group was

12   concerned?  How about that?

13   **A.**   Yes.

14   **Q.**   Fair?

10:19:10    15   **A.**   Yes.

16   **Q.**   Okay.  The point being that there were a lot of other

17   assets under management other than the CD product?

18   **A.**   Yes.

19   **Q.**   And these assets ran the gambit from equity to debt

10:19:22    20   to all sorts of municipal bonds, U.S. Treasury.  It was

21   anything the individual needed, any financial asset that

22   the individual needed, was available for them to purchase

23   through Stanford Group Company --

24   **A.**   Yes.

10:19:35    25   **Q.**   -- the broker dealer?

1   **A.**   That's correct.

2   **Q.**   Okay.  Now, you also -- excuse me.

3          You also did other things for Stanford in

4   the beginning as well.  For example, did you not introduce

10:20:00   5   Mr. -- is it Grossbeck?

6   **A.**   Yes.

7   **Q.**   And you thought that he would be a good fit in SGC

8   for doing what?

9   **A.**   Replacing me as the director of financial planning.

10:20:11   10   **Q.**   Okay.  So you were not only involved in financial

11   planning for Stanford International Group, but you also

12   recommended other people for come in and do things for

13   Stanford that you thought were worthy, were qualified to

14   do what they needed to be done; correct?

10:20:27   15   **A.**   Yes.

16   **Q.**   I mean, after all, you wouldn't recommend somebody

17   for Stanford if you didn't think they were qualified,

18   would you?

19   **A.**   That's correct.

10:20:34   20   **Q.**   You wouldn't recommend somebody for Stanford if you

21   thought that they were in some way committing fraud, would

22   you?

23   **A.**   Of course not.

24   **Q.**   Of course not.  So when you recommend people to work

10:20:43   25   at Stanford, you believed in them and thought they were

*Cross-Green-By Mr. Fazel*

1  going to do a yeoman's job, they were going to do a good

2  job?

3  **A.**   Absolutely.

4  **Q.**   All right.  At some point in time, you became a

5  branch manager.

6               Do you remember talking about that?

7  **A.**   Yes, uh-huh.

8  **Q.**   Okay.  And even though you were a branch manager, my

9  understanding and correct me if I'm wrong, you wanted to

10  continue to have your own portfolio of clients; correct?

11  **A.**   That's correct.

12  **Q.**   In other words, to make that clear to the jury, what

13  we're talking about here is that you were managing people

14  under you, people who sold securities and were financial

15  advisors; correct?

16  **A.**   Correct.

17  **Q.**   And at the same time, you had your own individual

18  clients that you helped and sold securities or put

19  portfolios together for; correct?

20  **A.**   Right.  That's known as a producing manager.

21  **Q.**   A producing manager.

22  **A.**   Yes, sir.

23  **Q.**   And again, the idea is to produce -- I mean, that's

24  the whole idea of the industry is to produce, is to get

25  people involved, to get people in the door, to get people

*Cross-Green-By Mr. Fazel*

1    do business with you; correct?

2    **A.**    Yes.

3    **Q.**    Is there anything illegal about that?

4    **A.**    No.

10:21:45    5    **Q.**    Is there anything fraudulent about that?

6    **A.**    No.

7    **Q.**    Okay.  Stanford company -- we talked -- we barely

8    touched on this yesterday.  Stanford companies were not

9    just one or two companies; correct?

10:22:00    10    **A.**    That's correct.

11    **Q.**    There were a lot of them; correct?

12    **A.**    Yes.

13    **Q.**    Can you give us an estimate in your mind of how many

14    companies there were?

10:22:07    15    **A.**    You know, it varied; but at one time, 75 is a number

16    that sticks out in my head, maybe as many as 75 different

17    affiliated companies.  It could have been --

18    **Q.**    Over a hundred maybe?

19    **A.**    No, I don't think so.

10:22:21    20    **Q.**    Okay.

21    **A.**    No.  Yeah.

22    **Q.**    And all these companies were somehow, in some way,

23    interrelated.

24                        Would you agree with that?

10:22:27    25    **A.**    Yes.

1    **Q.**   Anything illegal about that?

2    **A.**   No.

3    **Q.**   Anything about that that caused you concern?

4    **A.**   No.

10:22:34    5    **Q.**   Okay.  And each company helped the other company out

6    by providing business, providing resources; is that

7    correct?

8    **A.**   Yes.

9    **Q.**   Is there anything wrong about that?

10:22:43    10    **A.**   No.

11    **Q.**   It's actually a very interesting business model,

12    isn't it?

13    **A.**   Yes.

14    **Q.**   It is.

10:22:49    15                      By having each company feed the other

16    company and assist the other company; correct?

17    **A.**   Correct.

18    **Q.**   All right.  You also -- I don't think we talked about

19    this yesterday, but you also suggested another person, a

10:23:02    20    J.D. Perry.

21                      Do you remember him?

22    **A.**   Yes.

23    **Q.**   What did you suggest him for?

24    **A.**   To run a trust company.  We had bought a trust

10:23:10    25    charter in Louisiana, and I suggested him to be the

1 president of the trust company.

2 **Q.**   Anything illegal about that?

3 **A.**   No.

4 **Q.**   As a matter of fact, you were on the board of that

10:23:17  5 trust company, were you not?

6 **A.**   Yes, I was.

7 **Q.**   Anything illegal about that?

8 **A.**   No.

9 **Q.**   Anything fraudulent about that?

10:23:22  10 **A.**   No.

11 **Q.**   Anything you felt like, Umm, I don't like this, we

12 shouldn't do this?

13 **A.**   No.

14 **Q.**   Because if there was, you wouldn't have suggested

10:23:28  15 Mr. Perry join the group, would you?

16 **A.**   Correct.

17              All right.

18         MR. FAZEL:  Excuse me, Judge.  I'm sorry.

19 BY MR. FAZEL:

10:23:51  20 **Q.**   I'm sorry, Mr. Green.

21 **A.**   That's okay.

22 **Q.**   Now, at some point right before we left, we talked

23 about what Mr. Stanford did and what Mr. Davis did.

24              Do you remember that discussion?

10:24:00  25 **A.**   Yes.

1  Q.   Okay.  This is not an art; this is a science.

2  A.   Okay.

3  Q.   Nobody -- I mean, if you don't know the answers to

4  these things, just tell me you don't know.

10:24:10  5  A.   Okay.

6  Q.   I'm sorry.  It's the other way around.

7  A.   If I don't know the answer, then I don't know; right?

8  Q.   This is not science; this is art.

9            Okay.  Now, it is clear to you, is it not,

10:24:27  10  sir, that Mr. Davis ran Memphis; correct?

11  A.   He ran a portion of Memphis, correct.

12  Q.   Who ran the other portion?

13  A.   Well, we had a broker dealer presence there that was

14  run by Scott Notowich.

10:24:39  15  Q.   But Mr. Davis ran the investment arm of the Memphis;

16  is that correct?

17  A.   Ultimately, yes.  That -- they all reported up to

18  him.

19  Q.   Okay.  Now, are you familiar with the methodology and

10:24:54  20  the accounting practices of Stanford?

21            Do you want me to clear that question up a

22  little bit?

23  A.   Yeah, because there's, you know, various entities.

24  Q.   Do you know how the numbers were reported to the

10:25:06  25  accounting section of Stanford to be then produced in the

1  marketing departments and given out?

2  **A.**   I do not.

3  **Q.**   Do you know a Mr. Kuhrt?

4  **A.**   I know his -- yes, I know of him, yes.

10:25:18  5  **Q.**   Do you know Mr. Lopez?

6  **A.**   Yes.  I know of him, yes.

7  **Q.**   Are you familiar with the?  Did you have a lot of

8  interaction with them?

9  **A.**   No, not a lot.  I mean, I'd see them at functions and

10:25:29  10  informal interaction.

11  **Q.**   Okay.  Would it be fair to say then, sir, that your

12  main job at Stanford was to market and sell the products

13  that Stanford offered?

14  **A.**   Yes.  I would have phrased it maybe a little

10:25:44  15  differently, but yes, essentially.

16  **Q.**   Okay.  And is it fair to say that the number

17  crunching, the investment part of it, was handled by

18  another section at Stanford; correct?

19  **A.**   Well, number crunching, are you talking about

10:25:58  20  accounting or the investment management piece?

21  **Q.**   Well, both.

22  **A.**   It's -- because there were so many companies, it's

23  more complicated than maybe to give those simple answers,

24  if you will.

10:26:08  25  **Q.**   Okay.  Let me go through it and --

1    **A.**    There were some investment done on the brokerage side

2    decide that we would have handled directly.

3    **Q.**    And what would those be?

4    **A.**    Well, any mutual funds, stocks, bonds, any general --

10:26:22  5    you know, investment management for clients, the advisors

6    would have done.

7    **Q.**    And is there anything wrong or fraudulent about doing

8    that?

9    **A.**    No, there's not.

10:26:29  10    **Q.**    Okay.  And was that done on a regular basis?

11    **A.**    Yes, it was.

12    **Q.**    Is that done in any financial institution that does

13    what they did, SGC did?

14    **A.**    Yes.

10:26:38  15    **Q.**    Now, as far as the -- well, I guess -- let me ask the

16    question this way:  We talked about yesterday about

17    Mr. Stanford being a marketing guy, the salesperson?

18    **A.**    Correct.

19    **Q.**    Head salesperson.

10:26:49  20    **A.**    Uh-huh.

21    **Q.**    There's no debate that he owned the company, is

22    there?  I mean, he was the owner of the company?

23    **A.**    No.  He owned all the companies, right.

24    **Q.**    Right.  But he did rely on people to do their

10:26:57  25    correct; correct?

*Cross-Green-By Mr. Fazel*

1   **A.**   Certainly.

2   **Q.**   I mean, after all, this isn't just a four- or

3   five-person type of firm; correct?

4   **A.**   Right.

10:27:04   5   **Q.**   I mean, we're talking about -- how many people do you

6   think Stanford employed when it was shut down by the

7   receiver?

8   **A.**   I think maybe as many as 5,000.

9   **Q.**   Five thousand people.

10:27:11   10   **A.**   Uh-huh.

11   **Q.**   And there's no way for that one person to be able to

12   overview all 5,000, is there?

13   **A.**   Correct.

14   **Q.**   It's not possible, is it?

10:27:18   15   **A.**   No.

16   **Q.**   So you to have -- in a company that large, you have

17   to have some structure, do you not?

18   **A.**   Yes.

19   **Q.**   Some reporting structure?

10:27:24   20   **A.**   Yes.

21   **Q.**   That's not unusual, is it?

22   **A.**   No.

23   **Q.**   That's not fraudulent, is it?

24   **A.**   No.

10:27:28   25   **Q.**   That's simple, simple smart business, is it not?

*Cross-Green-By Mr. Fazel*

1    **A.**   Yes.

2    **Q.**   Okay.  And, so, would it be fair to say that

3    Mr. Davis was in charge -- as the CFO, was in charge of

4    the numbers?

10:27:40   5    **A.**   Of the accounting, yes.

6    **Q.**   He was.  I mean, is there any doubt in your mind

7    about that?

8    **A.**   No.

9    **Q.**   And Mr. Stanford was in charge of going out promoting

10:27:49  10    Stanford; yes?

11    **A.**   Mr. Stanford was in charge of everything.

12    **Q.**   He was.  But Mr. Stanford didn't have direct

13    knowledge of the number.  Mr. Davis did; correct?

14    **A.**   Well, I assume Mr. Davis reported to Mr. Stanford, so

10:28:00  15    how could he not have direct knowledge of the numbers?

16    **Q.**   Well, that's the problem.  When we start assuming

17    things, we all get in trouble.

18    **A.**   Well, I know that Mr. Davis reported to Mr. Stanford.

19    **Q.**   I do that too, Mr. Green.  I know that too.

10:28:08  20    **A.**   Yeah.

21    **Q.**   But what I'm asking you is not assume.  Let's just go

22    with what we know.

23    **A.**   I'm not assuming.  I'm --

24          THE COURT:  Hold it, one at a time and slow it

10:28:17  25    down.

*Cross-Green-By Mr. Fazel*

1                    THE WITNESS:  Okay.

2   BY MR. FAZEL:

3   Q.   Let's just you and I agree that we just go with what

4   we know; okay?

10:28:19  5   A.   Okay.

6   Q.   Thank you.  We know for a fact Mr. Stanford was in

7   charge of the numbers -- excuse me -- Mr. Davis was in

8   charge of the numbers; correct?

9   A.   Correct.

10:28:27  10   Q.   All right.  We know for a fact that Mr. Stanford was

11   a visionary of the company; correct?

12   A.   Yes.

13   Q.   He's the one that went out and promoted things;

14   correct?

10:28:34  15   A.   Correct.

16   Q.   And as a result, marketing material was important to

17   that; correct?

18   A.   Correct.

19   Q.   Because what was said, the look of the marketing

10:28:40  20   material, the color, the verbiage in there, these are

21   things that people look at; correct?

22   A.   Correct.

23   Q.   And so he was worried to make sure that the Stanford

24   icon, the Stanford, the name Stanford, was represented

10:28:54  25   correctly; correct?

*Cross-Green-By Mr. Fazel*

1  **A.**   Correct.

2  **Q.**   So it's important to him -- it's important to him

3  that nobody violates his -- what he wants his company to

4  be.

10:29:05  5                   After all, he -- it is his company;

6  correct?

7  **A.**   Yes.

8  **Q.**   Is there anything unusual about that?

9  **A.**   No.

10:29:10  10  **Q.**   Is there anything fraudulent about that?

11  **A.**   No.

12  **Q.**   Okay.  But he had to, just by the nature of the

13  company, just by what it -- it was set up, the way it was

14  set up, he had to rely on people to give him information.

10:29:27  15                   Would you agree with that?

16  **A.**   Yes.

17  **Q.**   Let's talk about the CDs for a minute.

18  **A.**   Okay.

19  **Q.**   I want to make sure I understand the CD product, and

10:29:45  20  I want to make sure the jury understands the CD product.

21  **A.**   Okay.

22  **Q.**   So let's talk about that just briefly.

23  **A.**   Okay.

24  **Q.**   I'm not a financial advisor; fair?

10:30:13  25  **A.**   I'm not an attorney.

*Cross-Green-By Mr. Fazel*

1  Q.   All right.  There's two main types of investments.

2  There's equity and there's debt.

3              Is that a fair statement?

4  A.   Yes, that's correct.

10:30:26  5  Q.   Okay.  And equity is the type of investment that you

6  take ownership of a company; correct?

7  A.   Correct, sir.

8  Q.   Some types of equity you have voting rights in;

9  correct?

10:30:36  10  A.   Yes.

11  Q.   So, for example, if I go out there and buy a share of

12  Enron -- that's not good -- Exxon --

13  A.   Okay.

14  Q.   -- I can go and get the share, and then when it comes

10:30:47  15  time to make voting decisions we just vote; right?

16  A.   Correct.

17  Q.   You can go to a meeting, and you decide if you want

18  to volt on a CEO or whatever they have up for a vote;

19  correct?

10:30:57  20  A.   Correct.

21  Q.   Okay.  And then there's debt; correct?

22  A.   Yes.

23  Q.   Now, when you have debt, it's a promise to pay;

24  correct?

10:31:03  25  A.   Yes.

1  **Q.**   Okay.  So the CD was a promise to pay; correct?

2  **A.**   Yes.

3  **Q.**   All right.  It was so that you pay a certain

4  percentage at a time certain; correct?

10:31:20  5  **A.**   Yes.

6  **Q.**   Okay.  Now, it didn't matter if SIBL was doing good

7  that year, was doing bad that year or was doing neutral

8  that year.

9                   When that CD was due, it had to be paid;

10:31:37  10  correct?

11  **A.**   Correct.

12  **Q.**   It made no difference to the manner in which the CD

13  was set up that they made earnings or they lost money,

14  "they" being SIBL.

10:31:49  15                   They had a debt obligation to pay;

16  correct?

17  **A.**   Right.

18  **Q.**   Okay.  So when you invested in the CD, you were

19  investing in a debt instrument?

10:32:00  20  **A.**   Correct.

21  **Q.**   All right.  Anything illegal about that?

22  **A.**   No, sir.

23  **Q.**   Anything fraudulent about that?

24  **A.**   No.

10:32:14  25  **Q.**   Now, they were not provided to all people.  In other

*Cross-Green-By Mr. Fazel*

1  words, not every person in Houston or in the U.S. were

2  able to purchase these CDs; correct?

3  **A.**    Correct.

4  **Q.**    They had to be accredited.

10:32:30  5                Do you remember talking about just briefly

6  yesterday?

7  **A.**    Yes.

8  **Q.**    That is, they had to have certain financial means?

9  **A.**    Yes.

10:32:36  10  **Q.**    Okay.  And we talked about this a little bit

11  yesterday as well.

12                The CD program was registered with a

13  certain entity.

14                Do you remember who that was?

10:32:44  15  **A.**    Yes.

16  **Q.**    Who was that?

17  **A.**    Securities and -- SEC.

18  **Q.**    Securities and Exchange Commission?

19  **A.**    Yes.  Thank you.

10:32:50  20  **Q.**    That's all right.

21  **A.**    Slipped my mind.

22  **Q.**    That's okay.  And they did that out of an abundance

23  of caution; correct?

24  **A.**    Yes.

10:32:58  25  **Q.**    Because they didn't feel like they, "they" being the

*Cross-Green-By Mr. Fazel*

1    SEC, SIBL didn't feel like SEC had any jurisdiction over

2    it because it's not a security as in Securities and

3    Exchange Commission.  It's not a security.  However, out

4    an abundance of caution, they went ahead and made a

10:33:16    5    registration with them; correct?

6    **A.**    Yes.  They were concerned someone may deem it to be a

7    security, so they weren't entirely sure and they took the

8    safer option.

9    **Q.**    Anything fraudulent about that?

10:33:24    10    **A.**    No.

11    **Q.**    Anything illegal about that?

12    **A.**    No.

13    **Q.**    When they made these offerings to the SEC, did they

14    not provide documentation to the SEC?

10:33:30    15    **A.**    Yes, I believe they did.

16    **Q.**    Did they not describe what the -- what the CD program

17    was?

18    **A.**    My understanding is, yes, they did.

19    **Q.**    And did SEC ever complain about that?

10:33:39    20    **A.**    Not that I'm aware of.

21    **Q.**    Let's put some time frame here because I feel like

22    we're kind of bunching in a lot of time together.

23    Sometimes we go in the future; sometimes we go way in the

24    past.

10:33:57    25                    When we're talking about the offering to

*Cross-Green-By Mr. Fazel*

1    the SEC and going to the SEC saying, Hey, we're going to

2    make this offering in the U.S., do you remember what

3    timeframe that was?

4    **A.**    I think that was done -- I believe they did that

10:34:09    5    around '98, 1998.

6    **Q.**    Okay.  Right when the program started?

7    **A.**    For the U.S. investors, yes.

8    **Q.**    Right.  And that's what we're talking about.

9    **A.**    Right.

10:34:19    10   **Q.**    I mean, after all, you were involved in the U.S.;

11   right?

12   **A.**    Correct.

13   **Q.**    So I know you weren't in the Bank of Venezuela, I

14   know you weren't in the Bank of Panama.  So let's just

10:34:27    15   assume what we're talking about with you is just in the

16   U.S.; fair?

17   **A.**    Okay.  Sure.  Yeah.

18   **Q.**    Now, the accredited investor program has certain

19   requirements, and it's financial in nature.  You have to

10:34:40    20   have a certain amount of money.  You have to have certain

21   assets before you can purchase this CDs; correct?

22   **A.**    Correct.

23   **Q.**    And every purchase of this CD had to attest, if you

24   will; that is, to sign a document promising, saying, that

10:34:56    25   they are accredited investors; correct?

*Cross-Green-By Mr. Fazel*

1  **A.**  That is correct.

2  **Q.**  All right.  Anything illegal about that?

3  **A.**  No.

4  **Q.**  Anything fraudulent about that?

10:35:03  5  **A.**  No.

6  **Q.**  All right.  Now let's talk about the subscription

7  agreement and generally how these CDs were sold.

8  It's my understanding, and correct me if

9  I'm wrong, that every time a CD was sold, there were

10:35:27  10  certain documents that were pulled by operations and they

11  were given a specific number and put on that document;

12  correct?

13  **A.**  That's correct.

14  **Q.**  And these documents had to be given to the particular

10:35:40  15  investor for that investor to review and sign before he

16  could purchase a CD?

17  **A.**  That is correct.

18  **Q.**  Okay.  Anything illegal about that?

19  **A.**  No.

10:35:47  20  **Q.**  Anything fraudulent about that?

21  **A.**  No.

22  **Q.**  Okay.  The gov- -- Mr. Stellmach yesterday put into

23  evidence Exhibit Number 131.

24  Do you remember talking about that?  That

10:36:10  25  was the disclosure statement.

*Cross-Green-By Mr. Fazel*

1  **A.**   Yes, I do.

2         MR. FAZEL:  Okay.  Can we pull that up, please,

3  Government's Exhibit 131?

4         MR. WARREN:  Your Honor, can you switch on the

5  monitor in the back for the jury?

6         THE COURT:  Okay.

7         MR. FAZEL:  All right.  If we can look at

8  Page 3.  That's one before that.  I'm sorry.  Apparently

9  stepping on my document and yours.

10        THE COURT:  Anything on there yet?

11        MR. WARREN:  Not yet.

12        THE COURT:  All right.  Give me a second.

13        MR. FAZEL:  If we can go to the very bottom of

14  the paragraph and highlight it, please.

15  BY MR. FAZEL:

16  **Q.**   Do you see that, sir, Mr. Green?

17  **A.**   Yes.

18  **Q.**   Now, this was provided to every single investor in

19  the CD program, correct, this document?

20  **A.**   Yes.

21  **Q.**   Now, I will tell you that I'm going to go through

22  this document with you and go through a lot of it, okay,

23  so just bear with me and I know it's a little tedious

24  and --

25        THE COURT:  Again, what is this document?

*Cross-Green-By Mr. Fazel*

1            MR. FAZEL:  Oh, I'm sorry.  It's Government's

2   Exhibit 131.  It's the disclosure statement provided to all

3   CD investors.

4            THE COURT:  I know -- there it is.

10:38:12   5            THE WITNESS:  Can we move this?  It's kind of

6   blocking the screen.

7   BY MR. FAZEL:

8   **Q.**   Sure.  I'm sorry.

9   **A.**   Thank you.

10:38:17   10  **Q.**   I thought I moved it for you.

11  **A.**   I can't see that left side.

12           THE COURT:  Pull it all the way in.  Is that

13  better?

14           THE WITNESS:  Yeah.  That's perfect.  Thank

10:38:27   15  you.

16  BY MR. FAZEL:

17  **Q.**   Okay.  It's that paragraph right there.  And I'm

18  going to read it.  I'm not going to make you read it.

19  **A.**   Thank you.

10:38:43   20  **Q.**   You're welcome.

21           "SIBL products are not subject to the

22  reporting requirements of any jurisdiction, nor are they

23  covered by the investor protection or securities insurance

24  laws of any jurisdiction, such as the U.S. Securities

10:38:56   25  Investor Protection Insurance Corporation."

1        Tell me what that corporation is, real

2  briefly.

3  **A.**    The Securities Investor Protection Insurance

4  Corporation --

10:39:08   5  **Q.**    Correct?

6  **A.**    -- was set up by -- I believe it was set up by

7  Congress, and it is supported by all of the brokers in the

8  U.S. that pay money into it, you know, to insure against

9  any of those broker dealers going insolvent.  That fund is

10:39:25  10  there to make clients whole if there's a loss due to

11  insolvency of a broker dealer.

12  **Q.**    So it tells you right on the first page, Guess what,

13  we're not covered under that; correct?

14  **A.**    That's correct.

10:39:34  15  **Q.**    The reason they're not covered under that is because

16  it's not a security; correct?

17  **A.**    Well, I believe because it's a non-U.S. entity is

18  what I would have assumed.

19  **Q.**    Okay.  Fair enough.

10:39:52  20        "The from CD deposits and CD certificates

21  are not issued by Federal Deposit Insurance Corporation

22  (FDIC) or any other agency of the United States Government

23  or any state jurisdiction or by any insurance program of

24  the Government of Antigua, Barbuda."

10:40:05  25        Do you see that?

*Cross-Green-By Mr. Fazel*

1   **A.**   Yes, I do.

2   **Q.**   So right off the bat, they're saying, Guess what, no

3   insurance; correct?

4   **A.**   Correct.

10:40:10   5   **Q.**   This is like the first page you flip open the

6   document to; correct?

7   **A.**   Correct.

8         MR. FAZEL:  Now, if we can go to Page 7, PDF

9   Page 7, please, highlighting the top portion.

10:40:24   10   BY MR. FAZEL:

11   **Q.**   "The CD deposits are ordinary deposit obligations of

12   SIBL.  We believe that the CD deposits and the CD

13   certificates are not securities as such term is defined

14   under U.S. federal and state securities laws.

10:40:47   15   Nevertheless, because of the possibility that the CDs

16   deposits or CD certificate" --

17         THE COURT:  Slow down a little bit, please.

18         MR. FAZEL:  Sorry, Your Honor.

19   BY MR. FAZEL:

10:40:54   20   **Q.**   -- "could be deemed to be securities by the U.S.

21   regulatory or judicial authorities, we have adopted the

22   same regulations and restrictions on solicitation."

23         Do you see that?

24   **A.**   Yes.

10:41:04   25   **Q.**   Okay.  So what they're telling at us there is, We

*Cross-Green-By Mr. Fazel*

1  don't think it's a security, but out of an abundance of

2  caution, we went ahead and registered it; correct?

3  **A.**   Correct.

4  **Q.**   All right.  Next paragraph.

10:41:20  5          "By signing the subscription agreement,

6  you are acknowledging receipt, as well as careful review

7  and understanding, of this document statement, the

8  subscription agreement, the investor questionnaire, any

9  additional account documents that we" -- "may be required,

10:41:39  10  and their respective terms and conditions."

11          Do you see that?

12  **A.**   Yes.

13  **Q.**   So what we're telling the client there, the person

14  purchasing this, is you agree that you have read this

10:41:49  15  thing in its entirety and understand it; correct?

16  **A.**   Correct.

17  **Q.**   I mean, after all, you did sell these CDs; correct?

18  **A.**   Correct.

19  **Q.**   All right.  And from time to time, did you not view

10:41:58  20  this document to review your -- with your clients?

21  **A.**   Yes.

22  **Q.**   And did you review it with your clients?

23  **A.**   Yes.

24  **Q.**   Did you make sure they signed it?

10:42:04  25  **A.**   Yes.

*Cross-Green-By Mr. Fazel*

1  **Q.**   Did you make sure they understood it?

2  **A.**   Yes.

3  **Q.**   Okay.  Was it a job of every financial analyst --

4  excuse me -- financial -- the FA?

10:42:12  5  **A.**   Financial advisor.

6  **Q.**   Advisor.  Thank you.

7              Was it their job to make sure their

8  clients understood this?

9  **A.**   Yes.

10:42:18  10  **Q.**   Okay.

11              MR. FAZEL:  Going down to the one -- to the

12  last paragraph, where it says "investors."  No.  No.  That

13  one right there.  That paragraph right there.  Thank you.

14  Very last line.

10:42:29  15  BY MR. FAZEL:

16  **Q.**   "The investor should be aware that they will be

17  required to bear the financial risks of this investment

18  for" -- and.

19              MR. FAZEL:  I can't even read that.

10:42:41  20              THE WITNESS:  "For an indefinite" --

21  BY MR. FAZEL:

22  **Q.**   -- "for an indefinite period of time."

23              I'm sorry.  Thank you.  My copy is real

24  bad.

10:42:44  25              What does that mean?

1  **A.**   That means that the investor was aware that they bore

2  the financial risks, that if the CD did not perform well,

3  they could take a financial loss.

4  **Q.**   Okay.  Let's talk about that right there.

10:42:57  5              You just said if the CD did not perform

6  well.

7              Do you remember that?

8  **A.**   Well, if the -- if the bank did not perform well.

9  **Q.**   But it doesn't matter, does it?  It's a debt

10:43:04  10  obligation.  If the bank is there, has the money, we'll

11  pay the debt obligation; correct?

12  **A.**   Correct.

13  **Q.**   If the bank is not there, if it goes bankrupt, if it

14  goes insolvent, they lose their money; correct?

10:43:15  15  **A.**   Correct.

16  **Q.**   Now, this is a debt obligation.  If you go buy debt

17  in GM, for example --

18  **A.**   Yes.

19  **Q.**   -- and GM goes bankrupt, what happens to your money?

10:43:23  20  **A.**   You're going to lose some portion of it, perhaps all

21  of it.

22  **Q.**   Perhaps all of it.

23              It's not unusual, is it.

24  **A.**   No.

10:43:29  25  **Q.**   Okay.  It's different than equity, because in equity

1  you have ownership right in the company; correct?

2  **A.**   Correct.

3  **Q.**   But not in this program, you had no ownership right

4  in this program; correct?

10:43:39  5  **A.**   Correct.

6  **Q.**   Right.  So it doesn't matter whether the CD performed

7  well or not, it's the bank is there, it pays the money.

8  If it's not there, guess what, you don't get your money;

9  correct?

10:43:48  10  **A.**   Correct.

11  **Q.**   All right.

12         MR. FAZEL:  If we go on to Page 2 of the actual

13  document.  It talks about general overview.  If you can

14  highlight that portion, please.

10:44:11  15  BY MR. FAZEL:

16  **Q.**   Okay.  And I don't know how to tell this to you, so I

17  apologize.  But in the middle of it, it says the

18  following:  "You may purchase three types of the time

19  deposit offered by SIBL CD depositors."

10:44:27  20         Do you see that?

21  **A.**   Yes.

22  **Q.**   Okay.  They used the term "time deposits."  What does

23  that mean to you?

24  **A.**   That means they deposit, that there's a contractual

10:44:37  25  agreement on you, give someone the money and they're going

*Cross-Green-By Mr. Fazel*

1    to keep it for a specified period of time and then return

2    it to you, with interest, you know.

3    **Q.**   With a promised interest?

4    **A.**   Interest or whatever was agreed to pay.

10:44:50    5    **Q.**   All right.  Let's focus in on that.  They're going to

6    take your money, they're going to promise they're going to

7    pay you an interest?

8    **A.**   Correct.

9    **Q.**   They're going to do whatever they want with the

10:44:57    10    money, and then at the end of that period, they're going

11    to pay you back; correct?

12    **A.**   Well, I would take a little exception with they're

13    going to do whatever they want with your money.

14    **Q.**   Well, it's a debt obligation, is it not, Mr. Green?

10:45:11    15    **A.**   It is a debt obligation.

16    **Q.**   As a debt obligation, once you put the money into GM,

17    does GM have to check with you before they do whatever

18    they want with the money?

19    **A.**   Depends on the covenants of that debt obligation.

10:45:23    20    **Q.**   The covenants of the debt obligation?

21    **A.**   Yes.

22    **Q.**   We'll talk about the covenants of this debt

23    obligation in a minute.

24                   Because the covenants of this debt

10:45:29    25    obligation is in this document right here, is it not, sir?

*Cross-Green-By Mr. Fazel*

1    **A.**   It's -- it's the -- this document and all the

2    documents that were put out by the -- by the international

3    bank.

4    **Q.**   Okay.  Well, I'm a little confused.  Doesn't this

10:45:42   5    document in a portion say that you're only to look at this

6    document and nothing else?

7    **A.**   I don't recall it saying you're only to look at this

8    document.

9    **Q.**   Okay.  Well, let's get there.

10:45:57   10            MR. FAZEL:  Let's move forward to the next

11   section, if you will.

12   BY MR. FAZEL:

13   **Q.**   Its says, "Global investment portfolio."

14            MR. FAZEL:  On Page 3.  I'm sorry.  That's

10:46:18   15   Page 2.  Thank you.

16   BY MR. FAZEL:

17   **Q.**   Do you see that section, sir?

18   **A.**   Yes, I do.

19   **Q.**   Now, you went over this with the government.  Is

10:46:35   20   there anything about that section you feel is fraudulent

21   or incorrect?

22   **A.**   I don't recall going over this with the government,

23   per se, in that detail.

24   **Q.**   Take your time reading it and tell us if there's

10:46:48   25   anything fraudulent or inaccurate about this section.

*Cross-Green-By Mr. Fazel*

1  Anything about that section that you thought was

2  inaccurate, fraudulent or anything like that?

3  **A.**   I've read the first paragraph so far and, no, there's

4  nothing I thought was inaccurate or fraudulent.  Would you

10:47:20  5  like me to read the next one?

6  **Q.**   You're more than welcome to, Mr. Green.  I'm assuming

7  you've read these documents before?

8  **A.**   I have.

9  **Q.**   Okay.  All right.

10:47:28  10          MR. FAZEL:  If I can get to Page 5 of that

11  document, please, the one we're looking at, which is

12  Exhibit Number 131.

13  BY MR. FAZEL:

14  **Q.**   And it says, "Investment Risk and Strategy."  Top

10:47:47  15  bold.  "You may lose your entire investment under the

16  circumstances where we may be financially unable to repay

17  those amounts.  Payments of principal and interest are

18  subject to risk."

19              What does that tell you?

10:48:04  20  **A.**   Exactly what it says.

21  **Q.**   What does that mean to you?

22  **A.**   All of your money is at risk, and if they're not able

23  to pay, you could lose all your money.

24  **Q.**   Right.  If the bank is not able to pay, you're going

10:48:15  25  to lose all your money?

*Cross-Green-By Mr. Fazel*

1    **A.**   Correct.

2    **Q.**   All right.

3            MR. FAZEL:  Now, let me move forward from

4    this -- thank you.  That's all I have for this document.

10:48:32   5    BY MR. FAZEL:

6    **Q.**   There's also another document that you had to sign as

7    the purchaser of the CD, and it was called a subscription

8    agreement; correct?

9    **A.**   Correct.

10:48:50   10   **Q.**   Have you reviewed that document before?

11   **A.**   Yes.  It's been awhile.

12   **Q.**   It's been awhile.  Okay.

13            Was there anything in that document that

14   you believed was illegal or fraudulent?

10:49:13   15   **A.**   No.

16   **Q.**   Did you review those with your particular clients as

17   well?

18   **A.**   Yes.

19   **Q.**   Okay.

10:49:35   20            MR. FAZEL:  If I can bring back Exhibit

21   Number 131 again, please.  Page 4.  Where it says, "Due

22   Diligence by Depositor."

23   BY MR. FAZEL:

24   **Q.**   Okay.  Let's talk about this.  "Due Diligence by

10:50:01   25   Depositor."  What does that mean to you, just the title

1    itself?

2    **A.**    Due diligence by depositor means that the depositor

3    is going to investigate whatever they're going to deposit

4    in.  They're going to investigate the risk and return

10:50:15    5    characteristics of something before they would make an

6    investment in it.

7    **Q.**    Okay.  Let's read the entire section.  "We have

8    prepared this disclosure statement to provide you selected

9    information about the U.S. accredited CD program" -- I'm

10:50:30    10    sorry -- "investor CD because this disclosure statement

11    cannot be all exclusive."

12                        Do you see that?

13    **A.**    Yes.

14    **Q.**    "We recommend you conduct further due diligence --

10:50:39    15    let me read it from mine because I can't read that far.

16                        -- "including examining of supplemental

17    data and information available through us before making

18    definitive commitments."

19                        What does that tell you?

10:50:50    20    **A.**    That this document cannot include all the information

21    about the potential investment and, so, they recommend

22    that you as an investor investigate it further and exam

23    supplemental data and information available.

24    **Q.**    Before you make the purchase; right?

10:51:14    25    **A.**    Correct, before.

1 **Q.**   They're saying, hey, look at this and let us know if

2 you want anything before you make the purchase?

3 **A.**   Correct.

4 **Q.**   All right.  "We will make available to you for

10:51:24  5 your -- let me read mine.  I can't see that far.

6             "We will make available to you for

7 inspection during normal business hours our relevant

8 business, financial and other information and data which

9 you may reasonably request to make informed judgments with

10:51:39  10 respect to investing to the U.S. accredited investor CDs,

11 including but not limited to anything that goes on

12 there" -- it talks about it; right?

13             So it's telling you that you can contact

14 us and go over whatever you want from us; correct?

10:51:53  15 **A.**   Correct.

16 **Q.**   Okay.  They could contact you and ask you any

17 questions they wanted from you; correct?

18 **A.**   Correct.

19 **Q.**   Ask for anything they wanted; correct?

10:52:02  20 **A.**   Correct.

21 **Q.**   And you would provide it to them; correct?

22 **A.**   If it was something that they were willing to provide

23 to me, I would provide to them.

24 **Q.**   Right.  Is there anything illegal about that?

10:52:12  25 **A.**   No.

*Cross-Green-By Mr. Fazel*

1  **Q.**   Is there anything fraudulent about that?

2  **A.**   No.

3  **Q.**   They're asking them to come ask questions.  "If you

4  have questions, let us know and we'll answer them for

10:52:20  5  you"; correct?

6  **A.**   Right.

7  **Q.**   All right.  Then it goes on to say, "We will also

8  make available to you an opportunity to ask questions and

9  receive answers and to obtain any additional information

10:52:36  10  as you may request concerning U.S. accredited investor CDs

11  and our financial condition and affairs."

12              Do you see that?

13  **A.**   Yes, I do.

14  **Q.**   Anything illegal about that?

10:52:49  15  **A.**   Only if people lie about their financial condition

16  and affairs.

17  **Q.**   Anything fraudulent about that?

18  **A.**   Only if people lie about their financial condition

19  and affairs.

10:52:58  20  **Q.**   Did you lie about the financial condition of affairs,

21  Mr. Green?

22  **A.**   I did not, but I was -- feel like I was lied to.

23  **Q.**   I understand you feel that way, but that's just your

24  opinion; right?

10:53:07  25  **A.**   It seems to be pretty clear.  I mean --

*Cross-Green-By Mr. Fazel*

1    **Q.**   Why is that, Mr. Green?  Do you have some information

2    I don't?

3    **A.**   I have a lot of clients, friends, relatives that

4    haven't gotten a penny back, and it doesn't look like they

10:53:18   5    will because there is no money.

6    **Q.**   Well, I understand that you feel that way, Mr. Green,

7    but the receiver took the bank over; correct?

8    **A.**   Yes, they did.

9    **Q.**   Prior to the receiver taking the bank over in 2008

10:53:29  10    when the economy was so terrible and everybody was in a

11    financial crunch at that time, was there anybody that

12    wasn't paid their CDs ahead of time?

13    **A.**   The last client, yes.

14    **Q.**   You keep talking --

10:53:42  15    **A.**   Yeah, there was a -- there was a withdrawal that

16    was -- a request that was put in, and he never --

17    **Q.**   You --

18    **A.**   -- received his money.

19              THE COURT:  Hold him.  Let him finish.

10:53:48  20              MR. FAZEL:  Sure.  I'm sorry, Your Honor.

21              THE WITNESS:  There was a withdrawal that --

22    one person I know of specifically that had a withdrawal

23    request in prior to Mr. Stanford stopping the withdrawals,

24    and he has never received his money.

10:54:00  25    BY MR. FAZEL:

*Cross-Green-By Mr. Fazel*

1  Q.   That one person?  How many clients --

2  A.   It was a large -- it was a 20-some-odd million-dollar

3  withdrawal, if I recall correctly.

4  Q.   And do you remember testifying about the fact that --

10:54:05   5           THE COURT:  Slow down.

6           MR. FAZEL:  Yes, Your Honor.

7           THE COURT:  You've got plenty of time.

8           MR. FAZEL:  I understand.

9  BY MR. FAZEL:

10:54:08  10  Q.   Do you remember testifying about the fact that there

11  were many large depositors in SIBL?

12  A.   Yes.

13  Q.   And prior to that stop that we're talking about, that

14  one client that we're talking about right now that you

10:54:19  15  keep mentioning, prior to that one client, was there

16  anybody else that requested their money back that did not

17  receive it that you're aware of?

18  A.   No.  There may have been a couple others, but not

19  that I'm aware of specifically.

10:54:31  20  Q.   Everybody who asked for their money, even people who

21  asked for their money ahead of time, got their money?

22  A.   Yes.

23  Q.   It's when the receiver took the company over that

24  that stopped; yes?

10:54:43  25  A.   No, it's when Mr. Stanford put the stop on people

1  taking early withdrawals out that it stopped.

2  **Q.**   But people were taking early withdrawals.  He wasn't

3  stopping people who were due to take their money out, was

4  he?

10:54:57  5  **A.**   No.

6  **Q.**   Was he stopping the interest rate program?

7  **A.**   No.

8  **Q.**   So it was people who wanted their money out early who

9  signed a contractual agreement saying they couldn't do

10:55:08  10  that that he stopped?

11  **A.**   That the bank at its discretion could discontinue

12  those early withdrawals, right.

13  **Q.**   And it used its discretion; correct?

14  **A.**   Correct.

10:55:17  15  **Q.**   Now, in 2008, was there not an economic calamity

16  going on?

17  **A.**   Yes, there was.

18  **Q.**   Was there not a run on the bank?

19  **A.**   I don't know if I would define it as a run, but there

10:55:27  20  was more withdrawals than there were deposits.

21  **Q.**   Were you in a position to know how much there were

22  withdrawals?

23  **A.**   No, not on a daily basis.

24  **Q.**   No.  So it's only just a sliver of your knowledge

10:55:38  25  that you're now talking about, that we're talking about --

1    and that's fair.  I'm not saying it's bad or good.  I'm

2    just saying that you just had one section of Stanford;

3    right?

4    **A.**   Correct.

10:55:48   5    **Q.**   You just talked about the other banks that were not

6    in the U.S.; right?  We --

7    **A.**   Right.

8    **Q.**   -- talked about that.

9                   We talked about there's other financial

10:55:56   10   advisors; right?

11   **A.**   Correct.

12   **Q.**   There are offices all over the U.S.; right?

13   **A.**   Yes.

14   **Q.**   And they had people coming in and asking for money,

10:56:03   15   too; right?

16   **A.**   Yes.

17   **Q.**   And they were asking for money -- well, let me phrase

18   it this way:  They were getting their monies out of the CD

19   program because they had -- "they" being the other

10:56:13   20   investors -- probably had cash calls and other

21   investments; right?

22   **A.**   There's only one that I'm aware of that was their

23   issue.

24   **Q.**   Right.  And, so, they had to cover that cash call;

10:56:23   25   correct?

*Cross-Green-By Mr. Fazel*

 1  **A.**   Correct.

 2  **Q.**   All right.  So my point is that even though you don't

 3  know there's a run on the bank, but there was most likely

 4  a high probability that there was a lot of people coming

10:56:32  5  to the bank asking for their money; right?

 6  **A.**   Yes.

 7  **Q.**   And that is defined as a run on the bank; right?

 8  **A.**   Honestly, I don't know where you cross the line

 9  between withdrawals and a bad -- to an absolute panic,

10:56:49 10  hysteria.  I mean, to me a run is a panic, hysteria,

11  people lined up outside the door, the old -- you know,

12  that's how I see a run.

13  **Q.**   Right.

14  **A.**   I was afraid it would turn into a run on the bank.

10:56:57 15  **Q.**   We are going to get to that in a little bit, because

16  you're right, there are some communications and there are

17  some e-mails from you having that fear; right?

18            THE COURT:  Slow down.

19            THE WITNESS:  Yes.

10:57:02 20            MR. FAZEL:  I'm sorry, Judge.

21 BY MR. FAZEL:

22  **Q.**   So, I guess my point to you is that everybody got

23  their money prior to the receiver taking it over; right?

24  **A.**   (Answered affirmatively.)

10:57:19 25  **Q.**   I know you were a little upset because -- and you had

1  family members invested in the CD program; right?

2  **A.**   Correct.

3  **Q.**   And they didn't get their money?

4  **A.**   No.

10:57:26  5  **Q.**   But they didn't get their money after the receiver

6  took over; right?

7  **A.**   Correct.

8                  MR. FAZEL:  Your Honor, there's a --

9                  THE COURT:  Yes.

10:57:36  10                  JUROR:  I need to go to the restroom.

11                  THE COURT:  Absolutely.

12                  JUROR:  I'm sorry.

13                  THE COURT:  No, no.  Hold it.  We always take

14  ten minutes.  No big deal.  It's now about -- what is it --

10:57:48  15  a couple of minutes before 10:00.  We'll get back in at

16  11:10.  No problem.  Hold it a second before we do that.

17                  **(Recessed at 10:58 a.m.)**

18              **(The following was held before the jury)**

19                  THE COURT:  Ladies and gentlemen, it's now

11:14:38  20  right about 11:15.  We're going to go to 12:45 and take a

21  break from 12:45 to 2:00 o'clock.  So I think we'll do

22  it -- again, anybody needs to take a break for any reason,

23  let me know.

24                  Go right ahead, Counsel.

11:14:52  25                  MR. FAZEL:  Thank you.

 1  BY MR. FAZEL:

 2  **Q.**    Okay.  Mr. Green, when we were talking last, I think

 3  we were talking about investments and all that, and then

 4  we were going to focus back in on the document we were

11:15:02   5  looking at.

 6  **A.**    Okay.

 7           MR. FAZEL:  So if I can get Your Honor to bring

 8  the screen down.  And if we can go to Page 4.

 9  BY MR. FAZEL:

11:15:28  10  **Q.**    Now, if you continue to read that paragraph, it will

11  tell you that neither SIBL -- which is Stanford

12  International Bank, Limited; correct?

13  **A.**    Correct.

14  **Q.**    -- "not any of our respective officers, directors,

11:15:41  15  control persons, employees, affiliates, consultants or

16  agents make any representations or warranties, express or

17  implied, as to the completeness of this disclosure

18  statement, and no legal liability is assumed or is to be

19  implied against any of them based on any such

11:16:00  20  representation or warranty."

21           Do you see that?

22  **A.**    Yes.

23  **Q.**    Okay.  Right after that, "The only information that

24  will have any legal effect will be" -- I'm going to let

11:16:14  25  you read the rest of that.

*Cross-Green-By Mr. Fazel*

1  **A.**   "...will be that expressly represented in this

2  disclosure statement and the accompanying subscription

3  agreement and investor questionnaire, the offering

4  documents."

11:16:24  5  **Q.**   Any questions about that?

6  **A.**   No.

7  **Q.**   Anything about that that's false?

8  **A.**   No.

9  **Q.**   Anything about that that's fraudulent?

11:16:29  10  **A.**   No.

11  **Q.**   Anything about that's confusing?

12  **A.**   No.

13  **Q.**   And if you go to the next page, on Page 5, it talks

14  about -- we already talked -- we already hit that section

11:16:50  15  right there.

16              Do you remember talking about that just a

17  minute ago?

18  **A.**   Yes.

19  **Q.**   Okay.  Right below that, it talks about referral

11:16:55  20  fees.

21              MR. FAZEL:  All the way down, next section.

22  There you go.

23  BY MR. FAZEL:

24  **Q.**   Is there anything about that section that's

11:17:01  25  fraudulent, illegal?

*Cross-Green-By Mr. Fazel*

1   **A.**   No.

2   **Q.**   And that basically tells you what?

3   **A.**   That there's a referral fee paid by the bank to

4   Stanford Group Company.

11:17:10   5   **Q.**   So it's informing the potential purchaser of the CD

6   what's going on; that is, Stanford International Bank will

7   pay a referral fee to SGC, Stanford Group Companies, for

8   this CD that was just purchased; correct?

9   **A.**   Correct.

11:17:26   10   **Q.**   Anything fraudulent about that?

11   **A.**   No.

12   **Q.**   Anything illegal about that?

13   **A.**   No.

14   **Q.**   All right.  Now, there were -- there are several

11:17:40   15   types of CDs; correct, Mr. Green?

16   **A.**   Yes.

17   **Q.**   There's three types?

18   **A.**   Yes.

19   **Q.**   All right.  Was there anything illegal about the

11:17:46   20   types of CDs that were available for purchasing?

21   **A.**   No, there's not.

22   **Q.**   Was there anything fraudulent about the three types

23   of CDs that were available for purchasing?

24   **A.**   No.

11:17:53   25   **Q.**   As a matter of fact, the types of CDs also had some

*Cross-Green-By Mr. Fazel*

1  flexibility as to when you should cash them in; right?

2  **A.**   Correct.

3  **Q.**   Some of them you could cash in quicker than other

4  ones?

11:18:01   5  **A.**   Right.

6  **Q.**   Was there anything illegal about that?

7  **A.**   No.

8  **Q.**   Anything fraudulent about that?

9  **A.**   No.

11:18:08   10  **Q.**   How about the fact that the ones that you could cash

11  in -- well, correct me if I'm wrong.

12          The ones that you couldn't cash in as

13  quickly had a higher interest rate; correct?

14  **A.**   Correct.

11:18:15   15  **Q.**   Is there anything illegal about that?

16  **A.**   No.

17  **Q.**   Anything fraudulent about that?

18  **A.**   No.

19          MR. FAZEL:  All right.  Going on to Page 10,

11:18:31   20  please.

21  BY MR. FAZEL:

22  **Q.**   Now, I believe you went over this with the government

23  when they were speaking with you earlier yesterday.

24          Do you remember that?

11:18:44   25  **A.**   Yes, I do.

*Cross-Green-By Mr. Fazel*

1  Q.    I want you to focus in on the third last -- that one

2  right there.

3               MR. FAZEL:  If you can highlight that for me.

4  And just the paragraph, not the numbers.  We'll get to the

11:18:53  5  numbers in a minute.

6  BY MR. FAZEL:

7  Q.    "The funds deposited with us are primarily invested

8  in foreign and U.S. investments."

9               Do you see that "primarily," that term?

11:19:05  10  A.    Yes, I do.

11  Q.    What does "primarily" mean to you?

12  A.    "Primarily" means predominantly.

13  Q.    Mainly?

14  A.    Vast majority.

11:19:13  15  Q.    Vast majority means "primarily"?

16  A.    Yes.

17  Q.    Mr. Green, if I was to look up "primarily" in a

18  dictionary, I would see "vast majority," you think?

19  A.    I don't know.

11:19:26  20  Q.    Okay.

21  A.    I think the context in which it's used here it means

22  substantially all, primarily, almost exclusively.

23  Q.    Is that the way you read it?

24  A.    That is how I read it.

11:19:40  25  Q.    Mr. Green, is that what you told your investors?

1  **A.**   That's what I was told, yes.

2  **Q.**   No.  No.  No.  I asked you a different question,

3  Mr. Green?

4  **A.**   Yes, I told my investors what I was told.

11:19:48  5  **Q.**   Even though the document says "primarily," you said

6  "vast majority"?

7  **A.**   Well, this document as you referred to earlier said

8  there's additional information that they should seek, and

9  in seeking that information, I was will told that it was

11:19:59  10  the vast majority of the assets were invested in

11  investments like this.

12  **Q.**   And then you ended up telling your clients that too?

13  **A.**   Yes, I did.

14  **Q.**   Even though that document clearly says "primarily"?

11:20:10  15  **A.**   The document and --

16  **Q.**   No, Mr. Green.  I'm sorry.  My question is:  That

17  document, in that paragraph, discussing those numbers

18  starts out by saying the funds are deposited with us

19  primarily, does it not?

11:20:23  20  **A.**   Yes, it does.

21  **Q.**   Okay.  Now, let me circle back around to your other

22  statement when you were talking.

23            You said that it tells I do you that you

24  can go seek other information; right?

11:20:32  25  **A.**   That's correct.

1    **Q.**    And that's what you did?

2    **A.**    Correct.

3    **Q.**    Did your other client -- did your clients go seek

4    that information?

11:20:37    5    **A.**    They perhaps -- yes, they did, you know, they did

6    seek that information directly and also indirectly through

7    me.

8    **Q.**    Okay.  So I guess, since I don't have the clients

9    will here, so I can't go into hearsay statements.

11:20:49    10                    But the document clearly says that the

11    clients can go seek that go information; right?  Right?

12    **A.**    Yes.

13    **Q.**    And there is training manuals that we can talk about

14    that you talked about that says, tells you, that you are

11:21:02    15    to stick with what is said in these documents and nothing

16    else; correct?

17    **A.**    I don't know about the training manual that says

18    that, to be honest.

19    **Q.**    Well, I mean, the whole point of this document,

11:21:14    20    Mr. Green, it is it not to make sure that everybody gets

21    the same type of information at the same level; that is,

22    the document is supposed to be the end-all for everybody

23    who purchases those CDs; right?  Correct?

24    **A.**    Except for the additional information they request.

11:21:31    25    **Q.**    If they request additional information; correct?  And

 1  they're the ones that are supposed to seek the additional

 2  information.  Isn't that what that document says?  You can

 3  come talk to us?

 4  **A.**   Yes, I believe that's what it said.

 5  **Q.**   All right.  Now, let me move on to something else, if

 6  I can.

 7                    Mr. Green, yesterday --

 8               MR. FAZEL:  I'm sorry.  I'm done with that

 9  document.  Thank you very much.

10  BY MR. FAZEL:

11  **Q.**   Do you remember yesterday talking about insurance?

12  **A.**   Yes.

13  **Q.**   Okay.  Now, there were three types of insurance --

14  let's -- let's put some time frame on this again because

15  there's some discussion about when you came on board and

16  some times when these insurance went into effect.  So

17  let's put this some time frame on this.

18  **A.**   Sure.

19  **Q.**   You came only board in 19 --

20  **A.**   1996.

21  **Q.**   -- 96?

22  **A.**   Uh-huh.

23  **Q.**   From '96 on -- if I'm incorrect, let me know --

24  **A.**   Okay.

25  **Q.**   -- there were three types of insurance that was

*Cross-Green-By Mr. Fazel*

1    provided for the CD purchasers; that is, SIBL maintained

2    three types of insurance; correct?

3    **A.**   That was not provided for the CD purchasers.

4    **Q.**   You're absolutely right, I was about to correct that.

11:22:39    5    **A.**   Right.

6    **Q.**   That was not provided for -- you are absolutely

7    correct.  I was wrong.

8    **A.**   Right.

9    **Q.**   It's for the bank; correct?

11:22:45   10    **A.**   Correct.

11    **Q.**   The CD purchasers never were told that they had

12    insurance; correct?

13    **A.**   Correct.

14    **Q.**   Because they didn't?

11:22:51   15    **A.**   They did not.

16    **Q.**   Okay.  After all, this was an offshore investment;

17    correct?

18    **A.**   Correct.

19    **Q.**   All right.  It's not supposed to be a safe as a bank

11:23:01   20    in the U.S.; correct?

21    **A.**   Right.  There was no FDIC insurance, for example.

22    **Q.**   Right.  There has to be a little bit of risk for

23    reward?

24    **A.**   Correct.

11:23:08   25    **Q.**   Okay.  There were three types of insurance that were

*Cross-Green-By Mr. Fazel*

1  held by SGC -- I'm sorry -- SIBL; correct?  Three types of

2  insurance?

3  **A.**   That was my understanding.

4  **Q.**   A depositor insolvency policy; correct?

11:23:19  5  **A.**   Correct.

6  **Q.**   Could you tell us what that is?

7  **A.**   Yes.  That was if the international bank had deposits

8  at another institution and that other institution became

9  insolvent, then that policy would pay for the loss of the

11:23:35  10  international bank's deposits at that institution.

11              Now -- so that was essentially what that

12  was.

13  **Q.**   Okay.  And then there is the blanket bond?

14  **A.**   Banker's blanket bond.

11:23:48  15  **Q.**   Thank you.  BBB.  Blanket -- banker's blanket bond.

16              Tell us what that is.

17  **A.**   I understand that's an insurance that would insure

18  things like embezzlement that you might expect could

19  happen at a bank.  That's about as much as I know about a

11:24:06  20  banker's blanket bond.

21  **Q.**   What about a DNO policy?

22  **A.**   Directors and officers liability insurance.  That

23  would insure against, you know, liabilities incurred, you

24  know, by the directors or officers of the bank.

11:24:23  25              MR. STELLMACH:  Do you have a copy?

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Cross-Green-By Mr. Fazel*

1           MR. FAZEL:  I'm sorry.  I thought I gave it to

2 you.

3           MR. STELLMACH:  Thank you.

4           MR. FAZEL:  Sure.

11:24:31   5 BY MR. FAZEL:

6   Q.   I'm going to hand you a document.  I want you to look

7   at it and tell me if you recognize the document.

8           MR. STELLMACH:  I'm sorry.  Could you specify

9 which document?

11:24:41  10           MR. FAZEL:  I did in the beginning.  3.2.

11           THE COURT:  All right.  Now, these are whose

12 documents?

13           MR. FAZEL:  These are going to be the defense,

14 Your Honor.  It's 3-2.

11:24:51  15           THE COURT:  These are defendant's documents?

16           THE WITNESS:  Yes.  I think I've seen this

17 document before.

18 BY MR. FAZEL:

19   Q.   Okay.  Could you briefly tell us where you saw this

11:24:58  20   document?  Not what it is, but where you saw it.

21   A.   I don't recall, to be honest.  It was either maybe in

22   the Houston office or in Baton Rouge.  I'm not sure where

23   I saw it.

24   Q.   Okay.  Correct me if I'm wrong, but was that document

11:25:14  25   something that was provided to the financial advisors to

*Cross-Green-By Mr. Fazel*

1    be able to give their clients or potential clients to talk

2    about these insurance policies that we just talked about?

3    **A.**    No.  This was not regularly given to the financial

4    advisors to distribute to clients.

11:25:30  5    **Q.**    What was this document used for?

6    **A.**    You know, I don't know.  And honestly, I'm thinking I

7    may have seen this document as an addendum to one of the

8    lawsuits to be honest.  I don't think I saw that when I

9    was at Stanford.

11:25:45  10   **Q.**    Fair.

11              MR. FAZEL:  I'm not going to introduce it.

12   BY MR. FAZEL:

13   **Q.**    The insurance -- types of insurance that we talked

14   about, would it be fair to say that you have no knowledge

11:26:09  15   here today that would tell you that you did not -- or

16   Stanford did not have those types of insurance?

17   **A.**    That's correct.  I have no knowledge of that.

18   **Q.**    Okay.  So to the best of your knowledge, Stanford, in

19   fact, did possess these types of insurance policies?

11:26:22  20              THE COURT:  Is that what you're saying?

21              THE WITNESS:  I'm saying I really had no -- I

22   was told that they had it, but I had no knowledge that they

23   did per --

24              THE COURT:  One way or another?

11:26:31  25              THE WITNESS:  Right.

*Cross-Green-By Mr. Fazel*

1          THE COURT:  Okay.

2          THE WITNESS:  Yeah.  I never saw the policies.

3  Yeah.

4  BY MR. FAZEL:

5  **Q.**   Okay.

6  **A.**   But I believed at the time when they told me that

7  they had them, that they, in fact, did have them.

8               And I believe at least one time there was

9  a letter written to a client by someone at Stanford

10  acknowledging it.  They asked for the additional

11  information, and there was a letter written to them.  I

12  don't think I ever saw the letter, but I heard of the

13  letter.  So I had reason to believe those policies exist.

14  **Q.**   Okay.  And is there anything illegal or fraudulent

15  about possessing these types of policies?

16  **A.**   No, there's not.

17  **Q.**   Okay.  Now, yesterday right before we stopped for the

18  day, we talked about captive insurance companies.

19               Do you remember that?

20  **A.**   Yes.

21  **Q.**   All right.  You weren't with the company when the

22  company was Guardian International Bank, were you?

23  **A.**   No, I was not.

24  **Q.**   Would you agree with me that, when you came on board

25  with the company, the company started to grow

*Cross-Green-By Mr. Fazel*

1  exponentially?  It started to get bigger and bigger?

2  **A.**   Yes.

3  **Q.**   Before that, it was a much smaller company?

4  **A.**   Yes.

11:27:29  5  **Q.**   And we talked about this briefly.  I just want to

6  circle back around and talk about it just a little bit.

7  **A.**   Okay.

8  **Q.**   Captive insurance companies are used commonly, are

9  they not?

11:27:38  10  **A.**   Yes, I believe so.

11  **Q.**   And captive insurance companies are generally used,

12  for example, with the big accounting firms.  They have

13  captive insurance companies, do they not?

14  **A.**   I think they do, yes.

11:27:45  15  **Q.**   And other financial institutions sometimes have

16  captive insurance companies?

17           THE COURT:  Slow down.

18           MR. FAZEL:  I actually --

19           THE COURT:  No.  Hang on, hang on one second.

11:27:52  20           Come on around here for a second.  Just

21  one attorney from each side.

22         **(Bench conference held without the reporter)**

23          **(The following was held before the jury)**

24  BY MR. FAZEL:

11:28:35  25  **Q.**   So captive insurance companies are not unusual to

*Cross-Green-By Mr. Fazel*

1    have, are they?

2  **A.**    No.

3  **Q.**    But when you were at Stanford, you were told that

4    they did not have captive insurance companies.  In fact,

11:28:46    5    they had these types of insurance policies we just

6    discussed?

7  **A.**    For that, yes.

8  **Q.**    Right.  And these insurance policies, again, were not

9    insurance for the CDs.  In other words, if the bank was to

11:28:56   10    go bankrupt or blew up or something happened to it, that

11    didn't fix that.  All this did was insure the bank itself,

12    not the depositor?

13  **A.**    That's correct.

14  **Q.**    Anything fraudulent about that?

11:29:10   15  **A.**    No.

16  **Q.**    Anything illegal about that?

17  **A.**    No.

18  **Q.**    Okay.  Let's talk about FINRA.

19  **A.**    Okay.

11:29:26   20  **Q.**    FINRA, F-I-N-R-A.

21                Do you know what it stands for?  And if

22    you don't, it's okay.

23  **A.**    Financial Institute -- no.  I did at one time.  Two

24    years ago, I could have told you.

11:29:41   25  **Q.**    FINRA, that is one of the financial -- excuse me --

*Cross-Green-By Mr. Fazel*

1  regulatory agencies that regulated SGC.

2  **A.**  Uh-huh.

3  **Q.**  But -- is that a "yes"?  When you say "uh-huh," is

4  that a "yes"?

5  **A.**  Yes.  I'm sorry.

6  **Q.**  And that was not just SGC or Stanford Group

7  Companies, the broker dealer, that FINRA regulated; it

8  regulates all the companies that do that type of business;

9  correct?

10  **A.**  All broker dealers, yes.

11  **Q.**  All broker dealers.

12              And therefore, SGC was under FINRA's

13  umbrella; correct?

14  **A.**  Correct.

15  **Q.**  All right.  And that's normal business practice for

16  that type of business?

17  **A.**  Yes.  It's required.

18  **Q.**  From time to time, FINRA requires certain matters to

19  be produced to it; correct?

20  **A.**  Correct.

21  **Q.**  Like, for example, the marketing material?

22  **A.**  Yes.

23  **Q.**  And that was produced to FINRA?

24  **A.**  As far as I'm aware, yes, it was.

25  **Q.**  Again, we are only talking about what you personally

*Cross-Green-By Mr. Fazel*

 1  know.

 2  **A.**   Well, I mean, I didn't see it presented to them.  I'm

 3  assuming it was presented to them.  That wasn't my

 4  responsibility.  So --

11:30:38  5  **Q.**   I understand.  And I'm going to guess FINRA isn't

 6  shy, and if it wasn't produced to them, they'd be coming

 7  knocking on the door saying, Hey, give it to me?

 8  **A.**   Yes, I would think so.

 9  **Q.**   I would think so.  Okay.

11:30:51  10          But that's not the only thing FINRA does.

 11  FINRA does regulate strictly these types of activities;

 12  correct?

 13  **A.**   Which types of activities?

 14  **Q.**   The broker dealer activities.

11:30:59  15  **A.**   Yes.

 16  **Q.**   Now, the broker dealer itself is a multi-compartment

 17  company.  I mean, it's not just FA's; correct?

 18  **A.**   Yes, correct.

 19  **Q.**   There's accountants?

11:31:10  20  **A.**   Correct.

 21  **Q.**   There are compliance officers?

 22  **A.**   Yes.

 23  **Q.**   And did Stanford Group Companies have that?

 24  **A.**   Yes.

11:31:16  25  **Q.**   And tell us what compliance does, or did for

*Cross-Green-By Mr. Fazel*

1    Stanford.

2    **A.**    Well, compliance is responsible to make sure that the

3    company is complying, as the word, you know, denotes, with

4    the regulatory regime.  Whatever the rules are,

11:31:33    5    requirements, laws, they're responsible to make sure that

6    the firm is in compliance with those laws and rules.

7    **Q.**    And did compliance in your estimation and your

8    knowledge, did they comply and do what FINRA wanted them

9    to do?

11:31:45    10    **A.**    Yes, I understood they did.

11    **Q.**    Did you have a legal department?

12    **A.**    Yes, we did.

13    **Q.**    Was there a specific individual in the legal

14    department that you asked questions of if you had legal

11:31:56    15    questions?

16    **A.**    Yes.

17    **Q.**    And who was that?

18    **A.**    There were a few.  Rebecca Hamrick (phonetic).  And

19    then another gentleman.  I can't recall his name now.

11:32:06    20    **Q.**    That's okay.

21    **A.**    And ultimately, Mauricio Alvarado, but hew as in

22    Stanford Financial Group's legal department.  So it

23    wasn't, per se, Stanford Group Companies.

24    **Q.**    And that's one of the issues that maybe we should

11:32:19    25    clear up.

*Cross-Green-By Mr. Fazel*

1               That although these companies have --

2    they're situated in different locations, have different

3    names, different structures, they did -- they were like

4    interwoven with each other; that is, they did interact

11:32:32    5    with each other quite frequently; correct?

6    **A.**   Yes, that's correct.

7    **Q.**   For example, the parent -- well, I don't know if it's

8    a parent company, but Stanford Financial Group Company,

9    their legal department did interact with Stanford Group

11:32:45    10   Companies; correct?

11   **A.**   That -- yes, they did.

12   **Q.**   Quite often; correct?

13   **A.**   Yes, I believe so.

14   **Q.**   And you relied on the legal vice of inhouse counsel;

11:32:56    15   correct?

16   **A.**   Yes.

17   **Q.**   Is that illegal?

18   **A.**   No.

19   **Q.**   Is that fraudulent?

11:32:58    20   **A.**   No.

21   **Q.**   I mean, the point of having inhouse counsel is for

22   them to advise you as to what to do?

23   **A.**   This is correct.

24   **Q.**   And Mr. Stanford relied on information that he was

11:33:10    25   given; correct?

*Cross-Green-By Mr. Fazel*

1    **A.**    I would assume so.

2    **Q.**    Including legal advice by Mauricio Alvarado?

3    **A.**    I would believe so.

4    **Q.**    And Mr. Stanford and yourself -- let's not that you

11:33:18    5    can about Allen, because you wouldn't know that -- but

6    you, yourself, you're not lawyer; correct?

7    **A.**    No.

8    **Q.**    You're not here to tell us that you can go through

9    the FINRA regulations and do exactly what it asks you to

11:33:27    10    do; correct?

11    **A.**    Correct.

12    **Q.**    You need some advice?

13    **A.**    Correct.

14    **Q.**    You need a person that went to law school that does a

11:33:34    15    lot of securities work to be able to tell you, Hey, in

16    this circumstance you do this, in other are circumstances

17    you do something different; correct?

18    **A.**    Yes, that's correct.

19    **Q.**    Nothing illegal about that?

11:33:43    20    **A.**    No, there's not.

21    **Q.**    Nothing fraudulent about that?

22    **A.**    No, there's not.

23    **Q.**    It's pretty normal.

24          THE COURT:  Slow down, guys.

11:33:45    25          MR. FAZEL:  I'm sorry, Judge.

*Cross-Green-By Mr. Fazel*

1          THE COURT:  It's basically for the court

2  reporter; okay?  It starts going back and forth --

3  everybody's doing fine.  I'm just telling them to slow down

4  a bit.

11:33:54    5          THE WITNESS:  I think my last answer was "no."

6          MR. FAZEL:  He asked me on a break if I was

7  drinking coffee, and I told him I was.

8          THE COURT:  I think you're doing just fine.

9  BY MR. FAZEL:

11:34:06   10  **Q.**   All right.  Now, did SGC, Stanford Group Companies,

11  the broker dealer let's just call it broker dealer for

12  simplicity.

13  **A.**   Okay.

14  **Q.**   Did the broker dealer have auditors?

11:34:18   15  **A.**   Yes.

16  **Q.**   Outside auditors?

17  **A.**   Yes.

18  **Q.**   In the U.S.?

19  **A.**   Yes.

11:34:22   20  **Q.**   Would you agree with me that when you're located --

21  physically located in Houston or Baton Rouge or something

22  like that, it would be much simpler for the auditing firm

23  to be close to or have offices near your location?

24  **A.**   Sure.

11:34:38   25  **Q.**   For example, in the broker dealer circumstances,

1  there are just not one offices; there are multiple

2  offices; correct?

3  **A.**   Correct.

4  **Q.**   And therefore, you needed an auditing firm to be able

11:34:51  5  to service, provide information, do what an auditor does

6  for all the company -- all the offices; correct?

7  **A.**   Yes.

8  **Q.**   Could you tell us -- and if you don't know, that's

9  okay -- how many offices the broker dealer had?

11:35:03  10  **A.**   About 30.

11  **Q.**   Thirty offices in the U.S.?

12  **A.**   Correct.

13  **Q.**   All over the U.S.?

14  **A.**   Correct.

11:35:09  15  **Q.**   West Coast?

16  **A.**   One, San Francisco.

17  **Q.**   Middle of the U.S.?

18  **A.**   Texas.  If you count Texas in the middle, several.

19  **Q.**   You have to count Texas?

11:35:18  20  **A.**   Yeah.  Well, I wasn't quite sure whether that's west.

21  Yes, central is Texas.

22  **Q.**   Right.

23  **A.**   Uh-huh.

24  **Q.**   And then anywhere else?

11:35:25  25  **A.**   Yeah.  We had Texas, Louisiana, Mississippi,

*Cross-Green-By Mr. Fazel*

1    Tennessee, Florida, Georgia, New York, Virginia, and I may

2    have skipped some.  And there were some states had

3    multiple offices, which is how you get to 30.

4    **Q.**   In auditing something like a broker dealer and

11:35:46   5    dealing with the requirements of FINRA, is much more

6    different than auditing a bank on an island; is it not?

7    **A.**   Yes, I would think so.

8    **Q.**   Because, with FINRA, in all the multitude of

9    regulations it has, you need somebody to devote a lot of

11:36:05   10   time and effort to be able audit the broker dealer;

11   correct?

12   **A.**   I'm not sure that the audit ties into the

13   regulations, to be honest.  I think, you know, an audit is

14   an audit.  You know, you're going to come in and verify

11:36:18   15   numbers.  I don't know that there's a regulatory overlay

16   there.  But honestly, I can only say "I don't know."

17   **Q.**   And that's a perfectly good answer.

18              But it's much simpler to audit one bank in

19   one location than it is to audit 30 offices dealing with

11:36:36   20   all sorts of securities issues like the broker dealer was;

21   correct?

22   **A.**   I would think so.

23   **Q.**   All right.  We talked about compliance and the

24   compliance.

11:36:49   25              Did you have a compliance group at

*Cross-Green-By Mr. Fazel*

1    Stanford Group Companies?

2    **A.**    Yes, we did.

3    **Q.**    And who was the head of that?

4    **A.**    Bernie Young, Bernard Young.

5    **Q.**    Was there anything about him that you were

6    uncomfortable with?

7    **A.**    Not at all.

8    **Q.**    Was there anything about him that gave you an idea or

9    an inclination that you thought that he was in any way

10   fraudulent?

11   **A.**    Not at all.

12   **Q.**    Deceitful?

13   **A.**    No.

14   **Q.**    Dishonest?

15   **A.**    No.  Quite the opposite.

16   **Q.**    And he was in charge of the compliance section of the

17   broker dealer?

18   **A.**    Yes.

19   **Q.**    And tell us with that did.

20   **A.**    Well, what I said earlier:  They were responsible for

21   making sure that the broker dealer complied with the rules

22   and regulations that we operated under.

23   **Q.**    And did they do that?

24   **A.**    Yes, I think so.  I mean, they were -- a fine here

25   and there for different infractions, but essentially, yes.

1    Q.   And, I mean, that's just normal business activity.  I

2    mean, it's not something that you said, Oh, my gosh.

3    There's a fine here, I've got to leave here?

4    A.   No.  No.  I thought it was at the time normal

11:37:46  5    business activity.

6    Q.   All right.  Now, the government, when they were

7    asking you questions, were asking about this British

8    Insurance Fund.

9              Had you ever heard of that?

11:37:57  10   A.   I don't recall them asking me about a British

11   Insurance Fund.

12   Q.   You don't recall.  Okay.  Well, let me you this:  Had

13   you ever heard of Stanford Group Companies or the broker

14   dealer having a captive insurance company?

11:38:13  15   A.   No.  I -- the only thing I recall was I think our

16   health insurance plan was self-insured.

17   Q.   Was a captive insurance?

18   A.   Yeah.  Self-insured, so I guess that's a captive --

19   the definition.  I'm not expert on captive insurance

11:38:29  20   companies or anything.

21   Q.   That's okay.  Anything fraudulent or misleading about

22   that?

23   A.   No, I don't think so.

24   Q.   The idea of self-funding, doesn't that -- to a

11:38:39  25   financial advisor, a person who has knowledge of finance

*Cross-Green-By Mr. Fazel*

1    and the manner in which one should accumulate wealth, such

2    as yourself, the idea of having a captive insurance,

3    doesn't that seem attractive, where you have funds there

4    and if you don't use it, you can actually invest it?  Is

11:39:00   5    that -- is that --

6    **A.**   Yeah.  I think -- under certain circumstances, it

7    makes sense, which is why people do it.

8    **Q.**   Do you remember or do you recall talking to the

9    government about the training manual?

11:39:12   10   **A.**   Yes.

11              MR. FAZEL:  And for the record, that's

12   Government's Exhibit 151.

13   BY MR. FAZEL:

14   **Q.**   The -- Page 2, that's PDF Page 2, talks about 24

11:39:38   15   affiliates.

16              Do you see that?

17   **A.**   Yes.

18   **Q.**   Is that, in your opinion, correct?

19   **A.**   I have no reason to think it's not correct.

11:39:49   20   **Q.**   Twelve countries; correct?

21   **A.**   Correct.

22   **Q.**   Forty-four cities?

23   **A.**   Correct.

24   **Q.**   3,000-plus employees?

11:39:56   25   **A.**   Yes.

*Cross-Green-By Mr. Fazel*

1  **Q.**   Okay.  Now, what year was this?

2  **A.**   March 2008.

3  **Q.**   90,000 clients.  Is that correct?

4  **A.**   As far as I know.

11:40:05  5  **Q.**   Okay.  Would you agree with me that is a very large

6  company?

7  **A.**   Yes.

8  **Q.**   Okay.  Tell us about the way the training happened

9  for the financial advisors.  Were you involved in that?

11:40:25  10  **A.**   I was not, but I did not use this manual.  This

11  was --

12  **Q.**   What manual did you use?

13  **A.**   I did not use a manual.  I had some PowerPoint slides

14  that I used.

11:40:34  15  **Q.**   I'm sorry.  I didn't know that.  Okay.

16              So when you went over with the --

17  **A.**   This was -- as my understanding, this was used by

18  Oreste Tonarelli.

19  **Q.**   So you did not use this?

11:40:45  20  **A.**   No.  But it was available to everyone on the company

21  Internet site as a source document.

22  **Q.**   Had you seen this before?

23  **A.**   I had seen it before.  I don't know that I saw the

24  March 2008 version.  What I was trained with originally

11:41:00  25  back in '99, Oreste used a earlier version of that

1   document to train me.

2              But the training you asked the financial

3   advisors, I was involved and compliance was involved in

4   training the domestic -- the U.S. financial advisors.

11:41:18  5   **Q.**   Why was compliance involved in training?

6   **A.**   To make sure that everything was, you know, done

7   correctly.

8   **Q.**   Done correctly.  That's part of being compliant?

9   **A.**   Yes.

11:41:26  10  **Q.**   And the idea of training everybody on these products

11  in a certain way, like we discussed earlier with those

12  documents, the disclosure statements and so forth, was to

13  make sure that everybody gave the same information to

14  their clients; correct?

11:41:43  15  **A.**   Yes.

16  **Q.**   Now, that's critical.  The client has to understand

17  what they're purchasing?

18  **A.**   Accurate information, yes.

19  **Q.**   I believe that one time you indicated that you wanted

11:41:57  20  to use a golden rule when it comes to selling products?

21  **A.**   That's correct.

22  **Q.**   Do you remember saying that?

23  **A.**   I actually remember that e-mail, yes.

24  **Q.**   Okay.  And that meant that you would only sell a

11:42:07  25  product to the individual which you felt like was

1   necessary?

2   **A.**   Which was suitable to them, yes.

3   **Q.**   All right.  Okay.  And the CD wasn't suitable to

4   everybody, was it?

11:42:16   5   **A.**   No, it was not.

6   **Q.**   And it wasn't sold to everybody, was it?

7   **A.**   No, it was not.

8   **Q.**   Were you ever told by Mr. Stanford that you must sell

9   the CD to every single client?

11:42:26   10   **A.**   No, I was not.

11   **Q.**   You only sold it to people that you felt like it

12   would fit within their needs?

13   **A.**   That's correct.

14   **Q.**   And this is what you told other people in the company

11:42:36   15   to do?

16   **A.**   That's correct.

17   **Q.**   So when we talked earlier, and the prosecute -- I'm

18   sorry -- the government was talking earlier and was

19   talking about the fact that there were these competitions.

11:42:45   20   **A.**   Yes.

21   **Q.**   Do you remember talking about that?

22        These competitions weren't forcing people

23   to sell items that they didn't want to sell, was it?

24   **A.**   No, I don't believe they were forcing people to sell

11:42:55   25   items they did not want to sell.

*Cross-Green-By Mr. Fazel*

1  **Q.**   They weren't forcing individuals to sell items or

2  sell this CD to people that didn't need it to buy those

3  CDs, was it?

4  **A.**   No, I don't believe that's -- it wasn't forcing

11:43:07  5  anyone to do anything.

6  **Q.**   It was simply a competition -- a friendly competition

7  among the company employees, as simple as that?

8  **A.**   Among the employees of the various companies.

9  **Q.**   Among the employees of the various companies?

11:43:17  10  **A.**   Right.

11  **Q.**   And there's nothing fraudulent about that?

12  **A.**   There's not.  Yesterday I started to discuss we

13  did -- the management of Stanford Group Company became

14  uncomfortable with the contest and, so, we were making

11:43:32  15  provisions to change that.  And it ultimately, you know,

16  never did get changed, but there was some -- there had

17  been some rules that made contests -- and I believe there

18  were SEC rules that made contests no longer really an

19  acceptable way to do business.  And, so, we had been

11:43:50  20  pushing for sometime internally trying to get those

21  contests, you know, basically changed to include, at a

22  minimum, a full range of products, not just one product.

23  **Q.**   Okay.  You brought up full range of products.  Let's

24  talk about SIM.  Are you familiar with SIM model?

11:44:07  25  **A.**   Yes, I am.

*Cross-Green-By Mr. Fazel*

1    Q.    Could you briefly tell us what the SIM model was?

2    A.    It was Stanford investment model, and it had

3    parameters.  It was overseen by Laura Colt and her group.

4    And it was designed to basically replicate in a way, not

5    fully, but in a way the way we understood the bank's money

6    was being managed to try to give a client a positive

7    return in good markets and avoid negative returns in bad

8    markets.

9                      So the goal was to, you know, make money

10   when things were going good but protect that portfolio

11   when they were not -- when times were bad.

12   Q.    Now -- I'm sorry.

13   A.    Uh-huh.

14   Q.    With the SIM model, was the CD involved in the SM

15   model at all?

16   A.    Yes, it was.  The CD was a component of the Stanford

17   investment model.

18   Q.    And when you say component, what do you mean by that?

19   A.    Well, let's say it could have been an allocation.  So

20   if you had -- take a hypothetical million dollars you were

21   going to put in the Stanford investment model, 200,000 may

22   have wound up in a CD and the other 800,000 in other, you

23   know, investment products, mutual funds, stocks, bonds,

24   hedge funds, a little bit of everything.

25   Q.    So it was a combination of, let's say, a -- if you

1  will, a pot, if you -- just for layman's term, there's a

2  pot and you put a bunch of stuff in that pot to make sure

3  that you're covering your basis.  If one portion of it

4  goes down, there's other portions that go up that will

5  equate that -- the circumstances and try to deal with the

6  fluctuations of the market?

7  **A.**   That's right.  You would try to diversify it.

8  **Q.**   And is there anything illegal about that?

9  **A.**   No.

10  **Q.**   Anything fraudulent about that?

11  **A.**   No.

12  **Q.**   You hit on something that I think is interesting.

13  With your business, or the business you were in, there is

14  some fluctuation to it, is there not?

15  **A.**   Yes, there is.

16  **Q.**   I mean, using the term "sum" is probably an

17  understatement.  There's a lot of fluctuation to it?

18  **A.**   Yes, in certain years, there's a gut-wrenching amount

19  of fluctuation.

20  **Q.**   And, so, nowhere in any of the representations that

21  I'm sure you made or anybody else that you were aware of

22  that made was there a statement that this is the only way

23  we invest the money, was there?

24  **A.**   No.

25  **Q.**   I mean, the idea is to have a flexibility in the way

11:45:48

11:45:57

11:46:09

11:46:18

11:46:34

1  folks's monies are invested; right?

2  **A.**   Correct.

3  **Q.**   And you used the term "dynamic."  Do you remember

4  using that term?

11:46:45  5  **A.**   I do remember using it.

6  **Q.**   And "dynamic" means what, being able to manipulate,

7  maneuver investments all the time?

8  **A.**   That's correct.

9  **Q.**   So there is no way that one person can look at one

11:46:56  10  individual piece of paper or one individual set of numbers

11  and assume that these numbers are going to be the way

12  their monies are going to be invested because there's

13  always going to be some change; correct?

14  **A.**   Correct.

11:47:16  15  **Q.**   Now, when we're talking about the training and

16  training manuals for the financial advisors, what would

17  happen to a financial advisor who spoke outside of the

18  training manual or discussed matters that was not approved

19  by compliance or approved in the disclosure statement?

11:47:32  20  What is that financial advisor doing?

21  **A.**   That's a violation, so he's out of compliance.  And

22  you know, if people are caught doing things they shouldn't

23  be doing, then there's penalties associated with it,

24  including, I guess, ultimately termination.

11:47:49  25  **Q.**   The broker dealer itself, would you agree with me

*Cross-Green-By Mr. Fazel*

1    that the broker dealer was a viable business, that is, it

2    was a business that did real work?

3    **A.**   Yes.

4    **Q.**   It provided a real service?

11:48:03   5    **A.**   Yes.

6              MR. FAZEL:  Judge, I need to approach for a

7    minute.

8              THE COURT:  Okay.

9              **(The following was held at the bench)**

11:48:23   10             MR. FAZEL:  On previous days, counsel was upset

11   at me because they claim that I did something with a motion

12   in limine, so I'm going to approach out of an abundance of

13   caution and talk about one of the motions in limine that we

14   discussed.

11:48:41   15             THE COURT:  This is the government?

16             MR. FAZEL:  Yes, sir.

17             MR. STELLMACH:  I think the valuation in

18   limine, I think, is the one think that's going to be at

19   issue.

11:48:47   20             MR. FAZEL:  Right.

21             THE COURT:  The government's motion or the

22   defense?

23             MR. FAZEL:  It's the government's motion.

24             THE COURT:  Which one?

11:48:51   25             MR. STELLMACH:  I think it's going to be the

1  motion regarding valuation, but I'll let Mr. Fazel -- the

2  first one.

3          MR. FAZEL:  Now, during the hearing -- I'm

4  going to let you read, Judge, I'm sorry.

11:49:00   5          THE COURT:  Financial condition --

6          MR. STELLMACH:  I think it's the first one.

7          THE COURT:  The very first?

8          MR. STELLMACH:  Yes, Your Honor.

9          THE COURT:  Okay.  All right.

11:49:21  10          MR. FAZEL:  During the hearing, I think your

11  ruling was that we don't discuss it in opening statements.

12          THE COURT:  Sure.

13          MR. FAZEL:  And that's it.  So I believe I have

14  a right to go into it now, but out of an abundance of

11:49:34  15  caution, I'm approaching to tell you that I'm about to go

16  into it.  I don't think I'm limined out.  We didn't talk

17  about in opening, so I'm about to discuss it with him.

18  This witness did send out e-mails talking about the value

19  of the broker dealer and how he thought he should sell it.

11:49:50  20          MR. STELLMACH:  Your Honor, we maintain our

21  objection to this entire line of questioning.  The reason

22  we moved for it be to be precluded was because the issues

23  evaluation are irrelevant.  Your Honor, may recall we

24  had submitted --

11:49:59  25          THE COURT:  As far as the gravamen of all of

*Cross-Green-By Mr. Fazel*

1  the charges that you have; correct?

2          MR. STELLMACH:  Yes, Your Honor.

3          THE COURT:  Does it go into the valuation of

4  the other businesses?

11:50:08  5          MR. STELLMACH:  That's right.

6          MR. FAZEL:  I think what the government

7  is saying -- and I don't want to put words in their

8  mouth -- I think their theory is that Mr. Stanford cannot

9  have a good faith belief that if they had a value that he

11:50:19  10  did not.

11          THE COURT:  Maybe he could put it in wherever

12  he wanted.

13          MR. FAZEL:  No, no, I think what they're saying

14  is he couldn't have a good faith belief saying I didn't

11:50:27  15  intend to commit a crime because I knew these companies had

16  value; therefore, I could sell it.

17          THE COURT:  I was saying the same thing --

18          MR. FAZEL:  I'm sorry.

19          THE COURT:  -- a different way.

11:50:34  20          MR. FAZEL:  Right.

21              But that has nothing to do with the fact

22  that we could certainly bring it in to show other things.

23          THE COURT:  Like what?

24          MR. FAZEL:  Well, I mean, it shows that the

11:50:42  25  company had value.  It shows that the company wasn't on

*Cross-Green-By Mr. Fazel*

1  fraudulent.  I mean, it shows many things.  It shows that

2  it's an ongoing concern.

3          MR. STELLMACH:  And it's still irrelevant to

4  the charges.

11:50:50  5          THE COURT:  That's your bottom line --

6          MR. STELLMACH:  That's my bottom line.

7          THE COURT:  -- because the alleged crimes were

8  that -- if I remember correctly, that he did some things

9  with the funds that he was not supposed to do.

11:51:00  10          MR. STELLMACH:  Exactly, that he was investing

11  it in very specific ways pursuant to a very specific

12  strategy that we've all seen --

13          THE COURT:  That was not subject -- that he

14  didn't disclose.

11:51:09  15          MR. STELLMACH:  Right.  And so good faith -- a

16  good faith defense to these charges would be when I made

17  that statement, I believe strategy was being executed.  He

18  can't now say it's still good faith even though I knew it

19  wasn't being executed.

11:51:21  20          THE COURT:  Let me put it to you this way:  In

21  every case, you always come across a point that you either

22  make it or break it for the whole trial, and you're at one

23  of those crossroads now.  I'm not avoiding ruling.  So what

24  do you want to do?

11:51:34  25          MR. STELLMACH:  Your Honor, we maintain our

 1  motion.

 2              THE COURT:  Okay.  And how do you get into it?

 3              MR. FAZEL:  Your Honor, I think that in order

 4  for them to make their case, they have to do two things

11:51:44  5  simultaneously:  They have to show that he had an intent to

 6  defraud, okay?  And I think this goes to -- although he

 7  might not have a good faith -- excuse me -- not a good

 8  faith defense to it, but it does go to intent.  I think

 9  they're combining --

11:52:01 10              MR. STELLMACH:  Good faith is --

11              THE COURT:  I understand it completely.  That's

12  why I asked them that loaded question.  And I got you a

13  reason why you need it in.  So I think both sides are

14  protected, regardless what the ruling was.  The ruling is

11:52:15 15  your request to get around the motion in limine is denied.

16              MR. FAZEL:  Yes, sir.

17      **(The following was held in the presence of the jury)**

18              MR. SCARDINO:  May we have just a moment, Your

19  Honor?

11:52:35 20              THE COURT:  Sure.

21  BY MR. FAZEL:

22  **Q.**   Mr. Green, do you remember talking about --

23              THE COURT:  I always have to activate this

24  particular one.  Okay.  Go on.  For some reason when we

11:53:24 25  approach the bench, the lectern mike turns off.  Go on.

*Cross-Green-By Mr. Fazel*

1          MR. FAZEL:  Yes, Your Honor.

2    BY MR. FAZEL:

3    Q.   Do you remember speaking about the full faith and

4    credit of R. Allen Stanford?

11:53:32    5    A.   No.  Full faith and credit of Stanford International

6    Bank.

7    Q.   I'm sorry.  And who was the single shareholder of

8    Stanford National Bank?

9    A.   R. Allen Stanford.

11:53:41    10   Q.   Do you remember talking about the fact that in

11   certain circumstances you had expected Mr. Stanford to put

12   in his capital and his money into the bank.  Do you

13   remember that?

14   A.   Yes.

11:53:49    15   Q.   And we'll get to that in a little while.

16   A.   Okay.

17   Q.   But when we were talking about the full faith and

18   credit of Stanford International Bank, does that in your

19   mind also equate to the full faith and credit of R. Allen

11:54:00    20   Stanford himself?

21   A.   I don't know.  I mean, perhaps.  I don't know how to

22   answer that.

23   Q.   Okay.  And does that not mean that one would expect

24   in your circumstances in 2008 when everything was just

11:54:17    25   going terribly haywire, everything was going down, banks

1    were -- companies were getting bankrupt, they were -- the

2    economy was bad, that if Mr. Stanford had the ability --

3    the financial ability to be able to invest money, that

4    would be an important thing for you to know; right?

11:54:36   5    **A.**   Yes.

6    **Q.**   And, therefore, his financial capabilities

7    involved -- equated to all the businesses that he had;

8    correct?

9    **A.**   Yes.

11:54:46   10   **Q.**   And that's -- in toto was Mr. Stanford; correct?

11   **A.**   His -- all of his wealth, yes.

12   **Q.**   All of his wealth?

13   **A.**   Businesses, investments, everything.

14   **Q.**   You discussed all those companies that -- we talked

11:54:56   15   about 90 companies that Stanford had; correct?

16   **A.**   Well, that last line said 24-affiliated companies,

17   but I understood he had many more than that.

18   **Q.**   Many more.

19   **A.**   Right.  I think the difference was the others may not

11:55:10   20   have been affiliated.  They were just portfolios of

21   companies he owned.

22   **Q.**   Correct.  So there's this whole worldwide of

23   companies that Stanford owned and operated; correct?

24   **A.**   Right.

11:55:18   25   **Q.**   And all of those could have come to bear?

1            MR. STELLMACH:  Objection as to relevance, Your

2 Honor.

3            THE COURT:  What's the relevance, please?

4            MR. FAZEL:  I'm laying the foundation to

11:55:27  5 approach the Court again to show why what I think is

6 important to get into.

7            THE COURT:  Let me ask you this:  Does it

8 concerning the ruling we just made?

9            MR. FAZEL:  Yes, sir.

11:55:36  10            THE COURT:  You object?

11            MR. STELLMACH:  I maintain the objection.

12            THE COURT:  Objection is sustained.

13 BY MR. FAZEL:

14  **Q.**   Were you aware of a program or a set of circumstances

11:55:54  15 where there was a consolidation ongoing with the Stanford

16 companies?

17  **A.**   I was told in probably late January, early February,

18 somewhere in there, of 2009, that there was going to be a

19 consolidation of these companies under one entity, and at

11:56:16  20 that time there would be a, you know, big accounting firm,

21 which we had been asking for, to come in and audit all of

22 the companies.

23  **Q.**   Okay.  And the consolidation was to take effect in

24 order to do what?

11:56:27  25  **A.**   Well, to shore up the financial strength.  My

*Cross-Green-By Mr. Fazel*

1    understanding was it was going to come up and help shore

2    up the international bank, add even additional capital

3    above and beyond the million dollars Mr. Stanford had in

4    there and provide the kind of accounting that everybody at

5    that point was looking for, big name auditor, accountant.

6    **Q.**   Because under those circumstances, you'd have

7    basically one company; correct?

8    **A.**   Yeah.  Now, I was not made privy to exactly -- I was

9    just sort of -- this was sort of spoken to me as a, you

10   know, it's not really supposed to be public right now, but

11   this is something they're talking about doing and maybe

12   happening soon, although, it's going to take time.

13   **Q.**   But as a financial person yourself, you understand by

14   consolidating those companies, putting them under one

15   umbrella, if you will, what happens to the one company,

16   how is it becoming stronger, what is it doing that's

17   becoming stronger?

18            MR. STELLMACH:  Objection as to relevance, Your

19   Honor.

20            THE COURT:  What's the relevance?

21            MR. FAZEL:  Well, Your Honor, it shows what

22   Mr. Stanford and the companies were doing in order to deal

23   with the 2008 issue.  It goes to show that he had no intent

24   to commit any kind of crime.

25            MR. STELLMACH:  It's irrelevant to the charges,

*Cross-Green-By Mr. Fazel*

1  which are misrepresentations made and materials.

2              THE COURT:  Explain what your objection is.

3              MR. STELLMACH:  These are events that take

4  place well after misrepresentations that we charged have

11:57:51  5  been made to depositors.

6              THE COURT:  So what -- what I'm doing here, I'm

7  having a visit with the attorneys as to what -- with the

8  government what their exact allegations are.

9                  What do you allege was the crime in this

11:58:04  10  case?

11              MR. STELLMACH:  That Mr. Stanford through his

12  annual reports that he signed through the marketing

13  materials that he disseminated through statements he made

14  to financial advisors such as Mr. Green, on repeated

11:58:13  15  occasions, consistently misrepresented the investment

16  strategy of the bank.  He said that the assets every time

17  bank were overwhelmingly, primarily as we saw in the CD

18  disclosure statement, invested in highly liquid --

19              THE COURT:  All right.  You're saying that he

11:58:27  20  put the funds in areas that he -- either he shouldn't have

21  or was advertised that he would not?

22              MR. STELLMACH:  Exactly.  Diametrically

23  opposite --

24              THE COURT:  All right.  That's all we have.

11:58:37  25                  Now, the purpose you're offering this for

1  is -- I want you to get both sides.  I'll make my ruling,

2  but you need to understand what -- well, conflicting

3  theories are.  And I'll make the ruling and we'll move on.

4                    Go right ahead, sir.

11:58:50    5          MR. FAZEL:  Your Honor, the government has to

6  show that Mr. Stanford himself did so with intent and

7  knowledge.  And what we're saying is that although there

8  might be some evidence that other people in his company did

9  what they did, that Mr. Stanford did not have the intent or

11:59:04   10  knowledge to do this.

11          THE COURT:  Response.  I mean, that's very

12  articulately put.  Response.

13          MR. STELLMACH:  Consolidation taking place in

14  2008, some 19 years after the fraud began and has been

11:59:14   15  taking place, isn't relevant to the charges here in this

16  case and to the misrepresentations Mr. Stanford had been

17  making throughout that time period.  This is a corporate

18  restructuring.  It has nothing to do with the charges.

19          MR. FAZEL:  I would disagree with you.  It has

11:59:25   20  100 percent to do with the charges.

21          THE COURT:  How so?

22          MR. FAZEL:  Because what they're doing is

23  they're putting their companies in a format to be able to

24  address the issue of the economy, to be able to address

11:59:32   25  being -- paying back the CD depositor.  It shows Allen

 1  Stanford's desire and effort 100 percent to be able to pay

 2  back his investors, and also shows that he's taking over

 3  his company back again -- let me finish -- to be able to

 4  take his company back again and do some of the things --

 5  deal with some of the things that Mr. Davis did, to put

 6  capital into the company and to restructure it in a way so

 7  that he can deal with the issues.

 8           MR. STELLMACH:  Mr. Stanford never said he was

 9  going to repay the depositors with assets and other

10  companies and other types of investments.  He was very

11  specific in the materials we saw about how he was going to

12  repay those depositors.

13           MR. FAZEL:  I'm sorry.  He's --

14           THE COURT:  Go on.  I'll allow you to wrap up.

15           MR. FAZEL:  He's talking about matters that are

16  not in evidence.  I'd love to see that material, because I

17  have a response for them.

18           THE COURT:  Wait.  He's not through with his

19  case at all yet.

20           Ladies and gentlemen, as to this, keep in

21  mind, and you will, what the government is alleging you

22  heard, in other words, in effect -- and if I paraphrase it

23  wrong, you need to correct me -- that under the law if you

24  say it's going into certain assets, certain -- you do

25  certain things with the money, you got to do that, and if

*Cross-Green-By Mr. Fazel*

1  you do it in anything else, okay, that's a violation of the

2  law.  We haven't -- the government hasn't even approved

3  their case yet.  I mean, that's what they're doing.

4                    After the government's through, I'll

12:00:53  5  determine if the case goes on.  And if it goes on, it will

6  be up to the defense for their position saying enough is in

7  for them not to proceed with the case, or they may

8  partially proceed with the case, or fully proceed.

9                    My ruling now is I'm going to sustain the

12:01:10  10  objection, because I think it goes beyond those parameters

11  that the government has set up.  So that's my ruling.

12                    I did want to give both sides sort of like

13  a mini-summation to give you a background as to what their

14  allegations are.  And I'm ruling that if it's narrow as the

12:01:28  15  government says, and I'll determine that at the end of the

16  government's case, to see if there's enough for it to go on

17  or go to the jury.  So pardon -- I mean, pardon me for

18  diverting like that, but I think at this point, since we

19  talked about some of it up here, you're entitled to get to

12:01:43  20  know what the alleged conflict is and why I'm keeping the

21  evidence out.

22                    Go right ahead, sir.

23              MR. FAZEL:  Thank you, Your Honor.

24  BY MR. FAZEL:

12:02:03  25  Q.   Mr. Green, do you remember speaking to members of the

*Cross-Green-By Mr. Fazel*

1  government prior to testifying today?

2  **A.**   Yes.

3  **Q.**   Do you remember specifically speaking to some law

4  enforcement on or about 6-1-2009?

12:02:23  5  **A.**   6-1-2009.

6  **Q.**   By telephone?

7  **A.**   By telephone.  Yes, I think so.  I believe so.  I'm

8  not certain of the date.  But, yes, I think it was an FBI

9  agent calling.

12:02:36  10  **Q.**   Would you agree with this statement or not:  "It was

11  stressed that the clients were buying a CD backed by the

12  full faith and credit of Robert Allen Stanford"?

13  **A.**   No, I would not.

14  **Q.**   So if a government agent wrote that in his report, he

12:02:51  15  or she would be wrong?

16  **A.**   I would say that they misunderstood what I said if

17  they wrote that in their report, because I would have been

18  clear to say Stanford International Bank.

19  **Q.**   Let's talk about capital infusion.

12:03:12  20  **A.**   Okay.

21  **Q.**   And let me back up one second.  I was looking at my

22  notes and I found it interesting that you indicated that

23  the CD program was going to be involved in SIM, S-I-M.  Do

24  you remember saying that?

12:03:49  25  **A.**   I don't recall saying that.

1    Q.   I'm sorry.  Then --

2    A.   When we spoke earlier, I said that the CDs were part

3    of the Stanford Investment Model.  Is that what you're

4    referring to?

12:03:58   5    Q.   Right.

6    A.   Right, yes.

7    Q.   So are you testifying that the SIM program, the

8    Stanford Investment Model that we just talked about, was

9    going to include the CDs or the CD program?

12:04:07   10   A.   Not necessarily in every situation, but, yes, it

11   would.

12   Q.   Okay.  It was available as part of it?

13   A.   Yes, it was.

14   Q.   Are you sure about that?

12:04:14   15   A.   I'm fairly certain.  It's been a few years now.

16   Q.   If there's testimony otherwise or it could be that --

17   are you --

18   A.   There's documents that show that, I'm certain of it.

19   Q.   Okay.  Let's get to capital infusion.  In the United

12:04:44   20   States, we have a certain methodology when we account for

21   numbers; correct?

22   A.   Yes.

23   Q.   It's called GAAP?

24   A.   Yes.  Generally accepted accounting principles.

12:04:53   25   Q.   All right.  Now, I know you're not an accountant.

*Cross-Green-By Mr. Fazel*

1  **A.**   I am not, thank God.

2  **Q.**   I am not either.  So I'm not asking you for your

3  expert opinion in accounting.  We're going to talk about

4  you generally.

12:05:03  5  **A.**   Good, because I don't have one.

6  **Q.**   I understand.

7              But you were a financial advisor at one

8  point in your life; correct?

9  **A.**   Correct.

12:05:09  10  **Q.**   And, so, you have to be able to read numbers and look

11  at documents?

12  **A.**   Yes.

13  **Q.**   Although you're not an accountant, you have some

14  understanding of numbers and how they're set up?

12:05:17  15  **A.**   Right.

16  **Q.**   All right.  GAAP is used in the United States;

17  correct?

18  **A.**   Correct.

19  **Q.**   Is it used anywhere else in the world?

12:05:22  20  **A.**   I do not know.

21  **Q.**   Is it correct -- or if you don't know, you don't

22  know -- that other methodologies are used without --

23  outside of the United States?

24  **A.**   I know that other methodologies are used outside of

12:05:32  25  the United States.

1   **Q.**   Do you know of the name of one?

2   **A.**   I do not.

3   **Q.**   Does IFRS ring a bell?

4   **A.**   No, not particularly.

12:05:40   5   **Q.**   Not particularly.  Okay.

6                    Would you agree with me that when you're

7   looking at a number or a set of documents, that one of the

8   things you need to know is what the accounting methodology

9   is being used?

12:05:52   10   **A.**   Yes.

11   **Q.**   Okay.  Because some accounting methodologies require

12   reporting a certain way and others require it differently;

13   correct?

14   **A.**   Yes, I assume so.

12:06:02   15   **Q.**   Okay.  For example, under certain circumstances, in

16   GAAP, when you buy a pen, the value of the pen is booked

17   at the time you purchase it $1?

18   **A.**   Okay.

19   **Q.**   Let's say this pen then goes up in value to $10.  Are

12:06:20   20   you with me?

21   **A.**   Yes.

22   **Q.**   But it's still booked as $1 in your books.

23   **A.**   Okay.

24   **Q.**   Do you agree with that?

12:06:26   25   **A.**   I don't know.  I know there's mark to market.

1    There's other accounting principals required, but I'm not

2    familiar enough with it to start saying what I think is

3    the case or not.

4    **Q.**   Do you agree with me that GAAP does not allow mark to

12:06:39   5    market?

6    **A.**   I do not know.

7    **Q.**   You don't know.  Okay.

8    **A.**   My accounting courses were 20-some-odd years ago.

9    **Q.**   That's right.  Mine were less than that, and I still

12:06:53   10    don't understand it.  I'm with you.

11              But I'm a little confused because -- I'm a

12    lawyer and thank God I don't have to look at a lot of that

13    stuff.  But you're a financial advisor and you did have to

14    look at all that information and you did have to make some

12:07:07   15    assessment.  So something that is somewhat important to

16    understand, which is mark to market or similar accounting

17    features like that, you never looked or looked into or

18    tried to look at when you were looking at investments for

19    your clients?

12:07:18   20    **A.**   I generally managed the managers.  I did not pick

21    specific securities for my clients, so I would have not

22    been delving into financial statements, you know, for

23    selecting specific securities --

24    **Q.**   I'm sorry --

12:07:32   25    **A.**   -- with the exception being, you know, looking at the

1 annual reports probably for Stanford International Bank.

2 **Q.**   All right.  Let's talk about that.  Those annual

3 reports, I mean, wouldn't it be important for you to see

4 what type of accounting they're using?

12:07:43  5 **A.**   Yes, I knew they were using international accounting

6 standards which --

7 **Q.**   If they were using international accounting

8 standards, wouldn't it be important to know a little bit

9 about it?

12:07:52  10 **A.**   I felt I knew enough about it.

11 **Q.**   Now, you also testified earlier that you were

12 insistent on keeping your own book of business.  Do you

13 remember that?

14 **A.**   Yes, I do.  Actually, the last two years, I did not

12:08:04  15 keep my own book of business.

16 **Q.**   Prior to that two years, you were keeping your own

17 book of business?

18 **A.**   Correct.

19 **Q.**   Which means you had interaction with your clients

12:08:13  20 that you termed were friends of yours?

21 **A.**   Yes.

22 **Q.**   You told us that they're all friends of yours.  All

23 your clients were friends; right?

24 **A.**   Pretty much, yes.

12:08:19  25 **Q.**   Right.

*Cross-Green-By Mr. Fazel*

1   **A.**   It was a -- it was a -- yes.

2   **Q.**   It's important for you to take care of them; right?

3   **A.**   Yes, I cared about them.

4   **Q.**   I understand.  So talking about that timeframe,

12:08:28   5   wouldn't it important to you to know things as basic as

6   IFRS and mark to market and things like that?  Is it you

7   forgot or --

8   **A.**   No, it's not that I forget.  I don't -- you know,

9   they were using a international accounting standard.

12:08:40   10   **Q.**   You said "they."  Just to clear it up, who are you --

11   **A.**   Stanford --

12   **Q.**   -- talking about?

13   **A.**   -- International Bank was.

14   **Q.**   But -- but --

12:08:41   15   **A.**   They were --

16   **Q.**   You were --

17           THE COURT:  One at a time.  Slow down, please.

18   BY MR. FAZEL:

19   **Q.**   You were using -- you were not just selling the CDs

12:08:49   20   to all your friends, you were selling other things; right?

21   **A.**   Yes.

22   **Q.**   And you were selling things that are sold

23   internationally, stocks, equities, bonds and so forth;

24   correct?

12:08:56   25   **A.**   Correct.

*Cross-Green-By Mr. Fazel*

1  Q.   So, I mean, if you purchased a stock of a company in

2  Germany --

3  A.   Yes.

4  Q.   -- shouldn't you -- don't you look at their

5  documentation before you made such a decision?

6  A.   No.

7  Q.   You just buy the stock?

8  A.   As I said, I wasn't purchasing specific securities.

9  I was using money managers typically, and they would be

10  analyzing the financial statements.  I mean, I had

11  accounting.  I basically can look at a financial statement

12  and see assets, liabilities, equity.  I felt like that was

13  more than sufficient for what was required.

14  Q.   Okay.

15  A.   Whether it was IFRS or FRAC or, you know, any other

16  acronym, it was not relevant to me.

17  Q.   Let's talk about capital infusion.  At some point in

18  time, you had interaction with Mr. Stanford about capital

19  infusion.  We talked about that somewhat.  Do you --

20  A.   That's correct.

21  Q.   -- remember that?  All right.

22          Now, I'm still a little foggy as to

23  exactly what happened, so let's take it a step at a time

24  so we're clear on it.

25  A.   Sure.

*Cross-Green-By Mr. Fazel*

1    Q.   Tell me what your understanding of the term "capital"

2    is.  What does "capital" mean?

3    A.   Capital is basically money that is put into a company

4    to, you know, provide you know, working capital, financial

12:10:37    5    capital, bank capital.  It's to provide -- it's in excess

6    of -- okay.  I'm going to have to be a little clearer.

7    Q.   Let me ask the question differently.  Capital doesn't

8    have to be money, does it?

9    A.   Capital doesn't have to be money.

12:10:54    10    Q.   Right.

11    A.   It has to have value.

12    Q.   It has to have value.

13                  But it doesn't have to be cash money?

14    A.   No, not necessarily.

12:11:00    15    Q.   All right.  So when somebody talks about capital

16    infusion, that is, putting capital into a company, one has

17    to be sure that they're not talking about -- I mean, one

18    has to be clear as to what the capital is; correct?

19    A.   Right.

12:11:15    20    Q.   All right.  So when there's announcements that

21    Mr. Stanford is putting capital into a company such as

22    Stanford International Bank, Limited --

23    A.   Right.

24    Q.   -- that doesn't mean that he's putting cash into the

12:11:26    25    company; correct?

*Cross-Green-By Mr. Fazel*

1    **A.**   That's correct.

2    **Q.**   And accounting standards, even in the United States,

3    allow for capital to be placed into a company that's not

4    cash; correct?

12:11:37   5    **A.**   That's correct.  That's why I asked them.

6    **Q.**   Right.  Now, there was -- the e-mails that were sent

7    out to investors and the correspondence that was sent out

8    to investors --

9    **A.**   Uh-huh.

12:11:53   10   **Q.**   -- all relay that there was capital put into SIBL;

11   correct?

12   **A.**   Correct.

13   **Q.**   None of them said currency; correct?

14   **A.**   Correct.

12:12:12   15   **Q.**   Now, as the 2008 economy began to boil up and heat up

16   and there was money coming out of SIBL because people had

17   to take out that money, as we discussed, to deal with

18   other issues that they're having with other market

19   situations --

12:12:26   20   **A.**   Or they were just worried about the strength of the

21   bank and they wanted to get the their money out.

22   **Q.**   I understand.  I was just relaying one information --

23   you told me about one of your clients.  That's what he was

24   doing, he was taking out money because he had to deal with

12:12:38   25   cash call.  Do you remember talking about that?

*Cross-Green-By Mr. Fazel*

1  **A.**   You mentioned that client specifically --

2  **Q.**   Right.

3  **A.**   -- and I said I knew of one out of thousands of

4  clients, and that was the only one I knew of that was

5  doing it for cash call, but there were thousands that were

6  taking -- I don't know if thousands, hundreds.  There were

7  a lot of clients taking it out it just because they was

8  nervous.

9  **Q.**   Okay.  Well, which one is it?  Was there a lot of

10  people taking it out or not enough people taking it out?

11  **A.**   There was a lot of people taking it out.

12  **Q.**   Okay.

13  **A.**   My understanding was primarily because they were

14  nervous.

15  **Q.**   So there were a lot of people coming to the bank and

16  taking their money out?

17  **A.**   Correct.

18  **Q.**   All right.  And it was because of the economic

19  circumstances at the time?

20  **A.**   Correct.

21  **Q.**   All right.  Now, did you have a conversation with

22  Mr. Stanford where you asked Mr. Stanford to put a -- you

23  asked or you agreed with Mr. Stanford to infuse a certain

24  amount of capital because you talked about Lehman

25  Brothers.

1           Do you remember that?

2  **A.**   I remember discussing Lehman Brothers, and I think my

3  comment was transparency.

4  **Q.**   I'm sorry.  Mr. Green.  Let's --

12:13:31  5  **A.**   No.  Well, you're tying two conversations --

6  **Q.**   I understand.

7  **A.**   -- and they're not really -- that's not how it was.

8  **Q.**   Mr. Green, if you could let me ask the question.  If

9  you can't answer it --

12:13:38  10          MR. STELLMACH:  Objection, Your Honor.  The

11  witness is trying to answer.

12          THE COURT:  Yeah.  If you can't answer it, let

13  me know.

14          THE WITNESS:  Okay.  I will.

12:13:43  15          THE COURT:  The easiest thing, "yes," "no" --

16          THE WITNESS:  Yes.  All right.

17          THE COURT:  If he asks for an explanation --

18          THE WITNESS:  Well, it was kind of a double

19  question.

12:13:49  20          THE COURT:  Okay.  That's your problem.

21  BY MR. FAZEL:

22  **Q.**   Then tell me it's a double question?

23          THE COURT:  It's a compound question.

24          THE WITNESS:  It's a compound question.  Yes to

12:13:55  25  one part and no to the other.

*Cross-Green-By Mr. Fazel*

1  BY MR. FAZEL:

2  **Q.**   Remember in the beginning when I told you if you

3  can't let me know and I'll rephrase it?

4  **A.**   Yes.  I'm sorry.

12:14:01  5          THE COURT:  Or let me know and I'll ask you to

6  rephrase it.

7  BY MR. FAZEL:

8  **Q.**   Or let him know.

9  **A.**   Okay.

12:14:04  10  **Q.**   Jus let somebody know.

11  **A.**   All right.

12  **Q.**   Do you remember having a conversation with

13  Mr. Stanford regarding Lehman Brothers?

14  **A.**   No.

12:14:14  15  **Q.**   Okay.

16  **A.**   I remember sending an e-mail out about Lehman

17  Brothers.

18  **Q.**   I'm trying to find it.

19          Now, November 2008, you and another

12:14:52  20  individual met with Mr. Stanford in Houston; correct?

21  **A.**   Correct.

22  **Q.**   All right.  In that meeting, Mr. Stanford relayed to

23  you that the board of directors of SIBL is considering

24  what to do about the situation, including a capital

12:15:07  25  infusion; correct?

*Cross-Green-By Mr. Fazel*

1  **A.**   No.

2  **Q.**   It was not in that meeting?

3  **A.**   Mr. Stanford said he, personally, had the idea, what

4  if I put in it -- there was no mention the board of

12:15:19  5  directors.  He just said, "What if I put in enough capital

6  to get the total capital up over a billion dollars?  How

7  do you think that would be perceived?"

8  **Q.**   Okay.  So if in a previous conversation with the

9  government, you indicated otherwise and they recorded that

12:15:34  10  in a writing, they would be incorrect?

11  **A.**   If they said that Mr. Stanford said he had met with

12  the board -- if they said what you just said, I made that

13  correction that it was him, not the board of directors,

14  right.

12:15:45  15  **Q.**   Did you agree with Mr. Stanford that a capital

16  infusion was a good idea?

17  **A.**   Very much so.

18  **Q.**   Was there anything illegal about making a capital

19  infusion?

12:16:12  20  **A.**   No.

21  **Q.**   Anything fraudulent about making a capital infusion?

22  **A.**   No.

23  **Q.**   As a matter of fact, you thought it was a good idea?

24  **A.**   I thought it was a great idea.

12:16:36  25  **Q.**   Now, let me circle back around a little bit.

1                     Were you aware -- and if you weren't, again,

2    just let me know, "I don't know."

3                     At some point in time when you were at the

4    broker dealer, did the SEC not provide, request, send a

12:16:59    5    questionnaire out to your clients for them to fill out

6    those questionnaires?

7    **A.**    Yes, the SEC did that to -- to certain clients that

8    held CDs.

9    **Q.**    Was it certain clients or all the clients?

12:17:10    10    **A.**    I'm not sure.

11    **Q.**    Okay.  Perfect.

12                     And did the clients do that?

13    **A.**    Did the clients respond with the questionnaire?

14    **Q.**    Right.

12:17:20    15    **A.**    I believe some did and some did not.

16    **Q.**    Was the SEC at that point satisfied with their

17    investigation?

18    **A.**    I do not know.  I believe it was still an ongoing

19    investigation.

12:17:29    20    **Q.**    Was the broker dealer -- did the broker dealer let

21    them come in and do whatever they needed to do?

22    **A.**    As far as I was aware, yes, they did.

23    **Q.**    Okay.  Did they hide anything from them?

24    **A.**    As far as I was aware, they did not.

12:17:41    25    **Q.**    Did they come and question you?

*Cross-Green-By Mr. Fazel*

1   **A.**   No.  I was not questioned directly.

2   **Q.**   Were you questioned indirectly?

3   **A.**   No, I don't think I was questioned indirectly either.

4   **Q.**   Now, do you remember speaking about Basil.  I think

12:18:02   5   you were -- you said, "I don't know if it's Basil or

6   Basil, or whatever it is."

7   **A.**   I'm pretty sure it's Basil.

8   **Q.**   I think you're right.  I think it is Basil.

9            These three Basils; right?  Basil 1,

12:18:12   10   Basil 2, Basil 3?

11   **A.**   Yes.

12   **Q.**   And each of them represent a standard for banking?

13   **A.**   Correct.

14   **Q.**   Basil 1 is what we are in the U.S.; correct?

12:18:23   15   **A.**   I believe so, but I'm not entirely certain.

16   **Q.**   That's all right.  Basil 2 is a higher standard;

17   correct?

18   **A.**   I believe it is for a capital requirement.

19   **Q.**   Is it just capital requirement or is there other

12:18:35   20   circumstances?

21   **A.**   I do not know.  I actually ordered a book on it, and

22   it never came in.  So I wanted to learn more about it.

23   **Q.**   Okay.  When did you order the book?

24   **A.**   In 2008 sometime, yeah.

12:18:44   25   **Q.**   Now, to your knowledge, Antigua, the island where

1    SIBL is located, is it not actually under Basil 2?

2    **A.**   I believe in 2008, they switched from Basil 1 to

3    Basil 2.

4    **Q.**   Now, which means their standards are higher than the

12:19:01    5    U.S.?

6    **A.**   That's what I understand.

7    **Q.**   Right.  Now, also, isn't it true, if you know, that

8    before they did that, that folks that made those

9    determinations by coming in and rate and make those

12:19:14    10    ratings and give those ratings actually audited SIBL?

11    **A.**   I do not know.

12    **Q.**   You do not know.

13                    Let's talk about the IRS --

14    **A.**   Okay.

12:19:34    15    **Q.**   -- just briefly?

16    **A.**   Uh-huh.

17    **Q.**   Are you aware that there was ongoing litigation

18    between Stanford, Mr. Stanford himself, and the Internal

19    Revenue Service?

12:19:44    20    **A.**   No.  What -- all I was aware was he told me he had an

21    Internal -- he had an IRS agent that was permanently

22    parked in his office with his -- I guess -- I think it was

23    two tax attorneys and a CPA he had working for him.

24    **Q.**   Okay.  Now, as a financial analyst --

12:20:03    25    **A.**   Advisor.

1  Q.   Advisor.  Sorry.

2                -- you understand that there are tax

3  consequences to certain conduct; correct?

4  A.   Yes.

12:20:10  5  Q.   So as a businessperson, for example, if one was to be

6  taxed a certain way, it would be prudent to take conduct

7  or take action so that it would reduce -- or he or she

8  would reduce their tax basis; correct?

9  A.   Yes, tax avoidance.

12:20:30  10  Q.   Tax avoidance.

11                Is there something illegal about tax

12  avoidance?

13  A.   No.

14  Q.   Is there anything fraudulent about tax avoidance?

12:20:39  15  A.   No.

16  Q.   Are you familiar with how loans are taxed?

17  A.   You know, not really.

18  Q.   Not really?

19  A.   We're getting back into accounting.

12:21:07  20        MR. FAZEL:  Judge, when did you say you wanted

21  to break for the morning?

22        THE COURT:  12:45.  You know, give or take.

23  12:45 to 12:50 today because we took that other break.

24  BY MR. FAZEL:

12:21:26  25  Q.   I'm going to direct your attention to a clip that we

*Cross-Green-By Mr. Fazel*

1    viewed yesterday of Mr. Stanford at a meeting.

2                    Do you remember that?

3    **A.**   Yes, I do.

4    **Q.**   In that meeting -- it was -- what was it?  2008?  Do

12:21:37  5    you remember?

6    **A.**   I believe it was October 2008.

7    **Q.**   Were you present in that meeting?

8    **A.**   I believe I was.

9    **Q.**   We saw some clips of it.  I want to show you other

12:21:45  10   clips of it.

11   **A.**   Okay.

12   **Q.**   Tell me, first of all, if you recognize this

13   individual that's going to come up.

14                    THE COURT:  Hang on just one second.

12:21:52  15                    MR. FAZEL:  I'm about to give the exhibit

16   number right now.

17                    THE COURT:  Okay.

18                    MR. FAZEL:  What exhibit is that?

19                    THE COURT:  You're going to put it on your

12:21:59  20   computer?

21                    MR. FAZEL:  Yes.

22                    THE COURT:  Okay.  Hang on.

23                    MR. FAZEL:  This would be Exhibit 1532.

24   Government 1532.

12:22:17  25                    THE COURT:  1532.  Yeah, it's already in.

*Cross-Green-By Mr. Fazel*

1                MR. FAZEL:  Yes, sir.

2                THE COURT:  Okay.  Just make sure -- I think

3 I've got it to the right back.  Anything coming through

4 yet?  There it is.

12:22:34  5 BY MR. FAZEL:

6   **Q.**   Let me ask you if you recognize this individual right

7   here.

8   **A.**   It's pretty grainy.  I'm not sure I do.

9                THE COURT:  Why don't you lead him, see if you

12:22:44 10 know who it is.  You know --

11 BY MR. FAZEL:

12   **Q.**   Is it Walter Johnson?  Is it Johnson?

13                     Is it Walter Johnson?

14   **A.**   I don't know.

12:22:48 15                THE COURT:  Okay.

16                MR. FAZEL:  Go ahead and play it.

17                **(Whereupon, the tape was played)**

18                "WALTER JOHNSON:  We all historically greed has

19 destroyed a lot of families."

12:23:00 20                MR. FAZEL:  Let me stop you right there.

21                THE COURT:  Get a little more volume.

22                THE WITNESS:  Yeah.  I -- he owned a bank in

23 Texas, I believe.

24 BY MR. FAZEL:

12:23:06 25   **Q.**   But it is Walter Johnson?

 1  **A.**   I don't know if that's his name or not.

 2  **Q.**   Okay.

 3  **A.**   And I can't tell you the name of the bank.  But I

 4  know -- I'm pretty sure I heard him speak, and he is a

12:23:14  5  banker.

 6            THE COURT:  Let me ask you this:  Any

 7  problem -- is that Mr. Johnson?  I'm asking the government.

 8            MR. STELLMACH:  I don't think we know, Your

 9  Honor.

12:23:20  10           THE COURT:  All right.

11            MR. FAZEL:  I can --

12            THE COURT:  Why don't you find out from your

13  table.

14            MR. FAZEL:  I can tell you it is.

12:23:26  15           THE COURT:  It is.  Okay.  All right.  As an

16  officer of the Court, I mean, that means an attorney says

17  so, we take it and we move on.

18            MR. FAZEL:  I can back it up to where

19  Mr. Stanford actually introduces him, Judge.

12:23:37  20           THE COURT:  No.  We all -- no problem.  Go on.

21            MR. FAZEL:  All right.

22            WALTER JOHNSON:  "...has destroyed

23  civilizations. And in my opinion, we're witnessing the

24  greatest amount of greed that I can imagine, and it is --

12:23:51  25  it's going to go down in financial history as what has

1  destroyed most of America today.  I've been a banker for 48

2  years.  I have seen a lot of cycles in 48 years.  I'm 73

3  years old.  But I never dreamed how stupid bank management

4  could be until now.  And in my opinion, so many problems

12:24:18  5  you've seen is because bank management, and I'll call that

6  the board of directors, they haven't put their right people

7  in office.  And I think in so many cases, the people that

8  are crashing and burning weren't really bankers at all.

9  And I liken them to the Jeff Skillings of the world who is

12:24:38  10  famous for destroying Enron.  Jeff came into Enron when

11  they had oil companies, they had financial, they had

12  pipelines."

13          MR. FAZEL:  Let me stop it right there.  I just

14  wanted to making that you recognized who this is, and we

12:24:50  15  know it's Walter Johnson.  So I want to go to Clip 2 and

16  talk about that.

17  **A.**   Okay.  Yeah.

18  **Q.**   You were at this meeting; right?

19  **A.**   I was at this meeting.  I remember this speech, yeah.

12:24:59  20          **(Whereupon, the tape was played)**

21          WALTER JOHNSON:  "Well, who is criminal?  In my

22  opinion, we can start with Amegy Bank of Texas, my bank for

23  the last 18 years that I started from scratch, Zions

24  Bancorp, my partner that I sold to about 24 months ago.

12:25:14  25  Harris Simmons, their CEO worked for me.  He shares my

*Cross-Green-By Mr. Fazel*

1  lending philosophy.  And we can start with Stanford

2  Financial, because as near as I can tell, Allen and I are

3  like two peas in a pod, the way we look at credit, the way

4  we look at people, the way we look at growth and the way we

12:25:34  5  want to do our business.  I've known Allen for a long time.

6  Not too many years ago, I scrubbed his bank in Antigua

7  because I was going to try to find some way we could do

8  some business together.  It didn't work because we were a

9  young bank and regulatory was all over us, screaming at me

12:25:49  10  every day, You can't grow this fast.  You're going to fail.

11  It's impossible.  No bank can grow like you're growing

12  safely and soundly.  And we did.

13            "But I know that Allen's philosophy

14  mirrors mine from everything I've seen of Allen.  I know

12:26:04  15  that he is concerned about integrity of himself, of his

16  company and of his staff.

17            "I know that he's concerned about his

18  employees.  Like me, he wants them to be the best they can

19  possibly be and to make the most they can possibly make

12:26:23  20  while doing sound, safe business.

21            "I know he's concerned about the client.

22  And you can't run a great institution, you can't have a

23  good staff, if your first concern is not the client.  I

24  know he's concerned about community because I have seen him

12:26:40  25  plow a lot of money back in the community, just like I do.

1          "I also know that there's no one in the

2   country more concerned about the quality of government

3   wherever he lives, wherever he does business.  And this is

4   something that we share -- both share a passion for in good

5   government.

6          "I don't think that things are ever going to

7   be the same; but I do know this:  I don't think that Allen

8   Stanford has ever booked assets, and neither have I, that

9   we didn't understand and that we didn't scrub every way we

10  could to be sure that they were safe and sound and weren't

11  going to come back to bite us.

12         I also know that Allen, like myself and my

13  staff, we're creative, we're imaginative, we think outside

14  the box, and we find opportunities for ourselves and for

15  our client.

16         "Amegy has no off-balance-sheet entities or

17  assets."

18         MR. FAZEL:  Let me stop it right there because

19  I think he goes into talking about Amegy Bank.

20         MR. STELLMACH:  And, Your Honor, I just wanted

21  to clarify something:  When we offered this tape, it was

22  only for the purpose of showing that this is what Mr. Green

23  was told.  I assume it came with the same limitation when

24  the defense is offering this portion from the speech by

25  Mr. Johnson, that it's not being offered for the truth of

1 what was said, just for the fact that this is what he said

2 in his speech.

3          THE COURT:  Any problem with that?

4          MR. FAZEL:  I want to bring it in for the truth

12:28:04  5 of the matters asserted.

6          MR. STELLMACH:  Sir, it's hearsay.

7          MR. FAZEL:  Well, let's -- let me lay the

8 foundation for it.  I'll do it right now.

9          THE COURT:  All right.  Go on.

12:28:11  10 BY MR. FAZEL:

11  **Q.**   Mr. Green, were you at that meeting?

12  **A.**   Yes, I was.

13  **Q.**   Did you hear that gentleman speak?

14  **A.**   I did.

12:28:15  15  **Q.**   Is this an accurate reflection of what he said at

16  that meeting?

17  **A.**   It's a recording of what he said at the meeting.

18  **Q.**   Did he say what he said in that --

19          THE COURT:  Hold it.  Let him continue.

12:28:25  20          MR. FAZEL:  I'm sorry.  I'm just curious what's

21 so funny.

22 BY MR. FAZEL:

23  **Q.**   Does this accurately what he said at that meeting?

24  **A.**   I mean, unless it's been edited, yes.

12:28:34  25  **Q.**   I guess that's my question.

*Cross-Green-By Mr. Fazel*

1          Do you recall him saying what he said

2   right now and a minute ago?

3   **A.**   Generally, yes, I do recall him saying that.

4          MR. FAZEL:  I tender it into evidence.

12:28:42   5          MR. STELLMACH:  That just goes to authenticity,

6   not hearsay.  Again, this is just what the witness heard

7   when he attended the speech.

8          THE COURT:  The objection is sustained.  I'm

9   going to do it for the limited purpose.  You've heard it.

12:28:52   10   It's just for the limited purpose of that was said.  The

11   man's not here.

12          It is in evidence, but it was offered, I

13   think, initially for a limited purpose and just going to

14   continue relative to the defense using part of what's

12:29:05   15   already in evidence.

16          Go on.

17   BY MR. FAZEL:

18   **Q.**   Mr. Green, did you remember the part when he talked

19   about he scrubbed his bank?

12:29:10   20   **A.**   Yes.

21   **Q.**   What does that mean to you?

22   **A.**   That means he went and looked at Mr. Stanford's bank,

23   although I don't know whether he was referring to Bank of

24   Antigua or Stanford International Bank.  He had two

12:29:23   25   different banks on the island.  And so he did some kind of

*Cross-Green-By Mr. Fazel*

1    analysis of -- of the bank.

2    **Q.**   And then did he say anything they wanted to do

3    business with Mr. Stanford?

4    **A.**   Yes, he did.

12:29:33    5        MR. FAZEL:  Can I have a moment, Judge?

6    BY MR. FAZEL:

7    **Q.**   Mr. Green, I want to ask you a question, only because

8    we chatted about this yesterday, and then you chatted

9    earlier about it with the government when you first got on

12:30:18   10    the witness stand.  So I just want to clear this up a

11    little bit.

12    **A.**   Okay.

13    **Q.**   You had indicated that you got some kind of a notice

14    from the SEC.

12:30:24   15        Do you remember testifying about that --

16    **A.**   Yes.

17    **Q.**   -- at the beginning?

18        Was it a Wells notice?

19    **A.**   Yes.

12:30:29   20    **Q.**   Okay.  And you have a counsel representing you on

21    that?

22    **A.**   Yes.

23    **Q.**   And are you still in -- dealing with the SEC

24    currently?  Are you still -- no?

12:30:38   25    **A.**   I am not myself directly.

 1  **Q.**   Of course.

 2  **A.**   Yes.

 3  **Q.**   I understand.  You have lawyer to do that.

 4              But are they still talking -- or what is

 5  the status of that; do you know?

 6  **A.**   I do not know.  I think there is some discussion, but

 7  I don't -- there's no -- there's nothing I know of

 8  happening right now, which suits me fine.

 9  **Q.**   I hear you.  Okay.  But you're not set to meet with

10  them next week or the following week?

11  **A.**   I am not set to meet with them anytime soon, and nor

12  do I ever hope to meet with them.

13  **Q.**   I understand.  I don't blame you.

14              Now, you also talked about, in their direct

15  testimony with you, when they were chatting with you --

16  when the government was chatting with you earlier, that

17  talked about the interest rates of the CDs.

18  **A.**   Correct.

19  **Q.**   Okay.  You said that, generally speaking, they are

20  about 4 percent higher than U.S. interest CDs?

21  **A.**   Yes.

22  **Q.**   Okay.  Let's kind of hammer that down a little bit --

23  **A.**   Okay.

24  **Q.**   -- because I want to make sure I understand you

25  correctly.

1          The 4 percent is -- it's a generality;

2   correct?

3   **A.**   Yes.  It is, yes.

4   **Q.**   Okay.  Because the CD structure was such that, if you

12:31:41   5   invest that amount of money, the interest rates would

6   differ; correct?

7   **A.**   Yes.

8   **Q.**   And the time would also cause it to be different?  In

9   other words, if it's a longer term, it's a higher rate; if

12:31:52  10   it's a shorter term, it's a lower rate?

11   **A.**   Correct.

12   **Q.**   And that's perfectly normal; is it not?

13   **A.**   Yes, it is.

14   **Q.**   There's nothing fraudulent or illegal about that.

12:31:58  15   **A.**   No.

16   **Q.**   Okay.  Now, the rates that they were offering SIBL,

17   Stanford International Bank Limited, was offering, were

18   those rates alarming to you?  Did you feel like they were

19   extravagantly high?

12:32:11  20   **A.**   No.

21   **Q.**   Were they within what you would expect?

22   **A.**   Yes.

23   **Q.**   Okay.  Were they -- in your opinion, would that cause

24   you to think, Wait a minute, there's some fraud going on

12:32:20  25   here because the rates are so high?

*Cross-Green-By Mr. Fazel*

1  **A.**   No.

2  **Q.**   Okay.  We talked about the commission structure of

3  the company.  The commission rates that were being offered

4  to the FAs.

12:32:44  5              Did you find that be extravagantly high or

6  somehow cause you to have some kind of tendency to go,

7  There something weird going on here?

8  **A.**   No.

9  **Q.**   Was it within the norms of what the industry did?

12:32:55  10  **A.**   Within the industry, it was unique.  Frankly, I

11  didn't know of anything exactly like it in the industry;

12  but neither was -- Stanford International Bank was unique.

13  And, so, the understanding that he was earning a 6 percent

14  spread, you know, difference between what he earned and

12:33:12  15  what he paid made it same reasonable to pay that to the

16  financial advisors.

17  **Q.**   It was also done in order to bring bright,

18  hard-working people into the company; correct?

19  **A.**   Yes, I assume -- we -- we had recruiting packages we

12:33:25  20  did to recruit people over, but that product was one that

21  made it attractive for them to come.

22  **Q.**   Right.  I mean, it -- well, the product.  But I mean,

23  the commission structure was such that it allowed people

24  who were well qualified to come and work for the company;

12:33:41  25  correct?

*Cross-Green-By Mr. Fazel*

1  **A.**   Correct.

2  **Q.**   There's nothing illegal or fraudulent about that?

3  **A.**   No, there's not.

4  **Q.**   As far as the Memphis group is concerned -- let's

12:34:11  5  talk about that, if we could, please.

6  **A.**   Okay.

7  **Q.**   Stanford International Bank was in Antigua; correct?

8  **A.**   Correct.

9  **Q.**   Just to get our geography right, Mr. Stanford officed

12:34:29  10  mostly in Antigua; correct?

11  **A.**   I'm not sure.  St. Croix, I thought he officed mostly

12  there.

13          THE COURT:  That's the Virgin Islands?

14          THE WITNESS:  Yes.  Virgin Islands, yes, sir.

12:34:41  15  BY MR. FAZEL:

16  **Q.**   Do you know why he moved from Antigua to St. Croix?

17  **A.**   Tax reasons was what I understood.

18  **Q.**   Tax reasons.

19           Was there a tax benefit in moving to

12:34:51  20  St. Croix?

21  **A.**   A substantial one is what I understood.

22  **Q.**   Okay.  But my point is that he was mostly in the

23  Caribbean and either in Antigua or St. Croix or that area

24  right there; correct?

12:35:03  25  **A.**   I thought he was mostly on his plane, to be honest.

1  I didn't know where he was.  Yeah.

2  **Q.**   Mostly on his plane doing what?

3  **A.**   I don't -- traveling to various locations.  I don't

4  know where he was mostly housed out of.  But I -- if you

12:35:14  5  say it was Antigua, St. Croix, then --

6  **Q.**   I understand that.

7  **A.**   Yeah.

8  **Q.**   But when you say "traveling on his plane," to do

9  business; correct?

12:35:21  10  **A.**   I assume so, yeah.

11  **Q.**   Let's be specific.  All right.

12              So now, when he was not on his plane doing

13  business, he was residing in either Antigua or St. Croix

14  in the Virgin Islands, wherever they are, in the

12:35:35  15  Caribbean; correct?  Would you agree with that?

16  **A.**   I guess so.  Yes.

17  **Q.**   Okay.

18  **A.**   I mean, I think he had a house in Miami as well.

19  So -- I'm not trying to be difficult.  I'm just trying to

12:35:40  20  be accurate --

21  **Q.**   I understand.

22  **A.**   -- with what I knew and did not know.

23  **Q.**   Mr. Davis, on the other hand, resided where?

24  **A.**   I believe he lived in Baldwin, Mississippi, officed

12:35:51  25  out of Memphis and then later Tupelo.

*Cross-Green-By Mr. Fazel*

1    **Q.**   Mississippi?

2    **A.**   Mississippi.

3    **Q.**   All right.  With Mr. Davis were the -- a set of group

4    of people who looked over the investments; correct?

12:36:05  5    **A.**   Yes.

6    **Q.**   Okay.  That set of group of people were reporting to

7    Mr. Davis, but they report to Laura Holt and then to

8    Mr. Davis; correct?

9    **A.**   Correct.

12:36:14  10   **Q.**   And there were financial analysts there; correct?

11   **A.**   Yes.

12   **Q.**   Do you remember the numbers of them?

13            THE COURT:  Which cities are we talking about?

14            MR. FAZEL:  Mr. Davis, Your Honor.  Now we're

12:36:22  15   talking about the David group -- the Memphis group.

16            THE WITNESS:  Memphis.  And at Tupelo later,

17   but primarily Memphis.

18                 I think there probably were between 15 and

19   20 people.

12:36:31  20   BY MR. FAZEL:

21   **Q.**   Okay.  Now, independent of that -- we'll get to that

22   in one minute.

23                 But independent of that, there's also a

24   group of research folks that were located in Washington--

12:36:43  25   **A.**   D.C., correct.

1  Q.   And who were they?

2  A.   They were the Washington research group.

3  Q.   Okay.

4  A.   And they were --

12:36:49  5  Q.   I'm sorry.  What did they -- who did they consist of,

6  if you know?

7  A.   Oh, very prominent people.  Former -- I believe a

8  former brigadier general looking at defense stocks.

9  Former people who work for the FDA.  The surgeon who

12:37:06  10  worked for the FDA looking at healthcare stocks.  People

11  who had been in presidential admissions.  It was, you

12  know, political insiders in Washington, D.C.

13  Q.   And what were their tasks?  What were they tasked to

14  do?

12:37:17  15  A.   They would do -- trying to think of the term.  There

16  was a specific term.  But basically turning politics into

17  profits,, looking at what's going on, coming -- basically

18  legislation coming out of Washington, D.C. and how might

19  that legislation affect the market's investments and how

12:37:38  20  might you might be able to profit from that if you had a

21  group there analyzing all this information.

22  Q.   Now, that group, when you say -- when you use

23  terminologies like you did, "turning politics into

24  profit," one might look at and it go, Wait a minute.  Are

12:37:53  25  you talking about something -- bribery or anything like

1  that?

2  **A.**   No, nothing illegal at all.

3  **Q.**   Right it wasn't fraudulent or illegal?

4  **A.**   No.

12:37:58   5          THE COURT:  Hold it.  One at a time.

6  BY MR. FAZEL:

7  **Q.**   It was simply research; correct?

8  **A.**   It was research.

9  **Q.**   Right.  And they would then produce that research and

12:38:05   10  give it to whom?

11  **A.**   Well, I believe their primary clients were large

12  institutions that would trade through them in exchange for

13  the research, and then they would also provide it to

14  Laura.  I think it -- the information flowed to Laura and

12:38:19   15  her team of analysts in Memphis.

16  **Q.**   Anything about the team in Washington that caused you

17  to have any discomfort?

18  **A.**   Quite the reverse.

19  **Q.**   Quite the reverse.

12:38:28   20          You were very -- you were happy with their

21  product and you thought they did a very good job?

22  **A.**   Yes.

23  **Q.**   Okay.  You relied on their information?

24  **A.**   Yes.

12:38:35   25  **Q.**   Okay.  Do you know what happened to that group after

*Cross-Green-By Mr. Fazel*

1    Stanford was -- after the receiver took Stanford over?

2    **A.**    Yes.

3    **Q.**    What happened?

4    **A.**    I think they went to MF Global.

12:38:48    5    **Q.**    Were they -- how did they -- how did they transition?

6    **A.**    I don't know.

7    **Q.**    You don't know?

8    **A.**    No.

9    **Q.**    What is MF Global?

12:38:55    10    **A.**    It was the firm run by the former governor of

11    New Jersey that recently went bankrupt.

12                THE COURT:  Corzine?

13                THE WITNESS:  Corzine.  Yeah.  I couldn't come

14    up with his name.  Yeah.

12:39:06    15    BY MR. FAZEL:

16    **Q.**    Now, let's talk about Memphis and Mr. Davis; okay?

17    And let's talk about that structure, if you will, for a

18    minute.

19                Did you have interaction with them?

12:39:14    20    **A.**    Yes.

21    **Q.**    On a daily basis?  On a weekly basis?  Tell us how

22    often?

23    **A.**    Memphis or Mr. Davis?

24    **Q.**    Well, let's start with Memphis first, and then we'll

12:39:23    25    move to Mr. Davis.

*Cross-Green-By Mr. Fazel*

1  **A.**   Maybe -- it varied.  It would be sometimes more

2  active, and sometimes not active at all.  So I mean, I

3  could go a month or two probably without talking to them,

4  and I could talk to them someone there several times a

12:39:39  5  week.  So it was largely dependent on what the need was or

6  situation at the time.

7  **Q.**   Now, you were located out of Louisiana; correct?

8  **A.**   I was in Baton Rouge.

9  **Q.**   You were not in Houston?

12:39:49  10  **A.**   I was not.

11  **Q.**   So you were in Baton Rouge, and you had interaction

12  with Davis' group and Ms. Holt, Mr. Davis.  All right.

13            Now, at that location, where Mr. Davis

14  was, he was a CFO of the bank; correct?

12:40:03  15  **A.**   Yes.

16  **Q.**   He was chief financial officer?

17  **A.**   Correct.

18  **Q.**   He was the numbers guy?

19  **A.**   Correct.

12:40:07  20  **Q.**   All right.  And then with him were the investments,

21  investors, correct?  The -- I'm sorry --

22  **A.**   The analysts?

23  **Q.**   The analysts.

24  **A.**   Yes.

12:40:13  25  **Q.**   Analysts.  All right.  Now, who did the analysts

*Cross-Green-By Mr. Fazel*

1    report to?

2    **A.**    To Laura Holt.

3    **Q.**    Who then reported to?

4    **A.**    Jim Davis.

12:40:22   5    **Q.**    Okay.  And what were the analysts tasked to do?

6    **A.**    They wrote research reports, so they would do

7    analysis.  And then they also -- my understanding was they

8    helped Laura manage the managers of the bank.

9    **Q.**    And make me understand it.  What do you mean by that?

12:40:39  10    **A.**    Well, again, yesterday we discussed that the bank

11    transferred money to these financial advisors in Europe

12    that were responsible with managing the portfolio of the

13    bank.

14    **Q.**    Right.

12:40:50  15    **A.**    And then Laura and her team would oversee these

16    managers.  So that's the term I'm using as "managing the

17    managers."

18    **Q.**    Okay.  Did you or any of your folks, your financial

19    advisors or people that were under your supervision, have

12:41:06  20    the ability to look at what they were doing?

21    **A.**    No.

22    **Q.**    Did -- so you couldn't pick up the phone and say,

23    Hey, what investments are you guys doing today?  What are

24    y'all doing?

12:41:20  25    **A.**    They would not disclose that much information.

*Cross-Green-By Mr. Fazel*

1   **Q.**   They would not?

2   **A.**   Right.

3   **Q.**   Okay.  Who hired, if you know -- and if you don't,

4   that's okay -- who hired Ms. Holt?

12:41:31   5   **A.**   I'm fairly certain Mr. Davis did.

6   **Q.**   Who hired the analysts predominantly in Memphis?

7   **A.**   I assume Ms. Holt and Mr. Davis.

8   **Q.**   Okay.  To your knowledge, how often -- and, again, if

9   you don't know, "I don't know."

12:41:48   10   **A.**   Okay.

11   **Q.**   How often was Mr. Stanford in Memphis dealing with

12   Mr. Davis?

13   **A.**   I do not know.

14          MR. FAZEL:  Your Honor, I'm at a good stopping

12:42:06   15   point here.  I have just a little bit left, but I do have

16   some left.

17          THE COURT:  Okay.  It's almost 12:45.  Let's

18   take our break at this time.  Please be back ready to

19   resume at 2:00 p.m.  See you in about an hour and

12:42:22   20   15 minutes.

21     **(The following was held out of the presence of the jury)**

22          THE COURT:  You can step down, sir.  Just one

23   housekeeping matter.  When we were up here talking at the

24   bench, inadvertently, I kept the time going on one, so I'll

12:43:14   25   probably be able to make it up.  I do that by the end of

*Cross-Green-By Mr. Fazel*

1  the day, but if there's any discrepancy, right now, it

2  should read defendant's time 2 hours and 10 minutes, and

3  the government's time 2 minutes and 44 seconds.  So there's

4  a ten-minute discrepancy.  I just want you to know right

12:43:32  5  here if I show you the clock later and I hold up that sign,

6  meaning I haven't been able to make it up.  It's a little

7  tricky, but I'm able to do it.  If not, I'll just announce

8  to you, show you the clock and, you know, add the

9  appropriate amounts.

12:43:46  10          MR. COSTA:  Your Honor, may I bring up a quick

11  request?  One was at the end of the first week of trial.

12  The United States would ask the Court to take judicial

13  notice of the fact that Mr. Stanford has been attentive all

14  week.  He's been engaged with his counsel.  And I think the

12:44:00  15  Court still hasn't issued his opinion on the competency,

16  although it's ruled.  We would also ask that in that

17  opinion, the Court would comment on what the Court has

18  observed during the trial.

19          THE COURT:  I'll have to comment on that at the

12:44:13  20  end of the trial, but I have been watching.  I've been

21  watching the jury and the whole folks here.  I just have a

22  little different view than you have.  And if it needs

23  noting at the end, remind me, and I may or may not have

24  that opinion out.  It's going to be a detailed opinion.

12:44:30  25          All right.  Thank you.  We'll see you

*Cross-Green-By Mr. Fazel*

1  back.

2          MR. SCARDINO:  Your Honor --

3          THE COURT:  Yes, sir.

4          MR. SCARDINO:  -- before we retire, we have

12:44:35  5  brought up an issue we might want to approach the --

6          THE COURT:  Do we need to approach it right now

7  because of what we've seen?  Have you been observing?

8          MR. SCARDINO:  I've been watching.

9          THE COURT:  Any problem right now today?

12:44:47  10          MR. SCARDINO:  Not at all.

11          THE COURT:  Okay.  I agree.  I agree.  If it

12  comes up again, either you or I, let's talk, and we'll get

13  back on the record.  All right?

14                **(Recessed at 12:44 p.m.)**

02:07:22  15          THE COURT:  Go right ahead, please.

16  BY MR. FAZEL:

17  **Q.**   Mr. Green?

18  **A.**   Yes.

19  **Q.**   When we last were chatting before lunch, we were

02:07:36  20  talking about Tupelo and Mr. Davis and Ms. Holt and her

21  section.  Do you remember that?

22  **A.**   Yes.

23  **Q.**   Okay.  Now, just to put some -- just to kind of paint

24  the picture for the jury, if you will, as to how that

02:07:47  25  system worked, let's just take it a step at a time.

1    **A.**   Okay.

2    **Q.**   The folks in Memphis, there were two distinct

3    operations going on in Memphis at the same time, it sounds

4    to me.

02:07:59    5    **A.**   Right.

6    **Q.**   One was the section that did the vesting, which was

7    under Ms. Holt; correct?

8    **A.**   Correct.

9    **Q.**   And which -- and one was the -- the maintaining of

02:08:08   10    the number and the accounting practices, which was

11    Mr. Davis; correct?

12    **A.**   Yes, as I understand it.

13    **Q.**   And I understand Ms. Holt reported to Mr. Davis

14    ultimately?

02:08:16   15    **A.**   Correct.

16    **Q.**   Okay.  So if I understand the picture correctly is

17    that the number crunching and the investment section were

18    all in Mississippi?

19    **A.**   Correct.

02:08:27   20    **Q.**   Okay.

21    **A.**   Well, Tennessee.

22    **Q.**   Tennessee?

23    **A.**   Memphis.

24    **Q.**   I'm sorry.  You're absolutely right.  Tennessee,

02:08:34   25    you're right.

*Cross-Green-By Mr. Fazel*

1          Now, all the accountants of these various

2   companies -- all these companies had senior staff; correct?

3   **A.**   Correct.

4   **Q.**   Okay.  Let me just draw this out.  This might help.

02:08:56   5   It might make more sense this way.  If you have this being

6   Davis, CFO.

7   **A.**   Okay.

8   **Q.**   Are you with me?  And then you've got the

9   investment -- I'm going to put an "I" here -- reporting to

02:09:28   10   him; correct?

11   **A.**   Okay.

12   **Q.**   And then you have -- I'm going to generally call the

13   accounting reporting to him; correct?

14   **A.**   Okay.

02:09:36   15   **Q.**   Is that correct?

16   **A.**   As I understood it, yes.

17   **Q.**   Okay.  Fair enough.

18          And so -- and below that there was people

19   sending information to accounting; correct?

02:09:48   20   **A.**   That's correct.

21   **Q.**   One of those people were with the bank; correct?

22   **A.**   Yes.

23   **Q.**   So we had information coming from SIBL to the folks

24   in Houston and from Houston to Davis?

02:10:09   25   **A.**   I guess.  I'm not sure.  I assume SIBL sent it to

*Cross-Green-By Mr. Fazel*

1   Houston, but I wouldn't know.

2   **Q.**   You wouldn't know?

3   **A.**   No.

4   **Q.**   And Mr. Lopez and Mr. Curt, you didn't have any

02:10:20   5   interaction with them?

6   **A.**   Not really.  Not business level, per se.  I think

7   Mr. Curt came through one time and audited our furniture

8   and fixtures just to make sure that they were according to

9   what their inventory showed.  I think that was the extent

02:10:33   10   of my involvement with him.

11   **Q.**   You know, that's interesting that you bring that up.

12   It just kind of shows you the level that the company went

13   through to make sure that they had an accounting system in

14   place that took care of all that.  Like, they would look

02:10:46   15   at how many chairs you have, how many desks you have,

16   which are generally assets; right?

17   **A.**   Right.

18   **Q.**   And that's what a company is supposed to do to

19   maintain that level of understanding of their assets;

02:10:55   20   correct?

21   **A.**   Correct.

22   **Q.**   Okay.  And this might be obvious, but it's impossible

23   for one person, Robert Allen Stanford, to be able to do

24   all of that without relying on his people; correct?

02:11:13   25   **A.**   Correct.

*Cross-Green-By Mr. Fazel*

1    Q.    I mean, it's just not possible, there's too much?

2    A.    I would think so, yes.

3    Q.    I mean, because not only is this chart just a very

4    simplistic view of it, we're talking about companies all

02:11:21    5    over the world?

6    A.    Correct.

7    Q.    We haven't even hit folks in Central and South

8    America?

9    A.    Correct.

02:11:26    10    Q.    And then Europe?

11    A.    Right.

12    Q.    And each of them have their structure of management

13    and people reporting to it; correct?

14    A.    Correct.

02:11:36    15    Q.    And then they, then, somehow piped it through to

16    Mr. Davis; correct?

17    A.    Yes.  The accounting, yes.

18    Q.    The numbers part?

19    A.    Right.

02:11:43    20    Q.    So how everybody was doing the investments,

21    everything was piped to Mr. Davis?

22    A.    Yes.  I assume so, yes.

23    Q.    Do you know who hired the folks that were working for

24    Ms. Holt?

02:12:11    25    A.    As I think I said earlier, I believe it was Ms. Holt

1   and/or Mr. Davis.

2   **Q.**   Some of the people that were working with Mr. Davis

3   were his own family members; right?

4   **A.**   Well, his son, I believe.

02:12:25   5   **Q.**   Two sons or just one son, if you know?

6   **A.**   Only one that I knew of.

7   **Q.**   And Mr. Bogar, I think, was your supervisor?

8   **A.**   Yes.

9   **Q.**   He was Mr. Davis's family member?

02:12:34   10   **A.**   Relative of some sort.  I think it was somewhat

11   distant, but I don't know.

12   **Q.**   Okay.

13   **A.**   Yeah.

14   **Q.**   Were you familiar with or do you have any knowledge

02:12:47   15   of the conduct of Mr. Davis regarding his own businesses

16   that he set up while he was in Tennessee and in

17   Mississippi?

18   **A.**   No.  The only thing I heard -- well, let's say this:

19   The only thing I heard was I had understood that Mr. Davis

02:13:05   20   and Ms. Holt had gone into business together doing some

21   sort of -- some sort of businesses in Tupelo, trying to

22   kind of revitalize their local community, and I think --

23   about the only thing I really knew for sure was a

24   restaurant, and I may even have that wrong it.  It might

02:13:24   25   have been, like, a coffee shop or something, but that was

*Cross-Green-By Mr. Fazel*

1  all I had heard about it.

2  **Q.**   Okay.  Now, you also mentioned somebody that I

3  highlighted, wanted to talk to you about, Tamara

4  Lindenberg.

02:13:37  5  **A.**   Yes.

6  **Q.**   Do you remember that conversation?

7  **A.**   I do.

8  **Q.**   Okay.  Do you remember when we were -- when you were

9  talking to the government, you were talking about the fact

02:13:44  10  that you had a phone call from Mr. Stanford regarding

11  Ms. Lindenberg?

12  **A.**   Correct.

13  **Q.**   Correct me if I'm wrong, Mr. Davis had hired

14  Ms. Lindenberg?

02:13:53  15  **A.**   Yes, that's my understanding.

16  **Q.**   Ms. Lindenberg was somewhat expensive?

17  **A.**   Yes, I thought so.

18  **Q.**   And Mr. Stanford found out about it?

19  **A.**   Found out about her expense?

02:14:06  20  **Q.**   Well, and the fact that she was hired.

21  **A.**   My understanding was he saw a report she had done

22  that Mr. Davis presented to him.

23  **Q.**   And obviously Mr. Stanford was not -- this was not

24  run up the ladder to Mr. Stanford before the report was

02:14:20  25  created or the money expended, obviously?

1    **A.**   I don't know of the -- all I know -- I don't know

2    that that was obvious.  I just know that he did not like

3    the report.  That's all I know.

4    **Q.**   Okay.  So it wasn't clear to you that Mr. Davis

02:14:36   5    obviously had done this on his own and Mr. Stanford had

6    found out about it and he was just going crazy thinking

7    how much money we're wasting on this?

8    **A.**   No, that was not the complaint I got from

9    Mr. Stanford about the money.  It was about the report he

02:14:48  10    did not like.

11    **Q.**   And you mentioned that you are on the board in the

12    trust company, the Stanford Trust Company, you were on the

13    board?

14    **A.**   Correct.

02:15:02  15    **Q.**   Was Mr. Stanford on that board?

16    **A.**   He was not.

17    **Q.**   Did you ever see him sit on that board?

18    **A.**   No, I didn't.

19    **Q.**   So it's obvious that a Stanford company -- even in

02:15:13  20    the Stanford company, there were situations where

21    Mr. Stanford wasn't even involved in those board of

22    director meetings?

23    **A.**   Correct, he was not.

24    **Q.**   Now, you also mentioned Libya.  Do you remember

02:15:25  25    talking about Libya briefly?

1    **A.**    I do remember talking about Libya.

2    **Q.**    Were you aware that the State Department had

3    contacted Mr. Stanford to ask him to engage with Libya;

4    did you know that?

02:15:36    5    **A.**    No.  What he told me was that he contacted the State

6    Department to see if it was okay if he did business with

7    Libya.

8    **Q.**    But you were not -- or you did not understand that it

9    was a state department that asked him to actually train

02:15:48    10    some folks from Libya?

11    **A.**    No, I didn't understand that.

12    **Q.**    Did you understand that the State had approved some

13    Libyan individuals to be trained in Europe, if you know,

14    in Europe, to deal with money management and money

02:16:03    15    managing skills and so forth; did you not that?

16    **A.**    I did not know.

17    **Q.**    Did you know Stanford trained those people?

18    **A.**    I did not know.

19    **Q.**    Could it be that you don't remember it accurately

02:16:13    20    about who contacted who, whether State contacted

21    Mr. Stanford or Stanford contacted State?

22    **A.**    All I remember is what Mr. Stanford told me.

23    **Q.**    Okay.  Now, I know there was times that you had

24    conversations with the government prior to testifying.

02:16:40    25    And I've looked at some of the notes that they took.

*Cross-Green-By Mr. Fazel*

1   **A.**   Okay.

2   **Q.**   And some of the things that we talked about earlier,

3   you said they were mistaken.  And I just want to -- I make

4   sure that maybe some -- some other mistakes I want to be

5   clear about.

6   **A.**   Sure.

7   **Q.**   Are you and Mr. Davis -- were you close?

8   **A.**   We were somewhat at first, you know, but I didn't

9   speak to him very often.

10   **Q.**   Are you close now?

11   **A.**   No, we're not -- I'm not close now.  I haven't spoken

12   to him in years.  And honestly, after the kind of fallout

13   with Tamara Lindenberg, as I said, he was cold to me and

14   pretty much was until the end after that.

15   **Q.**   Okay.  Tell me if this statement is true:  That at

16   some point in time in a conversation you had with

17   Mr. Davis, you understood Mr. Davis to say that every

18   decision of this company is bathed in prayer?

19   **A.**   Yes.  That was -- when I went to Houston before I was

20   hired, he made that statement to me.

21   **Q.**   And then did you tell the government that after you

22   heard that, you were going -- you would work there for

23   free?

24   **A.**   Just about.  Actually, what I said was I was glad I

25   had already negotiated my deal because I thought he could

 1  have hired me for free after that.

 2              THE COURT:  I don't understand.  What does that

 3  mean?

 4              THE WITNESS:  Well, I just meant, you know, to

02:18:08  5  have a --

 6              THE COURT:  That tells me my clock is now

 7  correct.

 8              MR. FAZEL:  I thought it was just me.

 9              THE COURT:  No.

02:18:14  10             THE WITNESS:  What I meant, Your Honor --

11              THE COURT:  Yes, sir.

12              THE WITNESS:  -- was that, you know, to have a

13  man in that prominent of a position tell me that every

14  decision -- he said, "Are you a Christian?"

02:18:22  15                  I said, "Yes, sir, I am."

16                  He said, "Well, I want you to know, every

17  major decision about these companies you're thinking of

18  joining have been bathed in prayer from the beginning."

19                  And that really impressed me as, you know,

02:18:33  20  the kind of people I would like to work for.

21  BY MR. FAZEL:

22  Q.   Did you --

23              MR. FAZEL:  May I continue?

24              THE COURT:  Sure.  Go on.

25

*Cross-Green-By Mr. Fazel*

BY MR. FAZEL:

**Q.** Did you also tell the government that at some time you were on juice fasts?

**A.** Yes, I did a juice fast.  Yeah.  My church had a corporate fasting period, and I --

**Q.** I just want to make sure that they're right.

**A.** Yeah, juice fast is correct.

**Q.** Did you feel like the devil wanted to make you break the fast at one point in time?

**A.** Somewhat, yes, I had a thought of that.

**Q.** I wanted to direct your attention to -- you testified that -- I don't know if we talked about this or not, but your income at Stanford.

**A.** Yes.

**Q.** We talked about the fact that, in the beginning, it was $70,000 and a $10,000 bonus to come on board?

**A.** Yeah.  I think I made a hundred thousand dollars plus that first year.

**Q.** Okay.  So you did make more than that?

**A.** Yes, I did.  I had other bonus and income potential.

**Q.** Did you make -- correct me if I'm wrong -- but did you make about $2 million a quarter there.  Is that right?

**A.** No.

**Q.** That's incorrect?

**A.** That is incorrect.

*Cross-Green-By Mr. Fazel*

1    **Q.**   So if the receivers filed documentation showing that

2    you made -- in another proceeding that you made $2 million

3    a quarter at Stanford, that would be incorrect?

4    **A.**   That would be incorrect.

02:20:15   5              THE COURT:  Are you talking about the gentleman

6    as an individual?  Individual or the -- his office?

7                   MR. FAZEL:  Individually.

8                   MR. STELLMACH:  Or just as a clarifier, are we

9    talking about salary or CD sales that were credited to --

02:20:29   10             THE COURT:  You're more articulate than my

11   question.  That was my question.  Is there a --

12                  MR. FAZEL:  Let me rephrase.

13                  THE COURT:  Yes.  Fine.  Thanks.  You do it.

14   BY MR. FAZEL:

02:20:37   15   **Q.**   Is it accurate to say that your total income a

16   quarter --

17                  THE COURT:  Which income -- personal?

18                  MR. FAZEL:  Personal income.

19                  THE COURT:  Personal?

02:20:47   20   BY MR. FAZEL:

21   **Q.**   Personal to you.

22   **A.**   Right.

23   **Q.**   Take-home pay was $2 million?

24   **A.**   No.

02:20:52   25   **Q.**   So they would be wrong about that?

*Cross-Green-By Mr. Fazel*

1   **A.**   Yes, they would be wrong about that.

2   **Q.**   Do you remember towards the end of your examination

3   with the government you were talking about a real estate

4   development that Mr. Stanford was working on?

02:21:09   5   **A.**   Yes.

6   **Q.**   Was that a secret?

7   **A.**   No.

8   **Q.**   Did many people know about it?

9   **A.**   Yes.

02:21:14   10   **Q.**   People that you worked with?

11   **A.**   Yes.

12   **Q.**   People in the Stanford company?

13   **A.**   Yes.

14          MR. FAZEL:   Judge, may I have a moment?

02:21:26   15          THE COURT:   Yes.

16   BY MR. FAZEL:

17   **Q.**   Let me ask you just couple of last questions, I

18   promise.

19          I want to be clear with the jury about -- I

02:22:07   20   just want to make sure everybody knows how big this company

21   is.

22          There was a bank in Venezuela; correct?

23   **A.**   Yes.

24   **Q.**   And that bank, after the receiver took over Stanford

02:22:16   25   here, that bank was taken over in Venezuela as well;

*Cross-Green-By Mr. Fazel*

1    correct?

2    **A.**   I assume so.

3    **Q.**   Okay.  And if you don't know, just say "I don't

4    know."

02:22:23    5    **A.**   I don't know.  I think I read something that said it

6    was taken over.

7    **Q.**   Just on your personal knowledge.

8    **A.**   I do not know.

9    **Q.**   Okay.  Perfect.  Don't assume or anything like that.

02:22:30    10                   What about the bank in Panama?  Were you

11    aware there was a bank in Panama?

12    **A.**   Yes, I was.

13    **Q.**   And do you have any knowledge of what happened to it?

14    **A.**   I do not know.

02:22:37    15    **Q.**   Then there's a bank in Antigua; correct?

16    **A.**   Yes.

17    **Q.**   Isn't there another bank?

18    **A.**   What do you mean "another bank"?  There were two

19    banks in Antigua, Stanford International Bank and Bank of

02:22:50    20    Antigua.

21    **Q.**   And one was a commercial bank that had loans, cars,

22    credit cards and so forth?

23    **A.**   Dealt with only the local residents.

24    **Q.**   And dealt with local residents; right.

02:22:59    25                   And then there are offices in Stanford in

*Cross-Green-By Mr. Fazel*

1    Europe as well; correct?

2    **A.**   Right.

3    **Q.**   How many cities in Europe, if you know?

4    **A.**   I believe just Zurich.

02:23:05    5    **Q.**   Just Zurich?

6                    Okay.  And then there are multiple offices

7    in Central and South America as well; correct?

8    **A.**   Yes.

9    **Q.**   Could you name those, if you know?

02:23:13   10    **A.**   I could name some of them.

11    **Q.**   Could you please?

12    **A.**   Mexico City; I believe, Quito, Ecuador; Caracas,

13    Venezuela.  I think there was an office in Monterey,

14    Mexico.  And that's about it for me.

02:23:31   15    **Q.**   That you're aware of?

16    **A.**   Yeah, that I could come up with.

17    **Q.**   Fair enough.  Again, and I guess the point I'm trying

18    to make is that this is a global, global company with a

19    lot of people working for it; correct?

02:23:43   20    **A.**   Correct.

21                    MR. FAZEL:  I pass the witness.  Thank you,

22    Judge.

23                    MR. STELLMACH:  Am I on the clock, Judge?

24                    THE COURT:  Yes.

25

1                    **REDIRECT EXAMINATION**

2  MR. STELLMACH:

3  **Q.**    Mr. Green, during your cross-examination, you were

4  asked a number of questions regarding early redemptions of

02:24:06   5  the CDs.

6                         Do you recall that?

7  **A.**    Yes, I do.

8  **Q.**    Could you remind us in October of 2008, when

9  Mr. Stanford had a meeting with financial advisors, I

02:24:15  10  think you called it a summit --

11  **A.**    Yes.

12  **Q.**    -- did he identify a problem with liquidity and the

13  bank's assets?

14  **A.**    I don't recall him doing that at that meeting.

02:24:25  15  **Q.**    Do you recall him mentioning having $5 billion too

16  much in liquid assets?

17  **A.**    Yes I do recall that.

18  **Q.**    And in the February 2009 call when he told you early

19  redemptions were no longer going to be allowed, did he say

02:24:40  20  in that call that the bank still had a billion dollars

21  more in capital than it needed?

22  **A.**    Yes, he did.

23  **Q.**    But before Mr. Stanford stopped allowing early

24  redemptions, were you aware of any instance where a

02:24:54  25  depositor couldn't get their money out when they wanted it

*Redirect-Green/By Mr. Stellmach*

1  out?

2  **A.**    Before he stopped it, no, I was not.

3  **Q.**    Who is Michael Moreno?

4  **A.**    Michael Moreno is a individual that lived in the --

02:25:06  5  Lafayette and Houston, and he was the one that I referred

6  to earlier that I was personally aware of that was trying

7  to get his money out of the bank.  He had put in his

8  withdrawal request before Mr. Stanford stopped them, and

9  he never did get his money.  I was working, you know,

02:25:22  10  diligently at the last minute, almost till the point where

11  we were shut down, trying to trying to get his money out

12  of the bank for him.

13  **Q.**    How much did Mr. Moreno have deposited in a CD or --

14  **A.**    Initially, I believe it was close to $50 million, and

02:25:37  15  he had already withdrawn some to pay taxes and he was

16  trying to withdraw some again this last time.  And he was

17  not able to get that money, or it may have been -- yes.

18  That's as I recall it.

19  BY MR. STELLMACH:

02:25:51  20  **Q.**    But before the policy was changed, Mr. Moreno had

21  made his request and he wasn't able to get the money back?

22  **A.**    That's correct.

23  **Q.**    Did you try to discuss that situation with

24  Mr. Stanford or anyone above your level?

02:26:03  25  **A.**    I discussed it with Juan Rodriguez specifically at

1    the bank.

2    **Q.**   What were you told about what the problem was, given

3    that you had been told in October the bank had over

4    $5 billion too much in liquid assets and Mr. Stanford WAS

02:26:18    5    still claming to have an extra billion in capital in the

6    bank?

7    **A.**   Yeah.   Juan told me that they were -- there was --

8              MR. FAZEL:  I'm sorry.  Excuse me.  Objection.

9    That's hearsay as to what Juan told him.

02:26:29   10              MR. STELLMACH:  Mr. Stanford's employee, a

11   vicarious admission by employee.

12              MR. FAZEL:  I respectfully disagree.

13              THE COURT:  All right.  What was the exact

14   question?  Don't answer it, sir, please.

02:26:36   15              THE WITNESS:  I won't.

16              MR. STELLMACH:  I asked what Mr. Rodriguez, the

17   president of Stanford International Bank, told Mr. Green

18   about why they weren't able to honor -- the bank was not

19   able to honor the redemption.

02:26:48   20              THE COURT:  How is that hearsay?  I mean,

21   technically, it is.  What's the exception to it?

22              MR. STELLMACH:  The exception is the one I

23   think Your Honor --

24              THE COURT:  By the way, there are about --

02:26:54   25   what -- 29 exceptions to the Hearsay Rule literally.

*Redirect-Green/By Mr. Stellmach*

1  Literally there are.

2  MR. STELLMACH:  This is the one that Your Honor

3  actually recalled off the top of his head yesterday.

4  THE COURT:  As far as --

02:27:03  5  MR. STELLMACH:  For vicarious admissions by an

6  employee within the scope of their employment.

7  Mr. Rodriguez is the president of the

8  bank.  It's within the scope of his employment he's talking

9  about a redemption of a CD issued by the bank.

02:27:15  10  MR. FAZEL:  He's an employee of the

11  corporation.

12  THE COURT:  Of what?

13  MR. FAZEL:  Of the corporation.  I mean, if you

14  want to be that technical, he's an employee of the

02:27:21  15  corporation, not Mr. Stanford.

16  MR. STELLMACH:  Well, who owns everything?

17  THE COURT:  Well, hold on.  Wait a second.  Go

18  on back behind the podium.

19  MR. STELLMACH:  Yes, Your Honor.

02:27:28  20  THE COURT:  Overrule the objection.  Go on.

21  MR. STELLMACH:  Thank you.

22  By MR. STELLMACH:

23  Q.  What did Mr. Rodriguez tell you about why the bank

24  could not honor the CD?

02:27:35  25  A.  Because they were waiting on some requests they had

1  made to other banks.  They had put in requests to sell

2  some products, but there was a specific window in which

3  this company that owned the product -- you know, they had

4  a timeframe that they had to deliver within and they still

02:27:53  5  weren't within that timeframe.  So it might be another

6  week before the money came to them.

7                    And, so, I asked Mr. Rodriguez, -- you

8  know, it didn't quite sound right to me, so I just started

9  asking him a lot of questions about that.

02:28:06  10  Q.   And what had Mr. Stanford told you from the point

11  that you were able to sell the CD here in the United

12  States in 1998 about how quickly the bank could turn its

13  assets into cash, if necessary?

14  A.   Very quickly.  You know, that they could do it within

02:28:21  15  short-term, most of it within seven days.

16  Q.   You were also asked on cross-examination about how

17  much of the brokerage firm's -- or how many of the

18  brokerage firm's clients had invested assets into the CDs

19  issued by Stanford International Bank.

02:28:41  20                    Do you recall those questions?

21  A.   Yes.

22  Q.   And I think Mr. Fazel drew a chart, and he showed

23  that it was in the neighborhood of 30 percent of the

24  assets under management at the brokerage firm.

02:28:56  25                    There it is.  30 percent of the assets

1    under management at the brokerage firm were invested in

2    the CDs issued by Mr. Stanford's bank.

3                    Do you recall being asked questions about

4    that?

5    **A.**   Yes, I do.

6    **Q.**   And you explained that, if you included international

7    sales as well, that number grew to how large?

8    **A.**   I think it could have been as large as $5 billion.

9    Of course, the entire bank, if you included everyone, the

10   bank was $8 billion; but in terms of what went through the

11   broker dealer, I think it could have been as much as 5

12   billion.

13   **Q.**   So 5 billion from the broker dealer would have been

14   about 50 percent?

15   **A.**   A little more than 50, maybe 60 percent.

16   **Q.**   So more than half of the assets under management at

17   the brokerage firm owned understand by Mr. Stanford were

18   invested in a single product issued by the bank he owned?

19   **A.**   I believe so.

20   **Q.**   And the bank if -- if -- had about $8 billion in CD

21   sales, and 5 billion of them are coming from the brokerage

22   firm, that's five-eights -- your math is even better than

23   mine in that, but --

24   **A.**   62 1/2, I guess, yes.

25   **Q.**   So well over half of the CDs were being -- that SIBL

*Redirect-Green/By Mr. Stellmach*

1  issued, that the bank issued, were being sold through

2  Mr. Stanford's bank, if that math is correct?

3  **A.**   Through the brokerage, yes.

4  **Q.**   I'm sorry.  Through the brokerage firm?

02:30:17  5  **A.**   Yes.

6  **Q.**   And do you have any understanding about how large CD

7  sales grew once the brokerage firm started selling the CDs

8  here in the United States in 1998?

9  **A.**   I think the bank -- in 1998 -- from 1998 through

02:30:38  10  2009, let's say it was 8 billion in 2009, maybe it was a

11  billion, 2 billion in 19 -- probably closer to a billion

12  in 1998, so a seven-fold increase.  I -- and these are my

13  best guesses.

14  **Q.**   So a growth spurt once the brokerage firm was in

02:30:59  15  operation in selling the CDs?

16  **A.**   Yes.

17  **Q.**   Pretty dramatic one, wouldn't you agree?

18  **A.**   Yes.

19  **Q.**   Mr. Fazel asked you questions about whether there was

02:31:09  20  anything wrong, or you felt you were doing anything wrong

21  in selling this product.  And I think you testified that

22  you didn't?

23  **A.**   Correct.

24  **Q.**   At the time, you didn't think you were doing anything

02:31:17  25  wrong?

*Redirect-Green/By Mr. Stellmach*

1   **A.**   That's exactly right.

2   **Q.**   What assumptions were you making when you were

3   selling that product, though?

4   **A.**   I was assuming that what I was being told was true.

02:31:26   5   **Q.**   What you were being told by who?

6   **A.**   By Mr. Stanford and the bank, Mr. Davis, everyone

7   that was involved and had firsthand knowledge.

8   **Q.**   And anything -- what specifically were you told by

9   Mr. Stanford that you relied on in recommending the CD

02:31:44   10   program?

11   **A.**   That the bank's assets were very liquid, that they

12   were globally diversified, that they were being managed by

13   financial advisors principally in Europe; that he had put

14   in an extra $700 million, 500-plus million, which he told

02:32:01   15   me was cash or marketable securities in 2008.  All of

16   these things, you know.  So I was expecting there to be

17   billions and billions of dollars held in Europe by these

18   money managers.

19   **Q.**   Well, how could you rely on what Mr. Stanford is

02:32:17   20   telling you if he's not running the bank and overseeing

21   the operation?

22   **A.**   He's the owner of the bank.  I mean, it's -- you

23   know, at the end of the day, the buck stops with him.

24   **Q.**   Was he also familiar with financial terms and the

02:32:30   25   numbers and the financial statements?

1   **A.**   He spoke as if he were.  Yes, he was.

2   **Q.**   Did he ever say anything along the lines, what we

3   heard in cross-examination, that he only looked at the

4   pictures in the annual reports?

02:32:44   5   **A.**   No.

6   **Q.**   If he had told you that, would that have troubled

7   you?

8   **A.**   Yes.

9   **Q.**   He was focused on some numbers, and we saw

02:32:54   10   Government's Exhibit 830.

11                MR. STELLMACH:  If we could see that.

12                     Your, Honor if we could switch to the --

13                THE COURT:  Which one?

14                MR. STELLMACH:  We're going to use the laptop.

02:33:08   15                THE COURT:  Okay.  Hang on a second.

16                     Your laptop?

17                MR. STELLMACH:  Yes, Your Honor.

18                THE COURT:  The back one?

19                MR. STELLMACH:  Thank you.

02:33:24   20   BY MR. STELLMACH:

21   **Q.**   Could you remind us what this score card was for?

22   **A.**   It was for tracking the deposits at the Stanford

23   International Bank by employees of Stanford Group Company.

24   **Q.**   And there's a detailed breakdown of how much is being

02:33:39   25   sold in CD sales, it looks like on a monthly basis.

*Redirect-Green/By Mr. Stellmach*

1  **A.**   Yes.  Monthly and daily.  The daily column would

2  change every day.

3  **Q.**   And there's a set of goals at the top of the page?

4  **A.**   Yes.

02:33:50   5  **Q.**   Could you remind us who set the goals for this

6  competition for CD sales?

7  **A.**   Mr. Stanford did.

8  **Q.**   And when you spoke with Mr. Stanford about CD sales,

9  was he familiar with how individual brokers and offices

02:34:03   10  were doing?

11  **A.**   Yes, generally.  Certainly familiar how the top

12  performers were doing and the offices were doing.

13  **Q.**   Right.  There were a lot of people working there.

14  He's not familiar how each individual salesman is doing.

02:34:18   15  But the top producers, he knew their numbers?

16  **A.**   Yes.

17  **Q.**   On cross-examination, you were also asked questions

18  about lawyers and compliance programs at the brokerage

19  firm.

02:34:35   20            Do you recall being asked those questions?

21  **A.**   Yes, I do.

22  **Q.**   There was also a question about whether Mr. Stanford

23  relied on lawyers.

24            Do you recall that?

02:34:43   25  **A.**   Yes.

*Redirect-Green/By Mr. Stellmach*

1  Q.   Were you with Mr. Stanford every time he met with

2  lawyers?

3  A.   No, I was not.

4  Q.   Do you know what he told them?

02:34:50  5  A.   No, I do not.

6  Q.   Do you know what he told them about what he was doing

7  with the bank's money?

8  A.   No, I do not.

9  Q.   Do you know what Mr. Stanford actually was relying on

02:34:59  10  when he spoke to lawyers or accountants or anyone else?

11  A.   No, I do not.

12  Q.   You were making an assumption that he acted in good

13  faith when dealing with these people?

14  A.   Yes.

02:35:07  15  Q.   You were also asked some questions on

16  cross-examination regarding different accounting

17  standards.  I think Basil 2.  Basil 1 was also discussed?

18  A.   Yes.

19  Q.   And something called IFRS?

02:35:27  20  A.   Yes.

21  Q.   Were you familiar with any accounting standards that

22  would have enabled to the bank to lie to depositors?

23  A.   I'm familiar with no accounting standards that allow

24  you to lie to depositors.

02:35:40  25  Q.   And you -- there was considerable time spent on

*Redirect-Green/By Mr. Stellmach*

1  cross-examination discussing the CD disclosure statement

2  which is in evidence as Government's Exhibit 131.  I'd

3  like to turn to that document.  And we talking about it

4  also on direct examination and went through it.

02:36:00  5              And are there claims in the CD disclosure

6  statement that are similar to the same claims made in the

7  marketing brochures and the annual reports that we looked

8  at?

9  **A.**   Yes, there are.

02:36:10  10  **Q.**   And if we could turn to Page 4 of the CD disclosure

11  statement.

12              MR. STELLMACH:  May be Page 10 in the -- in the

13  computer.

14              The due diligence section, if we could

02:36:28  15  enlarge that.

16  BY MR. STELLMACH:

17  **Q.**   Do you recall being questioned about this specific

18  portion of the disclosure statement?

19  **A.**   Yes, I do.

02:36:39  20              MR. STELLMACH:  If we could highlight the first

21  two or three sentences.

22  BY MR. STELLMACH:

23  **Q.**   If I could ask you to read those --

24  **A.**   Sure.

02:36:47  25  **Q.**   Read that for us.  Read the first sentence for us,

1   please.

2   **A.**   "We have prepared this disclosure statement to

3   provide you with selected information about the U.S.

4   accredited investors CD.  Because this disclosure

02:36:58   5   statement cannot be all-exclusive, we recommend you

6   conduct further due diligence, including examination of

7   supplemental data and information available through us

8   before making definitive commitments."

9   **Q.**   What was the supplemental data and information that

02:37:14   10   you were relying on and given?

11   **A.**   The annual reports, the brochures, certainly the

12   monthly newsletter Mr. Stanford wrote in December.  You

13   know, those were all supplemental information that -- that

14   we were given, and then comments made by various people.

02:37:33   15   **Q.**   If we go on to the second sentence, if you could read

16   that for us, up to here, up to that comma.

17   **A.**   Okay.  "We will make available to you for inspection

18   during normal business hours our relevant business,

19   financial and other information, and data with which you

02:37:52   20   may reasonably re" -- "and data which you may reasonably

21   request to make informed judgments with respect to

22   investing in U.S. accredited investor CDs."

23   **Q.**   Do you recall on cross-examination when you were

24   questioned about this, you stopped at that particular

02:38:03   25   point in the sentence?

*Redirect-Green/By Mr. Stellmach*

1    **A.**    Yes.  I was asked to stop.

2    **Q.**    And if you could just continue to read the rest of

3    the sentence.

4    **A.**    "...including but not limited to our monthly" -- "our

02:38:12   5    most recently published annual report."

6    **Q.**    Sir, right there, does the CD disclosure statement

7    say that the only thing you can rely on is just what's in

8    the four corners of the little brochure that is with the

9    disclosure statement?

02:38:27   10   **A.**    It does not.

11   **Q.**    Did Mr. Stanford ever suggest to you that he was

12   giving you the annual reports, the quarterly updates,

13   marketing brochures, for no reason whatsoever?

14   **A.**    No, he did not.

02:38:40   15   **Q.**    And if we turn to the prior page, Page 3 of this

16   document, and enlarge the section "Global Investment

17   Portfolio."

18                  I just want to get back to the point you

19   made earlier about the claims here being similar to the

02:39:04   20   claims in the other documents.

21                  There's a statement -- the first sentence

22   refers to portfolio managers.  Says that, "The bank's

23   ability to pay on the on CDs is dependent of the ability

24   of the portfolio managers to consistently make profitable

02:39:25   25   global investment decisions."

*Redirect-Green/By Mr. Stellmach*

1          Who did you understand the portfolio

2   managers to be that are being referenced in that document?

3   **A.**   The managers that were principally in Europe, London,

4   Switzerland, one in Canada, and then the group in Memphis

02:39:41  5   that oversaw them.

6   **Q.**   These are the global money managers who don't work

7   for Mr. Stanford, but are overseen by Ms. Holt and the

8   research analysts in Memphis; correct?

9   **A.**   Correct.  That's what I'm saying.

02:39:50  10   **Q.**   Would that sentence have been consistent with

11   Mr. Stanford taking money from the bank and putting it

12   into his own personal businesses?

13   **A.**   No, that would not have in any way been consistent

14   with that.

02:40:00  15   **Q.**   And if we turn to Page 5 of this document, you were

16   asked questions about the top portion involved under

17   "Investment, Risk and Strategy."

18          MR. STELLMACH:  Let's just bring up those first

19   two sentences up there.

02:40:22  20   BY MR. STELLMACH:

21   **Q.**   Do you recall that section being enlarged during your

22   cross-examination?

23   **A.**   Yes, I do.

24          MR. STELLMACH:  And if we could pull up the

02:40:30  25   paragraph directly beneath it, enlarge the entire thing.

*Redirect-Green/By Mr. Stellmach*

1   We'll show the jury the entire text.

2   BY MR. STELLMACH:

3   **Q.**   It says -- could you read that first sentence for us?

4   **A.**   "Conservation of principal and interest rates on CD

5   deposits are dependent upon the returns in our investment

6   portfolios."

7   **Q.**   So what was your understanding of the significance of

8   the bank's investment portfolios and the reason you were

9   being given the financial information in the annual

10   reports and the other documents about the bank's assets?

11   **A.**   Well, the strength of the bank was as good as the

12   strength of the investment portfolio.

13   **Q.**   And why did that matter for a bank that was not

14   insured by the FDIC?

15   **A.**   Because at the end of the day, the CDs were backed by

16   the full faith and credit of the bank, which was only as

17   good as the financial strength of the bank.

18              MR. STELLMACH:  And if we jump to Page 10 of

19   the document, which I believe is Page 16 on the computer,

20   again, just enlarging the sentence directly above the chart

21   of numbers.

22   BY MR. STELLMACH:

23   **Q.**   Do you recall on cross-examination being questioned

24   about these two sentences?

25   **A.**   Yes, I do.

*Redirect-Green/By Mr. Stellmach*

1  **Q.**   And could you just read them again for us?

2  **A.**   "The funds deposited with us are primarily invested

3  in foreign and U.S. investment grade bonds and securities

4  and Euro dollar and foreign currency deposits.  The

02:41:55  5  following data shows our historical portfolio investment

6  by specific categories of investments and the approximate

7  percentage of funds invested for 2003, 2004, 2005 and

8  2006."

9  **Q.**   You weren't asked about the chart mart directly

02:42:12  10  beneath that.

11              Do you recall that?

12  **A.**   I do recall.

13              MR. STELLMACH:  If we could blow up both the

14  text directly above the chart, as well as the chart.

02:42:16  15  BY MR. STELLMACH:

16  **Q.**   And you and Mr. Fazel had a discussion regarding the

17  meaning of the word "primarily"?

18  **A.**   Correct.

19  **Q.**   In the context of the numbers that you were provided

02:42:33  20  here with the breakdown of the products in which the bank

21  was investing, could you explain why you believed

22  substantially all or overwhelmingly all of the bank's

23  assets were being invested in investment grade bonds and

24  securities and Euro dollar and foreign currency deposits?

02:42:49  25  **A.**   Yes, because it says the funds with us deposit --

*Redirect-Green/By Mr. Stellmach*

1    with us primarily invested in all those items, and then it

2    gives you -- in the next sentence, it says, Here's it says

3    holler portfolio investment by specific category.  And you

4    have equities, 57 percent; treasuries, you know,

02:43:09  5    21 percent; metals, 13; and alternative 7.7.  So you know,

6    the two combined mean this is -- this is how the money's

7    invested.  I mean, it's extremely specific.

8    **Q.**   When you say "the two combined," what are you

9    referring to?

02:43:22  10   **A.**   Well, I'm referring to the word "primarily."

11   **Q.**   Right.

12   **A.**   And then this -- this further definition or

13   clarification of how the money is invested.

14   **Q.**   And I could actually just impose on you, using a

02:43:38  15   calculator add up --

16   **A.**   Certainly.

17   **Q.**   -- what the assets are that are described there.  And

18   just give us the total of how much are invested in those

19   particular categories, just so we can understand what

02:43:53  20   "primarily" means.

21   **A.**   That equals 100 percent.

22   **Q.**   How does -- how is that consistent with what

23   Mr. Stanford told you regarding the bank's assets?

24   **A.**   That was consistent with what he told me.

02:44:13  25                   MR. STELLMACH:  And if we turn to the next

1   page, Page 11, if we could just enlarge the operating

2   profits chart.

3   BY MR. STELLMACH:

4   **Q.**   Was there any indication in this chart that the

5   numbers being reported weren't related to the assets being

6   described on the prior page?

7   **A.**   No, there's no indication that the two are not

8   related.

9   **Q.**   And how is the operating profit that the bank was

10  reporting consistent with what Mr. Stanford was also

11  telling you?

12  **A.**   Exactly consistent.

13          MR. STELLMACH:   And, finally, if we could turn

14  to Page 12 of the document.   And just blow up the two

15  photographs that are in bold.

16  BY MR. STELLMACH:

17  **Q.**   Could you just read the section on top first?

18  **A.**   Yes.   "While we do not generally provide unsecured

19  credit facilities, we do provide loans to customers, often

20  secured by the customers' deposits at SIBL, usually in an

21  amount greater than the amount of the loan.   We also issue

22  letters of credit on behalf of our customers to support

23  debt obligations or to finance the shipment of goods.

24  Customers' deposits typically secure letters of credit

25  with SIBL in an amount equal to or greater than the

1  letters of credit issued."

2  **Q.**   Again, according to the disclosure statement itself,

3  what types of loans is the bank making?

4  **A.**   Loans to depositors, you know, loans -- only loans

02:45:57  5  backed by deposits of clients at the bank.

6  **Q.**   And, in fact, "backed by deposits," meaning they have

7  more on deposit than they're borrowing?

8  **A.**   Yes.  They could borrow up to 80 percent of their

9  deposit.

02:46:07  10  **Q.**   And beneath that, there's a reference to, in the next

11  bold section, audited financial statements prepared by CAS

12  Hewlett the bank's auditor down in Antigua.

13              We heard some questions on

14  cross-examination about the different types of audits that

02:46:23  15  took place.  I think there was a reference to somebody

16  keeping track of chairs and office furniture.

17              Do you recall those questions?

18  **A.**   Yes.  Yes, I do.

19  **Q.**   Did you care how much office furniture the bank had

02:46:34  20  or the brokerage firm had or what Mr. Hewlett was auditing

21  supposedly?

22  **A.**   Not particularly, yeah.

23  **Q.**   And what was your understanding of what Mr. Hewlett

24  was actually verifying?

02:46:45  25  **A.**   The assets of the bank, the values, the portfolio,

1    and also the deposits.

2    **Q.**    You worked for Mr. Stanford for approximately 13

3    years?

4    **A.**    Yes.

02:46:56    5    **Q.**    At any point were you ever told that any of the

6    information in any of the documents we've looked at -- and

7    I'm not going to march through them again -- was not true

8    and accurate and complete?

9    **A.**    Absolutely not.

02:47:10    10            MR. STELLMACH:  I pass the witness, Your Honor.

11                     **RECROSS EXAMINATION**

12    BY MR. FAZEL:

13    **Q.**    Just some brief questions, Mr. Green.

14            MR. FAZEL:  I'm sorry, Your Honor, may I

02:47:23    15    proceed?

16            THE COURT:  Sure.  Go on.

17    BY MR. FAZEL:

18    **Q.**    Okay.  Tell me if this question makes any sense to

19    you --

02:47:40    20    **A.**    Okay.

21    **Q.**    -- because it was written by an accountant.

22    **A.**    Okay.

23    **Q.**    Did you know the principal balance of the amount of

24    CD total deposits at SIBL?

02:47:50    25    **A.**    The principal balance?  Run that by me one more time.

*Recross-Green/By Mr. Fazel*

1    Q.   That's what I said.  I had to read it twice.

2    A.   Okay.

3    Q.   Did you know the principal balance of the amount of

4    CD total deposits at SIBL?

02:48:01   5    A.   What do you mean did I know it?  Can I tell you

6    what --

7    Q.   Yeah --

8    A.   -- it is today?

9    Q.   Can you tell me what it was?

02:48:05   10   A.   I cannot tell you exactly what it was.

11   Q.   Did you ever know it?

12   A.   Looking at a financial statement, it was on there,

13   yeah.

14   Q.   So you know it through looking at the financial

02:48:15   15   statements of the bank?

16   A.   The principal -- read it to me one more time because

17   it's a little bit tricky.

18   Q.   I know.

19            Do you know the principal balance -- the

02:48:25   20   principal balance, okay, of the amount of CDs -- of total

21   CD deposits at SIBL?

22   A.   I think the way it was reported was the total

23   deposits.  I don't think it was broken out into principal

24   and interest on financial statements.  I think it was just

02:48:41   25   total deposits.  So some would have been original

*Recross-Green/By Mr. Fazel*

1   principal, and then any accumulated interest would have

2   been included in the balance.  So that's the figure that I

3   would have known.  But I don't think I saw it separated

4   out where it was just the original principal going in.

02:48:55   5   **Q.**   So the answer to my question is you don't know the

6   principal balance?

7   **A.**   That's a ** long way to say I do not know.

8   **Q.**   Okay.  Fair enough.

9         Would it include accrued interest of the

02:49:07  10   balance?

11   **A.**   The principal balance?

12   **Q.**   Yes.

13   **A.**   Ultimately, yes, if it -- yes, it depends on the, you

14   know, terms you want to use, but a person's balance would

02:49:21  15   include their original principal plus any accrued

16   interest.

17   **Q.**   Now, do you remember the video when Mr. Stanford was

18   up there talking about $5 billion in liquidity?

19   **A.**   I do.

02:49:40  20   **Q.**   You didn't understand that to mean that he meant he

21   had $5 billion in liquid assets, did you?  Is that the way

22   you understood it?

23   **A.**   I meant -- understood there were $5 billion of liquid

24   assets in his companies in total.

02:49:51  25   **Q.**   Companies in total, exactly.  And that was important

*Recross-Green/By Mr. Fazel*

1  to you?

2  **A.**   Yes, it was.

3  **Q.**   Because that would mean that monies could be moved

4  around, that companies had values and monies could be

02:50:05  5  moved around to SIBL to help in case liquidity is needed?

6  **A.**   I assume so.

7  **Q.**   Now, do you remember --

8           MR. FAZEL:  Can I get Government's Exhibit 131,

9  please.  Actual Page 10.  Which would be Page 16 on PDF.

02:50:18  10  BY MR. FAZEL:

11  **Q.**   Do you remember the government speaking to you about

12  that right there?

13  **A.**   Yes, I do.

14  **Q.**   And we talked about this.  Without talking about this

02:50:32  15  over and over and over again, do you see the first line,

16  it says equities?

17  **A.**   Yes, I do.

18  **Q.**   Does it say what type of equities?

19  **A.**   No, it does not.

02:50:40  20  **Q.**   Does it say if it's private or public?

21  **A.**   No, it does not.

22  **Q.**   Would that be important to know?

23  **A.**   Yes, it would be.

24  **Q.**   It would be.

02:50:47  25           What about -- in the very top it says,

1  "Funds deposited with us are primarily."

2            Do you see that?

3  **A.**   Yes, I do.

4  **Q.**   Does this stay "exclusively"?

02:50:56  5  **A.**   No, it does not.

6  **Q.**   "Only"?

7  **A.**   No, it does not.

8  **Q.**   Okay.  When the government spoke to you a little bit

9  on recross -- redirect, sorry, we also spoke about Page 3,

02:51:13  10  which is Page 9 of the PDF, global investment portfolio,

11  second paragraph.

12            MR. FAZEL:  Scroll up a little bit.  Perfect.

13 BY MR. FAZEL:

14  **Q.**   You guys went over the first line.  Let's talk about

02:51:28  15  the second line you didn't go through.  Do you see where

16  it says, "There can be"?

17  **A.**   Yes.

18  **Q.**   Can you read that out loud, please?

19  **A.**   Sure.

02:51:35  20  **Q.**   All the way.

21  **A.**   All the way to the end?

22  **Q.**   All the way to the end.

23  **A.**   Okay.  "There can be no assurance that these

24  decisions will continue to yield profitable results for

02:51:43  25  SIBL or cause the investments made in the U.S. accredited

1  investor CD or any other products we offer to produce

2  returns sufficient to fund the payment obligations of the

3  CD" --

4          THE COURT:  Slow down, please.

02:51:53   5          THE WITNESS:  I'm sorry, sir.

6          THE COURT:  Again, not only do you read, we

7  need to take it down.

8          THE WITNESS:  Yes.  My bad.

9              -- "any other products we offer to produce

02:52:01  10  returns sufficient to fund the payment obligations of the

11  CD deposits.  Past performance is not indicative of future

12  results.  See description of investment philosophy and

13  portfolio diversification on Page 16."

14  BY MR. FAZEL:

02:52:20  15  **Q.**   Okay.  Thank you, Mr. Green.  I promise this will be

16  the one last time I'll make you ever read anything like

17  that.

18  **A.**   Okay.

19  **Q.**   Now, let me ask you something --

02:52:25  20  **A.**   Uh-huh.

21  **Q.**   -- and this will be my final question.  The CD, which

22  is a debt obligation, obliges the debtor, the bank --

23  **A.**   Right.

24  **Q.**   -- to pay the debtee, if there's such a term, the

02:52:38  25  person that's buying the CD --

1   **A.**   Correct.

2   **Q.**   -- money at a time certain at a set price; correct?

3   **A.**   Yes.

4   **Q.**   Doesn't matter how the functioning of a bank occurs,

02:52:46   5   that debt is locked in, it's a contract, as soon as they

6   purchase that CD?

7   **A.**   Correct.

8            MR. FAZEL:  I pass the witness.

9            MR. STELLMACH:  I'll be very brief.

02:52:58   10                **REDIRECT EXAMINATION**

11   MR. STELLMACH:

12   **Q.**   Mr. Stanford owned the bank?

13   **A.**   Yes.

14   **Q.**   There were no other shareholders according to what

02:53:05   15   you understood?

16   **A.**   None.

17   **Q.**   But the bank issued an annual report with a financial

18   statement that was supposedly audited by an accountant?

19   **A.**   Correct.

02:53:15   20   **Q.**   And who received that document?  Did it just go to

21   Mr. Stanford?  Did he have thousands of copies of the

22   document laying around?

23   **A.**   No.  He sent them to all the depositors in the bank.

24   **Q.**   And what was the reason for distributing descriptions

02:53:28   25   of the bank's assets and its investment strategy to the

1    depositors of this bank?

2    **A.**    Well, so the depositors could know what was backing

3    the CDs that they purchased, that they could, you know,

4    decide to continue to leave their money in there, take it

02:53:45    5    out or perhaps put more money in there, but it was

6    describing the financials condition of the bank that was

7    backing up the promise to pay.

8    **Q.**    Would you have invested or recommended the CD to your

9    family, as you did, if you had known that any of the

02:54:00    10    financial information you were being given about the bank

11    was anything other than 100 percent true?

12    **A.**    No, I would not have.

13                MR. STELLMACH:  I pass the witness, Your Honor.

14                MR. FAZEL:  Your Honor, can we approach

02:54:12    15    briefly?

16                THE COURT:  Come on up.

17                **(The following was held at the bench)**

18                THE COURT:  All right.  Hold it.

19                    Go on.

02:54:34    20                MR. FAZEL:  Judge, I wanted to ask again to let

21    the Court allow me to go into the valuation of the company,

22    and let me tell you why.

23                THE COURT:  Which company?

24                MR. FAZEL:  Well, during recross -- redirect,

02:54:48    25    the government asked about a statement made by Mr. Stanford

1 at the meeting, the video they put on, regarding $5 billion

2 in liquidity.  The witness testified that he thought that

3 was all of the companies and that he thought that's

4 important.

02:55:02  5               My representation to the Court is that

6 opens the door for us to discuss why he thought that was

7 important and what Mr. Stanford could do with all that

8 liquidity.  And here's the legal parameters that I see it.

9 In order for the government to be able to succeed at trial

02:55:19  10 to show Mr. Stanford is guilty, they have to show that he

11 had the intent to commit the crime at the time, intent and

12 time, the act and the intent have to be together.

13               So it's my position, Your Honor, putting

14 that legal argument together, plus what the witness said,

02:55:36  15 that we should be able to talk about the valuation,

16 specifically when the witness has told the government in

17 302 that he has knowledge of the value of the broker

18 dealer.

19               THE COURT:  Hang on a second.

02:55:48  20               How did he open the door, again.

21               MR. FAZEL:  He brought up the fact that -- he

22 asked the question regarding the video and what was said by

23 Mr. Stanford on the video about $5 billion in liquidity.

24               THE COURT:  Hang on.

02:56:09  25               All right.  Go on.

1          MR. FAZEL:  It's my position given what they

2   have to prove, in addition to the fact that he asked the

3   question and the witness --

4          THE COURT:  Wait a second.  Let me at least do

02:56:20   5   that.  Interrupt you more than a minute.

6              Go on.

7          MR. FAZEL:  And the fact that the witness has

8   some knowledge of the value and of -- the witness testified

9   that he would think it's important --

02:56:28   10         THE COURT:  Where did he say he thought it was

11  referring to what?

12         MR. FAZEL:  The liquidity of Mr. Stanford and

13  the values that Mr. Stanford had in other companies, that

14  is, how much money he had in other companies that he can

02:56:39   15  bring to bear to the bank.

16         THE COURT:  All right.  How does that open the

17  door?

18         MR. FAZEL:  Because then it opens the door into

19  the fact that this witness can testify and is relevant that

02:56:58   20  at some point in time Mr. Stanford could bring in the

21  monies into his bank to make the bank be able to pay CDs.

22         THE COURT:  Okay.  Got it.

23             What's your response?

24         MR. STELLMACH:  First of all, it's a legally

02:57:10   25  invalid defense.  If you make a misrepresentation and at

1 the time you make the statement you know that it's false,

2 you cannot -- you are not acting in good faith.

3          THE COURT:  At the time.

4          MR. STELLMACH:  At the time.

02:57:20

5          THE COURT:  It doesn't -- it's not applicable

6 if he cleansed it up later on.

7          MR. STELLMACH:  That's right.

8          THE COURT:  That's your point?

9          MR. STELLMACH:  That's our point.

02:57:28

10              And so -- if I could just finish.

11          MR. FAZEL:  I'll let you.

12          MR. STELLMACH:  Sure.

13              If you know at the time you're making a

14 misrepresentation, even if you believe that ultimately

02:57:37

15 you'll be able to make everybody whole with other assets

16 that you're not telling them about, that's not a defense,

17 that's not good faith.

18          THE COURT:  Okay.  Response.

19          MR. PARRAS:  Judge, the second element --

02:57:50

20          THE COURT:  That's Mr. Parras speaking.

21          MR. PARRAS:  The second element of the mail

22 fraud and wire fraud requires the specific intent to commit

23 fraud.  I have --

24          THE COURT:  I understand.

02:58:01

25          MR. PARRAS:  That's defined as the intent to

1    deceive or to cheat.  If at the time Mr. Stanford and his

2    agents of temples took the money of depositors and always

3    had the intent to pay them back, and there's evidence of

4    that in the record, there's evidence that they made

02:58:19    5    attempts to do that throughout 2008, to bring money into

6    the bank so that they could pay people back, the jury is

7    entitled to make a decision, and we're entitled to bring on

8    evidence so they can make that decision.  And that's our

9    point.

02:58:33    10    THE COURT:  Your position is at the time issued

11    that perspective, whatever it was, he had or you're going

12    to have to input, have to find beyond a reasonable doubt

13    that he knew at that time he was going to put it in other

14    stuff; correct?

02:58:51    15    MR. STELLMACH:  It was continuous.  I mean, he

16    knew that it wasn't being invested continuously.  It goes

17    on for 20 years.  So not only -- each time he's

18    dissemination the prospectus, the documents he knows is not

19    going to where it's supposed to go.

02:59:04    20    And to Mr. Parras' point, the intent is

21    Mr. Stanford's intent.  It doesn't get cleaned up if he

22    believes ultimately everything is going to turn out okay.

23    THE COURT:  All right.

24    MR. STELLMACH:  If you make -- just to use a

02:59:13    25    simple example.  If I make a mortgage application --

1              THE COURT:  I got you.  I understand.

2                   What's your response?

3              MR. PARRAS:  Judge, the Fochi ^  (phonetic)

4  case, which is a Fifth Circuit case, it's the one we cited,

02:59:21  5  it is a bit old, but it's good law, in that case, there was

6  a hot check, basically, that was written and handed over.

7  There's no doubt there was a misrepresentation.  There was

8  no money in the bank to pay that check.

9              THE COURT:  I remember that case.  Go on.

02:59:32  10             MR. PARRAS:  However, when that happened, the

11  person always intended to make that check.

12             THE COURT:  I remember that.  You distinguished

13  that case because you specifically said that was a hot

14  check case --

02:59:45  15             MR. STELLMACH:  That's right.

16             THE COURT:  -- something you wrote.

17             MR. STELLMACH:  Yes.

18             THE COURT:  Why?  What's the importance?

19             MR. STELLMACH:  When you write a bad check,

02:59:50  20  it's different than a misrepresentation if at the time you

21  write the bad check you believe you'll have funds to cover

22  it even if  --

23             THE COURT:  Okay.  Go on.

24             MR. STELLMACH:  -- check today and you

02:59:57  25  ultimately -- and you think at that time --

1                    THE COURT:  Then?

2                    MR. STELLMACH:  -- it will be covered in three

3    days when the check is due, that's a defense.  That's not a

4    defense in a misrepresentation case.

03:00:05    5                    THE COURT:  And you've got another case on

6    that?

7                    MR. STELLMACH:  Peterson.

8                    THE COURT:  Peterson.

9                    MR. STELLMACH:  Where the circuit -- I'm sorry,

03:00:10   10    Judge.

11                    THE COURT:  No, that's all right.  Tender is

12    refused.  In effect, your objection -- I understand you

13    want to go forward, that's denied.

14                    MR. FAZEL:  Judge, I need to make -- make a

03:00:21   15    offer of proof of this witness.

16                    THE COURT:  Okay.  With this witness?

17                    MR. FAZEL:  It's easier just Q & A.

18                    THE COURT:  Let me ask you this.

19                    MR. FAZEL:  Certainly.

03:00:28   20                    THE COURT:  In federal court, you make an offer

21    of proof or is it like a bill of exceptions, in state court

22    it's not a bill of exceptions.

23                    MR. FAZEL:  It's my understanding the proper

24    way to do it, if the witness is available, is to do it

03:00:38   25    through question and answer.

1           THE COURT:  Is that your understanding or is --

2           MR. STELLMACH:  Not my understanding.

3           MR. FAZEL:  That's my understanding.

4           MR. PARRAS:  Need to make a proffer.

03:00:45  5           MR. FAZEL:  But then we can do it with a

6  proffer.  As long as the Court allows me to make a record.

7           THE COURT:  Absolutely.

8           MR. FAZEL:  Okay.

9           THE COURT:  Whenever we take a break, we'll

03:00:51  10 stay and you're entitled to an offer of proof.  It's not

11 like state court where you got to put the guy on and ask

12 him.

13           An offer -- for you know, you granted

14 that?

03:01:01  15          MR. FAZEL:  Yes, sir.

16           THE COURT:  Just put it on sometime when we

17 take a break or ask for a day or before we get underway in

18 the morning.

19           MR. FAZEL:  Then I'm going to pass him.

03:01:09  20          THE COURT:  All right.

21           **(The following was held before the jury)**

22           THE COURT:  It's your time that's running.

23           MR. FAZEL:  Tell it to stop.

24           I have no questions, Your Honor.

03:01:30  25          THE COURT:  All right.  Thank you.  Pass the

1  witness.

2                    Government have anything further?

3                    MR. STELLMACH:  No, thank you, Your Honor.

4                    THE COURT:  Thank you, sir.  You may step down.

03:01:37   5  You're excused.  You're free to leave.  You can remain in

6  the courtroom, if you'd like, but you're free to leave.

7                    THE WITNESS:  Thank you, sir.

8                    THE COURT:  Call your next witness.

9                    MR. WARREN:  Your Honor, the United States

03:01:44  10  calls Joseph Flynn.

11                    THE COURT:  Mr. Flynn, please.

12                    Come around this way, please, sir.

13                    CASE MANAGER:  Mr. Flynn, please raise your

14  right hand.  Do you solemnly swear that the testimony you

03:02:25  15  are about to give in the case now before the Court will be

16  the truth, the whole truth and nothing but the truth?

17                    THE WITNESS:  I do.

18                    CASE MANAGER:  Thank you.  You may have a seat.

19                    THE COURT:  That chair doesn't move.  You need

03:02:43  20  to pull the microphone.

21                    THE WITNESS:  Pull the microphone?

22                    THE COURT:  Yes, sir.

23                    THE WITNESS:  Thank you.

24                    THE COURT:  Go on.

03:02:47  25                    MR. WARREN:  Thank you, Your Honor.

*Direct-Flynn/By Mr. Warren*

1      **JOSEPH FLYNN,**

2  after having been first cautioned and duly sworn, testified

3  as follows:

4          MR. WARREN:  Thank you, Your Honor.

03:02:54  5          **DIRECT EXAMINATION**

6  BY MR. WARREN:

7  **Q.**   Mr. Flynn, please state and spell your name for the

8  jury.

9  **A.**   Would you say that again, please.

03:03:03  10  **Q.**   Sure.  Can you state your name for the jury, please,

11  spelling your last name.

12  **A.**   Yes.  My name is Joseph James Flynn, F-L-Y-N-N.

13  **Q.**   Do you have a nickname, sir?

14  **A.**   Jim.

03:03:16  15  **Q.**   How old are you, Mr. Flynn?

16  **A.**   69.

17  **Q.**   And where are you originally from?

18  **A.**   I was born in Connecticut, raised in Pennsylvania.

19  **Q.**   Where do you live now?

03:03:24  20  **A.**   Winter Park, Florida, a suburb of Orlando, Florida.

21  **Q.**   Are you married, sir?

22  **A.**   Yes.

23  **Q.**   Have any children?

24  **A.**   Yes.

03:03:32  25  **Q.**   Do you have any grandchildren?

*Direct-Flynn/By Mr. Warren*

1    **A.**   Yes.

2    **Q.**   What do you do for a living?

3    **A.**   I am retired.

4    **Q.**   What are you retired from doing?

03:03:39   5    **A.**   I was an architect and a construction manager.

6    **Q.**   If you could walk us through your educational

7    background first, starting where you went to college.

8    **A.**   I went to college to the University of Pennsylvania

9    in Philadelphia.  I received a Bachelor of Arts degree in

03:03:59   10   architecture from undergraduate school and a master's --

11   Master of Architecture degree from graduate school.

12   **Q.**   Where did you get your master's from, sir?

13   **A.**   Same place.

14   **Q.**   University of Pennsylvania?

03:04:11   15   **A.**   Yes, sir.

16   **Q.**   Did you get your master's immediately after

17   graduating college?

18   **A.**   No.  There was about a four-and-a-half-year hiatus

19   between undergraduate and graduate.

03:04:21   20   **Q.**   What were you doing during that hiatus?

21   **A.**   I was in the Marine Corps.

22   **Q.**   Where were you stationed, sir?

23   **A.**   Predominantly in South Vietnam.

24   **Q.**   What was your rank with the Marines?

03:04:33   25   **A.**   Captain.

1    Q.    And what was your MOS, your military occupational

2    specialty?

3    A.    I had several.  I was in armor, infantry and I was an

4    advisor to the Army of the Republic of South Vietnam.

03:04:48    5    Q.    Were you discharged?

6    A.    Yes.

7    Q.    How so?

8    A.    I was honorably discharged in Okinawa.

9    Q.    Did you receive any accommodations for your service?

03:04:58    10    A.    Yes.

11    Q.    What did you receive?

12    A.    I received a Navy accomodation metal with Combat V.

13    Q.    Sir, if you could please summarize your employment

14    history for the jury?

03:05:09    15    A.    After graduate school, I was hired by a couple of my

16    graduate school professors to work in the area of Newtown

17    planning.  Subsequently, I was offered a job in St. Louis,

18    working with a small company that wanted to capitalize

19    upon my thesis project, which was the design of sports and

03:05:38    20    recreation facilities.  I worked there for approximately

21    15 years.

22              Then I was offered a job as a partner in a

23    design/build firm in Boston.  The firm specialized in

24    designing and building collegiate sports and recreation

03:05:56    25    facilities.

*Direct-Flynn/By Mr. Warren*

1  **Q.**   About how long were you with the firm in Boston, sir?

2  **A.**   About three years.

3  **Q.**   What did you do after that?

4  **A.**   I was recruited back to St. Louis to work with a

5  large architecture/engineering/construction firm called

6  Sverdrup Corporation.

7  **Q.**   And after that?

8  **A.**   I was transferred by Sverdrup to Florida to head up

9  one of their Florida operations.  I was with that company

10  in Florida for about three years, and I was recruited away

11  by a firm called 3D International, a firm based here in

12  Houston, to open a southeastern office for the firm.

13  **Q.**   What does 3D Intentional do?

14  **A.**   It is a fairly large architectural engineering and

15  construction firm.

16  **Q.**   When did you leave 3D International?

17  **A.**   December 31st of 2005.

18  **Q.**   Why did you leave?

19  **A.**   I retired because of health problems.

20  **Q.**   Did you ever go back to work full-time?

21  **A.**   No.  My health has precluded me from going back to

22  work.

23  **Q.**   And generally speaking, what are those health

24  problems, sir?

25  **A.**   Cardiac problems, stemming from congestive heart

*Direct-Flynn/By Mr. Warren*

1    failure.

2    **Q.**    What is your present source of income?

3    **A.**    My wife and I have some Social Security income and

4    some disability income from the Veterans Administration.

03:07:36    5    **Q.**    Are you military disabled?

6    **A.**    Yes, I am considered 120 percent permanently service

7    disabled by the military because of my service in Vietnam.

8    **Q.**    And what's the disability specifically?

9    **A.**    The disability is primarily cardiac disability.  I

03:08:00   10    have an inflammation attributed to Agent Orange exposure.

11    **Q.**    Mr. Flynn, have you ever heard of Stanford

12    International Bank?

13    **A.**    Yes.

14    **Q.**    When did you first hear about the bank?

03:08:13   15    **A.**    I believe it was in February of 2006.

16    **Q.**    And what was the context?

17    **A.**    I was in the process of having recently retired,

18    transferring my 401(k) with 3D International to an IRA

19    account, and I chosen to consider the Stanford group

03:08:38   20    companies to hold that IRA for me, because they had been

21    the managers of 3D International's 401(k) account --

22    **Q.**    And --

23    **A.**    -- and --

24    **Q.**    Please continue.

03:08:54   25    **A.**    I met the Stanford group companies' financial advisor

*Direct-Flynn/By Mr. Warren*

1    who I worked with, a fellow named Doug Shaw, and he

2    explained to me a number of investment options, one of

3    them was investing in Stanford International Bank CDs.

4    **Q.**    What did you discuss with Mr. Shaw initially about

03:09:15    5    those CDs?

6    **A.**    Well, initially, at that point in time --

7            THE COURT:  So, in other words, your 401(k) had

8    been kept in an account at Stanford Bank; is that correct?

9    And then when you retired, you were in effect given that,

03:09:30    10   and you had to determine whether to leave it there or to

11   take it out and put it somewhere else?  I don't want to put

12   words in your mouth.

13           THE WITNESS:  No, that's not exactly correct,

14   sir.

03:09:38    15           THE COURT:  What is it?

16           THE WITNESS:  The 401(k) was managed by the

17   Stanford group companies.

18           THE COURT:  Okay.  Go on.

19           MR. WARREN:  Thank you.

03:09:49    20           THE COURT:  So then you just had to determine

21   if you wanted to go into their CDs or do something else

22   with them?

23           THE WITNESS:  At that point in time, I had to

24   decide what to do with the funds that had accumulated in

03:10:02    25   the 401(k) and was looking to combine that and another IRA

*Direct-Flynn/By Mr. Warren*

1  that I had into a single IRA, and that's what we let the

2  Stanford group companies to do.

3  BY MR. WARREN:

4  **Q.**   Can you describe generally the discussion you had at

5  first with Mr. Shaw about those CDs as an investment

6  option?

7  **A.**   Well, I didn't choose to purchase any of these CDs in

8  February of 2006, and, so, it was pretty much a one-way

9  discussion talking about the CDs.  But eventually I became

10  more and more interested in them, and over the course of

11  about six months, we did have several discussions about

12  them.

13          And Mr. Shaw had told me that they were a

14  very secure investment.  He told me that they were an

15  investment that would fit what became my dominant need.

16  **Q.**   Mr. Flynn, let me stop you there for a minute.

17          What do you mean by a "secure investment"?

18  **A.**   Well, I had -- I had open-heart surgery in April of

19  that year, and by August of that year, I was having a lot

20  of difficulties.  In fact, in the 18 months that I ended

21  up purchasing the CDs, my doctor had told me that I

22  possibly had less than six months to live.

23          So with that kind of a diagnosis, I was

24  very concerned about how to manage my retirement money for

25  the benefit of my family.

*Direct-Flynn/By Mr. Warren*

1  Q.   And what were your financial goals at that time?

2  A.   The principal goal was preservation of principal.

3  Q.   Mr. Flynn, what were you told about the CDs in terms

4  of the asset portfolio in Stanford International Bank?

03:11:54  5  A.   I was told that it was a diverse portfolio consisting

6  of treasury bonds, private equity investments, some

7  commodities.  And as I recall, Stanford International Bank

8  did not do more mundane-type banking loans, that they were

9  interested in higher-return investments and, therefore,

03:12:20  10  they could provide a higher-than-normal return to their CD

11  holders.

12  Q.   Mr. Flynn, let's break that up a little bit.  You

13  mentioned diversity.  What do you mean by "diversity"?

14  A.   Well, diversity means being invested in a number of

03:12:42  15  different asset classes and kinds of assets so that if one

16  asset went bust, you would still have your entire

17  investment protected because it was spread across several

18  other investments.

19  Q.   Was what you were told about the diversification of

03:12:58  20  the bank's assets important to your decision to purchase

21  the CDs?

22  A.   Yes.  That was very important to me.

23  Q.   Do you understand the term "liquidity"?

24  A.   I am not an expert in financial matters at all, but I

03:13:12  25  did come to understand the term "liquidity."

1   Q.   How did you come to understand that term?

2   A.   Well, we considered -- my wife and I considered using

3   some of the retirement income that we had to pay off our

4   mortgage.  And I understood from conversations with my

03:13:32   5   Stanford Group Company's financial advisor that getting

6   about an 8 percent return on CDs as opposed to paying

7   5 percent for a mortgage would in essence give us about

8   3 percent of leverage.  And that was my understanding of

9   leverage.

03:13:51   10   Q.   Mr. Flynn, were you told anything about the

11   liquidity --

12   A.   Liquidity.

13   Q.   -- of Stanford International Bank's assets?

14   A.   Yes, we were told that -- and this was very important

03:14:04   15   to us.  We were told that if we needed any of the money at

16   any time, we'd be able to get it back.  And that was a

17   concern of mine, because if I needed money for healthcare,

18   for nursing home care, something like that, we would be

19   able to get back whatever we'd invested in certificates of

03:14:26   20   deposit.

21   Q.   You also mentioned being told about loans.  How did

22   that affect your decision to purchase the CDs?

23   A.   I'm sorry.  I don't understand --

24   Q.   Sure.

03:14:38   25   A.   -- what you mean.

*Direct-Flynn/By Mr. Warren*

1  **Q.**  What were you told about loans with regard to the

2  bank and the loans that the bank made or didn't make?

3  **A.**  Do you mean as a CD and holder, the loan that I could

4  have taken on my own account?

03:14:51  5  **Q.**  No, sir.  I'm sorry.  Let me clarify.

6  Did you talk with Mr. Shaw about whether

7  Stanford International Bank made loans?

8  **A.**  No, I don't believe we talked about Stanford

9  International Bank making loans other than they didn't do

03:15:09  10  typical commercial bank-type activities.

11  **Q.**  Did you discuss with Mr. Shaw whether the CDs were

12  FDIC insured?

13  **A.**  Yes.

14  **Q.**  What were you told?

03:15:19  15  **A.**  I was told that they were not FDIC insured.

16  **Q.**  Were you told -- did you discuss any other insurance

17  with Mr. Shaw?

18  **A.**  Yes.  My wife and I were very concerned about

19  preserving principal, and, so, we asked Mr. Shaw about

03:15:38  20  that.  And he explained to us that these certificates of

21  deposit would be very secure investments and that they

22  were insured by Lloyd's of London.

23  We specifically on several occasions asked

24  him if that Lloyd's of London insurance was for the

03:15:57  25  benefit of the CD holders as opposed to being something

*Direct-Flynn/By Mr. Warren*

1  different, and he assured us that it was for the benefit

2  of us as potential CD holders.

3  **Q.**  And was that relevant to your decision to purchase

4  the CDs?

03:16:13  5  **A.**  Yes, absolutely, that was very relevant.  My primary

6  objective was to preserve our principal investment.

7  **Q.**  Mr. Flynn, were you shown marketing materials before

8  you purchased any of the Stanford International Bank CDs?

9  **A.**  Yes.  We were shown brochures and annual reports.

03:16:35  10  And I've seen lots of these kinds of things in my 40-year

11  career, and these were done extremely well.  They were

12  very professional, and, quite frankly, very persuasive.

13  **Q.**  Mr. Flynn, I'm about to hand you what's already been

14  admitted as Government's Exhibit 118.

03:17:24  15              Do you recognize this document?  I know

16  it's a little hard to see on the screen.  Can you see it

17  in the hard copy, Mr. Flynn?

18  **A.**  I can see it on the hard copy.  I do have a serious

19  vision problem, so it's hard to make out the fine print.

03:17:38  20  **Q.**  Do you recognize this document?

21  **A.**  Yes.  This looks like the annual report of Stanford

22  International Bank for 2005.

23  **Q.**  Mr. Flynn, if you could turn to Page 5 of the annual

24  report?

03:17:57  25  **A.**  Got it.

*Direct-Flynn/By Mr. Warren*

1      MR. WARREN:  Your Honor, if I could inquire

2  through the Court if the jury can make that out on the

3  screen.

4      THE COURT:  It's not showing up on this.  Maybe

03:18:17  5  the screen itself is turned off.

6      MR. WARREN:  And Your Honor, I think the

7  witness can rely on the hard --

8      THE COURT:  Either away, sir, whatever you can

9  see better.

03:19:04  10      THE WITNESS:  I think I can see the hard copy

11  better than the screen.

12      THE COURT:  I got a little help for you here.

13  Old fashioned technology.  That sheds a little light on it.

14      THE WITNESS:  Yes, sir, that helps.

03:19:16  15      THE COURT:  So much for all the electronics.

16  BY MR. WARREN:

17  **Q.**   Mr. Flynn, do you recall seeing this page of the 2005

18  annual report --

19  **A.**   Yes.

03:19:24  20  **Q.**   -- when you were deciding whether or not to purchase

21  the CDs?

22  **A.**   Yes, I do.

23  **Q.**   What do you recall seeing on this page?

24  **A.**   I recall seeing and focussing upon two numbers:

03:19:37  25  $3 billion and $4 billion, being the total assets from

*Direct-Flynn/By Mr. Warren*

1  2004 and 2005.

2  **Q.**   And why were those numbers significant to you as you

3  were considering whether to buy the CDs?

4  **A.**   Well, that showed me that this was, oh, but a

03:20:03  5  boutique, but nonetheless a big league company that was

6  growing quite rapidly and, as I understood, due to its

7  expertise in financial management.

8  **Q.**   Mr. Flynn, can you please turn to Page 12 of the

9  annual report?

03:20:29  10  **A.**   Got it.

11  **Q.**   Mr. Flynn, could I ask you to read the second

12  paragraph at the top under "Our Investment Philosophy"?

13  **A.**   "Our investment philosophy may not produce dazzling

14  returns and does not always follow current trends, but we

03:20:58  15  have proved year after year it consistently protects

16  principal and gross capital."

17  **Q.**   Do you recall reading that before you decided to

18  purchase the CDs?

19  **A.**   I do.  In fact, I recall reading just about

03:21:12  20  everything in this book, but I particularly recall that.

21  **Q.**   Why is that?

22  **A.**   Because it's so aligned with my objective.

23  **Q.**   What do you mean by that, sir?

24  **A.**   My objective of preserving principal.  You know, I --

03:21:27  25  I wasn't as concerned with return on investment as I were

*Direct-Flynn/By Mr. Warren*

1   with making certain that my principal was preserved.

2   **Q.**   Further down that page, Mr. Flynn, there's a blow-up

3   quote.  If you could read that as well, please.

4   **A.**   "SIB's investment policy of absolute yields, combined

03:21:48   5   with a long-term core strategy, has resulted in two

6   decades of solid performance."  And it's in big type so

7   it's easier to read.

8   **Q.**   Do you recall seeing that before you decided to

9   purchase the CDs?

03:22:00   10   **A.**   Yes.

11   **Q.**   Was that relevant to your decision?

12   **A.**   Yes.  Because they were offering an 8, 8 1/2 percent

13   return, and you know, I wanted to know how they could

14   offer a few percentage points more than the CDs that we

03:22:16   15   currently had in a -- in an FDIC-insured account in the

16   United States.

17   **Q.**   Mr. Flynn, if you could turn to the next page in the

18   report.

19   **A.**   Got it.

03:22:35   20   **Q.**   It's a little -- there it goes.

21           If you could please read that quote that's

22   on -- on the page.

23   **A.**   "We manage risk by keeping the bank's investments

24   globally diversified across different economic sectors and

03:22:51   25   asset classes with prudent ROI expectations."

*Direct-Flynn/By Mr. Warren*

1  **Q.**   Do you recall reading about the global

2  diversification of the bank's investments?

3  **A.**   Yes.

4  **Q.**   And was that relevant to your decision?

03:23:05   5  **A.**   Yes, it was, because I had understood with very

6  limited financial expertise that global markets were

7  beginning to emerge as solid investments, and that helped

8  me understand why Stanford could produce the kind of

9  returns that they were returning.

03:23:26   10  **Q.**   Mr. Flynn, you ultimately ended up purchasing CDs;

11  correct?

12  **A.**   Yes, sir.

13  **Q.**   How much did you purchase?

14  **A.**   $1,647,000 worth.

03:23:39   15  **Q.**   Do you know the exact amount?

16  **A.**   $1,647,296.38.  I know the exact amount.

17  **Q.**   Oh, I was impressed that you knew the amount of

18  1.647.  I wasn't even asking for further detail.

19                        Was that all at once or was that over a

03:24:01   20  period of time?

21  **A.**   That was over about an 18-month period of time.

22  **Q.**   Starting when?

23  **A.**   Starting in August of 2006.

24  **Q.**   Of that $1.6 million, how much of that was your life

03:24:17   25  savings?

*Direct-Flynn/By Mr. Warren*

1    **A.**   Probably about 90 percent.

2    **Q.**   Mr. Flynn, why did you purchase so much?  Why put

3    90 percent of your life savings into the CDs?

4    **A.**   I alluded to this earlier.  I was not certain I was

03:24:35   5    going to be around, and I wanted an instrument that was

6    easy to manage so that my family, if they should receive

7    an inheritance, could be comfortable that the investment

8    was well managed and well protected, and the Stanford

9    International Bank CDs seemed to be that kind of

03:24:58   10   investment.

11   **Q.**   You mentioned diversification before.

12              Weren't you concerned about the lack of

13   diversity if you put 90 percent of your assets into a

14   single instrument?

03:25:07   15   **A.**   I was, and I believed that formed the basis of some

16   dialogue with my financial advisor, and I understood that

17   the bank's investments were very diversified and that, you

18   know, that would address my concern for diversity.

19   **Q.**   Mr. Flynn, I'm handing you what's been marked as

03:25:32   20   Government's Exhibit 1015.

21              Mr. Flynn, what's the first page of that

22   document.

23              MR. WARREN:  If we could below it up on the

24   screen.

03:26:10   25              THE WITNESS:  It is one page of the monthly

*Direct-Flynn/By Mr. Warren*

1  statement that I received.  It is from the August 2008

2  statement.

3  BY MR. WARREN:

4  **Q.**    Where did you receive the statement from?

03:26:20  5  **A.**    Monthly statements came in the mail from Stanford

6  Group Companies.

7  **Q.**    And I'd like to focus your attention -- first, what's

8  the date of this?  I'm sorry.

9  **A.**    August 2008.

03:26:35  10  **Q.**    Thank you.  I'd like to focus your attention on the

11  handwriting at the bottom of the page.

12                    Whose handwriting is that?

13  **A.**    That is my wife's handwriting.

14  **Q.**    Can you read what it says?

03:26:45  15  **A.**    "Secured by Lloyd's of London 105 percent bankers

16  bond."

17  **Q.**    What's it say below that, sir.

18  **A.**    "Invested in treasury bonds 60 percent."

19  **Q.**    What was the context of when your wife wrote this

03:27:01  20  down?

21  **A.**    At that point in time, the financial markets were

22  experiencing some stress.  I believe Lehman had gone

23  belly-up at somewhere around that time.

24  **Q.**    I'm sorry.  By Lehman, you mean Lehman Brothers?

03:27:23  25  **A.**    Lehman Brothers, yes.

1      And, so, my wife and I had a telephone

2   call with our financial advisor, and we wanted to be

3   certain that what was going on in the market would not

4   adversely affect our investments in certificates of

03:27:42   5   deposit.

6      And my wife took these notes to reconfirm

7   some questions that we asked.  And the first question is,

8   you know:  Was the account as had been previously

9   indicated insured by Lloyd's of London?

03:28:00   10   Q.   And what were you told?

11   A.   The answer was yes.  And we then followed up by

12   saying, "Now, is that insurance for the benefit of the

13   certificate of deposit holders?"

14      And, again, we received an affirmative

03:28:12   15   response.

16   Q.   Mr. Flynn, what about the sentence at the bottom,

17   "Invested in treasure bonds 60 percent"?

18   A.   Yes.  We'd asked about that.  And that was important

19   to us because treasury bonds were highly liquid and a

03:28:27   20   pretty fixed-rate investment.  And, you know, that -- that

21   was important at that point in time because of the stress

22   that the market was experiencing.

23   Q.   Did what you were told at this time address the

24   concerns you had about the safety and stability of your CD

03:28:47   25   purchases?

*Direct-Flynn/By Mr. Warren*

1  **A.**   Yes, it did.

2  **Q.**   Mr. Flynn, I'm handing you what's already been

3  admitted as Government's Exhibit 138.

4             THE COURT:  It's now 3:30.  We got in at 2:00,

03:29:14  5  so an hour and a half.

6                  I need to talk to all the attorneys, and

7  everybody just remain in the courtroom.

8                  Sir, if you would care to take a break,

9  we're going to take a break.  I'll be in here with the

03:29:24  10  attorneys for about -- what -- five minutes?  So we'll take

11  a break until 10 minutes to 4:00, but we'll be here on a

12  matter.

13                 So if everybody would stand and the jury

14  can take a break.

03:29:37  15                Mr. Flynn, if you want to step down and --

16  **(The following was held out of the presence of the jury)**

17             THE COURT:  All right.  Be seated, please.

18                  This is just one, only one of the

19  alternatives that I want to suggest to the attorneys.  I've

03:30:31  20  been noting that Mr. Stanford during at least the last half

21  of this last witness, bent over his desk, holding his head

22  and glasses off, glasses on.  So but what I want you to do,

23  okay, defense counsel, visit with your client.  If there's

24  some reason he's uncomfortable in the courtroom or needs to

03:30:54  25  even lay down, I have a rig in the room right behind my

1  office; all right?  There's chairs, there's a Lazy Boy in

2  there and there's even a couch.  And if that's the case, he

3  can stay in and he can listen to the evidence, and one of

4  his attorneys and, of course, the Marshals will have to be

03:31:13   5  with him at the same time, but I'm just giving you that

6  option.  You need to confer with your client, and if at any

7  time he feels like he's not feeling well, I'm going to just

8  mention to you, okay --

9              MR. SCARDINO:  Yes, sir.

03:31:25   10             THE COURT:  -- that that's the option.  He can

11  sit in there and listen with an attorney so he hears what

12  goes on.  The case is going to continue.

13                  We'll see you back in a little less than

14  20 minutes.

03:31:35   15             MR. FAZEL:  Yes, sir.

16              **(Recessed at 3:31 p.m.)**

17         **(The following was held before the jury)**

18              THE COURT:  Thank you.  Be seated.

19                  Go right ahead, Mr. Warren.

03:57:26   20             MR. WARREN:  Thank you, Your Honor.

21  BY MR. WARREN:

22  **Q.**   Mr. Flynn, do you have Government's Exhibit 138 in

23  front of you?

24  **A.**   Yes.

03:57:35   25  **Q.**   What is this document, sir?

1   **A.**   It is a monthly report from Stanford International

2   Bank.

3   **Q.**   From what month?

4   **A.**   From December of 2008.

03:57:53   5   **Q.**   Do you recall receiving this report from Stanford?

6   **A.**   Yes.

7   **Q.**   What was going on at the time?

8   **A.**   Around this time, the Madoff Ponzi scheme came to

9   light.

03:58:09   10   **Q.**   At that time, did you -- what were you thinking with

11   regard to your CDs?

12   **A.**   As we had done in September, we called our financial

13   advisor again and received the reassurance that our

14   certificates of deposit were safe.  And, so, we had

03:58:30   15   subsequent telephone calls with our financial advisor.

16   **Q.**   If I could focus you on the --

17           THE COURT:  Now, financial advisor, your

18   personal one or the advisor with the Stanford Group?

19           THE WITNESS:  The Stanford Group Company's

03:58:43   20   financial advisor, Mr. Douglas Shaw.

21           THE COURT:  Okay.

22   BY MR. WARREN:

23   **Q.**   Just to clarify Your Honor's question, Mr. Flynn, was

24   Mr. Shaw, your personal advisor, also the same advisor who

03:58:57   25   had been for 3D International's 401(k) accounts?

*Direct-Flynn/By Mr. Warren*

1    **A.**   Yes.

2    **Q.**   If I could focus your attention on the second

3    paragraph of text.  If I could ask you to read the first

4    sentence of that paragraph, please, beginning with "One of

03:59:19   5    the biggest."

6    **A.**   "One of the biggest topics in the news at this time

7    is Bernard Madoff's hedge fund collapse and the companies

8    and investors impacted."

9    **Q.**   If you just skip down to the last sentence in that

03:59:34   10   paragraph beginning with "also," can you read that as well

11   for the jury, please?

12   **A.**    "Also, SIBL has never made a structured loan or a

13   commercial loan.  All loans are cash secured and to SIBL

14   clients only at a maximum 70 percent loan to 100 percent

03:59:59   15   cash collateral ratio."

16   **Q.**   At the time -- or after the Madoff Ponzi scheme

17   became public, do you recall receiving this letter and

18   reading that information about the loans, the lack of

19   commercial loans that SIBL claimed to make?

04:00:18   20   **A.**   Yes.  And that was consistent with previous

21   representations that had been made to us by our Stanford

22   Group Company's financial advisor.

23   **Q.**   And if you could continue reading the last paragraph

24   that's there, beginning with "The bank's investment

04:00:32   25   strategy"?

*Direct-Flynn/By Mr. Warren*

1  A.    "The bank's investment strategy has always been

2  long-term, hands-on and globally diversified with strong

3  liquidity and minimal leverage.  SIBL has never had to

4  chase -- short-term and shortsighted returns for

04:00:59  5  shareholders."

6  Q.    Mr. Flynn, if I could direct you to the second page

7  of that document, the first full paragraph, the left

8  column towards the middle of the page.

9  A.    Yes.

04:01:16  10  Q.    Could you read starting with "The bank"?

11  A.    "The bank also maintains the following insurance

12  coverage through Lloyd's and other underwriters:  Banker's

13  blanket bond, directors and officers liability,

14  professional liability, errors and omissions, and excess

04:01:40  15  FDIC."  Shall I continue?

16  Q.    Please.

17  A.    "This extensive insurance program has been in place

18  for years and requires that a regular review of the bank's

19  risk management practices be conducted to determine that

04:01:55  20  adequate safeguards are in place."

21  Q.    At the time you received this, did that information

22  address concerns you had about what was going on with

23  regard to your CDs?

24  A.    Not so much this letter as the telephone

04:02:07  25  conversations on the same subject that we had with our

*Direct-Flynn/By Mr. Warren*

1    Stanford Group Company's financial advisor.

2    **Q.**   And is what Mr. Shaw told you consistent with what's

3    in this letter with regard to the insurance?

4    **A.**   Yes, it is.

04:02:20   5    **Q.**   And what about the last paragraph that we looked at

6    about the bank's investment strategy being globally

7    diversified and strong liquidity, did you discuss that at

8    the time with Mr. Shaw?

9    **A.**   I don't recall.

04:02:33   10   **Q.**   If you could continue reading where it says "Although

11   our earnings" in the top of the next page.

12   **A.**   "Although our earnings will not meet expectations in

13   2008, Stanford International Bank, Limited, is strong,

14   safe and fiscally sound."

04:02:49   15   **Q.**   Was that consistent with what Mr. Shaw told you at

16   this time?

17   **A.**   Yes.

18   **Q.**   And did that address your concerns about what was

19   going on with the economy after Madoff?

04:02:58   20   **A.**   Yes, in part, but Mr. Shaw also told us that

21   Mr. Stanford had made a very substantial personal

22   investment in the bank in order to assure liquidity,

23   hundreds of millions of dollars.

24   **Q.**   Now, if you could keep reading, actually, from there.

04:03:23   25   **A.**   "We have always believed that depositor's safety was

*Direct-Flynn/By Mr. Warren*

1    our number one priority.  To further support the bank's

2    growth and provide a strong cushion for any further market

3    volatility, the bank's board of directors made a decision

4    to increase the bank's capital by 541 million on

04:03:46   5    November 28, 2008."

6    **Q.**   Is this consistent with what Mr. Shaw told you about

7    Mr. Stanford having made a capital contribution to the

8    bank?

9    **A.**   Yes.

04:03:55   10   **Q.**   Do you see the next line there's a reference to the

11   contribution brings total of shareholder equity to over a

12   billion dollars?

13   **A.**   Yes.

14   **Q.**   Did you discuss that with Mr. Shaw as well?

04:04:06   15   **A.**   I don't believe so.

16   **Q.**   Did the information in this document and that

17   provided to you by Mr. Shaw consistent with this document

18   convince you to keep your money in the SIB CDs at this

19   time in December of 2008?

04:04:22   20   **A.**   Yes, and that remained our position until early in

21   January of 2009.

22   **Q.**   What happened in early January of 2009, sir?

23   **A.**   My wife and I determined that it would be prudent for

24   us to take a break for several months or even several

04:04:41   25   years and redeem our certificates of deposit.

*Direct-Flynn/By Mr. Warren*

1   Q.   And how did you try to redeem your certificates of

2   deposit?

3   A.   We called our Stanford Company's financial advisor

4   and told him we wanted to do that.

04:04:55   5   Q.   You said January of 2009.  Do you recall what part of

6   the month, beginning, middle or the end?

7   A.   I don't recall specifically.  I would estimate that

8   it was around the middle of the month.

9   Q.   Did you try to redeem all of your CDs?  You said you

04:05:13   10   held multiple CDs at that time; correct?

11   A.   Yes.  We told him we wanted to redeem all of our CDs.

12   We were going to keep the funds with Stanford Group

13   Companies, but we wanted to put them in a different type

14   of investment.

04:05:28   15   Q.   And had you been told before, both before you ever

16   purchased the first CD and subsequently, that you had the

17   option of withdrawing your funds if you wanted to?

18   A.   Yes, that was a very important part of our decision

19   to invest these CDs.  We knew that we would have to pay

04:05:47   20   several months' penalty in order to do that, but we were

21   willing to do that at that point in time.

22            We were quite surprised when Mr. Shaw told

23   us that they had frozen the accounts a week before our

24   telephone conversation.

04:06:03   25   Q.   What do you mean by that?

*Direct-Flynn/By Mr. Warren*

1   **A.**   That they said that we could not close our CDs or

2   withdraw our funds.

3   **Q.**   Were you able to redeem any of the CDs?

4   **A.**   Mr. Shaw indicated that we would be able to redeem

04:06:21   5   the interest that had been earned on the CDs while they

6   were in place, and, so, we told him we wanted to do that.

7   And --

8   **Q.**   Were you able to redeem the interest on the CDs?

9   **A.**   No.   The paperwork seemed to be quite cumbersome, and

04:06:39   10   we were not able to do so.

11   **Q.**   Did you attempt to?   Did you submit --

12   **A.**   Yes.

13   **Q.**   -- paperwork to do so?

14   **A.**   Yes, we did.   And we did submit paperwork to Stanford

04:06:50   15   Group Companies, you know, all of the different forms that

16   we had to sign in order to do that.

17   **Q.**   Now, Mr. Flynn, you said that this was happening in

18   January 2009, the middle part of the month, if I recall

19   your testimony?

04:06:59   20   **A.**   That is correct.

21   **Q.**   Do you remember when the receiver took over Stanford

22   International Bank?

23   **A.**   That's the date that's etched in my memory,

24   February 17th.

04:07:10   25   **Q.**   And would that date be before or after you tried to

*Direct-Flynn/By Mr. Warren*

1  redeem your CDs unsuccessfully?

2  **A.**   After.

3  **Q.**   And, so, the receiver, if I understand your

4  chronology correctly, came in after you were told you

04:07:21  5  wouldn't be allowed to redeem your CDs?

6  **A.**   Yes, that is correct.

7  **Q.**   Mr. Flynn, what ultimately happened with your CDs?

8  **A.**   Several months after the receiver took over, we

9  received a statement saying that all of our CDs had zero

04:07:37  10  value.

11  **Q.**   How much were your CDs worth at the time in total?

12  **A.**   $1,927,000.

13  **Q.**    Mr. Flynn, is it fair to say that you were paid

14  every penny on your CDs?

04:07:54  15  **A.**   Absolutely not.  We never withdrew a penny, and every

16  penny that we invested was lost.

17  **Q.**   Was the financial soundness of Stanford International

18  Bank important to your decision to purchase and maintain

19  your CDs?

04:08:13  20  **A.**   Absolutely.

21  **Q.**   Was the accuracy of Stanford International Bank's

22  financial statements important to your decision to

23  purchase and your decision to maintain your CDs?

24  **A.**   Yes.

04:08:23  25  **Q.**   What about the accuracy of SIB's marketing materials,

*Direct-Flynn/By Mr. Warren*

1    such as the 2005 annual report that we looked at, was that

2    important to your decision to purchase and your decision

3    to subsequently purchase CDs?

4    **A.**    Yes.

04:08:37    5    **Q.**    And what about your decision to maintain those CDs

6    rather than redeeming them?

7    **A.**    Yes.

8    **Q.**    Mr. Flynn, would you have purchased any CDs from

9    Stanford International Bank if you had known that only a

04:08:48    10    fraction of the bank's asset portfolio was invested, as

11    you had been told, in liquid safe investments?

12    **A.**    The investment next that we were told about was very

13    important to our decision to proceed with the purchase.

14    **Q.**    And would you have purchased those CDs if you had

04:09:08    15    known that only a small portion of the bank's assets were

16    actually invested in those types of assets?

17    **A.**    No.

18    **Q.**    Your first purchase was in August of 2006; correct?

19    **A.**    Yes.

04:09:20    20    **Q.**    Would you have purchased that first CD in August

21    of 2006 if you had known it at the time Mr. Stanford had

22    over $1 billion in loans taken out of the bank?

23    **A.**    No.  I would have regarded that as a conflict of

24    interest.

04:09:36    25    **Q.**    Mr. Flynn, you purchased additional CDs in 2007 and

*Direct-Flynn/By Mr. Warren*

1    2008; correct?

2    **A.**    Yes.

3    **Q.**    Would you have done so if you had known that as of

4    the end of 2007, Mr. Stanford had taken $1.6 billion out

04:09:48    5    of the bank?

6    **A.**    Absolutely not.

7    **Q.**    Now, in late 2008, we just looked at that December

8    report, you said that you decided to keep your CDs

9    invested; correct?

04:10:00    10    **A.**    Yes.

11    **Q.**    Would you have done so if you had known that as of

12    the end of 2008, Mr. Stanford had taken $2 billion in

13    loans out of Stanford International Bank?

14    **A.**    No.

04:10:15    15    **Q.**    Were you ever told that SIB's investment portfolio

16    included a holding company for Mr. Stanford's personal

17    yacht?

18    **A.**    No.

19    **Q.**    Would that have mattered?

04:10:24    20    **A.**    Yes.

21    **Q.**    Were you ever told that SIB's investment portfolio

22    included Caribbean airline companies?

23    **A.**    No.

24    **Q.**    Would that have mattered?

04:10:33    25    **A.**    Possibly, but not necessarily.

*Direct-Flynn/By Mr. Warren*

1  **Q.**   Were you ever told that SIB's investment portfolio

2  included a nonprofit company that promoted the sport of

3  cricket?

4  **A.**   No.

04:10:52  5  **Q.**   Would you have purchased CDs if you had been aware of

6  any of this?

7  **A.**   No.

8  **Q.**   Mr. Flynn, how has the loss affected you and your

9  family?

04:11:02  10  **A.**   It's been a pretty severe loss.  We've eaten a lot of

11  macaroni and cheese.  I've become pretty good selling our

12  assets on eBay.  We sold our car.  We sold my target

13  pistols.  We sold wristwatches.  We've really had to cut

14  back and restrict everything that we've done.

04:11:27  15              And currently our expenses are about

16  $2,500 more than the income we receive from Social

17  Security and disability, and one of my major concerns is

18  what we're with going to do.

19              MR. MCGUIRE:  Your Honor, at this point I'd

04:11:46  20  object to narrative.

21              THE COURT:  Sustained.

22  BY MR. WARREN:

23  **Q.**   Mr. Flynn, what are your concerns now having lost

24  that amount of money?

04:11:53  25              MR. MCGUIRE:  Your Honor, I object to the

1  relevance.

2                  THE COURT:  Overruled.

3                      You want to pull that mike in, Counsel,

4  because I can't hear you too well when you stand up.

04:12:00    5                      Okay.

6                  THE WITNESS:  Repeat the question, please.

7  BY MR. WARREN:

8  **Q.**   Sure.  What are your present concerns now after

9  having lost $1.9 million of money that was promised to

04:12:10   10  you?

11  **A.**   I have two sets of concerns:  One is what happens to

12  my wife if I should not be around, and the second is what

13  happens to both of us when the little bit of money that we

14  have in the bank now runs out.

04:12:28   15  **Q.**   Mr. Flynn, did the financial loss force you to forego

16  any medical treatment for your congenital heart condition?

17                  MR. MCGUIRE:  Your Honor, again --

18                  THE COURT:  I can't hear you.

19                  MR. MCGUIRE:  I would object to the relevance,

04:12:41   20  Your Honor.

21                  THE COURT:  Overruled.

22                  THE WITNESS:  Yes.  In October, my doctors

23  suggested that I go off of steroids and on --

24                  MR. MCGUIRE:  Object to the hearsay, Your

04:12:48   25  Honor.

*Cross-Flynn/By Mr. McGuire*

1           THE COURT:  Overruled.  This is a medical

2   diagnosis.  I'll allow it in.

3           THE WITNESS:  That I go off of steroid

4   treatment, which I've been on for five years, and go to a

5   newly prescribed -- newly marketed drug that would replace

6   the steroids.

7   BY MR. WARREN:

8   **Q.**   Mr. Flynn, are you able to afford that drug?

9   **A.**   It turned out that the drug was too new to be on the

10  Medicare formulary, so I would have to pay for it myself.

11  And we could not afford the approximate $2,500 that it

12  would month it cost, and, so, we did not go on it.

13  **Q.**   Thank you.

14          MR. WARREN:  Court's indulgence.

15              Pass the witness, Your Honor.

16          MR. MCGUIRE:  May I proceed?

17          THE COURT:  Yes, sir.

18                      **CROSS EXAMINATION**

19  BY MR. MCGUIRE:

20  **Q.**   Mr. Flynn, you testified a little bit earlier about

21  your educational background; is that correct?

22  **A.**   Yes.

23  **Q.**   And you have a bachelor's degree?

24  **A.**   Yes.

25  **Q.**   And also a master's degree from -- both from Penn?

1   **A.**   Yes.

2   **Q.**   And you also had a long career as an architect

3   engaging in construction management?

4   **A.**   Yes.

04:14:35   5   **Q.**   And that included engaging in construction projects

6   overseas?

7   **A.**   Yes.

8   **Q.**   So you're fairly familiar with contracts and complex

9   projects?

04:14:58   10   **A.**   I'm fairly familiar with implementing complex

11   projects.  And I've read many contracts, although our

12   company had a legal team that actually put together the

13   contracts for us.

14   **Q.**   Right.  And, in fact, around this time, you were also

04:15:16   15   engaged in some litigation; is that correct?

16   **A.**   Yes.

17   **Q.**   And you had an attorney as well who was representing

18   you in that litigation?

19   **A.**   Yes.

04:15:24   20   **Q.**   Can you tell us what that litigation was involved in?

21   **A.**   Yes.  When I retired from 3DI, one of the

22   requirements was that you sell your stock back to the

23   company.  I did so.  And several months later, about six

24   months later, the company was purchased by Parsons

04:15:46   25   Corporation of California at a substantially higher value

1    than I had been paid.

2                 And, so, that litigation had to do with

3    being compensated the difference between what I had been

4    paid and what the inquiring company paid for the company.

04:16:04   5    **Q.**    And you felt you had not gotten all the money that

6    you deserved in that case?

7    **A.**    That's correct.

8    **Q.**    And you brought a lawsuit?

9    **A.**    Yes.

04:16:17   10   **Q.**    And ultimately I understand you obtained a settlement

11   that was favorable to you?

12   **A.**    Yes.

13   **Q.**    Now, before you invested in the Stanford Group

14   Company, you were invested in other investments?

04:16:41   15   **A.**    My 401(k) was invested in various mutual funds.  My

16   IRA was invested in 3DI stock.

17   **Q.**    So you've made investment decisions in the past

18   before you had your IRA transferred to Stanford Group?

19   **A.**    With the benefit of financial advice, yes.

04:17:06   20   **Q.**    Okay.  Did you -- have you ever lost any money in the

21   past during any of the prior kind of stock market

22   downturns that we've had?

23   **A.**    Over my 40 years of -- in the business, we invested

24   occasionally in various kinds of investment products and

04:17:31   25   never made any money; often lost money.

1    Q.   I feel with you because I've also made investments

2    and lost money over the years, although not over the

3    extended period you have.

4                       But isn't it correct that, in the markets,

04:17:47    5    stocks go up, they go down, sometimes some are up, some

6    are down and it's a risky place to put your money

7    inherently?

8    A.   Yes, the stock market particularly is like that.

9    However, I would point out to you that we did not think

04:18:01    10   that the certificates of deposit would have the same kinds

11   of risk.

12   Q.   I understand.  But mutual funds that you claim --

13   that you've invested in, in the past also have ups and

14   downs in them; correct?

04:18:14    15   A.   I believe so.

16   Q.   In stocks have had ups and downs over the years?

17   A.   I have not invested in any stocks that I can recall,

18   so I don't know how to answer that question.

19   Q.   Okay.  Was it primarily mutual funds?

04:18:31    20   A.   Yes.

21   Q.   But mutual funds, to your understanding, is that

22   correct, that they contain sometimes groups of stocks,

23   sometimes groups of bonds, sometimes a mix of both?

24   A.   Yes.

04:18:40    25   Q.   Okay.  And in those, you've had ups and downs over

*Cross-Flynn/By Mr. McGuire*

1    the years?

2    **A.**   Yes.

3    **Q.**   And you've lost money over the years?

4    **A.**   Net, we've had gains; but during that course of time,

5    there have been some years of loss.

6    **Q.**   Right.  And in 2008 where we've just been talking

7    about, it was actually one of the worst financial years

8    we've probably had since the are great depression.

9                    Would you say that's accurate?  2008 and

10   2009?

11   **A.**   Well, I'm not an expert, by any means, and I've never

12   really tracked the history of the stock market, but I

13   would say it was a bad year.

14   **Q.**   Okay.  And I would agree with you, because I lost

15   money that year and I've lost money before.

16                    And that's part of being involved in stock

17   market investing, wouldn't you say?

18   **A.**   In stock market investing, yes.

19   **Q.**   And also mutual funds?

20   **A.**   Yes, as a consequence of the mutual funds investment

21   in various kinds of stocks.

22   **Q.**   Okay.  Now, you reviewed the offering documents from

23   SIB or from Stanford International Bank before you signed

24   them; is that correct?

25   **A.**   I perused the various documents.  I don't think it

*Cross-Flynn/By Mr. McGuire*

1   would be accurate to say that I reviewed them.

2   **Q.**   And do you recall what documents that you had to

3   review and sign before you purchased your first CD?

4   **A.**   No, I don't recall at this time.

04:20:31   5          MR. MCGUIRE:  If we could put up Government's

6   Exhibit 131.

7                Judge, could we switch to that input?

8          THE COURT:  Going to which one?  Back there?

9   Okay.

04:20:57   10          MR. MCGUIRE:  If you would go to Page 3 of the

11   disclosure statement.

12                Well, actually, if we could go back to the

13   first page.  Couple of pages, please.

14   BY MR. MCGUIRE:

04:21:20   15   **Q.**   I'm sorry.  Can you see that, Mr. Flynn?

16   **A.**   No.

17   **Q.**   Can you see it on your screen now?

18   **A.**   No.  There's a little box floating around in my

19   screen.

04:21:43   20          MR. MCGUIRE:  His screen is not on, Your Honor.

21          THE COURT:  That's -- again.  Let's see.  Let

22   me just double-check.

23          MR. WARREN:  Your Honor, I have a hard copy.

24          THE COURT:  All right.  But we need to get this

04:22:08   25   straightened out.

1          That's out again.  Let me stop your time.

2  Hang on a sec.  What did you do?

3          WE got it now.  Do you have it there, sir?

4          THE WITNESS:  No, sir.

04:23:02  5          THE COURT:  Still don't.

6          Wait a second.  I'll stop the time.

7          MR. MCGUIRE:  Judge, I could --

8          THE COURT:  No.  Let's get it straight, if we

9  can.  We did get that before, if he's got a copy of it now.

04:24:26  10          THE WITNESS:  Your Honor, in the interest of

11  time, I can't read what's on that box, in any event.

12          THE COURT:  Okay.  Angle it back.  I'm sorry.

13  Let's get moving.  That's fine.

14          CASE MANAGER:  Sorry.

04:24:39  15          THE COURT:  It's not your fault.  All right.

16  Go right ahead.

17          MR. MCGUIRE:  Can I inquire, Judge, can the

18  witness see what's on the screen right now or --

19          THE COURT:  Either that or he has a hard copy

04:24:59  20  in front of him.

21          MR. MCGUIRE:  He has a hard copy.  Okay.

22  BY MR. MCGUIRE:

23  Q.  Mr. Flynn, anyway, you have a hard copy there.

24  You're looking although Page 1 or the cover page -- excuse

04:25:03  25  me.

1                   Can you see that?

2   **A.**   It says "Disclosure Statement"?

3   **Q.**   Disclosure statement; correct?

4   **A.**   Yes, sir.

04:25:11   5   **Q.**   Do you recall this document?

6   **A.**   No.

7   **Q.**   You don't?

8   **A.**   No, sir.

9   **Q.**   You don't think you ever reviewed that?

04:25:17   10   **A.**   No.  I received a lot of documents, and a long time

11   ago, so I simply don't recall the specific documents.

12   **Q.**   Well, I'll go back to that in a minute, but let me

13   see if you can recall this document.

14             MR. MCGUIRE:  I believe it's Mr. Flynn's first

04:25:51   15   exhibit or the subscription agreement.  That's the one.

16   Okay.

17   BY MR. MCGUIRE:

18   **Q.**   Now, looking -- can you see that, Mr. Flynn?

19             MR. WARREN:  Your Honor, I would object.  This

04:26:23   20   document is not in evidence yet.

21             THE COURT:  It's not.  Take it down, please.

22   BY MR. MCGUIRE:

23   **Q.**   Mr. Flynn, I'd like to show you this document and see

24   if you recognize it.

04:26:39   25             MR. WARREN:  Counsel, what document is it?

*Cross-Flynn/By Mr. McGuire*

1        MR. MCGUIRE:  I think it's -- the number, it's

2   the subscription agreement.

3        MR. WARREN:  What number -- you got it.

4   BY MR. MCGUIRE:

04:27:05   5   **Q.**   Okay.  Mr. Flynn, seeing the cover page of that, can

6   you see what that says?

7   **A.**   Excuse me.  "Subscription Agreement Investor

8   Questionnaire, U.S. Accredited Investors Certificate of

9   Deposit Program, Private and Confidential, December 2004."

04:27:32   10  **Q.**   Okay.  If I could show you -- first of all, do you

11  recall seeing this document?

12  **A.**   I do not.

13  **Q.**   Okay.  And I'm showing you what's Page 2 of that

14  document.

04:27:48   15       Do you recognize the signature there?

16  **A.**   Yes, I do.  It is my signature.

17  **Q.**   Okay.  So you signed this document on, it looks like,

18  the 9th of August of 2006?

19       MR. WARREN:  Your Honor, I would just object to

04:28:03   20  counsel reading from a document that's not in evidence.

21       THE COURT:  Sustained.  Sustained.

22  BY MR. MCGUIRE:

23  **Q.**   Well, Mr. Flynn you did sign this document?

24  **A.**   Yes.

04:28:12   25  **Q.**   Okay.  Seeing your signature on it, do you recall it

1  now?

2  **A.**   No, sir.

3  **Q.**   But that is your signature?

4  **A.**   It appears to be my signature, yes, sir.

04:28:21  5  **Q.**   Okay.  Do you have any reason to believe it's not

6  your signature?

7  **A.**   No.

8  **Q.**   Now let me ask you, on Page 3, do you also see some

9  handwriting there?

04:28:34  10  **A.**   Yes.

11  **Q.**   And is that your handwriting?

12  **A.**   I don't think so.

13  **Q.**   Okay.  Now, I'm showing you another page that has a

14  signature on it.

04:28:58  15            Do you recognize that signature?

16  **A.**   That looks like my signature.

17  **Q.**   Okay.  And do you recall seeing this document

18  previously?

19  **A.**   No, sir.

04:29:07  20  **Q.**   There's also another signature on there.

21            Do you recognize that signature?

22  **A.**   I don't recognize the signature, but I recognize the

23  name Patricia Flynn.  That is my wife.

24  **Q.**   Okay.  And do you think that's her signature?

04:29:23  25  **A.**   Probably.

*Cross-Flynn/By Mr. McGuire*

1    Q.   Okay.  Now, there's another page.  Here again,

2    there's a signature on that page.

3                      Do you recall -- do you recognize that

4    signature?

04:29:38   5    A.   Looks like my signature.

6    Q.   Okay.  Do you recall that document?

7    A.   No, sir.

8    Q.   And then we have another -- the next page behind it,

9    that also has a signature on it.

04:29:58  10                      Do you recognize that signature?

11   A.   Again, it looks like my signature.

12   Q.   Okay.  And seeing all your signatures on this

13   document, do you now recall having signed those?

14   A.   No.  Lots of documents, lots of signatures, and I

04:30:21  15   don't recall the specific documents.

16   Q.   Okay.  But you do believe that's your signature?

17   A.   Probably, yes.

18                MR. MCGUIRE:  Your Honor, at this time I would

19   offer Defendant's 51.

04:30:32  20                MR. WARREN:  Objection, Your Honor.  Aside from

21   the problem of authentication, this is a hundred-page

22   document with lots of interoffice memos, faxes.

23                THE COURT:  When was the first time you knew

24   that was going to be offered today?

04:30:44  25                MR. WARREN:  I believe it was given to us last

*Cross-Flynn/By Mr. McGuire*

1 night, Your Honor.  But that's not the concern.

2                The government's concern is that it hasn't

3 been authenticated.  It's hearsay.

4                THE COURT:  Do you recognize that, sir?

04:30:54    5                THE WITNESS:  No, sir.

6                THE COURT:  All right.  Does that appear to be

7 your signature.

8                THE WITNESS:  It appears to be my signature,

9 yes, sir.

04:31:00   10                THE COURT:  Is it an original or is it a copy?

11 Is it an original or a copy?

12                MR. MCGUIRE:  It's a copy, Your Honor.  And

13 we're not offering it for the truth of the matter asserted,

14 just that he recognizes his signature.

04:31:12   15                THE COURT:  Sustain the objection.  I mean it

16 goes to whatever the jury wants to give it.  I'm not

17 striking it, but it's not in evidence.

18                MR. MCGUIRE:  Okay.

19 BY MR. MCGUIRE:

04:31:24   20   **Q.**   Mr. Flynn, do you recall having to sign papers in

21   order to purchase a CD?

22   **A.**   Yes.

23   **Q.**   And we've looked at some documents that you agree it

24   looks like your signature?

04:31:37   25   **A.**   Yes.

1    Q.   And they have to do with the CD program?

2    A.   I didn't look at them closely enough to make sure

3    that they all had to do with the CD program.  I signed

4    lots of documents for Stanford Group Company and other

04:31:51    5    things.  But the first document you showed me was for the

6    CD program.

7    Q.   Okay.  And Government's Exhibit 131, the disclosure

8    statement, you don't recall ever having reviewed that or

9    signed that -- or excuse me -- reviewed it?

04:32:17    10    A.   I'm not saying that I didn't, but I simply do not

11    recall having done so.

12    Q.   Okay.  Well, if we could go to Page 3 of the exhibit.

13    A.   The disclosure statement?

14    Q.   Yes.  It's actually marked at the bottom, Mr. Flynn.

04:32:41    15    A.   Page 3?

16    Q.   Yes.

17              MR. MCGUIRE:  Your Honor, because he can't see

18    the highlights on the screen, if I could point out with the

19    parts.

04:32:50    20              THE COURT:  Absolutely.

21              THE WITNESS:  I can't read this type.

22    BY MR. MCGUIRE:

23    Q.   It's too small?

24    A.   Yes, sir.

04:32:59    25              THE COURT:  Can you blow that up?  Oh, that's

*Cross-Flynn/By Mr. McGuire*

1  on your -- that's on the overhead projector.

2           MR. MCGUIRE:  Yes, to be blown up, but --

3           THE COURT:  Well, what I'm saying, that's not

4  on the overhead projector.  There we go.

04:33:13  5           Does that help at all, sir?

6           THE WITNESS:  Yes.

7  BY MR. MCGUIRE:

8  **Q.**  Can you read that?

9  **A.**  Excuse me.  Yes.

04:33:18  10  **Q.**  You can read that, Mr. Flynn?  Okay.

11  **A.**  "The viability of the U.S. Accredited" --

12  **Q.**  Actually, that's not the page.  We'll get to that in

13  a minute, Mr. Flynn.

14           MR. MCGUIRE:  On Page 3, the -- I'm sorry --

04:33:44  15  Page 3 of the PDF.  There we go.

16           Okay.  The sentence starting at "You" on

17  the first paragraph, could you highlight that?

18  BY MR. MCGUIRE:

19  **Q.**  Sentence starting with "you," could you read that

04:34:11  20  sentence, Mr. Flynn?

21  **A.**  "You should carefully consider the information set

22  forth" -- I can't make out the end of that sentence.

23           Next sentence, "affecting SIBL and the

24  U.S. Accredited Investors CD Program."

04:34:40  25           I think the end of it is just a little bit

Cross-Flynn/By Mr. McGuire

1  out of my focus.

2  Q.   I'm sorry, Mr. Flynn.  I didn't know you couldn't

3  read so well.  But does that help if you look at it up

4  close?

04:34:52  5  A.   No, sir.

6            THE COURT:  All right.  Okay.  What do you need

7  to read?  Do you want to read it?

8            MR. MCGUIRE:  I can read it, Your Honor.

9            THE COURT:  Read it, please.

04:34:58  10  BY MR. MCGUIRE:

11  Q.   Now, Mr. Flynn the document says, "You should

12  carefully consider the information set forth under risk

13  and other factors affecting SIBL and the U.S. Accredited

14  Investor CD program on Pages 3, 4 and 5, and disclaimers

04:35:18  15  on Pages 1, 2, 6, 7, 10, 11, 12, 13 and 16."

16            Do you recall ever reading that?

17  A.   I do not recall that.

18            MR. MCGUIRE:  And lower in the same document

19  where -- the bottom paragraph, if you could highlight that

04:35:38  20  and pull that up.

21  BY MR. MCGUIRE:

22  Q.   It says that, "SIBL's products are not subject to the

23  reporting requirements of any jurisdiction, nor are they

24  covered by the investor protection or securities insurance

04:35:51  25  laws of any jurisdiction, such as the U.S. Securities

*Cross-Flynn/By Mr. McGuire*

1  Investor Protection Insurance Corporation."

2              And I'll stop right there before I go to

3  the rest of it.

4              But, Mr. Flynn, you didn't read that

5  either?

6  **A.**   No.

7  **Q.**   Do you know what the U.S. Securities Investor

8  Protection Insurance Corporation is?

9  **A.**   I did not know at the time, but I know now.

10 **Q.**   Okay.  Now, the next sentence says, "The CD deposits

11 and the CD certificate are not insured by the Federal

12 Deposit Insurance Corporation or any other agency of the

13 United States Government or any state jurisdiction, or by

14 any insurance program of the Government of Antigua and

15 Barbuda."

16              Do you recall reading that before you

17 purchased your CD?

18 **A.**   No, sir.

19 **Q.**   Do you understand what that sentence means?

20 **A.**   I think so.

21 **Q.**   And that it's not FDIC insured?

22 **A.**   Yes, sir.

23 **Q.**   In other words, it has no insurance for you, the

24 depositor, under the FDIC program?

25 **A.**   Yes, sir.

1    Q.   Now, let me ask you:  What do you know about the FDIC

2    program?  And if you don't know, that's fine.

3    A.   I know it stands for Federal Deposit Insurance

4    Corporation.  It's an insurance program that's offered by

04:37:16    5    the United States banks, and that's about all I know about

6    it.

7    Q.   Do you know how much insurance FDIC offers when you

8    put money into a bank, a CD in a bank or any bank account?

9    A.   No.

04:37:31    10    Q.   Would it surprise you to know that you're only

11   covered up to a hundred thousand dollars?

12             MR. WARREN:  Objection, Your Honor.

13             THE COURT:  FDIC.

14             MR. MCGUIRE:  I believe at the time, that's

04:37:40    15   what it was, Your Honor.  I believe it's higher now, but at

16   the time --

17             THE COURT:  Okay.  What's your objection?

18             MR. WARREN:  To the relevance of FDIC

19   insurance, Your Honor.

04:37:48    20             MR. MCGUIRE:  Judge --

21             THE COURT:  Hold it.  Overruled.

22   BY MR. MCGUIRE:

23   Q.   Let me ask you again, Mr. Flynn.

24             THE COURT:  What year are you talking about?

04:37:59    25             MR. MCGUIRE:  In 2005.  I believe 2005 and

*Cross-Flynn/By Mr. McGuire*

1  2006, Judge.

2  BY MR. MCGUIRE:

3  **Q.**   Now, at that time, were you aware, Mr. Flynn, that

4  FDIC insurance was only valid for a hundred thousand

04:38:09  5  dollars per bank?

6  **A.**   No.

7  **Q.**   Did you understand that if you had put $1.6 million

8  in a U.S. bank that had FDIC insurance, you only would be

9  covered for a hundred thousand dollars?

04:38:27  10  **A.**   No.

11  **Q.**   Okay.  But you didn't read this part of the

12  disclosure statement that said that there's no insurance

13  at all, not even that hundred thousand dollars?

14  **A.**   I don't recall reading it.

04:38:45  15  **Q.**   Okay.  Did you understand that the SIBL CD products

16  were not insured?

17  **A.**   I understood that they were not insured by FDIC.

18  **Q.**   And you also understood they were not insured by

19  SIPC?

04:39:04  20  **A.**   No.  I had no understanding whatever in regard to

21  that at the time.

22  **Q.**   Okay.  Now, in your -- I understand that you worked

23  overseas at some point?

24  **A.**   Yes.

04:39:20  25  **Q.**   And you managed construction projects overseas?

*Cross-Flynn/By Mr. McGuire*

1   **A.**   I managed the start-up of a development management

2   company for about a year, and during my time there, none

3   every time projects that I was involved with proceeded to

4   the construction phase.

04:39:41   5   **Q.**   And where was that?

6   **A.**   That was in Abu Dhabi in the United Arab Emirates.

7   **Q.**   How large was the project?  What was the cost

8   expected in that project?

9   **A.**   Well, there were a number of projects.  More than

04:39:57   10   $10 billion of work was coming to the company.

11   **Q.**   And did you have to sign any contracts to accomplish

12   any of that work with subcontractors or general

13   contractors or any kinds of folks like those?

14   **A.**   No.

04:40:12   15   **Q.**   Was your company going to do all the work?

16   **A.**   No.  We were involved in managing from a fairly high

17   altitude some of the aspects of planning, design, and

18   contractor selection.

19   **Q.**   So you did have contractors?

04:40:30   20   **A.**   During my time in that job, we did not have

21   contractors.

22   **Q.**   Okay.  I guess what I'm trying to ask you is:  You

23   understand that contracts are important to business;

24   correct?

04:40:42   25   **A.**   Yes.

*Cross-Flynn/By Mr. McGuire*

1   Q.   And when you sign a contract, you're going to be held

2   to the terms of the contract?

3   A.   I understand that.  I also understand that --

4           MR. MCGUIRE:  Your Honor --

04:40:57   5           THE COURT:  Yes.

6           MR. MCGUIRE:  I'd object to the nonresponsive.

7           THE COURT:  Why?  Sustained.

8           THE WITNESS:  Okay.

9   BY MR. MCGUIRE:

04:41:04   10   Q.   Now, you understand -- you understood that the CD you

11   purchased was a time deposit?

12   A.   The CDs had a five-year term.  Is that what you mean?

13   Q.   No.  Well, that they could have had a five-year term

14   and some had lesser terms; correct?

04:41:23   15   A.   I'm pretty certain they were all five years.

16   Q.   Is the first CD you bought, was it a five-year term?

17   A.   Pretty sure it was.

18           MR. MCGUIRE:  Okay.  Now, Page 9 of the PDF,

19   please.

04:41:44   20   BY MR. MCGUIRE:

21   Q.   Under the paragraph where it says "Global Investment

22   Portfolio," can you see that, Mr. Flynn?

23   A.   Partially.

24   Q.   Partially.  Okay.  I'll just read it for you and ask

04:42:03   25   you the question.

1             It states:  "The viability of the U.S.

2   Accredited Investors CD and ability of SIBL to pay

3   principal and interest on the CD deposits are dependent on

4   our ability and the ability of our portfolio managers to

04:42:17   5   consistently make profitable global investment decisions.

6   There can be no assurance that these decisions will

7   continue to yield profitable results for SIBL or cause the

8   investments made in the U.S. Accredited Investor CD or any

9   other products we offer to produce returns sufficient to

04:42:34   10   fund the payment obligations of the CD deposits.  Past

11   performance is not indicative of future results."

12             Do you recall reading that before you

13   purchased your first CD?

14   **A.**   I do not.

04:42:48   15   **Q.**   Is it safe to say that you didn't review this

16   document before you purchased your first CD?

17   **A.**   I don't recall.

18   **Q.**   Okay.

19             MR. MCGUIRE:  On Page 16 of the PDF, could you

04:43:32   20   pull that up, please.

21                  Now, if you could blow up the part

22   beginning "The funds deposited."

23   BY MR. MCGUIRE:

24   **Q.**   Can you see any of that, Mr. Flynn?

04:43:52   25   **A.**   No.

1  Q.   You have a copy of the disclosure statement in front

2  of you.  If you go to Page 10.

3                 Can you see the sentence starting, "The

4  funds deposited"?

04:44:24  5  A.   Partially.

6  Q.   Okay.  If I represent to you that it's states:  "The

7  funds deposited with us are primarily invested in foreign

8  and U.S. investment grade bonds and securities and Euro

9  dollar and foreign currency deposits.  The following data

04:44:51  10  shows our historical portfolio investments by specific

11  categories of investments and the approximate percentage

12  of funds invested for 2003, 2004, 2005 and 2006."

13                 Do you recall ever reviewing any of this

14  before purchasing any of your CDs?

04:45:09  15  A.   I don't recall.

16  Q.   Okay.  Now, you stated in your earlier testimony that

17  you understood that the bank invested in, among other

18  things, private equities?

19  A.   Yes.

04:45:27  20  Q.   Do you recall that?

21                 What is your understanding of private

22  equities?

23  A.   My understanding is that they would work with a

24  company that needed funds, and in return, they'd get a

04:45:44  25  piece of the equity rather than just a return -- an

1    interest rate return on the money that they provided to

2    that entity.

3    **Q.**   And, so, you understood that the bank was investing

4    in, among other things, private companies and they were

5    getting a percentage ownership of those companies?

6    **A.**   Not specifically, but that's my understanding of

7    private equity.

8    **Q.**   Okay.  For example, would a baseball team, a major

9    league baseball team, a percentage of that, would that

10   fall within your understanding of what a private equity

11   is?

12   **A.**   Possibly.

13   **Q.**   Okay.  For example, let's say -- have you ever heard

14   of the Washington Nationals baseball team?

15   **A.**   Yes.

16   **Q.**   And that's a major legal franchise?

17   **A.**   I believe so.

18   **Q.**   Okay.  And if that was not a publicly traded company,

19   you understood that companies such as that, not

20   specifically the Washington Nationals, but could have been

21   a company like the Washington Nationals, that would have

22   been something that the bank would have invested in?

23   **A.**   You know, as a part of a private equity.

24   **Q.**   Possibly.  And they didn't specifically state that

25   company or any other company, but that was the type of

1  company that the bank could have invested in?

2  **A.**   Possibly, yes.

3  **Q.**   Okay.  Now, were you concerned with the percentages

4  of the bank's investments as to what percentage they

04:47:32  5  invested in public equities, what percentage they invested

6  in private equities, what percentage they invested in

7  bonds, what percentage they invested in currencies.  Was

8  that something that concerned you?

9  **A.**   Not initially.

04:47:46  10  **Q.**   Okay.  When did it begin to concern you?

11  **A.**   I believe it was in the telephone conversation we had

12  with our Stanford Company's financial advisor in September

13  of 2008 when he indicated that 60 percent of the bank's

14  investment portfolio was in treasury bonds.

04:48:07  15  **Q.**   Okay.  Do you see anywhere on that document in front

16  of you or on the screen where it says that 60 percent was

17  invested in treasury bonds?

18  **A.**   I'm sorry.  I can't see it well enough to answer that

19  question.

04:48:29  20  **Q.**   You can't see it?

21  **A.**   I can't see it.

22  **Q.**   Have you seen any printed material from Stanford

23  investment bank showing that they invested 60 percent in

24  U.S. treasury bonds.

04:48:40  25  **A.**   I don't recall.

1    Q.   So if someone told you that, that would have been

2    your financial advisor?

3    A.   Yes.

4    Q.   And that's Mr. Shaw?

04:48:50    5    A.   Yes, sir.

6    Q.   Okay.  You don't ever recall having read that

7    anywhere in something printed by the bank?

8    A.   I don't recall.

9    Q.   Okay.  Can you see on the screen where it actually

04:49:09    10   has a line that shows treasury bonds?

11   A.   Yes, I can see that.

12   Q.   And it says, "Treasury bonds, notes, corporate

13   bonds"?

14   A.   I see that line.

04:49:21    15   Q.   Okay.  And can you read the percentage in the end of

16   2006 of what they were invested in?

17   A.   I'm guessing.  It's like taking an eye test.  I think

18   it's 2, 4.

19   Q.   I'll just --

04:49:48    20              MR. WARREN:  Counsel could read it.

21              THE COURT:  Why don't you just read them.

22              MR. MCGUIRE:  I'm happy to do that, Judge.

23   BY MR. MCGUIRE:

24   Q.   If I represent to you, Mr. Flynn, that it says

04:49:55    25   21.9 percent that is stated there, I mean, that's less

1    than 60 percent; correct?

2    **A.**    Yes, 21 percent is less than 60 percent.

3    **Q.**    And if it says treasury bonds, notes and corporate

4    bonds, obviously that's more than just treasury bonds;

5    correct?

6    **A.**    Yes.

7    **Q.**    Because it's actually three separate categories of

8    securities, and that's less than -- and altogether they're

9    21.9 percent?

10    **A.**    I can agree with that.

11    **Q.**    Okay.  And that's substantially less than 60 percent?

12    **A.**    Yes, it's substantially less than our investment

13    advisor told us.

14    **Q.**    And is it possible that Mr. Shaw could have just been

15    wrong about that?

16    **A.**    Well, he may have been misinformed.  And I suppose

17    it's possible he could have been wrong about that.

18    **Q.**    Okay.  You also testified about having been told

19    about a banker's blanket bond from Mr. Shaw.  Do you

20    recall that?

21    **A.**    He indicated something about Lloyd's of London

22    insuring the certificates of deposit for the benefit of

23    the depositors, but I don't recall him specifically

24    talking to us about a banker's bond.  He may have, but I

25    don't recall that.

*Cross-Flynn/By Mr. McGuire*

1   **Q.**   Okay.  Do you know what a banker's blanket bond is?

2   **A.**   No.

3   **Q.**   You have been represented by attorneys before;

4   correct?

5   **A.**   Yes.

6   **Q.**   And have you had accountants represent you, also, or

7   help you with your taxes?

8   **A.**   Yes, we have an accountant help us prepare our taxes.

9   **Q.**   Okay.  If you had any question about what a banker's

10  blanket bond was, do you think you could have asked your

11  attorney what that meant?

12  **A.**   No.  We didn't have an attorney who we were working

13  with.  If we had a question about that, we would have

14  asked Mr. Shaw.

15  **Q.**   But you have had an attorney in the past, and if you

16  had any confusion, you could have asked for that to be

17  explained to you?  I mean, you've hired attorneys before,

18  haven't you?

19  **A.**   You know, I hired attorneys before, but because of

20  the advice we received from our Stanford Company's

21  financial advisor who was a very professional

22  knowledgeable young fellow, I don't think we would have

23  even considered doing that.  We would have simply asked

24  him.

25  **Q.**   Okay.  But you testified that you did not read the

*Cross-Flynn/By Mr. McGuire*

1    disclosure statement that you have in front of you and all

2    the different terms and provisions that that has?

3    **A.**   No.  My testimony is that I don't recall reading any

4    of this information that you provided to me.

04:53:21   5    **Q.**   Okay.  Would it surprise you to know that you signed

6    a document stating you had reviewed that and -- carefully

7    and understood it before you purchased the CD or any CD?

8    **A.**   We've signed lots of documents.  I think when we did

9    our mortgage, the pile was this high.  We did not read and

04:53:48   10   understand all those things.

11   **Q.**   You don't go through and try to understand all the

12   terms of documents you sign -- contracts you sign?

13   **A.**   Certainly we did not do that in this case.

14   **Q.**   Okay.  Do you think it's important when parties are

04:54:08   15   contracting together and they create agreements or offer

16   agreements, that those agreements are going to be upheld?

17   **A.**   More important to me is the trust and confidence you

18   have in the people you're working with.  The legal

19   agreements tend to be full of what is -- no offense

04:54:28   20   intended -- legalese, and, you know, when you get in court

21   like this, it can be very important.  But for making

22   fundamental decisions, I tend to rely upon the trust and

23   confidence I have in the people I work with.

24   **Q.**   And that's important, I understand that.  But it's

04:54:48   25   also important that you review and understand the risks

*Cross-Flynn/By Mr. McGuire*

1    involved in any major purchase you make.  Would you agree

2    with me?

3    **A.**    No.  Typically, me and other people sign hundreds and

4    hundreds of documents, and if you want to do something,

04:55:07    5    you have to accept the terms that are offered to you by

6    the entity that's offering them.  And, so, you rely upon

7    the trust and confidence you have and the people you're

8    working with that this is something that will be relevant,

9    you know, in the most extreme of circumstances rather than

04:55:27    10    an expectation that you should have.

11    **Q.**    I understand.  But some of your security or feelings

12    of security of what you're investing in -- well, first of

13    all, let me ask you this:  Nobody forced you to buy the

14    Stanford CD product; correct?

04:55:48    15    **A.**    We were not forced to do it.  We were persuaded to do

16    it.

17    **Q.**    And who persuaded you?

18    **A.**    Our financial advisor with Stanford.

19    **Q.**    Mr. Shaw?

04:56:00    20    **A.**    Mr. Shaw, yes, sir.

21    **Q.**    You weren't -- I guess because you don't recall

22    reading the disclosure statement, you weren't persuaded by

23    the disclosure statement, were you?

24    **A.**    No, I don't recall.

04:56:14    25    **Q.**    And you weren't persuaded by any of the statements or

*Cross-Flynn/By Mr. McGuire*

1   representations of how the money was going to be invested

2   and what percentages and what different types of

3   investments?

4   **A.**   No.  We made our decision after telephone

5   conversations and meetings with Mr. Shaw and simply

6   implemented the paperwork as it was pushed through us

7   without really studying the paperwork any further.

8   **Q.**   Okay.  Are you -- do you know whether or not Mr. Shaw

9   stuck with all of the materials that were provided by the

10   bank, as far as representing what they were going to

11   invest in and whether it was insured or not?

12   **A.**   I have no --

13          MR. WARREN:  Objection, Your Honor, as to form,

14   the phrase --

15          THE COURT:  Overruled.

16          THE WITNESS:  Please ask the question again.

17   BY MR. MCGUIRE:

18   **Q.**   Okay.  See if I can recall it.

19          THE COURT:  Do you want it read back?

20          MR. MCGUIRE:  That would help, Your Honor.

21          THE COURT:  Johnny, would you read it back,

22   please.

23      **(Last question read back by the court reporter)**

24          THE WITNESS:  My assumption was that he did,

25   because he was, you know, the representative of Stanford

1  Group Companies and Stanford International Bank.

2  BY MR. MCGUIRE:

3  **Q.**   But it's possible that he didn't exactly tell you

4  accurately what the bank -- what he was going to invest

5  in?

6  **A.**   I would be very surprised.  He was a very

7  well-educated, very articulate, very knowledgeable person.

8  You know, his capabilities were an important part of our

9  decision to proceed, and I would be very surprised if he

10  did not understand what he was doing and represent the

11  interests of the Stanford Companies accurately to us.

12  **Q.**   Is it possible you might have misunderstood what he

13  said to you?

14  **A.**   No.

15  **Q.**   So when he told you that 60 percent was going to be

16  invested in treasury bonds, you believed that was

17  accurate?

18  **A.**   I believed that was precise, because that was the

19  subject of inquiries by my wife and I about the security

20  of our investment.

21  **Q.**   But you knew -- you did understand that the CDs were

22  not insured?

23  **A.**   No, it was my understanding that they were insured by

24  Lloyd's of London for the benefit of the CD holders.

25  **Q.**   But you didn't get that assurance from the written

*Redirect-Flynn/By Mr. Warren*

1    materials from the bank, did you?

2    **A.**    As I indicated, I did not review all of the pile of

3    written materials, so I don't know whether that kind of

4    assurance was contained in any of that material.

04:59:33    5    **Q.**    Okay.  So if you got the assurance, it was from

6    Mr. Shaw?

7    **A.**    Yes.

8    **Q.**    And that's the same for the assurance that 60 percent

9    would be invested in treasury bonds?

04:59:52    10                   THE COURT:  What else?

11                   MR. MCGUIRE:  I have nothing further, Your

12    Honor.

13                   THE COURT:  Thank you.

14                   **REDIRECT EXAMINATION**

05:00:08    15    BY MR. WARREN:

16    **Q.**    Mr. Flynn, do you recall being asked about the

17    Washington Nationals?

18    **A.**    Yes.

19    **Q.**    Being from Washington, I can tell that they're barely

05:00:18    20    a major league team.

21                        Now, you were shown Exhibit 131.  Do you

22    still have that in front of you?

23    **A.**    Yes.

24    **Q.**    And if I could direct your attention to the third

05:00:42    25    page of the document overall.  Just hold that page for a

*Redirect-Flynn/By Mr. Warren*

1  moment, sir.

2                   When did you first purchase your CD?

3  **A.**   In August of 2006.

4  **Q.**   Can you tell me the date of this disclosure

05:01:01  5  statement?  Right there at the bottom, the third page.

6                   THE COURT:  Just tell us what it is.

7                   MR. WARREN:  If I could just have it pulled up

8  on the screen, Your Honor.

9  BY MR. WARREN:

05:01:13  10  **Q.**   That's hard to see.  It's at very bottom.  Do you see

11  that, sir?

12  **A.**   Yeah, it's -- the type is too small for me to make

13  out.

14  **Q.**   This disclosure statement is dated November 15, 2007,

05:01:25  15  is it not?  The very bottom line.  Do you see that?

16  **A.**   Get closer.

17                   MR. WARREN:  Can you highlight that.  The

18  bottom line that says, "Amended November 15, 2007."

19                   THE WITNESS:  Yes, that's what it says.

05:01:42  20  BY MR. WARREN:

21  **Q.**   Is it possible you don't remember reviewing this

22  document before you purchased the CD because it was

23  created a year and a half afterwards?

24  **A.**   (No audible answer.)

05:01:52  25                   THE COURT:  Is that possible?  Yes or no?

1          THE WITNESS:  I guess it's possible, yes.

2  BY MR. WARREN:

3  **Q.**    Well, could you have possibly reviewed a document

4  that was created a year and a half after you purchased

05:02:03  5  your CD before you purchased the CD?

6  **A.**    That would not be possible.

7  **Q.**    Do you recall discussion on cross-examination about

8  the 60 percent bonds?

9  **A.**    60 percent treasury bonds?

05:02:16  10  **Q.**    Treasury bonds.

11  **A.**    Yes, sir.

12  **Q.**    You were told that in December of 2008; right?

13  **A.**    Yes.

14  **Q.**    And that's reflected on the document that we looked

05:02:23  15  at, Government's Exhibit 1015, the handwritten note at the

16  bottom?

17  **A.**    Yes.

18  **Q.**    And you were told at the time, after the collapse of

19  Lehman, that 60 percent of SIB's assets were in treasury

05:02:37  20  bonds; right?

21  **A.**    Yes.

22  **Q.**    That makes sense considering what had been happening

23  in that equity market throughout that year; right?

24  **A.**    Yes.

05:02:43  25  **Q.**    So if SIB actually had 60 percent of its assets in

1    treasury bonds, it could do a good job of withstanding the

2    economic collapse that was going on in the equity markets;

3    right?

4    **A.**    Yes.

05:02:52  5    **Q.**    And if we turn to Page -- Exhibit 131.  Strike that.

6                    Mr. Flynn, you were asked on

7    cross-examination about whether you ever read anything

8    regarding the Lloyd's of London insurance.  Do you recall

9    that just a moment ago?

05:03:21  10    **A.**    Yes.

11    **Q.**    If we turn to Exhibit 138.  The second page.  And

12    counsel intimated that you had heard that from your

13    financial advisor, but that was never written in any of

14    the materials.  If I could address you to the first

05:03:42  15    paragraph -- the first full paragraph that's highlighted

16    there, can you read that first sentence again?

17                    THE COURT:  You might be able to see it up

18    there, sir.  It may be easier for you.  Why don't you just

19    read it for him.

05:03:54  20                    MR. WARREN:  Sure.

21                    THE COURT:  Anything that's required to read --

22                    MR. WARREN:  Of course.

23    BY MR. WARREN:

24    **Q.**    Sir, so you see where it says, "The bank also

05:04:00  25    maintains the following insurance coverage through Lloyd's

1   and other underwriters..."?

2   **A.**   I do see that.

3   **Q.**   Is that one of the things you were talking about --

4   **A.**   Yes.

05:04:08   5   **Q.**   -- and what you were told about the Lloyd's of London

6   insurance?

7   **A.**   Yes, that seems to reinforce what we were told.

8   **Q.**   Now, sir, you were asked about mutual funds on

9   cross-examination; do you remember that?

05:04:16   10   **A.**   Yes.

11   **Q.**   You had invested in mutual funds prior to moving your

12   money to SIB CDs; right?

13   **A.**   The 401(k) account at 3DI was invested in different

14   mutual funds.

05:04:32   15   **Q.**   How were those funds doing at the time?

16   **A.**   I don't recall.

17   **Q.**   When you decided to switch to the Stanford CDs, were

18   you willing to give up a higher rate of return that you

19   could have earned elsewhere?

05:04:46   20   **A.**   Yes.  In the first six months or so that we were with

21   Stanford before we bought any CDs, Stanford had invested

22   for us in various mutual funds and various stocks, and we

23   were receiving between 15 and 20 percent return on those.

24   **Q.**   And were you willing to give up that high return for

05:05:11   25   the lower return on the SIB CDs?

1    **A.**   Because of my health and concerns, I was willing to

2    accept a rate of return that was half of what we were

3    getting at the time with Stanford International Bank CDs.

4    **Q.**   Mr. Flynn, on cross-examination you were asked a

05:05:26  5    question and you had a discussion about trust and

6    confidence.  Do you recall that?

7    **A.**   Yes.

8    **Q.**   Did you place trust and confidence in what Mr. Shaw

9    told you about the CDs and the CD program?

05:05:37  10    **A.**   Absolutely.

11    **Q.**   Did you place trust and confidence in the written

12    material that you received from Stanford International

13    Bank?

14    **A.**   Absolutely.

05:05:45  15    **Q.**   Did you trust that the information passed on to you

16    both in written form and through Mr. Shaw was accurate and

17    complete?

18    **A.**   Yes.

19    **Q.**   Did you trust that important information such as

05:05:58  20    Mr. Stanford having withdrawn $2 billion from his bank

21    wouldn't have been omitted from that information?

22              MR. MCGUIRE:  Your Honor, I object.

23              THE COURT:  I can't hear you, Counsel.

24              MR. MCGUIRE:  Leading and it's not in evidence,

05:06:08  25    Your Honor.

1          THE COURT:  What's your response?

2          MR. WARREN:  Your Honor, I'm asking a question

3  about whether that information would have been material to

4  this witness.

05:06:16    5          MR. MCGUIRE:  Leading, and it's not in

6  evidence, Your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  Any significant investor by the

9  owner of the bank, any significant loans or activities for

05:06:28   10  his benefit would have been a serious concern for me.

11  BY MR. WARREN:

12  **Q.**   And just to focus on my particular question, did you

13  have trust and confidence that that information, if true,

14  would have been given to you?

05:06:41   15  **A.**   Yes.

16          MR. WARREN:  Pass the witness, Your Honor.

17                    **RECROSS EXAMINATION**

18  BY MR. MCGUIRE:

19  **Q.**   Mr. Flynn, you just testified that you would have

05:06:57   20  wanted to know about any loans within the bank?

21  **A.**   No.  My testimony, I believe, was that if the -- if

22  the bank had made loans to the owner of the bank, that

23  would have been a concern to me.  Other loans in the

24  mixing of the assets and investments were not a concern to

05:07:23   25  me.

*Recross-Flynn/By Mr. McGuire*

1    **Q.**   Okay.  If those were disclosed to you according to

2    the accounting rules that govern the bank and they were

3    properly accounted for, would that have been misleading?

4    **A.**   I don't know what the accounting rules are.

05:07:44    5    **Q.**   Right.  And that's something that generally

6    accountants have to make the call as to what's disclosed

7    and how it's disclosed and what the proper

8    characterization is?

9    **A.**   I presume so.

05:07:58   10    **Q.**   Okay.  Now, you understand that Mr. Shaw earned a

11   commission for selling CD products to his customers?

12              MR. WARREN:  Objection, Your Honor.  It's

13   beyond the scope.

14              THE COURT:  How -- did he go into that?  I

05:08:19   15   don't believe so.  Sustained.

16   BY MR. MCGUIRE:

17   **Q.**   You testified that you had -- I believe you just

18   finished testifying that you had -- you placed confidence

19   in Mr. Shaw; correct?

05:08:29   20   **A.**   Yes.

21   **Q.**   Okay.  And were you aware that Mr. Shaw was

22   compensated for selling CDs with a commission?

23   **A.**   Yes.

24   **Q.**   Okay.  So it's possible that Mr. Shaw may have told

05:08:45   25   you something that was not in -- was not accurate?

1   **A.**   Again, my view of Mr. Shaw was that he was a constant

2   professional, and I have no reason whatever to believe

3   that anything he told me would be other than accurate.

4   **Q.**   Okay.  Have you sued Mr. Shaw?

05:09:05   5   **A.**   No, sir.

6   **Q.**   Have you made a complaint against him?

7   **A.**   The Florida organization that governs, you know,

8   broker dealers had been planning some action against him,

9   and they asked me if I would be a witness in their trial,

05:09:25   10   and I told them if it would be helpful, I would.  But

11   that's the only action that I'm aware of.

12   **Q.**   Okay.  Did you tell them that Mr. Shaw did a good job

13   or a bad job, the investigators in Florida?

14   **A.**   I told them essentially the same thing I've told you,

05:09:43   15   that he did a very good job.  I told them about the

16   representations he made, as I told you.

17   **Q.**   You're not sure whether those representations were,

18   in fact, accurate or not?

19   **A.**   Well, I have no way of knowing -- I would say I had

05:10:02   20   no way of knowing whether they were accurate or not.

21   Subsequently, with all the publicity and reading news

22   articles, I've come to understand that they were not

23   accurate.

24   **Q.**   What Mr. Shaw told you?

05:10:15   25   **A.**   Yes.

1  **Q.**   Okay.

2               MR. MCGUIRE:  I have nothing further, Your

3  Honor.

4               THE COURT:  Anything further?

05:10:26  5               MR. WARREN:  No, Your Honor.

6               THE COURT:  Thank you, sir.  You may step down.

7  You're free to leave.  Thank you.

8               THE WITNESS:  Thank you, Your Honor.

9               THE COURT:  Call your next witness.

05:10:33  10               MR. WARREN:  United States calls Mark

11  Collinsworth.

12               THE COURT:  All right.  Before we get him in,

13  it's now -- of course, we got -- what did we get in, I

14  think ten minutes to 4:00, was that it -- or right at

05:10:49  15  4:00 -- about ten minutes to 4:00, wasn't it?  We can

16  always check with Johnny, because he's got it on his

17  machine.  Wasn't that about right?

18                   It's now ten after 5:00.  I don't mean to

19  run you -- do you want to take a ten-minute break?  We can

05:11:03  20  get on to the next witness, and then as soon as you run out

21  of time, we'll adjourn, or do you want to go straight

22  through?  I'm leaving it up to the jury.

23               JURORS:  (In unison) Straight through.

24               THE COURT:  All right.  Everybody.  I'm all for

05:11:18  25  that, too.

*Direct-Collinsworth/by Mr. Warren*

1           Let's call him in, please.

2           Come on down here, sir, if you would.

3 Please raise your right hand.  Do you swear that the

4 testimony you are about to give in this case on trial will

05:11:44   5 be the truth, the whole truth and nothing but the truth?

6           THE WITNESS:  I do.

7           THE COURT:  Have a seat, please.

8           **MARK PAUL COLLINSWORTH,**

9 after having been first cautioned and duly sworn, testified

05:11:47  10 as follows:

11                **DIRECT EXAMINATION**

12 BY MR. WARREN:

13  **Q.**   Can you please state and spell your last name for the

14  record?

05:12:13  15  **A.**   Mark Paul Collinsworth, C-O-L-L-I-N-S-W-O-R-T-H.

16           THE COURT:  You can move that a little bit.

17 It's fully flexible.  You can push it away from you if you

18 want.

19           Go on.

05:12:27  20           MR. WARREN:  Your Honor, if it please the

21 Court, I'm going to take down the light, the interrogation

22 light.

23           THE COURT:  Oh, yes, please.  Hang on.  I'll

24 get it.  It's my secret lamp.  It goes behind here.  This

05:12:37  25 is the last resort.

1  BY MR. WARREN:

2  **Q.**   Mr. Collinsworth, how old are you?

3  **A.**   42.

4  **Q.**   Where are you from originally?

05:12:48  5  **A.**   Dyersburg, Tennessee.

6  **Q.**   Where do you live now?

7  **A.**   Collierville, Tennessee.

8  **Q.**   Where is that?

9  **A.**   It's right outside of Memphis.

05:12:55  10  **Q.**   Are you married?

11  **A.**   Yes.

12  **Q.**   Do you have kids?

13  **A.**   Yes.

14  **Q.**   Did you go to college?

05:13:00  15  **A.**   Yes.

16  **Q.**   Where did you go to school?

17  **A.**   I went to UT Martin for undergraduate.

18  **Q.**   Did you graduate?

19  **A.**   Yes.

05:13:06  20  **Q.**   What year?

21  **A.**   1992.

22  **Q.**   And what did you study there?

23  **A.**   Finance.

24  **Q.**   Do you have a Bachelor of Arts or Bachelor of

05:13:14  25  Science?

1  **A.**   Bachelor of Science.

2  **Q.**   What did you do after college?

3  **A.**   I went to work at First Tennessee Bank.

4  **Q.**   Where is that?

05:13:24  5  **A.**   Memphis, Tennessee.

6  **Q.**   What were you doing for First Tennessee Bank?

7  **A.**   I worked in the trust department in the mutual fund

8  group doing trading stocks, bonds, mutual funds, research,

9  finance.

05:13:36  10  **Q.**   Did you receive any financial training when you were

11  at First Tennessee Bank?

12  **A.**   Yes.

13  **Q.**   Can you briefly describe the training that you

14  received?

05:13:46  15  **A.**   Fiduciary accounting, bank operations, mutual fund

16  operations, investment training.

17  **Q.**   How long were you with First Tennessee Bank?

18  **A.**   Four years.

19  **Q.**   Approximately when did you leave?

05:14:00  20  **A.**   End of 1996.

21  **Q.**   And what did you do after leaving First Tennessee

22  Bank?

23  **A.**   I went to graduate school.

24  **Q.**   Where did you go to school?

05:14:12  25  **A.**   Murray State Kentucky.

*Direct-Collinsworth/by Mr. Warren*

1   Q.   And what were you studying there?

2   A.   Finance.

3   Q.   That was for a master's degree?

4   A.   Correct.

05:14:17   5   Q.   Did you end up completing your master's at Murray

6   State?

7   A.   No.

8   Q.   Why not?

9   A.   Because I got activated for -- active duty for the

05:14:25   10   Army.  I had to finish my OBC course.

11   Q.   OBC, what's that?

12   A.   Officer basic course.  It's -- once you get

13   commissioned in the Army, you have to go to, depending on

14   the school, six, seven, eight months of specialized

05:14:34   15   training in your field of specialty.

16   Q.   Where were you doing your officer basic course?

17   A.   Fort Eustis, Virginia.

18   Q.   And for how long?

19   A.   About seven months.

05:14:45   20   Q.   What rank are you in the Army?

21   A.   First lieutenant.

22   Q.   Were you discharged?

23   A.   Yes.

24         THE COURT:  What was the specialty that you

05:14:55   25   went to Eustis for?

*Direct-Collinsworth/by Mr. Warren*

1                THE WITNESS:  Logistics and transportation.

2                THE COURT:  I thought the transportation school

3    was up there.

4                THE WITNESS:  Yes.

05:15:00   5    BY MR. WARREN:

6    **Q.**   How were you discharged?

7    **A.**   Honorable.

8    **Q.**   What did you do after your discharge?

9    **A.**   Well, since the OBC course overlapped with the next

05:15:14   10   graduate of grad school and I had nothing to do for the

11   next semester, I sent my resumé out to Robert Half

12   International to see if I -- be able to pick up a job.

13   **Q.**   What's Robert Half International?

14   **A.**   It's a headhunting firm.  They specialize in

05:15:25   15   people -- specialize in finance.

16   **Q.**   Any bites?

17   **A.**   Yes.

18   **Q.**   Did you get a job?

19   **A.**   Yes.

05:15:30   20   **Q.**   Where?

21   **A.**   Stanford Financial Group.

22                THE COURT:  What year?

23                THE WITNESS:  I was hired in April of 1999.

24   BY MR. WARREN:

05:15:40   25   **Q.**   Before we get into your time at Stanford Financial

1   Group, do you have any financial licenses?

2   **A.**   I do.

3   **Q.**   What do you have?

4   **A.**   I have a Series 7, Series 66, Series 87 and my CFS.

05:15:54   5   **Q.**   Mr. Collinsworth, I'm going to ask you to slow down

6   just a little bit so both the jury and the court reporter

7   can --

8         THE COURT:   Pull that mike in just about an

9   inch or two, just a little bit in.  A little more than

05:16:02   10   that.  All right.

11   BY MR. WARREN:

12   **Q.**   You identified a Series 7.  What's a Series 7?

13   **A.**   That is your basic stockbroker license that covers

14   regulations in relation to security sales.

05:16:15   15   **Q.**   This is an SEC-issued license?

16   **A.**   Yes.

17   **Q.**   You mentioned 66.  What's the Series 66?

18   **A.**   That is your investment advisor license that gives

19   you the ability to give investment advice.

05:16:26   20   **Q.**   And what's the 87 license?

21   **A.**   It's investment banking license for analysts.

22   **Q.**   And CFS, you mentioned that?

23   **A.**   That's certified fund specialist.  I am certified to

24   give a qualified opinion on mutual funds, hedge funds,

05:16:39   25   portfolio theories, things of that nature.

*Direct-Collinsworth/by Mr. Warren*

1   **Q.**   How long did it take you to obtain your certified

2   fund specialist license?

3   **A.**   A little bit over six months.

4   **Q.**   Are you presently employed?

05:16:49   5   **A.**   I am.

6   **Q.**   Where?

7   **A.**   Vere Asset Management.

8   **Q.**   Can you spell that?

9   **A.**   Vere, V-E-R-E, Asset Management.

05:16:55   10   **Q.**   What is Vere Assessment Management?

11   **A.**   It's a money management firm?

12   **Q.**   Where is it located?

13   **A.**   Texas.

14   **Q.**   And do you live in Texas?

05:17:03   15   **A.**   No.  It's located in Texas because the broker/dealer

16   affiliation is here in Texas.

17   **Q.**   Where do you work for Vere?

18   **A.**   Memphis, Tennessee.

19   **Q.**   What's your position there?

05:17:12   20   **A.**   Chief investment officer.

21   **Q.**   Who started Vere?

22   **A.**   I did.

23   **Q.**   And can you explain just very briefly what it is that

24   it actually does?

05:17:19   25   **A.**   It's a money management institution.  Individual

1  clients or corporations can come and, I buy stocks, bonds,

2  mutual funds for the portfolio, whatever, if they want

3  balance, growth, income, things of that nature.

4  **Q.**   Let's talk about your work for be Stanford Financial

05:17:30  5  Group.

6                              That was the company that hired you, SFG?

7  **A.**   Correct.

8  **Q.**   If I refer to as "SFG," will you understand what I'm

9  talking about?

05:17:42  10  **A.**   Yes.

11  **Q.**   What was your understanding when you were first hired

12  as to what SFG's business was, generally speaking?

13  **A.**   A conglomerate of companies.

14  **Q.**   What kind of conglomerate?

05:17:51  15  **A.**   Stock brokerage, real estate, just a hodgepodge of

16  different businesses.

17  **Q.**   This was a umbrella company?

18  **A.**   Umbrella company.

19  **Q.**   Who owns Stanford Financial Group?

05:18:08  20  **A.**   Mr. Stanford.

21  **Q.**   Mr. Allen Stanford?

22  **A.**   Correct.

23  **Q.**   Do you see Mr. Allen Stanford sitting in the

24  courtroom today?

05:18:14  25  **A.**   I do.

*Direct-Collinsworth/by Mr. Warren*

1   Q.   If you could please identify him by --

2               THE COURT:  He's standing up.

3               THE WITNESS:  Yes.

4               THE COURT:  And the record will reflect he

05:18:20   5  identified the defendant.

6               MR. WARREN:  Thank you, Your Honor.

7  BY MR. WARREN:

8   Q.   When you were first hired by Stanford Financial Group

9   in April of 1999, what was your position there?

05:18:27  10  A.   Research analyst.

11  Q.   Where were you located?

12  A.   Memphis, Tennessee.

13  Q.   Who did you interview with?

14  A.   First time, I interviewed with the lady from HR

05:18:39  15  department for Stanford.

16  Q.   Did you interview with anyone after that?

17  A.   Yes, Laura Pendergest.

18  Q.   What was Laura Pendergest's position at the time?

19  A.   Portfolio manager.

05:18:48  20              THE COURT:  She was where?  At Memphis?

21              THE WITNESS:  Correct, yes.

22  BY MR. WARREN:

23  Q.   Do you know someone by the name of Laura

24  Pendergest-Holt or Laura Holt?

05:18:55  25  A.   Yes.  That's her married name.

*Direct-Collinsworth/by Mr. Warren*

1   **Q.**   If I refer to her as "Ms. Holt," will you know who

2   I'm talking about?

3   **A.**   Yes.

4   **Q.**   It's easier to say than Pendergest.

05:19:04   5              Did you interview with anyone else?

6   **A.**   Yes, Mr. Davis.

7   **Q.**   What's Mr. Davis' first name?

8   **A.**   James Davis.

9   **Q.**   What was his position?

05:19:10   10   **A.**   CFO, chief financial officer.

11   **Q.**   Who did you report to?

12   **A.**   Laura Pendergest.

13   **Q.**   Now, you said you were a research analyst.

14              Can you please just give the jury a

05:19:22   15   general explanation of what you did when you were first

16   hired as a research analyst for SFG?

17   **A.**   I did basic research on stock, bonds, global

18   economies, investment vehicles, mutual funds, hedge funds.

19              I also wrote research reports on the

05:19:36   20   different economies around the world and traded market

21   futures.

22   **Q.**   Now, let's break that down a little bit.

23              You talked about doing investment

24   research.  That was one part, one aspect of your job?

05:19:46   25   **A.**   Right.

*Direct-Collinsworth/by Mr. Warren*

1   Q.   And what about the research reports?  What were

2   those?

3   A.   Well, we did research to pick stocks, and we

4   submitted those to the portfolio manager.  And if she

05:19:54   5   liked them, she put them not portfolio; if she didn't, she

6   passed on them.

7   Q.   Who was the portfolio manager?

8   A.   Laura Pendergest-Holt.

9   Q.   You also mentioned that you traded futures.

05:20:04   10                      What's that?

11   A.   Market futures, NASDAQ futures, S&P futures.  They're

12   basically contracts where you make a educated guess on

13   where you think the future price of a security is going to

14   trade at.

05:20:17   15   Q.   This is an asset?

16   A.   Commodity, yes.

17   Q.   Did you receive any promotions during the timer you

18   were at SFG?

19   A.   I did.

05:20:24   20   Q.   What was the first promotion that you received?

21   A.   I was promoted to senior research analyst.

22   Q.   How long was that?  After how long?

23   A.   That was probably in 2000.

24   Q.   Were your responsibilities generally the same?

05:20:37   25   A.   Yes.

*Direct-Collinsworth/by Mr. Warren*

1  **Q.**   Do you have any subsequent position changes after

2  being promoted to senior research analyst?

3  **A.**   I was promoted to research manager.

4  **Q.**   What's that?

05:20:46   5  **A.**   That's basically when I started to work for SGC,

6  Stanford Group Company, and that's when I started getting

7  mime securities license.  Stanford wanted to --

8  **Q.**   Let me stop you there for a minute.

9            You identified SGC.  What was SGC?

05:21:01   10  **A.**   Stanford Group Company.  That was the brokerage arm

11  of SFG.

12  **Q.**   What kind of work did you do as a research manager?

13  **A.**   That's when we started issuing re -- started getting

14  our securities license to start issuing research reports

05:21:16   15  on different stocks, like you see Goldman & Sachs issue,

16  Morgan Stanley issue.  And I was in charge of training the

17  analysts that would start writing those research reports.

18  **Q.**   Did you move offices?

19  **A.**   No, remained in Memphis.

05:21:31   20  **Q.**   And how long did that position last as a research

21  manager for SGC, the broker dealer?

22  **A.**   Probably, year, year and a half.

23  **Q.**   What was your next position with the Stanford

24  Financial Group?

05:21:46   25  **A.**   Asset allocation manager.

*Direct-Collinsworth/by Mr. Warren*

1    **Q.**    When did that happen, roughly?

2    **A.**    Probably 2003.

3    **Q.**    And what were your responsibilities as an asset

4    allocation manager?

05:21:54    5    **A.**    To basically management a piece of portfolio.

6    **Q.**    Did you continue to write market research?

7    **A.**    Yes.

8    **Q.**    Do you have any other positions with the

9    Stanford-owned companies?

05:22:06    10    **A.**    Yes.  I was promoted to managing director of asset

11    allocation.

12    **Q.**    When was that?

13    **A.**    2007.

14    **Q.**    And did your responsibilities change significantly

05:22:16    15    from when you were promoted to managing director of asset

16    allocation?

17    **A.**    Yes.

18    **Q.**    How so?

19    **A.**    That's when they started the SIM project, Stanford

05:22:26    20    Investment Models.  I had four analysts assigned to me to

21    do research on stocks, bonds, global economies and so

22    forth.

23    **Q.**    Can you very briefly explain what the Stanford

24    Investment Model is?

05:22:34    25    **A.**    It was an asset allocation model for clients to

*Direct-Collinsworth/by Mr. Warren*

1    invest in.  It would be a diversified portfolio of mutual
2    funds, hedge funds, gold, just a mixture of different
3    asset classes.
4    **Q.**    Did you supervise others during the time that you
05:22:49    5    were managing director of asset allocation?
6    **A.**    Yes.
7    **Q.**    How many people?
8    **A.**    Four.
9    **Q.**    When did you ultimately leave Stanford's employment?
05:22:56    10    **A.**    February of 2009.
11    **Q.**    Why?
12    **A.**    Company got shut down.
13    **Q.**    And let's talk about the management of money that you
14    identified.
05:23:08    15              Whose money was it that you were managing?
16    **A.**    Stanford, retained earnings.
17    **Q.**    What do you mean "retained earnings"?
18    **A.**    Retained earnings are the profits that a company
19    makes.  They reinvest them back into stocks, bonds, back
05:23:22    20    in the business.  For like Coca-Cola, it would be back
21    into bottling companies.
22    **Q.**    What entity owned the assets that you were managing?
23    **A.**    That would SIB.
24    **Q.**    Stanford International Bank?
05:23:34    25    **A.**    Correct.

*Direct-Collinsworth/by Mr. Warren*

1  Q.   Have you ever heard the term "Tier 2"?

2  A.   I have.

3  Q.   What's Tier 2?

4  A.   Tier 2 was the portfolio that was assigned to the

05:23:40  5  analysts in Memphis.

6  Q.   Can you generally describe the assets that were in

7  Tier 2, managed by the research analysts in memos?

8  A.   Yes, stocks, bonds, large cap blue chip companies,

9  hedge funds, things of that nature.

05:23:56  10  Q.   Do you know the term "liquidity"?

11  A.   Yes.

12  Q.   What's "liquidity" mean?

13  A.   "Liquidity" means you can basically sell a security

14  and get those funds very quickly, two plus three is the

05:24:08  15  basic definition.

16  Q.   Two plus three?  What's that?

17  A.   That's when you sell it, you can have access to your

18  cash within three days.

19  Q.   How would you characterize in terms of liquidity the

05:24:18  20  Tier 2 assets that you and the other people in Memphis

21  managed?

22  A.   Outside of hedge funds, the most of the portfolio is

23  fairly liquid.

24  Q.   I'm sorry.  Did you say "very" or "fairly"?

05:24:26  25  A.   "Fairly."  Fairly liquid.  Most of it was stocks,

*Direct-Collinsworth/by Mr. Warren*

1   bonds, like Microsoft, Exxon.

2   **Q.**   Who actually managed the Tier 2 money?

3   **A.**   That would be the analysts in Memphis.

4   **Q.**   Is that where the accounts were located?

05:24:40   5   **A.**   No.  The accounts were actually held in Europe in

6   different brokerage firms in Europe.

7   **Q.**   Mr. Collinsworth, I'd like to talk about the

8   interaction between the research analysts in Memphis and

9   the money managers in -- abroad.

05:24:54   10                  Would it help to have a demonstrative?

11   **A.**   Sure, yes.

12                  MR. WARREN:  Your Honor, if you could switch

13   the overhead, please.

14                  THE COURT:  Okay.

05:25:25   15                  Is that what you want?

16                  MR. WARREN:  Yes, Your Honor.  Thank you.

17                  Your Honor, I'm sorry.  It's still not up.

18                  THE COURT:  It's still not up there?  Pardon

19   me?

05:25:43   20                  No.  Is that -- what do you want?  Do you

21   want the computer or you want the overhead?

22                  MR. WARREN:  Computer at counsel table, Your

23   Honor.

24                  THE COURT:  The computer at counsel table.

05:26:00   25                  MR. WARREN:  Yes.  Sorry about that.

1          THE COURT:  Okay.  When you said "overhead," I

2    thought you meant the projector.

3          MR. WARREN:  I was unclear.

4          THE COURT:  That's all right.  Go on.

05:26:19   5          MR. WARREN:  And Your Honor --

6          THE COURT:  Oh, the lights.

7          MR. WARREN:  Would it help if the lights were

8    off?

9          THE COURT:  Please.  I'll get with it.  Kicking

05:26:26  10    and screaming into the 21st Century, that's what I'm doing.

11    Go on.  That's why I have a couple of experts here, my law

12    clerk.  Go on.

13          MR. WARREN:  Thank you, sir.

14    BY MR. WARREN:

05:26:37  15    Q.   Mr. Collinsworth, let's start at the top, the picture

16    of Robert Allen Stanford.  It says "Chairman, chief

17    executive officer and sole shareholder."

18               Is that your understanding of

19    Mr. Stanford's position within the Stanford entities?

05:26:48  20    A.   Correct.

21    Q.   And the box on the left-hand side, Stanford Financial

22    Group, what's that?

23    A.   That's the umbrella all the other companies were

24    under.

05:26:59  25    Q.   And the box in the middle, Stanford Group Company,

*Direct-Collinsworth/by Mr. Warren*

1   the brokerage firm?

2   **A.**   The brokerage firm that was under SFG.

3   **Q.**   Who worked at the brokerage firm?

4   **A.**   The financial advisors.

05:27:08   5   **Q.**   And very quickly, what did the financial advisors do?

6   **A.**   Financial advisors basically met with clients to help

7   them manage their portfolios, gather new assets.

8   **Q.**   Do you know Jason Green?

9   **A.**   I do.

05:27:22   10   **Q.**   What was his position with Stanford?

11   **A.**   He was a financial advisor out of Louisiana.

12   **Q.**   He fit into that box, the Stanford Group Company box?

13   **A.**   Yes.

14   **Q.**   There's an arrow with CD money pointing towards

05:27:37   15   Stanford International Bank.

16                        What does that illustrate?

17   **A.**   That's basically, when the clients put money into the

18   brokerage firm, that money went -- for the CDs, that money

19   was then redirected toward SIB.

05:27:48   20   **Q.**   And the arrow pointing down to global money managers,

21   what does that illustrate?

22   **A.**   That was the allocation that went to the money

23   managers that were in Europe.

24   **Q.**   And can you give an example of what the -- who these

05:27:58   25   money managers were in Europe?

1   **A.**   Soc Gen, Credit Suisse, Coutts, Axia.

2   **Q.**   These are large brokerage firms?

3   **A.**   Yes.

4   **Q.**   The research analyst in Memphis, what's that?

05:28:09   5   **A.**   The analysts that worked under SFG, they basically

6   monitored the performance and allocation of the money

7   managers in Europe.

8   **Q.**   And what box would you be?

9   **A.**   I would be in the research analysts for Memphis.

05:28:23   10   **Q.**   And your description about monitoring and managing

11   the money managers, that's the dotted line?

12   **A.**   Yes.

13   **Q.**   Mr. Collinsworth, how many research analyst were in

14   there in Memphis?

05:28:34   15   **A.**   27.

16   **Q.**   That's -- was that at the beginning?  At the end?

17   **A.**   In the very beginning, there was -- I was the second

18   person hired in Memphis.  So it started out two, and I

19   think it got up into the upper 20s by the time I left.

05:28:47   20   **Q.**   And were all those research analysts actually located

21   in Memphis?

22   **A.**   No.  Some were actually -- towards the end, some of

23   them were redirected towards Tupelo and some were

24   redirected towards St. Croix.

05:28:58   25   **Q.**   Where were the majority of the research analysts

*Direct-Collinsworth/by Mr. Warren*

1   located?

2   **A.**   Memphis.

3   **Q.**   Can you describe briefly the office space in Memphis,

4   the layout and the building?

05:29:06   5   **A.**   Yes.   The -- when you walked in the front door, the

6   analysts were basically on the right-hand side of the

7   office, a hallway separated them.   And then the financial

8   advisors were on the left-hand side.

9   **Q.**   Now, were people in Memphis, did they have

05:29:21   10   responsibility for certain global money managers?

11   **A.**   They were.

12   **Q.**   How did that work?

13   **A.**   The different analysts were assigned different

14   managers to track, like Soc Gen was assigned to one of the

05:29:31   15   analysts, and that analyst would refer e-mails or faxes

16   about that portfolio, and then they would put that into a

17   tracking program.

18   **Q.**   How many accounts did you personally manage?

19   **A.**   Let's see.   I had four brokerage firms and several

05:29:45   20   subaccounts under that.

21   **Q.**   And by the end of your tenure with Stanford Financial

22   Group, how much money were you managing personally?

23   **A.**   Over 200 million.

24   **Q.**   Over 200 million?

05:29:57   25   **A.**   200 million.

1  **Q.**   How was that relative to other analysts in Memphis?

2  **A.**   Other -- well, some analysts or some portfolio

3  managers, such as myself, managed money, had discretion on

4  the portfolios.  The other analysts simply tracked the

05:30:08  5  performance of the portfolio managers that were in Europe.

6  **Q.**   If you can explain that a little bit, please.

7  **A.**   Like for the -- some of the stuff that I did, if I

8  thought that, say, Coca-Cola was a good buy, I would -- I

9  could actually have the discretion to put Coca-Cola into

05:30:24  10  the portfolio that I managed.

11              The other analysts that did not have

12  discretion, they simply tracked the portfolio the money

13  managers that had discretion to buy Coke and Exxon in

14  Europe, they simply tracked their allocations.

05:30:34  15  **Q.**   And how many people in Memphis actually had that

16  discretionary authority out of the 20-something people who

17  were there?

18  **A.**   Probably about six.

19  **Q.**   And, again, the $200 million that you managed at the

05:30:45  20  end, how was that in size relative to the other five

21  people who had discretionary authority?

22  **A.**   It was probably about 20 percent.

23  **Q.**   Was that the largest -- did anyone else have more

24  discretionary authority than you did?

05:30:58  25  **A.**   No.

*Direct-Collinsworth/by Mr. Warren*

1  **Q.**   Were there any limitations on the trades that you did

2  in the accounts that you managed?

3  **A.**   On the portfolios I had, I'd always keep a minimum of

4  30 percent in bonds at all time.

05:31:13  5  **Q.**   We've been talking about Tier 2; right?

6  **A.**   Correct.

7  **Q.**   Do you have an understanding about other tiers within

8  the SIB portfolio?

9  **A.**   Basically, yes.

05:31:25  10  **Q.**   What's Tier 1?

11  **A.**   Tier 1 is liquid cash.

12  **Q.**   Who managed Tier 1?

13  **A.**   Patricia Maldonado.

14  **Q.**   Did anyone in Memphis have oversight or interaction

05:31:38  15  with Tier 1?

16  **A.**   No.

17  **Q.**   Was there a Tier 3?

18  **A.**   There was.

19  **Q.**   Who managed Tier 3?

05:31:44  20  **A.**   That was Mr. Davis, Mr. Stanford and the board of

21  directors.

22  **Q.**   Now, did -- do you have an understanding of the

23  assets in Tier 3?

24  **A.**   From what I've been told, yes.

05:31:57  25  **Q.**   Did that understanding change over time?

*Direct-Collinsworth/by Mr. Warren*

1   **A.**   Yes.

2   **Q.**   To the extent you can generalize, if you can -- and

3   if you can't, just let me know -- what did the Tier 3

4   assets consist of, as you were told?

05:32:06   5   **A.**   Originally, it was -- I was told that it was a

6   portfolio, some stocks, some bonds, hedge funds, more

7   conservative-type investments, more steady

8   income-producing.

9   **Q.**   More conservative-type investments than what?  Than

05:32:25   10   Tier 2?

11   **A.**   More conservative -- yeah, than Tier 2.

12   **Q.**   Can you describe for the jury the relative size

13   during the time that you were at Stanford Financial Group

14   of Tier 2 versus Tier 3?

05:32:39   15   **A.**   Tier 3 is probably nine times larger than Tier 2.

16   **Q.**   Nine times larger?

17   **A.**   Yeah.

18            THE COURT:  Was that also managed out of the

19   Memphis office?

05:32:48   20            THE WITNESS:  The Tier --

21            THE COURT:  Tier 3?

22            THE WITNESS:  I don't know where Tier 3 was

23   manager from.

24            THE COURT:  Tier 2 as out of the Memphis

05:32:53   25   office, wasn't it?

*Direct-Collinsworth/by Mr. Warren*

1          THE WITNESS:  Yes, correct.

2          THE COURT:  Okay.

3    BY MR. WARREN:

4    **Q.**   And to be clear, the 20-something research analysts

05:32:57   5    in Memphis managed just Tier 2?

6    **A.**   Just Tier 2.

7    **Q.**   How many analysts managed Tier 3?

8    **A.**   I do not know.

9    **Q.**   Do you know any research analysts who managed Tier 3?

05:33:08   10   **A.**   I do not.

11   **Q.**   Now, on the accounts that you managed, the global

12   money manager accounts --

13   **A.**   Uh-huh.

14   **Q.**   -- did you have insight into the assets that were in

05:33:16   15   those accounts?

16   **A.**   In the Tier 2?

17   **Q.**   Yes.

18   **A.**   Yes.  Definitely, in the ones I managed, I had

19   discretion on, and if I wanted to find out what was in

05:33:25   20   other portfolios, I could go ask the analyst that was

21   assigned to that specific portfolio.

22   **Q.**   Did you have any insight into the specific assets in

23   Tier 3?

24   **A.**   No.

05:33:37   25   **Q.**   Did any of the research analysts in Memphis, as far

1   as you know, have that insight?

2   **A.**   No.

3   **Q.**   Did anyone in Memphis have that insight?

4   **A.**   Mr. Davis and the chief investment officer.

05:33:48   5   **Q.**   And what about Ms. Holt?

6   **A.**   Yeah, Laura Pendergest-Holt.

7   **Q.**   She did as well, as you understood?

8   **A.**   Correct.

9   **Q.**   You had described writing research reports before.

05:34:03   10   These research reports, who did they go

11   to?

12   **A.**   I guess, clients.

13   **Q.**   Do you know?

14   **A.**   I'm not a hundred percent, but I know they went to

05:34:11   15   a -- they went to a printing company and they printed them

16   off.  So I'm assuming they went to clients after that

17   point.

18   **Q.**   Do you know whether or not the financial advisors

19   used the research reports?

05:34:18   20   **A.**   I don't know a hundred percent, no.

21   **Q.**   Have you ever talked with the financial advisors

22   about the type of research that you were doing?

23   **A.**   Once or twice, yes.

24   **Q.**   You talked to them about what was generally going on

05:34:30   25   in the market?

1    **A.**    Yes.

2    **Q.**    Did you ever talk with the financial advisors, the

3    people in Stanford Group Company who sold the CDs, about

4    the specific assets that were in Tier 2?

05:34:42    5    **A.**    Yes.  Roughly, yes.

6    **Q.**    Did you ever talk to them about the total amount of

7    money that was being managed in Tier 2?

8    **A.**    No.

9    **Q.**    Why not?

05:34:51    10    **A.**    We were specifically told not to.

11    **Q.**    Who told you not to?

12    **A.**    Laura Pendergest-Holt and James Davis.

13    **Q.**    Was this on one occasion?

14    **A.**    Several.

05:35:01    15    **Q.**    Over what period of time?

16    **A.**    Over the course of the 10 years I worked there.

17    **Q.**    Do you have any understanding as to why you were told

18    not for talk to the financial advisors about the total

19    assets in Tier 2?

05:35:14    20    **A.**    We were told because of privacy regulations in

21    Antigua.

22    **Q.**    Did you ever discuss with a financial advisor that

23    the research analysts in Memphis only managed the Tier 2

24    portfolio, and not Tier 3?

05:35:30    25    **A.**    I did once.

*Direct-Collinsworth/by Mr. Warren*

1    **Q.**   Describe to the jury what happened.

2    **A.**   Well, the broker was asking about the Tier 2

3    portfolio and started asking questions about Tier 3.

4    That's when basically every question he asked was, "I

05:35:42   5   don't know," "I don't know," "I have no idea."

6    **Q.**   I'm sorry.  The questions that he asked or your

7    answers?

8    **A.**   Correct.  He was asking questions like, Where's

9    Tier 3 -- where's Tier 3 housed at?

05:35:52   10                  I was like, "I don't know."

11                  "Who actually has oversight over Tier 3?"

12                  "I've been told board of directors."

13                  "Do you know what assets are in Tier 3?"

14                  "Just from what I've read in brochures."

05:36:04   15                  And from that point, from our

16   conversation, I think he must have contacted either

17   Mr. Davis or Laura Pendergest, because I actually was

18   instructed not to talk to brokers ever again about that.

19   **Q.**   Can you describe that interaction?  Who told you

05:36:18   20   never to talk to the financial advisors about Tier 3 ever

21   again?

22   **A.**   That was Laura Pendergest.

23                  MR. WARREN:  Your Honor, we're introducing

24   Exhibit 204.  I think counsel has an objection.

05:37:05   25                  THE COURT:  What's the objection?

*Direct-Collinsworth/by Mr. Warren*

1                MR. FAZEL:  Foundation, hearsay.  If he wants

2    for prove it up.

3                THE COURT:  Prove it up, whatever it is.

4    BY MR. WARRREN:

05:37:17   5    **Q.**   Mr. Collinsworth, what is that document?

6    **A.**   This is the master sheet of the consolidated

7    portfolios of all the managers in Tier 2.

8    **Q.**   Do you recognize it?

9    **A.**   Yes.

05:37:29  10    **Q.**   Where do you recognize its from?

11    **A.**   I've seen it in the office in Memphis.

12    **Q.**   Do you know who created this?

13    **A.**   Fred Palimden.

14    **Q.**   Do you know how Mr. Palimden created it?

05:37:41  15    **A.**   Yes.

16    **Q.**   Did Mr. Palimden have personal knowledge of the

17    information contained in that document?

18    **A.**   Yes.

19    **Q.**   Was that document contained -- created in the

05:37:48  20    ordinary course OF SFG's business?

21    **A.**   Yes.

22    **Q.**   And was it kept notice ordinary course of SFG's

23    business?

24    **A.**   Yes.

05:37:54  25                MR. WARREN:  Your Honor, at this time, we offer

1 Exhibit 204 as a business record exception under 8036.

2               MR. FAZEL:  Ask to take the witness on voir

3 dire, please.

4               THE COURT:  Go on.

05:38:04    5                    VOIR DIRE EXAMINATION

6 BY MR. FAZEL:

7 **Q.**   Mr. Collinsworth, good afternoon.  How are you?

8 **A.**   Afternoon.  I'm good.

9 **Q.**   I have a quick question about the documents that

05:38:10   10 we're trying to introduce into evidence, Exhibit 204.

11 **A.**   Okay.

12 **Q.**   You indicated that Mr. -- what was his name again?

13 **A.**   Fred Palimden.

14 **Q.**   And he had personal knowledge of this information?

05:38:19   15 **A.**   Well, he took the con -- how it worked is, every week

16 the analysts would receive --

17 **Q.**   And I'm sorry.  I didn't mean to interrupt you, but

18 this goes a lot quicker if you can just answer my

19 question --

05:38:30   20 **A.**   Okay.

21 **Q.**   -- and we go from there.  Fair enough?

22 **A.**   Okay.

23 **Q.**   And if you don't understand me, let me know and I'll

24 just -- I'll --

05:38:34   25               THE COURT:  Next point.

1          MR. FAZEL:  Yes, sir.

2  BY MR. FAZEL:

3  **Q.**   Did he have personal knowledge of the -- let me

4  rephrase it.

05:38:41  5          Did he understand the manner in which

6  these numbers were given to him, or did he just collect

7  it?

8  **A.**   He collected from other analysis.

9  **Q.**   So he did not have personal knowledge of it?

05:38:51  10 **A.**   Correct.

11 **Q.**   And you, yourself, you have some personal knowledge

12 of some of the stuff in here, but you don't have personal

13 knowledge of all of it?

14 **A.**   Correct.

05:38:59  15 **Q.**   Okay.  And you were not the company's set person to

16 be the custodian of records, were you?

17 **A.**   No.

18 **Q.**   In other words, when subpoenas -- if somebody was

19 suing Stanford would issue a subpoena, you wouldn't have

05:39:14  20 to go testify about it; correct?

21 **A.**   No.

22 **Q.**   Okay.  So your personal knowledge about understanding

23 of some of this stuff is limited to your portion of it;

24 correct?

05:39:22  25 **A.**   Correct.

*Voir Dire-Collinsworth/By Mr. Fazel*

1  **Q.**    And Mr. Pomlieden's understanding of the numbers and

2  so forth was limited to his portion of it; correct?

3  **A.**    Correct.

4  **Q.**    Okay.

05:39:30  5                MR. FAZEL:  I pass the witness.

6                        We'd object.  Foundation has not been

7  properly.  Laid it's hearsay as well.

8                THE COURT:  What's your response?

9                MR. WARREN:  Your Honor, one, it's coming in as

05:39:39  10  a business record exception under USC Jones 550 --

11                THE COURT:  I don't need to get a citation.

12  Just look at the --

13                MR. WARREN:  Sure.

14                THE COURT:  -- at the evidence book.

05:39:49  15                MR. WARREN:  Under Rule 8036 the question is --

16  the question for admissibility is whether the document was

17  created in the ordinary course of --

18                THE COURT:  Well, or the method or

19  circumstances of preparation indicated lack of

05:40:01  20  trustworthiness; correct?  That's the bottom line.

21                MR. WARREN:  Yes, Your Honor.

22                THE COURT:  Is that correct?

23                MR. WARREN:  Yes, Your Honor.

24                THE COURT:  Overrule the objection.

05:40:06  25                MR. FAZEL:  And the hearsay objection, Your

*Direct-Collinsworth/By Mr. Warren*

1  Honor?

2              THE COURT:  That's what I mean.  Overrule the

3  objection.

4              MR. FAZEL:  Okay.

05:40:10  5              THE COURT:  Now, what's the number of the

6  document?

7              MR. WARREN:  204, Your Honor.

8              THE COURT:  All right.

9                  All right.  We're waiting.

05:40:26  10             THE WITNESS:  I'm sorry.

11 BY MR. WARREN:

12  Q.   Mr. Collinsworth, can you please describe for the

13  jury exactly what this is?

14  A.   This is the master sheet that Fred Palimden together.

05:40:36  15  Q.   I'm sorry.  Are you looking at the hard copy or

16  the --

17  A.   Tier 2.

18  Q.   If you could flip to the December 31, 2007, report

19  contained in that document.  I believe it's three pages

05:40:50  20  from the end.

21              THE COURT:  Okay.

22 BY MR. WARREN:

23  Q.   I'm sorry.  So what's the date of this document?

24  A.   December 31st of 2007.

05:41:04  25  Q.   How often were these documents put together?

*Direct-Collinsworth/By Mr. Warren*

1   **A.**   Weekly.

2   **Q.**   How did Mr. Palimden -- who is Mr. Palimden again?

3   **A.**   He was the analyst that was in charge of

4   consolidating this information.

05:41:17   5   **Q.**   Where did he work?

6   **A.**   Memphis.

7   **Q.**   For SFG?

8   **A.**   Dually employed, SFG and SGC.

9   **Q.**   And how did he compile the information?

05:41:28   10   **A.**   From the individual portfolios that each analyst sent

11   to him on the portfolio they were assigned to.

12   **Q.**   And how did each analyst compile the information for

13   the portfolio that each of them were assigned to?

14   **A.**   Every week they received a brokerage statement either

05:41:45   15   through e-mail or by fax by the brokerage they were

16   assigned to.

17   **Q.**   And this documents was circulated in what electronic

18   format?

19   **A.**   I don't understand.

05:41:52   20   **Q.**   Was it a Word document or a spreadsheet?

21   **A.**   Excel.

22   **Q.**   It's an Excel spreadsheet?

23          And, in fact, we have up on the board in

24   Excel format; correct?

05:42:01   25   **A.**   Yes.

*Direct-Collinsworth/By Mr. Warren*

1  Q.   Do you see those tabs across the bottom of the page?

2  A.   Yes.

3  Q.   What does each one of those tabs represent?

4  A.   That represents the portfolio that the individual

05:42:13  5  analysts collected.  So like Toronto Dominion, Private

6  Assessment Management, the analyst that was assigned to

7  that, that's the tab of information that he sent to Fred

8  Palimden.

9  Q.   And the information contained in each of those tabs,

05:42:27  10  what did Mr. Palimden do with it?

11  A.   He took all the different portfolio managers and

12  consolidated it into one master sheet, which is what's on

13  the viewing screen.

14  Q.   If I could direct your attention -- oh, I'm sorry.

05:42:38  15               One other question:  Where did the

16  information that was in each of those tabs actually come

17  from?

18  A.   Came from actual brokerage firms.

19  Q.   In what format?

05:42:46  20  A.   In an e-mail brokerage or by fax.

21  Q.   But what was it?  Was it the text of an e-mail, the

22  information was contained in?

23  A.   It was in PDF.

24  Q.   What was actually sent in PDF?

05:42:57  25  A.   The actual brokerage statement.

*Direct-Collinsworth/By Mr. Warren*

1    Q.   The monthly account statements?

2    A.   On a weekly basis.

3    Q.   On a weekly basis.  Thank you.

4              Can I direct your attention to the number

05:43:07    5    in the middle, sort of on the right-hand side, where it

6    says "Current balance."

7    A.   Yes.

8    Q.   What is that number?

9    A.   That is the current balance of all the portfolios

05:43:15   10    combined for Tier 2 as of December 31, 2007.

11    Q.   And what is that number?

12    A.   888 million.

13    Q.   And you said for all the Tier 2 accounts.

14              How many Tier 2 accounts were there?

05:43:27   15    A.   28, I think.

16    Q.   And if we -- we don't need to do it, but would those

17    match up to all the different tabs on the bottom of the

18    screen?

19    A.   Correct.

05:43:36   20    Q.   Below the 888 million number, it says "Year-end

21    balance."

22              What is the year-end balance?

23    A.   That is the balance from the previously year.

24    Q.   So what's the figure there, sir?

05:43:51   25    A.   599 million.

1  Q.   And what date would that amount be from?

2  A.   That would reference December 31st of 2006.

3  Q.   And again, what does that number represent?

4  A.   That -- of all the portfolios within Tier 2.

05:44:03  5  Q.   Below that we see a "Return YTD."

6              What's that?

7  A.   That is a return of the -- all the portfolios

8  combined together, so that's the total of the performance

9  of all those portfolios combined together for the year,

05:44:19  10  year to date.

11  Q.   And what was the return for -- as of 12-31-2007 for

12  the Tier 2 accounts?

13  A.   9.86.

14  Q.   Do you see the cash and cash equivalence line up at

05:44:33  15  the top?

16  A.   Yes.

17  Q.   Was that cash different from the Tier 1 cash?

18  A.   That's correct.

19  Q.   Where was this cash held?

05:44:39  20  A.   This was the cash that was actually held in the

21  actual brokerage firms.

22  Q.   In those money manager accounts in Europe?

23  A.   Correct.  That was our cash allocation.

24  Q.   So all these assets here are a part of what tier?

05:44:50  25  A.   Just Tier 2.

*Direct-Collinsworth/By Mr. Warren*

1    **Q.**   If you look at the pie charts at the bottom of page,

2    what's that first pie chart, Currency Allocation?

3    **A.**   That is a breakdown of the overall Tier 2 portfolio

4    in reference to how much is allocated to U.S. dollars,

05:45:04   5    Swiss franc, Euro, British pounds, so forth.

6    **Q.**   And the chart next to it, that says "Stock

7    allocations"?

8    **A.**   That's the breakdown of the stock holdings by sector,

9    how much of the portfolio is allocated to healthcare,

05:45:19   10   utilities, energy.

11   **Q.**   And Product Allocations?

12   **A.**   That's the overall asset allocation, how much is

13   allocated to fixed income, to bonds, alternative funds,

14   precious metals, equities.

05:45:30   15   **Q.**   If I could direct your attention to the tab at the

16   bottom.  It says "CSFB bond."

17   **A.**   Yes.

18   **Q.**   What's that tab?

19   **A.**   That is one of the portfolios I actually had

05:45:45   20   management over.

21   **Q.**   And Mr. Collinsworth, the number you see, the current

22   balance, in the middle of the page, again, what's that

23   number?

24   **A.**   148 million.

05:45:57   25   **Q.**   And how does that 148 million number factor into the

1   888-million-dollar number we saw in the other master

2   spreadsheet?

3   **A.**   The 148 million is a piece of the 888 million.

4   **Q.**   And what are the other pieces of the 888 million?

05:46:13   5   **A.**   The -- it would reference the different tabs at the

6   bottom.

7            MR. WARREN:  Your Honor, we offer Government's

8   Exhibit 205.  It is the same spreadsheet compiled,

9   maintained and kept in the same way for a different date.

05:46:43   10            I believe counsel has the same objection.

11            MR. FAZEL:  I do.  I lodge the same objection.

12            THE COURT:  All right.  Will you accept,

13   Mr. Fazel, Mr. Warren's position that it would be proved up

14   exactly the same way?

05:46:54   15            MR. FAZEL:  I would.  I just want to lodge the

16   same objection.

17            THE COURT:  All right.  Same objection, same

18   ruling.  Overruled.

19   BY MR. WARREN:

05:47:03   20   **Q.**   Mr. Collinsworth, if you would please turn to the

21   December 31, 2008, weekly report at the back of

22   Exhibit 205.  Again, I believe it's the last three pages.

23            MR. WARREN:  And, Your Honor, a point of

24   clarification for the Court, the hard copy exhibits that

05:47:23   25   appear in the Court's binders are only the master sheet,

*Direct-Collinsworth/By Mr. Warren*

1  what the witness described as the master sheet, not all the

2  tabs behind it.

3              THE COURT:  So what are you saying?

4              MR. FAZEL:  They look like this, Your Honor,

05:47:37  5  basically.

6              THE COURT:  I know.  But what are you saying?

7  I understand that.  So what's in evidence?

8              MR. WARREN:  What's in evidence is going to be

9  just what we're showing the witness, so it's going to be

05:47:44  10  the master sheet.  And we will provide the additional

11  backup sheet for the one account that the witness has

12  looked at so far.

13             THE COURT:  All right.  In other words, that

14  needs to be in there for if the case goes anywhere from

05:47:55  15  here on out.  So you have it in the record, and you'll do

16  it, I'm sure, by the end of the trial?

17             MR. WARREN:  Yes, sir.

18  BY MR. WARREN:

19  **Q.**   Mr. Collinsworth, if you could briefly describe

05:48:04  20  what's going on here with this document?

21  **A.**   This is the master sheet as of December 31, 2008.

22  **Q.**   What's the current balance of Tier 2 as of the end of

23  2008?

24  **A.**   454 million.

05:48:19  25  **Q.**   And the year-end balance we see below of 888?

1    **A.**    That would be the balance as of December 31, 2007.

2    **Q.**    That matches what we looked at on the previous

3    document?

4    **A.**    Correct.

05:48:35   5    **Q.**    Mr. Collinsworth, I'm handing you what's been marked

6    as Government's Exhibits 200, 201, 202 and 203.  If you

7    could take a minute to look at those, please.

8              MR. WARREN:  Your Honor, I've handed the

9    witness the identical spreadsheets for the last week of

05:49:31   10   each quarter for year 2003, 2004, 2005 and 2006.  We offer

11   them with the proffer made before that these are still

12   business records kept in the ordinary course of business.

13             THE COURT:  Well, but with the same predicate

14   as you laid for the -- what is it -- for 204?

05:49:50   15             MR. WARREN:  Yes, Your Honor.

16             THE COURT:  Okay.  Again, you renew your

17   objections on the same grounds?

18             MR. FAZEL:  As to each exhibit.

19             THE COURT:  Pardon me?

05:49:57   20             MR. FAZEL:  As to each exhibit.

21             THE COURT:  It's overruled.

22             Give me the numbers again.  I'm at 205,

23   now from?

24             MR. WARREN:  200, 201, 202 and 203.

05:50:04   25             THE COURT:  Thank you.

*Direct-Collinsworth/By Mr. Warren*

1  BY MR. WARREN:

2   **Q.**   Mr. Collinsworth, if you could very briefly describe

3   the four exhibits that I just handed you.

4   **A.**   This is the copies of the master sheets as of the end

05:50:18  5   of different quarters for 2004, 2005, 2003 and 2006.

6   **Q.**   Mr. Collinsworth, I'm handing you what's been marked

7   as Government's Exhibit 1602 for identification.

8           MR. WARREN:  Your Honor, we'd offer this into

9   evidence if there's no objection.

05:51:02  10          MR. FAZEL:  There is.

11          THE COURT:  What number?

12          MR. WARREN:  1602, Your Honor.

13          MR. FAZEL:  Is this a summary chart?

14          MR. WARREN:  Yes.

05:51:09  15          MR. FAZEL:  Judge, we'd object to this witness

16  testifying to a summary chart.

17          MR. WARREN:  Under what rule, Counsel?

18          MR. FAZEL:  Give me a minute and let me look at

19  it, Counsel.

05:51:30  20              Did this witness create this document?

21  Did he create it?

22          MR. WARREN:  Irrelevance under the Rule, Your

23  Honor.  But the answer is no.

24          THE COURT:  Something else -- has he ever seen

05:51:42  25  it before?

1          MR. FAZEL:  I have no idea.

2          THE COURT:  Pardon?

3          MR. FAZEL:  I have no idea.

4          THE COURT:  No.  I'm going to sustain the

5  objection.  Lay some predicate.  At least he knows what it

6  is, he looked at it, it's an accurate representation of

7  what it purports to show.

8          MR. WARREN:  Of course, Your Honor, we're

9  relying on the Court's prior ruling that the exhibits were

10  admitted unless there was a specific objection.  That's why

11  I didn't --

12          THE COURT:  I think he is specifically

13  objecting.

14          MR. FAZEL:  Yes.  I'm sorry if I wasn't clear.

15          THE COURT:  That's why I picked up.

16          MR. WARREN:  Of course, Your Honor.  That's why

17  I didn't lay any foundation to start.

18  BY MR. WARREN:

19  **Q.**   Mr. Collinsworth, do you recognize that document,

20  1602?

21  **A.**   I do.

22  **Q.**   What is it?

23  **A.**   It is the year-end balances for the Tier 2 portfolio

24  for the years 2003 and 2008.

25  **Q.**   Did you prepare this document?

*Direct-Collinsworth/By Mr. Warren*

1   **A.**   No.

2   **Q.**   Have you verified the information contained in this

3   document?

4   **A.**   Yes.

05:52:26   5   **Q.**   How?

6   **A.**   Comparing it to the sheets that Fred Palimden

7   prepared to this.

8   **Q.**   Those are exhibits, 205, -4, -3, -2, -1 and -0 that

9   were just admitted in evidence?

05:52:42   10   **A.**   Correct.

11               MR. WARREN:  Your Honor, at this time we'd

12   offer Exhibit 1602 as a summary document under Rule 1006.

13               MR. FAZEL:  I guess -- I'm going to renew my

14   objection.  But I guess I'm confused as to -- it says

05:52:52   15   tracking reports as to 2004 to 2008.  You just indicated

16   it's from 2000 to 2000 and something different.  So which

17   one is?

18               MR. WARREN:  I was counting the exhibits that

19   it goes to Exhibits 200 to 205.

05:53:05   20               MR. FAZEL:  But it's for the years 2004 to

21   2008?

22               MR. WARREN:  That's correct.

23               MR. FAZEL:  I have the same objection.

24               THE COURT:  Okay.  Overruled.  The summary

05:53:12   25   Exhibit 1602 is admitted.

*Direct-Collinsworth/By Mr. Warren*

1  BY MR. WARREN:

2  **Q.**   Mr. Collinsworth, please explain to the jury what

3  this document shows.

4  **A.**   This is the year-end balances for the Tier 2

05:53:29  5  portfolio for the years 2003 and 2008.

6  **Q.**   And what was the total balance of Stanford

7  International Bank's Tier 2 assets as of year end 2003?

8  **A.**   145 million.

9  **Q.**   And what was the total year-end balance of the Tier 2

05:53:45  10  assets as of 2007?

11  **A.**   889 million.

12  **Q.**   Mr. Collinsworth, if you could hold that document

13  just to the side for a minute, I'd like to show you

14  Government's Exhibit 120, which has already been admitted

05:54:02  15  into evidence.

16           THE COURT:  120 is in, because you had 116

17  through 120 is in.

18           MR. WARREN:  Yes, Your Honor.

19           THE COURT:  Or -- yes, identify it.  All right.

05:54:15  20  Go on.  We understand.

21  BY MR. WARREN:

22  **Q.**   Mr. Collinsworth, what's Exhibit 120?

23  **A.**   It's the 2007 Stanford annual report.

24  **Q.**   Did you ever see annual reports during the time you

05:54:28  25  were at SFG?

*Direct-Collinsworth/By Mr. Warren*

1  **A.**  I did.

2  **Q.**  If you would please turn to Page 3, the financial

3  highlights page.

4         MR. WARREN:  If we could blow up the top half,

05:54:42  5  please.

6  BY MR. WARREN:

7  **Q.**  Mr. Collinsworth, what were the total reported assets

8  of Stanford International Bank as of year end 2005?

9  **A.**  Roughly 4 billion.

05:54:58  10  **Q.**  Now, if you could please flip back to Exhibit 1602

11  the chart, and I want you to remember that number in your

12  head, 4 billion, and tell me what the total Tier 2 assets

13  were as of year end 2005.

14  **A.**  403 million.

05:55:15  15  **Q.**  Why the discrepancy?

16  **A.**  The 403 million represents just the Tier 2 assets,

17  this -- the end report shows the combined totals of the

18  Tier 1, 2 and 3.

19         MR. WARREN:  And if we go back to the annual

05:55:34  20  report.

21  BY MR. WARREN:

22  **Q.**  And, Mr. Collinsworth, what were the total reported

23  assets of Stanford International Bank as of year end --

24  before we get there -- I'm sorry.  2005, you said.

05:56:17  25  **A.**  4 billion.

*Direct-Collinsworth/By Mr. Warren*

1  **Q.**   This is total assets.  And -- I'm sorry.  On 1602,

2  what was the total amount?

3  **A.**   For 2005, 403 million.

4  **Q.**   Now, if we look at 2006, what's the total reported

05:57:11  5  assets according to the annual report of Stanford

6  International Bank for 2006?

7  **A.**   5 billion.

8  **Q.**   That's the 5.3 billion?

9  **A.**   5.3 billion.

05:57:27  10  **Q.**   And what about the total Tier 2 assets, looking back

11  at Exhibit 1602?

12  **A.**   For 2006, it was 599 million.

13  **Q.**   And, lastly, let's look at 2007.  What was the total

14  reported assets by Stanford International Bank for year

05:58:04  15  end 2007?

16  **A.**   7 billion.

17  **Q.**   And what were the total Tier 2 assets as of year end

18  2007?

19  **A.**   889 million.

05:58:18  20  **Q.**   400 million out of 4 billion, 599 million out of

21  5.3 billion and 889 million out of 7 billion.  Are those

22  numbers correct?

23  **A.**   Yes.

24  **Q.**   Did this concern you at all?

05:58:39  25  **A.**   No.

*Direct-Collinsworth/By Mr. Warren*

1  Q.   Why not?

2  A.   Because we were told that the Tier 2 was retained

3  earnings.  Unless you can see all the Stanford companies,

4  you don't know if those retained earnings are just SIB or

05:58:52  5  they're coming from other parts of the company.

6  Q.   And what did you understand to be contained in the

7  total assets for each of these years, what tiers?

8  A.   The totals of those assets were the defined Tier 1,

9  2 and 3.

05:59:08  10        THE COURT:  Anytime within the next five

11  minutes will be okay.

12  BY MR. WARREN:

13  Q.   Mr. Collinsworth, my apologies for making you do math

14  on the spot, but can you tell me roughly what percentage

05:59:25  15  of the total assets -- excuse me -- the total reported

16  assets of Stanford International Bank were actually

17  contained in Tier 2?

18  A.   Looks about 10 percent.

19        MR. WARREN:  Your Honor, I'm at a good stopping

05:59:44  20  point.

21        THE COURT:  Okay.  All right, ladies and

22  gentlemen, we did well this week relative to the time and

23  the attorneys conserving as much time as they can, so it's

24  moving along.

05:59:55  25           Thank you for your attention.  We'll see

1   you back ready to -- raise the screen -- ready to reconvene

2   Monday at 10:00 a.m.  Thank you and good afternoon.

3                 **(Recessed at 6:00 p.m.)**

4      **(The following was held out of the presence of the jury)**

06:01:38   5                 THE COURT:  What do you want to talk about?

6                 MR. FAZEL:  Just to get an idea of what the

7   schedule next week is, Mr. Scardino is not going to be here

8   Monday of next week.  I know there are a couple of

9   witnesses that he's assigned to for next week, and I want

06:01:53   10   to make sure that we don't run afoul to that.

11                 MR. STELLMACH:  Well, I think, Your Honor,

12   we're going to continue the testimony of Mr. Collinsworth

13   and Ms. Althea Crick on Monday, and then Tuesday we'll

14   start, I think, Arnold Knoche and Henry Amadio.

06:02:16   15                 THE COURT:  Again.

16                 MR. STELLMACH:  On Monday, only two witnesses

17   we'll be able to do given the constraints are going to be

18   Ms. Crick and finishing up Mr. Collinsworth.

19                 THE COURT:  About how much more time do you

06:02:28   20   have with him, just ballpark, an hour?

21                 MR. WARREN:  Ballpark.

22                 THE COURT:  Okay.

23                 MR. FAZEL:  That's it for him?  An hour?  Okay.

24                 THE COURT:  And then cross?  I forget the

06:02:43   25   numbers you gave me.  I mean, you've you heard it now.

1  About how long?

2          MR. FAZEL:  I have heard -- I would say

3  probably equivalent to the direct, at least.

4          THE COURT:  Couple of hours?

06:02:50  5          MR. FAZEL:  At least.

6          THE COURT:  All right.  And then.

7          MR. FAZEL:  Ms. Crick.

8          THE COURT:  And then Ms. Crick.  What's her

9  role?

06:02:55  10         MR. COSTA:  She's from Antigua.  She's the

11  witness we have to get on Monday because she has foreign

12  travel that's not refundable.

13         THE COURT:  When is she getting back -- I mean,

14  when does she have to leave?

06:03:05  15         MR. COSTA:  We'll put her on Monday.  She's not

16  a lengthy witness.

17         THE COURT:  Oh, she's not.  That's the question

18  I had.

19         MR. COSTA:  The plan will be to finish up

06:03:10  20  Mr. Collinsworth, have Ms. Crick testify and then end it

21  there and then Tuesday we go into --

22         THE COURT:  And if it gets close, we can let

23  Mr. Collinsworth just step aside, get the lady from the

24  Caribbean on and get her back on her plane.

06:03:23  25         MR. COSTA:  I don't anticipate.  I think we'll

1  get them both done easily on Monday.

2          MR. FAZEL:  Somehow I thought that

3  Mr. Collinsworth is going to be longer for the government

4  than what appears to be.

06:03:34  5          THE COURT:  They have another hour.  Don't

6  worry about it.  We'll do it.  If we have to adjourn a

7  little bit early, nobody is going to complain.

8          MR. FAZEL:  All right.

9          MR. STELLMACH:  There's only one other issue,

06:03:44  10  Judge.

11          THE COURT:  One other issue.

12          MR. STELLMACH:  Regarding exhibits, I think the

13  Court indicated earlier today when we were given exhibits

14  in the middle of the cross that this would be sort of a new

06:03:53  15  chapter going forward.

16          THE COURT:  Correct.

17          MR. STELLMACH:  And I'd just like to have an

18  understanding of what this deadline is that the defense has

19  to meet.

06:04:02  20          THE COURT:  Well, you tell me.  What do you

21  want?  In other words, my position is that you get it --

22  and I'll determine what a reasonable time is, but get it a

23  reasonable time ahead of your witnesses starting in.  And

24  if I feel it's not reasonable, I know that's very

06:04:18  25  subjective, but then I'll just determine that they cannot

1 enter the exhibits they show you.

2                 So if you can reach an agreement between

3 yourself, fine; otherwise, it's going to be pretty

4 arbitrary, and that cuts both ways.

06:04:32  5                 MR. COSTA:  We've tried for a week to

6 reach an agreement.  I mean, basically, now we're getting

7 them the night before or even the morning of, which

8 means --

9                 THE COURT:  What's the minimum amount of time

06:04:40  10 you need in advance?  I mean, realistically, how many days?

11                 MR. COSTA:  We would ask three days.

12                 THE COURT:  Three days.

13                 MR. COSTA:  I mean, it really started as a week

14 before, if you remember.

06:04:46  15                 THE COURT:  Well, you have -- do you have -- do

16 you know what they're doing with this witness here,

17 Collinsworth?  Do you have the exhibits they're going to

18 use?

19                 MR. WARREN:  We were given exhibits this

06:04:56  20 morning, Your Honor.

21                 THE COURT:  All right.  That's this week.  You

22 got those; right?

23                 How about the next lady?

24                 MR. COSTA:  Nothing from Ms. Crick yet.

06:05:03  25                 THE COURT:  Ms. Crick.  All right.  So that's

1  Monday.

2              All right.  Who is next?  If you want, do

3  you need a --

4              MR. PARRAS:  They've been given the next two,

5  Judge.  Now, the only --

6              MR. COSTA:  I guess we're getting them in

7  rolling, then we get five more in the morning.

8              THE COURT:  No, no, I want to set a time limit,

9  all right?

10             MR. COSTA:  For the next two witnesses after

11 Ms. Crick, we have received a few exhibits.

12             THE COURT:  And those individuals are going on

13 Tuesday; is that correct?

14             MR. COSTA:  Correct.

15             THE COURT:  When can you get it to them?

16             MR. PARRAS:  We did, Judge.  We've given them

17 what we have.  If over the weekend in our preparation

18 something surprises us, we'll get them, but we given them.

19 We've done our good-faith effort to give them what we

20 believe we're going to use for those witnesses.

21             THE COURT:  That's all I can ask.  And if it's

22 not, I'll determine as to whether or not it's true,

23 surprise, and if I find out it's not, they won't get it in.

24             MR. COSTA:  But then after those two witnesses

25 on Tuesday, it's Mr. Davis --

1           THE COURT:  Try to do a three-day lead -- well,

2    do a three-day lead, but make sure they know who you're

3    calling.

4           MR. STELLMACH:  And we told them, Your Honor.

06:05:57    5           MR. PARRAS:  We do know Mr. Davis is next.

6    He's the biggest, most important witness in this whole

7    case.  We've worked on him all week, we're going to work on

8    him all day tomorrow, and we will do our best to be as

9    complete as possible this weekend.  I can't promise there

06:06:10   10    won't be one or two, but we're going to be as complete as

11    possible.

12           MR. STELLMACH:  I think my concern, Your Honor,

13    or our concern, is that given that they put such an

14    emphasis on him and they've been working on him, we've

06:06:19   15    gotten literally a handful of documents --

16           THE COURT:  Three days is it, period.  After

17    that, unless it's really a true surprise, a true rebuttal,

18    it's not coming in.

19           MR. STELLMACH:  Thank you, Your Honor.

06:06:29   20           THE COURT:  Thanks for your efforts.

21           MR. PARRAS:  Thank you, Judge.

22           THE COURT:  Off the record.

23           MR. FAZEL:  Actually, we have another one.

24           THE COURT:  Another one on the record.

06:06:37   25           MR. FAZEL:  We need to make an offer of proof

1 as to the value of the companies.

2            THE COURT:  If you want to do it now, that's

3 fine.

4            MR. FAZEL:  Your Honor, we'll submit something

06:06:52   5 in writing to make it simple.

6            THE COURT:  Is that satisfactory with the

7 government?  Government, is that satisfactory, an offer of

8 proof or do you want -- they want to do it in writing.

9            MR. COSTA:  Well, I know with Mr. Green they

06:07:04   10 said they wanted to put in some e-mails if you had ruled

11 differently, so just designate which e-mails those would

12 have been.

13            THE COURT:  Well, you tell me.  Do you want

14 to --

06:07:10   15            MR. COSTA:  The problem is Mr. Green -- we

16 never received those exhibits for Mr. Green, so I don't

17 even know what --

18            THE COURT:  What I'm going to do -- I'm not

19 sure -- most offers of proof I've got it right on the spot.

06:07:21   20 What I'll do, I want you to make the offer of proof orally

21 and do it -- if you don't want to do it today, okay, since

22 it's late -- I'm ready to stay around.  All right?

23            MR. FAZEL:  We can do it Monday.

24            THE COURT:  Do it Monday, first thing.  Remind

06:07:36   25 me Monday.

1          MR. FAZEL:  Sure.

2          THE COURT:  We'll let them stay in there for

3 five minutes and you can get it on the record.

4          MR. FAZEL:  We do have a matter to approach the

06:07:43  5 bench on the record.

6          THE COURT:  Do you need it on the record?

7          MR. FAZEL:  No.

8          MR. SCARDINO:  I don't think so.

9          THE COURT:  All right.  Come on up.

06:13:34 10          MR. SCARDINO:  I've been informed -- Mr. Costa

11 was nice to tell me they're getting access to transcripts

12 daily.

13          THE COURT:  Okay.

14          MR. SCARDINO:  I was wondering if the Court

06:13:43 15 would consider letting us have the equal opportunity to

16 have access to daily --

17          THE COURT:  What do they do, Johnny?

18          **(An off-the-record discussion was held)**

19               **(Recessed at 6:15 p.m.)**

20

21

22

23

24

25

1        **COURT REPORTER'S CERTIFICATE**

2

3   I, Johnny C. Sanchez, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6
                                    /s/
7                                   _____
                                    Johnny C. Sanchez, CRR, RMR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# #

**#8016** [1] - 1256:11

# $

**$1,647,000** [1] - 1460:14
**$1,647,296.38** [1] - 1460:16
**$1,927,000** [1] - 1473:12
**$10** [3] - 1266:2, 1357:19, 1496:10
**$10,000** [2] - 1262:23, 1405:16
**$2,500** [2] - 1476:16, 1478:11
**$200** [1] - 1539:19
**$50** [1] - 1411:14
**$70,000** [2] - 1262:23, 1405:16
**$700** [1] - 1417:14

# '

**'96** [1] - 1315:23
**'98** [1] - 1285:5
**'99** [1] - 1334:25

# /

**/s** [1] - 1574:6

# 0

**0** [1] - 1561:8
**09-CR-342** [1] - 1255:4

# 1

**1** [17] - 1357:17, 1357:22, 1369:9, 1369:14, 1370:2, 1420:17, 1474:22, 1484:24, 1492:15, 1540:10, 1540:11, 1540:12, 1540:15, 1554:17, 1561:8, 1563:18, 1565:8
**1.6** [3] - 1460:24, 1475:4, 1495:7
**1.647** [1] - 1460:18
**1.9** [1] - 1477:9
**1/2** [2] - 1415:24, 1459:12
**10** [11] - 1266:1, 1311:19, 1393:2, 1421:12, 1425:18, 1433:9, 1464:11, 1492:15, 1499:2, 1544:16, 1565:18
**100** [5] - 1351:20, 1352:1, 1427:21, 1437:11, 1467:14
**1004** [1] - 1255:22
**1006** [1] - 1561:12
**1015** [1] - 1461:20, 1511:15
**1018** [1] - 1256:3
**105** [1] - 1462:15
**10:00** [2] - 1307:15, 1566:2
**10:06** [1] - 1255:6
**10:58** [1] - 1307:17
**11** [4] - 1258:13, 1258:14, 1428:1, 1492:15

**116** [1] - 1562:16
**118** [1] - 1456:14
**11:10** [1] - 1307:16
**11:15** [1] - 1307:20
**12** [3] - 1428:14, 1458:8, 1492:15
**12-31-2007** [1] - 1554:11
**120** [5] - 1450:6, 1562:14, 1562:16, 1562:17, 1562:22
**1262** [1] - 1257:4
**12:44** [1] - 1394:14
**12:45** [5] - 1307:20, 1307:21, 1371:22, 1371:23, 1392:17
**12:50** [1] - 1371:23
**13** [3] - 1427:5, 1430:2, 1492:15
**131** [11] - 1286:23, 1287:3, 1288:2, 1297:12, 1298:21, 1421:2, 1433:8, 1483:6, 1490:7, 1509:21, 1512:5
**138** [3] - 1464:3, 1465:22, 1512:11
**1400** [1] - 1255:17
**1410** [1] - 1257:5
**1430** [1] - 1257:6
**1436** [1] - 1257:7
**1446** [1] - 1257:10
**145** [1] - 1562:8
**1478** [1] - 1257:11
**148** [3] - 1555:24, 1555:25, 1556:3
**15** [6] - 1386:18, 1392:20, 1448:21, 1510:14, 1510:18, 1513:23
**1509** [1] - 1257:12
**151** [1] - 1333:12
**1515** [1] - 1257:13
**1519** [1] - 1257:15
**1532** [3] - 1372:23, 1372:24, 1372:25
**1547** [1] - 1257:16
**16** [5] - 1425:19, 1433:9, 1435:13, 1492:15, 1498:19
**1602** [8] - 1559:7, 1559:12, 1560:20, 1561:12, 1561:25, 1563:10, 1564:1, 1564:11
**17th** [1] - 1472:24
**18** [2] - 1375:23, 1452:20
**18-month** [1] - 1460:21
**19** [3] - 1315:19, 1351:14, 1416:11
**1992** [1] - 1520:21
**1996** [2] - 1315:20, 1521:20
**1998** [6] - 1285:5, 1414:12, 1416:8, 1416:9, 1416:12
**1999** [2] - 1523:23, 1527:9

# 2

**2** [65] - 1256:4, 1294:12, 1296:15, 1333:14, 1369:10, 1369:16, 1370:1, 1370:3, 1375:15, 1393:2, 1393:3, 1405:22, 1406:2, 1406:23, 1416:11, 1420:17, 1475:12, 1486:13, 1492:15, 1502:18, 1514:20, 1533:1, 1533:3, 1533:4, 1533:7, 1533:20, 1534:2, 1540:5, 1541:10, 1541:11, 1541:14, 1541:15, 1541:24, 1542:5, 1542:6, 1542:16, 1544:4, 1544:7, 1544:19, 1544:22, 1545:2, 1546:7, 1546:14

1553:10, 1553:13, 1553:14, 1554:4, 1554:12, 1554:25, 1555:3, 1557:22, 1560:23, 1561:8, 1562:4, 1562:7, 1562:9, 1563:12, 1563:16, 1563:18, 1564:10, 1564:17, 1565:2, 1565:9, 1565:17
**20** [5] - 1386:19, 1441:17, 1465:14, 1513:23, 1539:22
**20-some-odd** [2] - 1303:2, 1358:8
**20-something** [2] - 1539:16, 1542:4
**200** [6] - 1538:23, 1538:24, 1538:25, 1558:6, 1558:24, 1561:19
**200,000** [1] - 1338:21
**2000** [3] - 1529:23, 1561:16
**20005** [1] - 1255:18
**2003** [8] - 1426:7, 1499:12, 1531:2, 1558:10, 1559:5, 1560:24, 1562:5, 1562:7
**2004** [8] - 1426:7, 1458:1, 1486:9, 1499:12, 1558:10, 1559:5, 1561:15, 1561:20
**2005** [15] - 1426:7, 1449:17, 1456:22, 1457:17, 1458:1, 1474:1, 1494:25, 1499:12, 1558:10, 1559:5, 1563:8, 1563:13, 1563:24, 1564:3
**2006** [8] - 1426:8, 1450:15, 1452:8, 1460:23, 1474:18, 1474:21, 1486:18, 1495:1, 1499:12, 1502:16, 1510:3, 1554:2, 1558:10, 1559:5, 1564:4, 1564:6, 1564:12
**2007** [14] - 1474:25, 1475:4, 1510:14, 1510:18, 1531:13, 1550:18, 1550:24, 1553:10, 1558:1, 1562:10, 1562:23, 1564:13, 1564:15, 1564:18
**2008** [36] - 1302:9, 1304:15, 1334:2, 1334:24, 1346:24, 1349:23, 1351:14, 1363:15, 1366:19, 1369:24, 1370:2, 1372:4, 1372:6, 1410:8, 1417:15, 1441:5, 1462:1, 1462:9, 1466:4, 1469:13, 1470:5, 1470:19, 1475:1, 1475:7, 1475:12, 1482:6, 1482:9, 1501:13, 1511:12, 1556:21, 1557:21, 1557:23, 1560:24, 1561:15, 1561:21, 1562:5
**2009** [10] - 1348:18, 1410:18, 1416:10, 1470:21, 1470:22, 1471:5, 1472:18, 1482:10, 1532:10
**201** [2] - 1558:6, 1558:24
**2012** [1] - 1255:5
**202** [2] - 1558:6, 1558:24
**203** [2] - 1558:6, 1558:24
**204** [5] - 1545:24, 1547:1, 1547:10, 1550:7, 1558:14
**205** [5] - 1556:8, 1556:22, 1558:22, 1561:8, 1561:19
**20s** [1] - 1537:19
**21** [2] - 1427:5, 1503:2
**21.9** [2] - 1502:25, 1503:9
**21st** [1] - 1535:10
**24** [2] - 1333:14, 1375:24
**24-affiliated** [1] - 1347:16
**27** [2] - 1255:5, 1537:15
**28** [2] - 1470:5, 1553:15

**29** [1] - 1412:25
**2:00** [3] - 1307:21, 1392:19, 1464:4

## 3

**3** [37] - 1267:6, 1287:8, 1296:14, 1369:10, 1423:15, 1434:9, 1454:8, 1457:25, 1483:10, 1487:8, 1490:12, 1490:15, 1491:14, 1491:15, 1492:14, 1540:17, 1540:19, 1540:23, 1541:3, 1541:14, 1541:15, 1541:21, 1541:22, 1542:7, 1542:9, 1542:23, 1544:24, 1545:3, 1545:9, 1545:11, 1545:13, 1545:20, 1561:8, 1563:2, 1563:18, 1565:9
**3,000-plus** [1] - 1333:24
**3-2** [1] - 1318:14
**3.2** [1] - 1318:10
**30** [11] - 1266:5, 1266:6, 1266:25, 1267:6, 1268:11, 1329:10, 1330:3, 1330:19, 1414:23, 1414:25, 1540:4
**302** [1] - 1438:17
**31** [5] - 1550:18, 1553:10, 1556:21, 1557:21, 1558:1
**31st** [3] - 1449:17, 1550:24, 1554:2
**3:30** [1] - 1464:4
**3:31** [1] - 1465:16
**3D** [6] - 1449:11, 1449:13, 1449:16, 1450:18, 1450:21, 1466:25
**3DI** [3] - 1479:21, 1480:16, 1513:13
**3rd** [1] - 1255:22

## 4

**4** [13] - 1298:21, 1308:8, 1381:20, 1382:1, 1421:10, 1457:25, 1492:14, 1502:18, 1561:8, 1563:9, 1563:12, 1563:25, 1564:20
**40** [1] - 1480:23
**40-year** [1] - 1456:10
**400** [1] - 1564:20
**401(k** [8] - 1450:18, 1450:21, 1451:7, 1451:16, 1451:25, 1466:25, 1480:15, 1513:13
**403** [3] - 1563:14, 1563:16, 1564:3
**42** [1] - 1520:3
**44** [1] - 1393:3
**454** [1] - 1557:24
**48** [2] - 1375:1, 1375:2
**4:00** [4] - 1464:11, 1518:14, 1518:15

## 5

**5** [20] - 1255:8, 1266:21, 1297:10, 1309:13, 1410:15, 1412:4, 1415:8, 1415:11, 1415:13, 1415:21, 1424:15, 1432:18, 1432:21, 1432:23, 1438:1, 1438:23, 1454:7, 1456:23, 1492:14, 1564:7
**5,000** [2] - 1277:8, 1277:12
**5.3** [3] - 1564:8, 1564:9, 1564:21

**50** [3] - 1267:1, 1415:14, 1415:15
**500-plus** [1] - 1417:14
**51** [1] - 1488:19
**515** [1] - 1256:11
**541** [1] - 1470:4
**550** [1] - 1549:10
**57** [1] - 1427:4
**599** [3] - 1553:25, 1564:12, 1564:20
**5:00** [1] - 1518:18

## 6

**6** [2] - 1383:13, 1492:15
**6-1-2009** [2] - 1354:4, 1354:5
**60** [15] - 1415:15, 1462:18, 1463:17, 1501:13, 1501:16, 1501:23, 1503:1, 1503:2, 1503:11, 1508:15, 1509:8, 1511:8, 1511:9, 1511:19, 1511:25
**61129** [1] - 1255:14
**62** [1] - 1415:24
**66** [2] - 1524:4, 1524:17
**69** [1] - 1446:16
**6:00** [1] - 1566:3
**6:15** [1] - 1573:19

## 7

**7** [8] - 1290:8, 1290:9, 1492:15, 1524:4, 1524:12, 1564:16, 1564:21
**7.7** [1] - 1427:5
**70** [1] - 1467:14
**713.250.5581** [1] - 1256:12
**73** [1] - 1375:2
**75** [2] - 1271:15, 1271:16
**77002** [2] - 1255:23, 1256:4, 1256:11
**77208-1129** [1] - 1255:15
**77279** [1] - 1256:7
**79535** [1] - 1256:7

## 8

**8** [6] - 1415:10, 1415:20, 1416:10, 1454:6, 1459:12
**80** [1] - 1429:8
**800,000** [1] - 1338:22
**8036** [2] - 1547:1, 1549:15
**830** [1] - 1418:10
**87** [2] - 1524:4, 1524:20
**888** [5] - 1553:12, 1553:20, 1556:3, 1556:4, 1557:25
**888-million-dollar** [1] - 1556:1
**889** [3] - 1562:11, 1564:19, 1564:21

## 9

**9** [2] - 1434:10, 1497:18
**9.86** [1] - 1554:13
**90** [4] - 1347:15, 1461:1, 1461:3, 1461:13
**90,000** [1] - 1334:2

**96** [1] - 1315:21
**9th** [1] - 1486:18

## A

**a.m** [3] - 1255:6, 1307:17, 1566:2
**ability** [9] - 1347:2, 1347:3, 1391:20, 1423:23, 1498:2, 1498:4, 1524:19
**able** [39] - 1277:11, 1283:2, 1297:22, 1297:24, 1319:1, 1327:15, 1329:4, 1330:10, 1340:6, 1347:3, 1351:23, 1351:24, 1352:1, 1352:3, 1356:10, 1387:20, 1392:25, 1393:6, 1393:7, 1397:23, 1411:17, 1411:21, 1412:18, 1412:19, 1414:11, 1438:9, 1438:15, 1439:21, 1440:15, 1454:16, 1454:19, 1472:3, 1472:4, 1472:8, 1472:10, 1478:8, 1512:17, 1523:12, 1566:17
**above-entitled** [1] - 1574:5
**abroad** [1] - 1534:9
**absolute** [2] - 1306:9, 1459:4
**absolutely** [14] - 1270:3, 1307:11, 1316:4, 1316:6, 1395:24, 1430:9, 1444:7, 1456:5, 1473:15, 1473:20, 1476:5, 1490:20, 1514:10, 1514:14
**Abu** [1] - 1496:6
**abundance** [5] - 1283:22, 1284:4, 1291:1, 1341:12, 1342:14
**accept** [3] - 1506:5, 1514:2, 1556:12
**acceptable** [1] - 1337:19
**accepted** [1] - 1355:24
**access** [3] - 1533:17, 1573:11, 1573:16
**accommodations** [1] - 1448:9
**accomodation** [1] - 1448:12
**accompanying** [1] - 1309:2
**accomplish** [1] - 1496:11
**according** [5] - 1397:8, 1429:2, 1436:14, 1516:1, 1564:5
**account** [12] - 1291:9, 1355:20, 1450:19, 1450:21, 1451:8, 1455:4, 1459:15, 1463:8, 1494:8, 1513:13, 1553:1, 1557:11
**accountant** [6] - 1349:5, 1355:25, 1356:13, 1430:21, 1436:18, 1504:8
**accountants** [5] - 1324:19, 1396:1, 1420:10, 1504:6, 1516:6
**accounted** [1] - 1516:3
**accounting** [32] - 1274:20, 1274:25, 1275:20, 1278:5, 1321:12, 1348:20, 1349:4, 1355:24, 1356:3, 1357:8, 1357:11, 1358:1, 1358:8, 1358:16, 1359:4, 1359:5, 1359:7, 1360:9, 1361:11, 1363:2, 1371:19, 1395:10, 1396:13, 1396:19, 1397:13, 1398:17, 1420:16, 1420:21, 1420:23, 1516:2, 1516:4, 1521:15
**accounts** [13] - 1466:25, 1471:23, 1534:4, 1534:5, 1538:18, 1540:2, 1542:11, 1542:12, 1542:15, 1553:13, 1553:14, 1554:12, 1554:22
**Accredited** [6] - 1486:8, 1491:11,

1491:24, 1492:13, 1498:2, 1498:8

**accredited** [9] - 1283:4, 1285:18, 1285:25, 1299:9, 1300:10, 1301:10, 1422:4, 1422:22, 1434:25

**accrued** [2] - 1432:9, 1432:15

**accumulate** [1] - 1333:1

**accumulated** [2] - 1432:1, 1451:24

**accuracy** [2] - 1473:21, 1473:25

**accurate** [16] - 1267:22, 1335:18, 1378:15, 1385:20, 1406:15, 1430:8, 1482:9, 1483:1, 1508:17, 1514:16, 1516:25, 1517:3, 1517:18, 1517:20, 1517:23, 1560:6

**accurately** [4] - 1378:23, 1402:19, 1508:4, 1508:11

**acknowledging** [2] - 1291:6, 1320:10

**acronym** [1] - 1361:16

**act** [1] - 1438:12

**acted** [1] - 1420:12

**acting** [1] - 1440:2

**action** [3] - 1371:7, 1517:8, 1517:11

**activate** [1] - 1345:23

**activated** [1] - 1522:9

**active** [2] - 1390:2, 1522:9

**activities** [5] - 1324:11, 1324:13, 1324:14, 1455:10, 1515:9

**activity** [2] - 1332:1, 1332:5

**actual** [5] - 1294:12, 1433:9, 1552:18, 1552:25, 1554:21

**add** [4] - 1266:15, 1349:2, 1393:8, 1427:15

**addendum** [1] - 1319:7

**addition** [1] - 1439:2

**additional** [10] - 1291:9, 1301:9, 1313:8, 1314:24, 1314:25, 1315:1, 1320:10, 1349:2, 1474:25, 1557:10

**address** [7] - 1351:24, 1461:18, 1463:23, 1468:22, 1469:18, 1512:14

**adequate** [1] - 1468:20

**adjourn** [2] - 1518:21, 1568:6

**Administration** [1] - 1450:4

**admissibility** [1] - 1549:16

**admission** [1] - 1412:11

**admissions** [2] - 1387:11, 1413:5

**admitted** [6] - 1456:14, 1464:3, 1560:10, 1561:9, 1561:25, 1562:14

**adopted** [1] - 1290:21

**advance** [1] - 1569:10

**adversely** [1] - 1463:4

**advertised** [1] - 1350:21

**advice** [5] - 1327:2, 1327:12, 1480:19, 1504:20, 1524:19

**advise** [1] - 1326:22

**advisor** [34] - 1280:24, 1292:5, 1292:6, 1332:25, 1340:17, 1340:20, 1356:7, 1358:13, 1370:25, 1371:1, 1448:4, 1450:25, 1454:5, 1461:16, 1463:2, 1466:13, 1466:15, 1466:17, 1466:18, 1466:20, 1466:24, 1467:22, 1469:1, 1471:3, 1501:12, 1502:2, 1503:13, 1504:21, 1506:18, 1512:13, 1524:18, 1536:11, 1544:22

**advisors** [28] - 1263:13, 1263:22, 1266:18, 1267:14, 1270:15, 1276:5, 1305:10, 1318:25, 1319:4, 1334:9, 1335:3, 1335:4, 1340:16, 1350:14, 1383:16, 1391:11, 1391:19, 1410:9, 1417:13, 1536:4, 1536:5, 1536:6, 1538:8, 1543:18, 1543:21, 1544:2, 1544:18, 1545:20

**affairs** [4] - 1301:11, 1301:16, 1301:19, 1301:20

**affect** [3] - 1387:19, 1454:22, 1463:4

**affected** [1] - 1476:8

**affecting** [2] - 1491:23, 1492:13

**affiliated** [2] - 1271:17, 1347:20

**affiliates** [2] - 1308:15, 1333:15

**affiliation** [1] - 1525:16

**affirmatively** [1] - 1306:24

**afford** [2] - 1478:8, 1478:11

**afoul** [1] - 1566:10

**afraid** [1] - 1306:14

**afternoon** [3] - 1547:7, 1547:8, 1566:2

**afterwards** [1] - 1510:23

**agencies** [1] - 1323:1

**agency** [2] - 1289:22, 1493:12

**agent** [3] - 1354:9, 1354:14, 1370:21

**Agent** [1] - 1450:10

**agents** [2] - 1308:16, 1441:2

**ago** [9] - 1258:20, 1309:17, 1322:24, 1358:8, 1375:24, 1376:6, 1379:2, 1485:11, 1512:9

**agree** [21] - 1271:24, 1279:3, 1280:15, 1291:14, 1320:24, 1328:20, 1334:5, 1340:25, 1354:10, 1357:6, 1357:24, 1358:4, 1367:15, 1385:15, 1394:11, 1416:17, 1482:14, 1489:23, 1503:10, 1506:1

**agreed** [2] - 1295:4, 1364:23

**agreement** [14] - 1265:2, 1265:10, 1265:21, 1286:7, 1291:5, 1291:8, 1294:25, 1298:8, 1304:9, 1309:3, 1485:15, 1486:2, 1569:2, 1569:6

**Agreement** [1] - 1486:7

**agreements** [4] - 1505:15, 1505:16, 1505:19

**ahead** [13] - 1261:25, 1284:4, 1291:2, 1302:12, 1303:21, 1307:24, 1351:4, 1353:22, 1373:16, 1394:15, 1465:19, 1484:16, 1568:23

**airline** [1] - 1475:22

**alarming** [1] - 1382:18

**Ali** [1] - 1255:20

**aligned** [1] - 1458:22

**all-exclusive** [1] - 1422:5

**allegations** [2] - 1350:8, 1353:14

**allege** [1] - 1350:9

**alleged** [2] - 1344:7, 1353:20

**alleging** [1] - 1352:21

**ALLEN** [1] - 1255:6

**Allen** [15] - 1327:5, 1346:4, 1346:9, 1346:19, 1351:25, 1354:12, 1376:2, 1376:5, 1376:14, 1377:7, 1377:12, 1397:23, 1526:21, 1526:23, 1535:16

**Allen's** [1] - 1376:13

**allocated** [3] - 1555:4, 1555:9, 1555:13

**allocation** [12] - 1264:4, 1338:19, 1530:25, 1531:4, 1531:11, 1531:16, 1531:25, 1532:5, 1536:22, 1537:6, 1554:23, 1555:12

**Allocation** [1] - 1555:2

**allocations** [2] - 1539:14, 1555:7

**Allocations** [1] - 1555:11

**allow** [6] - 1352:14, 1358:4, 1363:3, 1420:23, 1437:21, 1478:2

**allowed** [3] - 1383:23, 1410:19, 1473:5

**allowing** [1] - 1410:23

**allows** [1] - 1444:6

**alluded** [1] - 1461:4

**almost** [3] - 1312:22, 1392:17, 1411:10

**alternative** [2] - 1427:5, 1555:13

**alternatives** [1] - 1464:19

**Althea** [1] - 1566:13

**altitude** [1] - 1496:17

**altogether** [1] - 1503:8

**Alvarado** [2] - 1325:21, 1327:2

**Amadio** [1] - 1566:14

**Amegy** [3] - 1375:22, 1377:16, 1377:19

**amended** [1] - 1260:24

**Amended** [1] - 1510:18

**America** [3] - 1375:1, 1398:8, 1409:7

**AMERICA** [1] - 1255:4

**amount** [19] - 1285:20, 1339:18, 1364:24, 1374:24, 1382:5, 1428:21, 1428:25, 1430:23, 1431:3, 1431:20, 1460:15, 1460:16, 1460:17, 1476:24, 1544:6, 1554:1, 1564:2, 1569:9

**amounts** [2] - 1297:17, 1393:9

**analysis** [4] - 1263:21, 1380:1, 1391:7, 1548:8

**analyst** [15] - 1292:3, 1370:24, 1527:10, 1528:13, 1528:16, 1529:21, 1530:2, 1537:4, 1537:13, 1538:15, 1542:20, 1551:3, 1551:10, 1551:12, 1552:6

**analysts** [34] - 1386:10, 1388:15, 1390:22, 1390:23, 1390:25, 1391:5, 1392:6, 1424:8, 1524:21, 1530:17, 1531:20, 1533:5, 1533:7, 1534:3, 1534:8, 1537:5, 1537:9, 1537:20, 1537:25, 1538:6, 1538:13, 1538:15, 1539:1, 1539:2, 1539:4, 1539:11, 1542:4, 1542:7, 1542:9, 1542:25, 1544:23, 1547:16, 1552:5

**analyzing** [2] - 1361:10, 1387:21

**Andrew** [1] - 1255:16

**angle** [1] - 1484:12

**announce** [1] - 1393:7

**announcements** [1] - 1362:20

**annual** [20] - 1350:12, 1359:1, 1359:2, 1418:4, 1421:7, 1422:11, 1423:5, 1423:12, 1425:9, 1436:17, 1456:9, 1456:21, 1456:23, 1457:18, 1458:9,

1474:1, 1562:23, 1562:24, 1563:19, 1564:5

**answer** [18] - 1262:16, 1274:7, 1301:4, 1328:5, 1330:17, 1346:22, 1365:9, 1365:11, 1365:12, 1412:14, 1432:5, 1443:25, 1463:11, 1481:18, 1501:18, 1510:24, 1547:18, 1559:23

**Answered** [1] - 1306:24

**answers** [4] - 1274:3, 1275:23, 1301:9, 1545:7

**anticipate** [1] - 1567:25

**anticipated** [1] - 1261:13

**Antigua** [17] - 1289:24, 1369:25, 1376:6, 1379:24, 1384:7, 1384:10, 1384:16, 1384:23, 1385:5, 1385:13, 1408:15, 1408:19, 1408:20, 1429:12, 1493:14, 1544:21, 1567:10

**anytime** [2] - 1381:11, 1565:10

**anyway** [1] - 1484:23

**apologies** [1] - 1565:13

**apologize** [1] - 1294:17

**appear** [2] - 1489:6, 1556:25

**APPEARANCES** [2] - 1255:12

**applicable** [1] - 1440:5

**application** [1] - 1441:25

**apply** [1] - 1264:11

**appreciate** [1] - 1261:3

**approach** [8] - 1341:6, 1341:12, 1345:25, 1348:5, 1394:5, 1394:6, 1437:14, 1573:4

**approaching** [1] - 1342:15

**appropriate** [1] - 1393:9

**approved** [4] - 1340:18, 1340:19, 1353:2, 1402:12

**approximate** [3] - 1426:6, 1478:11, 1499:11

**April** [4] - 1452:18, 1523:23, 1527:9

**Arab** [1] - 1496:6

**arbitrary** [1] - 1569:4

**architect** [2] - 1447:5, 1479:2

**architectural** [1] - 1449:14

**architecture** [1] - 1447:10

**Architecture** [1] - 1447:11

**architecture/engineering/ construction** [1] - 1449:5

**area** [2] - 1384:23, 1448:16

**areas** [1] - 1350:20

**argument** [1] - 1438:14

**arm** [2] - 1274:15, 1530:10

**armor** [1] - 1448:3

**Army** [4] - 1448:4, 1522:10, 1522:13, 1522:20

**Arnold** [1] - 1566:14

**arrow** [2] - 1536:14, 1536:20

**art** [2] - 1274:1, 1274:8

**articles** [1] - 1517:22

**articulate** [2] - 1406:10, 1508:7

**articulately** [1] - 1351:12

**Arts** [2] - 1447:9, 1520:24

**aside** [2] - 1488:20, 1567:23

**aspect** [1] - 1528:24

**aspects** [1] - 1496:17

**asserted** [2] - 1378:5, 1489:13

**assessment** [1] - 1358:15

**Assessment** [2] - 1525:10, 1552:6

**asset** [16] - 1264:4, 1268:21, 1453:4, 1453:15, 1453:16, 1459:25, 1474:10, 1529:15, 1530:25, 1531:3, 1531:10, 1531:15, 1531:25, 1532:3, 1532:5, 1555:12

**Asset** [2] - 1525:7, 1525:9

**assets** [70] - 1266:2, 1268:17, 1268:19, 1285:21, 1313:10, 1350:16, 1352:9, 1352:24, 1361:12, 1377:8, 1377:17, 1397:16, 1397:19, 1410:13, 1410:16, 1412:4, 1414:13, 1414:18, 1414:24, 1414:25, 1415:16, 1417:11, 1425:10, 1426:23, 1427:17, 1427:23, 1428:5, 1429:25, 1432:21, 1432:24, 1436:25, 1440:15, 1453:15, 1453:20, 1454:13, 1457:25, 1461:13, 1474:15, 1474:16, 1476:12, 1511:19, 1511:25, 1515:24, 1532:22, 1533:6, 1533:20, 1536:7, 1540:23, 1541:4, 1542:14, 1542:22, 1544:4, 1544:19, 1545:13, 1554:24, 1562:7, 1562:10, 1563:7, 1563:12, 1563:16, 1563:23, 1564:1, 1564:5, 1564:10, 1564:14, 1564:17, 1565:7, 1565:8, 1565:15, 1565:16

**assigned** [10] - 1531:20, 1533:4, 1538:13, 1538:14, 1542:21, 1551:11, 1551:13, 1551:16, 1552:6, 1566:9

**assist** [1] - 1272:16

**Assistant** [1] - 1255:14

**assisted** [1] - 1256:13

**associated** [1] - 1340:23

**assume** [15] - 1278:14, 1278:21, 1285:15, 1327:1, 1340:11, 1357:14, 1377:23, 1383:19, 1385:10, 1392:7, 1396:25, 1398:22, 1408:2, 1408:9, 1433:6

**assumed** [2] - 1289:18, 1308:18

**assuming** [6] - 1278:16, 1278:23, 1297:6, 1324:3, 1417:4, 1543:16

**assumption** [2] - 1420:12, 1507:24

**assumptions** [1] - 1417:2

**assurance** [6] - 1434:23, 1498:6, 1508:25, 1509:4, 1509:5, 1509:8

**assure** [1] - 1469:22

**assured** [1] - 1456:1

**attempt** [1] - 1472:11

**attempts** [1] - 1441:5

**attended** [1] - 1379:7

**attention** [10] - 1371:25, 1405:11, 1462:7, 1462:10, 1467:2, 1509:24, 1552:14, 1553:4, 1555:15, 1565:25

**attentive** [1] - 1393:13

**attest** [1] - 1285:23

**Attorney** [2] - 1255:14, 1256:3

**attorney** [8] - 1280:25, 1321:21, 1374:16, 1465:11, 1479:17, 1504:11, 1504:12, 1504:15

**attorneys** [11] - 1258:4, 1350:7, 1370:23, 1464:6, 1464:10, 1464:19, 1465:4, 1504:3, 1504:8, 1504:10

**attractive** [2] - 1333:3, 1383:21

**attributed** [1] - 1450:10

**audible** [1] - 1510:24

**audit** [7] - 1330:10, 1330:12, 1330:13, 1330:14, 1330:18, 1330:19, 1348:21

**audited** [4] - 1370:10, 1397:7, 1429:11, 1436:18

**auditing** [5] - 1328:22, 1329:4, 1330:4, 1330:6, 1429:20

**auditor** [3] - 1329:5, 1349:5, 1429:12

**auditors** [2] - 1328:14, 1328:16

**audits** [1] - 1429:14

**August** [4] - 1452:19, 1460:23, 1462:1, 1462:9, 1474:18, 1474:20, 1486:18, 1510:3

**authenticated** [1] - 1489:3

**authentication** [1] - 1488:21

**authenticity** [1] - 1379:5

**authorities** [1] - 1290:21

**authority** [3] - 1539:16, 1539:21, 1539:24

**available** [13] - 1268:22, 1299:17, 1299:23, 1300:4, 1300:6, 1301:8, 1310:20, 1310:23, 1334:20, 1355:12, 1422:7, 1422:17, 1443:24

**Avenue** [1] - 1255:17

**avoid** [1] - 1338:7

**avoidance** [4] - 1371:9, 1371:10, 1371:12, 1371:14

**avoiding** [1] - 1344:23

**aware** [23] - 1284:20, 1292:16, 1293:1, 1303:17, 1303:19, 1305:22, 1323:24, 1339:21, 1348:14, 1368:1, 1368:22, 1368:24, 1370:17, 1370:20, 1402:2, 1408:11, 1409:15, 1410:24, 1411:6, 1476:5, 1495:3, 1516:21, 1517:11

**awhile** [2] - 1298:11, 1298:12

**Axia** [1] - 1537:1

**B**

**bachelor** [1] - 1521:1

**Bachelor** [3] - 1447:9, 1520:24

**bachelor's** [1] - 1478:23

**backed** [4] - 1354:11, 1425:15, 1429:5, 1429:6

**background** [3] - 1353:13, 1447:7, 1478:21

**backing** [2] - 1437:2, 1437:7

**backup** [1] - 1557:11

**bad** [12] - 1282:7, 1292:24, 1305:1, 1306:9, 1338:7, 1338:11, 1347:2, 1435:8, 1442:19, 1442:21, 1482:13, 1517:13

**balance** [23] - 1377:16, 1430:23, 1430:25, 1431:3, 1431:9, 1431:20, 1432:2, 1432:6, 1432:10, 1432:11, 1432:14, 1526:3, 1553:6, 1553:9, 1553:21, 1553:22, 1553:23, 1555:22, 1557:22, 1557:25, 1558:1, 1562:6, 1562:9

**balances** [2] - 1560:23, 1562:4
**Baldwin** [1] - 1385:24
**ball** [2] - 1261:7, 1261:15
**ballpark** [2] - 1566:20, 1566:21
**Bancorp** [1] - 1375:24
**Bank** [58] - 1260:18, 1264:25, 1285:13, 1285:14, 1308:12, 1310:6, 1320:22, 1346:6, 1346:8, 1346:18, 1354:18, 1359:1, 1360:13, 1362:22, 1375:22, 1377:19, 1379:23, 1379:24, 1382:17, 1383:12, 1384:7, 1408:19, 1412:17, 1414:19, 1418:23, 1450:12, 1451:3, 1451:8, 1453:4, 1453:7, 1455:7, 1455:9, 1456:8, 1456:22, 1461:9, 1466:2, 1469:13, 1472:22, 1473:18, 1474:9, 1475:13, 1482:23, 1508:1, 1514:3, 1514:13, 1521:3, 1521:6, 1521:11, 1521:17, 1521:22, 1532:24, 1536:15, 1563:8, 1563:23, 1564:6, 1564:14, 1565:16
  **bank** [138] - 1264:22, 1293:8, 1293:10, 1293:13, 1294:7, 1296:3, 1297:24, 1302:7, 1302:9, 1304:11, 1304:18, 1306:3, 1306:5, 1306:7, 1306:14, 1310:3, 1316:9, 1316:19, 1317:7, 1317:19, 1317:24, 1322:9, 1322:11, 1330:6, 1330:18, 1346:12, 1349:2, 1350:16, 1350:17, 1362:5, 1363:21, 1364:15, 1373:22, 1374:3, 1375:3, 1375:5, 1375:22, 1376:6, 1376:9, 1376:11, 1379:19, 1379:22, 1380:1, 1390:14, 1391:8, 1391:10, 1391:13, 1396:21, 1407:22, 1407:24, 1407:25, 1408:10, 1408:11, 1408:15, 1408:17, 1408:18, 1408:21, 1410:20, 1411:7, 1411:12, 1412:1, 1412:3, 1412:6, 1412:18, 1413:8, 1413:9, 1413:23, 1414:12, 1415:2, 1415:9, 1415:10, 1415:18, 1415:20, 1416:1, 1416:2, 1416:9, 1417:6, 1417:20, 1417:22, 1420:22, 1424:11, 1425:11, 1425:13, 1425:16, 1425:17, 1426:20, 1428:9, 1429:3, 1429:5, 1429:19, 1429:25, 1431:15, 1435:22, 1436:4, 1436:12, 1436:17, 1436:23, 1437:1, 1437:6, 1437:10, 1439:15, 1439:21, 1441:6, 1442:8, 1450:14, 1455:2, 1455:10, 1468:10, 1468:11, 1469:22, 1470:8, 1474:22, 1475:5, 1477:14, 1494:8, 1495:5, 1495:8, 1499:17, 1500:3, 1500:22, 1501:1, 1501:23, 1502:7, 1507:10, 1508:4, 1509:1, 1512:24, 1514:20, 1515:9, 1515:20, 1515:22, 1516:2, 1521:15
  **bank's** [27] - 1317:10, 1338:5, 1410:13, 1417:11, 1420:7, 1423:22, 1425:8, 1425:10, 1426:22, 1427:23, 1429:12, 1436:25, 1453:20, 1459:23, 1460:2, 1461:17, 1467:24, 1468:1, 1468:18, 1469:6, 1470:1, 1470:3, 1470:4, 1474:10, 1474:15, 1501:4, 1501:13
  **Bank's** [3] - 1454:13, 1473:21, 1562:7

**bank-type** [1] - 1455:10
**banker** [2] - 1374:5, 1375:1
**banker's** [8] - 1317:14, 1317:15, 1317:20, 1468:12, 1503:19, 1503:24, 1504:1, 1504:9
**bankers** [2] - 1375:8, 1462:15
**banking** [3] - 1369:12, 1453:8, 1524:21
**bankrupt** [5] - 1293:13, 1293:19, 1322:10, 1347:1, 1389:11
**banks** [7] - 1267:9, 1305:5, 1346:25, 1379:25, 1408:19, 1414:1, 1494:5
**Barbuda** [2] - 1289:24, 1493:15
**barely** [2] - 1271:7, 1509:19
**baseball** [3] - 1500:8, 1500:9, 1500:14
**based** [2] - 1308:19, 1449:11
**basic** [6] - 1360:5, 1522:12, 1522:16, 1524:13, 1528:17, 1533:15
**Basil** [15] - 1369:4, 1369:5, 1369:6, 1369:7, 1369:8, 1369:9, 1369:10, 1369:14, 1369:16, 1370:1, 1370:2, 1370:3, 1420:17
  **Basils** [1] - 1369:9
  **basis** [10] - 1276:10, 1304:23, 1339:3, 1371:8, 1389:21, 1418:25, 1461:15, 1553:2, 1553:3
**bat** [1] - 1290:2
**Bates** [1] - 1260:3
**bathed** [2] - 1403:18, 1404:18
**Baton** [4] - 1318:22, 1328:21, 1390:8, 1390:11
**BBB** [1] - 1317:15
**bear** [4] - 1287:23, 1292:17, 1347:25, 1439:15
**became** [6] - 1270:4, 1317:8, 1337:13, 1452:9, 1452:15, 1467:17
**become** [1] - 1476:11
**becoming** [2] - 1349:16, 1349:17
**BEFORE** [1] - 1255:10
**began** [2] - 1351:14, 1363:15
**begin** [1] - 1501:10
**beginning** [14] - 1269:4, 1318:10, 1366:2, 1380:17, 1404:18, 1405:15, 1460:7, 1467:4, 1467:10, 1467:24, 1471:6, 1498:22, 1537:16, 1537:17
**behalf** [1] - 1428:22
**behind** [6] - 1264:17, 1413:18, 1464:25, 1488:8, 1519:24, 1557:2
**belief** [2] - 1343:9, 1343:14
**believes** [1] - 1441:22
**bell** [1] - 1357:3
**belly** [1] - 1462:23
**belly-up** [1] - 1462:23
**below** [7] - 1309:19, 1396:18, 1461:23, 1462:17, 1553:20, 1554:5, 1557:25
**Bench** [1] - 1321:22
**bench** [6] - 1258:6, 1341:9, 1345:25, 1392:24, 1437:17, 1573:5
**beneath** [3] - 1424:25, 1426:10, 1429:10
**benefit** [9] - 1384:19, 1452:25, 1455:25, 1456:1, 1463:12, 1480:19,

1503:22, 1508:24, 1515:10
**bent** [1] - 1464:21
**Bernard** [2] - 1331:4, 1467:7
**Bernie** [1] - 1331:4
**best** [5] - 1267:5, 1319:18, 1376:18, 1416:13, 1571:8
**better** [4] - 1288:13, 1415:22, 1457:9, 1457:11
**between** [9] - 1306:9, 1370:18, 1383:14, 1386:18, 1447:19, 1480:3, 1513:23, 1534:8, 1569:2
**beyond** [4] - 1349:3, 1353:10, 1441:12, 1516:13
**big** [7] - 1307:14, 1321:12, 1348:20, 1349:5, 1407:20, 1458:5, 1459:6
**bigger** [2] - 1321:1
**biggest** [3] - 1467:5, 1467:6, 1571:6
**bill** [2] - 1443:21, 1443:22
**billion** [42] - 1266:1, 1266:2, 1266:21, 1267:6, 1367:6, 1410:15, 1410:20, 1412:4, 1412:5, 1415:8, 1415:10, 1415:12, 1415:13, 1415:20, 1415:21, 1416:10, 1416:11, 1432:18, 1432:21, 1432:23, 1438:1, 1438:23, 1457:25, 1470:12, 1474:22, 1475:4, 1475:12, 1496:10, 1514:20, 1563:9, 1563:12, 1563:25, 1564:7, 1564:8, 1564:9, 1564:16, 1564:20, 1564:21
**billions** [2] - 1417:17
**binders** [1] - 1556:25
**bit** [30] - 1258:23, 1265:15, 1274:22, 1283:10, 1290:17, 1306:15, 1316:22, 1321:6, 1328:4, 1338:24, 1359:8, 1367:25, 1380:11, 1381:22, 1392:15, 1431:17, 1434:8, 1434:12, 1442:5, 1453:12, 1477:13, 1478:20, 1491:25, 1519:16, 1524:6, 1524:9, 1525:3, 1528:22, 1539:6, 1568:7
**bite** [1] - 1377:11
**bites** [1] - 1523:16
**blame** [1] - 1381:13
**blanket** [9] - 1317:13, 1317:14, 1317:15, 1317:20, 1468:13, 1503:19, 1504:1, 1504:10
**blew** [1] - 1322:10
**blocking** [1] - 1288:6
**blow** [6] - 1426:13, 1428:14, 1459:2, 1490:25, 1498:21, 1563:4
**blow-up** [1] - 1459:2
**blown** [1] - 1491:2
**blue** [1] - 1533:8
**board** [20] - 1265:4, 1273:4, 1315:15, 1315:19, 1320:24, 1366:23, 1367:4, 1367:12, 1367:13, 1375:6, 1401:11, 1401:13, 1401:15, 1401:17, 1401:21, 1405:16, 1470:3, 1540:20, 1545:12, 1551:23
**Bogar** [1] - 1399:7
**boil** [1] - 1363:15
**bold** [3] - 1297:15, 1428:15, 1429:11
**bond** [11] - 1317:13, 1317:14, 1317:15, 1317:20, 1462:16, 1468:13, 1503:19, 1503:24, 1504:1, 1504:10, 1555:16

**bonds** [39] - 1268:20, 1276:4, 1338:23, 1360:23, 1426:3, 1426:23, 1453:6, 1462:18, 1463:17, 1463:19, 1481:23, 1499:8, 1501:7, 1501:14, 1501:17, 1501:24, 1502:10, 1502:12, 1502:13, 1503:3, 1503:4, 1508:16, 1509:9, 1511:8, 1511:9, 1511:10, 1511:20, 1512:1, 1521:8, 1526:1, 1528:17, 1531:21, 1532:19, 1533:8, 1534:1, 1540:4, 1541:6, 1555:13

**bonus** [4] - 1262:23, 1262:25, 1405:16, 1405:20

**book** [7] - 1359:12, 1359:15, 1359:17, 1369:21, 1369:23, 1458:20, 1497:8

**booked** [3] - 1357:16, 1357:22, 1377:8

**books** [1] - 1357:22

**bore** [1] - 1293:1

**born** [2] - 1265:5, 1446:18

**borrow** [1] - 1429:8

**borrowing** [1] - 1429:7

**Boston** [2] - 1448:23, 1449:1

**bottling** [1] - 1532:21

**bottom** [18] - 1287:13, 1344:5, 1344:6, 1462:11, 1463:16, 1490:14, 1549:14, 1510:5, 1510:10, 1510:15, 1510:18, 1511:16, 1549:20, 1552:1, 1553:17, 1555:1, 1555:16, 1556:6

**bought** [3] - 1272:24, 1497:16, 1513:21

**boutique** [1] - 1458:5

**box** [8] - 1377:14, 1483:18, 1484:11, 1535:21, 1535:25, 1536:12, 1537:8

**Box** [2] - 1255:14, 1256:7

**Boy** [1] - 1465:1

**branch** [2] - 1270:5, 1270:8

**break** [18] - 1307:21, 1307:22, 1328:6, 1344:22, 1371:21, 1371:23, 1392:18, 1405:8, 1444:9, 1444:17, 1453:12, 1464:8, 1464:9, 1464:11, 1464:14, 1470:24, 1518:19, 1528:22

**breakdown** [4] - 1418:24, 1426:20, 1555:3, 1555:8

**bribery** [1] - 1258:21, 1387:25

**brief** [2] - 1430:13, 1436:9

**briefly** [15] - 1280:22, 1283:5, 1289:2, 1318:19, 1321:5, 1338:1, 1370:15, 1401:25, 1437:15, 1521:13, 1525:23, 1531:23, 1538:3, 1557:19, 1559:2

**brigadier** [1] - 1387:8

**bright** [1] - 1383:17

**bring** [13] - 1262:9, 1298:20, 1308:7, 1343:22, 1378:4, 1383:17, 1393:10, 1397:11, 1424:18, 1439:15, 1439:20, 1441:5, 1441:7

**brings** [1] - 1470:11

**British** [3] - 1332:7, 1332:10, 1555:5

**brochure** [1] - 1423:8

**brochures** [5] - 1421:7, 1422:11, 1423:13, 1456:9, 1545:14

**broken** [1] - 1431:23

**broker** [36] - 1264:7, 1266:20, 1266:22, 1267:18, 1268:25, 1274:13, 1289:9, 1289:11, 1323:7, 1323:9,

1323:11, 1324:14, 1324:16, 1328:11, 1328:14, 1328:25, 1329:9, 1330:4, 1330:10, 1330:20, 1331:17, 1331:21, 1332:13, 1340:25, 1341:1, 1342:19, 1368:4, 1368:20, 1415:11, 1415:13, 1438:17, 1517:8, 1530:21, 1545:2

**broker/dealer** [1] - 1525:15

**brokerage** [28] - 1276:1, 1414:17, 1414:18, 1414:24, 1415:1, 1415:17, 1415:21, 1416:3, 1416:4, 1416:7, 1416:14, 1419:18, 1429:20, 1526:15, 1530:10, 1534:6, 1536:1, 1536:2, 1536:3, 1536:18, 1537:2, 1538:19, 1551:14, 1551:15, 1552:18, 1552:20, 1552:25, 1554:21

**brokers** [5] - 1260:17, 1264:6, 1289:7, 1419:9, 1545:18

**Brothers** [6] - 1364:25, 1365:2, 1366:13, 1366:17, 1462:24, 1462:25

**brought** [4] - 1337:23, 1394:5, 1438:21, 1480:8

**buck** [1] - 1417:23

**building** [2] - 1448:24, 1538:4

**bunch** [1] - 1339:2

**bunching** [1] - 1284:22

**burning** [1] - 1375:8

**business** [43] - 1265:22, 1267:15, 1271:1, 1272:6, 1272:11, 1277:25, 1300:7, 1300:8, 1323:8, 1323:15, 1323:16, 1332:1, 1332:5, 1337:19, 1339:13, 1341:1, 1341:2, 1359:12, 1359:15, 1359:17, 1376:5, 1376:8, 1376:20, 1377:3, 1380:3, 1385:9, 1385:13, 1397:6, 1399:20, 1402:6, 1422:18, 1480:23, 1496:23, 1526:12, 1532:20, 1546:20, 1546:23, 1547:1, 1549:10, 1558:12

**businesses** [7] - 1343:4, 1347:7, 1347:13, 1399:15, 1399:21, 1424:12, 1526:16

**businessperson** [1] - 1371:5

**bust** [1] - 1453:16

**buy** [10] - 1281:11, 1293:16, 1337:2, 1357:16, 1361:7, 1458:3, 1506:13, 1526:1, 1539:8, 1539:13

**buying** [2] - 1354:11, 1435:25

**BY** [133] - 1257:4, 1257:6, 1257:10, 1257:11, 1257:12, 1257:13, 1257:15, 1257:16, 1262:4, 1266:10, 1266:23, 1273:19, 1279:2, 1287:15, 1288:7, 1288:16, 1290:10, 1290:19, 1292:15, 1292:21, 1303:9, 1306:21, 1308:1, 1308:9, 1309:23, 1311:21, 1312:6, 1315:10, 1318:5, 1318:18, 1319:12, 1320:4, 1321:24, 1328:9, 1333:13, 1345:21, 1348:13, 1353:24, 1360:18, 1365:21, 1366:1, 1366:7, 1371:24, 1373:5, 1373:11, 1373:24, 1378:10, 1378:22, 1379:17, 1380:6, 1384:15, 1386:20, 1388:6, 1389:15, 1394:16, 1404:21, 1405:1, 1406:14, 1406:20, 1407:16, 1411:19, 1418:20, 1421:16, 1421:22, 1424:20, 1425:2, 1426:2,

1426:15, 1428:3, 1428:16, 1430:12, 1430:17, 1446:6, 1452:3, 1457:16, 1462:3, 1465:21, 1466:22, 1476:22, 1477:7, 1478:7, 1478:19, 1483:14, 1484:22, 1485:17, 1485:22, 1486:4, 1486:22, 1489:19, 1490:22, 1491:7, 1491:18, 1492:10, 1492:21, 1494:22, 1495:2, 1497:9, 1497:20, 1498:23, 1502:23, 1507:17, 1508:2, 1509:15, 1510:9, 1510:20, 1511:2, 1512:23, 1515:11, 1515:18, 1516:16, 1519:12, 1520:1, 1523:5, 1523:24, 1524:11, 1527:7, 1527:22, 1535:14, 1542:3, 1546:4, 1547:6, 1548:2, 1550:11, 1550:22, 1556:19, 1557:18, 1559:1, 1560:18, 1562:1, 1562:21, 1563:6, 1563:21, 1565:12

# C

**C-O-L-L-I-N-S-W-O-R-T-H** [1] - 1519:15

**calamity** [1] - 1304:15

**calculator** [1] - 1427:15

**California** [1] - 1479:25

**camera** [1] - 1261:20

**Canada** [1] - 1424:4

**cannot** [7] - 1299:11, 1299:20, 1343:8, 1422:5, 1431:10, 1440:2, 1568:25

**cap** [1] - 1533:8

**capabilities** [2] - 1347:6, 1508:8

**capital** [35] - 1346:12, 1349:2, 1352:6, 1354:19, 1355:19, 1361:17, 1361:18, 1362:1, 1362:2, 1362:3, 1362:4, 1362:5, 1362:7, 1362:9, 1362:15, 1362:16, 1362:18, 1362:21, 1363:3, 1363:10, 1364:24, 1366:24, 1367:5, 1367:6, 1367:15, 1367:18, 1367:21, 1369:18, 1369:19, 1410:21, 1412:5, 1458:16, 1470:4, 1470:7

**capitalize** [1] - 1448:18

**captain** [1] - 1447:25

**captive** [12] - 1320:18, 1321:8, 1321:11, 1321:13, 1321:16, 1321:25, 1322:4, 1332:14, 1332:17, 1332:18, 1332:19, 1333:2

**car** [1] - 1476:12

**Caracas** [1] - 1409:12

**card** [1] - 1418:21

**cardiac** [2] - 1449:25, 1450:9

**cards** [1] - 1408:22

**care** [5] - 1360:2, 1397:14, 1429:19, 1454:18, 1464:8

**cared** [1] - 1360:3

**career** [2] - 1456:11, 1479:2

**careful** [1] - 1291:6

**carefully** [3] - 1491:21, 1492:12, 1505:6

**Caribbean** [4] - 1384:23, 1385:15, 1475:22, 1567:24

**cars** [1] - 1408:21

**CAS** [1] - 1429:11

**case** [28] - 1344:21, 1345:4, 1350:10, 1351:16, 1352:19, 1353:3, 1353:5, 1353:7, 1353:8, 1353:16, 1358:3, 1433:5, 1442:4, 1442:5, 1442:9, 1442:13, 1442:14, 1443:4, 1443:5, 1445:15, 1465:2, 1465:12, 1480:6, 1505:13, 1519:4, 1557:14, 1571:7

**CASE** [4] - 1258:13, 1445:13, 1445:18, 1484:14

**cases** [1] - 1375:7

**cash** [24] - 1305:20, 1305:24, 1311:1, 1311:3, 1311:10, 1311:12, 1362:13, 1362:24, 1363:4, 1363:25, 1364:5, 1414:13, 1417:15, 1467:13, 1467:15, 1533:18, 1540:11, 1554:14, 1554:17, 1554:19, 1554:20, 1554:23

**categories** [4] - 1426:6, 1427:19, 1499:11, 1503:7

**category** [1] - 1427:3

**caught** [1] - 1340:22

**caused** [2] - 1272:3, 1388:16

**caution** [5] - 1283:23, 1284:4, 1291:2, 1341:13, 1342:15

**cautioned** [2] - 1446:2, 1519:9

**CD** [111] - 1268:17, 1280:19, 1280:20, 1282:1, 1282:9, 1282:12, 1282:18, 1283:12, 1284:16, 1285:23, 1286:9, 1286:16, 1287:19, 1288:3, 1289:20, 1290:11, 1290:12, 1290:16, 1293:2, 1293:5, 1294:6, 1294:19, 1298:7, 1299:9, 1299:10, 1305:18, 1307:1, 1310:5, 1310:8, 1316:1, 1316:3, 1316:11, 1336:3, 1336:9, 1337:2, 1338:14, 1338:16, 1338:22, 1350:17, 1351:25, 1354:11, 1354:23, 1355:9, 1382:4, 1406:9, 1411:13, 1413:9, 1413:24, 1414:11, 1415:20, 1416:6, 1417:9, 1418:25, 1419:6, 1419:8, 1421:1, 1421:5, 1421:10, 1422:4, 1423:6, 1425:4, 1430:24, 1431:4, 1431:21, 1435:1, 1435:3, 1435:11, 1435:21, 1435:25, 1436:6, 1437:8, 1453:10, 1455:3, 1455:25, 1456:2, 1463:24, 1471:16, 1474:20, 1483:3, 1489:21, 1490:1, 1490:3, 1490:6, 1491:24, 1492:14, 1493:10, 1493:11, 1493:17, 1494:8, 1495:15, 1497:10, 1497:16, 1498:2, 1498:3, 1498:8, 1498:10, 1498:13, 1498:16, 1505:7, 1506:14, 1508:24, 1510:12, 1510:22, 1511:5, 1514:9, 1516:11, 1536:14

**CDs** [98] - 1265:17, 1266:11, 1266:19, 1267:9, 1280:17, 1283:2, 1285:21, 1286:7, 1290:15, 1291:17, 1300:10, 1301:10, 1302:12, 1310:15, 1310:20, 1310:23, 1310:25, 1314:23, 1322:9, 1337:3, 1355:2, 1355:9, 1360:19, 1368:8, 1381:17, 1381:20, 1410:5, 1414:18, 1415:2, 1415:25, 1416:7, 1416:15, 1422:22, 1423:23, 1425:15, 1431:20, 1437:3, 1439:21, 1451:3, 1451:5, 1451:21, 1452:5, 1452:7, 1452:9, 1452:21, 1453:3, 1453:21,

1454:6, 1454:22, 1455:11, 1456:4, 1456:8, 1457:21, 1458:3, 1458:18, 1459:9, 1459:14, 1460:10, 1461:3, 1461:9, 1466:11, 1468:23, 1470:18, 1471:9, 1471:10, 1471:11, 1471:19, 1472:1, 1472:3, 1472:5, 1472:8, 1473:1, 1473:5, 1473:7, 1473:9, 1473:11, 1473:14, 1473:19, 1473:23, 1474:3, 1474:5, 1474:8, 1474:14, 1474:25, 1475:8, 1476:5, 1497:12, 1499:14, 1508:21, 1513:12, 1513:17, 1513:21, 1513:25, 1514:3, 1514:9, 1516:22, 1536:18, 1544:3

**Central** [2] - 1398:7, 1409:7

**central** [1] - 1329:21

**Century** [1] - 1535:10

**CEO** [2] - 1281:18, 1375:25

**certain** [36] - 1267:16, 1282:3, 1282:4, 1283:8, 1283:13, 1285:18, 1285:20, 1286:10, 1323:18, 1333:6, 1335:11, 1339:18, 1346:11, 1352:24, 1352:25, 1354:8, 1355:15, 1355:18, 1355:20, 1357:12, 1357:15, 1364:23, 1368:7, 1368:9, 1369:15, 1371:3, 1371:6, 1392:5, 1436:2, 1459:1, 1461:4, 1463:3, 1497:15, 1538:10

**certainly** [7] - 1277:1, 1343:22, 1419:11, 1422:11, 1427:16, 1443:19, 1505:13

**certificate** [3] - 1290:16, 1463:13, 1493:11

**Certificate** [1] - 1486:8

**CERTIFICATE** [1] - 1574:1

**certificates** [10] - 1289:20, 1290:13, 1454:19, 1455:20, 1463:4, 1466:14, 1470:25, 1471:1, 1481:10, 1503:22

**certified** [1] - 1524:23, 1525:1

**certify** [1] - 1574:3

**CFO** [4] - 1278:3, 1390:14, 1396:6, 1528:10

**CFS** [2] - 1524:4, 1524:22

**chair** [1] - 1445:19

**Chairman** [1] - 1535:16

**chairs** [3] - 1397:15, 1429:16, 1465:1

**change** [5] - 1337:15, 1340:13, 1419:2, 1531:14, 1540:25

**changed** [3] - 1337:16, 1337:21, 1411:20

**changes** [1] - 1530:1

**chapter** [1] - 1568:15

**characteristics** [1] - 1299:5

**characterization** [1] - 1516:8

**characterize** [1] - 1533:19

**charge** [9] - 1278:3, 1278:9, 1278:11, 1279:7, 1279:8, 1331:16, 1530:16, 1551:3

**charged** [1] - 1350:4

**charges** [7] - 1343:1, 1344:4, 1344:16, 1349:25, 1351:15, 1351:18, 1351:20

**chart** [13] - 1398:3, 1414:22, 1425:20, 1426:9, 1426:14, 1428:2, 1428:4, 1555:2, 1555:6, 1559:13, 1559:16,

**charter** [1] - 1272:25

**charts** [1] - 1555:1

**chase** [1] - 1468:4

**chatted** [2] - 1380:8

**chatting** [3] - 1381:15, 1381:16, 1394:19

**cheat** [1] - 1441:1

**check** [11] - 1295:17, 1442:6, 1442:8, 1442:11, 1442:14, 1442:19, 1442:21, 1442:24, 1443:3, 1483:22, 1518:16

**cheese** [1] - 1476:11

**chief** [5] - 1390:16, 1525:20, 1528:10, 1535:16, 1543:4

**children** [1] - 1446:23

**chip** [1] - 1533:8

**choose** [1] - 1452:7

**chosen** [1] - 1450:19

**Christian** [1] - 1404:14

**chronology** [1] - 1473:4

**church** [1] - 1405:4

**circle** [3] - 1313:21, 1321:6, 1367:25

**Circuit** [1] - 1442:4

**circuit** [1] - 1443:9

**circulated** [1] - 1551:17

**circumstance** [1] - 1327:16

**circumstances** [15] - 1259:24, 1297:16, 1327:16, 1328:25, 1333:6, 1339:5, 1346:11, 1346:24, 1348:14, 1349:6, 1357:15, 1364:19, 1369:20, 1506:9, 1549:19

**citation** [1] - 1549:11

**cited** [1] - 1442:4

**cities** [3] - 1333:22, 1386:13, 1409:3

**City** [1] - 1409:12

**civilizations** [1] - 1374:23

**claim** [2] - 1341:11, 1481:12

**claimed** [1] - 1467:19

**claims** [4] - 1421:5, 1421:6, 1423:19, 1423:20

**claming** [1] - 1412:5

**clarification** [2] - 1427:13, 1556:24

**clarifier** [1] - 1406:8

**clarify** [4] - 1268:5, 1377:21, 1455:5, 1466:23

**classes** [3] - 1453:15, 1459:25, 1532:3

**cleaned** [1] - 1441:21

**cleansed** [1] - 1440:6

**clear** [15] - 1270:12, 1274:9, 1274:21, 1301:25, 1325:25, 1354:18, 1360:10, 1361:24, 1362:18, 1380:10, 1401:4, 1403:5, 1407:19, 1542:4, 1560:14

**clearer** [1] - 1362:6

**clearly** [2] - 1313:14, 1314:10

**clerk** [1] - 1535:12

**client** [16] - 1264:8, 1291:13, 1302:13, 1303:14, 1303:15, 1314:3, 1320:9, 1335:16, 1336:9, 1338:6, 1364:1, 1376:21, 1376:23, 1377:15, 1464:23, 1465:6

**clients** [44] - 1263:13, 1270:10, 1270:18, 1276:5, 1289:10, 1291:20, 1291:22, 1292:8, 1298:16, 1302:3,

1303:1, 1313:12, 1314:3, 1314:8,
1314:11, 1319:1, 1319:4, 1334:3,
1335:14, 1354:11, 1358:19, 1358:21,
1359:19, 1359:23, 1363:23, 1364:4,
1364:7, 1368:5, 1368:7, 1368:9,
1368:12, 1368:13, 1388:11, 1414:18,
1429:5, 1467:14, 1526:1, 1531:25,
1536:6, 1536:17, 1543:12, 1543:16

**Clip** [1] - 1375:15

**clip** [1] - 1371:25

**clips** [2] - 1372:9, 1372:10

**clock** [4] - 1393:5, 1393:8, 1404:6,
1409:23

**close** [8] - 1328:23, 1403:7, 1403:10,
1403:11, 1411:14, 1472:1, 1492:4,
1567:22

**closely** [1] - 1490:2

**closer** [2] - 1416:11, 1510:16

**Coast** [1] - 1329:15

**Coca** [3] - 1532:20, 1539:8, 1539:9

**Coca-Cola** [3] - 1532:20, 1539:8,
1539:9

**coffee** [2] - 1328:7, 1399:25

**Coke** [1] - 1539:13

**Cola** [3] - 1532:20, 1539:8, 1539:9

**cold** [1] - 1403:13

**collapse** [3] - 1467:7, 1511:18, 1512:2

**collateral** [1] - 1467:15

**collect** [1] - 1548:6

**collected** [2] - 1548:8, 1552:5

**college** [5] - 1447:7, 1447:8, 1447:17,
1520:14, 1521:2

**collegiate** [1] - 1448:24

**collierville** [1] - 1520:7

**COLLINSWORTH** [2] - 1257:14,
1519:8

**Collinsworth** [29] - 1518:11, 1519:15,
1520:2, 1524:5, 1534:7, 1535:15,
1537:13, 1546:5, 1547:7, 1550:12,
1555:21, 1556:20, 1557:19, 1558:5,
1559:2, 1559:6, 1560:19, 1562:2,
1562:12, 1562:22, 1563:7, 1563:22,
1565:13, 1566:12, 1566:18, 1567:20,
1567:23, 1568:3, 1569:17

**color** [1] - 1279:20

**Colt** [1] - 1338:3

**column** [2] - 1419:1, 1468:8

**Combat** [1] - 1448:12

**combination** [1] - 1338:25

**combine** [1] - 1451:25

**combined** [1] - 1427:6, 1427:8,
1459:4, 1553:10, 1554:8, 1554:9,
1563:17

**combining** [1] - 1345:9

**comfortable** [1] - 1461:7

**coming** [16] - 1260:12, 1305:14,
1306:4, 1324:6, 1363:16, 1364:15,
1370:9, 1373:3, 1387:17, 1387:18,
1396:23, 1415:21, 1496:10, 1549:9,
1565:5, 1571:18

**comma** [1] - 1422:16

**comment** [3] - 1365:3, 1393:17,

1393:19

**comments** [1] - 1422:14

**commercial** [4] - 1408:21, 1455:10,
1467:13, 1467:19

**Commission** [2] - 1283:18, 1284:3

**commission** [5] - 1383:2, 1383:3,
1383:23, 1516:11, 1516:22

**commissioned** [1] - 1522:13

**commit** [4] - 1343:15, 1349:24,
1438:11, 1440:22

**commitments** [2] - 1299:18, 1422:8

**committing** [1] - 1269:21

**commodities** [1] - 1453:7

**commodity** [1] - 1529:16

**commonly** [1] - 1321:8

**communications** [1] - 1306:16

**community** [3] - 1376:24, 1376:25,
1399:22

**companies** [60] - 1262:22, 1271:8,
1271:9, 1271:14, 1271:17, 1271:22,
1275:22, 1276:23, 1320:18, 1321:8,
1321:11, 1321:13, 1321:16, 1321:25,
1322:4, 1323:8, 1326:1, 1332:20,
1337:8, 1337:9, 1343:15, 1347:1,
1347:14, 1347:15, 1347:16, 1347:21,
1347:23, 1348:16, 1348:19, 1348:22,
1349:14, 1349:22, 1351:23, 1352:10,
1375:11, 1396:2, 1398:4, 1404:17,
1432:24, 1432:25, 1433:4, 1438:3,
1439:13, 1439:14, 1450:20, 1451:17,
1452:2, 1467:7, 1475:22, 1500:4,
1500:5, 1500:19, 1526:13, 1531:9,
1532:21, 1533:8, 1535:23, 1565:3,
1572:1

**Companies** [13] - 1310:7, 1323:7,
1324:23, 1325:23, 1326:10, 1328:10,
1331:1, 1332:13, 1462:6, 1471:13,
1472:15, 1508:1, 1508:11

**companies'** [1] - 1450:25

**Company** [15] - 1267:12, 1267:15,
1268:23, 1310:4, 1326:8, 1337:13,
1401:12, 1418:23, 1480:14, 1490:4,
1530:6, 1530:10, 1535:25, 1536:12,
1544:3

**company** [91] - 1263:5, 1267:12,
1271:7, 1272:5, 1272:15, 1272:16,
1272:24, 1273:1, 1273:5, 1276:21,
1276:22, 1277:16, 1279:11, 1280:3,
1280:5, 1280:13, 1281:6, 1294:1,
1303:23, 1320:21, 1320:22, 1320:25,
1321:3, 1324:17, 1325:3, 1326:8,
1329:6, 1332:14, 1334:6, 1334:20,
1336:14, 1337:7, 1343:25, 1349:7,
1349:15, 1351:8, 1352:3, 1352:4,
1352:6, 1361:1, 1362:3, 1362:16,
1362:21, 1362:25, 1363:3, 1376:16,
1383:3, 1383:18, 1383:24, 1397:12,
1397:18, 1401:12, 1401:19, 1401:20,
1403:18, 1407:12, 1407:20, 1409:18,
1414:3, 1437:21, 1437:23, 1448:18,
1449:9, 1458:5, 1475:16, 1476:2,
1479:12, 1479:23, 1479:24, 1480:4,
1496:2, 1496:10, 1496:15, 1499:24,

1500:18, 1500:21, 1500:25, 1501:1,
1526:6, 1526:17, 1526:18, 1532:12,
1532:18, 1543:15, 1565:5

**Company's** [7] - 1454:5, 1466:19,
1467:22, 1469:1, 1471:3, 1501:12,
1504:20

**company's** [1] - 1548:15

**comparing** [1] - 1561:6

**compartment** [1] - 1324:16

**compensated** [2] - 1480:3, 1516:22

**competency** [1] - 1393:15

**competition** [3] - 1337:6, 1419:6

**competitions** [3] - 1336:19, 1336:22

**compile** [2] - 1551:9, 1551:12

**compiled** [1] - 1556:8

**complain** [2] - 1284:19, 1568:7

**complaint** [2] - 1401:8, 1517:6

**complete** [4] - 1430:8, 1514:17,
1571:9, 1571:10

**completely** [1] - 1267:19, 1345:11

**completeness** [1] - 1308:17

**completing** [1] - 1522:5

**complex** [2] - 1479:8, 1479:10

**compliance** [14] - 1324:21, 1324:25,
1325:2, 1325:6, 1325:7, 1330:23,
1330:24, 1330:25, 1331:16, 1335:3,
1335:5, 1340:19, 1340:21, 1419:18

**compliant** [1] - 1335:8

**complicated** [1] - 1275:23

**complied** [1] - 1331:21

**comply** [1] - 1325:8

**complying** [1] - 1325:3

**component** [2] - 1338:16, 1338:18

**compound** [2] - 1365:23, 1365:24

**computer** [7] - 1256:13, 1372:20,
1421:13, 1425:19, 1534:21, 1534:22,
1534:24

**computer-assisted** [1] - 1256:13

**con** [1] - 1547:15

**concern** [14] - 1272:3, 1344:2,
1376:23, 1454:17, 1461:18, 1489:1,
1489:2, 1501:10, 1515:10, 1515:23,
1515:24, 1564:24, 1571:12, 1571:13

**concerned** [14] - 1268:12, 1284:6,
1376:15, 1376:17, 1376:21, 1376:24,
1377:2, 1384:4, 1452:24, 1455:18,
1458:25, 1461:12, 1501:3, 1501:8

**concerning** [2] - 1301:10, 1348:8

**concerns** [8] - 1463:24, 1468:22,
1469:18, 1476:17, 1476:23, 1477:8,
1477:11, 1514:1

**condition** [7] - 1301:11, 1301:15,
1301:18, 1301:20, 1342:5, 1437:6,
1477:16

**conditions** [1] - 1291:10

**conduct** [5] - 1299:14, 1371:3, 1371:6,
1399:15, 1422:6

**conducted** [1] - 1468:19

**confer** [1] - 1465:6

**conference** [1] - 1321:22

**confidence** [8] - 1505:17, 1505:23,
1506:7, 1514:6, 1514:8, 1514:11,

1515:13, 1516:18
  **Confidential** [1] - 1486:9
  **conflict** [2] - 1353:20, 1474:23
  **conflicting** [1] - 1351:2
  **confused** [3] - 1296:4, 1358:11, 1561:14
  **confusing** [1] - 1309:11
  **confusion** [1] - 1504:16
  **congenital** [1] - 1477:16
  **congestive** [1] - 1449:25
  **conglomerate** [2] - 1526:13, 1526:14
  **Congress** [2] - 1255:22, 1289:7
  **Connecticut** [1] - 1446:18
  **consequence** [1] - 1482:20
  **consequences** [1] - 1371:3
  **Conservation** [1] - 1425:4
  **conservative** [3] - 1541:7, 1541:9, 1541:11
  **conservative-type** [2] - 1541:7, 1541:9
  **conserving** [1] - 1565:23
  **consider** [4] - 1450:19, 1491:21, 1492:12, 1573:15
  **considerable** [1] - 1420:25
  **considered** [4] - 1450:6, 1454:2, 1504:23
  **considering** [3] - 1366:23, 1458:3, 1511:22
  **consist** [2] - 1387:5, 1541:4
  **consistent** [11] - 1424:10, 1424:13, 1427:22, 1427:24, 1428:10, 1428:12, 1467:20, 1469:2, 1469:15, 1470:6, 1470:17
  **consistently** [4] - 1350:15, 1423:24, 1458:15, 1498:5
  **consisting** [1] - 1453:5
  **consolidated** [2] - 1546:6, 1552:12
  **consolidating** [1] - 1349:14, 1551:4
  **consolidation** [4] - 1348:15, 1348:19, 1348:23, 1351:13
  **constant** [1] - 1517:1
  **constraints** [1] - 1566:17
  **construction** [6] - 1447:5, 1449:15, 1479:3, 1479:5, 1495:25, 1496:4
  **consultants** [1] - 1308:15
  **contact** [2] - 1300:13, 1300:16
  **contacted** [6] - 1402:3, 1402:5, 1402:20, 1402:21, 1545:16
  **contain** [1] - 1481:22
  **contained** [9] - 1509:4, 1546:17, 1546:19, 1550:19, 1552:9, 1552:22, 1561:2, 1565:6, 1565:17
  **contest** [1] - 1337:14
  **contests** [3] - 1337:17, 1337:18, 1337:21
  **context** [4] - 1312:21, 1426:19, 1450:16, 1462:19
  **continue** [16] - 1270:10, 1308:10, 1378:19, 1379:14, 1404:23, 1423:2, 1434:24, 1437:4, 1450:24, 1465:12, 1467:23, 1468:15, 1469:10, 1498:7, 1531:6, 1566:12
  **Continued** [2] - 1256:1, 1256:2

  **continuous** [1] - 1441:15
  **continuously** [1] - 1441:16
  **contract** [3] - 1436:5, 1497:1, 1497:2
  **contracting** [1] - 1505:15
  **contractor** [1] - 1496:18
  **contractors** [3] - 1496:13, 1496:19, 1496:21
  **contracts** [7] - 1479:8, 1479:11, 1479:13, 1496:11, 1496:23, 1505:12, 1529:12
  **contractual** [4] - 1265:10, 1265:21, 1294:24, 1304:9
  **contribution** [2] - 1470:7, 1470:11
  **control** [1] - 1308:15
  **conversation** [8] - 1364:21, 1366:12, 1367:8, 1400:6, 1403:16, 1471:24, 1501:11, 1545:16
  **conversations** [5] - 1365:5, 1402:24, 1454:4, 1468:25, 1507:5
  **convince** [1] - 1470:18
  **copies** [2] - 1436:21, 1559:4
  **copy** [16] - 1292:23, 1317:25, 1456:17, 1456:18, 1457:10, 1483:23, 1484:9, 1484:19, 1484:21, 1484:23, 1489:10, 1489:11, 1489:12, 1499:1, 1550:15, 1556:24
  **core** [1] - 1459:5
  **corners** [1] - 1423:8
  **corporate** [4] - 1351:17, 1405:5, 1502:12, 1503:3
  **Corporation** [9] - 1288:25, 1289:4, 1289:21, 1449:6, 1479:25, 1493:1, 1493:8, 1493:12, 1494:4
  **corporation** [4] - 1289:1, 1413:11, 1413:13, 1413:15
  **corporations** [1] - 1526:1
  **Corps** [1] - 1447:21
  **correct** [359] - 1263:2, 1264:15, 1264:23, 1265:5, 1265:10, 1266:2, 1266:3, 1269:1, 1269:14, 1269:19, 1270:9, 1270:10, 1270:11, 1270:15, 1270:16, 1270:19, 1271:1, 1271:9, 1271:10, 1271:11, 1272:7, 1272:16, 1272:17, 1273:16, 1274:10, 1274:11, 1274:16, 1275:18, 1276:18, 1276:25, 1277:3, 1277:13, 1278:13, 1279:8, 1279:9, 1279:11, 1279:14, 1279:15, 1279:17, 1279:18, 1279:21, 1279:22, 1279:25, 1280:1, 1280:6, 1281:4, 1281:6, 1281:9, 1281:16, 1281:19, 1281:20, 1281:21, 1281:24, 1282:1, 1282:4, 1282:10, 1282:11, 1282:16, 1282:20, 1283:2, 1283:3, 1283:23, 1284:5, 1285:12, 1285:21, 1285:22, 1285:25, 1286:1, 1286:8, 1286:12, 1286:13, 1286:17, 1287:19, 1289:5, 1289:13, 1289:14, 1289:16, 1290:3, 1290:4, 1290:6, 1290:7, 1291:2, 1291:3, 1291:15, 1291:16, 1291:17, 1291:18, 1293:11, 1293:12, 1293:14, 1293:15, 1294:1, 1294:4, 1294:5, 1294:9, 1294:10, 1295:8, 1295:11, 1298:4, 1298:8, 1298:9, 1298:24,

1300:3, 1300:14, 1300:15, 1300:17, 1300:18, 1300:19, 1300:20, 1300:21, 1301:5, 1302:7, 1304:13, 1304:14, 1305:4, 1305:11, 1305:25, 1306:1, 1307:2, 1307:7, 1308:12, 1308:13, 1310:8, 1310:9, 1310:15, 1311:2, 1311:11, 1311:13, 1311:14, 1313:25, 1314:2, 1314:16, 1314:23, 1314:25, 1316:2, 1316:4, 1316:7, 1316:9, 1316:10, 1316:12, 1316:13, 1316:17, 1316:18, 1316:20, 1316:24, 1317:1, 1317:4, 1317:5, 1318:24, 1319:17, 1322:13, 1323:9, 1323:13, 1323:14, 1323:19, 1323:20, 1324:12, 1324:17, 1324:18, 1324:20, 1326:5, 1326:6, 1326:10, 1326:12, 1326:15, 1326:23, 1326:25, 1327:6, 1327:10, 1327:11, 1327:13, 1327:17, 1327:18, 1329:2, 1329:3, 1329:6, 1329:12, 1329:14, 1330:11, 1330:21, 1333:18, 1333:19, 1333:20, 1333:21, 1333:23, 1334:3, 1335:14, 1335:21, 1336:13, 1336:16, 1340:2, 1340:8, 1340:13, 1340:14, 1343:1, 1347:8, 1347:10, 1347:15, 1347:22, 1347:23, 1349:7, 1352:23, 1355:21, 1356:8, 1356:9, 1356:17, 1356:18, 1356:21, 1357:13, 1359:18, 1360:24, 1360:25, 1361:20, 1362:18, 1362:25, 1363:1, 1363:4, 1363:5, 1363:11, 1363:12, 1363:13, 1363:14, 1364:17, 1364:20, 1366:20, 1366:21, 1366:25, 1369:13, 1369:14, 1369:17, 1371:3, 1371:8, 1381:18, 1382:2, 1382:6, 1382:11, 1383:18, 1383:25, 1384:1, 1384:7, 1384:8, 1384:10, 1384:24, 1385:9, 1385:15, 1386:4, 1386:8, 1386:9, 1386:10, 1386:25, 1388:7, 1390:7, 1390:14, 1390:17, 1390:19, 1390:21, 1395:7, 1395:8, 1395:11, 1395:15, 1395:19, 1396:2, 1396:3, 1396:10, 1396:13, 1396:15, 1396:19, 1396:20, 1396:21, 1397:20, 1397:21, 1397:24, 1397:25, 1398:6, 1398:9, 1398:13, 1398:14, 1398:16, 1400:12, 1400:13, 1401:14, 1401:23, 1404:7, 1405:7, 1405:21, 1407:22, 1408:1, 1408:15, 1409:1, 1409:7, 1409:19, 1409:20, 1411:22, 1416:2, 1416:23, 1424:8, 1424:9, 1426:18, 1436:1, 1436:2, 1436:7, 1436:19, 1441:14, 1451:8, 1451:13, 1460:11, 1471:10, 1472:20, 1473:6, 1474:18, 1475:1, 1475:9, 1478:21, 1479:15, 1480:7, 1481:4, 1481:14, 1481:22, 1482:24, 1485:3, 1496:24, 1497:14, 1503:1, 1503:5, 1504:4, 1506:14, 1516:19, 1522:4, 1526:7, 1526:22, 1527:21, 1532:25, 1535:20, 1540:6, 1542:1, 1543:8, 1545:8, 1548:10, 1548:14, 1548:20, 1548:24, 1548:25, 1549:2, 1549:3, 1549:20, 1549:22, 1551:24, 1553:19, 1554:18, 1554:23, 1558:4, 1561:10, 1561:22, 1564:22,

1568:16, 1570:13, 1570:14, 1574:4

**Correct** [3] - 1264:24, 1281:7, 1294:2

**correction** [1] - 1367:13

**correctly** [8] - 1279:25, 1303:3, 1335:7, 1335:8, 1344:8, 1381:25, 1395:16, 1473:4

**correspondence** [1] - 1363:7

**Corzine** [2] - 1389:12, 1389:13

**cost** [2] - 1478:12, 1496:7

**Costa** [2] - 1255:13, 1259:16

**COSTA** [16] - 1259:4, 1259:9, 1393:10, 1567:10, 1567:15, 1567:19, 1567:25, 1569:11, 1569:13, 1569:24, 1570:6, 1570:10, 1570:14, 1570:24, 1572:9, 1572:15

**costa** [2] - 1569:5, 1573:10

**couch** [1] - 1465:2

**Counsel** [5] - 1307:24, 1477:3, 1514:23, 1559:17, 1559:19

**counsel** [14] - 1326:14, 1326:21, 1341:10, 1380:20, 1393:14, 1464:23, 1485:25, 1486:20, 1502:20, 1512:12, 1534:22, 1534:24, 1545:24, 1556:10

**count** [2] - 1329:18, 1329:19

**counting** [1] - 1561:18

**countries** [1] - 1333:20

**country** [1] - 1377:2

**couple** [8] - 1303:18, 1307:15, 1407:17, 1448:15, 1483:13, 1535:11, 1566:8, 1567:4

**course** [20] - 1269:23, 1269:24, 1381:1, 1415:9, 1452:10, 1465:4, 1482:4, 1512:22, 1518:13, 1522:10, 1522:12, 1522:16, 1523:9, 1544:16, 1546:20, 1546:22, 1549:17, 1558:12, 1560:8, 1560:16

**courses** [1] - 1358:8

**Court** [17] - 1256:10, 1259:11, 1348:5, 1374:16, 1393:12, 1393:15, 1393:17, 1437:21, 1438:5, 1444:6, 1445:15, 1457:2, 1519:21, 1556:24, 1568:13, 1573:14

**COURT** [347] - 1255:1, 1258:1, 1258:7, 1258:11, 1258:14, 1259:5, 1259:7, 1259:12, 1260:5, 1260:9, 1260:15, 1260:19, 1261:4, 1261:11, 1261:17, 1261:19, 1261:22, 1266:8, 1266:17, 1278:24, 1287:6, 1287:10, 1287:12, 1287:25, 1288:4, 1288:12, 1290:17, 1302:19, 1303:5, 1303:7, 1306:18, 1307:9, 1307:11, 1307:13, 1307:19, 1318:11, 1318:15, 1319:20, 1319:24, 1320:1, 1321:17, 1321:19, 1327:24, 1328:1, 1328:8, 1341:8, 1341:15, 1341:21, 1341:24, 1342:5, 1342:7, 1342:9, 1342:12, 1342:25, 1343:3, 1343:11, 1343:17, 1343:19, 1343:23, 1344:5, 1344:7, 1344:13, 1344:20, 1345:2, 1345:11, 1345:20, 1345:23, 1348:3, 1348:7, 1348:10, 1348:12, 1349:20, 1350:2, 1350:6, 1350:19, 1350:24, 1351:11, 1351:21, 1352:14, 1352:18, 1360:17, 1365:12, 1365:15

1365:17, 1365:20, 1365:23, 1366:5, 1371:22, 1372:14, 1372:17, 1372:19, 1372:22, 1372:25, 1373:2, 1373:9, 1373:15, 1373:21, 1374:6, 1374:10, 1374:12, 1374:15, 1374:20, 1378:3, 1378:9, 1378:19, 1379:8, 1384:13, 1386:13, 1388:5, 1389:12, 1392:17, 1392:22, 1393:19, 1394:3, 1394:6, 1394:9, 1394:11, 1394:15, 1404:2, 1404:6, 1404:9, 1404:11, 1404:24, 1406:5, 1406:10, 1406:13, 1406:17, 1406:19, 1407:15, 1409:24, 1412:13, 1412:20, 1412:24, 1413:4, 1413:12, 1413:17, 1413:20, 1418:13, 1418:15, 1418:18, 1430:16, 1435:4, 1435:6, 1437:16, 1437:18, 1437:23, 1438:19, 1438:24, 1439:4, 1439:10, 1439:16, 1439:22, 1440:3, 1440:5, 1440:8, 1440:18, 1440:20, 1440:24, 1441:10, 1441:23, 1442:1, 1442:9, 1442:12, 1442:16, 1442:18, 1442:23, 1443:1, 1443:5, 1443:8, 1443:11, 1443:16, 1443:18, 1443:20, 1444:1, 1444:7, 1444:9, 1444:16, 1444:20, 1444:22, 1444:25, 1445:4, 1445:8, 1445:11, 1445:19, 1445:22, 1445:24, 1451:7, 1451:15, 1451:18, 1451:20, 1457:4, 1457:8, 1457:12, 1457:15, 1464:4, 1464:17, 1465:10, 1465:18, 1466:17, 1466:21, 1476:21, 1477:2, 1477:18, 1477:21, 1478:1, 1478:17, 1483:8, 1483:21, 1483:24, 1484:5, 1484:8, 1484:12, 1484:15, 1484:19, 1485:21, 1486:21, 1488:23, 1489:4, 1489:6, 1489:10, 1489:15, 1490:20, 1490:25, 1491:3, 1492:6, 1492:9, 1494:13, 1494:17, 1494:21, 1494:24, 1497:5, 1497:7, 1502:21, 1507:15, 1507:19, 1507:21, 1509:10, 1509:13, 1510:6, 1510:25, 1512:17, 1512:21, 1514:23, 1515:1, 1515:7, 1516:14, 1518:4, 1518:6, 1518:9, 1518:12, 1518:24, 1519:7, 1519:16, 1519:23, 1522:24, 1523:2, 1523:22, 1524:8, 1527:2, 1527:4, 1527:20, 1534:14, 1534:18, 1534:24, 1535:1, 1535:4, 1535:6, 1535:9, 1541:18, 1541:21, 1541:24, 1542:2, 1545:25, 1546:3, 1547:4, 1547:25, 1549:8, 1549:11, 1549:14, 1549:18, 1549:22, 1549:24, 1550:2, 1550:5, 1550:8, 1550:21, 1556:12, 1556:17, 1557:6, 1557:13, 1558:13, 1558:16, 1558:19, 1558:21, 1558:25, 1559:11, 1559:24, 1560:2, 1560:4, 1560:12, 1560:15, 1561:24, 1562:16, 1562:19, 1565:10, 1565:21, 1566:5, 1566:15, 1566:19, 1566:22, 1566:24, 1567:4, 1567:6, 1567:8, 1567:13, 1567:17, 1567:22, 1568:5, 1568:11, 1568:16, 1568:20, 1569:9, 1569:12, 1569:15, 1569:21, 1569:25, 1570:8, 1570:12, 1570:15, 1570:21, 1571:1, 1571:16, 1571:20, 1571:22,

1571:24, 1572:2, 1572:6, 1572:13, 1572:18, 1572:24, 1573:2, 1573:6, 1573:9, 1573:13, 1573:17, 1574:1

**court** [8] - 1259:3, 1328:1, 1443:20, 1443:21, 1444:11, 1505:20, 1507:23, 1524:6

**Court's** [3] - 1478:14, 1556:25, 1560:9

**courtroom** [4] - 1445:6, 1464:7, 1464:24, 1526:24

**Coutts** [1] - 1537:1

**covenants** [4] - 1295:19, 1295:20, 1295:22, 1295:24

**cover** [4] - 1305:24, 1442:21, 1484:24, 1486:5

**coverage** [2] - 1468:12, 1512:25

**covered** [3] - 1288:23, 1289:13, 1289:15, 1443:2, 1492:24, 1494:11, 1495:9

**covering** [1] - 1339:3

**covers** [1] - 1524:13

**CPA** [1] - 1370:23

**crashing** [1] - 1375:8

**crazy** [1] - 1401:6

**create** [3] - 1505:15, 1559:20, 1559:21

**created** [7] - 1400:25, 1510:23, 1511:4, 1546:12, 1546:14, 1546:19, 1549:17

**creative** [1] - 1377:13

**credit** [12] - 1346:4, 1346:5, 1346:18, 1346:19, 1354:12, 1376:3, 1408:22, 1425:16, 1428:19, 1428:22, 1428:24, 1429:1

**Credit** [1] - 1537:1

**credited** [1] - 1406:9

**Crick** [8] - 1566:13, 1566:18, 1567:7, 1567:8, 1567:20, 1569:24, 1569:25, 1570:11

**cricket** [1] - 1476:3

**crime** [4] - 1343:15, 1349:24, 1350:9, 1438:11

**crimes** [1] - 1344:7

**criminal** [1] - 1375:21

**criteria** [1] - 1263:12

**critical** [1] - 1335:16

**Croix** [7] - 1384:11, 1384:16, 1384:20, 1384:23, 1385:5, 1385:13, 1537:24

**cross** [21] - 1259:22, 1260:8, 1260:9, 1260:13, 1306:8, 1410:3, 1414:16, 1418:3, 1419:17, 1420:16, 1421:1, 1422:23, 1424:22, 1425:23, 1429:14, 1511:7, 1512:7, 1513:9, 1514:4, 1566:24, 1568:14

**CROSS** [4] - 1257:4, 1257:11, 1262:3, 1478:18

**cross-examination** [15] - 1260:13, 1410:3, 1414:16, 1418:3, 1419:17, 1420:16, 1421:1, 1422:23, 1424:22, 1425:23, 1429:14, 1511:7, 1512:7, 1513:9, 1514:4

**CROSS-EXAMINATION** [2] - 1257:4, 1262:3

**cross-examine** [1] - 1259:22

**crossroads** [1] - 1344:23

**CRR** [2] - 1256:10, 1574:7
**crunch** [1] - 1302:11
**crunching** [3] - 1275:17, 1275:19, 1395:17
**CSFB** [1] - 1555:16
**cumbersome** [1] - 1472:9
**curious** [1] - 1378:20
**currencies** [1] - 1501:7
**Currency** [1] - 1555:2
**currency** [4] - 1363:13, 1426:4, 1426:24, 1499:9
**current** [4] - 1458:14, 1553:9, 1555:21, 1557:22
**Current** [1] - 1553:6
**Curt** [2] - 1397:4, 1397:7
**cushion** [1] - 1470:2
**custodian** [1] - 1548:16
**customers** [3] - 1428:19, 1428:22, 1516:11
**customers'** [2] - 1428:20, 1428:24
**cut** [1] - 1476:13
**cuts** [1] - 1569:4
**cycles** [1] - 1375:2

**D**

**D.C** [3] - 1386:25, 1387:12, 1387:18
**daily** [6] - 1304:23, 1389:21, 1419:1, 1573:12, 1573:16
**data** [9] - 1299:17, 1299:23, 1300:8, 1422:7, 1422:9, 1422:19, 1422:20, 1426:5, 1499:9
**date** [9] - 1354:8, 1462:8, 1472:23, 1472:25, 1510:4, 1550:23, 1554:1, 1554:10, 1556:9
**dated** [1] - 1510:14
**David** [1] - 1386:15
**DAVID** [1] - 1255:10
**Davis** [49] - 1273:23, 1274:10, 1274:15, 1278:3, 1278:13, 1278:14, 1278:18, 1279:7, 1352:5, 1385:23, 1386:3, 1386:7, 1386:8, 1386:14, 1389:16, 1389:23, 1389:25, 1390:12, 1390:13, 1391:4, 1392:5, 1392:7, 1392:12, 1394:20, 1395:11, 1395:13, 1396:6, 1396:24, 1398:16, 1398:21, 1399:1, 1399:2, 1399:15, 1399:19, 1400:13, 1400:22, 1401:4, 1403:7, 1403:17, 1417:6, 1528:6, 1528:8, 1540:20, 1543:4, 1544:12, 1545:17, 1570:25, 1571:5
**Davis'** [2] - 1390:12, 1528:7
**Davis's** [1] - 1399:9
**days** [8] - 1341:10, 1414:15, 1443:3, 1533:18, 1569:10, 1569:11, 1569:12, 1571:16
**dazzling** [1] - 1458:13
**DC** [1] - 1255:18
**deadline** [1] - 1568:18
**deal** [9] - 1307:14, 1339:5, 1349:22, 1352:5, 1352:7, 1363:17, 1363:24, 1402:14, 1403:25

**dealer** [30] - 1266:20, 1266:22, 1267:18, 1268:25, 1274:13, 1289:11, 1323:7, 1324:14, 1324:16, 1328:11, 1328:14, 1328:25, 1329:9, 1330:4, 1330:10, 1330:20, 1331:17, 1331:21, 1332:14, 1340:25, 1341:1, 1342:19, 1368:4, 1368:20, 1415:11, 1415:13, 1438:18, 1530:21
**dealers** [4] - 1289:9, 1323:10, 1323:11, 1517:8
**dealing** [5] - 1330:5, 1330:19, 1380:23, 1392:11, 1420:13
**dealt** [2] - 1408:23, 1408:24
**debate** [1] - 1276:21
**debt** [20] - 1268:19, 1281:2, 1281:21, 1281:23, 1282:15, 1282:19, 1293:9, 1293:11, 1293:16, 1295:14, 1295:15, 1295:16, 1295:19, 1295:20, 1295:22, 1295:24, 1428:23, 1435:22, 1436:5
**debtee** [1] - 1435:24
**debtor** [1] - 1435:22
**decades** [1] - 1459:6
**deceitful** [1] - 1331:12
**deceive** [1] - 1441:1
**December** [14] - 1422:12, 1449:17, 1466:4, 1470:19, 1475:7, 1486:9, 1511:12, 1550:18, 1550:24, 1553:10, 1554:2, 1556:21, 1557:21, 1558:1
**decide** [4] - 1276:2, 1281:17, 1437:4, 1451:24
**decided** [4] - 1458:17, 1459:8, 1475:8, 1513:17
**deciding** [1] - 1457:20
**decision** [22] - 1361:5, 1403:18, 1404:14, 1404:17, 1441:7, 1441:8, 1453:20, 1454:22, 1456:3, 1459:11, 1460:4, 1470:3, 1471:18, 1473:18, 1473:22, 1473:23, 1474:2, 1474:5, 1474:13, 1507:4, 1508:9
**decisions** [7] - 1281:15, 1423:25, 1434:24, 1480:17, 1498:5, 1498:6, 1505:22
**deem** [1] - 1284:6
**deemed** [1] - 1290:20
**DEFENDANT** [2] - 1255:20, 1256:2
**defendant** [1] - 1527:5
**Defendant's** [1] - 1488:19
**defendant's** [2] - 1318:15, 1393:2
**defense** [14] - 1318:13, 1341:22, 1344:16, 1345:8, 1353:6, 1377:24, 1379:14, 1387:8, 1439:25, 1440:16, 1443:3, 1443:4, 1464:23, 1568:18
**define** [1] - 1304:19
**defined** [4] - 1290:13, 1306:7, 1440:25, 1565:8
**definitely** [1] - 1542:18
**definition** [3] - 1332:19, 1427:12, 1533:15
**definitive** [2] - 1299:18, 1422:8
**defraud** [1] - 1345:6
**degree** [5] - 1447:9, 1447:11, 1478:23, 1478:25, 1522:3

**delving** [1] - 1358:22
**demonstrative** [1] - 1534:10
**denied** [2] - 1345:15, 1443:13
**denotes** [1] - 1325:3
**Department** [3] - 1255:17, 1402:2, 1402:6
**department** [7] - 1325:11, 1325:14, 1325:22, 1326:9, 1402:9, 1521:7, 1527:15
**departments** [1] - 1275:1
**dependent** [4] - 1390:5, 1423:23, 1425:5, 1498:3
**Deposit** [4] - 1289:21, 1486:9, 1493:12, 1494:3
**deposit** [17] - 1290:11, 1294:19, 1294:24, 1299:3, 1426:25, 1429:7, 1429:9, 1454:20, 1455:21, 1463:5, 1463:13, 1466:14, 1470:25, 1471:2, 1481:10, 1497:11, 1503:22
**deposited** [8] - 1312:7, 1313:18, 1411:13, 1426:2, 1434:1, 1498:22, 1499:4, 1499:7
**Depositor** [2] - 1298:22, 1298:25
**depositor** [7] - 1299:2, 1317:4, 1322:12, 1351:25, 1410:25, 1493:24
**depositor's** [1] - 1469:25
**depositors** [13] - 1294:19, 1303:11, 1350:5, 1352:9, 1352:12, 1420:22, 1420:24, 1429:4, 1436:23, 1437:1, 1437:2, 1441:2, 1503:23
**deposits** [27] - 1289:20, 1290:11, 1290:12, 1290:16, 1294:22, 1304:20, 1317:7, 1317:10, 1418:22, 1425:5, 1426:4, 1426:24, 1428:20, 1428:24, 1429:5, 1429:6, 1430:1, 1430:24, 1431:4, 1431:21, 1431:23, 1431:25, 1435:11, 1493:10, 1498:3, 1498:10, 1499:9
**depression** [1] - 1482:8
**describe** [11] - 1284:16, 1452:4, 1521:13, 1533:6, 1538:3, 1541:12, 1545:1, 1545:19, 1550:12, 1557:19, 1559:2
**described** [4] - 1427:17, 1428:6, 1543:9, 1557:1
**describing** [1] - 1437:6
**description** [2] - 1435:12, 1537:10
**descriptions** [1] - 1436:24
**deserved** [1] - 1480:6
**design** [2] - 1448:19, 1496:17
**design/build** [1] - 1448:23
**designate** [1] - 1572:11
**designed** [1] - 1338:4
**designing** [1] - 1448:24
**desire** [1] - 1352:1
**desk** [1] - 1464:21
**desks** [1] - 1397:15
**destroyed** [3] - 1373:19, 1374:22, 1375:1
**destroying** [1] - 1375:10
**detail** [2] - 1296:23, 1460:18
**detailed** [2] - 1264:3, 1393:24,

1418:24
**determinations** [1] - 1370:9
**determine** [9] - 1264:10, 1353:5, 1353:15, 1451:10, 1451:20, 1468:19, 1568:22, 1568:25, 1570:22
**determined** [1] - 1470:23
**developed** [1] - 1263:5
**development** [2] - 1407:4, 1496:1
**devil** [1] - 1405:8
**devote** [1] - 1330:9
**Dhabi** [1] - 1496:6
**diagnosis** [2] - 1452:23, 1478:2
**dialogue** [1] - 1461:16
**diametrically** [1] - 1350:22
**dictate** [1] - 1264:7
**dictionary** [1] - 1312:18
**differ** [1] - 1382:6
**difference** [4] - 1282:12, 1347:19, 1383:14, 1480:3
**different** [39] - 1261:15, 1271:16, 1293:25, 1313:2, 1326:2, 1326:3, 1327:17, 1330:6, 1331:25, 1343:19, 1379:25, 1382:8, 1393:22, 1420:16, 1429:14, 1442:20, 1453:15, 1456:1, 1459:24, 1471:13, 1472:15, 1505:2, 1507:2, 1513:13, 1526:16, 1528:20, 1530:15, 1532:2, 1534:6, 1538:13, 1552:11, 1553:17, 1554:17, 1556:5, 1556:9, 1559:5, 1561:16
**differently** [4] - 1275:15, 1357:12, 1362:7, 1572:11
**difficult** [1] - 1385:19
**difficulties** [1] - 1452:20
**Diligence** [2] - 1298:22, 1298:24
**diligence** [4] - 1299:2, 1299:14, 1421:14, 1422:6
**diligently** [1] - 1411:10
**DIRE** [2] - 1257:16, 1547:5
**dire** [1] - 1547:3
**direct** [13] - 1259:19, 1278:12, 1278:15, 1371:25, 1381:14, 1405:11, 1421:4, 1468:6, 1509:24, 1552:14, 1553:4, 1555:15, 1567:3
**DIRECT** [4] - 1257:10, 1257:15, 1446:5, 1519:11
**directly** [8] - 1276:2, 1314:6, 1369:1, 1380:25, 1424:25, 1425:20, 1426:9, 1426:14
**director** [5] - 1269:9, 1401:22, 1531:10, 1531:15, 1532:5
**directors** [11] - 1308:14, 1317:22, 1317:24, 1366:23, 1367:5, 1367:13, 1375:6, 1468:13, 1470:3, 1540:21, 1545:12
**disability** [5] - 1450:4, 1450:8, 1450:9, 1476:17
**disabled** [2] - 1450:5, 1450:7
**disagree** [2] - 1351:19, 1412:12
**discharge** [1] - 1523:8
**discharged** [4] - 1448:5, 1448:8, 1522:22, 1523:6
**disclaimers** [1] - 1492:14

**disclose** [2] - 1344:14, 1391:25
**disclosed** [4] - 1265:12, 1516:1, 1516:6, 1516:7
**Disclosure** [1] - 1485:2
**disclosure** [30] - 1265:12, 1286:25, 1288:2, 1299:8, 1299:10, 1308:17, 1309:2, 1335:12, 1340:19, 1350:18, 1421:1, 1421:5, 1421:10, 1421:18, 1422:2, 1422:4, 1423:6, 1423:9, 1429:2, 1483:11, 1485:3, 1490:7, 1490:13, 1495:12, 1499:1, 1505:1, 1506:22, 1506:23, 1510:4, 1510:14
**discomfort** [1] - 1388:17
**discontinue** [1] - 1304:11
**discrepancy** [3] - 1393:1, 1393:4, 1563:15
**discretion** [7] - 1304:11, 1304:13, 1539:3, 1539:9, 1539:12, 1539:13, 1542:19
**discretionary** [3] - 1539:16, 1539:21, 1539:24
**discuss** [11] - 1337:12, 1342:11, 1342:17, 1411:23, 1438:6, 1451:4, 1455:11, 1455:16, 1469:7, 1470:14, 1544:22
**discussed** [11] - 1262:7, 1262:12, 1322:6, 1335:11, 1340:18, 1341:14, 1347:14, 1363:17, 1391:10, 1411:25, 1420:17
**discussing** [3] - 1313:17, 1365:2, 1421:1
**discussion** [12] - 1262:24, 1265:18, 1266:12, 1273:24, 1315:15, 1381:6, 1426:16, 1452:4, 1452:9, 1511:7, 1514:5, 1573:18
**discussions** [1] - 1452:11
**dishonest** [1] - 1331:14
**disseminated** [1] - 1350:13
**dissemination** [1] - 1441:18
**distant** [1] - 1399:11
**distinct** [1] - 1395:2
**distinguished** [1] - 1442:12
**distribute** [1] - 1319:4
**distributing** [1] - 1436:24
**DISTRICT** [3] - 1255:1, 1255:1, 1255:10
**diverse** [1] - 1453:5
**diversification** [4] - 1435:13, 1453:19, 1460:2, 1461:11
**diversified** [6] - 1417:12, 1459:24, 1461:17, 1468:2, 1469:7, 1532:1
**diversify** [1] - 1339:7
**diversity** [5] - 1453:13, 1453:14, 1461:13, 1461:18
**diverting** [1] - 1353:18
**DIVISION** [1] - 1255:2
**DNO** [1] - 1317:21
**doctor** [1] - 1452:21
**doctors** [1] - 1477:22
**document** [98] - 1285:24, 1286:11, 1287:9, 1287:19, 1287:22, 1287:25, 1290:6, 1291:7, 1291:20, 1294:13,

1296:8, 1297:11, 1298:4, 1298:6, 1298:10, 1298:13, 1299:20, 1308:4, 1313:5, 1313:7, 1313:14, 1313:15, 1313:17, 1314:10, 1314:19, 1314:22, 1315:2, 1315:9, 1318:6, 1318:7, 1318:9, 1318:17, 1318:20, 1318:24, 1319:5, 1319:7, 1334:21, 1335:1, 1421:3, 1423:16, 1424:2, 1424:15, 1425:19, 1428:14, 1436:20, 1436:22, 1456:15, 1456:20, 1461:22, 1465:25, 1468:7, 1470:16, 1470:17, 1485:5, 1485:13, 1485:20, 1485:23, 1485:25, 1486:11, 1486:14, 1486:17, 1486:20, 1486:23, 1487:17, 1488:6, 1488:13, 1488:22, 1490:5, 1492:11, 1492:18, 1498:16, 1501:15, 1505:6, 1509:25, 1510:22, 1511:3, 1511:14, 1546:5, 1546:17, 1546:19, 1549:16, 1550:6, 1550:19, 1550:23, 1551:20, 1557:20, 1558:3, 1559:20, 1560:19, 1560:25, 1561:3, 1561:12, 1562:3, 1562:12
**documentation** [3] - 1284:14, 1361:5, 1406:1
**documents** [37] - 1259:21, 1260:12, 1260:14, 1260:16, 1286:10, 1286:14, 1291:9, 1296:2, 1297:7, 1309:4, 1314:15, 1318:12, 1318:15, 1335:12, 1355:18, 1356:11, 1357:7, 1423:20, 1425:10, 1430:6, 1441:18, 1482:22, 1482:25, 1483:2, 1485:10, 1485:11, 1488:14, 1488:15, 1489:23, 1490:4, 1505:8, 1505:12, 1506:4, 1547:9, 1550:25, 1551:17, 1571:15
**dollar** [4] - 1303:2, 1426:4, 1426:24, 1499:9
**dollars** [13] - 1338:20, 1349:3, 1367:6, 1405:17, 1410:20, 1417:17, 1469:23, 1470:12, 1494:11, 1495:5, 1495:9, 1495:13, 1555:4
**domestic** [1] - 1335:4
**dominant** [1] - 1452:15
**Dominion** [1] - 1552:5
**done** [21] - 1259:11, 1269:14, 1276:1, 1276:6, 1276:10, 1276:12, 1285:4, 1315:8, 1335:6, 1335:8, 1383:17, 1400:21, 1401:5, 1456:11, 1466:12, 1475:3, 1475:11, 1476:14, 1490:11, 1568:1, 1570:19
**door** [8] - 1270:25, 1306:11, 1324:7, 1438:6, 1438:20, 1439:17, 1439:18, 1538:5
**dotted** [1] - 1537:11
**double** [3] - 1365:18, 1365:22, 1483:22
**double-check** [1] - 1483:22
**doubt** [3] - 1278:6, 1441:12, 1442:7
**Doug** [1] - 1451:1
**Douglas** [1] - 1466:20
**down** [39] - 1258:23, 1266:25, 1277:6, 1278:25, 1290:17, 1292:11, 1303:5, 1306:18, 1308:8, 1309:21, 1321:17, 1327:24, 1328:3, 1339:4, 1346:25, 1367:10, 1374:25, 1381:22, 1392:22,

1411:11, 1429:12, 1435:4, 1435:7,
1445:4, 1459:2, 1462:20, 1464:15,
1464:25, 1467:9, 1481:5, 1481:6,
1485:21, 1518:6, 1519:2, 1519:21,
1524:5, 1528:22, 1532:12, 1536:20
**downs** [3] - 1481:14, 1481:16, 1481:25
**downturns** [1] - 1480:22
**dramatic** [1] - 1416:17
**draw** [1] - 1396:4
**dreamed** [1] - 1375:3
**drew** [1] - 1414:22
**drinking** [1] - 1328:7
**drug** [3] - 1478:5, 1478:8, 1478:9
**Dually** [1] - 1551:8
**due** [10] - 1282:9, 1289:10, 1298:24,
1299:2, 1299:14, 1304:3, 1421:14,
1422:6, 1443:3, 1458:6
**Due** [1] - 1298:21
**duly** [2] - 1446:2, 1519:9
**during** [18] - 1300:7, 1342:3, 1342:10,
1393:18, 1410:3, 1422:18, 1424:21,
1437:24, 1447:20, 1464:20, 1480:21,
1482:4, 1496:2, 1496:20, 1529:17,
1532:4, 1541:13, 1562:24
**duty** [1] - 1522:9
**dyersburg** [1] - 1520:5
**dynamic** [2] - 1340:3, 1340:6

# E

**e-mail** [6] - 1259:16, 1335:23, 1366:16,
1551:15, 1552:20, 1552:21
**e-mails** [6] - 1306:17, 1342:18, 1363:6,
1538:15, 1572:10, 1572:11
**early** [11] - 1304:1, 1304:2, 1304:8,
1304:12, 1348:17, 1410:4, 1410:18,
1410:23, 1470:20, 1470:22, 1568:7
**earned** [4] - 1383:14, 1472:5, 1513:19,
1516:10
**earning** [1] - 1383:13
**earnings** [8] - 1282:13, 1469:11,
1469:12, 1532:16, 1532:17, 1532:18,
1565:3, 1565:4
**ease** [2] - 1258:2, 1258:3
**easier** [4] - 1443:17, 1459:7, 1512:18,
1528:4
**easiest** [1] - 1365:15
**easily** [1] - 1568:1
**easy** [1] - 1461:6
**eaten** [1] - 1476:10
**eBay** [1] - 1476:12
**economic** [4] - 1304:15, 1364:18,
1459:24, 1512:2
**economies** [3] - 1528:18, 1528:20,
1531:21
**economy** [5] - 1302:10, 1347:2,
1351:24, 1363:15, 1469:19
**Ecuador** [1] - 1409:12
**edited** [1] - 1378:24
**educated** [2] - 1508:7, 1529:12
**education** [1] - 1263:20
**educational** [2] - 1447:6, 1478:21

**effect** [7] - 1265:21, 1308:24, 1315:16,
1348:23, 1352:22, 1443:12, 1451:9
**effort** [3] - 1330:10, 1352:1, 1570:19
**efforts** [1] - 1571:20
**eight** [1] - 1522:14
**eights** [1] - 1415:22
**either** [13] - 1318:21, 1344:21,
1350:20, 1356:2, 1369:3, 1384:23,
1385:13, 1394:12, 1457:8, 1484:19,
1493:5, 1545:16, 1551:14
**electronic** [1] - 1551:17
**electronics** [1] - 1457:15
**element** [2] - 1440:19, 1440:21
**Ellen** [2] - 1258:12, 1258:18, 1261:19
**elsewhere** [1] - 1513:19
**embezzlement** [1] - 1317:18
**emerge** [1] - 1460:7
**Emirates** [1] - 1496:6
**emphasis** [1] - 1571:14
**employed** [3] - 1277:6, 1525:4, 1551:8
**employee** [5] - 1412:10, 1412:11,
1413:6, 1413:10, 1413:14
**employees** [7] - 1308:15, 1333:24,
1337:7, 1337:8, 1337:9, 1376:18,
1418:23
**employment** [4] - 1413:6, 1413:8,
1448:13, 1532:9
**enabled** [1] - 1420:22
**end** [44] - 1258:21, 1295:10, 1314:22,
1353:15, 1392:25, 1393:11, 1393:20,
1393:23, 1403:14, 1407:2, 1417:23,
1425:15, 1434:21, 1434:22, 1471:6,
1475:4, 1475:12, 1491:22, 1491:25,
1502:15, 1521:20, 1522:5, 1537:16,
1537:22, 1538:21, 1539:20, 1550:20,
1553:20, 1553:22, 1557:16, 1557:22,
1557:25, 1559:4, 1560:23, 1562:4,
1562:7, 1562:9, 1563:8, 1563:13,
1563:17, 1563:23, 1564:15, 1564:17,
1567:20
**end-all** [1] - 1314:22
**ended** [3] - 1313:12, 1452:20, 1460:10
**energy** [1] - 1555:10
**enforcement** [1] - 1354:4
**engage** [1] - 1402:3
**engaged** [2] - 1393:14, 1479:15
**engaging** [2] - 1479:3, 1479:5
**engineering** [1] - 1449:14
**enlarge** [4] - 1421:15, 1423:16,
1424:25, 1428:1
**enlarged** [1] - 1424:21
**enlarging** [1] - 1425:20
**Enron** [3] - 1281:12, 1375:10
**enter** [1] - 1569:1
**entire** [7] - 1297:15, 1299:7, 1342:21,
1415:9, 1424:25, 1425:1, 1453:16
**entirely** [2] - 1284:7, 1369:15
**entirety** [1] - 1291:15
**entities** [3] - 1274:23, 1377:16,
1535:19
**entitled** [5] - 1353:19, 1441:7,
1444:10, 1574:5

**entity** [6] - 1283:13, 1289:17, 1348:19,
1500:2, 1506:6, 1532:22
**equal** [2] - 1428:25, 1573:15
**equals** [1] - 1427:21
**equate** [2] - 1339:5, 1346:19
**equated** [1] - 1347:7
**equities** [4] - 1360:23, 1427:4,
1433:16, 1433:18, 1499:18, 1499:22,
1501:5, 1501:6, 1555:14
**equity** [15] - 1268:19, 1281:2, 1281:5,
1281:8, 1293:25, 1361:12, 1453:6,
1470:11, 1499:25, 1500:7, 1500:10,
1500:23, 1511:23, 1512:2
**equivalence** [1] - 1554:14
**equivalent** [1] - 1567:3
**errors** [1] - 1468:14
**essence** [1] - 1454:7
**essentially** [4] - 1275:15, 1317:11,
1331:25, 1517:14
**estate** [3] - 1263:21, 1407:3, 1526:15
**estimate** [2] - 1271:13, 1471:7
**estimation** [1] - 1325:7
**etched** [1] - 1472:23
**Euro** [4] - 1426:4, 1426:24, 1499:8,
1555:5
**Europe** [17] - 1391:11, 1398:10,
1402:13, 1402:14, 1409:1, 1409:3,
1417:13, 1417:17, 1424:3, 1534:5,
1534:6, 1536:23, 1536:24, 1537:7,
1539:5, 1539:14, 1554:22
**Eustis** [2] - 1522:17, 1522:25
**evaluation** [1] - 1342:23
**event** [1] - 1484:11
**events** [1] - 1350:3
**eventually** [1] - 1452:9
**evidence** [24] - 1286:23, 1351:8,
1352:16, 1353:21, 1379:4, 1379:12,
1379:15, 1421:2, 1441:3, 1441:4,
1441:8, 1465:3, 1485:20, 1486:20,
1489:17, 1514:24, 1515:6, 1547:10,
1549:14, 1557:7, 1557:8, 1559:9,
1561:9, 1562:15
**exact** [5] - 1266:5, 1350:8, 1412:13,
1460:15, 1460:16
**exactly** [15] - 1297:20, 1327:9,
1344:10, 1349:8, 1350:22, 1361:23,
1383:11, 1417:1, 1428:12, 1431:10,
1432:25, 1451:13, 1508:3, 1550:13,
1556:14
**exam** [1] - 1299:22
**examination** [1] - 1259:19, 1260:13,
1407:2, 1410:3, 1414:16, 1418:3,
1419:17, 1420:16, 1421:1, 1421:4,
1422:6, 1422:23, 1424:22, 1425:23,
1429:14, 1511:7, 1512:7, 1513:9,
1514:4
**EXAMINATION** [20] - 1257:4, 1257:5,
1257:6, 1257:7, 1257:10, 1257:11,
1257:12, 1257:13, 1257:15, 1257:16,
1262:3, 1410:1, 1430:11, 1436:10,
1446:5, 1478:18, 1509:14, 1515:17,
1519:11, 1547:5
**examine** [1] - 1259:22

examining [1] - 1299:16
example [14] - 1269:4, 1281:11, 1293:17, 1316:21, 1321:12, 1323:21, 1326:7, 1328:25, 1357:15, 1371:5, 1441:25, 1500:8, 1500:13, 1536:24
excel [1] - 1551:21
Excel [2] - 1551:22, 1551:24
except [1] - 1314:24
exception [7] - 1261:10, 1295:12, 1358:25, 1412:21, 1412:22, 1547:1, 1549:10
exceptions [3] - 1412:25, 1443:21, 1443:22
excess [2] - 1362:5, 1468:14
exchange [1] - 1388:12
Exchange [2] - 1283:18, 1284:3
exclusive [2] - 1299:11, 1422:5
exclusively [2] - 1312:22, 1434:4
excuse [12] - 1269:2, 1273:18, 1279:7, 1292:4, 1322:25, 1345:7, 1412:8, 1484:24, 1486:7, 1490:9, 1491:9, 1565:15
excused [1] - 1445:5
executed [2] - 1344:17, 1344:19
executive [1] - 1535:17
Exhibit [32] - 1286:23, 1287:3, 1288:2, 1297:12, 1298:20, 1333:12, 1372:23, 1418:10, 1421:2, 1433:8, 1456:14, 1461:20, 1464:3, 1465:22, 1483:6, 1490:7, 1509:21, 1511:15, 1512:5, 1512:11, 1545:24, 1547:1, 1547:10, 1556:8, 1556:22, 1559:7, 1561:12, 1561:25, 1562:14, 1562:22, 1563:10, 1564:11
exhibit [7] - 1260:25, 1372:15, 1372:18, 1485:15, 1490:12, 1558:18, 1558:20
Exhibits [2] - 1558:6, 1561:19
exhibits [15] - 1259:14, 1259:15, 1260:24, 1556:24, 1559:3, 1560:9, 1561:8, 1561:18, 1568:12, 1568:13, 1569:1, 1569:17, 1569:19, 1570:11, 1572:16
exist [1] - 1320:13
expect [3] - 1317:18, 1346:23, 1382:21
expectation [1] - 1506:10
expectations [2] - 1459:25, 1469:12
expected [2] - 1346:11, 1496:8
expecting [1] - 1417:16
expended [1] - 1400:25
expense [1] - 1400:19
expenses [1] - 1476:15
expensive [1] - 1400:16
experiencing [2] - 1462:22, 1463:22
expert [4] - 1332:19, 1356:3, 1453:24, 1482:11
expertise [2] - 1458:7, 1460:6
experts [1] - 1535:11
explain [6] - 1350:2, 1426:21, 1525:23, 1531:23, 1539:6, 1562:2
explained [4] - 1415:6, 1451:2, 1455:20, 1504:17

explanation [2] - 1365:17, 1528:15
exponentially [1] - 1321:1
exposure [1] - 1450:10
express [1] - 1308:16
expressly [1] - 1309:1
extended [1] - 1481:3
extensive [1] - 1468:17
extent [2] - 1397:9, 1541:2
extra [2] - 1412:5, 1417:14
extravagantly [2] - 1382:19, 1383:5
extreme [1] - 1506:9
extremely [1] - 1427:7, 1456:11
Exxon [3] - 1281:12, 1534:1, 1539:13
eye [1] - 1502:17

# F

F-I-N-R-A [1] - 1322:20
F-L-Y-N-N [1] - 1446:12
FA [1] - 1292:4
FA's [1] - 1324:17
facilities [3] - 1428:19, 1448:20, 1448:25
fact [32] - 1264:22, 1265:20, 1265:25, 1273:4, 1279:6, 1279:10, 1303:4, 1303:10, 1310:25, 1311:10, 1319:19, 1320:7, 1322:4, 1336:19, 1343:21, 1346:10, 1367:23, 1378:1, 1393:13, 1400:9, 1400:20, 1405:15, 1429:6, 1438:21, 1439:2, 1439:7, 1439:19, 1452:20, 1458:19, 1479:14, 1517:18, 1551:23
factor [1] - 1555:25
factors [1] - 1492:13
fail [1] - 1376:10
failure [1] - 1450:1
fair [20] - 1262:19, 1262:20, 1264:13, 1268:8, 1268:14, 1275:11, 1275:16, 1278:2, 1280:24, 1281:3, 1285:16, 1289:19, 1305:1, 1319:10, 1319:14, 1396:17, 1409:17, 1432:8, 1473:13, 1547:21
fairly [11] - 1267:16, 1355:15, 1392:5, 1449:14, 1479:8, 1479:10, 1496:16, 1533:23, 1533:24, 1533:25
faith [18] - 1343:9, 1343:14, 1344:15, 1344:16, 1344:18, 1345:7, 1345:8, 1345:10, 1346:3, 1346:5, 1346:17, 1346:19, 1354:12, 1420:13, 1425:16, 1440:2, 1440:17, 1570:19
fall [1] - 1500:10
fallout [1] - 1403:12
false [2] - 1309:7, 1440:1
familiar [14] - 1274:19, 1275:7, 1337:24, 1358:2, 1371:16, 1399:14, 1417:24, 1419:9, 1419:11, 1419:14, 1420:21, 1420:23, 1479:8, 1479:10
families [1] - 1373:19
family [7] - 1307:1, 1399:3, 1399:9, 1437:9, 1452:25, 1461:6, 1476:9
famous [1] - 1375:10

1297:3, 1299:15, 1300:5, 1323:24, 1334:4, 1342:25, 1368:22, 1368:24, 1384:4, 1413:4, 1507:10, 1542:25, 1557:12
FAs [1] - 1383:4
fashioned [1] - 1457:13
fast [5] - 1262:13, 1376:10, 1405:4, 1405:7, 1405:9
fasting [1] - 1405:5
fasts [1] - 1405:3
fault [1] - 1484:15
favorable [1] - 1480:11
fax [2] - 1551:15, 1552:20
faxes [2] - 1488:22, 1538:15
fAZEL [1] - 1297:10
Fazel [8] - 1255:20, 1255:21, 1261:24, 1342:1, 1414:22, 1416:19, 1426:16, 1556:13
FAZEL [225] - 1258:10, 1259:6, 1259:10, 1259:13, 1260:7, 1260:20, 1261:2, 1262:1, 1262:4, 1266:10, 1266:23, 1273:18, 1273:19, 1279:2, 1287:2, 1287:7, 1287:13, 1287:15, 1288:1, 1288:7, 1288:16, 1290:8, 1290:10, 1290:18, 1290:19, 1292:11, 1292:15, 1292:19, 1292:21, 1294:12, 1294:15, 1296:10, 1296:12, 1296:14, 1296:16, 1297:13, 1298:3, 1298:5, 1298:20, 1298:23, 1302:20, 1302:25, 1303:6, 1303:8, 1303:9, 1306:20, 1306:21, 1307:8, 1307:25, 1308:1, 1308:7, 1308:9, 1309:21, 1309:23, 1311:19, 1311:21, 1312:3, 1312:6, 1315:8, 1315:10, 1318:1, 1318:4, 1318:5, 1318:10, 1318:13, 1318:18, 1319:11, 1319:12, 1320:4, 1321:18, 1321:24, 1327:25, 1328:6, 1328:9, 1333:11, 1333:13, 1341:6, 1341:10, 1341:16, 1341:20, 1341:23, 1342:3, 1342:10, 1342:13, 1343:6, 1343:13, 1343:18, 1343:20, 1343:24, 1345:3, 1345:16, 1345:21, 1346:1, 1346:2, 1348:4, 1348:9, 1348:13, 1349:21, 1351:5, 1351:19, 1351:22, 1352:13, 1352:15, 1353:23, 1353:24, 1360:18, 1365:21, 1366:1, 1366:7, 1371:20, 1371:24, 1372:15, 1372:18, 1372:21, 1372:23, 1373:1, 1373:5, 1373:11, 1373:16, 1373:20, 1373:24, 1374:11, 1374:14, 1374:18, 1374:21, 1375:13, 1377:18, 1378:4, 1378:7, 1378:10, 1378:20, 1378:22, 1379:4, 1379:17, 1380:5, 1380:6, 1384:15, 1386:14, 1386:20, 1388:6, 1389:15, 1392:14, 1394:16, 1404:8, 1404:21, 1404:23, 1405:1, 1406:7, 1406:12, 1406:14, 1406:18, 1406:20, 1407:14, 1407:16, 1409:21, 1412:8, 1412:12, 1413:10, 1413:13, 1430:12, 1430:14, 1430:17, 1433:8, 1433:10, 1434:12, 1434:13, 1435:14, 1436:8, 1437:14, 1437:20, 1437:24, 1438:21, 1439:1, 1439:7, 1439:12, 1439:18, 1440:11, 1443:14,

1443:17, 1443:19, 1443:23, 1444:3,
1444:5, 1444:8, 1444:15, 1444:19,
1444:23, 1465:15, 1546:1, 1547:2,
1547:6, 1548:1, 1548:2, 1549:5,
1549:25, 1550:4, 1556:11, 1556:15,
1557:4, 1558:18, 1558:20, 1559:10,
1559:13, 1559:15, 1559:18, 1560:1,
1560:3, 1560:14, 1561:13, 1561:20,
1561:23, 1566:6, 1566:23, 1567:2,
1567:5, 1567:7, 1568:2, 1568:8,
1571:23, 1571:25, 1572:4, 1572:23,
1573:1, 1573:4, 1573:7
  **FAZEL............** [1] - 1257:16
  **FAZEL..............** [1] - 1257:6
  **FAZEL................** [1] - 1257:4
  **FBI** [1] - 1354:8
  **FDA** [2] - 1387:9, 1387:10
  **FDIC** [16] - 1289:22, 1316:21, 1425:14,
1455:12, 1455:15, 1459:15, 1468:15,
1493:21, 1493:24, 1494:1, 1494:7,
1494:13, 1494:18, 1495:4, 1495:8,
1495:17
  **FDIC-insured** [1] - 1459:15
  **fear** [1] - 1306:17
  **features** [1] - 1358:17
  **February** [6] - 1348:17, 1410:18,
1450:15, 1452:8, 1472:24, 1532:10
  **Federal** [3] - 1289:21, 1493:11, 1494:3
  **federal** [2] - 1290:14, 1443:20
  **fee** [2] - 1310:3, 1310:7
  **feed** [1] - 1272:15
  **feelings** [1] - 1506:11
  **fees** [1] - 1309:20
  **fellow** [2] - 1451:1, 1504:22
  **felt** [7] - 1273:11, 1335:25, 1336:11,
1359:10, 1361:12, 1416:20, 1480:5
  **few** [4] - 1325:18, 1355:15, 1459:14,
1570:11
  **fiduciary** [1] - 1521:15
  **field** [2] - 1261:12, 1522:15
  **Fifth** [1] - 1442:4
  **figure** [2] - 1432:2, 1553:24
  **filed** [1] - 1406:1
  **fill** [1] - 1368:5
  **final** [1] - 1435:21
  **finally** [1] - 1428:13
  **finance** [6] - 1332:25, 1428:23,
1520:23, 1521:9, 1522:2, 1523:15
  **Financial** [13] - 1322:23, 1325:22,
1326:8, 1376:2, 1523:21, 1523:25,
1526:4, 1526:19, 1527:8, 1530:24,
1535:21, 1538:21, 1541:13
  **financial** [111] - 1263:8, 1263:9,
1263:12, 1263:19, 1264:6, 1268:21,
1269:9, 1269:10, 1270:14, 1276:12,
1280:24, 1283:8, 1285:19, 1292:3,
1292:4, 1292:5, 1292:17, 1293:2,
1293:3, 1300:8, 1301:11, 1301:15,
1301:18, 1301:20, 1302:11, 1305:9,
1318:25, 1319:3, 1321:15, 1322:25,
1332:25, 1334:9, 1335:2, 1335:4,
1340:16, 1340:17, 1340:20, 1342:5,
1347:3, 1347:6, 1348:25, 13⁴⁰:¹²,

1350:14, 1356:7, 1358:13, 1358:22,
1361:10, 1361:11, 1362:4, 1370:24,
1374:25, 1375:11, 1383:16, 1386:10,
1390:16, 1391:11, 1391:18, 1410:9,
1417:13, 1417:24, 1417:25, 1422:19,
1425:9, 1425:17, 1429:11, 1431:12,
1431:14, 1431:24, 1436:17, 1437:10,
1450:25, 1453:1, 1453:24, 1454:5,
1458:7, 1460:6, 1461:16, 1462:21,
1463:2, 1466:12, 1466:15, 1466:17,
1466:20, 1467:22, 1469:1, 1471:3,
1473:17, 1473:22, 1477:15, 1480:19,
1482:7, 1501:12, 1502:2, 1504:21,
1506:18, 1512:13, 1521:10, 1524:1,
1528:10, 1536:4, 1536:5, 1536:6,
1536:11, 1538:7, 1543:18, 1543:21,
1544:2, 1544:18, 1544:22, 1545:20,
1563:2
  **financially** [1] - 1297:16
  **financials** [1] - 1437:6
  **fine** [12] - 1259:1, 1328:3, 1328:8,
1331:24, 1332:3, 1381:8, 1406:13,
1456:19, 1484:13, 1494:2, 1569:3,
1572:3
  **finish** [5] - 1302:19, 1352:3, 1440:10,
1522:10, 1567:19
  **finished** [1] - 1516:18
  **finishing** [1] - 1566:18
  **FINRA** [12] - 1322:18, 1322:25, 1323:7,
1323:18, 1323:23, 1324:5, 1324:10,
1324:11, 1325:8, 1327:9, 1330:5,
1330:8
  **fINRA** [1] - 1322:20
  **FINRA's** [1] - 1323:12
  **firm** [29] - 1277:3, 1325:6, 1328:22,
1329:4, 1348:20, 1389:10, 1414:24,
1415:1, 1415:17, 1415:22, 1416:4,
1416:7, 1416:14, 1419:19, 1429:20,
1448:23, 1449:1, 1449:5, 1449:11,
1449:12, 1449:15, 1523:14, 1525:11,
1536:1, 1536:2, 1536:3, 1536:18
  **Firm** [1] - 1256:6
  **firm's** [2] - 1414:17, 1414:18
  **firms** [6] - 1321:12, 1534:6, 1537:2,
1538:19, 1552:18, 1554:21
  **first** [60] - 1289:12, 1290:5, 1297:3,
1342:2, 1342:6, 1342:7, 1372:12,
1376:23, 1380:9, 1389:24, 1393:11,
1403:8, 1405:18, 1421:20, 1421:25,
1423:21, 1424:18, 1425:3, 1428:17,
1433:15, 1434:14, 1439:24, 1446:2,
1447:7, 1450:14, 1452:5, 1461:21,
1462:7, 1463:7, 1467:3, 1468:7,
1471:16, 1474:18, 1474:20, 1483:3,
1483:13, 1485:14, 1486:10, 1488:23,
1490:5, 1491:17, 1497:16, 1498:13,
1498:16, 1506:12, 1510:2, 1512:14,
1512:15, 1512:16, 1513:20, 1519:9,
1522:21, 1526:11, 1527:8, 1527:14,
1528:7, 1528:15, 1529:20, 1555:2,
1572:24
  **First** [5] - 1521:3, 1521:6, 1521:11,
1521:17, 1521:21

  **firsthand** [1] - 1417:7
  **fiscally** [1] - 1469:14
  **fit** [4] - 1269:7, 1336:12, 1452:15,
1536:12
  **five** [13] - 1277:3, 1277:9, 1415:22,
1464:10, 1478:4, 1497:12, 1497:13,
1497:15, 1497:16, 1539:20, 1565:10,
1570:7, 1573:3
  **five-eights** [1] - 1415:22
  **five-person** [1] - 1277:3
  **five-year** [3] - 1497:12, 1497:13,
1497:16
  **fix** [1] - 1322:11
  **fixed** [2] - 1463:20, 1555:13
  **fixed-rate** [1] - 1463:20
  **fixtures** [1] - 1397:8
  **flexibility** [1] - 1311:1, 1339:25
  **flexible** [2] - 1261:8, 1519:17
  **flip** [3] - 1290:5, 1550:18, 1563:10
  **floating** [1] - 1483:18
  **Floor** [2] - 1255:22, 1256:4
  **Florida** [8] - 1330:1, 1446:20, 1449:8,
1449:9, 1449:10, 1517:7, 1517:13
  **flowed** [1] - 1388:14
  **fluctuation** [3] - 1339:14, 1339:17,
1339:19
  **fluctuations** [1] - 1339:6
  **FLYNN** [2] - 1257:9, 1446:1
  **Flynn** [64] - 1445:10, 1445:11,
1445:13, 1446:7, 1446:12, 1446:15,
1450:11, 1452:16, 1453:3, 1453:12,
1454:10, 1456:7, 1456:13, 1456:17,
1456:23, 1457:17, 1458:8, 1458:11,
1459:2, 1459:17, 1460:10, 1461:2,
1461:19, 1461:21, 1463:16, 1464:2,
1464:15, 1465:22, 1466:23, 1468:6,
1472:17, 1473:7, 1473:13, 1474:8,
1474:25, 1476:8, 1476:23, 1477:15,
1478:8, 1478:20, 1483:15, 1484:23,
1485:18, 1485:23, 1486:5, 1486:23,
1487:23, 1489:20, 1490:14, 1491:10,
1491:13, 1491:20, 1492:2, 1492:11,
1493:4, 1494:23, 1495:3, 1497:22,
1498:24, 1502:24, 1509:16, 1512:6,
1514:4, 1515:19
  **Flynn's** [1] - 1485:14
  **Fochi** [1] - 1442:3
  **focus** [10] - 1268:2, 1295:5, 1308:4,
1312:1, 1462:7, 1462:10, 1466:16,
1467:2, 1492:1, 1515:12
  **focused** [1] - 1418:9
  **focussing** [1] - 1457:24
  **foggy** [1] - 1361:22
  **fold** [1] - 1416:12
  **folks** [10] - 1370:8, 1386:24, 1391:18,
1393:21, 1395:2, 1396:23, 1398:7,
1398:23, 1402:10, 1496:13
  **folks's** [1] - 1340:1
  **follow** [1] - 1458:14
  **followed** [1] - 1463:11
  **following** [6] - 1258:6, 1261:21,
1294:18, 1307:18, 1321:23, 1341:9,
1345:17, 1381:10, 1392:21, 1426:5,

1437:17, 1444:21, 1464:16, 1465:17, 1468:11, 1499:9, 1512:25, 1566:4
**follows** [2] - 1446:3, 1519:10
**FOR** [3] - 1255:13, 1255:20, 1256:2
**force** [1] - 1477:15
**forced** [2] - 1506:13, 1506:15
**forcing** [4] - 1336:22, 1336:24, 1337:1, 1337:4
**forego** [1] - 1477:15
**foregoing** [1] - 1574:3
**foreign** [7] - 1312:8, 1426:3, 1426:4, 1426:24, 1499:7, 1499:9, 1567:11
**forget** [2] - 1360:8, 1566:24
**forgot** [1] - 1360:7
**form** [2] - 1507:13, 1514:16
**format** [4] - 1351:23, 1551:18, 1551:24, 1552:19
**formed** [1] - 1461:15
**former** [4] - 1387:7, 1387:8, 1387:9, 1389:10
**forms** [1] - 1472:15
**formulary** [1] - 1478:10
**Fort** [1] - 1522:17
**forth** [11] - 1259:16, 1328:2, 1335:12, 1360:23, 1402:15, 1408:22, 1491:22, 1492:12, 1531:22, 1549:2, 1555:5
**forty** [1] - 1333:22
**forty-four** [1] - 1333:22
**forward** [4] - 1296:10, 1298:3, 1443:13, 1568:15
**foundation** [5] - 1348:4, 1378:8, 1546:1, 1549:6, 1560:17
**four** [9] - 1277:2, 1333:22, 1423:8, 1447:18, 1521:18, 1531:20, 1532:8, 1538:19, 1559:3
**four-and-a-half-year** [1] - 1447:18
**FRAC** [1] - 1361:15
**fraction** [1] - 1474:10
**frame** [3] - 1284:21, 1315:14, 1315:17
**franc** [1] - 1555:5
**franchise** [1] - 1500:16
**Francisco** [1] - 1329:16
**frank** [1] - 1259:23
**frankly** [2] - 1383:10, 1456:12
**fraud** [6] - 1269:21, 1351:14, 1382:24, 1440:22, 1440:23
**fraudulent** [36] - 1271:5, 1273:9, 1276:7, 1277:23, 1280:10, 1282:23, 1284:9, 1286:4, 1286:20, 1296:20, 1296:25, 1297:2, 1297:4, 1298:14, 1301:1, 1301:17, 1309:9, 1309:25, 1310:10, 1310:22, 1311:8, 1311:17, 1320:14, 1322:14, 1326:19, 1327:21, 1331:10, 1332:21, 1337:11, 1339:10, 1344:1, 1367:21, 1371:14, 1382:14, 1384:2, 1388:3
**Fred** [5] - 1546:13, 1547:13, 1550:14, 1552:7, 1561:6
**free** [5] - 1403:23, 1404:1, 1445:5, 1445:6, 1518:7
**frequently** [1] - 1326:5
**Friday** [1] - 1261:6

**friendly** [1] - 1337:6
**friends** [5] - 1302:3, 1359:20, 1359:22, 1359:23, 1360:20
**front** [7] - 1465:23, 1484:20, 1499:1, 1501:15, 1505:1, 1509:22, 1538:5
**frozen** [1] - 1471:23
**full** [12] - 1337:22, 1337:23, 1346:3, 1346:5, 1346:17, 1346:19, 1354:12, 1425:16, 1449:20, 1468:7, 1505:19, 1512:15
**full-time** [1] - 1449:20
**fully** [3] - 1338:5, 1353:8, 1519:17
**functioning** [1] - 1436:4
**functions** [1] - 1275:9
**fund** [9] - 1289:9, 1435:2, 1435:10, 1467:7, 1498:10, 1521:7, 1521:15, 1524:23, 1525:2
**Fund** [2] - 1332:8, 1332:11
**fundamental** [1] - 1505:22
**funding** [2] - 1263:20, 1332:24
**Funds** [1] - 1434:1
**funds** [46] - 1264:8, 1276:4, 1312:7, 1313:18, 1333:3, 1338:23, 1338:24, 1344:9, 1350:20, 1426:2, 1426:7, 1426:25, 1442:21, 1451:24, 1471:12, 1471:17, 1472:2, 1480:15, 1481:12, 1481:19, 1481:21, 1482:19, 1482:20, 1498:22, 1499:4, 1499:7, 1499:12, 1499:24, 1513:8, 1513:11, 1513:14, 1513:15, 1513:22, 1521:8, 1524:24, 1526:2, 1528:18, 1532:2, 1533:9, 1533:14, 1533:22, 1541:6, 1555:13
**funny** [1] - 1378:21
**furniture** [3] - 1397:7, 1429:16, 1429:19
**future** [4] - 1284:23, 1435:11, 1498:11, 1529:13
**futures** [5] - 1528:21, 1529:9, 1529:11

# G

**GAAP** [4] - 1355:23, 1356:16, 1357:16, 1358:4
**gains** [1] - 1482:4
**gambit** [1] - 1268:19
**game** [3] - 1261:7, 1261:15, 1263:25
**gather** [1] - 1536:7
**Gen** [2] - 1537:1, 1538:14
**general** [6] - 1264:4, 1276:4, 1294:13, 1387:8, 1496:12, 1528:15
**generality** [1] - 1382:1
**generalize** [1] - 1541:2
**generally** [18] - 1286:7, 1321:11, 1355:24, 1356:4, 1358:20, 1379:3, 1381:19, 1396:12, 1397:16, 1419:11, 1428:18, 1449:23, 1452:4, 1516:5, 1526:12, 1529:24, 1533:6, 1543:24
**gentleman** [3] - 1325:19, 1378:13, 1406:5
**gentlemen** [3] - 1307:19, 1352:20, 1565:22
**geography** [1] - 1384:9

**Georgia** [1] - 1330:1
**Germany** [1] - 1361:2
**given** [23] - 1259:23, 1275:1, 1286:11, 1286:14, 1319:3, 1326:25, 1412:2, 1422:10, 1422:14, 1425:9, 1437:10, 1439:1, 1451:9, 1488:25, 1515:14, 1548:6, 1566:17, 1568:13, 1569:19, 1570:4, 1570:16, 1570:18, 1571:13
**glad** [1] - 1403:24
**glasses** [2] - 1464:22
**global** [13] - 1409:18, 1423:25, 1424:6, 1434:10, 1460:1, 1460:6, 1498:5, 1528:17, 1531:21, 1536:20, 1538:10, 1542:11
**Global** [5] - 1296:13, 1389:4, 1389:9, 1423:16, 1497:21
**globally** [4] - 1417:12, 1459:24, 1468:2, 1469:6
**GM** [4] - 1293:17, 1293:19, 1295:16, 1295:17
**goal** [2] - 1338:9, 1453:2
**goals** [3] - 1419:3, 1419:5, 1453:1
**God** [2] - 1356:1, 1358:12
**gold** [1] - 1532:2
**golden** [1] - 1335:20
**Goldman** [1] - 1530:15
**good-faith** [1] - 1570:19
**goods** [1] - 1428:23
**gosh** [1] - 1332:2
**gov** [1] - 1286:22
**govern** [1] - 1516:2
**GOVERNMENT** [1] - 1255:13
**government** [39] - 1259:14, 1261:5, 1296:19, 1296:22, 1311:22, 1332:6, 1333:9, 1336:18, 1341:15, 1343:6, 1350:8, 1351:5, 1352:21, 1353:2, 1353:11, 1353:15, 1354:1, 1354:14, 1367:9, 1372:24, 1374:7, 1377:2, 1377:5, 1380:9, 1381:16, 1400:9, 1402:24, 1403:21, 1405:2, 1407:3, 1433:11, 1434:8, 1437:25, 1438:9, 1438:16, 1445:2, 1568:3, 1572:7
**Government** [4] - 1289:22, 1289:24, 1493:13, 1493:14
**Government's** [17] - 1287:3, 1288:1, 1333:12, 1418:10, 1421:2, 1433:8, 1456:14, 1461:20, 1464:3, 1465:22, 1483:5, 1490:7, 1511:15, 1556:7, 1558:6, 1559:7, 1562:14
**government's** [6] - 1341:21, 1341:23, 1353:4, 1353:16, 1393:3, 1489:2
**governor** [1] - 1389:10
**governs** [1] - 1517:7
**grad** [1] - 1523:10
**grade** [3] - 1426:3, 1426:23, 1499:8
**graduate** [7] - 1447:11, 1447:19, 1448:15, 1448:16, 1520:18, 1521:23, 1523:10
**graduating** [1] - 1447:17
**grainy** [1] - 1373:8
**grandchildren** [1] - 1446:25
**granted** [1] - 1444:13

**gravamen** [1] - 1342:25
**great** [4] - 1262:21, 1367:24, 1376:22, 1482:8
**greater** [2] - 1428:21, 1428:25
**greatest** [1] - 1374:24
**greed** [2] - 1373:18, 1374:24
**Green** [38] - 1259:15, 1259:22, 1262:5, 1262:21, 1273:20, 1278:19, 1287:16, 1295:14, 1297:6, 1301:21, 1302:1, 1302:6, 1308:2, 1310:15, 1312:17, 1312:25, 1313:3, 1313:16, 1314:20, 1315:7, 1345:22, 1350:14, 1353:25, 1365:4, 1365:8, 1377:22, 1378:11, 1379:18, 1380:7, 1394:17, 1410:3, 1412:17, 1430:13, 1435:15, 1536:8, 1572:9, 1572:15, 1572:16
**GREEN** [2] - 1257:3, 1262:2
**Gregg** [1] - 1255:13
**grew** [2] - 1415:7, 1416:7
**gross** [1] - 1458:16
**Grossbeck** [1] - 1269:5
**grounds** [1] - 1558:17
**Group** [42] - 1267:12, 1267:15, 1268:23, 1269:11, 1310:4, 1310:7, 1323:6, 1324:23, 1325:23, 1326:8, 1326:9, 1328:10, 1331:1, 1332:13, 1337:13, 1418:23, 1454:5, 1462:6, 1466:18, 1466:19, 1467:22, 1469:1, 1471:12, 1472:15, 1480:13, 1480:18, 1490:4, 1508:1, 1523:21, 1524:1, 1526:5, 1526:19, 1527:8, 1530:6, 1530:10, 1530:24, 1535:22, 1535:25, 1536:12, 1538:22, 1541:13, 1544:3
**group** [24] - 1264:15, 1266:19, 1267:5, 1268:11, 1273:15, 1330:25, 1338:3, 1384:4, 1386:3, 1386:6, 1386:15, 1386:24, 1387:2, 1387:21, 1387:22, 1388:25, 1390:12, 1424:4, 1450:19, 1450:25, 1451:17, 1452:2, 1521:8
**Group's** [1] - 1325:22
**groups** [3] - 1267:11, 1481:22, 1481:23
**grow** [3] - 1320:25, 1376:10, 1376:11
**growing** [2] - 1376:11, 1458:6
**growth** [4] - 1376:4, 1416:14, 1470:2, 1526:3
**Guardian** [1] - 1320:22
**guess** [24] - 1267:5, 1267:6, 1267:7, 1276:15, 1294:8, 1306:22, 1314:8, 1324:5, 1332:18, 1340:24, 1370:22, 1378:25, 1385:16, 1396:25, 1409:17, 1415:24, 1496:22, 1506:21, 1511:1, 1529:12, 1543:12, 1561:13, 1561:14, 1570:6
**Guess** [2] - 1289:12, 1290:2
**guesses** [1] - 1416:13
**guessing** [1] - 1502:17
**guilty** [1] - 1438:10
**gut** [1] - 1339:18
**gut-wrenching** [1] - 1339:18
**guy** [3] - 1276:17, 1390:18, 1444:11
**guys** [3] - 1327:24, 1391:23, 1434:14

# H

**half** [10] - 1415:16, 1415:25, 1447:18, 1464:5, 1464:20, 1510:23, 1511:4, 1514:2, 1530:22, 1563:4
**Half** [2] - 1523:11, 1523:13
**hallway** [1] - 1538:7
**hammer** [1] - 1381:22
**Hamrick** [1] - 1325:18
**hand** [9] - 1318:6, 1385:23, 1445:14, 1456:13, 1519:3, 1535:21, 1538:6, 1538:8, 1553:5
**handed** [3] - 1442:6, 1558:8, 1559:3
**handful** [1] - 1571:15
**handing** [4] - 1461:19, 1464:2, 1558:5, 1559:6
**handled** [2] - 1275:17, 1276:2
**hands** [1] - 1468:2
**hands-on** [1] - 1468:2
**handwriting** [5] - 1462:11, 1462:12, 1462:13, 1487:9, 1487:11
**handwritten** [1] - 1511:15
**hang** [10] - 1258:1, 1321:19, 1372:14, 1372:22, 1418:15, 1438:19, 1438:24, 1484:2, 1519:23
**happy** [2] - 1388:20, 1502:22
**hard** [14] - 1383:18, 1456:16, 1456:17, 1456:18, 1456:19, 1457:7, 1457:10, 1483:23, 1484:19, 1484:21, 1484:23, 1510:10, 1550:15, 1556:24
**hard-working** [1] - 1383:18
**Harris** [1] - 1375:25
**haywire** [1] - 1346:25
**head** [7] - 1271:16, 1276:19, 1331:3, 1413:3, 1449:8, 1464:21, 1563:12
**headhunting** [1] - 1523:14
**health** [5] - 1332:16, 1449:19, 1449:21, 1449:23, 1514:1
**healthcare** [3] - 1387:10, 1454:17, 1555:9
**hear** [6] - 1378:13, 1381:9, 1450:14, 1477:4, 1477:18, 1514:23
**heard** [19] - 1320:12, 1332:9, 1332:13, 1352:22, 1374:4, 1379:6, 1379:9, 1399:18, 1399:19, 1400:1, 1403:22, 1418:3, 1429:13, 1450:11, 1500:13, 1512:12, 1533:1, 1566:25, 1567:2
**hearing** [2] - 1342:3, 1342:10
**hears** [1] - 1465:11
**hearsay** [10] - 1314:9, 1378:6, 1379:6, 1412:9, 1412:20, 1477:24, 1489:3, 1546:1, 1549:7, 1549:25
**Hearsay** [1] - 1412:25
**heart** [3] - 1449:25, 1452:18, 1477:16
**heat** [1] - 1363:15
**hedge** [8] - 1338:24, 1467:7, 1524:24, 1528:18, 1532:2, 1533:9, 1533:22, 1541:6
**held** [22] - 1258:6, 1261:21, 1307:18, 1317:1, 1321:22, 1321:23, 1341:9, 1345:17, 1368:8, 1392:21, 1417:17,

1471:10, 1497:1, 1534:5, 1554:19, 1554:20, 1566:4, 1573:18
**help** [13] - 1258:24, 1349:1, 1396:4, 1433:5, 1457:12, 1491:5, 1492:3, 1504:7, 1504:8, 1507:20, 1534:10, 1535:7, 1536:6
**helped** [4] - 1270:18, 1272:5, 1391:8, 1460:7
**helpful** [1] - 1517:10
**helps** [1] - 1457:14
**Henry** [1] - 1566:14
**hew** [1] - 1325:21
**Hewlett** [3] - 1429:12, 1429:20, 1429:23
**hiatus** [2] - 1447:18, 1447:20
**hide** [1] - 1368:23
**high** [8] - 1266:21, 1306:4, 1382:19, 1382:25, 1383:5, 1496:16, 1505:9, 1513:24
**higher** [10] - 1311:13, 1369:16, 1370:4, 1381:20, 1382:9, 1453:9, 1453:10, 1479:25, 1494:15, 1513:18
**higher-return** [1] - 1453:9
**higher-than-normal** [1] - 1453:10
**highlight** [7] - 1287:14, 1294:14, 1312:3, 1421:20, 1491:17, 1492:19, 1510:17
**highlighted** [2] - 1400:3, 1512:15
**highlighting** [1] - 1290:9
**highlights** [2] - 1490:18, 1563:3
**highly** [2] - 1350:18, 1463:19
**himself** [4] - 1346:20, 1351:6, 1370:18, 1376:15
**hired** [17] - 1392:3, 1392:4, 1392:6, 1398:23, 1400:13, 1400:20, 1403:20, 1404:1, 1448:15, 1504:17, 1504:19, 1523:23, 1526:6, 1526:11, 1527:8, 1528:16, 1537:18
**historical** [2] - 1426:5, 1499:10
**historically** [1] - 1373:18
**history** [3] - 1374:25, 1448:14, 1482:12
**hit** [3] - 1309:14, 1339:12, 1398:7
**HITTNER** [1] - 1255:10
**hodgepodge** [1] - 1526:15
**hold** [14] - 1266:8, 1278:24, 1302:19, 1307:13, 1307:16, 1378:19, 1388:5, 1393:5, 1413:17, 1437:18, 1450:20, 1494:21, 1509:25, 1562:12
**holder** [1] - 1455:3
**holders** [5] - 1453:11, 1455:25, 1456:2, 1463:13, 1508:24
**holding** [2] - 1464:21, 1475:16
**holdings** [1] - 1555:8
**holler** [1] - 1427:3
**Holt** [19] - 1386:7, 1390:12, 1391:2, 1392:4, 1392:7, 1394:20, 1395:7, 1395:13, 1398:24, 1398:25, 1399:20, 1424:7, 1527:24, 1528:1, 1529:8, 1543:5, 1543:6, 1544:12
**home** [2] - 1406:23, 1454:18
**honest** [5] - 1314:18, 1318:21, 1319:8,

1330:13, 1384:25
**honestly** [4] - 1306:8, 1319:6, 1330:16, 1403:12
**Honor** [119] - 1259:24, 1260:11, 1260:23, 1261:16, 1262:1, 1266:15, 1287:4, 1290:18, 1302:20, 1303:6, 1307:8, 1308:7, 1318:14, 1342:8, 1342:20, 1342:23, 1343:2, 1344:25, 1345:3, 1345:19, 1346:1, 1348:2, 1349:19, 1349:21, 1351:5, 1353:23, 1365:10, 1374:9, 1377:20, 1386:14, 1392:14, 1393:10, 1394:2, 1404:10, 1412:23, 1413:2, 1413:19, 1418:12, 1418:17, 1430:10, 1430:14, 1437:13, 1437:14, 1438:13, 1444:24, 1445:3, 1445:9, 1445:25, 1446:4, 1457:1, 1457:6, 1465:20, 1476:19, 1476:25, 1477:17, 1477:20, 1477:25, 1478:15, 1483:20, 1483:23, 1484:10, 1485:19, 1486:19, 1488:18, 1488:20, 1489:1, 1489:12, 1490:17, 1492:8, 1494:12, 1494:15, 1494:19, 1497:4, 1507:13, 1507:20, 1509:12, 1510:8, 1514:22, 1514:25, 1515:2, 1515:6, 1515:16, 1516:12, 1518:3, 1518:5, 1518:8, 1519:20, 1527:6, 1534:12, 1534:16, 1534:17, 1534:23, 1535:5, 1545:23, 1546:25, 1549:9, 1549:21, 1549:23, 1550:1, 1550:7, 1556:7, 1556:23, 1557:4, 1558:8, 1558:15, 1559:8, 1559:12, 1559:23, 1560:8, 1560:16, 1561:11, 1562:18, 1565:19, 1566:11, 1569:20, 1571:4, 1571:12, 1571:19, 1572:4
**honor** [3] - 1412:18, 1412:19, 1413:24
**Honor's** [1] - 1466:23
**honorable** [1] - 1523:7
**HONORABLE** [1] - 1255:10
**honorably** [1] - 1448:8
**hope** [1] - 1381:12
**hot** [2] - 1442:6, 1442:13
**hour** [5] - 1392:19, 1464:5, 1566:20, 1566:23, 1568:5
**hours** [4] - 1300:7, 1393:2, 1422:18, 1567:4
**house** [1] - 1385:18
**housed** [2] - 1385:4, 1545:9
**housekeeping** [1] - 1392:23
**HOUSTON** [1] - 1255:2
**Houston** [17] - 1255:4, 1255:15, 1255:23, 1256:4, 1256:7, 1256:11, 1283:1, 1318:22, 1328:21, 1366:20, 1390:9, 1396:24, 1397:1, 1403:19, 1411:5, 1449:12
**Howard** [1] - 1255:16
**HR** [1] - 1527:14
**hundred** [9] - 1271:18, 1405:17, 1488:21, 1494:11, 1495:4, 1495:9, 1495:13, 1543:14, 1543:20
**hundred-page** [1] - 1488:21
**hundreds** [4] - 1364:6, 1469:23, 1506:3, 1506:4
**hypothetical** [1] - 1338:20

**hysteria** [2] - 1306:10

# I

**icon** [1] - 1279:24
**idea** [15] - 1270:23, 1270:24, 1331:8, 1332:24, 1333:2, 1335:10, 1339:25, 1367:3, 1367:16, 1367:23, 1367:24, 1545:5, 1560:1, 1560:3, 1566:6
**identical** [1] - 1558:9
**identification** [1] - 1559:7
**identified** [4] - 1524:12, 1527:5, 1530:9, 1532:14
**identify** [3] - 1410:12, 1527:1, 1562:19
**IFRS** [4] - 1357:3, 1360:6, 1361:15, 1420:19
**illegal** [27] - 1271:3, 1272:1, 1273:2, 1273:7, 1282:21, 1284:11, 1286:2, 1286:18, 1298:14, 1300:24, 1301:14, 1309:25, 1310:12, 1310:19, 1311:6, 1311:15, 1320:14, 1322:16, 1326:17, 1327:19, 1339:8, 1367:18, 1371:11, 1382:14, 1384:2, 1388:2, 1388:3
**illustrate** [2] - 1536:16, 1536:21
**imaginative** [1] - 1377:13
**imagine** [1] - 1374:24
**immediately** [1] - 1447:16
**impacted** [1] - 1467:8
**implemented** [1] - 1507:6
**implementing** [1] - 1479:10
**implied** [1] - 1308:17, 1308:19
**importance** [1] - 1442:18
**important** [34] - 1279:16, 1280:2, 1347:4, 1348:6, 1358:15, 1359:3, 1359:8, 1360:2, 1360:5, 1432:25, 1433:22, 1438:4, 1438:7, 1439:9, 1453:20, 1453:22, 1454:14, 1463:18, 1463:21, 1471:18, 1473:18, 1473:22, 1474:2, 1474:13, 1496:23, 1505:14, 1505:17, 1505:21, 1505:24, 1505:25, 1508:8, 1514:19, 1571:6
**impose** [1] - 1427:14
**impossible** [2] - 1376:11, 1397:22
**impressed** [1] - 1404:19, 1460:17
**inaccurate** [3] - 1296:25, 1297:2, 1297:4
**inadvertently** [1] - 1392:24
**inception** [1] - 1265:4
**inch** [1] - 1524:9
**inclination** [1] - 1331:9
**include** [5] - 1299:20, 1337:21, 1355:9, 1432:9, 1432:15
**included** [10] - 1415:6, 1415:9, 1432:2, 1475:16, 1475:22, 1476:2, 1479:5
**including** [6] - 1299:16, 1300:11, 1327:2, 1340:24, 1366:24, 1422:6, 1423:4
**income** [13] - 1405:13, 1405:20, 1406:15, 1406:17, 1406:18, 1450:2, 1450:3, 1450:4, 1454:3, 1476:19, 1526:3, 1541:8, 1555:13
**income-producing** [1] - 1541:8

**incorrect** [7] - 1296:21, 1315:23, 1367:10, 1405:24, 1405:25, 1406:3, 1406:4
**increase** [2] - 1416:12, 1470:4
**incurred** [1] - 1317:23
**indefinite** [2] - 1292:20, 1292:22
**independent** [2] - 1386:21, 1386:23
**indicated** [13] - 1335:19, 1354:22, 1367:9, 1380:13, 1463:9, 1472:4, 1501:13, 1503:21, 1509:2, 1547:12, 1549:19, 1561:15, 1568:13
**indicating** [1] - 1260:4
**indication** [2] - 1428:4, 1428:7
**indicative** [2] - 1435:11, 1498:11
**indirectly** [3] - 1314:6, 1369:2, 1369:3
**individual** [5] - 1268:21, 1268:22, 1270:17, 1325:13, 1335:25, 1340:10, 1366:20, 1372:13, 1373:6, 1406:6, 1411:4, 1419:9, 1419:14, 1525:25, 1551:10, 1552:4
**individually** [2] - 1264:12, 1406:7
**individuals** [4] - 1264:11, 1337:1, 1402:13, 1570:12
**indulgence** [1] - 1478:14
**industry** [5] - 1263:2, 1270:24, 1383:9, 1383:10, 1383:11
**infantry** [1] - 1448:3
**inflammation** [1] - 1450:10
**informal** [1] - 1275:10
**information** [63] - 1267:8, 1280:14, 1299:9, 1299:17, 1299:20, 1299:23, 1300:8, 1301:9, 1302:1, 1308:23, 1313:8, 1313:9, 1313:24, 1314:4, 1314:6, 1314:11, 1314:21, 1314:24, 1314:25, 1315:2, 1320:11, 1326:24, 1329:5, 1335:13, 1335:18, 1358:14, 1363:22, 1387:21, 1388:14, 1388:23, 1391:25, 1396:19, 1396:23, 1422:3, 1422:7, 1422:9, 1422:13, 1422:19, 1425:9, 1430:6, 1437:10, 1467:18, 1468:21, 1470:16, 1491:21, 1492:12, 1505:4, 1514:15, 1514:19, 1514:21, 1515:3, 1515:13, 1546:17, 1547:14, 1551:4, 1551:9, 1551:12, 1552:7, 1552:9, 1552:16, 1552:22, 1561:2
**informed** [2] - 1300:9, 1422:21, 1573:10
**informing** [1] - 1310:5
**infractions** [1] - 1331:25
**infuse** [1] - 1364:23
**infusion** [9] - 1354:19, 1355:19, 1361:17, 1361:19, 1362:16, 1366:25, 1367:16, 1367:19, 1367:21
**inherently** [1] - 1481:7
**inheritance** [1] - 1461:7
**inhouse** [2] - 1326:14, 1326:21
**input** [2] - 1441:12, 1483:7
**inquire** [2] - 1457:1, 1484:17
**inquiries** [1] - 1508:19
**inquiring** [1] - 1480:4
**inquiry** [1] - 1258:2
**insiders** [1] - 1387:12
**insight** [4] - 1542:14, 1542:22, 1543:1,

1543:3

**insistent** [1] - 1359:12

**insolvency** [2] - 1289:11, 1317:4

**insolvent** [3] - 1289:9, 1293:14, 1317:9

**inspection** [2] - 1300:7, 1422:17

**instance** [1] - 1410:24

**Institute** [1] - 1322:23

**institution** [6] - 1276:12, 1317:8, 1317:10, 1376:22, 1525:25

**institutions** [2] - 1321:15, 1388:12

**instructed** [1] - 1545:18

**instrument** [3] - 1282:19, 1461:5, 1461:14

**Insurance** [9] - 1288:25, 1289:3, 1289:21, 1332:8, 1332:11, 1493:1, 1493:8, 1493:12, 1494:3

**insurance** [55] - 1259:20, 1260:17, 1288:23, 1289:23, 1290:3, 1315:11, 1315:13, 1315:16, 1315:25, 1316:2, 1316:12, 1316:14, 1316:25, 1317:2, 1317:17, 1317:22, 1319:2, 1319:13, 1319:16, 1319:19, 1320:18, 1321:8, 1321:11, 1321:13, 1321:16, 1321:25, 1322:4, 1322:5, 1322:8, 1322:9, 1332:14, 1332:16, 1332:17, 1332:19, 1333:2, 1455:16, 1455:24, 1463:12, 1468:11, 1468:17, 1469:3, 1492:24, 1493:14, 1493:23, 1494:4, 1494:7, 1494:19, 1495:4, 1495:8, 1495:12, 1512:8, 1512:25, 1513:6

**insure** [4] - 1289:8, 1317:17, 1317:23, 1322:11

**insured** [16] - 1332:16, 1332:18, 1425:14, 1455:12, 1455:15, 1455:22, 1459:15, 1463:9, 1493:11, 1493:21, 1495:16, 1495:17, 1495:18, 1507:11, 1508:22, 1508:23

**insuring** [1] - 1503:22

**integrity** [1] - 1376:15

**intend** [1] - 1343:15

**intended** [2] - 1442:11, 1505:20

**intent** [13] - 1345:5, 1345:8, 1349:23, 1351:6, 1351:9, 1438:11, 1438:12, 1440:22, 1440:25, 1441:3, 1441:20, 1441:21

**Intentional** [1] - 1449:13

**interact** [2] - 1326:4, 1326:9

**interaction** [10] - 1275:8, 1275:10, 1359:19, 1361:18, 1389:19, 1390:11, 1397:5, 1534:8, 1540:14, 1545:19

**interest** [21] - 1295:2, 1295:3, 1295:4, 1295:7, 1297:17, 1304:6, 1311:13, 1381:17, 1381:20, 1382:5, 1425:4, 1431:24, 1432:1, 1432:9, 1432:16, 1472:5, 1472:8, 1474:24, 1484:10, 1498:3, 1500:1

**interested** [2] - 1452:10, 1453:9

**interesting** [4] - 1272:11, 1339:12, 1354:22, 1397:11

**interests** [1] - 1508:11

**Internal** [2] - 1370:18, 1370:21

**internally** [1] - 1337:20

**international** [10] - 1266:18, 1267:14, 1296:2, 1317:7, 1317:10, 1349:2, 1359:5, 1359:7, 1360:9, 1415:6

**International** [54] - 1266:18, 1264:25, 1269:11, 1308:12, 1310:6, 1320:22, 1346:5, 1346:18, 1354:18, 1359:1, 1360:13, 1362:22, 1379:24, 1382:17, 1383:12, 1384:7, 1408:19, 1412:17, 1414:19, 1418:23, 1449:11, 1449:16, 1450:12, 1450:18, 1451:3, 1453:4, 1453:7, 1454:13, 1455:7, 1455:9, 1456:8, 1456:22, 1461:9, 1466:1, 1469:13, 1472:22, 1473:17, 1473:21, 1474:9, 1475:13, 1482:23, 1508:1, 1514:3, 1514:12, 1523:12, 1523:13, 1532:24, 1536:15, 1562:7, 1563:8, 1563:23, 1564:6, 1564:14, 1565:16

**International's** [2] - 1450:21, 1466:25

**internationally** [1] - 1360:23

**Internet** [1] - 1334:21

**interoffice** [1] - 1488:22

**interrelated** [1] - 1271:23

**interrogation** [1] - 1519:21

**interrupt** [2] - 1439:5, 1547:17

**interview** [3] - 1527:13, 1527:16, 1528:5

**interviewed** [1] - 1527:14

**interwoven** [1] - 1326:4

**intimated** [1] - 1512:12

**introduce** [3] - 1269:4, 1319:11, 1547:10

**introduces** [1] - 1374:19

**introducing** [1] - 1545:23

**invalid** [1] - 1439:25

**inventory** [1] - 1397:9

**invest** [11] - 1263:14, 1264:2, 1264:8, 1333:4, 1339:23, 1347:3, 1382:5, 1471:19, 1507:11, 1508:4, 1532:1

**invested** [51] - 1282:18, 1307:1, 1312:7, 1313:10, 1340:1, 1340:12, 1350:18, 1414:18, 1415:1, 1415:18, 1426:2, 1426:7, 1426:23, 1427:1, 1427:7, 1427:13, 1427:18, 1437:8, 1441:16, 1453:14, 1454:19, 1462:18, 1473:16, 1474:10, 1474:16, 1475:9, 1480:13, 1480:14, 1480:15, 1480:16, 1480:23, 1481:13, 1481:17, 1499:7, 1499:12, 1499:17, 1500:22, 1501:1, 1501:5, 1501:6, 1501:7, 1501:17, 1501:23, 1502:16, 1507:1, 1508:16, 1509:9, 1513:11, 1513:13, 1513:21

**Invested** [1] - 1463:17

**investigate** [3] - 1299:3, 1299:4, 1299:22

**investigation** [2] - 1368:17, 1368:19

**investigators** [1] - 1517:13

**investing** [10] - 1282:19, 1300:10, 1344:10, 1422:22, 1426:21, 1451:3, 1482:17, 1482:18, 1500:3, 1506:12

**investment** [71] - 1263:6, 1263:24, 1274:15, 1275:17, 1275:20, 1276:1, 1276:5, 1281:5, 1292:17, 1296:13, 1296:15, 1299:6, 1299:21, 1304:10,

1338:2, 1338:17, 1338:21, 1338:23, 1350:15, 1395:17, 1396:9, 1423:25, 1425:5, 1425:8, 1425:12, 1426:3, 1426:5, 1426:23, 1427:3, 1434:10, 1435:12, 1436:25, 1451:2, 1452:5, 1452:14, 1452:15, 1452:17, 1453:17, 1456:6, 1458:13, 1458:25, 1459:4, 1461:7, 1461:10, 1463:20, 1467:24, 1468:1, 1469:6, 1469:22, 1471:14, 1474:12, 1475:15, 1475:21, 1476:1, 1480:17, 1480:24, 1482:20, 1498:5, 1499:8, 1501:14, 1501:23, 1503:12, 1508:20, 1521:16, 1524:18, 1524:19, 1524:21, 1525:20, 1528:18, 1528:23, 1543:4

**Investment** [9] - 1297:14, 1355:3, 1355:8, 1423:16, 1424:17, 1458:12, 1497:21, 1531:20, 1531:24

**investments** [37] - 1263:15, 1281:1, 1305:21, 1308:3, 1312:8, 1313:11, 1340:7, 1347:13, 1352:10, 1358:18, 1386:4, 1387:19, 1390:20, 1391:23, 1398:20, 1426:6, 1434:25, 1453:6, 1453:9, 1453:18, 1455:21, 1459:23, 1460:2, 1460:7, 1461:17, 1463:4, 1474:11, 1480:14, 1481:1, 1498:8, 1499:10, 1499:11, 1501:4, 1507:3, 1515:24, 1541:7, 1541:9

**investor** [17] - 1285:18, 1286:15, 1287:18, 1288:23, 1291:8, 1292:16, 1293:1, 1299:10, 1299:22, 1300:10, 1301:10, 1309:3, 1422:22, 1435:1, 1492:24, 1515:8

**Investor** [7] - 1288:25, 1289:3, 1486:7, 1492:14, 1493:1, 1493:7, 1498:8

**Investors** [3] - 1486:8, 1491:24, 1498:2

**investors** [13] - 1285:7, 1285:25, 1288:3, 1292:12, 1305:20, 1312:25, 1313:4, 1352:2, 1363:7, 1363:8, 1390:21, 1422:4, 1467:8

**involved** [19] - 1263:24, 1269:10, 1270:25, 1285:10, 1334:9, 1335:3, 1335:5, 1338:14, 1347:7, 1354:23, 1401:21, 1417:7, 1424:16, 1479:20, 1482:16, 1496:3, 1496:16, 1506:1

**involvement** [1] - 1397:10

**IRA** [6] - 1450:18, 1450:20, 1451:25, 1452:1, 1480:16, 1480:18

**irrelevance** [1] - 1559:22

**irrelevant** [3] - 1342:23, 1344:3, 1349:25

**IRS** [2] - 1370:13, 1370:21

**island** [3] - 1330:6, 1369:25, 1379:25

**Islands** [3] - 1384:13, 1384:14, 1385:14

**issue** [12] - 1260:22, 1305:23, 1341:19, 1349:23, 1351:24, 1394:5, 1428:21, 1530:15, 1530:16, 1548:19, 1568:9, 1568:11

**issued** [12] - 1289:21, 1393:15, 1413:9, 1414:19, 1415:2, 1415:18, 1416:1, 1429:1, 1436:17, 1441:10,

1524:15
**issues** [5] - 1325:24, 1330:20, 1342:22, 1352:7, 1363:18
**issuing** [2] - 1530:13, 1530:14
**items** [4] - 1336:23, 1336:25, 1337:1, 1427:1
**itself** [6] - 1299:1, 1322:11, 1324:16, 1340:25, 1429:2, 1457:5

## J

**J.D** [1] - 1272:20
**James** [4] - 1258:20, 1446:12, 1528:8, 1544:12
**January** [6] - 1255:5, 1348:17, 1470:21, 1470:22, 1471:5, 1472:18
**JASON** [2] - 1257:3, 1262:2
**Jason** [1] - 1536:8
**Jeff** [2] - 1375:9, 1375:10
**Jersey** [1] - 1389:11
**Jim** [2] - 1391:4, 1446:14
**job** [16] - 1270:1, 1270:2, 1275:12, 1292:3, 1292:7, 1388:21, 1448:17, 1448:22, 1496:20, 1512:1, 1517:12, 1517:13, 1517:15, 1523:12, 1523:18, 1528:24
**John** [1] - 1256:2
**Johnny** [6] - 1256:10, 1507:21, 1518:16, 1573:17, 1574:3, 1574:7
**Johnson** [7] - 1373:12, 1373:13, 1373:25, 1374:7, 1375:15, 1377:25
**JOHNSON** [3] - 1373:18, 1374:22, 1375:21
**join** [1] - 1273:15
**joining** [2] - 1262:21, 1404:18
**Jones** [1] - 1549:10
**Joseph** [2] - 1445:10, 1446:12
**JOSEPH** [2] - 1257:9, 1446:1
**Juan** [3] - 1411:25, 1412:7, 1412:9
**JUDGE** [1] - 1255:10
**Judge** [28] - 1259:10, 1273:18, 1306:20, 1327:25, 1341:6, 1342:4, 1371:20, 1374:19, 1380:5, 1407:14, 1409:22, 1409:23, 1437:20, 1440:19, 1442:3, 1443:10, 1443:14, 1483:7, 1484:7, 1484:17, 1494:20, 1495:1, 1502:22, 1559:15, 1568:10, 1570:5, 1570:16, 1571:21
**judgments** [2] - 1300:9, 1422:21
**judicial** [2] - 1290:21, 1393:12
**juice** [3] - 1405:3, 1405:4, 1405:7
**jump** [1] - 1425:18
**jurisdiction** [7] - 1284:1, 1288:22, 1288:24, 1289:23, 1492:23, 1492:25, 1493:13
**juror** [1] - 1258:2
**JUROR** [2] - 1307:10, 1307:12
**Juror** [1] - 1258:13
**JURORS** [1] - 1518:23
**jurors** [5] - 1258:7, 1258:9, 1258:10, 1258:16, 1258:17
**jury** [33] - 1261:17, 1261:21, 1270:12,

1280:20, 1287:5, 1307:18, 1321:23, 1345:17, 1353:17, 1392:21, 1393:21, 1394:24, 1407:19, 1425:1, 1441:6, 1444:21, 1446:8, 1446:10, 1448:14, 1457:2, 1464:13, 1464:16, 1465:17, 1467:11, 1489:16, 1518:22, 1524:6, 1528:14, 1541:12, 1545:1, 1550:13, 1562:2, 1566:4
**JURY** [1] - 1255:7
**jus** [1] - 1366:10
**Justice** [1] - 1255:17

## K

**keep** [10] - 1295:1, 1302:14, 1303:15, 1352:20, 1359:15, 1469:24, 1470:18, 1471:12, 1475:8, 1540:3
**keeping** [5] - 1353:20, 1359:12, 1359:16, 1429:16, 1459:23
**Kenneth** [1] - 1256:6
**Kentucky** [1] - 1521:25
**kept** [5] - 1392:24, 1451:8, 1546:22, 1556:9, 1558:12
**kicking** [1] - 1535:9
**kids** [1] - 1520:12
**kind** [24] - 1262:7, 1262:9, 1265:10, 1284:22, 1288:5, 1349:4, 1349:24, 1365:18, 1379:25, 1380:13, 1381:22, 1383:6, 1394:23, 1397:12, 1399:22, 1403:12, 1404:20, 1452:23, 1460:8, 1461:9, 1480:21, 1509:3, 1526:14, 1530:12
**kinds** [6] - 1453:15, 1456:10, 1480:24, 1481:10, 1482:21, 1496:13
**Knoche** [1] - 1566:14
**knocking** [1] - 1324:7
**knowing** [2] - 1517:19, 1517:20
**knowledge** [27] - 1268:10, 1278:13, 1278:15, 1304:24, 1319:14, 1319:17, 1319:18, 1319:22, 1325:8, 1332:25, 1351:7, 1351:10, 1369:25, 1392:8, 1399:14, 1408:7, 1408:13, 1417:7, 1438:17, 1439:8, 1546:16, 1547:14, 1548:3, 1548:9, 1548:11, 1548:13, 1548:22
**knowledgeable** [2] - 1504:22, 1508:7
**known** [9] - 1270:20, 1376:5, 1432:3, 1437:9, 1474:9, 1474:15, 1474:21, 1475:3, 1475:11
**knows** [3] - 1407:20, 1441:18, 1560:5
**Kuhrt** [1] - 1275:3

## L

**lack** [3] - 1461:12, 1467:18, 1549:19
**ladder** [1] - 1400:24
**ladies** [3] - 1307:19, 1352:20, 1565:21
**lady** [5] - 1258:8, 1258:19, 1527:14, 1567:23, 1569:23
**Lafayette** [1] - 1411:5
**laid** [2] - 1549:7, 1558:14

**lamp** [1] - 1519:24
**laptop** [2] - 1418:14, 1418:16
**large** [13] - 1277:16, 1303:2, 1303:11, 1334:5, 1388:11, 1415:7, 1415:8, 1416:6, 1449:5, 1449:14, 1496:7, 1533:8, 1537:2
**largely** [1] - 1390:5
**larger** [2] - 1541:15, 1541:16
**largest** [1] - 1539:23
**last** [27] - 1261:5, 1292:12, 1292:14, 1302:13, 1308:2, 1312:1, 1328:5, 1347:16, 1359:14, 1375:23, 1394:19, 1407:17, 1411:10, 1411:16, 1435:16, 1446:11, 1464:20, 1464:21, 1467:9, 1467:23, 1469:5, 1488:25, 1519:13, 1519:25, 1530:20, 1556:22, 1558:9
**Last** [1] - 1507:23
**lastly** [1] - 1564:13
**late** [3] - 1348:17, 1475:7, 1572:22
**Laura** [17] - 1338:3, 1386:7, 1388:14, 1391:2, 1391:8, 1391:15, 1527:17, 1527:18, 1527:23, 1527:24, 1528:12, 1529:8, 1543:6, 1544:12, 1545:17, 1545:22
**law** [6] - 1327:14, 1352:23, 1353:2, 1354:3, 1442:5, 1535:11
**Law** [2] - 1256:3, 1256:6
**laws** [5] - 1288:24, 1290:14, 1325:5, 1325:6, 1492:25
**lawsuit** [1] - 1480:8
**lawsuits** [1] - 1480:12
**lawyer** [3] - 1327:6, 1358:12, 1381:3
**lawyers** [4] - 1419:18, 1419:23, 1420:2, 1420:10
**lay** [4] - 1378:7, 1464:25, 1560:5, 1560:17
**laying** [1] - 1348:4, 1436:22
**layman's** [1] - 1339:1
**layout** [1] - 1538:4
**Lazy** [1] - 1465:1
**lead** [3] - 1373:9, 1571:1, 1571:2
**leading** [2] - 1514:24, 1515:5
**league** [3] - 1458:5, 1500:9, 1509:20
**learn** [1] - 1369:22
**least** [6] - 1320:8, 1439:4, 1464:20, 1560:5, 1567:3, 1567:5
**leave** [9] - 1259:2, 1264:5, 1332:3, 1437:4, 1445:5, 1445:6, 1449:16, 1449:18, 1451:10, 1518:7, 1521:19, 1532:9, 1567:14
**leaving** [2] - 1518:22, 1521:21
**lectern** [1] - 1345:25
**left** [10] - 1261:12, 1262:8, 1273:22, 1288:11, 1392:15, 1392:16, 1468:7, 1535:21, 1537:19, 1538:8
**left-hand** [2] - 1535:21, 1538:8
**legal** [14] - 1308:18, 1308:24, 1325:11, 1325:13, 1325:14, 1325:22, 1326:9, 1326:14, 1327:2, 1438:8, 1438:14, 1479:12, 1500:16, 1505:18
**legalese** [1] - 1505:20
**legally** [1] - 1439:24

**legislation** [2] - 1387:18, 1387:19
**Lehman** [9] - 1364:24, 1365:2, 1366:13, 1366:16, 1462:22, 1462:24, 1462:25, 1511:19
**lending** [1] - 1376:1
**lengthy** [1] - 1567:16
**less** [10] - 1266:6, 1266:11, 1358:9, 1452:22, 1465:13, 1502:25, 1503:2, 1503:8, 1503:11, 1503:12
**lesser** [1] - 1497:14
**letter** [7] - 1320:9, 1320:11, 1320:12, 1320:13, 1467:17, 1468:24, 1469:3
**letters** [3] - 1428:22, 1428:24, 1429:1
**letting** [1] - 1573:15
**level** [5] - 1314:21, 1397:6, 1397:12, 1397:19, 1411:24
**leverage** [3] - 1454:8, 1454:9, 1468:3
**liabilities** [2] - 1317:23, 1361:12
**liability** [4] - 1308:18, 1317:22, 1468:13, 1468:14
**Libya** [5] - 1401:24, 1401:25, 1402:1, 1402:3, 1402:7, 1402:10
**Libyan** [1] - 1402:13
**license** [8] - 1524:13, 1524:15, 1524:18, 1524:20, 1524:21, 1525:2, 1530:7, 1530:14
**licenses** [1] - 1524:1
**lie** [5] - 1301:15, 1301:18, 1301:20, 1420:22, 1420:24
**lied** [1] - 1301:22
**lieutenant** [1] - 1522:21
**life** [3] - 1356:8, 1460:24, 1461:3
**light** [4] - 1457:13, 1466:9, 1519:21, 1519:22
**lights** [2] - 1535:6, 1535:7
**likely** [1] - 1306:3
**liken** [1] - 1375:9
**limine** [4] - 1341:12, 1341:13, 1341:18, 1345:15
**limined** [1] - 1342:16
**limit** [1] - 1570:8
**limitation** [1] - 1377:23
**limitations** [1] - 1540:1
**limited** [8] - 1300:11, 1379:9, 1379:10, 1379:13, 1423:4, 1460:6, 1548:23, 1549:2
**Limited** [5] - 1264:25, 1308:12, 1362:22, 1382:17, 1469:13
**Lindenberg** [5] - 1400:4, 1400:11, 1400:14, 1400:16, 1403:13
**line** [17] - 1292:14, 1306:8, 1342:21, 1344:5, 1344:6, 1347:16, 1433:15, 1434:14, 1434:15, 1470:10, 1502:10, 1502:14, 1510:15, 1510:18, 1537:11, 1549:20, 1554:14
**lined** [1] - 1306:11
**lines** [1] - 1418:2
**liquid** [11] - 1350:18, 1410:16, 1412:4, 1417:11, 1432:21, 1432:23, 1463:19, 1474:11, 1533:23, 1533:25, 1540:11
**liquidity** [18] - 1410:12, 1432:18, 1433:5, 1438:2, 1438:8, 1438:23,

1439:12, 1453:23, 1453:25, 1454:11, 1454:12, 1468:3, 1469:7, 1469:22, 1533:10, 1533:12, 1533:13, 1533:19
**listen** [2] - 1465:3, 1465:11
**literally** [4] - 1260:12, 1412:25, 1413:1, 1571:15
**litigation** [5] - 1370:17, 1479:15, 1479:18, 1479:20, 1480:2
**live** [4] - 1446:19, 1452:22, 1520:6, 1525:14
**lived** [2] - 1385:24, 1411:4
**lives** [1] - 1377:3
**living** [1] - 1447:2
**Lloyd's** [10] - 1455:22, 1455:24, 1462:15, 1463:9, 1468:12, 1503:21, 1508:24, 1512:8, 1512:25, 1513:5
**loaded** [1] - 1345:12
**loan** [5] - 1428:21, 1455:3, 1467:12, 1467:13, 1467:14
**loans** [22] - 1371:16, 1408:21, 1428:19, 1429:3, 1429:4, 1453:8, 1454:21, 1455:1, 1455:2, 1455:7, 1455:9, 1467:13, 1467:18, 1467:19, 1474:22, 1475:13, 1515:9, 1515:20, 1515:22, 1515:23
**local** [3] - 1399:22, 1408:23, 1408:24
**located** [12] - 1260:17, 1328:20, 1328:21, 1370:1, 1386:24, 1390:7, 1525:12, 1525:15, 1527:11, 1534:4, 1537:20, 1538:1
**location** [3] - 1328:23, 1330:19, 1390:13
**locations** [2] - 1326:2, 1385:3
**locked** [1] - 1436:5
**lodge** [2] - 1556:11, 1556:15
**logistics** [1] - 1523:1
**London** [9] - 1424:3, 1455:22, 1455:24, 1462:15, 1463:9, 1503:21, 1508:24, 1512:8, 1513:5
**long-term** [2] - 1459:5, 1468:2
**look** [31] - 1279:19, 1279:21, 1287:7, 1296:5, 1296:7, 1300:1, 1302:4, 1312:17, 1318:6, 1340:9, 1356:10, 1358:12, 1358:14, 1358:18, 1361:4, 1361:11, 1376:3, 1376:4, 1387:24, 1391:20, 1397:14, 1490:2, 1492:3, 1549:12, 1555:1, 1557:4, 1558:7, 1559:18, 1564:4, 1564:13
**looked** [16] - 1358:17, 1379:22, 1386:4, 1402:25, 1418:3, 1421:7, 1430:6, 1469:5, 1474:1, 1475:7, 1489:23, 1511:14, 1557:12, 1558:2, 1560:6
**looking** [17] - 1297:11, 1308:5, 1349:5, 1354:21, 1357:7, 1358:18, 1358:25, 1387:8, 1387:10, 1387:17, 1431:12, 1431:14, 1451:25, 1484:24, 1485:18, 1550:15, 1564:10
**looks** [8] - 1418:25, 1456:21, 1486:17, 1487:16, 1488:5, 1488:11, 1489:24, 1565:18
**Lopez** [2] - 1275:5, 1397:4

1297:23, 1297:25
**loss** [7] - 1289:10, 1293:3, 1317:9, 1476:8, 1476:10, 1477:15, 1482:5
**lost** [10] - 1282:13, 1473:16, 1476:23, 1477:9, 1480:20, 1480:25, 1481:2, 1482:3, 1482:14, 1482:15
**loud** [1] - 1434:18
**Louis** [2] - 1448:17, 1449:4
**Louisiana** [4] - 1272:25, 1329:25, 1390:7, 1536:11
**love** [1] - 1352:16
**lower** [4] - 1382:10, 1492:18, 1513:25
**lunch** [2] - 1259:6, 1394:19

**M**

**macaroni** [1] - 1476:11
**machine** [1] - 1518:17
**Madoff** [3] - 1466:8, 1467:16, 1469:19
**Madoff's** [1] - 1467:7
**mail** [8] - 1259:16, 1335:23, 1366:16, 1440:21, 1462:5, 1551:15, 1552:20, 1552:21
**mails** [6] - 1306:17, 1342:18, 1363:6, 1538:15, 1572:10, 1572:11
**main** [2] - 1275:12, 1281:1
**maintain** [7] - 1342:20, 1344:25, 1348:11, 1397:19, 1473:18, 1473:23, 1474:5
**maintained** [2] - 1316:1, 1556:9
**maintaining** [1] - 1395:9
**maintains** [2] - 1468:11, 1512:25
**major** [6] - 1404:17, 1476:17, 1500:8, 1500:16, 1506:1, 1509:20
**majority** [6] - 1312:14, 1312:15, 1312:18, 1313:6, 1313:10, 1537:25
**Maldonado** [1] - 1540:13
**man** [1] - 1404:13
**man's** [1] - 1379:11
**manage** [6] - 1391:8, 1452:24, 1459:23, 1461:6, 1536:7, 1538:18
**managed** [24] - 1338:6, 1358:20, 1417:12, 1451:16, 1461:8, 1495:25, 1496:1, 1533:7, 1533:21, 1534:2, 1539:3, 1539:10, 1539:19, 1540:2, 1540:12, 1540:19, 1541:18, 1542:5, 1542:7, 1542:9, 1542:11, 1542:18, 1544:7, 1544:23
**Management** [4] - 1525:7, 1525:9, 1525:10, 1552:6
**management** [21] - 1266:1, 1268:17, 1275:20, 1276:5, 1337:13, 1375:3, 1375:5, 1398:12, 1402:14, 1414:24, 1415:1, 1415:16, 1458:7, 1468:19, 1479:3, 1496:1, 1525:11, 1525:25, 1531:5, 1532:13, 1555:20
**MANAGER** [4] - 1258:13, 1445:13, 1445:18, 1484:14
**manager** [16] - 1270:5, 1270:8, 1270:20, 1270:21, 1447:5, 1527:19, 1529:4, 1529:7, 1530:3, 1530:12, 1530:21, 1530:25, 1531:4, 1541:23,

1542:12, 1554:22

**managers** [26] - 1358:20, 1361:9, 1391:8, 1391:16, 1391:17, 1417:18, 1423:22, 1423:24, 1424:2, 1424:3, 1424:6, 1450:21, 1498:4, 1534:9, 1536:20, 1536:23, 1536:25, 1537:7, 1537:11, 1538:10, 1538:14, 1539:3, 1539:5, 1539:13, 1546:7, 1552:11

**managing** [12] - 1270:13, 1391:12, 1391:16, 1402:15, 1496:16, 1531:10, 1531:15, 1532:5, 1532:15, 1532:22, 1537:10, 1538:22

**maneuver** [1] - 1340:7

**manipulate** [1] - 1340:6

**manner** [3] - 1282:12, 1333:1, 1548:5

**manual** [6] - 1314:17, 1333:9, 1334:10, 1334:12, 1334:13, 1340:18

**manuals** [2] - 1314:13, 1340:16

**March** [2] - 1334:2, 1334:24

**march** [1] - 1430:7

**Marine** [1] - 1447:21

**Marines** [1] - 1447:24

**MARK** [2] - 1257:14, 1519:8

**mark** [5] - 1357:25, 1358:4, 1358:16, 1360:6, 1519:15

**Mark** [1] - 1518:10

**marked** [4] - 1461:19, 1490:14, 1558:5, 1559:6

**market** [20] - 1275:12, 1339:6, 1357:25, 1358:5, 1358:16, 1360:6, 1363:18, 1463:3, 1463:22, 1470:2, 1480:21, 1481:8, 1482:12, 1482:17, 1482:18, 1511:23, 1528:20, 1529:11, 1531:6, 1543:25

**market's** [1] - 1387:19

**marketable** [1] - 1417:15

**marketed** [1] - 1478:5

**marketing** [10] - 1275:1, 1276:17, 1279:16, 1279:19, 1323:21, 1350:12, 1421:7, 1423:13, 1456:7, 1473:25

**markets** [6] - 1338:7, 1338:8, 1460:6, 1462:21, 1481:4, 1512:2

**married** [3] - 1446:21, 1520:10, 1527:25

**Marshals** [1] - 1465:4

**mart** [1] - 1426:9

**Martin** [1] - 1520:17

**master** [9] - 1546:6, 1550:14, 1552:12, 1556:1, 1556:25, 1557:1, 1557:10, 1557:21, 1559:4

**Master** [1] - 1447:11

**master's** [6] - 1447:10, 1447:12, 1447:16, 1478:25, 1522:3, 1522:5

**match** [1] - 1553:17

**matches** [1] - 1558:2

**material** [8] - 1279:16, 1279:20, 1323:21, 1352:16, 1501:22, 1509:4, 1514:12, 1515:3

**materials** [9] - 1350:1, 1350:13, 1352:11, 1456:7, 1473:25, 1507:9, 1509:1, 1509:3, 1512:14

**math** [3] - 1415:22, 1416:2, 1565:13

**matter** [15] - 1264:9, 1265:2,

1282:6, 1293:9, 1294:6, 1310:25, 1367:23, 1392:23, 1425:13, 1436:4, 1464:12, 1489:13, 1573:4, 1574:5

**mattered** [2] - 1475:19, 1475:24

**matters** [5] - 1323:18, 1340:18, 1352:15, 1378:5, 1453:24

**Mauricio** [2] - 1325:21, 1327:2

**maximum** [1] - 1467:14

**McGuire** [2] - 1256:6, 1256:6

**MCGUIRE** [59] - 1476:19, 1476:25, 1477:17, 1477:19, 1477:24, 1478:16, 1478:19, 1483:5, 1483:10, 1483:14, 1483:20, 1484:7, 1484:17, 1484:21, 1484:22, 1485:14, 1485:17, 1485:22, 1486:1, 1486:4, 1486:22, 1488:18, 1489:12, 1489:18, 1489:19, 1490:17, 1490:22, 1491:2, 1491:7, 1491:14, 1491:18, 1492:8, 1492:10, 1492:18, 1492:21, 1494:14, 1494:20, 1494:22, 1494:25, 1495:2, 1497:4, 1497:6, 1497:9, 1497:18, 1497:20, 1498:19, 1498:23, 1502:22, 1502:23, 1507:17, 1507:20, 1508:2, 1509:11, 1514:22, 1514:24, 1515:5, 1515:18, 1516:16, 1518:2

**MCGUIRE............** [1] - 1257:13

**MCGUIRE..............** [1] - 1257:11

**mean** [84] - 1258:15, 1266:24, 1269:16, 1270:23, 1274:3, 1275:9, 1276:22, 1277:2, 1277:5, 1278:6, 1285:10, 1291:17, 1292:25, 1294:23, 1297:21, 1298:25, 1301:25, 1306:10, 1312:11, 1314:19, 1324:2, 1324:17, 1326:21, 1331:24, 1332:1, 1332:2, 1338:18, 1339:16, 1339:25, 1343:24, 1344:1, 1346:21, 1346:23, 1351:11, 1353:3, 1353:17, 1359:3, 1361:1, 1361:10, 1362:2, 1362:17, 1362:24, 1374:16, 1378:24, 1379:21, 1383:22, 1385:18, 1390:2, 1391:9, 1398:1, 1398:3, 1404:3, 1408:18, 1412:20, 1413:13, 1417:22, 1427:6, 1427:7, 1431:5, 1432:20, 1433:3, 1441:15, 1452:17, 1453:13, 1454:25, 1455:3, 1458:23, 1462:24, 1471:25, 1489:15, 1497:12, 1502:25, 1504:17, 1518:18, 1532:17, 1533:12, 1547:17, 1550:2, 1566:25, 1567:13, 1569:6, 1569:10, 1569:13

**meaning** [3] - 1393:6, 1426:17, 1429:6

**means** [18] - 1283:8, 1293:1, 1294:24, 1299:2, 1312:12, 1312:15, 1312:21, 1340:6, 1359:19, 1370:4, 1374:16, 1379:22, 1427:20, 1453:14, 1482:11, 1493:19, 1533:13, 1569:8

**meant** [7] - 1335:24, 1404:4, 1404:10, 1432:20, 1432:23, 1504:11, 1535:2

**mechanical** [1] - 1256:13

**medical** [2] - 1477:16, 1478:1

**Medicare** [1] - 1478:10

**meet** [5] - 1381:9, 1381:11, 1381:12, 1469:12, 1568:19

**meeting** [21] - 1281:17, 1366:22,

1367:2, 1372:1, 1372:4, 1372:7, 1375:18, 1375:19, 1378:11, 1378:16, 1378:17, 1378:23, 1410:9, 1410:14, 1438:1

**meetings** [2] - 1401:22, 1507:5

**member** [1] - 1399:9

**members** [3] - 1307:1, 1353:25, 1399:3

**memory** [1] - 1472:23

**memos** [2] - 1488:22, 1533:7

**Memphis** [48] - 1274:10, 1274:11, 1274:15, 1384:4, 1385:25, 1386:15, 1386:16, 1386:17, 1388:15, 1389:16, 1389:23, 1389:24, 1392:6, 1392:11, 1395:2, 1395:3, 1395:23, 1424:4, 1424:8, 1520:9, 1521:5, 1525:18, 1527:12, 1527:20, 1530:19, 1533:5, 1533:20, 1534:3, 1534:8, 1537:4, 1537:9, 1537:14, 1537:18, 1537:21, 1538:2, 1538:3, 1538:9, 1539:1, 1539:15, 1540:14, 1541:19, 1541:24, 1542:5, 1542:25, 1543:3, 1544:23, 1546:11, 1551:6

**mention** [2] - 1259:20, 1367:4, 1465:8

**mentioned** [14] - 1258:8, 1258:9, 1258:18, 1258:19, 1364:1, 1400:2, 1401:11, 1401:24, 1453:13, 1454:21, 1461:11, 1524:17, 1524:22, 1529:9

**mentioning** [2] - 1303:15, 1410:15

**met** [5] - 1366:20, 1367:11, 1420:1, 1450:25, 1536:6

**metal** [1] - 1448:12

**metals** [2] - 1427:5, 1555:14

**method** [1] - 1549:18

**methodologies** [3] - 1356:22, 1356:24, 1357:11

**methodology** [3] - 1274:19, 1355:20, 1357:8

**Mexico** [2] - 1409:12, 1409:14

**MF** [2] - 1389:4, 1389:9

**Miami** [1] - 1385:18

**Michael** [2] - 1411:3, 1411:4

**microphone** [2] - 1445:20, 1445:21

**Microsoft** [1] - 1534:1

**middle** [12] - 1260:13, 1294:17, 1329:17, 1329:18, 1468:8, 1471:6, 1471:8, 1472:18, 1535:25, 1553:5, 1555:22, 1568:14

**might** [16] - 1259:17, 1317:18, 1345:7, 1351:8, 1387:18, 1387:20, 1387:24, 1394:5, 1396:4, 1396:5, 1397:22, 1399:24, 1414:5, 1508:12, 1512:17

**mike** [3] - 1345:25, 1477:3, 1524:8

**military** [3] - 1448:1, 1450:5, 1450:7

**million** [36] - 1303:2, 1338:20, 1349:3, 1405:22, 1406:2, 1406:23, 1411:14, 1417:14, 1460:24, 1470:4, 1477:9, 1495:7, 1538:23, 1538:24, 1538:25, 1539:19, 1553:12, 1553:20, 1553:25, 1555:24, 1555:25, 1556:3, 1556:4, 1557:24, 1562:8, 1562:11, 1563:14, 1563:16, 1564:3, 1564:12, 1564:19, 1564:20, 1564:21

**million-dollar** [1] - 1303:2
**millions** [1] - 1469:23
**mime** [1] - 1530:7
**mind** [5] - 1271:13, 1278:6, 1283:21, 1346:19, 1352:21
**mine** [7] - 1263:18, 1299:15, 1300:5, 1358:9, 1376:14, 1415:23, 1454:17
**mini** [1] - 1353:13
**mini-summation** [1] - 1353:13
**minimal** [1] - 1468:3
**minimum** [3] - 1337:22, 1540:3, 1569:9
**minute** [22] - 1259:17, 1280:17, 1295:23, 1309:17, 1312:5, 1347:7, 1379:2, 1382:24, 1386:22, 1387:24, 1389:18, 1393:4, 1411:10, 1439:5, 1452:16, 1485:12, 1491:13, 1518:19, 1530:8, 1558:7, 1559:18, 1562:13
**minutes** [12] - 1307:14, 1307:15, 1392:20, 1393:2, 1393:3, 1464:10, 1464:11, 1465:14, 1518:14, 1518:15, 1565:11, 1573:3
**mirrors** [1] - 1376:14
**misinformed** [1] - 1503:16
**misleading** [2] - 1332:21, 1516:3
**misrepresentation** [5] - 1439:25, 1440:14, 1442:7, 1442:20, 1443:4
**misrepresentations** [3] - 1350:1, 1350:4, 1351:16
**misrepresented** [1] - 1350:15
**Mississippi** [6] - 1329:25, 1385:24, 1386:1, 1386:2, 1395:18, 1399:17
**mistaken** [1] - 1403:3
**mistakes** [1] - 1403:4
**misunderstood** [2] - 1354:16, 1508:12
**mix** [1] - 1481:23
**mixing** [1] - 1515:24
**mixture** [1] - 1532:2
**Model** [3] - 1355:3, 1355:8, 1531:24
**model** [10] - 1263:6, 1272:11, 1337:24, 1338:1, 1338:2, 1338:14, 1338:15, 1338:17, 1338:21, 1531:25
**Models** [1] - 1531:20
**moment** [6] - 1258:5, 1345:18, 1380:5, 1407:14, 1510:1, 1512:9
**Monday** [13] - 1261:7, 1261:15, 1566:2, 1566:8, 1566:13, 1566:16, 1567:11, 1567:15, 1568:1, 1570:1, 1572:23, 1572:24, 1572:25
**money** [117] - 1282:13, 1285:20, 1289:8, 1293:10, 1293:14, 1293:19, 1294:7, 1294:8, 1294:25, 1295:6, 1295:10, 1295:13, 1295:16, 1295:18, 1297:22, 1297:23, 1297:25, 1302:5, 1302:18, 1302:24, 1303:16, 1303:20, 1303:21, 1304:3, 1304:8, 1305:14, 1305:17, 1306:5, 1306:23, 1307:3, 1307:5, 1338:5, 1338:9, 1339:23, 1346:12, 1347:3, 1352:25, 1361:9, 1362:3, 1362:8, 1362:9, 1362:13, 1363:16, 1363:17, 1363:21, 1363:24, 1364:16, 1376:25, 1382:5, 1391:11, 1400:25, 1401:7, 1401:9, 1402:14,

1410:25, 1411:7, 1411:9, 1411:11, 1411:17, 1411:21, 1414:6, 1417:18, 1420:7, 1424:6, 1424:11, 1427:13, 1436:2, 1437:4, 1437:5, 1439:14, 1441:2, 1441:5, 1442:8, 1452:24, 1454:15, 1454:17, 1470:18, 1476:24, 1477:9, 1477:13, 1480:5, 1480:20, 1480:25, 1481:2, 1481:6, 1482:3, 1482:15, 1494:8, 1500:1, 1507:1, 1513:12, 1525:11, 1525:25, 1532:13, 1532:15, 1534:2, 1534:9, 1536:14, 1536:17, 1536:18, 1536:20, 1536:22, 1536:25, 1537:6, 1537:11, 1538:10, 1538:22, 1539:3, 1539:12, 1542:12, 1544:7, 1554:22
**money's** [1] - 1427:6
**monies** [6] - 1305:18, 1340:1, 1340:12, 1433:3, 1433:4, 1439:21
**monitor** [1] - 1287:5
**monitored** [1] - 1537:6
**monitoring** [1] - 1537:10
**Monterey** [1] - 1409:13
**month** [6] - 1390:3, 1466:3, 1471:6, 1471:8, 1472:18, 1478:12
**monthly** [8] - 1418:25, 1419:1, 1422:12, 1423:4, 1461:25, 1462:5, 1466:1, 1553:1
**months** [12] - 1375:24, 1452:11, 1452:20, 1452:22, 1470:24, 1473:8, 1479:23, 1479:24, 1513:20, 1522:14, 1522:19, 1525:3
**months'** [1] - 1471:20
**Moreno** [4] - 1411:3, 1411:4, 1411:13, 1411:20
**Morgan** [1] - 1530:16
**morning** [9] - 1259:7, 1261:23, 1262:5, 1262:6, 1371:21, 1444:18, 1569:7, 1569:20, 1570:7
**mortgage** [4] - 1441:25, 1454:4, 1454:7, 1505:9
**MOS** [1] - 1448:1
**most** [10] - 1306:3, 1375:1, 1376:19, 1414:15, 1423:5, 1506:9, 1533:22, 1533:25, 1571:6, 1572:19
**mostly** [6] - 1384:10, 1384:11, 1384:22, 1384:25, 1385:2, 1385:4
**motion** [6] - 1341:11, 1341:21, 1341:23, 1342:1, 1345:1, 1345:15
**motions** [1] - 1341:13
**mouth** [2] - 1343:8, 1451:12
**move** [11] - 1266:14, 1288:5, 1296:10, 1298:3, 1315:5, 1351:3, 1374:17, 1389:25, 1445:19, 1519:16, 1530:18
**moved** [5] - 1288:10, 1342:22, 1384:16, 1433:3, 1433:5
**moving** [4] - 1349:19, 1484:13, 1513:11, 1565:24
**MR** [530] - 1257:4, 1257:5, 1257:6, 1257:7, 1257:10, 1257:11, 1257:12, 1257:13, 1257:15, 1257:16, 1258:10, 1259:4, 1259:6, 1259:9, 1259:10, 1259:13, 1260:3, 1260:7, 1260:8, 1260:20, 1260:22, 1261:1,

1261:9, 1261:16, 1262:1, 1262:4, 1266:10, 1266:23, 1273:18, 1273:19, 1279:2, 1287:2, 1287:4, 1287:7, 1287:11, 1287:13, 1287:15, 1288:1, 1288:7, 1288:16, 1290:8, 1290:10, 1290:18, 1290:19, 1292:11, 1292:15, 1292:19, 1292:21, 1294:12, 1294:15, 1296:12, 1296:14, 1296:16, 1297:13, 1298:5, 1298:20, 1298:23, 1302:20, 1302:25, 1303:6, 1303:9, 1306:20, 1306:21, 1307:8, 1307:25, 1308:1, 1308:7, 1308:9, 1309:21, 1309:23, 1311:19, 1311:21, 1312:3, 1312:6, 1315:8, 1315:10, 1317:25, 1318:1, 1318:3, 1318:4, 1318:5, 1318:8, 1318:10, 1318:13, 1318:18, 1319:11, 1319:12, 1320:4, 1321:18, 1321:24, 1327:25, 1328:6, 1328:9, 1333:11, 1333:13, 1341:6, 1341:10, 1341:16, 1341:17, 1341:20, 1341:23, 1341:25, 1342:3, 1342:6, 1342:8, 1342:10, 1342:13, 1342:20, 1343:2, 1343:5, 1343:6, 1343:13, 1343:18, 1343:20, 1343:24, 1344:3, 1344:6, 1344:10, 1344:15, 1344:25, 1345:3, 1345:10, 1345:16, 1345:18, 1345:24, 1346:1, 1346:2, 1348:1, 1348:4, 1348:9, 1348:11, 1348:13, 1349:18, 1349:21, 1349:25, 1350:3, 1350:11, 1350:22, 1351:5, 1351:13, 1351:19, 1351:22, 1352:8, 1352:13, 1352:15, 1353:23, 1353:24, 1360:18, 1365:10, 1365:21, 1366:1, 1366:7, 1371:20, 1371:24, 1372:15, 1372:18, 1372:21, 1372:23, 1373:1, 1373:5, 1373:11, 1373:16, 1373:20, 1373:24, 1374:8, 1374:11, 1374:14, 1374:18, 1374:21, 1375:13, 1377:18, 1377:20, 1378:4, 1378:6, 1378:7, 1378:10, 1378:20, 1378:22, 1379:4, 1379:5, 1379:17, 1380:5, 1380:6, 1384:15, 1386:14, 1386:20, 1388:6, 1389:15, 1392:14, 1393:10, 1394:2, 1394:4, 1394:8, 1394:10, 1394:16, 1404:8, 1404:21, 1404:23, 1405:1, 1406:7, 1406:8, 1406:12, 1406:14, 1406:18, 1406:20, 1407:14, 1407:16, 1409:21, 1409:23, 1410:2, 1411:19, 1412:8, 1412:10, 1412:12, 1412:16, 1412:22, 1413:2, 1413:5, 1413:10, 1413:13, 1413:16, 1413:19, 1413:21, 1413:22, 1418:11, 1418:14, 1418:17, 1418:19, 1418:20, 1421:12, 1421:16, 1421:20, 1421:22, 1424:18, 1424:20, 1424:24, 1425:2, 1425:18, 1425:22, 1426:13, 1426:15, 1427:25, 1428:3, 1428:13, 1428:16, 1430:10, 1430:12, 1430:14, 1430:17, 1433:8, 1433:10, 1434:12, 1434:13, 1435:14, 1436:8, 1436:9, 1436:11, 1437:13, 1437:14, 1437:20, 1437:24, 1438:21, 1439:1, 1439:7, 1439:12, 1439:18, 1440:11, 1440:12, 1440:19, 1440:21,

1440:25, 1441:15, 1441:24, 1442:3, 1442:10, 1442:15, 1442:17, 1442:19, 1442:24, 1443:2, 1443:7, 1443:9, 1443:14, 1443:17, 1443:19, 1443:23, 1444:2, 1444:3, 1444:4, 1444:5, 1444:15, 1444:19, 1444:23, 1445:3, 1445:9, 1445:25, 1446:4, 1446:6, 1451:19, 1452:3, 1457:1, 1457:6, 1457:16, 1461:23, 1462:3, 1465:9, 1465:15, 1465:20, 1465:21, 1466:22, 1476:19, 1476:22, 1476:25, 1477:7, 1477:17, 1477:19, 1477:24, 1478:7, 1478:14, 1478:16, 1478:19, 1483:5, 1483:10, 1483:14, 1483:20, 1483:23, 1484:7, 1484:17, 1484:21, 1484:22, 1485:14, 1485:17, 1485:19, 1485:22, 1485:25, 1486:1, 1486:3, 1486:4, 1486:19, 1486:22, 1488:18, 1488:20, 1488:25, 1489:12, 1489:18, 1489:19, 1490:17, 1490:22, 1491:2, 1491:7, 1491:14, 1491:18, 1492:8, 1492:10, 1492:18, 1492:21, 1494:12, 1494:14, 1494:18, 1494:20, 1494:22, 1494:25, 1495:2, 1497:4, 1497:6, 1497:9, 1497:18, 1497:20, 1498:19, 1498:23, 1502:20, 1502:22, 1502:23, 1507:13, 1507:17, 1507:20, 1508:2, 1509:11, 1509:15, 1510:7, 1510:9, 1510:17, 1510:20, 1511:2, 1512:20, 1512:22, 1512:23, 1514:22, 1514:24, 1515:2, 1515:5, 1515:11, 1515:16, 1515:18, 1516:12, 1516:16, 1518:2, 1518:5, 1518:10, 1519:12, 1519:20, 1520:1, 1523:5, 1523:24, 1524:11, 1527:6, 1527:7, 1527:22, 1534:12, 1534:16, 1534:22, 1534:25, 1535:3, 1535:5, 1535:7, 1535:13, 1535:14, 1542:3, 1545:23, 1546:1, 1546:4, 1546:25, 1547:2, 1547:6, 1548:1, 1548:2, 1549:5, 1549:9, 1549:13, 1549:15, 1549:21, 1549:23, 1549:25, 1550:4, 1550:7, 1550:11, 1550:22, 1556:7, 1556:11, 1556:15, 1556:19, 1556:23, 1557:4, 1557:8, 1557:17, 1557:18, 1558:8, 1558:15, 1558:18, 1558:20, 1558:24, 1559:1, 1559:8, 1559:10, 1559:12, 1559:13, 1559:14, 1559:15, 1559:17, 1559:18, 1559:22, 1560:1, 1560:3, 1560:8, 1560:14, 1560:16, 1560:18, 1561:11, 1561:13, 1561:18, 1561:20, 1561:22, 1561:23, 1562:1, 1562:18, 1562:21, 1563:4, 1563:6, 1563:19, 1563:21, 1565:12, 1565:19, 1566:6, 1566:11, 1566:16, 1566:21, 1566:23, 1567:2, 1567:5, 1567:7, 1567:10, 1567:15, 1567:25, 1568:2, 1568:8, 1568:9, 1568:12, 1568:17, 1569:5, 1569:11, 1569:13, 1569:19, 1569:24, 1570:4, 1570:6, 1570:10, 1570:14, 1570:16, 1570:24, 1571:4, 1571:5, 1571:12, 1571:19, 1571:21, 1571:23, 1571:25, 1572:4, 1572:9, 1572:15, 1572:23, 1573:4, 1573:7,

1573:8, 1573:10, 1573:14
**multi** [1] - 1324:16
**multi-compartment** [1] - 1324:16
**multiple** [4] - 1329:1, 1330:3, 1409:6, 1471:10
**multitude** [1] - 1330:8
**mundane** [1] - 1453:8
**mundane-type** [1] - 1453:8
**municipal** [1] - 1268:20
**Murray** [2] - 1521:25, 1522:5
**must** [2] - 1336:8, 1545:16
**mutual** [19] - 1276:4, 1338:23, 1480:15, 1481:12, 1481:19, 1481:21, 1482:19, 1482:20, 1513:8, 1513:11, 1513:14, 1513:22, 1521:7, 1521:8, 1521:15, 1524:24, 1526:2, 1528:18, 1532:1

# N

**name** [19] - 1279:24, 1325:19, 1349:5, 1357:1, 1374:1, 1374:3, 1389:14, 1409:9, 1409:10, 1446:7, 1446:10, 1446:11, 1446:12, 1487:23, 1519:13, 1527:23, 1527:25, 1528:7, 1547:12
**named** [1] - 1451:1
**names** [1] - 1326:3
**narrative** [1] - 1476:20
**narrow** [1] - 1353:14
**NASDAQ** [1] - 1529:11
**National** [1] - 1346:8
**Nationals** [4] - 1500:14, 1500:20, 1500:21, 1509:17
**nature** [5] - 1280:12, 1285:19, 1524:25, 1526:3, 1533:9
**Navy** [1] - 1448:12
**near** [2] - 1328:23, 1376:2
**necessarily** [3] - 1355:10, 1362:14, 1475:25
**necessary** [3] - 1263:15, 1336:1, 1414:13
**need** [28] - 1268:5, 1307:10, 1327:12, 1327:14, 1330:9, 1337:2, 1341:6, 1345:13, 1351:2, 1352:23, 1357:8, 1390:5, 1394:6, 1435:7, 1443:14, 1444:4, 1445:19, 1452:15, 1464:6, 1465:6, 1483:24, 1492:6, 1549:11, 1553:16, 1569:10, 1570:3, 1571:25, 1573:6
**needed** [13] - 1263:15, 1264:11, 1264:12, 1268:21, 1268:22, 1269:14, 1329:4, 1368:21, 1410:21, 1433:5, 1454:15, 1454:17, 1499:24
**needs** [5] - 1307:22, 1336:12, 1393:22, 1464:24, 1557:14
**negative** [1] - 1338:7
**negotiated** [1] - 1403:25
**neighborhood** [1] - 1414:23
**nervous** [2] - 1364:8, 1364:14
**net** [1] - 1482:4
**neutral** [1] - 1282:7
**never** [18] - 1302:16, 1302:24,

1316:11, 1320:2, 1337:16, 1352:8, 1358:17, 1369:22, 1375:3, 1411:9, 1467:12, 1468:3, 1473:15, 1480:25, 1482:11, 1512:13, 1545:20, 1572:16
**nevertheless** [1] - 1290:15
**New** [3] - 1255:17, 1330:1, 1389:11
**new** [4] - 1261:7, 1478:9, 1536:7, 1568:14
**newly** [1] - 1478:5
**news** [2] - 1467:6, 1517:21
**newsletter** [1] - 1422:12
**Newtown** [1] - 1448:16
**next** [33] - 1291:4, 1296:10, 1297:5, 1309:13, 1309:21, 1381:10, 1427:2, 1427:25, 1429:10, 1445:8, 1459:17, 1469:11, 1470:10, 1474:12, 1488:8, 1491:23, 1493:10, 1518:9, 1518:20, 1523:9, 1523:11, 1530:23, 1547:25, 1555:6, 1565:10, 1566:7, 1566:8, 1566:9, 1569:23, 1570:2, 1570:4, 1570:10, 1571:5
**nice** [1] - 1573:11
**nickname** [1] - 1446:13
**night** [2] - 1489:1, 1569:7
**nine** [2] - 1541:15, 1541:16
**nobody** [4] - 1274:3, 1280:3, 1506:13, 1568:7
**non** [1] - 1289:17
**non-U.S** [1] - 1289:17
**none** [3] - 1363:13, 1436:16, 1496:2
**nonetheless** [1] - 1458:5
**nonprofit** [1] - 1476:2
**nonresponsive** [1] - 1497:6
**normal** [7] - 1263:1, 1300:7, 1323:15, 1327:23, 1332:1, 1332:4, 1382:12, 1422:18, 1453:10
**norms** [2] - 1263:2, 1383:9
**note** [1] - 1511:15
**notes** [5] - 1354:22, 1402:25, 1463:2, 1502:12, 1503:3
**nothing** [19] - 1267:25, 1296:6, 1297:4, 1314:15, 1327:19, 1327:21, 1337:11, 1343:21, 1351:18, 1381:7, 1382:14, 1384:2, 1388:2, 1445:16, 1509:11, 1518:2, 1519:5, 1523:10, 1569:24
**notice** [4] - 1380:13, 1380:18, 1393:13, 1546:22
**noticed** [1] - 1258:15
**noting** [2] - 1393:23, 1464:20
**Notowich** [1] - 1274:14
**November** [4] - 1366:19, 1470:5, 1510:14, 1510:18
**nowhere** [1] - 1339:20
**number** [32] - 1258:12, 1260:4, 1266:21, 1271:15, 1275:16, 1275:19, 1278:13, 1286:11, 1357:7, 1372:16, 1395:10, 1395:17, 1410:4, 1415:7, 1451:2, 1453:14, 1470:1, 1486:1, 1486:3, 1496:9, 1550:5, 1553:4, 1553:8, 1553:11, 1553:20, 1554:3, 1555:21, 1555:23, 1555:25, 1556:1, 1559:11, 1563:11

**Number** [4] - 1258:13, 1286:23, 1297:12, 1298:21

**numbers** [31] - 1267:17, 1274:24, 1278:4, 1278:15, 1279:7, 1279:8, 1312:4, 1312:5, 1313:17, 1330:15, 1340:10, 1340:11, 1355:21, 1356:10, 1356:14, 1386:12, 1390:18, 1398:18, 1417:25, 1418:9, 1419:15, 1425:21, 1426:19, 1428:5, 1447:24, 1458:2, 1548:6, 1549:1, 1558:22, 1564:22, 1566:25

**nursing** [1] - 1454:18

**NW** [1] - 1255:17

## O

**o'clock** [1] - 1307:21

**OBC** [3] - 1522:10, 1522:11, 1523:9

**object** [12] - 1260:11, 1348:10, 1476:20, 1476:25, 1477:19, 1477:24, 1485:19, 1486:19, 1497:6, 1514:22, 1549:6, 1559:15

**objecting** [1] - 1560:13

**objection** [32] - 1342:21, 1348:1, 1348:11, 1348:12, 1349:18, 1350:2, 1353:10, 1365:10, 1379:8, 1412:8, 1413:20, 1443:12, 1488:20, 1489:15, 1494:12, 1494:17, 1507:13, 1516:12, 1545:24, 1545:25, 1549:24, 1549:25, 1550:3, 1556:10, 1556:11, 1556:16, 1556:17, 1559:9, 1560:5, 1560:10, 1561:14, 1561:23

**objections** [1] - 1558:17

**objective** [3] - 1456:6, 1458:22, 1458:24

**obligation** [12] - 1282:15, 1293:10, 1293:11, 1293:16, 1295:14, 1295:15, 1295:16, 1295:19, 1295:20, 1295:23, 1295:25, 1435:22

**obligations** [5] - 1290:11, 1428:23, 1435:2, 1435:10, 1498:10

**obliges** [1] - 1435:22

**observed** [1] - 1393:18

**observing** [1] - 1394:7

**obtain** [2] - 1301:9, 1525:1

**obtained** [1] - 1480:10

**obvious** [3] - 1397:22, 1401:2, 1401:19

**obviously** [4] - 1400:23, 1400:25, 1401:5, 1503:4

**occasion** [1] - 1544:13

**occasionally** [1] - 1480:24

**occasions** [2] - 1350:15, 1455:23

**occupational** [1] - 1448:1

**occurs** [1] - 1436:4

**October** [4] - 1372:6, 1410:8, 1412:3, 1477:22

**OF** [3] - 1255:1, 1255:4, 1546:20

**off-balance-sheet** [1] - 1477:16

**off-the-record** [1] - 1573:18

**offense** [1] - 1505:19

**offer** [18] - 1435:1, 1435:9, 1443:15,

1443:20, 1444:10, 1444:13, 1459:14, 1488:19, 1498:9, 1505:15, 1546:25, 1556:7, 1558:10, 1559:8, 1561:12, 1571:25, 1572:7, 1572:20

**offered** [11] - 1275:13, 1294:19, 1377:21, 1377:25, 1379:12, 1383:3, 1448:17, 1448:22, 1488:24, 1494:4, 1506:5

**offering** [11] - 1284:25, 1285:2, 1309:3, 1350:25, 1377:24, 1382:16, 1382:17, 1459:12, 1482:22, 1489:13, 1506:6

**offerings** [1] - 1284:13

**offers** [2] - 1494:7, 1572:19

**office** [14] - 1318:22, 1370:22, 1375:7, 1406:6, 1409:13, 1429:16, 1429:19, 1449:12, 1465:1, 1538:3, 1538:7, 1541:19, 1541:25, 1546:11

**officed** [3] - 1384:9, 1384:11, 1385:24

**officer** [8] - 1374:16, 1390:16, 1522:12, 1522:16, 1525:20, 1528:10, 1535:17, 1543:4

**officers** [5] - 1308:14, 1317:22, 1317:24, 1324:21, 1468:13

**offices** [14] - 1305:12, 1328:23, 1329:1, 1329:2, 1329:6, 1329:9, 1329:11, 1330:3, 1330:19, 1408:25, 1409:6, 1419:9, 1419:12, 1530:18

**offshore** [1] - 1316:16

**often** [8] - 1326:12, 1389:22, 1392:8, 1392:11, 1403:9, 1428:19, 1480:25, 1550:25

**oil** [1] - 1375:11

**Okinawa** [1] - 1448:8

**old** [6] - 1306:11, 1375:3, 1442:5, 1446:15, 1457:13, 1520:2

**older** [1] - 1258:14

**omissions** [1] - 1468:14

**omitted** [1] - 1514:21

**once** [7] - 1295:16, 1416:7, 1416:14, 1460:19, 1522:12, 1543:23, 1544:25

**One** [2] - 1467:4, 1568:11

**one** [137] - 1258:1, 1258:10, 1259:10, 1259:13, 1259:17, 1259:18, 1261:4, 1264:5, 1264:6, 1266:8, 1271:9, 1271:15, 1277:11, 1278:24, 1279:13, 1287:8, 1292:11, 1292:13, 1297:5, 1297:11, 1302:22, 1303:1, 1303:14, 1303:15, 1305:2, 1305:22, 1312:1, 1319:7, 1319:24, 1320:8, 1321:19, 1321:21, 1322:23, 1322:25, 1324:5, 1329:1, 1329:16, 1330:18, 1330:19, 1333:1, 1335:19, 1337:22, 1339:3, 1340:9, 1340:10, 1341:13, 1341:18, 1341:24, 1342:2, 1342:6, 1344:22, 1345:24, 1346:23, 1348:19, 1349:7, 1349:14, 1349:15, 1354:21, 1356:5, 1356:7, 1357:1, 1357:7, 1360:17, 1362:16, 1362:17, 1363:22, 1363:23, 1364:3, 1364:4, 1364:9, 1365:25, 1371:5, 1372:14, 1377:1, 1383:20, 1384:21, 1386:22, 1387:24, 1388:5, 1392:22, 1392:24, 1393:11, 1395:6,

1395:9, 1396:21, 1397:7, 1397:23, 1399:5, 1399:6, 1405:9, 1408:21, 1411:5, 1412:22, 1413:2, 1416:17, 1418:13, 1418:18, 1424:4, 1430:25, 1431:16, 1435:16, 1442:4, 1449:9, 1451:2, 1452:8, 1453:15, 1461:25, 1464:18, 1465:3, 1466:18, 1467:6, 1470:1, 1476:17, 1477:11, 1479:21, 1482:7, 1483:8, 1485:15, 1513:3, 1528:24, 1538:14, 1544:13, 1549:9, 1552:3, 1552:12, 1552:15, 1555:19, 1557:11, 1561:17, 1568:9, 1571:10, 1571:23, 1571:24

**one-way** [1] - 1452:8

**ones** [5] - 1311:4, 1311:10, 1311:12, 1315:1, 1542:18

**ongoing** [4] - 1344:2, 1348:15, 1368:18, 1370:17

**open** [5] - 1290:5, 1438:20, 1439:16, 1449:12, 1452:18

**open-heart** [1] - 1452:18

**opening** [2] - 1342:11, 1342:17

**opens** [2] - 1438:6, 1439:18

**operated** [2] - 1331:22, 1347:23

**operating** [2] - 1428:1, 1428:9

**operation** [2] - 1416:15, 1417:21

**operations** [5] - 1286:10, 1395:3, 1449:9, 1521:15, 1521:16

**opinion** [2] - 1301:24, 1333:18, 1356:3, 1374:23, 1375:4, 1375:22, 1382:23, 1393:15, 1393:17, 1393:24, 1524:24

**opportunities** [2] - 1264:6, 1454:6, 1455:25

**opportunity** [3] - 1263:14, 1301:8, 1573:15

**opposed** [1] - 1264:6, 1454:6, 1455:25

**opposite** [2] - 1331:15, 1350:23

**option** [5] - 1284:8, 1452:6, 1465:6, 1465:10, 1471:17

**options** [1] - 1451:2

**orally** [1] - 1572:20

**Orange** [1] - 1450:10

**order** [10] - 1345:3, 1348:24, 1349:22, 1369:23, 1383:17, 1438:9, 1469:22, 1471:20, 1472:16, 1489:21

**ordered** [1] - 1369:21

**ordinary** [5] - 1290:11, 1546:20, 1546:22, 1549:17, 1558:12

**Oreste** [1] - 1334:18, 1334:25

**organization** [1] - 1517:7

**original** [5] - 1431:25, 1432:4, 1432:15, 1489:10, 1489:11

**originally** [6] - 1259:15, 1263:5, 1334:24, 1446:17, 1520:4, 1541:5

**Orlando** [1] - 1446:20

**otherwise** [3] - 1355:16, 1367:9, 1569:3

**ourselves** [1] - 1377:14

**outside** [6] - 1306:11, 1328:16, 1340:17, 1356:23, 1356:24, 1377:13, 1520:9, 1533:22

**overall** [3] - 1509:25, 1555:3, 1555:12

**overhead** [5] - 1491:1, 1491:4,

1534:13, 1534:21, 1535:1
**overlapped** [1] - 1523:9
**overlay** [1] - 1330:15
**overrule** [3] - 1413:20, 1549:24, 1550:2
**overruled** [9] - 1477:2, 1477:21, 1478:1, 1494:21, 1507:15, 1515:7, 1556:18, 1558:21, 1561:24
**oversaw** [1] - 1424:5
**overseas** [3] - 1479:6, 1495:23, 1495:25
**oversee** [1] - 1391:15
**overseeing** [1] - 1417:20
**overseen** [2] - 1338:3, 1424:7
**oversight** [2] - 1540:14, 1545:11
**overview** [2] - 1277:12, 1294:13
**overwhelmingly** [2] - 1350:17, 1426:22
**own** [11] - 1260:1, 1270:10, 1270:17, 1359:12, 1359:15, 1359:16, 1399:3, 1399:15, 1401:5, 1424:12, 1455:4
**owned** [11] - 1276:21, 1276:23, 1347:21, 1347:23, 1373:22, 1414:3, 1415:17, 1415:18, 1436:12, 1531:9, 1532:22
**owner** [4] - 1276:22, 1417:22, 1515:9, 1515:22
**ownership** [4] - 1281:6, 1294:1, 1294:3, 1500:5
**owns** [2] - 1413:16, 1526:19

## P

**p.m** [5] - 1392:19, 1394:14, 1465:16, 1566:3, 1573:19
**packages** [1] - 1383:19
**page** [36] - 1261:10, 1289:12, 1290:5, 1309:13, 1419:3, 1423:15, 1428:1, 1428:6, 1457:17, 1457:23, 1459:2, 1459:17, 1459:22, 1461:21, 1461:25, 1462:11, 1468:6, 1468:8, 1469:11, 1483:13, 1484:24, 1486:5, 1487:13, 1488:1, 1488:2, 1488:8, 1488:21, 1491:12, 1509:25, 1510:5, 1512:11, 1552:1, 1555:1, 1555:22, 1563:3
**PAGE** [1] - 1257:2
**Page** [41] - 1287:8, 1290:8, 1290:9, 1294:12, 1296:14, 1296:15, 1297:10, 1298:21, 1308:8, 1309:13, 1311:19, 1333:14, 1421:10, 1421:12, 1423:15, 1424:15, 1425:18, 1425:19, 1428:1, 1428:14, 1433:9, 1434:9, 1434:10, 1435:13, 1456:23, 1458:8, 1483:10, 1484:24, 1486:13, 1487:8, 1490:12, 1490:15, 1491:14, 1491:15, 1497:18, 1498:19, 1499:2, 1512:5, 1563:2
**pages** [3] - 1483:13, 1550:19, 1556:22
**Pages** [2] - 1492:14, 1492:15
**paid** [8] - 1282:9, 1302:12, 1310:3, 1383:15, 1473:13, 1480:1, 1480:4
**paint** [1] - 1394:23
**Palimden** [10] - 1546:13, 1546:14,

1546:16, 1547:13, 1550:14, 1551:2, 1552:8, 1552:10, 1561:6
**Panama** [3] - 1285:14, 1408:10, 1408:11
**panic** [2] - 1306:9, 1306:10
**paper** [1] - 1340:10
**papers** [1] - 1489:20
**paperwork** [5] - 1472:9, 1472:13, 1472:14, 1507:6, 1507:7
**paragraph** [23] - 1287:14, 1288:17, 1291:4, 1292:12, 1292:13, 1297:3, 1308:10, 1312:4, 1313:17, 1424:25, 1434:11, 1458:12, 1467:3, 1467:4, 1467:10, 1467:23, 1468:7, 1469:5, 1491:17, 1492:19, 1497:21, 1512:15
**parameters** [1] - 1338:3, 1353:10, 1438:8
**paraphrase** [1] - 1352:22
**pardon** [2] - 1353:17, 1534:18, 1558:19, 1560:2
**parent** [2] - 1326:7, 1326:8
**Park** [1] - 1446:20
**parked** [1] - 1370:22
**Parras** [2] - 1256:2, 1440:20
**PARRAS** [10] - 1440:19, 1440:21, 1440:25, 1442:3, 1442:10, 1444:4, 1570:4, 1570:16, 1571:5, 1571:21
**Parras'** [1] - 1441:20
**Parsons** [1] - 1479:24
**part** [19] - 1275:17, 1335:8, 1355:2, 1355:12, 1365:25, 1379:14, 1379:18, 1398:18, 1469:20, 1471:5, 1471:18, 1472:18, 1482:16, 1495:11, 1498:21, 1500:23, 1508:8, 1528:24, 1554:24
**partially** [4] - 1353:8, 1497:23, 1497:24, 1499:5
**particular** [7] - 1262:8, 1286:14, 1298:16, 1345:24, 1422:24, 1427:19, 1515:12
**particularly** [5] - 1357:4, 1357:5, 1429:22, 1458:20, 1481:8
**parties** [1] - 1505:14
**partner** [2] - 1375:24, 1448:22
**parts** [2] - 1490:19, 1565:5
**pass** [9] - 1409:21, 1430:10, 1436:8, 1437:13, 1444:19, 1444:25, 1478:15, 1515:16, 1549:5
**passed** [2] - 1514:15, 1529:6
**passion** [1] - 1377:4
**past** [7] - 1284:24, 1435:11, 1480:17, 1480:21, 1481:13, 1498:10, 1504:15
**Patricia** [2] - 1487:23, 1540:13
**PAUL** [2] - 1257:14, 1519:8
**Paul** [1] - 1519:15
**pay** [28] - 1281:23, 1282:1, 1282:3, 1282:15, 1289:8, 1293:11, 1295:4, 1295:7, 1295:11, 1297:23, 1297:24, 1310:7, 1317:9, 1352:1, 1383:15, 1406:23, 1411:15, 1423:23, 1435:24, 1437:7, 1439:21, 1441:3, 1441:6, 1442:8, 1454:3, 1471:19, 1478:10, 1498:2

**payment** [3] - 1435:2, 1435:10, 1498:10
**payments** [1] - 1297:17
**pays** [1] - 1294:7
**PDF** [9] - 1290:8, 1333:14, 1433:9, 1434:10, 1491:15, 1497:18, 1498:19, 1552:23, 1552:24
**peas** [1] - 1376:3
**pen** [3] - 1357:16, 1357:19
**penalties** [1] - 1340:23
**penalty** [23] - 1471:20
**Pendergest** [9] - 1527:17, 1527:24, 1528:4, 1528:12, 1529:8, 1543:6, 1544:12, 1545:17, 1545:22
**Pendergest's** [1] - 1527:18
**Pendergest-Holt** [4] - 1527:24, 1529:8, 1543:6, 1544:12
**Penn** [1] - 1478:25
**Pennsylvania** [3] - 1446:18, 1447:8, 1447:14
**penny** [4] - 1302:4, 1473:14, 1473:15, 1473:16
**people** [78] - 1263:12, 1263:18, 1269:12, 1269:24, 1270:13, 1270:14, 1270:25, 1276:24, 1277:5, 1277:9, 1279:21, 1280:14, 1282:25, 1301:15, 1301:18, 1303:20, 1303:25, 1304:2, 1304:3, 1304:8, 1305:14, 1306:4, 1306:11, 1333:7, 1336:11, 1336:14, 1336:22, 1336:24, 1337:2, 1340:22, 1351:8, 1363:16, 1364:10, 1364:11, 1364:15, 1375:6, 1375:7, 1376:4, 1383:18, 1383:20, 1383:23, 1386:4, 1386:6, 1386:19, 1387:7, 1387:9, 1387:10, 1391:19, 1396:18, 1396:21, 1397:24, 1398:13, 1399:2, 1402:17, 1404:20, 1407:8, 1407:10, 1407:12, 1409:19, 1419:13, 1420:13, 1422:14, 1441:6, 1505:18, 1505:23, 1506:3, 1506:7, 1523:15, 1532:7, 1533:20, 1538:9, 1539:15, 1539:16, 1539:21, 1544:3
**per** [7] - 1263:16, 1263:24, 1296:23, 1319:23, 1325:23, 1397:6, 1495:5
**perceived** [1] - 1367:7
**percent** [54] - 1266:5, 1266:6, 1266:25, 1267:1, 1267:6, 1268:11, 1351:20, 1352:1, 1381:20, 1382:1, 1383:13, 1414:23, 1414:25, 1415:14, 1415:15, 1427:4, 1427:5, 1427:21, 1429:8, 1437:11, 1450:6, 1454:6, 1454:7, 1454:8, 1459:12, 1461:1, 1461:3, 1461:13, 1462:15, 1462:18, 1463:17, 1467:14, 1501:13, 1501:16, 1501:23, 1502:25, 1503:1, 1503:2, 1503:9, 1503:11, 1508:15, 1509:8, 1511:8, 1511:9, 1511:19, 1511:25, 1513:23, 1539:22, 1540:4, 1543:14, 1543:20, 1565:18
**percentage** [12] - 1282:4, 1426:7, 1459:14, 1499:11, 1500:5, 1500:9, 1501:4, 1501:5, 1501:6, 1501:7, 1502:15, 1565:14

**percentages** [2] - 1501:3, 1507:2
**perfect** [5] - 1261:3, 1288:14, 1368:11, 1408:9, 1434:12
**perfectly** [3] - 1263:1, 1330:17, 1382:12
**perform** [3] - 1293:2, 1293:5, 1293:8
**performance** [6] - 1435:11, 1459:6, 1498:11, 1537:6, 1539:5, 1554:8
**performed** [1] - 1294:6
**performers** [1] - 1419:12
**perhaps** [8] - 1263:11, 1263:18, 1267:1, 1293:20, 1293:22, 1314:5, 1346:21, 1437:5
**period** [11] - 1267:16, 1292:22, 1295:1, 1295:10, 1351:17, 1405:5, 1460:20, 1460:21, 1481:3, 1544:15, 1571:16
**permanently** [2] - 1370:21, 1450:6
**Perry** [2] - 1272:20, 1273:15
**person** [17] - 1272:19, 1277:3, 1277:11, 1283:1, 1291:13, 1302:22, 1303:1, 1327:14, 1332:25, 1340:9, 1349:13, 1397:23, 1435:25, 1442:11, 1508:7, 1537:18, 1548:15
**person's** [1] - 1432:14
**personal** [17] - 1406:17, 1406:18, 1406:19, 1406:21, 1408:7, 1424:12, 1466:18, 1466:24, 1469:21, 1475:16, 1546:16, 1547:14, 1548:3, 1548:9, 1548:11, 1548:12, 1548:22
**personally** [7] - 1267:21, 1268:2, 1323:25, 1367:3, 1411:6, 1538:18, 1538:22
**persons** [1] - 1308:15
**perspective** [1] - 1441:11
**persuaded** [4] - 1506:15, 1506:17, 1506:22, 1506:25
**persuasive** [1] - 1456:12
**perused** [1] - 1482:25
**Peterson** [2] - 1443:7, 1443:8
**phase** [1] - 1496:4
**Philadelphia** [1] - 1447:9
**Philosophy** [1] - 1458:12
**philosophy** [4] - 1376:1, 1376:13, 1435:12, 1458:13
**phone** [2] - 1391:22, 1400:10
**phonetic** [1] - 1442:3
**phonetic)** [1] - 1325:18
**photographs** [1] - 1428:15
**phrase** [2] - 1305:17, 1507:14
**phrased** [1] - 1275:14
**physically** [1] - 1328:21
**pick** [4] - 1358:20, 1391:22, 1523:12, 1529:3
**picked** [1] - 1560:15
**picture** [3] - 1394:24, 1395:16, 1535:15
**pictures** [1] - 1418:4
**pie** [2] - 1555:1, 1555:2
**piece** [6] - 1263:25, 1275:20, 1340:10, 1499:25, 1531:5, 1556:3
**pieces** [1] - 1556:4
**pile** [2] - 1505:9, 1509:2

**piped** [2] - 1398:15, 1398:21
**pipelines** [1] - 1375:12
**pistols** [1] - 1476:13
**pit** [1] - 1258:16
**place** [13] - 1262:8, 1350:4, 1351:13, 1351:15, 1397:14, 1429:15, 1447:13, 1468:17, 1468:20, 1472:6, 1481:6, 1514:8, 1514:11
**placed** [2] - 1363:3, 1516:18
**plan** [4] - 1263:20, 1264:12, 1332:16, 1567:19
**plane** [5] - 1384:25, 1385:2, 1385:8, 1385:12, 1567:24
**planner** [1] - 1264:7
**planning** [7] - 1263:9, 1263:21, 1269:9, 1269:11, 1448:17, 1496:17, 1517:8
**plans** [3] - 1263:8, 1263:19, 1264:3
**play** [1] - 1373:16
**played** [2] - 1373:17, 1375:20
**plenty** [1] - 1303:7
**plow** [1] - 1376:25
**plus** [5] - 1405:17, 1432:15, 1438:14, 1533:14, 1533:16
**PO** [2] - 1255:14, 1256:7
**pod** [1] - 1376:3
**podium** [1] - 1413:18
**point** [47] - 1264:9, 1266:15, 1267:7, 1267:18, 1268:16, 1270:4, 1273:22, 1306:2, 1306:22, 1314:19, 1326:21, 1344:21, 1349:5, 1353:18, 1356:8, 1361:17, 1368:3, 1368:16, 1384:22, 1392:15, 1403:16, 1405:9, 1409:17, 1411:10, 1414:10, 1422:25, 1423:18, 1430:5, 1439:20, 1440:8, 1440:9, 1441:9, 1441:20, 1451:6, 1451:23, 1462:21, 1463:21, 1471:21, 1476:19, 1481:9, 1490:18, 1495:23, 1543:17, 1545:15, 1547:25, 1556:23, 1565:20
**pointing** [2] - 1536:14, 1536:20
**points** [1] - 1459:14
**policies** [7] - 1319:2, 1319:19, 1320:2, 1320:13, 1320:15, 1322:5, 1322:8
**policy** [5] - 1317:4, 1317:9, 1317:21, 1411:20, 1459:4
**political** [1] - 1387:12
**politics** [2] - 1387:16, 1387:23
**Pomlieden's** [1] - 1549:1
**Ponzi** [2] - 1466:8, 1467:16
**Portfolio** [2] - 1423:17, 1497:22
**portfolio** [50] - 1270:10, 1296:13, 1338:10, 1391:12, 1423:22, 1423:24, 1424:1, 1425:12, 1426:5, 1427:3, 1429:25, 1434:10, 1435:13, 1453:4, 1453:5, 1474:10, 1475:15, 1475:21, 1476:1, 1498:4, 1499:10, 1501:14, 1524:25, 1526:2, 1527:19, 1529:4, 1529:5, 1529:7, 1531:5, 1532:1, 1533:4, 1533:22, 1538:16, 1539:2, 1539:5, 1539:10, 1539:12, 1540:8, 1541:6, 1542:21, 1544:24, 1545:3, 1551:11, 1551:13, 1552:4, 1552:11, 1555:8, 1555:9, 1560:22, 1560:2

**portfolios** [15] - 1270:19, 1347:20, 1425:6, 1425:8, 1536:7, 1539:4, 1540:3, 1542:20, 1546:7, 1551:10, 1553:9, 1554:4, 1554:7, 1554:9, 1555:19
**portion** [15] - 1265:22, 1266:4, 1274:11, 1274:12, 1290:9, 1293:20, 1294:14, 1296:5, 1339:3, 1377:24, 1421:18, 1424:16, 1474:15, 1548:23, 1549:2
**portions** [1] - 1339:4
**position** [19] - 1261:8, 1304:21, 1353:6, 1404:13, 1438:13, 1439:1, 1441:10, 1470:20, 1525:19, 1527:9, 1527:18, 1528:9, 1530:1, 1530:20, 1530:23, 1535:19, 1536:10, 1556:13, 1568:21
**positions** [1] - 1531:8
**positive** [1] - 1338:6
**possess** [1] - 1319:19
**possessing** [1] - 1320:15
**possibility** [1] - 1290:15
**possible** [13] - 1277:14, 1398:1, 1503:14, 1503:17, 1508:3, 1508:12, 1510:21, 1510:25, 1511:1, 1511:6, 1516:24, 1571:9, 1571:11
**possibly** [8] - 1376:19, 1452:22, 1475:25, 1500:12, 1500:24, 1501:2, 1511:3
**pot** [3] - 1339:1, 1339:2
**potential** [5] - 1299:21, 1310:5, 1319:1, 1405:20, 1456:2
**pounds** [1] - 1555:5
**PowerPoint** [1] - 1334:13
**practice** [1] - 1323:15
**practices** [3] - 1274:20, 1395:10, 1468:19
**prayer** [2] - 1403:18, 1404:18
**precious** [1] - 1555:14
**precise** [1] - 1508:18
**precluded** [2] - 1342:22, 1449:21
**predicate** [2] - 1558:13, 1560:5
**predominantly** [3] - 1312:12, 1392:6, 1447:23
**preparation** [2] - 1549:19, 1570:17
**prepare** [2] - 1504:8, 1560:25
**prepared** [4] - 1299:8, 1422:2, 1429:11, 1561:7
**prescribed** [1] - 1478:5
**presence** [5] - 1274:13, 1345:17, 1392:21, 1464:16, 1566:4
**present** [3] - 1372:7, 1450:2, 1477:8
**presented** [3] - 1324:2, 1324:3, 1400:22
**presently** [1] - 1525:4
**preservation** [1] - 1453:2
**preserve** [1] - 1456:6
**preserved** [1] - 1459:1
**preserving** [2] - 1455:19, 1458:24
**president** [3] - 1273:1, 1412:17, 1413:7
**presidential** [1] - 1387:11

**Preston** [1] - 1256:3
**presume** [1] - 1516:9
**pretty** [15] - 1301:25, 1327:23, 1359:24, 1369:7, 1373:8, 1374:4, 1403:14, 1416:17, 1452:8, 1463:20, 1476:10, 1476:11, 1497:15, 1497:17, 1569:3
**previous** [4] - 1341:10, 1367:8, 1467:20, 1558:2
**previously** [3] - 1463:8, 1487:18, 1553:23
**price** [2] - 1436:2, 1529:13
**primarily** [22] - 1312:7, 1312:9, 1312:11, 1312:12, 1312:15, 1312:17, 1312:22, 1313:5, 1313:14, 1313:19, 1350:17, 1364:13, 1386:17, 1426:2, 1426:17, 1427:1, 1427:10, 1427:20, 1434:1, 1450:9, 1481:19, 1499:7
**primary** [2] - 1388:11, 1456:5
**principal** [22] - 1297:17, 1425:4, 1430:23, 1430:25, 1431:3, 1431:16, 1431:19, 1431:20, 1431:23, 1432:1, 1432:4, 1432:6, 1432:11, 1432:15, 1453:2, 1455:19, 1456:6, 1458:16, 1458:24, 1459:1, 1498:3
**principally** [2] - 1417:13, 1424:3
**principals** [1] - 1358:1
**principles** [1] - 1355:24
**print** [1] - 1456:19
**printed** [3] - 1501:22, 1502:7, 1543:15
**printing** [1] - 1543:15
**priority** [1] - 1470:1
**privacy** [1] - 1544:20
**Private** [2] - 1486:9, 1552:5
**private** [9] - 1433:20, 1453:6, 1499:18, 1499:21, 1500:4, 1500:7, 1500:10, 1500:23, 1501:6
**privy** [2] - 1267:17, 1349:8
**probability** [1] - 1306:4
**problem** [14] - 1260:14, 1261:14, 1278:16, 1307:16, 1365:20, 1374:7, 1374:20, 1378:3, 1394:9, 1410:12, 1412:2, 1456:19, 1488:21, 1572:15
**problems** [6] - 1258:22, 1258:24, 1375:4, 1449:19, 1449:24, 1449:25
**proceed** [8] - 1261:23, 1353:7, 1353:8, 1430:15, 1474:13, 1478:16, 1508:9
**proceeded** [1] - 1496:3
**proceeding** [1] - 1406:2
**Proceedings** [1] - 1256:13
**proceedings** [1] - 1574:4
**process** [1] - 1450:17
**produce** [8] - 1270:23, 1270:24, 1388:9, 1435:1, 1435:9, 1458:13, 1460:8, 1498:9
**produced** [7] - 1256:13, 1259:25, 1260:4, 1274:25, 1323:19, 1323:23, 1324:6
**producers** [1] - 1419:15
**producing** [3] - 1270:20, 1270:21, 1541:8
**Product** [1] - 1555:11

**product** [13] - 1268:17, 1280:19, 1280:20, 1335:25, 1337:22, 1383:20, 1383:22, 1388:21, 1414:3, 1415:18, 1416:21, 1417:3, 1506:14
**production** [1] - 1267:10
**products** [16] - 1275:12, 1288:21, 1335:10, 1335:20, 1337:22, 1337:23, 1338:23, 1414:2, 1426:20, 1435:1, 1435:9, 1480:24, 1492:22, 1495:15, 1498:9, 1516:11
**professional** [4] - 1456:12, 1468:14, 1504:21, 1517:2
**professors** [1] - 1448:16
**proffer** [3] - 1444:1, 1444:6, 1558:11
**profit** [3] - 1387:20, 1387:24, 1428:9
**profitable** [4] - 1423:24, 1434:24, 1498:5, 1498:7
**profits** [3] - 1387:17, 1428:2, 1532:18
**Program** [2] - 1486:9, 1491:24
**program** [28] - 1283:12, 1284:16, 1285:6, 1285:18, 1287:19, 1289:23, 1294:3, 1294:4, 1299:9, 1304:6, 1305:19, 1307:1, 1348:14, 1354:23, 1355:7, 1355:9, 1417:10, 1468:17, 1490:1, 1490:3, 1490:6, 1492:14, 1493:14, 1493:24, 1494:2, 1494:4, 1514:9, 1538:17
**programs** [1] - 1419:18
**project** [4] - 1448:19, 1496:7, 1496:8, 1531:19
**projector** [3] - 1491:1, 1491:4, 1535:2
**projects** [6] - 1479:5, 1479:9, 1479:11, 1495:25, 1496:3, 1496:9
**prominent** [2] - 1387:7, 1404:13
**promise** [7] - 1281:23, 1282:1, 1295:6, 1407:18, 1435:15, 1437:7, 1571:9
**promised** [2] - 1295:3, 1477:9
**promising** [1] - 1285:24
**promoted** [7] - 1279:13, 1476:2, 1529:21, 1530:2, 1530:3, 1531:10, 1531:15
**promoting** [1] - 1278:9
**promotion** [1] - 1529:20
**promotions** [1] - 1529:17
**prompted** [1] - 1259:20
**proof** [7] - 1443:15, 1443:21, 1444:10, 1571:25, 1572:8, 1572:19, 1572:20
**proper** [2] - 1443:23, 1516:7
**properly** [2] - 1516:3, 1549:7
**prosecute** [1] - 1336:17
**prospectus** [1] - 1441:18
**protect** [1] - 1338:10
**protected** [3] - 1345:14, 1453:17, 1461:8
**protection** [2] - 1288:23, 1492:24
**Protection** [4] - 1288:25, 1289:3, 1493:1, 1493:8
**protects** [1] - 1458:15
**prove** [3] - 1439:2, 1546:2, 1546:3
**proved** [2] - 1458:15, 1556:13
**provide** [17] - 1284:14, 1299:8, 1300:21, 1300:22, 1300:23, 1329:5,

1349:4, 1362:4, 1362:5, 1368:4, 1388:13, 1422:3, 1428:18, 1428:19, 1453:10, 1470:2, 1557:10
**provided** [13] - 1282:25, 1287:18, 1288:2, 1316:1, 1316:3, 1316:6, 1318:25, 1341:4, 1426:19, 1470:17, 1500:1, 1505:4, 1507:9
**providing** [2] - 1272:6
**provisions** [2] - 1337:15, 1505:2
**prudent** [3] - 1371:6, 1459:25, 1470:23
**public** [4] - 1349:10, 1433:20, 1467:17, 1501:5
**publicity** [1] - 1517:21
**publicly** [1] - 1500:18
**published** [1] - 1423:5
**pull** [10] - 1264:18, 1287:2, 1288:12, 1424:24, 1445:20, 1445:21, 1477:3, 1492:20, 1498:20, 1524:8
**pulled** [2] - 1286:10, 1510:7
**purchase** [28] - 1268:22, 1283:2, 1285:21, 1285:23, 1286:16, 1294:18, 1299:24, 1300:2, 1357:17, 1436:6, 1452:7, 1453:20, 1454:22, 1456:3, 1457:20, 1458:18, 1459:9, 1460:13, 1461:2, 1473:18, 1473:23, 1474:2, 1474:3, 1474:13, 1474:18, 1489:21, 1506:1, 1510:2
**purchased** [20] - 1310:8, 1361:1, 1437:3, 1456:8, 1471:16, 1474:8, 1474:14, 1474:20, 1474:25, 1476:5, 1479:24, 1483:3, 1493:17, 1497:11, 1498:13, 1498:16, 1505:7, 1510:22, 1511:4, 1511:5
**purchaser** [2] - 1298:7, 1310:5
**purchasers** [3] - 1316:1, 1316:3, 1316:11
**purchases** [2] - 1314:23, 1463:25
**purchasing** [8] - 1291:14, 1310:20, 1310:23, 1335:17, 1361:8, 1452:21, 1460:10, 1499:14
**purely** [1] - 1261:12
**purport** [1] - 1260:16
**purports** [1] - 1560:7
**purpose** [5] - 1350:25, 1377:22, 1379:9, 1379:10, 1379:13
**pursuant** [1] - 1344:11
**push** [1] - 1519:17
**pushed** [1] - 1507:6
**pushing** [1] - 1337:20
**put** [58] - 1258:20, 1258:21, 1261:6, 1263:12, 1270:18, 1284:21, 1286:11, 1286:22, 1295:16, 1296:2, 1302:16, 1303:25, 1315:14, 1315:17, 1338:21, 1339:2, 1343:7, 1343:11, 1344:20, 1346:11, 1350:20, 1351:12, 1352:5, 1362:3, 1363:10, 1364:22, 1367:4, 1367:5, 1372:19, 1375:6, 1394:23, 1396:9, 1411:7, 1414:1, 1417:13, 1437:5, 1438:1, 1441:13, 1444:11, 1444:16, 1451:11, 1461:2, 1461:13, 1471:13, 1479:12, 1481:6, 1483:5, 1494:8, 1495:7, 1529:5, 1536:17, 1538:16, 1539:9, 1550:25, 1567:15,

1571:13, 1572:10

**putting** [7] - 1349:14, 1351:23, 1362:16, 1362:21, 1362:24, 1424:11, 1438:13

# Q

**qualified** [4] - 1269:13, 1269:17, 1383:24, 1524:24
**quality** [1] - 1377:2
**quarter** [4] - 1405:22, 1406:3, 1406:16, 1558:10
**quarterly** [1] - 1423:12
**quarters** [1] - 1559:5
**questioned** [6] - 1369:1, 1369:2, 1369:3, 1421:17, 1422:24, 1425:23
**questioning** [1] - 1342:21
**Questionnaire** [1] - 1486:8
**questionnaire** [4] - 1291:8, 1309:3, 1368:5, 1368:13
**questionnaires** [1] - 1368:6
**questions** [26] - 1300:17, 1301:3, 1301:4, 1301:8, 1309:5, 1325:14, 1325:15, 1332:7, 1407:17, 1410:4, 1414:9, 1414:20, 1415:3, 1416:19, 1419:17, 1419:20, 1420:15, 1424:16, 1429:13, 1429:17, 1430:13, 1444:24, 1463:7, 1545:3, 1545:6, 1545:8
**quick** [2] - 1393:10, 1547:9
**quicker** [2] - 1311:3, 1547:18
**quickly** [6] - 1264:19, 1311:13, 1414:12, 1414:14, 1533:14, 1536:5
**quite** [11] - 1326:5, 1326:12, 1329:20, 1331:15, 1388:18, 1388:19, 1414:8, 1456:12, 1458:6, 1471:22, 1472:9
**Quito** [1] - 1409:12
**quote** [2] - 1459:3, 1459:21

# R

**raise** [3] - 1445:13, 1519:3, 1566:1
**raised** [1] - 1446:18
**ran** [5] - 1268:19, 1274:10, 1274:11, 1274:12, 1274:15
**range** [2] - 1337:22, 1337:23
**rank** [2] - 1447:24, 1522:20
**rapidly** [1] - 1458:6
**rate** [9] - 1304:6, 1311:13, 1370:9, 1382:9, 1382:10, 1463:20, 1500:1, 1513:18, 1514:2
**rates** [8] - 1267:10, 1381:17, 1382:5, 1382:16, 1382:18, 1382:25, 1383:3, 1425:4
**rather** [3] - 1474:6, 1499:25, 1506:9
**ratings** [2] - 1370:10
**ratio** [1] - 1467:15
**re** [2] - 1422:20, 1530:13
**reach** [2] - 1569:2, 1569:6
**read** [68] - 1288:18, 1291:14, 1292:19, 1297:3, 1297:5, 1297:7, 1299:7, 1299:15, 1300:5, 1308:10, 1308:25,

1312:23, 1312:24, 1342:4, 1356:10, 1393:2, 1408:5, 1421:23, 1421:25, 1422:15, 1423:2, 1425:3, 1426:1, 1428:17, 1431:1, 1431:16, 1434:18, 1435:6, 1435:16, 1458:11, 1459:3, 1459:7, 1459:21, 1462:14, 1467:3, 1467:10, 1468:10, 1479:11, 1484:11, 1490:21, 1491:8, 1491:10, 1491:19, 1492:3, 1492:7, 1492:8, 1492:9, 1493:4, 1495:11, 1497:24, 1502:6, 1502:15, 1502:20, 1502:21, 1504:25, 1505:9, 1507:19, 1507:21, 1507:23, 1512:7, 1512:16, 1512:19, 1512:21, 1545:14

**reading** [16] - 1296:24, 1458:17, 1458:19, 1460:1, 1467:18, 1467:23, 1469:10, 1469:24, 1486:20, 1492:16, 1493:16, 1495:14, 1498:12, 1505:3, 1506:22, 1517:21
**ready** [5] - 1261:23, 1392:18, 1566:1, 1572:22
**real** [6] - 1289:1, 1292:23, 1341:2, 1341:4, 1407:3, 1526:15
**realistically** [1] - 1569:10
**really** [15] - 1319:21, 1337:18, 1349:10, 1365:7, 1371:17, 1371:18, 1375:8, 1397:6, 1399:23, 1404:19, 1476:13, 1482:12, 1507:7, 1569:13, 1571:17
**reason** [13] - 1289:15, 1307:22, 1320:13, 1333:19, 1342:21, 1345:13, 1345:24, 1423:13, 1425:8, 1436:24, 1464:24, 1487:5, 1517:2
**reasonable** [5] - 1383:15, 1441:12, 1568:22, 1568:23, 1568:24
**reasonably** [3] - 1300:9, 1422:20
**reasons** [2] - 1384:17, 1384:18
**reassurance** [1] - 1466:13
**Rebecca** [1] - 1325:18
**rebuttal** [2] - 1261:12, 1571:17
**recalled** [1] - 1413:3
**receipt** [1] - 1291:6
**receive** [10] - 1301:9, 1303:17, 1448:9, 1448:11, 1461:6, 1462:4, 1476:16, 1521:10, 1529:17, 1547:16
**received** [18] - 1302:18, 1302:24, 1436:20, 1447:9, 1448:12, 1462:1, 1463:14, 1466:13, 1468:21, 1473:9, 1485:10, 1504:20, 1514:12, 1521:14, 1529:20, 1551:14, 1570:11, 1572:16
**receiver** [11] - 1277:7, 1302:7, 1302:9, 1303:23, 1306:23, 1307:5, 1389:1, 1407:24, 1472:21, 1473:3, 1473:8
**receivers** [1] - 1406:1
**receiving** [3] - 1466:5, 1467:17, 1513:23
**recently** [3] - 1389:11, 1423:5, 1450:17
**Recessed** [5] - 1307:17, 1394:14, 1465:16, 1566:3, 1573:19
**recognize** [17] - 1318:7, 1372:12, 1373:6, 1456:15, 1456:20, 1485:24, 1486:15, 1487:13, 1487:21, 1487:22,

1488:3, 1488:10, 1489:4, 1546:8, 1546:10, 1560:19
**recognized** [1] - 1375:14
**recognizes** [2] - 1261:5, 1489:14
**recommend** [6] - 1269:16, 1269:20, 1269:24, 1299:14, 1299:21, 1422:5
**recommendations** [1] - 1264:1
**recommended** [2] - 1269:12, 1437:8
**recommending** [1] - 1417:9
**reconfirm** [1] - 1463:6
**reconvene** [1] - 1566:1
**record** [16] - 1333:11, 1394:13, 1441:4, 1444:6, 1519:14, 1527:4, 1547:1, 1549:10, 1557:15, 1571:22, 1571:24, 1573:3, 1573:5, 1573:6, 1573:18, 1574:4
**recorded** [2] - 1256:13, 1367:9
**recording** [1] - 1378:17
**records** [2] - 1548:16, 1558:12
**recreation** [2] - 1448:20, 1448:24
**recross** [2] - 1434:9, 1437:24
**RECROSS** [4] - 1257:6, 1257:13, 1430:11, 1515:17
**recruit** [1] - 1383:20
**recruited** [2] - 1449:4, 1449:10
**recruiting** [1] - 1383:19
**redeem** [9] - 1470:25, 1471:1, 1471:9, 1471:11, 1472:3, 1472:4, 1472:8, 1473:1, 1473:5
**redeeming** [1] - 1474:6
**redemption** [2] - 1412:19, 1413:9
**redemptions** [2] - 1410:4, 1410:19, 1410:24
**REDIRECT** [6] - 1257:5, 1257:7, 1257:12, 1410:1, 1436:10, 1509:14
**redirect** [2] - 1434:9, 1437:24
**redirected** [3] - 1536:19, 1537:23, 1537:24
**reduce** [2] - 1371:7, 1371:8
**refer** [3] - 1526:8, 1528:1, 1538:15
**reference** [6] - 1429:10, 1429:15, 1470:10, 1554:2, 1555:4, 1556:5
**referenced** [1] - 1424:2
**referral** [3] - 1309:19, 1310:3, 1310:7
**referred** [2] - 1313:7, 1411:5
**referring** [5] - 1355:4, 1379:23, 1427:9, 1427:10, 1439:11
**refers** [1] - 1423:22
**reflect** [1] - 1527:4
**reflected** [1] - 1511:14
**reflection** [1] - 1378:15
**refundable** [1] - 1567:12
**refused** [1] - 1443:12
**regard** [5] - 1455:1, 1466:11, 1468:23, 1469:3, 1495:20
**regarded** [1] - 1474:23
**regarding** [12] - 1342:1, 1366:13, 1399:15, 1400:10, 1410:4, 1420:16, 1426:16, 1427:23, 1438:1, 1438:22, 1512:8, 1568:12
**regardless** [1] - 1345:14
**regime** [1] - 1325:4

**registered** [2] - 1283:12, 1291:2
**registration** [1] - 1284:5
**regular** [2] - 1276:10, 1468:18
**regularly** [1] - 1319:3
**regulate** [1] - 1324:11
**regulated** [2] - 1323:1, 1323:7
**regulates** [1] - 1323:8
**regulations** [7] - 1290:22, 1327:9, 1330:9, 1330:13, 1331:22, 1524:14, 1544:20
**regulatory** [5] - 1290:21, 1323:1, 1325:4, 1330:15, 1376:9
**reinforce** [1] - 1513:7
**reinvest** [1] - 1532:19
**related** [2] - 1428:5, 1428:8
**relation** [1] - 1524:14
**relative** [6] - 1379:14, 1399:10, 1539:1, 1539:20, 1541:12, 1565:22
**relatives** [1] - 1302:3
**relay** [1] - 1363:10
**relayed** [1] - 1366:22
**relaying** [1] - 1363:22
**relevance** [7] - 1348:1, 1348:3, 1349:18, 1349:20, 1477:1, 1477:19, 1494:18
**relevant** [11] - 1259:21, 1300:7, 1351:15, 1361:16, 1422:18, 1439:19, 1456:3, 1456:5, 1459:11, 1460:4, 1506:8
**relied** [5] - 1326:14, 1326:24, 1388:23, 1417:9, 1419:23
**rely** [7] - 1276:24, 1280:14, 1417:19, 1423:7, 1457:7, 1505:22, 1506:6
**relying** [4] - 1397:24, 1420:9, 1422:10, 1560:9
**remain** [2] - 1445:5, 1464:7
**remained** [2] - 1470:20, 1530:19
**remember** [68] - 1262:24, 1263:7, 1264:17, 1265:13, 1265:18, 1265:23, 1266:12, 1270:6, 1272:21, 1273:24, 1283:5, 1283:14, 1285:2, 1286:24, 1293:7, 1303:4, 1303:10, 1309:16, 1311:24, 1315:11, 1320:19, 1333:8, 1335:22, 1335:23, 1336:21, 1340:3, 1340:5, 1344:8, 1345:22, 1346:3, 1346:10, 1346:13, 1353:25, 1354:3, 1354:24, 1359:13, 1361:21, 1363:25, 1365:1, 1365:2, 1366:2, 1366:12, 1366:16, 1369:4, 1372:2, 1372:5, 1375:19, 1379:18, 1380:15, 1386:12, 1394:21, 1400:6, 1400:8, 1401:24, 1402:1, 1402:19, 1402:22, 1407:2, 1432:17, 1433:7, 1433:11, 1442:9, 1442:12, 1472:21, 1510:21, 1513:9, 1563:11, 1569:14
**remind** [5] - 1393:23, 1410:8, 1418:21, 1419:5, 1572:24
**renew** [2] - 1558:16, 1561:13
**repay** [3] - 1297:16, 1352:9, 1352:12
**repeat** [2] - 1262:14, 1477:6
**repeated** [1] - 1350:14
**rephrase** [4] - 1366:3, 1366:6, 1406:12, 1548:4

**replace** [1] - 1478:5
**replacing** [1] - 1269:9
**replicate** [1] - 1338:4
**report** [26] - 1354:14, 1354:17, 1386:7, 1391:1, 1400:21, 1400:24, 1401:3, 1401:9, 1423:5, 1436:17, 1456:21, 1456:24, 1457:18, 1458:9, 1459:18, 1466:1, 1466:5, 1474:1, 1475:8, 1528:11, 1550:18, 1556:21, 1562:23, 1563:17, 1563:20, 1564:5
**reported** [13] - 1274:17, 1274:24, 1278:14, 1278:18, 1391:3, 1395:13, 1428:5, 1431:22, 1563:7, 1563:22, 1564:4, 1564:14, 1565:15
**reporter** [4] - 1321:22, 1328:2, 1507:23, 1524:6
**Reporter** [1] - 1256:10
**REPORTER'S** [1] - 1574:1
**reporting** [9] - 1277:19, 1288:22, 1357:12, 1386:6, 1396:9, 1396:13, 1398:13, 1428:10, 1492:23
**reports** [19] - 1350:12, 1359:1, 1359:3, 1391:6, 1418:4, 1421:7, 1422:11, 1423:12, 1425:10, 1456:9, 1528:19, 1529:1, 1530:14, 1530:17, 1543:9, 1543:10, 1543:19, 1561:15, 1562:24
**represent** [3] - 1369:12, 1499:6, 1502:24, 1504:6, 1508:10, 1552:3, 1554:3
**representation** [3] - 1308:20, 1438:5, 1560:6
**representations** [6] - 1308:16, 1339:20, 1467:21, 1507:1, 1517:16, 1517:17
**representative** [1] - 1507:25
**represented** [3] - 1279:24, 1309:1, 1504:3
**representing** [3] - 1380:20, 1479:17, 1507:10
**represents** [2] - 1552:4, 1563:16
**Republic** [1] - 1448:4
**request** [12] - 1300:9, 1301:10, 1302:16, 1302:23, 1314:24, 1314:25, 1345:15, 1368:4, 1393:11, 1411:8, 1411:21, 1422:21
**requested** [1] - 1303:16
**requests** [2] - 1413:25, 1414:1
**require** [2] - 1357:11, 1357:12
**required** [6] - 1291:9, 1292:17, 1323:17, 1358:1, 1361:13, 1512:21
**requirement** [2] - 1369:18, 1369:19
**requirements** [6] - 1285:19, 1288:22, 1325:5, 1330:5, 1479:22, 1492:23
**requires** [3] - 1323:18, 1440:22, 1468:18
**research** [41] - 1386:24, 1387:2, 1388:7, 1388:8, 1388:9, 1388:13, 1391:6, 1424:8, 1521:8, 1527:10, 1528:13, 1528:16, 1528:17, 1528:19, 1528:24, 1529:1, 1529:3, 1529:21, 1530:2, 1530:3, 1530:12, 1530:14, 1530:17, 1530:20, 1531:6, 1531:21, 1532:1, 1534:8, 1537:4

1537:13, 1537:20, 1537:25, 1542:4, 1542:9, 1542:25, 1543:9, 1543:10, 1543:19, 1543:22, 1544:23
**resided** [1] - 1385:23
**residents** [2] - 1408:23, 1408:24
**residing** [1] - 1385:13
**resort** [1] - 1519:25
**resources** [1] - 1272:6
**respect** [2] - 1300:10, 1422:21
**respectfully** [1] - 1412:12
**respective** [2] - 1291:10, 1308:14
**respond** [1] - 1368:13
**response** [9] - 1351:11, 1351:12, 1352:17, 1439:23, 1440:18, 1442:2, 1463:15, 1515:1, 1549:8
**responsibilities** [3] - 1529:24, 1531:3, 1531:14
**responsibility** [2] - 1324:4, 1538:10
**responsible** [5] - 1267:5, 1325:2, 1325:5, 1331:20, 1391:12
**rest** [3] - 1308:25, 1423:2, 1493:3
**restaurant** [1] - 1399:24
**restrict** [1] - 1476:14
**restrictions** [1] - 1290:22
**restroom** [1] - 1307:10
**restructure** [1] - 1352:6
**restructuring** [1] - 1351:18
**result** [1] - 1279:16
**resulted** [1] - 1459:5
**results** [4] - 1434:24, 1435:12, 1498:7, 1498:11
**resume** [1] - 1392:19
**resumé** [1] - 1523:11
**retained** [5] - 1532:16, 1532:17, 1532:18, 1565:2, 1565:4
**retire** [1] - 1394:4
**retired** [6] - 1447:3, 1447:4, 1449:19, 1450:17, 1451:9, 1479:21
**retirement** [3] - 1263:20, 1452:24, 1454:3
**Return** [1] - 1554:5
**return** [18] - 1295:1, 1299:4, 1338:7, 1453:9, 1453:10, 1454:6, 1458:25, 1459:13, 1499:24, 1499:25, 1500:1, 1513:18, 1513:23, 1513:24, 1513:25, 1514:2, 1554:7, 1554:11
**returning** [1] - 1460:9
**returns** [8] - 1338:7, 1425:5, 1435:2, 1435:10, 1458:14, 1460:9, 1468:4, 1498:9
**Revenue** [1] - 1370:19
**reverse** [2] - 1388:18, 1388:19
**review** [10] - 1286:15, 1291:6, 1291:20, 1291:22, 1298:16, 1468:18, 1483:3, 1498:15, 1505:25, 1509:2
**reviewed** [8] - 1298:10, 1482:22, 1483:1, 1485:9, 1490:8, 1490:9, 1505:6, 1511:3
**reviewing** [2] - 1499:13, 1510:21
**revitalize** [1] - 1399:22
**reward** [1] - 1316:23
**rig** [1] - 1464:25

right-hand [2] - 1538:6, 1553:5
rights [1] - 1281:8
ring [1] - 1357:3
risk [8] - 1297:18, 1297:22, 1299:4, 1316:22, 1459:23, 1468:19, 1481:11, 1492:12
Risk [2] - 1297:14, 1424:17
risks [3] - 1292:17, 1293:2, 1505:25
risky [1] - 1481:6
RMR [2] - 1256:10, 1574:7
ROBERT [1] - 1255:6
Robert [6] - 1255:21, 1354:12, 1397:23, 1523:11, 1523:13, 1535:16
Rodriguez [4] - 1411:25, 1412:16, 1413:7, 1414:7
rodriguez [1] - 1413:23
ROI [1] - 1459:25
role [3] - 1263:16, 1263:19, 1567:9
rolling [1] - 1570:7
room [1] - 1464:25
Rouge [4] - 1318:22, 1328:21, 1390:8, 1390:11
roughly [4] - 1531:1, 1544:5, 1563:9, 1565:14
RPR [1] - 1256:10
rule [2] - 1335:20, 1559:17
Rule [4] - 1412:25, 1549:15, 1559:22, 1561:12
ruled [2] - 1393:16, 1572:10
rules [7] - 1325:4, 1325:6, 1331:21, 1337:17, 1337:18, 1516:2, 1516:4
ruling [13] - 1261:4, 1342:11, 1344:23, 1345:14, 1348:8, 1351:1, 1351:3, 1353:9, 1353:11, 1353:14, 1556:18, 1560:9
run [17] - 1267:15, 1272:24, 1274:14, 1304:18, 1304:19, 1306:3, 1306:7, 1306:10, 1306:12, 1306:14, 1376:22, 1389:10, 1400:24, 1430:25, 1518:19, 1518:20, 1566:10
running [2] - 1417:20, 1444:22
runs [1] - 1477:14
Rusk [1] - 1256:11

## S

S&P [1] - 1529:11
S-I-M [1] - 1354:23
Sachs [1] - 1530:15
safe [7] - 1316:19, 1376:20, 1377:10, 1466:14, 1469:14, 1474:11, 1498:15
safeguards [1] - 1468:20
safely [1] - 1376:12
safer [1] - 1284:8
safety [2] - 1463:24, 1469:25
salary [2] - 1262:23, 1406:9
sales [8] - 1406:9, 1415:7, 1415:21, 1416:7, 1418:25, 1419:6, 1419:8, 1524:14
salesman [1] - 1419:14
salesperson [2] - 1276:17, 1276:19
San [1] - 1329:16

Sanchez [3] - 1256:10, 1574:3, 1574:7
satisfactory [2] - 1572:6, 1572:7
satisfied [1] - 1368:16
savings [2] - 1460:25, 1461:3
saw [14] - 1318:19, 1318:20, 1318:23, 1319:8, 1320:2, 1320:12, 1334:23, 1350:17, 1352:11, 1372:9, 1400:21, 1418:9, 1432:3, 1556:1
SCARDINO [9] - 1345:18, 1394:2, 1394:4, 1394:8, 1394:10, 1465:9, 1573:8, 1573:10, 1573:14
Scardino [3] - 1255:21, 1255:21, 1566:7
schedule [1] - 1566:7
scheme [2] - 1466:8, 1467:16
school [11] - 1327:14, 1447:10, 1447:11, 1448:15, 1448:16, 1520:16, 1521:23, 1521:24, 1522:14, 1523:2, 1523:10
Science [2] - 1520:25, 1521:1
science [3] - 1266:5, 1274:1, 1274:8
scope [3] - 1413:6, 1413:8, 1516:13
score [1] - 1418:21
Scott [1] - 1274:14
scratch [1] - 1375:23
screaming [2] - 1376:9, 1535:10
screen [18] - 1288:6, 1308:8, 1456:16, 1457:3, 1457:5, 1457:11, 1461:24, 1483:17, 1483:19, 1483:20, 1484:18, 1490:18, 1501:16, 1502:9, 1510:8, 1552:13, 1553:18, 1566:1
scroll [1] - 1434:12
scrub [1] - 1377:9
scrubbed [2] - 1376:6, 1379:19
se [5] - 1263:16, 1263:24, 1296:23, 1325:23, 1397:6
seat [3] - 1258:5, 1445:18, 1519:7
seated [3] - 1261:22, 1464:17, 1465:18
sec [1] - 1484:2
SEC [15] - 1283:17, 1284:1, 1284:13, 1284:14, 1284:19, 1285:1, 1337:18, 1368:4, 1368:7, 1368:16, 1380:14, 1380:23, 1524:15
SEC-issued [1] - 1524:15
second [23] - 1258:1, 1287:12, 1307:16, 1321:19, 1321:20, 1354:21, 1372:14, 1413:17, 1418:15, 1422:15, 1434:11, 1434:15, 1438:19, 1439:4, 1440:19, 1440:21, 1458:11, 1467:2, 1468:6, 1477:12, 1484:6, 1512:11, 1537:17
seconds [1] - 1393:3
secret [2] - 1407:6, 1519:24
section [21] - 1274:25, 1275:18, 1296:11, 1296:17, 1296:20, 1296:25, 1297:1, 1299:7, 1305:2, 1309:14, 1309:21, 1309:24, 1331:16, 1394:21, 1395:6, 1395:17, 1421:14, 1423:16, 1424:21, 1428:17, 1429:11
sector [1] - 1555:8
sectors [1] - 1459:24
secure [4] - 1428:24, 1452:14,

secured [3] - 1428:20, 1462:15, 1467:13
Securities [6] - 1283:18, 1284:2, 1288:24, 1289:3, 1492:25, 1493:7
securities [20] - 1270:14, 1270:18, 1283:17, 1288:23, 1290:13, 1290:14, 1290:20, 1327:15, 1330:20, 1358:21, 1358:23, 1361:8, 1417:15, 1426:3, 1426:24, 1492:24, 1499:8, 1503:8, 1530:7, 1530:14
Security [2] - 1450:3, 1476:17
security [11] - 1284:2, 1284:3, 1284:7, 1289:16, 1291:1, 1506:11, 1506:12, 1508:19, 1524:14, 1529:13, 1533:13
see [83] - 1258:4, 1260:3, 1260:15, 1261:4, 1263:23, 1275:9, 1287:16, 1288:11, 1289:25, 1290:23, 1291:11, 1294:20, 1296:17, 1299:12, 1300:5, 1301:12, 1306:12, 1308:21, 1312:9, 1312:18, 1324:2, 1333:16, 1352:16, 1353:16, 1359:3, 1361:12, 1373:9, 1393:25, 1401:17, 1402:6, 1418:11, 1433:15, 1434:2, 1434:15, 1435:12, 1438:8, 1456:16, 1456:18, 1457:9, 1457:10, 1465:13, 1470:10, 1483:15, 1483:17, 1483:21, 1484:18, 1485:1, 1485:13, 1485:18, 1485:23, 1486:6, 1487:8, 1490:17, 1497:22, 1498:24, 1499:3, 1501:15, 1501:18, 1501:20, 1501:21, 1502:9, 1502:11, 1502:14, 1507:18, 1510:10, 1510:15, 1512:17, 1512:24, 1513:2, 1523:12, 1526:23, 1530:15, 1538:19, 1552:1, 1554:5, 1554:14, 1555:21, 1557:25, 1562:24, 1565:3, 1565:25
See [1] - 1392:19
seeing [9] - 1457:17, 1457:23, 1457:24, 1459:8, 1486:5, 1486:11, 1486:25, 1487:17, 1488:12
seek [6] - 1313:8, 1313:24, 1314:3, 1314:6, 1314:11, 1315:1
seeking [1] - 1313:9
seem [1] - 1333:3
selected [2] - 1299:8, 1422:3
selecting [1] - 1358:23
selection [1] - 1496:18
self [3] - 1332:16, 1332:18, 1332:24
self-funding [1] - 1332:24
self-insured [2] - 1332:16, 1332:18
sell [18] - 1265:17, 1275:12, 1291:17, 1335:24, 1336:8, 1336:23, 1336:24, 1336:25, 1337:1, 1337:2, 1342:19, 1343:16, 1414:1, 1414:11, 1479:22, 1533:13, 1533:17
selling [11] - 1335:20, 1360:19, 1360:20, 1360:22, 1416:7, 1416:15, 1416:21, 1417:3, 1476:11, 1516:11, 1516:22
semester [1] - 1523:11
send [2] - 1342:18, 1368:4
sending [2] - 1366:16, 1396:19
senior [3] - 1396:2, 1529:21, 1530:2
sense [4] - 1333:7, 1396:5, 1430:18,

1511:22

**sent** [10] - 1259:16, 1260:23, 1363:6, 1363:7, 1396:25, 1436:23, 1523:11, 1551:10, 1552:7, 1552:24

**sentence** [21] - 1421:25, 1422:15, 1422:25, 1423:3, 1423:21, 1424:10, 1425:3, 1425:20, 1427:2, 1463:16, 1467:4, 1467:9, 1491:16, 1491:19, 1491:20, 1491:22, 1491:23, 1493:10, 1493:19, 1499:3, 1512:16

**sentences** [3] - 1421:21, 1424:19, 1425:24

**separate** [1] - 1503:7

**separated** [2] - 1432:3, 1538:7

**September** [2] - 1466:12, 1501:12

**sequence** [1] - 1261:14

**Series** [6] - 1524:4, 1524:12, 1524:17

**serious** [2] - 1456:18, 1515:10

**Service** [1] - 1370:19

**service** [5] - 1329:5, 1341:4, 1448:9, 1450:6, 1450:7

**set** [23] - 1265:9, 1280:13, 1280:14, 1282:13, 1289:6, 1340:10, 1348:14, 1353:11, 1356:14, 1357:7, 1381:9, 1381:11, 1386:3, 1386:6, 1399:16, 1419:3, 1419:5, 1436:2, 1491:21, 1492:12, 1548:15, 1570:8

**sets** [1] - 1477:11

**settlement** [1] - 1480:10

**seven** [4] - 1414:15, 1416:12, 1522:14, 1522:19

**seven-fold** [1] - 1416:12

**several** [14] - 1310:14, 1329:18, 1390:4, 1448:3, 1452:11, 1453:17, 1455:23, 1470:24, 1471:20, 1473:8, 1479:23, 1538:19, 1544:14

**severe** [1] - 1476:10

**SFG** [10] - 1526:6, 1526:8, 1528:16, 1529:18, 1530:11, 1536:2, 1537:5, 1551:7, 1551:8, 1562:25

**SFG's** [3] - 1526:12, 1546:20, 1546:22

**SGC** [19] - 1265:2, 1265:4, 1265:10, 1265:17, 1265:22, 1265:25, 1269:7, 1276:13, 1310:7, 1317:1, 1323:1, 1323:6, 1323:12, 1328:10, 1530:5, 1530:9, 1530:21, 1551:8

**shall** [1] - 1468:15

**share** [4] - 1281:11, 1281:14, 1377:4

**shareholder** [2] - 1346:7, 1470:11, 1535:17

**shareholders** [2] - 1436:14, 1468:5

**shares** [1] - 1375:25

**Shaw** [38] - 1451:1, 1451:4, 1452:5, 1452:13, 1455:6, 1455:11, 1455:17, 1455:19, 1466:20, 1466:24, 1469:2, 1469:8, 1469:15, 1469:20, 1470:6, 1470:14, 1470:17, 1471:22, 1472:4, 1502:4, 1503:14, 1503:19, 1504:14, 1506:19, 1506:20, 1507:5, 1507:8, 1509:6, 1514:8, 1514:16, 1516:10, 1516:19, 1516:21, 1516:24, 1517:1, 1517:4, 1517:12, 1517:24

**sheds** [1] - 1457:13

**sheet** [9] - 1377:16, 1546:6, 1550:14, 1552:12, 1556:25, 1557:1, 1557:10, 1557:11, 1557:21

**sheets** [2] - 1556:3, 1561:6

**shipment** [1] - 1428:23

**shop** [1] - 1399:25

**shore** [2] - 1348:25, 1349:1

**short** [2] - 1414:15, 1468:4

**short-term** [2] - 1414:15, 1468:4

**shorter** [1] - 1382:10

**shortsighted** [1] - 1468:4

**show** [17] - 1343:22, 1345:5, 1348:5, 1349:23, 1351:6, 1355:18, 1372:9, 1393:5, 1393:8, 1425:1, 1438:10, 1485:23, 1486:10, 1560:7, 1562:13, 1569:1

**showed** [4] - 1397:9, 1414:22, 1458:4, 1490:5

**showing** [7] - 1377:22, 1406:1, 1457:4, 1486:13, 1487:13, 1501:23, 1557:9

**shown** [13] - 1343:24, 1343:25, 1344:1, 1349:21, 1351:25, 1352:2, 1397:12, 1426:5, 1499:10, 1502:10, 1562:3, 1563:17

**shows** [13] - 1343:24, 1343:25, 1344:1, 1349:21, 1351:25, 1352:2, 1397:12, 1426:5, 1499:10, 1502:10, 1562:3, 1563:17

**shut** [1] - 1277:6, 1411:11, 1532:12

**shy** [1] - 1324:6

**SIB** [9] - 1470:18, 1482:23, 1511:25, 1513:12, 1513:25, 1532:23, 1536:19, 1540:8, 1565:4

**SIB's** [6] - 1459:4, 1473:25, 1475:15, 1475:21, 1476:1, 1511:19

**SIBL** [38] - 1264:22, 1265:9, 1265:17, 1282:6, 1282:14, 1284:1, 1288:21, 1290:12, 1294:19, 1303:11, 1308:11, 1316:1, 1317:1, 1363:10, 1363:16, 1366:23, 1370:1, 1370:10, 1382:16, 1396:23, 1396:25, 1415:25, 1428:20, 1428:25, 1430:24, 1431:4, 1431:21, 1433:5, 1434:25, 1467:12, 1467:13, 1467:19, 1468:3, 1491:23, 1492:13, 1495:15, 1498:2, 1498:7

**SIBL's** [1] - 1492:22

**side** [8] - 1276:1, 1288:11, 1321:21, 1535:21, 1538:6, 1538:8, 1553:5, 1562:13

**sides** [3] - 1345:13, 1351:1, 1353:12

**sign** [13] - 1285:24, 1286:15, 1298:6, 1393:5, 1472:16, 1483:3, 1486:23, 1489:20, 1496:11, 1497:1, 1505:12, 1506:3

**signature** [24] - 1486:15, 1486:16, 1486:25, 1487:3, 1487:4, 1487:6, 1487:14, 1487:15, 1487:16, 1487:20, 1487:21, 1487:22, 1487:24, 1488:2, 1488:4, 1488:5, 1488:9, 1488:10, 1488:11, 1488:16, 1489:7, 1489:8, 1489:14, 1489:24

**signatures** [2] - 1488:12, 1488:14

**signed** [10] - 1291:24, 1304:9, 1350:12, 1482:23, 1486:17, 1488:13, 1490:3, 1490:9, 1505:5, 1506:8

**significance** [1] - 1425:7

**significant** [3] - 1458:2, 1515:8, 1515:9

**significantly** [1] - 1531:14

**signing** [1] - 1291:5

**SIM** [7] - 1337:24, 1338:1, 1338:14, 1354:23, 1355:7, 1531:19

**similar** [3] - 1358:16, 1421:6, 1423:19

**Simmons** [1] - 1375:25

**simple** [6] - 1275:23, 1277:25, 1337:7, 1441:25, 1572:5

**simpler** [2] - 1328:22, 1330:18

**simplicity** [1] - 1328:12

**simplistic** [1] - 1398:4

**simply** [9] - 1337:6, 1388:7, 1485:11, 1490:10, 1504:23, 1507:5, 1539:4, 1539:12, 1539:14

**simultaneously** [1] - 1345:5

**single** [6] - 1287:18, 1336:9, 1346:7, 1415:18, 1452:1, 1461:14

**SIPC** [1] - 1495:19

**sit** [4] - 1258:2, 1258:23, 1401:17, 1465:11

**site** [1] - 1334:21

**sitting** [1] - 1526:23

**situated** [1] - 1326:2

**situation** [4] - 1355:10, 1366:24, 1390:6, 1411:23

**situations** [2] - 1363:19, 1401:20

**six** [7] - 1452:11, 1452:22, 1479:23, 1513:20, 1522:14, 1525:3, 1539:18

**size** [2] - 1539:20, 1541:12

**Skillings** [1] - 1375:9

**skills** [1] - 1402:15

**skip** [1] - 1467:9

**skipped** [1] - 1330:2

**sleeping** [3] - 1258:8, 1258:10, 1258:17

**slides** [1] - 1334:13

**slipped** [1] - 1283:21

**sliver** [1] - 1304:24

**slow** [10] - 1278:24, 1290:17, 1303:5, 1306:18, 1321:17, 1327:24, 1328:3, 1360:17, 1435:4, 1524:5

**SM** [1] - 1338:14

**small** [5] - 1266:4, 1448:18, 1474:15, 1490:23, 1510:12

**smaller** [1] - 1321:3

**smart** [1] - 1277:25

**Soc** [2] - 1537:1, 1538:14

**Social** [2] - 1450:3, 1476:16

**sold** [15] - 1267:9, 1270:14, 1270:18, 1286:7, 1286:9, 1336:6, 1336:11, 1360:22, 1375:24, 1416:1, 1418:25, 1476:12, 1476:13, 1544:3

**sole** [1] - 1535:17

**solemnly** [1] - 1445:14

**solicitation** [1] - 1290:22

**solid** [2] - 1459:6, 1460:7

**someone** [7] - 1263:20, 1284:6, 1294:25, 1320:9, 1390:4, 1502:1, 1527:23

**sometime** [3] - 1337:20, 1369:24, 1444:16
**sometimes** [9] - 1284:23, 1321:15, 1390:1, 1390:2, 1481:5, 1481:22, 1481:23
**somewhat** [6] - 1358:15, 1361:19, 1399:10, 1400:16, 1403:8, 1405:10
**somewhere** [3] - 1348:18, 1451:11, 1462:23
**son** [2] - 1399:4, 1399:5
**sons** [1] - 1399:5
**soon** [4] - 1349:12, 1381:11, 1436:5, 1518:20
**sorry** [66] - 1263:9, 1266:9, 1273:18, 1273:20, 1274:6, 1287:8, 1288:1, 1288:8, 1290:18, 1292:23, 1296:14, 1299:10, 1302:20, 1306:20, 1307:12, 1313:16, 1315:8, 1317:1, 1318:1, 1318:8, 1323:5, 1327:25, 1334:15, 1336:18, 1338:12, 1342:4, 1343:18, 1346:7, 1352:13, 1355:1, 1358:24, 1365:4, 1366:4, 1371:1, 1378:20, 1387:5, 1390:21, 1395:24, 1412:8, 1416:4, 1430:14, 1434:9, 1435:5, 1443:9, 1454:23, 1455:5, 1462:8, 1462:24, 1483:15, 1484:12, 1484:14, 1491:14, 1492:2, 1501:18, 1533:24, 1534:17, 1534:25, 1545:6, 1547:17, 1550:10, 1550:15, 1550:23, 1552:14, 1560:14, 1563:24, 1564:1
**sort** [8] - 1349:9, 1353:12, 1399:10, 1399:21, 1553:5, 1568:14
**sorts** [2] - 1268:20, 1330:20
**sound** [4] - 1376:20, 1377:10, 1414:8, 1469:14
**soundly** [1] - 1376:12
**soundness** [1] - 1473:17
**sounds** [1] - 1395:3
**source** [2] - 1334:21, 1450:2
**South** [4] - 1398:7, 1409:7, 1447:23, 1448:4
**southeastern** [1] - 1449:12
**SOUTHERN** [1] - 1255:1
**space** [1] - 1538:3
**speaking** [11] - 1268:2, 1311:23, 1346:3, 1353:25, 1354:3, 1369:4, 1381:19, 1433:11, 1440:20, 1449:23, 1526:12
**specialist** [2] - 1524:23, 1525:2
**specialize** [2] - 1523:14, 1523:15
**specialized** [2] - 1448:23, 1522:14
**specialty** [3] - 1448:2, 1522:15, 1522:24
**specific** [23] - 1286:11, 1325:13, 1344:11, 1352:11, 1358:21, 1358:23, 1361:8, 1385:11, 1387:16, 1414:2, 1421:17, 1426:6, 1427:3, 1427:7, 1440:22, 1485:11, 1488:15, 1499:10, 1542:21, 1542:22, 1544:4, 1560:10
**specifically** [17] - 1302:22, 1303:19, 1354:3, 1364:1, 1411:25, 1417:8, 1438:16, 1442:13, 1450:8, 1455:23, 1471:7, 1500:6, 1500:20, 1509:24,

1503:23, 1544:10, 1560:12
**specified** [1] - 1295:1
**specify** [1] - 1318:8
**speech** [4] - 1375:19, 1377:24, 1378:2, 1379:7
**spell** [3] - 1446:7, 1519:13, 1525:8
**spelling** [1] - 1446:11
**spent** [1] - 1420:25
**spoken** [2] - 1349:9, 1403:11
**sport** [1] - 1476:2
**sports** [2] - 1448:19, 1448:24
**spot** [2] - 1565:14, 1572:19
**spread** [2] - 1383:14, 1453:17
**spreadsheet** [4] - 1551:20, 1551:22, 1556:2, 1556:8
**spreadsheets** [1] - 1558:9
**spurt** [1] - 1416:14
**St** [9] - 1384:11, 1384:16, 1384:20, 1384:23, 1385:5, 1385:13, 1448:17, 1449:4, 1537:24
**stability** [1] - 1463:24
**staff** [4] - 1376:16, 1376:23, 1377:13, 1396:2
**stage** [1] - 1263:25
**stand** [4] - 1258:2, 1380:10, 1464:13, 1477:4
**standard** [3] - 1360:9, 1369:12, 1369:16
**standards** [7] - 1359:6, 1359:8, 1363:2, 1370:4, 1420:17, 1420:21, 1420:23
**standing** [1] - 1527:2
**stands** [2] - 1322:21, 1494:3
**STANFORD** [1] - 1255:6
**Stanford** [273] - 1260:18, 1262:22, 1264:25, 1267:12, 1267:15, 1268:23, 1269:3, 1269:11, 1269:13, 1269:17, 1269:20, 1269:25, 1271:7, 1271:8, 1273:23, 1274:20, 1274:25, 1275:12, 1275:13, 1275:18, 1276:17, 1277:6, 1278:9, 1278:10, 1278:11, 1278:12, 1278:14, 1278:18, 1279:6, 1279:10, 1279:23, 1279:24, 1302:23, 1303:25, 1305:2, 1308:11, 1310:4, 1310:6, 1310:7, 1319:9, 1319:16, 1319:18, 1320:9, 1322:3, 1323:6, 1324:23, 1325:1, 1325:22, 1325:23, 1326:8, 1326:9, 1326:24, 1327:4, 1328:10, 1331:1, 1332:13, 1336:8, 1337:13, 1338:2, 1338:16, 1338:21, 1343:8, 1346:4, 1346:5, 1346:8, 1346:9, 1346:11, 1346:18, 1346:20, 1347:2, 1347:10, 1347:15, 1347:23, 1348:15, 1349:3, 1349:22, 1350:11, 1351:6, 1351:9, 1351:16, 1352:8, 1354:12, 1354:18, 1355:3, 1355:8, 1359:1, 1360:11, 1361:18, 1362:21, 1362:22, 1364:22, 1364:23, 1366:13, 1366:20, 1366:22, 1367:3, 1367:11, 1367:15, 1370:18, 1372:1, 1374:19, 1376:1, 1377:8, 1379:24, 1380:3, 1382:17, 1383:12, 1384:7, 1384:9, 1389:1, 1389:11, 1393:13, 1397:23, 1400:10,

1400:18, 1400:23, 1400:24, 1401:5, 1401:9, 1401:12, 1401:15, 1401:19, 1401:20, 1401:21, 1402:3, 1402:17, 1402:21, 1402:22, 1405:13, 1406:3, 1407:4, 1407:12, 1407:24, 1408:19, 1408:25, 1410:9, 1410:23, 1411:8, 1411:24, 1412:4, 1412:17, 1413:15, 1414:10, 1414:19, 1415:17, 1417:6, 1417:9, 1417:19, 1418:22, 1418:23, 1419:7, 1419:8, 1419:22, 1420:1, 1420:9, 1422:12, 1423:11, 1424:7, 1424:11, 1427:23, 1428:10, 1430:2, 1432:17, 1436:12, 1436:21, 1437:25, 1438:7, 1438:10, 1438:23, 1439:12, 1439:13, 1439:20, 1441:1, 1450:11, 1450:19, 1450:25, 1451:3, 1451:8, 1451:17, 1452:2, 1453:4, 1453:7, 1454:5, 1454:13, 1455:7, 1455:8, 1456:8, 1456:21, 1460:8, 1461:8, 1462:5, 1464:20, 1466:1, 1466:5, 1466:18, 1466:19, 1467:21, 1469:1, 1469:13, 1469:21, 1470:7, 1471:3, 1471:12, 1472:14, 1472:21, 1473:17, 1473:21, 1474:9, 1474:21, 1475:4, 1475:12, 1475:13, 1480:13, 1480:18, 1482:23, 1490:4, 1501:12, 1501:22, 1504:20, 1506:14, 1506:18, 1507:25, 1508:1, 1508:11, 1513:17, 1513:21, 1514:3, 1514:12, 1514:20, 1523:21, 1523:25, 1526:4, 1526:19, 1526:20, 1526:21, 1526:23, 1527:8, 1527:15, 1530:6, 1530:7, 1530:10, 1530:23, 1531:9, 1531:19, 1531:23, 1532:16, 1532:24, 1535:16, 1535:19, 1535:21, 1535:25, 1536:10, 1536:12, 1536:15, 1538:21, 1540:20, 1541:13, 1544:3, 1548:19, 1562:6, 1562:23, 1563:8, 1563:23, 1564:5, 1564:14, 1565:3, 1565:16
**Stanford's** [9] - 1352:1, 1379:22, 1412:10, 1415:2, 1416:2, 1441:21, 1475:16, 1532:9, 1535:19
**Stanford-owned** [1] - 1531:9
**Stanley** [1] - 1530:16
**start** [11] - 1278:16, 1358:2, 1375:22, 1376:1, 1389:24, 1496:1, 1530:14, 1530:17, 1535:15, 1560:17, 1566:14
**start-up** [1] - 1496:1
**started** [16] - 1285:6, 1320:25, 1321:1, 1337:12, 1375:23, 1414:8, 1416:7, 1525:21, 1530:5, 1530:6, 1530:13, 1531:19, 1537:18, 1545:3, 1569:13
**starting** [8] - 1447:7, 1460:22, 1460:23, 1468:10, 1491:16, 1491:19, 1499:3, 1568:23
**starts** [2] - 1313:18, 1328:2
**State** [7] - 1402:2, 1402:5, 1402:12, 1402:20, 1402:21, 1521:25, 1522:6
**state** [11] - 1259:2, 1289:23, 1290:14, 1402:9, 1443:21, 1444:11, 1446:7, 1446:10, 1493:13, 1500:24, 1519:13
**statement** [49] - 1265:12, 1281:3, 1286:25, 1288:2, 1291:7, 1299:8,

1299:10, 1308:18, 1309:2, 1313:22,
1339:22, 1340:19, 1344:17, 1350:18,
1354:10, 1361:11, 1403:15, 1403:20,
1421:1, 1421:6, 1421:11, 1421:18,
1422:2, 1422:5, 1423:6, 1423:9,
1423:21, 1429:2, 1431:12, 1436:18,
1437:25, 1440:1, 1462:1, 1462:2,
1462:4, 1473:9, 1483:11, 1485:3,
1490:8, 1490:13, 1495:12, 1499:1,
1505:1, 1506:22, 1506:23, 1510:5,
1510:14, 1551:14, 1552:25

**Statement** [1] - 1485:2

**statements** [14] - 1314:9, 1335:12,
1342:11, 1350:13, 1358:22, 1361:10,
1417:25, 1429:11, 1431:15, 1431:24,
1462:5, 1473:22, 1506:25, 1553:1

**states** [3] - 1330:2, 1498:1, 1499:6

**STATES** [3] - 1255:1, 1255:4, 1255:10

**States** [14] - 1289:22, 1355:20,
1356:16, 1356:23, 1356:25, 1363:2,
1393:12, 1414:12, 1416:8, 1445:9,
1459:16, 1493:13, 1494:5, 1518:10

**stating** [2] - 1260:17, 1505:6

**stationed** [1] - 1447:22

**status** [1] - 1381:5

**stay** [5] - 1434:4, 1444:10, 1465:3,
1572:22, 1573:2

**steady** [1] - 1541:7

**Stellmach** [2] - 1255:16, 1286:22

**STELLMACH** [99] - 1260:3, 1260:8,
1260:11, 1260:16, 1261:1, 1261:9,
1261:16, 1317:25, 1318:3, 1318:8,
1341:17, 1341:25, 1342:6, 1342:8,
1342:20, 1343:2, 1343:5, 1344:3,
1344:6, 1344:10, 1344:15, 1344:25,
1345:10, 1348:1, 1348:11, 1349:18,
1349:25, 1350:3, 1350:11, 1350:22,
1351:13, 1352:8, 1365:10, 1374:8,
1377:20, 1378:6, 1379:5, 1406:8,
1409:23, 1410:2, 1411:19, 1412:10,
1412:16, 1412:22, 1413:2, 1413:5,
1413:16, 1413:19, 1413:21, 1413:22,
1418:11, 1418:14, 1418:17, 1418:19,
1418:20, 1421:12, 1421:16, 1421:20,
1421:22, 1424:18, 1424:20, 1424:24,
1425:2, 1425:18, 1425:22, 1426:13,
1426:15, 1427:25, 1428:3, 1428:13,
1428:16, 1430:10, 1436:9, 1436:11,
1437:13, 1439:24, 1440:4, 1440:7,
1440:9, 1440:12, 1441:15, 1441:24,
1442:15, 1442:17, 1442:19, 1442:24,
1443:2, 1443:7, 1443:9, 1444:2,
1445:3, 1566:11, 1566:16, 1568:9,
1568:12, 1568:17, 1571:4, 1571:12,
1571:19

**STELLMACH.............** [2] - 1257:5,
1257:7

**stemming** [1] - 1449:25

**stenography** [1] - 1256:13

**step** [7] - 1361:23, 1392:22, 1394:25,
1445:4, 1464:15, 1518:6, 1567:23

**stepping** [1] - 1287:9

**steroid** [1] - 1478:3

**steroids** [2] - 1477:23, 1478:6

**stick** [1] - 1314:15

**sticks** [1] - 1271:16

**still** [19] - 1343:1, 1344:18, 1357:22,
1358:9, 1361:22, 1368:18, 1380:23,
1380:24, 1381:4, 1393:15, 1410:20,
1412:5, 1414:4, 1453:16, 1484:5,
1509:22, 1534:17, 1534:18, 1558:11

**Stock** [1] - 1555:6

**stock** [12] - 1361:1, 1361:7, 1479:22,
1480:16, 1480:21, 1481:8, 1482:12,
1482:16, 1482:18, 1526:15, 1528:17,
1555:8

**stockbroker** [1] - 1524:13

**stocks** [20] - 1276:4, 1338:23,
1360:23, 1387:8, 1387:10, 1481:5,
1481:16, 1481:17, 1481:22, 1482:21,
1513:22, 1521:8, 1526:1, 1529:3,
1530:15, 1531:21, 1532:19, 1533:8,
1533:25, 1541:6

**stop** [12] - 1303:13, 1303:25, 1373:20,
1375:13, 1377:18, 1423:1, 1444:23,
1452:16, 1484:1, 1484:6, 1493:2,
1530:8

**stopped** [8] - 1303:24, 1304:1,
1304:10, 1320:17, 1410:23, 1411:2,
1411:8, 1422:24

**stopping** [5] - 1302:23, 1304:3,
1304:6, 1392:14, 1565:19

**stops** [1] - 1417:23

**straight** [2] - 1484:8, 1518:21

**Straight** [1] - 1518:23

**straightened** [1] - 1483:25

**strategy** [8] - 1344:12, 1344:17,
1350:16, 1436:25, 1459:5, 1467:25,
1468:1, 1469:6

**Strategy** [1] - 1297:14, 1424:17

**Street** [1] - 1255:22

**strength** [5] - 1348:25, 1363:20,
1425:11, 1425:12, 1425:17

**stress** [2] - 1462:22, 1463:21

**stressed** [1] - 1354:11

**strictly** [1] - 1324:11

**strike** [1] - 1512:5

**striking** [1] - 1489:17

**strong** [4] - 1468:2, 1469:7, 1469:13,
1470:2

**stronger** [2] - 1349:16, 1349:17

**structure** [7] - 1277:17, 1277:19,
1382:4, 1383:2, 1383:23, 1389:17,
1398:12

**structured** [1] - 1467:12

**structures** [1] - 1326:3

**stuck** [1] - 1507:9

**study** [1] - 1520:22

**studying** [2] - 1507:7, 1522:1

**stuff** [7] - 1260:1, 1339:2, 1358:13,
1441:14, 1539:7, 1548:12, 1548:23

**stupid** [1] - 1375:3

**subaccounts** [1] - 1538:20

**subcontractors** [1] - 1496:12

**subject** [6] - 1288:21, 1297:18,

1344:13, 1468:25, 1492:22, 1508:19

**subjective** [1] - 1568:25

**submit** [3] - 1472:11, 1472:14, 1572:4

**submitted** [2] - 1342:24, 1529:4

**subpoena** [1] - 1548:19

**subpoenas** [1] - 1548:18

**subscription** [8] - 1286:6, 1291:5,
1291:8, 1298:7, 1309:2, 1485:15,
1486:2, 1486:7

**subsequent** [2] - 1466:15, 1530:1

**subsequently** [4] - 1448:17, 1471:16,
1474:3, 1517:21

**substantial** [2] - 1384:21, 1469:21

**substantially** [5] - 1312:22, 1426:22,
1479:25, 1503:11, 1503:12

**suburb** [1] - 1446:20

**succeed** [1] - 1438:9

**sued** [1] - 1517:4

**sufficient** [4] - 1361:13, 1435:2,
1435:10, 1498:9

**suggest** [3] - 1272:23, 1423:11,
1464:19

**suggested** [4] - 1272:19, 1272:25,
1273:14, 1477:23

**suing** [1] - 1548:19

**Suisse** [1] - 1537:1

**suitable** [2] - 1336:2, 1336:3

**suits** [1] - 1381:8

**sum** [1] - 1339:16

**summarize** [1] - 1262:7, 1448:13

**summary** [4] - 1559:13, 1559:16,
1561:12, 1561:24

**summation** [1] - 1353:13

**summit** [1] - 1410:10

**supervise** [1] - 1532:4

**supervision** [1] - 1391:19

**supervisor** [1] - 1399:7

**supplemental** [5] - 1299:16, 1299:23,
1422:7, 1422:9, 1422:13

**support** [1] - 1428:22, 1470:1

**supported** [1] - 1289:7

**suppose** [1] - 1503:16

**supposed** [7] - 1314:22, 1315:1,
1316:19, 1344:9, 1349:10, 1397:18,
1441:19

**supposedly** [2] - 1429:21, 1436:18

**surgeon** [1] - 1387:9

**surgery** [1] - 1452:18

**surprise** [4] - 1494:10, 1505:5,
1570:23, 1571:17

**surprised** [3] - 1471:22, 1508:6,
1508:9

**surprises** [1] - 1570:18

**sustain** [2] - 1353:9, 1489:15, 1560:4

**sustained** [7] - 1348:12, 1379:8,
1476:21, 1486:21, 1497:7, 1516:15

**Sverdrup** [2] - 1449:6, 1449:8

**swear** [2] - 1445:14, 1519:3

**Swiss** [1] - 1555:5

**switch** [5] - 1287:4, 1418:12, 1483:7,
1513:17, 1534:12

**switched** [1] - 1370:2

**Switzerland** [1] - 1424:4
**sworn** [2] - 1446:2, 1519:9
**system** [2] - 1394:25, 1397:13

# T

**tab** [3] - 1552:7, 1555:15, 1555:18
**table** [3] - 1374:13, 1534:22, 1534:24
**tabs** [7] - 1552:1, 1552:3, 1552:9, 1552:16, 1553:17, 1556:6, 1557:2
**take-home** [1] - 1406:23
**talks** [6] - 1294:13, 1300:12, 1309:13, 1309:19, 1333:14, 1362:15
**Tamara** [2] - 1400:3, 1403:13
**tape** [3] - 1373:17, 1375:20, 1377:21
**target** [1] - 1476:12
**tasked** [2] - 1387:13, 1391:5
**tasks** [1] - 1387:13
**tax** [10] - 1370:23, 1371:2, 1371:8, 1371:9, 1371:10, 1371:11, 1371:14, 1384:17, 1384:18, 1384:19
**taxed** [2] - 1371:6, 1371:16
**taxes** [3] - 1411:15, 1504:7, 1504:8
**team** [8] - 1388:15, 1388:16, 1391:15, 1479:12, 1500:8, 1500:9, 1500:14, 1509:20
**technical** [1] - 1413:14
**technically** [1] - 1412:21
**technology** [1] - 1457:13
**tedious** [1] - 1287:23
**telephone** [8] - 1354:6, 1354:7, 1463:1, 1466:15, 1468:24, 1471:24, 1501:11, 1507:4
**temples** [1] - 1441:2
**ten** [6] - 1307:14, 1393:4, 1518:14, 1518:15, 1518:18, 1518:19
**ten-minute** [2] - 1393:4, 1518:19
**tend** [2] - 1505:19, 1505:22
**tendency** [1] - 1383:6
**tender** [2] - 1379:4, 1443:11
**tendered** [1] - 1259:14
**Tennessee** [15] - 1330:1, 1395:21, 1395:22, 1395:24, 1399:16, 1520:5, 1520:7, 1521:3, 1521:5, 1521:6, 1521:11, 1521:17, 1521:21, 1525:18, 1527:12
**tenure** [1] - 1538:21
**term** [26] - 1290:13, 1294:22, 1312:9, 1339:1, 1339:16, 1340:3, 1340:4, 1362:1, 1382:9, 1382:10, 1387:15, 1387:16, 1391:16, 1414:15, 1435:24, 1453:23, 1453:25, 1454:1, 1459:5, 1468:2, 1468:4, 1497:12, 1497:13, 1497:16, 1533:1, 1533:10
**termed** [1] - 1359:20
**termination** [1] - 1340:24
**terminologies** [1] - 1387:23
**terms** [11] - 1291:10, 1415:10, 1417:24, 1432:14, 1453:3, 1497:2, 1497:14, 1505:2, 1505:12, 1506:5, 1533:19
**terrible** [1] - 1302:10

**terribly** [1] - 1346:25
**test** [1] - 1502:17
**testified** [12] - 1359:11, 1405:11, 1416:21, 1438:2, 1439:8, 1446:2, 1478:20, 1503:18, 1504:25, 1515:19, 1516:17, 1519:9
**testify** [3] - 1439:19, 1548:20, 1567:20
**testifying** [8] - 1303:4, 1303:10, 1354:1, 1355:7, 1380:15, 1402:24, 1516:18, 1559:16
**testimony** [10] - 1263:7, 1355:16, 1381:15, 1445:14, 1472:19, 1499:16, 1505:3, 1515:21, 1519:4, 1566:12
**TEXAS** [1] - 1255:1
**Texas** [17] - 1255:4, 1255:15, 1255:23, 1256:4, 1256:7, 1256:11, 1329:18, 1329:19, 1329:21, 1329:25, 1373:23, 1375:22, 1525:13, 1525:14, 1525:15, 1525:16
**text** [4] - 1425:1, 1426:14, 1467:3, 1552:21
**THE** [412] - 1255:10, 1255:13, 1255:20, 1256:2, 1258:1, 1258:7, 1258:11, 1258:14, 1259:5, 1259:7, 1259:12, 1260:5, 1260:9, 1260:15, 1260:19, 1261:4, 1261:11, 1261:17, 1261:19, 1261:22, 1266:8, 1266:9, 1266:15, 1266:17, 1266:18, 1278:24, 1279:1, 1287:6, 1287:10, 1287:12, 1287:25, 1288:4, 1288:5, 1288:12, 1288:14, 1290:17, 1292:20, 1302:19, 1302:21, 1303:5, 1303:7, 1306:18, 1306:19, 1307:9, 1307:11, 1307:13, 1307:19, 1318:11, 1318:15, 1318:16, 1319:20, 1319:21, 1319:24, 1319:25, 1320:1, 1320:2, 1321:17, 1321:19, 1327:24, 1328:1, 1328:5, 1328:8, 1341:8, 1341:15, 1341:21, 1341:24, 1342:5, 1342:7, 1342:9, 1342:12, 1342:25, 1343:3, 1343:11, 1343:17, 1343:19, 1343:23, 1344:5, 1344:7, 1344:13, 1344:20, 1345:2, 1345:11, 1345:20, 1345:23, 1348:3, 1348:7, 1348:10, 1348:12, 1349:20, 1350:2, 1350:6, 1350:19, 1350:24, 1351:11, 1351:21, 1352:14, 1352:18, 1360:17, 1365:12, 1365:14, 1365:15, 1365:16, 1365:17, 1365:18, 1365:20, 1365:23, 1365:24, 1366:5, 1371:22, 1372:14, 1372:17, 1372:19, 1372:22, 1372:25, 1373:2, 1373:9, 1373:15, 1373:21, 1374:6, 1374:10, 1374:12, 1374:15, 1374:20, 1378:3, 1378:9, 1378:19, 1379:8, 1384:13, 1384:14, 1386:13, 1386:16, 1388:5, 1389:12, 1389:13, 1392:17, 1392:22, 1393:19, 1394:3, 1394:6, 1394:9, 1394:11, 1394:15, 1404:2, 1404:4, 1404:6, 1404:9, 1404:10, 1404:11, 1404:12, 1404:24, 1406:5, 1406:10, 1406:13, 1406:17, 1406:19, 1407:15, 1409:24, 1412:13, 1412:15, 1412:20, 1412:24, 1413:4, 1413:12, 1413:17, 1413:20, 1418:13, 1418:15,

1418:18, 1430:16, 1435:4, 1435:5, 1435:6, 1435:8, 1437:16, 1437:18, 1437:23, 1438:19, 1438:24, 1439:4, 1439:10, 1439:16, 1439:22, 1440:3, 1440:5, 1440:8, 1440:18, 1440:20, 1440:24, 1441:10, 1441:23, 1442:1, 1442:9, 1442:12, 1442:16, 1442:18, 1442:23, 1443:1, 1443:5, 1443:8, 1443:11, 1443:16, 1443:18, 1443:20, 1444:1, 1444:7, 1444:9, 1444:16, 1444:20, 1444:22, 1444:25, 1445:4, 1445:7, 1445:8, 1445:11, 1445:19, 1445:21, 1445:22, 1445:23, 1445:24, 1451:7, 1451:13, 1451:15, 1451:16, 1451:18, 1451:20, 1451:23, 1457:4, 1457:8, 1457:10, 1457:12, 1457:14, 1457:15, 1461:25, 1464:4, 1464:17, 1465:10, 1465:18, 1466:17, 1466:19, 1466:21, 1476:21, 1477:2, 1477:6, 1477:18, 1477:21, 1477:22, 1478:1, 1478:3, 1478:17, 1483:8, 1483:21, 1483:24, 1484:4, 1484:5, 1484:8, 1484:10, 1484:12, 1484:15, 1484:19, 1485:21, 1486:21, 1488:23, 1489:4, 1489:5, 1489:6, 1489:8, 1489:10, 1489:15, 1490:20, 1490:21, 1490:25, 1491:3, 1491:6, 1492:6, 1492:9, 1494:13, 1494:17, 1494:21, 1494:24, 1497:5, 1497:7, 1497:8, 1502:21, 1507:15, 1507:16, 1507:19, 1507:21, 1507:24, 1509:10, 1509:13, 1510:6, 1510:19, 1510:25, 1511:1, 1512:17, 1512:21, 1514:23, 1515:1, 1515:7, 1515:8, 1516:14, 1518:4, 1518:6, 1518:8, 1518:9, 1518:12, 1518:24, 1519:6, 1519:7, 1519:16, 1519:23, 1522:24, 1523:1, 1523:2, 1523:4, 1523:22, 1523:23, 1524:8, 1527:2, 1527:3, 1527:4, 1527:20, 1527:21, 1534:14, 1534:18, 1534:24, 1535:1, 1535:4, 1535:6, 1535:9, 1541:18, 1541:20, 1541:21, 1541:22, 1541:24, 1542:1, 1542:2, 1545:25, 1546:3, 1547:4, 1547:25, 1549:8, 1549:11, 1549:14, 1549:18, 1549:22, 1549:24, 1550:2, 1550:5, 1550:8, 1550:10, 1550:21, 1556:12, 1556:17, 1557:3, 1557:6, 1557:13, 1558:13, 1558:16, 1558:19, 1558:21, 1558:25, 1559:11, 1559:24, 1560:2, 1560:4, 1560:12, 1560:15, 1561:24, 1562:16, 1562:19, 1565:10, 1565:21, 1566:5, 1566:15, 1566:19, 1566:22, 1566:24, 1567:4, 1567:6, 1567:8, 1567:13, 1567:17, 1567:22, 1568:5, 1568:11, 1568:16, 1568:20, 1569:9, 1569:12, 1569:15, 1569:21, 1569:25, 1570:8, 1570:12, 1570:15, 1570:21, 1571:1, 1571:16, 1571:20, 1571:22, 1571:24, 1572:2, 1572:6, 1572:13, 1572:18, 1572:24, 1573:2, 1573:6, 1573:9, 1573:13, 1573:17
**theories** [2] - 1351:3, 1524:25

**theory** [1] - 1343:8
**therefore** [5] - 1323:12, 1329:4, 1343:16, 1347:6, 1453:9
**thesis** [1] - 1448:19
**they've** [2] - 1570:4, 1571:14
**thinking** [6] - 1266:7, 1266:20, 1319:6, 1401:6, 1404:17, 1466:10
**third** [3] - 1312:1, 1509:24, 1510:5
**Thirty** [1] - 1329:11
**thousand** [6] - 1277:9, 1405:17, 1494:11, 1495:4, 1495:9, 1495:13
**thousands** [4] - 1364:3, 1364:5, 1364:6, 1436:21
**three** [25] - 1259:14, 1294:18, 1310:17, 1310:22, 1315:13, 1315:25, 1316:2, 1316:25, 1317:1, 1369:9, 1421:21, 1443:2, 1449:2, 1449:10, 1503:7, 1533:14, 1533:16, 1533:18, 1550:19, 1556:22, 1569:11, 1569:12, 1571:1, 1571:2, 1571:16
**three-day** [2] - 1571:1, 1571:2
**throughout** [3] - 1351:17, 1441:5, 1511:23
**Tier** [65] - 1533:1, 1533:3, 1533:7, 1533:20, 1534:2, 1540:5, 1540:10, 1540:11, 1540:12, 1540:15, 1540:17, 1540:19, 1540:23, 1541:3, 1541:10, 1541:11, 1541:14, 1541:15, 1541:20, 1541:21, 1541:22, 1541:24, 1542:5, 1542:6, 1542:7, 1542:9, 1542:16, 1542:23, 1544:4, 1544:7, 1544:19, 1544:23, 1544:24, 1545:2, 1545:3, 1545:9, 1545:11, 1545:13, 1545:20, 1546:7, 1550:17, 1553:10, 1553:13, 1553:14, 1554:4, 1554:12, 1554:17, 1554:25, 1555:3, 1557:22, 1560:23, 1562:4, 1562:7, 1562:9, 1563:12, 1563:16, 1563:18, 1564:10, 1564:17, 1565:2, 1565:8, 1565:17
**tier** [2] - 1533:4, 1554:24
**tiers** [2] - 1540:7, 1565:7
**ties** [1] - 1330:12
**timeframe** [4] - 1285:3, 1360:4, 1414:4, 1414:5
**timer** [1] - 1529:17
**title** [1] - 1298:25
**today** [14] - 1259:14, 1261:8, 1319:15, 1354:1, 1371:23, 1375:1, 1391:23, 1394:9, 1431:8, 1442:24, 1488:24, 1526:24, 1568:13, 1572:21
**together** [13] - 1263:12, 1270:19, 1284:22, 1376:8, 1399:20, 1438:12, 1438:14, 1479:12, 1505:15, 1550:14, 1550:25, 1554:8, 1554:9
**tomorrow** [1] - 1571:8
**Tonarelli** [1] - 1334:18
**took** [16] - 1284:7, 1302:7, 1303:23, 1307:6, 1371:23, 1389:1, 1397:14, 1402:25, 1407:24, 1429:15, 1441:2, 1463:6, 1472:21, 1473:8, 1547:15, 1552:11
**top** [14] - 1290:9, 1297:14, 1413:3, 1419:3, 1419:11, 1419:15, 1424:16,

1428:17, 1433:25, 1458:12, 1469:11, 1535:15, 1554:15, 1563:4
**topics** [1] - 1467:6
**Toronto** [1] - 1552:5
**total** [30] - 1367:6, 1406:15, 1427:18, 1430:24, 1431:4, 1431:20, 1431:22, 1431:25, 1432:24, 1432:25, 1457:25, 1470:11, 1473:11, 1544:6, 1544:18, 1554:8, 1562:6, 1562:9, 1563:7, 1563:12, 1563:22, 1564:1, 1564:2, 1564:4, 1564:10, 1564:13, 1564:17, 1565:7, 1565:15
**totals** [2] - 1563:17, 1565:8
**toto** [1] - 1347:10
**touched** [1] - 1271:8
**toward** [1] - 1536:19
**towards** [6] - 1407:2, 1468:8, 1536:14, 1537:22, 1537:23, 1537:24
**track** [2] - 1429:16, 1538:14
**tracked** [4] - 1482:12, 1539:4, 1539:12, 1539:14
**tracking** [3] - 1418:22, 1538:17, 1561:15
**trade** [2] - 1388:12, 1529:14
**traded** [3] - 1500:18, 1528:20, 1529:9
**trades** [1] - 1540:1
**trading** [1] - 1521:8
**train** [2] - 1335:1, 1402:9
**trained** [2] - 1334:24, 1402:13, 1402:17
**training** [6] - 1314:13, 1314:17, 1333:9, 1334:8, 1335:2, 1335:4, 1335:5, 1335:10, 1340:15, 1340:16, 1340:18, 1521:10, 1521:13, 1521:16, 1522:15, 1530:16
**Transcript** [1] - 1256:13
**transcript** [1] - 1574:4
**transcription** [1] - 1256:13
**transcripts** [1] - 1573:11
**transferred** [3] - 1391:11, 1449:8, 1480:18
**transferring** [1] - 1450:18
**transition** [1] - 1389:5
**transparency** [1] - 1365:3
**transportation** [2] - 1523:1, 1523:2
**travel** [1] - 1567:12
**traveling** [2] - 1385:3, 1385:8
**treasure** [1] - 1463:17
**treasuries** [1] - 1427:4
**Treasury** [2] - 1268:20, 1502:12
**treasury** [15] - 1453:6, 1462:18, 1463:19, 1501:14, 1501:17, 1501:24, 1502:10, 1503:3, 1503:4, 1508:16, 1509:9, 1511:9, 1511:10, 1511:19, 1512:1
**treatment** [2] - 1477:16, 1478:4
**trends** [1] - 1458:14
**trial** [10] - 1258:21, 1260:23, 1344:22, 1393:11, 1393:18, 1393:20, 1438:9, 1517:9, 1519:4, 1557:16
**TRIAL** [1] - 1255:7
**tricky** [2] - 1393:7, 1431:17

**tried** [3] - 1358:18, 1472:25, 1569:5
**trouble** [1] - 1278:17
**troubled** [1] - 1418:6
**true** [9] - 1370:7, 1403:15, 1417:4, 1430:7, 1437:11, 1515:13, 1570:22, 1571:17
**trust** [15] - 1272:24, 1273:1, 1273:5, 1401:12, 1505:17, 1505:22, 1506:7, 1514:5, 1514:8, 1514:11, 1514:15, 1514:19, 1515:13, 1521:7
**Trust** [1] - 1401:12
**trustworthiness** [1] - 1549:20
**truth** [9] - 1377:25, 1378:4, 1445:16, 1489:13, 1519:5
**try** [9] - 1338:6, 1339:5, 1339:7, 1376:7, 1411:23, 1471:1, 1471:9, 1505:11, 1571:1
**trying** [17] - 1264:7, 1264:10, 1267:22, 1337:20, 1365:11, 1366:18, 1385:19, 1387:15, 1399:21, 1409:17, 1411:6, 1411:11, 1411:16, 1496:22, 1547:10
**Tuesday** [4] - 1566:13, 1567:21, 1570:13, 1570:25
**Tupelo** [5] - 1385:25, 1386:16, 1394:20, 1399:21, 1537:23
**turn** [16] - 1306:14, 1414:12, 1421:3, 1421:10, 1423:15, 1424:15, 1427:25, 1428:13, 1441:22, 1456:23, 1458:8, 1459:17, 1512:5, 1512:11, 1556:20, 1563:2
**turned** [3] - 1259:24, 1457:5, 1478:9
**turning** [2] - 1387:16, 1387:23
**turns** [1] - 1345:25
**twelve** [1] - 1333:20
**twice** [2] - 1431:1, 1543:23
**two** [37] - 1258:7, 1258:8, 1258:17, 1261:1, 1271:9, 1281:1, 1322:23, 1345:4, 1359:14, 1359:16, 1365:5, 1370:23, 1376:3, 1379:24, 1390:3, 1395:2, 1399:5, 1408:18, 1421:21, 1424:19, 1425:24, 1427:6, 1427:8, 1428:7, 1428:14, 1457:24, 1459:5, 1477:11, 1524:9, 1533:14, 1533:16, 1537:18, 1566:16, 1570:4, 1570:10, 1570:24, 1571:10
**tying** [1] - 1365:5
**type** [18] - 1263:5, 1277:3, 1281:5, 1314:21, 1323:8, 1323:16, 1359:4, 1433:18, 1453:8, 1455:10, 1459:6, 1471:13, 1490:21, 1500:25, 1510:12, 1541:7, 1541:9, 1543:22
**types** [25] - 1281:1, 1281:8, 1294:18, 1310:15, 1310:17, 1310:20, 1310:22, 1310:25, 1315:13, 1315:25, 1316:2, 1316:25, 1317:1, 1319:13, 1319:16, 1319:19, 1320:15, 1322:5, 1324:11, 1324:13, 1352:10, 1429:3, 1429:14, 1474:16, 1507:2
**typical** [2] - 1260:13, 1455:10
**typically** [3] - 1361:9, 1428:24, 1506:3

# U

**U.S** [44] - 1255:17, 1268:3, 1268:20, 1283:1, 1285:2, 1285:7, 1285:10, 1285:16, 1288:24, 1289:8, 1289:17, 1290:14, 1290:20, 1299:9, 1300:10, 1301:10, 1305:6, 1305:12, 1312:8, 1316:20, 1328:18, 1329:11, 1329:13, 1329:17, 1335:4, 1369:14, 1370:5, 1381:20, 1422:3, 1422:22, 1426:3, 1434:25, 1486:8, 1491:11, 1491:24, 1492:13, 1492:25, 1493:7, 1495:8, 1498:1, 1498:8, 1499:8, 1501:24, 1555:4

**ultimately** [13] - 1274:17, 1325:21, 1337:15, 1340:24, 1395:14, 1432:13, 1440:14, 1441:22, 1442:25, 1460:10, 1473:7, 1480:10, 1532:9

**umbrella** [5] - 1323:13, 1349:15, 1526:17, 1526:18, 1535:23

**Umm** [1] - 1273:11

**unable** [1] - 1297:16

**unclear** [1] - 1535:3

**uncomfortable** [3] - 1331:6, 1337:14, 1464:24

**under** [37] - 1266:1, 1266:19, 1268:17, 1270:14, 1289:13, 1289:15, 1290:14, 1297:15, 1323:12, 1331:22, 1333:6, 1348:19, 1349:6, 1349:14, 1352:23, 1357:15, 1370:1, 1391:19, 1395:7, 1414:24, 1415:1, 1415:16, 1424:16, 1458:12, 1492:12, 1493:24, 1497:21, 1535:24, 1536:2, 1537:5, 1538:20, 1547:1, 1549:10, 1549:15, 1559:17, 1559:22, 1561:12

**undergraduate** [1] - 1447:10, 1447:19, 1520:17

**understatement** [1] - 1339:17

**understood** [25] - 1292:1, 1292:8, 1325:10, 1338:5, 1347:17, 1384:17, 1384:21, 1396:16, 1399:19, 1403:17, 1432:22, 1432:23, 1436:15, 1454:4, 1458:6, 1460:5, 1461:16, 1495:17, 1495:18, 1497:10, 1499:17, 1500:3, 1500:19, 1505:7, 1543:7

**underway** [1] - 1444:17

**underwriters** [1] - 1468:12

**underwriters..** [1] - 1513:1

**unique** [2] - 1383:10, 1383:12

**unison** [1] - 1518:23

**United** [15] - 1289:22, 1355:19, 1356:16, 1356:23, 1356:25, 1363:2, 1393:12, 1414:11, 1416:8, 1445:9, 1459:16, 1493:13, 1494:5, 1496:6, 1518:10

**uNITED** [1] - 1255:1

**UNITED** [2] - 1255:4, 1255:10

**University** [1] - 1447:8

**university** [1] - 1447:14

**unless** [5] - 1261:11, 1378:24, 1560:10, 1565:3, 1571:17

**unsecured** [1] - 1428:18

**unsuccessfully** [1] - 1473:1

**unusual** [4] - 1277:21, 1280:8, 1293:23, 1321:25

**up** [115] - 1258:4, 1258:22, 1260:1, 1261:6, 1261:24, 1262:9, 1264:12, 1265:9, 1274:17, 1274:21, 1280:13, 1280:14, 1281:18, 1282:13, 1287:2, 1289:6, 1306:11, 1312:17, 1313:12, 1322:10, 1325:25, 1337:23, 1338:22, 1339:4, 1348:25, 1349:1, 1349:2, 1352:14, 1353:6, 1353:11, 1353:19, 1354:21, 1356:14, 1357:19, 1360:10, 1363:15, 1367:6, 1372:13, 1374:18, 1380:10, 1389:14, 1391:22, 1392:23, 1392:25, 1393:5, 1393:6, 1393:10, 1394:5, 1394:12, 1397:11, 1399:16, 1400:24, 1409:16, 1422:16, 1424:18, 1424:19, 1424:24, 1426:13, 1427:15, 1428:14, 1429:8, 1432:18, 1434:12, 1437:7, 1437:16, 1438:21, 1440:6, 1441:21, 1449:8, 1452:21, 1453:12, 1457:4, 1459:2, 1460:10, 1461:23, 1462:23, 1463:11, 1477:4, 1481:5, 1483:5, 1490:25, 1491:2, 1492:3, 1492:20, 1494:11, 1496:1, 1498:20, 1498:21, 1510:7, 1512:17, 1513:18, 1513:24, 1518:22, 1522:5, 1523:3, 1523:12, 1527:2, 1534:17, 1534:18, 1537:19, 1546:2, 1546:3, 1551:23, 1553:17, 1554:14, 1556:13, 1560:15, 1563:4, 1566:18, 1567:19, 1573:9

**updates** [1] - 1423:12

**upheld** [1] - 1505:16

**upper** [1] - 1537:19

**ups** [3] - 1481:13, 1481:16, 1481:25

**upset** [2] - 1306:25, 1341:10

**US** [1] - 1255:14

**USC** [1] - 1549:10

**UT** [1] - 1520:17

**utilities** [1] - 1555:10

# V

**valid** [1] - 1495:4

**valuation** [5] - 1341:17, 1342:1, 1343:3, 1437:21, 1438:15

**value** [13] - 1342:18, 1343:9, 1343:16, 1343:25, 1357:16, 1357:19, 1362:11, 1362:12, 1438:17, 1439:8, 1473:10, 1479:25, 1572:1

**values** [3] - 1429:25, 1433:4, 1439:13

**varied** [2] - 1271:15, 1390:1

**various** [12] - 1274:23, 1337:8, 1337:9, 1385:3, 1396:1, 1422:14, 1480:15, 1480:24, 1482:21, 1482:25, 1513:22

**vast** [5] - 1312:14, 1312:15, 1312:18, 1313:6, 1313:10

**vehicles** [1] - 1528:18

**Venezuela** [4] - 1285:13, 1407:22, 1407:25, 1409:13

**verbiage** [1] - 1279:20

**Vere** [5] - 1525:7, 1525:9, 1525:10,

1525:17, 1525:21

**VERE** [1] - 1525:9

**verified** [1] - 1561:2

**verify** [1] - 1330:14

**verifying** [1] - 1429:24

**version** [2] - 1334:24, 1334:25

**versus** [1] - 1541:14

**vesting** [1] - 1395:6

**Veterans** [1] - 1450:4

**viability** [2] - 1491:11, 1498:1

**viable** [1] - 1341:1

**vicarious** [2] - 1412:11, 1413:5

**vice** [1] - 1326:14

**video** [4] - 1432:17, 1438:1, 1438:22, 1438:23

**Vietnam** [3] - 1447:23, 1448:4, 1450:7

**view** [4] - 1291:19, 1393:22, 1398:4, 1517:1

**viewed** [1] - 1372:1

**viewing** [1] - 1552:13

**violates** [1] - 1280:3

**violation** [2] - 1340:21, 1353:1

**Virgin** [3] - 1384:13, 1384:14, 1385:14

**Virginia** [2] - 1330:1, 1522:17

**vision** [1] - 1456:19

**visionary** [1] - 1279:11

**visit** [2] - 1350:7, 1464:23

**voir** [1] - 1547:2

**VOIR** [2] - 1257:16, 1547:5

**volatility** [1] - 1470:3

**volt** [1] - 1281:18

**VOLUME** [1] - 1255:8

**volume** [1] - 1373:21

**vote** [2] - 1281:15, 1281:18

**voting** [2] - 1281:8, 1281:15

**VS** [1] - 1255:5

# W

**wait** [5] - 1259:17, 1352:18, 1413:17, 1439:4, 1484:6

**Wait** [2] - 1382:24, 1387:24

**waiting** [2] - 1413:25, 1550:9

**walk** [2] - 1258:22, 1447:6

**walked** [1] - 1538:5

**Walter** [4] - 1373:12, 1373:13, 1373:25, 1375:15

**WALTER** [3] - 1373:18, 1374:22, 1375:21

**wants** [4] - 1280:3, 1376:18, 1489:16, 1546:1

**warranties** [1] - 1308:16

**warranty** [1] - 1308:20

**Warren** [2] - 1255:16, 1465:19

**WARREN** [107] - 1287:4, 1287:11, 1445:9, 1445:25, 1446:4, 1446:6, 1451:19, 1452:3, 1457:1, 1457:6, 1457:16, 1461:23, 1462:3, 1465:20, 1465:21, 1466:22, 1476:22, 1477:7, 1478:7, 1478:14, 1483:23, 1485:19, 1485:25, 1486:3, 1486:19, 1488:20, 1488:25, 1494:12, 1494:18, 1502:20,



1507:13, 1509:15, 1510:7, 1510:9,
1510:17, 1510:20, 1511:2, 1512:20,
1512:22, 1512:23, 1515:2, 1515:11,
1515:16, 1516:12, 1518:5, 1518:10,
1519:12, 1519:20, 1520:1, 1523:5,
1523:24, 1524:11, 1527:6, 1527:7,
1527:22, 1534:12, 1534:16, 1534:22,
1534:25, 1535:3, 1535:5, 1535:7,
1535:13, 1535:14, 1542:3, 1545:23,
1546:25, 1549:9, 1549:13, 1549:15,
1549:21, 1549:23, 1550:7, 1550:11,
1550:22, 1556:7, 1556:19, 1556:23,
1557:8, 1557:17, 1557:18, 1558:8,
1558:15, 1558:24, 1559:1, 1559:8,
1559:12, 1559:14, 1559:17, 1559:22,
1560:8, 1560:16, 1560:18, 1561:11,
1561:18, 1561:22, 1562:1, 1562:18,
1562:21, 1563:4, 1563:6, 1563:19,
1563:21, 1565:12, 1565:19, 1566:21,
1569:19

**Warren's** [1] - 1556:13
**WARREN**............. [1] - 1257:12
**WARREN**............. [2] - 1257:10,
1257:15
**WARRREN** [1] - 1546:4
**WAS** [1] - 1412:4
**Washington** [11] - 1255:18, 1386:24,
1387:2, 1387:12, 1387:18, 1388:16,
1500:14, 1500:20, 1500:21, 1509:17,
1509:19
**wasting** [1] - 1401:7
**watch** [1] - 1258:16
**watching** [3] - 1393:20, 1393:21,
1394:8
**ways** [2] - 1344:11, 1569:4
**WE** [1] - 1484:3
**wealth** [3] - 1333:1, 1347:11, 1347:12
**week** [18] - 1381:10, 1390:5, 1393:11,
1393:14, 1414:6, 1471:23, 1547:15,
1551:14, 1558:9, 1565:22, 1566:7,
1566:8, 1566:9, 1566:9:5, 1569:13,
1569:21, 1571:7
**weekend** [3] - 1261:7, 1570:17, 1571:9
**weekly** [5] - 1389:21, 1551:1, 1553:2,
1553:3, 1556:21
**weeks** [1] - 1261:1
**weird** [1] - 1383:7
**welcome** [2] - 1288:20, 1297:6
**well-educated** [1] - 1508:7
**Wells** [1] - 1380:18
**West** [1] - 1329:15
**west** [1] - 1329:20
**whatsoever** [1] - 1423:13
**whole** [13] - 1261:7, 1267:18, 1270:24,
1289:10, 1314:19, 1344:22, 1347:22,
1393:21, 1440:15, 1445:16, 1519:5,
1571:6
**wife** [10] - 1450:3, 1454:2, 1455:18,
1462:19, 1463:1, 1463:6, 1470:23,
1477:12, 1487:23, 1508:19
**wife's** [1] - 1462:13
**William** [1] - 1255:16
**willing** [5] - 1300:22, 1471:21

1513:18, 1513:24, 1514:1
**window** [1] - 1414:2
**Winter** [1] - 1446:20
**wire** [1] - 1440:22
**withdraw** [2] - 1411:16, 1472:2
**withdrawal** [5] - 1302:15, 1302:21,
1302:22, 1303:3, 1411:8
**withdrawals** [7] - 1302:23, 1304:1,
1304:2, 1304:12, 1304:20, 1304:22,
1306:9
**withdrawing** [1] - 1471:17
**withdrawn** [2] - 1411:15, 1514:20
**withdrew** [1] - 1473:15
**withstanding** [1] - 1512:1
**witness** [41] - 1342:18, 1365:11,
1379:6, 1380:10, 1409:21, 1430:10,
1436:8, 1437:13, 1438:2, 1438:14,
1438:16, 1439:3, 1439:7, 1439:8,
1439:19, 1443:15, 1443:16, 1443:24,
1445:1, 1445:8, 1457:7, 1464:21,
1478:15, 1484:18, 1515:4, 1515:16,
1517:9, 1518:9, 1518:20, 1547:2,
1549:5, 1557:1, 1557:9, 1557:11,
1558:9, 1559:15, 1559:20, 1567:11,
1567:16, 1569:16, 1571:6
**WITNESS** [66] - 1257:2, 1266:9,
1266:15, 1266:18, 1279:1, 1288:5,
1288:14, 1292:20, 1302:21, 1306:19,
1318:16, 1319:21, 1319:25, 1320:2,
1328:5, 1365:14, 1365:16, 1365:18,
1365:24, 1373:22, 1384:14, 1386:16,
1389:13, 1404:4, 1404:10, 1404:12,
1412:15, 1435:5, 1435:8, 1445:7,
1445:17, 1445:21, 1445:23, 1451:13,
1451:16, 1451:23, 1457:10, 1457:14,
1461:25, 1466:19, 1477:6, 1477:22,
1478:3, 1484:4, 1484:10, 1489:5,
1489:8, 1490:21, 1491:6, 1497:8,
1507:16, 1507:24, 1510:19, 1511:1,
1515:8, 1518:8, 1519:6, 1523:1,
1523:4, 1523:23, 1527:3, 1527:21,
1541:20, 1541:22, 1542:1, 1550:10
**witnesses** [6] - 1566:9, 1566:16,
1568:23, 1570:10, 1570:20, 1570:24
**witnessing** [1] - 1374:23
**woman** [1] - 1258:14
**wondering** [1] - 1573:14
**Word** [1] - 1551:20
**word** [3] - 1325:3, 1426:17, 1427:10
**words** [12] - 1270:12, 1283:1, 1322:9,
1343:7, 1352:22, 1382:9, 1451:7,
1451:12, 1493:23, 1548:18, 1557:13,
1568:21
**world** [4] - 1356:19, 1375:9, 1398:5,
1528:20
**worldwide** [1] - 1347:22
**worried** [2] - 1279:23, 1363:20
**worry** [1] - 1568:6
**worst** [1] - 1482:7
**worth** [3] - 1266:2, 1460:14, 1473:11
**worthy** [1] - 1269:13
**wound** [1] - 1338:22

**wrenching** [1] - 1339:18
**wristwatches** [1] - 1476:13
**write** [3] - 1442:19, 1442:21, 1531:6
**writing** [5] - 1367:10, 1530:17, 1543:9,
1572:5, 1572:8
**written** [9] - 1320:9, 1320:11, 1430:21,
1442:6, 1508:25, 1509:3, 1512:13,
1514:11, 1514:16
**wrote** [7] - 1354:14, 1354:17, 1391:6,
1422:12, 1442:16, 1462:19, 1528:19

## Y 

**y'all** [1] - 1391:24
**yacht** [1] - 1475:17
**Year** [1] - 1553:20
**year** [39] - 1282:7, 1282:8, 1334:1,
1405:18, 1447:18, 1452:19, 1458:15,
1482:13, 1482:15, 1494:24, 1496:2,
1497:12, 1497:13, 1497:16, 1510:23,
1511:4, 1511:23, 1520:20, 1523:22,
1530:22, 1553:22, 1553:23, 1554:9,
1554:10, 1557:25, 1558:10, 1560:23,
1562:4, 1562:7, 1562:9, 1563:8,
1563:13, 1563:23, 1564:14, 1564:17
**Year-end** [1] - 1553:20
**year-end** [5] - 1553:22, 1557:25,
1560:23, 1562:4, 1562:9
**years** [36] - 1258:20, 1322:24,
1339:18, 1351:14, 1355:15, 1358:8,
1359:14, 1359:16, 1375:2, 1375:3,
1375:23, 1376:6, 1403:12, 1430:3,
1441:17, 1448:21, 1449:2, 1449:10,
1468:18, 1470:25, 1478:4, 1480:23,
1481:2, 1481:16, 1482:1, 1482:3,
1482:5, 1482:7, 1497:15, 1521:18,
1544:16, 1560:24, 1561:20, 1562:5,
1565:7
**yeoman's** [1] - 1270:1
**yesterday** [20] - 1260:24, 1262:8,
1262:9, 1262:12, 1264:20, 1271:8,
1272:19, 1276:16, 1283:6, 1283:11,
1286:22, 1311:23, 1315:7, 1315:11,
1320:17, 1337:12, 1372:1, 1380:8,
1391:10, 1413:3
**yield** [2] - 1434:24, 1498:7
**yields** [1] - 1459:4
**York** [2] - 1255:17, 1330:1
**Young** [1] - 1331:4
**young** [2] - 1376:9, 1504:22
**yourself** [7] - 1263:11, 1327:4, 1327:6,
1333:2, 1349:13, 1548:11, 1569:3
**YTD** [1] - 1554:5

## Z

**zero** [1] - 1473:9
**Zions** [1] - 1375:23
**Zurich** [2] - 1409:4, 1409:5