1                    **UNITED STATES DISTRICT COURT**
                      **SOUTHERN DISTRICT OF TEXAS**
2                          **HOUSTON DIVISION**

3

4    UNITED STATES OF AMERICA        *    09-CR-342
                                     *    Houston, Texas
5    VS.                             *
                                     *    February 2, 2012
6    ROBERT ALLEN STANFORD           *    10:17 a.m.

7
                              **JURY TRIAL**
8
                              **VOLUME 9**
9

10              **BEFORE THE HONORABLE DAVID HITTNER**
                 **UNITED STATES DISTRICT JUDGE**
11

12   **APPEARANCES: APPEARANCES:**

13   **FOR THE GOVERNMENT:**
     Gregg J. Costa
14   Assistant US Attorney
     PO Box 61129
15   Houston, Texas 77208-1129

16   William Stellmach
     Andrew Howard Warren
17   U.S. Department of Justice
     1400 New York Avenue NW
18   Washington, DC 20005

19

20   **FOR THE DEFENDANT:**
     Ali R. Fazel
21   Robert Scardino
     Scardino & Fazel
22   1004 Congress Street
     3rd Floor
23   Houston, Texas 77002

24

25

1  A P P E A R A N C E S: (Continued)

2  FOR THE DEFENDANT: (Continued)
   John M. Parras
3  Attorney at Law
   1018 Preston
4  Floor 2
   Houston, Texas 77002
5

6  Kenneth W. McGuire
   McGuire Law Firm
7  PO Box 79535
   Houston, Texas 77279
8

9

10

11 Court Reporter:
   Johnny C. Sanchez, RPR, RMR, CRR
12 515 Rusk, #8016
   Houston, Texas 77002
13 713.250.5581

14 Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-assisted transcription.
15

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2 <u>**WITNESS**</u>                                        <u>**PAGE**</u>

3

   **HENRY AMADIO**
4
        CROSS-EXAMINATION BY MR. SCARDINO.............. 2636
5
        REDIRECT EXAMINATION BY MR. COSTA.............. 2673
6
        RECROSS EXAMINATION BY MR. SCARDINO............ 2697
7
        REDIRECT EXAMINATION BY MR. COSTA.............. 2716
8
        RECROSS EXAMINATION BY MR. SCARDINO............ 2720
9

10 **JAMES DAVIS**

11        DIRECT EXAMINATION BY MR. STELLMACH:........... 2723

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2628

1          THE COURT:  I need to see everybody up here for

2    just a moment.

3          **(The following was held at the bench)**

4          THE COURT:  Nothing major, I just want

10:18:09  5    everybody to know, one of our colleagues, David Adler --

6    you know Adler?

7          MR. FAZEL:  Yes, Your Honor.

8          THE COURT:  Okay.  His housekeeper was set to

9    be naturalized.  He mentioned it to me.  I'm going to do a

10:18:20  10   private naturalization tomorrow at about 4:00 o'clock.

11              Anybody have any objection?

12              There's been so many in here.  I

13   understand the lady is coming maybe with 20 or 30 people.

14   I'm going to put them all in that courtroom there.

10:18:34  15             Anybody have a problem with the jury just

16   coming and sitting as in the audience and then immediately

17   leaving?  Any objection from the government?

18          MR. COSTA:  No.

19          THE COURT:  The defense?

10:18:42  20         MR. FAZEL:  No.

21          THE COURT:  Okay.

22          MR. FAZEL:  Judge, I think you naturalized me.

23          THE COURT:  Did I?

24          MR. FAZEL:  I think so.

10:18:46  25        THE COURT:  Oh, you mean in a whole big group?

1           MR. FAZEL:  Yes.

2           THE COURT:  Have you got that certificate?

3           MR. FAZEL:  I think so.

4           MR. SCARDINO:  Can you undo that?

10:18:54  5           THE COURT:  Pardon me?

6           MR. SCARDINO:  Can you undo that?  I just

7  wondered.

8           THE COURT:  If you guys want to attend, I mean,

9  that's fine.  It will be right across the way.  It's not

10:19:09  10  real private.  But I was going to do it here, but with so

11  many people here, another pile of people, then they want to

12  take pictures after I leave on the bench with the seal and

13  all that.

14           Okay.  What do you want to talk about?

10:19:19  15           MR. COSTA:  There's an issue with the exhibits.

16  This morning, I think, about -- right before 2:00 a.m., we

17  got e-mailed a bunch of exhibits.  It said they were Davis

18  exhibits.  Now, we think they're untimely even for

19  Mr. Davis, but then I was just told about ten minutes ago

10:19:35  20  that actually some of them are for this witness, Henry

21  Amadio.

22           So, number one, they're clearly untimely.

23  Number two, and this is a concern with the Davis, I don't

24  think most of these exhibits were part of the 17,000.  And

10:19:46  25  I thought the whole idea of this was we were trying to

1  winnow down the 17,000.  What's happening now is we're

2  adding to the 17.000.  So these were not disclosed as part

3  of the 17,000 pretrial.

4              THE COURT:  Okay.

10:19:57   5              MR. COSTA:  And then we get them at

6  2:00 o'clock this morning.

7              MR. SCARDINO:  Let me start, and you can

8  finish.

9                  Your Honor, we discovered -- the exhibits

10:20:04  10  we're referring to are pieces of correspondence, e-mails,

11  between the witness on the witness stand --

12              THE COURT:  We can do this out front --

13              MR. COSTA:  Yeah, uh-huh.

14              THE COURT:  -- can't we?  So we don't have to

10:20:14  15  be --

16              MR. COSTA:  Sure.

17              THE COURT:  Or do you want to do it up here?

18              MR. SCARDINO:  It's up to you.

19              MR. COSTA:  It's up to you.

10:20:19  20              THE COURT:  Let's do it outside.  Is that all

21  right?  Mention that.  I just want to get that first part

22  down.

23              **(The following was held in open court)**

24              THE COURT:  Be seated.  I'm sorry.  I had to be

10:21:21  25  reminded about that.

1                   Okay.  The question is, just to recap, the

2  government received some exhibits what, at 2:00 in the

3  morning?

4                   MR. COSTA:  A few minutes before 2:00, Your

10:21:29    5  Honor.

6                   THE COURT:  A.m.  And you say some of them

7  hadn't been previously identified; correct?

8                   MR. COSTA:  Correct.  And we were told at

9  2:00 a.m. they were for Mr. Davis, now we're being told,

10:21:41   10  just ten minutes ago, some of them, three or four, or for

11  this witness.

12                   THE COURT:  Okay.

13                   MR. COSTA:  And I don't think they were part of

14  the 17,000.  So our understanding was this designation was

10:21:47   15  supposed to narrow the 17,000, not expand it.

16                   THE COURT:  Response, please.

17                   MR. SCARDINO:  Yes, Your Honor.  These exhibits

18  are something that has been in the discovery.  We got them

19  from the government.

10:21:56   20                   THE COURT:  You got them from the government?

21                   MR. SCARDINO:  That's correct.  And they're

22  just pieces of -- three pieces of correspondence that -- we

23  obviously worked late, and the staff didn't designate them

24  as Amadio exhibits, but they're Amadio and Davis exhibits.

10:22:10   25  And all it is is three e-mails between the witness and a

1  third party, talking about the consolidation effort.

2                      And we found them last night as a result

3  of yesterday's testimony.  And I'll represent to the Court

4  we've been working hard to accomplish the Court's order to

10:22:28  5  be ready for trial, with the staff that we've got.  And

6  when we've discovered through -- like in all trials,

7  information came out from the witness stand that we focused

8  on -- made us focus on these exhibits.  And we got them to

9  them as soon as we discovered them and sent it over to

10:22:43  10  them.  Unfortunately, we didn't designate as Amadio

11  exhibits by mistake.

12                  THE COURT:  Okay.

13                  MR. SCARDINO:  It's just three pieces of

14  correspondence.

10:22:49  15                  THE COURT:  Well, I don't know what they say.

16  But let me ask you this:  They came from you, from the

17  government; correct?

18                  MR. COSTA:  From our database, but they still

19  had a requirement to designate pretrial, just like we did,

10:23:00  20  those exhibits they were going to use.  And on the issue

21  of -- there was no surprise and they had this thorough 302

22  from Mr. Amadio, and what he testified to yesterday was all

23  in there.  So there's no surprise issue.

24                      And, again, the bigger issue is they're

10:23:16  25  adding to the 17,000 when they designated 17,000 that was

1    too much to begin with, and the resolution the Court came

2    up with was supposed to narrow that down, but it's growing

3    it.

4                    MR. SCARDINO:  Actually, we're not trying to

10:23:28    5    grow it, we are trying to narrow it down.  We obviously

6    aren't going to use --

7                    THE COURT:  All right.  I'll just make a ruling

8    on this what's before me.  I'm not going to look at the

9    Davis matters yet.  As to those three exhibits, as far

10:23:40    10   as -- and I'm not staying they're admissible.  Timeliness

11   goes and outside of the initial designation, the

12   government's objection is overruled.  This is the last time

13   we'll do it.  Anything shows up outside of even that huge

14   set of exhibits, the next time they're out, all right?

10:23:58    15                   Two reasons:  They came from your

16   database.  It doesn't mean you knew about it.  I understand

17   that it's coming in at the last minute.  I'm not putting up

18   with too much of it.  I'll put up with -- this is it, okay?

19                   All right.  Now we're ready; correct?  You

10:24:14    20   got something else, Mr. Parras?

21                   MR. PARRAS:  I'd like to make a notice to the

22   Court, I guess because I anticipate we'll have another

23   issue with Davis because we continue with staff at the

24   office today now, to continue to prepare and to put things

10:24:27    25   together.

1            THE COURT:  You're on quicksand at this point.

2   That's all I can tell you.  I'm not going to prerule on

3   anything, except if it's not in the original even huge

4   amount that you let them know about, I'm not allowing it

10:24:41   5   in.  As far as last-minute filings, I'll consider on an

6   item-by-item basis.

7            MR. PARRAS:  And what I'd like to address

8   specifically, Judge, is the huge amount.  We did that to

9   some extent out of an abundance of caution, and, so, a

10:24:54  10  large portion of that are financial documents.

11            I anticipate we may have a few things, not

12  many, that come outside of that 17,000, and we are doing

13  our absolute best under the difficult situation that we're

14  under to get that as quickly as possible to Mr. Costa, and

10:25:13  15  I'd like that to be part of the record.

16            THE COURT:  It's in the record.

17            MR. COSTA:  Can I make a point?

18            THE COURT:  No.  In fairness, I've made my

19  ruling.  Anything out of that 17,400 or whatever it is, not

10:25:23  20  coming in.

21            MR. COSTA:  This isn't on the issue of

22  exhibits.  Just more generally on the issue of their

23  inability to be ready that they're claiming.

24            THE COURT:  All right.  If you want to get it

10:25:31  25  on the record.

1          MR. COSTA:  I would just point out they have

2    more attorneys than we do working on the case.  They have

3    more paralegals than we do working on the case.  They have

4    more experts than we do working on the case.  And it's my

10:25:41  5    understanding that there's never been a case in this

6    circuit with this much CJA money spent.

7          THE COURT:  Ever.

8          MR. COSTA:  So I would like that on the record.

9          THE COURT:  Yes.  All right.

10:25:48  10         MR. PARRAS:  And in fairness, if I could

11   respond, Judge.

12         THE COURT:  Go on.

13         MR. PARRAS:  We do not have -- the government

14   is one entity.  There's a receiver in this case who has

10:25:57  15   spent untold millions and has been ordered by the United

16   States Government to assist the prosecution in this case.

17         THE COURT:  That was ordered by the circuit

18   court, if I remember.

19         MR. PARRAS:  It was, Judge.

10:26:07  20              And, so, when Mr. Costa says they only

21   have three attorneys, the reality is they have probably

22   tens and scores of attorneys doing work on this case in

23   order to turn it over to them.  So I'd like that to be

24   known, and any incorporated orders from Judge Godbey to be

10:26:25  25   included in the record.

*Cross-Amadio/By Mr. Scardino*

1          THE COURT:  Judge Godbey, what does he have to
2    do with this?

3          MR. PARRAS:  The order.

4          THE COURT:  That's the judge in the SEC case in
10:26:32   5    Dallas.

6               Don't start bringing it in; okay?  Don't
7    start bringing it in.  We've already discussed that.  This
8    is the criminal matter, and anything that goes on with
9    another U.S. District Judge, that's the business of the SEC
10:26:45   10   case.  We're here trying this matter.  I think it's going
11   well.

12              We're ready to resume.  Let's call the
13   jury in.

14          **(The following was held before the jury)**

10:27:43   15         THE COURT:  Thank you.  Be seated.

16              All right.  Counsel, go right ahead.

17         MR. PARRAS:

18         MR. SCARDINO:  Thank you, Your Honor.

19         THE COURT:  Pull the mike down.

10:27:48   20              **HENRY AMADIO**

21              **CROSS-EXAMINATION**

22   BY MR. SCARDINO:

23   **Q.**   Good morning, Mr. Amadio.

24   **A.**   Good morning.

10:27:52   25   **Q.**   How are you today?

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Cross-Amadio/By Mr. Scardino*

1    **A.**    I'm doing fine.  Thank you.

2    **Q.**    Good.  Did you have an opportunity to consult with

3    your lawyer last night?

4    **A.**    No, I didn't.

10:27:59   5    **Q.**    Did you have a chance to consult with your lawyer

6    this morning?

7    **A.**    We chatted a little bit this morning.

8    **Q.**    Is your lawyer in the courtroom today?

9    **A.**    Yes, she is.

10:28:06   10    **Q.**    Mr. Amadio, when all this Stanford business started

11    to unravel, a receiver took over the business.  Isn't that

12    correct?

13    **A.**    That's correct.

14    **Q.**    Okay.  And Stanford was removed, and so were others

10:28:28   15    like Kuhrt, Lopez and Davis; right?

16    **A.**    That's correct.

17    **Q.**    But you stayed on and worked for the receiver, didn't

18    you?

19    **A.**    I stayed work for just two weeks.

10:28:44   20    **Q.**    Did you assist the receiver in the efforts to start

21    trying to run the Stanford businesses?

22    **A.**    No, I didn't.

23    **Q.**    So was the two weeks spent just relating information

24    to the receiver?

10:28:54   25    **A.**    Just basic information about the company's

*Cross-Amadio/By Mr. Scardino*

1    information, where documents were stored and filed.

2    **Q.**    Okay.  Which included the external hard drive?

3    **A.**    That's correct.

4    **Q.**    And yesterday you mentioned several times in front of

10:29:14    5    the jury that that information on the hard drive was to be

6    kept somewhat secret.

7                    Do you remember that?

8    **A.**    Yes.

9    **Q.**    And in the conversation you had with the Internal

10:29:27    10    Revenue Service criminal investigator that we talked about

11    somewhat yesterday, do you remember talking to that

12    investigator about that external hard drive?

13    **A.**    Somewhat I do remember.

14    **Q.**    Do you think your memory back in May of 2010 would

10:29:46    15    have been better than it is today in January -- or is it

16    February?  Is it February yet?  Anyway, whenever it is in

17    2012?

18    **A.**    Yes.

19    **Q.**    Okay.  So you remember telling that investigator that

10:30:03    20    the external hard drive had archive information but not

21    secret information?

22    **A.**    For the most part, yes.

23    **Q.**    So you do remember telling the investigator that?

24    **A.**    That's correct.

10:30:17    25    **Q.**    And not secret information that was not on the

1   server?

2                    Refresh your memory?  I've highlighted it.

3   Page 15.

4   **A.**   That is correct.  Information that was in the

5   external drive was previously in the server.

6   **Q.**   What's a server?

7   **A.**   Server is the network drive where all information is

8   stored in the company.

9   **Q.**   So back then in 2010, you told the investigator that

10  the external hard drive had information, but it wasn't

11  secret; right?

12  **A.**   It was.

13  **Q.**   It was not.  In fact, you didn't say, Oh, it was only

14  for dissemination among a certain inner group within the

15  Stanford empire.  You didn't tell him that, did you?  You

16  just said it wasn't secret.

17  **A.**   It was previously in the server.  That's what I told

18  the investigator.

19  **Q.**   Okay.  And that's different than what you told this

20  jury, though, isn't it?

21  **A.**   I might want to say that when it was in the server --

22  **Q.**   Is it different than what you told the jury?

23  **A.**   No, it was not different.

24  **Q.**   Okay.  Let's talk a little bit about what happened

25  during that period of time when the receiver took over and

1    everybody else was kicked out.

2              Do you know a fellow named Rolando Roca.

3    **A.**    Yes, I do.

4    **Q.**    Okay.  And tell the jury who is Mr. Roca?

10:31:46   5    **A.**    Mr. Roca was accountant in charge of the budget

6    coordination, the budget for the entity.

7    **Q.**    And did you work with Mr. Roca?

8    **A.**    Yes, I did.

9    **Q.**    And how long did you know him?  How long did you work

10:32:04   10   with him, better stated?

11   **A.**    I would say probably two years, two and a half years.

12   **Q.**    Of the six years you were there, two of the years you

13   knew Mr. Roca?

14   **A.**    That's correct.

10:32:14   15   **Q.**    Okay.  So he was there for the last two years that

16   you were there?

17   **A.**    Pretty much, yes.

18   **Q.**    And did you have a lot of interaction with him?

19   **A.**    Yes.

10:32:24   20   **Q.**    Did you have a trusting relationship with him?

21   **A.**    We were co-workers.

22   **Q.**    Was it trusting?

23   **A.**    Yeah.

24   **Q.**    Had no reason to mistrust him; right?

10:32:35   25   **A.**    No.

*Cross-Amadio/By Mr. Scardino*

1  Q.   Do you remember getting a phone call from Mr. Roca

2  where he was asking you about why is the FBI knocking on

3  Roca's door?

4  A.   Yes, I do.

10:32:45  5  Q.   And about -- can you place an approximate time frame

6  when that happened vis-à-vis when the receiver took over?

7  A.   That was probably the next day.

8  Q.   The next day?

9  A.   Yes, I believe it was the next day.

10:32:59  10  Q.   After the receiver took over?

11  A.   Maybe it was two days.  It was -- it was in that

12  week.

13  Q.   That was in February of 2009, wasn't it?

14  A.   That is correct.

10:33:08  15  Q.   Sometime during that period of time.

16            And Mr. Roca -- it wasn't a

17  person-to-person conversation, was it?

18  A.   Yeah, we were talking.  It was a person-to-person

19  call.

10:33:20  20  Q.   I mean, it was -- you were on the telephone.  You

21  weren't face-to-face?

22  A.   I understand, yes.

23  Q.   I didn't say that very well.

24  A.   That's correct.

10:33:26  25  Q.   And did he call you, or did you call him?

*Cross-Amadio/By Mr. Scardino*

 1  **A.**   He called me.

 2  **Q.**   Okay.  And what was the general topic of the

 3  conversation?

 4  **A.**   He was concerned and afraid because he had said that

10:33:39  5  the FBI had knocked on his door and they were asking for

 6  the football, the external drive.

 7  **Q.**   Had you given them the football at that time?

 8  **A.**   Yes, I did.

 9  **Q.**   So when he was asking you about it, you had already

10:33:53 10  turned it want over to the FBI?

11  **A.**   That is correct.

12  **Q.**   Was it password protected?

13  **A.**   No, it wasn't.

14  **Q.**   So the FBI didn't have any problem gaining access to

10:34:03 15  what was on the external hard drive when Roca called you?

16  **A.**   That's correct.

17  **Q.**   So the FBI knew what was on the external hard drive

18  when Roca called you?

19  **A.**   I would not know that.

10:34:19 20  **Q.**   Safe assumption.  I mean, they wanted it; right?  You

21  gave it to them; right?

22  **A.**   That's correct, yes.

23  **Q.**   And there was nothing to keep them from accessing the

24  information; right?

10:34:25 25  **A.**   Yes, I provided that to them.

*Cross-Amadio/By Mr. Scardino*

1   Q.   So two days later, Roca calls you.  And what does he

2   ask you about?  The external hard drive?  The football?

3   A.   Yeah.  He was telling me that they were asking about

4   it and that they had gone for his house and --

10:34:39   5   Q.   He was asking you a lot of questions about what's

6   going on, didn't he?

7   A.   That's correct.

8   Q.   He was asking you a lot of questions about, What do

9   you know, didn't he?

10:34:48   10   A.   That's correct, yes.

11   Q.   Did the conversation seem strange to you or normal?

12   A.   I was -- I think it was strange in the sense that he

13   was nervous and everything going on so recent, everything

14   happening.

10:35:03   15   Q.   You've learned since then, haven't you, not,

16   Mr. Amadio, that the FBI put Mr. Roca up to making that

17   phone call to you?  Do you know that?

18   A.   I learned that the other day.

19   Q.   Just the other day?

10:35:16   20   A.   Yes, sir.

21   Q.   Okay.  That the FBI was trying to get Mr. Roca to set

22   you up, weren't they?

23   A.   That's what I learned.

24   Q.   That's what you learned.  Hoping that Roca would get

10:35:26   25   you to say something that might get you indicted; right?

1            MR. COSTA:  Object to the speculation, Your

2 Honor.

3            THE COURT:  Sustained as to the form of the

4 question.

10:35:35  5 BY MR. SCARDINO:

6    **Q.**    You know the FBI asked Mr. Roca to call you?

7    **A.**    Yes.

8    **Q.**    And you know that the FBI was recording the

9 conversation?

10:35:47 10   **A.**    That's what I was told the other day.

11   **Q.**    And Mr. Roca didn't tell you, Hey, the FBI is here

12 recording this conversation, did he?

13   **A.**    No, he didn't.

14   **Q.**    And the questions he was asking to you were

10:36:00 15 calculated to see if you would say something that would

16 get you in trouble, weren't they?

17   **A.**    Looking back now, yes.

18   **Q.**    And you didn't learn about this until almost two

19 years later?

10:36:11 20   **A.**    That is correct.

21   **Q.**    Did the government turn over the recording that they

22 made of that conversation to you and your lawyer?

23   **A.**    No.  I just heard the recording.

24   **Q.**    You did listen to the recording?

10:36:27 25   **A.**    Yes, I did.

*Cross-Amadio/By Mr. Scardino*

```
 1   Q.   When did you first listen to it?

 2   A.   This past Saturday.

 3   Q.   Last Saturday?

 4   A.   Or two weeks ago, approximately.

 5   Q.   So what is this?  Three years later you get to hear

 6   the recording that the FBI made of your conversation?

 7   A.   That's correct.

 8   Q.   Okay.  Did that scare you, learning that the FBI put

 9   somebody up to calling you to see if you'd say something

10   they could use to prosecute you with?

11   A.   Looking back, yes.  I mean, it was conceivable.

12   Q.   You learned about it right before you came to testify

13   in front of this jury; right?

14   A.   Uh-huh.  Yes, sir.

15   Q.   Did that make you nervous?

16   A.   Somewhat, yes.

17   Q.   Somewhat.  Okay.  Let's shift gears.

18             You testified yesterday that the annual

19   report did not list -- did not report unlisted securities.

20             Do you remember talking about that?

21   A.   Yes, sir.

22   Q.   And it's your testimony that the annual report,

23   specifically Government's Exhibits 119 and Government's

24   Exhibits -- let me get my high tech stuff undone here --

25   Government's Exhibits 120, which are Stanford
```

10:36:35   (line 5)
10:36:56   (line 10)
10:37:06   (line 15)
10:37:27   (line 20)
10:37:44   (line 25)

*Cross-Amadio/By Mr. Scardino*

1  International Bank 2006 annual report in 119, and 2007

2  annual report in 120.

3                    And it's your testimony on direct

4  examination that those reports did not list, did not

10:38:01  5  reveal unlisted securities.  Is that correct?

6  **A.**   Did not disclose.

7  **Q.**   Okay.

8                MR. SCARDINO:  And could we have

9  Government's 119, please?  Could we have our computer's

10:38:11  10 version, Your Honor?  Okay.

11 BY MR. SCARDINO:

12 **Q.**   Do you see that, Mr. Amadio?

13 **A.**   Yes, I do.

14 **Q.**   Okay.  And you've reviewed that before, have you not?

10:38:18  15 **A.**   Yes.

16 **Q.**   And you've gone over it with the government before

17 you testified, did you not?

18 **A.**   Yes.

19 **Q.**   And you came to the conclusion that you would be able

10:38:27  20 to testify that in your opinion they did not -- they did

21 not include that and you thought they should?

22                MR. COSTA:  Object, vague as to what "that" is.

23                MR. SCARDINO:  The fact that they did not list

24 unlisted securities.  Did not report them --

10:38:42  25                MR. COSTA:  Vague as to what securities.

*Cross-Amadio/By Mr. Scardino*

1          MR. SCARDINO:  Did not report them.

2          THE COURT:  Okay.

3          MR. COSTA:  I think his testimony was they

4    didn't disclose ones to Mr. Stanford.

10:38:50   5          MR. SCARDINO:  Well, I object to the side bar.

6    BY MR. SCARDINO:

7    **Q.**   But the point I'm trying to make with you,

8    Mr. Amadio, is your testimony was that you thought that

9    these items should be listed in the annual report and they

10:39:00  10   were not?

11   **A.**   What I recall testifying is specifically, when we

12   were talking about, I think 2.9, about commercial loans

13   and the bank was not will lending commercial loans, only

14   secured loans.

10:39:15  15   **Q.**   And that would be an unlisted security, though,

16   right?

17   **A.**   That would be an unlisted loan.

18          MR. SCARDINO:  Okay.  Could we have Page 26 of

19   this exhibit, please?

10:39:26  20          And go -- one, two, three, four -- five

21   paragraphs down, please.  Right above 2.8, that one right

22   there.  Can you make -- there you go.  And would you

23   highlight it?

24   BY MR. SCARDINO:

10:39:38  25   **Q.**   Can you see that, Mr. Amadio?

 1   **A.**   Yes, I can.

 2   **Q.**   Can you read it for us, please?

 3   **A.**   "The fair values of quoted investments in active

 4   markets are based on current bid prices.  If the market

10:39:49    5   for a financial asset is not active for unlisted

 6   securities...."

 7   **Q.**   You can stop there.

 8                         So they make a reference to unlisted

 9   securities; right?

10:39:58   10   **A.**   Uh-huh.

11   **Q.**   How are they referenced in that part of this

12   financial report for 2006?

13                         They're talking about unlisted securities,

14   aren't they?

10:40:13   15   **A.**   But the loans are not securities.

16   **Q.**   Okay.  But you testified that they did not disclose

17   these in the report, and they refer to it on this page in

18   this report, do they not?  Yes or no.

19   **A.**   I don't know if that's referring to the loans.

10:40:28   20   **Q.**   You don't know what it's referring to, but they make

21   mention of it.

22                         That's not misleading, is it?

23   **A.**   There's mention of unlisted securities; right.

24                    MR. SCARDINO:  Let's go to Government's

10:40:38   25   Exhibit 120.

1  BY MR. SCARDINO:

2  **Q.**   And that is Stanford Financial -- annual report for

3  2007, isn't it?  Do you recognize it?

4  **A.**   Yes, I do.

10:40:53  5  **Q.**   You reviewed that before you testified yesterday?

6  **A.**   Yes, sir.

7  **Q.**   You went over it with the government?

8  **A.**   Yes.

9            MR. SCARDINO:  Okay.  Can we go to Page 16,

10:41:01  10  please?  And right -- the paragraph right above 2.8.  If

11  you could enlarge that and highlight it, please.

12  BY MR. SCARDINO:

13  **Q.**   Mr. Amadio, can you read that, please?

14  **A.**   "The fair values of quoted investments in active

10:41:18  15  markets are based on current bid prices in the market.

16  For a financial asset is not active for unlisted

17  securities, the bank establishes fair value by using

18  valuation techniques."

19  **Q.**   Talks about how the bank deals with unlisted

10:41:33  20  securities; is that correct?  Talking about fair market --

21  fair values of un -- "of quoted investments in active

22  markets are based on current bid prices if the market for

23  a financial asset is not active," and then they put in

24  brackets, "for unlisted securities," the bank establishes

10:41:51  25  fair value by using valuation techniques."

1          They talk about that as part of the

2     portfolio, don't they?

3     **A.**   This is part of the portfolio, yes.

4     **Q.**   Let me talk to you for a minute, Mr. Amadio, about a

10:42:18     5     different subject.

6          In the time that you worked for

7     Mr. Stanford's company, you were proud of what you did,

8     weren't you?  You feel like you did -- you do good work?

9     **A.**   I did what was my function and my responsibilities,

10:42:38     10    yes.

11    **Q.**   I mean, you didn't -- didn't slack on your work

12    effort, did you?

13    **A.**   No, I didn't.

14    **Q.**   You weren't chastised for being late all the time?

10:42:47     15    **A.**   No, I wasn't.

16    **Q.**   You weren't chastised for doing sloppy work?

17    **A.**   No, sir.

18    **Q.**   Okay.  You weren't -- you didn't have -- your HR file

19    wasn't replete with recriminations about how you were not

10:42:59     20    getting along with other employees or things of that

21    nature?

22    **A.**   No, sir.

23    **Q.**   In fact, when you left the bank after the receiver

24    took over, you were looking for a job?

10:43:11     25    **A.**   Yes, sir.

*Cross-Amadio/By Mr. Scardino*

1  Q.   Okay.  And one of the ways you looked for a job was

2  that you -- you put your resumé out to the world to look

3  at to see if somebody would be interested in hiring you

4  with your qualifications?

10:43:23  5  A.   That's correct.

6        MR. SCARDINO:  Okay.  At this time, Your Honor,

7  I'd offer Defendant's Exhibit 802.  That's been tendered to

8  the prosecution prior to today.

9        THE COURT:  Any objection?

10:43:35  10       MR. COSTA:  No, Your Honor.

11       THE COURT:  It's 802?

12       MR. SCARDINO:  Yes, sir.

13            Can we have Defendant's 802?  And if you

14  would go down to the bottom of the page where it starts --

10:43:57  15  there we go.  I think the next one is a picture of me and

16  my wife.

17  BY MR. SCARDINO:

18  Q.   The 802 at the bottom of the page under "Experience,"

19  can you see that?

10:44:08  20  A.   Yes.

21  Q.   Okay.  Tell me what you're doing with this,

22  Mr. Amadio.  Tell the jury what you're doing with this.

23  A.   This is a resumé of my current experience and past

24  experience.

10:44:22  25  Q.   And did you draft this?

1  **A.**    Yes, I did.

2              MR. SCARDINO:  I told them 802 and it's 8-2.

3              THE COURT:  8-2?

4              MR. SCARDINO:  It is 8-2.  That's why they

10:44:43  5  pulled up the wrong exhibit.  My bad.

6  BY MR. SCARDINO:

7  **Q.**    So you wrote this resumé and put it on this

8  information sheet; right?

9  **A.**    That's correct.

10:44:54  10  **Q.**    And, so, how is it distributed?  Does it go out,

11  like, to the Internet?

12  **A.**    This is at Linked in, yes.

13  **Q.**    What is Linked in?  What is that?

14  **A.**    It's a network, professional network.

10:45:11  15  **Q.**    Okay.

16  **A.**    So you post your resumé, and other professionals,

17  mainly of the same industry, other accountants, other

18  companies, will go to this Website.

19  **Q.**    It's targeted to people that might be interested in

10:45:27  20  looking for somebody with your qualifications to hire?

21  **A.**    Yeah.  You could say that.

22  **Q.**    And, so, you wrote your qualifications down and

23  spread it out to the world and you wanted to see what

24  you're good at and what you might be able to do for them?

10:45:40  25  **A.**    It's a normal resumé, correct.

*Cross-Amadio/By Mr. Scardino*

1  Q.    Okay.  And, so, let's review that for a second.

2            You tell them that your experience in the

3  past is that you were the controller for a Lopez Negrete

4  Communications; correct?

10:46:02  5  A.    That is my current employer.

6  Q.    Your current employment.  All right.

7            So you were looking for a job as you're

8  working for this company.  Is that correct?

9            Maybe I'm confused.  When you published

10:46:15  10  this, were you actually the controller for this company?

11  A.    This is a profile that you update.  Constantly you're

12  updating it.

13  Q.    I see.  So this is -- you're not looking for a job.

14  You're just putting your information out there in case

10:46:29  15  somebody wants to hire you and you might take a different

16  job?

17  A.    No.  Linked In is a network where you network with

18  other professionals, other accountants.

19  Q.    Okay.  Doesn't make any difference.  Let me get to

10:46:42  20  the point of this.

21  A.    Okay.

22  Q.    So you put in here, you publish in here, that your

23  history includes the general accounting manager for FSGC?

24  A.    Uh-huh.

10:46:50  25  Q.    That's Mr. Stanford's -- one of Mr. Stanford's

*Cross-Amadio/By Mr. Scardino*

```
 1  companies; right?

 2  A.   That's correct.

 3  Q.   That's Stanford Financial Group Company?

 4  A.   That is correct.

 5  Q.   Okay.  And you've already told us what generally you

 6  did there.

 7            But you tell in this publication that you

 8  managed the accounting and accounts payable department and

 9  you had 16 employees that worked under you; right?

10  A.   That's correct.

11  Q.   Okay.  And then you say you worked on global

12  consolidation project.

13  A.   Uh-huh.

14  Q.   We talked about that a little bit yesterday; right?

15  A.   Yes, sir.

16  Q.   So that was something that wasn't a secret; right?

17  A.   No.

18  Q.   And if somebody called you and said, Hey, Mr. Amadio,

19  we want to talk to you about your experience in

20  consolidation, you're telling them I've got experience

21  with consolidation projects; right?

22  A.   That I worked on global consolidations, yes.

23  Q.   Okay.  And that you researched conversion from U.S.

24  GAAP and other foreign local GAAP to IFRS?

25  A.   That's correct.
```

10:46:58
10:47:10
10:47:17
10:47:27
10:47:43

1    **Q.**   Explain that.  What do you mean:  You researched

2    conversion from U.S. GAAP and other foreign local GAAP.

3    What's -- tell us what GAAP is again.

4    **A.**   That's general acceptable accounting principles.

10:47:55    5    **Q.**   Okay.  And then you say that U.S. and then other

6    foreign local GAAP.

7                   Those are other foreign general accounting

8    principles; right?  For other countries?

9    **A.**   That is correct, yes.

10:48:09    10   **Q.**   And then to IFRS?

11   **A.**   Yes.

12   **Q.**   So you worked on converting accounting principles

13   from GAAP to IFRS?

14   **A.**   We were in that projects.

10:48:22    15   **Q.**   And IFRS is what again?

16   **A.**   International Financial Reporting Standards.

17   **Q.**   And those are standards that are different in some

18   respects and similar in some respects to U.S. and other

19   foreign GAAP; right?

10:48:37    20   **A.**   That is correct, yes.

21   **Q.**   Okay.  So you're telling the world that you're

22   familiar with the international financial regulatory

23   system?

24   **A.**   Yes.

10:48:46    25   **Q.**   So are you telling this jury, then, that you know

Cross-Amadio/By Mr. Scardino

1  whether or not Stanford had to report these transactions,

2  the loans to shareholder and the transactions between the

3  related companies, in his report under IFRS standards?

4  You're expert on that; right?

10:49:07  5  **A.**   I'm no expert, but I'm familiar with it.

6  **Q.**   You're no expert?

7  **A.**   Nowhere there am I saying I'm an expert.

8  **Q.**   Research conversion from U.S. GAAP and other foreign

9  local GAAP to IFRS?

10:49:20  10  **A.**   Yes.

11  **Q.**   What standard was Stanford working under on the

12  island?

13  **A.**   The bank was under IFRS.

14  **Q.**   And, so, IFRS would have controlled what he had to

10:49:33  15  report in the annual report regarding loans to

16  shareholders; correct?

17  **A.**   That is correct.

18  **Q.**   Are you telling this jury that you know that he had

19  to report those loans to shareholder under IFRS standards?

10:49:46  20  **A.**   Yes, sir.

21  **Q.**   That's your -- that's your position and your opinion?

22  **A.**   That is my opinion.

23  **Q.**   Okay.  And you've researched it?  You researched it?

24  Did you look up IFRS regs and look to see if those are the

10:50:00  25  regulations?

1  **A.**   It depends which regulation you're referring to.

2  **Q.**   The one that talks about shareholder -- reporting

3  loans to shareholder and interconnected or interrelated

4  transactions with these other companies.

10:50:11  5  **A.**   Talking about parties?

6  **Q.**   Yes, sir.

7  **A.**   This disclosure?

8  **Q.**   Yes, sir.

9  **A.**   Yes, sir.

10:50:15  10  **Q.**   And do you have that?  Do you have the research here

11  we can go over with you?

12  **A.**   I don't have it with me.

13  **Q.**   Do you have the IFRS regs that we can go over with

14  you, the ones that you researched?

10:50:25  15  **A.**   I believe, sir, that will you're referring to IAS 24.

16  **Q.**   Yes, sir, in fact, I am.  Do you have that?

17  **A.**   No, I don't have it in front of me.

18  **Q.**   Did you go over that with the prosecutors before you

19  came in here and testified today that it's your opinion

10:50:40  20  that he had to report those transactions under those

21  regulations?

22  **A.**   Yes, sir.

23  **Q.**   If we can show you you're wrong, will you admit it?

24  **A.**   If you show it to me.

10:50:51  25  **Q.**   Okay.  I want to talk to you a little bit about

*Cross-Amadio/By Mr. Scardino*

1    something we talked about yesterday, which is the

2    consolidation project that you referred to in your --

3              MR. COSTA:  You're not going to show it to him?

4              MR. SCARDINO:  Not right now.

10:51:15  5  BY MR. SCARDINO:

6    **Q.**   We talked yesterday about the consolidation project.

7    **A.**   Yes, sir.

8    **Q.**   And the effort -- in fact, you refer to it in your

9    Linked in publication and discussed it on direct

10:51:28  10  examination, you discussed it on cross-examination.

11              I would like to show you some documents,

12   Mr. Amadio, and see whether or not you agree or disagree

13   or remember these pieces of correspondence relating to the

14   effort to accomplish the consolidation.

10:51:48  15              I think you testified yesterday on direct

16   examination that the consolidation project was something

17   that happened suddenly; right?

18   **A.**   It was more recent, yes.

19   **Q.**   Well, you -- and I think you testified that it was

10:52:03  20  something that happened right at the end of 2008 when

21   everything started to come apart?

22   **A.**   There was talks of this conglomerate in

23   consolidation, yes.

24   **Q.**   Right.  And I think -- at least, I thought you left

10:52:15  25  the impression was that this was sort of a desperate,

1    last-ditch effort to maybe try to make things work and

2    keep things together, because you said it was sudden and

3    at the end of the year when, you know, they were coming

4    unglued.

10:52:26    5    **A.**    Well, I said the facts.  I didn't say "desperate,"

6    but I did say that it was towards the end of 2008 that

7    there was talks about consolidation, conglomeration and

8    all that.

9    **Q.**    And you said that it was -- it was -- I don't

10:52:38   10    remember the exact term, but I recall that the impression

11   you left that it was sudden?

12   **A.**    It was moving fast, yes.

13   **Q.**    And that would indicate that, if it was sudden, it

14   was something that hadn't been planned or

10:52:51   15   well-thought-out, but was just trying to grasp at straws

16   to make things work?

17   **A.**    It's a very complex thing to do.

18   **Q.**    As a matter of fact, it was very complex, and it had

19   been something that had been worked on for seven or eight

10:53:05   20   months, wasn't it?

21   **A.**    There was talks.

22   **Q.**    Talks.  In fact, there were more than talks.  They

23   hired a law firm to help them accomplish the consolidation

24   project, didn't they?

10:53:14   25   **A.**    I didn't know that.

*Cross-Amadio/By Mr. Scardino*

1   Q.   You didn't know that?

2   A.   I don't recall that.

3   Q.   You didn't have conversations and communication with

4   the lawyers and the law firm that talked to you about how

5   to accomplish the consolidation?

6   A.   I don't remember.

7              MR. SCARDINO:  Can we have Government --

8   Government -- Defendant's Exhibit 13.4, please?

9              MR. FAZEL:  13.5.

10             MR. SCARDINO:  13-4.

11             MR. COSTA:  Ever seen it to authenticate it.

12             MR. SCARDINO:  Yeah.  E-mailed to him.  I'm

13   sorry.  Oh, this is your copy of it.  Here.

14             MR. COSTA:  I have no objection to 13-4.

15             THE COURT:  13-4?

16             MR. SCARDINO:  It's 13-4.

17             THE COURT:  It's admitted.

18   BY MR. SCARDINO:

19   Q.   Can you see that, Mr. Amadio?

20   A.   Yes, I do.

21             MR. SCARDINO:  Let's go to the top.

22   BY MR. SCARDINO:

23   Q.   Do you know who made the writings on this?

24   A.   I did.

25   Q.   That's your handwriting?

1    **A.**    Yes, sir.

2    **Q.**    And this is an e-mail, isn't it?

3    **A.**    This is an e-mail, yes.

4    **Q.**    And it's from a Carlos Mas to you?

10:54:23    5    **A.**    That is correct, yes.

6    **Q.**    And the subject is what?

7    **A.**    The subject is the assignment and transfer of assets

8    from Stanford Venture Capital to Stanford International

9    Bank.

10:54:36    10    **Q.**    Assignment of Stanford Venture Capital to Stanford

11    International Bank, Limited.

12                        Who is Carlos Mas?

13    **A.**    He's a lawyer.

14    **Q.**    Okay.  He's a lawyer.

10:54:50    15                        So what are you trying to accomplish here

16    when he says, "Henry, attached for your review is a form

17    of assignment which we intend to use as the principal

18    document to assign the various rights held by SVCH to

19    Mr. Stanford and ultimately to SIBL"?

10:55:11    20    **A.**    Yes.

21    **Q.**    He's telling you here -- he's giving you information

22    that of a review about how to assign various rights held

23    by Stanford Venture Capital; right?

24    **A.**    Yes, sir.

10:55:24    25    **Q.**    To Allen Stanford and then go somewhere else after

*Cross-Amadio/By Mr. Scardino*

1    that; right?

2    **A.**   That's correct.

3    **Q.**   Okay.  So what you're working on here is moving

4    assets that Stanford owns, one of them is Stanford Venture

10:55:40  5    Capital, moving it to Stanford and then to the bank.

6    Isn't that what he's talking to you about?

7    **A.**   Yes.

8    **Q.**   And this was dated back in April of 2008?

9    **A.**   That's correct.

10:55:53  10    **Q.**   So what -- wasn't your goal then trying to move

11    assets into the bank?

12    **A.**   (No audible answer.)

13    **Q.**   That's what the effort was.  You and this lawyer that

14    had been hired, this lawyer that works for Carlton Fields

10:56:10  15    law firm, that's what you were doing?

16    **A.**   This is what was testified yesterday.

17    **Q.**   Yes, sir.  And this effort was made between you,

18    working for Stanford's company, and this law firm to

19    assign assets through Stanford into the bank.  Wasn't that

10:56:27  20    trying to consolidate the assets?

21    **A.**   That's not consolidation, sir.

22    **Q.**   But isn't that part of the effort to make everything

23    under one umbrellas?

24    **A.**   No, sir.  In context this is referring to the

10:56:37  25    capitalization of the bank.  This is not -- it has nothing

*Cross-Amadio/By Mr. Scardino*

1  to do with the consolidation.

2  **Q.**   It was moving assets that Stanford owned through

3  Stanford and under the umbrella of the bank, was it not?

4  **A.**   It was a transfer of related parties.  It was a

5  transfer of assets from one entity owned by Mr. Stanford

6  to Mr. Stanford and back to the bank.  And that's what was

7  testified yesterday of how it was transferred from book

8  value to Mr. Stanford and then to market value to SIBL to

9  Stanford National Bank, but it has nothing to do with

10 consolidation or combination that you're referring to,

11 sir.

12 **Q.**   It has nothing to do with trying to bring all the

13 assets under the umbrella of the bank?

14 **A.**   Not in context of this e-mail, this time, and this

15 point in time of the company.  It was a specific reason

16 why this was done, and it was done to capitalize the bank.

17 **Q.**   An effort to capitalize the bank?

18 **A.**   And we do some of the loan.

19 **Q.**   Reduce the loans that you said would never be paid

20 off; right?

21 **A.**   Reduce the shareholder funding.

22        MR. SCARDINO:  Can we have 13-6, please.

23 BY MR. SCARDINO:

24 **Q.**   Do you see that, Mr. Amadio?

25        THE COURT:  Any objection to 13-6?

1          MR. COSTA:  No, Your Honor.

2          THE COURT:  It's admitted.

3          THE WITNESS:  Yes, sir, I do see it.

4   BY MR. SCARDINO:

10:58:04   5   **Q.**   And this is a letter from the same lawyer,

6   Carlos Mas?

7   **A.**   Yes, sir.

8   **Q.**   And he works for the law firm of Carlton Fields,

9   attorneys at law?

10:58:12   10   **A.**   That is correct.

11   **Q.**   And where is he located, do you know, when you're

12   talking to him?  They've got offices in various places.

13   **A.**   Located in Miami.

14   **Q.**   And, so, what was Mr. Mas doing in working with you?

10:58:27   15   **A.**   Getting all the legal transfer and legal

16   documentation to transfer the title, the ownership, from

17   one entity to the other entity.

18   **Q.**   So a law firm had been hired to try to accomplish

19   that.  Was this a reputable firm; do you know?

10:58:39   20   **A.**   It was a reputable yes.

21   **Q.**   I mean, they weren't just fly-by-night guys, they

22   handled complicated business transactions, didn't they?

23   **A.**   That's what they do, yes, sir.

24   **Q.**   That is what they do.

10:58:52   25          And you were assigned the task of working

*Cross-Amadio/By Mr. Scardino*

1    with them as part of your job for Mr. Stanford to move

2    assets around to put capital in the bank that needed money

3    to pay off the depositors?

4    **A.**   It was to move capital to capitalize the bank, that's

10:59:07   5    correct.

6    **Q.**   And, so, back in June of 2008, when this letter was

7    written, Mr. Mas writes you a letter and says, Dear Henry,

8    enclosed are the transfer documents for each of the

9    portfolio companies."  For each of the portfolio

10:59:21   10    companies.

11                   How many companies were you working with

12    Mr. Mas to transfer under the umbrella of the bank?

13    **A.**   I can't remember, but probably there were more than

14    five or six.

10:59:32   15    **Q.**   More than five or six?

16    **A.**   Yes.

17    **Q.**   And he says, "Note, there are sets of documents for

18    each of the transactions.  For example, the transfer from

19    Stanford Venture Capital Holdings, Inc., to Mr. Stanford

10:59:48   20    and a transfer from Mr. Stanford to SIBL."

21                   SIBL is the bank, Stanford International

22    Bank, Limited; correct?

23    **A.**   That is correct.

24    **Q.**   So he's explaining to you that the effort is being

11:00:02   25    made by you and a law firm that was hired by

*Cross-Amadio/By Mr. Scardino*

1    Mr. Stanford's companies to move assets in this manner to

2    help put capital in the bank; is that correct?

3    **A.**   On paper, yes.

4    **Q.**   On paper, right.

5                    I know you testified that these companies

6    don't have value; right?

7    **A.**   (No audible answer.)

8    **Q.**   So this is all just a waste of time and money and

9    this lawyer is running up a bill and you're working with

10   him to accomplish this effort, but in your opinion, it was

11   of no moment because these companies have no value; right?

12   **A.**   I just said that because you said to pay back to the

13   depositors.  This is not cash, sir.

14   **Q.**   Well, in fact, you know, Mr. Amadio, that some of the

15   assets and some of these companies were worth a lot of

16   money.  In fact, in Government's 331-C -- and we talk

17   about the Venezuelan bank that they have at book price at

18   85 million, and you know the receiver was able to get a

19   lot more money for it than that, do you know that, over

20   $100 million?

21   **A.**   No, I did not.

22   **Q.**   Didn't know that.

23                    You also know that you've got Stanford

24   Development Company in Government 331-C, the list of

25   companies, they listed at $346 million at book value?

*Cross-Amadio/By Mr. Scardino*

1          MR. COSTA:  That's a misstatement.  That

2     exhibit is a statement of value or book value.  I don't

3     know where that's coming from.

4     BY MR. SCARDINO:

11:01:16   5     Q.   Well, they have it listed on the exhibit.  When you

6     have -- when you said that -- my point is that you say

7     that these companies that are being transferred don't have

8     value, that they're losers.  Stanford International

9     Company wasn't a loser.  Its book value is $346 million.

11:01:30   10    A.   Sir, I never said that the companies didn't have

11    value.  What I said, that the companies were constantly

12    losing money and not producing any --

13    Q.   Let's digress for a minute and talk about one of

14    these companies, Stanford Development Companies, owned

11:01:41   15    property -- acquired property and owned property; right?

16    A.   That's correct.

17    Q.   And developed property.  They also build -- they

18    built buildings and marinas and hangars and things; right?

19    A.   That's correct.

11:01:54   20    Q.   So when this was listed on that exhibit, at book

21    value, in 2008, here in 2012 where the economy is a little

22    different, don't you think maybe that the market value

23    would be a lot more?

24    A.   I would not know that, sir.

11:02:07   25    Q.   You have no idea.  That's the point.  So when you

page

*Cross-Amadio/By Mr. Scardino*

1  tell this jury that it doesn't have value to transfer

2  assets into the bank, that's just incorrect and

3  misleading, isn't it?

4  **A.**   I don't agree with you, sir.

11:02:19  5  **Q.**   I know you don't agree with me.  Let's go back to

6  this exhibit.

7              He goes on to tell you:  "Please arrange to

8  have these documents executed where indicated and return

9  the originals to my attention.  Please note that each set

11:02:31  10  of the documents include a cover memo for further

11  instructions and descriptions of the subject documents."

12              He's giving you specific instructions on how

13  to accomplish the transfer of these assets, isn't he?

14  **A.**   That's correct.

11:02:52  15              MR. SCARDINO:  Let's go to the second page of

16  that document.

17  BY MR. SCARDINO:

18  **Q.**   Attached to this is a letter from Gil Lopez for

19  Mr. Mas.  Do you see that?

11:03:10  20  **A.**   Yes, sir.

21  **Q.**   Are these part of the companies that they were

22  transferring under the umbrella of the bank to

23  recapitalize the bank?

24  **A.**   Yes, sir.

11:03:27  25              MR. SCARDINO:  And then if we could have

1   Defense Exhibit 13-10.

2                          We'd offer it.

3                  THE COURT:  Any objection?

4                  MR. COSTA:  No, Your Honor.

11:03:38   5                  THE COURT:  Let's do it this way:  Every time I

6   hear a number now from the defense, if there's any

7   objection, voice is; otherwise, I assume you have no

8   objection and I'm going to enter it into evidence.

9                          Go on.

11:03:48  10   BY MR. SCARDINO:

11   **Q.**   Can you see that, Mr. Amadio?

12   **A.**   Yes, I can.

13   **Q.**   This is back in June of 2008; is that correct?

14   **A.**   Yes, sir.

11:03:57  15   **Q.**   And it's a memorandum to you from Mr. Mas, right, the

16   transaction lawyer you were working with to help transfer

17   these assets?

18   **A.**   Yes.

19   **Q.**   You see that it goes down and it references transfer

11:04:11  20   of interest to Stanford International Bank from R. Allen

21   Stanford.  See that?

22   **A.**   Yes, sir.

23   **Q.**   And then under that it says, "Reignmaker

24   Communications, Inc., the issuer."

11:04:23  25                          What does that mean?

*Cross-Amadio/By Mr. Scardino*

1   **A.**   That was one of the entities.

2   **Q.**   One of the entities.

3                    So this was the -- is this the

4   document that the lawyer sent to you that referenced the

11:04:38   5   transfer of that asset to the bank?

6   **A.**   From Mr. Stanford to the bank, yes.

7   **Q.**   Right.  And you had specific instructions on how that

8   was to be accomplished, didn't you?

9   **A.**   These were the legal documents to accomplish that.

11:04:51   10                  MR. SCARDINO:  And if we could go to Page --

11   the fourth page of -- the fifth page of that document,

12   please.

13   BY MR. SCARDINO:

14   **Q.**   Can you see who signed?

11:05:08   15   **A.**   Yes, sir.

16   **Q.**   Who signed the assignment of this asset to the bank?

17   **A.**   R. Allen Stanford.

18   **Q.**   Do you recognize the signature underneath that?

19   **A.**   Yes, sir.

11:05:19   20   **Q.**   Who is it?

21   **A.**   Allen Stanford, and the bottom is James Davis.

22   **Q.**   James Davis?

23   **A.**   Yes, sir.

24   **Q.**   And this document was prepared by the lawyer that you

11:05:30   25   had hired to accomplish that; correct?

1   **A.**   That the company had hired, yes, sir.

2            MR. SCARDINO:  And then if we can go to the

3   eighth page of that document.

4   BY MR. SCARDINO:

5   **Q.**   Do you see that, Mr. Amadio?

6   **A.**   Yes, I do.

7   **Q.**   Transferring stock power.  Who signed that?

8   **A.**   Mr. Stanford.

9            MR. SCARDINO:  And the next page.

10  BY MR. SCARDINO:

11  **Q.**   Stock power, who signed that?

12  **A.**   Mr. Stanford.

13  **Q.**   In fact, all of those documents were prepared by the

14  lawyer for Mr. Stanford to sign to effect the transfer of

15  the asset; isn't that correct?

16  **A.**   That is correct.

17           MR. SCARDINO:  And then lastly, Defense

18  Exhibit 13-11.  These are your copies, actually.

19           THE COURT:  13-11 is admitted.  I don't even

20  have to say that; is that agreed?

21           MR. COSTA:  Yes, Your Honor.

22           THE COURT:  Okay.  Every time I hear it -- and

23  just remind me.  You keep track of it, because sometimes

24  they slip something in on me.

25           MR. SCARDINO:  We'd never do that.

*Cross-Amadio/By Mr. Scardino*

1          THE COURT:  I'm not saying that in a negative

2    way.  I may be temporarily distracted when a number comes

3    up.  We've got so many exhibits.  Double and triple check

4    does help.

5          MR. SCARDINO:  We can go to the next page of

6    that exhibit, please.

7    BY MR. SCARDINO:

8    Q.   Can you read that?  Go to the top and -- that's

9    another memorandum from Mr. Mas to you on June 11th?

10   A.   Yes.

11   Q.   Transfer of interest to R. Allen Stanford from

12   Stanford Venture Capital Holdings; right?

13   A.   Yes, sir.

14   Q.   And then -- and under -- it refers to a different

15   entity, doesn't it?  It's not Reignmaker, it's something

16   else?

17   A.   That's correct.

18   Q.   What is that company; do you know?

19   A.   I don't remember, sir.  It was part of one of the

20   companies that was owned by Stanford Venture Capital.

21   Q.   Do you know what they did?

22          THE COURT:  What are we referring to?

23          MR. SCARDINO:  The Acon-Bastion Partners II,

24   Limited.

25

1  BY MR. SCARDINO:

2  **Q.**   You don't know what that company was?

3  **A.**   I don't remember.

4  **Q.**   Okay.  How about the one before, Reignmaker, do you

11:08:07  5  remember what they did?

6  **A.**   No, I don't.

7  **Q.**   But you told the jury these companies don't have any

8  value; right?

9  **A.**   I never said that, sir.

11:08:16  10         MR. SCARDINO:  Pass the witness.

11                     **REDIRECT EXAMINATION**

12  BY MR. COSTA:

13  **Q.**   Good morning.

14  **A.**   Good morning.

11:08:30  15  **Q.**   Do you remember yesterday afternoon when Mr. Scardino

16  was beating you up for not being an entrepreneur?

17         MR. SCARDINO:  Object to the term "beating him

18  up."

19         THE COURT:  Sustained.

11:08:38  20  BY MR. COSTA:

21  **Q.**   Well, he did seem angry, didn't he?

22  **A.**   Yes.

23  **Q.**   Do you know why he was angry that you weren't an

24  entrepreneur?

11:08:46  25  **A.**   No, I don't, sir.

*Redirect-Amadio/By Mr. Costa*

1           MR. SCARDINO:  Object.  Asking him to speculate

2   why I'm angry.  Call Mrs. Scardino --

3           THE COURT:  No.  It's why he wasn't an

4   entrepreneur.

5                   Go on.

6   BY MR. COSTA:

7   **Q.**   And he said you're just an accountant, you just add

8   up numbers, that's all you do; right?  Do you remember him

9   saying that?

10  **A.**   Yes, sir.

11  **Q.**   Are you ashamed of being in the accounting

12  profession?

13  **A.**   No, I don't, sir.

14  **Q.**   But he was saying that in the context of saying that

15  Mr. Stanford was an entrepreneur and he was -- I think he

16  used the word "he took risks."  Do you remember that?

17  **A.**   Yes, sir.

18  **Q.**   And he said Mr. Stanford's investments were risky.

19  Do you remember that --

20  **A.**   Yes, sir.

21  **Q.**   -- question?

22  **A.**   Yes.

23  **Q.**   See 331-C.

24

25

Redirect-Amadio/By Mr. Costa

1           MR. COSTA:  If we can go back to the ELMO,

2  please, Ms. Alexander.  Thank you.

3  BY MR. COSTA:

4  **Q.**   This is your 2007 report.  Wait for it to focus.  But

11:09:34   5  at the end --

6           THE COURT:  If you get it in closer, it will

7  focus.

8  BY MR. COSTA:

9  **Q.**   At the end by 2008, how much money had gone from the

11:09:40  10  bank, the CD depositors' money, to Mr. Stanford's other

11  companies?

12  **A.**   End of 2007, it was $1.6 billion.

13  **Q.**   But at the end of 2008 -- we don't have the color

14  chart -- but how much?

11:09:52  15  **A.**   It was $2 billion.

16  **Q.**   Was that $2 billion that Mr. Stanford was taking big

17  risks with his money or the CD depositors' money?

18  **A.**   They was money that was coming from the bank CD

19  depositors.

11:10:06  20  **Q.**   Were they told he was taking big risks in startup

21  airline companies?

22           MR. SCARDINO:  Object, unless he has personal

23  knowledge of what the depositors were told or not told.

24           THE COURT:  It all has to be personal

11:10:19  25  knowledge.

Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com

1  BY MR. COSTA:

2  **Q.**   Did you --

3             THE COURT:  Hold it.  Hold it.  I see what

4  you're saying.  If it's not personal knowledge.

11:10:25    5             MR. COSTA:  Let me rephrase the question.

6             THE COURT:  You got the objection, work around

7  it, please.

8  BY MR. COSTA:

9  **Q.**   Did you see any annual report, any promotional

11:10:32   10  material, any document in your entire time with Stanford

11  that ever told the CD depositors that their money was

12  going to, quote, risky startup investments?

13  **A.**   No, sir.

14  **Q.**   In fact, what were the depositors told about whether

11:10:48   15  the investments the bank was making were conservative or

16  risky?

17  **A.**   Conservative.

18             MR. COSTA:  If we can go to Government 118,

19  please.  Switch back.  Thank you.  Page 19.  I'm sorry.

11:11:04   20  Stay there.  This is the 2005 annual report.  If we can go

21  to Page 19, please.  Let's go to the page before.

22  Highlight that, please.

23  BY MR. COSTA:

24  **Q.**   It's titled "Our Risk Management Strategy."  Can you

11:11:26   25  read that?

1  A.    "SIB employees, an investment strategy with the goal

2  of minimizing systematic and unsystematic risk while

3  maintaining more than adequate liquidity, portfolio

4  efficiency, operational flexibility and absolute yields as

11:11:45  5  opposed to index benchmark yields.  Our return on" --

6  Q.    And you can stop there.

7           So minimizing risk is what the depositors

8  are told in that annual report?

9  A.    Yes, sir.

11:11:55  10          MR. COSTA:  If we can go to 136, please.

11 BY MR. COSTA:

12  Q.    This is a bank marketing brochure.

13          MR. COSTA:  If we can go to Page 5.  And if we

14 can highlight that whole section.  Great.  Thank you.

11:12:11  15 BY MR. COSTA:

16  Q.    What's the title of this page?

17  A.    "Depositor Security."

18  Q.    What's the first sentence under that?

19  A.    "Our investment philosophy is anchored in time-proven

11:12:24  20 conservative criteria, promoting stability in our

21 certificate of deposits products."

22  Q.    And the next sentence?

23  A.    "Our prudent approach and methodology translate into

24 deposit security for our customers."

11:12:38  25  Q.    So conservative criteria.  And then if you can read

Redirect-Amadio/By Mr. Costa

1    under liquidity, that paragraph.

2    A.    "We focus on maintaining the highest degree of

3    liquidity as a protective factor for our depositors.  The

4    bank's assets are invested in a well-diversified portfolio

11:12:56    5    of highly marketable securities issued by stable

6    governments, strong multi-national companies and major

7    international banks."

8    Q.    Is investing in risky startup airlines consistent

9    with these representations we've seen?

11:13:15   10    A.    No, sir.

11    Q.    Probably easy to be risky with money when it's not

12    yours, don't you think?

13              MR. SCARDINO:  Object to speculation.

14              THE COURT:  Sustained.

11:13:27   15    BY MR. COSTA:

16    Q.    And Mr. Scardino, he was characterizing these as

17    investments Mr. Stanford was making.  That $2 billion,

18    what happened to most of that money?

19    A.    It's pretty much gone.

11:13:39   20    Q.    What was most of it used for?  Let's take the

21    airlines as an example, Caribbean Sun and Caribbean Star.

22    When they said, "We need money," multiple times a month,

23    what were they asking for that money for?

24    A.    It was mainly for operating expenses and covering

11:13:54   25    payroll.

*Redirect-Amadio/By Mr. Costa*

1   Q.   So the money was -- the cash was spent?

2   A.   That is correct.

3   Q.   And by the way, the $2 billion on the shareholder

4   funding report, did you ever see European money managers

5   at sophisticated banks making decisions to put that money

6   in Mr. Stanford's companies?

7   A.   No, sir.

8   Q.   Were you ever told that money managers were making

9   those decisions to send $2 billion to Mr. Stanford's

10  private companies?

11  A.   No, sir.

12  Q.   While we're talking about the annual reports and the

13  promissory note brochures, Mr. Scardino showed you an

14  annual report talking about unlisted securities?

15  A.   Yes, sir.

16  Q.   Are loans -- $2 billion loaned to Mr. Stanford, is

17  that a security?

18  A.   No, it's not a security.

19  Q.   And when he was asking you those questions, you

20  referred back to a provision -- a statement in the 2007

21  annual report talking about loans.  Do you remember that?

22  A.   Yes, sir.

23  Q.   So not only were the loans to Mr. Stanford not

24  disclosed but what did the annual report say about whether

25  any commercial loans were made?

Redirect-Amadio/By Mr. Costa

1    **A.**    That there was no commercial loans made by the bank.

2    The only loans that were made were cash-secure loans to

3    the clients.

4    **Q.**    And there's a section in the annual report that lists

11:15:27    5    those loans that were made on a cash-secure basis to

6    clients; is that correct?

7    **A.**    Yes, sir.

8    **Q.**    Do you also remember yesterday afternoon Mr. Scardino

9    asked you about whether you were a big shot like

11:15:41    10    Mr. Stanford who flew around in private jets?

11    **A.**    Yes, I recall that.

12    **Q.**    I think you said one time you were allowed to fly on

13    one of the Stanford jets?

14    **A.**    Yes.

11:15:50    15    **Q.**    Who was paying for the expenses of those jets that

16    Mr. Stanford was flying around the world on?

17    **A.**    All of those expenses were paid via the funding that

18    the companies were receiving.

19    **Q.**    And where did that money come from ultimately?

11:16:09    20    **A.**    That was coming from SIBL.

21    **Q.**    And whose money was in SIBL?

22    **A.**    The customers, consumers, clients.

23    **Q.**    How much CD depositors' money -- I think you said

24    yesterday you had an estimate of how much the last couple

11:16:25    25    of years was going for the expenses of those private jets,

Redirect-Amadio/By Mr. Costa

1   do you recall how much that was?

2   **A.**   A combination of all the entities were close to

3   $30 million.

4   **Q.**   Do you think if you took $2 billion of depositors'

11:16:36   5   money, then you might be able to be a big shot and fly

6   around in private jets?

7   **A.**   I suppose so.

8   **Q.**   Are you happy with the way you fly on commercial

9   planes?

11:16:47   10          MR. SCARDINO:  Object to relevance.

11          THE COURT:  You can ask all of us that; right?

12   Sustain the objection.

13   BY MR. COSTA:

14   **Q.**   Mr. Scardino also asked you if this $2 billion went

11:16:58   15   to Mr. Stanford personally.  Do you remember those

16   questions?

17   **A.**   Yes.

18   **Q.**   And you said it went though these companies; correct?

19   **A.**   That is correct.

11:17:07   20   **Q.**   Who was the sole owner of all of these companies?

21   **A.**   Mr. Stanford.

22   **Q.**   And remind the jury:  What was Stanford Eagle, one of

23   the companies receiving money?

24   **A.**   That company, Stanford Eagle, was the company that

11:17:22   25   owned the yachts and vessels, boats.

*Redirect-Amadio/By Mr. Costa*

1    **Q.**    Whose yachts and vessels?

2    **A.**    Mr. Stanford.

3    **Q.**    And Stanford Aviation, that was the private jets?

4    **A.**    That is correct, yes.

11:17:35  5    **Q.**    Whose private jets?

6    **A.**    Mr. Stanford's.

7    **Q.**    And the cricket companies with the -- that had the

8    20 million-dollar cricket prize, who owned those

9    companies?

11:17:45  10   **A.**    Mr. Stanford.

11   **Q.**    And we also talked -- I don't want to go through the

12   documents again.  But on direct examination, I showed you

13   that report of Mr. Stanford's personal expenses; do you

14   recall that?

11:17:55  15   **A.**    Yes, I do.

16   **Q.**    With his American Express bills and other personal

17   expenses?

18   **A.**    Yes, sir.

19   **Q.**    And where was a lot of the money that was being used

11:18:06  20   to, quote, pay off those personal expenses coming from?

21   **A.**    That money was coming from the bank.

22   **Q.**    And whose money was in the bank?

23   **A.**    That's the clients' money.

24   **Q.**    Mr. Scardino at one point said, "If Mr. Stanford owns

11:18:25  25   these companies, he can just move money around among all

1   his companies."  Do you remember those questions?

2   **A.**   Yes.

3   **Q.**   And you said something was different about the bank.

4   What was different about the bank when it comes to moving

11:18:37   5   around money?  Was that all Mr. Stanford's money in the

6   bank?

7   **A.**   No, it wasn't.

8   **Q.**   And on this issue of whether Mr. Stanford was

9   personally benefitting from this $2 billion -- were you

11:18:56   10   ever asked -- remember the Swiss bank account we talked

11   about yesterday?

12   **A.**   Yes.

13   **Q.**   The one that you never saw records for while you

14   worked for Mr. Stanford?

11:19:04   15   **A.**   That is correct.

16   **Q.**   And you had that one time when you heard about it

17   because of an insurance listing, and then you asked and

18   found out it was -- or Mr. Davis told you it was

19   Stanford's account; do you recall that?

11:19:16   20   **A.**   Yes, I do recall that.

21   **Q.**   Were you ever told to include in the $2 billion over

22   $100 million Mr. Stanford was getting out of that Swiss

23   account and putting it in his personal bank accounts?

24   **A.**   No, sir, I don't recall.

11:19:33   25   **Q.**   Mr. Scardino talked to you a lot about how you knew

*Redirect-Amadio/By Mr. Costa*

1  these companies were losing money; do you recall that?

2  **A.**   Yes, sir.

3  **Q.**   And you were trying to give an explanation.  I think

4  he cut you off.  How did you know about whether these

11:19:52   5  companies were making or losing money in a given year?

6  **A.**   We had access of all the financial statements of

7  every single company on a monthly basis.

8  **Q.**   Was there a name for a book that combined all those

9  financial statements?

11:20:10   10  **A.**   There was a red book that combined all of the

11  financial statements from all the affiliated companies.

12  **Q.**   And you had access to that?

13  **A.**   Yes, sir.

14  **Q.**   I'm going to show you Government 822.  I don't need

11:20:27   15  to admit it right now.  But is this one of those red books

16  that contains the financial statements for all the

17  entities?

18  **A.**   Yes, sir.

19  **Q.**   Mr. Scardino asked you about the consolidation

11:20:44   20  project that was underway in late 2008.  Do you recall --

21  **A.**   Yes.

22  **Q.**   -- those questions?

23  **A.**   Yes.

24  **Q.**   Was that -- and that consolidation project, you said,

11:20:53   25  was going to add all the financial statements together?

1    **A.**   That is correct, yes.

2    **Q.**   What happens when you add up a bunch of negative

3    numbers?

4    **A.**   It will still give you a negative number.

11:21:05   5    **Q.**   So in your view, was consolidating the financial

6    statements going to solve this issue of having billions of

7    dollars Mr. Stanford owed back to the bank?

8    **A.**   It would not solve.  It would show a clear picture of

9    the results and the profitability of each one of these

11:21:24   10   entities combined.

11   **Q.**   So the idea was to show by combining them how poorly

12   the overall picture was; is that right?

13   **A.**   Yes, sir.

14   **Q.**   It wasn't going to solve the problem, it was going to

11:21:39   15   highlight the financial status of all these companies; is

16   that right?

17   **A.**   That is correct.

18   **Q.**   And just the airlines themselves, did Mr. Kuhrt, one

19   of your supervisors, ever make a comment about the

11:21:53   20   airlines themselves and their profitability versus the

21   profits the bank was claming it was making?

22   **A.**   In a conversation that we were having with Mark, Mark

23   made a comment that because of a concern of how these

24   airlines were losing so much money, that the airlines had

11:22:11   25   pretty much eaten all the combined profits that the bank

1   had made at that point in time.

2   **Q.**   Even if the bank was reporting accurate numbers about

3   its profits?

4   **A.**   Yes, sir.

11:22:30   5   **Q.**   And Mr. Scardino was talking about treasury

6   yesterday; do you remember that?

7   **A.**   Yes, sir.

8   **Q.**   And he seemed to indicate that there was just one big

9   treasury bank account that all the money from all these

11:22:41   10   entities came into.  Was that the case?

11   **A.**   Treasury was -- just had a list of all the banks and

12   had access to some of the banks where transactions were

13   being made coming from the bank to all of the multiple

14   entities banks' accounts.

11:23:04   15   **Q.**   So he said, "How do you know that this $2 billion

16   came from Stanford International Bank?"  Explain to the

17   jury how you are sure of that?

18   **A.**   The treasury report that was producing Stanford

19   Financial Group Company in Houston had a list of all the

11:23:23   20   banks, and that treasury report will show the flow of the

21   money coming from the different banks and how that was

22   transferred to the different banks of each entity.  So

23   that report will show Stanford International Bank

24   transferring money to Stanford Financial Group Global

11:23:45   25   Management and then from that entity's bank account to the

1    rest of the affiliated companies.

2    **Q.**    So Stanford International Bank had its own accounts

3    the depositors were putting money into; is that right?

4    **A.**    I'm sure they had multiple different bank accounts,

11:24:00    5    yes.

6    **Q.**    Let's talk about that.

7              Do you remember yesterday Mr. Scardino --

8    you were saying that the money, like these private equity

9    transactions and then the real estate transaction that was

11:24:13    10   planned later on, you said that was just paper.  It wasn't

11   cash.  Do you recall that?

12   **A.**    Yes, I do.

13   **Q.**    And do you recall Mr. Scardino said, Well, it's

14   hardly ever cash?  Do you recall that?

11:24:22    15   **A.**    Yes, sir.

16   **Q.**    Let's talk about this.  When money -- when the CD

17   depositors put their billion dollars of lifetime savings

18   into the bank, was that cash?

19             MR. SCARDINO:  Object to the form of the

11:24:38    20   question.  It's a leading question.

21             THE COURT:  Rephrase it, please.

22   BY MR. COSTA:

23   **Q.**    When CD depositors put money into the bank, what was

24   the form that they -- of money they gave?

11:24:47    25   **A.**    It's cash, yes.

Redirect-Amadio/By Mr. Costa

1    Q.   So billions of cash is going into the bank.

2              When the bank sent $2 billion to fund

3    Mr. Stanford's companies, was that cash?

4    A.   Yes, it was.

11:25:17    5    Q.   But then when Mr. Stanford was trying to pay off the

6    loans through the -- Mr. -- one of the last things he did

7    was show you a bunch -- I think three documents about the

8    private equity companies that he was sending back to the

9    bank in 2008.

11:25:43    10              Do you recall those documents?

11    A.   Yes, I do.

12    Q.   Was that cash that was going back to the bank?

13    A.   No, it wasn't.

14    Q.   What was it?

11:25:52    15    A.   Those are just assets, companies.

16    Q.   What you called the paper value?

17    A.   Paper, yes.

18    Q.   So cash is coming in, and 2 billion in cash goes to

19    other Stanford companies.

11:26:07    20              So that's plenty of cash going around at

21    that point; correct?

22    A.   Yes, sir.

23    Q.   But when it comes to trying to pay that down,

24    Stanford doesn't give cash to pay down the loan.  Is that

11:26:22    25    right?

1  **A.**   That's correct.

2  **Q.**   And what was the value that was given to those

3  private equity deals?  Not just the ones in 2008, but even

4  going back to 2004.  The value that Stanford's own people

11:26:35  5  listed for those companies?

6  **A.**   The first one done in 2004, it was about two -- $310

7  million.

8  **Q.**   So that's going back here, and that's just value on

9  paper; correct?

11:26:56  10  **A.**   That's correct.

11  **Q.**   And that's why at the end -- the end of 2008, it was

12  listed that of that 2 billion, Mr. Stanford only owed 1.7

13  back.  Is that right?

14  **A.**   That's correct.

11:27:09  15  **Q.**   But did you ever see any significant cash payments in

16  the whole time you worked there drawing down on that

17  $2 billion.

18  **A.**   No, sir.

19  **Q.**   And what did CD depositors want when they tried to

11:27:22  20  redeem their CDs Mr. Stanford had promised them he could

21  redeem?

22  **A.**   Cash.

23  **Q.**   By the way, I don't want to go into those memos

24  Mr. Scardino showed you.  But you explained -- and this

11:27:39  25  had nothing to do with the consolidation project; correct?

1   **A.**   That is correct.

2   **Q.**   This was just that private equity, returning that to

3   try so deal with some financial problems the bank was

4   having.  Is that right?

11:27:49   5   **A.**   That is correct.

6   **Q.**   And he showed you a number of signatures of

7   Mr. Stanford on those documents; correct?

8   **A.**   Yes, sir.

9   **Q.**   So at least when it comes to those deals,

11:27:59   10   Mr. Stanford was involved in signing documents and not an

11   absentee owner.

12             Is that the way it appears?

13   **A.**   Yes, sir.

14   **Q.**   Let's talk briefly about the phone call.  He talked

11:28:21   15   about Mr. Roca calling you and it was recorded shortly

16   after you turned the football over to the FBI.

17             Do you recall that?

18   **A.**   Yes, sir.

19   **Q.**   And you said that you've listened to that call a few

11:28:32   20   days ago; correct?

21   **A.**   Yes, sir.

22   **Q.**   Was it about 10 minutes or so?

23   **A.**   Approximately, yes.

24   **Q.**   Might have seemed longer than that?

11:28:39   25   **A.**   Perhaps, yes.

*Redirect-Amadio/By Mr. Costa*

1   Q.   And what Mr. Roca was asking you in that call what he

2   should tell the FBI.

3                    Do you remember that?

4   A.   Yes, sir.

11:28:49  5   Q.   Did he say that repeatedly over the course of that

6   call?

7   A.   Repeatedly.

8   Q.   And what did you repeatedly tell Mr. Roca when he

9   said, What I should I tell the FBI?

11:28:58  10  A.   To tell the truth.

11  Q.   Anything on that recording that you listened to that

12  you're ashamed of?

13  A.   No, I'm not.

14  Q.   Anything inconsistent with what you've told this jury

11:29:12  15  yesterday and today?

16  A.   Nothing is inconsistent.

17  Q.   Let's talk about Mr. Hewlett for a moment.

18                    Mr. Scardino asked you yesterday whether

19  it was possible that Hewlett was auditing a lot of other

11:29:29  20  companies you didn't know about.

21                    Do you remember those questions?

22  A.   Yes, sir.

23  Q.   Now, the companies in the United States, did Hewlett

24  ever audit those, to your knowledge?

11:29:39  25  A.   No, sir, not to my knowledge.

Redirect-Amadio/By Mr. Costa

1  Q.    And you had that allocation document that listed the

2  companies he was actually auditing and that you were

3  allocating the on-the-book payments, the payments the

4  accounting department knew about, you had a list of those

11:29:54  5  companies; correct?

6  A.    That's correct, yes.

7  Q.    And if he was auditing any other companies, shouldn't

8  those have been accounted for on the books of those

9  companies?

11:30:04  10  A.    Yes, sir.

11  Q.    And they weren't?

12  A.    That's correct.

13  Q.    Mr. Scardino asked you a question if these were

14  bribes, if you were paying bribes, wouldn't you do it in

11:30:19  15  cash.  And you tried to say something, and he cut you off.

16            Do you recall what you were trying to say

17  when he said, Would you pay bribes in cash?

18  A.    Sorry.  I can't remember.

19  Q.    Do you have any experience yourself paying bribes?

11:30:35  20  A.    No, I don't.

21  Q.    And those -- the on-the-book payments to Hewlett were

22  made out of that Trustmark account from here in Texas.

23            Do you recall that?

24  A.    Yes, I do.

11:30:44  25  Q.    And those payments you didn't know about until long

1  after you left working for Stanford, where was that bank

2  account located?

3  **A.**   That's the bank account in Swiss -- Switzerland.

4  **Q.**   And Mr. Scardino was saying, Well, why would you wire

11:31:00  5  bribes?  Why would you use a wire transfer?

6                    What are Swiss banks known for?

7                  MR. SCARDINO:  Objection.  Speculation,

8  irrelevant -- not material, not relevant.

9                  THE COURT:  Overruled, if he knows.

11:31:11  10                 THE WITNESS:  What's known about Swiss bank,

11  they're very secretive in transactions.

12  BY MR. COSTA:

13  **Q.**   More secretive than a bank account in Texas?

14  **A.**   Yes, sir.

11:31:31  15  **Q.**   Let's go on to talk about the land transaction.

16                    You said that $3 billion that that real

17  estate was valued at was just listed on paper; correct?

18  **A.**   Yes, sir.

19  **Q.**   And Mr. Scardino was saying there was a plan.

11:31:47  20                    Do you recall those questions?

21  **A.**   Yes.

22  **Q.**   If I wrote $3 billion on a napkin, could that be used

23  to pay back depositors?

24  **A.**   No, sir.

11:32:00  25  **Q.**   Are you aware that $3 billion-plus that they were

1  valuing those few thousand acres an Antigua at is more

2  than the entire national gross product of the country of

3  Antigua?

4  **A.**   I didn't -- I didn't know that.

5  **Q.**   And he started asking a lot of questions.  Isn't

6  anything possible?  The stars can align?  Do you recall

7  those questions?

8  **A.**   Yes, sir.

9  **Q.**   It's possible I could win the lottery tomorrow;

10  right?

11  **A.**   The odds are against you, but yes.

12  **Q.**   But theoretically, it's possible; right?

13  **A.**   Yes.

14  **Q.**   Would you stake all your life savings on a CD that

15  relied on me winning the lottery tomorrow?

16  **A.**   No, sir.

17  **Q.**   I want to talk about secrecy.

18          Do you recall Mr. Scardino both yesterday

19  and this morning asking you a lot of questions about what

20  you had said about which are documents were secret?

21  **A.**   Yes, sir.

22  **Q.**   When Mr. Scardino talked about when you spoke to the

23  government back in 2010, do you remember a lot of

24  questions about that?

25  **A.**   Yes, sir.

Redirect-Amadio/By Mr. Costa

1   Q.   And he said, Do you remember telling the government

2   that a lot of the accountants at a lot of the companies,

3   like Caribbean Sun and Star, knew that they were getting

4   funding from the shareholder?

5                  Do you remember those questions?

11:33:31

6   A.   Yes, sir.

7   Q.   And you agreed.  And you said you told the government

8   about that back in 2010, and you still agree with that;

9   correct?

10  A.   That is correct, yes.

11:33:39

11  Q.   Going back to this chart we used yesterday, which

12  portion of the chart were you talking about when you said

13  the accountants at Caribbean Sun knew -- knew about?

14  A.   The bottom portion.

15  Q.   They knew the money was coming from Stanford to the

11:33:55

16  airlines; correct?

17  A.   That is correct.

18  Q.   Nothing secretive about that?

19  A.   Nothing -- nothing secret about that.

20  Q.   Do you remember right after lunch yesterday, I asked

11:34:05

21  you, in theory, was there anything wrong with just the

22  bottom half of this movement of money?

23  A.   No, nothing's wrong with that part.

24  Q.   What part was the problem for you?

25  A.   The problem is that the money being funded on behalf

11:34:16

*Redirect-Amadio/By Mr. Costa*

1    of the shareholder to all his entities were coming from

2    Stanford International Bank.

3    **Q.**    So which part of the chart was the problem?

4    **A.**    The upper part.

5    **Q.**    This part?

6    **A.**    Yes.

7    **Q.**    And who were the only people working for Stanford who

8    were told -- who had access to that report showing the

9    total amount of money coming from the bank for all the

10   different companies combined?

11   **A.**    That was Mr. Gil Lopez, Mark Kuhrt, Mr. Davis,

12   Mr. Stanford, myself.

13   **Q.**    And was there one single person you mentioned outside

14   the company who was the only person who was not an

15   employee who was allowed access to that document?

16   **A.**    That I remember providing him one time a copy, yes.

17   **Q.**    Who was that person?

18   **A.**    It was Harry Failing.

19   **Q.**    And who was he?

20   **A.**    He was Mr. Stanford personal CPA.

21   **Q.**    And we're talking about this Document 331C, the

22   shareholder funding report?

23   **A.**    Yes, sir.

24   **Q.**    And that's what you're testifying to was being

25   secret; correct?

1   **A.**   Yes, sir.

2   **Q.**   You never said everything on the football was secret,

3   did you?

4   **A.**   That's correct.  Not everything.

11:35:43   5   **Q.**   But what did you say you were told would happen if

6   you disclosed this document that only Mr. Stanford, Davis,

7   Lopez, Kuhrt and yourself were supposed to have access to?

8   **A.**   That was not to be seen by anybody, and that --

9   **Q.**   And what might happen if you did disclose it to

11:36:02   10   someone else, even in the company, let alone the public?

11   **A.**   Since it was a need-to-know basis, I could lose my

12   job, yes.

13          MR. COSTA:  Pass the witness.

14                  **RECROSS EXAMINATION**

11:36:18   15   BY MR. SCARDINO:

16   **Q.**   Mr. Amadio, did you have an opportunity to visit with

17   members of the prosecution last night when we broke?

18   **A.**   No, sir.

19   **Q.**   Didn't go over all -- any of my cross-examination

11:36:36   20   with you with members of the prosecution last night?

21   **A.**   No, sir.

22   **Q.**   Go over it with your lawyer?

23   **A.**   No, sir.

24   **Q.**   Didn't talk to anybody about yesterday's events in

11:36:48   25   court?

*Recross-Amadio/By Mr. Scardino*

1   **A.**   Nau-uh.

2   **Q.**   Mr. Costa asked you, talked about land transactions

3   and made a reference to would you bet your life's savings

4   on whether or not Mr. Costa would win the lottery.

11:37:07   5                    Does that have anything to do with this

6   case before this jury?  Does it?

7   **A.**   In the context that he was saying, I think it made

8   sense.

9   **Q.**   Okay.  So you agree with him that it is as ridiculous

11:37:19  10   as betting your life's savings on winning the lottery as

11   it is to invest in a company that owns 3,000 acres of

12   Caribbean real estate?  You're saying -- you're thinking

13   that's a good comparison?  That's what he's saying.  He's

14   asking you, It's as ridiculous to bet your life savings on

11:37:38  15   somebody, another person winning the lottery, as it is to

16   invest in a company that is purchased and developed

17   2,000 acres of Caribbean real estate.

18                    Do you agree with that?

19   **A.**   In the context that it was -- increased the values

11:37:51  20   5000 percent, yes.

21   **Q.**   Okay.  So you think that the comparison is a fair

22   comparison that Mr. Costa made with this jury?  The

23   lottery -- winning the lottery, whatever those odds are,

24   and investing in a company that has got myriad -- or

11:38:09  25   buying a CD from a bank that invests the money in myriad

1    investments, including real estate that happens to be that

2    they're developing in the Caribbean.  That's a fair

3    comparison to you?  I'm asking you:  Yes or no?

4    **A.**   I will say yes.

11:38:27   5    **Q.**   Yes.  And you say yes because you're going for agree

6    with whatever he says, aren't you?

7    **A.**   No, sir.

8    **Q.**   No, sir.  Well, you have so far.

9                   Anything you can think of he's asked you

11:38:36  10    an opinion of that you've disagreed with him?

11    **A.**   Everything that he asked me was the truth, what I

12    said.

13    **Q.**   He talked to you about Swiss bank accounts and what

14    they're known for.  And you told him they're known that

11:38:53  15    they're secret.

16                   This is something within the realm of your

17    personal knowledge, Mr. Amadio?  You know all about Swiss

18    banks?

19    **A.**   I don't know everything about Swiss banks, but I know

11:39:07  20    there's multiple articles and news about issues with Swiss

21    banks.

22    **Q.**   So what you've read, you're telling this jury you

23    know about Swiss banks and they're known to be secretive

24    from articles that you've read?  Movies, did you get that

11:39:22  25    from watching movies maybe?

*Recross-Amadio/By Mr. Scardino*

1  **A.**    No, articles.

2  **Q.**    Articles.  Okay.  So you're telling this jury that

3  Swiss banks are a place where you can put money and keep

4  it secret?

11:39:33  5  **A.**    They don't disclose -- in many cases, they don't

6  disclose their clients.

7  **Q.**    Have you contacted the Swiss banking authorities to

8  establish the basis for you sharing this information with

9  this jury?

11:39:44  10  **A.**    No, I didn't, sir.

11  **Q.**    You don't do that.

12              In fact, you don't even know that Swiss

13  banks will put a hold on any account that they have with

14  any customer, whether it's from the United States or

11:39:55  15  anyplace else in the world, if they even get a report that

16  that money might be money that was obtained in an illegal

17  manner.  They'll freeze the account.

18              Did you know that?

19  **A.**    No, I didn't know.

11:40:06  20  **Q.**    You did not know that.  Okay.

21              You talked about Mr. Hewlett.  God rest

22  his soul.

23              You never -- did you have a chance to talk

24  to Mr. Hewlett, meet him?

11:40:18  25  **A.**    Met him one time.

*Recross-Amadio/By Mr. Scardino*

1  **Q.**   Met him one time.  And he was an outside auditor;

2  right?

3  **A.**   That's correct.

4  **Q.**   He performed that service for Stanford companies?

11:40:24  5  **A.**   Yes, sir.

6  **Q.**   And -- but you weren't in the loop to know what else

7  he might have done for Stanford companies, do you?

8  **A.**   No, sir.

9  **Q.**   When Mr. Costa asked you, Did you know what he might

11:40:35  10  have done for any companies that were in any other part of

11  the world whether it be in South America, Europe or the

12  U.S., you have no idea, do you?

13  **A.**   No, sir.

14  **Q.**   So when you venture an opinion to this jury about you

11:40:47  15  think that the money that he was being paid was too high,

16  that's not based on information that you were in the loop

17  to know, is it, Mr. Amadio?

18          If you don't know what he did, how can you

19  form an opinion that he was being overpaid?

11:41:06  20  **A.**   Are we talking about specifically the money that was

21  not recorded in the books of the company?

22  **Q.**   That's a separate issue.  Whether it was recorded and

23  reported in some manner in the books that you audited is

24  different than whether or not he's being overpaid.

11:41:17  25  **A.**   In context that -- what I was referring to is the

*Recross-Amadio/By Mr. Scardino*

1   additional pounds that he was -- 20,000 pounds that he was

2   receiving.

3   **Q.**   Let's focus on the question, Mr. Amadio.

4                  You told this jury you thought he was

11:41:28  5   being overpaid, but you admit you don't know what he was

6   asked to do?

7   **A.**   I don't know everything he was doing.

8   **Q.**   You do know this:  That the type of audits that he

9   performed were referred to, at least I used to call them,

11:41:41 10   certified audits.

11                  Do you still call them certified audits,

12   where you take -- you go through a list of information

13   that is provided to you as an outside auditor, and you

14   just don't take it at face value.  You actually take the

11:41:56 15   entry and follow it to where it was deposited and where it

16   was withdrawn and trace the history of it.  And we used to

17   call that a certified audit or a verified audit.

18   **A.**   Okay.

19   **Q.**   Okay.  As opposed to just adding up a column of

11:42:09 20   numbers and making sure the numbers all add up when you do

21   an audit like that.

22                  Different are kind of audit; right?

23   **A.**   You trace it to the source.

24   **Q.**   Okay.  So Hewlett's audit was the kind of audit that

11:42:18 25   was a certified audit that takes a lot more time to do,

1  doesn't it?

2  **A.**   Correct.

3  **Q.**   Correct.  In fact, not only more time to do, but a

4  higher level of expertise to accomplish the audit because

11:42:29   5  you're tracking money, and you've got to know how to read

6  financial reports and statements of that nature in order

7  to accomplish that goal, don't you?

8  **A.**   If that's what he was doing, yes.

9  **Q.**   Well, you testified on direct examination that is

11:42:44   10  what he was doing, that he was doing certified audits.

11              Didn't you tell Mr. Costa -- tell the jury

12  that when asked by Mr. Costa?

13  **A.**   He was paid for that.

14  **Q.**   Okay.

11:42:52   15  **A.**   I don't know exact --

16  **Q.**   Okay.

17  **A.**   I don't know specifically what he was --

18  **Q.**   Were you telling this jury he didn't do his job?  Do

19  you know if he didn't do his job?

11:43:00   20  **A.**   No, I don't.

21  **Q.**   You talked about the Roca phone call for a minute and

22  that you were told to do nothing but tell the truth.

23              Actually that's what you told Roca; right?

24              You told Roca to cooperate with the FBI

11:43:20   25  and tell them everything, and that's probably why you're

1    not indicted.  You told him, when he called, what's going

2    on, what should I do, you told Roca tell the truth,

3    cooperate.  Isn't that correct?

4    **A.**    That is correct.

11:43:31    5    **Q.**    Okay.  The fact remains, though, that the FBI put him

6    up to it and they were trying to set you up, weren't they?

7    **A.**    At that point in time, yes.

8    **Q.**    Yeah.  And you just found out about it right before

9    you testified here; right?

11:43:43    10    **A.**    Yes, sir.

11    **Q.**    Okay.  Mr. Costa asked you about the depositors put

12    the money in the bank, put in cash, but they don't get --

13    they do get a check back; right?  People that -- I didn't

14    say that very well.  Let me start over.

11:44:04    15                Persons that purchased certificates of

16    deposits, they wrote a check and they were given a document

17    back that was a certificate of deposit that outlined the

18    agreement with the bank.  Isn't that correct?

19    **A.**    Correct.

11:44:20    20    **Q.**    Okay.  So it would be unusual for somebody to walk

21    into the bank with an icebox full of money or an ice

22    bucket full of money or bucket full of money, count it out

23    and say, I want a -- I want $200,000 worth of this CD.

24                Most of the transactions were done with

11:44:35    25    some kind of negotiable instrument, weren't they?

*Recross-Amadio/By Mr. Scardino*

1   **A.**   Yes.

2   **Q.**   And that all the depositors that got paid back the

3   money, the bank -- banks don't give them -- they don't --

4   you don't come to the bank and say, I want to redeem my

11:44:49   5   CD, and the bank says, Okay.  There's whip out, here's

6   cash, and counts them out cash.

7                   That would be very unusual, wouldn't it?

8   **A.**   That's correct.

9   **Q.**   Okay.  So when Mr. Costa talks about, Well, you know,

11:44:58   10   he -- Mr. Stanford was making these investments and was

11   recapitalizing the bank, that wasn't the same as what the

12   depositors put in.

13                   What the depositors got back was a check

14   just like they put in; right?

11:45:08   15   **A.**   That's correct.

16   **Q.**   Okay.  In fact, that all happened and they all got

17   their money until the receiver took over.  Isn't that

18   right?

19   **A.**   I don't know about that.

11:45:20   20   **Q.**   Well, you worked there until February when the

21   receiver took over, didn't you?

22   **A.**   Yes.  Two weeks after, yes.

23   **Q.**   And you know that all the depositors were paid every

24   penny of their money until that period of time, don't you?

11:45:35   25   **A.**   No, I don't know.  As a matter of fact, I heard

*Recross-Amadio/By Mr. Scardino*

1       that --

2                   MR. SCARDINO:  Nonresponsive.

3                   THE COURT:  Sustained.

4                        Can you answer that, sir?

11:45:43   5                   THE WITNESS:  No, I don't know that everybody

6       received all their money.

7   BY MR. SCARDINO:

8       **Q.**   You do know that when the receiver took over then,

9       that no money was paid after that period of time.

11:45:52   10                       You do know that; right?

11      **A.**   Yes, I do know that.

12      **Q.**   And you do know that since the receiver took over

13      three years ago, that nobody's been paid any money; right?

14      You know that; right?

11:46:02   15      **A.**   I read articles, yes.

16      **Q.**   Right.  And you know that since the receiver took

17      over and started managing the Stanford companies that the

18      receiver spent over a hundred million dollars on lawyers

19      and accountants since then.

11:46:12   20                       Do you know that?  A hundred million, do

21      you know that?

22      **A.**   I didn't keep track of the numbers.

23      **Q.**   All right.  You do know that the receiver had the

24      opportunity to sell the broker dealer --

11:46:31   25                   MR. COSTA:  I'd object to beyond the scope,

*Recross-Amadio/By Mr. Scardino*

1  Your Honor.

2            THE COURT:  Sustained.

3  BY MR. SCARDINO:

4  **Q.**   You're familiar with the broker dealer?

11:46:38   5  **A.**   Yes, sir.

6  **Q.**   Okay.  Mr. Costa asked you about the value of some

7  assets, including the broker dealer?

8            MR. COSTA:  I'd object.  I don't think I asked

9  any questions about value.  I asked what they were doing on

11:46:50  10  a yearly basis.

11  BY MR. SCARDINO:

12  **Q.**   Okay.  What they were doing on a yearly basis.  You

13  had knowledge about what -- let's talk about the broker

14  dealers, what they were doing on a yearly basis, you're

11:46:58  15  familiar with that; right?

16  **A.**   Yes.

17  **Q.**   And that was --

18            THE COURT:  Right at that point, maybe we'll

19  take a break because we've been in session now exactly an

11:47:05  20  hour and a half.  It's just about 15 minutes to 12:00.

21  Check your watch, we'll get back in and go from about 12:00

22  to 1:05, something like that.

23            We'll see you back in 15 minutes.

24            **(Recessed at 11:47 a.m.)**

12:06:17  25            **(The following was held before the jury)**

*Recross-Amadio/By Mr. Scardino*

1          THE COURT:  All right, sir.  Go right ahead.

2          MR. SCARDINO:  Thank you, Your Honor.

3          THE COURT:  You want to pull the microphone in,

4 please.

12:06:33   5 BY MR. SCARDINO:

6  **Q.**   Mr. Amadio, you remember when Mr. Costa asked you on

7  redirect examination about the consolidation project?

8  **A.**   Yes, sir.

9  **Q.**   And he asked you about if you added negatives

12:06:44  10 together, it would still be a negative; do you remember

11 that?

12 **A.**   Yes, sir.

13 **Q.**   You were talking about these related entities, these

14 other companies.  In your opinion, they did not have

12:06:55  15 value; correct?

16 **A.**   In my opinion, the combined financials of all these

17 entities were not producing profits.

18 **Q.**   Were not producing profits.  That's different from

19 not having value, though; right?

12:07:07  20 **A.**   That is different, yes.

21 **Q.**   So that even though they weren't producing profits,

22 they could have value, they could be sold for more money

23 than they were purchased for, even though they weren't

24 making profits?

12:07:20  25 **A.**   They could be sold, yes.

*Recross-Amadio/By Mr. Scardino*

1  **Q.**   In fact, that's not unusual for that to happen, is

2  it?

3  **A.**   No, it's not.

4  **Q.**   Okay.  In fact, some of the assets that were there

12:07:27  5  were sold for profits, some at even a great profit by the

6  receiver, weren't they?  Like the Venezuelan banks, over

7  $80 million, great profit; right?

8              MR. COSTA:  Beyond the scope, Your Honor.

9              THE COURT:  Sustained.

12:07:39  10  BY MR. SCARDINO:

11  **Q.**   You did talk about consolidation projects; right?

12  **A.**   Yes, sir.

13  **Q.**   And you did talk about assets, and you said they were

14  all negative.  Did you know about the Venezuelan bank?

12:07:48  15              MR. COSTA:  Object.  Talked about the profit

16  and loss of these companies.

17              THE COURT:  Sustained.

18              MR. COSTA:  Also refer to the limine motion as

19  well.

12:07:55  20              THE COURT:  That's true.  Thank you.

21  BY MR. SCARDINO:

22  **Q.**   Mr. Costa asked you about the money that was used to

23  make these investments and to purchase these entities.  Do

24  you remember that?

12:08:16  25  **A.**   Yes, sir.

*Recross-Amadio/By Mr. Scardino*

1   **Q.**   And he asked you about was that bank money that was

2   used to make these purchases?

3   **A.**   Yes.

4   **Q.**   And the intimation there, wasn't it, was that there

12:08:27   5   was something wrong with that?

6   **A.**   That's correct.

7   **Q.**   Okay.  And you're telling this jury you think

8   something is wrong with that?

9   **A.**   Yes, sir.

12:08:33   10   **Q.**   But when you by a CD from the bank, the bank invests

11   that money in other entities, doesn't it?  That's normal

12   for a bank to do that, isn't it?

13   **A.**   Other entities as securities, stocks, yes.

14   **Q.**   So just the fact that the bank purchased -- these

12:08:50   15   entities were purchased with bank money in and of itself

16   there's nothing wrong with it and it's usual practice for

17   banks, isn't it?

18   **A.**   Is usual practice of banks, yes.

19   **Q.**   And Mr. Costa referred to Government's Exhibit 118

12:09:09   20   when they were talking about minimalizing risk.  Do you

21   remember him asking you that?

22   **A.**   Yes.

23   **Q.**   Okay.  And he talked to you about whether or not some

24   of the risks was -- some effort was made to minimize the

12:09:21   25   risk.  Do you remember talking about that?

*Recross-Amadio/By Mr. Scardino*

1   **A.**   Yes.

2   **Q.**   Okay.  Now, Mr. Amadio, every investment just by the

3   nature that it's an investment is going to carry some

4   risk, isn't it?

12:09:35   5   **A.**   Correct.

6   **Q.**   I mean, if you want to put your money somewhere where

7   it's not going to possibly earn you money, you just have

8   to put it in a box, don't you?

9   **A.**   CDs are very low risks, sir.

12:09:48   10   **Q.**   CDs are very low risk.  But there's other investments

11   that the risk increases depending on the nature of the

12   investment; isn't that correct?

13   **A.**   That is correct, yes.

14   **Q.**   And it's the riskier investments that are likely to

12:10:02   15   bring you the greater return, isn't it?

16   **A.**   That is correct.

17   **Q.**   I mean, Mr. Costa's example was like winning the

18   lottery.  If you pay a $1, you might win $10 million.

19   What is that -- what percentage of increase in value does

12:10:17   20   that lottery ticket go from $1 to $10 million?  That's

21   huge, isn't it?

22   **A.**   Yes.

23   **Q.**   Maybe an extreme example of a risky investment, but

24   some investments are much more -- have a bigger risk than

12:10:30   25   others?

*Recross-Amadio/By Mr. Scardino*

1    **A.**    (No audible answer.)

2    **Q.**    In fact, Mr. Amadio, the persons that purchased the

3    CDs knew exactly what they were purchasing, didn't they --

4    have you seen the disclosure statement that they were

12:10:53   5    given?

6    **A.**    Yes.

7              MR. COSTA:  Object as beyond the scope.

8              MR. SCARDINO:  He talked about risk

9    minimalizing, Your Honor, and I'm responding to that.

12:11:04   10             THE COURT:  Overruled.

11   BY MR. SCARDINO:

12   **Q.**    So the people that bought these CDs were told within

13   a disclosure statement that was -- I mean, did you draft

14   the disclosure statement?

12:11:12   15   **A.**    No, I didn't.

16   **Q.**    Do you know who drafted it?

17   **A.**    I don't recall right now.

18   **Q.**    But you know that before anybody could purchase these

19   CDs, they were given a disclosure statement that explained

12:11:23   20   exactly what they were and weren't getting and were told

21   they could lose every penny of their money, weren't they,

22   because it was an investment; right?

23   **A.**    I don't recall reading that.

24   **Q.**    You don't recall reading in the disclosure statement

12:11:38   25   that everyone that purchased the CDs were told you can

*Recross-Amadio/By Mr. Scardino*

1  lose every penny of your money?

2  **A.**   I don't remember because I didn't read that.

3  **Q.**   Mr. Costa talked to you about jets that were used.

4  Do you remember him talking about -- and how the jets were

5  purchased.  They were purchased with bank money; do you

6  remember that?

7  **A.**   Yes, sir.

8  **Q.**   I mean, did Mr. Stanford consult with you about, hey,

9  Mr. Amadio, do you think it's a good idea that I should

10 buy some of these jets to attract some of the high net

11 worth people that I need to get involved to try to make

12 this a successful operation.  Did he ask you about that?

13 **A.**   No, sir.

14 **Q.**   Okay.  But you do know that the jets were purchased

15 to attract that type of investor or customer or depositor,

16 people that had a lot of money or the people that Stanford

17 was looking to attract into his investment ideas, wasn't

18 he?

19 **A.**   Yes, that's what I was told.

20 **Q.**   And those people fly around in jets, don't they?

21 **A.**   Yes, sir.

22 **Q.**   They're wealthy people, aren't they?

23 **A.**   Correct.

24 **Q.**   Anything wrong with being wealthy?

25 **A.**   Nothing wrong.

12:11:53

12:12:04

12:12:18

12:12:32

12:12:41

*Recross-Amadio/By Mr. Scardino*

1   **Q.**   Okay.  Mr. Costa asked you about did you see any

2   European managers making decisions about investments.  Do

3   you remember him asking you that?

4   **A.**   Yes, sir.

12:12:57   5   **Q.**   And you said, "No, I didn't see anything like that."

6   Do you remember that?

7   **A.**   Related to the 2 billion, yes.

8   **Q.**   Or related to anything.  I mean, your job would have

9   never put you in touch or had anything to do with anybody

12:13:08   10   that Mr. Stanford's organization had hired to help him

11   decide where to place these assets and how to make the

12   investments.  You wouldn't have known that, would you?

13   **A.**   The question was in context of the 2 billion when I

14   responded to that.

12:13:23   15   **Q.**   Were you in the loop to know about how -- who

16   Mr. Stanford hired to help him make decisions about where

17   to invest this money?

18   **A.**   No, sir.

19   **Q.**   No.

12:13:39   20           You testified on redirect examination that

21   the $2 billion was gone; right?

22   **A.**   For that --

23   **Q.**   Is that correct?  I mean, have you done an analysis?

24   Can you look at this jury and say, "I know it's gone

12:13:52   25   because I know where it went.  I know what's happened to

Recross-Amadio/By Mr. Scardino

1   it."  Do you know that?

2   **A.**   For the most -- most of that money was pretty much

3   gone.

4   **Q.**   Most of that money was pretty much gone?

12:14:04   5   **A.**   Uh-huh.

6   **Q.**   I mean, do you have some analysis that you can show

7   us that you've done where you can make a statement like

8   that under oath in this federal courtroom that's emphatic

9   that you know that the $2 billion is gone.  Can you do

12:14:18   10   that?

11   **A.**   The analysis is done in that shareholder funding

12   report, yes.  There is a lot of detail in that report that

13   states where that money was spent.  I will say not in the

14   entirety of the $2 billion it was invested in buildings,

12:14:34   15   on purchase of banks, but a lot of that money was also

16   spent on payroll, operating expenses.

17   **Q.**   Listen to my question.  Could you look this jury in

18   the eye and tell them that you know the $2 billion is

19   gone?

12:14:50   20   **A.**   Not all of it.

21   **Q.**   So when you say it's gone, that's just not correct,

22   you're just agreeing with what Mr. Costa says; isn't that

23   correct?  It was two questions.  I'll break it down.

24   **A.**   Okay.

12:15:06   25   **Q.**   You can't tell this jury you know it's gone, can you?

*Redirect-Amadio/By Mr. Costa*

1    **A.**    Still some of that money was invested, no.

2    **Q.**    Well, Mr. Amadio, I hope you accomplished your goal

3    with the government up here.  That's all I have.

4              MR. SCARDINO:  Pass the witness.

12:15:22   5              **REDIRECT EXAMINATION**

6  BY MR. COSTA:

7    **Q.**    I have just a few points, Mr. Amadio, then you can

8    hopefully be on your way.

9                   On the money managers's point, he asked

12:15:32  10  you if you knew whether money managers were involved with

11  the 2 billion; do you recall that?

12   **A.**    Yes.

13   **Q.**    When these companies like the airlines, like the

14   cricket company, like the yacht company, when they were

12:15:44  15   asking for money, was there an approval process before the

16   money from the bank was sent to these other companies?

17   **A.**    Yes, there was.

18   **Q.**    And you worked on this for a number of years;

19   correct?

12:15:55  20   **A.**    Yes, sir.

21   **Q.**    And you said these requests were often made a couple

22   of times a month by some of these companies?

23   **A.**    Yes, sir.

24   **Q.**    And on those requests seeking approval to give the

12:16:04  25   bank's money to these other companies, is there a single

*Redirect-Amadio/By Mr. Costa*

1    time when you remember a European money manager being

2    copied on those e-mails?

3    **A.**    No, sir.

4    **Q.**    Or ever had any involvement from what you saw

12:16:18   5    approving this $2 billion that went to Mr. Stanford's

6    companies?

7    **A.**    No, sir.

8    **Q.**    The disclosure statement -- you're familiar -- most

9    companies, most investments, have disclosure statements;

12:16:32  10    is that right?

11    **A.**    Correct.

12    **Q.**    If you give a disclosure statement, is that a license

13    to then go and lie as much as you want?

14    **A.**    No, it's not.

12:16:39  15    **Q.**    Is it a license to steal billions of dollars as long

16    as you have someone sign a disclosure statement?

17    **A.**    No, it's not.

18    **Q.**    And were you ever told in the years you worked at

19    Stanford, that it's okay, we can lie because these are

12:16:52  20    just CDs and we have a disclosure statement?

21    **A.**    No, it's not a license to lie.

22    **Q.**    If someone had said, "These are CDs, so we can lie,"

23    would you have agreed with that?

24    **A.**    No, I wouldn't agree with that.

12:17:04  25    **Q.**    Why not?

*Redirect-Amadio/By Mr. Costa*

1  **A.**   Because this is the depositors' money, and they're

2  putting their trust in what you're disclosing.  And even

3  though there is some risk, that at least you can make an

4  intelligent decision to invest or not to invest in the

12:17:23  5  bank based on the information given to you.

6  **Q.**   The whole reason there was so much time put into

7  these annual reports and these brochures is because the CD

8  depositors were relying on them; is that right?

9           MR. SCARDINO:  Beyond the scope of the

12:17:38  10 knowledge of the witness.

11          THE COURT:  Is it beyond the scope?

12 BY MR. COSTA:

13  **Q.**   When you were helping to prepare --

14          THE COURT:  It's beyond the scope of the

12:17:44  15 knowledge --

16          MR. COSTA:  I'll withdraw.

17          THE COURT:  Okay.

18 BY MR. COSTA:

19  **Q.**   When you were preparing those annual reports and

12:17:49  20 working on them, did you expect that clients and future

21  clients were planning to rely on that information?

22  **A.**   Yes.

23  **Q.**   Final point.  He said, "How do you know most of the

24  money is gone of the 2 billion?"  Could you explain again

12:18:06  25 to the -- and you've never said every single cent was out

1   the door, correct, of these companies?

2          MR. SCARDINO:  I'll object.  That's a

3   mischaracterization of his testimony.

4          THE COURT:  Sustained as to the form of the

12:18:17   5   question.

6   BY MR. COSTA:

7   **Q.**   Did you ever say that every single penny was spent on

8   operating expenses?

9   **A.**   Not every single penny.

12:18:22  10   **Q.**   But why are you telling this jury that most of that

11   $2 billion is out the door of those airline companies and

12   those cricket companies and those private jets and those

13   yachts?

14   **A.**   Because a large amount of the money that was funded

12:18:37  15   to these entities were to cover for bonuses, commissions,

16   payroll, operating expenses.  So in that context, is that

17   a lot of that $2 billion was spent and not invested on

18   purchasing property or other investments.

19   **Q.**   Do you remember the picture we showed the jury

12:19:01  20   yesterday of Mr. Stanford with that glass case at the

21   cricket tournament that supposedly had $20 million in it?

22   **A.**   Yes, sir.

23   **Q.**   Is that $20 million that was in that glass case, is

24   that still there to repay CD investors?

12:19:14  25   **A.**   No, it's not.

Recross-Amadio/By Mr. Costa

1        MR. COSTA:  Pass the witness.

2        MR. SCARDINO:  Can I have just a second, Judge?

3        THE COURT:  Sure.

4                **RECROSS EXAMINATION**

12:19:48  5 BY MR. SCARDINO:

6   **Q.**   Mr. Amadio, you don't know where that glass case or

7   Plexiglass case of money went because your job would not

8   have been to determine where that money went; isn't that

9   correct?

12:20:01  10  **A.**   I knew that it went to pay for the winners of the

11  20/20 tournament.

12  **Q.**   Okay.  So that's where the money went, the

13  $20 million?

14  **A.**   That is correct, yes.

12:20:14  15  **Q.**   So you knew where that money went, but you had no

16  idea how the other investments were made that Mr. Costa

17  has been referring to, do you?  The decisions that were

18  behind how these investments were made, that wasn't part

19  of your job?

12:20:30  20  **A.**   In context of the $2 billion, sir?

21  **Q.**   Just in context of your job description, Mr. Amadio.

22  When you tell this jury that you have knowledge about

23  something like investments, that just wasn't something you

24  were in the loop to know, was it?

12:20:43  25        MR. COSTA:  Object as to investments being

Recross-Amadio/By Mr. Costa

1    vague.  I'm not sure what he's talking about.

2                THE COURT:  Do you understand the question?

3                THE WITNESS:  No, sir.

4                THE COURT:  Okay.  Rephrase it.

12:20:50   5   BY MR. SCARDINO:

6    Q.    You talk about value of these companies; so,

7    therefore, the value of the companies would be --

8                MR. COSTA:  Object to the mischaracterization.

9    He's never said anything about the value of companies.

12:20:58   10  Refer to the motion in limine.

11                THE COURT:  That's correct.  We're butting up

12   close to it.

13                Go ahead.  Rephrase it, sir.

14   BY MR. SCARDINO:

12:21:11   15  Q.    You don't have any knowledge of how investments were

16   made in Europe, do you, or if investments were made in

17   Europe, do you?

18   A.    No, I don't.

19   Q.    And the same would apply to how investments were made

12:21:25   20  in the island -- or on the island of Antigua, do you?

21   A.    No, sir.

22   Q.    You're an accountant.  I'm not trying to demean or

23   belittle it.  But your job was to keep track of numbers

24   and information and not to make decisions about how money

12:21:44   25  was invested or how the money was used, was it?

Recross-Amadio/By Mr. Costa

1    **A.**   In detail, no.

2    **Q.**   In fact, all that time -- in the summer of 2008 when

3    you were working with the law firm and doing all that work

4    to transfer assets that you say were -- had no value, I

12:22:02    5    mean, you didn't just jump up and quit and say, "I'm not

6    participating in this effort because I know that these

7    companies are valueless," did you?

8    **A.**   They had some value, yes.

9    **Q.**   They had some value.

12:22:16    10           So you participated in that effort for the

11   entire -- from April on until the end of the year, didn't

12   you?

13   **A.**   That's correct.

14   **Q.**   Thank you.

12:22:24    15           MR. SCARDINO:  Pass the witness.

16           MR. COSTA:  Nothing further, Your Honor.

17           THE COURT:  Thank you, sir.  You may step down.

18   You're excused.  You're free to leave.

19           Call your next witness.

12:22:33    20           MR. STELLMACH:  Your Honor, the United States

21   calls James Davis.

22           THE COURT:  Mr. Davis, please.

23           Do you want to come around that way to

24   your right, please.  Raise your right hand to be sworn.

12:23:02    25           CASE MANAGER:  Do you solemnly swear that the

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Direct-Davis/By Mr. Stellmach*

1  testimony you are about to give in the case now before the

2  Court will be the truth, the whole truth and nothing but

3  the truth?

4                   THE WITNESS:  I do.

12:23:20    5                   CASE MANAGER:  Thank you.  You may have a seat.

6                   THE COURT:  Go right ahead, please.

7                   MR. STELLMACH:  Yes, Your Honor.

8                   THE COURT:  You can adjust that mike.  You can

9  raise it up, down.

10                        **JAMES DAVIS,**

11  after having been first cautioned and duly sworn, testified

12  as follows:

13                      **DIRECT EXAMINATION**

14  BY MR. STELLMACH:

12:23:41   15  **Q.**   Good afternoon, sir.

16  **A.**   Good afternoon.

17  **Q.**   Could you please introduce yourself to the jury and

18  spell your last name for the court reporter?

19  **A.**   Yes.  My name is James Davis, D-a-v-i-s.

12:23:56   20  **Q.**   Where do you live, Mr. Davis?

21  **A.**   I live in Michigan.

22  **Q.**   Where are you from originally?

23  **A.**   I was born in Texas.

24  **Q.**   Could you tell us whether you're married and have a

12:24:09   25  family?

*Direct-Davis/By Mr. Stellmach*

1    **A.**   Yes, sir.  I am married.  I have four married

2    children, boys, four daughters-in-law and two

3    grandchildren.

4    **Q.**   You say you're originally from Texas.

5                       Where in Texas?

6    **A.**   I was born in El Paso and was raised in the South,

7    graduated from high school in Mississippi.  Later went to

8    the United States Navy.  And then after the Navy, I went

9    into college, Baylor University.

10   **Q.**   How long did you serve in the United States Navy?

11   **A.**   Six years.

12   **Q.**   What did you do in the Navy?

13   **A.**   I was an electronics technician in the fleet

14   ballistic missile submarine repair service.  I specialized

15   in sonar equipment.

16   **Q.**   Were you honorably discharged from the Navy?

17   **A.**   Yes, sir, I was.

18   **Q.**   And when did you start Baylor?

19   **A.**   January of 1973.

20   **Q.**   When did you receive your degree?

21   **A.**   August of 1975.

22   **Q.**   How were you able to graduate so quickly?

23   **A.**   Well, I had a few credits that I had earned by going

24   to school at night while in the Navy, as I entered

25   college, and I took full course loads and went to school

*Direct-Davis/By Mr. Stellmach*

1    during every term while I was working.

2    Q.    After you graduated from Baylor, what did you do for

3    a living?

4    A.    I worked for Gibson Discount Centers, Central Texas

12:25:45    5    retail firm, as an accountant.  And following that, I

6    worked at several accounting positions until I came to

7    work for Stanford.

8    Q.    You say you worked as an accountant.

9                    Are you a CPA?

12:26:00   10    A.    No, sir, I'm not.

11    Q.    You just have an undergraduate degree in accounting?

12    A.    Yes, sir.  Accounting and finance.

13    Q.    What did you do after leaving Gibson?

14    A.    I took a job with a insurance brokerage firm, Insurex

12:26:19   15    International, in Tulsa, Oklahoma.

16    Q.    And how long did you stay at that company?

17    A.    A little over a year.

18    Q.    And then what did you do?

19    A.    Went to company by the name of Materials

12:26:34   20    Transportation Company in Temple, Texas.  And I moved to

21    that position following a medical condition.  My father

22    had a stroke, so we -- we moved to Central Texas at that

23    time, and I worked there at Materials Transportation.

24    Q.    And, again, what did you do at that company?

12:26:51   25    A.    I was an accountant.

*Direct-Davis/By Mr. Stellmach*

1  **Q.**   How long were you at that company?

2  **A.**   A little over a year.

3  **Q.**   And then what did you do after a year?

4  **A.**   I went to Michigan, worked for International Research

12:27:02  5  and Development Corporation.  It was a contract toxicology

6  laboratory.  Stayed there seven years as an accountant.

7  Went from there to small firm by the name of Stafford

8  Smith, which was a refrigeration firm in Michigan, and

9  then from there to Stanford Financial.

12:27:26  10  **Q.**   So between graduating from Baylor and starting at

11  Stanford Financial, you worked at a bunch of relatively

12  small regional companies as a bookkeeper/accountant?

13  **A.**   Yes, sir, that's correct.

14  **Q.**   So you started at Stanford in what year again?

12:27:41  15  **A.**   My employment date was February 1988.

16  **Q.**   How long did you stay at Stanford Financial?

17  **A.**   Until the end of the company, in February of 2009.

18  **Q.**   What did you do after the company stopped operating?

19  **A.**   Went to Michigan and worked for a two-year period as

12:28:08  20  a bookkeeper for a fruit storage and broker/distributor

21  company by the name of Spiech Farms.

22  **Q.**   Are you still working there?

23  **A.**   No.  As of the end of the year, I --

24          MR. SCARDINO:  Objection.  Nonresponsive.

12:28:24  25          THE COURT:  Overruled.

*Direct-Davis/By Mr. Stellmach*

1      THE WITNESS:  At the end of the year, of this

2  past year, I quit working there in anticipation of being

3  away from the job quite a bit.

4  BY MR. STELLMACH:

12:28:39  5  **Q.**   Did your employer at Spiech Farms understand that

6  when you were hired that you were potentially going to be

7  a witness and you were facing some charges in federal

8  court?

9  **A.**   Yes, sir, they did.

12:28:50  10  **Q.**   While you worked at Stanford Financial Group from

11  1988 through 2009, did you commit any crimes?

12  **A.**   Yes, sir, I did.

13  **Q.**   What did you do wrong?

14  **A.**   I lied about the truthfulness of the statements of

12:29:12  15  Stanford International Bank Limited.

16  **Q.**   I'm sorry sir.  But specifically what did you lie

17  about in those statements?

18  **A.**   Specifically, the investment section of the asset

19  category.  I lied as to overstating the value of those

12:29:29  20  investments, and I lied as to the type of products that

21  were in those investments.

22  **Q.**   Did there come a time when you pleaded guilty for

23  committing those crimes?

24  **A.**   Yes, sir.

12:29:42  25  **Q.**   When was that?

*Direct-Davis/By Mr. Stellmach*

1    **A.**    I pled guilty to those crimes in August of 2009.

2    **Q.**    And what crimes did you plead guilty to?

3    **A.**    One count of mail -- conspiracy to commit mail wire

4    securities fraud, one count of mail fraud, and one count

12:30:05   5    of conspiracy to impede an SEC investigation.

6    **Q.**    Who did you conspire to commit those crimes with?

7    **A.**    Mr. Allen Stanford and others.

8    **Q.**    Do you see in the courtroom today Allen Stanford,

9    your co-conspirator?

12:30:21   10   **A.**    Yes, sir, I do.

11   **Q.**    Could you identify where he's sitting, an article of

12   clothing he's wearing?

13   **A.**    Yes, sir.

14               THE COURT:  The man standing up right there?

12:30:29   15              THE WITNESS:  The man standing up in the back.

16               THE COURT:  The record will so reflect he

17   identified Mr. Stanford.

18   BY MR. STELLMACH:

19   **Q.**    Mr. Davis, I want to show you Government's

12:30:47   20   Exhibit 1514.

21               Do you recognize that document?

22   **A.**    Yes, sir.  This is the plea agreement that I made in

23   April of 2009.

24               MR. STELLMACH:  Your Honor, we offer that

12:31:15   25   agreement.

*Direct-Davis/By Mr. Stellmach*

1           MR. SCARDINO:  No objection.

2           THE COURT:  Okay.  It's in.

3           MR. STELLMACH:  And we're not going through it,

4  but it's just in evidence if anybody wants to look at the

12:31:22    5  terms of Mr. Davis's agreement with the government.

6  BY BY MR. STELLMACH:

7  **Q.**   Mr. Davis, could you tell us what your obligations

8  are under that agreement?

9  **A.**   Yes, sir.  My obligation is to tell the truth.

12:31:35   10  **Q.**   And what has the government agreed to do if you tell

11  the truth?

12  **A.**   The government, at their option, may share with the

13  Judge my level of cooperation.

14  **Q.**   Has the government agreed to recommend a specific

12:31:52   15  sentence to the Judge?

16  **A.**   No, sir.

17  **Q.**   Has anyone from the government made any promises

18  about the type of sentence you may receive?

19  **A.**   No, sir.

12:32:03   20  **Q.**   Under the terms of your plea agreement, what's the

21  maximum sentence you face at sentencing?

22  **A.**   30 years prison.

23  **Q.**   Who decides what your sentence will be?

24  **A.**   Judge David Hittner.

12:32:26   25  **Q.**   Mr. Davis, I want to step back and go to the

*Direct-Davis/By Mr. Stellmach*

1    beginning.

2                    When did you first meet Mr. Stanford?

3    **A.**   Met him in 1973, in the first quarter of 1973, maybe

4    the early second quarter.

5    **Q.**   While you were at Baylor?

6    **A.**   Yes, sir.

7    **Q.**   How did you meet him?

8    **A.**   I advertised for a roommate and placed the

9    advertisement, I think, on the School of Business bulletin

10   board in the hallway.

11                   One night subsequent to that, I had a

12   knock on the door, and it was Mr. Stanford.  He had the

13   document in his hand.  "My name's Allen Stanford.  I'm

14   your new roommate."

15   **Q.**   How long did you room together with Mr. Stanford?

16   **A.**   Well, until December of that year, basically one

17   semester.

18   **Q.**   Why only one semester?

19   **A.**   It got a little bit hectic for me and I wanted to get

20   back by myself.  So I moved out.

21   **Q.**   When did Mr. Stanford graduate from Baylor?

22   **A.**   1974.

23   **Q.**   So you graduated a year later?

24   **A.**   In 1975, yes, sir.

25   **Q.**   How frequently did you keep in touch with him once

12:32:48 (line 5)
12:33:05 (line 10)
12:33:22 (line 15)
12:33:40 (line 20)
12:33:56 (line 25)

*Direct-Davis/By Mr. Stellmach*

1   you were both graduated from Baylor?

2   **A.**   Early on after school, quite frequently, and

3   following, say, in 1977 very infrequently, a few times

4   before I started working for him.

12:34:12  5   **Q.**   How did the idea of you even going to work for him

6   come up?

7   **A.**   Mr. Stanford and I had discussed in 1987 toward end

8   of the year, had discussions about what he was doing, what

9   I was doing.  And ultimately, toward the end of December,

12:34:32  10  I think around the 23rd of December, we spoke on the

11  phone.

12                   He said that he is in need of some help in

13  client operations, I believe.  And that conversation

14  continued, and we ultimately came to an agreement in that

12:34:53  15  phone call that he would fly me down for a face-to-face

16  deeper discussion about possible employment.

17  **Q.**   You say Mr. Stanford mentioned needing help with

18  operations.

19                   What company did he tell you he was

12:35:08  20  running at that time?

21  **A.**   Well, he said that he had a offshore bank, and there

22  was a couple of other companies as well.  That's what he

23  talked about.

24  **Q.**   Did Mr. Stanford tell you how long he had been

12:35:24  25  operating this bank?

*Direct-Davis/By Mr. Stellmach*

1    **A.**   Yes.  I knew it was two, two or three years.  Yes,

2    sir.

3    **Q.**   Had Mr. Stanford told you what he did prior to

4    opening the bank?

12:35:37   5    **A.**   Yes, sir, he did.

6    **Q.**   What did he tell you about that?

7    **A.**   He said he was the owner of some fitness centers.  I

8    knew that.

9    **Q.**   Did he tell you how those fitness centers had

12:35:52   10   performed over time?

11   **A.**   Yes, sir.  He did tell me that they failed and they

12   entered bankruptcy ultimately.

13   **Q.**   Did he tell you whether he had personally filed for

14   bankruptcy?

12:36:04   15   **A.**   He did, yes, sir.

16   **Q.**   And what did he tell you about that, whether he had?

17   **A.**   He said that he had filed for personal bankruptcy.

18   **Q.**   So after the fitness centers failed, he opened the

19   bank?

12:36:16   20   **A.**   Well, after the fitness centers, he went to work --

21   according to his explanation at that time, he went to work

22   for, I believe, a relative in Southern Florida, and he

23   sold real estate partnerships.  And he sold those in the

24   Caribbean, in the southern part of the Caribbean, in The

12:36:51   25   Netherlands Antilles, Bonaire, Curacao, and Aruba area.

*Direct-Davis/By Mr. Stellmach*

1  Following that, in 1985 he started a bank.

2  **Q.**   So you were talking with him in 1987 about going to

3  the bank?

4  **A.**   Yes.  Really, we met face-to-face the first week of

12:37:12  5  January of 1988 in Houston, Texas, and we did discuss

6  that, yes.

7  **Q.**   Where did you meet in Houston?

8  **A.**   We met in his offices in the 38th floor of the Milam

9  Building, downtown Houston.

12:37:26  10  **Q.**   What did the offices look like?

11  **A.**   They were upscale, had marble, marble on the floor,

12  green carpeting, dark traditional furniture, cornice work,

13  high-end wallpaper.  They were very nice.

14  **Q.**   When you went there, how many people were working?

12:37:45  15  **A.**   I would say 20, 20 people.

16  **Q.**   And at that point, did the bank also have an office

17  anywhere else?

18  **A.**   Yes, sir.  There was an office in -- headquarters

19  office in Montserrat, British West Indies.

12:38:02  20  **Q.**   What did Mr. Stanford tell you how he picked

21  Montserrat has the base for the bank?

22  **A.**   The explanation he gave me was that in the very

23  beginning he had seen an advertisement for offshore banks.

24  I believe he said it was the airline magazine he had seen

12:38:27  25  that advertised.

*Direct-Davis/By Mr. Stellmach*

1  Q.   When you spoke with Mr. Stanford, did he explain to

2  you what possible job he had in mind for you?

3  A.   Yes.  The job discussed was to ultimately replace the

4  present sitting controller of Stanford Financial Group.

5  His name was Tom Broderick, deceased.

6  Q.   He's now deceased?

7  A.   Yes.  Along with five other of Mr. Stanford's

8  accountants.  Yes, he's deceased now.

9  Q.   But at the time Mr. Broderick was still working at

10 the bank was the controller?

11 A.   He was.

12 Q.   And could you just explain to us in general terms

13 what a controller does?

14 A.   A controller is in charge of a company's general

15 ledger accounting, bookkeeping and reporting from the

16 financial transactions.  Internal control in the financial

17 sector.

18 Q.   Did Mr. Stanford tell you who owned the bank?

19 A.   Yes, sir.  He explained that he and his father, James

20 Stanford, together owned the bank, Mr. Stanford, Allen

21 Stanford, owning the primary part of it, I believe, close

22 to 90 percent and Mr. James Stanford the difference.

23 Q.   Again, what was the bank's name at this point?

24 A.   Guardian International Bank Limited.

25 Q.   What did Mr. Stanford in these initial conversations

*Direct-Davis/By Mr. Stellmach*

1    you were having with you -- or with him, what did he tell

2    you about the bank's business?

3    **A.**    The bank's business was selling products, basically

4    two products, a cash CD certificate of deposit and a --

12:40:18   5    what was known as, I believe, an express account, which is

6    similar to a money market account, selling these products

7    to foreign nationals to the United States.

8    **Q.**    When you say selling to foreign nationals, was

9    anybody from the United States when you first started at

12:40:33   10   the bank allowed to buy the CD product?

11   **A.**    Not to my knowledge.  Possible exception might be

12   person of dual citizenship, but primary citizenship being

13   nonresident to the United States.

14   **Q.**    When you started, did Mr. Stanford -- when you met

12:40:51   15   with Mr. Stanford, did he discuss at all the interest

16   rates that Guardian paid on its CDs compared to the

17   interest rates that U.S. banks were paying at the same

18   time?

19   **A.**    Yes, sir.  He mentioned that they were higher than

12:41:04   20   the average rate of the U.S. market, and some cases

21   several percentage points higher.

22   **Q.**    Did Mr. Stanford explain how that was possible?

23   **A.**    He stated that there were reasons for that

24   differential, such as no income tax at source.  There were

12:41:32   25   amenities of scale in that there were few products, there

*Direct-Davis/By Mr. Stellmach*

1   was no, for example, loan division that usually takes a

2   huge staff to run, so there were smaller staffs, low tax

3   at source and other amenities of scale.

4   **Q.**   So when you actually started working at Stanford

12:41:57   5   Financial Group, approximately how much had the bank sold

6   in CDs?

7                I'm sorry.  You were working at -- what

8   was the name of the company you were actually working at?

9   **A.**   I was employed by Stanford Financial Group Company,

12:42:09   10   and it was a -- I believe it was a Florida corporation at

11   the time.

12   **Q.**   But when you started working there, approximately how

13   much had the bank sold in CDs?

14   **A.**   At previous year end, it was somewhere in the

12:42:22   15   neighborhood of $14 million.

16   **Q.**   Is that approximate?

17   **A.**   Yes, sir.

18   **Q.**   Was there any written agreement between yourself and

19   Mr. Stanford about what your job would be and your

12:42:34   20   reporting obligations?

21   **A.**   There wasn't a formal agreement, but there was an

22   agreement that he gave me.  He handwrote out, handed it to

23   me as I left that first meeting between ourselves in

24   January of 2 -- January of 1988.  It was on a legal pad

12:42:52   25   piece of paper, and he had covered how much he was going

*Direct-Davis/By Mr. Stellmach*

1   to pay me per annum, that my title would be eventually

2   controller.  I believe he would pay my moving expenses

3   down to Houston where I would be officing there in

4   downtown Houston at the Milam Building, and also stated

12:43:20   5   that not to go direct to his father, James Stanford,

6   with -- without going through him.

7   **Q.**   And at the time you started, James Stanford,

8   Mr. Stanford's father, could you remind us what his title

9   and role was at the bank?

12:43:35   10   **A.**   Yes, sir.  It was chairman of the board of directors

11   and chief financial officer.

12   **Q.**   Did Mr. Stanford explain at all why he didn't want

13   you reporting directly to his father, who was the chairman

14   of the board of directors of the bank?

12:43:49   15   **A.**   Well, not with -- not with any detail.  I knew that

16   Mr. Stanford Allen Stanford and Mr. James Stanford --

17           MR. SCARDINO:  Object to the nonresponsive

18   answer.

19           THE COURT:  Sustained.

12:44:02   20   BY BY MR. STELLMACH:

21   **Q.**   What had Mr. Stanford told you about his relationship

22   with his father?

23   **A.**   He said that his father was much more conservative

24   than he was, and that sometimes -- he being an

12:44:19   25   entrepreneurial individual that he is, sometimes they

*Direct-Davis/By Mr. Stellmach*

1  disagreed on business matters with respect to the

2  day-to-day.  And I just surmised, having --

3                MR. SCARDINO:  Object to the narrative and

4  nonresponsive answer.

5                THE COURT:  Sustained.

6  BY BY MR. STELLMACH:

7  **Q.**   So what was your understanding about Mr. Allen

8  Stanford's business philosophy compared to his father's

9  philosophy, based on what Mr. Stanford himself had told

10  you?

11  **A.**   Mr. Stanford said that his father was more

12  conservative than he was as an entrepreneurial and

13  risk-taker.

14  **Q.**   Mr. Allen Stanford described himself as

15  entrepreneurial and a risk-taker?

16  **A.**   Yes, sir.

17  **Q.**   When you first started working for Mr. Stanford,

18  where were you actually working out of?  What office?

19  **A.**   I worked on the 38th floor of the Milam Building,

20  downtown Houston.

21  **Q.**   Did you stay there throughout your time working for

22  Mr. Stanford?

23  **A.**   No, sir.  Beginning of the summer of 1988, sometime

24  in the summer of 1988, I moved with my family down to

25  Montserrat in the West Indies to work at the headquarters

12:44:34
12:44:44
12:44:54
12:45:09
12:45:24

*Direct-Davis/By Mr. Stellmach*

1  office, and I believe, came back in December of '88, but

2  moved in the summer of 88 to Montserrat.

3  **Q.**   When you moved, was that at Mr. Stanford's direction?

4  **A.**   Yes, sir.

12:45:46  5  **Q.**   Why did you have to go down to Montserrat?

6  **A.**   Well, the headquarters office, while it had a staff,

7  it needed expanding.  The bank's operations were growing,

8  size of the bank was growing, and it was domiciled and

9  licensed in Montserrat and needed a full-functioning

12:46:07  10  headquarters office eventually.

11           And there was no license in the United

12  States to operate as a bank; and therefore, the

13  transaction, the financial transactions, the customer

14  transactions, should take place at headquarters, so it was

12:46:25  15  an effort to build.

16  **Q.**   Did Mr. Stanford ever explain why he didn't just get

17  a license to be operate the bank here in the United

18  States, why he was keeping the bank offshore?

19  **A.**   Yes.  He talked about the offshore being capable of

12:46:46  20  running at a cost -- cost savings.  He also stated that

21  there was easy of entry, of course, into the marketplace

22  through the bank, and also that to open up in the United

23  States would take a great deal of effort scrutinywise to

24  due to the regulator -- regulatory processes.  And he did

12:47:13  25  not feel that he would be able to go through that rigorous

*Direct-Davis/By Mr. Stellmach*

1   regulatory vetting.  And those were the main explanations

2   I recall.

3   **Q.**   Well, when you first started, did Mr. Stanford

4   explain precisely what was his concern about being

5   regulated here in the United States?

6   **A.**   Yes, sir.  I recall that he felt -- told me that he

7   didn't feel he would be able to go through the rigorous

8   regulatory process and that he had been adjudicated a

9   bankrupt.

10   **Q.**   So what was the division of responsibilities between

11   the office down in Montserrat and the office in Houston?

12   **A.**   Montserrat, the -- eventually over months, the client

13   accounting; that is, accounting for depositors,

14   transactions and local accounts payable, and some local

15   reporting took place at headquarters, and the overall

16   chief executive operation and overall advertising,

17   promotion and sales took place in the United States.

18   **Q.**   Where was Mr. Stanford based?

19   **A.**   In Houston, Texas.

20   **Q.**   Did you have any role in overseeing the marketing

21   materials for the bank in the early period?

22   **A.**   No, sir.

23   **Q.**   Who did handle that?

24   **A.**   That was handled by Mr. Stanford, sales and the

25   marketing promotion.

*Direct-Davis/By Mr. Stellmach*

1    **Q.**   Did that generally remain true throughout your time

2    working for him?

3    **A.**   Yes, sir.

4    **Q.**   Right up until the end in 2009?

12:49:01   5    **A.**   Yes, sir.

6    **Q.**   How frequently, while you were down in Montserrat,

7    were you are dealing with Mr. Stanford?

8    **A.**   We talked weekly, every other week.  We talked by

9    phone.  Mr. Stanford visited the island from time to time.

12:49:21   10   There were meetings there.  I would say not often, but we

11   did communicate by phone.

12   **Q.**   How would you describe Mr. Stanford's management

13   style?

14   **A.**   I would say charismatic, charismatic dictator,

12:49:47   15   dictatorial.  He was -- in his charismatic way he

16   controlled by money, flattery, intimidation and fear.

17   **Q.**   Did Mr. Stanford ever tell you his view about being

18   feared by his employees?

19   **A.**   He did.  He said that he thought it was much better

12:50:11   20   to be feared as a leader than to be loved.  You get better

21   results.

22   **Q.**   You had been his college roommate back in the days at

23   Baylor and he had specifically recruited you to come and

24   work for him as the controller.

12:50:29   25            Did he treat you very well personally?

*Direct-Davis/By Mr. Stellmach*

1    **A.**    Paid me well.  I recall an incident regarding

2    treatment --

3                  MR. SCARDINO:  Objection in my opinion.

4                  THE COURT:  Overruled.

12:50:49   5                  THE WITNESS:  I would say our relationship was

6    professional, yet a little distant.  I recall early on one

7    time there was a question of a banking -- they called them

8    private banking officers -- a question of moving offices.

9    Stanford had not been in the office for a while and --

12:51:09   10   BY BY MR. STELLMACH:

11   **Q.**    Moving offices to another building or within --

12   **A.**    Yeah.  Within the same floor.

13                  Mr. Stanford hadn't been in the office

14   for -- while he was traveling; had not responded, I

12:51:22   15   suppose to phone messages to call in.  But --

16                  MR. SCARDINO:  I'll object to relevance.

17                  THE COURT:  What's the relevance?

18                  MR. STELLMACH:  It all goes to their

19   relationship, Your Honor, as to why Mr. Davis joined a

12:51:32   20   20-year conspiracy with Mr. Stanford.

21                  THE COURT:  All right.  For that limited

22   purpose, I'm overrule the objection.

23                  THE WITNESS:  At the end of the day, I went

24   ahead and made a decision in Mr. Stanford's absence to say,

12:51:45   25   Yeah, I'll update Mr. Stanford, and I don't see any problem

1  in moving offices.

2              Mr. Stanford finally returned and heavily

3  walked down the hall one morning, opened my door, and

4  yelled out, "I thought I was CEO around here," slammed the

12:52:04    5  door and went back to his office and didn't speak to me for

6  three months.  Just things like that.

7              I remember one time -- I remember one time

8  being asked to take a drive in a new Mercedes, and he went

9  out the Katy Freeway with me in the --

12:52:22   10              THE COURT:  Pardon me?

11              MR. SCARDINO:  Object to nonresponsive.

12              THE COURT:  I'll give him one more incident.

13  Then move on; okay?  So overruled to that extent.  Go on.

14              THE WITNESS:  Well, it was just, Hop in the

12:52:33   15  car, I'll show you how my new car rides, and went out to

16  the Katy Freeway going west at 170 miles an hour.  Scared

17  me half though death.  That's just kind of the

18  relationship.  On the other hand, paid well, flattered you.

19  Instilled intimidation and fear.

12:52:53   20  BY BY MR. STELLMACH:

21  Q.    I wanted to turn to the mechanics of how the sales of

22  the CDs actually worked.

23              Who were the private bankers?  What was

24  their role in the organization?

12:53:08   25  A.    The bankers were known by PBOs or private bankers,

*Direct-Davis/By Mr. Stellmach*

1   and they met with outside potential customers and

2   customers, and they sold bank CDs, certificates of deposit

3   for certain maturity, certain interest rates.

4   **Q.**   In the early years, was an individual named Michelle

12:53:31   5   Chambliess one of the private bankers?

6   **A.**   Yes, sir, she was.

7   **Q.**   Who did they report to?

8   **A.**   Mr. Allen Stanford.

9   **Q.**   Not to you?

12:53:40   10   **A.**   No, sir.  Everyone reported to Mr. Stanford.

11   **Q.**   Did you have any supervising?  Did you supervise at

12   all the private bankers who were selling the CDs?

13   **A.**   No, sir, I did not.

14   **Q.**   Who trained the private bankers, at least in the

12:53:57   15   early years?

16   **A.**   Mr. Stanford.

17   **Q.**   Did you see him actually doing that?

18   **A.**   I did, several occasions.

19   **Q.**   Did you personally ever sell CDs?

12:54:07   20   **A.**   Yes, sir, I did at one time.  1988, I believe, while

21   in Montserrat, a gentleman walked in the door.  He was a

22   captain of a windjammer ship.  I believe his name was

23   Maskell.

24             THE COURT:  Excuse me, sir.

12:54:26   25                 What's the objection?

*Direct-Davis/By Mr. Stellmach*

1          MR. SCARDINO:  Nonresponsive, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  His desire that day was to

4 deposit $50,000 at the bank.  And after some calls to

12:54:38   5 Houston for some processing help, took his check and closed

6 that particular CD purchase.

7 BY MR. STELLMACH:

8    Q.   Other than that one sale back in '88, '89, did you

9    ever personally sell CDs to anyone?

12:54:58  10    A.   No, sir.

11    Q.   But you were involved in the process by which CDs

12    were sold because you were involved with preparing

13    financial statements eventually?

14    A.   Yes, sir.  The part that we've already discussed, the

12:55:11  15    lies, that's how I was involved in that.

16    Q.   And we'll come to that.

17          MR. STELLMACH:  But I wonder, Your Honor, if

18 this might be a good point for a break.

19          THE COURT:  All right.  Is this a good place

12:55:22  20 for you?

21          MR. STELLMACH:  It is.

22          THE COURT:  Okay.  All right, ladies and

23 gentlemen, it's, you know, five minutes here or there.

24 It's now about five minutes until 1:00.  We'll take our

12:55:32  25 usual lunch break.  See you back ready to resume at 2:15.

*Direct-Davis/By Mr. Stellmach*

1  We'll see you at that time.

2                    **(Recessed at 12:55 p.m.)**

3           MR. STELLMACH:  Your Honor, I think there's an

4  issue that the defense wanted to raise before the jury came

02:17:55  5  in.

6           THE COURT:  All right.  Be seated, please.

7                    Just tell them that we're here.

8                    Go on, please.

9           MR. SCARDINO:  Your Honor, we take the position

02:18:29  10  that the government's last witness, Mr. Amadio, opened the

11  door to the valuation of the other companies that the

12  government has complained about that we shouldn't be able

13  to get into.

14           THE COURT:  How so?

02:18:41  15           MR. SCARDINO:  Well, he testified on direct

16  examination on numerous occasions about these various

17  related companies, and he talked about how at his opinion

18  what -- they were worthless, and I think that opens the

19  door to us to be able to come back and show that they had

02:18:54  20  value.  It is the core of our defense, and the government

21  knows that --

22           THE COURT:  I'm sorry.  No.  I'm sorry to cut

23  you off.  Let me make a note.  Keep going, please.

24           MR. SCARDINO:  So the government is well aware

02:19:07  25  that what happened in the history of this company is that

*Direct-Davis/By Mr. Stellmach*

1  they were making an effort, a consolidation effort, to

2  bring all these companies under one umbrella.  There's

3  plenty of evidence of that.  This last witness testified

4  about transferring of the companies through Stanford under

02:19:24  5  the umbrella of the bank.

6                THE There's plenty of testimony of that.  So

7  the government has convinced the Court that we shouldn't be

8  able to get into that.

9                THE COURT:  That's just my ruling.

02:19:33  10                MR. SCARDINO:  Okay.

11                THE COURT:  It's always subject to what we're

12  doing right now.

13                MR. SCARDINO:  Yes, sir.

14                And, so, the government knows that the

02:19:39  15  facts of the case and the reality of this is that was the

16  effort by not only Mr. Amadio but Mr. Kuhrt, Mr. Lopez and

17  even Mr. Davis, and there's lots of documentation from that

18  of e-mails and correspondence that that was the effort.

19                So for us not to be allowed to get into

02:19:57  20  that basically emasculates our defense, and the government

21  knows that.  I give them credit for being clever enough to

22  come up with their motion in limine asking that we not go

23  there, but regardless of their theory, we take the position

24  that with this last witness, and others, they opened the

02:20:13  25  door to letting us get into the valuation of these

*Direct-Davis/By Mr. Stellmach*

1  affiliated companies.

2          THE COURT:  Okay.

3              Yes, sir.

4          MR. FAZEL:  And if I can follow-up, I think the

02:20:22  5  government's motion in limine is saying that their position

6  is that -- our defensive theory is that we can't say there

7  was no intent by showing valuation of the companies.  But

8  by them opening up the door and saying that these companies

9  have no value, we should be able to rebut that and show

02:20:38  10  that they had value.  And that's step one what we want to

11  do.

12          THE COURT:  Wasn't there a conflict on what the

13  term "value" meant?

14          MR. STELLMACH:  There was, Your Honor.

02:20:45  15          THE COURT:  That's different than getting book

16  value or with an ongoing company.  I'm not ready for the

17  government yet.

18          MR. FAZEL:  Yes, there was, there was some

19  cross-examination.  The government put up in their exhibit,

02:20:57  20  which is what they claimed were the monies that were used

21  in order to fund some of these companies.  But that doesn't

22  mean that these companies didn't have value.  And the

23  witness is the one that said the companies had no value,

24  that there were money pits, blah, blah, blah, blah, blah.

02:21:12  25  So we should be able to rebut the witness and his

*Direct-Davis/By Mr. Stellmach*

1 assertions.

2                    THE COURT:  Okay.

3                    MR. STELLMACH:  May I, Your Honor?

4                    THE COURT:  Now, why is it -- you say, first of

02:21:21  5 all, it's not relevant.  We talked about that before --

6                    MR. STELLMACH:  Yes, Your Honor.

7                    THE COURT:  -- correct?

8                         Now, motions in limine, no matter who's

9 got them, are always subject to revisiting.  Why aren't

02:21:29 10 they relevant, the value of these other companies?

11                    MR. STELLMACH:  Because if Mr. Stanford misled

12 his depositors about how he was investing the money and he

13 knew at the time that he was misleading them, he doesn't

14 get to claim later under the law in this circuit, and I

02:21:45 15 think throughout the country, that he had an honest belief

16 that his lie didn't matter.

17                    THE COURT:  Now, are you telling me -- and I'm

18 doing -- being devil's advocate perhaps here -- that the

19 guilty or not guilty aspect of this case, which is the

02:22:00 20 bottom line, is going to ride on whether or not he said --

21 or -- well, Mr. Stanford said that the monies were going

22 into A, B and C, and, therefore, by putting them in your

23 theory of the case, X, Y and Z, that, per se, is a

24 violation of the law, and that's -- could return a guilty

02:22:23 25 verdict in and of itself?

1          MR. STELLMACH:  We still have to prove that

2   when he was misleading -- that he knew he was misleading

3   the depositors.

4          THE COURT:  As to what?

02:22:31   5          MR. STELLMACH:  As to the banks's assets and

6   the investment strategy and that the lie was material.

7   We're not taking away any possible defense to these

8   charges, we're just saying this is a illegally invalid one,

9   the one they want to raise.

02:22:45  10          THE COURT:  Well, but, then, again, what --

11  see, now I -- I understand what we raised before, but not

12  to this detail.  Explain that to me.  In other words, if

13  they -- we're not allowing valuation of the other company.

14  My understanding was -- and it's subject to refining as it

02:23:00  15  goes on -- that the law in this case is that, again, if he

16  said it's going into these certain areas only -- the liquid

17  asset concept; correct?

18          MR. STELLMACH:  Yes.

19          THE COURT:  -- instead, he put it into what you

02:23:15  20  would say -- defense would say modestly more speculative,

21  yours was absolutely speculative areas, and that is not

22  relevant to, in other words, either to the prosecution or

23  the defense in this case?

24          MR. STELLMACH:  I think that's the law under

02:23:32  25  the circuit, Judge.  The fact that he had some belief --

*Direct-Davis/By Mr. Stellmach*

1  even if he honestly believed that he would be able to repay

2  the depositors through the value of these undisclosed

3  assets, that is not a defense.  And just to the point that

4  Mr. Scardino raised that, you know, the door has somehow

02:23:48  5  been opened, first of all, I don't --

6              THE COURT:  But you also qualified that.

7              MR. STELLMACH:  Only with respect to

8  materiality is that Mr. Stanford both lied to investors --

9              THE COURT:  Lied as to what, as to where they

02:23:59  10 were going?

11             MR. STELLMACH:  As to where the assets of the

12 bank were going, what he was doing with their money.

13             THE COURT:  Number one.  And what's number two?

14             MR. STELLMACH:  That the lies were immaterial,

02:24:10  15 that it wouldn't have mattered to the depositors if they

16 knew the truth.

17             MR. FAZEL:  There should be a third one, Your

18 Honor.

19             THE COURT:  Is what, intent?

02:24:13  20             MR. FAZEL:  Intent, at the same time.

21             THE COURT:  All right.  Hit the intent, because

22 the mens rae has always got to be there.

23             MR. STELLMACH:  It does.  If you make a

24 misrepresentation and at the time you know you're making a

02:24:22  25 misrepresentation, that's intent.  Good faith -- a good

*Direct-Davis/By Mr. Stellmach*

1  faith defense --

2              THE COURT:  Of course, you can't -- very often

3  it's subject of rather than objective, and no one is going

4  to say out loud sometimes, but you say building up -- I

02:24:36  5  assume you're going to have a circumstantial evidence

6  instruction because you can -- how else are you going to

7  prove intent?  Sometimes it's objective, but a lot of time

8  it's subjective and based upon circumstances.

9              MR. STELLMACH:  Well, part of the way we're

02:24:48  10  going to prove intent, I think, is through Mr. Davis as

11  well as the accumulated other evidence that we have yet to

12  put on.

13              THE COURT:  What I'm going to do is this:  I'm

14  going to go revisit that, look at the briefing you have on

02:24:58  15  this point.  I'm not going to rule on it.  I'm not counting

16  it out.  But right now I'm going to allow the theory to

17  continue.  But you'll get another crack at it.

18              MR. STELLMACH:  Your Honor, I do want to

19  address this point that they raised that somehow the door

02:25:10  20  was opened through the questioning of Mr. Amadio.  All

21  Mr. Amadio has testified about and all our prior witnesses

22  have testified about and all our future witnesses will

23  testify about is the flow of money.  Nobody has taken the

24  stand and testified about value.  They have continually --

02:25:24  25              THE COURT:  But you have gotten and object

1  to protect the motion in limine.

2           MR. STELLMACH:  Right.

3           THE COURT:  You've even alluded to.  You know,

4  I wouldn't say sidebar in a negative way, so that's a

02:25:32   5  motion in limine.

6           MR. STELLMACH:  We tried to put them on notice

7  in case -- inadvertently slipped in through

8  cross-examination.  They're the ones who keep trying to put

9  it at issue.  The spreadsheet to which they keep referring,

02:25:43   10  the Mario spreadsheet, where he tracked the flow of money,

11  this doesn't go to value.  They keep asking questions about

12  risk.  Were these risky investments?  That's a very

13  different scenario, the ability to repay verus whether

14  these companies had some actual tangible value.

02:25:57   15           THE COURT:  I understand.  I got it.

16           MR. STELLMACH:  All right.

17           THE COURT:  Go on if you want --

18           MR. FAZEL:  I'm sorry.  I just want to rebut

19  what he's saying.  The fact is that his witness got on the

02:26:04   20  witness stand and clearly said -- and it wasn't on cross,

21  it was on direct -- that none of these investments had any

22  value, that they were putting into monies companies that

23  were then taking these monies and they were sucking --

24  needing for money and that these companies had no value,

02:26:19   25  that wasn't my statement, that was his witness's statement

*Direct-Davis/By Mr. Stellmach*

1  through direct examination.

2          THE COURT:  All right.  What I want is this --

3  and it's the major point.  We talked about this --

4          MR. STELLMACH:  Yes, Your Honor.

02:26:27  5          THE COURT:  -- at the beginning of the trial,

6  even beforehand, as to that -- this exact thing, what can

7  they show as far as the pivotal factor relative to the

8  valuation of these other companies.

9          What I'd like you to do -- we'll go back

02:26:44  10 and pull it out, but you probably have -- I want a short

11 memo.  I don't want an appellate brief.  That's not our

12 department here.  Like, three or four pages, max, if you

13 can --

14          MR. FAZEL:  Yes.

02:26:56  15          THE COURT:  -- with your best one or two cases

16 attached and highlighted.  I understand it, I think.  I'll

17 go back over the weekend myself and pull some of the

18 pleadings on this point, but if you would, give me the best

19 you got, because I may or may not reverse it.  But we don't

02:27:11  20 have to do it right now.  So I appreciate you bringing it

21 to my attention now, because I'll revisit every motion in

22 limine.  It's just an insurance policy not to get it in

23 until we do just what we're doing now.

24          MR. STELLMACH:  That's right.  And I just want

02:27:22  25 to be clear, you know, to the extent there has been --

*Direct-Davis/By Mr. Stellmach*

1  there haven't been any questions about valuation, I

2  respectfully disagree with Mr. Fazel's characterization

3  about Mr. Amadio's testimony.  We'll address that in our

4  submission.

02:27:33  5      THE COURT:  And literally I'm saying three or

6  four.  I'm not going to hold you to a page, but don't do

7  more than five pages.  You've got other things to do over

8  the weekend.  I've got the prior briefing.  But if

9  something -- if you want to just condense it down to bullet

02:27:47  10  points, almost, I'd be glad to consider it.

11      MR. FAZEL:  And, Your Honor, we'll also address

12  the fact that not only is it so that we can rebut

13  statements made by the government witnesses, that is, not

14  go into the ultimate issue that the government keeps

02:28:01  15  wanting to push you to, that's not the issue.  The issue is

16  if a witness testifies that these companies had no value,

17  which I would respectfully disagree with the government he

18  did, then we should be able to put on testimony that they

19  did to rebut and impeach the testimony of that witness.

02:28:13  20      THE COURT:  Again, you're trying to get, you

21  know, to Mr. Mario and as to that it had no value.  And I

22  think he -- are you saying it had no value?  I think he

23  said it might have had value, they were speculative, they

24  were start-ups, and then, of course, the point came in, for

02:28:28  25  instance, the airline was sold for what, $80 million?

*Direct-Davis/By Mr. Stellmach*

1          MR. FAZEL:  That was the Bank of Venezuela.

2          THE COURT:  Venezuela.  That's what I mean.

3          MR. FAZEL:  We'll brief it.

4          THE COURT:  All right.  I got it.  I don't want

02:28:37   5  an appellate brief, really.  I don't want to put you to

6  unnecessary work --

7          MR. FAZEL:  Yes, sir.

8          THE COURT:  -- over the weekend, but it's a

9  major point.  We discussed it before.  I'll be glad to

02:28:44  10  reconsider it.

11          MR. FAZEL:  Thank you, Judge.

12          THE COURT:  Let's call the jury in, please.

13          **(The following was held before the jury)**

14          THE COURT:  Thank you.  Be seated.

02:29:45  15                Go right ahead, sir.

16          MR. STELLMACH:  Thank you, Your Honor.

17  BY MR. STELLMACH:

18  **Q.**   Mr. Davis, I wanted to turn to the management of the

19  bank's assets and your understanding of how that was being

02:29:55  20  conducted when you first started working for Mr. Stanford

21  back in 1988.

22                When you first started, what did

23  Mr. Stanford tell you about the types of assets the bank

24  was buying with the CD money it was raising?

02:30:10  25  **A.**   Mr. Stanford said that the majority of the funds were

1    in bonds and foreign currencies, cash, bonds and cash.

2    **Q.**    Did he tell you whether the bank was making any real

3    estate investments?

4    **A.**    No, sir.

02:30:27   5    **Q.**    Did he tell you that the bank was putting money into

6    any companies he personally owned?  This is when you first

7    started.

8    **A.**    No, sir.

9    **Q.**    What did he tell you about whether the bank was even

02:30:37   10    making any loans at all?

11    **A.**    That there were no loans made.

12    **Q.**    What did Mr. Stanford tell you about who was

13    responsible for investing the CD money on a day-to-day

14    basis and managing the money?

02:30:53   15    **A.**    Money managers at financial institutions, primarily

16    Europe, specifically Switzerland.

17    **Q.**    These were money managers who were not employees of

18    the bank or of Mr. Stanford or any of his other companies?

19    **A.**    Yes, sir.  They were money managers that worked for

02:31:10   20    other banks and private financial -- public financial

21    companies --

22    **Q.**    And when you first --

23    **A.**    -- in Europe.

24    **Q.**    I'm sorry, Mr. Davis.

02:31:17   25    When you first --

*Direct-Davis/By Mr. Stellmach*

1    **A.**    In Europe.

2    **Q.**    In Europe.

3                    And when you first started, what did

4    Mr. Stanford tell you about how much of the bank's assets

02:31:26    5    were being managed by these overseas money managers?

6    **A.**    Mr. Stanford indicated that the primary corpus of

7    funds were being invested, all monies other than some

8    operations, salaries, expenses, normal operation and

9    operational expenses of the bank.

02:31:51   10    **Q.**    So all of the bank's assets were being managed by

11    these overseas money managers?

12    **A.**    Yes.

13    **Q.**    What did Mr. Stanford tell you about who within the

14    bank, within Guardian International Bank, was responsible

02:32:06   15    for overseeing the money managers?

16    **A.**    That was Mr. James Stanford and Mr. Allen Stanford.

17    **Q.**    And that was based on what Mr. Allen Stanford told

18    you; is that right?

19    **A.**    Yes, sir.

02:32:20   20    **Q.**    When you first started, were you involved in

21    overseeing the money managers at all?

22    **A.**    No, sir.

23    **Q.**    Did you receive statements that the money managers

24    submitted to the bank showing how they were handling the

02:32:33   25    funds and how the CD money was performing?

*Direct-Davis/By Mr. Stellmach*

1   **A.**   No, sir.

2   **Q.**   Who did get those statements?

3   **A.**   I presume and at -- early on presume Mr. Allen

4   Stanford, and later saw that --

02:32:48   5                 MR. SCARDINO:  Objection --

6                 THE COURT:  Hold it, sir.

7                 THE WITNESS:  Yes, sir.

8                 THE COURT:  When you see the other lawyer

9   getting up, and certainly when he starts talking or you

02:32:53   10  hear me, you need to stop; okay?

11                THE WITNESS:  Yes, sir.

12                THE COURT:  Yes, sir?

13                MR. SCARDINO:  He referred to his responses he

14  is presumed or he presumes.  Object to the speculation.

02:33:00   15                THE COURT:  Sustained.

16  BY MR. STELLMACH:

17  **Q.**   What -- did you later learn who was receiving the

18  statements within the bank?

19  **A.**   Yes, sir.  Mr. Allen Stanford.

02:33:09   20  **Q.**   How did you learn that?

21  **A.**   He told me.

22  **Q.**   You, yourself, weren't receiving those statements,

23  though, were you?

24  **A.**   No, sir, I was not.

02:33:16   25  **Q.**   At some point you replaced, I think you said the

*Direct-Davis/By Mr. Stellmach*

1  individual's name was Tom Broderick as the controller of

2  the bank?

3  **A.**   Yes, sir.  I replaced Tom Broderick, CPA.

4  **Q.**   Approximately when did that take place?

02:33:30  5  **A.**   No later -- I would say no later than April, April,

6  May of '88.

7  **Q.**   So just a couple of months after you first started?

8  **A.**   Yes, sir.

9  **Q.**   When you replaced Mr. Broderick, what were your

02:33:43  10  responsibilities just in general terms as the new

11  controller of the organization?

12  **A.**   My primary responsibilities were to account for

13  accounts payable of the Stanford Financial Group Company,

14  and to also construct certain analysis and statements from

02:34:04  15  those accounts payable.

16          THE COURT:  By the way, sir, if you're more

17  comfortable, you can sit back and pull the mike in.

18  Whatever you prefer; okay?

19          THE WITNESS:  Yes, Your Honor.

02:34:11  20          THE COURT:  You can sit back -- if you want to.

21  You don't have to.  But I'm saying it does move.  Just give

22  it a -- all right.

23          THE WITNESS:  Okay.  Thank you, sir.  Thank

24  you, Your Honor.

02:34:20  25          THE COURT:  All right.  Raise it up just a

*Direct-Davis/By Mr. Stellmach*

1  little bit.  That's great.  It may be too close even.

2  Let's see.

3           MR. STELLMACH:  We're about to find out.

4           THE COURT:  I see you're rocking back in the

02:34:33  5  chair.  I guess that's one way to solve it.

6                Go on.

7  BY MR. STELLMACH:

8  Q.   When you use the phrase "accounts payable," what are

9  you referring to?

02:34:39  10  A.   Local accounts applicable that were in the nature of

11  rents, salaries, vendor purchases of services in the local

12  area.

13  Q.   So you were responsible for handling the payment of

14  the day-to-day operating expenses of the bank?

02:34:56  15  A.   Not in the beginning, no, sir.

16  Q.   But once you became -- once you replaced

17  Mr. Broderick as the financial controller?

18  A.   Yes, sir.  At a timing of a few weeks beyond that

19  point, yes, sir.

02:35:11  20  Q.   What about the financial statements of the bank that

21  were provided to the depositors and which appeared in the

22  annual reports of the bank?  What was your -- did you play

23  any role in preparing those?

24  A.   At that time, those were prepared by an accountant by

02:35:25  25  the name of David Chambers who worked for the Stanford, so

*Direct-Davis/By Mr. Stellmach*

1  Mr. James and Allen Stanford.  And subsequent to that

2  time, yes, sir.

3  **Q.**   Subsequent to that, what became your role with

4  respect to the financial statements of the bank?

02:35:48  5  **A.**   I was responsible for preparing those statements or

6  seeing that they were prepared.

7  **Q.**   So in very broad terms, would those financial

8  statements list the liabilities of the bank and the bank's

9  assets?

02:36:00  10  **A.**   Yes, sir.

11  **Q.**   And could you just explain for us in just general

12  terms what the liabilities of Guardian International Bank

13  were?

14  **A.**   There were a few local accounts payable in the

02:36:13  15  liability section of the balance sheet, and the

16  preponderance of the liabilities were what were -- what

17  was owed to the individual depositors of the bank called

18  client accounts payable.

19  **Q.**   When you say "the preponderance," Mr. Davis, just in

02:36:31  20  ballpark terms as a percentage, how much was owed to the

21  depositors in terms of the bank's overall liabilities?

22  **A.**   95 percent.  In excess of 95 percent.

23  **Q.**   And where would you get the information on what the

24  bank's liabilities were?

02:36:46  25  **A.**   That information came from the lady who handled the

*Direct-Davis/By Mr. Stellmach*

1  client accounts payable operations, and at the time it was

2  a lady by the name of Dora Donis (phonetic).

3  Q.   And, so, Ms. Donis would tell you, This is what we

4  owe the depositors.  Principal and interest all combined,

02:37:07  5  this is the grand total of what we owed depositors?

6  A.   Yes, sir.  Ms. Donis would furnish those numbers.

7  Q.   Now, with respect to the bank's assets, what in

8  general terms were included in the assets of the bank on

9  this financial statement that you were involved in

02:37:24  10  preparing?

11  A.   In the financial statement assets, the listings were

12  comprised of furniture and fixtures.  There were possibly

13  some miscellaneous prepaid items, such as for utilities

14  that would have been made.  But the greater amount, the

02:37:49  15  lion's share, the 90 percentile and above amount was the

16  investments.

17  Q.   By "investments," what do you mean?

18  A.   Investments that were made with depositor monies or

19  should have been made with depositors' monies, inclusive

02:38:09  20  of bonds and foreign cash items at that time.

21  Q.   So the investments would be the funds, the CD money,

22  that was being invested as you then understood it with

23  these overseas money managers?

24  A.   Yes, sir.  They would have been the monies sent to

02:38:27  25  banks, say, in Switzerland for management.

*Direct-Davis/By Mr. Stellmach*

1    **Q.**    Now, I thought you testified earlier that you weren't

2    receiving all of the account statements for these overseas

3    money managers, at least initially; right?

4    **A.**    Yes, sir, that is correct.  Those statements went to

02:38:46    5    Mr. Allen Stanford.

6    **Q.**    Did Mr. Stanford then give you all of the statements

7    so that you could put together the list of the bank's

8    assets?

9    **A.**    Not -- initially, no, that didn't take place.

02:38:56    10    **Q.**    Initially, what information did Mr. Stanford give you

11    about the bank's assets, what its investments supposedly

12    were?

13    **A.**    When the statements were prepared initially under my

14    command, as it were, I would receive the balance sheet

02:39:16    15    that's inclusive of the assets and liabilities, all the

16    numbers, except for the investment section.  And

17    Mr. Stanford would, in effect, furnish those numbers to

18    me.

19            THE COURT:  What -- how would you define the

02:39:36    20    investment section?  What was on that sheet or couple of

21    sheets?

22            THE WITNESS:  The investment section would be

23    defined as products such as bonds, such as foreign

24    currencies, Swiss francs, British pounds.

02:39:51    25            THE COURT:  Go on.

*Direct-Davis/By Mr. Stellmach*

1  BY MR. STELLMACH:

2  **Q.**    When you say Mr. Stanford would furnish you with that

3  information, how did he give it to you?  Was he giving you

4  documents from financial institutions, or was he giving

02:40:01  5  you the information in some other way?

6  **A.**    In the early days, he was giving it to me just

7  variable.

8  **Q.**    So Mr. Stanford -- could you just explain that.

9  Mr. Stanford would come into your office and just verbally

02:40:14  10  tell you what the bank's assets were?

11  **A.**    Well, on occasions when a statement needed to be

12  prepared for a government agency or for a meeting of

13  sharing information with a board of directors, for

14  example, or a meeting with private banking officers, a

02:40:28  15  statement would have to be prepared, statement of

16  condition.

17            THE COURT:  And you say early on.  Later on,

18  how did you get it?  After orally, any others?  You say

19  "early on."

02:40:39  20            THE WITNESS:  Later on, I was made privy -- as

21  of the end of 1991, I was made privy to the statements that

22  then existed.

23            MR. SCARDINO:  Object to nonresponsive answer.

24            MR. STELLMACH:  I were thought it was directly

02:40:49  25  responsive.

1              THE COURT:  Overrule the objection.

2                    That's all.  I just wanted to clear that

3  up myself.  Go on.

4              THE WITNESS:  Yes, Your Honor.

02:40:54  5  BY MR. STELLMACH:

6    **Q.**   And that's -- and just to be clear, Mr. Davis, we're

7    still focussing in '88, '89, 1990.

8                    In that period, who was giving you the

9    information about the bank's assets?

02:41:06  10  **A.**   The only information I would have had would be

11   Mr. Allen Stanford.  That's where the information came

12   from, because I did not receive statements.  I was not on

13   the signatory.

14             THE COURT:  It was known as Guardian at the

02:41:17  15  time still?

16             THE WITNESS:  Yes, sir.

17  BY MR. STELLMACH:

18   **Q.**   Even though you weren't receiving the statements and

19   you didn't see who the money managers were and what the

02:41:25  20  actual assets were of the bank, did Mr. Stanford in your

21   presence ever make any statements about your role in

22   managing that money that was false?

23   **A.**   Well, we talked about this process of taking

24   information from Mr. Stanford to, as it were, make the

02:41:44  25  necessary entries into the general ledger to furnish these

*Direct-Davis/By Mr. Stellmach*

1    financial statements.

2                    He said, "Yes, of course you're going to

3    get these.  We just have to get -- in front of the

4    financial institutions and the money managers, we have to

02:42:00    5    change the signatory on these accounts and then you'll, of

6    course, receive these statements.  Naturally, you've

7    got -- you're the controller.  You have to see these

8    statements, but that will be -- that will come."

9    Q.    I'm sorry.  So that was his explanation about why you

02:42:17   10    hadn't gotten the statements yet?

11   A.    Correct.

12   Q.    And I think my question, just to go back to it, it

13   wasn't clear, was:  Did Mr. Stanford ever lie about your

14   role in overseeing the management of the CD money in the

02:42:30   15    early years?

16   A.    Well -- Well, yes, sir.  He would share with the

17   private banking officers that I was the numbers man and

18   that I was in charge of the financial statement, inclusive

19   of both sides of it, the assets and the liabilities.

02:42:46   20   Q.    Well, what did Mr. Stanford say to the private

21   bankers, these employees who were selling the CDs, that

22   was false about your role in overseeing the money?

23   A.    Said that I oversaw the money managers and the

24   investment section of the balance sheet.

02:43:03   25   Q.    And at the time he said that, that wasn't true?

*Direct-Davis/By Mr. Stellmach*

1   **A.**   No, sir.

2   **Q.**   When Mr. Stanford said that to the private bankers,

3   did you pull him aside later and ask him, "Why are you

4   saying that you know that's not true"?

02:43:17   5   **A.**   We talked about it.  Yes, we talked about it.  And he

6   said, "We're going to go to those money managers, we're

7   going to get you on the paper, and until we get that done,

8   just my -- they're there and they have to be put in.  The

9   entries have to be put in there."

02:43:37   10   **Q.**   Where you say, "They're there" -- when you say, "He

11   said they're there," what are you trying -- what are you

12   saying?  What are you communicating?

13   **A.**   He said, "The investments are there, as I said they

14   were, and we're making money."

02:43:50   15                     And I took his word for it, and I did it

16   and I put it down.  I put it down, as it were.

17   **Q.**   So in the period --

18   **A.**   And I did the statements.  I'm sorry.

19   **Q.**   So in the period you actually received the statements

02:44:02   20   and knew what the bank's assets were, did you also lie to

21   other people about what you were doing in your role in

22   overseeing the money managers?

23   **A.**   Yes, I did lie.

24   **Q.**   So it wasn't -- just to be clear, it's not just

02:44:16   25   Mr. Stanford saying, "Jim Davis oversees the money

*Direct-Davis/By Mr. Stellmach*

1   managers."  Jim Davis also went out and told private

2   bankers, "I'm overseeing the money managers"?

3   **A.**   Yes.  We lied.

4   **Q.**   Well, Mr. Davis, at this point, why did you lie?  Why

02:44:30   5   not just tell Mr. Stanford to stop doing that until he

6   actually gives you the statements?

7   **A.**   I wanted to please Mr. Stanford.  I was proud.  I was

8   embarrassed.  I was a coward.  Later on, years later, I

9   was greedy, regrettably.

02:45:01   10   **Q.**   So when you first started at Stanford Financial

11   Group, did Mr. Stanford also own other businesses at this

12   time?

13   **A.**   Yes, sir.  He owned a Guardian Development

14   Corporation.  Guardian Development Corporation was a real

02:45:21   15   estate acquisition and development company that was

16   located here in Houston, Texas.

17                    Also Stanford Financial Group Company,

18   which I already mentioned.  And the bank, Guardian

19   International Bank Limited.  Then some pieces of real

02:45:39   20   estate connected between those companies.

21   **Q.**   Did Mr. Stanford ever discuss with you how he was

22   financing his real estate projects at Guardian Development

23   Corporation?

24   **A.**   In the beginning, Mr. Stanford said that was out of

02:45:55   25   his own money.  He paid for them.

*Direct-Davis/By Mr. Stellmach*

1   **Q.**   Did you ever ask him whether any of the real estate

2   projects were being financed with CD money from the bank?

3   **A.**   I don't know that -- in the early days, I don't know

4   that I ever asked that question.  I believed him.

02:46:08  5   **Q.**   Were you ever present when private bankers asked

6   Mr. Stanford that question, whether he was financing any

7   real estate projects or other businesses using the CD

8   money?

9   **A.**   Over the years that was a fairly frequent question.

02:46:22  10   I've been in his pre --

11                MR. SCARDINO:  Object to the nonresponsive

12   answer.

13                THE COURT:  Sustained.

14   BY MR. STELLMACH:

02:46:26  15   **Q.**   Was that a "yes" or a "no"?  You were present?

16   **A.**   Yes, sir.

17   **Q.**   When these private bankers asked Mr. Stanford whether

18   he was using any CD money to finance his other businesses,

19   what did he say?

02:46:36  20   **A.**   Said no, they weren't.  "No, I was not using CD

21   money.  Those are funds of my corpus, my funds."

22   **Q.**   And at least initially in the first couple of years,

23   did you believe that to be true?

24   **A.**   Yes, sir.

02:47:01  25   **Q.**   I want to focus on 1990.  Guardian bank was an

*Direct-Davis/By Mr. Stellmach*

1  offshore bank?

2  **A.**   That is correct, yes, sir.

3  **Q.**   It wasn't insured by the FDIC, the Federal Depository

4  [sic] Insurance Corporation?

02:47:17  5  **A.**   No, sir, it was not.

6  **Q.**   Were you ever present when there were conversations

7  with Mr. Stanford and the private bankers about the fact

8  that Guardian didn't have FDIC insurance backing the

9  depositors?

02:47:32  10  **A.**   Yes, sir.

11  **Q.**   Could you tell us what you heard said in those

12  discussions?

13          MR. SCARDINO:   I would object to the form of

14  the question unless it can be established the parties that

02:47:43  15  he's referring to.

16          MR. STELLMACH:   I think I established private

17  bankers.

18          THE COURT:   It's a little open-ended.   Okay.

19  Narrow it down a bit, please.

02:47:50  20          MR. STELLMACH:   I will.

21  BY MR. STELLMACH:

22  **Q.**   So between -- starting in 1998 -- 1988 and 1990, did

23  you ever discuss insurance for the bank with Mr. Stanford?

24  **A.**   Yes, sir.

02:48:05  25  **Q.**   And specifically insurance for the CD depositors to

*Direct-Davis/By Mr. Stellmach*

1    protect them in the event the bank had a failure?

2    **A.**    Yes, sir.

3    **Q.**    Were you ever present when other private bankers,

4    other employees, rather, private bankers, raised concerns

02:48:19    5    about the lack of insurance with Mr. Stanford?

6    **A.**    Yes, sir.  At the private banking officer meetings.

7                   MR. SCARDINO:  Objection.  Nonresponsive.

8                   THE WITNESS:  Yes, sir.

9                   THE COURT:  If you can answer it yes or no.  If

02:48:30    10   you need to explain an answer, let me know and we'll have

11   the attorney rephrase it or move on; okay?  If it's a

12   yes-or-no question, that's all we need.  And then he'll

13   follow up.

14                   THE WITNESS:  Yes, Your Honor.

02:48:41    15                   THE COURT:  Okay.  Thank you.

16   BY MR. STELLMACH:

17   **Q.**    So, Mr. Davis, what were the private bankers telling

18   Mr. Stanford about the lack of insurance and how it was

19   affecting CD sales?

02:48:50    20                   MR. SCARDINO:  Object to assuming facts that

21   are not in evidence.

22                   THE COURT:  Overruled.

23                   You heard all the subparts to that

24   question.  If you can answer it -- can you answer it as

02:48:59    25   stated?  Are you able to?

*Direct-Davis/By Mr. Stellmach*

1        THE WITNESS:  Would you please repeat the

2   question.

3        THE COURT:  Let me have Johnny read it back,

4   please.

02:49:15    5        **(The requested portion was read.)**

6        THE WITNESS:  Private bankers told Mr. --

7        MR. SCARDINO:  I guess I have another objection

8   to that.  That would be hearsay, something that was said by

9   a third party outside of the courtroom.

02:49:23   10        MR. STELLMACH:  Not offered for the truth.

11  Merely for the fact that it was said to Mr. Stanford and

12  then he acted following those discussions, which we're

13  leading up to.

14        MR. SCARDINO:  Is the government taking the

02:49:31   15  position that it was not a truthful statement then?

16        MR. STELLMACH:  We're taking the position that

17  we don't have to say whether it was a truthful statement,

18  merely that it was told Mr. Stanford, and following those

19  conversations, it led directly to the insurance policy,

02:49:43   20  which we're about to turn to.

21        MR. SCARDINO:  I take the position that it's

22  not an exception to the Hearsay Rule offered for the truth

23  of the matter under this content --

24        MR. STELLMACH:  It is --

02:49:48   25        THE COURT:  Let him go.

*Direct-Davis/By Mr. Stellmach*

1          MR. SCARDINO:  -- not establishing an event or

2    time in place or that something occurred other than offered

3    for the truth.

4          THE COURT:  Sustained only to time and place.

02:49:59  5    Other items are overruled.

6               Set a timeframe so we know --

7          MR. STELLMACH:  Sure.

8          THE COURT:  -- if you're going to build a

9    progression on this.

02:50:05 10    BY MR. STELLMACH:

11    Q.    When you started in 1988, when you first started, did

12    private bankers have discussions with Mr. Stanford that

13    you were present at?

14    A.    Yes, sir.

02:50:16 15    Q.    During those discussions or during those meetings,

16    was there any discussion about Guardian and insurance?

17    A.    Yes, sir.

18    Q.    And in 1988, right when you first started, what did

19    the private bankers say to Mr. Stanford about the lack of

02:50:35 20    FDIC insurance?

21    A.    Private bankers said to Mr. Stanford that the lack of

22    insurance of that type impeded or held them back in

23    closing sales of CD products.  The competition was with

24    FDIC insurance, and they needed that for sales.

02:51:01 25    Q.    Was that a conversation or a concern that was

*Direct-Davis/By Mr. Stellmach*

1    expressed in 1989?

2    **A.**    Yes, sir.

3    **Q.**    In 1990?

4    **A.**    Yes, sir.  It was in 1990 as well.

02:51:14    5    **Q.**    What did Mr. Stanford say in response?

6    **A.**    Mr. Stanford indicated that there was FDI insurance

7    at the competition level, and that in the international

8    markets, there really wasn't a similar product sold at CDs

9    and insurance similar to the FDIC product; but that there

02:51:49    10    was a excess insurance coverage that existed and that was

11    available for them to use and share with their clients.

12    **Q.**    So could you just explain.  When you say "excess

13    coverage," what do you mean?

14    **A.**    Mr. Stanford stated that there was a policy in force

02:52:10    15    that would insure Stanford -- excuse me -- that would

16    insure Guardian International Bank bank deposits that were

17    held in other institutions.  And if there was a failure in

18    those financial institutions, that for a certain stated

19    amount on the declaration page of that insurance policy,

02:52:31    20    that Guardian International Bank would be indemnified or

21    made whole for a certain amount that was on that policy.

22              MR. STELLMACH:  And if we could see

23    Government's Exhibit 502 that's in evidence.

24    BY MR. STELLMACH:

02:52:46    25    **Q.**    And, Mr. Davis, do you see that document?  I'm going

*Direct-Davis/By Mr. Stellmach*

1    to hand you a hard copy as well.  You can follow along on

2    the screen or with the document itself.

3                    MR. STELLMACH:  If we could just go back to the

4    full shot of the document.

02:52:59  5   BY MR. STELLMACH:

6    **Q.**   When do you recall -- do you recall seeing this

7    document while you worked for Mr. Stanford?

8    **A.**   Yes, sir, I did see this.

9    **Q.**   When do you recall first seeing it?

02:53:10  10  **A.**   I believe in the summer of '88, most probably in

11   1989.

12   **Q.**   Who showed it to you?

13   **A.**   Mr. Stanford and/or private banking officers who got

14   a copy, and/or Mr. Sidney Adler, the general counsel of

02:53:33  15   the company at the time.

16                    MR. SCARDINO:  I object to the response.  If he

17   can't remember and it's "and/or," I would object to the

18   response.

19                    THE COURT:  Restate it, please.

02:53:40  20                   MR. STELLMACH:  Sure.

21   BY MR. STELLMACH:

22   **Q.**   My original question was:  Who first showed it to

23   you?  Do you recall who first showed it to you?

24   **A.**   No, sir, I don't believe I do, but I do recall --

02:53:51  25                   MR. SCARDINO:  Well, then, I would object to

*Direct-Davis/By Mr. Stellmach*

1 his previous answer and that the jury be instructed to

2 disregard.

3              THE COURT:  What's your response, Counsel?

4              MR. STELLMACH:  I believe Mr. Davis said, "I

02:54:00  5 think it was Sidney Adler, a lawyer, or Mr. Stanford who

6 first showed it to him.

7              MR. SCARDINO:  And then he said he didn't

8 remember.

9              MR. STELLMACH:  Because he doesn't which of the

02:54:07  10 two first showed it to him.

11              THE COURT:  Hold it.  Well, sustained at this

12 time, just as to the form and the responsiveness.  Just

13 hammer it down tight.

14 BY MR. STELLMACH:

02:54:17  15 Q.    At some point after you is a first saw it, do you

16    know specifically whether you ever discussed this policy

17    with Allen Stanford?

18 A.    Yes, I did.

19 Q.    What did Mr. Stanford, when he first discussed the

02:54:28  20    policy with you, tell you about this policy?

21 A.    He said it's a real policy.  It's a real company.

22    British Insurance Fund is a real company, it was a company

23    that is foreign to the U.S.  It has a charter and articles

24    of incorporation.

02:54:46  25 Q.    Well, when he first talked with you about the company

*Direct-Davis/By Mr. Stellmach*

1    and about this insurance policy, did he tell you whether

2    the British Insurance Fund was a company he personally

3    owned and had set up?

4              MR. SCARDINO:  Object to leading.

02:54:58  5              MR. STELLMACH:  I'm just asking what he was

6    told.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't believe initially he said

9    that, no.

02:55:07  10   BY MR. STELLMACH:

11   **Q.**   So when you first saw the policy, what did you

12   understand this to be in terms of whether it was a real

13   policy with a real company behind it?

14   **A.**   When I first saw it, I believed it to be a real

02:55:22  15   company, as he said it was.

16   **Q.**   And, in fact, in Subpart A, just to read it, "The

17   loss of the money due to the failure, collapse or

18   bankruptcy of a redeposit or investment source as approved

19   by the company and only where depositor liability exists."

02:55:41  20              Did Mr. Stanford ever explain what that

21   phrase "as approved by the company" meant, which company is

22   being referred to there?

23   **A.**   As approved by British Insurance Fund Limited is what

24   I understood from Mr. Stanford --

02:55:57  25   **Q.**   When --

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Direct-Davis/By Mr. Stellmach*

1  **A.**   -- and the policy.

2  **Q.**   When Mr. Stanford showed you this policy, did he tell

3  you whether British Insurance Fund was a company he

4  controlled?

02:56:09  5  **A.**   I don't remember on the initial, but afterwards, yes.

6  **Q.**   And afterwards, is that in the summer of 1990?

7  **A.**   Certainly -- no, sir.  Certainly 1991 rings a bell.

8  1991.

9  **Q.**   Okay.

02:56:35  10  **A.**   Late summer.

11  **Q.**   So focussing on the summer of 1991 -- I think I had

12  the date wrong -- did you discuss this policy with

13  Mr. Stanford again?

14  **A.**   Yes, sir, I did.  He called me into his office and --

02:56:56  15          MR. SCARDINO:  Object to the nonresponsive

16  answer.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes, sir, he did speak with me

19  again.

02:57:01  20  BY MR. STELLMACH:

21  **Q.**   When Mr. Stanford called you into his office, what

22  did he tell you about this policy?

23  **A.**   Ultimately, he said the policy was a -- although

24  legally speaking, it was a real chartered company with

02:57:24  25  articles of incorporation, that it was not a real company

1    in terms of an insurance company.  There wasn't an ability

2    in the company per se to pay a loss; that it was a

3    marketing device; and that at that time, he said, "I need

4    you to go to the office of British Insurance Fund and I

02:57:54    5    need you to send a document.  I want to fly -- I want you

6    to fly to London to -- where the office is located, and I

7    want you to send a fax to a certain perspective client

8    indicating to that client that there is real activity in a

9    real company, and then I want you to fly back here to

02:58:19    10    Houston."

11    **Q.**    Did Mr. Stanford explain why you had to fly to

12    London, England, to fax that document?

13    **A.**    He indicated that it was potential client that had

14    potentially a large amount of money to invest in CDs.  And

02:58:39    15    I went on the trip, flew and made a fax, facsimile.  I

16    sent a fax to an address that I was given --

17    **Q.**    Well, I just want to step back --

18    **A.**    -- and came back.

19    **Q.**    I just want to step back for a moment.

02:58:56    20         So this is in the summer of 1991?

21    **A.**    Late summer, yes, sir.  August, I believe.

22    **Q.**    You fly to London, England.

23         When you land, where did you go?

24    **A.**    I took a taxi to a hotel right off of Piccadilly in

02:59:16    25    the center of London, Le Meridien Hotel is the same of it.

*Direct-Davis/By Mr. Stellmach*

1    And I -- from the hotel, I went to the office of British

2    Insurance Fund.

3    **Q.**   What was the office of British Insurance Fund?  What

4    did it look like?

5    **A.**   There was this, I believe a second- or third-floor

6    office in a building across the main thoroughfare or main

7    street from the hotel, and it had a receptionist and also

8    many, many cubicles that housed a lot of offices that were

9    represented there on the floor.  It was an office, an

10   administrative services complex, where a number of

11   businesses had cubicle offices inside of.

12   **Q.**   So when you say you went to the office of the British

13   Insurance Fund Limited in London, how big was the office?

14   **A.**   It was a cubicle probably 10-foot square --

15   **Q.**   So about --

16   **A.**   -- maximum.

17   **Q.**   About half the size of the jury box, maybe a little

18   bit larger?

19   **A.**   Yes, sir, I would say it would be about half that

20   size.

21   **Q.**   Were there files and documents and other documents

22   related to an insurance business in the cubicle?

23   **A.**   No, sir.  I didn't find any files or documents of an

24   insurance company.

25   **Q.**   And was it literally a cubicle with partitions, or

1   was it an actual office?

2   **A.**   It was an office that was bordered by cubicles,

3   panels that were approximately seven feet high.

4   **Q.**   So partitions?

03:01:04   5   **A.**   Yes, sir, partitions.

6   **Q.**   So you went to the cubicle, and then what did you do?

7   **A.**   I took the facsimile that I was given, the sheet of

8   paper that I was handed before I left in Houston, and I

9   faxed it to the number that I was given, and I left --

03:01:25   10   left the cubicle and went back to the hotel.

11             THE COURT:  So what was in the cubicle?

12   Anybody employed?  Any people there or just equipment or

13   what?

14             THE WITNESS:  Yes, Your Honor.  There was a

03:01:37   15   desk, a chair, fax machine, and that's all.

16             THE COURT:  Okay.

17   BY MR. STELLMACH:

18   **Q.**   And when you say you faxed it, what was it that you

19   faxed?

03:01:49   20   **A.**   It was a type of confirmation of insurance coverage.

21   Beyond that, I don't remember the details of it.

22   **Q.**   And then how shortly after that did you return to the

23   United States?

24   **A.**   Next flight back to Houston, which was early the very

03:02:09   25   next morning.

*Direct-Davis/By Mr. Stellmach*

1  Q.   When Mr. Stanford asked you to do this, did he

2  explain at all why he was asking you and not someone else?

3  A.   He trusted me to keep the confidence.  If he told it

4  someone else, the fraud that was going on would have been

03:02:33  5  exposed.

6          MR. SCARDINO:  Object to nonresponsive.

7          THE COURT:  Sustained.

8  BY MR. STELLMACH:

9  Q.   He said he trusted you?

03:02:42  10  A.   Trusted me to do this.  He asked me to go for just a

11  short hop, but it was necessary.

12  Q.   And at this point when Mr. Stanford asks you to fly

13  to London and send a confirmation for this insurance

14  policy, did you still believe that the bank was

03:03:03  15  legitimate?

16  A.   No, sir, I didn't.  Previous suspicions were -- years

17  of suspicions.  At that time I did not have access to all

18  of the accounts, so there may be a little hope for the

19  fact that there was indeed a complete whole investment

03:03:37  20  portfolio, that there was a insurance policy that was

21  valid and actually did have cover.  After that, no, I knew

22  it was -- I knew it was a fraud.

23  Q.   As far as the policy itself goes, did Mr. Stanford

24  explain why he didn't just go out and get an actual

03:04:01  25  insurance policy?

*Direct-Davis/By Mr. Stellmach*

1   **A.**   As I earlier testified, that this was really a

2   marketing device, that there would be no failure, this

3   thing is going to work, this thing being the Guardian

4   International Bank, Limited, entity, and it's a waste of

03:04:25   5   money.

6   **Q.**   Real insurance is a waste of money?

7   **A.**   Premiums for it would be a waste of money.

8   **Q.**   If we turn to the last page of this document, the

9   schedule, it actually lists an insured amount, and it has

03:04:41   10   provisional first premium beneath that.  The insured

11   amount is supposedly $50 million, and the provisional

12   first premium is $50,000.  Do you see that?

13   **A.**   I do, yes, sir.

14   **Q.**   In your capacity as the controller of Stanford

03:04:59   15   Financial Group at this point in time, had you ever seen

16   any premiums being paid?

17   **A.**   I never saw any premiums paid, no, sir.

18   **Q.**   Did there come a time when Mr. Stanford ever set up

19   an actual set of accounts or tried to transfer assets so

03:05:19   20   that the British limited fund, the insurance fund, would

21   actually have real assets behind it?

22   **A.**   No, sir.

23   **Q.**   Was this policy used throughout the course of the

24   fraud?

03:05:36   25   **A.**   This policy was in place when I joined the company.

*Direct-Davis/By Mr. Stellmach*

1    It was in existence.

2    **Q.**    Did it continue being used, as you've described it,

3    as a marketing tool throughout the existence of the bank

4    or did there come a point when it stopped being used?

03:05:54  5    **A.**    There came a point when it stopped.  Shortly after

6    the trip, so-called trip, in 1991, it was stopped being

7    used.  I would say certainly by the middle of the next

8    year, yes, sir.

9    **Q.**    Did Mr. Stanford explain why he wasn't using this

03:06:13  10   particular document anymore?

11   **A.**    Well, the company, Guardian International Bank,

12   Limited, was growing to such a size that this would not

13   hold up to scrutiny.  There needed to be a real policy.

14   **Q.**    What did you understand Mr. Stanford to be -- to say

03:06:35  15   when he said that the bank was growing too large to

16   continue using this document?

17   **A.**    There would be inquiries, and inquiries would equal

18   discovering the ruse, the fraud.

19   **Q.**    So once Mr. Stanford asks you to fly to London, send

03:06:55  20   a fake confirm to an individual who is about to invest

21   their money into the CD program at the bank, why not pull

22   out at that point?  I mean, this is 1991, you're three

23   years in, you still haven't received the account

24   statements, why not quit?

03:07:15  25   **A.**    As I earlier testified, I wanted to please

*Direct-Davis/By Mr. Stellmach*

1    Mr. Stanford.  I was a coward.

2    **Q.**   Was he --

3    **A.**   Embarrassed.

4    **Q.**   Was he also paying you well?

5    **A.**   He signed my paycheck.

6    **Q.**   Did there come a point when you finally were given

7    access to the account statements from the overseas money

8    managers, these financial professionals who were

9    supposedly managing all of the bank's assets?

10   **A.**   Yes, sir, there was.

11   **Q.**   Approximately when did that happen?

12   **A.**   Approximately December of 1991.

13   **Q.**   A couple of months after this trip?

14   **A.**   Yes, sir.  That was the point in time where I sat

15   down and met some managers and was added to the signatory

16   on those accounts.

17   **Q.**   Did you notice any difference at that point between

18   the assets that the bank was reporting in its annual

19   report to depositor and to depositors and the amount of

20   assets that the account statements added up to that you

21   now had?

22   **A.**   Yes, sir, I did.  I noticed that there was maybe 40

23   to 50 percent in those statements with respect to total

24   investments reported.

25   **Q.**   So about half the money was missing?

*Direct-Davis/By Mr. Stellmach*

1    **A.**    Best of my recollection, yes, sir.

2    **Q.**    When you noticed that difference, did you discuss it

3    with Mr. Stanford?

4    **A.**    We discussed that difference at that time and --

03:09:08    5    **Q.**    At that time meaning when?

6    **A.**    December '91; January, February, '92, that time.  And

7    from that time until the end in February of 2009, it was a

8    frequent topic of conversation.

9    **Q.**    And I'm just focussing -- and we'll come to those

03:09:30    10    other conversations.  But I'm just focussing on that

11    initial conversation either at the end of '91, early '92,

12    when you asked Mr. Stanford about this difference where

13    half the reported assets of the bank are.  That's the

14    conversation I'm focusing on.  Was anyone else present

03:09:52    15    when you spoke with Mr. Stanford about this?

16    **A.**    No, sir.

17    **Q.**    Where was this conversation?

18    **A.**    We had this conversation in Switzerland when we made

19    the visit to make the addition of my name on those

03:10:11    20    signatory accounts, had the conversation in his office in

21    Houston, Texas, 38th floor, Milam, other places.

22    **Q.**    I'm just focussing on the initial conversation where

23    you asked Mr. Stanford about this difference between what

24    the bank is reporting and what you're actually seeing.

03:10:30    25    **A.**    38th floor, Milam Building.

*Direct-Davis/By Mr. Stellmach*

1  Q.   What did Mr. Stanford say?  What was his explanation?

2  A.   That the monies had been moved into investments in

3  real estate, into brick and mortar companies, that there

4  was value there, and that the bank was going to grow and

03:11:03   5  dwarf this small amount that is so-called missing, in

6  other words, it's not in the investment section as it is

7  reported to respective depositors and depositors.

8  Q.   Small amount, half the money is gone?

9         MR. SCARDINO:  I'll object to the form of the

03:11:24  10  question.

11         THE COURT:  Sustained.

12  BY MR. STELLMACH:

13  Q.   When Mr. Stanford said it was a small amount, did you

14  express any concern over the size, the actual size?

03:11:31  15  A.   As I earlier testified, I testified I wanted to

16  please Mr. Stanford.  I don't know the level of my

17  questioning.  I was certainly concerned.  I expressed my

18  concern to Mr. Stanford at that time.

19  Q.   Did Mr. Stanford explain how he was going to make up

03:11:59  20  the difference, the difference between what the bank was

21  reporting and what it actually had invested with these

22  money managers?

23  A.   Yes, sir.  He said he was going to grow CD sales so

24  quickly in such amount that when those CD sales and that

03:12:23  25  extreme growth curve were invested with the money

*Direct-Davis/By Mr. Stellmach*

1  managers, the money managers would make a sufficient

2  return to cover what was not there, the so-called hole,

3  plus pay the interest on current CD holders and make a

4  profit, in other words, grow out of the hole by a steep

03:12:50  5  curve of growth in the bank.

6  **Q.**   Growth in the bank in what particular area of the

7  bank?

8  **A.**   Selling CDs.

9  **Q.**   But did you express any concern about the fact that

03:13:06  10  the more CDs you sell, the more interest you have to pay

11  on those CDs?

12  **A.**   I don't recall which -- what exactly I said in reply

13  in voicing my concern, other than I've already testified

14  that I believed in Mr. Stanford, I believed wrongfully so,

03:13:32  15  regrettably so, God forgive me so, but I believed him, and

16  I stayed there and continued to lie with him, for him.

17  **Q.**   I think you testified earlier that after that initial

18  conversation, this issue, the GAAP between what the bank

19  was reporting and what it actually had in cash and liquid

03:13:53  20  assets, was a topic that came up again; is that correct?

21  **A.**   It was an ongoing topic of conversation, that is to

22  say, the difference between what was reported.

23          MR. SCARDINO:  Object to the nonresponsive

24  answer.

03:14:06  25          THE COURT:  Sustained.

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Direct-Davis/By Mr. Stellmach*

1  BY MR. STELLMACH:

2  **Q.**   When you discussed this issue with Mr. Stanford, did

3  you express any concerns about this?

4  **A.**   Yes, I did.

03:14:21   5  **Q.**   And how did Mr. Stanford react?  Was he also as

6  concerned from what you could tell?

7  **A.**   He expressed to me less concern that I had.  However,

8  he was confident, very charismatic, as I said before, and

9  he was confident that he could do it.

03:14:42   10  **Q.**   You say charismatic.  You're a grown man, aren't you,

11  Mr. Davis?

12  **A.**   Most people would say so.

13  **Q.**   But you made a conscious decision to continue and

14  participate in this fraud?

03:14:57   15           MR. SCARDINO:  I'll object to the reference.

16           THE COURT:  I think we got that already.

17           MR. STELLMACH:  Yes, Your Honor.

18           THE COURT:  Move on.

19  BY MR. STELLMACH:

03:15:04   20  **Q.**   When you discussed this with Mr. Stanford, did you in

21  expressing your concerns ever do anything to demonstrate

22  how severe you thought the problem was?

23  **A.**   Yes, sir, periodically I did.

24  BY MR. STELLMACH:

03:15:21   25  **Q.**   Was this a physical demonstration?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   Yes, sir.

2               MR. STELLMACH:  Your Honor, if I could ask the

3  witness to just demonstrate what he would do.

4               THE COURT:  Can you do it seated or do you need

03:15:28  5  to get up, sir?

6               THE WITNESS:  I'm probably going to need to

7  stand up.

8               THE COURT:  Okay.  Go on.

9               THE WITNESS:  Yes, Your Honor.  I would go into

03:15:35  10  his office and I would say nothing, but I would hold my

11  hands together as if handcuffed and my legs shackled and

12  scoot along as if I was in prison, meaning that what we're

13  doing is going to have consequences and those aren't good

14  consequences.

03:16:02  15               Occasionally he would laugh and say,

16  "Well, that's okay.  I'll just tell them that you're on the

17  books.  I was out building and growing my companies, and I

18  didn't know what was going on.  I'll just blame it all on

19  you."  Kind of laugh it off.

03:16:21  20  BY MR. STELLMACH:

21  **Q.**   When you would do that, when you would physically

22   demonstrate with your hands manacled, did Mr. Stanford

23   ever say to you:  "It doesn't matter, because on our

24   international accounting standards, we don't have to tell

03:16:36  25   the depositors the truth about what we're spending the

*Direct-Davis/By Mr. Stellmach*

1  depositors' money on"?

2  **A.**  I don't recall him saying that.

3  **Q.**  Do you ever recall Mr. Stanford saying that?

4  **A.**  No, sir.  I recall him saying, "Don't do that

03:16:50  5  anymore.  It's going to be -- brother, it's going to be

6  fine.  This is going to work.  We're going to close that

7  hole.  We're going to grow this bank, and we're going to

8  close that hole."

9  **Q.**  At least in the beginning, did you believe

03:17:04  10  Mr. Stanford?

11           THE COURT:  What do you mean by "the

12  beginning"?

13           MR. STELLMACH:  Fair enough, Your Honor.

14  BY MR. STELLMACH:

03:17:17  15  **Q.**  After late 1991, early 1992, when Mr. Stanford

16  explains how he plans to fill the, quote, hole, did you

17  believe it was still possible?

18  **A.**  I believe I did, sir.

19  **Q.**  And did you continue to believe it for a number of

03:17:35  20  years?

21  **A.**  Continued to believe and support Mr. Stanford for a

22  number of years, yes.

23  **Q.**  During that period of time, did Mr. Stanford ever

24  discuss the importance of secrecy concerning this issue,

03:17:54  25  the gap between what the bank actually had in cash and

*Direct-Davis/By Mr. Stellmach*

1  liquid assets and what it was reporting to the depositors?

2  **A.**   Yes, sir, we had discussions about secrecy.  All

3  discussions on this discussion were held between he and I

4  alone.  On one occasion, I was sharing the --

03:18:23  5             MR. SCARDINO:  Object to the nonresponsive

6  answer.

7             THE COURT:  Sustained.

8  BY MR. STELLMACH:

9  **Q.**   Did Mr. Stanford ever ask you whether you had shared

03:18:31  10  information with any of your family members?

11  **A.**   Yes, he asked me:  "Does Lorie know anything about

12  this?"

13  **Q.**   Who is Lorie?

14  **A.**   My wife, Lorie.

03:18:40  15  **Q.**   What did you tell him?

16  **A.**   I said, "no."

17  **Q.**   Was that true?

18  **A.**   Yes, sir, that is true.

19  **Q.**   You didn't even tell your own wife?

03:18:47  20  **A.**   I did not even tell my own wife, no.

21  **Q.**   And after that conversation with Mr. Stanford, early

22  or late '91, early '92, did your title in the -- had your

23  title in the organization changed at all?

24  **A.**   1991.  I was given the title chief financial officer

03:19:10  25  of Guardian International Bank, Limited.

*Direct-Davis/By Mr. Stellmach*

1    Q.    What did that mean?

2    A.    That meant at the time that Mr. James Stanford

3    stepped down from his title as chief financial officer and

4    I assume that chief financial officer designation, that's

03:19:30   5    about all.

6    Q.    And in general terms, what were your responsibilities

7    as the chief financial officer?

8    A.    I was responsible for the accounting and bookkeeping

9    systems, the general ledger from which the reports,

03:19:45   10   financial reports, were drawn from and disseminated for

11   the bank and other companies within the Stanford Group.

12   Q.    What about the board of directors of the bank.  Did

13   you eventually join that board?

14   A.    Yes, sir.  In 1992, I was added to the board of

03:20:06   15   directors.

16   Q.    What happened to your salary after you had that

17   conversation with Mr. Stanford?

18   A.    My salary steadily increased from the 60 to $65,000

19   that I was initially paid to a base pay of 900,000 by the

03:20:21   20   end of the bank.  So over the years, it went up.  Most of

21   the increased value of my salary was the last five years,

22   six years of the bank's existence, of the company's

23   existence.

24   Q.    And in addition to a salary, were you also receiving

03:20:43   25   bonuses in addition to your base salary?

*Direct-Davis/By Mr. Stellmach*

1   **A.**   Yes.  Large bonuses.  I received total salary and

2   bonuses probably of $14 million over the 21 years I was

3   employed.

4   **Q.**   Did you also borrow money from the bank?

03:20:56   5   **A.**   Yes, sir, I did.  December of 2008.

6   **Q.**   How much was that?

7   **A.**   $350,000 I believe.  Again, in January, another 400,

8   $450,000.

9                    MR. SCARDINO:  I'm sorry.  Can we have a

03:21:16   10   reference for that, the second borrowing in January of

11   which year?  Can we establish that?

12                    MR. STELLMACH:  I think he said December of '08

13   and then January of --

14                    THE WITNESS:  '09.

03:21:27   15                    MR. SCARDINO:  I'm sorry.  The amount again?

16                    THE WITNESS:  The total was $850,000, as I

17   recollect.  Could have been north or south of that number.

18   BY MR. STELLMACH:

19   **Q.**   Was that a loan that Mr. Stanford had approved?

03:21:37   20   **A.**   Yes, sir.  He knew about the loan.

21                    MR. SCARDINO:  I'm sorry.  That's nonresponsive

22   to the question:  Was that a loan that Mr. Stanford

23   approved.

24                    THE WITNESS:  Yes, sir, he approved it.

03:21:46   25                    THE COURT:  Sustained.

*Direct-Davis/By Mr. Stellmach*

1  BY MR. STELLMACH:

2  **Q.**   I want to talk about Montserrat.  When you first

3  joined, Guardian Bank was still based on Montserrat?

4  **A.**   Yes, sir.

03:22:03  5  **Q.**   What type of information was the bank providing to

6  the regulators on Montserrat about its finances?

7  **A.**   Montserrat department of treasury required each of

8  the offshore banks to file --

9               MR. SCARDINO:  That's nonresponsive to the

03:22:19  10  question.  I'll object.

11               THE COURT:  What was the question?

12               MR. STELLMACH:  What type of information about

13  its financial condition was the bank providing to

14  regulators.

03:22:26  15               THE COURT:  Overrule the objection.

16               THE WITNESS:  Quarterly the annual report was

17  required that included financial statements of the bank.

18  BY MR. STELLMACH:

19  **Q.**   Other than providing the financial statements of the

03:22:43  20  bank, were you given any underlying supporting documents

21  to the regulators on Montserrat?

22  **A.**   No, sir.

23  **Q.**   So you just had to give the Montserrat regulators the

24  same information that was contained in the annual report

03:23:01  25  of the bank?

*Direct-Davis/By Mr. Stellmach*

1  A.   Yes, sir, that's true.

2  Q.   Without any backup?

3  A.   Without any backup to those financial statements that

4  were submitted.

03:23:12  5  Q.   Like the account statements from the overseas money

6  managers?

7              MR. SCARDINO:  Object to the leading.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Overruled.

03:23:19  10             THE WITNESS:  No statements from the money

11 managers were included as backup to those reports.

12 BY MR. STELLMACH:

13 Q.   I want to turn to the decision to leave Montserrat.

14 Approximately when was the decision made, what year?

03:23:35  15 A.   1990.

16             MR. STELLMACH:  And if we could turn to

17 Government's Exhibit 511.

18 BY MR. STELLMACH:

19 Q.   We're not going to read the document at this point.

03:23:49  20 I think we all know it.  It's dated the 28the of

21 November 1990 from the Ministry of Finance and Economic

22 Development on Montserrat.  Addressed to Allen Stanford.

23             Who first showed you -- had you seen this

24 document before?

03:24:08  25 A.   Yes, sir, I had.

*Direct-Davis/By Mr. Stellmach*

1  Q.    Who first showed it to you?

2  A.    Mr. Allen Stanford.

3  Q.    Do you recall approximately when he did that, when he

4  showed you this document?

03:24:18  5  A.    Close to the date of the letter.  I would say maybe

6  30 to 60 days after.

7  Q.    And there's a reference in Line 4 to a director who

8  was a former bankrupt as a reason for the license being

9  revoked or the notification that the license is going to

03:24:44  10  be revoked.  What did you understand that to refer to?

11  A.    Referred to Mr. Allen Stanford.

12  Q.    Because of the fitness centers that had failed in the

13  '80s?

14  A.    That's my understanding, yes, sir.

03:25:01  15  Q.    When Mr. Stanford showed you the letter, did he

16  indicate whether the bank was going to stay on Montserrat

17  and fight this or whether it was going to move?

18  A.    At that time he indicated both.

19  Q.    When he talked about moving, did he tell you where he

03:25:25  20  wanted to move the bank to?

21  A.    Yes, he did.  To a nearby country, island country,

22  Antigua Barbuda.

23  Q.    Before seeing this letter, were you aware of any

24  decisions that had been made to relocate the bank from

03:25:45  25  Montserrat to Antigua?

*Direct-Davis/By Mr. Stellmach*

1    A.   I was aware that there were investigations that

2    were -- that were by Mr. Stanford himself and other

3    possible jurisdictions that he was looking and that there

4    was a bank in -- I believe a bank in Montserrat, actually,

03:26:12   5    that was for sale that was looked at in the year 1990.

6    Yes, sir.

7    Q.   When Mr. Stanford showed you this letter from the

8    Montserrat regulators or the -- I'm sorry -- the Ministry

9    of Finance saying that the license was going to be

03:26:29   10   revoked, did he tell you whether that information should

11   be shared with anyone, the information contained in this

12   letter?

13   A.   Yes, sir, that was -- that it was not to be shared

14   with anyone.

03:26:47   15   Q.   Did he tell you what people should be told about the

16   reason for leaving Montserrat?

17   A.   The reason for leaving Montserrat was to be the

18   Hurricane Hugo which had taken place in September, October

19   of 1989 that actually destroyed the operations there in

03:27:11   20   the island, and that was the impetus for the move.

21   Q.   Well.  The bank had actually been leveled, right,

22   when Hugo struck Montserrat?

23   A.   Basically, yes, sir, that's correct.

24   Q.   But was that -- from your conversation with

03:27:30   25   Mr. Stanford, was that the real reason that the bank was

*Direct-Davis/By Mr. Stellmach*

1    leaving the island?

2    **A.**    No, sir, it was not.

3    **Q.**    According to Mr. Stanford, what he told you, why was

4    the bank going to relocate off the island?

03:27:47  5    **A.**    There was action being taken by the Ministry of

6    Finance in Montserrat, supported by actions from their

7    mother country, as it were.  Montserrat was a colony of

8    the United Kingdom.  There was action in the United

9    Kingdom as well as Montserrat to pare down on the number

03:28:11  10    of offshore banks that had actually been licensed there,

11    some maybe 3 or 400 of these banks had been licensed there

12    in Montserrat, and there was a concerted effort by the

13    governments to pare those down, actually strike banks off.

14                And this letter came through loud and

03:28:31  15    clear as part of that action.  And in order move out from

16    under that environment, there needed to be a move to

17    another jurisdiction that didn't have the same controls.

18    **Q.**    Did Mr. Stanford discuss whether the bank should

19    obtain a license in another -- in another country before

03:28:55  20    it actually lost its license on Montserrat?

21    **A.**    Yes.  That was imperative.

22    **Q.**    Did he explain why?

23    **A.**    He explained -- yes, that if there was no license,

24    there was no bank, and if there was no bank, then the

03:29:10  25    fraud was going to be uncovered.  Actually, there would be

*Direct-Davis/By Mr. Stellmach*

1    a failure of the bank, and there would be no way to pay

2    cash on cash as promised to the depositors.  There had to

3    be a bank, had to be a license bank to operate under.

4    **Q.**    And I think you said that you thought you might have

5    been shown this letter about -- approximately 30 days

6    after the date on it?

7    **A.**    Fairly close.

8    **Q.**    Could it be more or less, you're not really sure

9    about how soon after the letter is dated, that you saw it?

10   **A.**    I think that's fair to say, yes.

11   **Q.**    But I did want to ask about Government's Exhibit 103,

12   the 1990 annual report for -- well, Guardian International

13   Bank.

14            MR. STELLMACH:  And if we can enlarge Note 9 at

15   the very top.

16            MR. SCARDINO:  I'm sorry, Mr. Stellmach, what

17   page?

18            MR. STELLMACH:  I'm sorry.  It's on Page 13 --

19            MR. SCARDINO:  Thank you.

20            MR. STELLMACH:  -- of the annual report.

21                 Sure.

22   BY MR. STELLMACH:

23   **Q.**    Could you read the note for us, just that first line?

24   **A.**    Yes, sir.  Under capital reserve.  "At a 17 September

25   1990 board of directors meeting, a decision was made to

*Direct-Davis/By Mr. Stellmach*

1    consolidate the bank's operation in Antigua, West Indies.

2    Capital reserve account consists of retained earnings

3    prior to this consolidation."

4    **Q.**   That's fine.

03:30:43   5    **A.**   Yes, sir.

6    **Q.**   Curious about that first date.

7               It references a board of directors meeting

8    on September 17, 1990, about two months before the letter

9    from the Montserrat authorities.  Was that accurate to

03:31:01   10   your knowledge?

11   **A.**   No, sir, I don't believe that was accurate.

12   **Q.**   Did Mr. Stanford ever discuss that note with you in

13   what people should be told about whether the decision was

14   made to leave Montserrat?

03:31:12   15   **A.**   Yes, sir.  He stated that the board of directors

16   meeting, the decision had to be before that letter was

17   issued that we looked at the earlier exhibit, had to be

18   evidence of a board meeting prior to that.

19   **Q.**   And just to clarify, was it your understanding that

03:31:35   20   there was actually a board meeting on September 17, 1990,

21   where the decision was made to move to Antigua or is that

22   note backdated?

23   **A.**   It's my opinion that the note was backdated.  I don't

24   recall.  I don't recall the meeting on the 17th of

03:31:55   25   September 1990.

*Direct-Davis/By Mr. Stellmach*

1   Q.   But when do you recall Mr. Stanford telling you for

2   the first time that the bank is going to leave Montserrat?

3   A.   After that date, for sure, yes.  In December.

4   Q.   Who decided where the bank should relocate to, that

03:32:21   5   it should be Antigua?

6   A.   Mr. Allen Stanford.

7   Q.   Did Mr. Stanford ever tell you how he picked Antigua?

8   A.   Yes, sir.

9   Q.   What did he tell you about how -- why he picked that

03:32:35   10   particular island?

11   A.   He said he had met with the then prime minister and

12   the cabinet, had become friends with -- I would say not

13   friends, he had become acquainted with them and he felt

14   that they were receptive to issuing a license to him to

03:32:54   15   operate there.

16   Q.   Did Mr. Stanford ever tell you whether he preferred

17   to do business in the Caribbean?

18   A.   Yes, sir, he did.  He said he thought that was a good

19   place to operate under the circumstances, in the

03:33:20   20   jurisdictions there, yes.

21   Q.   When you say under the circumstances, what did

22   Mr. Stanford tell you -- or did he tell you anything in

23   particular about why he liked doing business down in the

24   Caribbean?

03:33:29   25   A.   Well, he said that there's less red tape, less

*Direct-Davis/By Mr. Stellmach*

1  scrutiny by regulations, there's easy entry, easy exit,

2  low capitalization.

3  **Q.**   You mentioned Mr. Stanford commented that he had a

4  good relationship, I think you said, with the prime

03:33:53  5  minister of Antigua?

6  **A.**   Said he had established a good relationship with the

7  prime minister and the cabinet, but he liked the prime

8  minister.

9  **Q.**   Did he explain whether he did anything to win the

03:34:11  10  friendship of the prime minister?

11  **A.**   Well, he explained his case.  He said that the prime

12  minister was receptive, as well as the other ministers on

13  the cabinet, and there was discussion, as he later shared

14  with me, about a particular bank on the island that the

03:34:37  15  cabinet had mentioned, prime minister had mentioned, that

16  was ailing, it was bankrupt, name of it was Bank of

17  Antigua, Limited.  And in those negotiations, there was a

18  part of an agreement, as I understood from Mr. Stanford,

19  was that part and parcel to receiving a license or doing

03:35:00  20  business, setting up in Antigua, would be for Mr. Stanford

21  to purchase, buy, redeem this ailing bank called Bank of

22  Antigua, Limited.

23  **Q.**   What kind of bank was the Bank of Antigua?

24  **A.**   It's a commercial bank, serving clients and customers

03:35:18  25  of the country Antigua Barbuda.  It would be similar to a

*Direct-Davis/By Mr. Stellmach*

1    bank down the street here where you have checking accounts

2    and savings accounts and can obtain loans for various

3    business purposes or home ownership.

4    **Q.**    Did Mr. Stanford tell you anything about the actual

03:35:36    5    financial condition of the Bank of Antigua at the time

6    that he bought it?

7    **A.**    He said it was insolvent.  He said that it was under

8    water.  In fact, he said it's not under water, it's so

9    insolvent that it's sitting on the bottom of the ocean.

03:35:54    10    **Q.**    How much money did it cost him to buy the Bank of

11    Antigua?

12    **A.**    Several million dollars.

13    **Q.**    Could it have been approximately 40 or $50 million?

14            MR. SCARDINO:  Object to the leading question.

03:36:09    15    He's already answered it several million.

16            MR. STELLMACH:  That's not exactly a precise

17    number.

18            THE COURT:  Try to hammer the number down.

19    Overruled.

03:36:16    20            THE WITNESS:  It could have been as many as

21    $20 million.

22    BY MR. STELLMACH:

23    **Q.**    Okay.  Where did that money come from to buy this

24    insolvent bank down in Antigua?

03:36:26    25    **A.**    CD depositors is where all the money came from.

*Direct-Davis/By Mr. Stellmach*

1  Q.   Did Mr. Stanford ever discuss political donations

2  that he was making to parties, preliminary parties, down

3  in Antigua?

4  A.   Yes, sir, he did.  Both the Labor Party and the

03:36:44  5  Opposition Party.  The Labor Party in Antigua was the

6  current party in power.  The Bird family was historically

7  in power.

8  Q.   Did Mr. Stanford tell you where the money for those

9  campaign contributions was coming from?

03:37:01  10  A.   Mr. Stanford wrote the checks with, but all monies

11  came from the depositors or all the Stanford companies and

12  operations.

13  Q.   Did Mr. Stanford ever make any loans to the

14  government of Antigua?

03:37:21  15  A.   There were loans made by it, yes, they did.  Yes, he

16  did.

17  Q.   Approximately how much money did he loan to the

18  bank -- I'm sorry -- to the government of Antigua?

19  A.   Approximately $40 million.

03:37:36  20  Q.   And did the government of Antigua then repay the

21  loan?

22  A.   No, sir.

23  Q.   Did there come a point when Mr. Stanford received any

24  special honors or recognition from the Antiguan

03:37:54  25  government?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   Among other things, he received a diplomatic

2  passport.  He also received --

3  **Q.**   Can you explain what a diplomatic passport is?

4  **A.**   Yes, sir.  As I understand it, it's a special

03:38:07  5  passport that's issued to certain individuals, insiders,

6  as it were.  It's issued to certain dignitaries, certain

7  individuals may be ambassadors, those who have special

8  ties to the government.  And it enables one to travel

9  fairly freely and have special privileges in entry and

03:38:37  10  exist.

11  **Q.**   You mentioned the knighthood?

12  **A.**   Yes, sir, he was knighted by the Commonwealth of

13  Antigua and Barbuda.

14  **Q.**   Did he actually use the title, Sir Allen Stanford?

03:38:50  15  **A.**   Yes, sir.

16  **Q.**   Did he ever explain why he used the title?

17  **A.**   One of his explanations to me was that it's good for

18  branding and it's good for marketing, a good promotional

19  item.

03:39:05  20  **Q.**   Did Mr. Stanford ever discuss his relationships with

21  regulators on the island of Antigua?

22  **A.**   Yes, sir, he did.

23  **Q.**   What did he tell you about an individual named Althea

24  Crick?

03:39:24  25  **A.**   He said that she was appointed in an interim role, I

*Direct-Davis/By Mr. Stellmach*

1   believe, as head of the predecessor to the Financial

2   Regulatory Services Commission, and that she needed to be

3   terminated from that position, be ousted from that

4   position.

03:39:53   5   **Q.**   Did he tell you whether he subsequently took steps to

6   get Ms. Crick ousted from her position as chief of the

7   regulatory body?

8   **A.**   Yes, sir.  He told me that he did take steps to have

9   her replaced, yes, sir.

03:40:06   10   **Q.**   Did Mr. Stanford ever discuss her successor as head

11   of the regulatory body with you?

12   **A.**   Yes, sir.  He referred to a gentleman by the name of

13   Lee King, Leroy King.

14   **Q.**   What did Mr. Stanford tell you about his relationship

03:40:23   15   with Leroy King, the new head of the regulatory body on

16   Antigua?

17   **A.**   He knew Mr. King very well, had a close relationship.

18   They, in fact, had come to an agreement to work together

19   in terms of Mr. King not digging into the examination

03:40:49   20   process that took place through the Financial Regulatory

21   Services Commission.  In other words, not dig in for

22   confirmation of investments, for example.  And this

23   agreement was codified by a blood oath, as Mr. Stanford

24   told me, that he entered into between --

03:41:17   25            MR. SCARDINO:   Objection.

*Direct-Davis/By Mr. Stellmach*

1        THE WITNESS:  -- Mr. Lee King and Trevor

2   Bailey.

3        THE COURT:  Sustained.  Next question.

4        MR. STELLMACH:  Yes, Your Honor.

03:41:22   5   BY MR. STELLMACH:

6   **Q.**   Mr. Davis, what did Mr. Stanford tell you about a

7   blood oath with Mr. King?

8   **A.**   Said that he met them at the airport area -- I don't

9   remember exactly where in the airport area -- one night,

03:41:38  10   and they agreed that Mr. King and Mr. Trevor Bailey,

11   Mr. King's supervisor of offshore banks, would work with

12   him in terms of shielding scrutiny on the Stanford

13   International Bank, Limited, statements, and other things,

14   I presume, and they actually -- Mr. Stanford said they

03:42:10  15   actually cut themselves and had a blood oath.

16   **Q.**   Who was Trevor Bailey?

17   **A.**   Mr. Bailey was a person that worked in the Financial

18   Regulatory Services Commission as Mr. King's assistant.

19   He was supervisor of banks, I believe.

03:42:31  20   **Q.**   Did Mr. Bailey remain as the supervisor of banks

21   throughout your tenure at Stanford Financial?

22   **A.**   No, sir.  He eventually was hired as internal auditor

23   for Stanford International Bank, limited.

24   **Q.**   What did Mr. Stanford tell you about his relationship

03:42:51  25   with Bailey who at least at the time before he hired him

*Direct-Davis/By Mr. Stellmach*

1   as an employee was responsible for bank examinations?

2   **A.**   His relationship, as I indicated earlier in

3   testimony, was fairly close.  I presume they were blood

4   brothers.

03:43:12   5           MR. STELLMACH:  I'm about to show the witness

6   Government's Exhibit 1500.

7                        **(Attorneys conferring)**

8           MR. SCARDINO:  Can we have just a second,

9   Judge --

03:44:05   10          THE COURT:  Yes, sir.

11          MR. SCARDINO:  -- before this comes in?

12          THE COURT:  Do you want to stand for a second,

13  minute or so?

14              We'll see what they're up to at this

03:44:23   15  point.  I know we have an afternoon break approaching.

16  Okay.  Let's see what they decide on this.

17              Mr. Scardino, do you want to take a break

18  at this time so you can talk it over?

19          MR. SCARDINO:  That would she great, Judge.

03:45:05   20          THE COURT:  All right.  Ladies and gentlemen,

21  it's now about 3:45.  Take a break.  Be back ready to

22  resume -- this will be our afternoon break.  And be back in

23  20 minutes.  Check your watch.  We'll see you in

24  20 minutes.

03:45:33   25                   **(Recessed at 3:45 p.m.)**

*Direct-Davis/By Mr. Stellmach*

1    **(The following was held out of the presence of the jury)**

2              THE COURT:  Tell the jury we're in here with

3    the clock on.

4                   Who wants to raise it?

04:11:58   5         MR. SCARDINO:  Defense, Your Honor.

6              THE COURT:  All right.  Go on.

7              MR. SCARDINO:  Your Honor, we would --

8              THE COURT:  Be seated, please.

9              MR. SCARDINO:  -- respectfully object to the

04:12:07  10   admission of Government's 1500.  Apparently it was

11   obtained --

12             THE COURT:  You need to speak louder.

13             MR. SCARDINO:  Apparently it was obtained in a

14   manner that was not prescribed by law.  It was -- there was

04:12:17  15   no warrant that was -- no process used by which it could be

16   seized.  It was seized out of an office by the FBI.  And we

17   have previously filed -- or, actually, counsel prior to us

18   had filed a motion to suppress, and we respectfully suggest

19   that this would fall under that motion to suppress.

04:12:37  20                  Did we file one as well?

21             MR. STELLMACH:  Which was denied.

22             THE COURT:  Was it denied summarily?

23             MR. MCGUIRE:  Yes, it was, Judge.

24             MR. STELLMACH:  But we would just --

04:12:47  25             MR. MCGUIRE:  Reurge it.

*Direct-Davis/By Mr. Stellmach*

1          MR. SCARDINO:  -- reurge it for purposes of

2    this particular exhibit and further object to foundation.

3          THE COURT:  Did you object to it as an exhibit

4    beforehand pursuant to the local rule -- hold it a

04:12:57   5    second -- pursuant to local Rule 55.2B.

6          MR. SCARDINO:  I think there was a general

7    motion to suppress filed, because at the time it was filed,

8    we were not in a position to have reviewed all the

9    documents and specifically object to the documents.

04:13:16   10          THE COURT:  Also, if you file a motion to

11   suppress, it doesn't have to be specific.  Was it specific

12   on this book?

13          MR. MCGUIRE:  We mentioned, Your Honor --

14          THE COURT:  I can't hear you.

04:13:23   15          MR. MCGUIRE:  I'm sorry.  We mentioned any and

16   all articles belonging to Mr. Stanford received without a

17   warrant.

18          THE COURT:  Is that too broad?

19          MR. MCGUIRE:  I don't believe so, Your Honor.

04:13:32   20          THE COURT:  Response.

21          MR. COSTA:  Your Honor, I would response to the

22   motion, so I'll address it.  First of all, we did in the

23   response identify particular items.  So we think --

24          THE COURT:  Did he ever identify particular

04:13:40   25   items?

*Direct-Davis/By Mr. Stellmach*

1           MR. COSTA:  Right.  And this was marked in the

2   Government's exhibit List that was produced before trial.

3                 But, secondly --

4           MR. MCGUIRE:  Filed long before that, Your

04:13:49   5   Honor.  We didn't have --

6           THE COURT:  Well, do you object to, then, as an

7   exhibit?

8           MR. COSTA:  Not on suppression grounds.  I

9   think just a general foundation.

04:13:55   10          THE COURT:  That's what I mean.

11          MR. COSTA:  Not on suppression grounds once it

12  was identified by the government.

13                Secondly, whether it was identified or not

14  in the suppression motion, we cited in our response a clear

04:14:05   15  Fifth Circuit case from about two years ago, same

16  situation, a receivership was appointed.

17          THE COURT:  Oh, yes, the receiver turning, I

18  remember that.

19          MR. COSTA:  And the Fifth Circuit in a case

04:14:15   20  right on point said once the receiver comes in, the

21  defendant has no possessory interest in those materials

22  that are now the property of the receiver.  So the Court's

23  already ruled on it.  I mean, I don't think we need to

24  relitigate it.

04:14:26   25          THE COURT:  How about that case.  I remember

*Direct-Davis/By Mr. Stellmach*

1  looking at that.  Because I did that on submission,

2  right --

3              MR. COSTA:  Yes, Your Honor.

4              THE COURT:  -- once I saw that?

04:14:31   5              MR. MCGUIRE:  That's correct, Your Honor.

6                   And that Fifth Circuit case failed to

7  address two controlling U.S. Supreme Court cases, which are

8  cited in our brief, Mancusi versus DeForte, which is

9  392 U.S. 364 --

04:14:44  10              THE COURT:  Slow down a little bit.

11              MR. MCGUIRE:  -- from 1968, and, also, it also

12  failed to address the subsequent U.S. Supreme Court case,

13  which is Ortega versus O'Connor, 480 U.S. 709, from 1987,

14  both of which said when you have a private office in a

04:14:57  15  commercial premises, whether you own the office or not but

16  as -- if you have a private office, anything within that

17  office that you normally exclude others from, police or

18  other authorities, have to obtain an amendment -- excuse

19  me -- a warrant under the Fourth Amendment before they can

04:15:15  20  search and seize any items.

21              THE COURT:  Was that filed?  Did you file that

22  in your response?

23              MR. MCGUIRE:  Yes, Judge, I did.

24              THE COURT:  Where?  In --

04:15:20  25              MR. MCGUIRE:  It was actually in the initial

1   motion.

2            THE COURT:  Initial motion.

3                 Okay.  Go on.

4            MR. COSTA:  Neither of those Supreme Court

5   opinions address receivership issues.  And there was a

6   Court in this case from the Dallas federal Judge, Judge

7   Godbey, saying the receiver not only can but should be

8   producing stuff in response to government inquiry.  So --

9            MR. MCGUIRE:  No, must.

10           THE COURT:  Must.

11           MR. COSTA:  Well, must.  Even better.

12                So there's --

13           MR. MCGUIRE:  The --

14           THE COURT:  Hold it.  Wait.

15           MR. COSTA:  I mean, the main issue is this has

16  already been ruled on.  I'm not sure why we're relitigating

17  now.

18           THE COURT:  Well, he's entitled if he wants to

19  do it.  Again --

20           MR. COSTA:  The Rules say suppression issues

21  must be raised pretrial.

22           MR. MCGUIRE:  Which we did.

23           THE COURT:  They did, they said.

24           MR. STELLMACH:  12A.

25           MR. COSTA:  Right.  So, it was denied.  So I'm

 1  not sure why it's being relitigated.

 2                    Second of all --

 3                    THE COURT:  It's not being relitigated.  It's

 4  being reargued.

04:16:00  5          MR. COSTA:  The Fifth Circuit case is right on

 6  point.  It cites a -- Fifth Circuit case from the '80s,

 7  both receivership cases.  None of the cases they cite are

 8  receivership cases.

 9                    Secondly, the government argued in its

04:16:11  10 response that even if that Fifth Circuit case which is

11  right on point somehow doesn't control, certainly the good

12  faith exception applies, because the government relied on

13  Judge Godbey's order.

14                    And there are about two or three Supreme

04:16:23  15 Court decisions in the last three or four years, including

16  one from last term, that say reliance on existing law,

17  which would include a federal order from Judge Godbey,

18  precludes any exclusionary remedy.

19                    THE COURT:  The good faith exception came out

04:16:36  20 what, 10, 15 years ago?

21                    MR. COSTA:  But it's been strengthened in the

22  last --

23                    THE COURT:  Yes.

24                    MR. COSTA:  -- Supreme Court terms, including

04:16:43  25 just about six months ago.

1          MR. MCGUIRE:  And if I could respond to that,

2    Your Honor.  It obviously could not be good faith on the

3    part of the government not to seek an amendment under that

4    fourth -- excuse me -- a warrant under the Fourth Amendment

04:16:51   5    when there are two controlling U.S. Supreme Court cases on

6    point that say you have to have a warrant.

7          THE COURT:  Hold it.  Now, wasn't the

8    government in -- yes, it's a U.S. Government.  But it

9    wasn't in this criminal prosecution that the place was

04:17:04  10   rated, correct, or was it?

11         MR. STELLMACH:  Seized by the receiver.

12         MR. COSTA:  The civil case --

13         THE COURT:  It was seized by the -- hold it.

14         MR. COSTA:  -- receiver seized it.

04:17:10  15         THE COURT:  That's the point, the receiver went

16   in and got it, correct, and then you got it from the

17   receiver?

18         MR. COSTA:  Right.  And the Court --

19         THE COURT:  Hold it.  I understand.  I'm not

04:17:21  20   saying I disagree with it.  They turned it over.  So in

21   effect it wasn't the classic case where they're looking at

22   that office, and before they go in, before they want -- in

23   other words, in your case, the criminal prosecution, then

24   they could wait and get a -- what do you call it -- a

04:17:39  25   warrant.  Here, the receiver got it pursuant to the SEC

*Direct-Davis/By Mr. Stellmach*

1  action, I gather, in Dallas, and then you now got it from

2  the SEC in the turnover -- the receiver --

3              MR. COSTA:  Yes.

4              THE COURT:  -- you got it from the receiver

5  appointed under that SEC matter; is that correct?

6              MR. COSTA:  Correct.  For the last few years,

7  we've requested materials from the receiver.  They're not

8  just not giving us stuff.  We asked for specific items.

9  And that's pursuant to Judge Godbey's order which directed

10 the receiver to provide that stuff to law enforcement.

11             THE COURT:  I remember.  I remember working --

12 I didn't -- you know, working back and forth.

13                 Yes, sir.

14             MR. FAZEL:  If it please the Court.  For record

15 purposes, two issues:  Number one -- let me work backwards.

16 As far as Mr. Costa's opinion as to recent Supreme Court

17 cases as to good faith, I would respectfully disagree with

18 his interpretation of it.  The last good faith case I think

19 he's discussing is a circumstance in which the Supreme

20 Court said, well, if the police officers were working on

21 the basis prior to Gant and then Gant came into effect,

22 it's not a good idea for us to punish that officer who did

23 not know about the Gant law, for example.  Therefore, he's

24 good to go and it's not suppressed.

25                 As far as action is concerned and --

*Direct-Davis/By Mr. Stellmach*

1 police action -- state action is concerned, we briefed it

2 in our motion, but just to briefly just the Court's

3 inquiry, our position is state action is attached.  It

4 attaches when in circumstances such as this you have a

04:19:00   5 circumstance where there's police officers, U.S. marshals.

6 We have video that we attached with our submission showing

7 officers coming in with the receiver, and, therefore, we

8 have case law that shows that's state action.

9           THE COURT:  But you're saying it was seized --

04:19:13   10 it's been seized in a civil action and the receiver in the

11 civil action turned it over to the government?

12           MR. FAZEL:  Correct.  But we're saying the

13 Fourth Amendment does apply because state action occurred

14 when officers -- law enforcement officers were interacting

04:19:28   15 with the receiver.

16           THE COURT:  How can you go back and clean it up

17 in a situation like this?  I think there's no way to redeem

18 it, because they had no warrant, that's for sure.

19           MR. FAZEL:  That's for sure.

04:19:36   20           THE COURT:  And it was turned over through a

21 civil action pursuant to -- it was turned over as --

22 pursuant to a civil action -- the receiver appointed

23 pursuant to a civil action; is that correct?

24           MR. COSTA:  Yes, pursuant to a civil Court

04:19:50   25 order from Judge Godbey.

*Direct-Davis/By Mr. Stellmach*

1           THE COURT:  I understand.  I got it.

2                   Anything further?

3           MR. FAZEL:  That's it.

4           THE COURT:  Overruled.

04:20:00    5           All right.  Let's bring the jury in.

6           **(The following was held before the jury)**

7           THE COURT:  Go right ahead.

8           MR. STELLMACH:  Your Honor, if I could have the

9  ELMO, the overhead?

04:20:49   10           THE COURT:  Okay.

11 BY MR. STELLMACH:

12  Q.   Mr. Davis, I'm asking you to look at what's been

13  marked as Government's Exhibit 1500.  Do you recognize

14  that?

04:20:57   15  A.   Yes, sir.

16           THE COURT:  By the way, this has been ruled on

17 already.  It's overruled.  So any objections are overruled.

18 We've talking about this for a little bit.  And 1500 is

19 admitted.

04:21:11   20 BY MR. STELLMACH:

21  Q.   How do you recognize it?

22           THE COURT:  In other words, prove it up, but if

23 it's proved up to my satisfaction, no other motions are

24 applicable now.

04:21:17   25 BY MR. STELLMACH:

*Direct-Davis/By Mr. Stellmach*

1  Q.   Mr. Davis, how do you recognize this book?

2  A.   I've seen the book before in Mr. Stanford's

3  possession.

4  Q.   Do you understand -- do you recognize what it is?

04:21:29  5  A.   It's a call book, yes, addresses, phone numbers, A to

6  Z.

7            THE COURT:  Before you had BlackBerries, that's

8  an address book; right?  Is that correct, sir?

9            THE WITNESS:  Yes, Your Honor.

04:21:46  10  BY MR. STELLMACH:

11  Q.   And I want to turn to a few addresses in it.

12            MR. STELLMACH:  And, Your Honor, we've redacted

13  the phone numbers and all other names of other individuals.

14  We're only offering the specific pages that we're showing

04:21:58  15  the witness.

16            THE COURT:  All right.  And the record will

17  reflect what those pages are?

18            MR. STELLMACH:  They will, Your Honor.

19            THE COURT:  But 1500 is admitted with the

04:22:03  20  understanding it's just the pages that you identify.

21            MR. STELLMACH:  To protect the privacy of the

22  individuals, that's correct, Your Honor.

23  BY MR. STELLMACH:

24  Q.   Mr. Davis, who was Lester Bird?

04:22:14  25  A.   He was a member of the Antigua Labor Party and prime

*Direct-Davis/By Mr. Stellmach*

1   minister of the country of Antigua and Barbuda.

2   **Q.**   Approximately when was he prime minister?

3   **A.**   In the 1980s and '90s.

4   **Q.**   Was that Mr. Lester Bird or his father --

04:22:34   5   **A.**   His father in the beginning, Vere Bird, and then he

6   was -- Vere Bird was followed by Mr. Lester Bird's son.

7   **Q.**   And was Lester Bird the prime minister at the time

8   the bank relocated to Antigua?

9   **A.**   No, sir, I believe his father, Vere Bird, was at that

04:22:49   10   time.

11   **Q.**   I see.

12   **A.**   Shortly thereafter, there was an election, and

13   Mr. Lester Bird was elected following.

14   **Q.**   And Lester Bird was the leader of the party to which

04:22:57   15   Mr. Stanford made political contributions?

16   **A.**   Yes, sir.

17   **Q.**   And we see there that Mr. Stanford had both

18   Mr. Bird's home number and his cellphone number; is that

19   right?

04:23:09   20   **A.**   Yes, sir.

21   **Q.**   And 268, is that an Antiguan or a Caribbean area

22   code?

23   **A.**   Yes, it is.

24   **Q.**   Another individual we mentioned was Mr. Trevor

04:23:26   25   Bailey.  Could you remind us who Mr. Bailey was?

*Direct-Davis/By Mr. Stellmach*

1    **A.**    Mr. Trevor Bailey was an individual who worked with

2    the FSRC, which is the Financial Regulatory Services

3    Commission, in Antigua.

4    **Q.**    In what capacity did Mr. Bailey work there?

04:23:49   5    **A.**    He was supervisor of banks, worked for Mr. Lee King.

6    **Q.**    And at some point Mr. Bailey left and went to work

7    for the bank itself, for Stanford International Bank?

8    **A.**    At some point he did, yes.

9    **Q.**    In what capacity?

04:24:05  10    **A.**    As Standard International Bank, Limited's, internal

11    auditor.

12    **Q.**    And I want to talk about Leroy King.  Can you remind

13    us who Mr. King was?

14    **A.**    Mr. King was the director of Financial Regulatory

04:24:23  15    Services Commission at the department of treasury in

16    Antigua, Barbuda.

17    **Q.**    Just going down the list, could you tell us the

18    different phone numbers Mr. Stanford had in his address

19    book for Mr. King, the types of numbers beginning with

04:24:37  20    business?

21    **A.**    Yes, sir.  He had direct lines, he had fax numbers,

22    cellphone, home phone numbers and secretary.  Also, he had

23    a New York home number, his United States cell number,

24    home.  It appears his wife, Lisa, cell number was there as

04:25:02  25    well.

*Direct-Davis/By Mr. Stellmach*

1    Q.   And at the bottom, we also see the name Gizelle

2    (phonetic) and home.  Did you understand who Giselle was.

3    A.   Yes.  Giselle was an employee of the Stanford groups

4    of companies and was also in some way related to Mr. Lee

04:25:16    5    King.

6    Q.   And Mr. King was the individual who was supervising

7    or heading the Financial Services Regulatory Commission

8    after Ms. Crick was replaced?

9    A.   Yes, sir.

04:25:38   10    Q.   Did Mr. Stanford ever tell you anything else about

11   his relationship with Mr. King and Mr. Bailey?

12   A.   Well, he spoke of the close nature of the

13   relationship.  They spoke often.  And Mr. -- Mr. Stanford

14   mentioned various phone calls that he had with Mr. King.

04:26:04   15   Q.   What did Mr. Stanford say, if anything, about

16   payments to Mr. King?

17   A.   Mr. Stanford said that he made regular cash payments

18   to Mr. King as well as Mr. Trevor Bailey at one time, yes,

19   sir.

04:26:24   20   Q.   And we'll come back to those in a bit.

21             Do you understand what Mr. Stanford was

22   making those payments for?  What did he tell you he was

23   paying them for?

24   A.   It was hush money, bribes for them to look the other

04:26:40   25   way in their examination of Stanford International Bank,

1    Limited, and other situations that came up.

2    **Q.**    After the bank moved to Antigua, where was your

3    office?

4    **A.**    I officed in Houston, Texas, between 1990 and 1998 or

04:27:08    5    '-9.

6    **Q.**    What did you do after Houston?  Did you stay in

7    Houston throughout your time working for Mr. Stanford?

8    **A.**    No, sir.  In the late '90s, I moved my office to

9    Memphis, Tennessee, following a personal move of my family

04:27:24    10   in '92, '93, to Mississippi, nearby Memphis, Tennessee.

11   **Q.**    Where was Mr. Stanford based?

12   **A.**    He had offices several places.  I believe at that

13   time in Florida, but he also had offices in Houston.

14   **Q.**    Well, did Mr. Stanford spend a lot of time with you

04:27:44    15   in Memphis?

16   **A.**    No, sir.  I would say no.

17   **Q.**    Was he on the road a lot?

18   **A.**    Yes, sir, I believe he was.

19   **Q.**    So did that mean you were running the operation?

04:27:57    20   **A.**    No, that did not mean I was running the operation.  I

21   was CFO in charge of the financial side.  No one ran the

22   companies except Mr. Stanford.  He was the chairman of the

23   board and also chief --

24          MR. SCARDINO:  Object to nonresponsive.

04:28:13    25          THE WITNESS:  -- executive officer.

*Direct-Davis/By Mr. Stellmach*

1              THE COURT:  Sustained, narrative.

2                     Next question.

3  BY MR. STELLMACH:

4  **Q.**   Did Mr. Stanford ever say that you were his number

5  two?

6  **A.**   He said I was his -- no, sir.

7  **Q.**   What did he say about whether he had a number two?

8  **A.**   He said he had no number two.  And I recall that

9  being said in front of a number of people.  In fact, one

10  time --

11             MR. SCARDINO:  Object to nonresponsive.

12             THE COURT:  Sustained.

13  BY MR. STELLMACH:

14  **Q.**   Do you recall any specific times when Mr. Stanford

15  insisted that he had no number two?

16  **A.**   I recall an incident that was told to me by several

17  people that attended an executive meeting.

18             MR. SCARDINO:  Object to hearsay.

19             THE COURT:  Overruled.

20             THE WITNESS:  And at that executive meeting,

21  that I for whatever reason was not able to attend.  Several

22  attendees, general counsel -- excuse me -- chief of

23  staff --

24             THE COURT:  Hold it a second.

25                  Now, what's your point?  You say it's

1  hearsay?  It's building up now.

2            MR. SCARDINO:  Yes, sir.

3            THE COURT:  How do you get around it, Counsel?

4  You're safer not doing it that way.  So sustain the

04:29:22  5  objection now that I've heard a few more questions.

6            MR. STELLMACH:  Yes, Your Honor.

7  BY MR. STELLMACH:

8  **Q.**   Did Mr. Stanford ever tell you that you were not his

9  number two?

04:29:31 10 **A.**   Did Mr. Stanford ever tell me that I was not his

11 number two?

12 **Q.**   Right.

13 **A.**   Yes.  Not his number two.

14 **Q.**   When did he tell you that?

04:29:45 15 **A.**   2007, 2008.

16 **Q.**   Could you tell us what led to Mr. Stanford telling

17 you that?  What were the circumstances?

18 **A.**   The circumstances were that -- the suggestion was

19 made -- I made the suggestion -- that due to his

04:30:10 20 scheduling, due to his travel, that number two person

21 might be --

22            MR. SCARDINO:  I would object to the narrative.

23            THE COURT:  Sustained.

24 BY MR. STELLMACH:

04:30:20 25 **Q.**   Did you raise the issue with Mr. Stanford of becoming

*Direct-Davis/By Mr. Stellmach*

1    his number two?

2    **A.**   I did not.  I raised the issue -- I suggested, I

3    believe --

4                MR. SCARDINO:  Object.

04:30:30    5                THE COURT:  Sustained.

6  BY MR. STELLMACH:

7    **Q.**   What did you tell Mr. Stanford about --

8                THE COURT:  I tell you what, sir, remember yes

9  or no.

04:30:35   10                THE WITNESS:  Yes, sir.

11                THE COURT:  Yes or no question, please.

12                THE WITNESS:  Yes, sir, Your Honor.

13                THE COURT:  He'll bring it all out.

14  BY MR. STELLMACH:

04:30:40   15    **Q.**   Did you ever discuss with Mr. Stanford whether it

16    would be desirable for him to have a number two?

17    **A.**   I did.

18    **Q.**   When did you raise that with Mr. Stanford?

19    **A.**   Probably several times, 2007, 2008.

04:30:55   20    **Q.**   Why did you raise that with Mr. Stanford?  What did

21    you tell him about why he needed a number two?

22    **A.**   I believe that we needed someone -- a number two

23    person was needed because of the size and scope of

24    responsibilities and needed decision-making on a faster

04:31:17   25    turnaround basis and take the load off of him and help the

1  individuals in the regional and company leadership roles

2  to make quicker and better decisions.

3  **Q.**   What did Mr. Stanford say to you when you raised the

4  idea of him picking a number two?

04:31:32  5  **A.**   Didn't need a number two.  Everybody reported to him,

6  regional leaders, and the HR and so forth, other security

7  promotion, advertising, et cetera, they reported directly

8  to him, things were working fine.

9  **Q.**   Who were these other regional leaders that you

04:32:00  10  mentioned?

11  **A.**   Jack Staley (phonetic) led Europe; Danny Beauguard

12  (phonetic), North America; Juan Rodriguez, the Caribbean;

13  Frank Omoccia (phonetic) in South America.

14  **Q.**   When you say these individuals led these regions,

04:32:13  15  could you explain what you mean by that?

16  **A.**   They were responsible for the operations of Stanford

17  companies in those regions.  The individuals in those

18  regions who had oversight of companies reported to him

19  through them, to Mr. Stanford.

04:32:31  20  **Q.**   Did any of those regional leaders that you just

21  identified report to you?

22  **A.**   Of course not.

23  **Q.**   Who did they all report to?

24  **A.**   Sir?

04:32:41  25  **Q.**   Who did they all report to?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   Mr. Allen Stanford.

2  **Q.**   How hands-on was Mr. Stanford in running the

3  business?

4  **A.**   He had his finger on the pulse through phones,

04:32:59  5  through text, through e-mail, through quarterly meetings

6  that he met with the senior staff.  He had a network of

7  individuals reporting to him, as I said.

8  **Q.**   What about the marketing materials of the bank?  Was

9  he involved in those?

04:33:19  10  **A.**   Yes, sir.  The creative services department in charge

11  of the marketing distribution of materials and marketing

12  and promotion reported directly to him.

13  **Q.**   What about the annual report that the bank issued

14  each year?

04:33:36  15  **A.**   Annual report would be included in that

16  responsibility.

17  **Q.**   But you were the chief financial officer.

18              Were you also involved --

19  **A.**   Yes, sir, I was.

04:33:46  20  **Q.**   Let me finish my question.

21              Were you also involved in reviewing the

22  annual report?

23  **A.**   Yes, sir, I was.

24  **Q.**   And could you explain for us how that process would

04:33:57  25  work, what you would do and who actually had final

*Direct-Davis/By Mr. Stellmach*

1    approval on the annual report.

2    **A.**   As CFO, I was in charge of the accounting and

3    bookkeeping and reporting.  And those entities within the

4    company would prepare the numbers from the general ledger,

04:34:16    5    prepare a draft of the financial statements, as far as the

6    numbers.  The balance sheet, profit and loss statement,

7    the funds flow statement and the footnotes to those

8    statements would be responsibility of my staff.

9                    After they had finished their work in

04:34:36   10    compiling this document, I would then review it.  And that

11    review then would be shared with, and -- in due course

12    with the creative services department, which was

13    responsible with Mr. Stanford for producing the so-called

14    glossy, the report that goes out annually.

04:34:56   15    **Q.**   Who had final approval over the annual report?

16    **A.**   Chairman of the board, Mr. Allen Stanford.

17    **Q.**   Was the annual report always issued on time?

18    **A.**   No, sir.  That would have been an anomaly.  It was

19    always seemingly late.

04:35:18   20    **Q.**   Why was it late?

21    **A.**   Process waited on Mr. Stanford's final approval

22    before the annual report was completed and released.

23    **Q.**   We're going to turn to some of the marketing

24    materials.  But before we do, there's some terms I just

04:35:34   25    wanted to discuss.

*Direct-Davis/By Mr. Stellmach*

1          Are you familiar with the word "tier" as
2    it was used to describe assets of Stanford International
3    Bank?
4    **A.**    Yes, sir, I am.
04:35:47    5    **Q.**    Can you explain what a tier is?
6    **A.**    Yes, sir.  In our investment section of the balance
7    sheet, internally to our accounting staff, and to the
8    investment staff, research staff, Mr. Stanford and
9    others,, internally, the investments were broken down in
04:36:09    10    three sections called Tier 1, Tier 2 and Tier 3.
11    **Q.**    What was in Tier 1?
12    **A.**    Tier 1 was a classification that held cash and cash
13    instruments.
14    **Q.**    When you say "cash instruments," what do you mean?
04:36:28    15    **A.**    Could be what's called commercial paper, something
16    that is an investment which is called "near cash" that
17    would be issued by a financial institution, for example,
18    or a corporation.
19    **Q.**    So how quickly could commercial paper be turned into
04:36:43    20    cash?
21    **A.**    Very quickly.  Same as cash.
22    **Q.**    So that was Tier 1, cash.
23          What was in Tier 2?
24    **A.**    Tier 2 was a segment of the investments that were
04:36:57    25    made up of various securities:  Bonds, equities,

*Direct-Davis/By Mr. Stellmach*

1    investment funds, hedge funds, alternate funds, and

2    similar instruments.  Had some cash, but mostly were in

3    investable securities.

4    **Q.**    Were these marketable securities?

04:37:16   5    **A.**    Yes, sir, they were.

6    **Q.**    Were the investments that are in Tier 2 consistent

7    with the claims made in the marketing materials about the

8    bank's assets?

9    **A.**    Yes, sir, I would say they were consistent with what

04:37:28   10   was claimed in the marketing materials.

11   **Q.**    So as a general matter, as a percentage, how much of

12   the bank's assets would be in Tier 1, the cash?

13   **A.**    The latter years, generally 10 percent.

14   **Q.**    And how much would be in Tier 2, the asset category,

04:37:47   15   consistent with the marketing materials?

16   **A.**    15 percent.

17   **Q.**    Is that an approximation?  It varied over time

18   year-to-year?

19   **A.**    Yes, sir.  For example, in 2008, in June, that

04:37:55   20   would have been very close.

21             MR. SCARDINO:  Object nonresponsive.

22             THE COURT:  Sustained.

23   BY MR. STELLMACH:

24   **Q.**    So approximately 10 percent in cash, 15 percent in

04:38:11   25   liquid assets, stocks, bonds, precious metals?

*Direct-Davis/By Mr. Stellmach*

1   **A.**   Yes, sir.

2   **Q.**   And then what was Tier 3?

3   **A.**   Tier 3 was the missing funds.

4   **Q.**   That was the 75 percent of the bank's reported

5   assets?

04:38:26

6   **A.**   Yes, sir.

7   **Q.**   Could you explain why there were funds missing?

8   **A.**   Yes, sir.  The CD monies that were missing were

9   invested into Stanford companies and spent in other ways,

10  not the ways that were reported in the promotional

04:38:51

11  materials, but invested in other -- other items, other

12  assets and spent for operating expenses.

13  **Q.**   So of the bank's reported assets, and we'll go

14  through this in a little bit in a little bit more detail,

15  only about 25 percent were invested in ways consistent

04:39:11

16  with the marketing materials and the annual report?

17  **A.**   Yes, sir, that's correct.

18  **Q.**   How widely known within the Stanford Financial Group

19  was this tier system, these three different tiers?

20  **A.**   I believe it was not general knowledge, but it was

04:39:33

21  widely known along the lines of the financial reporting

22  departments.  It was known at the bank, Stanford

23  International Bank Limited.

24  **Q.**   Just the existence of the tiers?

25  **A.**   The existence of them, that there were three segments

04:39:51

1   in the investment section.

2   **Q.**   How many people knew within the bank what was

3   actually in Tier 3, the actual types of assets and how the

4   money had been spent on Stanford personal companies?

04:40:07   5   **A.**   Mr. Stanford and myself; the chief accounting

6   officer, Mr. Lopez; global controller, Mr. Kuhrt; possibly

7   others in their staff.

8   **Q.**   Some of the other accountants?

9   **A.**   Very possibly, yes.

04:40:28   10            MR. STELLMACH:  I want to turn to the marketing

11   materials.  And we can use the -- if we could switch to the

12   overhead.  Thank you, Ms. Alexander.

13   BY MR. STELLMACH:

14   **Q.**   Starting with Government's Exhibit 136.  If I can

04:40:47   15   impose on you, Mr. Davis, to follow along on the screen.

16                 Do you recognize that document?

17            THE COURT.  136?

18            MR. STELLMACH:  Yes, Your Honor.

19            THE COURT:  That's already been identified;

04:41:04   20   correct?

21            MR. STELLMACH:  Yes, Your Honor.

22   BY MR. STELLMACH:

23   **Q.**   I'm sorry, Mr. Davis.  Do you recognize it?

24   **A.**   Yes, sir.  Yes, sir, I do.  It's marketing brochure

04:41:17   25   cover, I believe.

*Direct-Davis/By Mr. Stellmach*

1   Q.   How involved was Mr. Stanford in preparing these

2   marketing materials like this brochure?

3   A.   I would say he was hands-on, very involved in the

4   process.  Creative services provided all of their work up

04:41:34   5   to Mr. Stanford for review and approval.

6            MR. SCARDINO:  Objection.  Nonresponsive.

7            THE COURT:  Sustained.

8   BY MR. STELLMACH:

9   Q.   What did Mr. Stanford do in reviewing the marketing

04:41:42   10   brochures?

11   A.   He read -- he looked and read each page.  I've seen

12   him go over the marketing brochures page by page.  At

13   times, he would make adjustments to the script, copy

14   writing as it were, and I've seen him interact with the

04:42:06   15   creative services employees regarding the promotional

16   materials.

17            MR. STELLMACH:  And if we could turn to Page 3

18   of the document.  Under "Depositors' security," if we could

19   just enlarge that top portion.

04:42:20   20   BY MR. STELLMACH:

21   Q.   And particularly under "Liquidity."  It says, "We

22   focus on maintaining THE highest degree of liquidity as a

23   protective factor for our depositors."

24                    Was that true?

04:42:39   25   A.   Overall, no, sir.

1  **Q.**   Why was it false?

2  **A.**   75 percent of the portfolio was not -- was not

3  liquid.

4  **Q.**   It states that "The bank's assets are invested in a

04:42:54  5  well-diversified portfolio of highly marketable securities

6  issued by strong governments, multinational companies."

7  **A.**   75 percent of the portfolio was invested in, I would

8  say, nonliquid, not marketable investments.

9  **Q.**   Did Mr. Stanford's companies have securities that

04:43:20  10  were traded on exchanges around the world?

11  **A.**   No, sir.

12  **Q.**   And if we look at "Investment Time Horizons," could

13  you read that and explain what you understand that to

14  mean?

04:43:34  15  **A.**   "Investment time horizons.  By continuously matching

16  investment time horizons against terms of deposits, we're

17  able to ensure adequate liquidity to meet all customers'

18  requirements."

19          Matching investment time horizons against

04:43:53  20  terms of deposits means that there is cash available to

21  meet tranches or groupings of deposits that have been made

22  by customers; for example, if $500,000 of deposits by

23  customers are due in October of a given year, then there

24  are investments that are timed out in their investments to

04:44:19  25  match it.

*Direct-Davis/By Mr. Stellmach*

1          MR. SCARDINO:  Objection.

2          THE COURT:  Excuse me.

3          MR. SCARDINO:  Narrative.

4          MR. STELLMACH:  He's explaining what investment

04:44:23   5  time horizons are.

6          THE COURT:  Overruled.

7              You may go ahead.

8          MR. STELLMACH:  Thank you, Your Honor.

9  BY MR. STELLMACH:

04:44:31  10  **Q.**   Mr. Davis, you were explaining that --

11  **A.**   I'll just finish up by saying there was to be --

12  according to this document, there was to be an investment

13  in an amount per time available to meet a client deposit

14  amount per time dollar for dollar.

04:44:52  15  **Q.**   So if there were CD -- if there were $500 million in

16  CDs due in October, according to this -- according to this

17  claim in the marketing brochure, what did that mean in

18  terms of assets the bank had invested in?

19  **A.**   That there would be assets that could be redeemed in

04:45:09  20  October if necessary to meet the demands of those who

21  invested in those CDs for 500 million.

22  **Q.**   Was that true?

23  **A.**   No, sir.

24  **Q.**   Well, let me ask you this:  When you start working at

04:45:22  25  the bank in 1988 until virtually the end in February

*Direct-Davis/By Mr. Stellmach*

1    of 2009, if somebody wanted to redeem, if they wanted to
2    cash in a CD that they had purchased from Stanford
3    International Bank, were they able to redeem?
4    **A.**   They were, yes.
04:45:41   5    **Q.**   So how is that wrong?  How is this statement wrong if
6    the bank for 19 years or so was able to cover redemptions?
7    **A.**   Most of the depositors left their money in the bank
8    renewing their certificates of deposit term to term rather
9    than withdrawing.  If there was a necessity placed upon
04:46:08   10   the bank to withdraw all the money that was owed to the
11   depositors, it would not have been possible.
12   **Q.**   Because the bank didn't have sufficient liquid
13   assets?
14   **A.**   Because there were not sufficient liquid assets.
04:46:19   15   **Q.**   But from time to time when people were actually
16   redeeming their CDs, putting aside the people who just let
17   their money sit in a CD and rolled over the CD, if people
18   were redeeming, where was the money coming from to pay
19   customers who wanted their money out of the CD program?
04:46:36   20   **A.**   The pool, the pool of money that was in the bank as
21   an investment was sufficient, as you say, to meet those
22   redemptions; but by and large, the biggest reason money
23   was available to redeem is that continually sales of CDs
24   came in at such a growth rate that there wasn't a problem
04:47:05   25   paying withdrawal requests as they came in from depositors

*Direct-Davis/By Mr. Stellmach*

1    over time until the economic debacle of 2008 when people

2    were afraid, they were scared and they began withdrawing

3    in heavy, heavy amounts.  And toward the end of 2008, it

4    became an issue of magnitude proportions.

04:47:29    5    **Q.**    So the bank was able to cover CD redemptions so long

6    as it was selling CDs --

7    **A.**    Correct.

8    **Q.**    -- to new customers?

9    **A.**    That's correct.

04:47:41    10             MR. STELLMACH:  And if we turn to Page 5 and

11    just enlarge the top two portions.

12    BY MR. STELLMACH:

13    **Q.**    "Global investment strategy."  It states, "The bank

14    has a global investment strategy that minimizes exposure

04:47:59    15    to any one regional market."

16                  Was that true?

17    **A.**    Only partially.  The strategy was there, but it was

18    only applied to the so-called Tier 2 investments that I

19    earlier testified about.  It did not include Tier 3, which

04:48:15    20    was 75 percent of the investment account.

21    **Q.**    Where was the concentration of the Tier 3 assets?

22    **A.**    Concentration of the reported Tier 3 assets was in

23    real estate in the Caribbean.  There were two other

24    segments, but most of the dollar amount was the real

04:48:38    25    estate Caribbean.

2841

*Direct-Davis/By Mr. Stellmach*

1    **Q.**    Well, let me be more specific --

2    **A.**    Yes.

3    **Q.**    For Mr. Stanford's personal companies that were

4    receiving CD money, what region were those companies based

5    in, mainly?

6    **A.**    Caribbean was heavy.  North American and South

7    America secondly.

8    **Q.**    And could you read under "No credit risk."  It states

9    that "The bank doesn't expose customers to the risks

10   associated with commercial loans.  Our only form of

11   lending is done on a cash-secured basis solely to existing

12   customers."

13   **A.**    That is a lie as well, because there was lending.

14   There was lending to the shareholder.

15   **Q.**    By "shareholder" you mean?

16   **A.**    Mr. Allen Stanford.  He had a $2 billion loan.

17   **Q.**    And if we turn to Page 6 of this brochure.

18           Under "Consistent profitability," it

19   states, "The bank has been consistently profitable since

20   inception."

21           Was that true?

22   **A.**    No, sir, it was not.

23   **Q.**    Did Mr. Stanford's bank ever have a profitable year?

24   **A.**    Not to my knowledge.

25   **Q.**    It states that "Rather than pay dividends to

*Direct-Davis/By Mr. Stellmach*

1   shareholders on earnings, our business model was designed

2   to use these resources to enhance interest rates to the

3   depositors."

4                    Could you just explain before we go on to

04:50:15   5   the question what dividends are?

6   **A.**   Dividends would be amounts paid to shareholders out

7   of the earnings of the company.

8   **Q.**   And what's the claim being made here about whether

9   the bank pays dividends to Mr. Stanford?

04:50:30   10   **A.**   It's basically that there are no dividends paid.

11   **Q.**   But Mr. Stanford had borrowed $2 billion from the

12   bank?

13   **A.**   That's correct, yes, sir.

14   **Q.**   Were there any earnings so that dividends could have

04:50:45   15   been withdrawn?

16   **A.**   No, sir.

17   **Q.**   And by "earnings," I mean net profits.

18   **A.**   There were no profits, net or otherwise.

19   **Q.**   Under "Global investments," there's a statement there

04:51:00   20   that "Global investments, diversified global investments,

21   not loans, are the primary source of bank earnings.

22   Interest rates paid to depositors are based upon

23   reasonable investment return expectations and are reviewed

24   quarterly by the board of directors."

04:51:18   25                    You were to the board of directors of the

*Direct-Davis/By Mr. Stellmach*

1   bank starting when, sir?

2   **A.**   1992.

3   **Q.**   How actively involved was the board in reviewing the

4   investment strategy of the bank?

04:51:28   5   **A.**   They were not very active in reviewing the strategy.

6   They received the same information that those in the

7   company as banking officers, for example, or financial

8   advisors or prospective CD holders or present customers

9   would receive:  Marketing brochures and the fraudulent

04:51:52   10   financial statements.

11   **Q.**   So to your knowledge, were the members of the board

12   of directors on which you sat receiving any information

13   beyond that which was being given to the depositors of the

14   bank?

04:52:06   15   **A.**   No, sir.

16   **Q.**   Concerning the bank's assets?  I should be more

17   specific.  Concerning the bank's assets?

18   **A.**   No, sir.

19   **Q.**   And if we go to "Low overhead," it states that "The

04:52:21   20   bank maintains low overhead, streamlines administrative

21   processes."

22                 What was the overhead like within the

23   Stanford organization?

24   **A.**   It was -- it was the organization at large, all

04:52:37   25   Stanford companies, overhead was exorbitantly high.

*Direct-Davis/By Mr. Stellmach*

1    Q.   Could you give us a sense of what types of expenses

2    the bank encountered -- or I'm sorry -- the organization

3    dealt with or had to pay?

4    A.   I would say the travel employee expenses were very

04:53:06   5    high.  I would say that the office build-outs were

6    extremely high.  I would say overhead, such as a fleet of

7    private aircraft and hangars and 42 private aircraft

8    employees were exorbitant, high -- higher than they should

9    have been.  That would be some examples.

04:53:36   10         MR. STELLMACH:  If we could turn to Page 7.

11   Then I think we'll be done with the document.

12   BY MR. STELLMACH:

13   Q.   "No loan losses and greater investable assets."

14         MR. STELLMACH:  That's fine.

04:53:50   15   BY MR. STELLMACH:

16   Q.   Under "No loan losses," it states, "The bank

17   eliminates credit risks and negative impact on earnings

18   due to loan losses."

19              Could you explain what credit risk is?

04:54:02   20   A.   Credit risk would be the risk that people that

21   entrust your money -- people entrusted money to you are

22   not going to get their money back.

23   Q.   So the risk that the bank makes a bad loan?

24   A.   Correct.

04:54:27   25   Q.   And it states there that "The bank only makes

*Direct-Davis/By Mr. Stellmach*

1    cash-secured loans."

2              What did you understand that to refer to?

3    **A.**    There was a -- there were a number of loans made to

4    bank customers; that is, CD holders, certificate of

04:54:46   5    deposit holders.   There were loans made to them under

6    policy and procedure.

7              For example, if a depositor had bought a

8    CD and the CD was a hundred thousand dollars, the basic

9    provision was that, at the will of the CD holder, they

04:55:02   10   could borrow up to 80 percent of that, and it was

11   cash-secured in that regard.

12   **Q.**    Was that true?

13   **A.**    Yes, sir.

14   **Q.**    The bank made cash-secured loans?

04:55:15   15   **A.**    Yes, sir.   To existing CD holders, yes, sir.

16   **Q.**    What about the loan to Mr. Stanford?   Was that

17   cash-secured?

18   **A.**    No, sir, it was not.

19   **Q.**    To your knowledge, was there any collateral put up by

04:55:27   20   Mr. Stanford for the 2 billion he was taking out in loans

21   of the CD money?

22   **A.**    Not to my knowledge no, sir.

23   **Q.**    Under "Greater investable assets," it states, "More

24   than 90 percent of the bank's own equity supplements

04:55:44   25   investable assets."

2846

*Direct-Davis/By Mr. Stellmach*

1          Could you just explain what's being said

2   there, or your understanding of what's being said there?

3   **A.**   Well, a couple of things, I suppose:  Number one,

4   it's stating that there is equity in the bank, meaning

04:55:58   5   there's more assets than there are liabilities.  Assets

6   minus liabilities equals the equity.

7          And number two, because there was no

8   equity, there was no supplemental investable assets.

9   **Q.**   So there was no equity in the bank.

04:56:19   10          Is that your testimony?

11   **A.**   Yes, sir, it is.

12          MR. STELLMACH:  I wanted to turn to the CD

13   disclosure statement, Government's Exhibit 131 which is

14   already in evidence.  Specifically Page 10.

04:56:43   15          If you could just enlarge that section

16   toward the bottom.

17   BY MR. STELLMACH:

18   **Q.**   Do you see there, Mr. Davis, it states, "The funds

19   deposited are primarily invested in foreign and U.S.

04:56:59   20   investment grade bonds and securities and foreign currency

21   deposits"?

22   **A.**   Yes, sir, I do see that.

23   **Q.**   Was that true?

24   **A.**   No, sir, that's not true.

04:57:12   25   **Q.**   Approximately how much of the bank's assets could you

*Direct-Davis/By Mr. Stellmach*

1  remind us were invested in that way?

2  **A.**   No more than 25 percent, other than cash, only

3  15 percent.

4  **Q.**   And are any of the numbers beneath that showing

04:57:28  5  breakdowns of the bank's assets?  Or from 2003 through

6  2006, to your knowledge, are any of those breakdowns under

7  products, those numbers, accurate?

8  **A.**   No, sir, they're all lies.

9         MR. STELLMACH:  And if we turn to the next

04:57:49  10  page.

11  BY MR. STELLMACH:

12  **Q.**   While we're figuring that out, Mr. Davis, could you

13  just explain, these numbers -- those numbers are all lies.

14         Were you involved in preparing those lies?

04:58:22  15  **A.**   Yes, sir.  I was one of the liars.

16  **Q.**   And you put together those fake numbers which were

17  put in the CD disclosure statement given to the

18  depositors?

19  **A.**   Yes, sir.  Among others, yes, sir, I was.

04:58:44  20  **Q.**   We're just going to turn now to the chart on

21  operating profit.

22         There's a chart there that supposedly

23  shows the operating profits of the bank from 1997 through

24  2006.

04:58:59  25         Is the information here accurate?

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Direct-Davis/By Mr. Stellmach*

1    **A.**   No, sir.

2    **Q.**   Is any of it?

3    **A.**   No, sir.

4    **Q.**   Now, you were in charge of the finances of the bank,

04:59:15   5   weren't you?

6    **A.**   I was chief financial officer, yes, sir.

7    **Q.**   So you put together these fake numbers, didn't you?

8    **A.**   I was involved and lied.  Yes, I did that, under the

9    direction --

04:59:35   10              MR. SCARDINO:  Object to nonresponsive.

11              THE COURT:  Hold it.  Hold it.  Sustained.

12                   Ask it again.  Narrow it down.

13              MR. STELLMACH:  Yes, Your Honor.

14   BY MR. STELLMACH:

04:59:43   15   **Q.**   The fake numbers or fake operating profits that are

16   shown in this chart --

17   **A.**   Yes, sir.

18   **Q.**   -- were you involved in faking those numbers?

19   **A.**   I was involved in faking them, yes.

04:59:53   20   **Q.**   Did Mr. Stanford know?

21   **A.**   Yes, sir.  He was the chief faker.  He had been

22   faking these before I became on board.

23              MR. SCARDINO:  Objection, Your Honor.

24              THE COURT:  Sustained.  Sustained as to that

05:00:04   25   comment.

*Direct-Davis/By Mr. Stellmach*

1           MR. STELLMACH:  Yes, Your Honor.

2   BY MR. STELLMACH:

3   Q.   And we'll just clarify that.

4           Based on your conversations with

05:00:11   5   Mr. Stanford, what did you under -- how far back did you

6   understand the fraud to go?

7           You started in 1988.  Had the fraud been

8   going on before or after you started?

9   A.   Mr. Stanford told me that there were bona fide -- I

05:00:29   10   asked him, "Was there ever profit?  Were you ever

11   profitable?"

12           He said, "We were in the beginning."

13           But from my tenure forward --

14           MR. SCARDINO:  Object to the nonresponsive.

05:00:41   15           THE COURT:  Sustained.

16           If you would sir, just don't volunteer

17   anything.

18           THE WITNESS:  Yes, sir.

19           THE COURT:  They'll get to it.

05:00:45   20           THE WITNESS:  Yes, Your Honor.

21   BY MR. STELLMACH:

22   Q.   But by the time you started in 1988, and then you

23   realized by late 1991, early 1992, that approximately half

24   of the bank's assets aren't where they should be.

05:00:59   25           From that point, were any of the financial

1  numbers reported in terms of the bank's assets or profits

2  accurate?

3  **A.**   No, sir.

4  **Q.**   And based on what Mr. Stanford told you, had there

05:01:15  5  been fake numbers used before you fully joined him in

6  1991, 1992?

7                  MR. SCARDINO:  I'll object to relevance.

8                  THE COURT:  What's the relevance?

9                  MR. SCARDINO:  What happened before 1998.

05:01:26  10                 MR. STELLMACH:  The fraud predated Mr. Davis.

11  He wasn't the orchestrator of this.

12                 MR. SCARDINO:  The charging instrument has a

13  date specific when it says it happened.  And anything

14  beyond that, I would submit to the Court is irrelevant.

05:01:34  15                 MR. STELLMACH:  It's 1990.  The indictment

16  alleges 1990, and it's in or about.

17                 MR. SCARDINO:  I thought he was asking him

18  questions about period of time that predated that.

19                 THE COURT:  What do you -- ask it again.

05:01:44  20                 MR. STELLMACH:  Yes, Your Honor.

21                 THE COURT:  And then date it at this time,

22  please.

23                 MR. STELLMACH:  Yes, sir.

24  BY MR. STELLMACH:

05:01:48  25  **Q.**   Did Mr. Stanford tell you whether the fraud had taken

*Direct-Davis/By Mr. Stellmach*

1  place prior to you learning about it in 1991?

2  **A.**   Mr. Stanford told me --

3             THE COURT:  Excuse me.  It's a yes or no.

4             THE WITNESS:  Yes, sir, he did.

05:02:18  5  BY MR. STELLMACH:

6  **Q.**   What did Mr. Stanford tell you?

7  **A.**   Told me two things, sir:  One, that originally, I

8  would say '85, '86, there were profits; after that, no,

9  that predated me, as you said, yes, sir.

05:02:37  10            MR. STELLMACH:  Your Honor, I wonder, is the

11  temperature rather high?  Am I only one?

12            THE COURT:  Is it warm in here?  Okay.

13            JUROR:  Depends on where you're sitting.

14            MR. STELLMACH:  Or standing.

05:02:51  15            THE COURT:  You know the old commercial, you

16  know, six pepperoni and six plain cheese pizzas and dealing

17  with the jury, it looks like half of it's one way and half

18  of it's another way.

19                 I'll see what we can do about it.  I'll

05:03:09  20  see what it is.

21            MR. STELLMACH:  If we could turn --

22            THE COURT:  We've also asked them to do it.

23            MR. STELLMACH:  If we could turn to Page 12 of

24  the CD disclosure statement.

05:03:17  25  BY MR. STELLMACH:

*Direct-Davis/By Mr. Stellmach*

1    Q.   And just the second paragraph, while we do -- while

2    we do generally.  It states:  "We do provide loans to

3    customers often secured by the customers' deposits at the

4    bank, usually in an amount greater than the amount of the

05:03:44    5    loan."

6                     This is consistent with the same claim we

7    saw in the marketing brochure, Mr. Davis, regarding the

8    nature of the loan the bank made?

9    A.   Yes, sir.

05:03:57    10   Q.   And, again, was that true?

11   A.   Yes, sir.

12   Q.   But were all of the bank's loans cash secured?

13   A.   It was true at the normal course of business with

14   customers who had CDs, as I testified earlier, but it did

05:04:13    15   not include the loans to Mr. Stanford.

16   Q.   And we'll just turn to one annual report, and we'll

17   do that actually very briefly.

18                     The annual report from 2004, Government's

19   Exhibit 117, which I believe is in evidence.

05:04:27    20             MR. STELLMACH:  If we could turn to Page 16 of

21   that document.

22   BY MR. STELLMACH:

23   Q.   Was there a chairman's letter in every issue of the

24   annual report issued by the bank?

05:04:54    25   A.   Yes, sir, there was.

*Direct-Davis/By Mr. Stellmach*

1  **Q.**   And this is from 2004.  Could you -- just jumping to

2  the next page -- could we just see who the chairman was?

3  **A.**   Mr. Allen Stanford.

4              MR. STELLMACH:  And going to the prior page of

05:05:09  5  Mr. Stanford's letter.  If we could enlarge the segment

6  under investment philosophy from Mr. Stanford's letter.

7  BY MR. STELLMACH:

8  **Q.**   And if you could just read that for us, Mr. Davis.

9  **A.**   "Investment Philosophy.  The bank's investment

05:05:44  10  philosophy is to remain globally diversified in an

11  assortment of asset classes, such as stocks, bonds,

12  commodities and currencies.  Over the years, this strategy

13  has produced consistent returns in both stable and

14  volatile market environments.  We will continue to follow

05:06:03  15  this philosophy, as mandated by the board of directors,

16  remaining prudent yet dynamic in our approach to investing

17  and doing the hard work necessary to uncover opportunities

18  for our clients not found anywhere else."

19  **Q.**   Again, were these --

05:06:22  20              THE COURT:  All right.  Hang on a second.

21              MR. STELLMACH:  Yes, Your Honor.

22              THE COURT:  I'm going to try to rig up

23  something here.  Why don't you come around this way.

24                    Again, if the lawyers want to take jackets

05:06:36  25  off, fine.  Because the problem we have with the jury is --

2854

*Direct-Davis/By Mr. Stellmach*

1 with all due respect to counsel, the primary concern is the

2 jury, okay?  So what we're going to do -- let's see if we

3 can do a little rigging.  I'm not going to pull my light

4 out.  Let's give that a try.

05:09:22   5           JUROR:  We got 45-degree angle.

6           MR. STELLMACH:  It so happens I need to move to

7 this area now.

8           THE COURT:  Let me turn the clock back on.

9           MR. STELLMACH:  If we could turn to

05:09:47  10 Government's Exhibit 120.

11           THE COURT:  Angle it just a little bit.  That's

12 all.  That's fine.

13                Which one?

14           MR. STELLMACH:  Government's Exhibit 120, the

05:09:54  15 2007 annual report for the bank.

16           THE COURT:  Okay.  I see it in my book here.

17           MR. STELLMACH:  I think it's Page 1103.

18           MR. SCARDINO:  I'm sorry, Mr. Stellmach, what

19 page?

05:10:06  20           MR. STELLMACH:  I think it's the Bates number

21 1038, but it's displayed on the screen, actually.

22                If we could just enlarge that section

23 right there.

24 BY MR. STELLMACH:

05:10:17  25   Q.   Mr. Davis, can you see that or can you follow it on

1    the screen?

2    **A.**    Yes, sir.

3    **Q.**    Under assets, there are a number of assets listed,

4    cash and balances with other banks.

05:10:29    5                    I think you testified earlier that would

6    be the Tier 1 category?

7    **A.**    Yes, sir.

8    **Q.**    And that was in the neighborhood of approximately

9    10 percent, give or take, at any given time?

05:10:40    10    **A.**    Yes, sir.

11    **Q.**    Was that number accurate?

12    **A.**    Yes, sir.

13    **Q.**    Why was that number for the bank's assets accurate?

14    **A.**    There was actual cash in banks supported by financial

05:10:56    15    statements from those banks, statements of balances.

16    **Q.**    And the rest of the assets that are reported -- we'll

17    go to loan and advances to clients -- the only loan --

18    amount of loans disclosed is for $69 million.  Do you see

19    that?

05:11:15    20    **A.**    I do.

21    **Q.**    Is that also accurate?

22    **A.**    No, sir.  Did not include the loans to Mr. Stanford.

23    **Q.**    And the rest of the assets were reported to the bank.

24    Other than that 627 million-dollar number, are any of the

05:11:33    25    other numbers to the assets accurate?

2856

*Direct-Davis/By Mr. Stellmach*

1    **A.**    Accurate, yes.  Property and equipment and other

2    assets.

3    **Q.**    What about the financial assets that come in at

4    $6.3 billion out of $7 billion reported by the bank?

05:11:51    5    **A.**    No, sir, that's not accurate.

6    **Q.**    Under liabilities, there's a total liability reported

7    of 6.7 billion of which 6.6 is owed to depositors?

8    **A.**    Yes, sir.

9    **Q.**    So as of the end of 2007, the bank owed 6.6 billion

05:12:21    10    to CD depositors?

11    **A.**    Yes, sir, that's correct.

12    **Q.**    And if we look at that chart, there's approximately

13    620 odd-million in Tier 1, is that correct, in the cash?

14    **A.**    Yes, sir.

05:12:47    15    **Q.**    The bank had about 627 million in cash.

16              MR. STELLMACH:  And if we could turn to

17    Government's Exhibit 211.

18    BY MR. STELLMACH:

19    **Q.**    Do you recognize the spreadsheet --

05:13:11    20              MR. STELLMACH:  If we could turn to the

21    attachment.

22    BY MR. STELLMACH:

23    **Q.**    -- what this is?

24    **A.**    Yes, sir, I do.

05:13:17    25    **Q.**    What is this document?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   This is a weekly recap summary of Tier 2 investments.

2  **Q.**   And there's a breakdown of the different types of

3  investments in Tier 2 which also includes cash fixed

4  income, equities, rating funds, alternative funds,

05:13:37  5  precious metals.  Do you see those numbers?

6  **A.**   Yes, sir, I do.

7  **Q.**   And there's a number there, year-end balance,

8  888 million.  What does that represent?

9  **A.**   The balance in Tier 2 of investable securities.

05:13:53  10  **Q.**   As of the end of the prior year, 2007?

11  **A.**   As of January 7, 2008, or one week passed.

12          THE COURT:  Hold on a second.  The court

13  reporter has a problem.

14          MR. SCARDINO:  Your Honor, if we could get a

05:16:29  15  clarification for Mr. Stellmach as to Government's 211, it

16  would be identified whether or not is a public document or

17  an internal document.  I'm not --

18          MR. STELLMACH:  I think we've heard prior

19  testimony about this.  This is one of the internal tracking

05:16:43  20  reports for Tier 2 that was prepared by the Memphis group

21  of research analysts.

22          MR. SCARDINO:  Not for publication?

23          MR. STELLMACH:  No, it was never offered to

24  depositors, because it's a fraction of the actual reported

05:16:56  25  deposits of the bank.

*Direct-Davis/By Mr. Stellmach*

1            MR. SCARDINO:  Thank you.

2            MR. STELLMACH:  Assets of the bank.

3            THE COURT:  That's 211; correct?

4            MR. STELLMACH:  211, yes, Judge.

05:17:03   5            THE COURT:  Okay.

6  BY MR. STELLMACH:

7  Q.    So, Mr. Davis, as of the end of 2007, the bank owed

8  $6.6 billion dollars to CD depositors.  We saw that from

9  the annual report?

05:17:14  10  A.    Yes, sir.

11  Q.    There was -- at the same time, there was 627 million

12  in cash, there was another 888 million invested in the

13  assets we see on the side, in the upper left-hand corner,

14  basically the Tier 2 liquid assets; right?

05:17:32  15  A.    Yes, sir.

16  Q.    And that together comes to 1.5 billion,

17  approximately?

18  A.    Yes, sir.

19  Q.    And, so, that leaves 6.6 billion owed, 1.5 billion in

05:17:53  20  actual cash and liquid assets, leaving 5.1 missing; right?

21  A.    Yes, sir.

22  Q.    Did you and Mr. Stanford have a term that you used to

23  describe the difference between what the bank owed to

24  depositors and what it actually had in cash and liquid

05:18:22  25  assets?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   It's referred to as the hole.

2  **Q.**   The hole.

3                And that's as of the end of '07, before

4  the economy turned and redemptions of the CD program

05:18:44  5  increased?

6  **A.**   That was before that time, yes, sir.

7  **Q.**   And, so, moving into 2008, which we'll do not today,

8  what happened to the hole?

9  **A.**   The hole got larger.

05:19:07  10  **Q.**   Why did it get larger?

11  **A.**   It got larger because of a couple of reasons

12  primarily.  One is the cash burn it took to supply monies

13  to run the other Stanford companies, and the fact that

14  there was no profits, lack of production in the small

05:19:39  15  25 percent of assets that were as reported, degradation.

16  **Q.**   So how were you covering redemption in 2008 if CDs

17  sales were down?

18  **A.**   Redemptions were covered by Tier 1 and Tier 2, the

19  items identified by yourself here on the screen, until

05:20:05  20  January of 2009 when liquidity had dried up.

21  **Q.**   There was no more money by '09?

22  **A.**   Yes, sir.

23  **Q.**   And we're going to come back to that.

24                But I want to talk a little bit more about

05:20:23  25  Tier 2, that 15 percent or so of the assets of the bank

1    that were invested consistent with the claims.  And I want

2    to turn to a demonstrative exhibit that we had.

3                MR. STELLMACH:  If I could switch now, Your

4    Honor, to the computer, to the laptop.

05:20:56   5                MR. COSTA:  Your Honor --

6                THE COURT:  Pardon me?

7                MR. STELLMACH:  Is this a demonstrative?

8    BY MR. STELLMACH:

9    Q.    While we're doing that, Mr. Davis, could you tell us

05:21:21  10    what depositors were told about who was overseeing the

11    investments of the bank?

12    A.    Yes, sir.  The direct oversight was by financial

13    institution money managers.  The internal oversight was by

14    the department called investments in Memphis.  There was

05:21:46  15    some 20 some-odd employees there that reviewed weekly the

16    investments.

17    Q.    When you say the investments, how much of the bank's

18    actual investments and assets did the research analysts in

19    Memphis have access to?

05:22:05  20    A.    Including the cash component, no more than

21    25 percent.

22    Q.    So the research analysts, were they -- we saw the

23    internal tracking report --

24    A.    Yes, sir.

05:22:18  25    Q.    -- from early '08.  That was based only on the

2861

*Direct-Davis/By Mr. Stellmach*

1  information from the money managers overseas?

2  **A.**   Yes, sir, for that portion only.

3  **Q.**   And, so, looking at this chart, could you explain to

4  us what depositors were told about how the bank's money

05:22:37  5  was being overseen and monitored?

6              MR. SCARDINO:  Pardon me, Mr. Stellmach.  Do

7  you have an exhibit number?

8              MR. STELLMACH:  This is a demonstrative.

9              THE COURT:  Microphone, please.

05:22:46  10             MR. STELLMACH:  I don't think we assigned an

11  exhibit number.

12             MR. SCARDINO:  Well, we would respectfully

13  request that it be identified in some way so that later on

14  on cross-examination it can be accessed and referred to.

05:22:57  15             MR. STELLMACH:  Demonstrative.

16             THE COURT:  This is the very first diagram that

17  was put up, if I remember, right, one of the very first?

18             MR. STELLMACH:  Yes, that's right, Judge.

19             THE COURT:  Why don't you refer to it as the

05:23:05  20  first diagram, how's that?

21             MR. SCARDINO:  Thank you.

22             MR. STELLMACH:  We can refer to it as

23  Demonstrative 1.

24             THE COURT:  Or the first diagram.

05:23:12  25             MR. STELLMACH:  Or the first diagram.  I defer

*Direct-Davis/By Mr. Stellmach*

1   to the man with the fan.

2   BY MR. STELLMACH:

3   **Q.**   Could you tell us, Mr. Davis, according to this

4   chart, what depositors were told about how the money was

05:23:26   5   being overseen?

6   **A.**   Yes, sir.   At the bottom of the right-hand side, it

7   was overseen directly by global money managers and was

8   reviewed and monitored by the research analysts under the

9   left side of the diagram, parenthesis, Memphis.

05:23:47   10   **Q.**   So Stanford Group Company was the brokerage firm

11   based here in the United States?

12   **A.**   That's correct, sir.

13   **Q.**   And could you explain what the diagram shows about

14   what Stanford Group Company did in its relationship to the

05:24:04   15   bank?

16   **A.**   Stanford Group Company, the brokerage, would sell CDs

17   to clients, and the monies placed into those CDs by

18   clients went to Stanford International Bank, Limited, and

19   then the CD money was, according to this diagram, sent to

05:24:25   20   the global money managers for direct investment.

21   **Q.**   And according to what depositors were told, how much

22   of the money was being invested with these global money

23   managers?

24   **A.**   All of the money.

05:24:36   25   **Q.**   And then we have a research group.   We see a research

*Direct-Davis/By Mr. Stellmach*

1    analyst based in Memphis working for the Stanford

2    Financial Group.

3                   And could you explain what depositors were

4    told about their function?

05:24:47   5    **A.**   Their function was to monitor the monies, investments

6    as it were, that were managed by the global money managers

7    and that those investments fulfill the Stanford investment

8    model parameters.

9    **Q.**   And just so I'm -- I should be more specific.  This

05:25:11   10   was told the depositors.  Was this also what the financial

11   advisors themselves, the actual salespeople working at

12   Stanford Group Company, were told about how the money was

13   being overseen?

14   **A.**   Yes, sir, they were.

05:25:23   15   **Q.**   So people like Michelle Chambliss and Jason Green,

16   they were led to believe this is how the money was being

17   managed?

18   **A.**   Yes, sir, that's what they were led to believe.

19   **Q.**   And, in fact, Mr. Davis, what percentage of the

05:25:38   20   portfolio was actually being run consistent with this

21   diagram?

22   **A.**   No more than 25 percent Tier 1 and Tier 2.

23   **Q.**   Now, who ran the research analyst group out in

24   Memphis?

05:25:54   25   **A.**   The chief investment officer's name was Laura Holt.

*Direct-Davis/By Mr. Stellmach*

1    **Q.**   And approximately how many research analysts did she

2    have working for her there?

3    **A.**   Excluding assistants to those people, 17 or so.

4    **Q.**   Was one of them an individual named Mark

05:26:14   5   Collinsworth?

6    **A.**   Yes, sir.

7    **Q.**   What about Zack Davis?

8    **A.**   Yes, sir.

9    **Q.**   Who is Zack Davis?

05:26:20   10   **A.**   He was a research analyst there.  He's also my son.

11   **Q.**   You hired your son to work as a research analyst in

12   Memphis?

13   **A.**   Yes, sir, I did.

14   **Q.**   What was his background before he got the job?

05:26:36   15   **A.**   He was a graduate of Union University in business

16   administration.  He also obtained his Series 7 and Series

17   86 and Series 87, I believe, licenses, which were licenses

18   conferred by the securities industry.  He was a research

19   analyst.

05:27:01   20   **Q.**   When did he start working as a research analyst?

21   **A.**   I believe 2002.  He had been a part-time student,

22   summer employee, for a number of years back in the late

23   '90s.

24   **Q.**   So this was about 10 or 11 years after you realized,

05:27:23   25   according to your earlier testimony, that you were

2865

*Direct-Davis/By Mr. Stellmach*

1   involved in a fraud with Mr. Stanford?

2   **A.**    Eight or nine years, yes, sir.

3   **Q.**    Why hire your own son to work at a company involved

4   in a fraud?

05:27:39   5   **A.**    Well, he was not part of the fraud.  He was way away

6   from the fraud.  He did not sell the CDs.

7            MR. SCARDINO:  Objection.  Nonresponsive.

8            THE COURT:  Sustained.

9   BY MR. STELLMACH:

05:27:50   10   **Q.**    Well, to be clear, what company was your son working

11   for?

12   **A.**    Stanford Financial Group Company.

13   **Q.**    Did he sell any CDs?

14   **A.**    No, sir.

05:28:01   15   **Q.**    Did he know about the existence of loans to

16   Mr. Stanford?

17   **A.**    No, sir.

18   **Q.**    Or that the financials -- the financial statements

19   were full of fake numbers and lies?

05:28:14   20   **A.**    No, sir, not at all, no, sir.

21   **Q.**    When you -- when he was hired, did you personally

22   hire him?

23   **A.**    No, sir.

24   **Q.**    Did he go through the normal hiring process?

05:28:24   25   **A.**    Yes, sir.  All employees went through the normal

2866

*Direct-Davis/By Mr. Stellmach*

1   process, yes.

2   Q.   When he went through that process, and he was hired,

3   did you expect him to stay at the company for a number of

4   years?

05:28:36   5   A.   Actually, no, I thought he would stay along enough to

6   get a year or so experience and get his further licensing

7   and be on his way.

8   Q.   Was it ever your intention to bring him into the

9   fraud?

05:28:51   10   A.   Absolutely not.

11   Q.   Did there come a time, several years after your son,

12   Zack Davis, started working as a research analyst, that

13   you ever told Mr. Stanford you wanted to retire, you

14   wanted to resign from the company?

05:29:09   15   A.   I ran through -- yes, sir, I did, I did, yes, sir.

16   Q.   Do you remember when that first came up?

17   A.   I believe it was 2006, 2007, maybe.

18   Q.   When you discussed that with Mr. Stanford, did you --

19   did he ever discuss a possible successor for you?

05:29:33   20   A.   At one point in time in those last years, he asked if

21   my son, Zack Davis, would continue to do what I had done,

22   and I said, "Absolutely not."

23   Q.   So your son was one of the research analysts, and

24   Ms. Holt was the supervisor?

05:29:52   25   A.   Yes.

*Direct-Davis/By Mr. Stellmach*

1    **Q.**   What was her title?

2    **A.**   Chief investment officer.

3    **Q.**   What was your relationship with Ms. Holt?

4    **A.**   I had a personal relationship and a professional

05:30:09  5    relationship with her.

6    **Q.**   What was the nature of your personal relationship

7    with her?

8    **A.**   Ms. Holt and I had an affair 2001 to 2003.

9    **Q.**   When did she receive the position of chief investment

05:30:22  10   officer?

11   **A.**   I believe subsequent to then, maybe 2004, 2005.

12   **Q.**   Who made the decision to make her chief investment

13   officer?

14   **A.**   Mr. Stanford.

05:30:37  15   **Q.**   Before she received that promotion, did you discuss

16   with Mr. Stanford the fact that you had had an affair with

17   Ms. Holt?

18   **A.**   Yes, sir, I told him.  He knew I had an affair with

19   Ms. Holt, yes.

05:30:49  20   **Q.**   Did he know back at the time or after the fact?

21   **A.**   At the time.

22   **Q.**   What did Mr. Stanford say about the fact you had had

23   an affair with her in connection with giving Ms. Holt the

24   position of chief investment officer?

05:31:02  25   **A.**   One of the things he said was: "That's good.  She'll

*Direct-Davis/By Mr. Stellmach*

1    be loyal."

2    **Q.**    Loyal in what way?

3    **A.**    She would continue to speak and act and manage in a

4    loyal way toward the method of selling CDs and the method

05:31:24    5    of sharing with internal and external individuals that

6    Tier 1, Tier 2 and Tier 3 were being managed and monitored

7    as depicted in this diagram.

8    **Q.**    So she would repeat the lies that we see in this

9    diagram?

05:31:44    10    **A.**    Yes, sir.

11    **Q.**    And can you just explain what the lie is that she

12    would be telling people?

13    **A.**    She would speak to the truth of the investment model

14    and that she was, in fact, monitoring -- hold herself up

05:32:02    15    to be monitoring all three tiers of investments, when, in

16    fact, she was not doing so.

17    **Q.**    Did she ever actually do that, hold herself out as

18    overseeing the entire portfolio of the bank when, in fact,

19    she only saw about 25 percent of it?

05:32:21    20    **A.**    Yes, sir.

21    **Q.**    Who did she do that to -- or with?  Who did she lie

22    to?

23    **A.**    That was done at the so-called quarterly performance

24    club meetings, TPC meetings.  That was done in -- from

05:32:39    25    time to time with certain groups of advisors.  That was

*Direct-Davis/By Mr. Stellmach*

1    done in -- time to time with certain investor groups.

2    **Q.**    How had you first met Ms. Holt?

3    **A.**    I met her in Baldwyn, Mississippi, at a college and

4    career Bible study class.

05:33:00   5    **Q.**    She was in the class, and you were also in the class?

6    **A.**    Yes.  I was a teacher.  My wife, Lorie, and I were

7    teachers of that class.

8    **Q.**    And then you recruited her to come to Stanford

9    Financial Group?

05:33:12   10    **A.**    Yes, sir, in 1996.  And she joined after she received

11    her Master's degree in '97, yes, sir.

12    **Q.**    And your affair with her took place from '01 through

13    '03?

14    **A.**    Yes, sir.

05:33:28   15    **Q.**    In addition to working with her and your personal

16    relationship, did you also have any businesses with

17    Ms. Holt?

18    **A.**    Yes, sir.  There was one in Baldwyn, Mississippi.  It

19    was a restaurant/coffee shop.

05:33:43   20    **Q.**    And just to be clear, was that restaurant or coffee

21    shop being funded with CD money?

22    **A.**    Everything was funded by CD money.

23            THE COURT:  The answer is yes?

24            THE WITNESS:  Yes, it was through my salaries.

05:33:58   25    BY MR. STELLMACH:

*Direct-Davis/By Mr. Stellmach*

1  Q.   I see.  So Mr. Stanford took out about $2 billion,

2  we've seen, for his companies.  Did you take any money

3  directly out of the bank to start up this coffee shop?

4  A.   Not directly, no.

05:34:11  5  Q.   The money -- when you say you used CD money, you're

6  referring to the fact that you used your salary and

7  bonuses and compensation, all of which necessarily came

8  from the CD money?

9  A.   That's correct.  My salaries and compensation,

05:34:23  10  bonuses, yes, sir.

11  Q.   So you weren't skimming money to open a coffee shop?

12  A.   No, sir, I was not.

13  Q.   Well, when Ms. Holt went to these TCP meetings, these

14  were attended by who?

05:34:41  15  A.   These TPC meetings were attended by the top

16  salespeople who sold CD, CDs to clients.

17  Q.   People like Jason Green.  Do you recognize that name?

18  A.   I do, yes, sir.

19  Q.   And what would Ms. Holt do at these meetings to

05:35:03  20  assist the fraud?

21  A.   She would stand up and explain the Stanford

22  investment model as adjusted, that is, how -- what the

23  philosophy was for investing the funds, as we've looked at

24  in testimony earlier in these diagrams that identify the

05:35:28  25  promotional materials.  She would stand up before the

*Direct-Davis/By Mr. Stellmach*

1    group and speak to this investment model, talk about the

2    economic environment around the world, and then would

3    point to charts that showed distribution of these

4    investable assets such as the products they were invested

05:35:50    5    in, which countries they were invested in, currencies they

6    were invested in.

7    **Q.**    What was Ms. Holt saying at these meetings and in

8    presentations that was a lie?

9    **A.**    That -- in effect that she was involved in all three

05:36:09    10    tiers, 1, 2 and 3, when, in fact, that was not the case.

11    **Q.**    Because -- did Ms. Holt know what was actually in

12    Tier 3?

13    **A.**    No, sir, I don't believe she did.

14    **Q.**    Did she know about the loans to Mr. Stanford?

05:36:25    15    **A.**    No, sir, she did not.

16    **Q.**    Did she ever ask:  "What's in Tier 3?"

17    **A.**    Yes, sir.  That was a question, yes, sir.

18    **Q.**    When she asked that, what did you tell her?

19            MR. SCARDINO:  I'll object to that.  He's

05:36:42    20    already testified she didn't know about Tier 3.

21            MR. STELLMACH:  I'll do it another way, Judge.

22            THE COURT:  Okay.

23    BY MR. STELLMACH:

24    **Q.**    Did Ms. Holt ever raise any concerns about the fact

05:36:54    25    she didn't know what was in the entire portfolio with

*Direct-Davis/By Mr. Stellmach*

1    Mr. Stanford in a meeting that you attended?

2              THE COURT:  Talking relative to Tier 3?

3              MR. STELLMACH:  Yes, Your Honor.

4              THE COURT:  Okay.

05:37:05    5              MR. SCARDINO:  Again, I'll object to the

6    logical question.  He's asking the witness how did she --

7    did she ever ask about something that she didn't know

8    about.

9              MR. STELLMACH:  She knew that the bank was

05:37:16   10    reporting $6.6 billion plus in assets and she only had a

11    fraction of that.  So my question to Mr. Davis is:  Did she

12    ever raise that as a concern in a meeting with

13    Mr. Stanford.

14              MR. SCARDINO:  Then I would suggest foundation.

05:37:29   15    He will have to establish that before, I think, he can get

16    in --

17              MR. STELLMACH:  I think I have.

18              THE COURT:  All right.  Try it a little more.

19    I understand exactly what he's saying.

05:37:36   20              MR. STELLMACH:  Yes, Your Honor.

21    BY MR. STELLMACH:

22    Q.   So, Mr. Davis, when you met -- when Ms. Holt was made

23    chief investment officer of the bank -- or, I'm sorry, of

24    Stanford Financial Group, was she given any information

05:37:54   25    about the actual contents, the types of assets and the

*Direct-Davis/By Mr. Stellmach*

1   loans to Mr. Stanford that were placed in the Tier 3

2   category?

3   **A.**   No, sir.

4   **Q.**   What assets of the bank was she told about?

05:38:09   5   **A.**   Tiers 1 and Tiers 2.  She knew the details of those

6   two tiers.

7   **Q.**   The cash being Tier 1?

8   **A.**   Yes, sir.

9   **Q.**   Tier 2 being the liquid assets that we saw in the

05:38:21   10  tracking report that came out of her group in Memphis?

11  **A.**   Yes, sir.

12  **Q.**   So she saw 25 percent of the bank's assets.  She

13  wasn't told the actual content of the other 75 percent.

14  Is that your testimony?

05:38:35   15             MR. SCARDINO:  That's a mischaracterization of

16  it.  He testified she didn't know about it.

17             MR. STELLMACH:  No, he testified -- I'm trying

18  to establish --

19             THE COURT:  I see nothing wrong with the

05:38:44   20  phraseology.  Overrule the objection.

21                  Go on.

22  BY MR. STELLMACH:

23  **Q.**   Could you answer the question?

24  **A.**   Would you repeat the question now that we've had

05:38:51   25  three interruptions, please, sir.

*Direct-Davis/By Mr. Stellmach*

1          THE COURT:  Hold it.  Let's read it back.  Be

2  completely accurate.  Please.

3              **(The requested portion was read.)**

4          THE WITNESS:  Yes, sir.

05:39:12   5  BY MR. STELLMACH:

6  **Q.**   But she attended meetings with financial advisors

7   where she talked as if she did oversee the entire

8   portfolio of the bank?

9          MR. SCARDINO:  I'll object to the leading

05:39:23  10  question.

11          THE COURT:  Overruled.

12  **A.**   Yes, sir, she did.

13  BY MR. STELLMACH:

14  **Q.**   Did Ms. Holt ever raise any concerns in any meeting

05:39:33  15   you attended with Mr. Stanford concerning the fact that

16   she didn't know the actual contents of Tier 3?

17  **A.**   Yes, sir, one meeting comes to mind.

18  **Q.**   When was that meeting?

19  **A.**   I believe it was 2007.

05:39:49  20  **Q.**   Where was that meeting?

21  **A.**   Four Seasons Hotel, bottom floor, breakfast area, in

22  Georgetown in Washington, D.C.

23  **Q.**   Who was present at that meeting?

24  **A.**   Ms. Holt, Mr. Stanford and myself.

05:40:07  25  **Q.**   What did Ms. Holt say to Mr. Stanford about Tier 3 in

*Direct-Davis/By Mr. Stellmach*

1    that meeting?

2    **A.**   One thing she said was that, in looking at

3    Mr. Stanford, I'm trusting and you that these assets are

4    as we've been reporting it, and I'm trusting Jim.

05:40:30  5    **Q.**   Did Mr. Stanford say anything?

6    **A.**   Said that you could trust us, you can trust me.  He

7    did.

8    **Q.**   What did Ms. Holt get out of participating in the

9    fraud?

05:40:45  10   **A.**   She got a paycheck.  She got bonuses.  She got --

11   **Q.**   Was she well paid?

12   **A.**   She was paid competitively in the marketplace, which

13   means in that environment she was well paid, yes.

14   **Q.**   What about loans from the bank.  Was she ever given

05:41:06  15   loans from the bank?

16   **A.**   Not to my knowledge.

17   **Q.**   Did you ever funnel any money to her?

18   **A.**   No, sir.

19   **Q.**   Her husband -- did you know her husband at the time?

05:41:17  20   **A.**   Yes, sir.

21   **Q.**   Was he one of the money managers used for Tier 2?

22   **A.**   Yes, sir.

23   **Q.**   Who made the decision to hire Ms. Holt's husband as

24   one of the managers?

05:41:33  25   **A.**   She made the recommendation.  I approved the

*Direct-Davis/By Mr. Stellmach*

 1  selection, the trial period, to see him manage.  I believe

 2  the initial funds were $2 million.

 3  **Q.**   Was Mr. Stanford told about that fact, the fact that

 4  Ms. Holt's own husband was running about $2 million of the

 5  Tier 2 assets?

 6  **A.**   Yes, sir.  He, in fact, met Mr. Holt in a restaurant,

 7  I believe Sea Catch restaurant in Georgetown, one evening.

 8  **Q.**   What did --

 9  **A.**   He knew Mr. Holt.

10  **Q.**   What did Mr. Stanford say to you about Mr. Holt?

11  **A.**   Said he liked him.

12  **Q.**   Did he say anything about whether it was okay to give

13  him money to manage?

14  **A.**   He said he liked him, and he would -- he could be

15  trusted to do so.

16  **Q.**   Before we move on from Memphis, I want to show you

17  Government's Exhibits 207 through 211.  While we're

18  looking at those, we saw Government's Exhibit 211 before.

19  This is Government's Exhibit 207.

20            These were the tracking reports of Tier 2?

21  **A.**   Yes, sir, that's correct.

22  **Q.**   And I'd just like to go through a few of those

23  starting with this particular exhibit.  It's for

24  December -- I'm sorry -- December 1st of 2003.  It's from

25  you to Mr. Stanford.

1            What were you forwarding to him?

2            MR. STELLMACH:  If we open the exhibit on the

3 attachment.

4            THE WITNESS:  This would be -- the question was

05:43:46    5 on that previous screen.  There was two attachments, one

6 was the investment portfolio of Bank of Antigua, Limited,

7 the other one was the investment portfolio of Stanford

8 International Bank, Limited, so-called Tier 2.

9 BY MR. STELLMACH:

05:44:01   10 Q.   And so this was an attachment that goes to

11 Mr. Stanford showing the performance of Tier 2 as of that

12 time period.

13            MR. STELLMACH:  If we go to the -- just go to

14 the next exhibit.

05:44:13   15 BY MR. STELLMACH:

16 Q.   We're going to go through these, I think pretty

17 quickly.

18            One of the questions I had for you,

19 Mr. Davis, was whether you actually sent the e-mail to

05:44:23   20 Mr. Stanford.

21 A.   Yes, sir.

22 Q.   And 208 is another e-mail from you to Mr. Stanford,

23 dated January 21, 2004.

24            Again what was attached?

05:44:35   25 A.   Attachments were the investment portfolios for Bank

*Direct-Davis/By Mr. Stellmach*

1    of Antigua, Limited, and Stanford International Bank,

2    Limited so-called Tier 2.

3                MR. STELLMACH:  And if we go to the next

4    exhibit.

05:44:50  5    BY MR. STELLMACH:

6    Q.   What's the date on that exhibit?

7    A.   October 31, 2007.

8    Q.   And, again, what were you forwarding to Mr. Stanford?

9    A.   This e-mail included, as before, Bank of Antigua,

05:45:13  10   Limited, investment portfolio, Stanford International

11   Bank, Limited, so-called Tier 3 investment portfolio and,

12   additionally, another Stanford company, the bank -- Panama

13   Bank of Panama portfolio.

14               THE COURT:  How many people were aware that

05:45:29  15   there was a Tier 3, to the best of your knowledge, sir?

16               THE WITNESS:  The --

17               THE COURT:  Just the existence of it.

18               THE WITNESS:  I would say maybe even 300.

19               THE COURT:  Okay.

05:45:49  20   BY MR. STELLMACH:

21   Q.   How many people were aware of the actual makeup of

22   Tier 3?

23   A.   Totally two people.  There were two plus others who

24   knew parts of Tier 2 such as the loans to Mr. Stanford.

05:46:11  25   Q.   Even Ms. Holt didn't actually know what was in

*Direct-Davis/By Mr. Stellmach*

1    Tier 3?

2    **A.**    No, sir.

3    **Q.**    Just that she didn't have access to that information?

4    **A.**    Correct.

05:46:21    5    **Q.**    And if we're just going to go through the rest of

6    these.  Again, another Tier 2 report dated November 7,

7    2007; is that right?

8    **A.**    Yes, sir, that is.

9                THE COURT:  Is this 207 through 214?

05:46:41    10                MR. STELLMACH:  It is, Your Honor.

11                THE COURT:  Got it.  Okay.

12                MR. STELLMACH:  The next exhibit.

13    BY MR. STELLMACH:

14    **Q.**    I think we've seen this one already.  This was for

05:46:56    15    January 11th of '08.  And you say there:  "Rough week, but

16    I assure you as in the past we will be moving up to

17    standard within our normal operating cycle."

18                What were you telling Mr. Stanford in that

19    e-mail?

05:47:10    20    **A.**    That the returns at that point in time were less than

21    they should have been, but it was expected with the

22    economic environment that during the normal operating

23    cycle, meaning that year, that there are improvements that

24    would be made in those portfolios.

05:47:32    25    **Q.**    This is -- the financial crisis is heating up going

1  into 2008?

2  **A.**   Very early stage, yes.

3  **Q.**   All right.

4           MR. STELLMACH:  And turning to the next

05:47:43  5  exhibit, 212.

6  BY MR. STELLMACH:

7  **Q.**   February 1st of 2008, a month later?

8  **A.**   Yes, sir.

9  **Q.**   Could you read the text there, Mr. Stanford (sic)?

05:47:52  10  **A.**   "Not what we wanted yet, but we are setting up for a

11  good year.  Timing of this drawdown is right insofar as it

12  is in January, say, versus last quarter."

13  **Q.**   What were you -- what were you writing there?

14  **A.**   Again, there were expectations that the returns would

05:48:15  15  pick up steam and increase over the period of the year.

16           MR. STELLMACH:  And turning to the next

17  exhibit.

18  BY MR. STELLMACH:

19  **Q.**   This is a couple of weeks later into 2008?

05:48:29  20  **A.**   Yes, sir.

21  **Q.**   What were you forwarding again to Mr. Stanford?

22  **A.**   The investment portfolios of Bank of Antigua,

23  Limited, and bank of Panama, as well as the second tier

24  investment portfolio of Stanford International Bank,

05:48:43  25  Limited.

2881

1  **Q.**   In February of '08, you write:  "We are fighting back

2  on the second tier."

3                      What did you mean by that?

4  **A.**   There were improvements in the returns in this

05:48:50  5  particular reporting period over the previous ones.

6                      MR. STELLMACH:  And the next exhibit.

7  BY MR. STELLMACH:

8  **Q.**    December 6th of 2008, what did you forward to

9  Mr. Stanford?

05:49:09  10  **A.**   The investment portfolio of Stanford International

11  Bank, Tier 2.

12  **Q.**   And these e-mails that we just went through, did you

13  actually send them to Mr. Stanford?

14  **A.**   Oh, yes.

05:49:20  15  **Q.**   Did you discuss them with him from time to time?

16  **A.**   Yes, I did.

17  **Q.**   At any point when you forwarded these tracking

18  reports, did Mr. Stanford say, "I don't understand why we

19  only see about 15 percent of the assets we're reporting in

05:49:37  20  the annual report site issued every year"?

21  **A.**   No, sir.

22                      MR. STELLMACH:  Your Honor, at this point I

23  would proffer that we've connected the documents in the way

24  that we proffered we would so that they're fully admitted.

05:49:51  25                      THE COURT:  All right.  Any objection to that?

*Direct-Davis/By Mr. Stellmach*

1          MR. STELLMACH:  They were in subject to us

2    establishing that they had actually been sent.  They were

3    discussed with another witness.  We've now heard Mr. Davis

4    testify that he did, in fact, forward them and actually

05:50:09    5    discuss several of them with Mr. Stanford.

6          MR. SCARDINO:  That's correct.  No objections.

7          THE COURT:  Okay.  They're in.  For all

8    purposes.

9    BY MR. STELLMACH:

05:50:23   10    Q.   I wanted to turn to Tier 3, Mr. Davis, and ask you in

11    general terms, what was in Tier 3?

12    A.   Private equity, which is investments in companies

13    that are publicly traded on an exchange, stock exchange,

14    loans made to Mr. Stanford and real estate.

05:50:51   15    Q.   Were any of those assets, including this $2 billion

16    loan, ever disclosed in the annual reports or the

17    marketing materials or the CD disclosure statement?

18    A.   No, sir.

19    Q.   Ever?

05:51:10   20    A.   No, sir.

21    Q.   Could you explain for us the process by which

22    Mr. Stanford's companies -- I want to focus on that

23    $2 billion in loans that he received -- how that money,

24    that CD money, would go from the bank to those companies?

05:51:30   25    A.   I can draw -- how do you -- I can draw -- will that

*Direct-Davis/By Mr. Stellmach*

1  work?

2  **Q.**   Let's do that.  We'll leave the hole for now.

3              THE COURT:  Will you need the lapel mike?

4              MR. STELLMACH:  No, I think I'm still --

05:52:08  5              THE COURT:  No, for the witness.  Is he going

6  to draw and explain?

7              MR. STELLMACH:  Yes, we can do that.  Maybe we

8  should have the mike.

9              THE COURT:  Mitchell, get the lapel mike,

05:52:18  10  please.

11                  Mr. Davis, when you put it on your tie,

12  you need to put it on your tie all the way up high on the

13  tie, if you can, please.

14              THE WITNESS:  Yes, Your Honor.

05:53:07  15              THE COURT:  And just keep in mind, Counsel,

16  when we hit about 6:00 o'clock, we adjourn between 6:00 and

17  6:05.

18              MR. STELLMACH:  Absolutely.

19              THE COURT:  So when you reach a point in that

05:53:17  20  area, just let me know.

21  BY MR. STELLMACH:

22  **Q.**   So, Mr. Davis, starting at the top, can you explain

23   the flow of money that eventually amounted to $2 billion

24   to Mr. Stanford's personal companies?

05:53:55  25  **A.**   Simply taking CD money from bank -- Stanford

*Direct-Davis/By Mr. Stellmach*

1    International Bank transferring to Stanford Financial

2    Group Company and then from Stanford Financial Group

3    Company would be sent to Stanford Development Company, for

4    example, Bank of Antigua, Limited, or Stanford Bank Panama

05:54:19    5    or others.  There were 20 some-odd companies that received

6    money in this manner.

7    **Q.**    Why didn't the money get transferred directly from

8    the bank to those companies?  Why use Stanford Financial

9    Group accounts as a intermediary?

05:54:37    10    **A.**    It was a way to disguise the origin of the monies,

11    the recipients feeling it came from a Stanford Financial

12    Group Company rather than the CD money, and it would have

13    certainly killed the company in terms of not being ever

14    reported to respective CD holders or internal FAs or

05:55:04    15    present customers.

16    **Q.**    Well, you say it's to conceal the origin of the funds

17    from the recipients, but all of these companies were owned

18    by Mr. Stanford personally; right?

19    **A.**    That is correct.

05:55:14    20    **Q.**    So who was being misled about the origin or the

21    source of the funds?

22        MR. SCARDINO:  Object to the form of that

23    question.

24        THE COURT:  Why?

05:55:25    25        MR. SCARDINO:  He's assuming that someone was

*Direct-Davis/By Mr. Stellmach*

1  misled.

2            MR. STELLMACH:  The witness said people were

3  misled, and that's why they used Stanford Financial Group

4  as an intermediary account.

05:55:34  5            THE COURT:  Overrule the objection.

6            THE WITNESS:  These individuals running these

7  companies would have been quite alarmed, I'm sure, you

8  know, that CD money was --

9            MR. SCARDINO:  Object to the nonresponsive

05:55:45  10 answer.

11           THE COURT:  Sustained.

12 BY MR. STELLMACH:

13 **Q.**   Were the individuals running those companies told

14 that the source of the funds that they were receiving from

05:55:55  15 Stanford Financial Group were, in fact, CD funds, to your

16 knowledge?

17 **A.**   No, sir.

18 **Q.**   Were any of these other companies Mr. Stanford owned,

19 Stanford Development Corporation, the Bank of Antigua,

05:56:06  20 Stanford Bank Panama, any of those other companies, were

21 they also audited?

22 **A.**   Yes, sir, they were.

23 **Q.**   And, so, would the auditors of those companies have

24 known that the money that was coming into those companies

05:56:26  25 originated from the CD if it's flowing first through

*Direct-Davis/By Mr. Stellmach*

1    Stanford Financial Group?

2    **A.**    No, sir.

3    **Q.**    Is that something you ever discussed with

4    Mr. Stanford, the need to cover up the source of funds?

05:56:40    5    **A.**    I don't believe I discussed that.

6               THE COURT:  I can't hear you, sir.  You need to

7    speak up, at least.

8               THE WITNESS:  Yes, Your Honor.

9                    No, sir, I don't remember specifically

05:56:49    10    discussing that.

11    BY MR. STELLMACH:

12    **Q.**    Why is that something you wouldn't need to discuss

13    with Mr. Stanford?

14    **A.**    Mr. Stanford was intimately aware of this transfer

05:57:06    15    process.  The money went to his companies.  He monitored

16    how much money went to those companies and the shareholder

17    funding report that he reviewed with me personally and

18    possibly on his own, as he was sent all of this financial

19    information on a regular basis, and he knew that there

05:57:27    20    were -- he did know there were public auditors in these

21    companies.

22    **Q.**    If I could ask you to take the stand again,

23    Mr. Davis.

24               MR. STELLMACH:  And if we could go to --

05:57:42    25               THE COURT:  Are you going to need him up there

*Direct-Davis/By Mr. Stellmach*

1  again?

2  MR. STELLMACH:  No, not right now, Your Honor.

3  THE COURT:  You may take that off, then, sir.

4  BY MR. STELLMACH:

05:58:04  5  **Q.**  I was going to turn, finally before we leave, to

6  Government's Exhibit 302.  Here's a hard copy, Mr. Davis.

7  Mr. Davis, could you take us through the

8  e-mail starting at the bottom dated October 17, 2003, from

9  Patricia Maldonado.  Who was Ms. Maldonado?  You can read

05:58:53  10  the screen --

11  **A.**  I'm just -- I'm sorry --

12  **Q.**  -- if you'd like.

13  **A.**  -- this is not the correct document.

14  **Q.**  Okay.

05:58:58  15  **A.**  I'm sorry.  I was reading that.

16  **Q.**  Our mistake.

17  **A.**  Yes, sir.  And the question again, please?

18  **Q.**  Who was Patricia Maldonado?

19  **A.**  Patricia Maldonado was the treasury manager for

05:59:13  20  Stanford Financial Group Company.

21  **Q.**  What was her job as the treasury manager?

22  **A.**  She monitored Tier 1s, cash accounts and transferred

23  monies between those accounts.

24  **Q.**  How would she know which accounts to transfer money

05:59:31  25  to?

*Direct-Davis/By Mr. Stellmach*

1    **A.**   She would be given instructions from -- on a routine

2    basis from a -- as I recall the system, from the

3    accounting department for covering bank accounts or

4    expenditures, and she would also receive instructions from

05:59:53   5   myself from time to time and Mr. Stanford from time to

6    time.

7    **Q.**   And in this e-mail, there are -- she states to

8    Mr. Stanford that there are two transfers pending, one for

9    $4 million to Stanford FDCL.  Which company was that?

06:00:07   10   **A.**   Stanford Development Corporation.  It's a real estate

11   acquisition development company that Mr. Stanford owned.

12   **Q.**   And another 8.8 million to SFGC.  Which company was

13   that?

14   **A.**   Stanford Financial Group Company, the service company

06:00:21   15   that provided various administrative, legal, accounting,

16   promotion, advertising services.

17   **Q.**   And the subject line reads:  "Transfers from

18   shareholders' accounts on Monday, October 20th."

19                    What was the shareholder's account?

06:00:38   20   **A.**   That was the tracking account for accounting and

21   treasury for the amounts of money that Mr. Stanford

22   borrowed from Stanford International Bank, Limited.

23   **Q.**   So these transfers would, if they were approved, fall

24   into the bucket of $2 billion of CD money he had taken

06:01:00   25   out?

*Direct-Davis/By Mr. Stellmach*

1  **A.**   Yes, sir.

2              MR. STELLMACH:  And if we could go to the

3  response -- I'm sorry -- the next e-mail in the chain from

4  Ms. Maldonado to Mr. Stanford.

06:01:15  5  **A.**   She's waiting for his response on the first e-mail.

6  BY MR. STELLMACH:

7  **Q.**   And what did she write specifically?

8  **A.**   "As per your instructions, I will wait for your

9  acknowledgement and approval to send instructions to

06:01:28  10  chase" -- that's Chase Bank -- "to process these

11  transfers."

12  **Q.**   You weren't authorizing the transfers of the CD money

13  to Mr. Stanford's personal companies here, were you?

14  **A.**   No, sir.

06:01:43  15             MR. STELLMACH:  And could we go to

16  Mr. Stanford's response?

17  BY MR. STELLMACH:

18  **Q.**   What did Mr. Stanford reply?

19  **A.**   "Patricia, I did not get your attachment with the

06:02:02  20  detail on the 8.8 million in payments.  I am traveling to

21  Caracas early in the a.m. and will phone you from the

22  plane to go over the detail of these disbursements."

23  **Q.**   Mr. Stanford didn't write there:  "I don't know what

24  you're talking about?  What shareholder account?  Why are

06:02:23  25  we disbursing CD money," did he?

*Direct-Davis/By Mr. Stellmach*

1    **A.**   Apparently not.

2    **Q.**   And he wrote there I did not get your attachment with

3    detail and I'll phone you.

4              Based on your 20 years of dealing with

06:02:36   5    Mr. Stanford, what do you understand him to be saying?

6    **A.**   I don't want to --

7              MR. SCARDINO:  Asking for speculation.  I'll

8    object, trying to --

9              MR. STELLMACH:  It's based on his 20 years of

06:02:46   10   co-conspiring.

11             THE COURT:  All right, ladies and gentlemen,

12   consider it for whatever weight you want to give it.  You

13   heard the objection.  So overrule the objection.  I'll

14   allow it in for whatever consideration you desire to afford

06:02:58   15   it.

16             THE WITNESS:  First of all, that -- let's don't

17   talk about this in e-mails, and, secondly, I'll take care

18   of it on the phone with you.

19             MR. STELLMACH:  Your Honor, I think this is a

06:03:14   20   good point to stop.

21             THE COURT:  Ladies and gentlemen -- first

22   thing, let me get that back up -- we'll see you tomorrow

23   ready to resume at 10:00 a.m.  Thank you, and good

24   afternoon.

06:03:36   25   **(The following was held out of the presence of the jury)**

1          THE COURT:  Thank you.  Give me a moment.  I'll

2  give you the time.  Here's your time if you want to look at

3  it for today.  I'll get it to you in writing.

4                    **(Recessed at 6:04 p.m.)**

5                **COURT REPORTER'S CERTIFICATE**

6

7  I, Johnny C. Sanchez, certify that the foregoing is a

8  correct transcript from the record of proceedings in the

9  above-entitled matter.

10

                                    /s/_____
11                                  Johnny C. Sanchez, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# #

**#8016** [1] - 2626:12

# $

**$10** [2] - 2711:18, 2711:20
**$100** [2] - 2666:20, 2683:22
**$14** [2] - 2736:15, 2795:2
**$20** [4] - 2719:21, 2719:23, 2720:13, 2805:21
**$200,000** [1] - 2704:23
**$30** [1] - 2681:3
**$310** [1] - 2689:6
**$346** [2] - 2666:25, 2667:9
**$350,000** [1] - 2795:7
**$40** [1] - 2806:19
**$450,000** [1] - 2795:8
**$50** [2] - 2784:11, 2805:13
**$50,000** [2] - 2745:4, 2784:12
**$500** [1] - 2838:15
**$500,000** [1] - 2837:22
**$65,000** [1] - 2794:18
**$69** [1] - 2855:18
**$80** [2] - 2709:7, 2755:25
**$850,000** [1] - 2795:16

# '

**'-9** [1] - 2825:5
**'01** [1] - 2869:12
**'03** [1] - 2869:13
**'07** [1] - 2859:3
**'08** [4] - 2795:12, 2860:25, 2879:15, 2881:1
**'09** [1] - 2795:14, 2859:21
**'80s** [2] - 2798:13, 2816:6
**'85** [1] - 2851:8
**'86** [1] - 2851:8
**'88** [5] - 2739:1, 2745:8, 2760:6, 2766:7, 2776:10
**'89** [2] - 2745:8, 2766:7
**'90s** [3] - 2822:3, 2825:8, 2864:23
**'91** [3] - 2787:6, 2787:11, 2793:22
**'92** [4] - 2787:6, 2787:11, 2793:22, 2825:10
**'93** [1] - 2825:10
**'97** [1] - 2869:11

# /

**/s** [1] - 2891:10

# 0

**09-CR-342** [1] - 2625:4

# 1

**1** [16] - 2711:18, 2711:20, 2832:10, 2832:11, 2832:12, 2832:22, 2833:12, 2855:6, 2856:13, 2859:18, 2861:23, 2863:22, 2868:6, 2871:10, 2873:5, 2873:7
**1.5** [2] - 2858:16, 2858:19
**1.6** [1] - 2675:12
**1.7** [1] - 2689:12
**10** [7] - 2690:22, 2816:20, 2833:13, 2833:24, 2846:14, 2855:9, 2864:24
**10-foot** [1] - 2781:14
**1004** [1] - 2625:22
**1018** [1] - 2626:3
**103** [1] - 2801:11
**1038** [1] - 2854:21
**10:00** [1] - 2890:23
**10:17** [1] - 2625:6
**11** [1] - 2864:24
**1103** [1] - 2854:17
**117** [1] - 2852:19
**118** [2] - 2676:18, 2710:19
**119** [3] - 2645:23, 2646:1, 2646:9
**11:47** [1] - 2707:24
**11th** [2] - 2672:9, 2879:15
**12** [1] - 2851:23
**120** [5] - 2645:25, 2646:2, 2648:25, 2854:10, 2854:14
**12:00** [2] - 2707:20, 2707:21
**12:55** [1] - 2746:2
**12A** [1] - 2815:24
**13** [1] - 2801:18
**13-10** [1] - 2669:1
**13-11** [2] - 2671:18, 2671:19
**13-4** [4] - 2660:10, 2660:14, 2660:15, 2660:16
**13-6** [2] - 2663:22, 2663:25
**13.4** [1] - 2660:8
**13.5** [1] - 2660:9
**131** [1] - 2846:13
**136** [3] - 2677:10, 2835:14, 2835:17
**1400** [1] - 2625:17
**15** [3] - 2639:3, 2707:20, 2707:23, 2816:20, 2833:16, 2833:24, 2847:3, 2859:25, 2881:19
**1500** [5] - 2810:6, 2811:10, 2820:13, 2820:18, 2821:19
**1514** [1] - 2728:20
**16** [3] - 2649:9, 2654:9, 2852:20
**17** [5] - 2801:24, 2802:8, 2802:20, 2864:3, 2887:8
**17,000** [8] - 2629:24, 2630:1, 2630:3, 2631:14, 2631:15, 2632:25, 2634:12
**17,400** [1] - 2634:19
**17.000** [1] - 2630:2
**170** [1] - 2743:16
**17th** [1] - 2802:24
**19** [3] - 2676:19, 2676:21, 2839:6
**1968** [1] - 2814:11
**1973** [3] - 2724:19, 2730:3

**1974** [1] - 2730:22
**1975** [2] - 2724:21, 2730:24
**1977** [1] - 2731:3
**1980s** [1] - 2822:3
**1985** [1] - 2733:1
**1987** [3] - 2731:7, 2733:2, 2814:13
**1988** [14] - 2726:15, 2727:11, 2733:5, 2736:24, 2738:23, 2738:24, 2744:20, 2756:21, 2771:22, 2774:11, 2774:18, 2838:25, 2849:7, 2849:22
**1989** [3] - 2775:1, 2776:11, 2799:19
**1990** [17] - 2766:7, 2770:25, 2771:22, 2775:3, 2775:4, 2779:6, 2797:15, 2797:21, 2799:5, 2801:12, 2801:25, 2802:8, 2802:20, 2802:25, 2825:4, 2850:15, 2850:16
**1991** [13] - 2765:21, 2779:7, 2779:8, 2779:11, 2780:20, 2785:6, 2785:22, 2786:12, 2792:15, 2793:24, 2849:23, 2850:6, 2851:1
**1992** [5] - 2792:15, 2794:14, 2843:2, 2849:23, 2850:6
**1996** [1] - 2869:10
**1997** [1] - 2847:23
**1998** [3] - 2771:22, 2825:4, 2850:9
**1:00** [1] - 2745:24
**1:05** [1] - 2707:22
**1s** [1] - 2887:22
**1st** [2] - 2876:24, 2880:7

# 2

**2** [67] - 2625:5, 2626:4, 2675:15, 2675:16, 2678:17, 2679:3, 2679:9, 2679:16, 2681:4, 2681:14, 2683:9, 2683:21, 2686:15, 2688:2, 2688:18, 2689:12, 2689:17, 2714:7, 2714:13, 2714:21, 2715:9, 2715:14, 2715:18, 2716:11, 2717:5, 2718:24, 2719:11, 2719:17, 2720:20, 2736:24, 2832:10, 2832:23, 2832:24, 2833:6, 2833:14, 2840:18, 2841:16, 2842:11, 2845:20, 2857:1, 2857:3, 2857:9, 2857:20, 2858:14, 2859:18, 2859:25, 2863:22, 2868:6, 2870:1, 2871:10, 2873:5, 2873:9, 2875:21, 2876:2, 2876:4, 2876:5, 2876:20, 2877:8, 2877:11, 2878:2, 2878:24, 2879:6, 2881:11, 2882:15, 2882:23, 2883:23, 2888:24
**2,000** [1] - 2698:17
**2.8** [2] - 2647:21, 2649:10
**2.9** [1] - 2647:12
**20** [10] - 2628:13, 2682:8, 2733:15, 2810:23, 2810:24, 2860:15, 2884:5, 2890:4, 2890:9
**20,000** [1] - 2702:1
**20-year** [1] - 2742:20
**20/20** [1] - 2720:11
**2005** [1] - 2625:18
**2001** [1] - 2867:8
**2002** [1] - 2864:21
**2003** [4] - 2847:5, 2867:8, 2876:24,

2887:8
**2004** [6] - 2689:4, 2689:6, 2852:18, 2853:1, 2867:11, 2877:23
**2005** [2] - 2676:20, 2867:11
**2006** [5] - 2646:1, 2648:12, 2847:6, 2847:24, 2866:17
**2007** [15] - 2646:1, 2649:3, 2675:4, 2675:12, 2679:20, 2827:15, 2828:19, 2854:15, 2856:9, 2857:10, 2858:7, 2866:17, 2874:19, 2878:7, 2879:7
**2008** [26] - 2658:20, 2659:6, 2662:8, 2665:6, 2667:21, 2669:13, 2675:9, 2675:13, 2684:20, 2688:9, 2689:3, 2689:11, 2722:2, 2795:5, 2827:15, 2828:19, 2833:19, 2840:1, 2840:3, 2857:11, 2859:7, 2859:16, 2880:1, 2880:7, 2880:19, 2881:8
**2009** [9] - 2641:13, 2726:17, 2727:11, 2728:1, 2728:23, 2741:4, 2787:7, 2839:1, 2859:20
**2010** [4] - 2638:14, 2639:9, 2694:23, 2695:8
**2012** [3] - 2625:5, 2638:17, 2667:21
**207** [3] - 2876:17, 2876:19, 2879:9
**208** [1] - 2877:22
**20th** [1] - 2888:18
**21** [2] - 2795:2, 2877:23
**211** [6] - 2856:17, 2857:15, 2858:3, 2858:4, 2876:17, 2876:18
**212** [1] - 2880:5
**214** [1] - 2879:9
**23rd** [1] - 2731:10
**24** [1] - 2657:15
**25** [7] - 2834:15, 2847:2, 2859:15, 2860:21, 2863:22, 2868:19, 2873:12
**26** [1] - 2647:18
**2636** [1] - 2627:4
**2673** [1] - 2627:5
**268** [1] - 2822:21
**2697** [1] - 2627:6
**2716** [1] - 2627:7
**2720** [1] - 2627:8
**2723** [1] - 2627:11
**28the** [1] - 2797:20
**2:00** [5] - 2629:16, 2630:6, 2631:2, 2631:4, 2631:9
**2:15** [1] - 2745:25

## 3

**3** [27] - 2693:16, 2693:22, 2693:25, 2800:11, 2832:10, 2834:2, 2834:3, 2835:3, 2836:17, 2840:19, 2840:21, 2840:22, 2868:6, 2871:10, 2871:12, 2871:16, 2871:20, 2872:2, 2873:1, 2874:16, 2874:25, 2878:11, 2878:15, 2878:22, 2879:1, 2882:10, 2882:11
**3,000** [1] - 2698:11
**30** [4] - 2628:13, 2729:22, 2798:6, 2801:5
**300** [1] - 2878:18
**302** [2] - 2632:21, 2887:6

**31** [1] - 2878:7
**331-C** [3] - 2666:16, 2666:24, 2674:23
**331C** [1] - 2696:21
**364** [1] - 2814:9
**38th** [4] - 2733:8, 2738:19, 2787:21, 2787:25
**392** [1] - 2814:9
**3:45** [2] - 2810:21, 2810:25
**3rd** [1] - 2625:22

## 4

**4** [2] - 2798:7, 2888:9
**40** [2] - 2786:22, 2805:13
**400** [2] - 2795:7, 2800:11
**42** [1] - 2844:7
**45-degree** [1] - 2854:5
**480** [1] - 2814:13
**4:00** [1] - 2628:10

## 5

**5** [2] - 2677:13, 2840:10
**5.1** [1] - 2858:20
**50** [1] - 2786:23
**500** [1] - 2838:21
**5000** [1] - 2698:20
**502** [1] - 2775:23
**511** [1] - 2797:17
**515** [1] - 2626:12
**55.2B** [1] - 2812:5

## 6

**6** [1] - 2841:17
**6.3** [1] - 2856:4
**6.6** [5] - 2856:7, 2856:9, 2858:8, 2858:19, 2872:10
**6.7** [1] - 2856:7
**60** [2] - 2794:18, 2798:6
**61129** [1] - 2625:14
**620** [1] - 2856:13
**627** [3] - 2855:24, 2856:15, 2858:11
**6:00** [2] - 2883:16
**6:04** [1] - 2891:4
**6:05** [1] - 2883:17
**6th** [1] - 2881:8

## 7

**7** [5] - 2844:10, 2856:4, 2857:11, 2864:16, 2879:6
**709** [1] - 2814:13
**713.250.5581** [1] - 2626:13
**75** [5] - 2834:4, 2837:2, 2837:7, 2840:20, 2873:13
**77002** [1] - 2625:23, 2626:4, 2626:12
**77208-1129** [1] - 2625:15
**77279** [1] - 2626:7

## 8

**8-2** [3] - 2652:2, 2652:3, 2652:4
**8.8** [2] - 2888:12, 2889:20
**80** [1] - 2845:10
**802** [5] - 2651:7, 2651:11, 2651:13, 2651:18, 2652:2
**822** [1] - 2684:14
**85** [1] - 2666:18
**86** [1] - 2864:17
**87** [1] - 2864:17
**88** [1] - 2739:2
**888** [2] - 2857:8, 2858:12

## 9

**9** [2] - 2625:8, 2801:14
**90** [3] - 2734:22, 2763:15, 2845:24
**900,000** [1] - 2794:19
**95** [2] - 2762:22

## A

**a.m** [7] - 2625:6, 2629:16, 2631:6, 2631:9, 2707:24, 2889:21, 2890:23
**ability** [2] - 2753:13, 2780:1
**able** [20] - 2646:19, 2652:24, 2666:18, 2681:5, 2724:22, 2739:25, 2740:7, 2746:12, 2746:19, 2747:8, 2748:9, 2748:25, 2751:1, 2755:18, 2772:25, 2826:21, 2837:17, 2839:3, 2839:6, 2840:5
**above-entitled** [1] - 2891:9
**absence** [1] - 2742:24
**absentee** [1] - 2690:11
**absolute** [2] - 2634:13, 2677:4
**absolutely** [3] - 2750:21, 2866:10, 2883:18
**Absolutely** [1] - 2866:22
**abundance** [1] - 2634:9
**acceptable** [1] - 2655:4
**access** [12] - 2642:14, 2684:6, 2684:12, 2686:12, 2696:8, 2696:15, 2697:7, 2783:17, 2786:7, 2860:19, 2879:3
**accessed** [1] - 2861:14
**accessing** [1] - 2642:23
**accomplish** [12] - 2632:4, 2658:14, 2659:23, 2660:5, 2661:15, 2664:18, 2666:10, 2668:13, 2670:9, 2670:25, 2703:4, 2703:7
**accomplished** [2] - 2670:8, 2716:2
**according** [9] - 2732:21, 2800:3, 2838:12, 2838:16, 2862:3, 2862:19, 2862:21, 2864:25
**account** [25] - 2683:10, 2683:19, 2683:23, 2686:9, 2686:25, 2692:22, 2693:2, 2693:3, 2693:13, 2700:13, 2700:17, 2735:5, 2735:6, 2760:12, 2764:2, 2785:23, 2786:7, 2786:20,

2797:5, 2802:2, 2840:20, 2885:4, 2888:19, 2888:20, 2889:24

**accountant** [8] - 2640:5, 2674:7, 2721:22, 2725:5, 2725:8, 2725:25, 2726:6, 2761:24

**accountants** [7] - 2652:17, 2653:18, 2695:2, 2695:13, 2706:19, 2734:8, 2835:8

**accounted** [1] - 2692:8

**accounting** [21] - 2653:23, 2654:8, 2655:4, 2655:7, 2655:12, 2674:11, 2692:4, 2725:6, 2725:11, 2725:12, 2734:15, 2740:13, 2791:24, 2794:8, 2831:2, 2832:7, 2835:5, 2888:3, 2888:15, 2888:20

**accounts** [27] - 2654:8, 2683:23, 2686:14, 2687:2, 2687:4, 2699:13, 2740:14, 2760:13, 2760:15, 2761:8, 2761:10, 2762:14, 2762:18, 2763:1, 2767:5, 2783:18, 2784:19, 2786:16, 2787:20, 2805:1, 2805:3, 2884:9, 2887:22, 2887:23, 2887:24, 2888:3, 2888:18

**accumulated** [1] - 2752:11

**accurate** [13] - 2686:2, 2802:9, 2802:11, 2847:7, 2847:25, 2850:2, 2855:11, 2855:13, 2855:21, 2855:25, 2856:1, 2856:5, 2874:2

**acknowledgement** [1] - 2889:9

**Acon** [1] - 2672:23

**Acon-Bastion** [1] - 2672:23

**acquainted** [1] - 2803:13

**acquired** [1] - 2667:15

**acquisition** [2] - 2769:15, 2888:11

**acres** [3] - 2694:1, 2698:11, 2698:17

**act** [1] - 2868:3

**acted** [1] - 2773:12

**action** [15] - 2800:5, 2800:8, 2800:15, 2818:1, 2818:25, 2819:1, 2819:3, 2819:8, 2819:10, 2819:11, 2819:13, 2819:21, 2819:22, 2819:23

**actions** [1] - 2800:6

**active** [7] - 2648:3, 2648:5, 2649:14, 2649:16, 2649:21, 2649:23, 2843:5

**actively** [1] - 2843:3

**activity** [1] - 2780:8

**actual** [17] - 2753:14, 2766:20, 2782:1, 2783:24, 2784:19, 2788:14, 2805:4, 2835:3, 2855:14, 2857:24, 2858:20, 2860:18, 2863:11, 2872:25, 2873:13, 2874:16, 2878:21

**add** [4] - 2674:7, 2684:25, 2685:2, 2702:20

**added** [4] - 2708:9, 2786:15, 2786:20, 2794:14

**adding** [3] - 2630:2, 2632:25, 2702:19

**addition** [4] - 2787:19, 2794:24, 2794:25, 2869:15

**additional** [1] - 2702:1

**additionally** [1] - 2878:12

**address** [11] - 2634:7, 2752:19, 2755:3, 2755:11, 2780:16, 2812:22, 2814:7, 2814:12, 2815:5, 28-1:9

2823:18

**addressed** [1] - 2797:22

**addresses** [2] - 2821:5, 2821:11

**adequate** [2] - 2677:3, 2837:17

**adjourn** [1] - 2883:16

**adjudicated** [2] - 2740:8

**adjust** [1] - 2723:8

**adjusted** [1] - 2870:22

**adjustments** [1] - 2836:13

**Adler** [4] - 2628:5, 2628:6, 2776:14, 2777:5

**administration** [1] - 2864:16

**administrative** [3] - 2781:10, 2843:20, 2888:15

**admissible** [1] - 2633:10

**admission** [1] - 2811:10

**admit** [3] - 2657:23, 2684:15, 2702:5

**admitted** [6] - 2660:17, 2664:2, 2671:19, 2820:19, 2821:19, 2881:24

**advances** [1] - 2855:17

**advertised** [2] - 2730:8, 2733:25

**advertisement** [2] - 2730:9, 2733:23

**advertising** [3] - 2740:16, 2829:7, 2888:16

**advisors** [4] - 2843:8, 2863:11, 2868:25, 2874:6

**advocate** [1] - 2749:18

**affair** [5] - 2867:8, 2867:16, 2867:18, 2867:23, 2869:12

**affecting** [1] - 2772:19

**affiliated** [3] - 2684:11, 2687:1, 2748:1

**afford** [1] - 2890:14

**afraid** [2] - 2642:4, 2840:2

**afternoon** [7] - 2673:15, 2680:8, 2723:15, 2723:16, 2810:15, 2810:22, 2890:24

**afterwards** [2] - 2779:5, 2779:6

**agency** [1] - 2765:12

**ago** [8] - 2629:19, 2631:10, 2645:4, 2690:20, 2706:13, 2813:15, 2816:20, 2816:25

**agree** [8] - 2658:12, 2668:4, 2668:5, 2695:8, 2698:9, 2698:18, 2699:5, 2717:24

**agreed** [6] - 2671:20, 2695:7, 2717:23, 2729:10, 2729:14, 2809:10

**agreeing** [1] - 2715:22

**agreement** [13] - 2704:18, 2728:22, 2728:25, 2729:5, 2729:8, 2729:20, 2731:14, 2736:18, 2736:21, 2736:22, 2804:18, 2808:18, 2808:23

**ahead** [9] - 2636:16, 2708:1, 2721:13, 2723:6, 2742:24, 2756:15, 2820:7, 2838:7

**ailing** [2] - 2804:16, 2804:21

**aircraft** [1] - 2844:7

**airline** [4] - 2675:24, 2719:11, 2733:24, 2755:25

**airlines** [8] - 2678:8, 2678:21, 2685:18, 2685:20, 2685:24, 2695:16, 2716:13

**airport** [2] - 2809:8, 2809:9

**alarmed** [1] - 2885:7

**Alexander** [2] - 2675:2, 2835:12

**Ali** [1] - 2625:20

**align** [1] - 2694:6

**alleges** [1] - 2850:16

**ALLEN** [1] - 2625:6

**Allen** [30] - 2661:25, 2669:20, 2670:17, 2670:21, 2672:11, 2728:7, 2728:8, 2730:13, 2734:20, 2737:16, 2738:7, 2738:14, 2744:8, 2758:16, 2758:17, 2759:3, 2759:19, 2762:1, 2764:5, 2766:11, 2777:17, 2797:22, 2798:2, 2798:11, 2803:6, 2807:14, 2830:1, 2831:16, 2841:16, 2853:3

**allocating** [1] - 2692:3

**allocation** [1] - 2692:1

**allow** [2] - 2752:16, 2890:14

**allowed** [4] - 2680:12, 2696:15, 2735:10, 2747:19

**allowing** [2] - 2634:4, 2750:13

**alluded** [1] - 2753:3

**almost** [2] - 2644:18, 2755:10

**alone** [2] - 2697:10, 2793:4

**alternate** [1] - 2833:1

**alternative** [1] - 2857:4

**Althea** [1] - 2807:23

**AMADIO** [1] - 2627:3, 2636:20

**amadio** [1] - 2649:13

**Amadio** [36] - 2629:21, 2631:24, 2632:10, 2632:22, 2636:23, 2637:10, 2643:16, 2646:12, 2647:8, 2647:25, 2650:4, 2651:22, 2654:18, 2658:12, 2660:19, 2663:24, 2666:14, 2669:11, 2671:5, 2697:10, 2699:17, 2701:17, 2702:3, 2708:6, 2711:2, 2712:2, 2713:9, 2716:2, 2716:7, 2720:6, 2720:21, 2746:10, 2747:16, 2752:20, 2752:21

**Amadio's** [1] - 2755:3

**ambassadors** [1] - 2807:7

**amendment** [2] - 2814:18, 2817:3

**Amendment** [3] - 2814:19, 2817:4, 2819:13

**amenities** [2] - 2735:25, 2736:3

**America** [4] - 2701:11, 2829:12, 2829:13, 2841:7

**AMERICA** [1] - 2625:4

**American** [2] - 2682:16, 2841:6

**amount** [23] - 2634:4, 2634:8, 2696:9, 2719:14, 2763:14, 2763:15, 2775:19, 2775:21, 2780:14, 2784:9, 2784:11, 2786:19, 2788:5, 2788:8, 2788:13, 2788:24, 2795:15, 2838:13, 2838:14, 2840:24, 2852:4, 2855:18

**amounted** [1] - 2883:23

**amounts** [3] - 2840:3, 2842:6, 2888:21

**analysis** [4] - 2714:23, 2715:6, 2715:11, 2760:14

**analyst** [3] - 2863:1, 2863:23, 2864:10, 2864:11, 2864:19, 2864:20, 2866:12

**analysts** [2] - 2857:21, 2860:18, 2860:22, 2862:8, 2864:1, 2866:23

**anchored** [1] - 2677:19
**Andrew** [1] - 2625:16
**angle** [2] - 2854:5, 2854:11
**angry** [3] - 2673:21, 2673:23, 2674:2
**annual** [38] - 2645:18, 2645:22, 2646:1, 2646:2, 2647:9, 2649:2, 2656:15, 2676:9, 2676:20, 2677:8, 2679:12, 2679:14, 2679:21, 2679:24, 2680:4, 2718:7, 2718:19, 2721:22, 2786:18, 2796:16, 2796:24, 2801:12, 2801:20, 2830:13, 2830:15, 2830:22, 2831:1, 2831:15, 2831:17, 2831:22, 2834:16, 2852:16, 2852:18, 2852:24, 2854:15, 2858:9, 2881:20, 2882:16
**annually** [1] - 2831:14
**annum** [1] - 2737:1
**anomaly** [1] - 2831:18
**answer** [19] - 2662:12, 2666:7, 2706:4, 2712:1, 2737:18, 2738:4, 2765:23, 2770:12, 2772:9, 2772:10, 2772:24, 2777:1, 2779:16, 2789:24, 2793:6, 2869:23, 2873:23, 2885:10
**answered** [1] - 2805:15
**anticipate** [2] - 2633:22, 2634:11
**anticipation** [1] - 2727:2
**Antigua** [38] - 2694:1, 2694:3, 2721:20, 2798:22, 2798:25, 2802:1, 2802:21, 2803:5, 2803:7, 2804:5, 2804:17, 2804:20, 2804:22, 2804:23, 2804:25, 2805:5, 2805:11, 2805:24, 2806:3, 2806:5, 2806:14, 2806:18, 2806:20, 2807:13, 2807:21, 2808:16, 2821:25, 2822:1, 2822:8, 2823:3, 2823:16, 2825:2, 2877:6, 2878:1, 2878:9, 2880:22, 2884:4, 2885:19
**Antiguan** [2] - 2806:24, 2822:21
**Antilles** [1] - 2732:25
**anyplace** [1] - 2700:15
**anyway** [1] - 2638:16
**apart** [1] - 2658:21
**APPEARANCES** [1] - 2625:12
**appeared** [1] - 2761:21
**appellate** [2] - 2754:11, 2756:5
**applicable** [2] - 2761:10, 2820:24
**applied** [1] - 2840:18
**applies** [1] - 2816:12
**apply** [2] - 2721:19, 2819:13
**appointed** [4] - 2807:25, 2813:16, 2818:5, 2819:22
**appreciate** [1] - 2754:20
**approach** [2] - 2677:23, 2853:16
**approaching** [1] - 2810:15
**approval** [7] - 2716:15, 2716:24, 2831:1, 2831:15, 2831:21, 2836:5, 2889:9
**approved** [8] - 2778:18, 2778:21, 2778:23, 2795:19, 2795:23, 2795:24, 2875:25, 2888:23
**approving** [1] - 2717:5
**approximate** [2] - 2641:5, 2736:16
**approximation** [1] - 2833:17
**April** [5] - 2662:8, 2722:11, 2728:23,

2760:5
**archive** [1] - 2638:20
**area** [9] - 2732:25, 2761:12, 2789:6, 2809:8, 2809:9, 2822:21, 2854:7, 2874:21, 2883:20
**areas** [2] - 2750:16, 2750:21
**argued** [1] - 2816:9
**arrange** [1] - 2668:7
**article** [1] - 2728:11
**articles** [8] - 2699:20, 2699:24, 2700:1, 2700:2, 2706:15, 2777:23, 2779:25, 2812:16
**Aruba** [1] - 2732:25
**ashamed** [2] - 2674:11, 2691:12
**aside** [2] - 2768:3, 2839:16
**aspect** [1] - 2749:19
**assertions** [1] - 2749:1
**asset** [10] - 2648:5, 2649:16, 2649:23, 2670:5, 2670:16, 2671:15, 2727:18, 2750:17, 2833:14, 2853:11
**assets** [101] - 2661:7, 2662:4, 2662:11, 2662:19, 2662:20, 2663:2, 2663:5, 2663:13, 2665:2, 2666:1, 2666:15, 2668:2, 2668:13, 2669:17, 2678:4, 2688:15, 2707:7, 2709:4, 2709:13, 2714:11, 2722:4, 2750:5, 2751:3, 2751:11, 2756:19, 2756:23, 2758:4, 2758:10, 2762:9, 2763:7, 2763:8, 2763:11, 2764:8, 2764:11, 2764:15, 2765:10, 2766:9, 2766:20, 2767:19, 2768:20, 2784:19, 2784:21, 2786:9, 2786:18, 2786:20, 2787:13, 2789:20, 2793:1, 2832:2, 2833:8, 2833:12, 2833:25, 2834:5, 2834:12, 2834:13, 2835:3, 2837:4, 2838:18, 2838:19, 2839:13, 2839:14, 2840:21, 2840:22, 2843:16, 2843:17, 2844:13, 2845:23, 2845:25, 2846:5, 2846:8, 2846:25, 2847:5, 2849:24, 2850:1, 2855:3, 2855:13, 2855:16, 2855:23, 2855:25, 2856:2, 2856:3, 2858:2, 2858:13, 2858:14, 2858:20, 2858:25, 2859:15, 2859:25, 2860:18, 2871:4, 2872:10, 2872:25, 2873:4, 2873:9, 2873:12, 2875:3, 2876:5, 2881:19, 2882:15
**assign** [3] - 2661:18, 2661:22, 2662:19
**assigned** [2] - 2664:25, 2861:10
**assignment** [4] - 2661:7, 2661:10, 2661:17, 2670:16
**assist** [3] - 2635:16, 2637:20, 2870:20
**Assistant** [1] - 2625:14
**assistant** [1] - 2809:18
**assistants** [1] - 2864:3
**assisted** [1] - 2626:14
**associated** [1] - 2841:10
**assortment** [1] - 2853:11
**assume** [3] - 2669:7, 2752:5, 2794:4
**assuming** [2] - 2772:20, 2884:25
**assumption** [1] - 2642:20
**assure** [1] - 2879:16
**attached** [6] - 2661:16, 2668:18, 2754:16, 2819:3, 2819:6, 2877:24

**attachment** [5] - 2856:21, 2877:3, 2877:10, 2889:19, 2890:2
**attachments** [2] - 2877:5, 2877:25
**attend** [2] - 2629:8, 2826:21
**attended** [6] - 2826:17, 2870:14, 2870:15, 2872:1, 2874:6, 2874:15
**attendees** [1] - 2826:22
**attention** [2] - 2668:9, 2754:21
**attorney** [1] - 2772:11
**Attorney** [1] - 2625:14, 2626:3
**attorneys** [5] - 2635:2, 2635:21, 2635:22, 2664:9, 2810:7
**attract** [3] - 2713:10, 2713:15, 2713:17
**audible** [3] - 2662:12, 2666:7, 2712:1
**audience** [1] - 2628:16
**audit** [9] - 2691:24, 2702:17, 2702:21, 2702:22, 2702:24, 2702:25, 2703:4
**audited** [2] - 2701:23, 2885:21
**auditing** [3] - 2691:19, 2692:2, 2692:7
**auditor** [4] - 2701:1, 2702:13, 2809:22, 2823:11
**auditors** [2] - 2885:23, 2886:20
**audits** [4] - 2702:8, 2702:10, 2702:11, 2703:10
**August** [3] - 2724:21, 2728:1, 2780:21
**authenticate** [1] - 2660:11
**authorities** [3] - 2700:7, 2802:9, 2814:18
**authorizing** [1] - 2889:12
**available** [4] - 2775:11, 2837:20, 2838:13, 2839:23
**Avenue** [1] - 2625:17
**average** [1] - 2735:20
**Aviation** [1] - 2682:3
**aware** [7] - 2693:25, 2746:24, 2798:23, 2799:1, 2878:14, 2878:21, 2886:14

# B

**backdated** [2] - 2802:22, 2802:23
**background** [1] - 2864:14
**backing** [1] - 2771:8
**backup** [3] - 2797:2, 2797:3, 2797:11
**backwards** [1] - 2818:15
**bad** [2] - 2652:5, 2844:23
**Bailey** [13] - 2809:2, 2809:10, 2809:16, 2809:17, 2809:20, 2809:25, 2822:25, 2823:1, 2823:4, 2823:6, 2824:11, 2824:18
**balance** [7] - 2762:15, 2764:14, 2767:24, 2831:6, 2832:6, 2857:7, 2857:9
**balances** [2] - 2855:4, 2855:15
**Baldwyn** [2] - 2869:3, 2869:18
**ballistic** [1] - 2724:14
**ballpark** [1] - 2762:20
**Bank** [54] - 2646:1, 2661:9, 2661:11, 2663:9, 2665:22, 2669:20, 2686:16, 2686:23, 2687:2, 2696:2, 2727:15, 2734:24, 2756:1, 2758:14, 2762:12, 2769:19, 2775:16, 2775:20, 2784:4, 2785:11, 2793:25, 2796:3, 2801:13,

2804:16, 2804:21, 2804:23, 2805:5, 2805:10, 2809:13, 2809:23, 2823:7, 2823:10, 2824:25, 2832:3, 2834:23, 2839:3, 2862:18, 2877:6, 2877:8, 2877:25, 2878:1, 2878:9, 2878:11, 2878:13, 2880:22, 2880:24, 2881:11, 2884:1, 2884:4, 2885:19, 2885:20, 2888:22, 2889:10

**bank** [242] - 2647:13, 2649:17, 2649:19, 2649:24, 2650:23, 2656:13, 2662:5, 2662:11, 2662:19, 2662:25, 2663:3, 2663:6, 2663:13, 2663:16, 2663:17, 2665:2, 2665:4, 2665:12, 2665:21, 2666:2, 2666:17, 2668:2, 2668:22, 2668:23, 2670:5, 2670:6, 2670:16, 2675:10, 2675:18, 2676:15, 2677:12, 2680:1, 2682:21, 2682:22, 2683:3, 2683:4, 2683:6, 2683:10, 2683:23, 2685:7, 2685:21, 2685:25, 2686:2, 2686:9, 2686:13, 2686:25, 2687:4, 2687:18, 2687:23, 2688:1, 2688:2, 2688:9, 2688:12, 2690:3, 2693:1, 2693:3, 2693:10, 2693:13, 2696:9, 2698:25, 2699:13, 2704:12, 2704:18, 2704:21, 2705:3, 2705:4, 2705:5, 2705:11, 2709:14, 2710:1, 2710:10, 2710:12, 2710:14, 2710:15, 2713:5, 2716:16, 2718:5, 2731:21, 2731:25, 2732:4, 2732:19, 2733:1, 2733:3, 2733:16, 2733:21, 2734:10, 2734:18, 2734:20, 2735:10, 2736:5, 2736:13, 2737:9, 2737:14, 2739:8, 2739:12, 2739:17, 2739:18, 2739:22, 2740:21, 2744:2, 2745:4, 2747:5, 2751:12, 2756:23, 2757:2, 2757:5, 2757:9, 2757:18, 2758:9, 2758:14, 2758:24, 2759:18, 2760:2, 2761:14, 2761:20, 2761:22, 2762:4, 2762:8, 2762:17, 2763:8, 2766:20, 2769:18, 2770:2, 2770:25, 2771:1, 2771:23, 2772:1, 2775:16, 2783:14, 2785:3, 2785:15, 2785:21, 2786:18, 2787:13, 2787:24, 2788:4, 2788:20, 2789:5, 2789:6, 2789:7, 2789:18, 2792:7, 2792:25, 2794:11, 2794:12, 2794:20, 2795:4, 2796:5, 2796:13, 2796:17, 2796:20, 2796:25, 2798:16, 2798:20, 2798:24, 2799:4, 2799:21, 2799:25, 2800:4, 2800:18, 2800:24, 2801:1, 2801:3, 2803:2, 2803:4, 2804:14, 2804:21, 2804:23, 2804:24, 2805:1, 2805:24, 2806:18, 2810:1, 2822:8, 2823:7, 2825:2, 2830:8, 2830:13, 2834:22, 2835:2, 2838:18, 2838:25, 2839:6, 2839:7, 2839:10, 2839:12, 2839:20, 2840:5, 2840:13, 2841:9, 2841:19, 2842:3, 2842:9, 2842:12, 2842:21, 2843:1, 2843:4, 2843:14, 2843:20, 2844:2, 2844:16, 2844:23, 2844:25, 2845:4, 2845:14, 2846:4, 2846:9, 2847:23, 2848:4, 2852:4, 2852:8, 2852:24, 2854:15, 2855:23, 2856:4, 2856:9, 2856:15, 2857:25,

2858:2, 2858:7, 2858:23, 2859:25, 2860:11, 2862:15, 2868:18, 2870:3, 2872:9, 2872:23, 2873:4, 2874:8, 2875:14, 2875:15, 2878:12, 2880:23, 2882:24, 2883:25, 2884:8, 2888:3

**bank's** [39] - 2678:4, 2716:25, 2734:23, 2735:2, 2735:3, 2739:7, 2756:19, 2758:4, 2758:10, 2762:8, 2762:21, 2762:24, 2763:7, 2764:7, 2764:11, 2765:10, 2766:9, 2768:20, 2786:9, 2794:22, 2802:1, 2833:8, 2833:12, 2834:4, 2834:13, 2837:4, 2843:16, 2843:17, 2845:24, 2846:25, 2847:5, 2849:24, 2850:1, 2852:12, 2853:9, 2855:13, 2860:17, 2861:4, 2873:12

**bankers** [20] - 2743:23, 2743:25, 2744:5, 2744:12, 2744:14, 2767:21, 2768:2, 2769:2, 2770:5, 2770:17, 2771:7, 2771:17, 2772:3, 2772:4, 2772:17, 2773:6, 2774:12, 2774:19, 2774:21

**banking** [8] - 2700:7, 2742:7, 2742:8, 2765:14, 2767:17, 2772:6, 2776:13, 2843:7

**bankrupt** [3] - 2740:9, 2798:8, 2804:16

**bankruptcy** [4] - 2732:12, 2732:14, 2732:17, 2778:18

**banks** [34] - 2678:7, 2679:5, 2686:11, 2686:12, 2686:20, 2686:21, 2686:22, 2693:6, 2699:18, 2699:19, 2699:21, 2699:23, 2700:3, 2700:13, 2705:3, 2709:6, 2710:17, 2710:18, 2715:15, 2733:23, 2735:17, 2757:20, 2763:25, 2796:8, 2800:10, 2800:11, 2800:13, 2809:11, 2809:19, 2809:20, 2823:5, 2855:4, 2855:14, 2855:15

**banks'** [1] - 2686:14

**banks's** [1] - 2750:5

**bar** [1] - 2647:5

**Barbuda** [5] - 2798:22, 2804:25, 2807:13, 2822:1, 2823:16

**base** [3] - 2733:21, 2794:19, 2794:25

**based** [20] - 2648:4, 2649:15, 2649:22, 2701:16, 2718:5, 2738:9, 2740:18, 2752:8, 2758:17, 2796:3, 2825:11, 2841:4, 2842:22, 2849:4, 2850:4, 2860:25, 2862:11, 2863:1, 2890:4, 2890:9

**basic** [2] - 2637:25, 2845:8

**basis** [14] - 2634:6, 2680:5, 2684:7, 2697:11, 2700:8, 2707:10, 2707:12, 2707:14, 2757:14, 2818:21, 2828:25, 2841:11, 2886:19, 2888:2

**Bastion** [1] - 2672:23

**Bates** [1] - 2854:20

**Baylor** [8] - 2724:9, 2724:18, 2725:2, 2726:10, 2730:5, 2730:21, 2731:1, 2741:23

**beating** [2] - 2673:16, 2673:17

**Beauguard** [1] - 2829:11

**became** [4] - 2761:16, 2762:3, 2840:4, 2848:22

**become** [2] - 2803:12, 2803:13

**becoming** [1] - 2827:25

**BEFORE** [1] - 2625:10

**beforehand** [2] - 2754:6, 2812:4

**began** [1] - 2840:2

**begin** [1] - 2633:1

**beginning** [11] - 2730:1, 2733:23, 2738:23, 2754:5, 2761:15, 2769:24, 2792:9, 2792:12, 2822:5, 2823:19, 2849:12

**behalf** [1] - 2695:25

**behind** [3] - 2720:18, 2778:13, 2784:21

**belief** [2] - 2749:15, 2750:25

**belittle** [1] - 2721:23

**bell** [1] - 2779:7

**belonging** [1] - 2812:16

**bench** [2] - 2628:3, 2629:12

**benchmark** [1] - 2677:5

**beneath** [2] - 2784:10, 2847:4

**benefitting** [1] - 2683:9

**best** [5] - 2634:13, 2754:15, 2754:18, 2787:1, 2878:15

**bet** [2] - 2698:3, 2698:14

**better** [6] - 2638:15, 2640:10, 2741:19, 2741:20, 2815:11, 2829:2

**betting** [1] - 2698:10

**between** [22] - 2630:11, 2631:25, 2656:2, 2662:17, 2726:10, 2736:18, 2736:23, 2740:10, 2769:20, 2771:22, 2786:17, 2787:23, 2788:20, 2789:18, 2789:22, 2792:25, 2793:3, 2808:24, 2825:4, 2858:23, 2883:16, 2887:23

**beyond** [10] - 2706:25, 2709:8, 2712:7, 2718:9, 2718:11, 2718:14, 2761:18, 2782:21, 2843:13, 2850:14

**Bible** [1] - 2869:4

**bid** [3] - 2648:4, 2649:15, 2649:22

**big** [7] - 2628:25, 2675:16, 2675:20, 2680:9, 2681:5, 2686:8, 2781:13

**bigger** [2] - 2632:24, 2711:24

**biggest** [1] - 2839:22

**bill** [1] - 2666:9

**billion** [49] - 2675:12, 2675:15, 2675:16, 2678:17, 2679:3, 2679:9, 2679:16, 2681:4, 2681:14, 2683:9, 2683:21, 2686:15, 2687:17, 2688:2, 2688:18, 2689:12, 2689:17, 2693:16, 2693:22, 2693:25, 2714:7, 2714:13, 2714:21, 2715:9, 2715:14, 2715:18, 2716:11, 2717:5, 2718:24, 2719:11, 2719:17, 2720:20, 2841:16, 2842:11, 2845:20, 2856:4, 2856:7, 2856:9, 2858:8, 2858:16, 2858:19, 2870:1, 2872:10, 2882:15, 2882:23, 2883:23, 2888:24

**billion-plus** [1] - 2693:25

**billions** [3] - 2685:6, 2688:1, 2717:15

**bills** [1] - 2682:16

**Bird** [9] - 2806:6, 2821:24, 2822:4, 2822:5, 2822:6, 2822:7, 2822:9, 2822:13, 2822:14

**Bird's** [2] - 2822:6, 2822:18
**bit** [16] - 2637:7, 2639:24, 2654:14, 2657:25, 2727:3, 2730:19, 2761:1, 2771:19, 2781:18, 2814:10, 2820:18, 2824:20, 2834:14, 2854:11, 2859:24
**BlackBerries** [1] - 2821:7
**blah** [5] - 2748:24
**blame** [1] - 2791:18
**blood** [4] - 2808:23, 2809:7, 2809:15, 2810:3
**board** [20] - 2730:10, 2737:10, 2737:14, 2765:13, 2794:12, 2794:13, 2794:14, 2801:25, 2802:7, 2802:15, 2802:18, 2802:20, 2825:23, 2831:16, 2842:24, 2842:25, 2843:3, 2843:11, 2848:22, 2853:15
**boats** [1] - 2681:25
**body** [3] - 2808:7, 2808:11, 2808:15
**bona** [1] - 2849:9
**Bonaire** [1] - 2732:25
**bonds** [8] - 2757:1, 2763:20, 2764:23, 2832:25, 2833:25, 2846:20, 2853:11
**bonuses** [7] - 2719:15, 2794:25, 2795:1, 2795:2, 2870:7, 2870:10, 2875:10
**book** [18] - 2663:7, 2666:17, 2666:25, 2667:2, 2667:9, 2667:20, 2684:8, 2684:10, 2692:3, 2692:21, 2748:15, 2812:12, 2821:1, 2821:2, 2821:5, 2821:8, 2823:19, 2854:16
**bookkeeper** [1] - 2726:20
**bookkeeper/accountant** - 2726:12
**bookkeeping** [3] - 2734:15, 2794:8, 2831:3
**books** [5] - 2684:15, 2692:8, 2701:21, 2701:23, 2791:17
**bordered** [1] - 2782:2
**born** [2] - 2723:23, 2724:6
**borrow** [2] - 2795:4, 2845:10
**borrowed** [2] - 2842:11, 2888:22
**borrowing** [1] - 2795:10
**bottom** [12] - 2651:14, 2651:18, 2670:21, 2695:14, 2695:22, 2749:20, 2805:9, 2824:1, 2846:16, 2862:6, 2874:21, 2887:8
**bought** [3] - 2712:12, 2805:6, 2845:7
**Box** [2] - 2625:14, 2626:7
**box** [2] - 2711:8, 2781:17
**boys** [1] - 2724:2
**brackets** [1] - 2649:24
**branding** [1] - 2807:18
**break** [8] - 2707:19, 2715:23, 2745:18, 2745:25, 2810:15, 2810:17, 2810:21, 2810:22
**breakdown** [1] - 2857:2
**breakdowns** [2] - 2847:5, 2847:6
**breakfast** [1] - 2874:21
**bribes** [6] - 2692:14, 2692:17, 2692:19, 2693:5, 2824:24
**brick** [1] - 2788:3
**brief** [4] - 2754:11, 2756:3, 2756:5, 2814:8

**briefed** [1] - 2819:1
**briefing** [2] - 2752:14, 2755:8
**briefly** [3] - 2690:14, 2819:2, 2852:17
**bring** [6] - 2663:12, 2711:15, 2747:2, 2820:5, 2828:13, 2866:8
**bringing** [3] - 2636:6, 2636:7, 2754:20
**British** [11] - 2733:19, 2764:24, 2777:22, 2778:2, 2778:23, 2779:3, 2780:4, 2781:1, 2781:3, 2781:12, 2784:20
**broad** [2] - 2762:7, 2812:18
**brochure** [6] - 2677:12, 2835:24, 2836:2, 2838:17, 2841:17, 2852:7
**brochures** [5] - 2679:13, 2718:7, 2836:10, 2836:12, 2843:9
**Broderick** [6] - 2734:5, 2734:9, 2760:1, 2760:3, 2760:9, 2761:17
**broke** [1] - 2697:17
**broken** [1] - 2832:9
**broker** [4] - 2706:24, 2707:4, 2707:7, 2707:13
**broker/distributor** [1] - 2726:20
**brokerage** [3] - 2725:14, 2862:10, 2862:16
**brother** [1] - 2792:5
**brothers** [1] - 2810:4
**bucket** [3] - 2704:22, 2888:24
**budget** [2] - 2640:5, 2640:6
**build** [4] - 2667:17, 2739:15, 2774:8, 2844:5
**build-outs** [1] - 2844:5
**building** [5] - 2742:11, 2752:4, 2781:6, 2791:17, 2827:1
**Building** [4] - 2733:9, 2737:4, 2738:19, 2787:25
**buildings** [2] - 2667:18, 2715:14
**built** [1] - 2667:18
**bullet** [1] - 2755:9
**bulletin** [1] - 2730:9
**bunch** [4] - 2629:17, 2685:2, 2688:7, 2726:11
**burn** [1] - 2859:12
**business** [18] - 2636:9, 2637:10, 2637:11, 2664:22, 2735:2, 2735:3, 2738:1, 2738:8, 2781:22, 2803:17, 2803:23, 2804:20, 2805:3, 2823:20, 2830:3, 2842:1, 2852:13, 2864:15
**Business** [1] - 2730:9
**businesses** [6] - 2637:21, 2769:11, 2770:7, 2770:18, 2781:11, 2869:16
**butting** [1] - 2721:11
**buy** [5] - 2713:10, 2735:10, 2804:21, 2805:10, 2805:23
**buying** [2] - 2698:25, 2756:24
**BY** [162] - 2627:4, 2627:5, 2627:6, 2627:7, 2627:8, 2627:11, 2636:22, 2644:5, 2646:11, 2647:6, 2647:24, 2649:1, 2649:12, 2651:17, 2652:6, 2658:5, 2660:18, 2660:22, 2663:23, 2664:4, 2667:4, 2668:17, 2669:10, 2670:13, 2671:4, 2671:10, 2672:7, 2673:1, 2673:12, 2673:20, 2674:6,

2675:3, 2675:8, 2676:1, 2676:8, 2676:23, 2677:11, 2677:15, 2678:15, 2681:13, 2687:22, 2693:12, 2697:15, 2706:7, 2707:3, 2707:11, 2708:5, 2709:10, 2709:21, 2712:11, 2716:6, 2718:12, 2718:18, 2719:6, 2720:5, 2721:5, 2721:14, 2723:14, 2727:4, 2728:18, 2729:6, 2737:20, 2738:6, 2742:10, 2743:20, 2745:7, 2756:17, 2759:16, 2761:7, 2765:1, 2766:5, 2766:17, 2770:14, 2771:21, 2772:16, 2774:10, 2775:24, 2776:5, 2776:21, 2777:14, 2778:10, 2779:20, 2782:17, 2783:8, 2788:12, 2790:1, 2790:19, 2790:24, 2791:20, 2792:14, 2793:8, 2795:18, 2796:1, 2796:18, 2797:12, 2797:18, 2801:22, 2805:22, 2809:5, 2820:11, 2820:20, 2820:25, 2821:10, 2821:23, 2826:3, 2826:13, 2827:7, 2827:24, 2828:6, 2828:14, 2833:23, 2835:13, 2835:22, 2836:8, 2836:20, 2838:9, 2840:12, 2844:12, 2844:15, 2846:17, 2847:11, 2848:14, 2849:2, 2849:21, 2850:24, 2851:5, 2851:25, 2852:22, 2853:7, 2854:24, 2856:18, 2856:22, 2858:6, 2860:8, 2862:2, 2865:9, 2869:25, 2871:23, 2872:21, 2873:22, 2874:5, 2874:13, 2877:9, 2877:15, 2878:5, 2878:20, 2879:13, 2880:6, 2880:18, 2881:7, 2882:9, 2883:21, 2885:12, 2886:11, 2887:4, 2889:6, 2889:17

# C

**cabinet** [4] - 2803:12, 2804:7, 2804:13, 2804:15
**calculated** [1] - 2644:15
**campaign** [1] - 2806:9
**capable** [1] - 2739:19
**capacity** [3] - 2784:14, 2823:4, 2823:9
**capital** [5] - 2665:2, 2665:4, 2666:2, 2801:24, 2802:2
**Capital** [7] - 2661:8, 2661:10, 2661:23, 2662:5, 2665:19, 2672:12, 2672:20
**capitalization** [2] - 2662:25, 2804:2
**capitalize** [3] - 2663:16, 2663:17, 2665:4
**captain** [1] - 2744:22
**car** [2] - 2743:15
**Caracas** [2] - 2889:21
**care** [1] - 2890:17
**career** [1] - 2869:4
**Caribbean** [7] - 2678:21, 2695:3, 2695:13, 2698:12, 2698:17, 2699:2, 2732:24, 2803:17, 2803:24, 2822:21, 2829:12, 2840:23, 2840:25, 2841:6
**Carlos** [3] - 2661:4, 2661:12, 2664:6
**Carlton** [2] - 2662:14, 2664:8
**carpeting** [1] - 2733:12
**carry** [1] - 2711:3
**CASE** [2] - 2722:25, 2723:5

**case** [39] - 2635:2, 2635:3, 2635:4, 2635:5, 2635:14, 2635:16, 2635:22, 2636:4, 2636:10, 2653:14, 2686:10, 2698:6, 2719:20, 2719:23, 2720:6, 2720:7, 2723:1, 2747:15, 2749:19, 2749:23, 2750:15, 2750:23, 2753:7, 2804:11, 2813:15, 2813:19, 2813:25, 2814:6, 2814:12, 2815:6, 2816:5, 2816:6, 2816:10, 2817:12, 2817:21, 2817:23, 2818:18, 2819:8, 2871:10

**cases** [9] - 2700:5, 2735:20, 2754:15, 2814:7, 2816:7, 2816:8, 2817:5, 2818:17

**cash** [62] - 2666:13, 2679:1, 2680:2, 2680:5, 2687:11, 2687:14, 2687:18, 2687:25, 2688:1, 2688:3, 2688:12, 2688:18, 2688:20, 2688:24, 2689:15, 2689:22, 2692:15, 2692:17, 2704:12, 2705:6, 2735:4, 2757:1, 2763:20, 2789:19, 2792:25, 2801:2, 2824:17, 2832:12, 2832:14, 2832:16, 2832:20, 2832:21, 2832:22, 2833:2, 2833:12, 2833:24, 2837:20, 2839:2, 2841:11, 2845:1, 2845:11, 2845:14, 2845:17, 2847:2, 2852:12, 2855:4, 2855:14, 2856:13, 2856:15, 2857:3, 2858:12, 2858:20, 2858:24, 2859:12, 2860:20, 2873:7, 2887:22

**cash-secure** [2] - 2680:2, 2680:5

**cash-secured** [5] - 2841:11, 2845:1, 2845:11, 2845:14, 2845:17

**Catch** [1] - 2876:7

**category** [4] - 2727:19, 2833:14, 2855:6, 2873:2

**caution** [1] - 2634:9

**cautioned** [1] - 2723:11

**CD** [73] - 2675:10, 2675:17, 2675:18, 2676:11, 2680:23, 2687:16, 2687:23, 2689:19, 2694:14, 2698:25, 2704:23, 2705:5, 2710:10, 2718:7, 2719:24, 2735:4, 2735:10, 2745:6, 2756:24, 2757:13, 2758:25, 2763:21, 2767:14, 2770:2, 2770:7, 2770:18, 2770:20, 2771:25, 2772:19, 2774:23, 2785:21, 2788:23, 2788:24, 2789:3, 2805:25, 2834:8, 2838:15, 2839:2, 2839:17, 2839:19, 2840:5, 2841:4, 2843:8, 2845:4, 2845:8, 2845:9, 2845:15, 2845:21, 2846:12, 2847:17, 2851:24, 2856:10, 2858:8, 2859:4, 2862:19, 2869:21, 2869:22, 2870:5, 2870:8, 2870:16, 2882:17, 2882:24, 2883:25, 2884:12, 2884:14, 2885:8, 2885:15, 2885:25, 2888:24, 2889:12, 2889:25

**CDs** [37] - 2689:20, 2711:9, 2711:10, 2712:3, 2712:12, 2712:19, 2712:25, 2717:20, 2717:22, 2735:16, 2736:6, 2736:13, 2743:22, 2744:2, 2744:12, 2744:19, 2745:9, 2745:11, 2767:21, 2775:8, 2780:14, 2789:8, 2789:10, 2789:11, 2838:16, 2838:21, 2839:16, 2839:23, 2840:6, 2852:14, 2859:16, 2862:16, 2862:17, 2865:6, 2865:13,

**cell** [2] - 2823:23, 2823:24

**cellphone** [2] - 2822:18, 2823:22

**cent** [1] - 2718:25

**center** [1] - 2780:25

**Centers** [1] - 2725:4

**centers** [5] - 2732:7, 2732:9, 2732:18, 2732:20, 2798:12

**Central** [2] - 2725:4, 2725:22

**CEO** [1] - 2743:4

**certain** [13] - 2639:14, 2744:3, 2750:16, 2760:14, 2775:18, 2775:21, 2780:7, 2807:5, 2807:6, 2868:25, 2869:1

**certainly** [7] - 2759:9, 2779:7, 2785:7, 2788:17, 2816:11, 2884:13

**certificate** [5] - 2629:2, 2677:21, 2704:17, 2735:4, 2845:4

**CERTIFICATE** [1] - 2891:5

**certificates** [3] - 2704:15, 2744:2, 2839:8

**certified** [5] - 2702:10, 2702:11, 2702:17, 2702:25, 2703:10

**certify** [1] - 2891:7

**cetera** [1] - 2829:7

**CFO** [2] - 2825:21, 2831:2

**chain** [1] - 2889:3

**chair** [2] - 2761:5, 2782:15

**Chairman** [1] - 2831:16

**chairman** [4] - 2737:10, 2737:13, 2825:22, 2853:2

**chairman's** [1] - 2852:23

**Chambers** [1] - 2761:25

**Chambliss** [2] - 2744:5, 2863:15

**chance** [2] - 2637:5, 2700:23

**change** [1] - 2767:5

**changed** [1] - 2793:23

**characterization** [1] - 2755:2

**characterizing** [1] - 2678:16

**charge** [7] - 2640:5, 2734:14, 2767:18, 2825:21, 2830:10, 2831:2, 2848:4

**charges** [2] - 2727:7, 2750:8

**charging** [1] - 2850:12

**charismatic** [5] - 2741:14, 2741:15, 2790:8, 2790:10

**chart** [10] - 2675:14, 2695:11, 2695:12, 2696:3, 2847:20, 2847:22, 2848:16, 2856:12, 2861:3, 2862:4

**charter** [1] - 2777:23

**chartered** [1] - 2779:24

**charts** [1] - 2871:3

**chase** [1] - 2889:10

**Chase** [1] - 2889:10

**chastised** [2] - 2650:14, 2650:16

**chatted** [1] - 2637:7

**check** [7] - 2672:3, 2704:13, 2704:16, 2705:13, 2707:21, 2745:5, 2810:23

**checking** [1] - 2805:1

**checks** [1] - 2806:10

**cheese** [1] - 2851:16

**chief** [19] - 2737:11, 2740:16, 2793:24, 2794:3, 2794:4, 2794:7, 2808:4,

2825:23, 2826:22, 2830:17, 2835:5, 2848:6, 2848:21, 2863:25, 2867:2, 2867:9, 2867:12, 2867:24, 2872:23

**children** [1] - 2724:2

**Circuit** [6] - 2813:15, 2813:19, 2814:6, 2816:5, 2816:6, 2816:10

**circuit** [4] - 2635:6, 2635:17, 2749:14, 2750:25

**circumstance** [2] - 2818:19, 2819:5

**circumstances** [6] - 2752:8, 2803:19, 2803:21, 2819:4, 2827:17, 2827:18

**circumstantial** [1] - 2752:5

**cite** [1] - 2816:7

**cited** [2] - 2813:14, 2814:8

**cites** [1] - 2816:6

**citizenship** [2] - 2735:12

**civil** [7] - 2817:12, 2819:10, 2819:11, 2819:21, 2819:22, 2819:23, 2819:24

**CJA** [1] - 2635:6

**claim** [2] - 2749:14, 2838:17, 2842:8, 2852:6

**claimed** [2] - 2748:20, 2833:10

**claiming** [1] - 2634:23

**claims** [2] - 2833:7, 2860:1

**claming** [1] - 2685:21

**clarification** [1] - 2857:15

**clarify** [2] - 2802:19, 2849:3

**class** [4] - 2869:4, 2869:5, 2869:7

**classes** [1] - 2853:11

**classic** [1] - 2817:21

**classification** [1] - 2832:12

**clean** [1] - 2819:16

**clear** [10] - 2685:8, 2754:25, 2766:2, 2766:6, 2767:13, 2768:24, 2800:15, 2813:14, 2865:10, 2869:20

**clearly** [2] - 2629:22, 2753:20

**clever** [1] - 2747:21

**client** [8] - 2731:13, 2740:12, 2762:18, 2763:1, 2780:7, 2780:8, 2780:13, 2838:13

**clients** [13] - 2680:3, 2680:6, 2680:22, 2700:6, 2718:20, 2718:21, 2775:11, 2804:24, 2853:18, 2855:17, 2862:17, 2862:18, 2870:16

**clients'** [1] - 2682:23

**clock** [2] - 2811:3, 2854:8

**close** [12] - 2681:2, 2721:12, 2734:21, 2761:1, 2792:6, 2792:8, 2798:5, 2801:7, 2808:17, 2810:3, 2824:12, 2833:20

**closed** [1] - 2745:5

**closer** [1] - 2675:6

**closing** [1] - 2774:23

**clothing** [1] - 2728:12

**club** [1] - 2868:24

**co** [3] - 2640:21, 2728:9, 2890:10

**co-conspirator** [1] - 2728:9

**co-conspiring** [1] - 2890:10

**co-workers** [1] - 2640:21

**code** [1] - 2822:22

**codified** [1] - 2808:23

**coffee** [3] - 2869:20, 2870:3, 2870:11

**collapse** [1] - 2778:17
**collateral** [1] - 2845:19
**colleagues** [1] - 2628:5
**college** [4] - 2724:9, 2724:25, 2741:22, 2869:3
**Collinsworth** [1] - 2864:5
**colony** [1] - 2800:7
**color** [1] - 2675:13
**column** [1] - 2702:19
**combination** [2] - 2663:10, 2681:2
**combined** [7] - 2684:8, 2684:10, 2685:10, 2685:25, 2696:10, 2708:16, 2763:4
**combining** [1] - 2685:11
**comfortable** [1] - 2760:17
**coming** [20] - 2628:13, 2628:16, 2633:17, 2634:20, 2659:3, 2667:3, 2675:18, 2680:20, 2682:20, 2682:21, 2686:13, 2686:21, 2688:18, 2695:15, 2696:1, 2696:9, 2806:9, 2819:7, 2839:18, 2885:24
**command** [1] - 2764:14
**comment** [3] - 2685:19, 2685:23, 2848:25
**commented** [1] - 2804:3
**commercial** [11] - 2647:12, 2647:13, 2679:25, 2680:1, 2681:8, 2804:24, 2814:15, 2832:15, 2832:19, 2841:10, 2851:15
**Commission** [6] - 2808:2, 2808:21, 2809:18, 2823:3, 2823:15, 2824:7
**commissions** [1] - 2719:15
**commit** [3] - 2727:11, 2728:3, 2728:6
**committing** [1] - 2727:23
**commodities** [1] - 2853:12
**Commonwealth** [1] - 2807:12
**communicate** [1] - 2741:11
**communicating** [1] - 2768:12
**communication** [1] - 2660:3
**Communications** [2] - 2653:4, 2669:24
**Companies** [1] - 2667:14
**companies** [125] - 2652:18, 2654:1, 2656:3, 2657:4, 2665:9, 2665:10, 2665:11, 2666:1, 2666:5, 2666:11, 2666:15, 2666:25, 2667:7, 2667:10, 2667:11, 2667:14, 2668:21, 2672:20, 2673:7, 2675:11, 2675:21, 2678:6, 2679:6, 2679:10, 2681:18, 2681:20, 2681:23, 2682:7, 2682:9, 2682:25, 2683:1, 2684:1, 2684:5, 2684:11, 2685:15, 2687:1, 2688:3, 2688:8, 2688:15, 2688:19, 2689:5, 2691:20, 2691:23, 2692:2, 2692:5, 2692:7, 2692:9, 2695:2, 2696:10, 2701:4, 2701:7, 2701:10, 2706:17, 2708:14, 2709:16, 2716:13, 2716:16, 2716:22, 2716:25, 2717:6, 2717:9, 2719:1, 2719:11, 2719:12, 2721:6, 2721:7, 2721:9, 2722:7, 2726:12, 2731:22, 2746:11, 2746:17, 2747:2, 2747:4, 2748:1, 2748:7, 2748:8, 2748:21, 2748:22, 2748:23, 2749:10,

2753:14, 2753:22, 2753:24, 2754:8, 2755:16, 2757:6, 2757:18, 2757:21, 2769:20, 2788:3, 2791:17, 2794:11, 2806:11, 2824:4, 2825:22, 2829:17, 2829:18, 2834:9, 2835:4, 2837:6, 2837:9, 2841:3, 2841:4, 2843:25, 2859:13, 2870:2, 2882:12, 2882:22, 2882:24, 2883:24, 2884:5, 2884:8, 2884:17, 2885:7, 2885:13, 2885:18, 2885:20, 2885:23, 2885:24, 2886:15, 2886:16, 2886:21, 2889:13
**company** [67] - 2639:8, 2650:7, 2653:8, 2653:10, 2662:18, 2663:15, 2671:1, 2672:18, 2673:2, 2681:24, 2684:7, 2696:14, 2697:10, 2698:11, 2698:16, 2698:24, 2701:21, 2716:14, 2725:16, 2725:19, 2725:24, 2726:1, 2726:17, 2726:18, 2726:21, 2731:19, 2736:8, 2746:25, 2748:16, 2750:13, 2769:15, 2776:15, 2777:21, 2777:22, 2777:25, 2778:2, 2778:13, 2778:15, 2778:19, 2778:21, 2779:3, 2779:24, 2779:25, 2780:1, 2780:2, 2780:9, 2781:24, 2784:25, 2785:11, 2829:1, 2831:4, 2842:7, 2843:7, 2865:3, 2865:10, 2866:3, 2866:14, 2878:12, 2884:13, 2888:9, 2888:11, 2888:12, 2888:14
**Company** [19] - 2654:3, 2666:24, 2667:9, 2686:19, 2725:20, 2736:9, 2760:13, 2769:17, 2862:10, 2862:14, 2862:16, 2863:12, 2865:12, 2884:2, 2884:3, 2884:12, 2887:20, 2888:14
**company's** [3] - 2637:25, 2734:14, 2794:22
**compared** [2] - 2735:16, 2738:8
**comparison** [4] - 2698:13, 2698:21, 2698:22, 2699:3
**compensation** [2] - 2870:7, 2870:9
**competition** [2] - 2774:23, 2775:7
**competitively** [1] - 2875:12
**compiling** [1] - 2831:10
**complained** [1] - 2746:12
**complete** [1] - 2783:19
**completed** [1] - 2831:22
**completely** [1] - 2874:2
**complex** [3] - 2659:17, 2659:18, 2781:10
**complicated** [1] - 2664:22
**component** [1] - 2860:20
**comprised** [1] - 2763:12
**computer** [2] - 2626:14, 2860:4
**computer's** [1] - 2646:9
**computer-assisted** [1] - 2626:14
**conceal** [1] - 2884:16
**conceivable** [1] - 2645:11
**concentration** [2] - 2840:21, 2840:22
**concept** [1] - 2750:7
**concern** [11] - 2629:23, 2685:23, 2740:4, 2774:25, 2788:14, 2788:18, 2789:9, 2789:13, 2790:7, 2854:1, 2872:12
**concerned** [5] - 2828:17,

2790:6, 2818:25, 2819:1
**concerning** [4] - 2792:24, 2843:16, 2843:17, 2874:15
**concerns** [5] - 2772:4, 2790:3, 2790:21, 2871:24, 2874:14
**concerted** [1] - 2800:12
**conclusion** [1] - 2646:19
**condense** [1] - 2755:9
**condition** [4] - 2725:21, 2765:16, 2796:13, 2805:5
**conducted** [1] - 2756:20
**conferred** [1] - 2864:18
**conferring** [1] - 2810:7
**confidence** [1] - 2783:3
**confident** [2] - 2790:8, 2790:9
**confirm** [1] - 2785:20
**confirmation** [3] - 2782:20, 2783:13, 2808:22
**conflict** [1] - 2748:12
**confused** [1] - 2653:9
**conglomerate** [1] - 2658:22
**conglomeration** [1] - 2659:7
**Congress** [1] - 2625:22
**connected** [2] - 2769:20, 2881:23
**connection** [1] - 2867:23
**conscious** [1] - 2790:13
**consequences** [2] - 2791:13, 2791:14
**conservative** [6] - 2676:15, 2676:17, 2677:20, 2677:25, 2737:23, 2738:12
**consider** [3] - 2634:5, 2755:10, 2890:2
**consideration** [1] - 2890:14
**consistent** [9] - 2678:8, 2833:6, 2833:9, 2833:15, 2834:15, 2852:6, 2853:13, 2860:1, 2863:20
**Consistent** [1] - 2841:18
**consistently** [1] - 2841:19
**consists** [1] - 2802:2
**consolidate** [2] - 2662:20, 2802:1
**consolidating** [1] - 2685:5
**consolidation** [22] - 2632:1, 2654:12, 2654:20, 2654:21, 2658:2, 2658:6, 2658:14, 2658:16, 2658:23, 2659:7, 2659:23, 2660:5, 2662:21, 2663:1, 2663:10, 2684:19, 2684:24, 2689:25, 2708:7, 2709:11, 2747:1, 2802:3
**consolidations** [1] - 2654:22
**conspiracy** [3] - 2728:3, 2728:5, 2742:20
**conspirator** [1] - 2728:9
**conspire** [1] - 2728:6
**conspiring** [1] - 2890:10
**constantly** [2] - 2653:11, 2667:11
**construct** [1] - 2760:14
**consult** [3] - 2637:2, 2637:5, 2713:8
**consumers** [1] - 2680:22
**contacted** [1] - 2784:2
**contained** [2] - 2796:24, 2799:11
**contains** [1] - 2684:16
**content** [2] - 2773:23, 2873:13
**contents** [2] - 2872:25, 2874:16
**context** [10] - 2662:24, 2663:14,

2674:14, 2698:7, 2698:19, 2701:25, 2714:13, 2719:16, 2720:20, 2720:21
**continually** [2] - 2752:24, 2839:23
**continue** [10] - 2633:23, 2633:24, 2752:17, 2785:2, 2785:16, 2790:13, 2792:19, 2853:14, 2866:21, 2868:3
**continued** [3] - 2731:14, 2789:16, 2792:21
**Continued** [2] - 2626:1, 2626:2
**continuously** [1] - 2837:15
**contract** [1] - 2726:5
**contributions** [2] - 2806:9, 2822:15
**control** [2] - 2734:16, 2816:11
**controlled** [3] - 2656:14, 2741:16, 2779:4
**controller** [14] - 2653:3, 2653:10, 2734:4, 2734:10, 2734:13, 2734:14, 2737:2, 2741:24, 2760:1, 2760:11, 2761:17, 2767:7, 2784:14, 2835:6
**controlling** [2] - 2814:7, 2817:5
**controls** [1] - 2800:17
**conversation** [23] - 2638:9, 2641:17, 2642:3, 2643:11, 2644:9, 2644:12, 2644:22, 2645:6, 2685:22, 2731:13, 2774:25, 2787:8, 2787:11, 2787:14, 2787:17, 2787:18, 2787:20, 2787:22, 2789:18, 2789:21, 2793:21, 2794:17, 2799:24
**conversations** [6] - 2660:3, 2734:25, 2771:6, 2773:19, 2787:10, 2849:4
**conversion** [3] - 2654:23, 2655:2, 2656:8
**converting** [1] - 2655:12
**convinced** [1] - 2747:7
**cooperate** [2] - 2703:24, 2704:3
**cooperation** [1] - 2729:13
**coordination** [1] - 2640:6
**copied** [1] - 2717:2
**copies** [1] - 2671:18
**copy** [6] - 2660:13, 2696:16, 2776:1, 2776:14, 2836:13, 2887:6
**core** [1] - 2746:20
**corner** [1] - 2858:13
**cornice** [1] - 2733:12
**corporation** [2] - 2736:10, 2832:18
**Corporation** [7] - 2726:5, 2769:14, 2769:23, 2771:4, 2885:19, 2888:10
**corpus** [2] - 2758:6, 2770:21
**correct** [140] - 2631:7, 2631:8, 2631:21, 2632:17, 2633:19, 2637:12, 2637:13, 2637:16, 2638:3, 2638:24, 2639:4, 2640:14, 2641:14, 2641:24, 2642:11, 2642:16, 2642:22, 2643:7, 2643:10, 2644:20, 2645:7, 2646:5, 2649:20, 2651:5, 2652:9, 2652:25, 2653:4, 2653:8, 2654:2, 2654:4, 2654:10, 2654:25, 2655:9, 2655:20, 2656:16, 2656:17, 2661:5, 2662:2, 2662:9, 2664:10, 2665:5, 2665:22, 2665:23, 2666:2, 2667:16, 2667:19, 2668:14, 2669:13, 2670:25, 2671:15, 2671:16, 2672:17, 2679:2, 2680:6, 2681:18, 2681:19, 2682:4, 2682:15,

2685:1, 2685:17, 2688:21, 2689:1, 2689:9, 2689:10, 2689:14, 2689:25, 2690:1, 2690:5, 2690:7, 2690:20, 2692:5, 2692:6, 2692:12, 2693:17, 2695:9, 2695:10, 2695:16, 2695:17, 2696:25, 2697:4, 2701:3, 2703:2, 2703:3, 2704:3, 2704:4, 2704:18, 2704:19, 2705:8, 2705:15, 2708:15, 2710:6, 2711:5, 2711:12, 2711:13, 2711:16, 2713:23, 2714:23, 2715:21, 2715:23, 2716:19, 2717:11, 2719:1, 2720:9, 2720:14, 2721:11, 2722:13, 2726:13, 2749:7, 2750:17, 2764:4, 2767:11, 2771:2, 2789:20, 2799:23, 2814:5, 2817:10, 2817:16, 2818:5, 2818:6, 2819:12, 2819:23, 2821:8, 2821:22, 2834:17, 2835:20, 2840:7, 2840:9, 2842:13, 2844:24, 2856:11, 2856:13, 2858:3, 2862:12, 2870:9, 2876:21, 2879:4, 2882:6, 2884:19, 2887:13, 2891:8
**correspondence** [5] - 2630:10, 2631:22, 2632:14, 2658:13, 2747:18
**cost** [3] - 2739:20, 2805:10
**costa** [4] - 2634:14, 2676:23, 2677:11, 2677:15
**COSTA** [79] - 2628:18, 2629:15, 2630:5, 2630:13, 2630:16, 2630:19, 2631:4, 2631:8, 2631:13, 2632:18, 2634:17, 2634:21, 2635:1, 2635:8, 2644:1, 2646:22, 2646:25, 2647:3, 2651:10, 2658:3, 2660:11, 2660:14, 2664:1, 2667:1, 2669:4, 2671:21, 2673:12, 2673:20, 2674:6, 2675:1, 2675:3, 2675:8, 2676:1, 2676:5, 2676:8, 2676:18, 2677:10, 2677:13, 2678:15, 2681:13, 2687:22, 2693:12, 2697:13, 2706:25, 2707:8, 2709:8, 2709:15, 2709:18, 2712:7, 2716:6, 2718:12, 2718:16, 2718:18, 2719:6, 2720:1, 2720:25, 2721:8, 2722:16, 2812:21, 2813:1, 2813:8, 2813:11, 2813:19, 2814:3, 2815:4, 2815:11, 2815:15, 2815:20, 2815:25, 2816:5, 2816:21, 2816:24, 2817:12, 2817:14, 2817:18, 2818:3, 2818:6, 2819:24, 2860:5
**Costa** [18] - 2625:13, 2635:20, 2698:2, 2698:4, 2698:22, 2701:9, 2703:11, 2703:12, 2704:11, 2705:9, 2707:6, 2708:6, 2709:22, 2710:19, 2713:3, 2714:1, 2715:22, 2720:16
**Costa's** [2] - 2711:17, 2818:16
**COSTA.............** [2] - 2627:5, 2627:7
**Counsel** [3] - 2777:3, 2827:3, 2883:15
**counsel** [5] - 2636:16, 2776:14, 2811:17, 2826:22, 2854:1
**count** [4] - 2704:22, 2728:3, 2728:4
**counting** [1] - 2752:15
**countries** [2] - 2655:8, 2871:5
**country** [8] - 2694:2, 2749:15, 2798:21, 2800:7, 2800:19, 2804:25, 2822:1

**counts** [1] - 2705:6
**couple** [10] - 2680:24, 2716:21, 2731:22, 2760:7, 2764:20, 2770:22, 2786:13, 2846:3, 2859:11, 2880:19
**course** [11] - 2691:5, 2724:25, 2739:21, 2752:2, 2755:24, 2767:2, 2767:6, 2784:23, 2829:22, 2831:11, 2852:13
**COURT** [296] - 2625:1, 2628:1, 2628:4, 2628:8, 2628:19, 2628:21, 2628:23, 2628:25, 2629:2, 2629:5, 2629:8, 2630:4, 2630:12, 2630:14, 2630:17, 2630:20, 2630:24, 2631:6, 2631:12, 2631:16, 2631:20, 2632:12, 2632:15, 2633:7, 2634:1, 2634:16, 2634:18, 2634:24, 2635:7, 2635:9, 2635:12, 2635:17, 2636:1, 2636:4, 2636:15, 2636:19, 2644:3, 2647:2, 2651:9, 2651:11, 2652:3, 2660:15, 2660:17, 2663:25, 2664:2, 2669:3, 2669:5, 2671:19, 2671:22, 2672:1, 2672:22, 2673:19, 2674:3, 2675:6, 2675:24, 2676:3, 2676:6, 2678:14, 2681:11, 2687:21, 2693:9, 2706:3, 2707:2, 2707:18, 2708:1, 2708:3, 2709:9, 2709:17, 2709:20, 2712:10, 2718:11, 2718:14, 2718:17, 2719:4, 2720:3, 2721:2, 2721:4, 2721:11, 2722:17, 2722:22, 2723:6, 2723:8, 2726:25, 2728:14, 2728:16, 2729:2, 2737:19, 2738:5, 2742:4, 2742:17, 2742:21, 2743:10, 2743:12, 2744:24, 2745:2, 2745:19, 2745:22, 2746:6, 2746:14, 2746:22, 2747:9, 2747:11, 2748:2, 2748:12, 2748:15, 2749:2, 2749:4, 2749:7, 2749:17, 2750:4, 2750:10, 2750:19, 2751:6, 2751:9, 2751:13, 2751:19, 2751:21, 2752:2, 2752:13, 2752:25, 2753:3, 2753:15, 2753:17, 2754:2, 2754:5, 2754:15, 2755:5, 2755:20, 2756:2, 2756:4, 2756:8, 2756:12, 2756:14, 2759:6, 2759:8, 2759:12, 2759:15, 2760:16, 2760:20, 2760:25, 2761:4, 2764:19, 2764:25, 2765:17, 2766:1, 2766:14, 2770:13, 2771:18, 2772:9, 2772:15, 2772:22, 2773:3, 2773:25, 2774:4, 2774:8, 2776:19, 2777:3, 2777:11, 2778:7, 2779:17, 2782:11, 2782:16, 2783:7, 2788:11, 2789:25, 2790:16, 2790:18, 2791:4, 2791:8, 2792:11, 2793:7, 2795:25, 2796:11, 2796:15, 2797:9, 2805:18, 2809:3, 2810:10, 2810:12, 2810:20, 2811:2, 2811:6, 2811:8, 2811:12, 2811:22, 2812:3, 2812:10, 2812:14, 2812:18, 2812:20, 2812:24, 2813:6, 2813:10, 2813:17, 2813:25, 2814:4, 2814:10, 2814:21, 2814:24, 2815:2, 2815:10, 2815:14, 2815:18, 2815:23, 2816:3, 2816:19, 2816:23, 2817:7, 2817:13, 2817:15, 2817:19, 2818:4, 2818:11, 2819:9, 2819:16, 2819:20, 2820:1, 2820:4, 2820:7,

2820:10, 2820:16, 2820:22, 2821:7, 2821:16, 2821:19, 2826:1, 2826:12, 2826:19, 2826:24, 2827:3, 2827:23, 2828:5, 2828:8, 2828:11, 2828:13, 2833:22, 2835:17, 2835:19, 2836:7, 2838:2, 2838:6, 2848:11, 2848:24, 2849:15, 2849:19, 2850:8, 2850:19, 2850:21, 2851:3, 2851:12, 2851:15, 2851:22, 2853:20, 2853:22, 2854:8, 2854:11, 2854:16, 2857:12, 2858:3, 2858:5, 2860:6, 2861:9, 2861:16, 2861:19, 2861:24, 2865:8, 2869:23, 2871:22, 2872:2, 2872:4, 2872:18, 2873:19, 2874:1, 2874:11, 2878:14, 2878:17, 2878:19, 2879:9, 2879:11, 2881:25, 2882:7, 2883:3, 2883:5, 2883:9, 2883:15, 2883:19, 2884:24, 2885:5, 2885:11, 2886:6, 2886:25, 2887:3, 2890:11, 2890:21, 2891:1, 2891:5

**Court** [19] - 2626:11, 2632:3, 2633:1, 2633:22, 2723:2, 2747:7, 2814:7, 2814:12, 2815:4, 2815:6, 2816:15, 2816:24, 2817:5, 2817:18, 2818:14, 2818:16, 2818:20, 2819:24, 2850:14

**court** [6] - 2630:23, 2635:18, 2697:25, 2723:18, 2727:8, 2857:12

**Court's** [3] - 2632:4, 2813:22, 2819:2

**courtroom** [5] - 2628:14, 2637:8, 2715:8, 2728:8, 2773:9

**cover** [8] - 2668:10, 2719:15, 2783:21, 2789:2, 2835:25, 2839:6, 2840:5, 2886:4

**coverage** [3] - 2775:10, 2775:13, 2782:20

**covered** [2] - 2736:25, 2859:18

**covering** [3] - 2678:24, 2859:16, 2888:3

**coward** [2] - 2769:8, 2786:1

**CPA** [3] - 2696:20, 2725:9, 2760:3

**crack** [1] - 2752:17

**creative** [4] - 2830:10, 2831:12, 2836:4, 2836:15

**credit** [5] - 2747:21, 2841:8, 2844:17, 2844:19, 2844:20

**credits** [1] - 2724:23

**Crick** [3] - 2807:24, 2808:6, 2824:8

**cricket** [5] - 2682:7, 2682:8, 2716:14, 2719:12, 2719:21

**crimes** [5] - 2727:11, 2727:23, 2728:1, 2728:2, 2728:6

**criminal** [4] - 2636:8, 2638:10, 2817:9, 2817:23

**crisis** [1] - 2879:25

**criteria** [2] - 2677:20, 2677:25

**cross** [6] - 2658:10, 2697:19, 2748:19, 2753:8, 2753:20, 2861:14

**CROSS** [2] - 2627:4, 2636:21

**cross-examination** [5] - 2658:10, 2697:19, 2748:19, 2753:8, 2861:14

**CROSS-EXAMINATION** [2] - 2627:4, 2636:21

**CRR** [2] - 2626:11, 2891:11

**cubicle** [7] - 2781:11, 2781:14, 2781:22, 2781:25, 2782:6, 2782:10, 2782:11

**cubicles** [2] - 2781:8, 2782:2

**Curacao** [1] - 2732:25

**curious** [1] - 2802:6

**currencies** [4] - 2757:1, 2764:24, 2853:12, 2871:5

**currency** [1] - 2846:20

**current** [8] - 2648:4, 2649:15, 2649:22, 2651:23, 2653:5, 2653:6, 2789:3, 2806:6

**curve** [2] - 2788:25, 2789:5

**customer** [3] - 2700:14, 2713:15, 2739:13

**customers** [16] - 2677:24, 2680:22, 2744:1, 2744:2, 2804:24, 2837:22, 2837:23, 2839:19, 2840:8, 2841:9, 2841:12, 2843:8, 2845:4, 2852:3, 2852:14, 2884:15

**customers'** [2] - 2837:17, 2852:3

**cut** [4] - 2684:4, 2692:15, 2746:22, 2809:15

**cycle** [2] - 2879:17, 2879:23

# D

**D-a-v-i-s** [1] - 2723:19

**D.C** [1] - 2874:22

**Dallas** [3] - 2636:5, 2815:6, 2818:1

**Danny** [1] - 2829:11

**dark** [1] - 2733:12

**database** [2] - 2632:18, 2633:16

**date** [9] - 2726:15, 2779:12, 2798:5, 2801:6, 2802:6, 2803:3, 2850:13, 2850:21, 2878:6

**dated** [6] - 2662:8, 2797:20, 2801:9, 2877:23, 2879:6, 2887:8

**daughters** [1] - 2724:2

**daughters-in-law** [1] - 2724:2

**DAVID** [1] - 2625:10

**David** [3] - 2628:5, 2729:24, 2761:25

**DAVIS** [2] - 2627:10, 2723:10

**Davis** [65] - 2629:17, 2629:19, 2629:23, 2631:9, 2631:24, 2633:9, 2633:23, 2637:15, 2670:21, 2670:22, 2683:18, 2696:11, 2697:6, 2722:21, 2722:22, 2723:19, 2723:20, 2728:19, 2729:7, 2729:25, 2742:19, 2747:17, 2752:10, 2756:18, 2757:24, 2762:19, 2766:6, 2768:25, 2769:1, 2769:4, 2772:17, 2775:25, 2777:4, 2790:11, 2809:6, 2820:12, 2821:1, 2821:24, 2835:15, 2835:23, 2838:10, 2846:18, 2847:12, 2850:10, 2852:7, 2853:8, 2854:25, 2858:7, 2860:9, 2862:3, 2863:19, 2864:7, 2864:9, 2866:12, 2866:21, 2872:11, 2872:22, 2877:19, 2882:3, 2882:10, 2883:11, 2883:22, 2886:23, 2887:6, 2887:7

**Davis's** [1] - 2729:5

**day-to-day** [3] - 2738:2. 2757:13.

2761:14

**days** [8] - 2641:11, 2643:1, 2690:20, 2741:22, 2765:6, 2770:3, 2798:6, 2801:5

**DC** [1] - 2625:18

**deal** [2] - 2690:3, 2739:23

**dealer** [3] - 2706:24, 2707:4, 2707:7

**dealers** [1] - 2707:14

**dealing** [3] - 2741:7, 2851:16, 2890:4

**deals** [3] - 2649:19, 2689:3, 2690:9

**dealt** [1] - 2844:3

**Dear** [1] - 2665:7

**death** [1] - 2743:17

**debacle** [1] - 2840:1

**deceased** [3] - 2734:5, 2734:6, 2734:8

**December** [12] - 2730:16, 2731:9, 2731:10, 2739:1, 2786:12, 2787:6, 2795:5, 2795:12, 2803:3, 2876:24, 2881:8

**decide** [2] - 2714:11, 2810:16

**decided** [1] - 2803:4

**decides** [1] - 2729:23

**decision** [12] - 2718:4, 2742:24, 2790:13, 2797:13, 2797:14, 2801:25, 2802:13, 2802:16, 2802:21, 2828:24, 2867:12, 2875:23

**decision-making** [1] - 2828:24

**decisions** [9] - 2679:5, 2679:9, 2714:2, 2714:16, 2720:17, 2721:24, 2798:24, 2816:15, 2829:2

**declaration** [1] - 2775:19

**deeper** [1] - 2731:16

**DEFENDANT** [2] - 2625:20, 2626:2

**defendant** [1] - 2813:21

**Defendant's** [2] - 2651:7, 2651:13, 2660:8

**Defense** [2] - 2669:1, 2671:17

**defense** [11] - 2628:19, 2669:6, 2746:4, 2746:20, 2747:20, 2750:7, 2750:20, 2750:23, 2751:3, 2752:1, 2811:5

**defensive** [1] - 2748:6

**defer** [1] - 2861:25

**define** [1] - 2764:19

**defined** [1] - 2764:23

**DeForte** [1] - 2814:8

**degradation** [1] - 2859:15

**degree** [5] - 2678:2, 2724:20, 2725:11, 2836:22, 2869:11

**demands** [1] - 2838:20

**demean** [1] - 2721:22

**demonstrate** [3] - 2790:21, 2791:3, 2791:22

**demonstration** [1] - 2790:25

**demonstrative** [4] - 2860:2, 2860:7, 2861:8, 2861:15

**Demonstrative** [1] - 2861:23

**denied** [3] - 2811:21, 2811:22, 2815:25

**department** [9] - 2654:8, 2692:4, 2754:12, 2796:7, 2823:15, 2830:10, 2831:12, 2860:14, 2888:3

**Department** [1] - 2625:17
**departments** [1] - 2834:22
**depicted** [1] - 2868:7
**deposit** [8] - 2677:24, 2704:17, 2735:4, 2744:2, 2745:4, 2838:13, 2839:8, 2845:5
**deposited** [2] - 2702:15, 2846:19
**depositor** [6] - 2677:17, 2713:15, 2763:18, 2778:19, 2786:19, 2845:7
**depositors** [58] - 2665:3, 2666:13, 2675:19, 2675:23, 2676:11, 2676:14, 2677:7, 2678:3, 2687:3, 2687:17, 2687:23, 2689:19, 2693:23, 2704:11, 2705:2, 2705:12, 2705:13, 2705:23, 2718:8, 2740:13, 2749:12, 2750:3, 2751:2, 2751:15, 2761:21, 2762:17, 2762:21, 2763:4, 2763:5, 2771:9, 2771:25, 2786:19, 2788:7, 2791:25, 2793:1, 2801:2, 2805:25, 2806:11, 2836:23, 2839:7, 2839:11, 2839:25, 2842:3, 2842:22, 2843:13, 2847:18, 2856:7, 2856:10, 2857:24, 2858:8, 2858:24, 2860:10, 2861:4, 2862:4, 2862:21, 2863:3, 2863:10
**depositors'** [7] - 2675:10, 2675:17, 2680:23, 2681:4, 2718:1, 2763:19, 2792:1
**Depositors'** [1] - 2836:18
**Depository** [1] - 2771:3
**deposits** [10] - 2677:21, 2704:16, 2775:16, 2837:16, 2837:20, 2837:21, 2837:22, 2846:21, 2852:3, 2857:25
**describe** [3] - 2741:12, 2832:2, 2858:23
**described** [2] - 2738:14, 2785:2
**description** [1] - 2720:21
**descriptions** [1] - 2668:11
**designate** [3] - 2631:23, 2632:10, 2632:19
**designated** [1] - 2632:25
**designation** [3] - 2631:14, 2633:11, 2794:4
**designed** [1] - 2842:1
**desirable** [1] - 2828:16
**desire** [2] - 2745:3, 2890:14
**desk** [1] - 2782:15
**desperate** [2] - 2658:25, 2659:5
**destroyed** [1] - 2799:19
**detail** [8] - 2715:12, 2722:1, 2737:15, 2750:12, 2834:14, 2889:20, 2889:22, 2890:3
**details** [2] - 2782:21, 2873:5
**determine** [1] - 2720:8
**developed** [2] - 2667:17, 2698:16
**developing** [1] - 2699:2
**Development** [10] - 2666:24, 2667:14, 2726:5, 2769:13, 2769:14, 2769:22, 2797:22, 2884:3, 2885:19, 2888:10
**development** [2] - 2769:15, 2888:11
**device** [2] - 2780:3, 2784:2
**devil's** [1] - 2749:18
**diagram** [10] - 2861:16, 2861:20, 2861:24, 2861:25, 2862:9, 2862:10,

2862:19, 2863:21, 2868:7, 2868:9
**diagrams** [1] - 2870:24
**dictator** [1] - 2741:14
**dictatorial** [1] - 2741:15
**difference** [11] - 2653:19, 2734:22, 2786:17, 2787:2, 2787:4, 2787:12, 2787:23, 2788:20, 2789:22, 2858:23
**different** [23] - 2639:19, 2639:22, 2639:23, 2650:5, 2653:15, 2655:17, 2667:22, 2672:14, 2683:3, 2683:4, 2686:21, 2686:22, 2687:4, 2696:10, 2701:24, 2702:22, 2708:18, 2708:20, 2748:15, 2753:13, 2823:18, 2834:19, 2857:2
**differential** [1] - 2735:24
**difficult** [1] - 2634:13
**dig** [1] - 2808:21
**digging** [1] - 2808:19
**dignitaries** [1] - 2807:6
**digress** [1] - 2667:13
**diplomatic** [2] - 2807:1, 2807:3
**DIRECT** [2] - 2627:11, 2723:13
**direct** [12] - 2646:3, 2658:9, 2658:15, 2682:12, 2703:9, 2737:5, 2746:15, 2753:21, 2754:1, 2823:21, 2860:12, 2862:20
**directed** [1] - 2818:9
**direction** [2] - 2739:3, 2848:9
**directly** [9] - 2737:13, 2765:24, 2773:19, 2829:7, 2830:12, 2862:7, 2870:3, 2870:4, 2884:7
**director** [2] - 2798:7, 2823:14
**directors** [12] - 2737:10, 2737:14, 2765:13, 2794:12, 2794:15, 2801:25, 2802:7, 2802:15, 2842:24, 2842:25, 2843:12, 2853:15
**disagree** [5] - 2658:12, 2755:2, 2755:17, 2817:20, 2818:17
**disagreed** [2] - 2699:10, 2738:1
**disbursements** [1] - 2889:22
**disbursing** [1] - 2889:25
**discharged** [1] - 2724:16
**disclose** [6] - 2646:6, 2647:4, 2648:16, 2697:9, 2700:5, 2700:6
**disclosed** [5] - 2630:2, 2679:24, 2697:6, 2855:18, 2882:16
**disclosing** [1] - 2718:2
**disclosure** [15] - 2657:7, 2712:4, 2712:13, 2712:14, 2712:19, 2712:24, 2717:8, 2717:9, 2717:12, 2717:16, 2717:20, 2846:13, 2847:17, 2851:24, 2882:17
**Discount** [1] - 2725:4
**discovered** [3] - 2630:9, 2632:6, 2632:9
**discovering** [1] - 2785:18
**discovery** [1] - 2631:18
**discuss** [19] - 2733:5, 2735:15, 2769:21, 2771:23, 2779:12, 2787:2, 2792:24, 2800:18, 2802:12, 2806:1, 2807:20, 2808:10, 2828:15, 2831:25, 2866:19, 2867:15, 2881:15, 2882:5,

**discussed** [16] - 2636:7, 2658:9, 2658:10, 2731:7, 2734:3, 2745:14, 2756:9, 2777:16, 2777:19, 2787:4, 2790:2, 2790:20, 2866:18, 2882:3, 2886:3, 2886:5
**discussing** [2] - 2818:19, 2886:10
**discussion** [4] - 2731:16, 2774:16, 2793:3, 2804:13
**discussions** [7] - 2731:8, 2771:12, 2773:12, 2774:12, 2774:15, 2793:2, 2793:3
**disguise** [1] - 2884:10
**displayed** [1] - 2854:21
**disregard** [1] - 2777:2
**disseminated** [1] - 2794:10
**dissemination** [1] - 2639:14
**distant** [1] - 2742:6
**distracted** [1] - 2672:2
**distributed** [1] - 2652:10
**distribution** [2] - 2830:11, 2871:3
**District** [1] - 2636:9
**DISTRICT** [3] - 2625:1, 2625:1, 2625:10
**ditch** [1] - 2659:1
**diversified** [4] - 2678:4, 2837:5, 2842:20, 2853:10
**dividends** [6] - 2841:25, 2842:5, 2842:6, 2842:9, 2842:10, 2842:14
**division** [2] - 2736:1, 2740:10
**DIVISION** [1] - 2625:2
**Document** [1] - 2696:21
**document** [35] - 2661:18, 2668:16, 2670:4, 2670:11, 2670:24, 2671:3, 2676:10, 2692:1, 2696:15, 2697:6, 2704:16, 2728:21, 2730:13, 2775:25, 2776:2, 2776:4, 2776:7, 2780:5, 2780:12, 2784:8, 2785:10, 2785:16, 2797:19, 2797:24, 2798:4, 2831:10, 2835:16, 2836:18, 2838:12, 2844:11, 2852:21, 2856:25, 2857:16, 2857:17, 2887:13
**documentation** [2] - 2664:16, 2747:17
**documents** [24] - 2634:10, 2638:1, 2658:11, 2665:8, 2665:17, 2668:8, 2668:10, 2668:11, 2670:9, 2671:13, 2682:12, 2688:7, 2688:10, 2690:7, 2690:10, 2694:20, 2765:4, 2781:21, 2781:23, 2796:20, 2812:9, 2881:23
**dollar** [5] - 2682:8, 2838:14, 2840:24, 2855:24
**dollars** [7] - 2685:7, 2687:17, 2706:18, 2717:15, 2805:12, 2845:8, 2858:8
**domiciled** [1] - 2739:8
**donations** [1] - 2806:1
**done** [16] - 2663:16, 2689:6, 2701:7, 2701:10, 2704:24, 2714:23, 2715:7, 2715:11, 2768:7, 2841:11, 2844:11, 2866:21, 2868:23, 2868:24, 2869:1
**Donis** [2] - 2763:2, 2763:3, 2763:6
**door** [14] - 2641:3, 2642:5, 2719:1, 2719:11, 2730:12, 2743:3, 2743:5, 2744:21, 2746:11, 2746:19, 2747:25, 2748:8, 2751:4, 2751:19, 2752:19

**Dora** [1] - 2763:2
**double** [1] - 2672:3
**down** [41] - 2630:1, 2630:22, 2633:2, 2633:5, 2636:19, 2647:21, 2651:14, 2652:22, 2669:19, 2688:23, 2688:24, 2689:16, 2715:23, 2722:17, 2723:9, 2731:15, 2737:3, 2738:24, 2739:5, 2740:11, 2741:6, 2743:3, 2755:9, 2768:16, 2771:19, 2777:13, 2786:15, 2794:3, 2800:9, 2800:13, 2803:23, 2805:1, 2805:18, 2805:24, 2806:2, 2814:10, 2823:17, 2832:9, 2848:12, 2859:17
**downtown** [3] - 2733:9, 2737:4, 2738:20
**draft** [3] - 2651:25, 2712:13, 2831:5
**drafted** [1] - 2712:16
**draw** [3] - 2882:25, 2883:6
**drawdown** [1] - 2880:11
**drawing** [1] - 2689:16
**drawn** [1] - 2794:10
**dried** [1] - 2859:20
**drive** [12] - 2638:2, 2638:5, 2638:12, 2638:20, 2639:5, 2639:7, 2639:10, 2642:6, 2642:15, 2642:17, 2643:2, 2743:8
**dual** [1] - 2735:12
**due** [9] - 2739:24, 2778:17, 2827:19, 2827:20, 2831:11, 2837:23, 2838:16, 2844:18, 2854:1
**duly** [1] - 2723:11
**during** [7] - 2639:25, 2641:15, 2725:1, 2774:15, 2792:23, 2879:22
**dwarf** [1] - 2788:5
**dynamic** [1] - 2853:16

## E

**e-mail** [12] - 2661:2, 2661:3, 2663:14, 2830:5, 2877:19, 2877:22, 2878:9, 2879:19, 2887:8, 2888:7, 2889:3, 2889:5
**e-mailed** [2] - 2629:17, 2660:12
**e-mails** [6] - 2630:10, 2631:25, 2717:2, 2747:18, 2881:12, 2890:17
**Eagle** [2] - 2681:22, 2681:24
**early** [21] - 2730:4, 2731:2, 2740:21, 2742:6, 2744:4, 2744:15, 2759:3, 2765:6, 2765:17, 2765:19, 2767:15, 2770:3, 2782:24, 2787:11, 2792:15, 2793:21, 2793:22, 2849:23, 2860:25, 2880:2, 2889:21
**earn** [1] - 2711:7
**earned** [1] - 2724:23
**earnings** [7] - 2802:2, 2842:1, 2842:7, 2842:14, 2842:17, 2842:21, 2844:17
**easy** [4] - 2678:11, 2739:21, 2804:1
**eaten** [1] - 2685:25
**Economic** [1] - 2797:21
**economic** [3] - 2840:1, 2871:2, 2879:22
**economy** [2] - 2667:21, 2859:4

**effect** [5] - 2671:14, 2764:17, 2817:21, 2818:21, 2871:9
**efficiency** [1] - 2677:4
**effort** [21] - 2632:1, 2650:12, 2658:8, 2658:14, 2659:1, 2662:13, 2662:17, 2662:22, 2663:17, 2665:24, 2666:10, 2710:24, 2722:6, 2722:10, 2739:15, 2739:23, 2747:1, 2747:16, 2747:18, 2800:12
**efforts** [1] - 2637:20
**eight** [2] - 2659:19, 2865:2
**eighth** [1] - 2671:3
**either** [2] - 2750:22, 2787:11
**El** [1] - 2724:6
**elected** [1] - 2822:13
**election** [1] - 2822:12
**electronics** [1] - 2724:13
**eliminates** [1] - 2844:17
**ELMO** [2] - 2675:1, 2820:9
**emasculates** [1] - 2747:20
**embarrassed** [2] - 2769:8, 2786:3
**emphatic** [1] - 2715:8
**empire** [1] - 2639:15
**employed** [3] - 2736:9, 2782:12, 2795:3
**employee** [5] - 2696:15, 2810:1, 2824:3, 2844:4, 2864:22
**employees** [11] - 2650:20, 2654:9, 2677:1, 2741:18, 2757:17, 2767:21, 2772:4, 2836:15, 2844:8, 2860:15, 2865:25
**employer** [2] - 2653:5, 2727:5
**employment** [3] - 2653:6, 2726:15, 2731:16
**enables** [1] - 2807:8
**enclosed** [1] - 2665:8
**encountered** [1] - 2844:2
**end** [30] - 2658:20, 2659:3, 2659:6, 2675:5, 2675:9, 2675:12, 2675:13, 2689:11, 2722:11, 2726:17, 2726:23, 2727:1, 2731:7, 2731:9, 2733:13, 2736:14, 2741:4, 2742:23, 2765:21, 2787:7, 2787:11, 2794:20, 2838:25, 2840:3, 2856:9, 2857:7, 2857:10, 2858:7, 2859:3
**ended** [1] - 2771:18
**enforcement** [2] - 2818:10, 2819:14
**England** [2] - 2780:12, 2780:22
**enhance** [1] - 2842:2
**enlarge** [7] - 2649:11, 2801:14, 2836:19, 2840:11, 2846:15, 2853:5, 2854:22
**ensure** [1] - 2837:17
**enter** [1] - 2669:8
**entered** [3] - 2724:24, 2732:12, 2808:24
**entire** [6] - 2676:10, 2694:2, 2722:11, 2868:18, 2871:25, 2874:7
**entirety** [1] - 2715:14
**entities** [16] - 2670:1, 2670:2, 2681:2, 2684:17, 2685:10, 2686:10, 2686:14, 2696:1, 2708:13, 2708:17, 2709:23,

2710:11, 2710:13, 2710:15, 2719:15, 2831:3
**entitled** [2] - 2815:18, 2891:9
**entity** [8] - 2635:14, 2640:6, 2663:5, 2664:17, 2672:15, 2686:22, 2784:4
**entity's** [1] - 2686:25
**entrepreneur** [4] - 2673:16, 2673:24, 2674:4, 2674:15
**entrepreneurial** [3] - 2737:25, 2738:12, 2738:15
**entries** [2] - 2766:25, 2768:9
**entrust** [1] - 2844:21
**entrusted** [1] - 2844:21
**entry** [4] - 2702:15, 2739:21, 2804:1, 2807:9
**environment** [4] - 2800:16, 2871:2, 2875:13, 2879:22
**environments** [1] - 2853:14
**equal** [1] - 2785:17
**equals** [1] - 2846:6
**equipment** [3] - 2724:15, 2782:12, 2856:1
**equities** [2] - 2832:25, 2857:4
**equity** [10] - 2687:8, 2688:8, 2689:3, 2690:2, 2845:24, 2846:4, 2846:6, 2846:8, 2846:9, 2882:12
**establish** [4] - 2700:8, 2795:11, 2872:15, 2873:18
**established** [3] - 2771:14, 2771:16, 2804:6
**establishes** [2] - 2649:17, 2649:24
**establishing** [2] - 2774:1, 2882:2
**estate** [17] - 2687:9, 2693:17, 2698:12, 2698:17, 2699:1, 2732:23, 2757:3, 2769:15, 2769:20, 2769:22, 2770:1, 2770:7, 2783:2, 2840:23, 2840:25, 2882:14, 2888:10
**estimate** [1] - 2680:24
**et** [1] - 2829:7
**Europe** [8] - 2701:11, 2721:16, 2721:17, 2757:16, 2757:23, 2758:1, 2758:2, 2829:11
**European** [3] - 2679:4, 2714:2, 2717:1
**evening** [1] - 2876:7
**event** [2] - 2772:1, 2774:1
**events** [1] - 2697:24
**eventually** [7] - 2737:1, 2739:10, 2740:12, 2745:13, 2794:13, 2809:22, 2883:23
**evidence** [10] - 2669:8, 2729:4, 2747:3, 2752:5, 2752:11, 2772:21, 2775:23, 2802:18, 2846:14, 2852:19
**exact** [3] - 2659:10, 2703:15, 2754:6
**exactly** [7] - 2707:19, 2712:3, 2712:20, 2789:12, 2805:16, 2809:9, 2872:19
**examination** [2] - 2646:4, 2658:10, 2658:16, 2682:12, 2697:19, 2703:9, 2708:7, 2714:20, 2746:16, 2748:19, 2753:8, 2754:1, 2808:19, 2824:25, 2861:14
**EXAMINATION** [2] - 2627:4, 2627:5, 2627:6, 2627:7, 2627:8, 2627:11, 2636:21, 2673:11, 2697:14, 2716:5,

2720:4, 2723:13
  **examinations** [1] - 2810:1
  **example** [14] - 2665:18, 2678:21, 2711:17, 2711:23, 2736:1, 2765:14, 2808:22, 2818:23, 2832:17, 2833:19, 2837:22, 2843:7, 2845:7, 2884:4
  **examples** [1] - 2844:9
  **except** [3] - 2634:3, 2764:16, 2825:22
  **exception** [4] - 2735:11, 2773:22, 2816:12, 2816:19
  **excess** [3] - 2762:22, 2775:10, 2775:12
  **exchange** [2] - 2882:13
  **exchanges** [1] - 2837:10
  **exclude** [1] - 2814:17
  **excluding** [1] - 2864:3
  **exclusionary** [1] - 2816:18
  **excuse** [7] - 2744:24, 2775:15, 2814:18, 2817:4, 2826:22, 2838:2, 2851:3
  **excused** [1] - 2722:18
  **executed** [1] - 2668:8
  **executive** [4] - 2740:16, 2825:25, 2826:17, 2826:20
  **exhibit** [25] - 2647:19, 2652:5, 2667:2, 2667:5, 2667:20, 2668:6, 2672:6, 2748:19, 2802:17, 2812:2, 2812:3, 2813:2, 2813:7, 2860:2, 2861:7, 2861:11, 2876:23, 2877:2, 2877:14, 2878:4, 2878:6, 2879:12, 2880:5, 2880:17, 2881:6
  **Exhibit** [21] - 2648:25, 2651:7, 2660:8, 2669:1, 2671:18, 2710:19, 2728:20, 2775:23, 2797:17, 2801:11, 2810:6, 2820:13, 2835:14, 2846:13, 2852:19, 2854:10, 2854:14, 2856:17, 2876:18, 2876:19, 2887:6
  **exhibits** [16] - 2629:15, 2629:17, 2629:18, 2629:24, 2630:9, 2631:2, 2631:17, 2631:24, 2632:8, 2632:11, 2632:20, 2633:9, 2633:14, 2634:22, 2672:3
  **Exhibits** [4] - 2645:23, 2645:24, 2645:25, 2876:17
  **exist** [1] - 2807:10
  **existed** [2] - 2765:22, 2775:10
  **existence** [8] - 2785:1, 2785:3, 2794:22, 2794:23, 2834:24, 2834:25, 2865:15, 2878:17
  **existing** [3] - 2816:16, 2841:11, 2845:15
  **exists** [1] - 2778:19
  **exit** [1] - 2804:1
  **exorbitant** [1] - 2844:8
  **exorbitantly** [1] - 2843:25
  **expand** [1] - 2631:15
  **expanding** [1] - 2739:7
  **expect** [2] - 2718:20, 2866:3
  **expectations** [2] - 2842:23, 2880:14
  **expected** [1] - 2879:21
  **expenditures** [1] - 2888:4
  **expenses** [17] - 2678:24, 2680:15, 2680:17, 2680:25, 2682:13,

2682:20, 2715:16, 2719:8, 2719:16, 2737:2, 2758:8, 2758:9, 2761:14, 2834:12, 2844:1, 2844:4
  **Experience** [1] - 2651:18
  **experience** [7] - 2651:23, 2651:24, 2653:2, 2654:19, 2654:20, 2692:19, 2866:6
  **expert** [4] - 2656:4, 2656:5, 2656:6, 2656:7
  **expertise** [1] - 2703:4
  **experts** [1] - 2635:4
  **explain** [41] - 2655:1, 2686:16, 2718:24, 2734:1, 2734:12, 2735:22, 2737:12, 2739:16, 2740:4, 2750:12, 2762:11, 2765:8, 2772:10, 2775:12, 2778:20, 2780:11, 2783:2, 2783:24, 2785:9, 2788:19, 2800:22, 2804:9, 2807:3, 2807:16, 2829:15, 2830:24, 2832:5, 2834:7, 2837:13, 2842:4, 2844:19, 2846:1, 2847:13, 2861:3, 2862:13, 2863:3, 2868:11, 2870:21, 2882:21, 2883:6, 2883:22
  **explained** [5] - 2689:24, 2712:19, 2734:19, 2800:23, 2804:11
  **explaining** [3] - 2665:24, 2838:4, 2838:10
  **explains** [1] - 2792:16
  **explanation** [5] - 2684:3, 2732:21, 2733:22, 2767:9, 2788:1
  **explanations** [2] - 2740:1, 2807:17
  **expose** [1] - 2841:9
  **exposed** [1] - 2783:5
  **exposure** [1] - 2840:14
  **express** [4] - 2735:5, 2788:14, 2789:9, 2790:3
  **Express** [1] - 2682:16
  **expressed** [3] - 2775:1, 2788:17, 2790:7
  **expressing** [1] - 2790:21
  **extent** [3] - 2634:9, 2743:13, 2754:25
  **external** [10] - 2638:2, 2638:12, 2638:20, 2639:5, 2639:10, 2642:6, 2642:15, 2642:17, 2643:2, 2868:5
  **extreme** [2] - 2711:23, 2788:25
  **extremely** [1] - 2844:6
  **eye** [1] - 2715:18

# F

  **face** [8] - 2641:21, 2702:14, 2729:21, 2731:15, 2733:4
  **face-to-face** [3] - 2641:21, 2731:15, 2733:4
  **facing** [1] - 2727:7
  **facsimile** [2] - 2780:15, 2782:7
  **fact** [49] - 2639:13, 2646:23, 2650:23, 2657:16, 2658:8, 2659:18, 2659:22, 2666:14, 2666:16, 2671:13, 2676:14, 2700:12, 2703:3, 2704:5, 2705:16, 2705:25, 2709:1, 2709:4, 2710:14, 2712:2, 2722:2, 2750:25, 2753:19, 2752:16, 2771:7, 2773:11, 2782:6,

2783:19, 2789:9, 2805:8, 2808:18, 2826:9, 2859:13, 2863:19, 2867:16, 2867:20, 2867:22, 2868:14, 2868:16, 2868:18, 2870:6, 2870:11, 2871:24, 2874:15, 2876:3, 2876:6, 2882:4, 2885:15
  **factor** [3] - 2678:3, 2754:7, 2836:23
  **facts** [3] - 2659:5, 2747:15, 2772:20
  **failed** [2] - 2732:11, 2732:18, 2798:12, 2814:6, 2814:12
  **Failing** [1] - 2696:18
  **failure** [5] - 2772:1, 2775:17, 2778:17, 2784:2, 2801:1
  **fair** [10] - 2648:3, 2649:14, 2649:17, 2649:20, 2649:21, 2649:25, 2698:21, 2699:2, 2792:13, 2801:10
  **fairly** [4] - 2770:9, 2801:7, 2807:9, 2810:3
  **fairness** [2] - 2634:18, 2635:10
  **faith** [7] - 2751:25, 2752:1, 2816:12, 2816:19, 2817:2, 2818:17, 2818:18
  **fake** [7] - 2785:20, 2847:16, 2848:7, 2848:15, 2850:5, 2865:19
  **faker** [1] - 2848:21
  **faking** [3] - 2848:18, 2848:19, 2848:22
  **fall** [2] - 2811:19, 2888:23
  **false** [3] - 2766:22, 2767:22, 2837:1
  **familiar** [6] - 2655:22, 2656:5, 2707:4, 2707:15, 2717:8, 2832:1
  **family** [5] - 2723:25, 2738:24, 2793:10, 2806:6, 2825:9
  **fan** [1] - 2862:1
  **far** [9] - 2633:9, 2634:5, 2699:8, 2754:7, 2783:23, 2818:16, 2818:25, 2831:5, 2849:5
  **Farms** [2] - 2726:21, 2727:5
  **FAs** [1] - 2884:14
  **fast** [1] - 2659:12
  **faster** [1] - 2828:24
  **father** [11] - 2725:21, 2734:19, 2737:5, 2737:8, 2737:13, 2737:22, 2737:23, 2738:11, 2822:4, 2822:5, 2822:9
  **father's** [1] - 2738:8
  **fax** [6] - 2780:7, 2780:12, 2780:15, 2780:16, 2782:15, 2823:21
  **faxed** [3] - 2782:9, 2782:18, 2782:19
  **Fazel** [2] - 2625:20, 2625:21
  **FAZEL** [22] - 2628:7, 2628:20, 2628:22, 2628:24, 2629:1, 2629:3, 2660:9, 2748:4, 2748:18, 2751:17, 2751:20, 2753:18, 2754:14, 2755:11, 2756:1, 2756:3, 2756:7, 2756:11, 2818:14, 2819:12, 2819:19, 2820:3
  **Fazel's** [1] - 2755:2
  **FBI** [18] - 2641:2, 2642:5, 2642:10, 2642:14, 2642:17, 2643:16, 2643:21, 2644:6, 2644:8, 2644:11, 2645:6, 2645:8, 2690:16, 2691:2, 2691:9, 2703:24, 2704:5, 2811:16
  **FDCL** [1] - 2888:9
  **FDI** [1] - 2775:6
  **FDIC** [5] - 2771:3, 2771:8, 2774:20, 2774:24, 2775:9

**fear** [2] - 2741:16, 2743:19
**feared** [2] - 2741:18, 2741:20
**February** [12] - 2625:5, 2638:16, 2641:13, 2705:20, 2726:15, 2726:17, 2787:6, 2787:7, 2838:25, 2880:7, 2881:1
**Federal** [1] - 2771:3
**federal** [4] - 2715:8, 2727:7, 2815:6, 2816:17
**feet** [1] - 2782:3
**fellow** [1] - 2640:2
**felt** [2] - 2740:6, 2803:13
**few** [14] - 2631:4, 2634:11, 2690:19, 2694:1, 2716:7, 2724:23, 2731:3, 2735:25, 2761:18, 2762:14, 2818:6, 2821:11, 2827:5, 2876:22
**fide** [1] - 2849:9
**Fields** [2] - 2662:14, 2664:8
**fifth** [1] - 2670:11
**Fifth** [6] - 2813:15, 2813:19, 2814:6, 2816:5, 2816:6, 2816:10
**fight** [1] - 2798:17
**fighting** [1] - 2881:1
**figuring** [1] - 2847:12
**file** [5] - 2650:18, 2796:8, 2811:20, 2812:10, 2814:21
**filed** [9] - 2638:1, 2732:13, 2732:17, 2811:17, 2811:18, 2812:7, 2813:4, 2814:21
**files** [2] - 2781:21, 2781:23
**filings** [1] - 2634:5
**fill** [1] - 2792:16
**final** [4] - 2718:23, 2830:25, 2831:15, 2831:21
**finally** [3] - 2743:2, 2786:6, 2887:5
**finance** [2] - 2725:12, 2770:18
**Finance** [3] - 2797:21, 2799:9, 2800:6
**financed** [1] - 2770:2
**finances** [2] - 2796:6, 2848:4
**Financial** [37] - 2649:2, 2654:3, 2655:16, 2686:19, 2686:24, 2726:9, 2726:11, 2726:16, 2727:10, 2734:4, 2736:5, 2736:9, 2760:13, 2769:10, 2769:17, 2784:15, 2808:1, 2808:20, 2809:17, 2809:21, 2823:2, 2823:14, 2824:7, 2834:18, 2863:2, 2865:12, 2869:9, 2872:24, 2884:1, 2884:2, 2884:8, 2884:11, 2885:3, 2885:15, 2886:1, 2887:20, 2888:14
**financial** [62] - 2634:10, 2648:5, 2648:12, 2649:16, 2649:23, 2655:22, 2684:6, 2684:9, 2684:11, 2684:16, 2684:25, 2685:5, 2685:15, 2690:3, 2703:6, 2734:16, 2737:11, 2739:13, 2745:13, 2757:15, 2757:20, 2761:17, 2761:20, 2762:4, 2762:7, 2763:9, 2763:11, 2765:4, 2767:1, 2767:4, 2767:18, 2775:18, 2786:8, 2793:24, 2794:3, 2794:4, 2794:7, 2794:10, 2796:13, 2796:17, 2796:19, 2797:3, 2805:5, 2825:21, 2830:17, 2831:5, 2832:17, 2834:21, 2843:7, 2843:10, 2848:6, 2849:25, 2855:14, 2855:22,

2860:12, 2863:10, 2865:18, 2874:6, 2879:25, 2886:18
**financials** [2] - 2708:16, 2865:18
**financing** [2] - 2769:22, 2770:6
**fine** [8] - 2629:9, 2637:1, 2792:6, 2802:4, 2829:8, 2844:14, 2853:25, 2854:12
**finger** [1] - 2830:4
**finish** [3] - 2630:8, 2830:20, 2838:11
**finished** [1] - 2831:9
**firm** [14] - 2659:23, 2660:4, 2662:15, 2662:18, 2664:8, 2664:18, 2664:19, 2665:25, 2722:3, 2725:5, 2725:14, 2726:7, 2726:8, 2862:10
**Firm** [1] - 2626:6
**first** [56] - 2630:21, 2645:1, 2677:18, 2689:6, 2723:11, 2730:2, 2730:3, 2733:4, 2735:9, 2736:23, 2738:17, 2740:3, 2749:4, 2751:5, 2756:20, 2756:22, 2757:6, 2757:22, 2757:25, 2758:3, 2758:20, 2760:7, 2769:10, 2770:22, 2774:11, 2774:18, 2776:9, 2776:22, 2776:23, 2777:6, 2777:10, 2777:15, 2777:19, 2777:25, 2778:1, 2778:14, 2784:10, 2784:12, 2796:2, 2797:23, 2798:1, 2801:23, 2802:6, 2803:2, 2812:22, 2861:16, 2861:17, 2861:20, 2861:24, 2861:25, 2866:16, 2869:2, 2885:25, 2889:5, 2890:16, 2890:21
**fitness** [5] - 2732:7, 2732:9, 2732:18, 2732:20, 2798:12
**five** [8] - 2647:20, 2665:14, 2665:15, 2734:7, 2745:23, 2745:24, 2755:7, 2794:21
**fixed** [1] - 2857:3
**fixtures** [1] - 2763:12
**flattered** [1] - 2743:18
**flattery** [1] - 2741:16
**fleet** [2] - 2724:13, 2844:6
**flew** [2] - 2680:10, 2780:15
**flexibility** [1] - 2677:4
**flight** [1] - 2782:24
**Floor** [2] - 2625:22, 2626:4
**floor** [9] - 2733:8, 2733:11, 2738:19, 2742:12, 2781:5, 2781:9, 2787:21, 2787:25, 2874:21
**Florida** [3] - 2732:22, 2736:10, 2825:13
**flow** [3] - 2686:20, 2752:23, 2753:10, 2831:7, 2883:23
**flowing** [1] - 2885:25
**fly** [13] - 2664:21, 2680:12, 2681:5, 2681:8, 2713:20, 2731:15, 2780:5, 2780:6, 2780:9, 2780:11, 2780:22, 2783:12, 2785:19
**fly-by-night** [1] - 2664:21
**flying** [1] - 2680:16
**focus** [8] - 2632:8, 2675:4, 2675:7, 2678:2, 2702:3, 2770:25, 2836:22, 2882:22
**focused** [1] - 2632:7

**focussing** [5] - 2766:7, 2779:11, 2787:9, 2787:10, 2787:22
**follow** [7] - 2702:15, 2748:4, 2772:13, 2776:1, 2835:15, 2853:14, 2854:25
**follow-up** [1] - 2748:4
**followed** [1] - 2822:6
**following** [16] - 2628:3, 2630:23, 2636:14, 2707:25, 2725:5, 2725:21, 2731:3, 2733:1, 2756:13, 2773:12, 2773:18, 2811:1, 2820:6, 2822:13, 2825:9, 2890:25
**follows** [1] - 2723:12
**football** [5] - 2642:6, 2642:7, 2643:2, 2690:16, 2697:2
**footnotes** [1] - 2831:7
**FOR** [3] - 2625:13, 2625:20, 2626:2
**force** [1] - 2775:14
**foregoing** [1] - 2891:7
**foreign** [14] - 2654:24, 2655:2, 2655:6, 2655:7, 2655:19, 2656:8, 2735:7, 2735:8, 2757:1, 2763:20, 2764:23, 2777:23, 2846:19, 2846:20
**forgive** [1] - 2789:15
**form** [14] - 2644:3, 2661:16, 2687:19, 2687:24, 2701:19, 2719:4, 2771:13, 2777:12, 2788:9, 2841:10, 2884:22
**formal** [1] - 2736:21
**former** [1] - 2798:8
**forth** [2] - 2818:12, 2829:6
**forward** [3] - 2849:13, 2881:8, 2882:4
**forwarded** [1] - 2881:17
**forwarding** [3] - 2877:1, 2878:8, 2880:21
**foundation** [3] - 2812:2, 2813:9, 2872:14
**four** [7] - 2631:10, 2647:20, 2724:1, 2724:2, 2754:12, 2755:6, 2816:15
**Four** [1] - 2874:21
**Fourth** [3] - 2814:19, 2817:4, 2819:13
**fourth** [2] - 2670:11, 2817:4
**fraction** [2] - 2857:24, 2872:11
**frame** [1] - 2641:5
**francs** [1] - 2764:24
**Frank** [1] - 2829:13
**fraud** [19] - 2728:4, 2783:4, 2783:22, 2784:24, 2785:18, 2790:14, 2800:25, 2849:6, 2849:7, 2850:10, 2850:25, 2865:1, 2865:4, 2865:5, 2865:6, 2866:9, 2870:20, 2875:9
**fraudulent** [1] - 2843:9
**free** [1] - 2722:18
**freely** [1] - 2807:9
**Freeway** [2] - 2743:9, 2743:16
**freeze** [1] - 2700:17
**frequent** [2] - 2770:9, 2787:8
**frequently** [3] - 2730:25, 2731:2, 2741:6
**friends** [2] - 2803:12, 2803:13
**friendship** [1] - 2804:10
**front** [6] - 2630:12, 2638:4, 2645:13, 2657:17, 2767:3, 2826:9
**fruit** [1] - 2726:20

**FSGC** [1] - 2653:23
**FSRC** [1] - 2823:2
**fulfill** [1] - 2863:7
**full** [7] - 2704:21, 2704:22, 2724:25, 2739:9, 2776:4, 2865:19
**full-functioning** [1] - 2739:9
**fully** [2] - 2850:5, 2881:24
**function** [3] - 2650:9, 2863:4, 2863:5
**functioning** [1] - 2739:9
**Fund** [8] - 2777:22, 2778:2, 2778:23, 2779:3, 2780:4, 2781:2, 2781:3, 2781:13
**fund** [4] - 2688:2, 2748:21, 2784:20
**funded** [4] - 2695:25, 2719:14, 2869:21, 2869:22
**funding** [7] - 2663:21, 2679:4, 2680:17, 2695:4, 2696:22, 2715:11, 2886:17
**funds** [22] - 2756:25, 2758:7, 2758:25, 2763:21, 2770:21, 2831:7, 2833:1, 2834:3, 2834:7, 2846:18, 2857:4, 2870:23, 2876:2, 2884:16, 2884:21, 2885:14, 2885:15, 2886:4
**funnel** [1] - 2875:17
**furnish** [4] - 2763:6, 2764:17, 2765:2, 2766:25
**furniture** [2] - 2733:12, 2763:12
**future** [2] - 2718:20, 2752:22

## G

**GAAP** [11] - 2654:24, 2655:2, 2655:3, 2655:6, 2655:13, 2655:19, 2656:8, 2656:9, 2789:18
**gaining** [1] - 2642:14
**Gant** [3] - 2818:21, 2818:23
**gap** [1] - 2792:25
**gather** [1] - 2818:1
**gears** [1] - 2645:17
**general** [20] - 2642:2, 2653:23, 2655:4, 2655:7, 2734:12, 2734:14, 2760:10, 2762:11, 2763:8, 2766:25, 2776:14, 2794:6, 2794:9, 2812:6, 2813:9, 2826:22, 2831:4, 2833:11, 2834:20, 2882:11
**generally** [5] - 2634:22, 2654:5, 2741:1, 2833:13, 2852:2
**gentleman** [2] - 2744:21, 2808:12
**gentlemen** [4] - 2745:23, 2810:20, 2890:11, 2890:21
**Georgetown** [2] - 2874:22, 2876:7
**Gibson** [2] - 2725:4, 2725:13
**Gil** [2] - 2668:18, 2696:11
**Giselle** [3] - 2824:2, 2824:3
**given** [20] - 2642:7, 2684:5, 2689:2, 2704:16, 2712:5, 2712:19, 2718:5, 2780:16, 2782:7, 2786:6, 2793:24, 2796:20, 2837:23, 2843:13, 2847:17, 2855:9, 2872:24, 2875:14, 2888:1
**Gizelle** [1] - 2824:1
**glad** [2] - 2755:10, 2756:9

**glass** [2] - 2719:20, 2719:23, 2720:6
**Global** [3] - 2686:24, 2842:19, 2842:20
**global** [10] - 2654:11, 2654:22, 2835:6, 2840:13, 2840:14, 2842:20, 2862:7, 2862:20, 2862:22, 2863:6
**globally** [1] - 2853:10
**glossy** [1] - 2831:14
**goal** [4] - 2662:10, 2677:1, 2703:7, 2716:2
**God** [2] - 2700:21, 2789:15
**Godbey** [5] - 2635:24, 2636:1, 2815:7, 2816:17, 2819:25
**Godbey's** [2] - 2816:13, 2818:9
**GOVERNMENT** [1] - 2625:13
**Government** [7] - 2635:16, 2660:7, 2660:8, 2666:24, 2676:18, 2684:14, 2817:8
**government** [43] - 2628:17, 2631:2, 2631:19, 2631:20, 2632:17, 2635:13, 2644:21, 2646:16, 2649:7, 2694:23, 2695:1, 2695:7, 2716:3, 2729:5, 2729:10, 2729:12, 2729:14, 2729:17, 2746:12, 2746:20, 2746:24, 2747:7, 2747:14, 2747:20, 2748:17, 2748:19, 2755:13, 2755:14, 2755:17, 2765:12, 2773:14, 2806:14, 2806:18, 2806:20, 2806:25, 2807:8, 2813:12, 2815:8, 2816:9, 2816:12, 2817:3, 2817:8, 2819:11
**government's** [3] - 2633:12, 2746:10, 2748:5
**Government's** [26] - 2645:23, 2645:25, 2646:9, 2648:24, 2666:16, 2710:19, 2728:19, 2775:23, 2797:17, 2801:11, 2810:6, 2811:10, 2813:2, 2820:13, 2835:14, 2846:13, 2852:18, 2854:10, 2854:14, 2856:17, 2857:15, 2876:17, 2876:18, 2876:19, 2887:6
**governments** [2] - 2678:6, 2800:13, 2837:6
**grade** [1] - 2846:20
**graduate** [3] - 2724:22, 2730:21, 2864:15
**graduated** [4] - 2724:7, 2725:2, 2730:23, 2731:1
**graduating** [1] - 2726:10
**grand** [1] - 2763:5
**grandchildren** [1] - 2724:3
**grasp** [1] - 2659:15
**great** [6] - 2677:14, 2709:5, 2709:7, 2739:23, 2761:1, 2810:19
**greater** [2] - 2711:15, 2763:14, 2844:13, 2852:4
**Greater** [1] - 2845:23
**greedy** [1] - 2769:9
**green** [1] - 2733:12
**Green** [2] - 2863:15, 2870:17
**Gregg** [1] - 2625:13
**gross** [1] - 2694:2
**grounds** [2] - 2813:8, 2813:11
**group** [7] - 2628:25, 2639:14, 2857:20, 2862:25, 2863:23, 2871:1, 2873:10

2727:10, 2734:4, 2736:5, 2736:9, 2760:13, 2769:11, 2769:17, 2784:15, 2794:11, 2834:18, 2862:10, 2862:14, 2862:16, 2863:2, 2863:12, 2865:12, 2869:9, 2872:24, 2884:2, 2884:9, 2884:12, 2885:3, 2885:15, 2886:1, 2887:20, 2888:14
**groupings** [1] - 2837:21
**groups** [3] - 2824:3, 2868:25, 2869:1
**grow** [5] - 2633:5, 2788:4, 2788:23, 2789:4, 2792:7
**growing** [6] - 2633:2, 2739:7, 2739:8, 2785:12, 2785:15, 2791:17
**grown** [1] - 2790:10
**growth** [4] - 2888:25, 2789:5, 2789:6, 2839:24
**Guardian** [19] - 2734:24, 2735:16, 2758:14, 2762:12, 2766:14, 2769:13, 2769:14, 2769:18, 2769:22, 2770:25, 2771:8, 2774:16, 2775:16, 2775:20, 2784:3, 2785:11, 2793:25, 2796:3, 2801:12
**guess** [3] - 2633:22, 2761:5, 2773:7
**guilty** [5] - 2727:22, 2728:1, 2728:2, 2749:19, 2749:24
**guys** [2] - 2629:8, 2664:21

## H

**half** [12] - 2640:11, 2695:22, 2707:20, 2743:17, 2781:17, 2781:19, 2786:25, 2787:13, 2788:8, 2849:23, 2851:17
**hall** [1] - 2743:3
**hallway** [1] - 2730:10
**hammer** [2] - 2777:13, 2805:18
**hand** [6] - 2722:24, 2730:13, 2743:18, 2776:1, 2858:13, 2862:6
**handcuffed** [1] - 2791:11
**handed** [2] - 2736:22, 2782:8
**handle** [2] - 2740:23
**handled** [2] - 2664:22, 2740:24, 2762:25
**handling** [2] - 2758:24, 2761:13
**hands** [4] - 2791:11, 2791:22, 2830:2, 2836:3
**hands-on** [2] - 2830:2, 2836:3
**handwriting** [1] - 2660:25
**handwrote** [1] - 2736:22
**hang** [1] - 2853:20
**hangars** [2] - 2667:18, 2844:7
**happy** [1] - 2681:8
**hard** [12] - 2632:4, 2638:2, 2638:5, 2638:12, 2638:20, 2639:10, 2642:15, 2642:17, 2643:2, 2776:1, 2853:17, 2887:6
**hardly** [1] - 2687:14
**Harry** [1] - 2696:18
**head** [3] - 2808:1, 2808:10, 2808:15
**heading** [1] - 2824:7
**headquarters** [4] - 2733:18, 2738:25, 2739:6, 2739:10, 2739:14, 2740:15
**hear** [6] - 2645:5, 2669:6, 2671:22,

2759:10, 2812:14, 2886:6
**heard** [9] - 2644:23, 2683:16, 2705:25, 2771:11, 2772:23, 2827:5, 2857:18, 2882:3, 2890:13
**hearsay** [3] - 2773:8, 2826:18, 2827:1
**Hearsay** [1] - 2773:22
**heating** [1] - 2879:25
**heavily** [1] - 2743:2
**heavy** [3] - 2840:3, 2841:6
**hectic** [1] - 2730:19
**hedge** [1] - 2833:1
**held** [14] - 2628:3, 2630:23, 2636:14, 2661:18, 2661:22, 2707:25, 2756:13, 2774:22, 2775:17, 2793:3, 2811:1, 2820:6, 2832:12, 2890:25
**help** [10] - 2659:23, 2666:2, 2669:16, 2672:4, 2714:10, 2714:16, 2731:12, 2731:17, 2745:5, 2828:25
**helping** [1] - 2718:13
**HENRY** [2] - 2627:3, 2636:20
**Henry** [3] - 2629:20, 2661:16, 2665:7
**herself** [2] - 2868:14, 2868:17
**Hewlett** [6] - 2691:17, 2691:19, 2691:23, 2692:21, 2700:21, 2700:24
**Hewlett's** [1] - 2702:24
**high** [12] - 2645:24, 2701:15, 2713:10, 2724:7, 2733:13, 2782:3, 2843:25, 2844:5, 2844:6, 2844:8, 2851:11, 2883:12
**high-end** [1] - 2733:13
**higher** [4] - 2703:4, 2735:19, 2735:21, 2844:8
**highest** [2] - 2678:2, 2836:22
**highlight** [5] - 2647:23, 2649:11, 2676:22, 2677:14, 2685:15
**highlighted** [2] - 2639:2, 2754:16
**highly** [2] - 2678:5, 2837:5
**himself** [3] - 2738:9, 2738:14, 2799:2
**hire** [5] - 2652:20, 2653:15, 2865:3, 2865:22, 2875:23
**hired** [14] - 2659:23, 2662:14, 2664:18, 2665:25, 2670:25, 2671:1, 2714:10, 2714:16, 2727:6, 2809:22, 2809:25, 2864:11, 2865:21, 2866:2
**hiring** [2] - 2651:3, 2865:24
**historically** [1] - 2806:6
**history** [3] - 2653:23, 2702:16, 2746:25
**hit** [2] - 2751:21, 2883:16
**HITTNER** [1] - 2625:10
**Hittner** [1] - 2729:24
**Hold** [2] - 2817:19, 2857:12
**hold** [18] - 2676:3, 2700:13, 2755:6, 2759:6, 2777:11, 2785:13, 2791:10, 2812:4, 2815:14, 2817:7, 2817:13, 2826:24, 2848:11, 2868:14, 2868:17, 2874:1
**holder** [1] - 2845:9
**holders** [6] - 2789:3, 2843:8, 2845:4, 2845:5, 2845:15, 2884:14
**Holdings** [2] - 2665:19, 2672:12
**hole** [10] - 2789:2, 2789:4, 2792:7,

2792:8, 2792:16, 2859:1, 2859:2, 2859:8, 2859:9, 2883:2
**Holt** [23] - 2863:25, 2866:24, 2867:3, 2867:8, 2867:17, 2867:19, 2867:23, 2869:2, 2869:17, 2870:13, 2870:19, 2871:7, 2871:11, 2871:24, 2872:22, 2874:14, 2874:24, 2874:25, 2875:8, 2876:6, 2876:9, 2876:10, 2878:25
**Holt's** [2] - 2875:23, 2876:4
**home** [6] - 2805:3, 2822:18, 2823:22, 2823:23, 2823:24, 2824:2
**honest** [1] - 2749:15
**honestly** [1] - 2751:1
**Honor** [80] - 2628:7, 2630:9, 2631:5, 2631:17, 2636:18, 2644:2, 2646:10, 2651:6, 2651:10, 2664:1, 2669:4, 2671:21, 2707:1, 2708:2, 2709:8, 2712:9, 2722:16, 2722:20, 2723:7, 2728:24, 2742:19, 2745:1, 2745:17, 2746:3, 2746:9, 2748:14, 2749:3, 2749:6, 2751:13, 2752:18, 2754:4, 2755:11, 2756:16, 2760:19, 2760:24, 2766:4, 2772:14, 2782:14, 2790:17, 2791:2, 2791:9, 2792:13, 2809:4, 2811:5, 2811:7, 2812:13, 2812:19, 2812:21, 2813:5, 2814:3, 2814:5, 2817:2, 2820:8, 2821:9, 2821:12, 2821:18, 2821:22, 2827:6, 2828:12, 2835:18, 2835:21, 2838:8, 2848:13, 2848:23, 2849:1, 2849:20, 2850:20, 2851:10, 2853:21, 2857:14, 2860:4, 2860:5, 2872:3, 2872:20, 2879:10, 2881:22, 2883:14, 2886:8, 2887:2, 2890:19
**HONORABLE** [1] - 2625:10
**honorably** [1] - 2724:16
**honors** [1] - 2806:24
**hop** [1] - 2783:11
**Hop** [1] - 2743:14
**hope** [2] - 2716:2, 2783:18
**hopefully** [1] - 2716:8
**hoping** [1] - 2643:24
**Horizons** [1] - 2837:12
**horizons** [4] - 2837:15, 2837:16, 2837:19, 2838:5
**hotel** [4] - 2780:24, 2781:1, 2781:7, 2782:10
**Hotel** [2] - 2780:25, 2874:21
**hour** [2] - 2707:20, 2743:16
**house** [1] - 2643:4
**housed** [1] - 2781:8
**housekeeper** [1] - 2628:8
**HOUSTON** [1] - 2625:2
**Houston** [25] - 2625:4, 2625:15, 2625:23, 2626:4, 2626:7, 2626:12, 2686:19, 2733:5, 2733:7, 2733:9, 2737:3, 2737:4, 2738:20, 2740:11, 2740:19, 2745:5, 2769:16, 2780:10, 2782:8, 2782:24, 2787:21, 2825:4, 2825:6, 2825:7, 2825:13
**Howard** [1] - 2625:16
**HR** [2] - 2650:18, 2829:6

**Hugo** [2] - 2799:18, 2799:22
**hundred** [3] - 2706:18, 2706:20, 2845:8
**Hurricane** [1] - 2799:18
**husband** [4] - 2875:19, 2875:23, 2876:4
**hush** [1] - 2824:24

**I**

**IAS** [1] - 2657:15
**ice** [1] - 2704:21
**icebox** [1] - 2704:21
**idea** [9] - 2629:25, 2667:25, 2685:11, 2701:12, 2713:9, 2720:16, 2731:5, 2818:22, 2829:4
**ideas** [1] - 2713:17
**identified** [9] - 2631:7, 2728:17, 2813:12, 2813:13, 2829:21, 2835:19, 2857:16, 2859:19, 2861:13
**identify** [5] - 2728:11, 2812:23, 2812:24, 2821:20, 2870:24
**IFRS** [11] - 2654:24, 2655:10, 2655:13, 2655:15, 2656:3, 2656:9, 2656:13, 2656:14, 2656:19, 2656:24, 2657:13
**II** [1] - 2672:23
**illegal** [1] - 2700:16
**illegally** [1] - 2750:8
**immaterial** [1] - 2751:14
**immediately** [1] - 2628:16
**impact** [1] - 2844:17
**impeach** [1] - 2755:19
**impede** [1] - 2728:5
**impeded** [1] - 2774:22
**imperative** [1] - 2800:21
**impetus** [1] - 2799:20
**importance** [1] - 2792:24
**impose** [1] - 2835:15
**impression** [2] - 2658:25, 2659:10
**improvements** [2] - 2879:23, 2881:4
**inability** [1] - 2634:23
**inadvertently** [1] - 2753:7
**Inc** [2] - 2665:19, 2669:24
**inception** [1] - 2841:20
**incident** [3] - 2742:1, 2743:12, 2826:16
**include** [7] - 2646:21, 2668:10, 2683:21, 2816:17, 2840:19, 2852:15, 2855:22
**included** [7] - 2635:25, 2638:2, 2763:8, 2796:17, 2797:11, 2830:15, 2878:9
**includes** [2] - 2653:23, 2857:3
**including** [6] - 2699:1, 2707:7, 2816:15, 2816:24, 2860:20, 2882:15
**inclusive** [3] - 2763:19, 2764:15, 2767:18
**income** [2] - 2735:24, 2857:4
**inconsistent** [2] - 2691:14, 2691:16
**incorporated** [1] - 2635:24
**incorporation** [2] - 2777:24, 2779:25

**incorrect** [1] - 2668:2
**increase** [2] - 2711:19, 2880:15
**increased** [4] - 2698:19, 2794:18, 2794:21, 2859:5
**increases** [1] - 2711:11
**indeed** [1] - 2783:19
**indemnified** [1] - 2775:20
**index** [1] - 2677:5
**indicate** [3] - 2659:13, 2686:8, 2798:16
**indicated** [6] - 2668:8, 2758:6, 2775:6, 2780:13, 2798:18, 2810:2
**indicating** [1] - 2780:8
**indicted** [2] - 2643:25, 2704:1
**indictment** [1] - 2850:15
**Indies** [3] - 2733:19, 2738:25, 2802:1
**individual** [9] - 2737:25, 2744:4, 2762:17, 2785:20, 2807:23, 2822:24, 2823:1, 2824:6, 2864:4
**individual's** [1] - 2760:1
**individuals** [11] - 2807:5, 2807:7, 2821:13, 2821:22, 2829:1, 2829:14, 2829:17, 2830:7, 2868:5, 2885:6, 2885:13
**industry** [2] - 2652:17, 2864:18
**information** [44] - 2632:7, 2637:23, 2637:25, 2638:1, 2638:5, 2638:20, 2638:21, 2638:25, 2639:4, 2639:7, 2639:10, 2642:24, 2652:8, 2653:14, 2661:21, 2700:8, 2701:16, 2702:12, 2718:5, 2718:21, 2721:24, 2762:23, 2762:25, 2764:10, 2765:3, 2765:5, 2765:13, 2766:9, 2766:10, 2766:11, 2766:24, 2793:10, 2796:5, 2796:12, 2796:24, 2799:10, 2799:11, 2843:6, 2843:12, 2847:25, 2861:1, 2872:24, 2879:3, 2886:19
**infrequently** [1] - 2731:3
**initial** [9] - 2633:11, 2734:25, 2779:5, 2787:11, 2787:22, 2789:17, 2814:25, 2815:2, 2876:2
**inner** [1] - 2639:14
**inquiries** [2] - 2785:17
**inquiry** [2] - 2815:8, 2819:3
**inside** [1] - 2781:11
**insiders** [1] - 2807:5
**insisted** [1] - 2826:15
**insofar** [1] - 2880:11
**insolvent** [3] - 2805:7, 2805:9, 2805:24
**instance** [1] - 2755:25
**instead** [1] - 2750:19
**instilled** [1] - 2743:19
**institution** [2] - 2832:17, 2860:13
**institutions** [5] - 2757:15, 2765:4, 2767:4, 2775:17, 2775:18
**instructed** [1] - 2777:1
**instruction** [1] - 2752:6
**instructions** [7] - 2668:11, 2668:12, 2670:7, 2888:1, 2888:4, 2889:8, 2889:9
**instrument** [2] - 2704:25, 2850:12
**instruments** [1] - 2832:13, 2832:14,

2833:2
**insurance** [27] - 2683:17, 2725:14, 2754:22, 2771:8, 2771:23, 2771:25, 2772:5, 2772:18, 2773:19, 2774:16, 2774:20, 2774:22, 2774:24, 2775:6, 2775:9, 2775:10, 2775:19, 2778:1, 2780:1, 2781:22, 2781:24, 2782:20, 2783:13, 2783:20, 2783:25, 2784:6, 2784:20
**Insurance** [9] - 2771:4, 2777:22, 2778:2, 2778:23, 2779:3, 2780:4, 2781:2, 2781:3, 2781:13
**insure** [2] - 2775:15, 2775:16
**insured** [3] - 2771:3, 2784:9, 2784:10
**Insurex** [1] - 2725:14
**intelligent** [1] - 2718:4
**intend** [1] - 2661:17
**intent** [7] - 2748:7, 2751:19, 2751:20, 2751:21, 2751:25, 2752:7, 2752:10
**intention** [1] - 2866:8
**interact** [1] - 2836:14
**interacting** [1] - 2819:14
**interaction** [1] - 2640:18
**interconnected** [1] - 2657:3
**interest** [11] - 2669:20, 2672:11, 2735:15, 2735:17, 2744:3, 2763:4, 2789:3, 2789:10, 2813:21, 2842:2, 2842:22
**interested** [2] - 2651:3, 2652:19
**interim** [1] - 2807:25
**intermediary** [2] - 2884:9, 2885:4
**internal** [9] - 2734:16, 2809:22, 2823:10, 2857:17, 2857:19, 2860:13, 2860:23, 2868:5, 2884:14
**Internal** [2] - 2638:9
**internally** [2] - 2832:7, 2832:9
**international** [5] - 2655:16, 2655:22, 2678:7, 2775:7, 2791:24
**International** [39] - 2646:1, 2661:8, 2661:11, 2665:21, 2667:8, 2669:20, 2686:16, 2686:22, 2687:2, 2696:2, 2725:15, 2726:4, 2727:15, 2734:24, 2758:14, 2762:12, 2769:19, 2775:16, 2775:20, 2784:4, 2793:25, 2801:12, 2809:13, 2809:23, 2823:7, 2823:10, 2824:25, 2832:2, 2834:23, 2839:3, 2862:18, 2877:8, 2878:1, 2878:10, 2880:24, 2881:10, 2884:1, 2888:22
**Internet** [1] - 2652:11
**interpretation** [1] - 2818:18
**interrelated** [1] - 2657:3
**interruptions** [1] - 2873:25
**intimately** [1] - 2886:14
**intimation** [1] - 2710:4
**intimidation** [2] - 2741:16, 2743:19
**introduce** [1] - 2723:17
**invalid** [1] - 2750:8
**invest** [7] - 2698:11, 2698:16, 2714:17, 2718:4, 2780:14, 2785:20
**investable** [7] - 2833:3, 2844:13, 2845:23, 2845:25, 2846:8, 2857:9,

**invested** [24] - 2678:4, 2715:14, 2716:1, 2719:17, 2721:25, 2758:7, 2763:22, 2788:21, 2788:25, 2834:9, 2834:11, 2834:15, 2837:4, 2837:7, 2838:18, 2838:21, 2846:19, 2847:1, 2858:12, 2860:1, 2862:22, 2871:4, 2871:5, 2871:6
**investigation** [1] - 2728:5
**investigations** [1] - 2799:1
**investigator** [6] - 2638:10, 2638:12, 2638:19, 2638:23, 2639:9, 2639:18
**investing** [6] - 2678:8, 2698:24, 2749:12, 2757:13, 2853:16, 2870:23
**investment** [56] - 2677:1, 2677:19, 2711:2, 2711:3, 2711:12, 2711:23, 2712:22, 2713:17, 2727:18, 2750:6, 2764:16, 2764:20, 2764:22, 2767:24, 2778:18, 2783:19, 2788:6, 2832:6, 2832:8, 2832:16, 2833:1, 2835:1, 2837:15, 2837:16, 2837:19, 2838:4, 2838:12, 2839:21, 2840:13, 2840:14, 2840:20, 2842:23, 2843:4, 2846:20, 2853:6, 2853:9, 2862:20, 2863:7, 2863:25, 2867:2, 2867:9, 2867:12, 2867:24, 2868:13, 2870:22, 2871:1, 2872:23, 2877:6, 2877:7, 2877:25, 2878:10, 2878:11, 2880:22, 2880:24, 2881:10
**Investment** [1] - 2837:12
**investments** [59] - 2648:3, 2649:14, 2649:21, 2674:18, 2676:12, 2676:15, 2678:17, 2699:1, 2705:10, 2709:23, 2711:10, 2711:14, 2711:24, 2714:2, 2714:12, 2717:9, 2719:18, 2720:16, 2720:18, 2720:23, 2720:25, 2721:15, 2721:16, 2721:19, 2727:20, 2727:21, 2753:12, 2753:21, 2757:3, 2763:16, 2763:17, 2763:18, 2763:21, 2764:11, 2768:13, 2786:24, 2788:2, 2808:22, 2832:9, 2832:24, 2833:6, 2837:8, 2837:24, 2840:18, 2842:19, 2842:20, 2857:1, 2857:3, 2860:11, 2860:14, 2860:16, 2860:17, 2860:18, 2863:5, 2863:7, 2868:15, 2882:12
**investor** [2] - 2713:15, 2869:1
**investors** [2] - 2719:24, 2751:8
**invests** [2] - 2698:25, 2710:10
**involved** [21] - 2690:10, 2713:11, 2716:10, 2745:11, 2745:12, 2745:15, 2758:20, 2763:9, 2830:9, 2830:18, 2830:21, 2836:1, 2836:3, 2843:3, 2847:14, 2848:8, 2848:18, 2848:19, 2865:1, 2865:3, 2871:9
**involvement** [1] - 2717:4
**irrelevant** [2] - 2693:8, 2850:14
**island** [11] - 2656:12, 2721:20, 2741:9, 2798:21, 2799:20, 2800:1, 2800:4, 2803:10, 2804:14, 2807:21
**issue** [23] - 2629:15, 2632:20, 2632:23, 2632:24, 2633:23, 2634:21, 2634:22, 2683:8, 2685:6, 2701:22, 2746:4, 2753:9, 2755:14, 2755:15, 2789:18, 2790:2, 2792:24, 2815:15,

2827:25, 2828:2, 2840:4, 2852:23

**issued** [10] - 2678:5, 2802:17, 2807:5, 2807:6, 2830:13, 2831:17, 2832:17, 2837:6, 2852:24, 2881:20

**issuer** [1] - 2669:24

**issues** [4] - 2699:20, 2815:5, 2815:20, 2818:15

**issuing** [1] - 2803:14

**item** [1] - 2634:6

**item-by-item** [1] - 2634:6

**items** [10] - 2647:9, 2763:13, 2763:20, 2774:5, 2812:23, 2812:25, 2814:20, 2818:8, 2834:11, 2859:19

**itself** [5] - 2710:15, 2749:25, 2776:2, 2783:23, 2823:7

---

# J

**Jack** [1] - 2829:11

**jackets** [1] - 2853:24

**James** [12] - 2670:21, 2670:22, 2722:21, 2723:19, 2734:19, 2734:22, 2737:5, 2737:7, 2737:16, 2758:16, 2762:1, 2794:2

**JAMES** [2] - 2627:10, 2723:10

**January** [14] - 2638:15, 2724:19, 2733:5, 2736:24, 2787:6, 2795:7, 2795:10, 2795:13, 2857:11, 2859:20, 2877:23, 2879:15, 2880:12

**Jason** [2] - 2863:15, 2870:17

**jets** [13] - 2680:10, 2680:13, 2680:15, 2680:25, 2681:6, 2682:3, 2682:5, 2713:3, 2713:4, 2713:10, 2713:14, 2713:20, 2719:12

**Jim** [3] - 2768:25, 2769:1, 2875:4

**job** [21] - 2650:24, 2651:1, 2653:7, 2653:13, 2653:16, 2665:1, 2697:12, 2703:18, 2703:19, 2714:8, 2720:7, 2720:19, 2720:21, 2721:23, 2725:14, 2727:3, 2734:2, 2734:3, 2736:19, 2864:14, 2887:21

**John** [1] - 2626:2

**Johnny** [4] - 2626:11, 2773:3, 2891:7, 2891:11

**join** [1] - 2794:13

**joined** [5] - 2742:19, 2784:25, 2796:3, 2850:5, 2869:10

**Juan** [1] - 2829:12

**judge** [1] - 2636:4

**JUDGE** [1] - 2625:10

**Judge** [26] - 2628:22, 2634:8, 2635:11, 2635:19, 2635:24, 2636:1, 2636:9, 2720:2, 2729:13, 2729:15, 2729:24, 2750:25, 2756:11, 2810:9, 2810:19, 2811:23, 2814:23, 2815:6, 2816:13, 2816:17, 2818:9, 2819:25, 2858:4, 2861:18, 2871:21

**jump** [1] - 2722:5

**jumping** [1] - 2853:1

**June** [4] - 2665:6, 2669:13, 2672:9, 2833:19

**jurisdiction** [1] - 2800:17

---

**jurisdictions** [2] - 2799:3, 2803:20

**JUROR** [2] - 2851:13, 2854:5

**jury** [47] - 2628:15, 2636:13, 2636:14, 2638:5, 2639:20, 2639:22, 2640:4, 2645:13, 2651:22, 2655:25, 2656:18, 2668:1, 2673:7, 2681:22, 2686:17, 2691:14, 2698:6, 2698:22, 2699:22, 2700:2, 2700:9, 2701:14, 2702:4, 2703:11, 2703:18, 2707:25, 2710:7, 2714:24, 2715:17, 2715:25, 2719:10, 2719:19, 2720:22, 2723:17, 2746:4, 2756:12, 2756:13, 2777:1, 2781:17, 2811:1, 2811:2, 2820:5, 2820:6, 2851:17, 2853:25, 2854:2, 2890:25

**JURY** [1] - 2625:7

**Justice** [1] - 2625:17

---

# K

**Katy** [2] - 2743:9, 2743:16

**keep** [13] - 2642:23, 2659:2, 2671:23, 2700:3, 2706:22, 2721:23, 2730:25, 2746:23, 2753:8, 2753:9, 2753:11, 2783:3, 2883:15

**keeping** [1] - 2739:18

**keeps** [1] - 2755:14

**Kenneth** [1] - 2626:6

**kept** [1] - 2638:6

**kicked** [1] - 2640:1

**killed** [1] - 2884:13

**kind** [6] - 2702:22, 2702:24, 2704:25, 2743:17, 2791:19, 2804:23

**King** [7] - 2808:13, 2808:15, 2809:1, 2823:5, 2823:12, 2824:5

**king** [12] - 2808:17, 2808:19, 2809:7, 2809:10, 2823:13, 2823:14, 2823:19, 2824:6, 2824:11, 2824:14, 2824:16, 2824:18

**king's** [2] - 2809:11, 2809:18

**Kingdom** [2] - 2800:8, 2800:9

**knighted** [1] - 2807:12

**knighthood** [1] - 2807:11

**knock** [1] - 2730:12

**knocked** [1] - 2642:5

**knocking** [1] - 2641:2

**knowledge** [22] - 2675:23, 2675:25, 2676:4, 2691:24, 2691:25, 2699:17, 2707:13, 2718:10, 2718:15, 2720:22, 2721:15, 2735:11, 2802:10, 2834:20, 2841:24, 2843:11, 2845:19, 2845:22, 2847:6, 2875:16, 2878:15, 2885:16

**known** [11] - 2635:24, 2693:6, 2693:10, 2699:14, 2699:23, 2714:12, 2735:5, 2743:25, 2766:14, 2834:18, 2834:21, 2834:22, 2885:24

**knows** [4] - 2693:9, 2746:21, 2747:14, 2747:21

**Kuhrt** [6] - 2637:15, 2685:18, 2696:11, 2697:7, 2747:16, 2835:6

---

# L

**Labor** [3] - 2806:4, 2806:5, 2821:25

**laboratory** [1] - 2726:6

**lack** [5] - 2772:5, 2772:18, 2774:19, 2774:21, 2859:14

**ladies** [4] - 2745:22, 2810:20, 2890:11, 2890:21

**lady** [3] - 2628:13, 2762:25, 2763:2

**land** [3] - 2693:15, 2698:2, 2780:23

**lapel** [2] - 2883:3, 2883:9

**laptop** [1] - 2860:4

**large** [4] - 2634:10, 2719:14, 2780:14, 2785:15, 2795:1, 2839:22, 2843:24

**larger** [4] - 2781:18, 2859:9, 2859:10, 2859:11

**last** [25] - 2632:2, 2633:12, 2633:17, 2634:5, 2637:3, 2640:15, 2645:3, 2659:1, 2680:24, 2688:6, 2697:17, 2697:20, 2723:18, 2746:10, 2747:3, 2747:24, 2784:8, 2794:21, 2816:15, 2816:16, 2816:22, 2818:6, 2818:18, 2866:20, 2880:12

**last-ditch** [1] - 2659:1

**last-minute** [1] - 2634:5

**lastly** [1] - 2671:17

**late** [12] - 2631:23, 2650:14, 2684:20, 2779:10, 2780:21, 2792:15, 2793:22, 2825:8, 2831:19, 2831:20, 2849:23, 2864:22

**latter** [1] - 2833:13

**laugh** [2] - 2791:15, 2791:19

**Laura** [1] - 2863:25

**Law** [2] - 2626:3, 2626:6

**law** [269] - 2639:9, 2660:4, 2662:15, 2662:18, 2664:8, 2664:9, 2664:18, 2665:25, 2722:3, 2724:2, 2749:14, 2749:24, 2750:15, 2750:24, 2811:14, 2816:16, 2818:10, 2818:23, 2819:8, 2819:14

**lawyer** [17] - 2637:3, 2637:5, 2637:8, 2644:22, 2661:13, 2661:14, 2662:13, 2662:14, 2664:5, 2666:9, 2669:16, 2670:4, 2670:24, 2671:14, 2697:22, 2759:8, 2777:5

**lawyers** [3] - 2660:4, 2706:18, 2853:24

**Le** [1] - 2780:25

**leader** [2] - 2741:20, 2822:14

**leaders** [3] - 2829:6, 2829:9, 2829:20

**leadership** [1] - 2829:1

**leading** [6] - 2687:20, 2773:13, 2778:4, 2797:7, 2805:14, 2874:9

**learn** [3] - 2644:18, 2759:17, 2759:20

**learned** [5] - 2643:15, 2643:18, 2643:23, 2643:24, 2645:12

**learning** [2] - 2645:8, 2851:1

**least** [9] - 2658:24, 2690:9, 2702:9, 2718:3, 2744:14, 2764:3, 2770:22, 2792:9, 2809:25, 2886:7

**leave** [7] - 2629:12, 2722:18, 2797:13, 2802:14, 2803:2, 2883:2, 2887:5

**leaves** [1] - 2858:19

**leaving** [6] - 2628:17, 2725:13, 2799:16, 2799:17, 2800:1, 2858:20
**led** [6] - 2773:19, 2827:16, 2829:11, 2829:14, 2863:16, 2863:18
**ledger** [4] - 2734:15, 2766:25, 2794:9, 2831:4
**Lee** [4] - 2808:13, 2809:1, 2823:5, 2824:4
**left** [12] - 2650:23, 2658:24, 2659:11, 2693:1, 2736:23, 2782:8, 2782:9, 2782:10, 2823:6, 2839:7, 2858:13, 2862:9
**left-hand** [1] - 2858:13
**legal** [5] - 2664:15, 2670:9, 2736:24, 2888:15
**legally** [1] - 2779:24
**legitimate** [1] - 2783:15
**legs** [1] - 2791:11
**lending** [4] - 2647:13, 2841:11, 2841:13, 2841:14
**Leroy** [3] - 2808:13, 2808:15, 2823:12
**less** [3] - 2790:7, 2801:8, 2803:25, 2879:20
**Lester** [6] - 2821:24, 2822:4, 2822:6, 2822:7, 2822:13, 2822:14
**letter** [17] - 2664:5, 2665:6, 2665:7, 2668:18, 2798:5, 2798:15, 2798:23, 2799:7, 2799:12, 2800:14, 2801:5, 2801:9, 2802:8, 2802:16, 2852:23, 2853:5, 2853:6
**letting** [1] - 2747:25
**level** [4] - 2703:4, 2729:13, 2775:7, 2788:16
**leveled** [1] - 2799:21
**liabilities** [10] - 2762:8, 2762:12, 2762:16, 2762:21, 2762:24, 2764:15, 2767:19, 2846:5, 2846:6, 2856:6
**liability** [3] - 2762:15, 2778:19, 2856:6
**liars** [1] - 2847:15
**license** [14] - 2717:12, 2717:15, 2717:21, 2739:11, 2739:17, 2798:8, 2798:9, 2799:9, 2800:19, 2800:20, 2800:23, 2801:3, 2803:14, 2804:19
**licensed** [3] - 2739:9, 2800:10, 2800:11
**licenses** [2] - 2864:17
**licensing** [1] - 2866:6
**lie** [16] - 2717:13, 2717:19, 2717:21, 2717:22, 2727:16, 2749:16, 2750:6, 2767:13, 2768:20, 2768:23, 2769:4, 2789:16, 2841:13, 2868:11, 2868:21, 2871:8
**lied** [7] - 2727:14, 2727:19, 2727:20, 2751:8, 2751:9, 2769:3, 2848:8
**lies** [7] - 2745:15, 2751:14, 2847:8, 2847:13, 2847:14, 2865:19, 2868:8
**life** [2] - 2694:14, 2698:14
**life's** [2] - 2698:3, 2698:10
**lifetime** [1] - 2687:17
**light** [1] - 2854:3
**likely** [1] - 2711:14
**limine** [8] - 2709:18, 2721:10, 2747:22, 2748:5, 2749:8, 2753:1, 2753:...

2754:22
**limited** [3] - 2742:21, 2784:20, 2809:23
**Limited** [27] - 2661:11, 2665:22, 2672:24, 2727:15, 2734:24, 2769:19, 2778:23, 2781:13, 2784:4, 2785:12, 2793:25, 2804:17, 2804:22, 2809:13, 2825:1, 2834:23, 2862:18, 2877:6, 2877:8, 2878:1, 2878:2, 2878:10, 2878:11, 2880:23, 2880:25, 2884:4, 2888:22
**Limited's** [1] - 2823:10
**line** [3] - 2749:20, 2801:23, 2888:17
**Line** [1] - 2798:7
**lines** [2] - 2823:21, 2834:21
**Linked** [3] - 2652:12, 2652:13, 2658:9
**linked** [1] - 2653:17
**lion's** [1] - 2763:15
**liquid** [11] - 2750:16, 2789:19, 2793:1, 2833:25, 2837:3, 2839:12, 2839:14, 2858:14, 2858:20, 2858:24, 2873:9
**liquidity** [5] - 2677:3, 2678:1, 2678:3, 2836:22, 2837:17, 2859:20
**Liquidity** [1] - 2836:21
**Lisa** [1] - 2823:24
**list** [12] - 2645:19, 2646:4, 2646:23, 2666:24, 2686:11, 2686:19, 2692:4, 2702:12, 2762:8, 2764:7, 2813:2, 2823:17
**listed** [9] - 2647:9, 2666:25, 2667:5, 2667:20, 2689:5, 2689:12, 2692:1, 2693:17, 2855:3
**listen** [3] - 2644:24, 2645:1, 2715:17
**listened** [2] - 2690:19, 2691:11
**listing** [1] - 2683:17
**listings** [1] - 2763:11
**lists** [2] - 2680:4, 2784:9
**literally** [2] - 2755:5, 2781:25
**live** [2] - 2723:20, 2723:21
**living** [1] - 2725:3
**load** [1] - 2828:25
**loads** [1] - 2724:25
**loan** [20] - 2647:17, 2663:18, 2688:24, 2736:1, 2795:19, 2795:20, 2795:22, 2806:17, 2806:21, 2841:16, 2844:13, 2844:16, 2844:18, 2844:23, 2845:16, 2852:5, 2852:8, 2855:17, 2882:16
**loaned** [1] - 2679:16
**loans** [44] - 2647:12, 2647:13, 2647:14, 2648:15, 2648:19, 2656:2, 2656:15, 2656:19, 2657:3, 2663:19, 2679:16, 2679:21, 2679:23, 2679:25, 2680:1, 2680:2, 2680:5, 2688:6, 2757:10, 2757:11, 2805:2, 2806:13, 2806:15, 2841:10, 2842:21, 2845:1, 2845:3, 2845:5, 2845:14, 2845:20, 2852:2, 2852:12, 2852:15, 2855:18, 2855:22, 2865:15, 2871:14, 2873:1, 2875:14, 2875:15, 2878:24, 2882:14, 2882:23
**local** [11] - 2654:24, 2655:2, 2655:6, 2656:9, 2740:14, 2761:10, 2761:11, 2811:24, 2812:1, 2812:5...

**located** [5] - 2664:11, 2664:13, 2693:2, 2769:16, 2780:6
**logical** [1] - 2872:6
**London** [7] - 2780:6, 2780:12, 2780:22, 2780:25, 2781:13, 2783:13, 2785:19
**look** [15] - 2633:8, 2651:2, 2656:24, 2714:24, 2715:17, 2729:4, 2733:10, 2752:14, 2781:4, 2820:12, 2824:24, 2837:12, 2856:12, 2891:2
**looked** [5] - 2651:1, 2799:5, 2802:17, 2836:11, 2870:23
**looking** [13] - 2644:17, 2645:11, 2650:24, 2652:20, 2653:7, 2653:13, 2713:17, 2799:3, 2814:1, 2817:21, 2861:3, 2875:2, 2876:18
**looks** [1] - 2851:17
**loop** [4] - 2701:6, 2701:16, 2714:15, 2720:24
**Lopez** [7] - 2637:15, 2653:3, 2668:18, 2696:11, 2697:7, 2747:16, 2835:6
**Lorie** [5] - 2793:11, 2793:13, 2793:14, 2869:6
**lose** [3] - 2697:11, 2712:21, 2713:1
**loser** [1] - 2667:9
**losers** [1] - 2667:8
**losing** [4] - 2667:12, 2684:1, 2684:5, 2685:24
**loss** [4] - 2709:16, 2778:17, 2780:2, 2831:6
**losses** [3] - 2844:13, 2844:16, 2844:18
**lost** [1] - 2800:20
**lottery** [9] - 2694:9, 2694:15, 2698:4, 2698:10, 2698:15, 2698:23, 2711:18, 2711:20
**loud** [2] - 2752:4, 2800:14
**louder** [1] - 2811:12
**loved** [1] - 2741:20
**low** [5] - 2711:9, 2711:10, 2736:2, 2804:2, 2843:20
**Low** [1] - 2843:19
**loyal** [3] - 2868:1, 2868:2, 2868:4
**lunch** [2] - 2695:20, 2745:25

**M**

**machine** [1] - 2782:15
**magazine** [1] - 2733:24
**magnitude** [1] - 2840:4
**mail** [15] - 2661:2, 2661:3, 2663:14, 2728:3, 2728:4, 2830:5, 2877:19, 2877:22, 2878:9, 2879:19, 2887:8, 2888:7, 2889:3, 2889:5
**mailed** [2] - 2629:17, 2660:12
**mails** [6] - 2630:10, 2631:25, 2717:2, 2747:18, 2881:12, 2890:17
**main** [2] - 2740:1, 2781:6, 2815:15
**maintaining** [3] - 2677:3, 2678:2, 2836:22
**maintains** [1] - 2843:20
**major** [4] - 2628:4, 2678:6, 2754:3, 2756:9...

**majority** [1] - 2756:25
**makeup** [1] - 2878:21
**Maldonado** [5] - 2887:9, 2887:18, 2887:19, 2889:4
**man** [5] - 2728:14, 2728:15, 2767:17, 2790:10, 2862:1
**manacled** [1] - 2791:22
**manage** [3] - 2868:3, 2876:1, 2876:13
**managed** [6] - 2654:8, 2758:5, 2758:10, 2863:6, 2863:17, 2868:6
**management** [4] - 2741:12, 2756:18, 2763:25, 2767:14
**Management** [2] - 2676:24, 2686:25
**manager** [2] - 2653:23, 2717:1, 2887:19, 2887:21
**MANAGER** [2] - 2722:25, 2723:5
**managers** [36] - 2679:4, 2679:8, 2714:2, 2716:10, 2757:15, 2757:17, 2757:19, 2758:5, 2758:11, 2758:15, 2758:21, 2758:23, 2763:23, 2764:3, 2766:19, 2767:4, 2767:23, 2768:6, 2768:22, 2769:1, 2769:2, 2786:8, 2786:15, 2788:22, 2789:1, 2797:6, 2797:11, 2860:13, 2861:1, 2862:7, 2862:20, 2862:23, 2863:6, 2875:21, 2875:24
**managers's** [1] - 2716:9
**managing** [4] - 2706:17, 2757:14, 2766:22, 2786:9
**Mancusi** [1] - 2814:8
**mandated** [1] - 2853:15
**manner** [5] - 2666:1, 2700:17, 2701:23, 2811:14, 2884:6
**marble** [2] - 2733:11
**marinas** [1] - 2667:18
**Mario** [2] - 2753:10, 2755:21
**Mark** [4] - 2685:22, 2696:11, 2864:4
**marked** [2] - 2813:1, 2820:13
**market** [10] - 2648:4, 2649:15, 2649:20, 2649:22, 2663:8, 2667:22, 2735:6, 2735:20, 2840:15, 2853:14
**marketable** [4] - 2678:5, 2833:4, 2837:5, 2837:8
**marketing** [24] - 2677:12, 2740:20, 2740:25, 2780:3, 2784:2, 2785:3, 2807:18, 2830:8, 2830:11, 2831:23, 2833:7, 2833:10, 2833:15, 2834:16, 2835:10, 2835:24, 2836:2, 2836:9, 2836:12, 2838:17, 2843:9, 2852:7, 2882:17
**marketplace** [2] - 2739:21, 2875:12
**markets** [4] - 2648:4, 2649:15, 2649:22, 2775:8
**married** [3] - 2723:24, 2724:1
**marshals** [1] - 2819:5
**Mas** [9] - 2661:4, 2661:12, 2664:6, 2664:14, 2665:7, 2665:12, 2668:19, 2669:15, 2672:9
**Maskell** [1] - 2744:23
**Master's** [1] - 2869:11
**match** [1] - 2837:25
**matching** [2] - 2837:15, 2837:19

**material** [3] - 2676:10, 2693:8, 2750:6
**materiality** [1] - 2751:8
**materials** [16] - 2740:21, 2813:21, 2818:7, 2830:8, 2830:11, 2831:24, 2833:7, 2833:10, 2833:15, 2834:11, 2834:16, 2835:11, 2836:2, 2836:16, 2870:25, 2882:17
**Materials** [2] - 2725:19, 2725:23
**matter** [11] - 2636:8, 2636:10, 2659:18, 2705:25, 2749:8, 2749:16, 2773:23, 2791:23, 2818:5, 2833:11, 2891:9
**mattered** [1] - 2751:15
**matters** [2] - 2633:9, 2738:1
**maturity** [1] - 2744:3
**max** [1] - 2754:12
**maximum** [2] - 2729:21, 2781:16
**McGuire** [2] - 2626:6, 2626:6
**MCGUIRE** [14] - 2811:23, 2811:25, 2812:13, 2812:15, 2812:19, 2813:4, 2814:5, 2814:11, 2814:23, 2814:25, 2815:9, 2815:13, 2815:22, 2817:1
**mean** [37] - 2628:25, 2629:8, 2633:16, 2641:20, 2642:20, 2645:11, 2650:11, 2655:1, 2664:21, 2669:25, 2711:6, 2711:17, 2712:13, 2713:8, 2714:8, 2714:23, 2715:6, 2722:5, 2748:22, 2756:2, 2763:17, 2775:13, 2785:22, 2792:11, 2794:1, 2813:10, 2813:23, 2815:15, 2825:19, 2825:20, 2829:15, 2832:14, 2837:14, 2838:17, 2841:15, 2842:17, 2881:3
**meaning** [4] - 2787:5, 2791:12, 2846:4, 2879:23
**means** [2] - 2837:20, 2875:13
**meant** [3] - 2748:13, 2778:21, 2794:2
**mechanical** [1] - 2626:14
**mechanics** [1] - 2743:21
**medical** [1] - 2725:21
**meet** [9] - 2700:24, 2730:2, 2730:7, 2733:7, 2837:17, 2837:21, 2838:13, 2838:20, 2839:21
**meeting** [12] - 2736:23, 2765:12, 2765:14, 2801:25, 2802:7, 2802:16, 2802:18, 2802:20, 2802:24, 2806:17, 2826:20, 2872:1, 2872:12, 2874:14, 2874:17, 2874:18, 2874:20, 2874:23, 2875:1
**meetings** [11] - 2741:10, 2772:6, 2774:15, 2830:5, 2868:24, 2870:13, 2870:15, 2870:19, 2871:7, 2874:6
**member** [1] - 2821:25
**members** [4] - 2697:17, 2697:20, 2793:10, 2843:11
**memo** [2] - 2668:10, 2754:11
**memorandum** [2] - 2669:15, 2672:9
**memory** [2] - 2638:14, 2639:2
**memos** [1] - 2689:23
**Memphis** [12] - 2825:9, 2825:10, 2825:15, 2857:20, 2860:14, 2860:19, 2862:9, 2863:1, 2863:24, 2864:12, 2873:10, 2876:16
**mens** [1] - 2751:22

2648:23
**mentioned** [15] - 2628:9, 2638:4, 2696:13, 2731:17, 2735:19, 2769:18, 2804:3, 2804:15, 2807:11, 2812:13, 2812:15, 2822:24, 2824:14, 2829:10
**Mercedes** [1] - 2743:8
**merely** [2] - 2773:11, 2773:18
**Meridien** [1] - 2780:25
**messages** [2] - 2742:15
**met** [15] - 2700:25, 2701:1, 2730:3, 2733:4, 2733:8, 2735:14, 2744:1, 2786:15, 2803:11, 2809:8, 2830:6, 2869:2, 2869:3, 2872:22, 2876:6
**metals** [2] - 2833:25, 2857:5
**method** [2] - 2868:4
**methodology** [1] - 2677:23
**Miami** [1] - 2664:13
**Michelle** [2] - 2744:4, 2863:15
**Michigan** [4] - 2723:21, 2726:4, 2726:8, 2726:19
**microphone** [1] - 2708:3
**Microphone** [1] - 2861:9
**middle** [1] - 2785:7
**might** [17] - 2639:21, 2643:25, 2652:19, 2652:24, 2653:15, 2681:5, 2690:24, 2697:9, 2700:16, 2701:7, 2701:9, 2711:18, 2735:11, 2745:18, 2755:23, 2801:4, 2827:21
**mike** [6] - 2636:19, 2723:8, 2760:17, 2883:3, 2883:8, 2883:9
**Milam** [5] - 2733:8, 2737:4, 2738:19, 2787:21, 2787:25
**miles** [1] - 2743:16
**million** [39] - 2666:18, 2666:20, 2666:25, 2667:9, 2681:3, 2682:8, 2683:22, 2689:7, 2706:18, 2700:20, 2709:7, 2711:18, 2711:20, 2719:21, 2719:23, 2720:13, 2736:15, 2755:25, 2784:11, 2795:2, 2805:12, 2805:13, 2805:15, 2805:21, 2806:19, 2838:15, 2838:21, 2855:18, 2855:24, 2856:3, 2856:11, 2858:11, 2858:12, 2876:2, 2876:4, 2888:9, 2888:12, 2889:20
**million-dollar** [2] - 2682:8, 2855:24
**millions** [1] - 2635:15
**mind** [3] - 2734:2, 2874:17, 2883:15
**minimalizing** [2] - 2710:20, 2712:9
**minimize** [1] - 2710:24
**minimizes** [1] - 2840:14
**minimizing** [2] - 2821:2, 2677:7
**minister** [10] - 2803:11, 2804:5, 2804:7, 2804:8, 2804:10, 2804:12, 2804:15, 2822:1, 2822:2, 2822:7
**ministers** [1] - 2804:12
**Ministry** [3] - 2797:21, 2799:8, 2800:5
**minus** [1] - 2846:6
**minute** [6] - 2633:17, 2634:5, 2650:4, 2667:13, 2703:21, 2810:13
**minutes** [10] - 2629:19, 2631:4, 2631:10, 2690:22, 2707:20, 2707:23, 2745:23, 2745:24, 2810:23, 2810:24
**miscellaneous** [1] - 2763:13

**mischaracterization** [3] - 2719:3, 2721:8, 2873:15

**misleading** [5] - 2648:22, 2668:3, 2749:13, 2750:2

**misled** [4] - 2749:11, 2884:20, 2885:1, 2885:3

**misrepresentation** [2] - 2751:24, 2751:25

**missile** [1] - 2724:14

**missing** [6] - 2786:25, 2788:5, 2834:3, 2834:7, 2834:8, 2858:20

**Mississippi** [4] - 2724:7, 2825:10, 2869:3, 2869:18

**misstatement** [1] - 2667:1

**mistake** [2] - 2632:11, 2887:16

**mistrust** [1] - 2640:24

**Mitchell** [1] - 2883:9

**model** [5] - 2842:1, 2863:8, 2868:13, 2870:22, 2871:1

**modestly** [1] - 2750:20

**moment** [5] - 2628:2, 2666:11, 2691:17, 2780:19, 2891:1

**Monday** [1] - 2888:18

**money** [211] - 2635:6, 2665:2, 2666:8, 2666:16, 2666:19, 2667:12, 2675:9, 2675:10, 2675:17, 2675:18, 2676:11, 2678:11, 2678:18, 2678:22, 2678:23, 2679:1, 2679:4, 2679:5, 2679:8, 2680:19, 2680:21, 2680:23, 2681:5, 2681:23, 2682:19, 2682:21, 2682:22, 2682:23, 2682:25, 2683:5, 2684:1, 2684:5, 2685:24, 2686:9, 2686:21, 2686:24, 2687:3, 2687:8, 2687:16, 2687:23, 2687:24, 2695:15, 2695:22, 2695:25, 2696:9, 2698:25, 2700:3, 2700:16, 2701:15, 2701:20, 2703:5, 2704:12, 2704:21, 2704:22, 2705:3, 2705:17, 2705:24, 2706:6, 2706:9, 2706:13, 2708:22, 2709:22, 2710:1, 2710:11, 2710:15, 2711:6, 2711:7, 2712:21, 2713:1, 2713:5, 2713:16, 2714:17, 2715:2, 2715:4, 2715:13, 2715:15, 2716:1, 2716:9, 2716:10, 2716:15, 2716:16, 2716:25, 2717:1, 2718:1, 2718:24, 2719:14, 2720:7, 2720:8, 2720:12, 2720:15, 2721:24, 2721:25, 2735:6, 2741:16, 2748:24, 2749:12, 2751:12, 2752:23, 2753:10, 2753:24, 2756:24, 2757:5, 2757:13, 2757:14, 2757:15, 2757:17, 2757:19, 2758:5, 2758:11, 2758:15, 2758:21, 2758:23, 2758:25, 2763:21, 2763:23, 2764:3, 2766:19, 2766:22, 2767:4, 2767:14, 2767:22, 2767:23, 2768:6, 2768:14, 2768:22, 2768:25, 2769:2, 2769:25, 2770:2, 2770:8, 2770:18, 2770:21, 2778:17, 2780:14, 2784:5, 2784:6, 2784:7, 2785:21, 2786:7, 2786:25, 2788:8, 2788:22, 2788:25, 2789:1, 2792:1, 2795:4, 2797:5, 2797:10, 2805:10, 2805:23, 2805:25, 2806:8, 2806:17, 2824:24, 2835:4, 2839:7, 2839:10, 2839:17, 2839:24

**2839:19**, 2839:20, 2839:22, 2841:4, 2844:21, 2844:22, 2845:21, 2859:21, 2860:13, 2861:1, 2861:4, 2862:4, 2862:7, 2862:19, 2862:20, 2862:22, 2862:24, 2863:6, 2863:12, 2863:16, 2869:21, 2869:22, 2870:2, 2870:5, 2870:8, 2870:11, 2875:17, 2875:21, 2876:13, 2882:23, 2882:24, 2883:23, 2883:25, 2884:6, 2884:7, 2884:12, 2885:8, 2885:24, 2886:15, 2886:16, 2887:24, 2888:21, 2888:24, 2889:12, 2889:25

**monies** [16] - 2748:20, 2749:21, 2753:22, 2753:23, 2758:7, 2763:18, 2763:19, 2763:24, 2788:2, 2806:10, 2834:8, 2859:12, 2862:17, 2863:5, 2884:10, 2887:23

**monitor** [1] - 2863:5

**monitored** [5] - 2861:5, 2862:8, 2868:6, 2886:15, 2887:22

**monitoring** [2] - 2868:14, 2868:15

**month** [3] - 2678:22, 2716:22, 2880:7

**monthly** [1] - 2684:7

**months** [7] - 2659:20, 2740:12, 2743:6, 2760:7, 2786:13, 2802:8, 2816:25

**Montserrat** [33] - 2733:19, 2733:21, 2738:25, 2739:2, 2739:5, 2739:9, 2740:11, 2740:12, 2741:6, 2744:21, 2796:2, 2796:3, 2796:6, 2796:7, 2796:21, 2796:23, 2797:13, 2797:22, 2798:16, 2798:25, 2799:4, 2799:8, 2799:16, 2799:17, 2799:22, 2800:6, 2800:7, 2800:9, 2800:12, 2800:20, 2802:9, 2802:14, 2802:2

**morning** [12] - 2629:16, 2630:6, 2631:3, 2636:23, 2636:24, 2637:6, 2637:7, 2673:13, 2673:14, 2694:19, 2743:3, 2782:25

**mortar** [1] - 2788:3

**most** [17] - 2629:24, 2638:22, 2678:18, 2678:20, 2704:24, 2715:2, 2715:4, 2717:8, 2717:9, 2718:23, 2719:10, 2776:10, 2790:12, 2794:20, 2839:7, 2840:24

**mostly** [1] - 2833:2

**mother** [1] - 2800:7

**motion** [16] - 2709:18, 2721:10, 2747:22, 2748:5, 2753:1, 2753:5, 2754:21, 2811:18, 2811:19, 2812:7, 2812:10, 2812:22, 2813:14, 2815:1, 2815:2, 2819:2

**motions** [2] - 2749:8, 2820:23

**move** [18] - 2662:10, 2665:1, 2665:4, 2666:1, 2682:25, 2743:13, 2760:21, 2772:11, 2790:18, 2798:17, 2798:20, 2799:20, 2800:15, 2800:16, 2802:21, 2825:9, 2854:6, 2876:16

**moved** [9] - 2725:20, 2725:22, 2730:20, 2738:24, 2739:2, 2739:3, 2788:2, 2825:2, 2825:8

**movement** [1] - 2695:22

**movies** [2] - 2699:24, 2699:25

**moving** [12] - 2659:12, 2662:3, 2662:5, 2663:2, 2683:4, 2737:2, 2742:8, 2742:11, 2743:1, 2798:19, 2859:7, 2879:16

**MR** [530] - 2627:4, 2627:5, 2627:6, 2627:7, 2627:8, 2627:11, 2628:18, 2628:20, 2628:24, 2629:1, 2629:3, 2629:4, 2629:6, 2629:15, 2630:5, 2630:7, 2630:13, 2630:16, 2630:18, 2631:4, 2631:8, 2631:13, 2631:17, 2631:21, 2632:13, 2632:18, 2633:4, 2633:21, 2634:7, 2634:17, 2634:21, 2635:1, 2635:8, 2635:10, 2635:13, 2635:19, 2636:3, 2636:17, 2636:18, 2636:22, 2644:1, 2644:5, 2646:8, 2646:11, 2646:22, 2646:23, 2646:25, 2647:1, 2647:3, 2647:5, 2647:6, 2647:18, 2647:24, 2648:24, 2649:1, 2649:9, 2649:12, 2651:6, 2651:10, 2651:12, 2651:17, 2652:2, 2652:4, 2652:6, 2658:3, 2658:4, 2658:5, 2660:7, 2660:9, 2660:10, 2660:11, 2660:12, 2660:14, 2660:16, 2660:18, 2660:21, 2660:22, 2663:22, 2663:23, 2664:1, 2664:4, 2667:1, 2667:4, 2668:15, 2668:17, 2668:25, 2669:4, 2669:10, 2670:10, 2670:13, 2671:2, 2671:4, 2671:9, 2671:10, 2671:17, 2671:21, 2671:25, 2672:5, 2672:7, 2672:23, 2673:1, 2673:10, 2673:12, 2673:17, 2673:20, 2674:1, 2674:6, 2675:1, 2675:3, 2675:8, 2675:22, 2676:1, 2676:5, 2676:8, 2676:18, 2676:23, 2677:10, 2677:11, 2677:13, 2677:15, 2678:13, 2678:15, 2681:10, 2681:13, 2687:19, 2687:22, 2693:7, 2693:12, 2697:13, 2697:15, 2706:2, 2706:7, 2706:25, 2707:3, 2707:8, 2707:11, 2708:2, 2708:5, 2709:8, 2709:10, 2709:15, 2709:18, 2709:21, 2712:7, 2712:8, 2712:11, 2716:4, 2716:6, 2718:9, 2718:12, 2718:16, 2718:18, 2719:2, 2719:6, 2720:1, 2720:2, 2720:5, 2720:25, 2721:5, 2721:8, 2721:14, 2722:15, 2722:16, 2722:20, 2723:7, 2723:14, 2726:24, 2727:4, 2728:18, 2728:24, 2729:1, 2729:3, 2729:6, 2737:17, 2737:20, 2738:3, 2738:6, 2742:3, 2742:10, 2742:16, 2742:18, 2743:11, 2743:20, 2745:1, 2745:7, 2745:17, 2745:21, 2746:3, 2746:9, 2746:15, 2746:24, 2747:10, 2747:13, 2748:4, 2748:14, 2748:18, 2749:3, 2749:6, 2749:11, 2750:1, 2750:5, 2750:18, 2750:24, 2751:7, 2751:11, 2751:14, 2751:17, 2751:20, 2751:23, 2752:9, 2752:18, 2753:2, 2753:6, 2753:16, 2753:18, 2754:4, 2754:14, 2754:24, 2755:11, 2756:1, 2756:3, 2756:7, 2756:11, 2756:16, 2756:17, 2759:5, 2759:13, 2759:16, 2761:3, 2761:7, 2765:1, 2765:23, 2765:24, 2766:5, 2766:17,

2770:11, 2770:14, 2771:13, 2771:16,
2771:20, 2771:21, 2772:7, 2772:16,
2772:20, 2773:7, 2773:10, 2773:14,
2773:16, 2773:21, 2773:24, 2774:1,
2774:7, 2774:10, 2775:22, 2775:24,
2776:3, 2776:5, 2776:16, 2776:20,
2776:21, 2776:25, 2777:4, 2777:7,
2777:9, 2777:14, 2778:4, 2778:5,
2778:10, 2779:15, 2779:20, 2782:17,
2783:6, 2783:8, 2788:9, 2788:12,
2789:23, 2790:1, 2790:15, 2790:17,
2790:19, 2790:24, 2791:2, 2791:20,
2792:13, 2792:14, 2793:5, 2793:8,
2795:9, 2795:12, 2795:15, 2795:18,
2795:21, 2796:1, 2796:9, 2796:12,
2796:18, 2797:7, 2797:12, 2797:16,
2797:18, 2801:14, 2801:16, 2801:18,
2801:19, 2801:20, 2801:22, 2805:14,
2805:16, 2805:22, 2808:25, 2809:4,
2809:5, 2810:5, 2810:8, 2810:11,
2810:19, 2811:5, 2811:7, 2811:9,
2811:13, 2811:21, 2811:23, 2811:24,
2811:25, 2812:1, 2812:6, 2812:13,
2812:15, 2812:19, 2812:21, 2813:1,
2813:4, 2813:8, 2813:11, 2813:19,
2814:3, 2814:5, 2814:11, 2814:23,
2814:25, 2815:4, 2815:9, 2815:11,
2815:13, 2815:15, 2815:20, 2815:22,
2815:24, 2815:25, 2816:5, 2816:21,
2816:24, 2817:1, 2817:11, 2817:12,
2817:14, 2817:18, 2818:3, 2818:6,
2818:14, 2819:12, 2819:19, 2819:24,
2820:3, 2820:8, 2820:11, 2820:20,
2820:25, 2821:10, 2821:12, 2821:18,
2821:21, 2821:23, 2825:24, 2826:3,
2826:11, 2826:13, 2826:18, 2827:2,
2827:6, 2827:7, 2827:22, 2827:24,
2828:4, 2828:6, 2828:14, 2833:21,
2833:23, 2835:10, 2835:13, 2835:18,
2835:21, 2835:22, 2836:6, 2836:8,
2836:17, 2836:20, 2838:1, 2838:3,
2838:4, 2838:8, 2838:9, 2840:10,
2840:12, 2844:10, 2844:12, 2844:14,
2844:15, 2846:12, 2846:17, 2847:9,
2847:11, 2848:10, 2848:13, 2848:14,
2848:23, 2849:1, 2849:2, 2849:14,
2849:21, 2850:7, 2850:9, 2850:10,
2850:12, 2850:15, 2850:17, 2850:20,
2850:23, 2850:24, 2851:5, 2851:10,
2851:14, 2851:21, 2851:23, 2851:25,
2852:20, 2852:22, 2853:4, 2853:7,
2853:21, 2854:6, 2854:9, 2854:14,
2854:17, 2854:18, 2854:20, 2854:24,
2856:16, 2856:18, 2856:22, 2857:14,
2857:18, 2857:22, 2857:23, 2858:1,
2858:2, 2858:4, 2858:6, 2860:3,
2860:5, 2860:7, 2860:8, 2861:6,
2861:8, 2861:10, 2861:12, 2861:15,
2861:18, 2861:21, 2861:22, 2861:25,
2862:2, 2865:7, 2865:9, 2869:25,
2871:19, 2871:21, 2871:23, 2872:3,
2872:5, 2872:9, 2872:14, 2872:17,
2872:20, 2872:21, 2873:15, 2873:17,

2873:22, 2874:5, 2874:9, 2874:13,
2877:2, 2877:9, 2877:13, 2877:15,
2878:3, 2878:5, 2878:20, 2879:10,
2879:12, 2879:13, 2880:4, 2880:6,
2880:16, 2880:18, 2881:6, 2881:7,
2881:22, 2882:1, 2882:6, 2882:9,
2883:4, 2883:7, 2883:18, 2883:21,
2884:22, 2884:25, 2885:2, 2885:9,
2885:12, 2886:11, 2886:24, 2887:2,
2887:4, 2889:6, 2889:15, 2889:17,
2890:7, 2890:9, 2890:19

**multi** [1] - 2678:6
**multi-national** [1] - 2678:6
**multinational** [1] - 2678:6
**multiple** [4] - 2678:22, 2686:13,
2687:4, 2699:20
**must** [4] - 2815:9, 2815:10, 2815:11,
2815:21
**myriad** [2] - 2698:24, 2698:25

# N

**name** [19] - 2684:8, 2723:18, 2723:19,
2725:19, 2726:7, 2726:21, 2734:5,
2734:23, 2736:8, 2744:22, 2760:1,
2761:25, 2763:2, 2787:19, 2804:16,
2808:12, 2824:1, 2865:23, 2870:17
**name's** [1] - 2730:13
**named** [4] - 2640:2, 2744:4, 2807:23,
2864:4
**names** [1] - 2821:13
**napkin** [1] - 2693:22
**narrative** [4] - 2738:3, 2826:1,
2827:22, 2838:3
**narrow** [5] - 2631:15, 2633:2, 2633:5,
2771:19, 2848:12
**national** [2] - 2678:6, 2694:2
**National** [1] - 2663:9
**nationals** [2] - 2735:7, 2735:8
**naturalization** [1] - 2628:10
**naturalized** [2] - 2628:9, 2628:22
**naturally** [1] - 2767:6
**nature** [8] - 2650:21, 2703:6, 2711:3,
2711:11, 2761:10, 2824:12, 2852:8,
2867:6
**nau** [1] - 2698:1
**nau-uh** [1] - 2698:1
**Navy** [6] - 2724:8, 2724:10, 2724:12,
2724:16, 2724:24
**near** [1] - 2832:16
**nearby** [2] - 2798:21, 2825:10
**necessarily** [1] - 2870:7
**necessary** [4] - 2766:25, 2783:11,
2838:20, 2853:17
**necessity** [1] - 2839:9
**need** [23] - 2628:1, 2678:22, 2684:14,
2697:11, 2713:11, 2731:12, 2759:10,
2772:10, 2772:12, 2780:3, 2780:5,
2791:4, 2791:6, 2811:12, 2813:23,
2829:5, 2854:6, 2883:3, 2883:12,
2886:4, 2886:6, 2886:12, 2886:25
**need-to-know** [1] - 2697:11

**needed** [12] - 2665:2, 2739:7, 2739:9,
2765:11, 2774:24, 2785:13, 2800:16,
2808:2, 2828:21, 2828:22, 2828:23,
2828:24
**needing** [2] - 2731:17, 2753:24
**negative** [7] - 2672:1, 2685:2, 2685:4,
2708:10, 2709:14, 2753:4, 2844:17
**negatives** [1] - 2708:9
**negotiable** [1] - 2704:25
**negotiations** [1] - 2804:17
**Negrete** [1] - 2653:3
**neighborhood** [2] - 2736:15, 2855:8
**nervous** [2] - 2643:13, 2645:15
**net** [3] - 2713:10, 2842:17, 2842:18
**Netherlands** [1] - 2732:25
**network** [6] - 2639:7, 2652:14,
2653:17, 2830:6
**never** [13] - 2635:5, 2663:19, 2667:10,
2671:25, 2673:9, 2683:13, 2697:2,
2700:23, 2714:9, 2718:25, 2721:9,
2857:17, 2857:23
**new** [6] - 2730:14, 2743:8, 2743:15,
2760:10, 2808:15, 2840:8
**New** [2] - 2625:17, 2823:23
**news** [1] - 2699:20
**next** [23] - 2633:14, 2641:7, 2641:8,
2641:9, 2651:15, 2671:9, 2672:5,
2677:22, 2722:19, 2782:24, 2782:25,
2785:7, 2809:3, 2826:2, 2847:9,
2853:2, 2877:14, 2878:3, 2879:12,
2880:4, 2880:16, 2881:6, 2889:3
**nice** [1] - 2733:13
**night** [8] - 2632:2, 2637:3, 2664:21,
2697:17, 2697:20, 2724:24, 2730:11,
2809:9
**nine** [1] - 2865:2
**nobody** [1] - 2752:23
**nobody's** [1] - 2706:13
**none** [2] - 2753:21, 2816:7
**nonliquid** [1] - 2837:8
**nonresident** [1] - 2735:13
**Nonresponsive** [4] - 2726:24, 2772:7,
2836:6, 2865:7
**nonresponsive** [19] - 2706:2, 2737:17,
2738:4, 2743:11, 2745:1, 2765:23,
2770:11, 2779:15, 2783:6, 2789:23,
2793:5, 2795:21, 2796:9, 2825:24,
2826:11, 2833:21, 2848:10, 2849:14,
2885:9
**normal** [9] - 2643:11, 2652:25,
2710:11, 2758:8, 2852:13, 2865:24,
2865:25, 2879:17, 2879:22
**normally** [1] - 2814:17
**North** [2] - 2829:12, 2841:6
**north** [1] - 2795:17
**note** [12] - 2668:9, 2679:13, 2746:23,
2801:23, 2802:12, 2802:22, 2802:23
**Note** [2] - 2665:17, 2801:14
**nothing** [17] - 2628:4, 2642:23,
2662:25, 2663:9, 2663:12, 2689:25,
2691:16, 2695:18, 2695:19, 2703:22,
2710:16, 2713:25, 2722:16, 2723:2,
2791:10, 2873:19

**nothing's** [1] - 2695:23
**notice** [3] - 2633:21, 2753:6, 2786:17
**noticed** [2] - 2786:22, 2787:2
**notification** [1] - 2798:9
**November** [2] - 2797:21, 2879:6
**nowhere** [1] - 2656:7
**number** [51] - 2629:22, 2629:23, 2669:6, 2672:2, 2685:4, 2690:6, 2716:18, 2751:13, 2781:10, 2782:9, 2792:19, 2792:22, 2795:17, 2800:9, 2805:17, 2805:18, 2818:15, 2822:18, 2823:23, 2823:24, 2826:4, 2826:7, 2826:8, 2826:9, 2826:15, 2827:9, 2827:11, 2827:13, 2827:20, 2828:1, 2828:16, 2828:21, 2828:22, 2829:4, 2829:5, 2845:3, 2846:3, 2846:7, 2854:20, 2855:3, 2855:11, 2855:13, 2855:24, 2857:7, 2861:7, 2861:11, 2864:22, 2866:3
**numbers** [32] - 2674:8, 2685:3, 2686:2, 2702:20, 2706:22, 2721:23, 2763:6, 2764:16, 2764:17, 2767:17, 2821:5, 2821:13, 2823:18, 2823:19, 2823:21, 2823:22, 2831:4, 2831:6, 2847:4, 2847:7, 2847:13, 2847:16, 2848:7, 2848:15, 2848:18, 2850:1, 2850:5, 2855:25, 2857:5, 2865:19
**numerous** [1] - 2746:16
**NW** [1] - 2625:17

# O

**o'clock** [3] - 2628:10, 2630:6, 2883:16
**O'Connor** [1] - 2814:13
**oath** [4] - 2715:8, 2808:23, 2809:7, 2809:15
**object** [59] - 2644:1, 2646:22, 2647:5, 2673:17, 2674:1, 2675:22, 2678:13, 2681:10, 2687:19, 2706:25, 2707:8, 2709:15, 2712:7, 2719:2, 2720:25, 2721:8, 2737:17, 2738:3, 2742:16, 2743:11, 2752:25, 2759:14, 2765:23, 2770:11, 2771:13, 2772:20, 2776:16, 2776:17, 2776:25, 2778:4, 2779:15, 2783:6, 2788:9, 2789:23, 2790:15, 2793:5, 2796:10, 2797:7, 2805:14, 2811:9, 2812:2, 2812:3, 2812:9, 2813:6, 2825:24, 2826:11, 2826:18, 2827:22, 2828:4, 2833:21, 2848:10, 2849:14, 2850:7, 2871:19, 2872:5, 2874:9, 2884:22, 2885:9, 2890:8
**objection** [33] - 2628:11, 2628:17, 2633:12, 2651:9, 2660:14, 2663:25, 2669:3, 2669:7, 2669:8, 2676:6, 2681:12, 2693:7, 2726:24, 2729:1, 2742:3, 2742:22, 2744:25, 2759:5, 2766:1, 2772:7, 2773:7, 2796:15, 2808:25, 2827:5, 2836:6, 2838:1, 2848:23, 2865:7, 2873:20, 2881:25, 2885:5, 2890:13
**objections** [2] - 2820:17, 2882:6
**objective** [2] - 2752:3, 2752:7

**obligation** [1] - 2729:9
**obligations** [2] - 2729:7, 2736:20
**obtain** [3] - 2800:19, 2805:2, 2814:18
**obtained** [4] - 2700:16, 2811:11, 2811:13, 2864:16
**obviously** [3] - 2631:23, 2633:5, 2817:2
**occasion** [1] - 2793:4
**occasionally** [1] - 2791:15
**occasions** [3] - 2744:18, 2746:16, 2765:11
**occurred** [3] - 2774:2, 2819:13
**ocean** [1] - 2805:9
**October** [7] - 2799:18, 2837:23, 2838:16, 2838:20, 2878:7, 2887:8, 2888:18
**odd** [3] - 2856:13, 2860:15, 2884:5
**odd-million** [1] - 2856:13
**odds** [2] - 2694:11, 2698:23
**OF** [2] - 2625:1, 2625:4
**offer** [3] - 2651:7, 2669:2, 2728:24
**offered** [4] - 2773:10, 2773:22, 2774:2, 2857:23
**offering** [1] - 2821:14
**office** [37] - 2633:24, 2733:16, 2733:18, 2733:19, 2738:18, 2739:1, 2739:6, 2739:10, 2740:11, 2742:9, 2742:13, 2743:5, 2765:9, 2779:14, 2779:21, 2780:4, 2780:6, 2781:1, 2781:3, 2781:6, 2781:9, 2781:12, 2781:13, 2782:1, 2782:2, 2787:20, 2791:10, 2811:16, 2814:14, 2814:15, 2814:16, 2814:17, 2817:22, 2825:3, 2825:8, 2844:5
**officed** [1] - 2825:4
**officer** [16] - 2737:11, 2772:6, 2793:24, 2794:3, 2794:4, 2794:7, 2818:22, 2825:25, 2830:17, 2835:6, 2848:6, 2867:2, 2867:10, 2867:13, 2867:24, 2872:23
**officer's** [1] - 2863:25
**officers** [10] - 2742:8, 2765:14, 2767:17, 2776:13, 2818:20, 2819:5, 2819:7, 2819:14, 2843:7
**offices** [10] - 2664:12, 2733:8, 2733:10, 2742:8, 2742:11, 2743:1, 2781:8, 2781:11, 2825:12, 2825:13
**officing** [1] - 2737:3
**offshore** [8] - 2731:21, 2733:23, 2739:18, 2739:19, 2771:1, 2796:8, 2800:10, 2809:11
**often** [5] - 2716:21, 2741:10, 2752:2, 2824:13, 2852:3
**Oklahoma** [1] - 2725:15
**old** [1] - 2851:15
**Omoccia** [1] - 2829:13
**on-the-book** [2] - 2692:3, 2692:21
**once** [7] - 2730:25, 2761:16, 2785:19, 2813:11, 2833:20, 2814:4
**one** [95] - 2628:5, 2629:22, 2635:14, 2647:20, 2647:21, 2651:1, 2651:15, 2653:25, 2657:2, 2662:4, 2662:23,

2670:2, 2672:19, 2673:4, 2680:12, 2680:13, 2681:22, 2682:24, 2683:13, 2683:16, 2684:15, 2685:9, 2685:18, 2686:8, 2688:6, 2689:6, 2696:13, 2696:16, 2700:25, 2701:1, 2728:3, 2728:4, 2730:11, 2730:16, 2730:18, 2742:6, 2743:3, 2743:7, 2743:12, 2744:5, 2744:20, 2745:8, 2747:2, 2748:10, 2748:23, 2750:8, 2750:9, 2751:13, 2751:17, 2752:3, 2754:15, 2761:5, 2793:4, 2807:8, 2807:17, 2809:9, 2811:20, 2816:16, 2818:15, 2824:18, 2825:21, 2826:9, 2840:15, 2846:3, 2847:15, 2851:7, 2851:11, 2851:17, 2852:16, 2854:13, 2857:11, 2857:19, 2859:12, 2861:17, 2864:4, 2866:20, 2866:23, 2867:25, 2869:18, 2874:17, 2875:2, 2875:21, 2875:24, 2876:7, 2877:5, 2877:7, 2877:18, 2879:14, 2888:8
**ones** [5] - 2647:4, 2657:14, 2689:3, 2753:8, 2881:5
**ongoing** [2] - 2748:16, 2789:21
**open** [5] - 2630:23, 2739:22, 2771:18, 2870:11, 2877:2
**open-ended** [1] - 2771:18
**opened** [6] - 2732:18, 2743:3, 2746:10, 2747:24, 2751:5, 2752:20
**opening** [2] - 2732:4, 2748:8
**opens** [1] - 2746:18
**operate** [2] - 2739:12, 2739:17, 2801:3, 2803:15, 2803:19
**operating** [13] - 2678:24, 2715:16, 2719:8, 2719:16, 2726:18, 2731:25, 2761:14, 2834:12, 2847:21, 2847:23, 2848:15, 2879:17, 2879:22
**operation** [6] - 2713:12, 2740:16, 2758:8, 2802:1, 2825:19, 2825:23
**operational** [2] - 2677:4, 2758:9
**operations** [8] - 2731:13, 2731:18, 2739:7, 2758:8, 2763:1, 2799:19, 2806:12, 2829:16
**opinion** [14] - 2646:20, 2656:21, 2656:22, 2657:19, 2666:10, 2699:10, 2701:14, 2701:19, 2708:14, 2708:16, 2742:3, 2746:17, 2802:23, 2818:16
**opinions** [1] - 2815:5
**opportunities** [1] - 2853:17
**opportunity** [3] - 2637:2, 2697:16, 2706:24
**opposed** [2] - 2677:5, 2702:19
**Opposition** [1] - 2806:5
**option** [1] - 2729:12
**orally** [1] - 2765:18
**orchestrator** [1] - 2850:11
**order** [10] - 2632:4, 2635:23, 2636:3, 2703:6, 2748:21, 2800:15, 2816:13, 2816:17, 2818:9, 2819:25
**ordered** [2] - 2635:15, 2635:17
**orders** [1] - 2635:24
**organization** [7] - 2714:10, 2743:24, 2760:11, 2793:23, 2843:23, 2843:24, 2844:2

origin [3] - 2884:10, 2884:16, 2884:20
original [2] - 2634:3, 2776:22
originally [3] - 2723:22, 2724:4, 2851:7
originals [1] - 2668:9
originated [1] - 2885:25
Ortega [1] - 2814:13
otherwise [2] - 2669:7, 2842:18
ourselves [1] - 2736:23
ousted [2] - 2808:3, 2808:6
outlined [1] - 2704:17
outs [1] - 2844:5
outside [9] - 2630:20, 2633:11, 2633:13, 2634:12, 2696:13, 2701:1, 2702:13, 2744:1, 2773:9
overall [5] - 2685:12, 2740:15, 2740:16, 2762:21, 2836:25
overhead [7] - 2820:9, 2835:12, 2843:19, 2843:20, 2843:22, 2843:25, 2844:6
overpaid [3] - 2701:19, 2701:24, 2702:5
overrule [6] - 2742:22, 2766:1, 2796:15, 2873:20, 2885:5, 2890:13
overruled [19] - 2633:12, 2693:9, 2712:10, 2726:25, 2742:4, 2743:13, 2745:2, 2772:22, 2774:5, 2778:7, 2779:17, 2797:9, 2805:19, 2820:4, 2820:17, 2826:19, 2838:6, 2874:11
oversaw [1] - 2767:23
overseas [7] - 2758:5, 2758:11, 2763:23, 2764:2, 2786:7, 2797:5, 2861:1
oversee [1] - 2874:7
overseeing [9] - 2740:20, 2758:15, 2758:21, 2767:14, 2767:22, 2768:22, 2769:2, 2860:10, 2868:18
overseen [4] - 2861:5, 2862:5, 2862:7, 2863:13
oversees [1] - 2768:25
oversight [3] - 2829:18, 2860:12, 2860:13
overstating [1] - 2727:19
owe [1] - 2763:4
owed [11] - 2685:7, 2689:12, 2762:17, 2762:20, 2763:5, 2839:10, 2856:7, 2856:9, 2858:7, 2858:19, 2858:23
own [11] - 2687:2, 2689:4, 2769:11, 2769:25, 2793:19, 2793:20, 2834:15, 2845:24, 2865:3, 2876:4, 2886:18
owned [15] - 2663:2, 2663:5, 2667:14, 2667:15, 2672:20, 2681:25, 2682:8, 2734:18, 2734:20, 2757:6, 2769:13, 2778:3, 2884:17, 2885:18, 2886:9
owner [3] - 2681:20, 2690:11, 2732:7
ownership [2] - 2664:16, 2805:3
owning [1] - 2734:21
owns [3] - 2662:4, 2682:24, 2698:11

# P

p.m [3] - 2746:2, 2810:25, 2891:4

pad [1] - 2736:24
Page [16] - 2639:3, 2647:18, 2649:9, 2670:10, 2676:19, 2676:21, 2677:13, 2801:18, 2836:17, 2840:10, 2841:17, 2844:10, 2846:14, 2851:23, 2852:20, 2854:17
page [22] - 2648:17, 2651:14, 2651:18, 2668:15, 2670:11, 2671:3, 2671:9, 2672:5, 2676:21, 2677:16, 2755:6, 2775:19, 2784:8, 2801:17, 2836:11, 2836:12, 2847:10, 2853:2, 2853:4, 2854:19
PAGE [1] - 2627:2
pages [4] - 2754:12, 2755:7, 2821:14, 2821:17, 2821:20
paid [21] - 2663:19, 2680:17, 2701:15, 2703:13, 2705:2, 2705:23, 2706:9, 2706:13, 2735:16, 2742:1, 2743:18, 2769:25, 2784:16, 2784:17, 2794:19, 2842:6, 2842:10, 2842:22, 2875:11, 2875:12, 2875:13
Panama [5] - 2878:12, 2878:13, 2880:23, 2884:4, 2885:20
panels [1] - 2782:3
paper [12] - 2666:3, 2666:4, 2687:10, 2688:16, 2688:17, 2689:9, 2693:17, 2736:25, 2768:7, 2782:8, 2832:15, 2832:19
paragraph [2] - 2649:10, 2678:1, 2852:1
paragraphs [1] - 2647:21
paralegals [1] - 2635:3
parameters [1] - 2863:8
parcel [1] - 2804:19
pardon [4] - 2629:5, 2743:10, 2860:6, 2861:6
pare [2] - 2800:9, 2800:13
parenthesis [1] - 2862:9
Parras [2] - 2626:2, 2633:20
PARRAS [7] - 2633:21, 2634:7, 2635:10, 2635:13, 2635:19, 2636:3, 2636:17
part [30] - 2629:24, 2630:2, 2630:21, 2631:13, 2634:15, 2638:22, 2648:11, 2650:1, 2650:3, 2662:22, 2665:1, 2668:21, 2672:19, 2695:23, 2695:24, 2696:3, 2696:4, 2696:5, 2701:10, 2720:18, 2732:24, 2734:21, 2745:14, 2752:9, 2800:15, 2804:18, 2804:19, 2817:3, 2864:21, 2865:5
part-time [1] - 2864:21
partially [1] - 2840:17
participate [1] - 2790:14
participated [1] - 2722:10
participating [2] - 2722:6, 2875:8
particular [1] - 2745:6, 2785:10, 2789:6, 2803:10, 2803:23, 2804:14, 2812:2, 2812:23, 2812:24, 2876:23, 2881:5
particularly [1] - 2836:21
parties [5] - 2657:5, 2663:4, 2771:14, 2806:2
partitions [1] - 2781:25, 2782:4

2782:5
Partners [1] - 2672:23
partnerships [1] - 2732:23
parts [1] - 2878:24
Party [4] - 2806:4, 2806:5, 2821:25
party [4] - 2632:1, 2773:9, 2806:6, 2822:14
Paso [1] - 2724:6
pass [5] - 2673:10, 2697:13, 2716:4, 2720:1, 2722:15
passed [1] - 2857:11
passport [3] - 2807:2, 2807:3, 2807:5
password [1] - 2642:12
past [5] - 2645:2, 2651:23, 2653:3, 2727:2, 2879:16
Patricia [4] - 2887:9, 2887:18, 2887:19, 2889:19
pay [20] - 2665:3, 2666:12, 2682:20, 2688:5, 2688:23, 2688:24, 2692:17, 2693:23, 2711:18, 2720:10, 2737:1, 2737:2, 2780:2, 2789:3, 2789:10, 2794:19, 2801:1, 2839:18, 2841:25, 2844:3
payable [8] - 2654:8, 2740:14, 2760:13, 2760:15, 2761:8, 2762:14, 2762:18, 2763:1
paycheck [2] - 2786:5, 2875:10
paying [7] - 2680:15, 2692:14, 2692:19, 2735:17, 2786:4, 2824:23, 2839:25
payment [1] - 2761:13
payments [9] - 2689:15, 2692:3, 2692:21, 2692:25, 2824:16, 2824:17, 2824:22, 2889:20
payroll [3] - 2678:25, 2715:16, 2719:16
pays [1] - 2842:9
PBOs [1] - 2743:25
pending [1] - 2888:8
penny [5] - 2705:24, 2712:21, 2713:1, 2719:7, 2719:9
people [37] - 2628:13, 2629:11, 2652:19, 2689:4, 2696:7, 2704:13, 2712:12, 2713:11, 2713:16, 2713:20, 2713:22, 2733:14, 2733:15, 2768:21, 2782:12, 2790:12, 2799:15, 2802:13, 2826:9, 2826:17, 2835:2, 2839:15, 2839:16, 2839:17, 2840:1, 2844:20, 2844:21, 2863:15, 2864:3, 2868:12, 2870:17, 2878:14, 2878:21, 2878:23, 2885:2
pepperoni [1] - 2851:16
per [6] - 2737:1, 2749:23, 2780:2, 2838:13, 2838:14, 2889:8
percent [27] - 2698:20, 2734:22, 2762:22, 2786:23, 2833:13, 2833:16, 2833:24, 2834:4, 2834:15, 2837:2, 2837:7, 2840:20, 2845:10, 2845:24, 2847:2, 2847:3, 2855:9, 2859:15, 2859:25, 2860:21, 2863:22, 2868:19, 2873:12, 2873:13, 2881:19
percentage [5] - 2711:19, 2735:21, 2762:20, 2833:11, 2863:19

percentile [1] - 2763:15
performance [2] - 2868:23, 2877:11
performed [3] - 2701:4, 2702:9, 2732:10
performing [1] - 2758:25
perhaps [2] - 2690:25, 2749:18
period [15] - 2639:25, 2641:15, 2705:24, 2706:9, 2726:19, 2740:21, 2766:8, 2768:17, 2768:19, 2792:23, 2850:18, 2876:1, 2877:12, 2880:15, 2881:5
periodically [1] - 2790:23
person [12] - 2641:17, 2641:18, 2696:13, 2696:14, 2696:17, 2698:15, 2735:12, 2809:17, 2827:20, 2828:23
person-to-person [2] - 2641:17, 2641:18
personal [18] - 2675:22, 2675:24, 2676:4, 2682:13, 2682:16, 2682:20, 2683:23, 2696:20, 2699:17, 2732:17, 2825:9, 2835:4, 2841:3, 2867:4, 2867:6, 2869:15, 2883:24, 2889:13
personally [11] - 2681:15, 2683:9, 2732:13, 2741:25, 2744:19, 2745:9, 2757:6, 2778:2, 2865:21, 2884:18, 2886:17
persons [2] - 2704:15, 2712:2
perspective [1] - 2780:7
Philosophy [1] - 2853:9
philosophy [7] - 2677:19, 2738:8, 2738:9, 2853:6, 2853:10, 2853:15, 2870:23
phone [17] - 2641:1, 2643:17, 2690:14, 2703:21, 2731:11, 2731:15, 2741:9, 2741:11, 2742:15, 2821:5, 2821:13, 2823:18, 2823:22, 2824:14, 2889:21, 2890:3, 2890:18
phones [1] - 2830:4
phonetic [4] - 2824:2, 2829:11, 2829:12, 2829:13
phonetic) [1] - 2763:2
phrase [2] - 2761:8, 2778:21
phraseology [1] - 2873:20
physical [1] - 2790:25
physically [1] - 2791:21
Piccadilly [1] - 2780:24
pick [1] - 2880:15
picked [3] - 2733:20, 2803:7, 2803:9
picking [1] - 2829:4
picture [4] - 2651:15, 2685:8, 2685:12, 2719:19
pictures [1] - 2629:12
piece [1] - 2736:25
pieces [6] - 2630:10, 2631:22, 2632:13, 2658:13, 2769:19
pile [1] - 2629:11
pits [1] - 2748:24
pivotal [1] - 2754:7
pizzas [1] - 2851:16
place [18] - 2641:5, 2700:3, 2714:11, 2739:14, 2740:15, 2740:17, 2745:19, 2760:4, 2764:9, 2774:2, 2774:4,

2784:25, 2799:18, 2803:19, 2808:20, 2817:9, 2851:1, 2869:12
placed [4] - 2730:8, 2839:9, 2862:17, 2873:1
places [3] - 2664:12, 2787:21, 2825:12
plain [1] - 2851:16
plan [1] - 2693:19
plane [1] - 2889:22
planes [1] - 2681:9
planned [2] - 2659:14, 2687:10
planning [1] - 2718:21
plans [1] - 2792:16
play [1] - 2761:22
plea [2] - 2728:22, 2729:20
plead [1] - 2728:2
pleaded [1] - 2727:22
pleadings [1] - 2754:18
pled [1] - 2728:1
plenty [3] - 2688:20, 2747:3, 2747:6
Plexiglass [1] - 2720:7
plus [4] - 2693:25, 2789:3, 2872:10, 2878:23
PO [2] - 2625:14, 2626:7
point [56] - 2634:1, 2634:17, 2635:1, 2647:7, 2653:20, 2663:15, 2667:6, 2667:25, 2682:24, 2686:1, 2688:21, 2704:7, 2707:18, 2716:9, 2718:23, 2733:16, 2734:23, 2745:18, 2751:3, 2752:15, 2752:19, 2754:3, 2754:18, 2755:24, 2756:9, 2759:25, 2761:19, 2769:4, 2777:15, 2783:12, 2784:15, 2785:4, 2785:5, 2785:22, 2786:6, 2786:14, 2786:17, 2797:19, 2806:23, 2810:15, 2813:20, 2816:6, 2816:11, 2817:6, 2817:15, 2823:6, 2823:8, 2826:25, 2849:25, 2866:20, 2871:3, 2879:20, 2881:17, 2881:22, 2883:19, 2890:20
points [3] - 2716:7, 2735:21, 2755:10
police [4] - 2814:17, 2818:20, 2819:1, 2819:5
policy [25] - 2754:22, 2773:19, 2775:14, 2775:19, 2775:21, 2777:16, 2777:20, 2777:21, 2778:1, 2778:11, 2778:13, 2779:1, 2779:2, 2779:12, 2779:22, 2779:23, 2783:14, 2783:20, 2783:23, 2783:25, 2784:23, 2784:25, 2785:13, 2845:6
political [2] - 2806:1, 2822:15
pool [2] - 2839:20
poorly [1] - 2685:11
portfolio [21] - 2650:2, 2650:3, 2665:9, 2677:3, 2678:4, 2783:20, 2837:2, 2837:5, 2837:7, 2863:20, 2868:18, 2871:25, 2874:8, 2877:6, 2877:7, 2878:10, 2878:11, 2878:13, 2880:24, 2881:10
portfolios [3] - 2877:25, 2879:24, 2880:22
portion [7] - 2634:10, 2695:12, 2695:14, 2773:5, 2836:19, 2861:2, 2874:3

position [15] - 2656:21, 2725:21, 2746:9, 2747:23, 2748:5, 2773:15, 2773:16, 2773:21, 2808:3, 2808:4, 2808:6, 2812:8, 2819:3, 2867:9, 2867:24
positions [1] - 2725:6
possession [1] - 2821:3
possessory [1] - 2813:21
possible [14] - 2634:14, 2691:19, 2694:6, 2694:9, 2694:12, 2731:16, 2734:2, 2735:11, 2735:22, 2750:7, 2792:17, 2799:3, 2839:11, 2866:19
possibly [5] - 2711:7, 2763:12, 2835:6, 2835:9, 2886:18
post [1] - 2652:16
potential [2] - 2744:1, 2780:13
potentially [2] - 2727:6, 2780:14
pounds [3] - 2702:1, 2764:24
power [4] - 2671:7, 2671:11, 2806:6, 2806:7
practice [2] - 2710:16, 2710:18
pre [1] - 2770:10
precious [2] - 2833:25, 2857:5
precise [1] - 2805:16
precisely [1] - 2740:4
precludes [1] - 2816:18
predated [3] - 2850:10, 2850:18, 2851:9
predecessor [1] - 2808:1
prefer [1] - 2760:18
preferred [1] - 2803:16
preliminary [1] - 2806:2
premises [1] - 2814:15
premium [2] - 2784:10, 2784:12
premiums [3] - 2784:7, 2784:16, 2784:17
prepaid [1] - 2763:13
prepare [4] - 2633:24, 2718:13, 2831:4, 2831:5
prepared [8] - 2670:24, 2671:13, 2761:24, 2762:6, 2764:13, 2765:12, 2765:15, 2857:20
preparing [7] - 2718:19, 2745:12, 2761:23, 2762:5, 2763:10, 2836:1, 2847:14
preponderance [2] - 2762:16, 2762:19
prerule [1] - 2634:2
prescribed [1] - 2811:14
presence [3] - 2766:21, 2811:1, 2890:25
present [10] - 2734:4, 2770:5, 2770:15, 2771:6, 2772:3, 2774:13, 2787:14, 2843:8, 2874:23, 2884:15
presentations [1] - 2871:8
Preston [1] - 2626:3
presume [4] - 2759:3, 2809:14, 2810:3
presumed [1] - 2759:14
presumes [1] - 2759:14
pretrial [3] - 2630:3, 2632:19, 2815:21
pretty [6] - 2640:17, 2678:19, 2685:25, 2715:2, 2715:4, 2877:16
previous [5] - 2736:14, 2777:1,

2783:16, 2877:5, 2881:5
**previously** [4] - 2631:7, 2639:5, 2639:17, 2811:17
**price** [1] - 2666:17
**prices** [3] - 2648:4, 2649:15, 2649:22
**primarily** [3] - 2757:15, 2846:19, 2859:12
**primary** [6] - 2734:21, 2735:12, 2758:6, 2760:12, 2842:21, 2854:1
**prime** [10] - 2803:11, 2804:4, 2804:7, 2804:10, 2804:11, 2804:15, 2821:25, 2822:2, 2822:7
**principal** [2] - 2661:17, 2763:4
**principles** [3] - 2655:4, 2655:8, 2655:12
**prison** [2] - 2729:22, 2791:12
**privacy** [1] - 2821:21
**private** [43] - 2628:10, 2629:10, 2679:10, 2680:10, 2680:25, 2681:6, 2682:3, 2682:5, 2687:8, 2688:8, 2689:3, 2690:2, 2719:12, 2742:8, 2743:23, 2743:25, 2744:5, 2744:12, 2744:14, 2757:20, 2765:14, 2767:17, 2767:20, 2768:2, 2769:1, 2770:5, 2770:17, 2771:7, 2771:16, 2772:3, 2772:4, 2772:6, 2772:17, 2773:6, 2774:12, 2774:19, 2774:21, 2776:13, 2814:14, 2814:16, 2844:7, 2882:12
**privileges** [1] - 2807:9
**privy** [2] - 2765:20, 2765:21
**prize** [1] - 2682:8
**problem** [11] - 2628:15, 2642:14, 2685:14, 2695:24, 2695:25, 2696:3, 2742:25, 2790:22, 2839:24, 2853:25, 2857:13
**problems** [1] - 2690:3
**procedure** [1] - 2845:6
**proceedings** [1] - 2891:8
**Proceedings** [1] - 2626:14
**process** [15] - 2716:15, 2740:8, 2745:11, 2766:23, 2808:20, 2811:15, 2830:24, 2831:21, 2836:4, 2865:24, 2866:1, 2866:2, 2882:21, 2886:15, 2889:10
**processes** [2] - 2739:24, 2843:21
**processing** [1] - 2745:5
**produced** [3] - 2626:14, 2813:2, 2853:13
**producing** [7] - 2667:12, 2686:18, 2708:17, 2708:18, 2708:21, 2815:8, 2831:13
**product** [4] - 2694:2, 2735:10, 2775:8, 2775:9
**production** [1] - 2859:14
**products** [10] - 2677:21, 2727:20, 2735:3, 2735:4, 2735:6, 2735:25, 2764:23, 2774:23, 2847:7, 2871:4
**profession** [1] - 2674:12
**professional** [3] - 2652:14, 2742:6, 2867:4
**professionals** [3] - 2652:16, 2653:18, 2786:8
**proffer** [1] - 2881:23

**proffered** [1] - 2881:24
**profile** [1] - 2653:11
**profit** [7] - 2709:5, 2709:7, 2709:15, 2789:4, 2831:6, 2847:21, 2849:10
**profitability** [3] - 2685:9, 2685:20, 2841:18
**profitable** [3] - 2841:19, 2841:23, 2849:11
**profits** [15] - 2685:21, 2685:25, 2686:3, 2708:17, 2708:18, 2708:21, 2708:24, 2709:5, 2842:17, 2842:18, 2847:23, 2848:15, 2850:1, 2851:8, 2859:14
**program** [3] - 2785:21, 2839:19, 2859:4
**progression** [1] - 2774:9
**project** [9] - 2654:12, 2658:2, 2658:6, 2658:16, 2659:24, 2684:20, 2684:24, 2689:25, 2708:7
**projects** [6] - 2654:21, 2655:14, 2709:11, 2769:22, 2770:2, 2770:7
**promised** [2] - 2689:20, 2801:2
**promises** [1] - 2729:17
**promissory** [1] - 2679:13
**promoting** [1] - 2677:20
**promotion** [6] - 2740:17, 2740:25, 2829:7, 2830:12, 2867:15, 2888:16
**promotional** [5] - 2676:9, 2807:18, 2834:10, 2836:15, 2870:25
**property** [5] - 2667:15, 2667:17, 2719:18, 2813:22, 2856:1
**proportions** [1] - 2840:4
**prosecute** [1] - 2645:10
**prosecution** [7] - 2635:16, 2651:8, 2697:17, 2697:20, 2750:22, 2817:9, 2817:23
**prosecutors** [1] - 2657:18
**prospective** [1] - 2843:8
**protect** [3] - 2753:1, 2772:1, 2821:21
**protected** [1] - 2642:12
**protective** [2] - 2678:3, 2836:23
**proud** [2] - 2650:7, 2769:7
**prove** [4] - 2750:1, 2752:7, 2752:10, 2820:22
**proved** [1] - 2820:23
**proven** [1] - 2677:19
**provide** [2] - 2818:10, 2852:2
**provided** [5] - 2642:25, 2702:13, 2761:21, 2836:4, 2888:15
**providing** [4] - 2696:16, 2796:5, 2796:13, 2796:19
**provision** [2] - 2679:20, 2845:9
**provisional** [2] - 2784:10, 2784:11
**prudent** [2] - 2677:23, 2853:16
**public** [4] - 2697:10, 2757:20, 2857:16, 2886:20
**publication** [2] - 2654:7, 2658:9, 2857:22
**publicly** [1] - 2882:13
**publish** [1] - 2653:22
**published** [1] - 2653:9
**pull** [8] - 2636:19, 2708:3, 2754:10,

2754:17, 2760:17, 2768:3, 2785:21, 2854:3
**pulled** [1] - 2652:5
**pulse** [1] - 2830:4
**punish** [1] - 2818:22
**purchase** [5] - 2709:23, 2712:18, 2715:15, 2745:6, 2804:21
**purchased** [11] - 2698:16, 2704:15, 2708:23, 2710:14, 2710:15, 2712:2, 2712:25, 2713:5, 2713:14, 2839:2
**purchases** [2] - 2710:2, 2761:11
**purchasing** [2] - 2712:3, 2719:18
**purpose** [1] - 2742:22
**purposes** [4] - 2805:3, 2812:1, 2818:15, 2882:8
**pursuant** [8] - 2812:4, 2812:5, 2817:25, 2818:9, 2819:21, 2819:22, 2819:23, 2819:24
**push** [1] - 2755:15
**put** [44] - 2628:14, 2633:18, 2633:24, 2643:16, 2648:9, 2649:23, 2651:2, 2652:7, 2653:22, 2665:2, 2666:2, 2679:5, 2687:17, 2687:23, 2700:3, 2700:13, 2704:5, 2704:11, 2704:12, 2705:12, 2705:14, 2711:6, 2711:8, 2714:9, 2718:6, 2748:19, 2750:19, 2752:12, 2753:6, 2753:8, 2755:18, 2756:5, 2764:7, 2768:8, 2768:9, 2768:16, 2845:19, 2847:16, 2847:17, 2848:7, 2861:17, 2883:11, 2883:12
**putting** [9] - 2633:17, 2653:14, 2683:23, 2687:3, 2718:2, 2749:22, 2753:22, 2757:5, 2839:16

## Q

**qualifications** [3] - 2651:4, 2652:20, 2652:22
**qualified** [1] - 2751:6
**quarter** [3] - 2730:3, 2730:4, 2880:12
**quarterly** [4] - 2796:16, 2830:5, 2842:24, 2868:23
**questioning** [2] - 2752:20, 2788:17
**questions** [21] - 2643:5, 2643:8, 2644:14, 2679:19, 2681:16, 2683:1, 2684:22, 2691:21, 2693:20, 2694:5, 2694:7, 2694:19, 2694:24, 2695:5, 2707:9, 2715:23, 2753:11, 2755:1, 2827:5, 2850:18, 2877:18
**quicker** [1] - 2829:2
**quickly** [6] - 2634:14, 2724:22, 2788:24, 2832:19, 2832:21, 2877:17
**quicksand** [1] - 2634:1
**quit** [3] - 2722:5, 2727:2, 2785:24
**quite** [3] - 2727:3, 2731:2, 2885:7
**quote** [3] - 2676:12, 2682:20, 2792:16
**quoted** [3] - 2648:3, 2649:14, 2649:21

## R

**rae** [1] - 2751:22

**raise** [12] - 2722:24, 2723:9, 2746:4, 2750:9, 2760:25, 2811:4, 2827:25, 2828:18, 2828:20, 2871:24, 2872:12, 2874:14

**raised** [8] - 2724:6, 2750:11, 2751:4, 2752:19, 2772:4, 2815:21, 2828:2, 2829:3

**raising** [1] - 2756:24

**ran** [3] - 2825:21, 2863:23, 2866:15

**rate** [2] - 2735:20, 2839:24

**rated** [1] - 2817:10

**rates** [5] - 2735:16, 2735:17, 2744:3, 2842:2, 2842:22

**Rather** [1] - 2841:25

**rather** [5] - 2752:3, 2772:4, 2839:8, 2851:11, 2884:12

**rating** [1] - 2857:4

**reach** [1] - 2883:19

**react** [1] - 2790:5

**read** [24] - 2648:2, 2649:13, 2672:8, 2676:25, 2677:25, 2699:22, 2699:24, 2703:5, 2706:15, 2713:2, 2773:3, 2773:5, 2778:16, 2797:19, 2801:23, 2836:11, 2837:13, 2841:8, 2853:8, 2874:1, 2874:3, 2880:9, 2887:9

**reading** [3] - 2712:23, 2712:24, 2887:15

**reads** [1] - 2888:17

**ready** [8] - 2632:5, 2633:19, 2634:23, 2636:12, 2745:25, 2748:16, 2810:21, 2890:23

**real** [32] - 2629:10, 2687:9, 2693:16, 2698:12, 2698:17, 2699:1, 2732:23, 2757:2, 2769:14, 2769:19, 2769:22, 2770:1, 2770:7, 2777:21, 2777:22, 2778:12, 2778:13, 2778:14, 2779:24, 2779:25, 2780:8, 2780:9, 2784:6, 2784:21, 2785:13, 2788:3, 2799:25, 2840:23, 2840:24, 2882:14, 2888:10

**reality** [2] - 2635:21, 2747:15

**realized** [2] - 2849:23, 2864:24

**really** [5] - 2733:4, 2756:5, 2775:8, 2784:1, 2801:8

**realm** [1] - 2699:16

**reargued** [1] - 2816:4

**reason** [9] - 2640:24, 2663:15, 2718:6, 2798:8, 2799:16, 2799:17, 2799:25, 2826:21, 2839:22

**reasonable** [1] - 2842:23

**reasons** [3] - 2633:15, 2735:23, 2859:11

**rebut** [5] - 2748:9, 2748:25, 2753:18, 2755:12, 2755:19

**recap** [2] - 2631:1, 2857:1

**recapitalize** [1] - 2668:23

**recapitalizing** [1] - 2705:11

**receive** [9] - 2724:20, 2729:18, 2758:23, 2764:14, 2766:12, 2767:6, 2843:9, 2867:9, 2888:4

**received** [14] - 2631:2, 2706:6, 2768:19, 2785:23, 2795:1, 2806:23, 2807:1, 2807:2, 2812:16, 2843:6, 2867:15, 2869:10, 2882:23, 2894:1

**receiver** [35] - 2635:14, 2637:11, 2637:17, 2637:20, 2637:24, 2639:25, 2641:6, 2641:10, 2650:23, 2666:18, 2705:17, 2705:21, 2706:8, 2706:12, 2706:16, 2706:18, 2706:23, 2709:6, 2813:17, 2813:20, 2813:22, 2815:7, 2817:11, 2817:14, 2817:15, 2817:17, 2817:25, 2818:2, 2818:4, 2818:7, 2818:10, 2819:7, 2819:10, 2819:15, 2819:22

**receivership** [4] - 2813:16, 2815:5, 2816:7, 2816:8

**receiving** [12] - 2680:18, 2681:23, 2702:2, 2759:17, 2759:22, 2764:2, 2766:18, 2794:24, 2804:19, 2841:4, 2843:12, 2885:14

**recent** [3] - 2643:13, 2658:18, 2818:16

**receptionist** [1] - 2781:7

**receptive** [1] - 2803:14, 2804:12

**Recessed** [4] - 2707:24, 2746:2, 2810:25, 2891:4

**recipients** [2] - 2884:11, 2884:17

**recognition** [1] - 2806:24

**recognize** [11] - 2649:3, 2670:18, 2728:21, 2820:13, 2820:21, 2821:1, 2821:4, 2835:16, 2835:23, 2856:19, 2870:17

**recollect** [1] - 2795:17

**recollection** [1] - 2787:1

**recommend** [1] - 2729:14

**recommendation** [1] - 2875:25

**reconsider** [1] - 2756:10

**record** [9] - 2634:15, 2634:16, 2634:25, 2635:8, 2635:25, 2728:16, 2818:14, 2821:16, 2891:8

**recorded** [4] - 2626:14, 2690:15, 2701:21, 2701:22

**recording** [7] - 2644:8, 2644:12, 2644:21, 2644:23, 2644:24, 2645:6, 2691:11

**records** [1] - 2683:13

**recriminations** [1] - 2650:19

**RECROSS** [4] - 2627:6, 2627:8, 2697:14, 2720:4

**recruited** [2] - 2741:23, 2869:8

**red** [3] - 2684:10, 2684:15, 2803:25

**redacted** [1] - 2821:12

**redeem** [8] - 2689:20, 2689:21, 2705:4, 2804:21, 2819:17, 2839:1, 2839:3, 2839:23

**redeemed** [1] - 2838:19

**redeeming** [2] - 2839:16, 2839:18

**redemption** [1] - 2859:16

**redemptions** [5] - 2839:6, 2839:22, 2840:5, 2859:4, 2859:18

**redeposit** [1] - 2778:18

**REDIRECT** [4] - 2627:5, 2627:7, 2673:11, 2716:5

**redirect** [2] - 2708:7, 2714:20

**reduce** [2] - 2663:19, 2663:21

**refer** [8] - 2648:17, 2658:8, 2709:18, 2721:10, 2798:10, 2845:2, 2861:19, 2894:1

**reference** [5] - 2648:8, 2698:3, 2790:15, 2795:10, 2798:7

**referenced** [2] - 2648:11, 2670:4

**references** [2] - 2669:19, 2802:7

**referred** [10] - 2658:2, 2679:20, 2702:9, 2710:19, 2759:13, 2778:22, 2798:11, 2808:12, 2859:1, 2861:14

**referring** [14] - 2630:10, 2648:19, 2648:20, 2657:1, 2657:15, 2662:24, 2663:10, 2672:22, 2701:25, 2720:17, 2753:9, 2761:9, 2771:15, 2870:6

**refers** [1] - 2672:14

**refining** [1] - 2750:14

**reflect** [2] - 2728:16, 2821:17

**refresh** [1] - 2639:2

**refrigeration** [1] - 2726:8

**regard** [1] - 2845:11

**regarding** [4] - 2656:15, 2742:1, 2836:15, 2852:7

**regardless** [1] - 2747:23

**region** [1] - 2841:4

**regional** [6] - 2726:12, 2829:1, 2829:6, 2829:9, 2829:20, 2840:15

**regions** [3] - 2829:14, 2829:17, 2829:18

**regrettably** [2] - 2769:9, 2789:15

**regs** [2] - 2656:24, 2657:13

**regular** [2] - 2824:17, 2886:19

**regulated** [1] - 2740:5

**regulation** [1] - 2657:1

**regulations** [3] - 2656:25, 2657:21, 2804:1

**regulator** [1] - 2739:24

**regulators** [6] - 2796:6, 2796:14, 2796:21, 2796:23, 2799:8, 2807:21

**Regulatory** [6] - 2808:2, 2808:20, 2809:18, 2823:2, 2823:14, 2824:7

**regulatory** [7] - 2655:22, 2739:24, 2740:1, 2740:8, 2808:7, 2808:11, 2808:15

**Reignmaker** [3] - 2669:23, 2672:15, 2673:4

**related** [8] - 2656:3, 2663:4, 2708:13, 2714:7, 2714:8, 2746:17, 2781:22, 2824:4

**relating** [2] - 2637:23, 2658:13

**relationship** [19] - 2640:20, 2737:21, 2742:5, 2742:19, 2743:18, 2804:4, 2804:6, 2808:14, 2808:17, 2809:24, 2810:2, 2824:11, 2824:13, 2862:14, 2867:3, 2867:4, 2867:5, 2867:6, 2869:16

**relationships** [1] - 2807:20

**relative** [3] - 2732:22, 2754:7, 2872:2

**relatively** [1] - 2726:11

**released** [1] - 2831:22

**relevance** [5] - 2681:10, 2742:16, 2742:17, 2850:7, 2850:8

**relevant** [4] - 2693:8, 2749:5, 2749:10, 2750:22

**reliance** [1] - 2816:16

**relied** [2] - 2694:15, 2816:12

2919

**relitigate** [1] - 2813:24
**relitigated** [2] - 2816:1, 2816:3
**relitigating** [1] - 2815:16
**relocate** [3] - 2798:24, 2800:4, 2803:4
**relocated** [1] - 2822:8
**rely** [1] - 2718:21
**relying** [1] - 2718:8
**remain** [3] - 2741:1, 2809:20, 2853:10
**remaining** [1] - 2853:16
**remains** [1] - 2704:5
**remedy** [1] - 2816:18
**remember** [61] - 2635:18, 2638:7, 2638:11, 2638:13, 2638:19, 2638:23, 2641:1, 2645:20, 2658:13, 2659:10, 2660:6, 2665:13, 2672:19, 2673:3, 2673:5, 2673:15, 2674:8, 2674:16, 2674:19, 2679:21, 2680:8, 2681:15, 2683:1, 2683:10, 2686:6, 2687:7, 2691:3, 2691:21, 2692:18, 2694:23, 2695:1, 2695:5, 2695:20, 2696:16, 2708:6, 2708:10, 2709:24, 2710:21, 2710:25, 2713:2, 2713:4, 2713:6, 2714:3, 2714:6, 2717:1, 2719:19, 2743:7, 2776:17, 2777:8, 2779:5, 2782:21, 2809:9, 2813:18, 2813:25, 2818:11, 2828:8, 2861:17, 2866:16, 2886:9
**remind** [6] - 2671:23, 2681:22, 2737:8, 2822:25, 2823:12, 2847:1
**reminded** [1] - 2630:25
**removed** [1] - 2637:14
**renewing** [1] - 2839:8
**rents** [1] - 2761:11
**repair** [1] - 2724:14
**repay** [4] - 2719:24, 2751:1, 2753:13, 2806:20
**repeat** [3] - 2773:1, 2868:8, 2873:24
**repeatedly** [3] - 2691:5, 2691:7, 2691:8
**rephrase** [5] - 2676:5, 2687:21, 2721:4, 2721:13, 2772:11
**replace** [1] - 2734:3
**replaced** [6] - 2759:25, 2760:3, 2760:9, 2761:16, 2808:9, 2824:8
**replete** [1] - 2650:19
**reply** [2] - 2789:12, 2889:18
**report** [64] - 2645:19, 2645:22, 2646:1, 2646:2, 2646:24, 2647:1, 2647:9, 2648:12, 2648:17, 2648:18, 2649:2, 2656:1, 2656:3, 2656:15, 2656:19, 2657:20, 2675:4, 2676:9, 2676:20, 2677:8, 2679:4, 2679:14, 2679:21, 2679:24, 2680:4, 2682:13, 2686:18, 2686:20, 2686:23, 2696:8, 2696:22, 2700:15, 2715:12, 2744:7, 2786:19, 2796:16, 2796:24, 2801:12, 2801:20, 2829:21, 2829:23, 2829:25, 2830:13, 2830:15, 2830:22, 2831:1, 2831:14, 2831:15, 2831:17, 2831:22, 2834:16, 2852:16, 2852:18, 2852:24, 2854:15, 2858:9, 2860:23, 2873:10, 2879:6, 2881:20, 2886:17
**reported** [22] - 2701:23, 2744:10,

2786:24, 2787:13, 2788:7, 2789:22, 2829:5, 2829:7, 2829:18, 2830:12, 2834:4, 2834:10, 2834:13, 2840:22, 2850:1, 2855:16, 2855:23, 2856:4, 2856:6, 2857:24, 2859:15, 2884:14
**Reporter** [1] - 2626:11
**reporter** [2] - 2723:18, 2857:13
**REPORTER'S** [1] - 2891:5
**Reporting** [1] - 2655:16
**reporting** [18] - 2657:2, 2686:2, 2734:15, 2736:20, 2737:13, 2740:15, 2786:18, 2787:24, 2788:21, 2789:19, 2793:1, 2830:7, 2831:3, 2834:21, 2872:10, 2875:4, 2881:5, 2881:19
**reports** [13] - 2646:4, 2679:12, 2703:6, 2718:7, 2718:19, 2761:22, 2794:9, 2794:10, 2797:11, 2857:20, 2876:20, 2881:18, 2882:16
**represent** [2] - 2632:3, 2857:8
**representations** [1] - 2678:9
**represented** [1] - 2781:9
**reputable** [2] - 2664:19, 2664:20
**request** [1] - 2861:13
**requested** [3] - 2773:5, 2818:7, 2874:3
**requests** [2] - 2716:21, 2716:24, 2839:25
**required** [2] - 2796:7, 2796:17
**requirement** [1] - 2632:19
**requirements** [1] - 2837:18
**Research** [1] - 2726:4
**research** [17] - 2656:8, 2657:10, 2832:8, 2857:21, 2860:18, 2860:22, 2862:8, 2862:25, 2863:23, 2864:1, 2864:10, 2864:11, 2864:18, 2864:20, 2866:12, 2866:23
**researched** [5] - 2654:23, 2655:1, 2656:23, 2657:14
**reserve** [2] - 2801:24, 2802:2
**resign** [1] - 2866:14
**resolution** [1] - 2633:1
**resources** [1] - 2842:2
**respect** [6] - 2738:1, 2751:7, 2762:4, 2763:7, 2786:23, 2854:1
**respectfully** [2] - 2755:2, 2755:17, 2811:9, 2811:18, 2818:17, 2861:12
**respective** [2] - 2788:7, 2884:14
**respects** [2] - 2655:18
**respond** [2] - 2635:11, 2817:1
**responded** [2] - 2714:14, 2742:14
**responding** [1] - 2712:9
**response** [15] - 2631:16, 2775:5, 2776:16, 2776:18, 2777:3, 2812:20, 2812:21, 2812:23, 2813:14, 2814:22, 2815:8, 2816:10, 2889:3, 2889:5, 2889:16
**responses** [1] - 2759:13
**responsibilities** [6] - 2650:9, 2740:10, 2760:10, 2760:12, 2794:6, 2828:24
**responsibility** [2] - 2830:16, 2831:8
**responsible** [8] - 2757:13, 2758:14, 2761:13, 2762:5, 2794:8, 2810:1, 2829:16, 2831:13

**responsive** [1] - 2765:25
**responsiveness** [1] - 2777:12
**rest** [5] - 2687:1, 2700:21, 2855:16, 2855:23, 2879:5
**restate** [1] - 2776:19
**restaurant** [3] - 2869:20, 2876:6, 2876:7
**restaurant/coffee** [1] - 2869:19
**result** [1] - 2632:2
**results** [2] - 2685:9, 2741:21
**resume** [4] - 2636:12, 2745:25, 2810:22, 2890:23
**resumé** [5] - 2651:2, 2651:23, 2652:7, 2652:16, 2652:25
**retail** [1] - 2725:5
**retained** [1] - 2802:2
**retire** [1] - 2866:13
**return** [7] - 2668:8, 2677:5, 2711:15, 2749:24, 2782:22, 2789:2, 2842:23
**returned** [1] - 2743:2
**returning** [1] - 2690:2
**returns** [7] - 2853:13, 2879:20, 2880:14, 2881:4
**reurge** [2] - 2811:25, 2812:1
**reveal** [1] - 2646:5
**Revenue** [1] - 2638:10
**reverse** [1] - 2754:19
**review** [6] - 2653:1, 2661:16, 2661:22, 2831:10, 2831:11, 2836:5
**reviewed** [7] - 2646:14, 2649:5, 2812:8, 2842:23, 2860:15, 2862:8, 2886:17
**reviewing** [4] - 2830:21, 2836:9, 2843:3, 2843:5
**revisit** [2] - 2752:14, 2754:21
**revisiting** [1] - 2749:9
**revoked** [3] - 2798:9, 2798:10, 2799:10
**ride** [1] - 2749:20
**rides** [1] - 2743:15
**ridiculous** [2] - 2698:9, 2698:14
**rig** [1] - 2853:22
**rigging** [1] - 2854:3
**right-hand** [1] - 2862:6
**rights** [2] - 2661:18, 2661:22
**rigorous** [2] - 2739:25, 2740:7
**rings** [1] - 2779:7
**Risk** [1] - 2676:24
**risk** [18] - 2677:2, 2677:7, 2710:20, 2710:25, 2711:4, 2711:10, 2711:11, 2711:24, 2712:8, 2718:3, 2738:13, 2738:15, 2753:12, 2841:8, 2844:19, 2844:20, 2844:23
**risk-taker** [2] - 2738:13, 2738:15
**riskier** [1] - 2711:14
**risks** [7] - 2674:16, 2675:17, 2675:20, 2710:24, 2711:9, 2841:9, 2844:17
**risky** [7] - 2674:18, 2676:12, 2676:16, 2678:8, 2678:11, 2711:23, 2753:12
**RMR** [1] - 2626:11, 2891:11
**road** [1] - 2825:17
**ROBERT** [1] - 2625:6

**Robert** [1] - 2625:21
**Roca** [22] - 2640:2, 2640:4, 2640:5, 2640:7, 2640:13, 2641:1, 2641:16, 2642:15, 2642:18, 2643:1, 2643:16, 2643:21, 2643:24, 2644:6, 2644:11, 2690:15, 2691:1, 2691:8, 2703:21, 2703:23, 2703:24, 2704:2
**Roca's** [1] - 2641:3
**rocking** [1] - 2761:4
**Rodriguez** [1] - 2829:12
**Rolando** [1] - 2640:2
**role** [10] - 2737:9, 2740:20, 2743:24, 2761:23, 2762:3, 2766:21, 2767:14, 2767:22, 2768:21, 2807:25
**roles** [1] - 2829:1
**rolled** [1] - 2839:17
**room** [1] - 2730:15
**roommate** [3] - 2730:8, 2730:14, 2741:22
**Rough** [1] - 2879:15
**routine** [1] - 2888:1
**RPR** [1] - 2626:11
**Rule** [2] - 2773:22, 2812:5
**rule** [2] - 2752:15, 2812:4
**ruled** [3] - 2813:23, 2815:16, 2820:16
**Rules** [1] - 2815:20
**ruling** [3] - 2633:7, 2634:19, 2747:9
**run** [4] - 2637:21, 2736:2, 2859:13, 2863:20
**running** [9] - 2666:9, 2731:20, 2739:20, 2825:19, 2825:20, 2830:2, 2876:4, 2885:6, 2885:13
**ruse** [1] - 2785:18
**Rusk** [1] - 2626:12

**S**

**safe** [1] - 2642:20
**safer** [1] - 2827:4
**salaries** [4] - 2758:8, 2761:11, 2869:24, 2870:9
**salary** [7] - 2794:16, 2794:18, 2794:21, 2794:24, 2794:25, 2795:1, 2870:6
**sale** [2] - 2745:8, 2799:5
**sales** [10] - 2740:17, 2740:24, 2743:21, 2772:19, 2774:23, 2774:24, 2788:23, 2788:24, 2839:23, 2859:17
**salespeople** [2] - 2863:11, 2870:16
**Sanchez** [3] - 2626:11, 2891:7, 2891:11
**sat** [2] - 2786:14, 2843:12
**satisfaction** [1] - 2820:23
**Saturday** [2] - 2645:2, 2645:3
**savings** [7] - 2687:17, 2694:14, 2698:3, 2698:10, 2698:14, 2739:20, 2805:2
**saw** [16] - 2683:13, 2717:4, 2759:4, 2777:15, 2778:11, 2778:14, 2784:17, 2801:9, 2814:4, 2852:7, 2858:8, 2860:22, 2868:19, 2873:9, 2873:12, 2876:18
**scale** [2] - 2735:25, 2736:3

**SCARDINO** [172] - 2629:4, 2629:6, 2630:7, 2630:18, 2631:17, 2631:21, 2632:13, 2633:4, 2636:18, 2636:22, 2644:5, 2646:8, 2646:11, 2646:23, 2647:1, 2647:5, 2647:6, 2647:18, 2647:24, 2648:24, 2649:1, 2649:9, 2649:12, 2651:6, 2651:12, 2651:17, 2652:2, 2652:4, 2652:6, 2658:4, 2658:5, 2660:7, 2660:10, 2660:12, 2660:16, 2660:18, 2660:21, 2660:22, 2663:22, 2663:23, 2664:4, 2667:4, 2668:15, 2668:17, 2668:25, 2669:10, 2670:10, 2670:13, 2671:2, 2671:4, 2671:9, 2671:10, 2671:17, 2671:25, 2672:5, 2672:7, 2672:23, 2673:1, 2673:10, 2673:17, 2674:1, 2675:22, 2678:13, 2681:10, 2687:19, 2693:7, 2697:15, 2706:2, 2706:7, 2707:3, 2707:11, 2708:2, 2708:5, 2709:10, 2709:21, 2712:8, 2712:11, 2716:4, 2718:9, 2719:2, 2720:2, 2720:5, 2721:5, 2721:14, 2722:15, 2726:24, 2729:1, 2737:17, 2738:3, 2742:3, 2742:16, 2743:11, 2745:1, 2746:9, 2746:15, 2746:24, 2747:10, 2747:13, 2759:5, 2759:13, 2765:23, 2770:11, 2771:13, 2772:7, 2772:20, 2773:7, 2773:14, 2773:21, 2774:1, 2776:16, 2776:25, 2777:7, 2778:4, 2779:15, 2783:6, 2788:9, 2789:23, 2790:15, 2793:5, 2795:9, 2795:15, 2795:21, 2796:9, 2797:7, 2801:16, 2801:19, 2805:14, 2808:25, 2810:8, 2810:11, 2810:19, 2811:5, 2811:7, 2811:9, 2811:13, 2812:1, 2812:6, 2825:24, 2826:11, 2826:18, 2827:2, 2827:22, 2828:4, 2833:21, 2836:6, 2838:1, 2838:3, 2848:10, 2848:23, 2849:14, 2850:7, 2850:9, 2850:12, 2850:17, 2854:18, 2857:14, 2857:22, 2858:1, 2861:6, 2861:12, 2861:21, 2865:7, 2871:19, 2872:5, 2872:14, 2873:15, 2874:9, 2882:6, 2884:22, 2884:25, 2885:9, 2890:7
**Scardino** [23] - 2625:21, 2625:21, 2673:15, 2674:2, 2678:16, 2679:13, 2680:8, 2681:14, 2682:24, 2683:25, 2684:19, 2686:5, 2687:7, 2687:13, 2689:24, 2691:18, 2692:13, 2693:4, 2693:19, 2694:18, 2694:22, 2751:4, 2810:17
**SCARDINO...........** [2] - 2627:6, 2627:8
**SCARDINO.............** [1] - 2627:4
**scare** [1] - 2645:8
**scared** [2] - 2743:16, 2840:2
**scenario** [1] - 2753:13
**schedule** [1] - 2784:9
**scheduling** [1] - 2827:20
**school** [4] - 2724:7, 2724:24, 2724:25, 2731:2
**School** [1] - 2730:9
**scoot** [1] - 2791:12
**scope** [7] - 2706:25, 2709:8, 2712:7,

2718:9, 2718:11, 2718:14, 2828:23
**scores** [1] - 2635:22
**screen** [7] - 2776:2, 2835:15, 2854:21, 2855:1, 2859:19, 2877:5, 2887:10
**script** [1] - 2836:13
**scrutiny** [3] - 2785:13, 2804:1, 2809:12
**scrutinywise** [1] - 2739:23
**se** [2] - 2749:23, 2780:2
**Sea** [1] - 2876:7
**seal** [1] - 2629:12
**search** [1] - 2814:20
**Seasons** [1] - 2874:21
**seat** [1] - 2723:5
**seated** [6] - 2630:24, 2636:15, 2746:6, 2756:14, 2791:4, 2811:8
**SEC** [6] - 2636:4, 2636:9, 2728:5, 2817:25, 2818:2, 2818:5
**second** [16] - 2653:1, 2668:15, 2720:2, 2730:4, 2781:5, 2795:10, 2810:8, 2810:12, 2812:5, 2816:2, 2826:24, 2852:1, 2853:20, 2857:12, 2880:23, 2881:2
**secondly** [5] - 2813:3, 2813:13, 2816:9, 2841:7, 2890:17
**secrecy** [3] - 2694:17, 2792:24, 2793:2
**secret** [12] - 2638:6, 2638:21, 2638:25, 2639:11, 2639:16, 2654:16, 2694:20, 2695:19, 2696:25, 2697:2, 2699:15, 2700:4
**secretary** [1] - 2823:22
**secretive** [4] - 2693:11, 2693:13, 2695:18, 2699:23
**section** [13] - 2677:14, 2680:4, 2727:18, 2762:15, 2764:16, 2764:20, 2764:22, 2767:24, 2788:6, 2832:6, 2835:1, 2846:15, 2854:22
**sections** [1] - 2832:10
**sector** [1] - 2734:17
**secure** [2] - 2680:2, 2680:5
**secured** [8] - 2647:14, 2841:11, 2845:1, 2845:11, 2845:14, 2845:17, 2852:3, 2852:12
**securities** [23] - 2645:19, 2646:5, 2646:24, 2646:25, 2648:9, 2648:13, 2648:15, 2648:23, 2649:17, 2649:20, 2649:24, 2678:5, 2679:14, 2710:13, 2728:4, 2832:25, 2833:3, 2833:4, 2837:5, 2837:9, 2846:20, 2857:9, 2864:18
**securities...** [1] - 2648:6
**Security** [1] - 2677:17
**security** [6] - 2647:15, 2677:24, 2679:17, 2679:18, 2829:6, 2836:18
**see** [67] - 2628:1, 2644:15, 2645:9, 2646:12, 2647:25, 2651:3, 2651:19, 2652:23, 2653:13, 2656:24, 2658:12, 2660:19, 2663:24, 2664:3, 2668:19, 2669:11, 2669:19, 2669:21, 2670:14, 2671:5, 2674:23, 2676:3, 2676:9, 2679:4, 2689:15, 2707:23, 2714:1, 2714:5, 2728:8, 2742:25, 2744:17, 2745:25, 2746:21, 2750:11, 2759:8,

2761:2, 2761:4, 2766:19, 2767:7,
2775:22, 2775:25, 2776:8, 2784:12,
2810:14, 2810:16, 2810:23, 2822:11,
2822:17, 2824:1, 2846:18, 2846:22,
2851:19, 2851:20, 2853:2, 2854:2,
2854:16, 2854:25, 2855:18, 2857:5,
2858:13, 2862:25, 2868:8, 2870:1,
2873:19, 2876:1, 2881:19, 2890:22
  **seeing** [5] - 2762:6, 2776:6, 2776:9,
2787:24, 2798:23
  **seek** [1] - 2817:3
  **seeking** [1] - 2716:24
  **seem** [2] - 2643:11, 2673:21
  **seemingly** [1] - 2831:19
  **segment** [2] - 2832:24, 2853:5
  **segments** [2] - 2834:25, 2840:24
  **seize** [1] - 2814:20
  **seized** [7] - 2811:16, 2817:11,
2817:13, 2817:14, 2819:9, 2819:10
  **selection** [1] - 2876:1
  **sell** [7] - 2706:24, 2744:19, 2745:9,
2789:10, 2862:16, 2865:6, 2865:13
  **selling** [8] - 2735:3, 2735:6, 2735:8,
2744:12, 2767:21, 2789:8, 2840:6,
2868:4
  **semester** [2] - 2730:17, 2730:18
  **send** [7] - 2679:9, 2780:5, 2780:7,
2783:13, 2785:19, 2881:13, 2889:9
  **sending** [1] - 2688:8
  **senior** [1] - 2830:6
  **sense** [3] - 2643:12, 2698:8, 2844:1
  **sent** [11] - 2632:9, 2670:4, 2688:2,
2716:16, 2763:24, 2780:16, 2862:19,
2877:19, 2882:2, 2884:3, 2886:18
  **sentence** [6] - 2677:18, 2677:22,
2729:15, 2729:18, 2729:21, 2729:23
  **sentencing** [1] - 2729:21
  **separate** [1] - 2701:22
  **September** [5] - 2799:18, 2801:24,
2802:8, 2802:20, 2802:25
  **Series** [3] - 2864:16, 2864:17
  **serve** [1] - 2724:10
  **server** [6] - 2639:1, 2639:5, 2639:6,
2639:7, 2639:17, 2639:21
  **service** [3] - 2701:4, 2724:14, 2888:14
  **Service** [1] - 2638:10
  **Services** [6] - 2808:2, 2808:21,
2809:18, 2823:2, 2823:15, 2824:7
  **services** [7] - 2761:11, 2781:10,
2830:10, 2831:12, 2836:4, 2836:15,
2888:16
  **serving** [1] - 2804:24
  **session** [1] - 2707:19
  **set** [9] - 2628:8, 2633:14, 2643:21,
2668:9, 2704:6, 2774:6, 2778:3,
2784:18, 2784:19
  **sets** [1] - 2665:17
  **setting** [2] - 2804:20, 2880:10
  **seven** [3] - 2659:19, 2726:6, 2782:3
  **several** [12] - 2638:4, 2725:6, 2735:21,
2744:18, 2805:12, 2805:15, 2825:12,
2826:16, 2826:21, 2828:19, 2866:11,

2882:5
  **severe** [1] - 2790:22
  **SFGC** [1] - 2888:12
  **shackled** [1] - 2791:11
  **share** [4] - 2729:12, 2763:15, 2767:16,
2775:11
  **shared** [5] - 2793:9, 2799:11, 2799:13,
2804:13, 2831:11
  **shareholder** [14] - 2656:2, 2656:19,
2657:2, 2657:3, 2663:21, 2679:3,
2695:4, 2696:1, 2696:22, 2715:11,
2841:14, 2841:15, 2886:16, 2889:24
  **shareholder's** [1] - 2888:19
  **shareholders** [2] - 2656:16, 2842:1,
2842:6
  **shareholders'** [1] - 2888:18
  **sharing** [4] - 2700:8, 2765:13, 2793:4,
2868:5
  **sheet** [8] - 2652:8, 2762:15, 2764:14,
2764:20, 2767:24, 2782:7, 2831:6,
2832:7
  **sheets** [1] - 2764:21
  **shielding** [1] - 2809:12
  **shift** [1] - 2645:17
  **ship** [1] - 2744:22
  **shop** [4] - 2869:19, 2869:21, 2870:3,
2870:11
  **short** [2] - 2754:10, 2783:11
  **shortly** [4] - 2690:15, 2782:22, 2785:5,
2822:12
  **shot** [3] - 2680:9, 2681:5, 2776:4
  **show** [18] - 2657:23, 2657:24, 2658:3,
2658:11, 2684:14, 2685:8, 2685:11,
2686:20, 2686:23, 2688:7, 2715:6,
2728:19, 2743:15, 2746:19, 2748:9,
2754:7, 2810:5, 2876:16
  **showed** [17] - 2679:13, 2682:12,
2689:24, 2690:6, 2719:19, 2776:12,
2776:22, 2776:23, 2777:6, 2777:10,
2779:2, 2797:23, 2798:1, 2798:4,
2798:15, 2799:7, 2871:3
  **showing** [7] - 2696:8, 2748:7,
2758:24, 2819:6, 2821:14, 2847:4,
2877:11
  **shown** [2] - 2801:5, 2848:16
  **shows** [4] - 2633:13, 2819:8, 2847:23,
2862:13
  **SIB** [1] - 2677:1
  **SIBL** [6] - 2661:19, 2663:8, 2665:20,
2665:21, 2680:20, 2680:21
  **sic** [2] - 2771:4, 2880:9
  **side** [5] - 2647:5, 2825:21, 2858:13,
2862:6, 2862:9
  **sidebar** [1] - 2753:4
  **sides** [1] - 2767:19
  **Sidney** [2] - 2776:14, 2777:5
  **sign** [2] - 2671:14, 2717:16
  **signatory** [4] - 2766:13, 2767:5,
2786:15, 2787:20
  **signature** [1] - 2670:18
  **signatures** [1] - 2690:6
  **signed** [5] - 2670:14, 2670:16, 2671:7,

2671:11, 2786:5
  **significant** [1] - 2689:15
  **signing** [1] - 2690:10
  **similar** [6] - 2655:18, 2735:6, 2775:8,
2775:9, 2804:25, 2833:2
  **simply** [1] - 2883:25
  **single** [6] - 2684:7, 2696:13, 2716:25,
2718:25, 2719:7, 2719:9
  **sit** [3] - 2760:17, 2760:20, 2839:17
  **site** [1] - 2881:20
  **sitting** [5] - 2628:16, 2728:11, 2734:4,
2805:9, 2851:13
  **situation** [3] - 2634:13, 2813:16,
2819:17
  **situations** [1] - 2825:1
  **six** [8] - 2640:12, 2665:14, 2665:15,
2724:11, 2794:22, 2816:25, 2851:16
  **size** [7] - 2739:8, 2781:17, 2781:20,
2785:12, 2788:14, 2828:23
  **skimming** [1] - 2870:11
  **slack** [1] - 2650:11
  **slammed** [1] - 2743:4
  **slip** [1] - 2671:24
  **slipped** [1] - 2753:7
  **sloppy** [1] - 2650:16
  **slow** [1] - 2814:10
  **small** [6] - 2726:7, 2726:12, 2788:5,
2788:8, 2788:13, 2859:14
  **smaller** [1] - 2736:2
  **Smith** [1] - 2726:8
  **so-called** [9] - 2785:6, 2788:5, 2789:2,
2831:13, 2840:18, 2868:23, 2877:8,
2878:2, 2878:11
  **sold** [12] - 2708:22, 2708:25, 2709:5,
2732:23, 2736:5, 2736:13, 2744:2,
2745:12, 2755:25, 2775:8, 2870:16
  **sole** [1] - 2681:20
  **solely** [1] - 2841:11
  **solemnly** [1] - 2722:25
  **solve** [4] - 2685:6, 2685:8, 2685:14,
2761:5
  **some-odd** [2] - 2860:15, 2884:5
  **someone** [7] - 2697:10, 2717:16,
2717:22, 2783:2, 2783:4, 2828:22,
2884:25
  **sometime** [2] - 2641:15, 2738:23
  **sometimes** [5] - 2671:23, 2737:24,
2737:25, 2752:4, 2752:7
  **somewhat** [5] - 2638:6, 2638:11,
2638:13, 2645:16, 2645:17
  **somewhere** [3] - 2661:25, 2711:6,
2736:14
  **son** [8] - 2822:6, 2864:10, 2864:11,
2865:3, 2865:10, 2866:11, 2866:21,
2866:23
  **sonar** [1] - 2724:15
  **soon** [2] - 2632:9, 2801:9
  **sophisticated** [1] - 2679:5
  **sorry** [28] - 2630:24, 2660:13, 2676:19,
2692:18, 2727:16, 2736:7, 2746:22,
2753:18, 2757:24, 2767:9, 2768:18,
2795:9, 2795:15, 2795:21, 2799:8,

2801:16, 2801:18, 2806:18, 2812:15, 2835:23, 2844:2, 2854:18, 2872:23, 2876:24, 2887:11, 2887:15, 2889:3
**sort** [1] - 2658:25
**soul** [1] - 2700:22
**source** [8] - 2702:23, 2735:24, 2736:3, 2778:18, 2842:21, 2884:21, 2885:14, 2886:4
**south** [1] - 2795:17
**South** [4] - 2701:11, 2724:6, 2829:13, 2841:6
**Southern** [1] - 2732:22
**SOUTHERN** [1] - 2625:1
**southern** [1] - 2732:24
**speaking** [1] - 2779:24
**special** [4] - 2806:24, 2807:4, 2807:7, 2807:9
**specialized** [1] - 2724:14
**specific** [13] - 2663:15, 2668:12, 2670:7, 2729:14, 2812:11, 2818:8, 2821:14, 2826:14, 2841:1, 2843:17, 2850:13, 2863:9
**specifically** [15] - 2634:8, 2645:23, 2647:11, 2701:20, 2703:17, 2727:16, 2727:18, 2741:23, 2757:16, 2771:25, 2777:16, 2812:9, 2846:14, 2886:9, 2889:7
**speculate** [1] - 2674:1
**speculation** [4] - 2644:1, 2678:13, 2759:14, 2890:7
**Speculation** [1] - 2693:7
**speculative** [3] - 2750:20, 2750:21, 2755:23
**spell** [1] - 2723:18
**spend** [1] - 2825:14
**spending** [1] - 2791:25
**spent** [12] - 2635:6, 2635:15, 2637:23, 2679:1, 2706:18, 2715:13, 2715:16, 2719:7, 2719:17, 2834:9, 2834:12, 2835:4
**Spiech** [2] - 2726:21, 2727:5
**spread** [1] - 2652:23
**spreadsheet** [3] - 2753:9, 2753:10, 2856:19
**square** [1] - 2781:14
**stability** [1] - 2677:20
**stable** [2] - 2678:5, 2853:13
**staff** [12] - 2631:23, 2632:5, 2633:23, 2736:2, 2739:6, 2826:23, 2830:6, 2831:8, 2832:7, 2832:8, 2835:7
**Stafford** [1] - 2726:7
**staffs** [1] - 2736:2
**stage** [1] - 2880:2
**stake** [1] - 2694:14
**Staley** [1] - 2829:11
**stand** [9] - 2630:11, 2632:7, 2752:24, 2753:20, 2791:7, 2810:12, 2870:21, 2870:25, 2886:22
**Standard** [1] - 2823:10
**standard** [2] - 2656:11, 2879:17
**Standards** [1] - 2655:16
**standards** [4] - 2655:17, 2656:3,

2656:19, 2791:24
**standing** [3] - 2728:14, 2728:15, 2851:14
**STANFORD** [1] - 2625:6
**Stanford** [437] - 2637:10, 2637:14, 2637:21, 2639:15, 2645:25, 2647:4, 2649:2, 2654:3, 2656:1, 2656:11, 2661:8, 2661:10, 2661:19, 2661:23, 2661:25, 2662:4, 2662:5, 2662:19, 2663:2, 2663:3, 2663:5, 2663:6, 2663:8, 2663:9, 2665:1, 2665:19, 2665:20, 2665:21, 2666:23, 2667:8, 2667:14, 2669:20, 2669:21, 2670:6, 2670:17, 2670:21, 2671:8, 2671:12, 2671:14, 2672:11, 2672:12, 2672:20, 2674:15, 2675:16, 2676:10, 2678:17, 2679:16, 2679:23, 2680:10, 2680:13, 2680:16, 2681:15, 2681:21, 2681:22, 2681:24, 2682:2, 2682:3, 2682:10, 2682:24, 2683:8, 2683:14, 2683:22, 2685:7, 2686:16, 2686:18, 2686:23, 2686:24, 2687:2, 2688:5, 2688:19, 2688:24, 2689:12, 2689:20, 2690:7, 2690:10, 2693:1, 2695:15, 2696:2, 2696:7, 2696:12, 2696:20, 2697:6, 2701:4, 2701:7, 2705:10, 2706:17, 2713:8, 2713:16, 2714:16, 2717:19, 2719:20, 2725:7, 2726:9, 2726:11, 2726:14, 2726:16, 2727:10, 2727:15, 2728:7, 2728:8, 2728:17, 2730:2, 2730:12, 2730:13, 2730:15, 2730:21, 2731:7, 2731:17, 2731:24, 2732:3, 2733:20, 2734:1, 2734:4, 2734:18, 2734:20, 2734:21, 2734:22, 2734:25, 2735:14, 2735:15, 2735:22, 2736:4, 2736:9, 2736:19, 2737:5, 2737:7, 2737:12, 2737:16, 2737:21, 2738:9, 2738:11, 2738:14, 2738:17, 2738:22, 2739:16, 2740:3, 2740:18, 2740:24, 2741:7, 2741:9, 2741:17, 2742:9, 2742:13, 2742:20, 2742:25, 2743:2, 2744:8, 2744:10, 2744:16, 2747:4, 2749:11, 2749:21, 2751:8, 2756:20, 2756:23, 2756:25, 2757:12, 2757:18, 2758:4, 2758:6, 2758:13, 2758:16, 2758:17, 2759:4, 2759:19, 2760:13, 2761:25, 2762:1, 2764:5, 2764:6, 2764:10, 2764:17, 2765:2, 2765:8, 2765:9, 2766:11, 2766:20, 2766:24, 2767:13, 2767:20, 2768:2, 2768:25, 2769:5, 2769:7, 2769:10, 2769:11, 2769:17, 2769:21, 2769:24, 2770:6, 2770:17, 2771:7, 2771:23, 2772:5, 2772:18, 2773:11, 2773:18, 2774:12, 2774:19, 2774:21, 2775:5, 2775:6, 2775:14, 2775:15, 2776:7, 2776:13, 2777:5, 2777:17, 2777:19, 2778:20, 2778:24, 2779:2, 2779:13, 2779:21, 2780:11, 2783:1, 2783:12, 2783:23, 2784:14, 2784:18, 2785:9, 2785:14, 2785:19, 2786:1, 2787:3, 2787:12, 2787:15, 2787:23, 2788:1, 2788:13, 2788:16, 2788:18, 2788:19, 2789:14,

2790:2, 2790:5, 2790:20, 2791:22, 2792:3, 2792:10, 2792:15, 2792:21, 2792:23, 2793:9, 2793:21, 2794:2, 2794:11, 2794:17, 2795:19, 2795:22, 2797:22, 2798:2, 2798:11, 2798:15, 2799:2, 2799:7, 2799:25, 2800:3, 2800:18, 2802:12, 2803:1, 2803:6, 2803:7, 2803:16, 2803:22, 2804:3, 2804:18, 2804:20, 2805:4, 2806:1, 2806:8, 2806:10, 2806:11, 2806:13, 2806:23, 2807:14, 2807:20, 2808:10, 2808:14, 2808:23, 2809:6, 2809:12, 2809:14, 2809:21, 2809:23, 2809:24, 2812:16, 2822:15, 2822:17, 2823:7, 2823:18, 2824:3, 2824:10, 2824:13, 2824:15, 2824:17, 2824:21, 2824:25, 2825:7, 2825:11, 2825:14, 2825:22, 2826:4, 2826:14, 2827:8, 2827:10, 2827:16, 2827:25, 2828:7, 2828:15, 2828:18, 2828:20, 2829:3, 2829:16, 2829:19, 2830:1, 2830:2, 2831:13, 2831:16, 2832:2, 2832:8, 2834:9, 2834:18, 2834:22, 2835:4, 2835:5, 2836:1, 2836:5, 2836:9, 2839:2, 2841:16, 2842:9, 2842:11, 2843:23, 2843:25, 2845:16, 2845:20, 2848:20, 2849:5, 2849:9, 2850:4, 2850:25, 2851:2, 2851:6, 2852:15, 2853:3, 2855:22, 2858:22, 2859:13, 2862:10, 2862:14, 2862:16, 2862:18, 2863:1, 2863:7, 2863:12, 2865:1, 2865:12, 2865:16, 2866:13, 2866:18, 2867:14, 2867:16, 2867:22, 2869:8, 2870:1, 2870:21, 2871:14, 2872:1, 2872:13, 2872:24, 2873:1, 2874:15, 2874:24, 2874:25, 2875:3, 2875:5, 2876:3, 2876:10, 2876:25, 2877:7, 2877:11, 2877:20, 2877:22, 2878:1, 2878:8, 2878:10, 2878:12, 2878:24, 2879:18, 2880:9, 2880:21, 2880:24, 2881:9, 2881:10, 2881:13, 2881:18, 2882:5, 2882:14, 2883:25, 2884:1, 2884:2, 2884:3, 2884:4, 2884:8, 2884:11, 2884:18, 2885:3, 2885:15, 2885:18, 2885:19, 2885:20, 2886:1, 2886:4, 2886:13, 2886:14, 2887:20, 2888:5, 2888:8, 2888:9, 2888:10, 2888:11, 2888:14, 2888:21, 2888:22, 2889:4, 2889:18, 2889:23, 2890:5
**Stanford's** [34] - 2650:7, 2653:25, 2662:18, 2666:1, 2674:18, 2675:10, 2679:6, 2679:9, 2682:6, 2682:13, 2683:5, 2683:19, 2688:3, 2689:4, 2714:10, 2717:5, 2734:7, 2737:8, 2738:8, 2739:3, 2741:12, 2742:24, 2821:2, 2831:21, 2837:9, 2841:3, 2841:23, 2853:5, 2853:6, 2882:22, 2883:24, 2889:13, 2889:16
**Star** [2] - 2678:21, 2695:3
**stars** [1] - 2694:6
**start** [10] - 2630:7, 2636:6, 2636:7, 2637:20, 2704:14, 2724:18, 2755:24, 2838:24, 2864:20, 2870:3

**start-ups** [1] - 2755:24
**started** [28] - 2637:10, 2658:21, 2694:5, 2706:17, 2726:14, 2731:4, 2733:1, 2735:9, 2735:14, 2736:4, 2736:12, 2737:7, 2738:17, 2740:3, 2756:20, 2756:22, 2757:7, 2758:3, 2758:20, 2760:7, 2769:10, 2774:11, 2774:18, 2849:7, 2849:8, 2849:22, 2866:12
**starting** [7] - 2726:10, 2771:22, 2835:14, 2843:1, 2876:23, 2883:22, 2887:8
**starts** [2] - 2651:14, 2759:9
**startup** [3] - 2675:20, 2676:12, 2678:8
**state** [4] - 2819:1, 2819:3, 2819:8, 2819:13
**statement** [30] - 2667:2, 2679:20, 2712:4, 2712:13, 2712:14, 2712:19, 2712:24, 2715:7, 2717:8, 2717:12, 2717:16, 2717:20, 2753:25, 2763:9, 2763:11, 2765:11, 2765:15, 2767:18, 2773:15, 2773:17, 2831:6, 2831:7, 2839:5, 2842:19, 2846:13, 2847:17, 2851:24, 2882:17
**statements** [52] - 2684:6, 2684:9, 2684:11, 2684:16, 2684:25, 2685:6, 2703:6, 2717:9, 2727:14, 2727:17, 2745:13, 2755:13, 2758:23, 2759:2, 2759:18, 2759:22, 2760:14, 2761:20, 2762:4, 2762:5, 2762:8, 2764:2, 2764:4, 2764:6, 2764:13, 2765:21, 2766:12, 2766:18, 2766:21, 2767:1, 2767:6, 2767:8, 2767:10, 2768:18, 2768:19, 2769:6, 2785:24, 2786:7, 2786:20, 2786:23, 2796:17, 2796:19, 2797:3, 2797:5, 2797:10, 2809:13, 2831:5, 2831:8, 2843:10, 2855:15, 2865:18
**States** [17] - 2635:16, 2691:23, 2700:14, 2722:20, 2724:8, 2724:10, 2735:7, 2735:9, 2735:13, 2739:12, 2739:18, 2739:23, 2740:5, 2740:17, 2782:23, 2823:23, 2862:11
**states** [13] - 2715:13, 2837:4, 2840:13, 2841:8, 2841:19, 2841:25, 2843:19, 2844:16, 2844:25, 2845:23, 2846:18, 2852:2, 2888:7
**STATES** [3] - 2625:1, 2625:4, 2625:10
**stating** [1] - 2846:4
**status** [1] - 2685:15
**stay** [8] - 2676:20, 2725:16, 2726:16, 2738:21, 2798:16, 2825:6, 2866:3, 2866:5
**stayed** [4] - 2637:17, 2637:19, 2726:6, 2789:16
**staying** [1] - 2633:10
**steadily** [1] - 2794:18
**steal** [1] - 2717:15
**steam** [1] - 2880:15
**steep** [1] - 2789:4
**STELLMACH** [232] - 2722:20, 2723:7, 2723:14, 2727:4, 2728:18, 2728:24, 2729:3, 2729:6, 2737:20, 2738:6,

2742:10, 2742:18, 2743:20, 2745:7, 2745:17, 2745:21, 2746:3, 2748:14, 2749:3, 2749:6, 2749:11, 2750:1, 2750:5, 2750:18, 2750:24, 2751:7, 2751:11, 2751:14, 2751:23, 2752:9, 2752:18, 2753:2, 2753:6, 2753:16, 2754:4, 2754:24, 2756:16, 2756:17, 2759:16, 2761:3, 2761:7, 2765:1, 2765:24, 2766:5, 2766:17, 2770:14, 2771:16, 2771:20, 2771:21, 2772:16, 2773:10, 2773:16, 2773:24, 2774:7, 2774:10, 2775:22, 2775:24, 2776:3, 2776:5, 2776:20, 2776:21, 2777:4, 2777:9, 2777:14, 2778:5, 2778:10, 2779:20, 2782:17, 2783:8, 2788:12, 2790:1, 2790:17, 2790:19, 2790:24, 2791:2, 2791:20, 2792:13, 2792:14, 2793:8, 2795:12, 2795:18, 2796:1, 2796:12, 2796:18, 2797:12, 2797:16, 2797:18, 2801:14, 2801:18, 2801:20, 2801:22, 2805:16, 2805:22, 2809:4, 2809:5, 2810:5, 2811:21, 2811:24, 2815:24, 2817:11, 2820:8, 2820:11, 2820:20, 2820:25, 2821:10, 2821:12, 2821:18, 2821:21, 2821:23, 2826:3, 2826:13, 2827:6, 2827:7, 2827:24, 2828:6, 2828:14, 2833:23, 2835:10, 2835:13, 2835:18, 2835:21, 2835:22, 2836:8, 2836:17, 2836:20, 2838:4, 2838:8, 2838:9, 2840:10, 2840:12, 2844:10, 2844:12, 2844:14, 2844:15, 2846:12, 2846:17, 2847:9, 2847:11, 2848:13, 2848:14, 2849:1, 2849:2, 2849:21, 2850:10, 2850:15, 2850:20, 2850:23, 2850:24, 2851:5, 2851:10, 2851:14, 2851:21, 2851:23, 2851:25, 2852:20, 2852:22, 2853:4, 2853:7, 2853:21, 2854:6, 2854:9, 2854:14, 2854:17, 2854:20, 2854:24, 2856:16, 2856:18, 2856:20, 2856:22, 2857:18, 2857:23, 2858:2, 2858:4, 2858:6, 2860:3, 2860:7, 2860:8, 2861:8, 2861:10, 2861:15, 2861:18, 2861:22, 2861:25, 2862:2, 2865:9, 2869:25, 2871:21, 2871:23, 2872:3, 2872:9, 2872:17, 2872:20, 2872:21, 2873:17, 2873:22, 2874:5, 2874:13, 2877:2, 2877:9, 2877:13, 2877:15, 2878:3, 2878:5, 2878:20, 2879:10, 2879:12, 2879:13, 2880:4, 2880:6, 2880:16, 2880:18, 2881:6, 2881:7, 2881:22, 2882:1, 2882:9, 2883:4, 2883:7, 2883:18, 2883:21, 2885:2, 2885:12, 2886:11, 2886:24, 2887:2, 2887:4, 2889:2, 2889:6, 2889:15, 2889:17, 2890:9, 2890:19
**Stellmach** [5] - 2625:16, 2801:16, 2854:18, 2857:15, 2861:6
**STELLMACH:..........** [1] - 2627:11
**stenography** [1] - 2626:14
**step** [5] - 2722:17, 2729:25, 2748:10, 2780:17, 2780:19
**stepped** [1] - 2794:3

**steps** [2] - 2808:5, 2808:8
**still** [17] - 2632:18, 2685:4, 2695:8, 2702:11, 2708:10, 2716:1, 2719:24, 2726:22, 2734:9, 2750:1, 2766:7, 2766:15, 2783:14, 2785:23, 2792:17, 2796:3, 2883:4
**stock** [3] - 2671:7, 2671:11, 2882:13
**stocks** [3] - 2710:13, 2833:25, 2853:11
**stop** [5] - 2648:7, 2677:6, 2759:10, 2769:5, 2890:20
**stopped** [4] - 2726:18, 2785:4, 2785:5, 2785:6
**storage** [1] - 2726:20
**stored** [2] - 2638:1, 2639:8
**strange** [2] - 2643:11, 2643:12
**Strategy** [1] - 2676:24
**strategy** [8] - 2677:1, 2750:6, 2840:13, 2840:14, 2840:17, 2843:4, 2843:5, 2853:12
**straws** [1] - 2659:15
**streamlines** [1] - 2843:20
**street** [2] - 2781:7, 2805:1
**Street** [1] - 2625:22
**strengthened** [1] - 2816:21
**strike** [1] - 2800:13
**stroke** [1] - 2725:22
**strong** [2] - 2678:6, 2837:6
**struck** [1] - 2799:22
**student** [1] - 2864:21
**study** [1] - 2869:4
**stuff** [4] - 2645:24, 2815:8, 2818:8, 2818:10
**style** [1] - 2741:13
**subject** [10] - 2650:5, 2661:6, 2661:7, 2668:11, 2747:11, 2749:9, 2750:14, 2752:3, 2882:1, 2888:17
**subjective** [1] - 2752:8
**submarine** [1] - 2724:14
**submission** [3] - 2755:4, 2814:1, 2819:6
**submit** [1] - 2850:14
**submitted** [2] - 2758:24, 2797:4
**Subpart** [1] - 2778:16
**subparts** [1] - 2772:23
**subsequent** [5] - 2730:11, 2762:1, 2762:3, 2814:12, 2867:11
**subsequently** [1] - 2808:5
**successful** [1] - 2713:12
**successor** [2] - 2808:10, 2866:19
**sucking** [1] - 2753:23
**sudden** [3] - 2659:2, 2659:11, 2659:13
**suddenly** [1] - 2658:17
**sufficient** [4] - 2789:1, 2839:12, 2839:14, 2839:21
**suggest** [2] - 2811:18, 2872:14
**suggested** [1] - 2828:2
**suggestion** [2] - 2827:18, 2827:19
**summarily** [1] - 2811:22
**summary** [1] - 2857:1
**summer** [11] - 2722:2, 2738:23, 2738:24, 2739:2, 2776:10, 2779:6, 2779:10, 2779:11, 2780:20, 2780:21,

2864:22
**Sun** [3] - 2678:21, 2695:3, 2695:13
**supervise** [1] - 2744:11
**supervising** [2] - 2744:11, 2824:6
**supervisor** [5] - 2809:11, 2809:19, 2809:20, 2823:5, 2866:24
**supervisors** [1] - 2685:19
**supplemental** [1] - 2846:8
**supplements** [1] - 2845:24
**supply** [1] - 2859:12
**support** [1] - 2792:21
**supported** [2] - 2800:6, 2855:14
**supporting** [1] - 2796:20
**suppose** [3] - 2681:7, 2742:15, 2846:3
**supposed** [3] - 2631:15, 2633:2, 2697:7
**supposedly** [5] - 2719:21, 2764:11, 2784:11, 2786:9, 2847:22
**suppress** [4] - 2811:18, 2811:19, 2812:7, 2812:11
**suppressed** [1] - 2818:24
**suppression** [4] - 2813:8, 2813:11, 2813:14, 2815:20
**Supreme** [8] - 2814:7, 2814:12, 2815:4, 2816:14, 2816:24, 2817:5, 2818:16, 2818:19
**surmised** [1] - 2738:2
**surprise** [2] - 2632:21, 2632:23
**suspicions** [2] - 2783:16, 2783:17
**sustain** [2] - 2681:12, 2827:4
**sustained** [32] - 2644:3, 2673:19, 2678:14, 2706:3, 2707:2, 2709:9, 2709:17, 2719:4, 2737:19, 2738:5, 2759:15, 2770:13, 2774:4, 2777:11, 2783:7, 2788:11, 2789:25, 2793:7, 2795:25, 2809:3, 2826:1, 2826:12, 2827:23, 2828:5, 2833:22, 2836:7, 2848:11, 2848:24, 2849:15, 2865:8, 2885:11
**SVCH** [1] - 2661:18
**swear** [1] - 2722:25
**Swiss** [14] - 2683:10, 2683:22, 2693:3, 2693:6, 2693:10, 2699:13, 2699:17, 2699:19, 2699:20, 2699:23, 2700:3, 2700:7, 2700:12, 2764:24
**switch** [3] - 2676:19, 2835:11, 2860:3
**Switzerland** [4] - 2693:3, 2757:16, 2763:25, 2787:18
**sworn** [2] - 2722:24, 2723:11
**system** [3] - 2655:23, 2834:19, 2888:2
**systematic** [1] - 2677:2
**systems** [1] - 2794:9

**T**

**taker** [2] - 2738:13, 2738:15
**talks** [8] - 2649:19, 2657:2, 2658:22, 2659:7, 2659:21, 2659:22, 2705:9
**tangible** [1] - 2753:14
**tape** [1] - 2803:25
**targeted** [1] - 2652:19
**task** [1] - 2664:25

**tax** [2] - 2735:24, 2736:2
**taxi** [1] - 2780:24
**TCP** [1] - 2870:13
**teacher** [1] - 2869:6
**teachers** [1] - 2869:7
**tech** [1] - 2645:24
**technician** [1] - 2724:13
**techniques** [2] - 2649:18, 2649:25
**telephone** [1] - 2641:20
**temperature** [1] - 2851:11
**Temple** [1] - 2725:20
**temporarily** [1] - 2672:2
**ten** [2] - 2629:19, 2631:10
**tendered** [1] - 2651:7
**Tennessee** [2] - 2825:9, 2825:10
**tens** [1] - 2635:22
**tenure** [2] - 2809:21, 2849:13
**term** [8] - 2659:10, 2673:17, 2725:1, 2748:13, 2816:16, 2839:8, 2858:22
**terminated** [1] - 2808:3
**terms** [22] - 2729:5, 2729:20, 2734:12, 2760:10, 2762:7, 2762:12, 2762:20, 2762:21, 2763:8, 2778:12, 2780:1, 2794:6, 2808:19, 2809:12, 2816:24, 2831:24, 2837:16, 2837:20, 2838:18, 2850:1, 2882:11, 2884:13
**testified** [33] - 2632:22, 2645:18, 2646:17, 2648:16, 2649:5, 2657:19, 2658:15, 2658:19, 2662:16, 2663:7, 2666:5, 2703:9, 2704:9, 2714:20, 2723:11, 2746:15, 2747:3, 2752:21, 2752:22, 2752:24, 2764:1, 2784:1, 2785:25, 2788:15, 2789:13, 2789:17, 2840:19, 2852:14, 2855:5, 2871:20, 2873:16, 2873:17
**testifies** [1] - 2755:16
**testify** [4] - 2645:12, 2646:20, 2752:23, 2882:4
**testifying** [2] - 2647:11, 2696:24
**testimony** [17] - 2632:3, 2645:22, 2646:3, 2647:3, 2647:8, 2719:3, 2723:1, 2747:6, 2755:3, 2755:18, 2755:19, 2810:3, 2846:10, 2857:19, 2864:25, 2870:24, 2873:14
**TEXAS** [1] - 2625:1
**Texas** [19] - 2625:4, 2625:15, 2625:23, 2626:4, 2626:7, 2626:12, 2692:22, 2693:13, 2723:23, 2724:4, 2724:5, 2725:4, 2725:20, 2725:22, 2733:5, 2740:19, 2769:16, 2787:21, 2825:4
**text** [2] - 2830:5, 2880:9
**THE** [351] - 2625:10, 2625:13, 2625:20, 2626:2, 2628:1, 2628:4, 2628:8, 2628:19, 2628:21, 2628:23, 2628:25, 2629:2, 2629:5, 2629:8, 2630:4, 2630:12, 2630:14, 2630:17, 2630:20, 2630:24, 2631:6, 2631:12, 2631:16, 2631:20, 2632:12, 2632:15, 2633:7, 2634:1, 2634:16, 2634:18, 2634:24, 2635:7, 2635:9, 2635:12, 2635:17, 2636:1, 2636:4, 2636:15, 2636:19, 2644:3, 2647:2, 2651:9, 2651:11, 2652:3, 2660:15, 2660:17, 2661:7

2664:2, 2664:3, 2669:3, 2669:5, 2671:19, 2671:22, 2672:1, 2672:22, 2673:19, 2674:3, 2675:6, 2675:24, 2676:3, 2676:6, 2678:14, 2681:11, 2687:21, 2693:9, 2693:10, 2706:3, 2706:5, 2707:2, 2707:18, 2708:1, 2708:3, 2709:9, 2709:17, 2709:20, 2712:10, 2718:11, 2718:14, 2718:17, 2719:4, 2720:3, 2721:2, 2721:3, 2721:4, 2721:11, 2722:17, 2722:22, 2723:6, 2723:8, 2726:25, 2727:1, 2728:14, 2728:15, 2728:16, 2729:2, 2737:19, 2738:5, 2742:4, 2742:5, 2742:17, 2742:21, 2742:23, 2743:10, 2743:12, 2743:14, 2744:24, 2745:2, 2745:3, 2745:19, 2745:22, 2746:6, 2746:14, 2746:22, 2747:9, 2747:11, 2748:2, 2748:12, 2748:15, 2749:2, 2749:4, 2749:7, 2749:17, 2750:4, 2750:10, 2750:19, 2751:6, 2751:9, 2751:13, 2751:19, 2751:21, 2752:2, 2752:13, 2752:25, 2753:3, 2753:15, 2753:17, 2754:2, 2754:5, 2754:15, 2755:5, 2755:20, 2756:2, 2756:4, 2756:8, 2756:12, 2756:14, 2759:6, 2759:7, 2759:8, 2759:11, 2759:12, 2759:15, 2760:16, 2760:19, 2760:20, 2760:23, 2760:25, 2761:4, 2764:19, 2764:22, 2764:25, 2765:17, 2765:20, 2766:1, 2766:4, 2766:14, 2766:16, 2770:13, 2771:18, 2772:8, 2772:9, 2772:14, 2772:15, 2772:22, 2773:1, 2773:3, 2773:6, 2773:25, 2774:4, 2774:8, 2776:19, 2777:3, 2777:11, 2778:7, 2778:8, 2779:17, 2779:18, 2782:11, 2782:14, 2782:16, 2783:7, 2788:11, 2789:25, 2790:16, 2790:18, 2791:4, 2791:6, 2791:8, 2791:9, 2792:11, 2793:7, 2795:14, 2795:16, 2795:24, 2795:25, 2796:11, 2796:15, 2796:16, 2797:8, 2797:9, 2797:10, 2805:18, 2805:20, 2809:1, 2809:3, 2810:10, 2810:12, 2810:20, 2811:2, 2811:6, 2811:8, 2811:12, 2811:22, 2812:3, 2812:10, 2812:14, 2812:18, 2812:20, 2812:24, 2813:6, 2813:10, 2813:17, 2813:25, 2814:4, 2814:10, 2814:21, 2814:24, 2815:2, 2815:10, 2815:14, 2815:18, 2815:23, 2816:3, 2816:19, 2816:23, 2817:7, 2817:13, 2817:15, 2817:19, 2818:4, 2818:11, 2819:9, 2819:16, 2819:20, 2820:1, 2820:4, 2820:7, 2820:10, 2820:16, 2820:22, 2821:7, 2821:9, 2821:16, 2821:19, 2825:25, 2826:1, 2826:12, 2826:19, 2826:20, 2826:24, 2827:3, 2827:23, 2828:5, 2828:8, 2828:10, 2828:11, 2828:12, 2828:13, 2833:22, 2835:17, 2835:19, 2836:7, 2836:22, 2838:2, 2838:6, 2848:11, 2848:24, 2849:15, 2849:18, 2849:19, 2849:20, 2850:8, 2850:19, 2850:21, 2851:3, 2851:4, 2851:12, 2851:15, 2851:22,

2853:20, 2853:22, 2854:8, 2854:11,
2854:16, 2857:12, 2858:3, 2858:5,
2860:6, 2861:9, 2861:16, 2861:19,
2861:24, 2865:8, 2869:23, 2869:24,
2871:22, 2872:2, 2872:4, 2872:18,
2873:19, 2874:1, 2874:4, 2874:11,
2877:4, 2878:14, 2878:16, 2878:17,
2878:18, 2878:19, 2879:9, 2879:11,
2881:25, 2882:7, 2883:3, 2883:5,
2883:9, 2883:14, 2883:15, 2883:19,
2884:24, 2885:5, 2885:6, 2885:11,
2886:6, 2886:8, 2886:25, 2887:3,
2890:11, 2890:16, 2890:21, 2891:1

**themselves** [4] - 2685:18, 2685:20,
2809:15, 2863:11

**theoretically** [1] - 2694:12

**theory** [5] - 2695:21, 2747:23, 2748:6,
2749:23, 2752:16

**thereafter** [1] - 2822:12

**therefore** [5] - 2721:7, 2739:12,
2749:22, 2818:23, 2819:7

**they've** [1] - 2664:12

**thinking** [1] - 2698:12

**third** [4] - 2632:1, 2751:17, 2773:9,
2781:5

**third-floor** [1] - 2781:5

**thorough** [1] - 2632:21

**thoroughfare** [1] - 2781:6

**thousand** [2] - 2694:1, 2845:8

**three** [23] - 2631:10, 2631:22, 2631:25,
2632:13, 2633:9, 2635:21, 2645:5,
2647:20, 2688:7, 2706:13, 2732:1,
2743:6, 2754:12, 2755:5, 2785:22,
2816:14, 2816:15, 2832:10, 2834:19,
2834:25, 2868:15, 2871:9, 2873:25

**throughout** [7] - 2738:21, 2741:1,
2749:15, 2784:23, 2785:3, 2809:21,
2825:7

**ticket** [1] - 2711:20

**tie** [3] - 2883:11, 2883:12, 2883:13

**tier** [5] - 2832:1, 2832:5, 2834:19,
2880:23, 2881:2

**Tier** [58] - 2832:10, 2832:11, 2832:12,
2832:22, 2832:23, 2832:24, 2833:6,
2833:12, 2833:14, 2834:2, 2834:3,
2835:3, 2840:18, 2840:19, 2840:21,
2840:22, 2855:6, 2856:13, 2857:1,
2857:3, 2857:9, 2857:20, 2858:14,
2859:18, 2859:25, 2863:22, 2868:6,
2871:12, 2871:16, 2871:20, 2872:2,
2873:1, 2873:7, 2873:9, 2874:16,
2874:25, 2875:21, 2876:5, 2876:20,
2877:8, 2877:11, 2878:2, 2878:11,
2878:15, 2878:22, 2878:24, 2879:1,
2879:6, 2881:11, 2882:10, 2882:11,
2887:22

**Tiers** [1] - 2873:5

**tiers** [6] - 2834:19, 2834:24, 2868:15,
2871:10, 2873:5, 2873:6

**ties** [1] - 2807:8

**tight** [1] - 2777:13

**time-proven** [1] - 2677:19

**timed** [1] - 2837:24

**timeframe** [1] - 2774:6

**timeliness** [1] - 2633:10

**timing** [2] - 2761:18, 2880:11

**title** [11] - 2664:16, 2677:16, 2737:1,
2737:8, 2793:22, 2793:23, 2793:24,
2794:3, 2807:14, 2807:16, 2867:1

**titled** [1] - 2676:24

**today** [10] - 2633:24, 2636:25, 2637:8,
2638:15, 2651:8, 2657:19, 2691:15,
2728:8, 2859:7, 2891:3

**together** [12] - 2633:25, 2659:2,
2684:25, 2708:10, 2730:15, 2734:20,
2764:7, 2791:11, 2808:18, 2847:16,
2848:7, 2858:16

**Tom** [3] - 2734:5, 2760:1, 2760:3

**tomorrow** [4] - 2628:10, 2694:9,
2694:15, 2890:22

**took** [25] - 2637:11, 2639:25, 2641:6,
2641:10, 2650:24, 2674:16, 2681:4,
2705:17, 2705:21, 2706:8, 2706:12,
2706:16, 2724:25, 2725:14, 2740:15,
2740:17, 2745:5, 2768:15, 2780:24,
2782:7, 2808:5, 2808:20, 2859:12,
2869:12, 2870:1

**tool** [1] - 2785:3

**top** [7] - 2660:21, 2672:8, 2801:15,
2836:19, 2840:11, 2870:15, 2883:22

**topic** [4] - 2642:2, 2787:8, 2789:20,
2789:21

**total** [6] - 2696:9, 2763:5, 2786:23,
2795:1, 2795:16, 2856:6

**totally** [1] - 2878:23

**touch** [2] - 2714:9, 2730:25

**tournament** [2] - 2719:21, 2720:11

**toward** [5] - 2731:7, 2731:9, 2840:3,
2846:16, 2868:4

**towards** [1] - 2659:6

**toxicology** [1] - 2726:5

**TPC** [2] - 2868:24, 2870:15

**trace** [2] - 2702:16, 2702:23

**track** [3] - 2671:23, 2706:22, 2721:23

**tracked** [1] - 2753:10

**tracking** [7] - 2703:5, 2857:19,
2860:23, 2873:10, 2876:20, 2881:17,
2888:20

**traded** [2] - 2837:10, 2882:13

**traditional** [1] - 2733:12

**trained** [1] - 2744:14

**tranches** [1] - 2837:21

**transaction** [4] - 2669:16, 2687:9,
2693:15, 2739:13

**transactions** [15] - 2656:1, 2656:2,
2657:4, 2657:20, 2664:22, 2665:18,
2686:12, 2687:9, 2693:11, 2698:2,
2704:24, 2734:16, 2739:13, 2739:14,
2740:14

**transcript** [1] - 2891:8

**Transcript** [1] - 2626:14

**transcription** [1] - 2626:14

**transfer** [21] - 2661:7, 2663:4, 2663:5,
2664:15, 2664:16, 2665:8, 2665:12,
2665:18, 2665:20, 2668:1, 2668:13,

2669:16, 2669:19, 2670:5, 2671:14,
2672:11, 2693:5, 2722:4, 2784:19,
2886:14, 2887:24

**transferred** [5] - 2663:7, 2667:7,
2686:22, 2884:7, 2887:22

**transferring** [5] - 2668:22, 2671:7,
2686:24, 2747:4, 2884:1

**transfers** [5] - 2888:8, 2888:17,
2888:23, 2889:11, 2889:12

**translate** [1] - 2677:23

**Transportation** [2] - 2725:20, 2725:23

**travel** [3] - 2807:8, 2827:20, 2844:4

**traveling** [2] - 2742:14, 2889:20

**treasury** [10] - 2686:5, 2686:9,
2686:11, 2686:18, 2686:20, 2796:7,
2823:15, 2887:19, 2887:21, 2888:21

**treat** [1] - 2741:25

**treatment** [1] - 2742:2

**Trevor** [6] - 2809:1, 2809:10, 2809:16,
2822:24, 2823:1, 2824:18

**TRIAL** [1] - 2625:7

**trial** [4] - 2632:5, 2754:5, 2813:2,
2876:1

**trials** [1] - 2632:6

**tried** [4] - 2689:19, 2692:15, 2753:6,
2784:19

**trip** [4] - 2780:15, 2785:6, 2786:13

**triple** [1] - 2672:3

**trouble** [1] - 2644:16

**true** [17] - 2709:20, 2741:1, 2767:25,
2768:4, 2770:23, 2793:17, 2793:18,
2797:1, 2836:24, 2838:22, 2840:16,
2841:21, 2845:12, 2846:23, 2846:24,
2852:10, 2852:13

**trust** [3] - 2718:2, 2875:6

**trusted** [4] - 2783:3, 2783:9, 2783:10,
2876:15

**trusting** [4] - 2640:20, 2640:22,
2875:3, 2875:4

**Trustmark** [1] - 2692:22

**truth** [15] - 2691:10, 2699:11, 2703:22,
2704:2, 2723:2, 2723:3, 2729:9,
2729:11, 2751:16, 2773:10, 2773:22,
2774:3, 2791:25, 2868:13

**truthful** [2] - 2773:15, 2773:17

**truthfulness** [1] - 2727:14

**try** [8] - 2659:1, 2664:18, 2690:3,
2713:11, 2805:18, 2853:22, 2854:4,
2872:18

**trying** [23] - 2629:25, 2633:4, 2633:5,
2636:10, 2637:21, 2643:21, 2647:7,
2659:15, 2661:15, 2662:10, 2662:20,
2663:12, 2684:3, 2688:5, 2688:23,
2692:16, 2704:6, 2721:22, 2753:8,
2755:20, 2768:11, 2873:17, 2890:8

**Tulsa** [1] - 2725:15

**turn** [29] - 2635:23, 2644:21, 2743:21,
2756:18, 2773:20, 2784:8, 2797:13,
2797:16, 2821:11, 2831:23, 2835:10,
2836:17, 2840:10, 2841:17, 2844:10,
2844:12, 2847:9, 2847:20, 2851:21,
2851:23, 2852:16, 2852:20, 2854:8,
2854:9, 2856:16, 2856:20, 2860:2,

2882:10, 2887:5
**turnaround** [1] - 2828:25
**turned** [8] - 2642:10, 2690:16, 2817:20, 2819:11, 2819:20, 2819:21, 2832:19, 2859:4
**turning** [3] - 2813:17, 2880:4, 2880:16
**turnover** [1] - 2818:2
**two** [53] - 2629:23, 2633:15, 2637:19, 2637:23, 2640:11, 2640:12, 2640:15, 2641:11, 2643:1, 2644:18, 2645:4, 2647:20, 2689:6, 2705:22, 2715:23, 2724:2, 2726:19, 2732:1, 2735:4, 2751:13, 2754:15, 2777:10, 2802:8, 2813:15, 2814:7, 2816:14, 2817:5, 2818:15, 2826:5, 2826:7, 2826:8, 2826:15, 2827:9, 2827:11, 2827:13, 2827:20, 2828:1, 2828:16, 2828:21, 2828:22, 2829:4, 2829:5, 2840:11, 2840:23, 2846:7, 2851:7, 2873:6, 2877:5, 2878:23, 2888:8
**two-year** [1] - 2726:19
**type** [8] - 2702:8, 2713:15, 2727:20, 2729:18, 2774:22, 2782:20, 2796:5, 2796:12
**types** [6] - 2756:23, 2823:19, 2835:3, 2844:1, 2857:2, 2872:25

## U

**U.S** [19] - 2625:17, 2636:9, 2654:23, 2655:2, 2655:5, 2655:18, 2656:8, 2701:12, 2735:17, 2735:20, 2777:23, 2814:7, 2814:9, 2814:12, 2814:13, 2817:5, 2817:8, 2819:5, 2846:19
**ultimate** [1] - 2755:14
**ultimately** [7] - 2661:19, 2680:19, 2731:9, 2731:14, 2732:12, 2734:3, 2779:23
**umbrella** [6] - 2663:3, 2663:13, 2665:12, 2668:22, 2747:2, 2747:5
**umbrellas** [1] - 2662:23
**uncover** [1] - 2853:17
**uncovered** [1] - 2800:25
**under** [54] - 2634:13, 2634:14, 2651:18, 2654:9, 2656:3, 2656:11, 2656:13, 2656:19, 2657:20, 2662:23, 2663:3, 2663:13, 2665:12, 2668:22, 2669:23, 2672:14, 2677:18, 2678:1, 2715:8, 2729:8, 2729:20, 2747:2, 2747:4, 2749:14, 2750:24, 2764:13, 2773:23, 2800:16, 2801:3, 2801:24, 2803:19, 2803:21, 2805:7, 2805:8, 2811:19, 2814:19, 2817:3, 2817:4, 2818:5, 2836:18, 2836:21, 2841:8, 2841:18, 2842:19, 2844:16, 2845:5, 2845:23, 2847:6, 2848:8, 2849:5, 2853:6, 2855:3, 2856:6, 2862:8
**undergraduate** [1] - 2725:11
**underlying** [1] - 2796:20
**underneath** [1] - 2670:18
**understood** [3] - 2763:22, 2778:24, 2804:18

**underway** [1] - 2684:20
**undisclosed** [1] - 2751:2
**undo** [2] - 2629:4, 2629:6
**undone** [1] - 2645:24
**unfortunately** [1] - 2632:10
**unglued** [1] - 2659:4
**Union** [1] - 2864:15
**United** [19] - 2635:15, 2691:23, 2700:14, 2722:20, 2724:8, 2724:10, 2735:7, 2735:9, 2735:13, 2739:11, 2739:17, 2739:22, 2740:5, 2740:17, 2782:23, 2800:8, 2823:23, 2862:11
**uNITED** [1] - 2625:1
**UNITED** [2] - 2625:4, 2625:10
**University** [2] - 2724:9, 2864:15
**unless** [2] - 2675:22, 2771:14
**unlisted** [13] - 2645:19, 2646:5, 2646:24, 2647:15, 2647:17, 2648:5, 2648:8, 2648:13, 2648:23, 2649:16, 2649:19, 2649:24, 2679:14
**unnecessary** [1] - 2756:6
**unravel** [1] - 2637:11
**unsystematic** [1] - 2677:2
**untimely** [2] - 2629:18, 2629:22
**untold** [1] - 2635:15
**unusual** [3] - 2704:20, 2705:7, 2709:1
**up** [80] - 2628:1, 2630:17, 2630:18, 2630:19, 2633:2, 2633:13, 2633:17, 2633:18, 2643:16, 2643:22, 2645:9, 2652:5, 2656:24, 2666:9, 2672:3, 2673:16, 2673:18, 2674:8, 2685:2, 2702:19, 2702:20, 2704:6, 2716:3, 2721:11, 2722:5, 2723:9, 2728:14, 2728:15, 2731:6, 2739:22, 2741:4, 2747:22, 2748:4, 2748:8, 2748:19, 2752:4, 2759:9, 2760:25, 2766:3, 2772:13, 2773:13, 2778:3, 2784:18, 2785:13, 2786:20, 2788:19, 2789:20, 2791:5, 2791:7, 2794:20, 2804:20, 2810:14, 2819:16, 2820:22, 2820:23, 2825:1, 2827:1, 2832:25, 2836:4, 2838:11, 2845:10, 2845:19, 2853:22, 2859:20, 2861:17, 2866:16, 2868:14, 2870:3, 2870:21, 2870:25, 2879:16, 2879:25, 2880:10, 2880:15, 2883:12, 2886:4, 2886:7, 2886:25, 2890:22
**update** [2] - 2653:11, 2742:25
**updating** [1] - 2653:12
**upper** [2] - 2696:4, 2858:13
**ups** [1] - 2755:24
**upscale** [1] - 2733:11
**US** [1] - 2625:14
**usual** [3] - 2710:16, 2710:18, 2745:25
**utilities** [1] - 2763:13

## V

**vague** [3] - 2646:22, 2646:25, 2721:1
**valid** [1] - 2783:21
**valuation** [8] - 2649:18, 2649:25, 2746:11, 2747:25, 2748:7, 2750:13, 2754:8, 2755:1

**value** [54] - 2649:17, 2649:25, 2663:8, 2666:6, 2666:11, 2666:25, 2667:2, 2667:8, 2667:9, 2667:11, 2667:21, 2667:22, 2668:1, 2673:8, 2688:16, 2689:2, 2689:4, 2689:8, 2702:14, 2707:6, 2707:9, 2708:15, 2708:19, 2708:22, 2711:19, 2721:6, 2721:7, 2721:9, 2722:4, 2722:8, 2722:9, 2727:19, 2746:20, 2748:9, 2748:10, 2748:13, 2748:16, 2748:22, 2748:23, 2749:10, 2751:2, 2752:24, 2753:11, 2753:14, 2753:22, 2753:24, 2755:16, 2755:21, 2755:22, 2755:23, 2788:4, 2794:21
**valued** [1] - 2693:17
**valueless** [1] - 2722:7
**values** [4] - 2648:3, 2649:14, 2649:21, 2698:19
**valuing** [1] - 2694:1
**variable** [1] - 2765:7
**varied** [1] - 2833:17
**various** [8] - 2661:18, 2661:22, 2664:12, 2746:16, 2805:2, 2824:14, 2832:25, 2888:15
**vendor** [1] - 2761:11
**Venezuela** [2] - 2756:1, 2756:2
**Venezuelan** [3] - 2666:17, 2709:6, 2709:14
**Venture** [7] - 2661:8, 2661:10, 2661:23, 2662:4, 2665:19, 2672:12, 2672:20
**venture** [1] - 2701:14
**verbally** [1] - 2765:9
**verdict** [1] - 2749:25
**Vere** [3] - 2822:5, 2822:6, 2822:9
**verified** [1] - 2702:17
**version** [1] - 2646:10
**versus** [4] - 2685:20, 2814:8, 2814:13, 2880:12
**verus** [1] - 2753:13
**vessels** [2] - 2681:25, 2682:1
**vetting** [1] - 2740:1
**via** [1] - 2680:17
**video** [1] - 2819:6
**view** [2] - 2685:5, 2741:17
**violation** [1] - 2749:24
**virtually** [1] - 2838:25
**vis-à-vis** [1] - 2641:6
**visit** [2] - 2697:16, 2787:19
**visited** [1] - 2741:9
**voice** [1] - 2669:7
**voicing** [1] - 2789:13
**volatile** [1] - 2853:14
**VOLUME** [1] - 2625:8
**volunteer** [1] - 2849:16
**VS** [1] - 2625:5

## W

**wait** [4] - 2675:4, 2815:14, 2817:24, 2889:8
**waited** [1] - 2831:21

**waiting** [1] - 2889:5
**walk** [1] - 2704:20
**walked** [2] - 2743:3, 2744:21
**wallpaper** [1] - 2733:13
**wants** [4] - 2653:15, 2729:4, 2811:4, 2815:18
**warm** [1] - 2851:12
**warrant** [7] - 2811:15, 2812:17, 2814:19, 2817:4, 2817:6, 2817:25, 2819:18
**Warren** [1] - 2625:16
**Washington** [2] - 2625:18, 2874:22
**waste** [4] - 2666:8, 2784:4, 2784:6, 2784:7
**watch** [2] - 2707:21, 2810:23
**watching** [1] - 2699:25
**water** [1] - 2805:8
**ways** [4] - 2651:1, 2834:9, 2834:10, 2834:15
**wealthy** [2] - 2713:22, 2713:24
**wearing** [1] - 2728:12
**Website** [1] - 2652:18
**week** [5] - 2641:12, 2733:4, 2741:8, 2857:11, 2879:15
**weekend** [3] - 2754:17, 2755:8, 2756:8
**weekly** [3] - 2741:8, 2857:1, 2860:15
**weeks** [6] - 2637:19, 2637:23, 2645:4, 2705:22, 2761:18, 2880:19
**weight** [1] - 2890:12
**well-diversified** [2] - 2678:4, 2837:5
**well-thought-out** [1] - 2659:15
**West** [3] - 2733:19, 2738:25, 2802:1
**west** [1] - 2743:16
**whip** [1] - 2705:5
**whole** [8] - 2628:25, 2629:25, 2677:14, 2689:16, 2718:6, 2723:2, 2775:21, 2783:19
**widely** [2] - 2834:18, 2834:21
**wife** [6] - 2651:16, 2793:14, 2793:19, 2793:20, 2823:24, 2869:6
**William** [1] - 2625:16
**win** [4] - 2694:9, 2698:4, 2711:18, 2804:9
**windjammer** [1] - 2744:22
**winners** [1] - 2720:10
**winning** [5] - 2694:15, 2698:10, 2698:15, 2698:23, 2711:17
**winnow** [1] - 2630:1
**wire** [3] - 2693:4, 2693:5, 2728:3
**withdraw** [2] - 2718:16, 2839:10
**withdrawal** [1] - 2839:25
**withdrawing** [2] - 2839:9, 2840:2
**withdrawn** [2] - 2702:16, 2842:15
**WITNESS** [54] - 2627:2, 2664:3, 2693:10, 2706:5, 2721:3, 2723:4, 2727:1, 2728:15, 2742:5, 2742:23, 2743:14, 2745:3, 2759:7, 2759:11, 2760:19, 2760:23, 2764:22, 2765:20, 2766:4, 2766:16, 2772:8, 2772:14, 2773:1, 2773:6, 2778:8, 2779:18, 2782:14, 2791:6, 2791:9, 2795:14, 2795:16, 2795:24, 2796:16, 2797:8,

2797:10, 2805:20, 2809:1, 2821:9, 2825:25, 2826:20, 2828:10, 2828:12, 2849:18, 2849:20, 2851:4, 2869:24, 2874:4, 2877:4, 2878:16, 2878:18, 2883:14, 2885:6, 2886:8, 2890:16
**witness** [30] - 2629:20, 2630:11, 2631:11, 2631:25, 2632:7, 2673:10, 2697:13, 2716:4, 2718:10, 2720:1, 2722:15, 2722:19, 2727:7, 2746:10, 2747:3, 2747:24, 2748:23, 2748:25, 2753:19, 2753:20, 2755:16, 2755:19, 2791:3, 2810:5, 2821:15, 2872:6, 2882:3, 2883:5, 2885:2
**witness's** [1] - 2753:25
**witnesses** [3] - 2752:21, 2752:22, 2755:13
**wonder** [2] - 2745:17, 2851:10
**wondered** [1] - 2629:7
**word** [3] - 2674:16, 2768:15, 2832:1
**words** [7] - 2750:12, 2750:22, 2788:6, 2789:4, 2808:21, 2817:23, 2820:22
**workers** [1] - 2640:21
**works** [2] - 2662:14, 2664:8
**world** [8] - 2651:2, 2652:23, 2655:21, 2680:16, 2700:15, 2701:11, 2837:10, 2871:2
**worth** [3] - 2666:15, 2704:23, 2713:11
**worthless** [1] - 2746:18
**write** [3] - 2881:1, 2889:7, 2889:23
**writes** [1] - 2665:7
**writing** [3] - 2836:14, 2880:13, 2891:3
**writings** [1] - 2660:23
**written** [2] - 2665:7, 2736:18
**wrongfully** [1] - 2789:14
**wrote** [6] - 2652:7, 2652:22, 2693:22, 2704:16, 2806:10, 2890:2

## Y

**yacht** [1] - 2716:14
**yachts** [3] - 2681:25, 2682:1, 2719:13
**year** [31] - 2659:3, 2684:5, 2722:11, 2725:17, 2726:2, 2726:3, 2726:14, 2726:19, 2726:23, 2727:1, 2727:2, 2730:16, 2730:23, 2731:8, 2736:14, 2785:8, 2795:11, 2797:14, 2799:5, 2830:14, 2833:18, 2837:23, 2841:23, 2857:7, 2857:10, 2866:6, 2879:23, 2880:11, 2880:15, 2881:20
**year-end** [1] - 2857:7
**year-to-year** [1] - 2833:18
**yearly** [3] - 2707:10, 2707:12, 2707:14
**years** [44] - 2640:11, 2640:12, 2640:15, 2644:19, 2645:5, 2680:25, 2706:13, 2716:18, 2717:18, 2724:11, 2726:6, 2729:22, 2732:1, 2744:4, 2744:15, 2767:15, 2769:8, 2770:9, 2770:22, 2783:16, 2785:23, 2792:20, 2792:22, 2794:20, 2794:21, 2794:22, 2795:2, 2813:15, 2816:15, 2816:20, 2818:6, 2833:13, 2839:6, 2853:12, 2864:22, 2864:24, 2865:2, 2866:4,

2866:11, 2866:20, 2890:4, 2890:9
**yelled** [1] - 2743:4
**yes-or-no** [1] - 2772:12
**yesterday** [23] - 2632:22, 2638:4, 2638:11, 2645:18, 2649:5, 2654:14, 2658:1, 2658:6, 2658:15, 2662:16, 2663:7, 2673:15, 2680:8, 2680:24, 2683:11, 2686:6, 2687:7, 2691:15, 2691:18, 2694:18, 2695:11, 2695:20, 2719:20
**yesterday's** [2] - 2632:3, 2697:24
**yields** [2] - 2677:4, 2677:5
**York** [2] - 2625:17, 2823:23
**yourself** [6] - 2692:19, 2697:7, 2723:17, 2736:18, 2759:22, 2859:19

## Z

**Zack** [4] - 2864:7, 2864:9, 2866:12, 2866:21