**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CR. NO. 4:09-342-01** |
| **v.** | § | |
| | § | |
| **ROBERT ALLEN STANFORD** | § | |

## UNITED STATES' SENTENCING MEMORANDUM

Robert Allen Stanford is a ruthless predator responsible for one of the most egregious frauds in history, and he should be sentenced to the statutory maximum sentence of 230 years' imprisonment.  For more than twenty years, Stanford orchestrated an epic, multibillion dollar fraud to indulge an extraordinarily lavish lifestyle and to finance a personal business empire, with devastating consequences for thousands of victims who entrusted him with their savings.

Displaying an audacity that only further illustrates his depravity, Stanford seeks a sentence of time-served, brazenly arguing that there are no losses and resorting to the same baseless, self-serving arguments that the jury squarely

rejected when it convicted him.[1]  As explained below, the nature, scope, and duration of his crimes render Allen Stanford exceptionally deserving of the maximum punishment permitted by law—the Guidelines advisory sentence of 230 years' imprisonment.

## RELEVANT FACTS

### A.    STANFORD OVERSAW THE FRAUD FOR TWENTY YEARS

#### 1.    OVERVIEW OF STANFORD'S SCHEME

As the proof at trial established, Stanford's fraud began prior to 1990 when he was operating Guardian International Bank ("GIB") on Montserrat.  Although the bank later relocated to Antigua and changed its name to Stanford International Bank ("SIB"), the core fraud remained the same.  The bank's business revolved around one product: it issued certificates of deposit which averaged a return 3-4% higher than CDs from domestic U.S. banks, supposedly because of low taxes and

---

[1]    Stanford requests a sentence in the range of 31-44 months (Dkt. # 849, at 79), which amounts to time-served because he will have been in custody for three years at the time of sentencing.  *See* 18 U.S.C. § 3585(b)(1) (providing credit toward service of a term of imprisonment for any time in official detention prior to sentencing).  A sentence within Stanford's requested range therefore would result in his immediate release (even at the upper end of that range, given the standard 15% discount for good behavior which the BOP would apply).

the bank's low overhead.[2]  Through various marketing materials and purportedly audited annual reports, Stanford claimed that the bank: invested in highly liquid, safe, conservative stocks, bonds, and precious metals; made no loans unless they were secured by an equal amount in cash, and therefore incurred no credit risk; and was rigorously audited by an independent accountant and regulated by authorities even tougher than in the United States.  In short, Stanford painted a completely false picture of the bank.  None of those claims were true.

Prior to 1990, Stanford began diverting depositor funds into various speculative real estate ventures he personally owned.  By late 1990, at least half the bank's reported assets did not exist, as James Davis, Stanford's chief financial officer, discovered.  Davis testified that Stanford predicted that his real estate bets would pay off and allow him to fill the "hole"—the gaping difference between the principal and accrued interest owed to depositors and the bank's actual, much lower assets.  Stanford would repeat that empty claim for two decades.

In reality, Stanford secretly funneled depositor funds from the bank into a web of companies which he owned, using various overseas bank accounts to launder the misappropriated funds.  By February 2009, Stanford had sunk over $2

---

[2]      Contrary to the defense claim that SIB's CDs paid only fractionally higher premiums, SIB's marketing materials represented that its CDs averaged 3.9% higher returns than U.S. CDs.  (GX 136.)

billion in depositor funds into various failing businesses he owned, including, among other things: restaurants, regional airlines, a newspaper, and a host of companies which were not even actual businesses but which existed solely to hold title for tax purposes to Stanford's fleet of jets and boats.  Contrary to his repeated claims to depositors that the bank's portfolio was globally diversified, these "assets" were concentrated primarily in the Caribbean.

Because Stanford's failing businesses hemorrhaged money, he was regularly stealing money from the bank in the form of undisclosed "loans."  As the trial showed, Stanford's corporate treasurer, Patricia Maldonado, regularly advised Stanford of the cash needs of his businesses, and he would then approve the transfer of depositor funds to one of his Swiss accounts, from which the funds would be routed to various Stanford-owned companies or to cover his personal expenses.  Despite the constant infusions of stolen CD proceeds, the businesses remained unprofitable, and Stanford kept doubling down with his depositor's money.  By 2008, Stanford was stealing $1 million a day from the bank to keep his failing personal businesses open.

Throughout the twenty years of his scheme, the financial advisors selling the CDs and their clients repeatedly asked whether any CD proceeds were being invested in Stanford's businesses or loaned to Stanford.  Stanford consistently

4

lied, unequivocally denying any connection between the CD program and his personal businesses.

### 2.   STANFORD CLOSELY SUPERVISED THE FRAUD

Despite his claims at trial to be an absentee owner, Stanford was intimately involved in overseeing every step of the fraud, particularly his review of the marketing materials and CD sales.  He understood that the lifeline for his bank, like any Ponzi scheme, was the continued flow of fresh funds from new depositors to repay any redeeming depositors, and he was highly focused on painting the best picture of the bank and the rate of new CD sales.  In 1990, when the Montserrat authorities notified him of their intent to revoke GIB's banking license, Stanford masterfully manipulated the system.  He relocated to Antigua and surrendered GIB's license before it was formally revoked, then falsified that year's annual report to make it appear the decision had been made prior to the Montserrat notification letter, and informed depositors and his CD sales staff that the bank moved to Antigua because of Hurricane Hugo.

Virtually every Stanford employee who testified, including defense witnesses, confirmed CD sales were a constant topic of conversation with Stanford.  At one point Stanford even directed members of his CD sales team to increase sales no matter what: "Do whatever you need to do.  I don't care how you

do it, just do it, but don't tell me.  I don't want to know." (Tr. 687.)  Stanford

practiced what he preached.  When Michelle Chambliess, a veteran salesperson

who was one of his first employees, lost several clients who redeemed their CDs,

Stanford had someone else unceremoniously fire her.  In 1995, Stanford opened

Stanford Group Company, a U.S.-based brokerage firm, and opened sales offices

across this country staffed with financial analysts who he incentivized to sell CDs

issued by SIB.  As the Court knows, the evidence at trial was overwhelming

concerning how tightly Stanford monitored CD sales, down to daily spreadsheets

which he reviewed with regional managers.  (GX 922-A.)  He also set up sales

competitions, organizing different financial advisors into teams (the Miami Money

Machine, the Aztec Eagles, etc.), and he awarded generous bonuses and

commissions based solely on CD sales.[3]  For financial advisors who sold more

than $1 million in CDs each year, there were also quarterly boondoggles at luxury

hotels called Top Producer Club meetings where prizes and awards were

distributed, and Stanford and his top lieutenants repeated the same lies about the

---

[3]        The defense mistakenly contends that Stanford Group Company's
commissions were in line with those of other financial institutions.  (Dkt. #849, ¶
4.)  In fact, Michael Callahan, a defense expert witness on brokerage practices,
testified on cross-examination that it was standard industry practice for a
brokerage firm like Stanford Group Company to pay commissions on securities,
*not* CDs.  (Tr. 6779-80.)

composition and performance of SIB's investment porfolio.

In addition to misrepresenting the fundamental nature of the bank's business, Stanford also lied to his sales staff about the existence of insurance for deposits. At one point, in the early 1990s, he actually produced a fake insurance policy which was shown to the sales staff and even provided to depositors to allay their concerns about the risks of buying a CD from an offshore bank that lacked FDIC insurance. Leo Mejia, a marketing chief for Stanford, described how Stanford asked him to create a new fake policy and admitted that the policy had no real value. (Tr. 833.) Stanford even cavalierly joked to Mejia that it was amazing the risks people were prepared to take for an extra 2 percent return on their CDs. (Tr. 796-97.) When a potential depositor wanted to confirm the existence of the purported issuer of the insurance policy, Stanford admitted to Davis that the policy was fake and had Davis fly to London for a day to fax a false confirmation of the insurance company's existence from a cubicle which Stanford rented. (Tr. 2780.) Again, the fake policy and elaborate precautions to perpetuate it predated Davis' arrival and were entirely the handiwork of Stanford.

Stanford was similarly hands-on in the fabrication of the bank's purported investment returns. Although he employed Davis and several accountants to fake financial numbers for the bank's annual statements, Stanford also regularly

7

reviewed the fake numbers and pushed Davis repeatedly to inflate the fictitious profits.  Three different witnesses involved in marketing—Mejia, Ron Rossi, and Kelley Hawkins—also testified that they each, at different times, saw Stanford personally doctoring numbers in the draft financial statements.  (Tr. 816-18, 4566-68, 5808.)

During the fraud, Stanford boasted he was the "hardest working person at the company" in a speech delivered to employees in Antigua.  (GX 1535-F.)  He was certainly the hardest working person in the fraud: at every step, from the marketing materials to the faked financials to the bank transfers, Stanford was in charge and the prime beneficiary.

## B.     STANFORD USED THE PROCEEDS OF HIS FRAUD TO FINANCE HIS BUSINESSES AND A LAVISH LIFESTYLE

Unlike many other major financial frauds such as Enron or Madoff, this scheme overwhelmingly benefitted one person: Allen Stanford.  While certainly Stanford's co-conspirators received inflated compensation or even bribes, it was Stanford who directly misappropriated $2 billion in depositor funds to keep his personal businesses afloat.  As shown at trial, if any of these businesses had miraculously become profitable, Stanford alone would have reaped the windfall,

not the CD depositors who had been funding these companies for years.[4]

In addition to the $2 billion, Stanford also routed another $116 million in CD proceeds through a Swiss slush fund he controlled at Societe Generale ("Soc Gen"). Stanford frittered away the CD money he laundered through the Soc Gen account on a lavish lifestyle replete with private planes and multiple homes around the world. Nothing was too expensive. He purchased suits from Bijan, a private Beverly Hills clothier that advertised itself as the world's "most expensive" mens clothing store, spending more than $400,000 in CD proceeds at the store between 2000 and 2002. (GX 1319-G.) He used his planes to fly a tailor from Bergdorf Goodman to his Miami and Antigua homes for measurements, regularly flew bottled artesian water to his home in St. Croix, flew fish for his koi pond to St. Croix, and had a Stanford IT employee fly to Antigua just to bring him laptops

---

[4]    At trial, there was testimony concerning a proposed "reorganization" involving several of Stanford's personal businesses. As the Court may recall, there was internal discussion between Davis and several Stanford accountants regarding a reorganization which would transfer several money-losing businesses to the bank's ownership. That reorganization was never even begun, much less completed. Moreover, if the reorganization had been completed, an artificially inflated value for these worthless companies would have been "credited" against the $2 billion in real CD proceeds that Stanford stole. The reorganization therefore would have enabled Stanford to realize a double benefit: he could transfer some of his doomed businesses directly to the bank's balance sheet and also write-off part of his skyrocketing loan from the bank.

because Stanford destroyed his repeatedly.

In Antigua, he became a one-man stimulus package, eventually becoming the largest employer after the government.  He developed a massive complex adjacent to the airport, constructing large, impressive buildings to headquarter his various businesses, complete with their own water treatment facility.  Stanford also became a leading patron of cricket, building an enormous stadium and sponsoring the Stanford 20/20 cricket tournament with a $20 million prize.  The Court may recall the publicity photographs of Stanford standing in front of a case housing the money, all of which secretly came from his depositors.

On sea, the story was similar.  Stanford owned several boats, including a 112 foot yacht which he spent approximately $13 million refitting to his exacting specifications.  The yacht even required support vessels.  Indeed, Stanford purchased a British naval frigate which he planned to carry supplies for the yacht in a proposed trip up the Amazon.

To promote the mirage of Stanford as a successful businessman, he frequently and publicly touted his supposed wealth, boasting of his billionaire status in the media, including interviews with *Forbes* and CNBC, and even a University of Houston commencement address (where Stanford also stressed the importance of integrity and warned that "BS may get you to the top, but it won't

10

keep you there." (GX 1531.))  During a speech in Antigua to his employees,

Stanford openly bragged that he lived a lifestyle few people on the planet would

ever know.  (GX 1536-E.)  But only Stanford and a handful of people in his inner

circle knew that his outsized lifestyle and its trappings were entirely at the expense

of his depositors, and not remotely close to the "investments" into which

depositors believed they had placed their savings based on Stanford's lies.

## C.   STANFORD ORCHESTRATED AN ELABORATE COVER-UP

A twenty year fraud on this scale requires a careful and thorough cover-up,

which Stanford oversaw both within his organization and outside of it.

### 1.   STANFORD PROMOTED A SECRETIVE CULTURE IN HIS ORGANIZATION

Stanford clearly promoted a secretive culture within his organization.  To

assuage any concerns about oversight, Stanford represented in marketing materials

at the Top Producer Club meetings to the financial analysts that Stanford Financial

Group employed a group of expert research analysts in Memphis, supervised by

Laura Holt, his Chief Investment Officer, who oversaw the bank's entire portfolio

and monitored the network of global money managers who purportedly managed

the portfolio on a day to day basis.  In fact, Holt's group of research analysts

managed only about 15-20% of the bank's portfolio and had no access to

information about the various undisclosed investments in Stanford's personal

businesses.  As Mark Collinsworth, one of the research analysts testified, he and

his Memphis colleagues were expressly instructed not to ever tell the financial

advisors or anyone else that the bulk of the bank's portfolio was not managed from

Memphis.

Similarly, Henry Amadio, an internal accountant at Stanford Financial

Group who tracked the undisclosed $2 billion in "loans" to Stanford, was

informed that, if anyone ever learned of his tracking spreadsheet, he would be

fired.  Stanford also instructed employees on numerous occasions not to

communicate anything in email that was confidential or related to him personally

(DX 13-19), including any statements from Stanford's personal Bank of Antigua

account (GX 641-B).

Thus, to ensure that only a relative handful of insiders knew about the fraud,

Stanford engaged in a pattern of intimidation to ensure secrecy in his organization.

### 2.    STANFORD CORRUPTED SIB'S EXTERNAL AUDITOR

Controlling outsiders required outright bribes.  From the beginning when it

was still based on Montserrat, the bank had one auditor: C.A.S. Hewlett, who ran a

small accounting firm in St. John's, Antigua.  Despite constant questions from the

Montserrat regulators, Stanford Group Company financial advisors and CD

depositors, Stanford resolutely refused to hire a larger, more reputable accounting

firm, for a simple reason: Hewlett accepted bribes to rubber-stamp the bank's

faked financial statements without doing an iota of actual auditing—a fact that led

Stanford to tell Davis that "God led me to Hewlett."  (Tr. 3086.)

Through his Swiss slush fund at Soc Gen, Stanford paid Hewlett more than

$3.4 million, nearly three times as much as the enormous fees paid on the books.

(GX 1610.)  Stanford was regularly copied on transmittal letters to Soc Gen (GX

1220), including a letter increasing the monthly bribes (GX 1220-A).

### 3.    STANFORD CORRUPTED THE ANTIGUAN REGULATORS

After relocating to Antigua in 1990, Stanford quickly proceeded to

undermine and eventually eliminate any meaningful regulation of his bank.  The

entry price for the island was steep: Stanford spent $50 million in CD proceeds to

the government to purchase the Bank of Antigua, an insolvent commercial bank,

and loaned the government an additional $40 million which he then forgave.  In

return, he received a new license just in time to surrender voluntarily the license

that the Montserratians were about to revoke, and a considerable reservoir of

goodwill on which he regularly drew to obstruct any meaningful regulation of his

bank.

First, he removed Althea Crick, the chief banking regulator in the early

years on Antigua.  After declining a free airline upgrade from Stanford for a

European trip and criticizing his interference with regulators, Crick made herself a

target.  Crick specifically recommended that Stanford step back from the day to

day back and forth with the regulators, and Stanford told her, "I don't operate that

way."  (Tr. 1852.)  Instead, Stanford supervised the after hours removal of bank

exam files from Crick's office, and she then found herself dispatched on a round

of tours through the Caribbean by the government.  As Crick testified, the rat was

watching the cheese.

After her resignation, Stanford planted two U.S. citizens into the Antiguan

regulatory body, Patrick O'Brien and Lloyd Harrell.  Each of these gentlemen had

previously worked for Stanford and continued to do so on the side while also

ostensibly regulating SIB.  While on Antigua, they also resided for free at Stanford

Development Corporation housing.

Eventually, Leroy King became head of the Antiguan Financial Services

Regulatory Commission (the "FSRC"), and Stanford found an ideal partner and,

according to testimony, a literal "blood brother."[5]  The Court is familiar with the

---

[5]     Davis' description of the blood brother ceremony which Stanford
recounted to him is corroborated.  In envelopes (GX 672) located in Stanford's
home containing confidential FSRC documents, King addressed his notes to "Big
B," or "Big Brother"—the nickname which Davis testified King used when
referring to Stanford.

various bribes which Stanford paid to King, including kickbacks from the Soc Gen

account in Switzerland to various King accounts in the United States (GX 1615),

free flights on Stanford-owned planes, and expensive Super Bowl tickets (GX 2).

King was a critical conspirator, reflected in the fact that Stanford had a dozen

different phone numbers in his address book (GX 1500) for King to ensure he

could be reached at any hour of the day.

King provided value for the fraud.  He shared numerous internal FSRC

documents with Stanford, including confidential memoranda (GX 618, 672)

relating to regulatory policy and hiring decisions for bank examiners clearly

labeled "Confidential," and he ran interference for the fraud.  When Paul Ashe, an

examiner and Government witness, pressed for corroboration of the bank's assets,

Stanford provided forged account statements which King prevented Ashe from

verifying.

### 4.    STANFORD OBSTRUCTED THE SEC INVESTIGATION

More importantly, as the jury found, Stanford effectively used King to

obstruct the U.S. Securities and Exchange Commission's investigation of the CD

program at SIB.  In 2005, the SEC began a series of confidential requests to the

FSRC for information regarding the bank (GX 668), and King promptly shared

those requests and allowed Stanford and his attorney to write the FSRC's response

(GX 671).  Through his bribes and other gifts, Stanford effectively turned the FSRC into his puppet.

After the SEC investigation heated up again in 2008, on two separate occasions Stanford personally directed Kelly Taylor, the manager of his St. Croix estate, to fill empty barrels with Stanford's bank records and other personal financial information, and he then torched the documents.

In early 2009, the SEC issued actual subpoenas for testimony regarding SIB's entire investment portfolio.  Despite clear instructions from the bank's own outside counsel that the SEC wanted testimony concerning all of the bank's assets, Stanford unsuccessfully sought to have SIB's president testify and ultimately secured Laura Holt's agreement to testify even though neither she nor SIB's president knew about the 80% of SIB's reported assets which Stanford had diverted into his own pockets.  With characteristic hubris, Stanford told Davis that the SEC would not uncover anything because they were not that smart.

This fraud lasted as long as it did, to the cost of additional thousands of victims each year, largely because Stanford orchestrated an effective, comprehensive cover-up, relying on intimidation, bribes, and obstruction.

## D.   THE SCHEME UNRAVELS

As the financial crisis hit in 2008, redemptions of CDs at SIB sharply

increased and new sales flatlined—a deadly combination that caused Stanford's scheme to unravel.  His failing businesses generated only losses and consequently were illiquid and could not readily be sold.  In a series of emails throughout 2008, his Corporate Treasurer, Patricia Maldonado, constantly updated Stanford on the bank's dwindling stockpile of cash and liquid securities.  Stanford's reaction was to engage in another round of fraudulent statements and prodigal spending.

In late 2008, Stanford informed several financial advisors that he had personally injected $741 million into SIB, thereby increasing its capital to more than $1 billion.  In conversations with a Stanford Group Company executive, Jason Green, Stanford explicitly stated that his capital contribution consisted of cash he had saved for an islands resort project.  The news of Stanford's purported capital contribution was promptly broadcast publicly in marketing materials (GX 138) which Stanford personally edited and approved.

In fact, Stanford did not add a penny.  By 2008, his personal businesses were consuming more than $1 million a day in misappropriated CD proceeds, and there was no cash coming in from new CD sales.  Instead, Stanford planned a real estate "flip" to back up the announcement of the capital contribution.  In June 2008, the bank paid $63.5 million to acquire undeveloped real estate in Antigua

for a resort for billionaires which Stanford had talked about building for years.[6]

Because of an impending divorce, Stanford kept title in the bank's name, contrary

to his typical practice with undisclosed use of CD proceeds.  The proposed flip

would have led to the land then being transferred to Stanford, marked up to $3.2

billion, and then transferred back to SIB at this artificially inflated price, at which

point it would be "credited" to repay Stanford's $2 billion in loans from SIB and

to support the announced capital contribution.  Although this proposed sham

transaction never took place (title was never even transferred to Stanford),

Stanford knew that this "deal" was the basis for his public announcement to

depositors—one last attempt to perpetuate his fraud.

SIB's depositors, however, continued to press for redemptions.  James

Flynn, a Vietnam veteran who had invested his life savings into the CD program,

testified that in January 2009 he attempted to redeem.  Jason Green, a financial

advisor, testified that he had a client who also attempted to redeem at the same

---

[6]     The project was intended to be a compound with approximately 30 residences.  The entry fee was going to be $50 million, with additional annual dues of approximately $15 million.  Giselle James, a defense witness, testified that the proposed project never got off the drawing board and the land at issue remains to this day undeveloped jungle.

time.  But it was too late: no one could get out because the money was gone.[7]

Stanford's conduct throughout 2008 and into 2009 was telling.  In December 2008, en route to California, he made a $1 million pledge to Jason Green's church (which was never honored), and then he arrived for a Christmas vacation in the Napa Valley wine country.  Knowing the end was near, Stanford flew his children from his various families on his private jets, and they spent the holiday together (for the first time) at a luxury resort that cost more than $250,000.  At the same time SIB was imploding and depositors were desperate to redeem their CDs, Stanford indulged in an epic splurge.

After the Napa Valley holiday, Stanford spent a week in January 2009 in Las Vegas, proving as successful a gambler as he was a businessman.  Stanford burned through more than $515,000—again, all depositor money—at the Bellagio, both in gambling and jewelry for his then-girlfriend.  (GX 1317.)  After that trip, he went to Libya in an unsuccessful bid to obtain additional funds from the Muammar Gaddafi regime.  Until the bitter end, Stanford was still attempting to continue his fraud and burning through CD funds with abandon.

---

[7]       This evidence also flatly belied Stanford's later claims at trial that all depositors were repaid while he ran the bank.

## E.   STANFORD'S MISCONDUCT FOLLOWING EXPOSURE OF HIS FRAUD

Even following the exposure of his misconduct and the collapse of SIB, Stanford persisted in his pattern of deceit on a number of fronts.

In this very case, as the Court knows, Stanford tried to manipulate his medical treatment in BOP custody purely to delay trial.  Exploiting his medical treatment at Butner, Stanford pretended to have a unique form of amnesia, which apparently ceased the moment this Court declined to grant a continuance.  As this Court determined after a thorough hearing, the medical record clearly established that Stanford was not only "competent to stand trial, but also that he was **malingering**."  (Dkt. #577, at 2 (emphasis in original)).

Stanford's blatant attempt to game the system in this case is also paralleled in his conduct in the civil case before Judge Godbey, where Stanford has shown a consistent contempt for the legal process and his own victims.  From the beginning, Stanford has refused to provide any court-ordered financial information (including a specific accounting of all of his assets) or to cooperate with the Receiver by repatriating assets to the United States.  While the Receiver has publicly disclosed that he can only locate approximately $500 million in assets against the $7.2 billion in principal which SIB owed its depositors, Stanford has refused to provide any assistance in the recovery process.  Indeed, during trial,

throughout questioning of defense experts, Stanford's counsel even suggested in their questions that the Receiver had not seized all of Stanford's assets, implicitly suggesting his strategy to conceal assets had worked.  (Hollander Tr. 7441-47; Lyons Tr. 7522-25, 7539-45, 7593, 7643, 7647-50.)

Remarkably, as recently as last week, Stanford suggested that he could sign over assets in Antigua to the United States in exchange for a lower sentence.[8] Stanford's proposal is putrescent.  Despite the fact that those assets were purchased with victim money, Stanford nevertheless attempted to leverage them for a lower sentence.  Moreover, Stanford, who apparently believed he still controlled these assets, should have disclosed them when seeking bail from this Court repeatedly—in fact, Stanford has consistently represented to the Court that *all* of his assets were frozen.[9]

In sum, Stanford's post-arrest conduct in this case revealed a profound lack of remorse and continuing contempt for the law, further emphasizing the need for a Guidelines sentence.

---

[8]    As we understand it, those assets in fact were previously frozen by an Antiguan court.

[9]    Stanford should also have disclosed the existence of any assets in response to Judge Godbey's order in the civil action and when applying for CJA funds in this case.

F.   THE EFFECTS OF STANFORD'S FRAUD

As of February 2009, SIB reported approximately $10.2 billion in deposits, overstating the amount by billions.  The Receiver later discovered the actual amount on deposit was $7.2 billion, of which $1.3 billion was fictitious interest, meaning that the bank owed $5.9 billion in principal to its depositors.  Ultimately, the Receiver determined that the market value for all Stanford entities, including SIB, amounted to merely $500 million.

In short, Stanford has inflicted massive financial losses on his depositors with devastating consequences for them, as reflected in trial testimony from several victims and the many victim impact statements submitted to this Court.  Nothing the United States can write here can convey as clearly as those victim impact statements the horrific consequences of Allan Stanford's greed and crimes.

DISCUSSION

A.   APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 125 S. Ct. 738, 760 (2005).

In furtherance of that goal, a sentencing court is required to "consider the

Guidelines 'sentencing range established for . . . the applicable category of offense

committed by the applicable category of defendant,' the pertinent Sentencing

Commission policy statements, the need to avoid unwarranted sentencing

disparities, and the need to provide restitution to victims." *United States v.*

*Booker*, 125 S. Ct. at 764 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a)

must be considered.  Section 3553(a) directs the Court to impose a sentence

"sufficient, but not greater than necessary" to comply with the purposes set forth

in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....

Section 3553(a) further directs the Court—in determining the particular sentence

to impose—to consider:  (1) the nature and circumstances of the offense and the

history and characteristics of the defendant; (2) the statutory purposes noted

above; (3) the kinds of sentences available; (4) the kinds of sentence and the

sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing

Guidelines policy statements; (6) the need to avoid unwarranted sentencing

disparities; and (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a).

## B.    THE GUIDELINES CALCULATION RESULTS IN A LIFE SENTENCE

Application of the sentencing factors to Stanford's conduct calls for a

Guidelines sentence of 230 years or, alternatively, a term of years that would both

assure that Stanford will remain in prison for life and emphatically promote

general deterrence.[10]

Because each of the offenses of conviction is fraud-related and grouped,

Section 2B1.1 of the Guidelines determines the applicable offense level.  Under

Section 2B1.1, and including applicable Chapter Three adjustments, the

defendant's offense level is calculated as follows: base offense level of six (§

2B1.1(a)(2)); thirty levels for a loss of more than $400 million (§

2B1.1(b)(1)(P));[11] six levels for 250 or more victims (§ 2B1.1(b)(2)(C)); six levels

---

[10]    Stanford's various objections to the PSR and his Guidelines arguments were addressed separately in the United States' Response to Stanford's PSR Objections filed on May 25, 2012 (Dkt. # 855).

[11]    As addressed in the United States' response to Stanford's PSR objections, the loss amount in this case is $5.9 billion—a sum nearly fifteen times greater than the maximum loss threshold established in the Guidelines.  Notably,

because Stanford relocated the bank to Antigua to evade regulatory officials (§ 2B1.1(b)(10)(A)); two levels because the offense endangered the solvency or financial security of 100 or more victims (§ 2B1.1(b)(15)(B)(iii)).[12]  *See* PSR, ¶¶ 99-109.

Because Stanford's web of bribery and obstruction concealed his crimes for twenty years, he is in Criminal History Category I and has an adjusted offense level of 56, which is outside the parameters of the Guidelines sentencing chart and therefore automatically reduced to an offense level of 43.  At that reduced level, the Guidelines sentence is life imprisonment.  *See* U.S.S.G. § Ch. 5, Pt. A. Because Stanford is not charged with any offense that carries a maximum term of life imprisonment, the Guidelines call for the applicable statutory maximums on all counts of conviction to be added together, which results in a Guidelines sentence of 230 years' imprisonment.  *See* U.S.S.G. § 5G1.2(d).

Although no longer binding upon the Court, the Guidelines sentence in this

---

although the loss amount is responsible for 30 of the 56 offense levels attributed to Stanford, the applicable Guidelines range reflects numerous other enhancements that apply due to Stanford's conduct and role.  Given the base offense level and those enhancements, any finding of a loss greater than $120,000 would yield an identical sentencing range of 230 years' imprisonment.

[12]    Although this enhancement normally calls for a four-level increase, only two levels are added due to a reduction for overlapping enhancements pursuant to U.S.S.G. § 2B1.1(b)(14)(C).

case reflects the seriousness of the offenses of conviction and the particular

aggravating factors relating to Stanford's conduct.

### C.   CONSIDERATION OF ALL OF THE SECTION 3553(A) FACTORS HEAVILY FAVOR A LIFE SENTENCE

Allan Stanford is responsible for one of the largest and most brazen frauds

in history.  The sheer magnitude of the money stolen, the duration of the crime,

and the extent to which Stanford lived a life steeped in deceit are almost unrivaled.

He has earned a place among the greediest, most selfish, and utterly remorseless

criminals.  Accordingly, under the factors set forth in Section 3553(a), the nature

and circumstances of Stanford's fraud, his own role and personal history, and the

need for forceful deterrence calls for the most severe punishment permitted by

law.

### 1.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

Stanford's crimes were serious, long-running, and highly orchestrated, with

horrific consequences to investors around the country and overseas.  Through two

decades of lies, Stanford caused billions in depositor funds to flow through his

bank and then laundered stolen funds through a web of accounts around the world.

By February 2009, even after the flurry of redemptions caused by the financial

crisis, Stanford had still managed to retain over $5.9 billion in depositor principal,

at least in part by falsely touting that he had personally increased the bank's capital to more than a billion dollars.  In the end, however, the Receiver ultimately valued all of the Stanford entities at only approximately $500 million—a sliver of the amount owed.

Referring to these enormous losses captures only a part of the harm Stanford inflicted on his victims, as illustrated by their impact statements and the trial testimony of several victims.  As the Court recalls, James Flynn was a Vietnam veteran suffering from congestive heart failure who invested his life's savings into the CD program to ensure a safe financial future for his wife; they now sell their belongings on eBay and subsist on macaroni and cheese.  Diane Hammer was an Air Force veteran and single mother who invested her life's savings, together with that of her father who now suffers from Alzheimer's.  These are just two of the thousands of victims of this crime, and their story reflects that the dollar amount of loss in this case only conveys a fraction of the harm Stanford caused with his greed.

These crimes also depended on an intricate layer of corruption which Stanford masterminded to cover-up and perpetuate his fraud.  In addition to lying repeatedly for years to depositors and numerous employees, Stanford also aggressively corrupted gatekeepers critical to concealing his scheme.  Relying on

his secret Swiss slush fund, Stanford funneled millions in kickbacks—all from stolen CD money—to SIB's auditor and chief regulator, and effectively eliminated any meaningful oversight of his banking operation.  When the SEC attempted to investigate the CD program, Stanford successfully stonewalled them for years, using Leroy King at the FSRC as his mouthpiece to buy time and ensuring depositor losses multiplied.

Stanford's fraudulent conduct was repetitive and constant for twenty years, not the product of an aberrant act or temporary moral lapse.  Abusing the many positions of trust he held in almost every conceivable way, Stanford enriched himself with billions of dollars of stolen funds, and as a direct result his victims are currently out-of-pocket approximately $5.9 billion.  The scope and duration of this fraud weigh heavily in favor of a life sentence.

### 2.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Stanford's history and characteristics also strongly support a lengthy sentence in this case.  For twenty years, Stanford looted his bank while blatantly lying to depositors and others who placed their trust in him.  Stanford masterminded this scheme and was also its prime beneficiary.  Although several co-conspirators clearly profited from generous compensation and bonuses, no one remotely approached the more than $2 billion which Stanford personally stole.

Unlike many criminals who come before the Court who began life with almost nothing, Stanford began with and continued throughout his life to enjoy virtually every advantage.   *See* PSR, ¶¶ 117, 137-138 (summarizing Stanford's good relationship with his parents, comfortable upbringing and education at Baylor University).   Notwithstanding his advantages in life, he committed his crimes simply to satisfy his own greed and vanity.   Unable to succeed legitimately as a businessman, Stanford simply robbed thousands of depositors to finance the trappings of a billionaire lifestyle, complete with yachts, planes, mansions and assorted businesses emblazoned with his name.   As described above, in the final weeks when SIB's collapse was imminent, Stanford indulged one last spending spree from Napa Valley to the Bellagio.   Consistent with his selfishness, Stanford radiated contempt for others, particularly his depositors.[12]

Among the many incredible claims Stanford makes in his sentencing submission is that he is a "first time offender."   (Dkt. #849, at 78.)   To be clear, he is in Criminal History Category I (PSR, ¶¶ 110-112), but that categorization does

---

[12]   As discussed above, in discussing the fake insurance policy he had created and distributed to depositors, Stanford laughed to Leo Mejia, his then-marketing chief, that it was incredible the risks people were willing to take to earn an extra two percent on SIB's CDs.   Similarly, Stanford lectured a group of financial advisors that "[p]eople are stupid, they're greedy, they're lazy, they don't stick to their core values."   (GX 1532.1 (video recording of a Top Producer Club meeting in October 2008.))

not come *close* to telling the whole story.  For twenty years, Stanford organized and led a massive, international criminal organization masquerading as a bank.  On a daily basis, he directly defrauded depositors, bribed auditors, corrupted regulators, and obstructed justice.  The criminal history category here therefore grossly understates Stanford's criminality, and his attempt to exploit it is misleading to the Court.

As if more proof were required, nothing speaks more eloquently of Stanford's character than his sentencing arguments in this case.  Stanford denies any loss from his fraud, complains that he was "stripped of all his assets," and requests a sentence amounting to time-served.  (Dkt. #849, at 78-80.)  After everything that he has done to so many innocent victims, Stanford does not show a hint of remorse for his misconduct, only the same arrogant, narcissistic behavior that led to it.  Stanford's character and role in the offense, from the inception of his fraud through this sentencing, fully justifies the maximum sentence.

### 3.    THE NEED TO AFFORD ADEQUATE DETERRENCE

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered.  Here, the Government respectfully submits that a lengthy sentence is necessary to serve this purpose.  There are numerous executives in the financial

services industry and major international companies who are afforded tremendous trust by their investors and control over vast assets.  Imposing a long term of imprisonment in this case will serve to deter other executives and money managers who are tempted to break that trust to enrich themselves.  The need for an emphatic deterrent message is particularly acute in this case where Stanford, after masterminding a multi-billion dollar Ponzi scheme, never accepted responsibility and continued to game the system even after arrest.[13]  Any sentence other than life imprisonment would positively incentivize others to commit the same crimes as Stanford, and the aggravating factors surrounding his conduct justify the strongest possible deterrent message—the maximum sentence.

### 4.   THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid

---

[13]   Aside from clearly bearing no rational relation to the circumstances of his offenses, Stanford's requested sentencing range is also inconsistent with sentences for other Ponzi defendants, including those who accepted responsibility and pleaded guilty.  *See, e.g., United States v. Bernard Madoff,* 09 Cr. 213 (S.D.N.Y. 2009) (150 years for $13 billion scheme following plea and cooperation in recovering assets); *United States v. Scott Rothstein,* 09 Cr. 60331 (S.D.F.L. 2010) (50 years for $429 million scheme with 250 victims); *United States v. Robert Stinson,* 10 Cr. 724 (E.D.P.A. 2012) (33 years for $14 million scheme).  Ponzi defendants who, like Stanford, proceeded to trial have received much stiffer sentences for *significantly* smaller loss amounts.  *See, e.g., United States v. Edward Okun,* 08 Cr. 132 (E.D.V.A. 2009) (100 years for $126 million scheme); *United States v. Richard Harkless,* 07 Cr. 18 (C.D.C.A. 2009) (100 years for $39 million scheme with 600 victims).

unwarranted sentencing disparities."  We respectfully submit that, given

Stanford's role as the sole shareholder and chief executive of an offshore bank,

and overwhelming beneficiary of the fraud, there are few defendants who compare

with him and the scope of his offenses.  Given his position and role, the scope and

complexity of his schemes, the egregious manner in which he carried them out,

and his personal use of almost all of the proceeds, a very substantial sentence

would simply not implicate any "unwarranted" disparity.

### 5.   OTHER FACTORS

None of the other factors identified in Section 3553(a) appear to be

applicable to the case at hand.  *See* 18 U.S.C. § 3553(a)(2)(D) ("vocational

training, medical care, or other correctional treatment"); § 3553(a)(3) ("the kinds

of sentences available"); § 3553(a)(5) ("any pertinent policy statement").

### CONCLUSION

Accordingly, a reasonable sentence in this case would be the Guidelines sentence of 230 years or, alternatively, a term of years that would ensure that Robert Allen Stanford remains in prison for life.

Respectfully submitted,
KATHLEEN McGOVERN
Acting Chief, Fraud Section


/s/ William Stellmach
WILLIAM STELLMACH
Deputy Chief, Fraud Section
ANDREW H. WARREN
Trial Attorney, Fraud Section
Department of Justice

JASON VARNADO
Assistant United States Attorney
Southern District of Texas

## CERTIFICATE OF SERVICE

I certify this Sentencing Memorandum was served to counsel for Stanford via ECF on June 6, 2012.

/s/ Andrew H. Warren
ANDREW H. WARREN